**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
GREENVILLE DIVISION**

| | |
|---|---|
| DYAMONE WHITE; DERRICK SIMMONS; TY PINKINS; CONSTANCE OLIVIA SLAUGHTER HARVEY-BURWELL, <br><br> *Plaintiffs*, <br><br> vs. <br><br> STATE BOARD OF ELECTION COMMISSIONERS; TATE REEVES *in his official capacity as Governor of Mississippi*; LYNN FITCH *in her official capacity as Attorney General of Mississippi*; MICHAEL WATSON *in his official capacity as Secretary of State of Mississippi*. <br><br> *Defendants*. | 4:22cv62-MPM-JMV <br><br> **COMPLAINT FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF** |

**INTRODUCTION**

1.     Plaintiffs bring this action because the district boundaries used in Mississippi's State Supreme Court elections dilute the voting strength of Black Mississippians in violation of the Voting Rights Act and the United States

Constitution.  Those districts must be redrawn so that Black voters in Mississippi have a full and fair opportunity to elect candidates of their choice.

2.      Mississippi's population is almost 40 percent Black—a greater proportion than any other State in the nation.  Yet in the 100 years that Mississippi has elected its Supreme Court by popular vote, there have been a total of only four Black justices ever to sit on that body. There has never been more than one Black justice on the nine-member Supreme Court at any given time.  And the last time a Black justice was elected to the Mississippi Supreme Court in a contested election was in 2004, nearly 20 years ago. The reason for this persistent underrepresentation is that Mississippi employs Supreme Court district boundaries that dilute the voting strength of Black Mississippians in Supreme Court elections.

3.      Mississippi has used the same three at-large voting districts to elect its nine Supreme Court justices since 1987.  Those districts were drawn by the Legislature over the objections of Black lawmakers, who protested the dilutive effect the proposed plan would have.  There is no record that these districts were ever submitted to the U.S. Department of Justice for preclearance as then required by law.  And the districts have remained the same over the intervening 30-plus years.

4.      Under the current district boundaries, Black voters—despite comprising a majority of the population in certain regions of the State, such as the Mississippi Delta region and the City of Jackson—do not constitute a majority in any one Supreme Court district.  Voting is heavily polarized on the basis of race across Mississippi—indeed, no Black candidate has won statewide office in Mississippi in the 140 years since Reconstruction.  Black voters are thus typically outvoted by white voters and Black candidates typically lose contested elections in the districts as drawn.   As a result, Black voting strength is diluted—submerged across white-majority districts—and Black voters are denied an equal opportunity to elect candidates of choice to the Mississippi Supreme Court, in violation of Section 2 of the Voting Rights Act.

5.      However, the district representing the center of the State—District 1—could readily be redrawn, in a manner consistent with traditional districting principles, to have a Black voting age majority, such that Black voters have an opportunity to elect candidates of choice.  This modest change would keep the State's overall districting scheme for Supreme Court elections intact, while also ensuring that those elections comply with federal law.  The Voting Rights Act requires nothing less.

6.      Mississippi's failure to draw new district lines that fairly reflect the voting strength of Black voters also violates the United States Constitution, which prohibits States from maintaining or reaffirming electoral structures for a discriminatory purpose.  Here, the State has continued to use its Supreme Court districts even though their discriminatory effects are by now obvious and have long been understood.  The same modest changes to District 1 would remedy this constitutional violation as well.

7.      Plaintiffs are citizens and civic leaders who are Black and who live in District 1—one of whom was not even born when the current Supreme Court districts were drawn.  Plaintiffs want fair elections, a Supreme Court representative of their communities, and to ensure that Black lawyers, civic leaders, and citizens in Mississippi have full and fair opportunities for representation at the highest level, including a fair and equal opportunity to become a justice of the Mississippi Supreme Court.

8.      Unless and until Mississippi configures Supreme Court districts that comply with Section 2 of the Voting Rights Act and the Constitution, the Court should remedy the harms to Black Mississippians caused by the State's continued maintenance of unlawful Supreme Court district lines by ordering the use of new, lawful district lines that ensure that all voters in Mississippi are afforded the

opportunity to participate in politics with equal dignity and equal opportunity to elect representatives of their choice.

## JURISDICTION AND VENUE

9. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it arises under federal law. This Court also has jurisdiction of this action pursuant to 28 U.S.C. §§ 1343(a)(4) and 1357, because this is a civil action to secure equitable relief under Section 2 of the Voting Rights Act, which is an Act of Congress that protects the right to vote.

10. Plaintiffs' action for declaratory and injunctive relief is authorized by 28 U.S.C. §§ 2201 and 2202, and Rules 57 and 65 of the Federal Rules of Civil Procedure. Plaintiffs are entitled to relief under, among other provisions of law, 52 U.S.C. § 10301 and 42 U.S.C. § 1983. Upon prevailing, Plaintiffs will further be entitled to fees and costs pursuant to 52 U.S.C. § 10310(e) and 42 U.S.C. § 1988.

11. This Court has personal jurisdiction over the Defendants, who are citizens of the State of Mississippi.

12. Venue is proper under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims has occurred and is occurring in the Northern District of Mississippi. The effects of the unlawful challenged districts are acutely experienced in this District—including in portions of Supreme

Court District 1 that currently lie within the Northern District, and in portions of the Mississippi Delta region that also lie in the Northern District that would be part of Supreme Court District 1, if it was redrawn in conformity with the Voting Rights Act and the Constitution. Venue is also proper under 28 U.S.C. § 1391(b) because the Defendants are State instrumentalities and officials sued in their official capacities, at least one of whom, the Secretary of State, maintains offices in the Northern District of Mississippi.

## PARTIES

13.    Plaintiff DYAMONE WHITE is a citizen of the United States and the State of Mississippi. Ms. White lives in Edwards, Mississippi in Hinds County, which is in Supreme Court District 1, and has been registered to vote in Edwards for 11 years. She votes regularly. Ms. White is a financial professional and civic entrepreneur and leader. Ms. White is Black. Ms. White was not yet born in 1987 when the challenged Supreme Court districts were put into place.

14.    Ms. White lives in a region where Black Mississippians form a cohesive political community that is sufficiently large and geographically compact to constitute a majority of eligible voters in a district in which Black voters would have the opportunity to elect candidates of their choice for the Mississippi Supreme Court. However, under the challenged Supreme Court districting

scheme, candidates of choice for Black voters will typically be outvoted by the white majority in the district. The challenged scheme dilutes Ms. White's voting power and denies her an equal opportunity to elect a candidate of her choice to the Mississippi Supreme Court.

15.     Plaintiff DERRICK SIMMONS is a citizen of the United States and the State of Mississippi. Senator Simmons represents Mississippi State Senate District 12, consisting of all or part of Bolivar, Coahoma, and Washington Counties. Bolivar and Washington Counties are in Supreme Court District 1, and Coahoma County is in Supreme Court District 3. Senator Simmons was born and raised in Greenville, in Washington County, and he currently lives there and is registered to vote there. He votes regularly. In addition to serving as the Minority Leader of the Mississippi State Senate, Sen. Simmons is an attorney with an active law practice, and a law office in Greenville. Senator Simmons is Black.

16.     Senator Simmons lives in a region where Black Mississippians form a cohesive political community that is sufficiently large and geographically compact to constitute a majority of eligible voters in a district in which Black voters would have the opportunity to elect candidates of their choice for the Mississippi Supreme Court. However, under the challenged Supreme Court districting scheme, candidates of choice for Black voters will typically be outvoted by the white

majority in the district. The challenged scheme dilutes Senator Simmons' voting power and denies him an equal opportunity to elect a candidate of his choice to the Mississippi Supreme Court.

17.     Plaintiff TY PINKINS is a citizen of the United States and the State of Mississippi. He currently lives in and is registered to vote in Vicksburg, in Warren County, Mississippi, which is in Supreme Court District 1.  He grew up in and during his years of military service voted by absentee ballot in Sharkey County, which is also in Supreme Court District 1.  He votes regularly.  Mr. Pinkins served in the U.S. Army for over 20 years, including three tours in Iraq and a stint in the White House, before obtaining a law degree.  Mr. Pinkins is Black.

