# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF MISSISSIPPI
### GREENVILLE DIVISION

DYAMONE WHITE; DERRICK
SIMMONS; TY PINKINS; CONSTANCE
OLIVIA SLAUGHTER HARVEY-
BURWELL,

        *Plaintiffs,*

vs.

STATE BOARD OF ELECTION
COMMISSIONERS; TATE REEVES *in his
official capacity as Governor of Mississippi*;
LYNN FITCH *in her official capacity as
Attorney General of Mississippi*; MICHAEL
WATSON *in his official capacity as
Secretary of State of Mississippi*,

        *Defendants.*

4:22-cv-0062-SA-JMV

## REPORT OF PROFESSOR JAMES T. CAMPBELL

October 3, 2022

**EXHIBIT**
_____

# TABLE OF CONTENTS

Page

I.    INTRODUCTION AND SUMMARY OF OPINIONS ........................................ 1

II.    BACKGROUND AND QUALIFICATIONS ...................................................... 2

III.   DISCUSSION ........................................................................................... 3

1.    RECONSTRUCTION AND REDEMPTION ..................................................... 3

    1.1   Reconstruction in History, Memory and Myth ........................................ 3

    1.2   1865-1866: From Slavery to Black Codes .............................................. 5

    1.3   The Constitution of 1868 and the Beginning of Black Voting ..................... 6

    1.4   The End of Reconstruction: Southern "Redemption" and the Assault on Black Voting ...................................................................................................... 8

2.    THE CONSTITUTION OF 1890 ................................................................ 10

    2.1   Origins of the Constitutional Convention ............................................. 10

    2.2   The Politics of Literacy Testing: The Poor White Problem ..................... 12

    2.3   Other Impediments to Black Voting: Poll Taxes and Criminal Disfranchisement .......................................................................................... 14

    2.4   An "Impregnable Barrier": Apportioning the Legislature, Executive, and Judiciary ...................................................................................................... 15

3.    THE AGE OF JIM CROW ........................................................................ 17

    3.1   Implementing the New Constitution ..................................................... 17

    3.2   Securing the Racial Order: White Primaries and the Politics of Demagoguery .......... 18

    3.3   Counting the Costs of Disfranchisement ............................................... 19

4.    THE CIVIL RIGHTS ERA ........................................................................ 21

    4.1   Changing Relations of State and Nation: The Impact of World War II ...................... 21

    4.2   The Birth of a Voting Rights Movement ............................................... 22

    4.3   White Reaction: New Restrictions on Black Voting ............................... 24

4.4 White Reaction:  Violence .................................................................................... 26

4.5 S.N.C.C. and the Birth of the Voter Education Project, 1961-1964 ............................. 27

4.6 The 1964 Mississippi Summer Project ........................................................... 29

5. NULLIFYING THE VOTING RIGHTS ACT .................................................... 30

5.1 From Denial to Dilution........................................................................ 30

5.2 Seeding Resistance:  The 1965 Special Session ........................................... 31

5.3 Nullifying the Voting Rights Act at Local and County Levels ..................................... 32

5.4 Nullifying the Voting Rights Act at State and National Levels..................................... 34

6. DEFENDING THE RIGHT TO VOTE ............................................................ 36

6.1 Combating voter dilution ................................................................... 36

6.2 The struggle for the Delta district ........................................................ 37

7. THE JUDICIARY.................................................................................. 40

7.1 The first Black judges .......................................................................... 40

7.2 *Kirksey v. Allain*, *Martin v. Allain*, *Martin v. Mabus*, and *Magnolia Bar* .................. 40

8. RACE AND VOTING IN THE AGE OF PARTISAN REALIGNMENT ..................... 42

8.1 Thirty Years Later.............................................................................. 42

8.2 The "Southern Strategy" ....................................................................... 42

8.3 Reagan at the Neshoba County Fair............................................................ 44

8.4 The Strange Career of Partisan Realignment in Mississippi ................................ 45

8.5 The Ebb and Flow of Section 5 Objections ................................................... 46

8.6 Voting Rights in the 1990s:  Fordice v. Molpus............................................. 46

8.7 Implementing the National Voter Registration Act in Mississippi.............................. 47

9. CONCLUSION.................................................................................... 49

## I.    __INTRODUCTION AND SUMMARY OF OPINIONS__

My name is James T. Campbell. I am the Edgar E. Robinson Professor in United States History at Stanford University, where I teach courses in American, African American, and South African history. I was retained by counsel for Plaintiffs in the above-captioned litigation to address the history of official voting-related discrimination in Mississippi and the State's use of discriminatory voting practices and procedures.

My report focuses in particular on three periods: the late nineteenth century, which saw the overthrow of Reconstruction and the drafting of a new state constitution deliberately designed to deny Black Mississippians the rights guaranteed them by the 14th and 15th Amendments to the U.S. Constitution; the post-World War II era, a period marked by the emergence of a vital Black voting rights movement as well as a violent, state-led campaign to crush it; and the decades following the enactment of the 1965 Voting Rights Act, which saw a concerted state campaign to minimize and dilute the electoral power of newly enfranchised African Americans. The report closes with a survey of the current historical moment, which exhibits significant continuities with earlier period of Black voter suppression in Mississippi.

Based on my years of researching, writing, and teaching and my review of the sources cited herein, it is my opinion that:

1. In Mississippi, the struggle for racial equality is and has always been a struggle over voting. Virtually from the moment of slavery's abolition right to the present, politics in the state has revolved around the struggle to enlarge or diminish the electoral power of Black Mississippians.

2. The State of Mississippi has (in the language of the "Senate Factors") "a history of official discrimination" in regard to minority voting that is the most extreme of any of the fifty states. It also has a long history of deploying "voting practices or procedures that may enhance the opportunity for discrimination against the minority group."

3. To understand the history of voter suppression in Mississippi, it is necessary to look closely at the origins and implementation of the state constitution, which was written in 1890 and remains in force today, albeit in amended form. The purpose of that constitution, as its framers freely averred, was not simply to erect an "impregnable barrier" between Black citizens and the ballot box, but to do so in a manner that skirted the guarantees of the 14th and 15th Amendments, as well as the "fundamental conditions" of the 1870 Mississippi Readmission Act.

4. The passage of the 1965 Voting Rights Act did not end the battle over Black voting so much as change the terms on which it was waged. Rather than comply with the act, the Mississippi State Legislature, still without a single Black member, devised a dizzying array of devices to ensure that Black citizens, while technically allowed to vote, would have no chance of exercising meaningful political power or electing candidates of their choice. Dismantling those devices would be the work of decades.

5. The long history of denying and diluting Black electoral power has left profound and enduring legacies. In the case of Black Mississippians, these legacies include generations of poverty, ill-education, and ill-health, conditions that remain widespread to this day and that continue

(again, in the words of the Senate Factors) to "hinder their ability to participate effectively in the political process." Though less obvious, the state's racial history also left an imprint on white Mississippians, generations of whom grew up in a world in which it was virtually impossible to imagine that Black people had the right and capacity to participate in political life as equal citizens.

6. Mississippi's racial history has produced an African American community that is not only geographically concentrated – the areas with the largest enslaved populations are still, generally speaking, the areas with the largest Black populations today – but also politically cohesive.

7. The legacies of Mississippi's long and bitter struggle over Black suffrage include extreme racial polarization in voting, as well as an extraordinarily high propensity toward "bloc voting" among white Mississippians.

8. Racial polarization and bloc voting are more pronounced today than at any time since passage of the Voting Rights Act, thanks to party realignment and an unprecedented convergence of race and partisan affiliation. As of 2022, the Mississippi State Legislature's 174 members include only five white Democrats and zero Black Republicans.

9. Political campaigns in Mississippi are characterized by racial appeals. For most of the state's history, these appeals were overt, even outrageous, with demagogic politicians stoking fears of "Negro supremacy" and "mongrelization." In the post-Civil Rights era, they have tended to be more subtle, relying on so-called "dog whistles" to encourage racial antipathy and fear. Recent years have seen a notable upsurge in such campaigning.

## II.     BACKGROUND AND QUALIFICATIONS

I earned my undergraduate degree in History at Yale University in 1980 and my doctoral degree, also in History, at Stanford University in 1989. In the years that followed, I taught at Northwestern University in Evanston, Illinois; Wits University in Johannesburg, South Africa; and Brown University in Providence, Rhode Island. In 2008, I returned to Stanford, where I presently serve as the Edgar E. Robinson Professor in United States History.

My curriculum vitae, which includes my academic credentials, publications, and professional activities, is attached as Appendix A. As it shows, I am the author, co-author, or editor of numerous scholarly books and articles, including *Songs of Zion: The African Methodist Episcopal Church in the United States and South Africa*, published by Oxford University Press in 1995; *Middle Passages: African American Journeys to Africa, 1787 to 2005*, published by the Penguin Press in 2006; *Race, Nation, and Empire in American History*, published by the University of North Carolina Press in 2007; *Slavery and the University: Histories and Legacies*, published by the University of Georgia Press in 2019; and *Mississippi Witness: The Photographs of Florence Mars*, published by the University Press of Mississippi, also in 2019. My current book project is a study of the history and legacy of the 1964 Mississippi Summer Project, in the course of which I have made more than seventy research trips to the state to gather archival materials and conduct oral interviews with individuals touched by the events of that extraordinary summer.

Over the course of my career, I have won numerous scholarly fellowships and prizes, as well as a half dozen teaching awards. *Songs of Zion* was recognized with the Organization of American Historians Frederick Jackson Turner Prize as well as the Carl Sandburg Literary Award for Non-Fiction. *Middle Passages* won the Mark Lynton History Prize, the Lois P. Rudnick Prize, and was a finalist for the 2007 Pulitzer Prize in History. I am a Distinguished Lecturer of the Organization of American Historians, an honor I have held since 2011, and in 2020 I received a John Simon Guggenheim Memorial Foundation Fellowship.

In addition to my scholarly work, I am a public historian, committed to sharing the fruits of my research with the world beyond the university gates. I have served as historical consultant for various school curricula, digital humanities projects, documentary films, and museum exhibitions, including the "Power of Place" exhibit at the Smithsonian Institution's National Museum of African American History and Culture.

I have not previously been retained as or testified as an expert witness. I am being compensated for my work on this matter at a hourly rate of $160. My compensation is not contingent on the opinions I offer or the outcome of the litigation and in no way influences the conclusions I have reached. I understand that the discovery process is not yet complete in this litigation, and this report is based on the information presently available to me. I reserve the right to supplement or modify this report based on additional facts, testimony, or other information that may come to light.

A list of the materials I considered in drafting this report is attached as Appendix B.

## III.  DISCUSSION

### 1.  RECONSTRUCTION AND REDEMPTION

#### 1.1  Reconstruction in History, Memory and Myth

It is difficult to say for certain when a Black person first cast a ballot in Mississippi. Under the Mississippi Organic Law established by Congress, which governed the Mississippi Territory between 1798 and 1817, voting was restricted to free white males over the age of 21 who had resided in the territory for at least two years and owned at least fifty acres of land within it. Those restrictions were largely carried over in the 1817 state constitution. The second state constitution, which took effect in 1832, abolished the property requirement but continued to restrict the franchise to free white male adults. It is possible that a few free people of color voted in municipal elections, which tended to have more permissive franchise standards, but there were scarcely a thousand such people in the entire state and the number of them casting votes would have been vanishingly small. With the coming of the Civil War and subsequent onset of Reconstruction, all this would change. Virtually overnight, Mississippi would go from having zero Black voters to having a majority Black electorate.[1]

---

[1] R.H. Thompson, "Suffrage in Mississippi," *Publications of the Mississippi Historical Society*, vol. 1 (Oxford Mississippi Historical Society, 1898).

Few if any periods in American history are as encrusted in myth as Reconstruction. An unprecedented attempt to extend full citizenship to the formerly enslaved, Reconstruction would come to be remembered as "The Tragic Era," an orgy of corruption perpetrated by Northern "adventurers" bent on plundering and humiliating a proud but prostrate White South. In this version of history, enshrined in textbooks such as Woodrow Wilson's five-volume *History of the American People* (1902) and dramatized in Hollywood films such as *The Birth of a Nation* (1915) and *Gone With the Wind* (1939), slavery was a benign, paternalistic institution; the Civil War was an unnecessary conflict fomented by abolitionist fanatics; and Reconstruction, particularly the extension of the franchise to the formerly enslaved, was folly, a foredoomed attempt to confer political equality on an inferior race incapable of bearing it. By the same logic, the violent restoration of white supremacy in the 1870s and '80s – still called "Redemption" in textbooks – was a necessary, even noble crusade.[2]

This view of Reconstruction and "Redemption" prevailed across the country for more than half a century, right through the 1950s, when the first stirrings of the modern Civil Rights movement prompted a major reassessment. It persisted far longer in Mississippi, embedded not only in popular memory but also in the textbooks that high school students, Black and white alike, read in their required state history course. "The war was over, but the fighting was not; reconstruction was a worse battle than the war had ever been," wrote John K. Bettersworth in *Mississippi: A History*, which was selected in 1962 by Governor Ross Barnett as the sole authorized textbook for use in the class. "The struggle of the state to free itself in the war was hardly more difficult than the struggle to free itself during Reconstruction." Periodically re-issued, Bettersworth's book remained in print – and in classroom use – into the 1980s. When an alternative textbook, James Loewen and Charles Sallis's *Mississippi: Conflict and Change*, became available in 1974, Mississippi authorities refused to approve it. When Loewen and Sallis successfully challenged that decision in court, officials shifted the Mississippi history course from tenth to eighth grade, enabling them to argue that the book was too "advanced" for students.[3]

The portrayal of Reconstruction in Mississippi textbooks is a useful starting point not only because it illustrates the continuing obstructionism of state officials, long after the passage of the Civil Rights and Voting Rights Acts, but also because it suggests the way in which generations of white Mississippians understood the issue of Black voting. Within the historical "story" in which they were steeped, the emergence of a renewed voting rights movement in the early 1960s – a movement of local people, supported by northern Civil Rights organizations – was Reconstruction all over again, another "invasion" by "outsiders" intent on destroying Mississippians' "way of life." The passage of the 1965 Voting Rights Act, and the subsequent struggles in federal courts

---

[2] For the older tradition, see, for example, Woodrow Wilson, *A History of the American People* (New York: Harper and Bro., 1902) and Claude G. Bowers, *The Tragic Era: The Revolution After Lincoln* (Cambridge: Houghton-Mifflin Co., 1929). For a more recent interpretation, see Eric Foner, *Reconstruction: America's Unfinished Revolution, 1863-1877* (New York: Harper & Row, 1989).

[3] James Loewen and Charles Sallis, *Mississippi: Conflict and Change* (New York: Pantheon, 1974); John K. Bettersworth, *Mississippi: A History* (Austin: The Stock Co., 1959). (The quotation is from p. 313.) See also Charles W. Eagles, *Civil Rights, Culture Wars: The Fight Over a Mississippi Textbook* (Chapel Hill: University of North Carolina Press, 2019).

to render its guarantees meaningful, only confirmed the tale. Like the noble "Redeemers" a century before, Mississippians would resist.

## 1.2    1865-1866: From Slavery to Black Codes

However one represents the history of Reconstruction, the issue of Black voting was front and center. In June, 1865, even before the final abolition of slavery by the 13th Amendment, a group of Black "Loyal Citizens" in Vicksburg petitioned Congress, asking it to make enfranchisement of the formerly enslaved a condition of Mississippi's readmission to the United States. The idea appealed to many Congressional Republicans, but not to Andrew Johnson, who had become president after Abraham Lincoln's assassination. A Tennessee Unionist, Johnson had opposed secession, but he was himself a former slaveowner and he was certainly no friend to Black equality. "This is a country for white men, and by God, as long as I am President, it shall be a government for white men," he declared in one speech. With Congress out of session, Johnson moved quickly to readmit the southern states, issuing blanket pardons to most Confederates (officeholders and large slaveowners were required to apply for pardons individually) and pledging to recognize new state governments as soon as ten percent of the total number of voters in 1860 had sworn oaths of allegiance. His only condition was that the states amend their constitutions to abolish slavery and ratify the 13th Amendment. He did not require Black enfranchisement, though he suggested that it "might be expedient" to permit a few literate and property-holding African Americans to cast votes in order to stave off Republican demands for non-racial suffrage.[4]

White Mississippians were quick to seek readmission under Johnson's lenient terms. In August, 1865, a convention of white delegates, selected by white voters, assembled in Jackson to revise the state constitution. In the event, they acceded to only half of the President's demand, acknowledging the "de facto" abolition of slavery in the state but declining to ratify the 13th Amendment. (The refusal only briefly delayed the Amendment, which was adopted in early December following ratification by Alabama, North Carolina, and Georgia.) As for Johnson's suggestion of extending voting rights to a few educated, propertied Black people, delegates rejected it outright, leaving the franchise provisions of the 1831 constitution intact. "Several hundred thousand of the negro race, unfitted for political equality with the white race, have been thrown loose upon society," explained newly elected Governor Benjamin G. Humphreys. While these newly free people were entitled to "rights of person and property, they cannot be admitted to political or social equality with the white race."[5]

The problem, as the century and a half since has shown again and again, is that "rights of person and property" are never secure absent the protection of the ballot. The new, all-white state legislature that convened in Jackson in late 1865 proceeded to enact the most draconian set of "Black Codes" in American history, imposing restrictions on the daily lives of freedpeople that were, in some respects, even harsher than those they had endured under slavery. Black people

---

[4] Vernon Lane Wharton, *The Negro in Mississippi, 1865-1890* (Chapel Hill: University of North Carolina Press, 1947), p. 140; Hans L. Trefousse, *Andrew Johnson: A Biography* (New York: Norton, 1989), p. 236; Alfred Holt Stone, "Mississippi's Constitution and Statutes in Reference to Freedmen," *Publications of the Mississippi Historical Society* 4 (1901), p. 152.

[5] *The South in the Building of the Nation: A History of the Southern States*, vol. 11 (Richmond: Southern Historical Publishing Society, 1909), p. 430.

(defined as everyone "descended of a negro to the third generation") were prohibited from keeping or bearing arms, "unlawfully assembling together," engaging in "seditious speeches, insulting gestures, languages, or acts," and preaching the Gospel without a license. (Wittingly or unwittingly, the restrictions represented a point by point denial of the guarantees of the 1st and 2nd Amendments of the Bill of Rights.) Other codes were equally severe. Marriage to or cohabitation with a white person was a felony, carrying a mandatory life sentence. Existing laws pertaining to crime and punishment for the enslaved were re-adopted virtually verbatim, with the word "freedmen" substituted for "slaves." After some debate, the legislature chose not to impose a blanket prohibition on Black land ownership, though in the circumstances of the time few of the formerly enslaved had the wherewithal to purchase land anyway. An 1880 survey by the U.S. Census Bureau of 17 counties with large African American populations found that not one in a hundred Black families owned the land they worked.[6]

Many of the Black Codes aimed at reasserting white control over Black labor. Black people were required to show written proof of employment by the second Monday of January every year, starting on January 8, 1866. Minor children were bound out as "apprentices" to their former masters. Individuals leaving employment before the conclusion of their contracts forfeited accrued wages and made themselves subject to arrest as "vagrants." Those arrested for vagrancy (or otherwise deemed "idle and disorderly") were subject to imprisonment and fines of up to one hundred dollars – a veritable fortune at the time. Those unable to pay their fines were "hired out" to white employers by local sheriffs – the beginnings of the state's notorious system of convict leasing. Perhaps most extraordinary of all, authority to arrest those "considered vagrants" was vested not just in "civil officers" but in "every person" – which is to say that every white person operated under color of law.[7]

## 1.3    The Constitution of 1868 and the Beginning of Black Voting

The passage of the Black Codes ensured that Black Mississippians, though legally free, would remain all but slaves in practice. It also provoked a furious reaction in the North, contributing significantly to the Republican sweep in the midterm elections of 1866. Armed with veto-proof majorities, Congressional Republicans seized control of the Reconstruction process, impeached (and nearly removed) President Johnson, and enacted, over his veto, the Reconstruction Act of 1867, dividing the states of the former Confederacy into military districts. To win readmission and regain representation in Congress, states were required not only to ratify the 14th Amendment but also to draft new state constitutions – constitutions to be ratified by the state's voters, including freedmen. Though adoption of the 15th Amendment remained three years in the future, the battle lines over Black voting were now drawn.[8]

In no state was the business of drafting a new state constitution more conflicted than in Mississippi. The process of creating a new voters roll was contested and sometimes violent. Many prospective voters, white as well as Black, claimed unfair exclusion, though the roll that ultimately

---

[6] *Laws of the State of Mississippi, passed at a Regular Session of the Mississippi Legislature, held in the City of Jackson, October-December, 1865* (Jackson: J.J. Shannon & Co., 1866), pp. 82-91, 165-167, ff.

[7] *Ibid.*

[8] Foner, *op. cit.*

emerged – 60,167 Black registrants (56%) versus 46,636 whites (44%) – almost exactly mirrored the proportions of Black and white people in the state. These voters elected delegates to a constitutional convention, known to this day as the "Black and Tan" convention, though only sixteen of the hundred delegates were Black. Reflecting the bitter circumstances of its birth, the state constitution of 1868 was in some ways a punitive document, particularly Article 6 on the Franchise, which included a section effectively barring all former Confederates from holding public office and another requiring voters to take an oath affirming "the political and civil equality of all men; so help me God." In other ways, however, it was a visionary document, apportioning representation based on population, establishing "a uniform system of free public schools" (the first such system in the state's history), abolishing imprisonment for debt, protecting the property rights of married women, eliminating property qualifications for jury service and elective office, prohibiting discrimination on "public conveyances," and extending legal protections to criminal defendants. Unlike the U.S. Constitution, the new constitution began rather than ended with its "Bill of Rights," a lengthy catalogue guaranteeing all the rights and privileges denied under slavery and the post-emancipation Black Codes. Most important in the current context was Article I, Section 18: "No property or educational qualification shall ever be required for any person to become an elector."[9]

Publication of the draft constitution ignited yet another round of violent opposition, focused not simply on the punitive elements of Article 6 but on the very idea of Black voting, which the vast majority of white Mississippians vehemently rejected. Lacking the votes to prevent ratification, white opponents launched a campaign of violence and intimidation, even going so far as to deploy armed guards at polling stations on election day. When the votes were tallied, the new constitution fell short of ratification by some 8,000 votes. The election prompted an investigation by the U.S. Congress, but it also persuaded proponents to remove the controversial provisions of Article 6 and submit them separately to voters. In a second referendum, ordered by President Ulysses S. Grant in 1869, the offending sections were rejected but the constitution itself was ratified.

