UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF MISSISSIPPI
JACKSON DIVISION

SOUTHERN DISTRICT OF MISSISSIPPI
**FILED**

JUL - 7 1999

J.T. NOBLIN, CLERK
BY _____ DEPUTY

NAACP, ET AL.                                                    PLAINTIFFS

VS.                                        CIVIL ACTION NO. 3:92 CV250LN

KIRK FORDICE, ET AL.                                            DEFENDANTS

## MEMORANDUM OPINION AND ORDER

The plaintiffs in this case, a class consisting of the
registered black voters of the State of Mississippi, filed this
action against defendants, Mississippi Governor Kirk Fordice, et
al.,[1] alleging that the State of Mississippi's districting plan for
the election of public service commissioners and highway
commissioners violates § 2 of the 1965 Voting Rights Act, 42 U.S.C.
§ 1973, as well as the Fourteenth and Fifteenth Amendments to the
United States Constitution.  They charge that the use of the three
current majority white supreme court districts for election to
these offices impermissibly dilutes black voting strength in
violation of the constitution and Voting Rights Act, and they
therefore seek an order directing that the districts currently in
effect, which are configured with district lines running in an
east-west direction, be reconfigured so as to create a majority
black district running north-to-south along the western side of the
state, where the largest concentration of the state's black

_____

[1]     The defendants are Governor Fordice, Mississippi Attorney
General Mike Moore and Secretary of State Eric Clark, as members of
the Mississippi State Board of Election Commissioners; the
Mississippi State Board of Election Commissioners; the Mississippi
Democratic Executive Committee; and the Mississippi Republican
Executive Committee.

**EXHIBIT**
B

0485

population is located.[2]  The case was tried to the court on May 3-4, 1999 and, based on the evidence adduced at trial and having duly considered the parties' post-trial memoranda/proposed findings and conclusions, the court finds and concludes that the plaintiffs have not sustained their burden to prove that the current districting plan for the election to the public offices at issue violates § 2. Neither have they shown, nor do they purport to have shown, a constitutional violation.  Accordingly, and for the reasons set forth herein, the court concludes that plaintiffs' complaint is without merit and is therefore due to be dismissed.

The court observes at the outset that this is not the first time black voters in this state have brought a § 2 challenge to the district lines to which the plaintiffs herein object.  In <u>Magnolia Bar Association, Inc. v. Lee</u>, 793 F. Supp. 1386 (S.D. Miss. 1992),

---

[2]     As reflected in the pretrial order, plaintiffs complain that

> the use of three majority white voting age population east-to-west configurated supreme court judge districts to elect highway and public service commissioners violates their voting rights secured by Section 2, [the Fourteenth and Fifteenth Amendments, and 42 U.S.C. § 1983] because the use of the supreme court judge districts to elect highway and public service commissioners was adopted for the racially discriminatory purpose of diluting, minimizing and canceling out black voting strength, and the use of the supreme court judge districts to elect highway and public service commissioners results in a denial or abridgement of the right of black voters to vote on account of race or color because black voters have less opportunity than white voters to participate in the political process and to elect representatives of their choice for highway and public service commissioners.

2

several individual black voters, along with a number of organizations, including the Mississippi State Conference of the NAACP, filed suit in this court contending that the districts from which justices to the Mississippi Supreme Court are elected (which, again, are the very same districts from which the public service and highway commissioners are elected), violate § 2 and the federal constitution.  Just as here, the plaintiffs in Magnolia Bar objected that "the east-west configuration of these lines dilutes black voting strength by dividing the heavily black populated areas on the western side of the state into each of three majority white districts."  Id. at 1391.  Based on much of the same evidence as has been adduced in this case, and for reasons fully set forth in his opinion in Magnolia Bar, Judge Barbour found that there was no § 2 violation, and the Fifth Circuit affirmed, Magnolia Bar Assoc., Inc. v. Lee, 994 F.2d 1143 (5th Cir.), cert. denied, 510 U.S. 994, 114 S. Ct. 555, 126 L. Ed. 2d 456 (1993).  While Judge Barbour's ruling in Magnolia Bar does not have preclusive effect in this case, see NAACP v. Fordice, No. 95-60293 (5th Cir. Dec. 23, 1996), it is nevertheless of undeniable interest, given the likeness not only of the issues but of the evidence presented there and here. With that having been said, the court proceeds to consider the merits of the current § 2 challenge to these district lines.

Section 2 of the Voting Rights Act, as amended by Congress in 1982, provides:

(a) No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner

3

> which results in a denial or abridgement of the right of
> any citizen ... to vote on account of race or color ...
> (b) A violation of subsection (a) is established if,
> based on the totality of the circumstances, it is shown
> that the political processes leading to nomination or
> election in the State or political subdivision are not
> equally open to participation by members of a class of
> citizens protected by subsection (a) of this section in
> that its members have less opportunity than other members
> of the electorate to participate in the political process
> and to elect representatives of their choice.  The extent
> to which members of a protected class have been elected
> to office in the State or political subdivision is one
> circumstance which may be considered:
> Provided, That nothing in this section establishes a
> right to have members of a protected class elected in
> numbers equal to their proportion in the population.

42 U.S.C. § 1973.[3]  In Thornburg v. Gingles, 478 U.S. 30, 34-35,
106 S. Ct. 2752, 2758, 92 L. Ed. 2d 25 (1986), the Supreme Court's
first interpretation of amended § 2, the Court explained that
"[t]he essence of a § 2 claim is that a certain electoral law,
practice, or structure interacts with social and historical
conditions to cause an inequality in the opportunities enjoyed by
African-American and white voters to elect their preferred
representatives." Id. at 47, 106 S. Ct. at 2764.  The Court
identified three preliminary, or threshold conditions which must be
proven in order to establish a violation of § 2:

---

[3]     In 1982, "Congress substantially revised § 2 to make
clear that a violation could be proved by showing discriminatory
effect alone and to establish as the relevant legal standard, the
'results test,' applied by [the Supreme] Court in White v.
Regester, 412 U.S. 755, 93 S. Ct. 2332, 37 L. Ed. 2d 314, ... and
by other federal courts before [City of Mobile v. Bolden, 446 U.S.
55, 100 S. Ct. 1490, 64 L. Ed. 2d 47 (1980)]." Gingles, 478 U.S.
at 34-35, 106 S. Ct. at 2758.  Thus, while the fact that the
current district lines were adopted, and have been maintained, for
race-neutral reasons, would be dispositive of plaintiffs'
constitutional challenge (if they were actually pursuing that
claim), it is not pertinent to plaintiffs' § 2 claim.

4

C488

> First, the minority group must be able to demonstrate
> that it is sufficiently large and geographically compact
> to constitute a majority in a single-member district....
> Second, the minority group must be able to show that it
> is politically cohesive.... Third, the minority must be
> able to demonstrate that the white majority votes
> sufficiently as a bloc to enable it--in the absence of
> special circumstances, ...--usually to defeat the
> minority's preferred candidate.

Gingles, 478 U.S. at 50-51, 106 S. Ct. at 2766 (citations omitted).

