THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
GREENVILLE DIVISION

DYAMONE WHITE; DERRICK
SIMMONS; TY PINKINS;
CONSTANCE OLIVIA SLAUGHTER
HARVEY-BURWELL                                                        **PLAINTIFFS**

**VS.**                                    **CIVIL ACTION NO. 4:22-cv-00062-SA-JMV**

STATE BOARD OF ELECTION
COMMISSIONERS; TATE REEVES
*in his official capacity as Governor of*
*Mississippi*; LYNN FITCH *in her*
*official capacity as Attorney General of*
*Mississippi*; MICHAEL WATSON *in*
*his official capacity as Secretary of*
*State of Mississippi*                                                 **DEFENDANTS**

---

**MEMORANDUM OF AUTHORITIES IN SUPPORT OF DEFENDANTS' RESPONSE
IN OPPOSITION TO PLAINTIFFS' MOTION TO OVERRULE DEFENDANTS'
OBJECTIONS AND COMPEL DISCOVERY [DKT. #74]**

---

**INTRODUCTION**

Plaintiffs' motion to overrule Defendants' objections and compel discovery should be

denied because (1) the information Plaintiffs seek, to the extent it exists, is presumably in the State

Archives—it is not in the possession, custody, or control of Defendants; (2) the information

Plaintiffs seek regarding judicial appointments is not relevant and thus is not discoverable; and (3)

Defendants have no obligation to assume the unreasonable burden of investigating the actions of

prior administrations of state-wide elected officers.

This action challenges—for the fourth time—MISS. CODE ANN. § 9-3-1, the 1987 statute

that defines the three election districts from which Mississippi elects its Supreme Court Justices,

Public Service Commissioners, and Transportation Commissioners.  In 1989, Judge Davidson

1

dismissed the first action without prejudice in *McCray v. Mississippi State Bd. of Election Comm'rs,* No. DC 84-131-GD-O (N.D. Miss. Oct. 5, 1989) (Ex. "A" to Mtn. Resp.).  In 1992, after a full trial, Judge Barbour upheld the legality of the lines in *Magnolia Bar Ass'n, Inc. v. Lee*, 793 F. Supp. 1386 (S.D. Miss. 1992), *aff'd,* 994 F.3d 1143 (5th Cir.), *cert. denied,* 510 U.S. 994 (1993).  Finally, after another full trial in 1999, Judge Lee upheld the lines once again in an action concentrating on their effect in elections for Public Service Commissioners and Transportation Commissioners in *N.A.A.C.P. v. Fordice,* No. J92-0250(L)(N) (S.D. Miss. July 7, 1999) (Ex. "B" to Mtn. Resp.), *aff'd*, 252 F.3d 361 (5th Cir. 2001).

In this now fourth attempt to invalidate Mississippi's Supreme Court districts, Plaintiffs seek to compel Defendants to respond to six interrogatories with information they do not have and cannot reasonably obtain, and much of which is irrelevant in any event.  In addition to producing over 7,700 pages of responsive documents to date, Defendants have responded to all six disputed interrogatories with information that is reasonably available to their respective administrations.  In so doing, Defendants have discharged their obligations under FRCP 33.  Having failed to present any controlling authority requiring Defendants to do more than they have done already, Plaintiffs cannot meet their burden to compel discovery.  For these reasons and those set forth herein, Plaintiffs' motion should be denied.

## STATEMENT OF FACTS

Plaintiffs filed this action against Mississippi's Governor, Attorney General, Secretary of State—all in their official capacities only—and the State Board of Election Commissioners ("SBEC") (hereinbefore and after collectively "Defendants") alleging that Mississippi's three Supreme Court districts "dilute the voting strength of Black Mississippians in violation of the

Voting Rights Act and the United States Constitution." Complaint at 1-2, ¶ 1 (Dkt. # 1).[1] Plaintiffs

allege that Mississippi's Supreme Court districts—which have been in place since 1987—"must

be redrawn so that Black voters in Mississippi have a full and fair opportunity to elect candidates

of their choice." *Id.* at 2, ¶ 1.

Against all of the defendants, Plaintiffs assert a claim under Section 2 of the Voting Rights

Act of 1965 (Count 1). *Id.* at 52-53, ¶¶ 140-44. Against the Governor, Attorney General, and

Secretary of State, Plaintiffs assert a claim of intentional discrimination under the Fourteenth and

Fifteenth Amendments to the United States Constitution (Count 2). *Id.* at 53-55, ¶¶ 145-51. Both

claims are asserted pursuant to 42 U.S.C. § 1983. *See id.* at 52-53.

