## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF MISSISSIPPI
## GREENVILLE DIVISION

DYAMONE WHITE; DERRICK SIMMONS; TY PINKINS; CONSTANCE OLIVIA SLAUGHTER HARVEY-BURWELL,

        *Plaintiffs*,

        vs.

STATE BOARD OF ELECTION COMMISSIONERS; TATE REEVES *in his official capacity as Governor of Mississippi*; LYNN FITCH *in her official capacity as Attorney General of Mississippi*; MICHAEL WATSON *in his official capacity as Secretary of State of Mississippi*,

        *Defendants*.

4:22-cv-0062-SA-JMV

## REPORT OF OLIVER E. DIAZ, JR.

October 3, 2022



EXHIBIT

B

## TABLE OF CONTENTS

Page

I.     INTRODUCTION AND QUALIFICATIONS ........................................................ 1

II.    ASSIGNMENT ............................................................................................... 2

III.   SUMMARY OF CONCLUSIONS ...................................................................... 3

IV.    THE MISSISSIPPI SUPREME COURT'S STRUCTURE AND FUNCTION ................. 4

       A.    Court Structure ............................................................................... 4

       B.    Court Operations ............................................................................. 6

V.     THE ELECTORAL PROCESS FOR MISSISSIPPI SUPREME COURT JUSTICES ... 10

       A.    Mississippi Supreme Court Districts ............................................. 10

       B.    Mississippi Supreme Court Elections ............................................ 12

       C.    Running For Election ...................................................................... 15

       D.    Rules Governing Supreme Court Campaigns ................................ 20

       E.    Involvement of Interest Groups in Supreme Court Elections ................ 23

VI.    GUBERNATORIAL APPOINTMENTS .............................................................. 32

## I. INTRODUCTION AND QUALIFICATIONS

1.      My name is Oliver E. Diaz, Jr. I have been retained as an expert by counsel for Plaintiffs in *White et al. v. State Board of Elections et al.,* captioned above. I have prepared this report according to Federal Rule of Civil Procedure 26(a)(2)(B).

2.      In March 2000, I was appointed as a Justice of the Mississippi Supreme Court by Governor Ronnie Musgrove. I was seated in District 2, Place 2. Several months later, in November 2000, I was elected to serve an eight-year term as a Justice of the Mississippi Supreme Court in that same district and seat. I served my full term. I served as a Presiding Justice on the Court for two years and was second in seniority when I left the bench. In November 2008, I lost my bid for re-election to the Mississippi Supreme Court.

3.      Since leaving the bench, I have been engaged in private practice of law in Mississippi with an emphasis on appellate litigation. I have served as a Special Master in federal court in the District of Columbia, and I am currently a Senior Status Judge in the state of Mississippi. I have been appointed by the Mississippi Supreme Court to serve as a Circuit Court judge in Hinds County, Mississippi, and to serve on the Special Committee on Judicial Election Campaign Intervention, which previously oversaw judicial elections in the state of Mississippi.[1]

4.      Prior to my appointment to the Mississippi Supreme Court, I served as a judge on the Mississippi Court of Appeals. I was elected to the Court of Appeals in November 1994 and I remained in that role until I ascended to serve on the Mississippi Supreme Court in March 2000.

---

[1]  *See* Supreme Court of Mississippi, *The Judicial Election Oversight Committee,* https://courts.ms.gov/commissions/electionoversight.php ("The Judicial Election Oversight Committee ('Oversight Committee') was created by Order of the Mississippi Supreme Court on November 30, 2021 . . . . The Oversight Committee replaced the previous Special Committee on Judicial Election Campaign Intervention which existed under the prior version of Canon 5F.").

5. From 1988 until 1994, I served as a member of the Mississippi House of Representatives. I represented District 116, which included Biloxi and D'Iberville. During my tenure in the Mississippi Legislature, I was a subcommittee chairman on the Insurance and Judiciary Committees, and served as Secretary of the Constitution Committee. In addition, I was a member of the Ways and Means Committee.

6. From 1989 to 1995, I held the position of City Attorney for the City of D'Iberville.

7. I earned my B.A. from the University of South Alabama in 1982, and my J.D. from the University of Mississippi School of Law in 1985. I also went on to earn an L.L.M. degree from the University of Virginia School of Law in 2004.

8. As a Supreme Court Justice, I authored approximately 337 opinions which have been published in the Southern Reporter. I have lectured at the National Press Club, the Center for American Progress, the American Association for Justice, along with various judicial, bar association, and law school events around the country. I have also presented continuing legal and judicial education courses around the country.

9. A copy of my curriculum vitae is attached as Appendix A.

10. I have not previously testified as an expert witness.

## II. ASSIGNMENT

11. I have been asked by counsel for Plaintiffs in this action to provide my understanding and opinions as to the history, structure, and composition of the Mississippi Supreme Court, including but not limited to appointments and elections to the Court.

12. I am being compensated for my work at the rate of $450 an hour ($550 per hour for testimony). This remuneration is not contingent on my opinions and does not influence my conclusions in any way.

2

13. The information and opinions in this report are based largely on the eight and one half years I spent as a Justice of the Mississippi Supreme Court, my more than five years as a judge on the Court of Appeals of the State of Mississippi, my experiences running for election for seats on the Mississippi Supreme Court and the Court of Appeals, my time as a state legislator, and my continued involvement with elections and with the Mississippi judiciary.

14. In preparing this report, I have also relied on my knowledge of the inner workings of the Mississippi appellate court system, scholarly research, news articles, and other materials in the public domain, as well as the statutes and rules relevant to the Supreme Court's composition and operations cited herein. A list of the materials I considered in preparing this report is attached as Appendix B.

15. I understand that fact discovery in this litigation is ongoing. This report is based on the information presently available to me, and I reserve the right to supplement or modify this report based on additional facts, testimony, or other information that may come to light.

## III. SUMMARY OF CONCLUSIONS

16. In this report, I first discuss the structure and function of the Mississippi Supreme Court. I then discuss the process by which candidates are elected to the Court and the rules and practices governing that process. Throughout, I offer my observations based on my personal involvement with the Court and the electoral process. I also reach the following conclusions:

    a. It is surprising to me that the Supreme Court districts have not been redrawn since 1987. When I was a state legislator, it was my expectation that these districts would be redrawn periodically to reflect population changes within the districts.

    b. Despite the fact that elections for the Supreme Court are non-partisan, such elections include many of the same features as partisan elections for political office. Successful campaigns are expensive, and elections are influenced by outside interest

3

groups. In addition, even though elections are non-partisan, political parties and party leaders can and do make endorse Supreme Court candidates.

c.  Supreme Court elections are not free from racial appeals, though often subtle rather than overt. Those appeals can be made rhetorically—for example, through "tough on crime" messaging—or visually, particularly through opponents' gratuitous use of photographs of Black candidates in campaign materials to highlight their race.

d.  There have only been four Black justices on the Mississippi Supreme Court in its history, with each serving in succession starting in 1985. Each Black justice has held the District 1, Place 2 seat, and has first been appointed by the Governor before subsequently running for election as an incumbent. Given the racial polarization of Mississippi voters and the lack of a majority-minority district under the district lines as currently drawn, an incumbent Black Justice is far more likely to be reelected to the seat than an otherwise similarly situated Black candidate.

## IV.  THE MISSISSIPPI SUPREME COURT'S STRUCTURE AND FUNCTION

### A.  Court Structure

17.  The Mississippi Supreme Court (the "Supreme Court" or the "Court") is the highest court in Mississippi.[2] The Court sits in Jackson, Mississippi and holds two terms each year, one commencing on the second Monday in September and another commencing on the first Monday of March, for a total of at least nine months in session.[3] Among other responsibilities, the Supreme Court is vested with general rule-making authority over the courts, and sets the rules of evidence

---

[2] *See* Miss. Const., art. VI, § 144.

[3] *See* Miss. Const. art. VI § 148; Miss. Code § 9-3-3.

4

and practice and procedure for trials in the circuit, chancery and county courts of Mississippi and appeals in the Court of Appeals.[4]

18.     The Justice who has continuously been as a member of the Court for the longest time serves as the Chief Justice of the Court.[5] The two Justices who have been members of the Court for the next longest continuous periods of time serve as the Presiding Justices.[6] The Chief Justice is presently compensated at $174,000 per annum; the Presiding Justices are presently compensated at $169,500 per annum; and the Associate Justices are presently compensated at $166,500.[7] The Chief Justice serves as chief administrative officer of all Mississippi courts,[8] and has a variety of responsibilities, including:

- Appointing the Chief Judge of the Court of Appeals[9];

- Appointing special judges to temporary assignments[10];

- Assigning Court of Appeals judges to serve as lower court trial judges to provide docket relief[11];

- Serving as a member of the Mississippi Sentencing Disparity Task Force[12];

- Appointing members of the Mississippi Ethics Commission[13]; and

- Appointing a member of the Corrections and Criminal Justice Oversight Task Force.[14]

---

[4] Miss. Code § 9-3-61.