18.     Mr. Pinkins lives in a region where Black Mississippians form a cohesive political community that is sufficiently large and geographically compact to constitute a majority of eligible voters in a district in which Black voters would have the opportunity to elect candidates of their choice for the Mississippi Supreme Court. However, under the challenged Supreme Court districting scheme, candidates of choice for Black voters will typically be outvoted by the white majority in the district. The challenged scheme dilutes Mr. Pinkins' voting power and denies him an equal opportunity to elect a candidate of his choice to the Mississippi Supreme Court.

19.     Plaintiff CONSTANCE OLIVIA SLAUGHTER HARVEY-BURWELL is a citizen of the United States and the State of Mississippi.  Ms. Burwell is originally from Forest, Mississippi, which is in Supreme Court District 1, and currently resides in and is registered to vote in Jackson, which is also in District 1.  She votes regularly.  Ms. Harvey-Burwell is a mother, educator, and civic leader.  Ms. Harvey-Burwell is Black.

20.     Ms. Harvey-Burwell lives in a region where Black Mississippians form a cohesive political community that is sufficiently large and geographically compact to constitute a majority of eligible voters in a district in which Black voters would have the opportunity to elect candidates of their choice for the Mississippi Supreme Court. However, under the challenged Supreme Court districting scheme, candidates of choice for Black voters will typically be outvoted by the white majority in the district. The challenged scheme dilutes Ms. Harvey-Burwell's voting power and denies her an equal opportunity to elect a candidate of her choice to the Mississippi Supreme Court.

21.     Defendant THE STATE BOARD OF ELECTION COMMISSIONERS is the state body responsible for overseeing the conduct of its elections and implementing election laws and regulations, including the Supreme

Court districts at issue in this litigation. *See Thomas v. Bryant*, 366 F. Supp. 3d 786, 801 (S.D. Miss. 2019).

22.   Defendant TATE REEVES is the Governor of the State of Mississippi, and is a member of the State Board of Election Commissioners pursuant to Miss. Code Ann. § 23-15-211 (Rev. 2018). He is sued in his official capacity.

23.   Defendant LYNN FITCH is the Attorney General of the State of Mississippi and is a member of the State Board of Election Commissioners pursuant to Miss. Code Ann. § 23-15-211 (Rev. 2018). She is sued in her official capacity.

24.   Defendant MICHAEL WATSON is the Secretary of State of the State of Mississippi and is a member of the State Board of Election Commissioners pursuant to Miss. Code Ann. § 23-15-211 (Rev. 2018). He is sued in his official capacity.

## LEGAL BACKGROUND

25.   The Voting Rights Act of 1965 (the "VRA") is one of the most significant pieces of legislation that arose out of the Civil Rights Movement—a hard-won national reform that sought to replace the disenfranchisement and racial discrimination of the Jim Crow era with a true multi-racial democracy. Both

Democratic and Republican members of Congress and presidents have repeatedly reauthorized and expanded the VRA, including in 2006, when the statute was reauthorized by a massive bipartisan majority in the U.S. House of Representatives, a unanimous U.S. Senate (including Senators Lott and Cochran of Mississippi), and the "proud" signature of President George W. Bush.

26. The VRA prohibits any state law or practice "which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color . . . ." 52 U.S.C. § 10301(a). Section 2 of the VRA in particular bars any districting scheme whereby members of a racial minority group "have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." 52 U.S.C. § 10301(b).

27. The Supreme Court has expressly held that, where a State chooses to elect judges, the VRA applies to judicial districting schemes. *See, e.g.*, *Chisom v. Roemer*, 501 U.S. 380, 401 (1991).

28. As Congress made clear when it reauthorized and amended the VRA in the 1980s, a Section 2 claim may be established purely based on discriminatory *effects* and does not require discerning or ferreting out any particular intent on the part of state lawmakers. *See, e.g.*, *Thornburg v. Gingles*, 478 U.S. 30, 47 (1986). A court considering a potential Section 2 violation in the districting context thus

needs only determine whether the *result* of the enacted plan is the dilution of minority voting strength, regardless of any intent.

29.     Courts applying Section 2's effects-based standard rely on the test laid out in the Supreme Court's *Thornburg v. Gingles* decision. Under the *Gingles* standard, a plaintiff challenging a redistricting scheme as a dilution of minority voting strength must first show that three preconditions are met: (1) the racial minority group or groups are sufficiently large and geographically compact to constitute a majority in a proposed district; (2) the minority group is politically cohesive; and (3) the white majority votes as a bloc such that it will usually defeat the minority group's preferred candidate under the current district configuration. *See* 478 U.S. at 49–51.

30.     Beyond those preconditions, vote dilution claims under Section 2 are subject to "[a] totality of circumstances" analysis, guided by a non-exhaustive set of factors enumerated by Congress in a Senate Report that accompanied the 1982 amendment to the VRA (and in the Fifth Circuit's decision in *Zimmer v. McKeithen*, 485 F.2d 1297 (5th Cir. 1973)).[1] The ultimate question is whether

---

[1] These non-exhaustive factors, often called the "Senate Factors," include: (1) the extent of any history of official discrimination that touched the right of the members of the minority group to register, to vote, or otherwise to participate in

minority voters "have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." 52 U.S.C. § 10301(b).

31.     In addition to Section 2 of the Voting Rights Act, which prohibits election rules that produce discriminatory *results*, the Fourteenth and Fifteenth Amendments to the U.S. Constitution separately prohibit any state policy that is instituted or maintained for a discriminatory purpose. "Racial discrimination need only be one purpose, and not even a primary purpose, of an official act" in order for that act to violate the Constitution. *Velasquez v. City of Abilene*, 725 F.2d 1017, 1022 (5th Cir. 1984).

---

the democratic process; (2) the extent to which voting is racially polarized; (3) the extent to which the State has voting practices or procedures that may enhance the opportunity for discrimination against the minority group; (4) whether the members of the minority group have been denied access to a candidate slating process, if any; (5) the extent to which members of the minority group in the State bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process; (6) whether political campaigns have been characterized by overt or subtle racial appeals; and (7) the extent to which members of the minority group have been elected to public office in the jurisdiction. *See* S. Rep. No. 97-417, at 28–29 (1982). Courts have also considered (8) whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group; and (9) whether the policy underlying the State's use of the challenged standard, practice or procedure is tenuous.

32.     That a particular practice has been maintained or reaffirmed at least in part for discriminatory purposes can be deduced based on factors such as the discriminatory impact of the challenged practice; its historical background; the context of the decision to institute or reaffirm the practice; any departures from the regular decision-making process that went into the practice; and the viewpoints expressed by the decisionmakers who instituted or maintained the practice. *E.g.*, *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266–68 (1977).

## FACTUAL BACKGROUND

### THE HISTORY OF MISSISSIPPI SUPREME COURT ELECTIONS

33.     The Mississippi Supreme Court has only had four Black justices in its entire history.  Since 1985, one Black justice at a time has successively served in the same seat in District 1.  Each one of those justices was appointed to office by the Governor in the first instance, and with a few exceptions, their subsequent elections have been uncontested.  As discussed below, the lack of Black representation that is anywhere near commensurate with the State's Black population is a direct result of the State's maintenance of Supreme Court election districts that impermissibly dilute Black voting strength.  The context from which

that districting scheme arose is Mississippi's long history of discrimination against the State's Black citizens, the legacy of which persists today.

34.    For much of the 20th Century, Mississippi was run as a white one-party State, with Democratic Party nominees selected via a racially exclusionary all-white primary process that effectively barred all Black political participation. This system persisted in Mississippi for decades even after the Supreme Court outlawed such "white primaries" in cases like *Smith v. Allright*, 321 U.S. 649 (1944).  The white primary system was combined with numerous other legal prohibitions, as well as the threat of violence, to lock Black Mississippians out of the franchise.  Black Mississippians only attained the ability to participate in the electoral process through hard-fought struggle, including but not limited to the fight to pass the VRA in 1965 and subsequent efforts to ensure the law's active enforcement in the decades since its passage.