The legislature that finally convened in early 1870 was the first in Mississippi history to include Black people. Five of the 33 state senators (15%) and thirty of the 107 state representatives (28%) were African Americans. The new legislators immediately ratified the 14th and 15th Amendments and selected an African American, Hiram Revels, to represent the state in the U.S. Senate. (Mississippi has the distinction of having produced the nation's first two Black Senators, Revels and Blanche K. Bruce.) Having fulfilled its requirements under Congressional Reconstruction, the state was formally readmitted to the United States.[10]

---

[9] For the ratified version, see https://mshistorynow.mdah.ms.gov/issue/mississippi-constitution-of-1868. For an account of the calling and conduct of the convention itself see, Kenneth D. Kemper, "Restrictions on Negro Voting in Mississippi History," Appendix to the Brief of the American Civil Liberties Union, Amicus Curiae in *United States v. State of Mississippi*, Supreme Court of the United States, October Term, 1964, No. 73.

[10] Eric Foner, *Freedom's Lawmakers: A Directory of Black Officeholders During Reconstruction* (New York: Oxford University Press, 1993).

Though largely forgotten today, the Mississippi Readmission Act, signed into law by President Grant in late February, 1870, made the state's restoration contingent on three "fundamental conditions":

> And provided further, That the State of Mississippi is admitted to representation in Congress as one of the States of the Union, upon the following fundamental conditions: First, That the constitution of Mississippi shall never be so amended or changed as to deprive any citizen or class of citizens of the United States of the right to vote who are entitled to vote by the constitution herein recognized, except as a punishment for such crimes as are now felonies at common law, whereof they shall have been duly convicted under laws equally applicable to all…; Second, That it shall never be lawful for the said State to deprive any citizen of the United States, on account of his race, color, or previous condition of servitude, of the right to hold office under the constitution and laws of said State, or upon any such ground to require of him any other qualifications for office than such as are required of all citizens; Third, That the constitution of Mississippi shall never be so amended or changed as to deprive any citizen or class of citizens of the United States of the school rights and privileges secured by the constitution of said State.[11]

In the years that followed, the state would violate those conditions in every particular.

## 1.4    The End of Reconstruction: Southern "Redemption" and the Assault on Black Voting

In contrast to the *Birth of a Nation* version of Reconstruction, with its lurid tales of Black leaders drunk with power heaping humiliation on beleaguered whites, the Mississippi legislature that came to power in 1870 pursued a remarkably conciliatory course. One of its first actions was to petition Congress to remove the disabilities preventing ex-Confederates from holding public office, an option provided by Section 3 of the 14th Amendment. Senator Revels in Washington made the same proposal multiple times. But no gestures of conciliation could staunch the implacable opposition of most white Mississippians to the idea of Black voting. "N****r voting, holding office and sitting in the jury box are all wrong," opined the *Columbus Democrat*, in a typical editorial. To end these outrages, white Mississippians needed a revitalized Democratic Party, organized around three simple ideas: "that white men shall govern, that n****rs are not rightly entitled to vote, and that when it gets power, n****rs will be placed upon the same footing as a white minor who do[es] not vote or hold office."[12]

Such appeals did not fall on deaf ears. Para-military organizations, not only the Ku Klux Klan but also the "Red Shirts," "White League" and "White Line," proliferated across the state.

---

[11] The Readmission Act can be found at https://www.census.gov/history/pdf/ms-readmit22020.pdf.

[12] Quoted in Wharton, *op. cit.*, p. 182.

Their tactics ranged from economic coercion – dismissal from jobs, evictions, and so forth – to beating, burning, and outright assassination, but the goal was always the same: to prevent Black Mississippians from exercising the franchise. Black voters who braved the nightriders and armed pickets at polling places were often met at the ballot box by "checkers," who recorded their names for publication in local newspapers, an obvious invitation to retaliation. (The Mississippi legislature would adopt an identical tactic in the Civil Rights era.) Black Mississippians vigorously defended their rights, protesting, petitioning, and organizing militias of their own, but they were simply outgunned. In the state elections of 1875, following a campaign marred by violence and bloody "riots" in a dozen counties, white Democrats swept back into power.[13]

By the time of Mississippi's "Redemption," many political leaders in Washington, Republicans as well as Democrats, had made their peace with the return of white supremacy in the South. But the election of 1875 was so egregious, so fraudulent and literally murderous, that Congress commissioned another investigation, producing yet another withering assessment of the political situation in the state. "[T]he State of Mississippi is at present under the control of political organizations composed largely of armed men whose common purpose is to deprive the negroes of the free exercise of the right of suffrage," the investigators concluded. "[White Mississippians have] refused to accept the negro as their political equal, and for ten years they have seized every fresh opportunity for a fresh denial of his rights. At last they have regained supremacy in the State by acts of violence, fraud, and murder, without honor, dignity, generosity or justice." Faced with such open defiance, the report concluded, the only possible response was federal interposition. Under terms of the Constitution, the federal government had "guaranteed to the State of Mississippi a republican form of government, and this guarantee must be made good."[14]

In its diagnosis as well as its prescription, the Congressional report echoed the contentions of Civil Rights organizers working in Mississippi in the early 1960s, who likewise described a violent reign of terror against Black voting that demanded forceful federal action. But few in Washington were prepared to go down that route. With the disputed presidential election of November, 1876, and the subsequent "Compromise of 1877," the curtain fell on Reconstruction.

As the final scenes of Reconstruction played out in Washington, white Democrats in Mississippi moved quickly to consolidate their control. The sitting Governor and State Superintendent of Education, both Republicans, were deposed. The Lieutenant Governor, also a Republican, was impeached. Most important in the present context, the "Redeemers" introduced a new system for administering elections, from a State Board of Election Commissioners right down to a network of appointed county registrars.

Significantly, the "Redeemers" did not move immediately to purge Black voters, preferring instead to carry elections through administrative chicanery, fraud, and violence. In avoiding formal disfranchisement, they clearly hoped not only to forestall a 15th Amendment challenge, but also to avoid triggering a still untested clause in Section 2 of the 14th Amendment, which pledged to reduce the representation of states that "in any way abridged" the voting rights of eligible citizens. The end result was much the same. Though Black voters remained a substantial majority

---

[13] *Ibid.*, pp. 181-198.

[14] Quoted in Kemper, *op. cit.*, pp. 35-37.

on the state rolls, their chances of exercising significant political power were nil. Many did not even attempt to cast ballots, particularly when racial tempers were running high. In the violent municipal 1888 elections in Jackson, one of the last Republican strongholds in the state, only one Black person appeared at the polls. A local newspaper gave the episode a comic spin: "One old negro attempted to vote in the South Ward about half past nine. He was an old negro and looked silly, and he was not hurt, but told to hustle out in double-quick time, and he hustled."[15]

## 2.    THE CONSTITUTION OF 1890

### 2.1    Origins of the Constitutional Convention

On February 5, 1890, the Mississippi state legislature voted to call a convention to draft a new state constitution – the constitution that remains in force today, though in significantly amended form. Delegates to the convention, chosen in a violence-marred special election in July, gathered in Jackson in mid-August and completed their work on November 1. Of the 133 delegates in attendance, only two were Republicans. Only one was African American, Isaiah Montgomery, representing the all-Black community of Mound Bayou in Bolivar County.[16]

The purpose of the 1890 constitutional convention was to remove Black Mississippians from the voting rolls, a fact acknowledged at the time and ever after. "Let's tell the truth if it bursts the bottom of the Universe," declared Judge Sol Calhoon, the convention's president. "We came here to exclude the Negro. Nothing short of this will answer." By that measure, the delegates succeeded admirably, introducing a series of devices that virtually erased Black voters from the rolls. The most notorious of those devices, including poll taxes and literacy tests, were abolished in the 1960s. But the victories of the Civil Rights era, as profound as they were, did not expunge all the racially discriminatory devices inserted into the document, several of which were repurposed in the decades after the Voting Rights Act in order to dilute Black political power.[17]

Probably the first question to ask of the new constitution is why it was written in the first place. Given the effectiveness of the existing, extra-legal system of voter suppression, why risk formalizing disfranchisement? Many asked that question at the time, warning that a constitutional convention would only re-enflame the "largely abated" issue of Black voting. "While the Federal Constitution remains unchanged, white supremacy cannot be made permanent in Mississippi by any ordinance a state convention can adopt," declared U.S. Senator Edward Walthall. The answer to the question is to be found, in part, in national politics, specifically in the election of 1888, which saw Republicans gain unified control of the federal government for the first time since the end of Reconstruction. With Congressional Republicans and President-elect Benjamin Harrison pledging to protect "the free exercise of the right of suffrage" for Black people in the South, there

---

[15] Quoted in Wharton, *op. cit.*, p. 202.

[16] Dorothy Overstreet Pratt, *Sowing the Wind: The Mississippi Constitutional Convention of 1890* (University Press of Mississippi, 2018).

[17] Quoted in Neil R. McMillen, *Dark Journey: Black Mississippians in the Age of Jim Crow* (Urbana: University of Illinois Press, p. 41). See also S.A. Calhoon, "The Causes and Effects that Led to the Calling of the Constitutional Convention of 1890," in Franklin L. Riley (ed.), *Publications of the Mississippi Historical Society*, vol. 6 (Oxford: Mississippi Historical Society, 1902).

was a renewed risk of federal "interposition." In that context, Mississippi officials were eager to find "any scheme that would put a legal face" on disfranchisement.[18]

Another part of the answer lies in Mississippi politics, which were roiled in these years by the emergence of the Farmers' Alliance. While the origins of the Alliance (and of the Populist or "People's" Party to which it gave rise) were complicated, the result in Mississippi was what historian has memorably called "the Revolt of the Rednecks" -- an insurgent movement of so-called "hill country" whites against the planter elite of the Black majority counties in the Delta and southwards along the river. As so often in the Mississippi history, the bogey of "Negro domination" bulked large in the contest, with each faction accusing the other of mobilizing Black voters to secure election. Seen in this light, the new constitution represented a kind of white disarmament treaty, ensuring that no faction could ever deploy the weapon of "the Negro vote" against the other. As one convention delegate later put it, the "inspirations of a common peril commanded the two forces to fuse their antagonisms." The editor of the *Natchez Democrat* put the matter more drolly: removing Black voters from the rolls served "to remove the temptation by legalizing the fraud."[19]

There is yet another explanation. While white Mississippi leaders were virtually unanimous in their determination to stop Black voting, there were many who were genuinely troubled by the means used to accomplish it, which were corrupting the young and besmirching "the purity of the ballot box, the fundamental basis of American conceptions of government." "[T]he old men of the present generation can't afford to die and leave their children and grandchildren with shot-guns in their hands, a lie in the mouth, and perjury on their lips in order to defeat the negroes," the editor of the *Jackson Clarion-Ledger* opined. Judge J.B. Chrisman, chair of the State Bar Association chair, said the same thing in an oft-quoted speech on the convention floor:

> [I]t is no secret that there has not been a full vote and a fair count in Mississippi since 1875, that we have been preserving the ascendancy of the white people by revolutionary methods. In other words, we have been stuffing ballot boxes, committing perjury, here and there in the State carrying the elections by fraud and violence. The public conscience revolted, thoughtful men everywhere foresaw that there was a disaster somewhere along the line of such a policy as certainly as there is a righteous judgment for nations as well as men. No man can be in favor of perpetuating the election methods which have prevailed in Mississippi since 1875 who is not a moral idiot.[20]

---

[18] Quoted in Kemper, *op. cit.*, pp. 47, 49.

[19] Albert D. Kirwan, *Revolt of the Rednecks: Mississippi Politics, 1876-1925* (Lexington: University of Kentucky Press, 1951. (The quotation from the *Natchez Democrat* is on p. 62.) For the comment on common perils, see Calhoon, *op. cit.*, p. 133.

[20] *Jackson Clarion Ledger*, May 6, 1890 and September 11, 1890 (Chrisman).

The irony, of course, was that preserving "the purity of the ballot box," in the context of 1890, meant keeping it out of the hands of the majority population. Delegates also needed to negotiate a complicated series of legal and political hurdles, including the 14th and 15th Amendments, the 1870 Mississippi Readmission Act (which forbad any change to the previous constitution's franchise rules), and a Federal Elections Bill recently introduced by Congressional Republicans, quickly dubbed the "Force Bill" by southern legislators. Recognizing the challenges the framers faced helps us to understand the document they drafted. Uncertain which devices would pass muster, they took a kind of 'kitchen sink' approach to the problem, exploring literally dozens of different ways to dilute or outright eliminate the "dangerous power" of Black suffrage. As Justice George Etheridge put it in his 1928 book, *Mississippi Constitutions*, "the scheme [was] to acquire white supremacy, and the convention was searching the field of expedients for methods to accomplish that end."[21]

## 2.2    The Politics of Literacy Testing:  The Poor White Problem

In surveying the "field of expedients," delegates faced an awkward question:  What proportion of white voters were they willing to sacrifice in order to achieve the larger goal of Black disfranchisement?  With explicitly racial restrictions prohibited by the 15th Amendment, delegates needed to find other ways to raise the bar on voting – perhaps with a property requirement (unknown in the state since 1831) or educational qualification.  The problem was that such qualifications, if fairly applied, would disfranchise not only Black voters but also tens of thousands of landless, illiterate white voters.  In the context of the current Populist agitation, that was too high a price for most delegates, though some would happily have paid it.  "To avoid the disfranchisement of a lot of white ignoramuses, we can't have an educational qualification, and to pander to the prejudices of those who have no property, we cannot have a property qualification," Judge Chrisman grumbled.[22]

As the weeks passed, delegates vetted various solutions, some more quixotic than others. Some suggested, in lieu of a property requirement, a weighted franchise, in which property owners would receive extra votes.  Others proposed watering down Black voting strength by enfranchising certain classes of white women – school teachers, for example, or propertied widows.  Still others dismissed such small-bore devices as inadequate to the task, insisting that the "only true and efficient remedy … lies in the repeal of the XV Amendment of the Constitution of the United States."  A subcommittee was appointed to draft a petition asking the U.S. Congress to commence the process of repeal.[23]

Much of the debate focused on literacy testing, an idea generally supported by delegates representing the planter elite in the Black-majority counties but opposed by delegate from the white-majority counties.  Among the supporters was Isaiah Montgomery, the convention's sole Black delegate.  Montgomery had risen from slavery (he grew up on a plantation owned by Jefferson Davis's brother) to become the wealthiest Black man in the state.  He was also a pragmatist, who arrived at the convention fully aware of its purpose: "to restrict the franchise by

---

[21] George Etheridge, *Mississippi Constitutions* (Jackson: Tucker Printing, 1928).

[22] Quoted in Kirwan, *op. cit.*, p. 66.

[23] Pratt, *op. cit.*, pp. 75-76, 106-114.

prescribing such qualifications for voters as would reduce the negro vote considerably below the white vote of the state – such restrictions, of course, to be fairly applied." In a remarkable speech to his fellow delegates, Montgomery endorsed a literacy test for all voters. Such a requirement, he argued, citing census estimates on Black and white illiteracy rates, would remove 65% of the state's registered Black voters from the rolls while eliminating only about 10% of white voters, thus converting the current Black majority of about 70,000 to a white majority of 40,000.[24]

Viewed today, Montgomery proposal – to "sacrifice … for the good of the state" two-third of the Black electorate, 120,000 registered voters electorate – seems shockingly conciliatory. Yet for delegates at the time the proposal was unacceptable, because it eliminated too many white voters and too few Black. The provision that ultimately found its way into the new constitution, essentially a compromise between Black- and white-majority counties, was a literacy test with a very large loophole. According to Section 244, a qualified elector was required "to be able to read any section of the constitution of this State," but an illiterate individual could still be registered if he was "able to understand the same when read to him, or give a reasonable interpretation thereof." Crucially, power to determine whether applicants met the necessary standard was vested in the voting registrars of each county.[25]

The seeds of the Mississippi Civil Rights struggle of the early 1960s – and of more than two-dozen voting rights lawsuits filed against the state in those years by the U.S. Department of Justice – were sown right here. In effect, county registrars, all white, all appointed rather than elected to office, became the gatekeepers of suffrage, with virtual *carte blanche* to determine who could or could not register to vote. (Alert to the threat of federal registrars contained in the Federal Elections Bill, delegates also included a provision, Section 249, stipulating that only voters enrolled by "proper officers of this State" could cast ballots.) The possibilities for abuse in the new registration system were widely noted at the time. As a correspondent for the *Port Gibson Reveille* put it, "Every State suffers more or less from corrupt practices at elections, but it was reserved for the State of Mississippi to make its very Constitution the instrument and shield of fraud."[26]

In the long run, literacy testing probably eliminated fewer Black voters than the poll tax, to which we will turn momentarily. But it epitomized the logic of the new constitution. By requiring a complete re-registration of electors, by imposing an ostensibly non-racial test on all applicants (with a loophole for illiterate whites), and by endowing appointed county registrars with virtually unlimited discretion to approve or reject registrants, the constitution achieved precisely the result its framers sought: eliminating vast numbers of Black citizens from the rolls without unduly infringing the suffrage of whites, while also conforming to the letter, though certainly not the spirit, of the 15th Amendment. Recognizing the value of the system, white legislators and voters would work over the years to make the registration process even more stringent. The very

---

[24] *Ibid.,* pp. 39-46, 88-93. Montgomery's speech, was reported in the *Jackson Clarion Ledger*, September 16, 1890, and is also quoted in Kemper, *op. cit.,* pp. 87-88. On Joseph Davis and the experimental community at Davis Bend, see Janet Sharp Herman, *The Pursuit of a Dream* (University Press of Mississippi, 1999).

[25] https://www.mshistorynow.mdah.ms.gov/issue/mississippi-constitution-of-1890-as-originally-adopted.

[26] Quoted in Wharton, *op. cit.,* p. 214.

decentralization of the system put a nearly insuperable burden on the Justice Department attorneys who later sought to challenge it, requiring them to sue individual registrars on a county-by-county basis. But the heaviest burden fell on ordinary Black citizens, thousands of whom tried and failed to pass what by the 1960s had grown into a four-page written test – a literal game of twenty questions.

## 2.3    Other Impediments to Black Voting:  Poll Taxes and Criminal Disfranchisement

Probably the most notorious device included in the new constitution was the poll tax. According to Section 241, each would-be voter was required to supply written proof that he had paid all legal taxes for the previous two years, and moreover that he had done so "on or before the first day of February of the year in which he shall offer to vote" – before most taxes were otherwise due and long before any scheduled elections. The required taxes included (thanks to Section 243) a new "uniform poll tax" of two dollars per year, assessed – in theory – on every male inhabitant between the ages of twenty-one and sixty. The wisdom of introducing a tax that the framers expected, indeed hoped, would go mostly unpaid provoked some discussion, leading to the addition of a clause clarifying that "no criminal proceedings shall be allowed to enforce the collection of the poll tax." In short, the new levy was not designed to raise revenue but to restrict voting. As one delegate put it, "The very idea of a poll tax qualification is tantamount to the State of Mississippi saying to the negro: 'We will give you two dollars not to vote.'"[27]

Of all the elements of the so-called "Mississippi Plan," the poll tax was the one most quickly emulated by other states. In many of those states, including Alabama, Georgia, Louisiana, North Carolina, Oklahoma, and Virginia, it was supplemented by a "grandfather clause," effectively exempting white voters from having to pay it – a practice later disallowed by the U.S. Supreme Court in *Guinn v. United States* (1915). The Mississippi legislature did not adopt a grandfather clause, because it had no need to. In the course of litigating voting rights cases in the 1960s, Justice Department attorneys found abundant evidence of local registrars enforcing poll tax requirements in utterly arbitrary ways, often simply waiving the requirement for white registrants, even as they enforced it against Black registrants. (Several took the opposite course, refusing to allow Black people to pay the tax or, having collected it, to issue them the necessary receipts. In either case, the result was disqualification.)[28]

In designing the various impediments to suffrage, the constitution's framers exhibited a keen understanding of the brute realities of Black Mississippi life. Two dollars was an enormous sum of money to people struggling to feed and clothe their children. Preserving written records over multiple years while living in overcrowded, ill-furnished cabins and shacks was no simple task. Long residency requirements – two years in the state and one year in the specific election district – targeted tenants and sharecroppers, who routinely moved from farm to farm in search of better land and less exploitative landlords. The very act of walking into a county courthouse and announcing one's desire to register was, in the context of Jim Crow Mississippi, a provocative, potentially fatal act.

---

[27] *Jackson Clarion Ledger*, September 12, 1890, also quoted in Kemper, *op. cit.*, p. 72.

[28] *Guinn v. United States*, 238 U.S. 347 (1915).

The framers evinced similar understanding in the manner in which they expanded the catalogue of crimes warranting disfranchisement. While the 1817 and 1831 constitutions both included disfranchisement provisions, the crimes they listed – "bribery, perjury, forgery or other high crimes or misdemeanors" – were offenses associated with white men (who were, after all, the only people eligible to vote). In drafting the new constitution, delegates deliberately supplemented this list of "robust" (i.e. white) crimes with the more "furtive" offenses associated with the Black poor. The new roster, found in Section 241, added not only burglary, but also bigamy (an easy charge to bring, given the uncertain status of "marriages" contracted during slavery), theft, arson, and the catch-all crime of "obtaining money or goods under false pretenses." The purpose of these additions was candidly, if paternalistically, acknowledged by the Mississippi Supreme Court six years later in *Ratliff v. Beale*: "Restrained by the Federal Constitution from discriminating against the negro race, the Convention discriminated against its characteristics and the offenses to which its weaker members were prone."[29]

## 2.4    An "Impregnable Barrier":  Apportioning the Legislature, Executive, and Judiciary

The framers added provisions to ensure that, even if Black voters somehow managed to cast ballots, they would still be unable to elect candidates of their choice. Probably the best example is to be found in Article 13 on Apportionment. Rather than basing representation on population, as the previous constitution had done, the 1890 constitution simply stipulated how many senators and representatives each county could send to the legislature. The allocations were clearly designed to enhance the power of white-majority counties at the expense of Black-majority counties, as was the decision to create thirteen new districts in white-majority areas. (A 1906 amendment to Article 13 tilted the balance even further toward white areas.) This racially skewed system of apportionment applied also to the Executive branch, whose officers were chosen not simply by popular vote but also through a kind of county-based electoral college, in which the winning candidate was required to obtain both a majority of the popular vote and a majority of electors from the "several counties." (The system was finally eliminated by referendum in 2020.)[30]

The constitution did include a provision for decennial re-apportionment, but the process was not state wide. Instead, framers divided counties into three groups, basically two sets of white-majority counties and one set of Black, allowing re-apportionment within but not between the groups, which retained relative shares of total representation, regardless of population. Thus was the control of white counties over the Legislative and Executive branches secured in perpetuity, even in the event that significant numbers of Black people found their way on to the voting rolls. As one of the delegate who drafted Article 13 put it, "The design of the legislative apportionment,

---

[29] *Ratliff v. Beale*, 74 Miss. 247, 266, 20 So. 865, 868 (1896). For the provisions in earlier constitutions, see https://mshistorynow.mdah.ms.gov/issue/mississippi-constitution-of-1817 and https://www.mshistorynow.mdah.ms.gov/issue/mississippi-constitution-of-1832.