Proof of each of these Gingles "preconditions" by a preponderance

of the evidence is essential to the success of any § 2 claim,

Gingles, 478 U.S. at 50, 106 S. Ct. at 2766; Magnolia Bar, 994 F.2d

at 1146 ("Failure to establish any one of the Gingles factors

precludes a section 2 violation. . . ."); but more is required to

prove a violation.  Johnson v. DeGrandy, 512 U.S. 997, 1009, 114 S.

Ct. 2647, 2656, 129 L. Ed. 2d 775 (1994).  The court must go

further and undertake an examination of the "totality of the

circumstances" surrounding an alleged § 2 claim to determine

whether plaintiffs have proven that they have "less opportunity

than other members of the electorate to participate in the

political process and to elect representatives of their choice" to

the offices at issue.  Gingles, 478 U.S. at 80, 106 S. Ct. at 2782;

DeGrandy, 512 U.S. at 1012, 114 S. Ct. at 2657-58.  In this regard,

the Senate Report accompanying the 1982 amendments to the Voting

Rights Act identifies a number of factors that are relevant, or

potentially relevant, to this "totality of the circumstances"

inquiry.  Gingles, 478 U.S. at 44-45, 106 S. Ct. at 2762-64.  They

include:

> a. the extent of any history of official discrimination
> in the state or political subdivision that touched the

5

0489

right of the members of the minority group to register,
to vote, or otherwise to participate in the democratic
process;
b.  the extent to which voting in the elections of the
state or political subdivision is racially polarized;
c.  the extent to which the state or political
subdivision has used unusually large election districts,
majority vote requirements, anti-single shot provisions,
or other voting practices or procedures that may enhance
the opportunity for discrimination against the minority
group;
d.  whether members of the minority group have been
denied access to [any candidate slating] process;
e.  the extent to which members of the minority group in
the state or political subdivision bear the effects of
discrimination in such areas as education, employment and
health, which hinder their ability to participate
effectively in the political process;
f.  whether political campaigns have been characterized
by overt or subtle racial appeals [and]
g. the extent to which members of the minority group have
been elected to public office in the jurisdiction.

S.REP. No. 417, 97th Cong., 2d Sess., at 28-29, (1982), reprinted

in 1982 U.S.C.C.A.N. 177, 206-07 (quoted in Gingles).  The report

lists two "[a]dditional factors that in some cases have had

probative value . . . to establish a violation," id. at 29, 1982

U.S.C.C.A.N. at 207, namely,

h.  whether there is a significant lack of responsiveness
on the part of elected officials to the particularized
needs of the members of the minority group; [and]
I.  whether the policy underlying the state or political
subdivision's use of such voting qualification,
prerequisite to voting, or standard, practice or
procedure is tenuous.

Id. at 20, 1982 U.S.C.C.A.N. at 207.

"While these enumerated factors will often be the most

relevant ones, in some cases other factors will be indicative of

the alleged dilution."  Id. at 30, 1982 U.S.C.C.A.N. at 207;

Gingles, 478 U.S. at 45, 106 S. Ct. at 2763 (noting that list of

Senate Report factors is "neither comprehensive nor exclusive").

6

0490

> Ultimately, a district court can find a § 2 violation only if, "in the particular situation, the [challenged] practice operate[s] to deny the minority plaintiff[s] an equal opportunity to participate [in the political process] and to elect candidates of their choice." Id. at 30, 1982 U.S.C.C.A.N. at 207. The Senate Report instructs courts not to become bogged down in "mechanical point counting," id. at 29 n. 118, but rather, to make a "searching practical evaluation of the [locality's] `past and present reality,'" id. at 30, 1982 U.S.C.C.A.N. at 208. "[T]here is no requirement that any particular number of [the Senate] factors be proved, or that a majority of them point one way or another." Id. at 29, 1982 U.S.C.C.A.N. at 207.

Magnolia Bar, 994 F.2d at 1146-47.

To summarize, then, to prevail on their claim that the districting for election to the offices of highway commissioner and public service commissioner abridges their right to vote "on account of race," the plaintiffs must first satisfy the threshold requirements set forth in Gingles, and, if successful in that endeavor, "must then offer evidence of the circumstances of the local political landscape," Magnolia Bar, 994 F.2d at 1146, to show that blacks in this state "have less opportunity than other members of the electorate to participate in the political process and elect representatives of their choice."[4] 42 U.S.C. § 1973. See Magnolia Bar, 994 F.2d at 1146 (citing Chisom v. Roemer, 501 U.S. 380, 394, 111 S. Ct. 2354, 115 L. Ed. 2d 348 (1991)) ("Ultimately, the [relatively narrow] Gingles threshold inquiry and the broad,

---

[4] While Gingles involved multimember districts, the same analysis applies to challenges to single-member districts, such as those at issue in the case at bar. Growe v. Emison, 507 U.S. 25, 39-40, 113 S. Ct. 1075, 1084, 122 L. Ed. 2d 388 (1993); Magnolia Bar, 994 F.2d at 1146 (citing Growe) (plaintiffs alleging that single-member district lines fragment their voting strength must satisfy Gingles requirements).

7

AO 72A
(Rev. 8/82)

totality of the circumstances inquiry are designed to probe whether the challenged election practice 'has resulted in the denial or abridgement of the right to vote based on color or race'.").

PART ONE: THE GINGLES THRESHOLD INQUIRY

In this case, while cohesiveness among minority voters is manifest from the record, and especially from the testimony of plaintiffs' expert, Dr. Allan Lichtman, so that the first <u>Gingles</u> prong is thus satisfied,[5] the evidence is more equivocal with respect to the first and third <u>Gingles</u> requirements, but in the end, the court is persuaded that plaintiffs have met their burden as to this part of the analysis.

Again, to satisfy the first <u>Gingles</u> requisite, plaintiffs must show that blacks in this state, as a group, are sufficiently numerous and geographically compact that they could constitute a majority of the voting age population in one of the three single-member districts. This first <u>Gingles</u> precondition, along with the second, minority political cohesion, are necessary "to establish that the minority has the potential to elect a representative of its own choice in some single-member district," <u>Growe v. Emison</u>, 507 U.S. at 40, 113 S. Ct. at 1084, for there can be no remedy for a group that is not sufficiently large or politically cohesive, or which is too geographically dispersed, <u>Reed v. Town of Babylon</u>, 914 F. Supp. 843, 863 (E.D.N.Y. 1996) (citing <u>McNeil v. Springfield</u>

---

[5]      Judge Barbour likewise found in <u>Magnolia Bar</u> that there is black political cohesion in the state of Mississippi in that "blacks overwhelmingly tend to vote for blacks in both judicial and non-judicial elections." <u>Magnolia Bar</u>, 793 F. Supp. at 1405. Defendant does not seriously contend otherwise.

8

Park Dist., 851 F.2d 937, 942 (7th Cir. 1988), cert. denied, 490 U.S. 1031, 109 S. Ct. 1769, 104 L. Ed. 2d 204 (1989)); see also Gingles, 478 U.S. at 51 n.17, 106 S. Ct. at 2767 n.17 ("Unless minority voters possess the potential to elect representatives in the absence of the challenged structure or practice, they cannot claim to have been injured by that structure or practice.").