Plaintiffs seek to have this Court "[d]eclare the district boundaries and/or districting

scheme used by the State of Mississippi in electing the justices of the Mississippi Supreme Court

to be in violation of Section 2 of the Voting Rights Act and the United States Constitution[.]" *Id.*

at 55, ¶ A. Plaintiffs further seek to "[p]reliminarily and permanently enjoin the Defendants and

their agents from holding elections for the Mississippi Supreme Court under the existing

districts[,]" and to compel Mississippi to adopt new Supreme Court districts. *Id.* at 55, ¶¶ B-D.

Mississippi's current Supreme Court districts were precleared by the U.S. Department of

Justice in December 1987. *See* USDOJ Preclearance Letter (Ex. "C" to Mtn. Resp.). After Judge

Davidson dismissed *McCray*, two Section 2 challenges to Mississippi's current Supreme Court

districts failed, with Judge Barbour in 1992 finding the current three-district configuration legal in

*Magnolia Bar, supra*, and Judge Lee doing the same in 1999 in *N.A.A.C.P. v. Fordice*, *supra*.

---

[1] Neither the Constitution nor the Voting Rights Act mentions vote dilution. To prevail on their statutory claim, Plaintiffs must prove that the challenged district lines afford black Mississippians "less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." 52 U.S.C. § 10301(b).

In this fourth effort to invalidate Mississippi's Supreme Court districts, Plaintiffs served Defendants with interrogatories and requests for production of documents implicating a time span of over 35 years.[2] Defendants, all of whom are (or in the case of the SBEC, are composed of) state-wide elected officers, timely served objections and responses, nevertheless producing over 7,700 pages of responsive documents and responsive information that is reasonably available to their respective administrations.

Plaintiffs now ask this Court to order Defendants to do more. Specifically, Plaintiffs seek an order compelling Defendants to supplement six interrogatory responses to provide information that is (1) irrelevant; and/or (2) not available to or reasonably obtainable by Defendants. Defendants file the instant response in opposition to Plaintiffs' motion.

**ARGUMENT**

**I. THE INFORMATION PLAINTIFFS SEEK, TO THE EXTENT IT EXISTS, IS PRESUMABLY IN THE STATE ARCHIVES; IT IS NOT IN THE POSSESSION, CUSTODY, OR CONTROL OF DEFENDANTS.**

In their motion filed herein, Plaintiffs do not contend that Governor Reeves, General Fitch, Secretary Watson, or any member of their respective staffs, has any information responsive to the six interrogatories in question that has not already been revealed.[3] All three defendants have provided under oath the information available to them and their staffs, including the appointment letters which came into Secretary Watson's possession, custody, and control when he took charge

---

[2] Plaintiffs' Interrogatory No. 9 seeks information concerning Governor Allain's appointment of Justice Anderson in 1985. Dkt. #74-1 at 6.

[3] The closest they come is their assertion that Governor Reeves "served in the preceding Bryant administration" and should "have knowledge of matters responsive to Plaintiffs' interrogatories by virtue of such service." Dkt. # 75 at 13. To the contrary, every elected officer in all three branches of Mississippi government is elected independently. In the case of the Governor and Lt. Governor, their physical offices are not even located in the same building. Governor Bryant was not obliged to consult Lt. Governor Reeves about any of his appointments, and there is no evidence that he did.

of the permanent records kept in his office.  By contrast, Governor Reeves found no files or records in his office when he entered it.  *See* Dkt. # 74-7 at 2, ¶ 4.

Defendants, then, have provided the responsive information and records they possess, and the only way to find more information is to find more records.  Plaintiffs acknowledge that their Request for Production No. 7 sought "documents and communications concerning gubernatorial appointments to fill vacancies on the Mississippi Supreme Court, from 1995 to present," Dkt. # 75 at 4, but they do not move to compel production.  That is no doubt because they know that—other than the appointment letters in Secretary Watson's office, which Defendants produced— Defendants have no such documents in their possession, custody, or control.