[5] Miss. Code § 9-3-1.

[6] *Id.*

[7] Miss. Code § 25-3-35. Salary increases go into effect in January 1, 2023. *Id.*

[8] Miss. Code § 9-21-3.

[9] Miss. Code § 9-4-7(3).

[10] Miss. Code § 9-1-105.

[11] Miss. Code § 9-4-7(4).

[12] Miss. Code § 99-19-13.

[13] Miss. Code § 25-4-5.

[14] Miss. Code § 47-5-6.

19.     The Justices serve on panels of three Justices, each headed by either the Chief Justice or a Presiding Justice.[15] Cases are randomly assigned to the panels, which are responsible for reviewing the cases and preparing opinion recommendations. Each panel remains together for an eight week period, the last two weeks of which are consumed by writing the opinions and wrapping up the appeals. At the end of the eight week period, known as a "sitting," the panels are reconstituted. As a result, each term, Justices sit on panels with most of the other Justices. The Supreme Court has six sittings per year.[16]

20.     Opinion recommendations are made in accordance with the views of at least two out of the three Justices on the panel. The panel's decisions are presented to the full Court for review and approval. In the event that one or more of the Justices on the Court disagrees with the decision, the case may be considered and adjudged by the full Court or a quorum of the Court.[17] The full Court can override a panel decision and issue a decision that is different from the opinion of the panel.

## B.     Court Operations

21.     The Supreme Court has jurisdiction over all appeals from final orders of trial courts.[18] The Court may try and determine all issues of fact arising out of any appeal before the Court.[19] The Supreme Court may, in its discretion, assign cases to the Mississippi Court of Appeals (the "Court of Appeals") for intermediate appellate review, subject to the exceptions set forth in

---

[15] Miss. Const. art VI § 149A.

[16] Supreme Court Docket Calendar, https://courts.ms.gov/appellatecourts/sc/scdocketcalendar.php.

[17] *See generally* Miss. Const. art VI § 149A.

[18] Miss. Const. art. VI §146; Miss. Code § 9-3-9; M.R.A.P. 16(a).

[19] Miss. Code § 9-3-37; M.R.A.P. 14(a).

paragraph 22 below.[20] The Court may, by order, provide that certain categories of cases will be immediately transferred to the Court of Appeals or retained by the Court.[21] Once the Supreme Court enters an order assigning a case to the Court of Appeals, no party may seek reassignment of the case to the Supreme Court.[22]

22. The Court must retain jurisdiction over appeals in cases involving election contests, the imposition of the death penalty, utility rates, annexations, and bond issues; as well as any appeal of a trial court decision holding a state statute unconstitutional.[23] The Court also retains jurisdiction over cases involving attorney discipline and judicial performance, and certified questions from a federal court.[24] In addition, the Court ordinarily retains jurisdiction over cases involving: (1) a major question of first impression; (2) fundamental and urgent issues of broad public importance requiring prompt or ultimate determination by the Supreme Court; (3) substantial constitutional questions as to the validity of a statute, ordinance, court rule, or administrative rule or regulation; or (4) issues as to which there is an inconsistency in the decisions of the Court of Appeals or of the Supreme Court or conflicts between the decisions of the two courts.[25]

23. When I served on the Court, one of the Justices was assigned the responsibility of screening cases for assignment or retention on a rotating basis. Each of the Justices took turns serving in this role. A staff attorney on the Court would initially review each case and make a

---

[20] M.R.A.P. 16(a).

[21] M.R.A.P. 16(d).

[22] M.R.A.P. 16(e).

[23] M.R.A.P. 16(b).

[24] M.R.A.P. 16(d); *id.* 20(a).

[25] M.R.A.P. 16(d).

recommendation as to whether the case should be retained or assigned to the Court of Appeals. In most cases, the screening Justice would simply accept the recommendation of the staff attorney. In the event that the screening Justice recommended that a case be assigned to the Court of Appeals, the case would nonetheless be retained by the Court if a majority of the Justices disagreed with the recommendation and voted to retain jurisdiction.

24.     Once the Court assigns a case to the Court of Appeals, there is no appeal as of right to the Supreme Court.[26] A party may petition the Supreme Court for a writ of certiorari, which the Supreme Court may grant in its sole discretion upon the affirmative vote of at least four of the nine Justices.[27] The Supreme Court will typically grant a writ of certiorari "only for the purpose of resolving substantial questions of law of general significance."[28] The Supreme Court often grants review of (a) Court of Appeals decisions that conflict with controlling Supreme Court precedent or a prior decision of the Court of Appeals; (b) cases in which it appears that the Court of Appeals did not consider a controlling constitutional provision; (c) cases that should have been decided by the Supreme Court rather than the Court of Appeals under the Mississippi Code and/or the Mississippi Rules of Procedure; and (d) cases involving fundamental issues of broad public importance that require determination by the Supreme Court.[29] However, the Supreme Court is not required to grant review of cases that fall into any of the foregoing categories, and may grant review of cases that do not meet any of the foregoing criteria.[30] Even after the Court grants a

---

[26] M.R.A.P. 17(a).

[27] *Id.*

[28] *Id.*

[29] *Id.*

[30] *Id.*

petition for certiorari, the Supreme Court may decide that there is no need for further review of the Court of Appeals' decision and may dismiss the petition on its own motion.[31]

25.    All decisions of the Supreme Court to grant or deny a petition for a writ of certiorari are final and not subject to reconsideration.[32] No party may move for reconsideration of the Court's decision.[33] When I served on the Court, we denied petitions for certiorari in over 90% of cases.

26.    The Supreme Court announces decisions every Thursday when the Court is in session.[34] The Supreme Court may, but is not required to, write opinions in cases heard by the Court.[35] All written opinions by the Court are published.[36] The Supreme Court's general practice is to write opinions in cases where it reverses or remands a trial court or administrative agency.[37] In cases where the Court affirms the decision of the trial court, the Supreme Court (a) will issue a written opinion if the Court assesses damages for a frivolous appeal; and (b) may issue a written opinion if a majority of the Justices deciding the case determine that it would add to the value of Mississippi jurisprudence or be useful to the parties or to the trial court.[38]

---

[31] M.R.A.P. 17(f).

[32] *Id.*

[33] *Id.*

[34] M.R.A.P. 23(d).

[35] M.R.A.P. 35-A(a).

[36] *Id.*

[37] M.R.A.P. Comment to Rules 35-A and 35-B.

[38] M.R.A.P. 35-A(a); *id.* 35-A(c)

9

## V.    THE ELECTORAL PROCESS FOR MISSISSIPPI SUPREME COURT JUSTICES

### A.    Mississippi Supreme Court Districts

27.    Mississippi Supreme Court Justices are elected from three districts demarcated by the Legislature.[39] The First Supreme Court District ("District 1") consists of the counties of Bolivar, Claiborne, Copiah, Hinds, Holmes, Humphreys, Issaquena, Jefferson, Kemper, Lauderdale, Leake, Madison, Neshoba, Newton, Noxubee, Rankin, Scott, Sharkey, Sunflower, Warren, Washington and Yazoo. The Second Supreme Court District ("District 2") consists of the counties of Adams, Amite, Clarke, Covington, Forrest, Franklin, George, Greene, Hancock, Harrison, Jackson, Jasper, Jefferson Davis, Jones, Lamar, Lawrence, Lincoln, Marion, Pearl River, Perry, Pike, Simpson, Smith, Stone, Walthall, Wayne, and Wilkinson. The Third Supreme Court District ("District 3") consists of the counties of Alcorn, Attala, Benton, Calhoun, Carroll, Chickasaw, Choctaw, Clay, Coahoma, DeSoto, Grenada, Itawamba, Lafayette, Lee, Leflore, Lowndes, Marshall, Monroe, Montgomery, Oktibbeha, Panola, Pontotoc, Prentiss, Quitman, Tallahatchie, Tate, Tippah, Tishomingo, Tunica, Union, Webster, Winston and Yalobusha.[40]

28.    Three justices are elected from each district on an at-large basis, for a total of nine justices.[41] Each of the nine Supreme Court seats is considered a separate office.[42] The three seats in each district are designated as Position or Place Number 1, Position or Place Number 2 and Position or Place Number 3.[43] Each Justice serves for a staggered term of eight years, such that not

---

[39] Miss. Const. art. VI, § 145.

[40] Miss. Code § 9-3-1.

[41] MS. Const. art. VI, § 145B; *see also id.* §§ 145, 145A,

[42] Miss. Code § 23-15-993.

[43] Miss. Code § 23-15-993.