35.    Even after the VRA was passed, Mississippi continued to deploy mechanisms to block or dilute the ability of Black voters to participate in politics and elect representatives of their choice.  Until 2013, Mississippi was a "covered jurisdiction" under Section 5 of the Voting Rights Act due to the State's history of having maintained "test[s] or device[s] . . . for the purpose or with the effect of denying or abridging the right to vote on account of race or color."  52 U.S.C.

§ 10303.  Because of this, Mississippi was required to submit any changes to its voting laws to the U.S. Department of Justice ("DOJ") before those changes could be enforced.  In all, there were at least 169 challenges to Mississippi voting changes under Section 5 by the DOJ during this period, with nearly two-thirds of those objections raised after the reauthorization of Section 5 in 1982 (*i.e.*, in the last 40 years). Among other things, the DOJ challenged discriminatory districting schemes, dual registration systems (laws requiring voters to separately register for federal elections and for state and local elections) and other measures that disproportionately hamper Black political participation.  Federal courts have also repeatedly found that voting mechanisms (including districting plans) adopted in Mississippi violated Section 2 of the VRA.  In just the last 25 years, Section 2 lawsuits have resulted in at least seven judgments and at least four consent decrees against state or local defendants.

36.     Mississippi is one of four states to elect its Supreme Court by districts.[2]  The three-district scheme is set forth in the 1890 Constitution, which was amended in 1914 and 1916 to provide for a system of at-large elections in each

---

[2] The others are Kentucky, Illinois, and Louisiana.

of the three districts.[3]  In 1952, the Constitution was further amended to add one additional seat per district, bringing the Court to its current composition of nine justices.  Currently, three justices are elected from each of the three Districts.  The Supreme Court seats for each district are denominated as "Places" or "Positions" (*e.g.*, "District 1, Place 1"), but the elections are held on an at-large basis, meaning that voters in a particular District cast votes for all three "Places" within that District.

37.    The district lines have been redrawn only a handful of times in the last century:  In 1917, 1930, 1942, and most recently in 1987.  A map of the present districts is reproduced below.



---

[3] In the period prior to the Civil War, Mississippi also elected judges to its High Court of Errors and Appeals using a three-district system.

38.     While their shapes have shifted somewhat over time, the three districts have generally been oriented in an east-west direction, with a northern district (District 3), a central district (District 1), and a southern district (District 2) each stretching across the state.[4]  Jackson and Hinds County are in District 1, as is Greenville and Washington County.  One result of the districts' east-west orientation is that the Mississippi Delta region, where the State's Black population is densely concentrated, is divided across multiple districts.

39.     From 1914, when elections for the Supreme Court began, until the 1990s, the Mississippi Supreme Court was elected on the basis of partisan elections, and was thus subject to the white primary system that persisted for much of the Twentieth Century.  During that period, there were a total of only four contested general elections for a seat on the Mississippi Supreme Court.

---

[4] **District 1** consists of Bolivar, Claiborne, Copiah, Hinds, Holmes, Humphreys, Issaquena, Jefferson, Kemper, Lauderdale, Leake, Madison, Neshoba, Newton, Noxubee, Rankin, Scott, Sharkey, Sunflower, Warren, Washington, and Yazoo Counties.  **District 2** consists of Adams, Amite, Clarke, Covington, Forrest, Franklin, George, Greene, Hancock, Harrison, Jackson, Jasper, Jefferson Davis, Jones, Lamar, Lawrence, Lincoln, Marion, Pearl River, Perry, Pike, Simpson, Smith, Stone, Walthall, Wayne, and Wilkinson Counties.  **District 3** consists of Alcorn, Attala, Benton, Calhoun, Carroll, Chickasaw, Choctaw, Clay, Coahoma, Desoto, Grenada, Itawamba, Lafayette, Lee, Leflore, Lowndes, Marshall, Monroe, Montgomery, Oktibbeha, Panola, Pontotoc, Prentiss, Quitman, Tallahatchie, Tate, Tippah, Tishomingo, Tunica, Union, Webster, Winston, and Yalobusha Counties.

40.     This lack of contested races is also due in part to the practice of Supreme Court justices resigning in advance of their term's expiration, so that the sitting governor can choose their successor, who then runs in the next election with the advantages of incumbency, and often unopposed.

41.     It took until 1985 for a Black Mississippian to serve on the Mississippi Supreme Court.  In that year, Governor Bill Allain, a Democrat, appointed Justice Reuben Anderson to the bench, filling a vacancy in the District 1, Place 2 seat.

42.     Justice Anderson went on to win a special election in 1986.  He prevailed in the Democratic primary over a challenger who made explicit racial appeals.  There was no general election.  Justice Anderson then ran unopposed for a full eight-year term in 1988.

43.     The year after Justice Anderson's special election win, in 1987, the legislature adopted the current Supreme Court district lines. The revised districts shifted Attala and Winston counties out of District 1 and into District 3 and moved Claiborne, Copiah, and Jefferson counties into District 1 from District 2.

44.     Supporters of the redrawn lines claimed the change was necessary to equalize the population among the Supreme Court districts, and pointed to the fact that redistricting had been recommended by the State Attorney General's office.

But Black lawmakers opposed the new Supreme Court boundaries, decrying the dilutive effect that the proposed plan would have on Black voters and arguing that the State would be targeted with "an easy lawsuit." Black lawmakers offered an amendment to the plan that would have created a majority-Black District 1, but the proposal was defeated. The Legislature then adopted the current Supreme Court district lines, which have not been revised since 1987.

45. Despite the requirement then in effect that all election law changes in Mississippi be submitted in advance to the DOJ for preclearance pursuant to Section 5 of the VRA, there is no record that the 1987 Supreme Court districts were ever submitted.

46. In 1990, Justice Anderson resigned, and Governor Ray Mabus, a Democrat, appointed Fred Banks to succeed him to the same District 1, Place 2 seat. In the subsequent 1991 Special Election, Justice Banks, the Democratic nominee, defeated a Republican candidate, Chet Dillard, by about 6,000 votes in a razor-thin general election. Dillard was accused of race-baiting in the campaign. For example, he published a newspaper ad showing his picture alongside Justice Banks' picture in order to show voters that Justice Banks was Black and that he was white. Despite the fact that Justice Banks was a sitting Supreme Court justice, the photo of Justice Banks was captioned "Fred Banks," while Dillard's photo was

captioned "Judge W.O. 'Chet' Dillard." When questioned about the ad, Dillard told the *Clarion-Ledger*, "I can't run a campaign against a ghost," and complained that Banks' own ads featured his predominantly white endorsers but "they never show you who it is they want you to vote for."

47.    Around the same time as Justice Banks's election, the State began moving towards the present system of non-partisan judicial elections, including for the Supreme Court. When the idea was proposed in 1991, some Black lawmakers expressed opposition to the change, arguing that the move would lead to the election of fewer Black judges. One Black State Senator said at the time: "All I know is that you ha[d] more Black judges elected last year. It's suspicious to me that we come up with such legislation after the elections."

48.    Also in the early 1990s, a group of plaintiffs challenged the 1987 Supreme Court districts pursuant to the VRA, seeking the establishment of single-member districts or a proportional alternative to at-large elections (such as limited voting). That challenge, styled as *Magnolia Bar Association v. Lee*, was unsuccessful. The district court determined that, at that time, it was not possible to draw any one of the three districts as a majority-Black voting age population district, as required under *Gingles*. The court also rejected a proposal to convert Mississippi's Supreme Court into a single-member district system, concluding

among other things that the recent elections of Anderson and Banks with some white support showed that such a change was not necessary to ensure that Black candidates were not outvoted by white bloc voting. The decision was later affirmed on appeal.

49.    Today, in contrast, District 1 can readily be redrawn as majority-Black consistent with traditional districting principles and without changes to the overall three-district framework for Mississippi Supreme Court elections. Moreover, as explained further below, the history of elections in District 1 in the decades since the *Magnolia Bar Association* decision demonstrates a clear pattern of white bloc voting against Black candidates.