[30] See Albert D. Kirwan, Apportionment in the Mississippi Constitution of 1890, *Journal of Southern History* 14, 2 (1948), pp. 234-246. See also Pratt, *op. cit.*

with its electoral supplement, was to erect an impregnable barrier to any possible organization of the negro majority, by extraneous force or internal faction, for political dominance."[31]

The racially discriminatory design of the state's Legislative and Executive branches also had profound, if less obvious, implications for the Judicial branch. Under the new constitution, all judges, from county and chancery courts right up to the state Supreme Court, were to be appointed by the Governor, with the advice and consent of the Senate. The choice of an appointive judiciary, which emerged out of the convention's Judiciary Committee, represented a rare defeat for the white-majority counties, which had strongly supported judicial elections, but it was hardly a victory for Black Mississippians. With white-majority counties exerting effective control over legislative and gubernatorial elections, there was zero chance of judges sympathetic to Black equality (let alone of judges who were themselves Black) being appointed to the state bench.

Those were the short-term consequences. But there were long-term consequences as well, which would only become fully apparent with passage of the Voting Rights Act. Having made the decision for an appointive judiciary, delegates had little reason to trouble over the drawing of judicial districts, since Governors would simply pick their preferred candidates anyway. The constitution they wrote, which went on for page after page on the subject of legislative districting and apportionment, said almost nothing about Supreme Court districts, simply instructing the legislature to divide the state into three districts, which the legislature proceeded to do, using the East-West lines that had prevailed previously and that still prevail today. But what was a seemingly unimportant decision in 1890 became significant later, first in 1914, when voters, fueled by another upsurge of poor-white insurgency, amended the constitution to make judges, including Supreme Court Justices, elected rather than appointed; and then again in 1965, when Black Mississippians finally recovered their long-denied right to vote. Given that the lion's share of the state's Black citizens lived – and still live today – in a relatively small number of counties in the western third of the state, the effect of the East-West alignment perpetuated in the 1890 constitution was to disperse a highly concentrated Black population into three different Supreme Court districts. The persistence of that alignment today means that all nine Supreme Court justices are elected from white-majority districts.

So thoroughgoing and systematic was the defense of white supremacy in the 1890 constitution that some delegates worried that they had gone too far. Most did so on strategic grounds, warning (incorrectly, as it turned out) that some of the devices resorted to were so patently unconstitutional that the U.S. Supreme Court would immediately disallow them. A few objected on principle, arguing that the near total exclusion of Black people from the voting rolls was excessive and unfair. But most were proud of their handiwork. In a florid speech on the convention's final day, Judge Sol Calhoon, who had presided over the deliberations, praised his colleagues for saving Mississippi from the "animal savagery" and "universal ruin" of Negro rule. In the final vote (unlike the 1868 state constitution, the 1890 constitution was not submitted to voters for ratification but simply approved and promulgated by the delegates themselves), only seven delegates voted nay, all Hill Country representatives who had sought even more severe

---

[31] J.S. McNeilly, "History of the Measures Submitted to the Committee on Elective Franchise, Apportionment, and Election in the Constitutional Convention of 1890," in Reilly, *op. cit.*, p. 133-135.

checks on the electoral power of Black-majority counties. Only four ultimately refused to sign the document.[32]

### 3. THE AGE OF JIM CROW

#### 3.1 Implementing the New Constitution

In 1897, a new organization, the Mississippi Historical Society, was chartered in Jackson. In the years that followed, the Society published a series of annual "Proceedings," purporting to offer a definitive history of the state, from its territorial days, through secession and the Civil War, the "mongrel" days of Reconstruction and the triumph of "Redemption," all culminating with the creation of the new constitution. Among the selections was a 1902 address by J.S. McNeilly, who had served as a member of the convention's Committee on Elective Franchise, Apportionment, and Elections. Looking back on his experience, McNeilly expressed satisfaction. While solving "the negro problem" remained "beyond governmental or mortal power," delegates had "drawn as much of the blood poison as possible." The suffrage restrictions they devised were operating "as they were intended to do, reduc[ing] negro majorities to a negligible political quantity." The conditions of the Mississippi Readmission Act had been effectively nullified, and the guarantees of the 15th Amendment ("that evil heritage of war, a veritable Pandora's box to the South") had been skirted. The Republican "Elections Bill" of 1890, which had hovered over the convention, had been filibustered to death, and prospects of "further imposition of the Federal Power into Southern political affairs" were remote. Through statesmanship and principled compromise, delegates had bridged the chronic division between white-majority and Black-majority counties and brought "rest to the plantations," where "the masses of the Sons of Ham" once again labored contentedly, untroubled by the "distractions" of electoral matters they did not understand. These achievements, McNeilly conceded, had come at some cost to public morality and democratic values. The "extraordinary control … over the registration and qualification of voters" invested in local registrars particularly troubled him, being "a facility of oligarchy" rather than of "representative government." But a "desiccated" democracy was better than a "diseased" one, and anything was better than "the monstrosity of an unrestricted negro suffrage."[33]

One can abjure McNeilly's racial sentiments, but it is hard to quarrel with his conclusion. The constitution had produced precisely the settlement its framers envisioned. While some white Mississippians fell afoul of the new franchise qualifications, the vast majority had no trouble registering. By 1896, five years after the state-wide re-registration process began, the number of white voters on the rolls had rebounded almost to its previous level, and it would go nowhere but up thereafter. The number of Black voters on the rolls, in contrast, had plummeted by more than 90%. Perhaps most important, the new constitutional dispensation had received the imprimatur of the U.S. Supreme Court in *Williams v. Mississippi* (1898), a case involving a 14th Amendment equal protection claim by a Black man indicted and convicted for murder by all-white grand and petit juries. Because juror pools were drawn from county voting rolls, the case implicated the new franchise restrictions, providing a test case for the new constitution. The Court concluded: "The constitution of Mississippi and its statutes do not on their face discriminate between the races, and

---

[32] Pratt, *op. cit.*, pp. 142-143.

[33] McNeilly, *op. cit.*

it has not been shown that their actual administration was evil; only that evil was possible under them."[34]

## 3.2    Securing the Racial Order:  White Primaries and the Politics of Demagoguery

Even as McNeilly delivered his address, assuring his fellows that white supremacy was "lawful, complete, and secure," the state legislature was busy creating additional bulwarks. Perhaps the most enduring was the "dual registration" system, which required would-be voters to register twice, once for federal elections and a second time for state and local elections, doubling their peril.  The system persisted for nearly a century, until 1987, when it was finally struck down by the federal district court.  (As we shall see, the state tried reintroducing dual registration a few years later its abolition, in response to passage of the 1993 National Voter Registration Act, but it was struck down again, this time by the Department of Justice.)

The introduction of so-called "white primaries" played an even more important role in reinforcing the racist regime, not only in Mississippi but across the South.  The trailblazer in this case was South Carolina, which introduced its white primary in 1896.  Over the next decade, seven other southern states adopted the device, including Mississippi, which replaced the previous system of party nominating conventions with primary elections in 1902.  While the immediate debate in Mississippi centered, as always, on the balance of power between white-majority counties and the Black Belt counties (which had long dominated nominating conventions), the introduction of whites-only party primaries effectively completed the process of Black disfranchisement.  In what was for all purposes a one-party state, in which the winner of the Democratic primary invariably prevailed in the general election, even those few African Americans who remained on the rolls would have no opportunity to vote for candidates of their choice.  Like other disfranchising devices, white primaries faced challenges on both Fourteenth and Fifteenth Amendment grounds, challenges that reached the Supreme Court in 1927, 1932 and, most famously, in the 1935 case of *Grovey v. Townsend*, in which the court unanimously allowed them so long as the racial exclusion was enacted by the party (a "private" entity) rather than the state.  Only in 1944, in *Smith v. Allwright*, did the court declare white primaries unconstitutional.[35]

Notwithstanding the complete exclusion of Black Mississippians from the political process, generations of demagogic politicians would use the specter of "Negro supremacy" to rally voters and justify ever more draconian restrictions on Black life.  James K. Vardaman, who served as Governor of Mississippi from 1904 to 1908 and later represented the state in the U.S. Senate, was a past master of the technique.  By apt coincidence, Vardaman first won state office in the election of November 1890, held just three days after the adoption of the new constitution – a constitution written, in his words, "for no other purpose than to eliminate the n****r from politics. Not the 'ignorant and vicious,' as some of the apologists would have you believe, but the n****r."  The problem, for Vardaman, was that the framers had not gone far enough, providing only a "temporary expedient" rather than a final solution to the problem.  Over the course of his long career, Vardaman would propose a variety of more extreme remedies, including abolishing the

---

[34] *Williams v. Mississippi*, 170 U.S. 213 (1898).

[35] *Nixon v. Herndon*, 273 U.S. 536 (1927); *Nixon v. Condon*, 286 U.S. 73 (1932); *Grovey v. Townsend*, 295 U.S. 45 (1935); *Smith v. Allwright*, 321 U.S. 649 (1944).

15th Amendment and revising the 14th Amendment explicitly to exclude Black people from the equal protection clause. In the meantime, he advocated closing all Black schools in the state, in order to ensure that no Black Mississippian would ever be able to pass the literacy test. Educating a Black person was a waste in any case, he declared, serving only to "spoil a good field hand" or "make an insolent cook."[36]

It is difficult, in retrospect, to grasp just how effective Mississippi's system of racial disfranchisement was, Vardaman's dire warnings to the contrary. Historians today routinely note that only 6.7% of eligible Black Mississippians were on the voting rolls prior to the enactment of the Voting Rights Act, often contrasting that figure with the corresponding statistics from other Deep South states, including Georgia (27.4%), Alabama (19.3%), and Louisiana (31.6). Yet the 6.7% measure actually exaggerates the extent of Black voting in the state during the Jim Crow era, reflecting as it does the effects of twenty years of courageous voting rights activism by Black Mississippians. Registration rates previously were much, much lower. Precise statistics are difficult to obtain, in part because of the state's studied refusal to compile them, but scholarly surveys conducted at the end of World War II suggest that something between 2,000 and 2,500 African Americans were on the voting rolls. Given a voting-age Black population of half a million (497,354, according to the 1940 census), those figures suggest a registration rate of between 0.4% and 0.5%. Entire counties, including some with large Black majorities, had zero Black voters. (Panola County, where the Justice Department filed one of its first voting rights suits in 1961, had exactly one Black voter at the time, 92-year-old R.H. Hightower, who had been on the rolls since 1892.)[37]

### 3.3    Counting the Costs of Disfranchisement

In denying Black Mississippians the right to vote, authorities were not merely excluding them from a cherished civic rite, though they were certainly doing that. They were exposing them to exploitation, deprivation, and violent cruelty. As late as 1960, 83% of Black families in the state lived below the federal poverty line, which was then about $3,000 for a family of four. A majority lived on less than half that. 77% of Black Mississippians lived in dwellings without bathtubs or showers. Less than half of Black adults had completed elementary school, and only 8% had finished high school. Per capita funding for Black education varied from about one-fifth to one-fifteenth of funding for white education, and much of the money that was allocated was misappropriated by local officials. (A 1934 survey found that, in the case of a half dozen Delta counties, only 36% of the funds appropriated for Black education were actually spent.) Professional opportunities were vanishingly rare. In 1890, when the new constitution was

---

[36] For Vardaman on the 1890 constitution, see McMillen, *op. cit.*, p. 43. For Vardaman on Black education, see Calvin McLeod Logue and Howard Dorgan (eds.), *The Oratory of Southern Demagogues* (Baton Rouge, Louisiana State University Press, 1981).

[37] For estimates of postwar registration rates, see Earl M. Lewis, "The Negro Voter in Mississippi," Journal of Negro Education 26, 3 (1957); Luther P. Jackson, "Race and Suffrage in the South Since 1940," New South (June-July, 1948); and Alexander Heard, A Two-Party South? (Chapel Hill: University of North Carolina Press, 1952). For the story of R.H. Hightower, Panola County's sole Black registered voter, see *United States v. Duke*, 332 F.2d 759, 760 (5th Cir. 1964).

promulgated, there were six Black practicing lawyers in Mississippi. In 1960, seventy years later, there were just four.[38]

The consequences of political powerlessness were registered particularly dramatically in the realm of public health. In a state with far and away the highest child mortality rates in the nation, Black children were twice as likely as white children to die before the age of one, and four to five times more likely to die before the age of five. Malnutrition was chronic. A survey of 500 families in Washington and Sunflower counties found that over sixty percent of Black residents were consuming less than two-thirds of the recommended minimum daily caloric requirement. Last but not least, Black Mississippians were vastly more likely to be victims of violence, not only of routine assaults and "whippings" by employers, law enforcement officers, and others, but also of lynching. According to the most recent accounting, Mississippi played host to at least 656 lynchings in the years between 1877 and 1950, more than any other state. (Recent scholarship suggests that legacies of violence can hinder political participation just as poor health does: A 2022 study in the journal of the American Economic Association found that "Blacks who reside in southern counties that experienced a relatively higher number of historical lynchings" in the years between 1882 and 1930 have significantly lower voter registration rates to this day.)[39]

Stripped of the defense of the ballot, African Americans had little or no recourse, save perhaps leaving the state, which was the path chosen by some 400,000 Black Mississippians in the half century between 1915 and 1965. Though Black people represented a majority or near majority of Mississippians for most of the period, there were literally no Black officials in the state, elected or appointed, save for the mayor and town council of the all-black community of Mound Bayou. Everyone in a position of legal authority was white: the legislators who wrote laws and the governors who signed them; the county sheriffs and municipal police who enforced (and sometimes ignored) those laws; the judges who presided over criminal and civil cases, from the Supreme Court right down to local justices of the peace; the prosecutors who brought cases and the jurors who rendered verdicts; the county supervisors who controlled public works contracts (and customarily controlled jury pools within their beats); the agricultural stabilization boards that allocated planting acreage and doled out federal crop subsidies; the officials who distributed funds under the G.I. Bill (U.S. Representative John Rankin of Itawamba County, who chaired the

---

[38] On Black life in the Delta, see James C. Cobb, *The Most Southern Place on Earth: The Mississippi Delta and the Roots of Regional Identity* (New York: Oxford University Press, 1992). See also Frank R. Parker, *Black Votes Count: Political Empowerment in Mississippi After 1965* (Chapel Hill: University of North Carolina Press, 1990), pp. 19-21; McMillen, *op. cit.*, pp. 74-77; and Wharton, *op. cit.*, p. 129.

[39] On health, "Statement of Cyril A. Walwyn, MD, Medical Adviser to Friends of the Children of Mississippi, Yazoo City, Miss.," *in Hunger and Malnutrition in America: Hearings before the Subcommittee on Employment, Manpower, and Poverty of the Committee on Labor and Public Welfare, United States Senate, Ninetieth Congress, first session on hunger and malnutrition in America, July 11 and 12, 1967* (Washington: Government Printing Office, 1967). See also Walter Rugaber, "In the Delta, Poverty is a Way of Life," *New York Times*, July 31, 1967. The most reliable figures on lynching are those produced by the Equal Justice Initiative. For an interactive county-by-county map, see https://lynchinginamerica.eji.org/explore. On lynching and voter participation, see Jhacova Williams, "Historical Lynchings and the Contemporary Behavior of Blacks," *American Economic Journal: Applied Economics* 14, 3 (2022).

committee that drafted the bill, made certain to invest disbursement power in local rather than federal authorities); the entire panoply of local officials, including mayors and boards of aldermen, county attorneys, circuit clerks, constables, coroners, and, of course, the county voting registrars who guarded the ballot box. It is hard to think of any other purportedly democratic society in history in which a majority population was so thoroughly dispossessed of political rights.

## 4. THE CIVIL RIGHTS ERA

### 4.1 Changing Relations of State and Nation: The Impact of World War II

The political struggle that would transform Mississippi in the Civil Rights era was presaged by an unlikely encounter in 1934 in the small town of Decatur. Theodore Bilbo, the state's flamboyantly racist former governor, was campaigning for a seat in the U.S. Senate. Delivering his standard stump speech on the courthouse square (his policy prescriptions included deporting Black people to Africa), Bilbo spied two Black children on the outskirts of the crowd. If white Mississippians relaxed their vigilance, he warned, "we will live to see the day when those two n****r boys right there will be asking for everything that is ours by right." The children were Charles and Medgar Evers, twelve and nine years old at the time, and Theodore Bilbo was precisely correct.[40]

Though most Americans today think of Civil Rights as a product of "the Sixties," the roots of the Mississippi voting rights movement reach back far longer. The Second World War represented a critical watershed. The task of mobilizing a nation for war – and the exigencies of waging war against an avowedly racist enemy like Nazi Germany – inevitably threw questions of domestic race relations into sharp relief. To take just one example: in June, 1941, President Franklin Roosevelt, anxious to head off a planned 'March on Washington' by African American protesters, signed Executive Order 8802, banning race-based employment discrimination in government and defense industries. Though maligned and resisted (including in the shipyards of the Mississippi Gulf Coast), Roosevelt's order, and the Fair Employment Practices Commission (F.E.P.C.) established to enforce it, signaled a sea change in the federal government's *laissez faire* attitude to the racial practices of the Jim Crow South. The Supreme Court's 1944 decision on white primaries in *Smith v. Allwright* was, from the perspective of white Southerners, an even more ominous development, not only because it removed a major prop in the disfranchisement regime, but also because of what it revealed about the changing temper of the court. (The eight justices in the majority had all been appointed by Roosevelt between 1937 and 1944, while the lone dissenter was also the sole holdover from the court that had unanimously permitted white primaries in 1935.)[41]

---

[40] Myrlie Evers, Medgar's widow, told the story in her memoir, *For Us, the Living* (New York: Doubleday, 1967), p. 17. Charles Evers also told the story in the oral history he provided for Robert Penn Warren's 1965 book, *Who Speaks for the Negro?* For the original recording, see https://whospeaks.library.vanderbilt.edu/.

[41] On resistance to the Fair Employment Practices Committee, see Keith M. Finley, *Delaying the Dream: Southern Senators and the Fight Against Civil Rights, 1938-1965* (Baton Rouge: Louisiana State University Press, 2008); and Daniel Kryder, *Divided Arsenal: Race and the American State During World*

Southern hopes of a return to the *status quo antebellum* were quickly dashed. Roosevelt's successor, Harry Truman, was hardly free of racial prejudice, as numerous historians have shown, but he took steps as president that would have been inconceivable before the war. In 1946, he appointed a President's Committee on Civil Rights, charging it to examine the status of civil rights in the nation and recommend ways they might be safeguarded and extended. The committee's report, entitled *To Secure These Rights*, contained a host of proposals anathema to the White South, including re-authorizing the F.E.P.C. (which Southern Democrats in Congress had succeeded in de-funding), abolishing segregation in the U.S. Armed Forces, enacting a federal anti-lynching statute, and eliminating the poll tax and other impediments to the right to vote. Truman acted on only some of the recommendations, but he did enough to outrage white Southerners, who abandoned their traditional political home and decamped *en masse* for the newly created State's Rights or "Dixiecrat" Party. "You won't be elected dogcatcher in 1948," one southern minister promised the President. In the election, the Dixiecrat ticket of Strom Thurmond and Mississippian Fielding Wright carried four traditionally Democratic southern states, including Mississippi, where it garnered 87.2% of the popular (white) vote. These defections, however, were offset by surging Democratic turnout in the North, especially among African American voters, and Truman was re-elected.[42]

## 4.2    The Birth of a Voting Rights Movement

Even as they faced new challenges from Washington, Mississippi authorities confronted an unexpected new challenge at home: a revived Black voting rights movement. Though they were quick to blame the New York-based National Association for the Advancement of Colored People (N.A.A.C.P.), the movement was spearheaded by local people, including a cadre of returning Black veterans, who, having fought for freedom and democracy abroad, were determined to claim them at home. In early 1946, an organization calling itself the Mississippi Progressive Voters' League announced a campaign to qualify Black voters to participate in the Democratic Party primary of July, 1946 – an election that featured the notorious Theodore Bilbo, who was seeking a third term in the U.S. Senate. The campaign was obviously enabled by the recent Supreme Court ban on white primaries, but it was also made possible by a recent act of the Mississippi legislature, which, in order to ensure that returning white soldiers were not turned away at the polls, had temporarily waived poll taxes for servicemen. The door to the ballot box had cracked open, and Black Mississippians were determined to push through.[43]

Studies from the time suggest that perhaps 2,500 Black Mississippians succeeded in registering as a result of the League's campaign – a paltry figure in the context of half a million eligible voters, but one that virtually doubled the total number of African Americans on the rolls. The campaign was significant enough to garner the attention of the national press, including the *New York Times*, which wrote: "For the first time, Negroes are preparing to vote in numbers in a

---

*War II* (New York: Cambridge University Press, 2001). On *Grovey v. Townsend* and *Smith v. Allwright*, see above.

[42] *To Secure These Rights: The Report of the President's Committee on Civil Rights* (Washington: Government Printing Office, 1947). On Thurmond and the Dixiecrats, see Joseph Crespino, *Strom Thurmond's America* (New York: Hill and Wang, 2012).