As currently configured, each of the three election districts at issue in this case has a majority white population, and a majority white voting age population. The Central District has the highest percentage of black population and a black voting age population of 42.24%. The black voting age percentages in the Northern and Southern Districts are substantially lower, at 28.49% and 23.91%, respectively.[6] To meet their burden as to the first

---

[6] According to the 1990 Census data, the districts are comprised as follows:

9

( 493

Gingles precondition, plaintiffs have presented three variations of
a districting plan, in each of which the westernmost district,
running along the Mississippi River, is asserted to have a majority
black voting age population.[7]  Plaintiffs' Plan A splits Madison

|  | Total Pop. | Black Pop. | Total VAP | BVAP | %BVAP |
|---|---|---|---|---|---|
| Dist. 1:<br>Central | 887,966 | 414,478 | 623,064 | 263,205 | 42.24% |
| Dist. 2:<br>Southern | 869,885 | 235,601 | 619,462 | 148,097 | 23.91% |
| Dist. 3:<br>Northern | 815,365 | 264,978 | 583,931 | 166,367 | 28.49% |

|  | Total Pop. | White &<br>Other Pop. | White &<br>Other Pop.% | Black Pop. | Black Pop.% |
|---|---|---|---|---|---|
| Dist. 1:<br>Central | 887,966 | 612,988 | 67.50% | 264,978 | 32.50% |
| Dist. 2:<br>Southern | 869,885 | 455,407 | 53.32% | 414,478 | 46.68% |
| Dist. 3:<br>Northern | 815,365 | 550,387 | 67.50% | 264,978 | 32.50% |

|  | Total VAP | White &<br>Other VAP | White&<br>Other VAP% | BVAP. | BVAP% |
|---|---|---|---|---|---|
| Dist. 1:<br>Central | 623,064 | 389,859 | 57.76% | 263,205 | 42.24% |
| Dist. 2:<br>Southern | 619,562 | 471,365 | 76.09% | 148,097 | 23.91% |
| Dist. 3:<br>Northern | 583,931 | 416,994 | 71.51% | 166,937 | 28.94% |

[7]     The pertinent inquiry is "whether minority opportunity is
less under the challenged plan than what it would be under some
other arrangement, one that would comply with § 2." Little Rock
School Dist. v. Pulaski, 56 F.3d 904, 910 (8th Cir. 1996).   Thus,
"[i]t makes sense [to use plaintiffs' plan as a sort of working
hypothesis] because the plaintiffs' plan is a way of making
concrete their contention that the Gingles preconditions are

10

0494

County along the boundary between U.S. Congressional Districts 2 and 3, and creates one district which, according to the 1990 decennial census data, has a black voting age population (BVAP) of 50.66%, and overall population deviation of 8.34%. Like Plan A, Plan B splits Madison County along the boundary between the two congressional districts, but also splits Hinds County by placing State Senate District 29 and State House District 64 in District 2 of the plan, with the remainder of Hinds County being placed in District 1. Applying the 1990 census data, that plan has a population deviation of 8.15% and creates a 52.66% BVAP district. The only plan offered by plaintiffs which creates a majority black district without splitting counties, Plan C, has a mere 50.12% BVAP age population, according to the 1990 census data, and a 12.75% population deviation.

Defendants submit that plaintiffs have failed to give due regard to key districting criteria in drawing their plans and have thus failed to carry their burden under the first <u>Gingles</u> precondition. More to the point, they submit that by reference to 1997 and 1998 census estimates, Plan C is grossly malapportioned and is for that reason fatally deficient. They further submit that Plans A and B put forth by plaintiffs do not satisfy plaintiffs' burden under <u>Gingles</u> since the plans impermissibly split counties and carve out two majority white counties, Franklin and Lincoln Counties, which fall within the "natural plane" of the proposed district.

met.]." <u>Id</u>.

11

0495

AO 72A
(Rev. 8/82)

Obviously, at 50.66%, 50.12% and 52.66%, respectively, the BVAP percentages of District 1 in all three of plaintiffs' plans fall well below what has traditionally been considered to be required for a "safe" minority-majority voting district, i.e., a 65% total black population/60% BVAP. See Magnolia Bar, 793 F. Supp. at 1396 (citing United Jewish Orgs. v. Carey, 430 U.S. 144, 97 S. Ct. 996, 51 L. Ed. 2d 229 (1977)) (setting forth percentages for "safe" district).[8] However, as Judge Barbour recognized in Magnolia Bar, all that plaintiffs must show to satisfy the first part of the Gingles tripartite test is that "the minority's voting age population exceeds 50%." Id. at 1398 (quoting Westwego Citizens v. City of Westwego, (Westwego III), 946 F.2d 1109, 1117 (5th Cir. 1991)). Plaintiffs' plans satisfy this minimal

---

[8]    These figures have been used "to ensure minorities `the opportunity to elect a candidate of their choice'," Magnolia Bar, 793 F. Supp. at 1396, since the prevailing view for some time has been that "a substantial nonwhite population majority--in the vicinity of 65%--would be required to achieve a nonwhite majority of eligible voters'," id. (quoting United Jewish Orgs., 430 U.S. at 164, 97 S. Ct. at 1009). As the court explained in Magnolia Bar,

    [The 65% figure is derived] by augmenting a simple
    majority population by 5 percent to account for low
    minority voter registration; by 5 percent to account for
    low voter turnout; and, if total population is used, by 5
    percent to account for minority population younger than
    age 18.

Id. (citing Ketchum v. Byrne, 740 F.2d 1398, 1405 (7th Cir. 1984), cert. denied, 471 U.S. 1135, 105 S. Ct. 2673, 86 L. Ed. 2d 692 (1985).

12

0496

standard.[9]  The court thus proceeds to consider defendants'