While Defendants dispute that such information is relevant or discoverable, see Part II, *infra,* the judicial appointment information Plaintiffs seek, to the extent it exists, is presumably contained in records in the custody of MDAH.  As a matter of law, title to those records is vested exclusively in MDAH—not in Defendants.  MISS. CODE ANN. § 25-59-13(d).  MDAH has advised that all of these records are subject to MDAH's records control schedule No. 283.  That schedule states that these documents are "to be sealed at State Archives for a period of thirty (30) years." *See* MDAH Records Control Schedule No. 283 (Ex. "D" to Mtn. Resp.).  Records control schedules have the force and effect of law.  MISS. CODE ANN. § 25-59-7.  Defendants do not control these records and have no obligation to pursue any court order seeking their release.  Plaintiffs literally had years to pursue this information from MDAH prior to filing this lawsuit.  The fact that they did not belies any alleged importance of such information.[4]

The information Plaintiffs seek can be found, if at all, in <u>records</u>, as accessible to them as to Defendants or to any other citizen.  That is why Plaintiffs do not seek to compel their production

---

[4] Plaintiffs did not serve a subpoena duces tecum on MDAH for the records they seek until November 1, 2022—*after* filing the instant motion.  Dkt. #77, #79.

by Defendants. Instead, they want Defendants to undertake the burden of securing those documents from MDAH and summarizing them in interrogatory answers. No such duty exists.

## II. THE INFORMATION PLAINTIFFS SEEK REGARDING JUDICIAL APPOINTMENTS IS NOT RELEVANT AND THUS IS NOT DISCOVERABLE.

Three of the interrogatories made the subject of Plaintiffs' motion to compel—Interrogatory Nos. 8, 9, and 10—seek information pertaining to gubernatorial appointments of Mississippi Supreme Court Justices. In response to these interrogatories, and subject to objections on relevance and other grounds, Defendants provided Plaintiffs with reasonably obtainable information within their possession, custody, or control.

For instance, in response to Interrogatory No. 8, the Governor stated that "his office does not have any written or unwritten policies or procedures addressing Supreme Court appointments," and that "[t]o date, [he] has not made any such appointments, as no Supreme Court vacancies have occurred during [his] term in office." Dkt. #74-2 at 8-9. Nevertheless, the Governor went on to describe his practice in making judicial appointments generally. *Id.* at 9. He referred Plaintiffs to MDAH for additional information that may bear on judicial appointments by former Governors. *See id. See also* Governor's Response to Interrogatory No. 10, *id.* at 10. In response to Interrogatory No. 8, the Secretary of State stated that "his office issues commissions in connection with gubernatorial appointments upon receipt of instructions from the Governor." Dkt. # 74-4 at 8. In response to Plaintiffs' Request for Production No. 7, and subject to objections on relevance and other grounds, Defendants produced a copy of all documents in Defendants' possession, custody, or control regarding communications concerning gubernatorial appointments to fill vacancies on the Mississippi Supreme Court from 1985 to present. *See* Defendants' Response to RFP No. 7 at 6-7 (Ex. "E" to Mtn. Resp.).

Plaintiffs now seek to compel Defendants to supplement their responses to Interrogatory Nos. 8, 9, and 10 to produce information concerning policies, procedures, and practices followed by former Mississippi Governors in appointing Justices to the Mississippi Supreme Court, as well as the names of persons who were involved in the process of making such appointments. In short, Plaintiffs seek discovery of information regarding the *process* underlying past gubernatorial appointments of Supreme Court Justices—both generally and in relation to the appointment of Justices Anderson, Banks, Graves, and King in particular. Plaintiffs' motion should be denied because none of the information sought is relevant to Plaintiffs' claims.

It is well settled that "the Voting Rights Act does not reach appointment procedures which do not involve voting." *Prewitt v. Moore*, 840 F. Supp. 436, 440 (N.D. Miss. 1993) (citing *Chisom v. Roemer*, 501 U.S. 380, 398-402 (1991)). Where, as here, the claims asserted do not involve a "shift in the filling of vacancies from elected to appointed positions," it is equally well settled that "the Voting Rights Act does not touch the appointive process." *See id. See also Mixon v. State of Ohio*, 193 F.3d 389, 407 (6th Cir. 1999); *African-Am. Voting Rights Legal Defense Fund, Inc. v. State of Mo.*, 994 F. Supp. 1105, 1122 (E.D. Mo. 1997).

Plaintiffs' lawsuit involves a challenge to the geographical boundaries of Mississippi's current central district for Mississippi Supreme Court elections. Plaintiffs claim those boundaries deny blacks an equal opportunity to vote and to elect candidates of their choice, and that those boundaries were established and/or maintained—intentionally—for racially discriminatory reasons. Plaintiffs have not asserted any claim challenging Mississippi's laws governing judicial appointments by Governors, nor have they asserted any claim challenging the administration of those laws. The *process* by which any Governor has handled appointments to fill vacancies on the Supreme Court has no bearing on the boundaries of the election districts or on Supreme Court

7

elections generally. Such information is accordingly irrelevant and beyond the scope of permissible discovery.

Plaintiffs cite six cases in support of their argument that information regarding the process of gubernatorial appointments of Supreme Court justices is relevant to their claims. None of these cases supports expanding the scope of discovery to encompass the information Plaintiffs seek.