10

all Supreme Court seats are up for election at the same time.[44] Below is a chart of the most recent

election year, and the next election year, for each Supreme Court seat.[45]

| Supreme Court Seat | Most recent general election | Next general election |
|---|---|---|
| District 1, Place 1 | 2020 | 2028 |
| District 1, Place 2 | 2020 | 2028 |
| District 1, Place 3 | 2016 | 2024 |
| District 2, Place 1 | 2018 | 2026 |
| District 2, Place 2 | 2016 | 2024 |
| District 2, Place 3 | 2020 | 2028 |
| District 3, Place 1 | 2016 | 2024 |
| District 3, Place 2 | 2016 | 2024 |
| District 3, Place 3 | 2020 | 2028 |

29.    All Justices participate in hearing cases from across the state.[46] Although the

Justices are elected by Supreme Court districts, there is no distinction made in the law between the

Justices based on the districts from which they were elected, nor do the districts have any

implications for their roles on the Court. Consistent with this, in my experience, Justices view

themselves and each other as statewide officials rather than as representatives of the specific

districts from which they were elected.

30.    In 1987, shortly before I was elected to serve in the State Legislature, the Supreme

Court districts were redrawn to their current configuration, shifting Attala and Winston counties

from District 1 to District 3, and Claiborne, Copiah, and Jefferson counties from District 1 to

---

[44] Miss. Const. art. VI § 149; Miss. Code §§ 23-15-991; 23-15-993.

[45] Mississippi Supreme Court elections, Ballotpedia, *available at*
https://ballotpedia.org/Mississippi_Supreme_Court_elections#2016;
https://ballotpedia.org/Mississippi_Supreme_Court_elections#2018;
https://ballotpedia.org/Mississippi_Supreme_Court_elections#2020.

[46] *See* Mississippi Supreme Court website, https://www.ms.gov/Agencies/mississippi-supreme-court
("Each Supreme Court justice participates in deciding appeals from the entire state.").

11

District 2.[47] Because at that time the districts had recently been redrawn, to the best of my recollection, the legislature did not consider proposals to redraw the Supreme Court district lines while I was in my legislative office.

31.    In 1982, a constitutional amendment was passed to provide for redistricting of circuit and chancery court districts following each federal decennial census.[48] Although there is no statutory or constitutional requirement to redistrict Supreme Court districts, there was a general understanding among the legislators at the time that I served that the Supreme Court districts should also be redistricted following each decennial census, to account for population changes in the districts. It is thus surprising to me that the Supreme Court districts have remained unchanged since 1987.

## B.    Mississippi Supreme Court Elections

32.    Supreme Court elections are held concurrently with regular federal elections for representatives of Congress, *i.e.*, on even numbered years, on the first Tuesday after the first Monday in November.[49] This is unlike most elections for statewide office in Mississippi, which are held in odd-numbered years.[50] The term of office of the winning candidate commences on the first Monday of January of the year in which the incumbent's term expires.[51] As explained above

---

[47] *See* H.B. 552 (1987).

[48] *See* House Concurrent Resolution No. 23 (Nov. 2, 1982), reproduced in Inter-university Consortium for Political and Social Research, REFERENDA AND PRIMARY ELECTION MATERIALS [Computer file]. CPSR ed. Ann Arbor, MI: Inter-university Consortium for Political and Social Research [producer and distributor], 1994, https://cdn.ballotpedia.org/images/1/1b/Referenda_Elections_for_Mississippi_1968-1990.pdf, at p.24. Note that this amendment passed before the creation of the Mississippi Court of Appeals.

[49] Miss. Code § 23-15-991.

[50] Miss. Code § 23-15-193.

[51] Miss. Code § 23-15-991.

(*see* paragraph 28), because Supreme Court Justices serve for staggered eight year terms, not all Supreme Court Justices are up for election at once.

33.     All voters from the relevant Supreme Court district, regardless of party affiliation, may vote for Supreme Court Justices.[52] The names of all qualifying Supreme Court candidates for any given seat will be placed on the ballot for electors in the relevant Supreme Court district.[53] The candidate names are listed on a separate portion of the ballot in alphabetical order, with no reference to any party affiliation.[54] If a candidate receives an absolute majority of the votes, that candidate wins the seat outright, but if no candidate receives a majority of the votes (*i.e.*, 50% + 1), then the two candidates receiving the highest number of votes proceed to a runoff election held a few weeks later.[55]

34.     Because elections for Supreme Court Justice positions are non-partisan, there are no primaries. Primary elections for the two main political parties often have the effect of narrowing the field to two credible candidates. The absence of such a primary process creates the possibility that more than two candidates will be on the ballot at any one time without the signaling provided by party affiliation in partisan elections as to which candidates have a realistic possibility of success. This, in turn, increases the chances that when more than two candidates are on the ballot, no candidate will achieve an absolute majority of votes in the general election, necessitating a runoff.

35.     Turnout for Supreme Court general elections is dependent on turnout for other races held on the same date, particularly federal Presidential or Congressional elections, though voters

---

[52] Miss. Code § 23-15-985.

[53] Miss. Code §§ 23-15-981, 23-15-993.

[54] Miss. Code §§ 23-15-978, 23-15-979.

[55] Miss. Code § 23-15-981.

might vote for the "top of the ticket" race (such as the Presidential race) and not vote for Supreme Court Justice. Turnout at runoff elections for Supreme Court positions is typically very low. Such elections are held on weekdays, making it potentially difficult for voters with work or childcare obligations to participate. Runoff elections are also held less than a month after the general election, which makes it even less likely that voters will be motivated to return to the polls.[56]

36.     For example, when I was elected to the Supreme Court in 2000, three candidates were on the ballot. I won a plurality with 39% of the votes in the November 7, 2000 general election; one of my opponents, then-Circuit Judge Keith Starrett, came in second place with 31%.[57] This led to a runoff election held on Tuesday, November 21, 2000. Only about a third of the voters who turned out for the November 7, 2000 general election cast ballots in the runoff election.[58] As another, more recent example of this phenomenon, in 2016, now-Justice Robert Chamberlin won 31.17% of the votes in the general election held on November 8, 2016 for the District 3, Place 1 seat while the candidate with the second-most votes, John Brady, won 29.15% of the vote.[59] This led to a runoff election on Tuesday, November 29, 2016 in which Justice Chamberlin prevailed.[60] While 330,845 voters cast ballots in the general election for that Supreme Court seat, only 36,586 voters cast ballots in the runoff election.[61]

---

[56] *Id.*

[57] "Justice Runoff Set Today: Circuit Judge Challenges Incumbent Oliver Diaz," *The Commercial Appeal* (Memphis, TN) (Nov. 21, 2000) (available on Lexis).

[58] "Miss. justice wins controversial race," *The Advocate* (Nov. 23, 2000) (available on Lexis).

[59] Mississippi Supreme Court elections, 2016, Ballotpedia, *available at* https://ballotpedia.org/Mississippi_Supreme_Court_elections,_2016.

[60] *Id.*

[61] *Id.*

14

## C. Running For Election

37.     A candidate for a Supreme Court seat must be a qualified elector at least 30 years of age who resides in the Supreme Court district in which the candidate seeks election and has been a practicing attorney and citizen of Mississippi for at least five years immediately preceding the election.[62] Any eligible attorney who wishes to run for a Supreme Court seat may become a candidate by (i) filing a "Qualifying Statement of Intent" form with the State Board of Election Commissioners by February 1 of the year in which the general election will be held (or the first business day after February 1 if that date falls on a weekend or legal holiday); (ii) paying a $200 candidacy fee; and (iii) signing an "Affidavit of Judicial Candidate" form attesting that the candidate will abide by all laws, canons and regulations applicable to judicial elections.[63] The candidate must identify both the Supreme Court district and the position number of the seat in which the candidate wishes to run.[64]

38.     Since 1994, elections for Supreme Court Justice positions are non-partisan.[65] I was a member of the legislature that passed the bill changing the electoral process from partisan to non-partisan, and I voted in favor of the bill. My recollection is that this was a good-government initiative aimed at removing party politics from judicial elections, in keeping with the principle that judges should be independent and above party politics. However, while I still strongly believe that non-partisan judicial elections are preferable to overtly partisan elections, I do not believe that

---

[62] Miss. Const. art. VI, § 150.

[63] Miss. Code §§ 23-15-977, 23-15-977.1. A copy of the "Qualifying Statement of Intent" form is available at https://www.sos.ms.gov/content/documents/elections/candidate%20qualifying/Judicial%20Cand%20Qualifying%20Statement_Rev%209%202019.pdf. A copy of the "Affidavit of Judicial Candidate" form is available at https://www.sos.ms.gov/content/documents/elections/candidate%20qualifying/Affidavit%20of%20Judical%20Candidate_Rev%209%202019.pdf.

[64] Miss. Code § 23-15-993.

[65] Miss. Code § 23-15-976.

15

the goal of removing partisan politics from the judicial elections process was accomplished. Party politics continue to play a major role in judicial elections in general, and even more acutely in elections to the Supreme Court.