50.    In 1996, incumbent Justice Banks won reelection with a 7 percent margin, in a campaign that again included racial appeals. Justice Banks later resigned, after which James Graves was appointed to serve on the Court in the same District 1, Place 2 seat.

51.    Justice Graves was elected to a full term in 2004 after prevailing in a runoff election. That 2004 election, nearly two decades ago, was the third and last time a Black jurist won a contested general election for a seat on the Mississippi Supreme Court. Justice Graves resigned in 2010, at which time Governor Haley Barbour, a Republican, appointed Justice Leslie King, who remains on the Court to

this day.  Justice King has been elected without opposition twice since his initial appointment.

52.     Thus, until 1985, there were no Black Justices at all on the Supreme Court, and since then there has been just one Black Justice at a time, always in the District 1, Place 2 seat, and always first appointed by the Governor.

53.     Black candidates have run for additional seats on the Supreme Court, but despite Mississippi's substantial Black population, and despite those candidates receiving strong support from Black voters, they have been unsuccessful.

54.     For example, and most recently, in 2020, despite strong support from Black voters, a sitting Court of Appeals judge, Latrice Westbrooks, lost a race for the open seat in District 1, Seat 1 by about 12,000 votes.  Judge Westbrooks lost with 48.5% of the vote.  The Black voting age percentage of the population in District 1 was around 49%.

55.     A Black candidate, Earle Banks, also sought election to the District 1, Seat 1 seat in 2012, and he was also defeated despite strong support by Black voters.  Banks lost with 44.5% of the vote.  The Black voting age percentage of the population in District 1 at the time was approximately 48%.

56.     Additionally, in 2016, a Black candidate, Michael Shareef, unsuccessfully sought election to the Supreme Court in District 2, losing with 33%

percent of the vote, a number similar to the Black voting age percentage of the population at the time.

**MISSISSIPPI'S SUPREME COURT DISTRICTS DILUTE BLACK VOTING STRENGTH**

57.     Plaintiffs satisfy the three *Gingles* preconditions for proving a vote dilution claim under Section 2 of the Voting Rights Act.

58.     With respect to the first *Gingles* precondition, Mississippi's Black population is sufficiently numerous and geographically compact to constitute a majority of the voting-age population in one of the three Supreme Court districts. In its current configuration, the Black voting age population of District 1 in particular is approximately 49%. This figure could be brought to over 50% in any number of configurations and without splitting any county lines or altering the overall orientation of the districts, such that Black voters would have the opportunity to elect candidates of choice in District 1.

59.     With respect to the second and third *Gingles* preconditions, and as described already, voting is racially polarized across the state. Voting in Mississippi is highly polarized on the basis of race. In statewide elections, Supreme Court elections, and local contests, Black communities demonstrate substantial cohesion in voters' candidate preferences, and Black voters tend to vote similarly, comprising a politically cohesive minority voting bloc. Conversely,

white voters typically vote cohesively against and, in the absence of a majority-Black population in the electoral district at issue typically defeat, Black-preferred candidates. Racially polarized voting is a basic fact of political life in Mississippi. Indeed, no Black candidate has won statewide office in Mississippi in the 140 years since Reconstruction, despite Mississippi being almost 40 percent Black by population. Consistent with that, federal courts have recognized the significant level of racially polarized voting in Mississippi. *See, e.g.*, *Thomas v. Bryant*, 366 F.Supp.3d 786, 807 (S.D. Miss. 2019), *aff'd* 938 F.3d 134, 160-61 (5th Cir. 2019).

60.     With respect to the Supreme Court districting scheme in particular, the degree of racially polarized voting means that, despite being numerous and compact enough to comprise a majority in at least one of three Supreme Court districts, the preferred candidates of Black voters will typically be defeated by a white majority in each of the districts under the current districting scheme. That dynamic was seen most vividly in the 2020 and 2012 District 1, Position 1 general elections, in which Black Supreme Court candidates lost their respective races while attaining proportions of the vote similar (and in 2020 nearly identical) to the District's Black voting age population at the time.

61.     In addition, Mississippi uses the same Supreme Court districts to elect the members of the State Transportation Commission and Public Service

Commission. Unlike positions on the Supreme Court, those offices are elected on a partisan basis. In the most recent 2019 elections in the Central District (which is the same as Supreme Court District 1), a Black Democratic candidate, Willie Simmons, prevailed in the elections for Transportation Commission, winning the election by just 6,500 votes. However, another Black candidate, D'Keither Stamps, was defeated by a white Republican in the contest for the Central District seat on the Public Service Commission, losing by around 2,000 votes. Both Black candidates, a former state legislator and Jackson city councilman, respectively, received overwhelming support from Black voters in a district that was close to 50% Black by voting age population. In addition, Black candidates also lost in contested elections for those Commissioner seats in District 1 in 2015 and 2011, respectively.

62. In all, then, there have been six elections in District 1 since 2010 where a Black candidate ran against a white candidate, and the Black candidate was defeated by white bloc voting in five of those six contests, including in both Supreme Court contests.

63. Meeting the three *Gingles* factors gives rise to an inference that the challenged scheme is unlawful. *See, e.g.*, *Nipper v. Smith*, 39 F.3d 1494, 1525 (11th Cir. 1994); *see also Johnson v. De Grandy*, 512 U.S. 997, 1012 (1994) ("lack

of equal electoral opportunity" sufficient to support Section 2 liability "may be readily imagined and unsurprising when demonstrated under circumstances that include the three essential *Gingles* factors"). Here, in addition to the facts satisfying the three *Gingles* preconditions, the totality of the circumstances confirms that Black voters in Mississippi have less opportunity than white voters to participate in the political process and elect representatives of their choice. An analysis of the facts under the so-called "Senate Factors" strongly indicates that the challenged districting scheme dilutes Black voting strength.

***Senate Factor 1: History of Official Voting-Related Discrimination***

64.     Mississippi has an extensive, well-documented, and ongoing record of voting discrimination that has placed substantial burdens on the ability of Black and other minority voters to register to vote and otherwise participate in the political process. *League of United Latin Am. Citizens v. Clements*, 999 F.2d 831, 866 (5th Cir. 1993). This long history of official discrimination in voting has been recognized by federal courts. *See, e.g. Clark v. Calhoun County, Miss.*, 88 F.3d 1393, 1399 (5th Cir. 1996) ("The long and unhappy history of discrimination in Mississippi requires no protracted discussion.").

65.     Mississippi's current Constitution was drafted in 1890. The framers of the 1890 Constitution explicitly sought to disenfranchise and subordinate Black

Mississippians, and indeed went so far as to attempt to repeal the 15th Amendment to the U.S. Constitution, which prohibits discrimination in voting on the basis of race. More broadly, in the period following the end of Reconstruction, Mississippi created poll taxes, literacy tests, and numerous other mechanisms to thwart Black Mississippians from voting or gaining any political power. In addition to formal legal rules, groups such as the Ku Klux Klan and the White Man's League, a white supremacist organization founded in Mississippi in 1875, inflicted terror and violence on Black Mississippians to prevent them from voting or participating in politics.

66. Since the ratification of the Mississippi Constitution of 1890, Mississippi has passed countless laws that deny or diminish Black democratic participation, including grandfather clauses, poll taxes, and educational, property, "character" and other immaterial qualifications. As a result of those laws and other barriers, in 1964 less than 7% of eligible Black Mississippians were registered to vote despite numerous voter registration drives and the submission of thousands of voter registration applications, and Black Mississippians who attempted to register or vote, and those who assisted them, continued to face the threat of lethal violence.

67.     Even after the passage of the VRA in 1965, the State continued to deploy discriminatory election policies.  Up until the abrogation of the Section 5 preclearance regime less than 10 years ago, the DOJ continuously lodged objections to a wide array of discriminatory voting practices in Mississippi, and private plaintiffs successfully challenged others in court.[5]  Voting policies that were found to disenfranchise Black voters and thus invalidated through Section 5 review have included at-large election schemes, onerous candidate qualification requirements, modifications to polling place locations, open primary laws, and others.