[43] On the Progressive Voters' League, see Lewis, *op. cit.*

Mississippi Democratic primary to nominate a United States Senator." Inevitably, the campaign also attracted the attention of Senator Bilbo, eliciting a menacing response. "I'm calling on every red-blooded American who believes in the superiority and integrity of the white race to get out and see that no n****rs vote," the Senator told his supporters. He added: "And the best time to do it is the night before."[44]

Some clearly took the suggestion to heart. Though Bilbo won another term, the election was so marred by violence and intimidation that the Senate dispatched an investigating committee to Mississippi to conduct hearings to determine whether he should be allowed to take his seat. In the end, Bilbo escaped censure (the committee's majority of three Senators, all Southern Democrats, concluded that he was guilty of no "illegality or impropriety other than in certain cases departure from ordinarily accepted good taste as some view it"), but committee Republicans took the unusual step of filing a minority report, documenting countless irregularities: registrars who "outright refused" to register qualified African Americans; armed mobs patrolling polling places; Black voters "beaten up by whites" or "prevented from placing their ballots in the ballot box." Though not mentioned in the report, Medgar Evers, just turned twenty-one years old and back from military service in Europe, was one of those prevented from voting. Arriving at the courthouse in Decatur with his brother Charles and four other veterans, he was turned back by a mob of white men armed with rifles and shotguns – a mob that included men the Evers brothers had hunted and fished with growing up.[45]

The 1946 election was at once a throwback to the violent days of "Redemption" and a harbinger of the violent days to come. But if Bilbo and his supporters imagined that their show of strength would dissuade Black Mississippians from demanding their constitutional right to vote, they were disappointed. The Progressive Voters League campaign continued to operate into the 1950s, supported by the N.A.A.C.P. and a new Delta-based organization called the Regional Council of Negro Leadership (R.C.N.L.), headquartered in the all-Black town of Mound Bayou. Founded by a Black physician and businessman named T.R.M. Howard, the R.C.N.L. demanded not only an end to segregation (one of its first campaigns was "Don't Buy Gas Where You Can't Use the Restroom") but also an end to disfranchisement. Progress was slow and harrowing, but registrations increased. A 1952 study by scholars at Mississippi State College counted over 19,000 Black Mississippians on the voting rolls, though only about a third of them had managed to cast ballots in the 1951 state elections. A 1954 study, commissioned by Attorney General James P. Coleman, counted more than 22,000 Black voters, though a majority were apparently in arrears on their poll taxes. Again, the figure seems modest – still only about 4% of the eligible pool – but it represented a ten-fold increase from a decade before.[46]

---

[44] Quoted in Lewis, *op. cit.*, p. 32; *New York Times*, June 6, 1946.

[45] Evers, *op. cit.*, pp. 26-27; Lewis, *op. cit.*, pp. 331-335.

[46] William Buchanon, The Mississippi Electorate (State College: Social Science Research Center, 1953). On the R.C.N.L., see David Beito and Linda Royster Beito, *Black Maverick: T.R.M. Howard's Fight for Civil Rights and Economic Power* (Urbana: University of Illinois Press, 2009).

### 4.3    White Reaction:  New Restrictions on Black Voting

Detecting a new challenge to white supremacy, state leaders responded as their predecessors had, introducing still more devices to harass and hamstring would-be Black voters. Step one was to restore the white primary by other means.  In 1947, the Mississippi State Legislature enacted a statute requiring party primary voters to take an oath affirming their sincere support for the "principles" of the party in question.  The "principles" of the Mississippi Democratic Party, which the state executive committee immediately released in writing, included opposition to the F.E.P.C., poll tax reform, and anti-lynching legislation, as well as opposition to any organization that challenged the "cherished traditions of the South."  New elements were grafted onto the law in the years that followed.  The period of agreement with party principles was extended to two years, akin to the rule on poll tax payments.  Primary voters were required to swear to vote for the party's nominees in the general election (a singularly ironic requirement, given white Democrats' recent defection to the Dixiecrats).  The legislature also enacted a provision permitting any party member to challenge the *bona fides* of any other.  Voters thus challenged were required to submit, in public and under oath, oral and written statements confirming their support for party principles.  Their votes remained uncounted, pending adjudication by local party officials.[47]

State authorities endeavored to raise the bar on general elections as well.  In 1952, the legislature submitted to the voters an amendment to the franchise provisions of the state constitution, designed to make the already stringent registration process even more exacting.  Would-be voters would now face a written test, which required them to copy down, letter perfect, a section of the constitution, unassisted and in their own hands, and to provide, also in writing, a "reasonable interpretation" of its meaning.  In effect, the "understanding" and "interpretation" clauses, initially introduced as alternative means of qualification for illiterate White registrants, now became additional requirements for Black registrants, with a new writing requirement thrown in as well.  Would-be voters were also asked to provide, again in writing, a statement providing their understanding of the obligations of citizenship in a republican society.  Determining whether candidates passed or failed the test remained the prerogative of individual county registrars, who also got to decide what sections of the constitution to assign to individuals.  In *U.S. v. Duke*, one of the first federal voting rights lawsuits brought by the Department of Justice in the 1960s, the court found that Black applicants were routinely given the most abstruse sections to copy and interpret – a provision on the status of "recognizances, bonds, obligations, and all other instruments" contracted before 1890, for example, or on interest disbursements from the Chickasaw School Fund – while white applicants were given straightforward sections (or simply allowed to register with no examination at all).  Registrars were also forbidden from informing failed applicants what they had done wrong, on the grounds that such information constituted illegal "help."[48]

To the surprise of legislators, the proposed amendment was initially rejected by the state's white voters, many of whom clearly worried that the new restrictions would be used against them. But when the legislature submitted a nearly identical amendment two years later, it passed

---

[47] On the list of party "principles," see Lewis, *op. cit.*, p. 341.

[48] *United States v. Duke*, 332 F.2d 759, 764 & n.9 (5th Cir. 1964).

overwhelmingly. The reason for the change was clear. In May, 1954, the U.S. Supreme Court had handed down its decision in the *Brown v. Board of Education* case, igniting a furious reaction across the white South. U.S. Senator James O. Eastland, soon to ascend to the chair of the Senate Judiciary Committee, decried the Court's ruling as a "monstrous crime," part of a Communist plot to destroy "our Republican form of government" and ensure "the mongrelization of the white race." "You are not required to obey any court which passes out such a ruling," Eastland declared. "In fact, you are obligated to defy it." Eastland's Sunflower County became the seedbed of a new organization, the White Citizens Council, which pledged to do precisely that. By the end of 1955, the Council boasted chapters all over the South, but its heartland was Mississippi, where it claimed over 100,000 members.[49]

The 1954 franchise restriction referendum provided the Council with an opportunity to flex its political muscles and it did exactly that, exhorting Mississippians not only to ratify the proposed amendment but also to do everything in their power to "discourage" Black voting, including punishing white candidates who campaigned for Black votes. In the vote in November, 83% of Mississippi voters approved the "reforms" they had rejected only two years before. The margin in counties with large Council chapters was still higher. Significantly, the state legislature, in passing enabling legislation for the new requirements, elected to make them retrospective, compelling recently enrolled voters to re-register under the new rules. In theory, the requirement pertained only to those who had registered after January 1, 1954, but some counties clearly used it as an excuse to purge Black voters who had registered long before. According to a complaint brought by the N.A.A.C.P., officials in Jefferson Davis County used the occasion to purge all but 65 of the county's 1,221 Black voters from the rolls.[50]

The years that followed would see a long train of such "reforms," all intended to reinforce the no longer "impregnable" barrier between Black Mississippians and the ballot box. Before 1955, the legislature not only permitted but actually required county registrars to set up satellite registration sites in all five supervisors' districts, thus making it easier for people living in remote areas to register. After 1955, registrars were prohibited from establishing such sites; individuals wishing to register were now required to appear in person at the courthouse during regular business hours, virtually ensuring exposure and inviting retaliation. Anticipating passage of the 1960 Civil Rights Bill, which required registrars to preserve voting records and make them available for inspection, the legislature passed a bill of its own, authorizing the destruction of such records, including the applications of failed registrants. Later that same year, voters approved another constitutional amendment, adding a "good character" requirement for all would-be voters (as determined, of course, by local registrars).[51]

---

[49] Neil R. McMillen, *The Citizen's Council: Organized Resistance to the Second Reconstruction, 1954-1964* (Urbana: University of Illinois Press, 1971). On Eastland, see Maarten Zwiers, *Senator James Eastland: Mississippi's Jim Crow Democrat* (Baton Rouge: Louisiana State University Press, 2015); and Chris Myers Asch, *The Senator and the Sharecropper: The Freedom Struggle of James O. Eastland and Fannie Lou Hamer* (New York: New Press, 2008); *Brown v. Bd. of Educ. of Topeka*, 347 U.S. 483 (1954).

[50] Lewis, *op. cit.*, pp. 339-344.

[51] All these laws and obstacles, both before and after 1965, as well as the endless litigation that was required to remove them post-Voting Rights era, are detailed in an exhaustive 2001 report by the United States Commission on Civil Rights. See USCCR, *Racial and Ethnic Tension in American Communities: Poverty,*

In 1962, the legislature adopted two more laws, both clearly designed to license violent intimidation of would-be voters. The first required the publication in local newspapers for two consecutive weeks of the names of anyone attempting to register to vote, a tactic employed, with similarly intimidatory intent, by "Redeemers" ninety years before. The second added an additional two week interval at the end of the notification period, during which time the qualifications and "good character" of any prospective registrant could be disputed by any other registered voter. Though modelled on the system already in use in party primaries, the new system was even more threatening, since challenges were to be adjudicated in public hearings before white tribunals.[52]

## 4.4    White Reaction:  Violence

Behind each and every one of these electoral "reforms" was a palpable threat of violence, and violence was not long in coming. In 1953, two Black Mississippians, the Rev. George Lee and Gus Courts, members of both the N.A.A.C.P. and R.C.N.L., launched a voters league in Humphreys County, a Black majority county in the Delta with the distinction of having zero registered voters among its more than 16,000 Black residents. More than four hundred local people agreed to pay their poll taxes, step one for getting onto the rolls. When the local sheriff refused to accept the payments, Lee and Courts sued to compel him to do so. Two years later, in early 1955, with the entire state of Mississippi in the throes of racial reaction, nearly a hundred Black citizens went together to the Humphreys County courthouse in Belzoni, poll tax receipts in hand, to register to vote. At least some succeeded, including Rev. Lee, who was, according to accounts from the time, the first African American to register in the county since the end of Reconstruction.[53]

The campaign in Humphreys County provoked a furious response, not only from the Citizens Council but also from elected officials and members of local law enforcement. Facing economic reprisals and threats of violence, some of the registrants withdrew their applications, but others, including Lee and Courts, refused to back down. In April, 1955, Lee was shot dead while driving near Belzoni. No one was ever prosecuted for the murder, which local officials dismissed as a traffic accident. (According to the county coroner, the shotgun pellets embedded in Lee's jaw were dental fillings knocked loose in the crash.) With Lee gone, Courts took up the reins of leadership, continuing to press for voting rights despite being told that "If you don't go down and get your name off the register, you are going to be next." In August, Courts and 22 other unfathomably brave people marched to the county courthouse intent on casting ballots in the Democratic primary. All were turned away, but simply attempting to vote was enough to seal Courts's fate. In November, he was shot outside a grocery store that he owned. Though seriously wounded, he somehow survived, notwithstanding the fact that the nearest hospital willing to admit him was eighty miles away. Again, no one was prosecuted for the crime.[54]

---

*Inequality, and Discrimination*, especially volume seven, chapter three, "Voting Rights and Political Representation in the Mississippi Delta," available at https://www.usccr.gov/files/pubs/msdelta/ch3.htm.

[52] *Ibid.*

[53] On Lee and Courts, see Charles M. Payne, I've Got the Light of Freedom: The Organizing Tradition and the Mississippi Freedom Struggle (Berkeley: University of California Press, 1995), pp. 36-51, *passim.*

[54] *Ibid.*

Lee and Courts were not alone. Another R.C.N.L. member, Lamar Smith, was shot dead in August on the steps of the Lincoln County Courthouse in Brookhaven, in front of dozens of witnesses, including the local sheriff. Smith had come to deliver absentee ballots for Black voters who sought to vote in a run-off race between two white county supervisor candidates, but hoped to do so without exposing themselves at the courthouse. Three men were arrested for the crime, but an all-white grand jury refused to return indictments.[55]

Black voting rights activists pressed for justice for their slain comrades. R.C.N.L. leaders T.R.M. Howard and Medgar Evers launched independent investigations into the killings (as well as into the slaying of fourteen-year-old Emmett Till, who was murdered two weeks after Smith), in a vain effort to provoke the interest of federal authorities. Howard, facing severe economic pressure and constant death threats, decided to leave Mississippi. In 1956, he resettled in Chicago, where he was joined a short time later by Gus Courts, who had finally despaired of ever being allowed to cast a ballot in his home state. (When the U.S. Commission on Civil Rights visited Mississippi in 1965, they found that there were once again zero registered Black voters in Humphreys County.) Medgar Evers refused to leave. In 1963, he too would fall to an assassin's bullet. Among the effects returned to his widow by the morgue was the poll tax receipt he kept in his wallet, stained with his blood.[56]

In February, 1957, both houses of the U.S. Congress convened hearings into the violent electoral irregularities in the state. Among the witnesses called by the Senate Judiciary Committee's Subcommittee on Constitutional Rights was Gus Courts, who described in painful detail his long, unsuccessful struggle to vote in his home state. At virtually the same time, a subcommittee of the House Judiciary Committee heard from J.P. Coleman, the former State Attorney General, who had recently ascended to the governorship. Coleman offered a very different account of recent events. Race relations in the state were "tranquil," he assured the Representatives, and reports of voter suppression were pure "fantasy." "There is no discrimination in Mississippi as to voting," he said. "Intimidation is often talked about, but it is a figment of the imagination." Elevated to the U.S. Court of Appeals for the Fifth Circuit in 1965, Coleman would later preside over the three judge panel that heard most of the federal voting rights cases brought against Mississippi officials after the passage of the Voting Rights Act.[57]

### 4.5    S.N.C.C. and the Birth of the Voter Education Project, 1961-1964

The struggle over Black voting rights in Mississippi would be joined anew in the early 1960s, with the arrival in Mississippi of the young activists of the Student Nonviolent Coordinating Committee (S.N.C.C.) A product of the lunch counter sit-in movement, which first erupted in Greensboro, North Carolina, in February, 1960, S.N.C.C. did not begin as a voting rights movement. It focused instead on desegregating public accommodations, using "direct action" tactics of the sort seen in the sit-ins and later the Freedom Rides. At the inaugural S.N.C.C.

---

[55] *Ibid.*

[56] Beito and Beito, *op. cit.*; Evers, *op. cit.* See also Myrlie Evers-Williams, The Autobiography of Medgar Evers: A Hero's Life and Legacy Revealed Through his Writings, Letters, and Speeches (New York: Basic Civitas, 2005).

[57] Lewis, *op. cit.*, pp. 344-345.

conference in April, Mississippi went unrepresented, chiefly because there had not yet been any sit-ins there. Hoping to see the state represented at the 1961 conference, Ella Baker, a former Director of Branches of the N.A.A.C.P. and something of a godmother to the student movement, dispatched a graduate student named Bob Moses to Mississippi, equipped with a list of contacts of older activists that she had met during the voting rights struggles of the 1940s and '50s. It was these older activists, individuals like Medgar Evers and Amzie Moore, an N.A.A.C.P. and R.C.N.L. veteran in Bolivar County, who persuaded Moses and his colleagues that the only way to achieve meaningful change in Mississippi was by breaking the white monopoly on voting.[58]

Many in the student movement were initially unenthusiastic about devoting energy to voting, which they saw as an "establishment" activity, lacking the élan and existential commitment of direct action. (Many were themselves still too young to vote.) The support that the idea of voter registration received from white liberals, including members of the Kennedy administration, only increased their doubts. After considerable debate, S.N.C.C. resolved to create two distinct wings, one of which would continue to engage in direct action, while the other focused on voter registration. The division did not last long, as S.N.C.C. fieldworkers quickly discovered that, in Mississippi, voting was a form of direct action, which absolutely meant putting one's life on the line.[59]

S.N.C.C.'s first beachhead was in Southwest Mississippi, in Pike and Amite counties, where Moses, armed with a modest grant from the Taconic Foundation and the tacit support of Robert Kennedy's Department of Justice, set up a small "Voter Education Project." The white response was swift and fierce. Just weeks after his arrival, Moses was savagely beaten while accompanying two would-be voters to the Amite County Courthouse in Liberty. His assailant, a cousin of the local sheriff, was acquitted by an all-white jury. In September, Herbert Lee, a local farmer and long-time N.A.A.C.P. member who had been one of the first to welcome Moses, was shot dead at a local cotton gin in front of multiple witnesses. The gunman, E.H. Hurst, who also happened to represent Amite County in the Mississippi House of Representatives, walked free after an all-white jury ruled the killing a "justifiable homicide." (When a Black witness, Louis Allen, came forward to dispute Hurst's version of events, he too was murdered.) Movement supporters faced arbitrary arrest and saw their homes and businesses shot up and bombed. In McComb, a group of Black high school students who walked out of school to protest the arrest of a classmate were not simply expelled but arrested and sentenced to jail, in some cases for six months. You "are like sheep being led to the slaughter," the judge declared in pronouncing

---

[58] SNCC has produced a voluminous historical literature, including not only scholarly works but also scores of memoirs. Veterans of the movement also maintain an active web presence at www.crmvet.org For an introduction to the organization, see, inter alia, Clayborne Carson, *In Struggle: SNCC and the Black Awakening of the 1960s* (Cambridge: Harvard University Press, 1981); John Dittmer, *Local People: The Struggle for Civil Rights in Mississippi* (Urbana: University of Illinois Press, 1994); Wesley C. Hogan, *Many Minds, One Heart: SNCC's Dream for a New America* (Chapel Hill: University of North Carolina Press, 2007); and Payne, *op. cit.*

[59] Carson, *op. cit.*

sentence. "If you continue to follow the advice of outside agitators, you will be like sheep and be slaughtered."[60]

Unwilling to endanger the lives of local people any further, S.N.C.C. abandoned Pike and Amite counties and relocated its voting rights headquarters to the Delta. The move brought no respite in the violence. A car carrying Moses and other S.N.C.C. organizers was sprayed with machine gun fire. No one died, but one fieldworker, Jimmy Travis, was seriously injured. The organization's headquarters in Greenwood was attacked by a white mob. Movement supporters were fired from their jobs and saw their homes shot up by nightriders. Peaceful protesters were greeted with police dogs and truncheons. In Itta Bena, a voting rights workshop in a local church was sprayed with teargas. (The Itta Bena episode provoked yet another Justice Department lawsuit.) When violence failed to repel the movement, local authorities attempted to starve it out. In the winter of 1962-63, officials in Leflore County cut off a federal surplus commodities program upon which thousands of local people depended to survive.[61]

## 4.6    The 1964 Mississippi Summer Project

Facing a violent and intransigent foe, movement organizers conceived their most audacious project: the 1964 Mississippi Summer Project. Launched under the umbrella of C.O.F.O., the Congress of Federated Organizations, a union of S.N.C.C., the N.A.A.C.P, the Congress of Racial Equality, and Martin Luther King's Southern Christian Leadership Conference, the project brought some 800 student volunteers to the state to register voters and teach in so-called "Freedom Schools." The idea, simply put, was that if the people being assaulted and killed were white students from prestigious northern colleges rather than Black Mississippians, then the conscience of the nation might finally be roused. "There was a tremendous amount of violence in the state that was being ignored," one C.O.F.O. organizer later explained. "You had to bring the country's attention to the state, and the obvious way to do that is to bring the country's children down there."[62]

Events quickly proved the calculus. On June 21, 1964, the first day of "Freedom Summer," a trio of voting rights activists, Mickey Schwerner, James Chaney, and Andrew Goodman, were arrested in Neshoba County. Their bodies were recovered forty-four days later from an earthen dam outside the town of Philadelphia, just a few miles from the site of the Neshoba County Fair. The disappearance of "the three Civil Rights workers," two of them white New Yorkers, aroused the nation in ways that the murders of Black Mississippians had not. The Federal Bureau of Investigation, which had long refused to involve itself in crimes against Civil Rights workers, committed more than 150 agents to the case. Network news programs reported nightly on developments in "Bloody Neshoba." But the murders were only one episode in a very violent

---

[60] Payne, *op. cit.*, pp. 111-131. For the judge's comment, see Student Nonviolent Coordinating Committee, *Mississippi: A Chronology of Violence and Intimidation in Mississippi Since 1961* (Atlanta: SNCC, 1964), p. 6, available at https://www.crmvet.org/docs/sncc_ms_violence.pdf.

[61] Dittmer, *op. cit.*

[62] Interview with Charles E. Cobb, Jr., October 21, 1996, Center for Oral History and Cultural Heritage, University of Southern Mississippi, p. 16.

summer, which saw over a thousand arrests, more than 80 violent assaults, three dozen church burnings, and the killing of at least three other young men.[63]

The story of the voting rights struggle in Mississippi in the early 1960s is a tale of boundless determination and courage. Yet the movement did not produce substantial change in the racial composition of the Mississippi voting rolls. In Leflore County, for example, the Black registration rate was 1.98% when S.N.C.C. arrived in 1962; of the 13,567 voting-age African Americans in the county, just 268 were on the rolls. Eighteen months later, that number had grown by exactly 13, to 281. (According to data assembled as part of one of the Justice Department's voting rights lawsuits, 681 Black citizens applied to vote in Leflore County in the three month period between March and June, 1963, of whom only eight were registered.) State-wide, only about 4,000 Black Mississippians had been added to the rolls by the end of 1963, despite two and a half years of intense organizing. Even Freedom Summer barely made a dent. Over the course of the summer, about 17,000 Black Mississippians went down to local courthouses and submitted applications, often risking their lives to do so, but fewer than 10% of them – about 1,600 people in all – were added to the rolls. By the time the Voting Rights Act was passed a year later, the total number of registered Black voters in Mississippi was just over 30,000, less than 7% percent of the eligible pool.[64]

## 5.    NULLIFYING THE VOTING RIGHTS ACT

### 5.1    From Denial to Dilution

In the end, the restoration of voting rights to Black Mississippians did not come as the result of a grass roots registration campaign, at least not simply so. Nor did it come through any change of heart on the part of Mississippi authorities. It came in exactly the way the framers of the 1890 Constitution had feared and sought to forestall: through "imposition of the Federal power." The Civil Rights Acts of 1957, 1960, and 1964 all included voting provisions, but ultimately it was the 1965 Voting Rights Act that made the difference. In the two years following the Act's enactment in August, 1965, some 230,000 Black Mississippians joined the rolls, nearly eight times the number registered previously. Many were enrolled by federal registrars, who were deployed in 23 of the state's counties – counties distinguished by particularly low registration rates or particularly recalcitrant registrars. The rate of growth inevitably slowed thereafter, but over the next decade another 100,000 or so Black Mississippians joined the rolls, producing a registration rate of about 64%. That rate, it should be noted, was dramatically lower than the figure for white Mississippians, which in 1980 actually stood at 102.2% of the eligible population, thanks to the state's traditionally casual attitude toward purging out-of-date registrations. (That attitude has changed radically in recent years.) But with nearly two out of three eligible Black voters now on

---

[63] The Neshoba murders have been recounted in dozens of books and no fewer than four Hollywood movies. The most reliable account is Seth Cagin and Philip Dray, *We Are Not Afraid: The Story of Goodman, Schwerner, and Chaney and the Civil Rights Campaign for Mississippi* (New York: Macmillan, 1988).