---

[9]      Judge Barbour noted a "tension between the [<u>Gingles</u>] majority threshold requirement and the 65% remedial guideline," since "[p]roving section 2 liability merely requires a showing that the minority group . . . could constitute a bare majority of the voting age population in a proposed district, but a bare majority district is usually insufficient to allow plaintiffs to elect candidates of their choice." <u>Magnolia Bar</u>, 793 F. Supp. at 1397 n.12.  Reason would seem to dictate that the question of whether a remedy could actually be fashioned, i.e., an electable minority district created, could not be overlooked in determining whether there is § 2 <u>liability</u>, since, as the Supreme Court emphasized in <u>Gingles</u>, "[u]nless minority voters possess the potential to elect representatives in the absence of the challenged structure or practice, they cannot claim to have been injured by that structure or practice." <u>Gingles</u>, 478 U.S. at 51 n.17, 106 S. Ct. at 2767 n.17; <u>see</u> <u>also</u> <u>Campos v. City of Baytown, Tex.</u>, 840 F.2d 1240, 1244 (5th Cir. 1988), <u>cert. denied</u>, 492 U.S. 905, 109 S. Ct. 3213, 106 L. Ed. 2d 564 (1989).  <u>But see</u> <u>Dickinson v. Indiana State Election Bd.</u>, 933 F.2d 497, 503 (7th Cir. 1991) (difficulty in fashioning remedy "should not impede the judge at the liability stage of the proceedings").  While the issue may be irrelevant for purposes of the <u>Gingles</u> <u>threshold</u> analysis, in the court's view, if it were to plainly appear that no constitutionally permissible remedy could be devised, that circumstance would preclude a finding of liability.
      The court recognizes that plaintiffs' plans are illustrative and intended only to show the feasiblity of creating a majority BVAP district; plaintiffs do not ask that the court adopt any of their plans as a remedy.  Nevertheless, if the "safe districting rule" were the ultimate remedial goal in this case, that rule "would work atypically against plaintiffs," <u>Concerned Citizens for Equality v. McDonald</u>, 868 F. Supp. 393, 403 (E.D. Tex. 1994), since it is apparent that plaintiffs have barely been able to achieve a <u>simple majority</u>-minority district.  However, plaintiffs take the position (perhaps because they must) that because of the increase in this state in recent years in black voter turnout, "at least as a general rule, . . . you [no] longer need supermajority districts in the order of 60 to 65 percent" in Mississippi to remedy a § 2 violation.  In this vein, Dr. Lichtman testified to his "very surprising and notable findings" that "at least overall in general elections, blacks (in Mississippi) have come very close to closing the gap" in voter turnout.  This, he said, is a "very important change in the state of Mississippi."
      Notably, Dr. Lichtman did not opine that a higher than 50% BVAP will <u>not</u> be required to remedy the violation alleged in this case and in fact stated that he has not analyzed all relevant data to determine the percentage which he thinks will ultimately be required to <u>remedy</u> this particular alleged violation.  Since here, it is merely questionable whether an effective remedy could be devised, (that is, it has not been shown that no acceptable remedy

13

0497

arguments relative to plaintiffs' plans.

While each of these plans creates a majority black district when judged by reference to 1990 census figures, defendants submit that based on the more recent census estimates prepared by the Census Bureau in 1997 and 1998, Plan C is grossly malapportioned. They point out, more particularly, that based on the July 1998 census estimates, the total population deviation of plaintiffs' Plan C is 30.38%.[10] Plaintiffs do not deny that such a substantial deviation would be unacceptable. They take the position, though, that the court should reject the recent census estimates as a basis for evaluating Plan C since, according to plaintiffs, the only relevant data for assessing a claim under § 2 is the 1990 decennial census data.

The court recognizes that in order to satisfy the first Gingles requisite, plaintiffs need not produce the "ideal" districting plan, Clark v. Calhoun County, 21 F.3d 92, 95 (5th Cir. 1994); and contrary to defendants' urging, from an apportionment standpoint, it is not required that a proposed plan satisfy the de

is possible), the court does not consider this issue in its assessment of liability vel non.

[10]     Under the 1997 census estimate, the area encompassed by plaintiffs' proposed District 3 (lying in the northeastern portion of the state) has increased in population by 78,159 over the 1990 figure to a total of 976,491, while District 1 (the proposed majority black district) has decreased in population by 5702, to a total population of 783,240, resulting in an overall population deviation of 21.24%. The 1998 census estimate reflects yet a further increase in the population of District 3 to a total of 1,060,457, and a further decrease of 1488 in the population of District 1 to a total of 781,752, resulting in a deviation of 30.38%.

14

minimis apportionment deviation standard.[11]  In the court's view,
the fact of a 12.75% deviation--the percentage of deviation under
Plan C as derived from the 1990 census figures--would not render
that plan an unacceptable hypothetical district for purposes of
satisfying plaintiffs' burden as to the first _Gingles_ threshold
criteria (the deviation there being only marginally greater than
the 10% standard).  It is clear, however, that a plan with a
deviation in excess of 30%--as claimed by defendants with respect
to plaintiffs' Plan C based on the 1998 census estimates--would be
unconstitutional, as it would violate the one person, one vote
requirement.

In _Gaffney v. Cummings_, 412 U.S. 735, 745-47, 93 S. Ct. 2321,
2328, 37 L. Ed. 2d 298 (1973), the Supreme Court recognized that

> total population, even if absolutely accurate as to each
> district when counted, is nevertheless not a talismanic
> measure of the weight of a person's vote under a
> later-adopted reapportionment plan.  The United States
> census is more of an event than a process.  It measures

---

[11]    The standard deviation applicable to legislative
districting plans is 10%, _see_ _Voinovich v. Quilter_, 507 U.S. 146,
160-62, 113 S. Ct. 1149, 1159, 122 L. Ed. 2d 500 (1993) (finding
that deviation below 10% in plan devised by state or local
governing body would be permissible), whereas a more exacting "de
minimis" standard governs court-ordered remedial plans, _see_ _Chapman
v. Meier_, 420 U.S. 1, 26, 95 S. Ct. 751, 765 (1975)
(court-ordered remedial plans may have no more than a de minimis
deviation unless "important and significant state considerations
rationally mandate departure from" that standard).  No court, to
this court's knowledge, has required that a plan proffered for
purposes of satisfying the _Gingles_ threshold meet the de minimis
requirement; at least one has held that such plans must meet the
10% standard.  _See_ _Reed v. Town of Babylon_, 914 F. Supp. 843, 870
(E.D.N.Y. 1996)(to satisfy first _Gingles_ precondition, "plaintiffs
do not have to meet the stricter population deviation standard for
court-ordered plans," but rather must propose a redistricting plan
that meets the 10% population deviation rule applicable to
legislative plans).

15

0499

population at only a single instant in time. District populations are constantly changing, often at different rates in either direction, up or down. Substantial differentials in population growth rates are striking and well-known phenomena.

It is, nevertheless, generally recognized that while "court[s] [are] not confined to United States census data in deciding whether a sufficiently large and geographically compact majority-minority single-member district can be created to satisfy [the first prong of Gingles," Perez v. Padasena Indep. School Dist., 958 F. Supp. 1196, 1210 (S.D. Tex. 1997)(citing Kirkpatrick v. Preisler, 394 U.S. 526, 534-36, 89 S. Ct. 1225, 1231, 22 L. Ed. 2d 519 (1969) (additional citations omitted), the decennial census generally provides the most accurate and reliable population information, id. On the other hand, "[c]ommon sense . . . teaches that the further away in time one moves from the census, the less reliable it becomes." Id. at 1211. See also McNeil v. Springfield Park Dist., 851 F.2d at 945, 946 ("With a mobile population, the demographic facts may always be a bit stale" and "census data may not accurately reflect present population."). Therefore, decennial census data, while presumptively correct, is not conclusive, and can be overcome by clear and convincing proof of changed figures. See Perez, 958 F. Supp. at 1211; McNeil, 851 F.2d at 946 ("the census figures are presumed accurate until proven otherwise by "clear, cogent, and convincing" evidence). In other words, "[f]ederal census data must be used unless there is more reliable data." Perez, 958 F. Supp. at 1211 (citing McNeil).