In support of their argument that the information they seek is relevant to their Section 2 claim, Plaintiffs cite *Martin v. Allain* and *Magnolia Bar Ass'n, Inc. v. Lee* as proof that federal courts have considered evidence of judicial appointments in evaluating the power of incumbency in conjunction with Section 2 totality-of-the-circumstances analyses. Dkt. #75 at 8. In both cases, Judge Barbour considered the *fact* of appointment as part of his evaluation of the challenged election procedures. Black candidates had been successfully elected as trial judges in *Martin* and as Supreme Court Justices in *Magnolia Bar*. Plaintiffs argued that black candidates lacked equal opportunity because they could not win elections without the special advantage of a gubernatorial appointment. In evaluating all the evidence, Judge Barbour found that argument persuasive in *Martin,* 658 F. Supp. at 1203-04, but not in *Magnolia Bar,* 793 F. Supp. at 1406-07. Neither of these cases reflects that the *process* underlying gubernatorial appointments of Supreme Court Justices was considered or had any bearing on the Court's ruling. While Plaintiffs here may rely on the *fact* of appointment, neither case supports the proposition that the information Plaintiffs seek concerning *process* is relevant or discoverable.

Plaintiffs also cite *Lopez v. Abbott*, in which the District Court noted that there was "some evidence that Republican governors . . . prioritized appointing Latinos to high judicial office and . . . looked beyond members of their own party when considering candidates for appointment." *Lopez v. Abbott*, 339 F. Supp. 3d 589, 615 (S.D. Tex. 2018). The Court made this observation in

evaluating an allegation that appointments were analogous to a "slating process" but found it to be of "little weight and neutral benefit between the parties." *Id*. In *Lopez,* as well, it was the judicial appointments themselves—and not the *process* underlying such appointments—that were probative of the power-of-incumbency question. Thus, *Lopez* does not help Plaintiffs.

Curiously, Plaintiffs cite *Westwego Citizens for Better Gov't v. City of Westwego* for the proposition that—according to Plaintiffs—"efforts of outside groups to influence [the] gubernatorial appointments process, which tended to lead to the exclusion of minority candidates, could be relevant under Section 2." Dkt. #75 at 9. No such proposition was stated or implied in *Westwego*, which does not address judicial appointments at all. The footnote Plaintiffs cite merely affirms the District Court's finding that a slating process did not exist in connection with the election of city aldermen in that case—a fact supported by a lack of endorsements by civic organizations.[5] *See Westwego Citizens for Better Gov't v. City of Westwego*, 946 F.2d 1109, 1116 n.5 (5th Cir. 1991). Most importantly, Plaintiffs here do not contend that blacks were excluded from the appointment process, but that blacks were appointed for the allegedly invidious purpose of preserving the 1987 districts. *See* Dkt. # 75 at 11. *Westwego* has no bearing on the issue at hand.

Plaintiffs have not pointed this Court to any controlling authority providing that information concerning the *process* underlying gubernatorial appointments of Supreme Court justices is relevant and discoverable in a Section 2 Voting Rights Act case. Alternatively, Plaintiffs

---

[5] The complaint alleges that Mississippi has run afoul of some, but not all, of "the so-called 'Senate factors,'" Dkt. # 1 at 27, ¶63, a list of considerations found in the report of the Senate Judiciary Committee, never put to a vote in either chamber of Congress. One such factor is minority access to "a candidate slating process," S. Rep. No. 97-417, 97th Cong., 2d Sess. 29 (1982), like that considered in *White v. Regester*, 412 U.S. 755 (1973). Plaintiffs' lengthy allegations concerning the Senate factors, see Dkt. # 1 at 27-47, ¶¶ 64-120, contain no reference to a slating process. Both *Lopez* and *Westwego* addressed slating allegations and are inapplicable here for that additional reason.

9

argue that such information is relevant to their Fourteenth/Fifteenth Amendment claim of intentional discrimination.  In support of this alternative argument, Plaintiffs cite only *Village of Arlington Heights v. Metro. Housing Dev. Auth.* and *Veasey v. Abbott*.  Neither of these cases provides any help to Plaintiffs.