39.     Because elections for the Mississippi Supreme Court are non-partisan, candidates and their political committees may not campaign on the basis of a party affiliation or align themselves with party-affiliated candidates who are running in any primary or general election.[66] Supreme Court candidates are also prohibited from holding leadership roles in a political organization, making speeches for a political organization, or publicly endorsing a candidate for public office.[67]

40.     Political parties may, however, participate in Supreme Court elections by supporting candidates. As the Supreme Court explained in a 2019 order revising the Code of Judicial Conduct, the provisions of Miss. Code § 23-15-976 that prohibit political parties from endorsing judicial candidates or fundraising for candidates were held unconstitutional in a case called *Mississippi Republican Party v. Musgrove*, No. 3:02-cv-1578-WS (S.D. Miss. Oct. 21, 2002). *See In re Code of Judicial Conduct*, 2019 Miss. LEXIS 422, at ¶4 (Miss. Dec. 12, 2019). As the Supreme Court explained, in that case United States District Judge Henry Wingate "ruled that political parties, just as any other citizen or association, have a constitutional right to participate in judicial elections, including the endorsement of judicial candidates." *Id.*

41.     In contested elections, parties, or leading State party figures, can and do endorse Supreme Court candidates. For example, in the 2016 race for the District 1, Place 3 seat, between

---

[66] Miss. Code § 23-15-973.

[67] Miss. Code of Judicial Conduct, Canon 5A(1). Candidates for Supreme Court may, however, attend or speak at political gatherings in their personal capacity. *See* Miss. Code of Judicial Conduct, Commentary to Canon 5C ("Attending or speaking at a political party gathering in the judge's own behalf while a candidate does not constitute alignments or affiliation with the party sponsoring the gathering.").

16

incumbent Justice Jim Kitchens and challenger Kenny Griffis, then a judge on the Court of Appeals, the *Clarion-Ledger* reported:

> Although judicial races are nonpartisan, Republicans Gov. Phil Bryant and Lt. Gov. Tate Reeves are apparently supporting Griffis. A notice was sent out about a fundraiser in April hosted by Bryant. Then in May, a reception was held for Griffis listing Reeves as the special guest. Bryant spokesman Knox Graham said last week Bryant is indeed supporting Griffis. Reeves' spokeswoman Laura Hipp said Reeves being at the event speaks for itself.[68]

The same article later quotes Kitchens' campaign spokeswoman Pam Johnson as stating "'it would be impractical to think that partisan politics can be avoided in any election."[69] (Note that Justice Kitchens prevailed in the 2016 election for the District 1, Place 3 seat, and then-Judge Griffis was appointed to the District 1, Place 1 seat on the Supreme Court by Governor Bryant on February 1, 2019.[70])

42.     Similarly, in the 2020 race for the District 1, Place 1 seat between incumbent Justice Griffis and challenger Latrice Westbrooks, a judge on the Court of Appeals, *Mississippi Today* reported that "[a]lthough Mississippi Supreme Court races are nonpartisan, Griffis has been endorsed by the state Republican Party, and Westbrooks has the support of numerous Democratic state leaders and groups."[71]

---

[68] Jimmie E. Gates, "State high court race takes political tone," Clarion Ledger (June 16, 2016), https://www.clarionledger.com/story/news/2016/06/16/state-high-court-race-takes-political-tone/85925878/.

[69] *Id.*

[70] Jimmie E. Gates, "Justice Jim Kitchens wins re-election," Clarion Ledger (Nov. 8, 2016), https://www.clarionledger.com/story/news/2016/11/08/kitchens-and-griffis-close-battle/93442776/; Kenny Griffis, University of Mississippi School of Law, https://law.olemiss.edu/faculty-directory/kenny-griffis/#:~:text=Justice%20Kenny%20Griffis%20was%20appointed.tenure%20as%20its%20Chief%20Judge.

[71] Geoff Pender, "Kenny Griffis claims Supreme Court opponent Latrice Westbrooks voted illegally, Mississippi Today (Oct. 28, 2020), https://mississippitoday.org/2020/10/28/kenny-griffis-claims-supreme-court-opponent-latrice-westbrooks-voted-illegally/

43.     Another example of how partisan affiliates can be conveyed in non-partisan elections is the below newspaper advertisement, published on November 2, 2000 in *The Conservative*, a newspaper from Carrollton, Mississippi, in connection with that year's race between incumbent Chief Justice Lenore Prather and challenger Charles Easley. As can be seen below, the advertisement—paid for by Easley's campaign—highlights claimed distinctions between the two candidates. The first identified distinction is that Easley is "conservative" while Prather is "liberal." Mr. Easley then goes on to present himself as a tough-on-crime prosecutor, contrasting this with Prather having "[v]oted to reverse and/or remand "over 400 criminal convictions," "over 100 murder convictions," and "Death Penalty cases." Mr. Easley won the election with 51.9% of the vote.

*[remainder of page left blank; see image on following page]*

18



44.     Lawyers and judges also play a major role in identifying and electing qualified candidates for the Supreme Court.[72] Candidates spend a great deal of time cultivating support

---

[72] *See, e.g.,* Miss. Code of Judicial Conduct, Commentary to Canon 2B ("Judges may participate in the process of judicial selection by cooperating with appointing authorities and screening committees seeking names for consideration, and by responding to official inquiries concerning a person being considered for a judgeship.").

19

among the members of the bar. In fact, one of the ways that Supreme Court candidates may campaign is through addresses to jury pools at the circuit court.[73]

### D.    Rules Governing Supreme Court Campaigns

45.    A Supreme Court candidate's campaign committee may "conduct campaigns for the candidate through media advertisements, brochures, mailings, candidate forums and other means not prohibited by law.[74] Any materials distributed by a candidate or the candidate's campaign committee must state that these materials are being distributed with the candidate's approval; and conspicuously identify who prepared and is distributing the material.[75]

46.    During a campaign, a Supreme Court candidate may not "make statements that commit or appear to commit the candidate with respect to cases, controversies or issues that are likely to come before the court."[76] While the rules prohibit a candidate from "making pledges or promises to decide cases in any particular way," a candidate may use phrases that indicate a general view on categories of cases (e.g., "tough on crime" or "pro-business").[77] A candidate may also "respond to personal attacks or attacks on the candidate's record," subject to the restrictions of Judicial Canon 5A(3)(d) (described above).[78] A candidate is also prohibited from "knowingly

---

[73] See Miss. Code § 23-15-973 ("It shall be the duty of the judges of the circuit court to give a reasonable time and opportunity to the candidates for the office of judge of the Supreme Court, judges of the Court of Appeals, circuit judge and chancellor to address the people during court terms.").

[74] Miss. Code of Judicial Conduct, Canon 5C(2).

[75] Miss. Code § 23-15-1025; see also Miss. Sec'y of State, Presentation on 2020 Mississippi Judicial Elections, at 37, https://courts.ms.gov/commissions/JCI/2020%20Judicial%20Presentation.PPTX.

[76] Miss. Code of Judicial Conduct, Canon 5A (3)(d)(ii).

[77] Miss. Code of Judicial Conduct, Commentary to Canon 5-A (3)(d).

[78] Miss. Code of Judicial Conduct, Canon 5A (3)(e).

misrepresent[ing] the identity, qualifications, present position or other fact concerning the candidate or an opponent."[79]

47.     Over the past few decades, the costs of running a Supreme Court campaign have skyrocketed. In the early 1990s, the winning candidate might have spent somewhere in the order of $25,000 on a successful election campaign. When I ran in 2000, my campaign cost approximately a million dollars. Since then, costs have continued to rise, in part due to the influx of spending by outside interest groups. Such outside spending has become even more prevalent after the U.S. Supreme Court's decision in *Citizens United v. Federal Election Commission*, 558 U.S. 310 (2010), which removed limitations on corporate funding of independent political communications.

48.     Under Mississippi law, Supreme Court candidates may not "personally solicit or accept campaign contributions."[80] A candidate may, however, create campaign committees to "solicit and accept reasonable campaign contributions, manage the expenditure of funds for the candidate's campaign and obtain public statements of support for the candidacy."[81] The committees are specifically authorized to "solicit[ ] and accept[ ] reasonable campaign contributions from lawyers."[82] The committee may seek campaign contributions beginning from the date the individual qualifies as a candidate until 120 days after the last election in which the

---

[79] Miss. Code of Judicial Conduct, Canon 5A (3)(d)(iii).

[80] Miss. Code of Judicial Conduct, Canon 5B (2).

[81] *Id.*

[82] *Id.*

candidate participates during the calendar year.[83] Campaign contributions may not be used for the private benefit of the candidate or any other person.[84]

49. No individual or political action committee not affiliated with a political party may donate, directly or indirectly, more than $5,000 to a Supreme Court candidate's campaign.[85] No corporation may contribute more than $1,000 to a Supreme Court candidate's campaign.[86]

50. Strict reporting requirements apply to judicial candidates and campaign committees. Both a Supreme Court candidate and the candidate's campaign committees must file reports of contributions and disbursements until such time as they submit a final report attesting that contributions will no longer be received, disbursements will no longer be made, and that there are no outstanding debts or obligations.[87] The reports must also identify each person, political committee or entity who makes a contribution or receives a payment totaling $200 or more in the calendar year, as well as the total amount of all contributions, the total amount of all expenditures, and the total amount of cash on hand.[88]

51. Supreme Court candidates must disclose the identity of any person or entity from which the candidate or the candidate's campaign committee receives a loan or extension of credit, as well as any cosigners of the loan or extension of credit.[89] The candidate or the candidate's

---

[83] *Id.*

[84] *Id.*

[85] Miss. Code Ann. § 23-15-1021; *see also* Miss. Sec'y of State, Presentation on 2020 Mississippi Judicial Elections, at 7, https://courts.ms.gov/commissions/JCI/2020%20Judicial%20Presentation.PPTX.