68.     For example, since 1892, Mississippi had employed a dual registration system, requiring Mississippians to register separately for federal elections on the one hand, and state and local elections on the other.  A federal district court struck down this system in 1987 after finding both that it was enacted for a racially

_____

[5] Some of the more recent private actions that resulted in judgment or consent decrees include: a successful challenge to the electoral scheme for statewide county boards of education and boards of trustees for certain school districts; a successful challenge to redistricting in the City of Clinton, the City of Natchez, and Amite County; a successful challenge to the Town of Kilmichael's attempt to cancel an election; a successful challenge to the City of McComb's attempt to change polling locations; and a successful challenge to the City of Grenada's attempt to cancel a municipal election and impose a redistricting scheme that diluted Black voting strength.

discriminatory purpose and that it continued to undermine the voting strength of Black Mississippians.  In 1995, the State once again enacted a *de facto* dual registration system.  Under these new provisions, voters registering under the registration-expanding procedures in the federal National Voter Registration Act were deemed eligible to vote only in federal elections and were required to separately register for other elections under state procedures.  After the State refused to submit the change for preclearance, the United States Supreme Court required it to do so in 1997.  The DOJ then objected to the new registration procedures due to their discriminatory effects on Black voters.  Only then did the State return to a unitary registration system.

69.     Mississippi's electoral districting schemes have repeatedly been challenged as unlawful and racially discriminatory.  Of the 169 objections to voting changes in Mississippi issued by the DOJ pursuant to Section 5 of the VRA between 1965 and 2009, the vast majority—104—related to redistricting.

70.     For example, in 1966, the Mississippi legislature split the Mississippi Delta region between three of the state's five congressional districts, eliminating the state's only majority-Black congressional district. The same general configuration was adopted again in 1971 and 1981. The 1981 plan drew an

objection from the DOJ. Ultimately, the State was ordered to draw a Black-majority congressional district by a federal court.

71.     Throughout the 1990s, the DOJ also objected to Mississippi's state legislative maps under the VRA. From 2002 to 2013, a three-judge panel was responsible for drawing Mississippi's legislative district boundaries because the Legislature repeatedly failed to draw a plan that did not dilute Black voting strength. As recently as 2019, a federal court determined that Mississippi's state legislative lines violated the VRA by diluting the voting strength of Black Mississippians in the State Senate.

72.     Mississippi also repeatedly refused to submit its policies for Section 5 preclearance, as it did with the new dual registration system in the 1990s. In 1986, a federal district court enjoined the enforcement of certain statutes pertaining to state judicial elections until the statutes were submitted for Section 5 review. *Kirksey v. Allain*, 635 F. Supp. 347, 347-38 (S.D. Miss. 1986). The DOJ then objected under Section 5 to several of the statutes' provisions regarding judicial elections because of their retrogressive effects in diminishing Black representation. Notably, the current Supreme Court districts were enacted around the same time.

73.     Today, the State continues to enact voting measures that disproportionately burden Black Mississippians, such as limiting the number of

polling places and poll hours, imposing needlessly strict voter identification and registration requirements, and limiting early voting.

74. The legacy of official discrimination in Mississippi lives on in other ways as well. For example, to this very day, the justices of the Supreme Court hear cases at the Carroll Gartin Building, a facility named for a lieutenant governor who called himself a "total segregationist," advocated for banning the NAACP; and helped create a state "Sovereignty Commission," which spied on and harassed civil rights activists for decades.

75. The historical and modern realities of official discrimination in and around voting in Mississippi, and the burdens that such discrimination imposes on Black political participation, support the conclusion that Black voters have less opportunity than white voters to participate in the political process and elect representatives of their choice.

***Senate Factor 2: The Extent of Racial Polarization***

76. In Mississippi, starkly racially polarized voting exists throughout the State, including in non-partisan Supreme Court elections. In District 1 elections, for example, Black voters typically support Black-preferred candidates at a rate of 80% or more, and white voters typically support white-preferred candidates (and oppose Black-preferred candidates) by similar margins.

77.     The extent of racial polarization in Mississippi is evidenced by the fact that, while Mississippi has hundreds of Black elected officials, virtually none of them represent majority-white districts.

78.     Plaintiffs in VRA redistricting cases across the state have repeatedly demonstrated racially polarized voting.  *See, e.g.*, *Thomas v. Bryant*, 366 F. Supp. 3d 786, 807 (S.D. Miss.) (Mississippi Delta State Senate district), *aff'd*, 931 F.3d 455 (5th Cir. 2019); *Fairley v. City of Hattiesburg*, 122 F. Supp. 3d 553, 580 (S.D. Miss. 2015), *aff'd*, 662 F. App'x 291 (5th Cir. 2016); *United States v. Brown*, 494 F. Supp. 2d 440, 484 (S.D. Miss. 2007) (Noxubee County), *aff'd*, 561 F.3d 420 (5th Cir. 2009); *Jamison v. Tupelo, Mississippi*, 471 F. Supp. 2d 706, 713 (N.D. Miss. 2007); *Teague v. Attala County*, 92 F.3d 283 (5th Cir. 1996); *Clark v. Calhoun County*, 88 F.3d 1393 (5th Cir. 1996); *Houston v. Lafayette County*, 20 F. Supp. 2d 996 (N.D. Miss. 1998); *Ewing v. Monroe County*, 740 F. Supp. 417 (N.D. Miss. 1990); *Gunn v. Chickasaw County*, 705 F. Supp. 315 (N.D. Miss. 1989); *Jordan v. City of Greenwood*, 599 F. Supp. 397 (N.D. Miss. 1984).

79.     The persistence and extent of racial polarization in Mississippi support the conclusion that the Supreme Court districts dilute Black voting strength and that Black voters have less opportunity than white Mississippians to participate in the political process and elect representatives of their choice.

***Senate Factor 3: Use of At-large Elections, Majority Vote Requirements, and Other Discrimination-Enhancing Mechanisms***

80.     Mississippi's electoral system maintains and has historically upheld voting procedures and practices—such as at-large elections and unusually large electoral districts—that exacerbate the dilution of political power for Black citizens.  *See e.g.*, *Martin v. Allain*, 658 F. Supp. 1183, 1192 (S.D. Miss. 1987) (taking judicial notice of the state's "long history of official discrimination touching on the right of black citizens to vote and participate in the democratic process," including its "frequent use in municipal elections of at-large elections and majority-white election districts which had the effect of precluding black citizens from election to public office.").

81.     For example, at-large voting effectively blocked Black candidates from gaining representation as state trial court judges throughout Mississippi until the early 1990s, when extensive litigation under the VRA forced the creation of majority-Black judicial election subdistricts.  *See Martin v. Mabus*, 734 F. Supp. 1216 (S.D. Miss. 1990); *Martin v. Mabus*, 700 F. Supp. 327 (S.D. Miss. 1988); *Martin*, 658 F. Supp. at 1183; *Kirksey*, 635 F. Supp. at 347.

82.     Until 2020, Mississippi also maintained a state constitutional provision requiring candidates for statewide office to win the popular vote *and* a

majority of Mississippi's 122 House districts in order to win statewide election. Black office-seekers sued Mississippi to enjoin enforcement of that requirement, which posed an all but insurmountable hurdle for Black candidates to overcome given the composition of the state's house districts (a large majority of which are majority-white) as well as persistent racial polarization in voting.

83.     The presence of these and other electoral mechanisms that burden the exercise of political power by Black voters support the conclusion that Black voters have less opportunity than white Mississippians to participate in the political process and elect representatives of their choice.

***Senate Factor 5: Effects of Mississippi's History of Discrimination***

84.     In addition to voting discrimination, Black Mississippians and other minority voters in the state face disparities across a wide range of other policy areas, including health, housing, education, employment, and treatment in the criminal justice system.  These burdens are the legacy of intentional policy choices made by the State whose effects continue to operate into the present day.