[64] Parker, *op. cit.*, pp. 15-17, 25.

the rolls, Mississippi had the highest Black registration rate of any of the states subject to the Voting Rights Act.[65]

Looking back today, however, it is clear that passage of the Voting Rights Act did not mark the end of racial discrimination in voting so much as the beginning of a new, more complicated chapter. Though now legally entitled to vote, Black Mississippians continued to face harassment and intimidation. The U.S. Commission on Civil Rights, in a 1975 report marking the tenth anniversary of the Voting Rights Act, singled out Mississippi for its continuing obstructionism. "Blacks attempting to register and vote faced dual registration requirements, erratic hours at the clerks' offices, intimidation and humiliation by registration officials, purging of voter registration rolls, denial of ballots, and the location of polling places in all-white clubs and lodges," the commissioners wrote. Black candidates for office also faced impediments, including "filing fees; obstruction by officials in obtaining information about qualifying to run and lists of registered voters; restrictions on and interference with the use of poll watchers by black candidates; [and] discrimination in vote counting." All these obstacles and more "made running for office and winning extremely difficult."[66]

Unfortunately, the petty obstructionism of local election officials represented only the tip of the proverbial iceberg. Recognizing that it was no longer possible simply to prevent Black people from casting ballots, leaders at the state level launched a concerted campaign to diminish the value of the votes they cast. Exhibiting the same "ingenuity" as the framers of the 1890 state constitution, they surveyed the "field of expedients," seeking ways to "reduce the negro majorities to a negligible political quantity." They gerrymandered legislative boundaries. They introduced at-large voting in white-majority constituencies, and changed previously elective offices into appointive positions. They ratcheted up qualifying requirements for candidates, particularly for independent candidates of the insurgent Mississippi Freedom Democratic Party. Significantly, none of these changes was submitted to the Department of Justice for approval, as required by the Voting Rights Act. When they finally were submitted (after years of litigation), most were disallowed. Others were struck down by federal courts. But the process took a very, very long time, dragging out an already century-long struggle for decades more. Today, nearly sixty years later, the promise of the Voting Rights Act is still only imperfectly realized.

## 5.2    Seeding Resistance:  The 1965 Special Session

The campaign to subvert the Voting Rights Act commenced even before the law was passed. In June, 1965, with the Senate filibuster of the bill overcome and passage inevitable, Governor Paul B. Johnson called the Mississippi Legislature into "extraordinary session" to address "matters dealing with the voter laws." The ostensible purpose of the session was to "remove from the statutes those qualification requirements that have heretofore been determined by the United States Supreme Court to be unconstitutional," as well as other franchise restrictions that would soon become illegal under the Voting Rights Act. Yet even as he issued the call, Johnson assured the state's white citizens that the session's real purpose was not compliance but

---

[65] *Ibid.*, pp. 29-33.

[66] United States Commission on civil Rights, *The Voting Rights Act, Ten Years After:  A Report of the United States Commission on Civil Rights* (Washington: The Commission, 1975), pp. 69-72, 130-131.

to mobilize continued resistance. By repealing the illegal provisions, he explained, Mississippians would put themselves "in a more formidable position to fight" against a federal law that "proposes to usurp the authority reserved to the states to determine their voters."[67]

The special session convened on June 15 and continued for ten days. Though business was supposedly restricted to matters of suffrage, both houses found time to consider a bill providing for a one-year sentence for illegal picketing (as lawmakers cast their votes, more than 500 Black protesters were being held in livestock barns at the nearby State Fairgrounds on just such a charge), as well as a bill asserting state jurisdiction over public education, yet another attempt to evade *Brown v. Board of Education*. (Eleven years after the *Brown* decision and ten years after *Brown II*, with its order to desegregate "with all deliberate speed," only 0.02% of Black children in Mississippi – 57 out of a pool of about 280,000 – were enrolled in previously white schools.)[68]

Because both houses chose mostly to meet in "closed caucuses" rather than open sessions, it is difficult to reconstruct all that was said. But the tenor of the deliberations can be gleaned from the comments of individual legislators in the press. Legislators outdid one another in denouncing what one described as "the most viciously inspired tyranny of the century, the unconstitutional civil rights acts of 1964 and 1965." Inevitably, many invoked the twice-told tale of Reconstruction. One decried the Voting Rights Act, particularly the deployment of federal registrars, as an unfair "entitlement" for Black people. Insofar as there was conflict at the special session, it pitted pragmatists who wished to "live to fight another day" against bitter enders who rejected "knuckling under to federal pressures." A squall erupted when Republican Party state chairman Wirt Yeager (a man widely hailed today as "the father of the modern Mississippi Republican Party") suggested that Governor Johnson, in calling for the removal of unconstitutional provisions from the statute book, was actually conspiring with President Lyndon Johnson "to remove the last vestige of protection the people of our state have against an ignorant [federal] legislature." The whole special session, Yeager alleged, was "a poorly disguised attempt to win the state's Negro vote for the Democrats," a claim Governor Johnson denounced as a "treacherous and vicious falsehood." In the short term at least, Johnson prevailed, and the offending provisions were struck.[69]

## 5.3 Nullifying the Voting Rights Act at Local and County Levels

Having cleaned the slate, legislators returned to Jackson in January, 1966, and passed a bevy of new electoral laws. In all, the legislature, which was still without a single Black member, considered some thirty bills. Virtually all were introduced at the very beginning of the session, suggesting a high degree of advance preparation. Not all bore fruit. A so-called "Open Primary" law, which would have required candidates in general elections to achieve electoral majorities or face run-offs, was vetoed by Governor Johnson, in part because it also eliminated the traditional party primary system. (Over the next decade, lawmakers would pass open primary bills at least four more times, but by the time one was finally signed the standards for Section 5 pre-clearance

---

[67] *Jackson Clarion Ledger*, June 14, 1965.

[68] *Ibid.*, June 16, 17, 1965. On the slow pace of school integration, see Parker, *op. cit.*, p. 23.

[69] *Ibid.*, June 16, 17, 18, 23, 1965.

had been clarified and the Justice Department objected.)  In the end, a dozen electoral bills were passed and signed into law in 1966.[70]

Nine of the new laws addressed elections at the county level, an important site of governance in Mississippi.  HB 223, for example, pertained to county supervisors, who not only controlled public works spending on roads, bridges, and the like, but also customarily vetted local jury pools.  Since 1869, supervisors had been elected in individual "beats," five per county.  Under the new law, counties – in fact, the supervisors themselves – had the option of switching to county-wide "at-large" voting, thus diluting the power of Black voters, who, for obvious historical reasons, tended to be concentrated in particular areas.  (The legislature had enacted a similar bill for municipalities in 1962, introduced by a legislator, who, three years before the passage of the Voting Rights Act, had presented the switch to at-large voting as the best way "to maintain our southern way of life.")[71]

Several of the election bills focused on public education.  HB 446 and SB 1880 increased qualifying requirements for school district trustees, while HB 183 authorized county-wide referenda to make the position of School Superintendent, traditionally an elective office, into an appointed one.  In the case of eleven counties, almost all of them Black majority, the legislature actually required the change from election to appointment.  A trio of bills – SB 1966, HB 275, and HB 1074 – licensed counties to switch from district-based to at-large elections for school board members, who were responsible under the new system for appointing superintendents.  In several counties, all of them white-majority counties with Black-majority districts, the legislature mandated at-large voting, though in doing so it ran afoul of an arcane provision in the state constitution prohibiting the identification of such counties by name.  The statutory circumlocutions that resulted might, in another context, have been funny, e.g., "any Class Four county having a land area of six hundred ninety five (695) square miles, bordering on the State of Alabama, wherein the Treaty of Dancing Rabbit Creek was signed and wherein U.S. Highway 45 and Mississippi Highway 14 intersect."  (In other words, Noxubee County.)  In three Delta counties, Leflore, Washington, and Coahoma, all counties with large (and impoverished) Black majorities, the legislature actually introduced a property requirement, requiring that all candidates for county school boards own real estate valued at more than $5,000.[72]

In HB 68, the legislature took specific aim at the Mississippi Freedom Democratic Party (M.F.D.P.), founded by Civil Rights movement members as an alternative to the lily-white "regular" Democrats.  Under the law, "independent" candidates faced extremely high qualifying requirements in order even to appear on the ballot.  Candidates for state-wide office, for example, who under previous law needed the signatures of a thousand registered voters on their nominating petitions, now needed ten thousand signatures.  The proportional increase for candidates at the local level were even greater.  Independents running for county supervisor or constable, for example, who previously needed fifteen signatures to appear on the ballot, now needed at least 500.  Candidates could escape the additional burden by running in the primary of an established

---

[70] The "massive resistance" campaign launched by the legislature in 1966 is recounted in Parker, *op. cit.*, pp. 34-77.

[71] *Ibid.*, pp. 51-66.  (The legislator's comment is quoted on p. 53.)

[72] *Ibid.*, pp. 55-58.  (The reference to Noxubee County is on p. 56.)

party, but those who did so, according to another provision of HB 68, surrendered the right to run subsequently as independents.[73]

## 5.4    Nullifying the Voting Rights Act at State and National Levels

Having bolstered white control at the municipal and county levels, legislators returned in the Fall of 1966 for another special session, this one dedicated to ensuring white political control at the state and national levels. Two more bills were passed, SB 1504, which redistricted the state legislature, and HB 911, which redistricted the state's Congressional districts. Both bills were extremely unusual; like other states, Mississippi typically did its redistricting at the beginning of decades, in response to decennial censuses. And both were blatant examples of racial gerrymandering, though they went about the business in opposite ways.

SB 1504 was an exercise in voter dilution. The bill dramatically increased the number of multi-member districts in both the State Senate and the State House. It further stipulated that all legislators elected from multi-member districts – and two-thirds of state representatives now were – were to be chosen on a district-wide, at-large basis. Thus, counties with Black majorities could simply be folded in with larger white counties, creating multi-member districts with comfortable white majorities. The same logic operated in single county units. In Hinds County, for example, the most populous county in the state, about 40% of residents in 1966 were African Americans, the lion's share of whom lived in Jackson, the capital. In a district-based electoral system, four of the county's nine Representatives and two of its five Senators might be expected to be African Americans. The new system, with at-large voting in multi-member districts, ensured that none would be.[74]

HB 911, which pertained to Congressional districts, was an exercise in "cracking." Its target was the so-called Delta district. First created in by 1882 by the "Redeemer" legislature, the district had a very large Black majority—every county in it was majority Black, at least until 1962. Though the district's precise boundaries had shifted over the years – it initially included several downriver counties, hence its moniker as "the shoestring district" – it had remained largely intact for more than eighty years, notwithstanding a series of major reapportionments (in 1932, 1952, and 1962) necessitated by the loss of one of the state's Congressional seats. In the 1962 reapportionment, the legislature added several white-majority counties to the district, not so much to dilute Black votes – virtually no Black people in the Delta could vote at the time – but rather to ensure the election of a hard-line segregationist over the incumbent, Frank Smith, the last remaining moderate in the state's Congressional delegation. But even then, it remained a Black-majority constituency.[75]

In addition to being the most heavily Black of the state's Congressional districts, the Delta district was also by far the largest, with a population (according to the 1960 census) of 608,441, more than twice that of the neighboring 4th District, which had a population of only 295,072. This disparity made it an obvious target for litigation, especially after the Supreme Court's "one man,

---

[73] *Ibid.*, pp. 60-63.

[74] *Ibid.*, pp. 63-66, 111, 125.

[75] *Ibid.*, pp. 41-51, 85-91.

one vote" decision in *Reynolds v. Sims* (1964). In October, 1965, activists of the M.F.D.P. filed just such a suit, *Connor v. Johnson*, alleging that the existing district lines denied Black citizens in the Delta the Congressional representation to which they were entitled. The M.F.D.P.'s goal was obviously to increase Black electoral power, but in some ways the suit backfired, opening the door for the State Legislature to "crack" the district.[76]

As in the 1890 Constitutional Convention, the debate among legislators in the 1966 special session was not over the goal – all wanted to ensure that Mississippi continued to send an all-white Congressional delegation to Washington – but over how aggressively to pursue it. Senators, anxious to avoid a challenge under the Voting Rights Act, proposed a map in which four districts would have white majorities but the fifth would have a black majority of about 55%. "Our purpose with this bill is to pass a bill all of us can live with and still pass the scrutiny of the court," the Senate bill's sponsor explained. The House, more defiant, drew a map with white majorities across the board. The eventual compromise map had one district with a very slim Black majority in total population (51%), though a white majority in voting-age population. To achieve that result, lawmakers took the old Delta district, which had always run along a North-South axis, in keeping with the land itself, and reoriented it on an East-West axis, akin to the system used for Supreme Court elections. By the time they were finished, counties of a long-established, 65% Black-majority constituency had been dispersed into three other districts.[77]

If the 1966 legislative sessions echoed the 1890 Constitutional Convention in some ways, they differed in others. Perhaps most obvious was the difference in rhetoric. While the delegates in 1890 had frankly, even proudly, acknowledged their racial mission, lawmakers in 1966 generally avoided talking about race, lest they invite further legislation or litigation. They debated redistricting in closed session. They convened no public hearings. When they did meet in public, they indulged in almost comical euphemisms. (The new Congressional districts, one lawmaker explained, were "drawn in a manner to devalue the vote of a certain group of people.") When individual lawmakers acknowledged the obvious – that creating multi-member districts was a means of "diluting the Negro vote"; "that the Negro situation was the main factor" behind the redrawing of the Delta district – they were hastily shushed. According to press reports, Lieutenant Governor Carroll Gartin, presiding over the State Senate, "repeatedly banged the speaker's gavel for order as controversy rose regarding alleged racial gerrymandering."[78]

In the years that followed, white political leaders would continue to insist that the electoral laws enacted by the legislature in 1966 had nothing to do with race. Mississippi Attorney General Joe T. Patterson, defending the newly drawn Congressional map in court, went even further. The real racists, he insisted, were the plaintiffs, who were trying to "guarantee the election of Negro candidates" by carving out "a segregated congressional district" in which white candidates could not fairly compete. At the time he made the statement, in late 1966, Mississippi had not sent a

---

[76] *Reynolds v. Sims*, 377 U.S. 533 (1964); *Connor v. Johnson*, Civ. A. No. 3830 (S.D. Miss.).

[77] Parker, *op. cit.*, pp. 41-51. (The quotation is from p. 48.)

[78] *Ibid.*, pp. 38-39, 47-48, 65-66.

Black person to Congress in more than eighty years. Thanks to the map he defended, it would not do so for the next twenty years either.[79]

## 6.    DEFENDING THE RIGHT TO VOTE

### 6.1    Combating voter dilution

The effectiveness of the new electoral barriers was quickly demonstrated. In the 1967 state elections, the first conducted under the new rules, 127 Black Mississippians ran for office. Of those, just 22 were elected, slightly more than the 19 removed from the ballot after falling afoul of the new qualifying standards. Eight others won pluralities in the first primary, only to be defeated by white candidates in the ensuing run-offs. The roster of the defeated included seven of the eight candidates for the state legislature and 32 of 36 contenders for county boards of supervisors. Results in the 1969 state elections were scarcely better. Of the 309 Black contenders, 259 were defeated, including 14 of 14 candidates for county sheriff, 10 of 10 candidates for chancery clerk, and 67 of 74 candidates for county supervisor. Five years and two statewide elections after passage of the Voting Rights Act, Black Mississippians, who represented nearly forty percent of the state's population and now nearly a third of its registered voters, controlled about 1% of the state's public offices.[80]

Overcoming the various voter dilution devices introduced by the legislature in 1966 would take years, even decades, of struggle. Activists won a critical victory in 1969 in the *Allen v. State Board of Elections* case, which established that the new electoral rules (including the switch to at-large supervisors' elections, the appointment of school superintendents, and increased qualifying standards for independent candidates) did, in fact, have to be submitted for pre-clearance under the Voting Rights Act. Belatedly submitted in 1969, all were immediately rejected by the Justice Department, the first of what would eventually be 173 formal objections to proposed changes in Mississippi voting laws.[81]

In 1971, just two years after the initial objection, the state legislature essentially re-enacted the law authorizing counties to introduce at-large county election, the sole change being a requirement that supervisors actually reside in the beats they represented. The Justice Department again objected. Two counties, Granada and Attala, implemented the plan anyway, prompting two more objections. In the case of Granada, it would ultimately take twenty years and two further Section 5 objections for the county to submit an acceptable districting plan. Other counties pursued racial gerrymanders, provoking years of litigation and more than 80 additional Section 5 objections, involving 48 different counties. In Hinds County, the Board of Supervisors, acting in defiance of the Justice Department, dispersed the predominantly Black city of Jackson into five majority-white beats. (The resulting map, the District Court reviewing the plan noted, produced

---

[79] *Ibid.*, pp. 89, 196.

[80] *Ibid.*, pp. 31-33, 69-77.

[81] *Allen v. State Bd. of Elections*, 393 U.S. 544 (1969). For a review of the operation of Section 5 in Mississippi, see Robert McDuff, "The Voting Rights Act and Mississippi: 1965-2006," *Review of Law and Social Justice* 17, 2 (2008). The objections themselves can be found at https://www.justice.gov/crt/voting-determination-letters-mississippi.

one beat that resembled a "turkey" and another shaped like "a baby elephant.") After further litigation, Hinds County finally drew a map with two majority-Black districts in 1979. Two Black supervisors were elected that November, one of whom, Bennie Thompson, currently serves in the U.S. House of Representatives.[82]

The battle at the state level proved even more tortuous. The primary vehicle in this case was *Connor v. Johnson*, which began in 1965 as a malapportionment, "one-man, one-vote" case but transmogrified, over the course of fourteen years and nine separate visits to the U.S. Supreme Court, into a contest over the multi-member, at-large electoral system that the state legislature had introduced in 1966. The three-member judicial panel overseeing the case at the district level, which included not only James P. Coleman, the man who in 1957 had told the House Judiciary Committee that claims of "discrimination in Mississippi as to voting" were "a figment of the imagination," but also Harold Cox, college roommate of Senator James Eastland and a man described by fellow federal district judge Constance Baker Motley as "the most openly racist judge ever to sit on a federal court bench." So dilatory and hostile was the panel that plaintiffs took the highly unusual step of applying for leave to file a petition for a writ of mandamus against the District Court, which the Supreme Court, even more unusually, granted. (In its opinion in *Connor v. Finch*, a related case decided in 1977, the Supreme Court noted that some of the panel's rulings were so irregular that they could "lead, as they did here, to a charge that the departures are explicable only in terms of a purpose to minimize the voting strength of a minority group.")[83]

It took another two years after that, but in 1979 the state finally produced a constitutionally apportioned legislative map, in which every member was chosen from a single-member district. The change was significant. From 1967 to 1976, only one Black candidate had won election to the Mississippi State Legislature, Robert Clarke, who represented a multi-member district including Holmes and Yazoo counties, both of which were majority Black. In the 1979 election, conducted under the new single-member system, seventeen won victories, including the first two Black state senators since Reconstruction. In proportional terms, African Americans still represented just 10% of the legislature, scarcely a quarter of their proportion in the population as a whole, but it was still a milestone in the continuing campaign to realize the promise of democracy in Mississippi.

## 6.2    The struggle for the Delta district

Unscrambling the gerrymandered Congressional map the state legislature had drawn in the 1966 special session took longer still. Ultimately it took fifteen years, until 1981, for the scheme to be submitted to the Department of Justice for clearance. When it finally was, the Department

---

[82] For the Section 5 objection to the revived supervisor scheme, see Department of Justice Determination Letters, *op. cit.*, Submission No. T-7901 (Sept. 10, 1971), available at https://www.justice.gov/crt/records/vot/obj_letters/letters/MS/MS-1120.pdf. On the Granada and Attala cases, see McDuff, *op. cit.*, pp. 480-481. On the Hinds County gerrymander and eventual election of Thompson, see Parker, *op. cit.*, pp. 151-161.

[83] On the course of the *Connor* litigation, see Parker, *op. cit.*, pp. 168-180, passim. Judge Motley's remark can be found in her memoir, *Equal Justice Under Law: An Autobiography* (New York: Farrar, Straus and Giroux, 1998), p. 180. On the *Connor* litigation, see *Connor v. Coleman*, 425 U.S. 675 (1976) (granting leave to file mandamus petition) and *Connor v. Finch*, 431 U.S. 407, 425 (1977).

objected. The letter of objection, written by W. Bradford Reynolds, Assistant Attorney General for Civil Rights under President Ronald Reagan, explicitly addressed the impact of electoral districts "drawn horizontally" across the state, an issue pertinent to the current case. In arranging Congressional districts in an "east-west configuration," Reynolds wrote, lawmakers had not only failed to recognize the Delta's importance as a majority-Black "community of interest"; they had also acted "in such manner as to dismember the black population concentration and effectively dilute its voting strength."[84]

State officials were again slow to provide an appropriate remedy. In the initial redistricting, used in the 1982 election, the restored Delta district remained majority white in voting-age population, though it had a slim Black majority in terms of total population. In the 1984 election, after some additional tinkering with the boundaries, it had a 53% Black voting-age population. Robert Clark contested both the 1982 and 1984 elections; having already become the first Black Mississippian to serve in the state legislature in the twentieth century, he now sought the same distinction in the U.S. Congress. Clark handily won the Democratic primaries, only to lose in the general elections to a Republican candidate, an early sign of the partisan realignment that would soon remake the politics of this once solidly Democratic state. In November, 1986, more than twenty years after the passage of the Voting Rights Act, Mike Espy won a narrow victory in the Delta district. When sworn in, he became the first African American to represent Mississippi in the U.S. Congress in more than a century.[85]

### 6.3 **Taking stock: Race and voting in Mississippi, ca. 1987**

The election of a Black Congressman in Mississippi was widely hailed across the nation as a symbol of progress, proof of the extraordinary changes that had overtaken the Magnolia State in the years since passage of the Voting Rights Act. That narrative was reinforced by a widely publicized survey of Black officeholding by the Joint Center for Political Studies, which showed that Mississippi had substantially more Black elected officials – 646 in 1989 – than any other state. (In contrast to so many racial statistics, the Joint Center's finding was touted by both white and Black political leaders, the former because it belied images of Mississippi as a racist backwater, the latter because it vindicated the achievements of the Civil Rights movement.) While the vast majority of those elected officials were concentrated in lower-level municipal and county positions, the number of African Americans in the state legislature was also growing, from one in 1975 to 22 in 1987. In 1992, the number jumped again, to 32, following a court-ordered special election. As members of a cohesive Black Caucus within a Democratic Party that still comfortably controlled both houses of the state legislature, many of these lawmakers exercised substantial political power.[86]

Yet amidst all the signs of change there was also evidence of stubborn continuity. The figure of 646 elected officials, while substantial, still represented only 13% of officeholders in the

---

[84] See Department of Justice Determination Letters, *op. cit.*, Submission No. 81-1697 (March 30, 1982), available at https://www.justice.gov/crt/records/vot/obj_letters/letters/MS/MS-1560.pdf.