16

0500

Given this exacting standard, and the evident difficulties in making reliable projections of population growth and shifts, see McNeil, 851 F.2d at 946 ("Estimates based on past trends are generally not sufficient to override 'hard' decennial census data."), most courts have found it appropriate to use the decennial census data, even late in the census cycle. See, e.g., McNeil, (relying, in July 1988, on 1980 census based on finding that "'the meager [projection] evidence' . . . [could not] override the presumption of census accuracy"); Perez, 958 F. Supp. at 1211 (using 1980 census figures to find that plaintiffs failed to meet first Gingles factor upon finding that plaintiffs' 1987 projected population growth was not sufficiently reliable to overcome presumption of census accuracy); Graves v. Barnes, 446 F. Supp. 560, 568 (W.D. Tex. 1977) (relying, in October 1977, on 1970 census upon finding "several scientific defects" in plaintiffs' method of projection); cf. Garza v. County of Los Angeles, 918 F.2d 763, 773 (9th Cir. 1990), cert. denied, 498 U.S. 1028, 111 S. Ct. 681, 112 L. Ed. 2d 673 (1991) (allowing use of projections in fashioning remedy for proven intentional discrimination "where ... the census data [was] almost a decade old and therefore no longer reliable.").

In the cited cases, save one, the court rejected a party's estimates of population in favor of "hard" decennial census data, even when that census data was outdated and concededly inaccurate to some extent, since in each case, the party's estimates were not shown to have been more accurate, and hence reliable, than the "stale" census data. In contrast, the population estimates which

17

C501

form the basis of defendants' objection to plaintiffs' Plan C are not the product of some mathematical calculation by the defendants or their expert, but rather are estimates made by the United States Census Bureau. Moreover, and in further contrast, plaintiffs' experts in this case have not contended that the 1998 census estimates, which are based not on projections but on sampling by the Census Bureau, are not reliable, or not more reliable than the outdated 1990 census data. Accordingly, defendants, and the court, may properly rely on the recent estimates, which, the court reiterates, reflects a deviation of more than thirty percent for Plan C. That renders Plan C an unacceptable alternative.

Unlike Plan C, calculation of the deviation in Plans A and B cannot be made based on the 1997 or 1998 census estimates since both of those plans split counties and the census estimates provide only whole-county data. It seems probable, nonetheless (or at least not improbable), that those plans, like Plan C, are also unconstitutionally malapportioned. That is to say, while the census estimates do not provide a concrete basis for ascertaining the total population in the districts in Plans A and B (or the racial composition of the districts), it strikes the court as unlikely, given the magnitude of the population changes reflected in the 1998 census estimates, that the deviation under those plans would not be similarly affected, particularly given the slight variation in those plans and Plan C. Since the 1990 census information is "presumptively correct" unless proven incorrect by "clear and convincing" evidence, however, the court, for purposes

18

of determining whether plaintiffs have met their threshold burden under <u>Gingles</u>, will assume that these plans are not objectionable on this basis.[12]

In addition to their contention that plaintiffs' proposed districts are malapportioned, defendants argue that the proposed plans were drawn with race as the near exclusive criterion and that the plans thus violate the Equal Protection Clause. Defendants submit that for this reason, plaintiffs cannot use these plans to satisfy their burden under <u>Gingles</u>.

Defendants' argument in this regard derives from the Supreme Court's rulings in <u>Miller v. Johnson</u>, 515 U.S. 900, 115 S. Ct. 2475, 132 L. Ed. 2d 762 (1995), and <u>Shaw v. Reno</u>, 509 U.S. 630, 113 S. Ct. 2816, 125 L. Ed. 2d 511 (1993), in which the Court held that a plaintiff challenging districting legislation states a cognizable claim under the Fourteenth Amendment's Equal Protection Clause where he can show, "either through circumstantial evidence of a district's shape and demographics or more direct evidence going to legislative purpose, that race was the predominant factor motivating the legislature's decision to place a significant number of voters within or without a particular district." <u>Miller</u>, 515 U.S. at 901, 115 S. Ct. at 2488; <u>see Shaw</u>, 509 U.S. at 647, 113 S. Ct. at 2827. "To make this showing, a plaintiff must prove that the legislature subordinated traditional race-neutral districting principles, including but not limited to compactness, contiguity,

_____

[12] This circumstance, however, does bear on the court's "totality of the circumstances" inquiry, <u>infra</u>.

19

0503

respect for political subdivisions or communities defined by actual shared interests, to racial considerations." Miller, 515 U.S. at 901, 115 S. Ct. at 2488. If race is the "predominant, overriding factor explaining" the plan, then the plan "cannot be upheld unless it satisfies strict scrutiny," that is, unless it is "narrowly tailored to achieve a compelling interest." Id. at 920, 115 S. Ct. at 2490; see Shaw, 509 U.S. at 657, 113 S. Ct. at 2832.

Shaw and Miller imply that "a race-based remedial measure to correct a § 2 violation would, at a minimum, have to be narrowly tailored to that goal." Reed v. Town of Babylon, 914 F. Supp. at 871; cf. Harvell v. Blytheville School Dist. # 5, 71 F.3d 1382, 1391 (8th Cir. 1995) (cautioning district court on remand to "steer clear of the type of racial gerrymandering proscribed in Miller, while keeping in mind the need to vindicate the rights of the minority voters"). A number of courts have thus held that "[a] plaintiff seeking to meet its burden of showing compactness under the first Gingles precondition should not be permitted to rely on a plan which, if subsequently adopted by the Court after a finding of a Section 2 violation, would have no chance of being found to be narrowly tailored to redress the violation." Reed, 914 F. Supp. at 871; Cane v. Worcester County, Maryland, 35 F.3d 921, 927 (4th Cir. 1994); Jeffers v. Tucker, 847 F. Supp. 655, 661 (E.D. Ark. 1994).

In Clark v. Calhoun County, 21 F.3d 92 (5th Cir. 1994), the Fifth Circuit found it unnecessary to decide whether "a bizarrely-shaped district which would enable plaintiffs to state a claim under the Equal Protection Clause would necessarily flunk the

20

0504

_Gingles_ compactness test." _Id._ at 96. The court went on to note, however, that a district court "should make sure that any _remedial plan_ is narrowly tailored to correct any § 2 violation found to exist," _id._ at 96 n.2 (emphasis added), consistent with "the spirit of _Shaw,_" _id._ In this court's view, it would make little sense to find that the plaintiffs could establish a § 2 violation merely because they could show that it was physically possible to configure a district with a majority black voting age population when the violation could not be remedied without violating the Equal Protection Clause. That is to say, in order to meet their burden of proof under _Gingles,_ plaintiffs ought be required to "either proffer a districting plan which does not subordinate racial considerations to traditional districting principles, including compactness, contiguity, conformance with geographic boundaries and respect for political subdivisions or communities, or justify the need for such subordination."[13] _Reed,_ 914 F. Supp. at 871. Like the Fifth Circuit in _Clark,_ however, the court need not definitively resolve the issue, for Plans A and B formulated by plaintiffs' expert to show that a majority black district can be crafted, i.e., to demonstrate "geographic compactness," are not bizarrely-shaped and in the court's opinion, do not necessarily subordinate "traditional race-neutral" districting principles to

---

[13]    The fact that defendants' expert, Kathryn Hester, conceded that a majority BVAP district _can_ be configured based on the 1990 census data is a concession only that blacks in the state are "sufficiently numerous" and does not account for the further requirement of geographic compactness, and the constitutional considerations attending that notion.