*Arlington Heights* says nothing of judicial appointments.  *See Village of Arlington Heights v. Metro. Housing Dev. Auth.*, 429 U.S. 252 (1977).  In fact, all of the so-called "*Arlington Heights* factors" referenced in Plaintiffs' memorandum, Dkt. # 75 at 10, relate only to the challenged practice—here, the creation and/or maintenance of the current Supreme Court district lines.  Plaintiffs "contend that the practice of successive gubernatorial appointments of Black justices to [the District 1, Place 2 seat]—and to no other seats—reflects an implicit recognition that an all-white Court would be politically or legally untenable, and that an all-white Court is the most likely result absent such gubernatorial appointments given the current districting scheme and the prevalence of racially polarized voting."  Dkt. # 75 at 11.  But the process underlying gubernatorial appointments is not the challenged practice in this lawsuit, which focuses exclusively on the creation and maintenance of Mississippi's current district lines for Supreme Court elections.  The process by which Governors appoint Supreme Court Justices to fill vacancies has no bearing on whether those election districts were created, or have been maintained, for reasons that were purposefully discriminatory.

Finally, Plaintiffs cite *Veasey* for the proposition that "evidence that policymakers were 'aware of the likely disproportionate effect of the law on minorities' would support [a] finding of discriminatory intent."  *Id.* (quoting *Veasey v. Abbott*, 830 F.3d 216, 236 (5th Cir. 2016)).   Like *Arlington Heights*, *Veasey* says nothing of judicial appointments.  Crucially, Plaintiffs' claim involves not "policymakers" but lawmakers.  Since Governor Allain signed § 9-3-1 in 1987, no

Governor has played any role in maintaining the statute. Information regarding the process underlying gubernatorial appointments of Supreme Court Justices has no bearing on any lawmaker's purported "aware[ness]" of any discriminatory effect of the current Supreme Court district lines. Plaintiffs cannot credibly argue otherwise, and *Veasey* avails Plaintiffs nothing.

The necessary focus on the supposed discriminatory intent of lawmakers is not merely a matter of semantics. In *Rogers v. Lodge*, 458 U.S. 613 (1982), the Supreme Court affirmed a factual finding that a Georgia county had maintained an at-large electoral system for invidiously discriminatory reasons. In so doing, the Court identified the responsible lawmakers:

> As a practical matter, maintenance of the state statute providing for at-large elections in Burke County is determined by Burke County's state representatives, for the legislature defers to their wishes on matters of purely local application. The court found that Burke County's state representatives "have retained a system which has minimized the ability of Burke County Blacks to participate in the political system."

*Id.* at 626. *See also Fusilier v. Landry*, 963 F.3d 447, 464 (5th Cir. 2020) (reaffirming that "[f]undamental to this inquiry [of discriminatory intent in the context of *Arlington Heights*] is the sensitive nature of questioning the intent *of lawmakers*") (emphasis added). Nothing in Plaintiffs' 56-page complaint remotely suggests that any Governor of Mississippi has ever exercised such control over the decisions of Mississippi lawmakers, who possess constitutional authority to retain or to change § 9-3-1.

As "the party seeking to compel discovery," Plaintiffs have the "burden . . . to establish that the information sought is relevant and proportional." *See Ayo v. Dunn*, Civil Action No. 17-526-SDD-EWD, 2018 WL 4896723, at *1 (M.D. La. Oct. 9, 2018). "Any information sought that is not relevant to [Plaintiffs' claims] is not discoverable, regardless of proportionality." *See id. See also* FED. R. CIV. P. 26(b)(1). Having failed to show that the information requested in Interrogatory

11

Nos. 8, 9, and 10 is relevant to their Section 2 Voting Rights Act claim or their constitutional claim of intentional discrimination, Plaintiffs cannot meet their burden to compel discovery of this information. For all these reasons, Plaintiffs' motion should be denied.

## III. DEFENDANTS HAVE NO OBLIGATION TO ASSUME THE UNREASONABLE BURDEN OF INVESTIGATING THE ACTIONS OF PRIOR STATE-WIDE ELECTED OFFICERS.

All six of the interrogatories made the subject of Plaintiffs' motion to compel—*viz.*, Interrogatory Nos. 1, 2, 8, 9, 10, and 11—implicate the actions of prior state-wide elected officers. In response to these interrogatories, and subject to objections on relevance, proportionality, unreasonable time scope, burdensomeness, and other grounds, Defendants provided Plaintiffs with all reasonably obtainable information available to them as state-wide elected officers.

Interrogatory No. 1 seeks information regarding the involvement of the Governor, Attorney General, Secretary of State, and SBEC in formulating the current Supreme Court districts in 1987. In response to this request for information regarding events that occurred 35 years ago, Defendants referred Plaintiffs to the USDOJ preclearance file related to the 1987 implementation of the current Supreme Court districts, a copy of which Defendants produced; Defendants each stated that no additional responsive information is available to them. Dkt. #74-2 at 3; #74-3 at 3; #74-4 at 3; #74-5 at 3. *See also* Defendants' Response to RFP No. 1 at 2 (Ex. "E" to Mtn. Resp.).