[86] Miss. Code § 97-13-15; *see also* Miss. Sec'y of State, Presentation on 2020 Mississippi Judicial Elections, at 7, https://courts.ms.gov/commissions/JCI/2020%20Judicial%20Presentation.PPTX.

[87] Miss. Code §§ 23-15-807(a), 23-15-805(a).

[88] Miss. Code § 23-15-807(d); *see also* Miss. Sec'y of State, Presentation on 2020 Mississippi Judicial Elections, at 12, https://courts.ms.gov/commissions/JCI/2020%20Judicial%20Presentation.PPTX.

[89] Miss. Code § 23-15-1023.

campaign committee must disclose how the loan or extension of credit was used, how and when the loan or extension credit will be repaid, and the method of repayment.[90] In addition, the candidate or the candidate's campaign committee must disclose all loan documents related to such loans or extensions of credit.[91]

52. Any entity or individual who contributes more than \$2,000 to a Supreme Court Justice's most recent election campaign is considered a "major donor" under the Mississippi Code of Judicial Conduct.[92] For purposes of determining who is a major donor, contributions include "all contributions of every kind and type whatsoever, whether in the form of cash, goods, services, or other form of contribution, and whether donated directly to the judge's campaign or donated to any other person or entity for the purpose of supporting the judge's campaign and/or opposing the campaign of the judge's opponent(s);" as well as "any publication, advertisement or other release of information, or payment therefor, other than a bona fide news item published by existing news media, which contains favorable information about the judge or . . . unfavorable information about the judge's opponent(s)."[93] A party to a litigation pending before the Court may file a motion to recuse a Justice if a major donor is an opposing party or counsel of record for an opposing party in the case.[94]

### E. Involvement of Interest Groups in Supreme Court Elections

53. Mississippi has a law in place that attempts to limit the involvement of interest groups in judicial campaigns by regulating any "independent expenditure," defined as "an

---

[90] *Id.*

[91] *Id.*

[92] Miss. Code of Judicial Conduct, Terminology.

[93] *Id.*

[94] Miss. Code of Judicial Conduct, Canon 3E (2).

23

expenditure by a person expressly advocating the election or defeat of a clearly identified candidate that is made without cooperation or consultation with any candidate or any authorized committee or agent of the candidate, and that is not made in concert with or at the request or suggestion of any candidate or any authorized committee or agent of the candidate."[95] Specifically, the law requires that every person or entity, other than a political committee, who makes "independent expenditures" of $200 or more during a calendar year must file a statement indicating the name of the contributor and "[i]nformation indicating whether the independent expenditure is in support of, or in opposition to, the candidate involved"; as well as a certification made under penalty of perjury attesting to whether the expenditure was made in cooperation or consultation with, or at the request or suggestion of, the candidate.[96]

54.     These laws were put to the test during my 2000 election for a Supreme Court seat. The United States Chamber of Commerce aired a series of commercials favorable to my opponent, Keith Starrett. In particular, the commercials emphasized my opponent's views on the rights of victims of crimes. The U.S. District Court for the Southern District of Mississippi held that these commercials constituted "independent expenditures" for the purposes of Mississippi's campaign finance laws.[97] However, the Fifth Circuit reversed and held that the commercials did not constitute "express advocacy" within the meaning of the definition of "independent expenditures" because the commercials did "not contain explicit words exhorting viewers to take specific electoral action for or against the featured candidates."[98] The Fifth Circuit held that "a state may

---

[95] Miss. Code § 23-15-801.

[96] Miss. Code § 23-15-809.

[97] *Chamber of Commerce of the United States v. Moore*, 191 F. Supp. 2d 747 (S.D. Miss. 2000).

[98] *Chamber of Commerce of the United States v. Moore*, 288 F.3d 187, 198 (5th Cir. 2002).

regulate a political advertisement only if the advertisement advocates *in express terms* the election or defeat of a candidate."[99]

55.     Since the Fifth Circuit's decision, there have been no limits on the amount of money that interest groups may spend to influence Supreme Court elections, provided those groups are careful to avoid expressly advocating for the election or defeat of any given candidate.

56.     The advertisements at issue in that lawsuit are illustrative of the tactics of outside interest groups. The Chamber of Commerce represents business interests, and was motivated to support judges who were viewed as having broadly pro-defendant views in civil cases. Particularly in the 1990s and 2000s, Mississippi was a site of conflict between business groups and the plaintiffs' bar, following the success of certain high-profile plaintiffs' attorneys in litigation against asbestos and tobacco companies, and in light of the then-prominent national "tort reform" movement promoted by business interests. However, because of the relative lower salience of civil law issues to the general public, advertisements funded by interest groups typically focused on criminal law issues. For instance, the court described the Chamber of Commerce-funded advertisement in favor of my opponent as follows:

> Exhibit C begins with the narration, "Keith Starrett — a common sense Justice." As pictures of Judge Starrett appear on the screen, followed by scenes of school children and scenes of citizens going about their daily routines, the narrator says that Keith Starrett formed the first drug court in Mississippi, and that Starrett's drug court saved taxpayers over one half million dollars in the first year. Then, as the words "Baptist Deacon" and "Victim's Rights Count" appear on the screen, the narration states, "a Baptist Deacon who once headed South Mississippi Child Protection, Starrett knows victims have as much a right to justice as defendants do." The narration closes with, "Judge Keith Starrett — he knows victims rights count!"[100]

---

[99] *Id.* at 190.

[100] *Chamber of Commerce of U.S. v. Moore*, 191 F. Supp. 2d 747, 751-52 (S.D. Miss. 2000).

25

57.     Another Chamber-funded advertisement at issue in that case favored Chief Justice Prather, whose opponent, Charles Easley, was a plaintiffs' personal injury lawyer. The court's description of that advertisement is set forth below:

> Exhibit B begins with the photograph of a gavel and a picture of Chief Justice Lenore Prather slowly materializes in the background. The narration states, "Lenore Prather — Chief Justice of Mississippi's Supreme Court; Lenore Prather — using common sense principles to uphold the law; Lenore Prather — putting victims rights ahead of criminals and protecting our Supreme Court from the influence of special interests." As the narration proceeds, the words "Chief Justice," "Common Sense," and "Victims Rights" appear on the screen. The narrator then states that Lenore Prather was the first woman appointed to the Mississippi Supreme Court, and that she has thirty-five years of experience.[101]

58.     As can be seen in comparing this advertisement to the newspaper advertisement from Prather's opponent Charles Easley, both focus on criminal law issues and both present the favored candidate as "tough on crime."

59.     Outside interest groups offer an easy mechanism for individuals and entities to influence campaigns without being subject to the legal limits on direct campaign contributions. Instead of donating to a Supreme Court candidate's campaign committee, an individual or entity may simply donate to, or create, an interest group that is willing to run advertisements that influence voters to choose the desired candidate, without explicitly instructing the voters to do so. In my view, such spending by interest groups is one of the most significant factors impacting state Supreme Court elections.

60.     As a general rule, Supreme Court candidates themselves do not run overtly negative campaigns, in keeping with the ideal that judges are not partisans and will evaluate matters fairly and not based on partisan biases. Negative campaigning is typically left to outside groups, who

---

[101] *Id.* at 751.

26

can highlight perceived weaknesses in the records of the candidates they oppose, without requiring the candidate they support to engage in attacks on their opponents. As can be seen from the advertisements presented above, crime and public safety issues are typically the primary focus of Supreme Court campaigns—even though the Court typically resolves more civil than criminal cases on the merits.[102] Negative campaigns typically cherry-pick the records of the opposing candidates to find examples of pro-defendant opinions or dissents joined or authored by the candidate, and argue based on these examples that the candidate represents a danger to public safety or is out of step with Mississippi values.