85.     All of these socioeconomic disparities are correlated with increased burdens on effective political participation.  Thus, the effect of these additional forms of discrimination is to further limit Black Mississippians' access to effective opportunities to elect candidates of their choice.

86.     With respect to income, Black Mississippians on average earn significantly less than white Mississippians and experience poverty at nearly three times the rate of white Mississippians.  Black Mississippians are also more likely to be unemployed or underemployed, and to suffer from employment discrimination.  Income and economic security are correlated with political participation.

87.     With respect to housing, the legacy of decades of redlining policies and continued discrimination in lending continues to disproportionately lock Black Mississippians out of homeownership.  For example, during the period leading up to and after the 2008 financial crisis, foreclosures resulted in $352 million in lost wealth from communities of color in Mississippi, and Black homeownership further declined even after the ensuing recession. As of 2019, the mortgage denial rate for Black residents in Mississippi earning more than $150,000 was higher than the denial rate for white residents earning between $30,000 and $50,000.   In addition to being less likely to own a home, Black Mississippians move more frequently.  Homeownership and housing stability are correlated with political participation.

88.     With respect to education, as of December 2020 nearly half of Mississippi's 130 school districts were operating under desegregation orders or

voluntary agreements with federal courts, state courts, or agencies for failure to adequately desegregate. In one recent case, the City of Cleveland only merged its two high schools to integrate Black and white students in 2016, after 50 years of failing to do so.

89.     Public schools in majority-Black areas are more regularly under-resourced—a disparity exacerbated by the disproportionate effect of housing inequality, underemployment, and lower incomes for Black Mississippians on the local tax base. All of Mississippi's failing school districts are majority-Black, and 80% of Mississippi's highest-performing school districts are majority-white. Education is correlated with political participation, and the lack of access to quality education further restricts Black Mississippians' engagement with the political process.

90.     With respect to health, Black Mississippians also have significantly worse health outcomes compared to white Mississippians, including higher rates of obesity, invasive cancer, renal disease, infant mortality, HIV, heart disease, hypertension, stroke, diabetes, and cancer. Relatedly, Black Mississippians also have less access to and worse healthcare coverage than white Mississippians. Health and access to healthcare are correlated with political participation.

91.     With respect to criminal justice, Black Mississippians are disproportionately incarcerated and disenfranchised.  As of April 2021, Black Mississippians account for 64% of the state's incarcerated population while comprising only 38% of the state's total population.  Black Mississippians also make up 71.5% of those serving life sentences without parole.

92.     Mississippi employs stringent felony disenfranchisement laws, having retained most of the provisions on that subject from the State's original 1890 Constitution—provisions that were, when enacted, specifically intended to disenfranchise Black voters.  *See Ratliff v. Beale*, 20 So. 865, 868 (Miss. 1896) ("Within the field of permissible action under the limitations imposed by federal constitution, the [1890] convention swept the circle of expedience to obstruct the franchise by the negro race. . . . Restrained by the federal constitution from discriminating against the negro race, the convention discriminated against its characteristics and the offenses to which its weaker members were prone.").

93.     A person convicted of a disenfranchising crime can attempt to restore their right to vote by applying for a pardon from the Governor, applying for an Executive Order Restoring Civil Rights from the Governor, or seeking to have the Mississippi State Legislature pass a Bill of Suffrage on their behalf with a two-

thirds majority. In practice, vanishingly few people successfully restore their voting rights through these processes.

94.     The combination of Mississippi's high incarceration rate for Black citizens and its disenfranchisement laws for qualifying criminal offenses means that over 15% Black voting-age Mississippians in the state cannot vote due to a felony conviction.

95.     All of these race-based disparities burden the ability of Black voters to participate in politics, including elections for State Supreme Court justices.  The existence of these pervasive disparities supports the conclusion that Black voters have less opportunity than white Mississippians to participate in the political process and elect representatives of their choice.

### Senate Factor 6: Use of Racial Appeals in Political Campaigns

96.     For more than a century, candidates have been making racial appeals in Mississippi elections, including in contests for seats on the Supreme Court.

97.     For example, in the 1986 special election between the recently appointed Justice Anderson and challenger Richard Barrett, Barrett campaigned by claiming that he was "against reserving a seat on the Mississippi Supreme Court for the NAACP" and said that he was "for the majority, not the minority."

98.     As noted already, in the 1991 election against Justice Banks, his white opponent Chet Dillard produced advertisements showing both his and Justice Banks' faces, attempting to highlight Justice Banks' race.  In the ads, which reference Dillard's "tough on crime" stance, Dillard captions the photo of himself as "Judge Dillard," but captions the photo of his opponent, a sitting Supreme Court justice, as "Fred Banks."

99.     In the 2004 general election race for the seat then-occupied by incumbent Justice Graves, who is Black, a white candidate used the slogan "One of Us," a clear racial appeal.  In that same election, another white Supreme Court candidate placed ads in the newspaper noting that his father had been "murdered by the Republic of New Africa," a reference to a 1971 police raid on the headquarters of a Black nationalist group in Jackson.

100.    In lower court elections, white candidates for Circuit and Chancery Court seats have also distributed campaign literature with Black opponents' faces in an effort to highlight their race.

101.    Racial appeals have not been limited to Supreme Court and judicial elections. For example, during a ballot initiative campaign related to education funding, current State Representative Lester "Bubba" Carpenter was recorded campaigning against the initiative by arguing that "[i]f 42 passes in its form, a

judge in Hinds County, Mississippi (which is) predominantly Black—it's going to be a Black judge—they're going to tell us where the state of education money goes."

102.    As another example, during the 2018 Senate campaign between the white Republican candidate Cindy Hyde-Smith and Black Democratic candidate Mike Espy, Hyde-Smith sent mailers to Mississippi voters with Espy's face, emphasizing his race.  Some of the mailers also wrongly insinuated that Espy was convicted of crimes of which he had been acquitted.  During the campaign, Hyde-Smith at one point told voters that she would attend a public hanging in the "front row."  A few years earlier, while holding public office, she circulated photos of herself wearing a cap with a confederate flag at the home of confederate leader Jefferson Davis with the caption "Mississippi history at its best!"

103.    These examples of racial appeals are in keeping with other racist comments made by sitting elected officials.  For example, in 2014, a Mississippi Justice Court judge, Bill Weisenberger, was sanctioned and later convicted of assault after slapping a young Black man and shouting racial slurs at him. In 2015, State Representative Gene Alday defended comments claiming that he was "from a town where all the Blacks are getting food stamps and . . . 'welfare crazy checks.'" In 2017, state representative Karl Oliver called in a Facebook post for Louisiana

officials who were removing statutes of confederate leaders from the City of New Orleans to be "LYNCHED" for trying to "destroy historical monuments of OUR HISTORY."  The post was "liked" by the sitting chair of the State House Appropriations Committee.  In 2019, a Mississippi Election Commissioner, Gail Welch, expressed concern in a social media comment that "the Blacks are having lots [of] events for voter registration." In 2021, Bill Dawson, the mayor of Byhalia, Mississippi, stepped down after accusations that he told white employees to ignore the resumes of Black candidates and to remove magazines featuring Black women from the lobby of the town hall.

104.   The extensive and ongoing use of racial appeals in politics, including with respect to elected judicial offices, supports the conclusion that Black voters have less opportunity than white Mississippians to participate in the political process and elect representatives of their choice.

*Senate Factor 7: Lack of Success of Black Candidates for Office*

105.   Under the districting scheme at issue here, there have only been four Black State Supreme Court justices in the history of the State of Mississippi, and never more than one at a time.  From 1985 until today, the Supreme Court has been 11% Black in a state where the voting-age population is nearly 40% Black.

106.   Each of the four Black justices in Mississippi history has served in the same District 1, Place 2 seat.  Each one of the four was initially appointed and, where challenged in a general election contest, won reelection by only slim margins.  Meanwhile, whenever a Black candidate has sought election to the Supreme Court without the benefit of a prior appointment (as has happened three times in the last decade, including twice in District 1), they have lost.