[85] Clark's defeats and Espy's subsequent victory in the Delta district are discussed in greater detail below, using electoral data included in the Findings of Fact in the District Court's opinion in *Martin v. Allain*.

[86] Joint Center for Political Studies, Black Elected Officials (Washington: Joint Center, 1989), table 2.

state, scarcely a third of the Black proportion of the population. Moreover, virtually all these officials – all but 19, according to a contemporary study cited by the District Court in *Martin v. Allain* (1987) – represented districts that were more than 65% African American. When Black candidates were forced to rely on white votes, they tended to fare very poorly. An analysis of the 1984 Congressional campaign in the Delta, also included in the Findings of Fact in *Martin v. Allain*, showed that Robert Clark garnered 95% of the Black vote, yet still lost the election after winning only 7% of the white vote. (Mike Espy won a narrow victory in the district two years later by nudging both figures up a few percentage points.) Indeed, there appeared to be only four Black officials in the entire state who had managed to secure election in white majority districts, three of them from very small constituencies (specifically the County Attorney and Coroner of Clay County and an alderman from Corinth). The fourth example, Supreme Court Justice Reuben Anderson, who won re-election in 1986, was, as the court noted, a difficult case from which to draw conclusions, given that Anderson's opponent, Richard Barrett, "an avowed segregationist," had been repudiated by the entire political and legal establishment of the state. (Barrett was not simply a segregationist, but a virulent white nationalist, who, at the time of his campaign, advocated not only the sterilization of inferior races but also the deportation of African Americans, Puerto Ricans, Asians, and Jews. In these circumstance, the salient fact may not be that Anderson won 58% of the white vote but that, 42% of white voters still supported Barrett.)[87]

Understanding the persistence of racial voting in Mississippi helps to explain another oft-repeated datum that first began to make the rounds in the 1980s: the fact that no African American had ever been elected to state-wide office since the end of Reconstruction. Today, nearly forty years later, that is still the case. The explanation is not far to seek. Given a choice between Black and white candidates, white voters have almost invariably supported candidates of their own race. And because Mississippi as a state now has a solid white majority (thanks to a massive Black outmigration – a migration that was itself partly a consequence of political powerlessness), Black candidates operate at a severe disadvantage in state-wide elections. Indeed, it is extremely difficult for a Black candidate to compete successfully in any race that involves a broad cross-section of the state's voters, particularly when the district lines are "drawn horizontally" across the state. The only apparent exception is Willie Simmons, who in 2019 was elected to the Mississippi Transportation Commission. An abundantly qualified candidate, with 26 years as a state senator, including eight years as chair of the Senate Highways and Transportation Committee, Simmons was elected in the Central District with a bare 51% majority. In the 108 year history of the Commission, which began in 1914 as the Highway Commission, he is the sole Black commissioner. The 138-year-old Public Service Commission, established in 1884 as the Railroad Commission, has never had a Black commissioner. The Mississippi Supreme Court, whose members are elected along the same lines as the commissions, has never had a Black justice who was originally seated through election, though four have earned re-elections after being appointed to a vacant seat. All have occupied the same seat – District One, Place Two.[88]

---

[87] *Martin v. Allain*, 658 F. Supp. 1183, 1193-95 (S.D. Miss. 1987). See also Parker, *op. cit.*, pp. 196, 203. Barrett returned to the spotlight in Mississippi in 2004, when he announced plans for a booth at the State Fair honoring Edgar Ray Killen, the Klan Kleagle who would soon be convicted of orchestrating the murders of Chaney, Schwerner, and Goodman in Neshoba County.

[88] On Simmons, see https://mdot.ms.gov/portal/central_commissioner

7. **THE JUDICIARY**

## 7.1 **The first Black judges**

In their deliberations at the 1966 regular and special sessions, lawmakers seem to have devoted relatively little attention to judicial elections. They did increase qualifying standards, as they did for virtually all elective offices: candidates for chancery and circuit court judgeships now needed to submit nominating petitions with 1,000 rather than 100 signatures, while candidates in Supreme Court races (and also in races for the Public Service and Transportation commissions) now needed 3,500 signatures rather than 200. But lawmakers certainly did not give judicial elections the attention they gave to elections for the state legislature, county boards of supervisors, or even local school boards. The most likely explanation is that they did not imagine judicial elections as a problem. According to a provision in the state constitution, an individual seeking election as a judge was required to have practiced law in the state for at least five years, and the number of African Americans who met that criterion in 1966 could literally be counted on one's hands. The University of Mississippi, the sole accredited law school in the state in the Civil Rights era, only graduated its first Black law student—future State Supreme Court Justice Reuben Anderson—a year later, in 1967.[89]

Progress toward diversifying the state bench was very, very slow. Of the 111 state judges in Mississippi in 1987, including nine Supreme Court justices, 39 chancery judges, 40 circuit judges, and 23 county court judges, exactly two were African American: Anderson, who was appointed to fill a vacancy on the State Supreme Court by Governor Bill Allain in 1985; and Fred Banks, who was appointed to fill Anderson's seat on the circuit court. (A third African American, Cleve McDowell, had previously served on a county court in Tunica County, after running unopposed in 1978.)

## 7.2 *Kirksey v. Allain*, *Martin v. Allain*, *Martin v. Mabus*, and *Magnolia Bar*

At the same time that Governor Allain was appointing Anderson and Banks to their posts, he had also been named as a defendant in a pair of voting rights lawsuits, *Kirksey v. Allain* and *Martin v. Allain*, which together would greatly accelerate the process of change in the Mississippi judiciary. The suits were precipitated by a statute enacted a few years before by the state legislature creating 24 new state judgeships. The statute had no obvious racial intent; the professed goal was to reduce judicial workloads. The problem was that the legislature, in implementing the act, opted not to draw new districts but simply to fold the additional judges into existing districts using a numbered post system, thus introducing for judicial elections the very system – at-large elections in multi-member districts – that had just been exhaustively litigated and rejected for elections to the state legislature, county boards of supervisors, city councils, and school boards. The legislature also implemented the new system without submitting it to the Department of Justice for pre-clearance, on the grounds that judges were not "representatives" and their selection was thus not encompassed within Section 5 of the Voting Rights Act.[90]

---

[89] On qualifying standards, see Parker, *op. cit.*, p. 61.

[90] *Kirksey v. Allain*, 635 F. Supp. 347 (S.D. Miss. 1986); *Martin v. Allain*, 658 F. Supp. 1183 (S.D. Miss. 1987). On Section 5 jurisprudence in regard to judicial elections, see McDuff, *op. cit.*, 489-95.

In *Kirksey v. Allain*, a District Court confirmed that changes in judicial elections were indeed subject to the Voting Rights Act, and enjoined the state from implementing the new scheme until it had been cleared by the Department of Justice. The Department lodged an objection. In the ensuing case, *Martin v. Allain*, the Court found for the plaintiffs. The court confirmed the "preconditions" prescribed by the Supreme Court in *Thornburg v. Gingles* and then worked through the so-called Senate Factors. The court acknowledged the long history of official discrimination in the state (discrimination that "extended to the bar and consequently to the judiciary"), as well as the persistence of racially polarized voting, the systematic use of electoral devices to dilute and frustrate Black electoral power, the existence of profound socio-economic disparities between Black and white Mississippians, and the continued use of racial appeals in campaigning, both overt and subtle.[91]

Having confirmed the existence of a Voting Rights Act violation, the Court proceeded, in *Martin v. Mabus*, to devise a solution. It ordered the state to devise a new scheme of judicial apportionment based on single-member sub-districts, a specified number of which would have Black majorities. In the elections that followed, including a special election in 1989, these new majority Black constituencies began to produce Black judges. Change did not come overnight, but by the early 2000s 17% of the state bench was African American, including eight chancery court judges, eight circuit court judges, and five county court judges.[92]

In 1990, another suit related to judicial elections, *Magnolia Bar Association v. Lee*, was filed in federal court. The suit asked the Court, in essence, to provide the same remedy for elections to the State Supreme Court that it had provided in regard to other state judicial elections. The Court reached a different conclusion, determining that the plaintiffs had failed to prove a Section 2 violation. Specifically, it concluded that plaintiffs had failed to meet the third *Gingles* pre-condition pertaining to legally significant white bloc voting. It based that conclusion on two recent elections in the Central District: incumbent Reuben Anderson's victory over Richard Barrett in 1986, discussed above, and incumbent Fred Banks' much narrower victory (51% - 49%) in 1991. The decision was affirmed by the U.S. Court of Appeals for the Fifth Circuit. "Although a close call," the Appeals Court wrote, "we think that the district court could reasonably conclude that the election of two black judges from the Central District was not aberrational, but rather, probative evidence that whites would not vote as a bloc so as to usually defeat the preferred supreme court candidate of black voters." The fact that Justice Banks had retained his seat in a contest with a "well known white chancery judge," and that he had done so with "approximately 30% of the white vote" seemed particularly to register with the Appeals Court, suggesting that a growing share of white Mississippi voters were finally willing to consider Black candidates on their merits rather than their race.[93]

---

[91] *Kirksey v. Allain*, 635 F. Supp. 347 (S.D. Miss. 1986); *Martin v. Allain*, 658 F. Supp. 1183, 1192 (S.D. Miss. 1987); *Thornburg v. Gingles*, 478 U.S. 30 (1986).

[92] *Martin v. Mabus*, 700 F. Supp. 327 (S.D. Miss. 1988).

[93] *Magnolia Bar Association, Inc. v. Lee*, 793 F. Supp. 1386, 1407 (S.D. Miss. 1992); *Magnolia Bar Association, Inc. v. Lee*, 994 F.2d 1143, 1149 (5th Cir. 1993).

## 8.     RACE AND VOTING IN THE AGE OF PARTISAN REALIGNMENT

### 8.1     <u>Thirty Years Later</u>

Almost 27 years passed between the signing of the Voting Rights Act in August, 1965, and the District Court decision in *Magnolia Bar v. Lee* in July, 1992. More than thirty years have passed since. The remainder of this report is dedicated to those thirty years. As it shows, racially polarized voting, white bloc voting, and the use of coded racial appeals by candidates for office have not, in fact, abated in Mississippi elections. If anything, they are more pronounced today than at any time since passage of the Voting Rights Act, thanks to a partisan realignment that has made race and party identification in the state increasingly co-extensive. The composition of the current Mississippi State Legislature tells a tale. Of the 58 Democrats currently serving in the legislature, 53 are Black and five are white. Of the 112 Republican lawmakers, 112 are white and zero are Black. (There is also one Black independent member, a former Democrat who frequently votes with the Republicans.) It is difficult to imagine how a political system could be more racially polarized than that.

Elections to the State Supreme Court are in some ways different, given that candidates do not run under party labels, but the results in any case are much the same. In the most recent contested elections involving white and Black candidates (Justice Leslie D. King has twice been returned to the Court unopposed), state representative Earle Banks, running against incumbent Justice William Waller in 2012, earned an estimated 5.5% of the white vote, while Appeals Court Justice Latrice Westbrooks, attempting to unseat Justice Kenneth Griffis in 2020, received an estimated 6.4% of the white vote. Both Black candidates were defeated. To this day, Mississippi has never elected a Black Justice to the State Supreme Court who was not first appointed to the seat. Though African Americans represent more than 38% of the state's population, there has never been more than one Black Justice serving on the nine-member court, and the four who have served have all occupied the same numbered post seat. Given the current political realities of the state, with a virtually all-white Republican Party controlling super-majorities in both houses of the state legislature as well as all state-wide offices, Black Mississippians are essentially compelled to rely on the good will of the majority party to retain the one seat they hold.[94]

### 8.2     <u>The "Southern Strategy"</u>

To understand the political and racial landscape of Mississippi today it is necessary to go back in time and beyond the borders of the state, to the beginnings of a sweeping partisan realignment in American politics, a realignment that literally altered the complexion of the nation's two major political parties. This transformation has generated a massive historical literature; indeed, over the last generation there is no other topic in the entire field of American history that has attracted such sustained scholarly attention. Different historians have focused on different people and places and offered somewhat different periodizations. While some give George Wallace pride of place in the story, others focus on long-running racial struggles over housing or

---

[94] The 2012 and 2020 voting figures referenced here are derived from the October 3, 2022 Report of Dr. Byron D'Andra Orey in this lawsuit.

the emergence of a new white Republican suburban voter in southern cities such as Charlotte and Atlanta. But few dispute the critical role of race – and of voting – in the story.[95]

On May 17, 1970, the *New York Times Sunday Magazine* carried an article entitled "Nixon's Southern Strategy 'It's all in the charts'." The article quoted a young Nixon campaign strategist named Kevin Phillips, author of a recent book entitled *The Emerging Republican Majority*. "All the talk about Republican making inroads into the Negro vote is persiflage," Phillips said. "From now on, Republicans are never going to get more than 10 to 20 percent of the Negro vote…" The good news, he continued, was "they don't need any more than that." Rather than seek to weaken the Voting Rights Act, as some proposed to do, Phillips suggested embracing it as a positive opportunity. "The more Negroes who register as Democrats in the South, the sooner the Negrophobe whites will quit the Democrats and become Republicans," he explained. "That's where the votes are. Without that prodding from the blacks, the whites will backslide into their old comfortable arrangement with the local Democrats."[96]

Historians debate whether and when Nixon read *The Emerging Republican Majority* or the earlier memo on which it was based. But there is no doubt of the impact of his analysis on Republican political leaders, who in the years that followed would adopt Phillips's prescription, using coded racial appeals, some more subtle than others, to "prod" traditionally Democratic white voters, not only in the once "Solid South" but also in working class areas of the North. Nixon's appeals to the so-called "Silent Majority" represented an obvious example, as did the rising chorus of critiques of "government" policies such as "welfare," "forced busing," affirmative action, and reform of the criminal justice system. While none of these critiques was necessarily or explicitly racist, all invoked a narrative in which a reckless federal government was favoring undeserving African Americans over hard-working whites.

Lee Atwater, political strategist for Ronald Reagan and George H.W. Bush and later Chairman of the Republican National Committee, candidly described the approach in a now notorious 1981 interview. Asked whether Reagan, in attacking "food stamps" and legal services for the poor, was appealing to the "racist side of the Wallace voter," Atwater gave a very direct answer. "Y'all don't quote me on this," he began. "You start out in 1954 by saying, 'N****r, n****r, n****r.' By 1968, you can't say 'n****r' – that hurts you. Backfires. So you say stuff

---

[95] The historical literature on the topic is voluminous. See, *inter alia*, Matthew Lassiter, *Silent Majority: Suburban Politics in the Sunbelt South* (Princeton: Princeton University Press, 2006); Byron E. Shafer and Richard Johnston, *The End of Southern Exceptionalism* (Cambridge: Harvard University Press, 2009); Dan T Carter, *The Politics of Rage: George Wallace, the Origins of the New Conservatism, and the Transformation of American Politics* (New York: Simon & Schuster, 1995); Joseph Crespino, *In Search of Another Country: Mississippi and the Conservative Counterrevolution* (Princeton: Princeton University Press, 2007); Kevin Kruse, *White Flight: Atlanta and the Making of Modern Conservatism* (Princeton: Princeton University Press, 2005); Leah Wright Rigueur, *The Loneliness of the Black Republican: Pragmatic Politics and the Pursuit of Power* (Princeton: Princeton University Press, 2014); Thomas and Mary Edsall, *Chain Reaction: The Impact of Race, Rights, and Taxes on American Politics* (New York: W.W. Norton and Co., 1991); and Bruce J. Schulman and Julian E. Zelizer eds., *Rightward Bound: Making America Conservative in the 1970s* (Cambridge: Harvard University Press, 2008).

[96] James Boyd, "Nixon's Southern Strategy: It's all in the charts," *New York Times Magazine*, May 17, 1970. (The quotation is on p. 106.)

like forced busing, states' rights and all that stuff. You're getting so abstract now, you're talking about cutting taxes, and all these things you're talking about are totally economic things and a byproduct of them is blacks get hurt worse than white… 'We want to cut this,' is much more abstract than even the busing thing, and a hell of a lot more abstract than 'N****r, n****r'…"[97]

### 8.3   Reagan at the Neshoba County Fair

In the context of Mississippi, a watershed moment in the Southern Strategy came in 1980, when candidate Ronald Reagan, fresh from his nomination at the Republican National Convention, elected to open his Fall campaign at the Neshoba County Fair. Delivering a speech at "Mississippi's Giant House Party" was a rite of passage for politicians in the state, but that tradition was largely lost on other Americans, who chiefly remembered Neshoba County (if they remembered it at all) as the epicenter of violent white resistance to the "federal invasion" of the 1960s – the place where voting rights activists James Chaney, Mickey Schwerner, and Andrew Goodman were murdered in 1964. As Reagan himself observed at the outset, a rural southern county in which well over 90% of voters were registered Democrats was an unlikely place for a Republican presidential candidate to launch a campaign. But that was precisely the point. In traveling to this symbolically charged site, the campaign was throwing open the doors of the Republican Party to white southerners unhappy with the changes in the Democratic Party in the post-Voting Rights age.[98]

In his address at the fair, Reagan stuck mostly to his standard stump speech. ('The Best of the Carter Years,' a television spot for his opponent, Jimmy Carter, was "a three-second station break," he quipped.) But the speech was also threaded with subtle racial messages, redolent of the rhetoric that white southerners had used in their struggle against federal authority during Reconstruction and again during the Civil Rights era. "I believe in state's rights," Reagan told the virtually all-white crowd, pledging to rein in the "federal establishment" and "restore to the states and local communities" the control they deserved. He denounced "welfare" as a scheme concocted by federal "bureaucrats" to ensure themselves a "clientele" and thus preserve their jobs. And he received the loudest applause of all when he demanded that control of "education … be turned back to the states and the local communities with the tax sources to fund them" – a suggestion that clearly evoked not only Mississippi's long rearguard action against the *Brown v. Board of Education* decision, but also the current battle in the state over the use of public funds to support the segregated private academies to which the majority of white families had decamped once integration became inescapable.[99]

---

[97] Atwater was being interviewed by political scientist Alexander Lamis for his 1984 book The Two-Party South. Lamis included the comment without attribution, but Atwater was later identified as the speaker. The entire interview is now available online at https://www.thenation.com/article/archive/exclusive-lee-atwaters-infamous-1981-interview-southern-strategy/.

[98] See Crespino, *In Search…*, *op. cit.*

[99] Reagan's speech was recorded and transcribed by Stanley Dearman, longtime editor of the Neshoba Democrat. For a transcript, see https://neshobademocrat.com/stories/ronald-reagans-1980-neshoba-county-fair-speech,49123.

Voters clearly got the message. In the election in November, Reagan carried Mississippi over Carter, who had won the state four years before. From that moment to the present, Mississippi has remained firmly within the Republican column in presidential elections. So has the rest of the South, broadly speaking, though that pattern may now be changing. Cast in the crucible of racial change, the "Solid South," core of the Democratic coalition from the end of Reconstruction through the Civil Rights era, became what we now call the "Red States."

### 8.4    The Strange Career of Partisan Realignment in Mississippi

Viewed from the perspective of presidential elections, Mississippi is the very embodiment of the future prophesied in Kevin Phillips's "emerging Republican majority," in which "Negrophobe whites will quit the Democrats and become Republicans." Indeed, it was the bellwether state, breaking with the national Democratic Party to deliver its electoral votes to Strom Thurmond in 1948, Harry Byrd in 1960, Barry Goldwater in 1964, George Wallace in 1968, and Richard Nixon in 1972. But when one examines the process of partisan realignment at the state and local level, the picture almost completely reverses, and Mississippi becomes the laggard, the last southern state to shift from "blue" to "red." Control of the governor's mansion, for example, remained in Democratic hands until January, 1992, when newly-elected Kirk Fordice became the state's first Republican governor since the violent deposal of Adelbert Ames in 1876. Save for a four year hiatus in the early 2000s, Republicans have controlled the governorship ever since.