21

race.  While the plaintiffs' expert necessarily took race into
account in constructing a district that is majority black in voting
age population since his goal was to create a majority BVAP
district, he did not do so, in Plans A and B, in complete disregard
of other districting criteria.  It is true that one of the plans
splits Madison County, and the other splits Madison and Hinds
counties, and that it is typically desirable to avoid such splits.
But there is no per se rule against splitting counties, and the
county/counties are split along other political boundaries.
Moreover, while both plans exclude majority white Franklin and
Lincoln counties, which defendants submit fall within the "natural
plane" of the district, the districts are not bizarrely or
irregularly shaped, and certainly are not so to such an extent as
would preclude plaintiffs' using the plans to meet their burden
with respect to the first <u>Gingles</u> precondition.

To satisfy the third <u>Gingles</u> precondition, plaintiffs must
show that the white majority in Mississippi votes sufficiently as a
bloc to enable it--in the absence of special circumstances--usually
to defeat the minority group's preferred candidate.  <u>Gingles</u>, 478
U.S. at 48-51, 106 S. Ct. at 2765-67.  The existence of racial bloc
voting has been termed the "essence of a vote dilution claim
because, to be actionable, the electoral defeat at issue must come
at the hands of a cohesive white majority." <u>Nipper v. Smith</u>, 39
F.3d 1494, 1533 (11th Cir. 1994), <u>cert. denied</u>, 514 U.S. 1083, 115
S. Ct. 1795, 131 L. Ed. 2d 723 (1995).  For their part, plaintiffs
submit that Dr. Lichtman's analysis of voting in this state over

0506

the past twenty years using standard recognized methodologies of ecological regression and homogenous precinct analysis, as reflected in Plaintiffs' Exhibits 5 and 21, clearly demonstrates that legally significant white bloc voting exists throughout Mississippi in black versus white elections for all types of offices. Defendants, on the other hand, while denying that the evidence of record demonstrates that white bloc voting is "usual" in elections throughout the state, submit that in any event, in the most relevant elections, i.e., those from the districts at issue in this case, whites have not voted sufficiently as a bloc to defeat the black candidates or the candidates preferred by black voters. More to the point, they note that in 1986, Reuben Anderson, a black candidate, was elected over white candidate Richard Barrett, receiving 58% of the white vote; in 1991, Fred Banks, a black candidate, received approximately 30% of the overall white vote to win election over a white candidate, Chet Dillard; and in 1996, Justice Banks defeated white candidate Ryan Hood for the position, receiving approximately 28% of the white vote.

In addition to the evidence of Justices Anderson's and Banks' success in the Central District, defendants presented evidence that black candidates have won in other recent biracial elections for other offices in the state, i.e, elections other than from the districts at issue, and elections for which Dr. Lichtman's analysis did not account. Specifically, Myra Murrell, a black candidate, was elected as tax assessor/collector in Scott County in 1997, defeating a white candidate in a county with a 33% black voting age

0507

population; Antwinette McCrary, a black candidate for the at-large
council position in the City of Quitman, defeated a white candidate
in a town with a 26.88% black voting age population; Tommy Storey,
a black candidate, defeated a white candidate in majority white
Tippah County in the election for sheriff in 1997.

The existence of legally significant white bloc voting in
Mississippi has been found by numerous courts, see, e.g., Houston
v. Haley, 859 F.2d 341 (5th Cir. 1988) ("racial bloc voting is
common in Mississippi"), and in fact, was found by Judge Barbour in
Magnolia Bar with respect to the plaintiffs' east-west district
lines challenge, Magnolia Bar, 793 F. Supp. at 1416 ("whites in
Mississippi generally vote as a bloc").  For purposes of evaluating
plaintiffs' proof under the threshold Gingles criteria, this court
takes the same road, for while the substantial white support
received by black candidates Anderson and Banks in the Central
District demonstrates that in the Central District, the white
majority does not "vote sufficiently as a bloc to enable it . . .
usually to defeat the minority's preferred candidate," Gingles, 478
U.S. at 51, 106 S. Ct. at 2767,[14] that cannot be said as to

---

[14]    The plaintiffs in this case, as did the plaintiffs in
Magnolia Bar, would have the court treat these elections of Justice
Anderson and Justice as aberrational and hence of no analytical
significance since both candidates were incumbents who had
originally been appointed by white governors.  Like Judge Barbour,
however, this court considers these elections to be highly
probative.  Regarding the Anderson election and the 1991 Banks
election, Judge Barbour observed, in recognition of Dr. Lichtman's
suggestion that these elections were extraordinary, that "the power
of incumbency can be a mitigating factor of which courts should be
cognizant in examining the existence of racially polarized voting."
Magnolia Bar, 793 F. Supp. at 1407.  He found, though, that "the
election of Anderson and the election of Banks to the Mississippi

24

elections <u>in the state as a whole</u>. Accordingly, based on Dr.
Lichtman's analysis,[15] the court finds that plaintiffs have
sustained their burden as to the <u>Gingles</u> threshold criteria.[16]

---

Supreme Court were not aberrational but evidence that whites will
not necessarily vote as a bloc for white candidates having black
opponents in Mississippi Supreme Court elections so as to `usually
defeat the minority's preferred candidate.'" <u>Id.</u> at 1407; <u>see also</u>
<u>Magnolia Bar</u>, 994 F.2d at 1144 ("[W]e think that the district court
could reasonably conclude that the election of two black judges
from the Central District was not aberrational, but rather,
probative evidence that whites would not vote as a bloc so as to
usually defeat the preferred supreme court candidate of black
voters," and therefore, "the district court did not clearly err in
finding no legally significant white bloc voting in Mississippi
elections in the Central District.").

[15]     In addition to Dr. Lichtman's expert testimony, David
Jordan testified on behalf of plaintiffs without equivocation or
exception that blacks in Mississippi cannot win an election for any
office in a majority white district because of voter polarization.
Jordan stated, "It's a fact that whites will not elect blacks to
office unless blacks have a majority of [the] district." Upon
cross-examination concerning the fact that Justice Fred Banks was
elected to the Mississippi Supreme Court from a majority white
district, he described Banks as "unique" and his election as
"miraculous." Upon further questioning, he acknowledged he was
unaware of a number of other elections in which black candidates
had won in majority white districts. Moreover, after expressing
the view that blacks are discouraged from running for office in the
state, he acknowledged that two of the declared candidates for the
upcoming election for Transportation Commissioner for the Central
District are black. While lay testimony may be admitted on the
subject of voting polarization, the court does not consider Senator
Jordan's testimony to be especially probative on this issue. <u>See</u>
<u>Gingles</u>, 478 U.S. at 53 n.20, 106 S. Ct. at 2767 ("Although lay
testimony may evidence political cohesiveness or racial bloc
voting, statistical evidence in the form of double-equation
ecological regression analysis and extreme case analysis, presented
through expert testimony is typically also offered."); <u>Monroe v.</u>
<u>City of Woodville</u>, 897 F.2d 763, 764 (5th Cir. 1990) ("Statistical
proof of political cohesion is likely to be the most persuasive
form of evidence, although other evidence may also establish this
phenomenon.").