In response to Interrogatory No. 2, which seeks information regarding any subsequent analyses of Supreme Court districts, the Governor, Attorney General, and Secretary of State each stated that their respective administrations have not been involved in any such activities; Defendants referred Plaintiffs to the numerous preclearance file materials produced by Defendants, and Defendants again each stated that no additional responsive information is available to them.

Dkt. #74-2 at 4; #74-3 at 4; #74-4 at 4; #74-5 at 4. *See also* Defendants' Responses to RFP No. 1 at 2; RFP No. 6 at 6 (Ex. "E" to Mtn. Resp.).

Defendants' responses to Interrogatory Nos. 8, 9, and 10 concerning gubernatorial appointments are addressed in Part II, *supra*. As noted *supra* and confirmed by Governor Reeves in his interrogatory responses, he has not yet had occasion to make any appointments to the Supreme Court. Thus, all of the gubernatorial appointments implicated by Plaintiffs' interrogatories—including the appointments of Justices Anderson, Banks, Graves, and King— were made by previous Governors. Defendants responded to these interrogatories with the information available to them.

The sole remaining interrogatory at issue—Interrogatory No. 11—asks Defendants to "[i]dentify all persons involved in any evaluation, analysis, or study conducted on [the defendant's] behalf or at [their] discretion concerning voting patterns, habits, behaviors, or practices by race or ethnicity between 2000 and present." Dkt. #74-1 at 8. In response to this interrogatory, Defendants each stated that with the exception of expert witnesses to be designated in this case, no responsive information is available to them. Dkt. #74-2 at 11; #74-3 at 10; #74-4 at 10; #74-5 at 10.

Plaintiffs now seek to compel Defendants to provide information that could only be obtained from records of prior state-wide elected officers. Plaintiffs' motion should be denied because Defendants have satisfied their obligations under FRCP 33. Defendants have no duty to assume the unreasonable burden of investigating the actions of prior state-wide elected officers on Plaintiffs' behalf. To the extent Plaintiffs seek discovery of information that is not reasonably available to Defendants, Plaintiffs alone should bear the burden of pursuing that information directly.[6]

---

[6] Plaintiffs assert that "Defendants cannot credibly contend that nothing that occurred outside the last three years is relevant to the Section 2 and *Arlington Heights* claims here." Dkt. # 75 at 12. Defendants

The Governor, Attorney General, and Secretary of State are all state-wide elected officers. They have all been sued solely in their official capacities, by virtue of their membership on the SBEC. *See* MISS. CODE ANN. § 23-15-211(1). As a matter of law, a state-wide elected officer may discharge his/her obligation to respond to interrogatories by "furnish[ing] the information available to [the officer]." *See* FED. R. CIV. P. 33(b)(1)(B). As set forth immediately *supra*, Defendants have done exactly that, providing Plaintiffs with responsive information available to their respective administrations for all six interrogatories at issue. Plaintiffs have not identified any controlling authority expanding Defendants' obligations under FRCP 33 in a voting rights case or otherwise.

As a practical matter, all three elected defendants operate separate administrations. They are organized, staffed, and operated independently of each other and, more importantly here, independently of prior elected officers. As concerns the subjects implicated by the six interrogatories at issue—and with the exception of preclearance file materials and appointment letters, which Defendants have produced—there is no repository of pertinent information held over from one administration to the next. By way of example, as Defendants have advised Plaintiffs, at the conclusion of Governor Phil Bryant's term in office, all of the records of the outgoing Bryant administration were boxed and transferred to MDAH, such that the incoming Reeves Administration assumed occupancy of empty office suites devoid of any records or files from the outgoing Bryant Administration. Dkt. #74-7 at 2, ¶ 4. In other words, given that the time period implicated by the disputed interrogatories spans over 35 years and six prior gubernatorial

---

have never made such a sweeping assertion. As it relates to the issue of whether Defendants can and should be compelled to investigate the actions of prior administrations, Defendants' position is not predicated exclusively on a relevance inquiry in any event.

administrations (including the administrations of two Governors who are now deceased), Defendants have no reasonable means of acquiring the additional information Plaintiffs now seek.