61. For instance, in my 2008 campaign for reelection, an outside interest group called "Law Enforcement Alliance of America" ran an ad that accused me of "voting for" convicted killers and rapists. This ad was denounced by Mississippi's Special committee on Judicial Election Campaign Intervention, and as a result, some but not all television stations stopped running it.[103] The storyboard for this ad, as documented by the Brennan Center, is reproduced below.[104]

*[remainder of page left blank; see image on following page]*

---

[102] *See, e.g.*, Supreme Court of Mississippi, 2021 Annual Report at 3 ("Of the 109 appeals decided on the merits, 82 (75.2 percent) were civil, and 27 (24.8 percent) were criminal."), *available at* https://courts.ms.gov/research/reports/SCTAnnRep2021.pdf; Supreme Court of Mississippi, 2007 Annual Report at 13 ("Of those [cases] decided on the merits, 141 (66%) were civil, and 47 (21%) were criminal."), *available at* https://courts.ms.gov/research/reports/SCTAnnRep2007.pdf; Supreme Court of Mississippi, 2000 Annual Report at 1 ("Of the cases disposed of on the merits, 222 (or 79%) were civil and 60 (or 21%) were criminal."), *available at* https://courts.ms.gov/research/reports/SCTAnnRep2000.pdf.

[103] Brennan Center for Justice, *Buying Time 2008: Mississippi*, https://www.brennancenter.org/our-work/research-reports/buying-time-2008-mississippi.

[104] Brennan Center for Justice, *Buying Time 2008: Mississippi – Advertisements: LEAA Diaz Protect Our Families*, https://www.brennancenter.org/sites/default/files/analysis/Buying_Time/10-21-08%20STSUPCT_MS_LEAA_DIAZ_PROTECT_OUR_FAMILIES.pdf



[Announcer 1]: We need judges to protect our families in Mississippi. But when a 6-month-old child

was raped and murdered... [Announcer 2]: Supreme Court Justice Diaz is the only one

voting for the child's killer. [Announcer 1]: An elderly woman kidnapped, beaten and

raped. [Announcer 2]: Diaz, the only one voting for the rapist. [Announcer 1]: A 20-month-old baby

dead from blows to her head. [Announcer 2]: Justice Diaz votes to overturn the

baby-killer's conviction. [Announcer 1]: Log on and tell Justice Diaz to protect

Mississippi families, not criminals. Paid for by Law Enforcement Alliance of America.

[PFB]: LAW ENFORCEMENT ALLIANCE OF AMERICA

62.     I believe that Black candidates for the Supreme Court are targets of subtle racial appeals to white voters in a number of different ways. First, in my opinion, voting in Mississippi is extremely polarized along racial lines. White candidates are generally understood to be associated with the Republican party, and Black candidates with the Democratic party, and, as discussed above, even though Supreme Court elections are non-partisan, parties and party leaders can and do endorse particular candidates.

63.     Second, while campaigns around criminal law and public safety issues are pervasive, "tough on crime" messaging can also have a racial component. White candidates, and

28

outside groups supporting them, can appeal to the preexisting prejudices of white voters that connect concerns over crime with stereotypes about Black Mississippians and Black-majority areas of the state. So, too, can messaging that a white candidate is "one of us" or supports "traditional Mississippi values." For example, in the 2004 race against incumbent Justice James Graves, the third Black Mississippian appointed to the Court, Justice Graves' opponent ran advertisements focused on the phrase "one of us." One such ad, presented below, stated that "In the race for Supreme Court, Central District, only one candidate stands for traditional Mississippi values."[105] Another reiterated that "[a]t a time when our civil liberties and traditional values are under attack, we need Samac Richardson on the State Supreme Court. He's one of us."[106] Notably, the three-judge panel in *Jordan v. Winter*, 604 F. Supp. 807 (N.D. Miss. 1984), found that an earlier instance of such "one of us" messaging, made in a congressional campaign by a white candidate opposing a Black candidate, amounted to a "racial campaign tactic[]" that "support[ed] the conclusion that Mississippi voters are urged to cast their ballots according to race."[107]

*[remainder of page left blank; see image on following page]*

---

[105] Brennan Center for Justice,
https://www.brennancenter.org/sites/default/files/legacy/d/STSUPCT_MS_RICHARDSON_ONE_OF_US_.pdf

[106] Brennan Center for Justice,
https://www.brennancenter.org/sites/default/files/legacy/d/STSUPCT_MS_FRICHARDSON_ONE_FO_US_2.pdf

[107] *Jordan v. Winter*, 604 F. Supp. 807, 813 & n.8 (N.D. Miss. 1984).



64.     Third, white candidates and outside groups supporting them can also make subtle racial appeals through the use of advertisements that feature photographs of their Black opponents. For example, I reviewed a report submitted by former Justice Fred Banks in another redistricting case.[108] In that report, Justice Banks stated that when he ran for election after having been appointed to the Supreme Court, his opponent, "who is white, put out campaign posters in predominantly white areas prominently featuring a photograph of me, showing that I was African American, because my literature did not indicate the race of either candidate." Justice Banks also

---

[108] Report of Fred L. Banks, *Thomas v. Bryant*, No. 3:18-cv-00441, ECF No. 81-9 (S.D. Miss. Feb. 28, 2019).

30

noted that when he ran for reelection in 1996, his white opponent's television advertisements also included such photographs.

65.    A copy of the advertisement referenced by Justice Banks is reproduced below.[109] The court in the *Magnolia Bar* case concluded based on this advertisement, and others like it, "that subtle and overt racial appeals have characterized some Supreme Court elections and other judicial elections in Mississippi," although it ultimately gave less weight to this finding based on other evidence presented in that case.[110]



---

[109] JACKSON CLARION-LEDGER, Oct. 29, 1991, at 6A; Carole Lawes, *Banks' Supporters Blast Court Race Opponent's Ad*, JACKSON CLARION-LEDGER, Oct. 30, 1991, at 13

[110] *Magnolia Bar Ass'n, Inc. Lee*, 793 F. Supp. 1386, 1410 (S.D. Miss. 1992).

31

## VI. GUBERNATORIAL APPOINTMENTS

66. If a Supreme Court Justice seat becomes vacant for any reason, such as through the retirement of a sitting Justice, the Governor may appoint a qualified individual to fill the seat.[111] If less than half the term remains, the Governor's appointee shall serve until the expiration of the term.[112] If half or more of the term remains, the Governor's appointee shall serve until the next regular election for state officers or for representatives in Congress occurring more than nine months after the vacancy to be filled occurred.[113] The term of office of the Justice elected to fill a Supreme Court vacancy begins on the first Monday in January following the election.[114]

67. Prospective candidates for appointment to a vacant Supreme Court seat may not solicit or accept funds, either personally or through a committee, to support their appointment;[115] or engage in any political activity to secure the appointment.[116] However, a candidate may (i) communicate with any person from the Governor's Office who is involved in the selection process or any selection or nominating committee regarding the candidate's interest in the position and qualifications for the role; and (ii) seek the support or endorsement of individuals or organizations that make recommendations for Supreme Court appointments.[117]

68. The appointment process takes place largely outside of the public view. Governors have complete discretion in deciding whom to nominate for an open seat on the Court, and there

---

[111] Miss. Code § 9-1-103; *see also* Miss. Code § 9-1-101(a); Miss. Code § 23-15-849(2).

[112] Miss. Code § 23-15-849(2).

[113] *Id.*

[114] *Id.*

[115] Miss. Code of Judicial Conduct, Canon 5B (1).

[116] Miss. Code of Judicial Conduct, Canon 5B (2).

[117] Miss. Code of Judicial Conduct, Canon 5B (2).

is no constitutionally or statutorily-mandated selection committee or process.[118] To the extent that Governors might play a role in encouraging Justices to step down to create vacancies that can be filled by appointments, any such conversations would be completely private and off the record.

69.     I was appointed to the Court by Governor Ronnie Musgrove in 2000, following the unexpected death of Justice Michael Sullivan, who served in the District 2, Place 2 seat. I was serving as an appellate judge on the Court of Appeals at the time. Given my judicial experience, a number of the Governor's supporters recommended that the Governor appoint me to the seat. I had known the Governor for a number of years, and we had served together in the State Legislature. He knew me well and was comfortable with me. Prior to the appointment, someone from the Governor's Office contacted me to ask if I would accept the appointment if it were offered. Shortly after that conversation, I was appointed to the Court.

70.     Since 1985, Governors have historically appointed Black candidates to serve in the District 1, Place 2 seat. In 1985, Governor Bill Allain appointed Reuben Anderson, who is Black, to fill a vacancy in the District 1, Place 2 seat.[119] Justice Anderson subsequently won a special election in 1986, and ran unopposed in 1988. In 1990, when Justice Anderson resigned, Governor Ray Mabus appointed Fred Banks, who is Black, to replace him. Justice Banks won a contested Special Election in 1991; and won reelection in 1996. In 2001, Justice Banks resigned. Governor Ronnie Musgrove appointed James Graves, who is Black, to take his seat. He was elected for a full term in 2004 after winning a contested runoff election. Justice Graves resigned in 2010 to take a position as a judge on the U.S. Court of Appeals for the Fifth Circuit.[120] Governor Haley Barbour

---

[118] Judicial Selection in Mississippi (2022), https://ballotpedia.org/Judicial_selection_in_Mississippi.

[119] Robert McDuff, *The Voting Rights Act and Mississippi 1956-2006,*
http://www.protectcivilrights.org/pdf/voting/MississippiVRA.pdf.