107.   The state of affairs is similar with respect to the offices of Transportation Commission and Public Service Commission, which use the same districts as the State Supreme Court. In 2019, Willie Simmons became the first Black candidate ever elected to the Transportation Commission, representing the Central District (i.e., District 1). No Black candidate has ever been elected to the Public Service Commission.

108.   Similarly, no Black candidate has ever been elected to statewide office in Mississippi since 1890, despite Mississippi having the highest percentage Black population in the nation.  For example, and most recently, Mike Espy, a former Cabinet Secretary and Congressman, lost the 2020 U.S. Senate election to Cindy Hyde-Smith.  In 2011, Johnny DuPree was the first Black candidate to run for governor since Reconstruction. After winning in the Democratic primary, he lost in the general election with 39% of the vote. In 2003, Gary Anderson, the

former Director of the Mississippi Department of Finance (an appointed position), lost the election for State Treasurer to a white candidate nearly twenty years younger who had no experience in state finance.

109.    The story is similar with respect to Congress.  Since 1877, there have only been two Black Mississippians seated in the U.S. House of Representatives: Mike Espy, elected in 1986, and Bennie Thompson, elected to succeed him in the same district in 1992.

110.    Black candidates have also obtained disproportionately less success in more local races.  For example, as of 2020, only 27% of the Mississippi State Senate was Black, despite Black Mississippians comprising nearly 37% of the state's citizen voting-age population.

111.    The pervasive barriers to Black candidates winning election outside of Black-majority districts support the conclusion that Black voters have less opportunity than white Mississippians to participate in the political process and elect representatives of their choice.

### Senate Factor 8: Significant Lack of Responsiveness

112.    As described already, racial disparities in education, employment, housing, health, and criminal justice have plagued Mississippi for generations.  Yet

Mississippi public officials are often directly opposed to specific policies that might ameliorate the challenges faced by Black communities.

113.   For example, Mississippi state leaders have for decades refused to invest in infrastructure projects in the city of Jackson (80% Black) after white flight following public school integration, despite demands from the majority-Black local community.

114.   Mississippi has also taken no significant action to reform its dual education system of high-performing, well-resourced majority-white schools and low-performing, under-resourced majority-Black schools, despite the outcry from Black communities.  Black students at majority-Black schools in the state endure the consequences of chronic underfunding.  The state scheme for funding public schools only perpetuates the accumulated disadvantages for Black students, and thus perpetuates disproportionate poverty rates for Black Mississippians.  State officials have demonstrated no urgency to change the status quo.

115.   In another demonstration of non-responsiveness, Mississippi did not adopt Medicaid expansion under the Affordable Care Act, which would have expanded Medicaid coverage for low-income adults to 138% of the federal poverty level, again despite demands from low-income communities and communities of color, including Black Mississippians.  Medicaid has been critical to ameliorating

some of the racial disparities in healthcare coverage and health outcomes discussed above, but Mississippi has not prioritized maximizing healthcare for the poorest residents of the state, who are disproportionately Black.

116.    These few examples (among many others not detailed here) of non-responsiveness to the concerns of Black voters further supports the conclusion that Black voters are disadvantaged in the political process and in electing representatives of their choice.

### Senate Factor 9: Tenuous Policy Justification for the Challenged Practice

117.    Lastly, any asserted interest in maintaining the current, 35-year-old district lines rather than creating a Black-majority district where Black voters could elect candidates of choice would be tenuous.

118.    The Supreme Court districts are purely electoral and have no bearing on the Supreme Court's jurisdiction or substantive activities.  These district lines need not be maintained in order to address any particular function of Mississippi's judicial system.

119.    Moreover, the reasons given for enacting these districts in 1987—among them, equalizing population—no longer apply today.

120.    Moreover, to the extent that there is some generalized state interest in drawing Supreme Court districts that maintain whole counties or have an east-west

configuration (interests that are not reflected in the State's Court of Appeals districts), districts that meet those criteria while also complying with the VRA can be drawn.

### RACE WAS A MOTIVATING FACTOR IN THE MAINTENANCE OF MISSISSIPPI'S VOTE-DILUTIVE SUPREME COURT DISTRICTS

121. Despite the dilutive effects of Mississippi's Supreme Court district boundaries, the State has maintained those districts without any change for decades, even as the districting scheme has foreseeably resulted in a nearly all-white Supreme Court and denied Black voters an equal opportunity to elect candidates of choice. Mississippi's maintenance of a districting scheme that undermines Black voting strength violates the Fourteenth and Fifteenth Amendments.

122. Notably, the current districts were enacted just a year after the first Black justice, Justice Anderson, was appointed to the Supreme Court (and shortly after Justice Anderson prevailed in a special election).

123. The Mississippi State Legislature passed the revised district plan in 1987 over objections during the legislative process from Black lawmakers, who recognized that the proposed districts diluted Black voting strength. The

Legislature rejected a proposal from the Black caucus that would have created a majority-Black District 1.

124.   Over the years, Mississippi's Governors have successively appointed Black justices to the District 1, Place 2 seat.  These conscious efforts to appoint a Black justice in that particular seat (and that seat alone) demonstrate an awareness of the districting scheme's dilutive effects, and an apparent attempt to mitigate or else mask those effects. [6]  Because these appointments have been limited to a single seat within District 1, the only four Black justices ever seated on the Supreme Court have each served their terms as the sole Black jurist on the Court.

125.   Outside such appointments, Black-preferred candidates still do not prevail in open Supreme Court races.

126.   Additional circumstantial evidence shows that discrimination on the basis of race is, at least in part, a motivating factor in maintaining the State's Supreme Court districts.

---

[6] *See, e.g.*, Mississippi Today, *November election could put two black justices on the Supreme Court for first time in Mississippi history* (May 24, 2020) ("Since 1985, Democratic and Republican governors have made efforts to ensure there would be at least one black Mississippian on the Supreme Court – all representing the same Central District post."), *available at* https://mississippitoday.org/2020/05/24/november-election-could-put-two-black-justices-on-the-supreme-court-for-first-time-in-mississippi-history/.

127.  For one, the State has maintained the same district lines since 1987, over 30 years ago.  That in itself is unusual, compared to the normal process in the legislative context of adjusting districts every ten years in light of the decennial census.  The State has also adjusted the boundaries of Court of Appeals districts at least once in the last 30 years.  It has never done so for the Supreme Court.

128.  Moreover, the State apparently never submitted the 1987 district lines for preclearance by the DOJ, a departure from lawful procedure that is indicative of improper discriminatory motives.  Indeed, around the time the districts were enacted, Mississippi regularly failed to submit voting changes for review by the DOJ as required by Section 5, necessitating repeated federal court interventions.  In addition to the Supreme Court districting, the State repeatedly failed to submit other changes related to judicial elections and elective offices for DOJ review. As recently as 2015, a federal district court recognized that the State had never submitted for Section 5 preclearance a 1980 law that barred judges from future office once removed by the Mississippi Supreme Court.  *See Thompson v. Attorney General of Mississippi*, 129 F. Supp. 3d 430, 435 (S.D. Miss. 2015) ("[I]t is undisputed that § 5's approval requirements were never met.").

129.  Meanwhile, State policymakers have repeatedly chosen to reject legislative proposals to revise the Supreme Court districts—proposals that would

have allowed legislators to draw districts that fairly weight the voting strength of Black Mississippians, and that have drawn attention to the dilutive effects of the current districting scheme.

130.   For example, in 2005, Representative Edward Blackmon, Jr., introduced proposals to increase the number of Supreme Court districts from three to nine and to create nine single-member districts, expanding opportunities for Black voters to elect Black-preferred candidates. The proposals died in committee without an opportunity for debate or consideration.

131.   Additional proposed legislation to increase the number of Supreme Court districts, such as House Bills 1531, 2005 Leg. Reg. Sess. (Miss. 2005), 810, 2006 Leg. Reg. Sess. (Miss. 2006), and 725, 2007 Leg. Reg. Sess. (Miss. 2007), also failed at the committee stage.