The process of partisan realignment in the state legislature took a full generation longer. In 1979, when Reagan announced his intention to seek the presidency, only 2.3% of the state legislature was Republican – which is to say four of its 174 members. When he left office in 1989, that figure was still only 9.8%. As late as 2008, by which time Mississippi had become the safest of "red" states in presidential balloting, Democrats held controlling majorities in both houses of the legislature. Republicans finally gained control of the legislature in 2012, following the landslide state election of 2011. In 2015, they gained 60% supermajorities in both houses, which they retain today.[100]

Thus, in the Mississippi of today, political polarization along lines of race, always high in the state, is now reinforced by lines of partisan affiliation; indeed, the two systems are virtually aligned. The Republican Party, the party of abolition, Reconstruction, and the Federal Elections "Force" Bill, is now almost entirely white, at least at the level of the state legislature. The changes in the Democratic Party are equally remarkable. By the 1980s and '90s, the Democrats, the party of James Vardaman and James Eastland, Black disfranchisement and "massive resistance" to integration, had grown into a genuinely bi-racial party. In 2011, the final year of Democratic control before the landslide loss that November, the Democratic majority in the legislature was almost equally split along racial lines, with members of the Black Caucus holding 37 of the party's 72 seats in the House (52%) and 13 of the party's 27 seats in the Senate (48%). Today, thanks to the continued exodus of white voters into the Republican Party (and also to a Republican-drawn legislative map clearly designed to "pack" Democratic voters into fewer, Blacker districts), 53 of 58 Democratic lawmakers are African Americans. The figure of 53 Black lawmakers is

---

[100] For the Reagan-era figures, see Parker, *op. cit.*, p. 147. More recent figures are retrieved from Ballotpedia; see https://ballotpedia.org/Mississippi_State_Legislature.

unprecedented in the state's history, yet the group is virtually powerless to enact legislation or to stop legislation that it opposes – including a new wave of legislation designed to impeded Black voting.[101]

### 8.5     The Ebb and Flow of Section 5 Objections

As previously noted, the Department of Justice interposed 173 objections to proposed changes in Mississippi in the 48 years between passage of the Voting Rights Act and the Supreme Court decision in *Shelby County v. Holder* (2013), which eliminated the requirement of Section 5 pre-clearance. The objections confirm the continued history of official discrimination in regard to voting while also showing the array of electoral policies and procedures that have been used to impede effective Black voting. Less obvious but perhaps more important, the catalogue of objections helps to illuminate the origins of the partisan battle over voting rights that rages in Mississippi today.[102]

We have already examined the first Justice Department objection, which was lodged in 1969 after the state belatedly submitted some of the electoral "reforms" enacted by legislature in 1966. A spate of objections followed in the early 1970s, as lawmakers at the state and county level, no longer able to rely on multi-member districts to dilute Black voting, sought to do so through gerrymandering and other means. There was another flurry of objections in the early 1980s – 25 in 1983 alone – following Congress's amendment to the Voting Rights Act, which clarified that electoral devices could be challenged solely on the grounds of impact, without the need to prove racist intent. The years that followed brought a marked diminution in objections, which dwindled to as little as two or three per year, most of them directed against county redistricting plans. In the early 1990s, however, the numbers jump again, with the Department lodging some forty objections in a two-and-a-half year period. This new wave of cases was not some statistical anomaly, but an early indication of a new battle over voting rights erupting across the state, a battle that pitted – to put the matter as simply as possible – those who wished to make voting easier against those who sought to make it more difficult.[103]

### 8.6     Voting Rights in the 1990s:  Fordice v. Molpus

While this long-running battle engaged a host of combatants, in the 1990s it came to be embodied by two elected officials, who would compete against one another in the 1995 gubernatorial election. Democrat Dick Molpus, who served as Mississippi Secretary of State from 1984 to 1996, was a native of Neshoba County, where he witnessed the aftermath of the 1964 Civil Rights murders as a teenager. He first entered state politics as one of the "Boys of Winter," a cohort of young reformers drawn into government service in the early 1980s by newly-elected Governor William Winter. Elected as Secretary of State in 1983, he immediately convened a task force to examine Mississippi voting laws and make recommendations about how they might be

---

[101] The figures from 2011 are from David Bositis, "The Re-Segregation of Southern Politics," retrieved at https://www.scribd.com/document/79970841/Bositis-Re-Segregation-in-Southern-Politics.

[102] *Shelby County v. Holder*, 570 U.S. 529 (2013).

[103] For the roster of Department of Justice Determination Letters, see https://www.justice.gov/crt/voting-determination-letters-mississippi.

reformed. A host of recommendations followed, including extending hours at polling places; re-authorizing satellite registration (which the legislature had prohibited in 1955); ending at-large municipal elections, majority vote run-off requirements, anti-single shot voting regulations and other devices historically used to dilute Black votes; restoring the right to vote to some convicted criminals on completion of sentence; and reforming the notorious "dual registration" system inherited from the 1890s. Over the next twelve years, Molpus would accomplish many, though not all, of these reforms. (The dual registration system was ultimately ended not by legislative act but by District Court in *Operation PUSH v. Allain* (1987).) By Molpus's own account, his proudest accomplishment was securing passage – after two failed attempts – of a bill permitting mail-in registration, sparing would-be voters, in his words, the need to "go down to the courthouse and be intimidated and count the bottles in a bar of soap, you know, all that that went on. You just mail in your form." The act quickly brought more than 50,000 new voters on to the rolls.[104]

Molpus's adversary was Kirk Fordice, who served as the state's governor from 1992 to 2000. A businessman and long-time leader in the state Republican Party (which he had joined during the Goldwater campaign of 1964), Fordice was a past master of the kind of racially coded campaign techniques described by Kevin Phillips and Lee Atwater. While generally avoiding explicitly racist statements, he railed against "welfare" and affirmative action, judges who coddled criminals and prisons like "country clubs." He revived Confederate Heritage Month, which his immediate predecessors had quietly retired. But Fordice found his core issue in voting, specifically in the idea that Mississippi's electoral system was riddled with fraudulent voting that could only be cured by the adoption of a strict Voter ID law. Immediately following his election, even before his inauguration, he appointed a task force to expose the scale of the crisis. On leaving office eight years later, he appointed another. Molpus, who supervised state elections in his capacity as Secretary of State, sought to dispel the idea, but so persistent was the claim that in 1993 he appointed a task force of his own. It found no evidence of fraud.[105]

### 8.7 Implementing the National Voter Registration Act in Mississippi

The passage of the 1993 National Voter Registration Act brought the simmering debate in Mississippi over access to voting to a head. Written in response to a decade of falling voter registration rates across the country, the bill was passed by a Democratic Congress in a more or less straight party line vote and signed into law by President Bill Clinton. The act included a variety of instruments to simplify and encourage the registration process, including standard forms, facilities for mail-in registration, and provision of assistance to would be registrants in certain state agencies, including departments of motor vehicles and public assistance offices. The state legislature adopted the necessary bill, but Fordice proceeded to veto it, leaving Mississippi as the only state in the nation without any system of facilitated voting. In the ensuing debate, the Governor derided the proposed legislation as the "welfare voters" bill, and insisted that he would never sign it unless it included a strict Voter ID requirement. The bill he eventually signed did not

---

[104] *Mississippi State Chapter, Operation Push v. Allain*, 674 F. Supp. 1245 (N.D. Miss. 1987). The quotation from Molpus is from a 1994 interview of Molpus by historian Tom Dent, housed at the Amistad Research Center, Tulane University, Oral History Box 153/9 and 153/10.

[105] The difference between Molpus and Fordice were on display in their debate at the Neshoba County Fair during their 1995 gubernatorial race; for a transcript, see *Madison County Journal*, August 17, 1995.

have such a provision, but it did include a provision establishing that voters who enrolled under the new procedures were only eligible to vote in federal elections. Those wishing to cast ballots in state and local elections were required to register separately, under the previous system of rules. In short, the act re-established the same dual registration system that the state legislature had installed following the 1890 constitutional convention, the very system that federal courts had prohibited in *Operation PUSH v. Allain* only a few years before.[106]

Though it took several years (and a ruling from a federal court), the state eventually submitted the new voters bill to the Department of Justice for Section 5 pre-clearance. The Department took no time at all in objecting. In her letter of objection, Isabelle K. Pinzler, Acting Assistant Attorney General for Civil Rights, expressed considerable surprise that the state would attempt to reintroduce a system that the District Court had just determined was "adopted for a racially discriminatory purpose … resulting in a denial or abridgement of the right of black citizens in Mississippi to vote and participate in the electoral process." She went on to object to several other provisions. According to information provided by the state, a majority of those enrolled under the new process, about 30,000 people in all, had registered in public assistances offices, particularly the Mississippi Department of Human Services – an agency, the Justice Department noted, serving a "predominantly black" population. Unlike the predominantly white voters enrolling at drivers' license agencies, who were offered a choice of two different registration forms, one covering all elections and the other covering only federal elections, registrants at public assistance offices were only given access to the NRVA, federal election-only form. Not only were they not informed of their inability to vote in state and local elections without an additional registration, they were actively misled by the form itself, which was titled "Mississippi Voter Registration Application" and included a set of instructions on how to "register to vote in Mississippi." The end result, the Assistant Attorney General concluded, was that there were upwards of 15,000 Mississippian, most of them poor and Black, who did not realize that they were not, in fact, eligible to cast ballots in state and local election.[107]

While Fordice may have lost this particular battle, he can hardly be said to have lost the war. In his re-election race against Molpus in 1995, the question of who should be able to vote and under what circumstances inevitably emerged as a central issue. Fordice won the election comfortably, earning nearly 56% of the vote, only a few percentage points below the white proportion of the state's population. Of perhaps longer term significance, the seed that he had planted in Mississippi politics, the idea that there was an epidemic of voter fraud that could only be stemmed by stern measures, took deep root. Fordice himself would not live to see it, but in 2011, in the same landslide election that propelled Republicans to a new legislative majority, Mississippi voters passed by constitutional vote one of the strictest Voter ID laws in the nation. The newly seated legislature promptly adopted enabling legislation. In a letter to U.S. Attorney

---

[106] On the NRVA, see Royce Crocker, "The National Voter Registration Act of 1993: History Implementation, and Effects," published by the Congressional Research Service, available at https://sgp.fas.org/crs/misc/R40609.pdf. For Fordice's veto of the enabling legislation, and for the task forces he appointed to investigate alleged voter fraud, see https://www.djournal.com/news/hed-task-force-to-examine-voter-fraud-in-mississippi/article_72113490-05c2-5a45-9722-e9c53695ddb1.html.

[107] Department of Justice Determination Letter, Submission No. 95-0418 (Sept. 22, 1997), available at https://www.justice.gov/sites/default/files/crt/legacy/2014/05/30/MS-2650.pdf.

General Eric Holder, Molpus, still a prominent figure in Mississippi politics, urged Holder to "deny implementation of this new law under the charge the U.S. Justice Department has under Section V of the 1965 Voting Rights Act." He added that, of the 62 elections supervised by his office during his twelve-year tenure as Secretary of State, elections involving an estimated 13,683,777, "we had zero (0) complaints that would have been prevented by a Voter ID law." After the Supreme Court's decision in *Shelby County*, however, there was nothing Holder could do.

### 9.    CONCLUSION

This final section of the Report seeks briefly to assay the current landscape of race and voting in Mississippi. It notes historical continuities, but also highlights ways in which the situation today is distinctive and uniquely challenging. The observations are organized broadly around the Senate Factors.

**Mississippi has a long history of official discrimination in regard to voting rights**. This history began at the very moment of abolition, when state leaders spurned the idea of enfranchising even a tiny proportion of freedpeople and opted instead to enact the Black Codes, and it has continued ever since. Opposition to Black voting propelled the overthrow of Reconstruction and the violent decades of "Redemption" that followed, and it animated the drafting of a new state constitution, whose framers endeavored, in their own words, not just to "reduce the negro majorities to a negligible quantity" but to do so in a way that would pass muster with the U.S. Supreme Court. Though demagogues continued to enflame white voters with dire prophesies of "Negro supremacy," by the 1930s and '40s more than 99% of Black Mississippians had been completely excluded from the political process.

The rise of a renewed Black voting rights movement in the years after the Second World War ushered in another period of racial reaction, a period marked, on one hand, by a dramatic increase in racial violence, much of it directed against those who sought to vote; and, on the other, by a flurry of new "legal" procedures and processes designed to make it even more difficult for a Black person to register or cast a ballot. The passage of the Voting Rights Act, as we have seen, did not so much end the struggle over Black voting as alter the way in which it was waged. Unable to deny the right to vote outright, white authorities created a host of new electoral procedures designed to dilute and diminish Black electoral power. Overcoming these devices and obstacles would prove a very long and arduous process, and it was never completely accomplished. The battle over the 1993 National Voter Registration Act offers a pertinent example, not only because of its timing – nearly three decades after the Voting Rights Act – but also because of the utter cynicism of state officials, who used a law intended to promote political participation as an opportunity to resuscitate a dual registration system and further marginalize the Black and poor.

**Voting in Mississippi today is racially polarized** – indeed, it is more polarized today than at any other time since the Voting Rights Act. This fact is apparent not only in the composition of the state legislature, in which one set of lawmakers is 100% white and other is over 90% Black, but also in the extraordinarily high levels of racial bloc voting that prevail in elections pitting Black and white candidates against one another. Time will tell what this unprecedented political situation will produce, but it certainly carries dangers. Given the racial demography of the state and the extremely high (and mutually reinforcing) rates of racial and partisan polarization in its politics, the party enjoying a legislative supermajority has very little need or incentive to campaign for

votes from the Black minority. It certainly has no incentive to work to enhance rates of voter participation among African Americans. If anything, the current political configuration incentivizes the white majority party to act in precisely the opposite way, to discourage and impede political participation within the minority population and party. The recent, much publicized comments by the Secretary of State (Mississippi's chief elections officer) and one of its Senators to the effect that voting should be made "harder" in order to ensure that "uninformed voters" and "woke" liberals do not swamp the state evokes troubling echoes from the state's past.[108]

The extent to which state officials are actually operationalizing such ideas is difficult to say, in part because of the end of Section 5 preclearance, which historically served not only as a way to enjoin polices that diluted minority voting strength but also a means of monitoring what was happening in particular jurisdictions. While there are no devices or procedures in use today akin to those that prevailed during the long years of Jim Crow, there are reasons to believe that **casting a ballot in Mississippi is more difficult to do than it was a generation ago and certainly more difficult than it is to do in most, if not all, other states.** Current studies of "cost of voting," for example (an index that uses more than thirty separate variables to measure the ease or difficulty of casting a ballot in different states) rate Mississippi as the second most "costly" state in the nation for voters. (It was 50th in 2016, but rose to 49th in 2020 after a series of policy changes in Texas.) The strict Voter ID law adopted in 2011 partially accounts for this ranking, but there are other factors as well. For example, Mississippi is one of only eight states that refuses to allow new registrants to enroll online. It generally does not allow no-excuse early voting or voting by mail, and voters who wish to vote absentee must affirm a specified reason such as disability or travel outside the country in order to qualify. Those who do receive permission to vote by mail face a complicated process, which requires submitting a notarized application and then, if the right to vote by mail is granted, to notarize the completed ballot before returning it by mail. Paying postage is the responsibility of the voter. These policies mark the state as a significant outlier nationally: according to the Census Bureau, nearly 70% of Americans today cast their ballots early or by mail, versus only 18.5% of Mississippians.[109]

The recent revival of "Confederate History Month," a tradition that earlier governors had let lapse, suggests that **racially coded campaign appeals are still being used** in the state. The same might be said of increasingly frequent allusions to "state's rights," even in issues that are not directly related to the state's white supremacist history. "It's a great day to advocate for state sovereignty," one of the state's Congressman recently remarked in explaining his opposition to the

---

[108] Mississippi Free Press, Mississippi Elections Chief Warns Biden May Register 'Uninformed,' 'Woke' College Voters (April 6, 2021), https://www.mississippifreepress.org/11009/mississippi-elections-chief-warns-biden-may-register-uninformed-woke-college-voters/; Washington Post, GOP Senator: It's a 'great idea' to make it harder for 'liberal folks' to vote (Nov. 16, 2018), https://www.washingtonpost.com/politics/2018/11/16/cindy-hyde-smith-its-great-idea-make-it-harder-liberal-folks-vote/.

[109] Scot Schraufnagel, Michael J. Pomante II, and Quan Li, "Cost of Voting in the American States, 2020," Election Law Journal 19, 4 (2020); United States Census Bureau, What Methods Did People Use to vote in the 2020 Election?, https://www.census.gov/library/stories/2021/04/what-methods-did-people-use-to-vote-in-2020-election.html.

Biden administration's immigration policy. "I joined my GOP colleagues to remind the American people that our Constitution recognizes states' rights to defend themselves against invasion."[110]

In addition, while **Black candidates have won elections, they have done so almost exclusively from solidly Black majority districts**. To this day, only three Black lawmakers in Mississippi in history have been sent to the statehouse from white majority districts – the most recent in 2019, in an election decided by 14 votes. **Black Mississippians remain disproportionately poor, underemployed, and ill-educated** compared to their white counterparts. The extent to which **elected officials are unresponsive to the concerns of the minority group** is fiercely disputed in the state today, but Black-majority schools in the state are failing at more than three times the rate of white schools and residents of the city of Jackson, a heavily Black majority city, do not have access to safe drinking water.

Under the circumstances prevailing in Mississippi today, and in light of the history from which those circumstances originate, it is my opinion that Black Mississippians are not afforded an equal opportunity to elect candidates of their choice in Supreme Court elections.

James T. Campbell

---

[110] Steven Palazzo, June 23, 2021, https://twitter.com/CongPalazzo/status/1407816934759018497.

# APPENDIX A

# Curriculum Vitae
# James T. Campbell

## Address
Department of History
Stanford University
Stanford, CA  94305

## Education
1980   B.A. in History, Yale University
1983   M.A. in History, Stanford University
1989   Ph.D.  in History, Stanford University

## Professional appointments
| | |
|---|---|
| 2008- | Edgar E. Robinson Professor in U.S. History, Stanford University |
| 2015-2019 | Faculty Director of Residential Programs, Stanford University |
| 2010-2012 | Faculty Director, Research Institute in Comparative Studies in Race and Ethnicity, Stanford University |
| 2007-2008 | Professor of American Civilization, Africana Studies, and History, Brown University |
| 2003-2006 | Chair, Brown University Steering Committee on Slavery and Justice |
| 1999-2007 | Associate Professor of American Civilization, Africana Studies, and History, Brown University |
| 1996-1998 | Senior Research Officer, Institute for Advanced Social Research, University of the Witwatersrand |
| 1989-1996 | Assistant Professor of History, Northwestern University |
| 1988-1989 | Instructor in History, Stanford University |
| 1986-1987 | Junior Lecturer in History, University of the Witwatersrand, South Africa |

## Awards and prizes (teaching and service)
| | |
|---|---|
| 2019 | Lloyd W. Dinkelspiel Award for Outstanding Service to Undergraduate Education, Stanford University |
| 2018 | John Etchemendy Student Affairs Faculty Award for Outstanding Service, Stanford University |
| 2011- | Organization of American Historians Distinguished Lecturer |
| 2011- | Bass University Fellow in Undergraduate Education, Stanford University |
| 2011 | Phi Beta Kappa Award for Undergraduate Teaching, Stanford University |
| 2007 | Community and Justice Award, Rhode Island for Community and Justice, for chairing the Brown Steering Committee on Slavery and Justice |
| 2007 | Brown University Undergraduate Council of Students Award for Excellence in Teaching |
| 1996 | Faculty Honor Roll for Teaching, Northwestern University |

## Awards and prizes (scholarship)

| | |
|---|---|
| 2007 | Finalist, Pulitzer Prize in History for Middle Passages: African American Journeys to Africa, 1787-2005 |
| 2007 | Mark Lynton History Prize, Columbia School of Journalism and Nieman Foundation, Harvard University, for Middle Passages |
| 2007 | Lois P. Rudnik Prize, New England American Studies Association, for Middle Passages |
| 2006 | Choices Outstanding Academic Title for Middle Passages |
| 1996 | Organization of American Historians' Frederick Jackson Turner Prize for Songs of Zion: The A.M.E. Church in the United States and South Africa |
| 1996 | Carl Sandburg Literary Award for Non-Fiction for Songs of Zion |

## Grants and fellowships

| | |
|---|---|
| 2022 | Lady Davis Distinguished Scholar, Hebrew University of Jerusalem |
| 2021-2022 | Obert and Grace Tanner Humanities Center, University of Utah |
| 2020-2021 | John Simon Guggenheim Memorial Fellowship |
| 2012-2013 | Stanford Humanities Center, Stanford University |
| 2004-2005 | Research Institute for Comparative Studies in Race and Ethnicity, Stanford University |
| 2001-2002 | Charles Warren Center for Studies in American History, Harvard University |
| 1992-1993 | Fulbright African Regional Research Fellowship |
| 1992 | National Endowment for the Humanities Summer Fellowship |

## Scholarship

### Books

Mississippi Witness: The Photographs of Florence Mars (Jackson: University Press of Mississippi, 2019), co-edited with Elaine Owens.

Slavery and the University (Athens: University of Georgia Press, 2019), co-edited with Leslie Harris and Alfred Brophy.

Race, Nation, and Empire in American History (Chapel Hill: University of North Carolina Press, 2007), co-edited with Robert Lee and Matthew Guterl.

Middle Passages: African American Journeys to Africa, 1787-2005 (New York: Penguin Press, 2006).

Songs of Zion: The African Methodist Episcopal Church in the United States and South Africa (New York: Oxford University Press, 1995).

### Chapters in books

"Truth Telling at Universities," in Kirt von Daacke (ed.), <u>After Emancipation: Race at the University of Virginia</u> (Charlottesville: University of Virginia Press, forthcoming).

"Slavery and Justice at Brown: A Personal Reflection," in Anthony Bogues, Cass Cliatt and Allison Levy (eds.), <u>Brown University's Slavery and Justice Report</u>, 2nd edition (Providence: Brown University, 2021).

"Lawrence and History," in <u>Promised Land: The Art of Jacob Lawrence</u> (Stanford: Iris and B. Gerald Cantor Center for Visual Arts, 2015).

"Du Bois in the Kingdom of Culture," in <u>Du Bois in Our Time: Ten Contemporary Artists Explore the Legacy of W.E.B. Du Bois</u> (Amherst: University Museum of Contemporary Art, 2014).

"'A Last Great Crusade for Humanity': W.E.B. Du Bois and the Pan-African Congress," in Bruce J. Schulman (ed.), <u>Making the American Century: New Perspectives on Twentieth-Century America</u> (New York: Oxford University Press, 2014).

"African Subjects," in Santu Mofokeng (ed.), <u>The Black Photo Album</u> (London: Steidl Verlag, 2013).

"Afterword," in Lisa Lindsay and John Sweet (eds.), <u>The Black Atlantic and the Biographical Turn</u> (Philadelphia: University of Pennsylvania Press, 2013).

"Foreword," in Andrew Losowsky and Lyra Monteiro (eds.), <u>A Thousand Ships: A Ritual of Remembrance Marking the Bicentennial of the Abolition of the Transatlantic Slave Trade</u> (New York: The Museum on Site, 2012).

"The Black Panther Party in History and Memory," in Jama Lazerow and Yohuru Williams (eds.), <u>In Search of the Black Panther Party: New Perspectives on a Revolutionary Movement</u> (Durham: Duke University Press, 2006).

"Francis Ouimet at the Country Club," in Randy Roberts (ed.), <u>The Rock, the Curse, and the Hub: A Random History of Boston Sports</u> (Cambridge: Harvard University Press, 2005).

"Beyond the Pale: Jewish Immigrants and the South African Left," in Milton Shain and Richard Mendelsohn (eds.), <u>Memories, Realities and Dreams: Studies in South African Jewish Experience</u> (Johannesburg: Jonathan Ball, 2002).