[16]     Plaintiffs' assertion as to the existence of white bloc
voting in the state, as opposed to the particular districts at

0509

PART TWO: TOTALITY OF THE CIRCUMSTANCES

While the Gingles threshold inquiry is "relatively narrow," Magnolia Bar, 994 F.2d at 1146, the "totality of the circumstances" aspect of the Gingles analysis is a flexible, fact-intensive inquiry, requiring "an intensely local appraisal of the design and impact of the contested electoral mechanisms," Magnolia Bar, 994 F.2d at 1147, based "upon a searching practical evaluation of the 'past and present reality' ... and on a 'functional' view of the political process," League of United Latin American Citizens v. Clements, 999 F.2d 831, 860 (LULAC IV) (5th Cir. 1993) (quoting S.Rep. at 30, 1982 U.S.C.C.A.N. at 208). Under this analysis, "'there is no requirement that any particular number of factors be proved or that a majority of them point one way or the other.'" Gingles, 478 U.S. at 45, 106 S. Ct. at 2763 (quoting S.Rep. at 29, 1982 U.S.C.C.A.N. at 207).

The issues to which this inquiry are addressed are not simply whether the minority group has the ability to elect but also whether there is the opportunity to participate in the political process, for the Supreme Court has repeatedly made clear that lack of opportunity to participate in the political process is as critical to a plaintiff class's § 2 claim as the opportunity to elect. See, e.g., Chisom v. Roemer, 501 U.S. 380, 396-97, 111 S.

---

issue, is belied to an extent by defendants' evidence of electoral success by black candidates Murrell, McRary and Storey, which suggests that black electoral success in white majority districts is becoming less "unusual" with the passage of time. Nevertheless, for now, the court is persuaded that white bloc voting is still prevalent in Mississippi.

0510

Ct. 2354, 2364-65, 115 L. Ed. 2d 348 (1991) ("[T]he inability to elect representatives of their choice is not sufficient to establish a violation [of § 2] unless, under the totality of the circumstances, it can also be said that the members of the protected class have less opportunity to participate in the political process."); <u>White</u>, 412 U.S. at 769, 93 S. Ct. at 2341 (vote dilution exists only where the minority group is excluded from "effective political participation in political life"). In this case, while the court has concluded that plaintiffs have proven each of the <u>Gingles</u> threshold requisites, the court further concludes that their claim fails under the "totality of the circumstances" inquiry, for the record evidence as to "the circumstances of the local political landscape" does not demonstrate that black citizens of this state "have less opportunity than other members of the electorate to participate in the political process and elect representatives of their choice."

<u>Minority Electoral Success and Racially Polarized Voting</u>:

"[T]he existence of racially polarized voting and the extent to which minorities are elected to public office [are] the two most important factors considered in the totality-of-circumstances inquiry." <u>Clark</u>, 88 F.3d at 1397 (citing <u>Gingles</u>, 478 U.S. at 48 n.15, 106 S. Ct. at 2765-66, n.15). The court resolves neither of these factors in plaintiffs' favor.

While it is true that no black person has ever been elected to a statewide office in Mississippi, "blacks have attained

27

0511

significant electoral success in the State of Mississippi."
Magnolia Bar, 793 F. Supp. at 1410. In 1990, 669 of the 4622
elected officials in Mississippi were black, and in 1996, that
number had risen to 819. Moreover, the court has concluded that as
to the state as a whole, racially polarized voting is obviously
present to an extent, as shown by Dr. Lichtman's statistical
analysis; yet just as plainly, there has been significant and
decisive crossover voting of white voters for black candidates in
the districts under consideration. Black candidates have enjoyed
substantial success in the elections for positions in the districts
at issue, or more to the point, in the Central District. The Fifth
Circuit recognized in Magnolia Bar that the most probative evidence
as to black electoral success, and the presence and/or degree of
white bloc voting, is evidence with respect to the particular
office at issue. Magnolia Bar, 994 F.2d at 1149 ("the most
probative elections are generally those in which a minority
candidate runs against a white candidate," and "elections involving
the particular office at issue will be more relevant than elections
involving other offices"). Though the elections of Anderson and
Banks to the Mississippi Supreme Court are not for the same office
as those at issue in this case, these individuals were elected from
the same districts that are at issue. Plainly, these elections are
the most probative for purposes of determining whether the current
districts operate to dilute minority voting strength and whether an
alternative district would likely provide greater electoral
success.

0512

<u>Historical Discrimination and Resulting Socioeconomic Effects</u>:

The first and fifth Senate factors, namely, the extent of any history of official discrimination and the extent of any socioeconomic effects of discrimination, are related, inasmuch as "[t]he courts have recognized that disproportionate educational, employment, income level and living conditions arising from past discrimination tend to depress minority political participation." LULAC IV, 999 F.3d at 866-67 (quoting S.Rep. 417 at 29 n.114, reprinted in 1982 U.S.C.C.A.N. 207 n. 114.).

It is well established, and undisputed, that Mississippi has a past history of official discrimination touching upon the right of blacks to register and to vote. See Magnolia Bar, 793 F. Supp. at 1408. And no one denies that the socioeconomic status of blacks is lower than that of whites in the state,[17] or that this condition is a "tragic legac[y] of the State's discriminatory practices." LULAC IV, 999 F.2d at 866. Yet the facts of socioeconomic disparities and a history of discrimination, "by themselves, are insufficient to support a `finding' that minorities do not enjoy equal access to the political process absent some indication that these effects of past discrimination actually hamper the ability of minorities to participate." Id. That is not to say that plaintiffs must prove "any further causal nexus between their disparate socio-economic status and the depressed level of political participation." Id.

---

[17]    The 1990 census data shows, for example, that blacks in Mississippi suffer from less education, less employment, lower income levels, and disparate living conditions as compared to whites.

29

0513

(quoting S.Rep. 417 at 29 n.114, reprinted in 1982 U.S.C.C.A.N. at 207 n.114.). In fact, they need not. Id. But they are "required [to show] that [black residents of the state] [do] not in fact participate to the same extent as other citizens." Id. (requiring proof that participation in the political process is in fact depressed among minority citizens).

In this vein, the plaintiffs herein do not contend and have not undertaken to prove reduced levels of black voter registration or lower turnout among black voters. In fact, through the testimony of their expert, Dr. Lichtman, they have conceded that in spite of the state's history of official discrimination and in the face of socioeconomic barriers, black voter turnout in recent elections in Mississippi has been roughly equal that of the state's white voters.[18] Plaintiffs nevertheless maintain that the ability of blacks to "participate" in elections is hampered by these factors in that black citizens, being socially and economically disadvantaged as a result of historical discrimination, are less able to participate in elections as candidates. Blacks remain politically disadvantaged, plaintiffs say, not so much at the polls, necessarily, but on the campaign trail because the lack of resources--particularly financial resources--available to prospective black candidates significantly impairs their ability to run effective campaigns. In other words, they can't win because they can't afford to run.

---

[18]     See supra note 9.

0514

30

Addressing a similar contention "that minority citizens' lack of financial resources makes it very difficult for minority-preferred candidates to secure funds sufficient to run creditable county-wide campaigns," the Fifth Circuit in LULAC IV stated:

> [T]he inference plaintiffs ask us to draw might well be true in most cases; regardless of its general validity, however, it is no substitute for proof that a minority group's poverty has had the predicted effect in this particular case. The evidence presented at trial simply does not show that past discrimination has inhibited the ability of minorities to participate in the process. In fact, the record discloses that minority-preferred candidates frequently raised and spent more money than their white opponents.