Consistent with FRCP 33, Defendants have responded to all six disputed interrogatories with information that is reasonably available to their respective administrations. Plaintiffs alone should bear the burden of investigating the actions of prior elected officers. As a legal matter, Defendants have no duty to assume that burden. Plaintiffs have cited no controlling authority to the contrary. As a practical matter, Defendants have no ability to acquire such information in any reasonable or efficient manner.[7]

The only authority cited by Plaintiffs, Dkt. # 75 at 13, which is binding on this Court is *Kentucky v. Graham*, 473 U.S. 159 (1985). That case says nothing about discovery in actions brought against state officers in their official capacities. Before saying that "an official-capacity suit is in all respects, other than name, to be treated as a suit against the entity," the Court made plain that it was addressing the "[p]roper application of this principle in damages actions." *Id.* at 165-66. The ensuing "concrete examples of the practical and doctrinal differences between personal and official capacity actions," *id.* at 165, included no examples of discovery disputes. Under FED. R. CIV. P. 33(b)(1)(B), an officer who is sued "must furnish the information available to the party," namely the officer. Nothing in *Kentucky v. Graham* purports to broaden that responsibility to impose a duty to investigate the actions of prior elected officers.

---

[7]Plaintiffs misquote defense counsel's letter of October 11, 2022, in a way that implies that Defendants contend they have no obligation to investigate the actions of their own respective administrations. Dkt. # 75 at 13. While Defendants assume this error was inadvertent, Defendants would note that, accurately quoted, defense counsel in fact stated that "Defendants have no obligation to assume the unreasonable burden of investigating the actions of *prior administrations of* state-wide elected officials on Plaintiffs' behalf." Dkt. #74-7 at 1, ¶ 1 (emphasis added to denote words omitted from quotation in Plaintiffs' memorandum).

In support of their argument that Defendants should be required to investigate the actions of prior administrations, Plaintiffs cite a bevy of non-controlling opinions, Dkt. # 75 at 14, for the proposition that Defendants must produce information that is available to them and reasonably obtainable. As set forth in detail *supra*, Defendants have done as much with respect to all six of the disputed interrogatories. Requiring Defendants to undertake an investigation of the actions of prior administrations would compel Defendants to assume a heavier burden than that imposed by FRCP 33. Accordingly, the aforementioned authorities lend no support to Plaintiffs' argument.

Plaintiffs further assert that their argument is supported by *Hobson v. Buncich* and *Arab Am. Civil Rights League v. Trump*. However, neither of these cases is controlling or supportive of Plaintiffs' argument. In *Hobson*, a § 1983 case, a Magistrate Judge in the Northern District of Indiana noted in dicta that a defendant-sheriff was "responsible for responding to discovery requests directed to the Sheriff's Department, including requests related to events that preceded his election." *Hobson v. Buncich*, Cause No. 2:10-CV-429-TLS-PRC, 2013 WL 208934, at *7 n.4 (N.D. Ind. Jan. 16, 2013). The Court made this statement in a footnote, citing no authority in support. Regardless, the issue in *Hobson* was whether the plaintiff was entitled to sanctions against the sheriff for his failure to produce documents in the possession of his office, or to identify documents that he knew had been destroyed by a prior administration. *See id.* at *6-8.[8] In the case at bar, Plaintiffs do not contend that Defendants have withheld or refused to identify any responsive documents of which they are aware. In fact, to date, Defendants have produced over 7,700 pages of responsive documents to Plaintiffs. Thus, *Hobson*, which is not controlling in any event, is distinguishable and has no application here.

---

[8] The District Court denied the plaintiff's motion for sanctions against the sheriff. *Hobson*, 2013 WL 208934 at *8.

*Arab Am. Civil Rights League* is likewise inapplicable here.  In that case, which involved a constitutional challenge to a presidential executive order, a District Judge in the Eastern District of Michigan ordered defendant-executive branch officials affiliated with the Trump Administration to preserve all potentially relevant information in their possession, custody, or control—including information that pre-dated their taking office. *Arab Am. Civil Rights League v. Trump*, Case No. 17-10310, 2017 WL 2501060, at *3 (E.D. Mich. June 9, 2017).  *Arab Am. Civil Rights League* focused solely on the preservation, during a stay, of information within the defendants' possession, custody, or control.  Here, of course, the information, to the extent it exists, is already preserved at the State Archives.

The only other authorities Plaintiffs cite in support of their argument are *Thomas v. Cate* and *Biggs v. Finn*, two federal habeas cases from California.  Neither case advances Plaintiffs' position.  In *Thomas*, the Magistrate Judge held that FRCP 33(b)(1)(B) required the Governor to produce information "available" to his office within the meaning of that rule in responding to an interrogatory.  *Thomas v. Cate*, 715 F. Supp. 2d 1012, 1032 (E.D. Cal. 2010).  *Thomas* has no impact here, where Defendants have produced all responsive information reasonably available to their respective administrations in responding to the six interrogatories at issue.