[120] *Id.*

33

appointed Leslie King, who is Black, to take his seat. Justice King has twice been reelected without opposition, and he remains on the Court.[121]

71.    These gubernatorial appointments have ensured that, since 1985, there is always a Black Justice on the Court. Once appointed, that Justice has an incumbency advantage in future elections, including strong name recognition among the members of the Bar, and automatic credibility from the Justice's position on the bench. Given the racial polarization of Mississippi voters and the lack of a majority-minority district under the district lines as currently drawn, an incumbent Black Justice is far more likely to be reelected to the seat than a similarly-credentialed Black attorney who does not have experience on the Court.

Oliver E. Diaz, Jr.

---

[121] Ward Schaefer, "Barbour Taps Leslie King for Supreme Court", Jackson Free Press (Feb. 24, 2011), https://www.jacksonfreepress.com/news/2011/feb/24/barbour-taps-leslie-king-for-supreme-court/.

# APPENDIX A

# OLIVER E. DIAZ, JR.

███████████████████████████████

## EDUCATION

| | |
|---|---|
| LL.M. University of Virginia School of law | 2004 |
| J.D. University of Mississippi School of Law | 1985 |
| B.A. University of South Alabama | 1982 |
| A.A. Mississippi Gulf Coast Junior College | 1979 |

## WORK EXPERIENCE

| | |
|---|---|
| Licensed attorney in private practice | 1985 – 1995; 2009 - present |
| Special Master Federal Court, Washington, D.C. | 2012 - present |
| Mississippi Supreme Court Justice (Elected) | 2001 - 2009 |
| Mississippi Supreme Court Justice (Appointed) | 2000 - 2001 |
| Mississippi Court of Appeals Judge (Elected) | 1995 - 2000 |
| Mississippi House of Representatives (Elected) | 1987 - 1995 |
| City Attorney, D'Iberville, Mississippi | 1990 - 1995 |

## PUBLICATIONS

I have authored approximately 337 opinions which have been published in the Southern Reporter. The opinions were published between 1997 and 2009 on various issues of law and ethics. Of those, approximately 231 are majority opinions, 93 are dissenting opinions, and 13 are concurring opinions. Notable opinions include:

*Edmonds v. State*, 955 So. 2d 787 (Miss. 2007), reversing life without parole sentence for thirteen-year-old child.

*Caves v. Yarbrough*, 991 So. 2d 142 (Miss. 2008), citing *Monty Python and the Holy Grail* for the proposition that the statute of limitations in a wrongful death case begins to run at the time of death.

*Doss v. State*, No. 2007-CA-00429-SCT, December 11, 2008, calling for the abolition of the death penalty in Mississippi.

*Biglane v. Under the Hill Corp.*, 949 So. 2d 9 (Miss. 2007), a majority opinion which includes a historical recitation of Natchez, Mississippi. "No spot on the American continent ever bore a viler name..."

*Governor Haley Barbour et al., v. Trudy Berger et al.*, No. 2008-M-01534-SCT (Order, September 18, 2008), holding that Governor Barbour overstepped his authority in mandating the order of candidates and issues appearing on the ballot.

## INVITED TALKS

I have lectured at the National Press Club, the Center for American Progress, and the American Association for Justice, along with various judicial, bar association, and law school events around the country. I served as the keynote speaker for the Roscoe Pound Institute and presented the 2013 Howard Twiggs Lecture at the American Association for Justice annual convention. I have given keynote addresses for the Missouri Trial Lawyers Association, the Wyoming Association for Justice, the Tennessee Association for Justice, and the Workers' Injury Law and Advocacy Group. A partial list of the groups that I have presented lectures to include the Washington and Oregon Trial Lawyers Association, the Florida Bar Association, the Kentucky Association for Justice, the Oklahoma Defense Lawyers Association, the Wisconsin Association for Justice, the Virginia Trial Lawyers Association, the Mississippi Association for Justice, the Mississippi Bar Association, the University of Washington Law School, the University of Mississippi Law School, the University of Southern Mississippi, the Mississippi College School of Law, and Mass Torts Made Perfect. I have also presented continuing legal education courses at various seminars around the country.

## PROFESSIONAL ASSOCIATIONS

Mississippi Bar Association

Mississippi Association for Justice

Innocence Project of Mississippi, Board of Directors

## AWARDS AND HONORS

| | |
|---|---|
| Washington State Association for Justice "Pillar of Justice" Award | 2013 |
| WILG "Esther S. Weissman Eternal Optimism" Award | 2012 |
| Mississippi Trial Lawyers Association "Judicial Fairness and Integrity" Award | 2007 |

## MEDIA COVERAGE

I have appeared on CSPAN, the BBC, CNN, *Democracy Now!*, Public Radio, and various national and local television and radio programs. I am featured in the award winning HBO documentary film *Hot Coffee*. Best-selling author John Grisham has stated that my story was the inspiration for his novel, *The Appeal*. I have been highlighted in numerous publications including the *New York Times*, *Harper's Magazine*, the *ABA Journal*, *The Huffington Post*, *The Raw Story*, *Daily Kos* and various news outlets and blogs. The film rights to my life story were recently purchased for a feature length movie.

# APPENDIX B

**Appendix B**

**Material Considered**

### Judicial Rulings

1. *Chamber of Commerce of the United States v. Moore*, 191 F. Supp. 2d 747 (S.D. Miss. 2000)
2. *Chamber of Commerce of the United States v. Moore*, 288 F.3d 187 (5th Cir. 2002)
3. *Citizens United v. Federal Election Commission*, 558 U.S. 310 (2010)
4. *In re Code of Judicial Conduct*, 2019 Miss. LEXIS 422 (Miss. Dec. 12, 2019)
5. *Jordan v. Winter*, 604 F. Supp. 807 (N.D. Miss. 1984)
6. *Magnolia Bar Ass'n, Inc. Lee*, 793 F. Supp. 1386 (S.D. Miss. 1992)

### Statutes and Rules

1. H.B. 552 (1987)
2. House Concurrent Resolution No. 23 (Nov. 2, 1982), reproduced in Inter-university Consortium for Political and Social Research, Referenda and Primary Election Materials CPSR ed. Ann Arbor, MI: Inter-university Consortium for Political and Social Research (1994)
3. Mississippi Code (various provisions cited in footnotes)
4. Mississippi Code of Judicial Conduct (various provisions cited in footnotes)
5. Mississippi Constitution (various provisions cited in footnotes)
6. Mississippi Rules of Appellate Procedure (various provisions cited in footnotes)

### State of Mississippi Online Resources

1. Mississippi Secretary of State, "Affidavit of Judicial Candidate", https://www.sos.ms.gov/content/documents/elections/candidate%20qualifying/Affidavit%20of%20Judical%20Candidate_Rev%209%202019.pdf
2. Mississippi Secretary of State, Presentation on 2020 Mississippi Judicial Elections, https://courts.ms.gov/commissions/JCI/2020%20Judicial%20Presentation.PPTX
3. Mississippi Secretary of State, "Qualifying Statement of Intent", https://www.sos.ms.gov/content/documents/elections/candidate%20qualifying/Judicial%20Cand%20Qualifying%20Statement_Rev%209%202019.pdf
4. Mississippi Supreme Court website, https://www.ms.gov/Agencies/mississippi-supreme-court
5. Mississippi Supreme Court Docket Calendar, https://courts.ms.gov/appellatecourts/sc/scdocketcalendar.php
6. Supreme Court of Mississippi, 2021 Annual Report, *available at* https://courts.ms.gov/research/reports/SCTAnnRep2021.pdf
7. Supreme Court of Mississippi, 2007 Annual Report, *available at* https://courts.ms.gov/research/reports/SCTAnnRep2007.pdf

1

8. Supreme Court of Mississippi, 2000 Annual Report, *available at* https://courts.ms.gov/research/reports/SCTAnnRep2000.pdf

## Court Filings

1. Report of Fred L. Banks, *Thomas v. Bryant*, No. 3:18-cv-00441, ECF No. 81-9 (S.D. Miss. Feb. 28, 2019)

## News Articles

1. Carole Lawes, Banks' Supporters Blast Court Race Opponent's Ad, JACKSON CLARION-LEDGER, Oct. 30, 1991, at 13
2. Justice Runoff Set Today: Circuit Judge Challenges Incumbent Oliver Diaz, THE COMMERCIAL APPEAL (Memphis, TN) (Nov. 21, 2000)
3. Miss. justice wins controversial race, THE ADVOCATE (Nov. 23, 2000)
4. Ward Schaefer, Barbour Taps Leslie King for Supreme Court, JACKSON FREE PRESS (Feb. 24, 2011), *available at* https://www.jacksonfreepress.com/news/2011/feb/24/barbour-taps-leslie-king-for-supreme-court/
5. Jimmie E. Gates, State high court race takes political tone, JACKSON CLARION-LEDGER (June 16, 2016), *available at* https://www.clarionledger.com/story/news/2016/06/16/state-high-court-race-takes-political-tone/85925878/
6. Jimmie E. Gates, Justice Jim Kitchens wins re-election, CLARION-LEDGER (Nov. 8, 2016), *available at* https://www.clarionledger.com/story/news/2016/11/08/kitchens-and-griffis-close-battle/93442776/
7. Geoff Pender, Kenny Griffis claims Supreme Court opponent Latrice Westbrooks voted illegally, MISSISSIPPI TODAY (Oct. 28, 2020), *available at* https://mississippitoday.org/2020/10/28/kenny-griffis-claims-supreme-court-opponent-latrice-westbrooks-voted-illegally/