132.   More recently, the Legislature gave significant consideration to a proposal that would have *exacerbated* the vote-dilutive effects of the districts. This proposal was made after the 2015 election in which a white Democrat prevailed in the Public Service Commission race in District 1.

133.   During the 2016 regular session that followed, a white Republican legislator introduced House Bill 868, a proposal to modify the district boundaries by adding majority-white Simpson County to Supreme Court District 1. H.B. 868

not only reached the House floor for debate, but it passed the chamber—without a single vote from any Black lawmakers.

134.   During floor debate on the measure, Black lawmakers raised strong objections, explaining that the proposal would further dilute Black voting strength. Representative Willie Bailey, a Black lawmaker, explained that the plan would "remove Justice Leslie King from the Supreme Court. And it's going to make it impossible to get another Black to serve there."

135.   Black legislators also alleged that the measure had been proposed in response to the 2015 Public Service Commission election, in an effort to ensure the defeat of other Democratic candidates (who often obtain substantial support from Black voters) in the future.

136.   Local and national media outlets highlighted Black legislators' concerns in their coverage of the H.B. 868 debate. For example, the Associated Press described the proceedings as a "racially charged debate about whether the bill is meant to prevent African-Americans from being elected to the court."

137.   Black lawmakers offered four amendments to the bill that would have strengthened Black voting power in District 1, but these were defeated.

138.   H.B. 868 died in the Senate.  But the racially divided House floor debate once again put the State of Mississippi and its policymakers on notice of the

dilutive effects of the Supreme Court districts.  H.B. 868 also demonstrates a continued willingness and interest among state policymakers to leverage race for political purposes, including in particular with respect to the design of the State's Supreme Court districts.

139.   Yet, in spite of repeated efforts by Black lawmakers to call attention to and remedy the districts' discriminatory effects over the past decade, the State reaffirmed the same lines that have been in place since 1987. When taken together with the direct evidence of the Supreme Court districts' discriminatory impact, it is clear that the State continues to maintain the districts with the purpose of diluting Black voting strength.

## CLAIMS FOR RELIEF

### COUNT 1: SECTION 2 OF THE VOTING RIGHTS ACT OF 1965
### (52 U.S.C. § 10301 AND 42 U.S.C. § 1983)
### (Against All Defendants)

140.   The allegations contained in the preceding paragraphs 1 through 139 are re-alleged as if fully set forth herein.

141.   Mississippi's Supreme Court electoral districts do not afford Black Mississippians, including Plaintiffs and/or their members, an equal opportunity to participate in the political process and to elect representatives of their choice.

142. Accordingly, the challenged districting scheme results in the denial or abridgement of Plaintiffs' and/or their members' right to vote on account of their race and color by diluting their voting strength as Black citizens in Mississippi, all in violation of 52 U.S.C. § 10301.

143. Plaintiffs are entitled to redress from this violation of their federal rights, including pursuant to 42 U.S.C. § 1983.

144. Plaintiffs have no adequate remedy at law. Unless the conduct of elections under Mississippi's Supreme Court electoral districts is enjoined and a remedial map is adopted, Plaintiffs will be irreparably harmed by being subjected to racial vote dilution in violation of Section 2 of the Voting Rights Act.

### COUNT 2: VIOLATION OF THE FOURTEENTH AND FIFTEENTH AMENDMENTS TO THE U.S. CONSTITUTION

### (U.S. CONST. AMEND. XIV; U.S. CONST. AMEND. XV; 42 U.S.C. § 1983)

### (Against Defendants REEVES, LYNCH, and WATSON)

145. The allegations contained in the preceding paragraphs 1 through 144 are re-alleged as if fully set forth herein.

146. The Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution forbids states from creating or maintaining election districts for which a racially discriminatory intent or purpose is a motivating factor and which produces discriminatory results.

147.   The Fifteenth Amendment to the U.S. Constitution similarly forbids states from creating or maintaining election districts that "den[y] or abridge[ ]" any U.S. citizen's right to vote "on account of race."

148.   "Racial discrimination need only be one purpose, and not even a primary purpose, of an official act in order for a violation of the Fourteenth and the Fifteenth Amendments to occur." *Velasquez v. City of Abilene*, 725 F.2d 1017, 1022 (5th Cir. 1984); *see also Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266–68 (1977).

149.   The vote-dilutive effects of Mississippi's Supreme Court electoral districts are not merely accidental or incidental.  Rather, those districts have been maintained or reaffirmed by the State for the past 30-plus years at least in part because of those dilutive effects, and thus for purposes of discrimination on the basis of race in violation of the Fourteenth and Fifteenth Amendments.

150.   Plaintiffs are entitled to redress from this violation of their federal rights, including pursuant to 42 U.S.C. § 1983.

151.   Plaintiffs have no adequate remedy at law.  Unless the conduct of elections under Mississippi's Supreme Court electoral districts is enjoined and a remedial map is adopted, Plaintiffs will be irreparably harmed by being subjected

to racially discriminatory election districts in violation of the Fourteenth and Fifteenth Amendments to the United States Constitution.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court:

A. Declare the district boundaries and/or districting scheme used by the State of Mississippi in electing the justices of the Mississippi Supreme Court to be in violation of Section 2 of the Voting Rights Act and the United States Constitution;

B. Preliminarily and permanently enjoin the Defendants and their agents from holding elections for the Mississippi Supreme Court under the existing districts;

C. Set a reasonable deadline for State authorities to enact or adopt Mississippi Supreme Court districts that do not abridge or dilute the ability of Black voters to elect candidates of choice or otherwise violate the United States Constitution and, if State authorities fail to enact or adopt valid plans by the Court's deadline, order the adoption of remedial plans that do not abridge or dilute the ability of Black voters to elect candidates of choice or otherwise violate the United States Constitution;

D. Order, if necessary, an interim electoral plan for future elections;

E. Award Plaintiffs their costs, expenses, and disbursements, and reasonable attorneys' fees incurred in bringing this action pursuant to and in accordance with 52 U.S.C. § 10310(e) and 42 U.S.C. § 1988;

F. Retain jurisdiction over this matter until Defendants have complied with all orders and mandates of this Court;

G. Grant such other and further relief as the Court may deem just and proper.


Respectfully submitted,

/s/ *Joshua Tom*
AMERICAN CIVIL LIBERTIES UNION
  OF MISSISSIPPI FOUNDATION
Joshua Tom (Miss. Bar No. 105392)
Lakyn Collier (Miss. Bar No. 106224)
Vara Lyons*
101 South Congress Street
Jackson, MS 39201
(601) 354-3408
*JTom@aclu-ms.org*
*Lcollier@aclu-ms.org*
*Vlyons@aclu-ms.org*


SIMPSON THACHER & BARTLETT LLP
Jonathan K. Youngwood*
Isaac Rethy*
425 Lexington Avenue
New York, NY 100017
(212) 455-2000
*jyoungwood@stblaw.com*
*irethy@stblaw.com*

ACLU FOUNDATION
Ari J. Savitzky*
Samantha Osaki*
Sophia Lin Lakin*
125 Broad Street, 18th Floor
New York, New York 10004
(212) 549-2500
*asavitzky@aclu.org*
*sosaki@aclu.org*
*slakin@aclu.org*

Patricia Yan*
915 15th Street NW
Washington, DC 20005
(202) 457-0800
*pyan@aclu.org*

SOUTHERN POVERTY LAW CENTER
Jade Olivia Morgan (Miss. Bar No. 105760)
Leslie Faith Jones (Miss. Bar No. 106092)
111 East Capitol Street, Suite 280

Jackson, MS 39201
(601) 948-8882
*jade.morgan@splcenter.org*
*leslie.jones@splcenter.org*

Bradley E. Heard*
Liza Weisberg*
150 E Ponce de Leon Avenue, Suite 340
Decatur, GA 30030
(470) 521-6700
*bradley.heard@splcenter.org*
*liza.weisberg@splcenter.org*

*Attorneys for Plaintiffs*

*Pro Hac Vice Forthcoming