"The A.M.E. Church and the South African State," in Holger Bernt Hansen and Michael Twaddle (eds.), <u>Christian Missionaries and the State in the Third World</u> (Athens, Ohio University Press, 2002).

"The Americanization of South Africa," in Elaine Tyler May and Reinhold Wagnleitner (eds.), <u>Here, There and Everywhere: The Foreign Politics of American Popular Culture</u> (Hanover:

University Press of New England, 2000). (Reprinted in Andrew Offenburger, Scott Rosenberg, and Christopher Saunders (eds.), Safundi: A South African and American Comparative Reader (Phoenix: Safundi, 2002).)

"Models and Metaphors: Industrial Education in the United States and South Africa," in Ran Greenstein (ed.), Comparative Perspectives on South Africa (New York: Macmillan, 1998).

"Towards a Transnational Comparative History," in Shula Marks, Hilary Sapire and Rick Halpern (eds.), Beyond White Supremacy: Towards a New Agenda for the Comparative Histories of South Africa and the United States (London: Institute of Commonwealth Studies, 1997), pp. 37-46.

"The Invention of Race: Rereading White Over Black" (co-authored with James Oakes), in Stanley I. Kutler (ed.), American Retrospectives: Historians on Historians (Baltimore: Johns Hopkins University Press, 1995). (Originally published in Reviews in American History; also reprinted in Richard Delgado and Jean Stefancic (eds.), Critical White Studies: Looking Behind the Mirror (Philadelphia: Temple University Press, 1997).)

**Articles and essays**
"Race, Memory, and Monuments," Angles: Carolina Planning Journal, April, 2019.

"The Timeliness of Langston Hughes," The Langston Hughes Review 25,1 (2019), pp. 126-135.

"Settling Accounts? An Americanist Perspective on Historical Reconciliation," American Historical Review 114,4 (October, 2009), pp. 963-977.

"The Public History of Slavery and Justice: An Introduction," The Public Historian 29,2 (2007), pp. 13-34.

"Confronting the Legacy of Slavery and the Slave Trade: Brown University Investigates its Painful Past, U.N. Chronicle 44,3 (2007).

"The Courage to Fight Injustice: One Mississippi Woman Dared to Stand up for Civil Rights," Philadelphia Inquirer, May 11, 2006.

"What's this Battle About Anyway? Like Kerry, We're Still in Conflict Over Vietnam (co-authored with Derek Buckaloo), Washington Post Sunday Outlook, August 29, 2004.

"A Century of Service: Reflections on the Life of Josephus R. Coan," A.M.E. Church Review CXIX, 392 (Oct.-Dec., 2003), pp. 57-61.

"The Money that Proposed to Save the Nation from Mudbloods and Mongrelization: The Funding of Scientific Racism," Journal of Blacks in Higher Education 38 (Winter, 2002/2003), pp. 126-130.

"Habits of Mind," Dissent, Summer, 2002, pp. 90-94.

"Last Refuge of a Politician in Trouble," Los Angeles Times, February 3, 2002.

"Discriminating Rage," Dissent, Winter, 2001, pp. 118-123.

"Redeeming the Race:  Martin Delany and the Niger Valley Exploring Party, 1859-60," New Formations  45 (Winter 2001), pp. 125-149.

"Print the Legend:  John Wayne and Postwar American Culture," Reviews in American History 28,3 (2000), pp. 465-477.

"Romantic Revolutionaries:  David Ivon Jones, S.P. Bunting and the Origins of Non-racial Politics in South Africa, Journal of African History  39,2 (1998), pp. 181-194.

"Life and Legacy of a South African Communist," Transformations  37 (1998), pp. 84-100.

"The Power of the Word," African Affairs  97,1 (1998), pp. 121-126.

"What is Africa to Me?" Dissent, Winter, 1998, pp. 134-139.

"Like Locusts in Pharaoh's Palace:  The Origins and Politics of African Methodism in the Orange Free State," African Studies  53,1 (1994), pp. 147-149.

 "The Invention of Race:  Rereading White Over Black" (co-authored with James Oakes), Reviews in American History  21,1 (1993), pp. 172-183.

"America's Long History of Black Churches Burning," Los Angeles Times, June 16, 1996. (Reprinted in USA Today and International Herald Tribune.)

"Godspeed, David Webster," Northwestern Perspective  5,1 (1991), pp. 15-16.

"Chiefly Authority and the A.M.E. Church, 1896-1910," Societies of Southern Africa in the Nineteenth and Twentieth Centuries, vol. 15  (London:  Institute of Commonwealth Studies, 1990), pp. 48-61.


## Public humanities
### Exhibitions
Consulting historian, "Skin:  Living Armor, Evolving Identity," California Academy of Sciences, opened 2019.

Consulting historian, "The Power of Place," Smithsonian Institution National Museum of African American History and Culture, opened 2016.

Consulting historian, "Du Bois in Our Time," a collaboration of artists and historians to create an exhibition of original artworks celebrating the life and legacy of W.E.B. Du Bois, University of Massachusetts Museum of Contemporary Art, opened 2013.

Consulting historian, "A Thousand Ships: A Ritual of Remembrance," a collaboration of The Museum on Site and Providence Waterfire, October, 2008.

Co-curator, "Navigating the Past: The Voyage of the Slave Ship Sally, 1764-1765," Rhode Island Historical Society, opened 2006.

Consulting historian, "Echoes of Brown: Documenting and Performing the Legacy of Brown v. Board of Education," a collaboration of the Graduate Center of the City University of New York and students from New York City public schools. (Book and DVD published in the Teaching for Social Justice Series, 2004.)

### Documentary films
Consulting historian, "U.S.S. Constellation: Battling for Freedom," a film on the U.S. Anti-slavery Squadron, Indigo Films, premiered on History Channel, February, 2007.

Consulting historian, "This Far by Faith: African-American Spiritual Journeys," Blackside Pictures, premiered on PBS, June, 2003.

### Education
Consulting historian for a high school curriculum, Freedom Now: The Civil Rights Movement in Mississippi (Providence: Watson Institute Choices Program, 2012).

Consulting historian for Slavery: Real People and their Stories of Enslavement, illustrated historical reference work for juvenile readers, DK Publisher, 2009.

Consulting historian for a high school curriculum, Forgotten History: The Slave Trade and Slavery in New England (Providence: Watson Institute Choices Program, 2005).

Consulting historian for a high school curriculum, Freedom in Our Lifetime: South Africa's Struggle (Providence: Watson Institute Choices Program, 2003).

Lead historian for seven U.S. Department of Education Teaching American History Grants, in collaboration with the Rhode Island Historical Society, the Gilder-Lehrman Institute of Yale University, and George Mason University, 2009-2014.

### Boards

Member, National Advisory Board, President's Commission on the University in the Age of Segregation, University of Virginia, 2018-present.

Member, National Advisory Board, President's Commission on Slavery and the University, University of Virginia, 2013-2018.

Member, President's Advisory Board, Center for the Study of Slavery and Justice, Brown University, 2012-present.

# APPENDIX B

# Appendix B

## Materials Considered

Allen v. State Bd. of Elections, 393 U.S. 544 (1969).

An Act to admit the State of Mississippi to Representation in the Feb. 23, 1870, available at https://www.census.gov/history/pdf/ms-readmit22020.pdf.

Chris Myers Asch, The Senator and the Sharecropper: The Freedom Struggle of James O. Eastland and Fannie Lou Hamer (New York: New Press, 2008).

Ballotpedia, https://ballotpedia.org/Mississippi_State_Legislature.

David Beito and Linda Royster Beito, Black Maverick: T.R.M. Howard's Fight for Civil Rights and Economic Power (Urbana: University of Illinois Press, 2009).

John K. Bettersworth, Mississippi: A History (Austin: The Stock Co., 1959).

David Bositis, "The Re-Segregation of Southern Politics," available at https://www.scribd.com/document/79970841/Bositis-Re-Segregation-in-Southern-Politics.

Claude G. Bowers, The Tragic Era: The Revolution After Lincoln (Cambridge: Houghton-Mifflin Co., 1929).

James Boyd, "Nixon's Southern Strategy: It's all in the charts," New York Times Magazine, May 17, 1970.

Brown v. Bd. of Educ. of Topeka, 347 U.S. 483 (1954).

William Buchanon, The Mississippi Electorate (State College: Social Science Research Center, 1953).

Seth Cagin and Philip Dray, We Are Not Afraid: The Story of Goodman, Schwerner, and Chaney and the Civil Rights Campaign for Mississippi (New York: Macmillan, 1988).

S.A. Calhoon, "The Causes and Effects that Led to the Calling of the Constitutional Convention of 1890," in Franklin L. Riley (ed.), Publications of the Mississippi Historical Society, vol. 6 (Oxford: Mississippi Historical Society, 1902).

Clayborne Carson, In Struggle: SNCC and the Black Awakening of the 1960s (Cambridge: Harvard University Press, 1981).

Dan T Carter, The Politics of Rage: George Wallace, the Origins of the New Conservatism, and the Transformation of American Politics (New York: Simon & Schuster, 1995)

Interview with Charles E. Cobb, Jr., October 21, 1996, Center for Oral History and Cultural Heritage, University of Southern Mississippi.

James C. Cobb, The Most Southern Place on Earth: The Mississippi Delta and the Roots of Regional Identity (New York: Oxford University Press, 1992).

Connor v. Coleman, 425 U.S. 675 (1976).

Connor v. Finch, 431 U.S. 407 (1977).

Constitution of the State of Mississippi, 1817.

Constitution of the State of Mississippi, 1832.

Constitution of the State of Mississippi, 1868.

Constitution of the State of Mississippi, 1890.

Joseph Crespino, In Search of Another Country: Mississippi and the Conservative Counterrevolution (Princeton: Princeton University Press, 2007).

Joseph Crespino, Strom Thurmond's America (New York: Hill and Wang, 2012).

Royce Crocker, "The National Voter Registration Act of 1993: History Implementation, and Effects," Congressional Research Service, available at https://sgp.fas.org/crs/misc/R40609.pdf.

Tom Dent, 1994 interview of Dick Molpus, housed at the Amistad Research Center, Tulane University, Oral History Box 153/9 and 153/10.

John Dittmer, Local People: The Struggle for Civil Rights in Mississippi (Urbana: University of Illinois Press, 1994).

Charles W. Eagles, Civil Rights, Culture Wars: The Fight Over a Mississippi Textbook (Chapel Hill: University of North Carolina Press, 2019).

Thomas and Mary Edsall, Chain Reaction: The Impact of Race, Rights, and Taxes on American Politics (New York: W.W. Norton and Co., 1991).

Equal Justice Initiative, Lynching in America, https://lynchinginamerica.eji.org/explore.

George Etheridge, Mississippi Constitutions (Jackson: Tucker Printing, 1928).

Myrlie Evers, For Us, the Living (New York: Doubleday, 1967).

Myrlie Evers-Williams, The Autobiography of Medgar Evers: A Hero's Life and Legacy Revealed Through his Writings, Letters, and Speeches (New York: Basic Civitas, 2005).

Keith M. Finley, Delaying the Dream: Southern Senators and the Fight Against Civil Rights, 1938-1965 (Baton Rouge: Louisiana State University Press, 2008).

Eric Foner, Freedom's Lawmakers: A Directory of Black Officeholders During Reconstruction (New York: Oxford University Press, 1993).

Eric Foner, Reconstruction: America's Unfinished Revolution, 1863-1877 (New York: Harper & Row, 1989).

Grovey v. Townsend, 295 U.S. 45 (1935).

Guinn v. United States, 238 U.S. 347 (1915).

Alexander Heard, A Two-Party South? (Chapel Hill: University of North Carolina Press, 1952).

Janet Sharp Herman, The Pursuit of a Dream (University Press of Mississippi, 1999).

Wesley C. Hogan, Many Minds, One Heart: SNCC's Dream for a New America (Chapel Hill: University of North Carolina Press, 2007).

Luther P. Jackson, "Race and Suffrage in the South Since 1940," New South (June-July, 1948).

Jackson Clarion Ledger, May 6, 1890.

Jackson Clarion Ledger, September 11, 1890.

Jackson Clarion Ledger, September 12, 1890.

Jackson Clarion Ledger, September 16, 1890.

Jackson Clarion Ledger, June 14, 1965.

Jackson Clarion Ledger, June 16, 1965.

Jackson Clarion Ledger, June 17, 1965.

Jackson Clarion Ledger, June 18, 1965.

Jackson Clarion Ledger, June 23, 1965.

Joint Center for Political Studies, Black Elected Officials (Washington: Joint Center, 1989).

Kenneth D. Kemper, "Restrictions on Negro Voting in Mississippi History," Appendix to the Brief of the American Civil Liberties Union, Amicus Curiae in the United States v. State of Mississippi, Supreme Court of the United States, October Term, 1964, No. 73.

Kirksey v. Allain, 635 F. Supp. 347 (S.D. Miss. 1986).

Albert D. Kirwan, Apportionment in the Mississippi Constitution of 1890, Journal of Southern History 14, 2 (1948).

Albert D. Kirwan, Revolt of the Rednecks: Mississippi Politics, 1876-1925 (Lexington: University of Kentucky Press, 1951).

Kevin Kruse, White Flight: Atlanta and the Making of Modern Conservatism (Princeton: Princeton University Press, 2005).

Daniel Kryder, Divided Arsenal: Race and the American State During World War II (New York: Cambridge University Press, 2001).

Andrew Lamis, Interview with Lee Atwater, available at https://www.thenation.com/article/archive/exclusive-lee-atwaters-infamous-1981-interview-southern-strategy/.

Matthew Lassiter, Silent Majority: Suburban Politics in the Sunbelt South (Princeton: Princeton University Press, 2006).

Laws of the State of Mississippi, passed at a Regular Session of the Mississippi Legislature, held in the City of Jackson, October-December, 1865 (Jackson: J.J. Shannon & Co., 1866).

Earl M. Lewis, "The Negro Voter in Mississippi," Journal of Negro Education 26, 3 (1957).

James Loewen and Charles Sallis, Mississippi: Conflict and Change (New York: Pantheon, 1974).

Calvin McLeod Logue and Howard Dorgan (eds.), The Oratory of Southern Demagogues (Baton Rouge, Louisiana State University Press, 1981).

Madison County Journal, August 17, 1995.

Magnolia Bar Association, Inc. v. Lee, 793 F. Supp. 1386 (S.D. Miss. 1992).

Magnolia Bar Association, Inc. v. Lee, 994 F.2d 1143 (5th Cir. 1993).

Martin v. Allain, 658 F. Supp. 1183 (S.D. Miss. 1987).

Martin v. Mabus, 700 F. Supp. 327 (S.D. Miss. 1988).

Robert McDuff, "The Voting Rights Act and Mississippi: 1965-2006," Review of Law and Social Justice 17, 2 (2008).

Neil R. McMillen, The Citizen's Council: Organized Resistance to the Second Reconstruction, 1954-1964 (Urbana: University of Illinois Press, 1971).

Neil R. McMillen, Dark Journey: Black Mississippians in the Age of Jim Crow (Urbana: University of Illinois Press).

J.S. McNeilly, "History of the Measures Submitted to the Committee on Elective Franchise, Apportionment, and Election in the Constitutional Convention of 1890."

Mississippi Department of Transportation, Central Commissioner Willie Simmons, https://mdot.ms.gov/portal/central_commissioner.

Mississippi Free Press, Mississippi Elections Chief Warns Biden May Register 'Uninformed,' 'Woke' College Voters (April 6, 2021), https://www.mississippifreepress.org/11009/mississippi-elections-chief-warns-biden-may-register-uninformed-woke-college-voters/.

Mississippi State Chapter, Operation Push v. Allain, 674 F. Supp. 1245 (N.D. Miss. 1987).

Constance Baker Motley, Equal Justice Under Law: An Autobiography (New York: Farrar, Straus and Giroux, 1998).

New York Times, June 6, 1946.

Nixon v. Condon, 286 U.S. 73 (1932).

Nixon v. Herndon, 273 U.S. 536 (1927).

Dr. Byron D'Andra Orey, Expert Report (Oct. 3, 2022).

Steven Palazzo, June 23, 2021, https://twitter.com/CongPalazzo/status/1407816934759018497.

Frank R. Parker, Black Votes Count: Political Empowerment in Mississippi After 1965 (Chapel Hill: University of North Carolina Press, 1990).

Charles M. Payne, I've Got the Light of Freedom: The Organizing Tradition and the Mississippi Freedom Struggle (Berkeley: University of California Press, 1995).

Dorothy Overstreet Pratt, Sowing the Wind: The Mississippi Constitutional Convention of 1890 (University Press of Mississippi, 2018).

Ratliff v. Beale, 74 Miss. 247, 20 So. 865 (1896).

Ronald Reagan, Speech and the Neshoba County Fair, available at https://neshobademocrat.com/stories/ronald-reagans-1980-neshoba-county-fair-speech,49123.

Reynolds v. Sims, 377 U.S. 533 (1964).

Leah Wright Rigueur, The Loneliness of the Black Republican: Pragmatic Politics and the Pursuit of Power (Princeton: Princeton University Press, 2014).

Walter Rugaber, "In the Delta, Poverty is a Way of Life," New York Times, July 31, 1967.

Scot Schraufnagel, Michael J. Pomante II, and Quan Li, "Cost of Voting in the American States, 2020," Election Law Journal 19, 4 (2020).

Bruce J. Schulman and Julian E. Zelizer eds., Rightward Bound: Making America Conservative in the 1970s (Cambridge: Harvard University Press, 2008).

Byron E. Shafer and Richard Johnston, The End of Southern Exceptionalism (Cambridge: Harvard University Press, 2009).

Shelby County v. Holder, 570 U.S. 529 (2013).

Smith v. Allwright, 321 U.S. 649 (1944).

The South in the Building of the Nation: A History of the Southern States, vol. 11 (Richmond: Southern Historical Publishing Society, 1909).

Alfred Holt Stone, "Mississippi's Constitution and Statutes in Reference to Freedmen," Publications of the Mississippi Historical Society 4 (1901).

Student Nonviolent Coordinating Committee, Mississippi: A Chronology of Violence and Intimidation in Mississippi Since 1961 (Atlanta: SNCC, 1964), available at https://www.crmvet.org/docs/sncc_ms_violence.pdf.

R.H. Thompson, "Suffrage in Mississippi," Publications of the Mississippi Historical Society, vol. 1 (Oxford Mississippi Historical Society, 1898).

Thornburg v. Gingles, 478 U.S. 30 (1986).

To Secure These Rights: The Report of the President's Committee on Civil Rights (Washington: Government Printing Office, 1947).

Hans L. Trefousse, Andrew Johnson: A Biography (New York: Norton, 1989).

Tupelo Daily Journal, May 21, 1998.

United States Census Bureau, What Methods Did People Use to vote in the 2020 Election?, https://www.census.gov/library/stories/2021/04/what-methods-did-people-use-to-vote-in-2020-election.html.

United States Commission on Civil Rights, Racial and Ethnic Tension in American Communities: Poverty, Inequality, and Discrimination, available at https://www.usccr.gov/files/pubs/msdelta/ch3.htm.

United States Commission on Civil Rights, The Voting Rights Act, Ten Years After: A Report of the United States Commission on Civil Rights (Washington: The Commission, 1975).

United States Department of Justice, Determination Letters, available at https://www.justice.gov/crt/voting-determination-letters-mississippi.

United States Department of Justice Determination Letters, Submission No. T-7901 (Sept. 10, 1971), available at https://www.justice.gov/crt/records/vot/obj_letters/letters/MS/MS-1120.pdf.

United States Department of Justice, Determination Letter, Submission No. 81-1697 (March 30, 1982), available at https://www.justice.gov/crt/records/vot/obj_letters/letters/MS/MS-1560.pdf.

United States Department of Justice, Determination Letter, Submission No. 95-0418 (Sept. 22, 1997), available at https://www.justice.gov/sites/default/files/crt/legacy/2014/05/30/MS-2650.pdf.

United States v. Duke, 332 F.2d 759 (5th Cir. 1964).

"Statement of Cyril A. Walwyn, MD, Medical Adviser to Friends of the Children of Mississippi, Yazoo City, Miss.," in Hunger and Malnutrition in America : Hearings before the Subcommittee on Employment, Manpower, and Poverty of the Committee on Labor and Public Welfare, United States Senate, Ninetieth Congress, first session on hunger and malnutrition in America, July 11 and 12, 1967 (Washington: Government Printing Office, 1967).

Robert Penn Warren, Who Speaks for the Negro? (New York: Random House, 1965).

Washington Post, GOP Senator: It's a 'great idea' to make it harder for 'liberal folks' to vote (Nov. 16, 2018), https://www.washingtonpost.com/politics/2018/11/16/cindy-hyde-smith-its-great-idea-make-it-harder-liberal-folks-vote/.

Vernon Lane Wharton, The Negro in Mississippi, 1865-1890 (Chapel Hill: University of North Carolina Press, 1947).

Jhacova Williams, "Historical Lynchings and the Contemporary Behavior of Blacks," American Economic Journal: Applied Economics 14, 3 (2022).

Williams v. Mississippi, 170 U.S. 213 (1898).

Woodrow Wilson, A History of the American People (New York: Harper and Bro., 1902).

Maarten Zwiers, Senator James Eastland: Mississippi's Jim Crow Democrat (Baton Rouge: Louisiana State University Press, 2015).

**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
GREENVILLE DIVISION**

DYAMONE WHITE; DERRICK SIMMONS; TY PINKINS;
CONSTANCE OLIVIA SLAUGHTER HARVEY-
BURWELL,

        *Plaintiffs,*

        vs.

STATE BOARD OF ELECTION COMMISSIONERS;
TATE REEVES *in his official capacity as Governor of
Mississippi*; LYNN FITCH *in her official capacity as
Attorney General of Mississippi*; MICHAEL WATSON *in his
official capacity as Secretary of State of Mississippi*,

        *Defendants.*

4:22-cv-0062-SA-JMV

<u>**DECLARATION OF JAMES T. CAMPBELL**</u>

    I, James T. Campbell, make the following declaration based on personal knowledge:

    1.    I have been retained by Plaintiffs in the above-captioned matter as an expert.

    2.    The foregoing report dated October 3, 2022 is a true and correct copy of the report I provided to Plaintiffs in this matter.

    3.    The information and opinions contained in the report are true and correct to the best of my knowledge.

    Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Oct. 3, 2022

                                    _____
                                          JAMES T. CAMPBELL