Id. at 867-68.

In LULAC, plaintiffs presented witnesses who testified that "minority candidates generally were unable to raise the money necessary to run county-wide," and that "black incumbents had difficulty raising funds." Id. at 868. Yet almost all of the minority candidates who appeared at trial testified that they "had outspent their white opponents, often by a very large amount." Id. Reviewing this evidence, the court concluded:

> The record before us does not remotely suggest that the visible scars of discrimination have left minority-preferred candidates and their supporters within minority communities without the funds needed to launch broad-based, county-wide campaigns. In fact, the available evidence shows just the opposite. For this reason, we must conclude that plaintiffs have not established that the effects of past discrimination have hindered their ability to participate in the political process.

Id.[19]

---

[19]     The plaintiffs' expert in LULAC IV had testified that "socioeconomic differences 'indicate[] that minorities may have a diminished ability to participate fully in the electoral system

31

0515

The court in LULAC IV emphasized that "[a] district court's findings under § 2 must rest on an 'intensely local appraisal' of the social and political climate of the cities and counties [and states] in which such suits are brought, [White v. Regester, 412 U.S. 755, 769, 93 S. Ct. 2332, 2341, 37 L. Ed. 2d 314 (1973)] not . . . generalized armchair speculation." Id. ("We need evidence, not musings."). In the case at bar, plaintiffs have speculated, but presented no evidence that any prospective black candidate for any political office in this state has either lost an election, or was unable to run for office, due to a lack of resources. In short, there is no competent record evidence from which the court might find that the effects of past discrimination have hindered the ability of blacks to participate in the political process.

The court could well conclude, based on its findings with respect to the foregoing factors, that plaintiffs had failed to sustain their burden to demonstrate a § 2 violation under the "totality of the circumstances." Yet none of the remaining Senate factors, which plaintiffs acknowledge are typically of less relevance than those already addressed, cuts in favor of plaintiffs.

Remaining Senate Factors

because of their lower status and stratification that exists in that community'." LULAC IV, 999 F.2d at 867. The Fifth Circuit found that while this testimony "provide[d] support for the common sense proposition that depressed political participation typically accompanies poverty and a lack of education," "it certainly [did] not amount to proof that minority voters . . . [had] failed to participate equally in the political processes." Id.

0516

With respect to the factor of potentially discriminatory voting practices or procedures, the court observes that the districts at issue are large, but are necessarily so since each commission has only three members. Each district is a single-member district. There is a majority-vote requirement, but such a requirement "is not inherently discriminatory," Magnolia Bar, 793 F. Supp. at 1409, and Mississippi does not have anti-single shot voting provisions, id. Plaintiffs have identified no other voting practices or procedures that may enhance the opportunity for discrimination against blacks.

There is no candidate slating process in Mississippi. Id. And plaintiffs have offered little or no evidence of racial appeals in Mississippi campaigns or of any lack of responsiveness on the part of Transportation or Public Service Commissioners to the needs of black citizens.

The sole remaining factor identified in the Senate Report is "whether the policy underlying the state or political subdivision's use of such voting qualification, prerequisite to voting, or standard, practice or procedure is tenuous." On this issue, defendants assert that the state has a legitimate, nontenuous interest in maintaining the east-west district lines since alteration of the district lines as proposed by plaintiffs would result in considerable cost to the Department of Transportation in terms of dollars and efficiency.

On this topic, Transportation Commissioner Zack Stewart explained that the state is divided into six Department of

0517

Transportation "maintenance districts," which are allotted two each to the existing commissioner districts. Each district has a headquarters complete with a building, testing laboratory, and other physical plant features. Commissioner Stewart testified that it would not be administratively feasible to change the commissioner district lines without also changing the maintenance district lines and moving district office headquarters, where necessary, to accommodate the changed district lines, all at a cost which he estimated would run into millions of dollars. He further explained that the district engineer and crews in each district have particular knowledge of and familiarity with the maintenance needs of the highways within their individual maintenance districts, and opined that changes in district lines as proposed by plaintiffs and the attendant changes in maintenance district lines, would result in a severe decline in the efficiency of highway maintenance which could last for years to come.

An alteration of district lines in virtually every case will result in some cost and administrative inconvenience, the extent of which would depend on the extent of the changes. The fact of such costs and inconvenience associated with implementation of district line modifications alone would not justify denial of relief. Cf. Reed, 914 F. Supp. at 873 ("[A]dministrative convenience alone should not be a basis for rejecting a plan under the first Gingles precondition."); Murphree v. Winter, 589 F. Supp. 374, 381 (S.D. Miss. 1984) ("Mere administrative inconvenience can never justify denial of a constitutional right."). Here, though, it is clear

34

6518

from Commissioner Stewart's testimony that much more would be involved to implement the types of district changes proposed by plaintiffs than merely redrawing the lines on the map; the substantial restructuring of the Department of Transportation's organization and/or facilities described by Commissioner Stewart goes far beyond that. Even though the magnitude of these changes and the attendant cost estimated by Commissioner Stewart would not likely be a basis for denying relief that otherwise was appropriate, in this case, this is yet one of many factors which weighs against plaintiffs' claim.

CONCLUSION

On the whole, even though the court has concluded that plaintiffs have satisfied their initial burden under <u>Gingles</u>, the court is of the opinion that the "totality of the circumstances" do not make a case in plaintiffs' favor. Although by reference to the 1990 census data, plaintiffs' Plans A and B each includes a majority BVAP, the BVAP majorities reflected by those plans are exceedingly narrow and, in fact, may be presently nonexistent. Further, the court considers it probable that the plans are unacceptably malapportioned.[20]  Given these facts, in particular,

---

[20]  There is no requirement, and the court does not suggest otherwise, that minority groups seeking relief under § 2 must "either bring their lawsuits within the first few years after census figures are released or engage in a costly re-estimation of population figures" in order to overcome the problem of outdated census data and prove their claim.  <u>League of United Latin American Citizens v. Clements</u>, 986 F.2d 728, 775 (<u>LULAC III</u>) (5th Cir. 1993).  The court merely observes that when considered together with the totality of all other circumstances in this case, the facts that the 2000 census is just <u>months</u> away and that the 1998 census estimates suggest likely malapportionment of plaintiffs'

35

0519

AO 72A
(Rev. 8/82)

the court has no confidence that it could fashion a remedy for a violation of § 2. And considering these factors in conjunction with the further circumstances of the proven record of success by black candidates in the existing Central District, the lack of evidence that blacks' efforts to participate in the electoral process have been impeded and the high costs in terms of dollars and convenience that would attend the changes which plaintiffs propose, the court is simply not persuaded that plaintiffs have proven a violation of § 2.

Accordingly, it is ordered that plaintiffs' complaint be dismissed with prejudice.

SO ORDERED this 7th day of July, 1999.

_____
UNITED STATES DISTRICT JUDGE

_____

proposed plans, are factors which militate against plaintiffs' claim.

36

0520

AO 72A
(Rev. 8/82)