And finally, in *Biggs*, the Magistrate Judge granted the plaintiff leave to propound interrogatories to the Governor, requesting statistics concerning parole release decisions made by the Governor's office dating back 20 years.  *Biggs v. Finn*, Civ. No. S-07-0470 WBS KJM P, 2008 WL 2119916, at *1-3 (E.D. Cal. May 20, 2008).  While Plaintiffs erroneously characterized the Magistrate Judge's order in *Biggs* as a ruling "compelling production" of documents by the Governor, Dkt. # 75 at 15, the Court's order in fact merely granted the plaintiff leave to serve such interrogatories; the opinion does not adjudicate any objection asserted by the Governor.  *See Biggs*,

17

2008 WL 2119916 at *3. Regardless, the statistical data at issue in *Biggs* is the type of information for which records may have been maintained across successive administrations by the Governor's office in California. That is not the case here, where Plaintiffs seek information that is not preserved in records in the possession, custody, or control of Defendants. Therefore, *Biggs* is likewise distinguishable and avails Plaintiffs nothing.

Plaintiffs have not identified any controlling authority requiring Defendants to produce information that is not available to and reasonably obtainable by their respective administrations. In responding to the six interrogatories at issue, Defendants have satisfied their obligations under FRCP 33(b)(1)(B). To require Defendants to investigate the actions of prior state-wide elected officers would impose a burden on them that is not reasonable or proportional to the needs of this litigation. Defendants have no greater access to information related to prior state-wide elected officers than Plaintiffs do. Plaintiffs alone should bear the burden of conducting any investigation of the actions of such prior state-wide elected officers. For all these reasons, Plaintiffs' motion should be denied.

## CONCLUSION

Defendants have provided complete responses to all six disputed interrogatories based on the information that is available to and reasonably obtainable by them. Plaintiffs have not established any legal basis to compel Defendants to do more. Nor have Plaintiffs met their burden to establish that supplemental information regarding judicial appointments is relevant and discoverable. For all these reasons, Plaintiffs' motion to overrule Defendants' objections and compel discovery should be denied.

THIS the 14th day of November, 2022.

Respectfully submitted,

STATE BOARD OF ELECTION
COMMISSIONERS, TATE REEVES, IN HIS
OFFICIAL CAPACITY AS GOVERNOR OF
MISSISSIPPI, LYNN FITCH, IN HER OFFICIAL
CAPACITY AS ATTORNEY GENERAL OF
MISSISSIPPI, AND MICHAEL WATSON, IN HIS
OFFICIAL CAPACITY AS SECRETARY OF
STATE OF MISSISSIPPI, DEFENDANTS

By:    LYNN FITCH, ATTORNEY GENERAL
        STATE OF MISSISSIPPI

By:    s/Rex M. Shannon III
        REX M. SHANNON III (MSB #102974)
        Special Assistant Attorney General

REX M. SHANNON III (MSB #102974)
GERALD L. KUCIA (MSB #8716)
LINDSAY THOMAS DOWDLE (MSB #102873)
STATE OF MISSISSIPPI
OFFICE OF THE ATTORNEY GENERAL
CIVIL LITIGATION DIVISION
Post Office Box 220
Jackson, Mississippi 39205-0220
Tel.: (601) 359-4184
Fax: (601) 359-2003
rex.shannon@ago.ms.gov
gerald.kucia@ago.ms.gov
lindsay.dowdle@ago.ms.gov

MICHAEL B. WALLACE (MSB #6904)
WISE CARTER CHILD & CARAWAY, P.A.
Post Office Box 651
Jackson, Mississippi 39205-0651
Tel.: (601) 968-5500
Fax: (601) 944-7738
mbw@wisecarter.com

ATTORNEYS FOR DEFENDANTS STATE
BOARD OF ELECTION COMMISSIONERS,
TATE REEVES, IN HIS OFFICIAL CAPACITY
AS GOVERNOR OF MISSISSIPPI, LYNN
FITCH, IN HER OFFICIAL CAPACITY AS
ATTORNEY GENERAL OF MISSISSIPPI, AND

19

MICHAEL WATSON, IN HIS OFFICIAL
CAPACITY AS SECRETARY OF STATE OF
MISSISSIPPI

## **CERTIFICATE OF SERVICE**

I, Rex M. Shannon III, Special Assistant Attorney General and one of the attorneys for the above-named State Defendants, do hereby certify that I have this date caused to be filed with the Clerk of the Court a true and correct copy of the above and foregoing via the Court's ECF filing system, which sent notification of such filing to all counsel of record.

THIS the 14th day of November, 2022.

s/Rex M. Shannon III
REX M. SHANNON III

20