## Campaign Advertisements

1. Newspaper advertisement, "Judge Dillard has the Experience," JACKSON CLARION-LEDGER, Oct. 29, 1991, at 6A.
2. Newspaper advertisement, "$480,000.00," THE CONSERVATIVE, Nov. 2, 2000, at 7.
3. Television advertisement, "One of Us" (Oct. 2004), *available at* Brennan Center for Justice, https://www.brennancenter.org/sites/default/files/legacy/d/STSUPCT_MS_RICHARDSON_ONE_OF_US_.pdf
4. Television advertisement, Law Enforcement Association of America, "Diaz – Protect our Families" (Oct. 2008), *available at* Brennan Center for Justice, *Buying Time 2008: Mississippi*, https://www.brennancenter.org/sites/default/files/analysis/Buying_Time/10-21-08%20STSUPCT_MS_LEAA_DIAZ_PROTECT_OUR_FAMILIES.pdf

**Other Sources**

1. Brennan Center for Justice, *Buying Time 2008: Mississippi*,
   https://www.brennancenter.org/our-work/research-reports/buying-time-2008-mississippi

2. Robert McDuff, *The Voting Rights Act and Mississippi 1956-2006*,
   http://www.protectcivilrights.org/pdf/voting/MississippiVRA.pdf

3. Ballotpedia, Judicial Selection in Mississippi (2022),
   https://ballotpedia.org/Judicial_selection_in_Mississippi

4. Ballotpedia, Mississippi Supreme Court elections, *available at*
   https://ballotpedia.org/Mississippi_Supreme_Court_elections#2016;
   https://ballotpedia.org/Mississippi_Supreme_Court_elections#2018;
   https://ballotpedia.org/Mississippi_Supreme_Court_elections#2020

5. University of Mississippi School of Law, Kenny Griffis, https://law.olemiss.edu/faculty-directory/kenny-griffis/#:~:text=Justice%20Kenny%20Griffis%20was%20appointed,tenure%20as%20its%20Chief%20Judge

3

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF MISSISSIPPI**
**GREENVILLE DIVISION**

|  |  |
|---|---|
| DYAMONE WHITE; DERRICK SIMMONS; TY PINKINS; CONSTANCE OLIVIA SLAUGHTER HARVEY-BURWELL,<br><br>*Plaintiffs*,<br><br>vs.<br><br>STATE BOARD OF ELECTION COMMISSIONERS; TATE REEVES *in his official capacity as Governor of Mississippi*; LYNN FITCH *in her official capacity as Attorney General of Mississippi*; MICHAEL WATSON *in his official capacity as Secretary of State of Mississippi*,<br><br>*Defendants*. | 4:22-cv-0062-SA-JMV |

## DECLARATION OF OLIVER E. DIAZ, JR.

I, Oliver E. Diaz, Jr., make the following declaration based on personal knowledge:

1.      I have been retained by Plaintiffs in the above-captioned matter as an expert.

2.      The foregoing report dated October 3, 2022 is a true and correct copy of the report I provided to Plaintiffs in this matter.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Oct. 3, 2022

OLIVER E. DIAZ, JR.

# OLIVER E. DIAZ, JR.

## EDUCATION

| | |
|---|---|
| LL.M. University of Virginia School of law | 2004 |
| J.D. University of Mississippi School of Law | 1985 |
| B.A. University of South Alabama | 1982 |
| A.A. Mississippi Gulf Coast Junior College | 1979 |

## WORK EXPERIENCE

| | |
|---|---|
| Licensed attorney in private practice | 1985 – 1995; 2009 - present |
| Special Master Federal Court, Washington, D.C. | 2012 - present |
| Mississippi Supreme Court Justice (Elected) | 2001 - 2009 |
| Mississippi Supreme Court Justice (Appointed) | 2000 - 2001 |
| Mississippi Court of Appeals Judge (Elected) | 1995 - 2000 |
| Mississippi House of Representatives (Elected) | 1987 - 1995 |
| City Attorney, D'Iberville, Mississippi | 1990 - 1995 |

## PUBLICATIONS

I have authored approximately 337 opinions which have been published in the Southern Reporter. The opinions were published between 1997 and 2009 on various issues of law and ethics. Of those, approximately 231 are majority opinions, 93 are dissenting opinions, and 13 are concurring opinions. Notable opinions include:

*Edmonds v. State*, 955 So. 2d 787 (Miss. 2007), reversing life without parole sentence for thirteen-year-old child.

*Caves v. Yarbrough*, 991 So. 2d 142 (Miss. 2008), citing *Monty Python and the Holy Grail* for the proposition that the statute of limitations in a wrongful death case begins to run at the time of death.

*Doss v. State*, No. 2007-CA-00429-SCT, December 11, 2008, calling for the abolition of the death penalty in Mississippi.

*Biglane v. Under the Hill Corp.*, 949 So. 2d 9 (Miss. 2007), a majority opinion which includes a historical recitation of Natchez, Mississippi. "No spot on the American continent ever bore a viler name..."

*Governor Haley Barbour et al., v. Trudy Berger et al.*, No. 2008-M-01534-SCT (Order, September 18, 2008), holding that Governor Barbour overstepped his authority in mandating the order of candidates and issues appearing on the ballot.

## INVITED TALKS

I have lectured at the National Press Club, the Center for American Progress, and the American Association for Justice, along with various judicial, bar association, and law school events around the country. I served as the keynote speaker for the Roscoe Pound Institute and presented the 2013 Howard Twiggs Lecture at the American Association for Justice annual convention. I have given keynote addresses for the Missouri Trial Lawyers Association, the Wyoming Association for Justice, the Tennessee Association for Justice, and the Workers' Injury Law and Advocacy Group. A partial list of the groups that I have presented lectures to include the Washington and Oregon Trial Lawyers Association, the Florida Bar Association, the Kentucky Association for Justice, the Oklahoma Defense Lawyers Association, the Wisconsin Association for Justice, the Virginia Trial Lawyers Association, the Mississippi Association for Justice, the Mississippi Bar Association, the University of Washington Law School, the University of Mississippi Law School, the University of Southern Mississippi, the Mississippi College School of Law, and Mass Torts Made Perfect. I have also presented continuing legal education courses at various seminars around the country.

## PROFESSIONAL ASSOCIATIONS

Mississippi Bar Association

Mississippi Association for Justice

Innocence Project of Mississippi, Board of Directors

## AWARDS AND HONORS

| | |
|---|---|
| Washington State Association for Justice "Pillar of Justice" Award | 2013 |
| WILG "Esther S. Weissman Eternal Optimism" Award | 2012 |
| Mississippi Trial Lawyers Association "Judicial Fairness and Integrity" Award | 2007 |

## MEDIA COVERAGE

I have appeared on CSPAN, the BBC, CNN, *Democracy Now!*, Public Radio, and various national and local television and radio programs. I am featured in the award winning HBO documentary film *Hot Coffee*. Best-selling author John Grisham has stated that my story was the inspiration for his novel, *The Appeal*. I have been highlighted in numerous publications including the *New York Times*, *Harper's Magazine*, the *ABA Journal*, *The Huffington Post*, *The Raw Story*, *Daily Kos* and various news outlets and blogs. The film rights to my life story were recently purchased for a feature length movie.

## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF MISSISSIPPI
## GREENVILLE DIVISION

DYAMONE WHITE; DERRICK SIMMONS; TY PINKINS;
CONSTANCE OLIVIA SLAUGHTER HARVEY-
BURWELL,

        *Plaintiffs,*

        vs.

STATE BOARD OF ELECTION COMMISSIONERS;
TATE REEVES *in his official capacity as Governor of
Mississippi*; LYNN FITCH *in her official capacity as
Attorney General of Mississippi*; MICHAEL WATSON *in his
official capacity as Secretary of State of Mississippi*,

        *Defendants.*

4:22-cv-0062-SA-JMV

## DECLARATION OF OLIVER E. DIAZ, JR.

I, Oliver E. Diaz, Jr., make the following declaration based on personal knowledge:

1.     I have been retained by Plaintiffs in the above-captioned matter as an expert.

2.     The foregoing report dated October 3, 2022 is a true and correct copy of the report I provided to Plaintiffs in this matter.

3.     The information and opinions contained in the report are true and correct to the best of my knowledge.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Oct. 3, 2022

OLIVER E. DIAZ, JR.