# Deposition of David Arthur Swanson, Ph.D.

# White v. State Board of Election Commissioners

# October 5, 2023



**206.287.9066 I 800.846.6989**
1325 Fourth Avenue, Suite 1840, Seattle, Washington 98101
www.buellrealtime.com
email: info@buellrealtime.com



Page 1

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF MISSISSIPPI
Greenville Division

DYAMONE WHITE, et al.,          )
                                )
        Plaintiffs,             )
                                )
    v.                          ) No. 4:22-cv-00062-SA-JMV
                                )
STATE BOARD OF ELECTION         )
COMMISSIONERS, et al.,          )
                                )
        Defendants.             )
_____   )


DEPOSITION UPON ORAL EXAMINATION

OF

DAVID ARTHUR SWANSON, Ph.D.
_____


714 LAKEWAY DRIVE
BELLINGHAM, WASHINGTON


DATE TAKEN:   October 5, 2023

REPORTED BY:  Evelyn M. Adrean, RPR, CCR 22009424

White v. State Board of Election Commissioners                    David Arthur Swanson, Ph.D.

Page 2

1               A P P E A R A N C E S:

2

3    FOR PLAINTIFF:

4    ARI SAVITZKY, ESQUIRE
     American Civil Liberties Union
5    125 Broad Street, 18th Floor
     New York, New York 10004
6    212-549-2681
     asavitzky@aclu.org
7
     LESLIE F. JONES, ESQUIRE
8    AHMED K. SOUSSI, ESQUIRE (Appearing remotely)
     Southern Poverty Law Center
9    400 Washington Avenue
     Montgomery, Alabama 36104
10   334-956-8200
     leslie.jones@splcenter.org
11   ahmed.soussi@splcenter.org

12   JONATHAN K. YOUNGWOOD, ESQUIRE (Appearing remotely)
     Simpson Thacher & Bartlett, LLP
13   425 Lexington Avenue
     New York, New York 10017
14   212-455-3539
     jyoungwood@stblaw.com
15
     NOAH GIMBEL, ESQUIRE (Appearing remotely)
16   Simpson Thacher & Bartlett, LLP
     900 G Street NW
17   Washington, DC 20001
     202-636-5505
18   noah.gimbel@stblaw.com

19

20   FOR DEFENDANTS:

21   MICHAEL B. WALLACE, ESQUIRE
     Wise Carter Child & Caraway, P.A.
22   600 Heritage Building, 401 East Capitol Street
     Jackson, Mississippi 39201
23   601-968-5534
     mbw@wisecarter.com

24

25

White v. State Board of Election Commissioners                    David Arthur Swanson, Ph.D.

Page 3

```
 1              A P P E A R A N C E S: (Continued)

 2

 3   GERALD L. KUCIA, ESQUIRE (Appearing remotely)
     REX MORRIS SHANNON, III, ESQUIRE (Appearing remotely)
 4   Mississippi Attorney General's Office
     500 High Street, Suite 1200
 5   Jackson, Mississippi 39205
     601-359-3680
 6   gerald.kucia@ago.ms.gov
     rex.shannon@ago.ms.gov

 7

 8

 9   ALSO PRESENT;

10   Alexandra Hough

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

657fddd4-f0ef-43b0-bb10-e1f1abd7c8a1

White v. State Board of Election Commissioners                David Arthur Swanson, Ph.D.

Page 4

1          DEPOSITION OF DAVID ARTHUR SWANSON, Ph.D.

2                       EXAMINATION INDEX

3    EXAMINATION BY                                    PAGE

4    Mr. Savitzky                                        6

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

White v. State Board of Election Commissioners                David Arthur Swanson, Ph.D.

Page 5

1                                    EXHIBIT INDEX
2      EXHIBITS FOR IDENTIFICATION                              PAGE
3       1  Notice of Deposition of David A. Swanson, Ph.D.      9
        2  Expert Report of David A. Swanson, Ph.D.
4          dated 5 January 2023                                 10
        3  Singleton v. Merrill case law                        27
5       4  Caster v. Merrill case law                           29
        5  Allen v. Milligan case law                           32
6       6  Robinson v Ardoin case law                           36
        7  Article:  Is "Being Republican" a Risk to
7          One's Health and the Health of Others?               44
        8  Article:  Is Hawaii A Racial Paradise?               45
8       9  Declaration of William S. Cooper                     57
       10  Responsive Declaration of William S. Cooper          65
9      11  Congressional Redistricting:  An Overview
           November 21, 2021                                    73
10     12  Redistricting Criteria updated July 16, 2021         76
       13  Redistricting:  A Manual for Analysts                86
11     14  How to Measure Legislative District Compactness
           If You Only Know It When You See It
12         July 12, 2017 presentation                           110
       15  How to Measure Legislative District Compactness
13         If You Only Know it When You See It,
           Slides by Gary King                                  112
14     16  Redrawing The Map on Redistricting
           2012 Addendum                                        120
15     17  Mississippi Board of Trustees of State
           Institutions of Higher Learning Policies and
16         Bylaws Amended Through July 20, 2023                 169
       18  Scope of Report and Summary of Conclusions
17         by Traci Burch                                       200
       19  Traci Burch Qualifications and Background            211
18     20  Declaration of David A. Swanson, Ph.D.               219
       21  Article:  Vote Overreporting White Black:
19         Identifying the Mechanism Behind Black Survey
           Respondents' Vote Overreporting                      226
20     22  Article:  The Current Population Survey Voting
           and Registration Supplement Overstates
21         Minority Turnout                                     227
       23  Guide to the 2020 Cooperative Election Study
22         June 2021                                            235
       24  Excel spreadsheet                                    244
23     25  Excel spreadsheet                                    244
       26  Article:  The Perils of Cherry Picking Low
24         Frequency Events in Large Sample Surveys             280
25

657fddd4-f0ef-43b0-bb10-e1f1abd7c8a1

White v. State Board of Election Commissioners                    David Arthur Swanson, Ph.D.

Page 6

1              BELLINGHAM, WASHINGTON; OCTOBER 5, 2023

2                          8:57 a.m.

3     DAVID ARTHUR SWANSON, Ph.D.,   witness herein,
                                     having been first
4                                    duly sworn on oath,
                                     was examined and
5                                    testified as follows:

6                     E X A M I N A T I O N

7     BY MR. SAVITZKY:

8          Q.  Good morning, Dr. Swanson.

9          A.  Good morning.

10         Q.  Good to see you today.  So I introduced myself

11    already, but I'm Ari Savitzky.  I'm an attorney for the

12    ACLU.  I represent the plaintiffs in this matter.  Do

13    you understand that?

14         A.  Yes.

15         Q.  And can you state your full name for the record

16    and spell it?

17         A.  David Arthur Swanson, D-a-v-i-d, A-r-t-h-u-r,

18    S-w-a-n-s-o-n.

19         Q.  All right.  And I'll sort of briefly go over

20    some of the ground rules for deposition.  The court

21    reporter just swore you in, you're going to be under

22    oath, means you're swearing to the truthfulness and

23    accuracy of your answers.  Do you understand that?

24         A.  Yes.

25         Q.  And the oath that you just took has the same

657fddd4-f0ef-43b0-bb10-e1f1abd7c8a1

Page 7

1    effect as if you were testifying in court.  Do you

2    understand that?

3         A.  Yes.

4         Q.  And as you can see, we have the court reporter

5    here, she's transcribing your answers.  It's really

6    important to answer audibly so that your answers can be

7    recorded on the transcript.  So no nodding or shaking

8    your head.  Do you understand that?

9         A.  I do.

10        Q.  And I'm going to do my best to wait until

11   you're finished with an answer, and I would ask you to

12   sort of wait until I'm finished giving a question before

13   you start speaking.  Does that sound fair?

14        A.  It does.

15        Q.  All right.  I'm going to ask questions, your

16   job is to answer the question and you have to answer the

17   questions unless you're instructed not to answer them by

18   your attorney.  Do you understand that?

19        A.  I do.

20        Q.  Okay.  And it's important that we understand

21   each other.  We're going to have a conversation, we're

22   going to talk about a lot of different topics.  If you

23   don't understand a question, let me know, try to

24   rephrase it so we can understand each other.  Does that

25   make sense?

657fddd4-f0ef-43b0-bb10-e1f1abd7c8a1

White v. State Board of Election Commissioners                    David Arthur Swanson, Ph.D.

Page 8

1      A.   Yes.

2      Q.   Okay.  And if you need to take a break at any

3    time, just let me know.  The only thing I ask is, if

4    there's a question pending, if I've asked you a

5    question, let's finish the question before we take a

6    break.  Okay?

7      A.   Sounds good.

8      Q.   And if you realize at any time you gave an

9    answer that wasn't accurate, wasn't complete, just let

10   me know so that we can get that corrected on the record.

11   Okay?

12     A.   Will do.

13     Q.   Any questions about any of the instructions

14   that I've given here?

15     A.   No.

16          MR. WALLACE:  Did we just have somebody else

17   chime in?

18          MS. JONES:  Make sure they're on the record.

19          MR. SAVITZKY:  I don't know.  Do we want to

20   have everyone who's on the Zoom announce themselves for

21   the record at this point?

22          MR. YOUNGWOOD:  Jonathan Youngwood with

23   Simpson Thacher & Bartlett.

24          MS. HOUGH:  Hi, this is Alexandra Hough,

25   that's H-o-u-g-h, here on behalf of the plaintiffs.

White v. State Board of Election Commissioners                David Arthur Swanson, Ph.D.

Page 9

1          MR. SAVITZKY:  Anybody else on the Zoom who
2    we haven't registered yet?
3          THE REPORTER:  I think I got the others.
4          MR. SAVITZKY:  Okay.
5    BY MR. SAVITZKY:
6       Q.  And Dr. Swanson, is there any reason that you
7    can't provide complete and accurate testimony here
8    today?
9       A.  Not that I know of.
10      Q.  Are you taking any medications or drugs that
11   might impact your ability to give complete and accurate
12   testimony?
13      A.  I don't think so.
14          MR. SAVITZKY:  All right.  Let's start by
15   talking about your background.  And actually before we
16   do that, even, I'm just going to mark as Exhibit 1 the
17   notice of deposition just so we have it in the record.
18   So I'll mark as Exhibit 1.  This is just the notice of
19   deposition for today's deposition.  I'll put it right
20   there if you'd like to examine it.  There's a copy for
21   you as well.
22          MR. WALLACE:  Is this a copy for me?
23          MR. SAVITZKY:  This is a copy that you can
24   look at, but no need to ask any questions about it, I
25   just wanted to mark it in the record.

657fddd4-f0ef-43b0-bb10-e1f1abd7c8a1

White v. State Board of Election Commissioners                    David Arthur Swanson, Ph.D.

Page 10

1              Now what I am going to mark as Exhibit 2 and

2      hand to you is a copy of the report that you submitted

3      January 2023.  And this one is for you, and here's a

4      copy for you, Mr. Wallace.

5              MR. WALLACE:  Now, that's stamped.

6      Ultimately, that goes with the court reporter; right?

7              MR. SAVITZKY:  Correct, yes.

8              MR. WALLACE:  Uh-huh.

9              MR. SAVITZKY:  So the stamped is for the

10     court reporter.

11     BY MR. SAVITZKY:

12         Q.  So just taking a look at that stamped copy that

13     I handed you, is that -- does that look like a copy of

14     your January 2023 report?

15         A.  It does.

16         Q.  And just looking at Appendix 6 which is on page

17     136 of this document, just confirm that that's your CV?

18         A.  It is my CV that was current as of the time I

19     submitted this.

20         Q.  Any updates that you want to make to your CV

21     while we're talking about it?

22         A.  I think there are more publications I have and

23     there may be some other things, but I don't think it's

24     anything substantial.

25         Q.  What's your current job?

657fddd4-f0ef-43b0-bb10-e1f1abd7c8a1

White v. State Board of Election Commissioners                    David Arthur Swanson, Ph.D.

Page 11

1        A.   My current job is, I'm retired from the
2    University of California Riverside, I have a .25 full
3    time equivalent faculty position with Portland State
4    University's population research center.
5        Q.   And is that population research center in a
6    particular department or is it an independent center?
7        A.   It's in the School of Urban Public Affairs, or
8    whatever the name is of the school right now.
9        Q.   And your academic career, fair to say you're a
10   demographer?
11       A.   Yes.  Thank you.
12       Q.   What is demography?
13       A.   It's a study of populations, could be either
14   human or nonhuman, wildlife, insects.
15       Q.   Do you study human demography or the demography
16   of other species?
17       A.   Humans.
18       Q.   And would you say that you are an applied
19   demographer?  What kind of demography do you --
20       A.   I have a broad range of interests, many people
21   call me applied, but I do academic work as well.
22       Q.   And what type of analysis do you do as a
23   demographer?  How do you analyze human populations?
24       A.   I usually take on what the major focuses are
25   that demographers use, and one is on the size of a

657fddd4-f0ef-43b0-bb10-e1f1abd7c8a1

White v. State Board of Election Commissioners                    David Arthur Swanson, Ph.D.

Page 12

1   population, second is on the geographic distribution of

2   the population, third is on the population composition,

3   fourth is on the components of population change for

4   building migration, mortality, and the fifth is on the

5   determinants and consequences of population change.

6       Q.  Would it be fair to say that your research is

7   focused on the areas of social demography and population

8   health?

9       A.  I'm probably more focused on methods other than

10  social demography and population health, but I've

11  covered those fields.

12      Q.  Okay.  Just one second.  Have you ever held an

13  appointment in a political science department in any

14  institution?

15      A.  No.

16      Q.  And just looking we'll turn to page 147 of your

17  resumé -- or your CV, excuse me.  That's where the list

18  of publications begins.  Just let me know when you're

19  there.

20      A.  I'm there.

21      Q.  Just looking at this list of publications, fair

22  to say that most of them are about studying human

23  populations, population change, and forecasting?

24      A.  That's fair.  I do have a book that has just

25  been published today that's basically on population

White v. State Board of Election Commissioners                    David Arthur Swanson, Ph.D.

Page 13

1   health.  It's called Socio-Demographic Perspectives on

2   the COVID-19 Pandemic.  It's an edited book I did with

3   my colleague Rich Verdugo.

4       Q.  Congratulations on the publication.

5       A.  Thanks.

6       Q.  And so that book is about social demography as

7   it relates to the COVID --

8       A.  It would be more on health demography, but it

9   also covered methods, how to look at and estimate COVID

10  infections very early on when you don't have the ability

11  to use a real complex model with lots of data input

12  requirements.

13      Q.  Okay.  So let's talk about some of the tools

14  and methods that you use in your research.  Well, why

15  don't you tell me about the tools and methods that you

16  use as a demographer?

17      A.  I use most of the standard tools that

18  demographers use, so I'll use life tables, for example,

19  I'll do different modeling techniques, regression type

20  techniques, so that's where it spills over into the

21  statistical area largely and that is in common with a

22  lot of other social science fields, we use those kinds

23  of methods.

24      Q.  Do you use software in your research?

25      A.  I do.

657fddd4-f0ef-43b0-bb10-e1f1abd7c8a1

Page 14

1     Q.  What kind of software tools do you typically

2   use?

3     A.  The major one I use is called NCSS, it's an

4   acronym.  It stands for Number Cruncher Statistical

5   System.

6     Q.  How long have you been using NCSS?

7     A.  Since about 1980, '82.

8     Q.  Do you ever use SPSS?

9     A.  Not for many years.

10     Q.  You have used it in the past?

11     A.  I have.

12     Q.  Ever used Stata?

13     A.  Never.

14     Q.  Do you ever use the R programming language?

15     A.  No.

16     Q.  Do you use any other programming languages?

17     A.  Visual Basic.  I have a minor in math, computer

18   science, so I know how to program in languages that are

19   long gone like PL/1, Fortran.  Visual Basic is probably

20   the most current one.

21     Q.  How often does your work involve coding in

22   Visual Basic?

23     A.  I've just been working on a project right now

24   that involves using some Visual Basic coding.

25     Q.  Do you ever use any GI S programs?

657fddd4-f0ef-43b0-bb10-e1f1abd7c8a1

White v. State Board of Election Commissioners                    David Arthur Swanson, Ph.D.

Page 15

1      A.  I don't implement them, if that's what you're

2   asking.  Yeah, I don't do shape files or I don't do GIS

3   work myself.

4      Q.  You don't work with any geographical mapping

5   software?

6      A.  No.

7      Q.  Don't work with Maptitude?

8      A.  No.

9      Q.  Don't work with ArcGIS?

10     A.  No.

11     Q.  Do you use survey data in your research?

12     A.  Yes, I have.

13     Q.  What are some examples of the survey data that

14  you've used?

15     A.  Well when I was at Pacific Lutheran University,

16  I ran a small institute, and we did annual surveys of

17  Pierce County, so I was responsible for going out and

18  contracting with a private vendor to actually conduct

19  the surveys and supervise them, put the questionnaires

20  together.  When I worked on the Yucca Mountain high

21  -level nuclear waste repository, I was responsible for

22  surveys that were done of people that were in the impact

23  area, so --

24     Q.  Sorry, go ahead.  Finish your --

25     A.  That's okay.  Go ahead.

657fddd4-f0ef-43b0-bb10-e1f1abd7c8a1

White v. State Board of Election Commissioners                    David Arthur Swanson, Ph.D.

Page 16

1     Q.  Those are surveys that you conducted?

2     A.  Yes.

3     Q.  Do you ever work with survey data that has been

4   gathered by others?

5     A.  I have.

6     Q.  Do you ever work with ACS, American Community

7   Survey --

8     A.  I do.

9     Q.  -- data?

10    A.  Wrote a book on that -- or a section of a book

11  for the ACS when that first started coming out, was part

12  of the pilot study programs for the ACS.

13    Q.  Do you ever use voter rolls in your work?

14    A.  Not until I started doing expert witness work.

15  Or looked at them, but I don't use them.

16    Q.  You don't use voter rolls in your work?

17    A.  No.

18    Q.  And you said when you started doing expert

19  work --

20    A.  Witness work in areas like redistricting, in

21  the case we're talking about now.  I'm aware more of

22  voter rolls, but I haven't actually used it -- yeah,

23  there's actually one exception.  I did a volunteer

24  survey for Kitsap County, Washington that was in regard

25  to some issue that was going to be on the ballot.  And

White v. State Board of Election Commissioners                    David Arthur Swanson, Ph.D.

Page 17

1   the people I worked with that was probably now defunct,

2   the Kitsap County Sun, which is a newspaper, had access

3   to voting rolls.  So we were calling people who

4   registered voters.

5       Q.  And when did you conduct this Kitsap County,

6   Washington survey?

7       A.  Early 1990s, late 1980s.

8       Q.  And so other than that instance, you haven't

9   used voter rolls in your work?

10      A.  That's correct.

11      Q.  Ever use ecological inference analysis?

12      A.  I have.

13      Q.  Tell me about your use of ecological inference.

14      A.  It's not the guaranteeing program, but I've

15  used ecological inferences in -- one of the publications

16  I have, actually.  It's in the Journal Demography, and

17  it takes a state level regression method for estimating

18  life expectancy at birth and applies it to subcounty

19  areas.  And that, in fact, would be ecological inference

20  because you went from a higher level of aggregation to

21  lower levels of aggregation.  And the paper involved

22  doing a test of its accuracy.

23      Q.  And you mentioned it's not Gary King's method?

24      A.  That's correct.

25      Q.  So it's not the R x C method?

657fddd4-f0ef-43b0-bb10-e1f1abd7c8a1

White v. State Board of Election Commissioners                    David Arthur Swanson, Ph.D.

Page 18

1        A.   That's correct.

2        Q.   Is it a homogenous precinct type analysis that

3    you did?

4        A.   It's a regression analysis.  And people can use

5    multilevel regression analyses to do things that are

6    very similar to ecological analysis.

7        Q.   And other than that -- and was that just one

8    example?  Have you used ecological inference analyses in

9    other instances in your work?

10        A.   There my be.  That's one I can recall.

11        Q.   And as you sit here, can you recall any others?

12        A.   Not offhand.

13        Q.   In your research, have you studied voting

14    behavior?

15        A.   No.

16        Q.   Have you published any scholarly work on voting

17    behavior?

18        A.   No.

19        Q.   Any scholarly work on voter turnout?

20        A.   No.

21        Q.   Have you published any political science

22    journals?

23        A.   Not that I can think of.  There might be some

24    journals with the term "political" in it, but I can't

25    recall for sure.

657fddd4-f0ef-43b0-bb10-e1f1abd7c8a1

White v. State Board of Election Commissioners          David Arthur Swanson, Ph.D.

Page 19

1      Q.  And we'll talk about CES, Cooperative Election
2  Survey studies -- data later, but have you ever used
3  that CES study before this case?
4      A.  No.
5      Q.  Were you familiar with the CES before your
6  involvement in this case?
7      A.  No.
8      Q.  Have you ever drawn an electoral map before?
9      A.  No.
10      Q.  And I'm looking at pages 6 and 7 of your
11  report.  I'll let you take a second to get there.  This
12  is your --
13      A.  This is the report of January you're talking
14  about again?
15      Q.  Yes, correct.  The one that's been marked, I
16  believe, as Exhibit 2.  You sort of summarize here some
17  of the expert work and some of the other references in
18  your CV; is that right?
19      A.  That's correct.
20      Q.  And you say that you played an active role in
21  the development of redistricting, a manual for
22  practitioners, analysts, and citizens.  Do I have that
23  right?
24      A.  That's correct.
25      Q.  What was the role that you played in the

657fddd4-f0ef-43b0-bb10-e1f1abd7c8a1

Page 20

1  development of that?

2       A.  I reviewed the work that Peter Morrison and Tom

3  Bryan did, the authors of that book.  I helped them with

4  some questions on how to do methods.

5       Q.  And what parts of the -- of that work did you

6  review?

7       A.  I can't remember.  I -- basically the whole

8  book, but I concentrated especially on some of the

9  measurement issues.

10      Q.  And you provided comments?

11      A.  I did.

12      Q.  You're not credited as an author of the book?

13      A.  No.

14      Q.  You're mentioned in the front matter and the

15  dedication and acknowledgments?

16      A.  I believe that's true.

17      Q.  That's not a peer-reviewed publication, is it?

18      A.  Every book I've been associated with goes

19  through a review process that's set up by the publisher.

20  So in a sense, it's a peer-review process.  They

21  internally will go out and ask reviewers.  You know, I

22  served as a series editor of Applied Demography for

23  Springer Publications, and if we get a proposal, it goes

24  out to review to other people.  So in a sense it's peer

25  reviewed, but not in the same manner that people think

657fddd4-f0ef-43b0-bb10-e1f1abd7c8a1

White v. State Board of Election Commissioners          David Arthur Swanson, Ph.D.

Page 21

1    of as academic journal peer reviews.
2         Q.  So the redistricting title was not peer
3    reviewed in the same way as an academic journal?
4         A.  No.  But it's a Springer publication, I
5    believe, so it went through some sort of review process.
6         Q.  And you're not aware of what their review
7    process was, if any, for this particular title?
8         A.  I'm just aware that they are likely to have
9    sent it out for a review to at least one, probably two,
10   other people to look at it before they even accepted the
11   proposal, and they may have done it sometime during the
12   whole process where they're putting it together.  You'd
13   have to ask the editors at -- the people in charge of it
14   at Springer, for example.
15        Q.  But you don't know, that's your assumption?
16        A.  Well it's more than an assumption because I can
17   see some of the paperwork that flows back and forth.  So
18   I know they're reviewing it, but exactly the details, I
19   don't know.
20        Q.  You saw the paperwork for -- with respect to
21   this redistricting title?
22        A.  I think I did.  I see it for almost every time
23   that's ever come through my hands when I do it for
24   Springer, so I'm guessing that's the case.
25        Q.  So let's talk about your prior expert work, and

657fddd4-f0ef-43b0-bb10-e1f1abd7c8a1

White v. State Board of Election Commissioners                David Arthur Swanson, Ph.D.

Page 22

1  we can stay looking at pages 7 and 8 of your January

2  report Exhibit 2 where you list some of that work.  It's

3  also, I think, on page 187 of your CV, but this synapsis

4  that you have here will do just fine.

5            Looking at some of the on-the-stand

6  testimony that you list, these mostly involved instances

7  where you testified about population forecasting; is

8  that right?

9       A.  Some -- one, two, three, at least three of them

10 did.

11      Q.  I see a case about water rights in Arizona,

12 life expectancy, patient populations.  None of the cases

13 you list here are voting rights or voting-related cases;

14 right?

15      A.  That's correct.

16      Q.  You never testified in a voting rights case

17 before?

18      A.  That's correct.

19      Q.  And do you know whether the court in the cases

20 or the courts, I should say, in the cases that you

21 testified in previously credited your testimony?

22      A.  What does "credited" mean?

23      Q.  Do you know whether they viewed it favorably,

24 they relied on it in coming to their decision?

25      A.  Well, I was sworn in as an expert witness in

White v. State Board of Election Commissioners                    David Arthur Swanson, Ph.D.

Page 23

1    the case where I did testify, so I assume they used it
2    in some manner.
3         Q.  You don't know which manner they used it in?
4         A.  No.
5         Q.  Okay.  And looking at some of these cases that
6    you have listed here, you indicate there's some cases
7    where you produced -- and actually, let's look at page 8
8    where you say:  "I produced expert reports as a
9    consultant of potential expert witness in other court
10   cases."  You have a list of those here on page 8.  None
11   of these are voting-related cases?
12        A.  That's correct.
13        Q.  And you never submitted a report in any
14   voting-related case?
15        A.  That's correct.
16        Q.  And then on page 8, paragraph 9 you say you
17   served as a consultant to Bryan GeoDemographics, BGD, in
18   regard to certain redistricting cases.  Do I have that
19   right?
20        A.  You do.
21        Q.  What is Bryan GeoDemographics?
22        A.  It's a company owned and operated by Tom Bryan.
23   He calls it a boutique consulting company based near
24   Richmond or in Richmond, Virginia.
25        Q.  What is your role as a consultant for Bryan

657fddd4-f0ef-43b0-bb10-e1f1abd7c8a1

White v. State Board of Election Commissioners                    David Arthur Swanson, Ph.D.

Page 24

1    GeoDemographics?

2         A.   It varies.   He -- when Tom Bryan contacts me,

3    it's usually about questions about a method.

4         Q.   What kind of questions would he contact you

5    with?

6         A.   I'd have to look up to remember them all, but

7    typically involve methods, statistical and otherwise,

8    sometimes demographic measures, sometimes summary-type

9    measures.

10        Q.   What's an example?

11        A.   I'd have to think about one off the top of my

12   head.   I believe I've worked with him on doing some

13   statistical things.   And they may have -- occur in the

14   book that he and Peter did too.   But I haven't thought

15   about in a while, so off the top of my head I can't

16   remember what they were.

17        Q.   And you said you've been working as a

18   consultant with Bryan GeoDemographics since about 2021?

19        A.   Give or take that's correct.

20        Q.   And you mentioned four cases here in paragraph

21   9 for which you serve as a consultant to Bryan

22   GeoDemographics, two of them are Caster versus Merrill

23   and Singleton versus Morrill; is that right?

24        A.   Yes.   Whatever's listed.   And I don't remember

25   the cases.   I know they're -- I just put them down in my

657fddd4-f0ef-43b0-bb10-e1f1abd7c8a1

White v. State Board of Election Commissioners David Arthur Swanson, Ph.D.

Page 25

1   vitae once I send reports to Tom and he told me what the
2   cases were.
3       Q.  And do you know that those are cases involving
4   Alabama's congressional districting from the 2020 cycle?
5       A.  Not offhand I wouldn't.
6       Q.  What did you do as a consultant in those cases?
7       A.  Generally, Tom would ask me questions about a
8   method, and I would respond to them and try and give him
9   advice.
10      Q.  Did you conduct any analysis of Alabama's black
11  belt as part of your consulting on those cases?
12      A.  No.
13      Q.  Did you conduct any analysis on the gulf coast
14  area of Alabama as part of your analysis in those cases?
15      A.  Not in those cases, but I've done work on --
16  with an attorney in Texas that looked at the effects of
17  the oil spill where we looked at all the gulf coast, and
18  part of that involved gulf coast populations, but it
19  wasn't a voting rights case.
20      Q.  And you -- do you draw any electoral maps or
21  review any electoral maps in your consulting in the
22  Caster and Singleton case?
23      A.  Not that I recall.  I certainly didn't draw
24  any.  Usually the questions that Tom asks me are about
25  is this an appropriate statistical method to use in this

Page 26

1  test?  If it's a t-test, for example, should I use the

2  equal variance assumption or the unequal variance

3  assumption?  If I use regression after I've transformed

4  variables, what would I do?  So those are the types of

5  questions I typically help with him.

6      Q.  And so, for example, he would take the analysis

7  that he'd done, take it to you and say, does this

8  methodology look right to you?

9      A.  Sometimes they're even in advance of that.

10  He'd ask me what kind of advice would you give me on

11  some technique to use.  And I stress I'm probably not

12  the only one he's asking for advice.

13      Q.  And you know that Mr. Bryan and Bryan

14  GeoDemographics were working to defend the electoral

15  maps that were challenged in those Alabama cases?

16      A.  That I do know.

17      Q.  And do you know how the Court decided those

18  cases?

19      A.  No.

20      Q.  Do you know whether the Court determined that

21  the congressional districts in Alabama -- or the

22  challenged congressional districts in Alabama was likely

23  unlawful?

24      A.  No.  I don't follow the court cases.

25      Q.  Do you know whether the Court in those cases

657fddd4-f0ef-43b0-bb10-e1f1abd7c8a1

White v. State Board of Election Commissioners          David Arthur Swanson, Ph.D.

Page 27

1    credited the analysis and testimony that Bryan provided?

2         A.  I don't know.

3              MR. SAVITZKY:  And I just want to mark

4    now -- what exhibit are we on?

5              MS. JONES:  3.

6              MR. SAVITZKY:  Just going to mark as Exhibit

7    3, this is the Singleton case.  And I'll hand this copy

8    to you and this copy to you, Mr. Wallace.

9              MR. WALLACE:  Very good.

10             MR. SAVITZKY:  And take a peek over my copy.

11   BY MR. SAVITZKY:

12        Q.  And you can turn to page -- excuse me.  Let's

13   turn to page 1007.  The pages are marked in the top

14   right corner.  And just let me know when you're there.

15        A.  I'm there.

16        Q.  And just looking at that first -- it's right in

17   the top left, the Court says:  "We're concerned about

18   numerous other instances in which Mr. Bryan offered an

19   opinion without a sufficient basis or in some instances

20   any basis."  Did I read that accurately?

21        A.  Yes.

22        Q.  And the Court lists various instances.  And

23   then looking at that time the next page, page 1008, the

24   last sentence of the first full paragraph, the Court

25   says that:  "Mr. Bryan overstated his opinions, offered

657fddd4-f0ef-43b0-bb10-e1f1abd7c8a1

White v. State Board of Election Commissioners                    David Arthur Swanson, Ph.D.

Page 28

1   testimony without a sufficient basis, cited material

2   that he had not reviewed, offered opinions at the

3   preliminary injunction hearing that he had not offered

4   in his reports."  Is that --

5              MR. WALLACE:  Go ahead and read the whole

6   sentence instead of paraphrasing from the middle.

7   That's a form objection.

8              MR. SAVITZKY:  That's fine.  We can do that.

9   BY MR. SAVITZKY:

10     Q.   The Court said in that last sentence:

11  "Although the schedule might have limited Mr. Bryan's

12  ability to perform some work that he otherwise might

13  have performed, it did not cause him to overstate his

14  opinions, offer testimony without a sufficient basis,

15  cite material that he had not reviewed, or offer

16  opinions at the preliminary injunction hearing that he

17  had not offered in his reports."  Did I read that

18  accurately?

19     A.   You did.

20     Q.   And then looking at the last sentence in the

21  last paragraph, last full paragraph, I should say, on

22  that same page, the Court says:  "Because Mr. Bryan

23  consistently had difficulty defending both his methods

24  and his conclusions and repeatedly offered opinions

25  without a sufficient basis and because we observed

657fddd4-f0ef-43b0-bb10-e1f1abd7c8a1

White v. State Board of Election Commissioners                David Arthur Swanson, Ph.D.

Page 29

1    internal inconsistencies in his testimony on important
2    issues, we find that his testimony is unreliable."  Did
3    I read that right?
4         A.  You did.
5              MR. SAVITZKY:  And just for completeness,
6    I'm also going to mark as Exhibit 4 the Caster case.
7    And here is your copy.  And Mr. Wallace there's a copy
8    for you.
9    BY MR. SAVITZKY:
10        Q.  And just looking at the Caster case we can turn
11   to pages 52 and 53 of the document.  And we don't have
12   to reread it all, but I just want you to confirm for me
13   that --
14             MR. WALLACE:  Can I stop you and ask:  I'm
15   trying to find the pagination here.  You've got these --
16   are you looking at the asterisks, the --
17             MR. SAVITZKY:  No.  The pagination is right
18   at the bottom of the page.
19             MR. WALLACE:  Oh, I see where we are.  Okay.
20   Give me those numbers again, please?
21             MR. SAVITZKY:  It's just starting at
22   page 52.
23             MR. WALLACE:  Okay.
24   BY MR. SAVITZKY:
25        Q.  And I just want to confirm that this is

White v. State Board of Election Commissioners                    David Arthur Swanson, Ph.D.

Page 30

1    verbatim the same statements are in the Caster opinion

2    as well.  So starting in the first full paragraph in the

3    seconds column on page 52:  "We're concerned about

4    numerous other instances in which

5    Mr. Bryan offered an opinion about a sufficient basis or

6    in some instances any basis."  Same statement?

7         A.   Where are you reading?

8         Q.   On page 52, last part of the first full

9    paragraph.

10        A.   That would be paragraph 60?

11        Q.   No.  Just on the second column, the first full

12   paragraph of the second column on page 52.

13        A.   The one that starts out "separate"?

14        Q.   Correct.  And the last -- after the citation

15   there:  "We are concerned about numerous instances in

16   which Mr. Bryan offered an opinion without a sufficient

17   basis or in some instances any basis."

18        A.   I see that.  I do.

19        Q.   Okay.  And then moving to the next page,

20   page 53, same statement that we read from the Singleton

21   opinion, this is in the second to the last paragraph in

22   the first column.  "Although the schedule might have

23   limited Mr. Bryan's ability to perform some work that he

24   otherwise might have performed, it did not cause him to

25   overstate his opinion, offer testimony without a

657fddd4-f0ef-43b0-bb10-e1f1abd7c8a1

White v. State Board of Election Commissioners                          David Arthur Swanson, Ph.D.

Page 31

1    sufficient basis, cite material that he had not

2    reviewed, or offer opinions at the preliminary

3    injunction hearing that he had not offered in his

4    reports."  Same statement as before; and that's right?

5         A.  That is.

6         Q.  Okay.  And then just looking at the next page,

7    page 54, last sentence of the first paragraph there,

8    again same conclusion:  Mr. Bryan consistently had

9    difficulty defending his methods and his conclusions,

10   repeatedly offered opinions without a sufficient basis,

11   and concluding that his testimony is unreliable; right?

12        A.  I read that.

13        Q.  Okay.  So let me ask you another question:  Do

14   you know whether the supreme court ended up ruling in an

15   appeal in the Singleton and Caster cases?

16        A.  I do not.

17        Q.  Do you know whether William Cooper, plaintiff's

18   mapping expert in this case, the White case, drew any of

19   the plaintiff's illustrative maps in the Alabama cases?

20        A.  I don't recall.  I don't know.

21        Q.  Do you recall conducting any analysis in

22   Mr. Cooper's maps in the Alabama cases?

23        A.  No.

24        Q.  Would you dispute that a panel of three medical

25   judges in the Singleton case found that the plans that

657fddd4-f0ef-43b0-bb10-e1f1abd7c8a1

White v. State Board of Election Commissioners          David Arthur Swanson, Ph.D.

Page 32

1   Mr. Cooper drew in Alabama were consistent with

2   traditional districting principles?

3       A.  I'm not in a position to dispute or not dispute

4   it.

5       Q.  And we can just look back at Exhibit 4, which

6   you should still have in front of you -- excuse me,

7   Exhibit 3 in the Singleton case here.  And I just want

8   to look at page 1016 this time.  Excuse me, 1015.

9               MR. WALLACE:  15?

10              MR. SAVITZKY:  Sorry, 16.

11              MR. WALLACE:  16.

12              MR. SAVITZKY:  Strike that.  That's all

13  right.  We don't have to do that.

14  BY MR. SAVITZKY

15      Q.  And you said you didn't know whether the

16  supreme court reviewed these decision?

17      A.  I believe -- I knew that it went to the supreme

18  court, but I just don't follow whatever they did with

19  it.  And I may have heard from Tom about it, but that

20  didn't stick in my head.

21              MR. SAVITZKY:  And we can now mark as 5,

22  this is the supreme court's decision reviewing those

23  Alabama -- Alabama decisions.  Copy for Mr. Wallace.

24  I'm looking at page 15 on the bottom of this document,

25  second column, first full paragraph.  Let me know when

657fddd4-f0ef-43b0-bb10-e1f1abd7c8a1

White v. State Board of Election Commissioners                    David Arthur Swanson, Ph.D.

Page 33

1    you're there.

2              MR. WALLACE:  All right.  This is page 15 of

3    Westlaw print-off and it's somewhere.

4              MR. SAVITZKY:  Second column.

5              MR. WALLACE:  Okay.

6    BY MR. SAVITZKY:

7       Q.  So first of all just in the first full sentence

8    in that second column, that Caster plans to rely on

9    illustrative maps produced by expert Bill Cooper.  Do I

10   have that right?

11      A.  Are you asking me?

12      Q.  Yes.

13      A.  Yes, that's what it says.

14      Q.  And then looking at that next paragraph, says:

15   "The District Court agreed, found Cooper's testimony

16   highly credible commended Cooper for working hard to

17   give equal weight to all traditional districting

18   criteria."  Do I have that right?

19      A.  That's what I read.

20      Q.  And then the last -- and actually, we'll

21   continue on.  The next sentence:  "The Court also

22   explained that Alabama's evidence of racial predominance

23   in Cooper's maps was exceedingly thin.  Alabama's expert

24   Thomas Bryan testified he never reviewed the exhibits to

25   Mr. Cooper's report and never reviewed one of the

657fddd4-f0ef-43b0-bb10-e1f1abd7c8a1

White v. State Board of Election Commissioners                    David Arthur Swanson, Ph.D.

Page 34

1     illustrative plans that Cooper submitted."  That's

2     right?

3          A.  It is.

4          Q.  And just skipping a sentence going to:  "By his

5     own admission, Bryan's analysis of any race predominance

6     in Cooper's maps was pretty light.  District court did

7     not err in finding that race did not predominate in

8     Cooper's maps in light of the evidence before it."

9     Right?

10         A.  That's what I read, too.

11         Q.  So you also mentioned -- and we can put those

12    aside for now, maybe put them over here if we're not

13    using them.  We'll want to hang onto this.

14              And in fact, just referring back to it,

15    page 8 of your report, you also mention that you worked

16    on the Ardoin case, Robinson v. Ardoin?  That's the

17    Louisiana congressional districting case?  I'm looking

18    at page 8 of your report.

19         A.  Yes.

20         Q.  Okay.  And what did you do as a consultant for

21    Bryan GeoDemographics in that case?

22         A.  I'd have to look back at my records and see

23    what I did, if I have e-mail correspondence.  Again,

24    most of these where I would serve as a consultant to

25    him, he'd either contact me via e-mail or call me and

657fddd4-f0ef-43b0-bb10-e1f1abd7c8a1

White v. State Board of Election Commissioners                    David Arthur Swanson, Ph.D.

Page 35

1   ask me questions about particular methods or ask me for

2   advice on these or something.  And I don't recall

3   specifically what it was.

4        Q.  Do you recall how actively involved you were in

5   consulting on the Ardoin case for Bryan GeoDemographics?

6        A.  No.

7        Q.  Do you recall whether you worked on a

8   misallocation analysis?

9        A.  That sounds familiar.  I think I did.

10       Q.  And to be clear, you didn't draw any electoral

11   maps in that case?

12       A.  I did not.

13       Q.  Would you say that the analysis in that case

14   from Mr. Bryan reflects your input in your analysis?

15       A.  It may reflect some of my advice that I give to

16   him about misallocation error or how to measure it?

17       Q.  And by the way, for those Alabama cases, Caster

18   and Singleton, would you say that Mr. Bryan's analysis

19   reflects your input in your analysis as well?

20       A.  I don't know.

21       Q.  And you know that Thomas Bryan and Bryan

22   GeoDemographics were working to defend the congressional

23   districts that were challenged on behalf of the State of

24   Louisiana in that case?

25       A.  Yes.

657fddd4-f0ef-43b0-bb10-e1f1abd7c8a1

White v. State Board of Election Commissioners                    David Arthur Swanson, Ph.D.

Page 36

1      Q.  Did you review the Court's decision in the

2   Ardoin case?

3      A.  No.

4      Q.  Do you know whether the Court determined that

5   the challenged congressional district there likely

6   violated the Voting Rights Act?

7      A.  No.

8      Q.  And this is the last one of these, I swear.

9   I'm not going to take that back rather than swear to

10  anything.  I'm just going to mark a copy of the Ardoin

11  case.  I think we're on Exhibit 6.  And --

12          MR. WALLACE:  I'm missing the first page of

13  it.  I'm sure I can get it someplace else, but --

14          MR. SAVITZKY:  Happy to.

15          MR. WALLACE:  Did you miss a page?

16          MR. SAVITZKY:  Here, I'll give you my first

17  page.  I may have missed one.

18  BY MR. SAVITZKY:

19      Q.  So would you dispute that the federal judge in

20  the Ardoin case agreed with the plaintiffs and held that

21  the challenged congressional districts there violated

22  the -- likely violated the Voting Rights Act?

23      A.  I don't know what decision the judge made, so

24  I'm not in a position to dispute it or not dispute it.

25      Q.  Do you know whether the Court credited the

657fddd4-f0ef-43b0-bb10-e1f1abd7c8a1

White v. State Board of Election Commissioners                    David Arthur Swanson, Ph.D.

Page 37

1   analysis that Thomas Bryan and Bryan GeoDemographics

2   provided?

3        A.  I don't know.

4        Q.  And looking at what's been marked as Exhibit 6,

5   and turning to page 824, and we can start just in that

6   first full paragraph.  Let me know when you're there.

7   First full sentence:  "After observing Bryan on the

8   stand in this case, the Court finds his demeanor was not

9   so problematic as to disqualify him.  But the Court

10  found his methodology to be poorly supported, his

11  conclusions carried little, if any, probative value on

12  the question of racial predominance."  Did I read that

13  right?

14       A.  You did.

15       Q.  Okay.  And then in the next paragraph, the

16  Court discusses how Bryan opined that race was a

17  prevailing factor in the design of plaintiff's

18  illustrative plans based on his "index of misallocation"

19  which purports to flag areas where a disproportionate

20  share of the black population was grouped into a

21  majority, minority district."

22            Is that the misallocation analysis that we

23  were talking about before?

24       A.  Yeah, I'm sure what I helped him with was in

25  regard to how do you measure misallocation.

White v. State Board of Election Commissioners                    David Arthur Swanson, Ph.D.

Page 38

1      Q.   Okay.  And then looking at the next paragraph,

2   the Court says:  "Even if this misallocation method is

3   accepted, the factual assumptions upon which his

4   conclusions rest are absent in this case.  Hence,

5   Bryan's conclusions are unsupported by the facts and

6   data in this case and thus wholly unreliable."  Did I

7   read that right?

8      A.   You did.

9      Q.   And then moving to the next column, first full

10  paragraph, concluding, the Court says:  "Finally, the

11  Court finds that Bryan's analysis lacks rigor and

12  thoroughness which further undermines the reliability of

13  his opinions."  Do I have that right?

14     A.   You do.

15     Q.   And in the last sentence:  "For the foregoing

16  reasons, the Court gives very little weight to Bryan's

17  analysis and conclusions."  Is that right?

18     A.   It is.

19     Q.   Okay.  Now, the last case you mentioned -- and

20  we can put that one away as well.  Put it right here.

21  Thank you.

22           So the last case is McConchie versus the

23  State Board of Elections that you listed.  Is that an

24  Illinois redistricting case?

25     A.   I think that was Illinois.

657fddd4-f0ef-43b0-bb10-e1f1abd7c8a1

White v. State Board of Election Commissioners          David Arthur Swanson, Ph.D.

Page 39

1      Q.  Do you know what the legal issue is in that

2  case?

3      A.  No.

4      Q.  Do you know whether it involved the Voting

5  Rights Act or racial votes dilution?

6      A.  I don't.

7      Q.  Do you remember anything about what the case

8  was about?

9      A.  No.  Seriously, I don't.

10      Q.  Do you remember anything about the analysis

11  that you did for Mr. Bryan?

12      A.  I'd have to look back at my records and see

13  what questions he asked me.

14      Q.  So as I understand it, the issue in that case

15  is whether it violated the federal constitution for

16  Illinois to use ACS population estimates to draw their

17  legislative districts rather than waiting for the 2020

18  census to come out.  Does that sound right to you?

19      A.  It does sound familiar.

20      Q.  And the issue was that because ACS estimates

21  are estimates and not full measures of the population as

22  with the census, that was a one person, one vote

23  problem, it couldn't be sure that you had one person,

24  one vote allocation for population across the districts.

25  Does that sound right?

White v. State Board of Election Commissioners                    David Arthur Swanson, Ph.D.

Page 40

1        A.   I don't know how people viewed a sample based

2   estimate compared to the census and how they used it.

3   That part I don't know.

4        Q.   But based on what you recall, it wasn't a case

5   about racial vote dilution or racial representation?

6        A.   I don't recall.

7        Q.   So in the three cases where -- well, let me

8   strike that.

9             You do understand that the Caster and the

10  Singleton and Robinson cases are about racial vote

11  dilution?

12       A.   I believe that's the case.

13       Q.   So in the three cases where you consulted for

14  Bryan GeoDemographics that you know involved racial vote

15  dilution, in each one of those cases the Court did not

16  credit the Bryan GeoDemographics analysis; right?

17       A.   That's what appears to be the case based on

18  what you read.

19       Q.   Now, in your January report looking on to

20  page 10 -- you have it if you want to look at it -- you

21  say:  "Because of its expertise and experience, I have

22  used the services of Bryan GeoDemographics which under

23  my direction has assembled data, maps, and other work

24  product."  So you use Bryan GeoDemographics to assemble

25  data, maps, and work product for your report in this

657fddd4-f0ef-43b0-bb10-e1f1abd7c8a1

White v. State Board of Election Commissioners                    David Arthur Swanson, Ph.D.

Page 41

1    case?

2         A.   I'm sorry, where are you at?

3         Q.   Oh, I'm sorry.  Paragraph 10 on page 8.  That's

4    my -- my mistake.  Just the next paragraph from what we

5    were talking about:  "Because of its experience and

6    expertise, I've used the services of Bryan

7    GeoDemographics to assemble data, maps, and other work

8    product."  For this case for your report in this case,

9    yes?

10        A.   Yes.

11        Q.   And just looking -- I mean, I looked at the

12   maps in your report, they tend to have produced by Bryan

13   GeoDemographics legends or notes at the bottom; is that

14   right?

15        A.   That's correct.

16        Q.   So who actually created those maps and other

17   tables that are indicated as being produced by Bryan

18   GeoDemographics in your report?

19        A.   They were -- they were done under a request

20   from me to -- I would -- could use a table or a graph or

21   something like this to put together in my report.

22        Q.   And then Thomas Bryan created them?

23        A.   Yes.

24        Q.   And what information did you give him to

25   instruct him to create the report?

657fddd4-f0ef-43b0-bb10-e1f1abd7c8a1

White v. State Board of Election Commissioners                    David Arthur Swanson, Ph.D.

Page 42

1        A.   I gave him a general picture of what I wanted

2    to see in a table or a graph, and then he produced it

3    using probably the Public Law 94171 data or whatever

4    else was involved in it.

5        Q.   Do you know what software he used to create --

6        A.   Maps.

7        Q.   To create the maps, yeah.

8        A.   I think he uses map -- or the -- what's the

9    company in Redlands, California -- Arcinfo.  I believe

10   that's what he used I'm pretty sure he uses things from

11   that group.

12       Q.   Do you know what software he used to create any

13   data tables that he created for you for these purposes?

14       A.   He usually uses Excel.

15       Q.   Is this work that you could have done yourself?

16       A.   Most of it involves really large files, and

17   he's adept at bashing around data and big files and

18   using parts of Excel that I don't use routinely like

19   pivot tables.  So I probably could have done it but it

20   would have been a learning curve for me to get to that

21   point and also assemble all the data and have it

22   together.  So it was much easier to work through Tom.

23       Q.   Did he also provide substantive comments or

24   analysis on the types of analysis that you were doing

25   for your report?

657fddd4-f0ef-43b0-bb10-e1f1abd7c8a1

White v. State Board of Election Commissioners                    David Arthur Swanson, Ph.D.

Page 43

1       A.  No.

2       Q.  Do you know whether any of the methods that you

3   used are the same methods that he used in the Louisiana

4   or Alabama cases?

5       A.  I'd have to look at the reports to see.

6       Q.  Could any of the reports -- analyses that

7   you've done be characterized as a misallocation analysis

8   similar to what Mr. Bryan did in Louisiana?

9       A.  I can't recall using a misallocation index.

10      Q.  Did Bryan GeoDemographics run the compactness

11  analyses that you use in your report?

12      A.  He produced the Excel tables that produced

13  numbers for that.

14      Q.  And did he actually produce the compactness

15  scores that you used?

16      A.  The scores, yeah.  He's got that, I think,

17  written up in various ways so he can produce them pretty

18  quickly.

19      Q.  Looking back at your resumé, and I'm to turn to

20  page 159 of your report.  Just a couple more items.  I

21  don't want to -- it's a long resumé, I know.  On page

22  158 you list some non-refereed articles.  And one of

23  them is an internet article from around the time of the

24  2020 election called:  Is Being Republican a Risk to

25  One's Health and the Health of Others?  Do you see that?

657fddd4-f0ef-43b0-bb10-e1f1abd7c8a1

White v. State Board of Election Commissioners                David Arthur Swanson, Ph.D.

Page 44

1      A.  I do.

2            MR. SAVITZKY:  And I'm just going to mark a

3      copy of that as Exhibit 7.

4            MR. WALLACE:  This on page 159?

5            MR. SAVITZKY:  Correct.

6            MR. WALLACE:  Okay.

7            MR. SAVITZKY:  Let me just confirm that for

8      you.  Oh, you know what, it's on page 160, third one

9      from the bottom.  It's a long list of non-refereed

10     articles that we have here.  And we're marking this

11     article as Exhibit 7.

12     BY MR. SAVITZKY:

13     Q.  And in this article, you looked at heavily

14     Democrat and Republican counties and you compared per

15     capita case race of COVID?

16     A.  They were counties that had voted one way or

17     another in the presidential election.

18     Q.  And your finding was that:  Per capita, the

19     cases of COVID in areas that voted heavily Republican

20     were higher and they were increasing even though they

21     were sort of more sparsely populated?

22     A.  That's correct.

23     Q.  And you concluded that this finding:  "Supports

24     the view that residents of those areas are ill disposed

25     to outside mandates to self isolate, practice social

657fddd4-f0ef-43b0-bb10-e1f1abd7c8a1

White v. State Board of Election Commissioners                David Arthur Swanson, Ph.D.

Page 45

1    distancing, and wear masks possibly due to

2    misinformation they consumed from conservative media

3    outlets."

4        A.   Yes.

5        Q.   And you concluded:  "Our take is that political

6    orientations should be considered along with other

7    factors likely to generate COVID-19 cases.  So along

8    with testing and its accuracy, data suppression,

9    potential superspreader venues, population density,

10   rates of interaction, age, race, and ethnicity and

11   gender, we believe that being Republican or being in

12   proximity to them could be a very real risk factor."

13       A.   That's correct.

14       Q.   And you still agree that being a Republican

15   could be considered a risk to your own health and that

16   of others with respect to COVID?

17       A.   It was at that point in time.  Whether is it

18   now, I'd have to go back and research it again.  But it

19   definitely appeared to be the case when we did that

20   research.

21       Q.   Okay.  And just one other article, one of these

22   non-refereed articles, and we'll mark that as Exhibit 8.

23   This is an article from a publication called Zócalo

24   entitled:  Is Hawaii a Racial Paradise.  Do you recall

25   this article?

White v. State Board of Election Commissioners                    David Arthur Swanson, Ph.D.

Page 46

1      A.   I do.

2      Q.   This is, I think, a forum -- sort of internet

3    forum set of articles.  And your article's on page 5 of

4    this document, if you want to turn to it.  And it's

5    specifically entitled:  "Compare Hawaii and

6    Mississippi."  Do I have that right?

7      A.   It is.

8      Q.   And in your article, you note that Hawaii has a

9    very high proportion of people who identified as

10   multiracial, where as Mississippi has a lowest

11   proportion of people who identify as multiracial; is

12   that right?

13     A.   That is.

14     Q.   And you note that Hawaii has the highest life

15   expectancy, and Mississippi has one of the lowest or the

16   lowest?

17     A.   That's correct.

18     Q.   And you note that Mississippi is well below the

19   U.S. average in terms of people with bachelor's degrees?

20     A.   Yes.

21     Q.   And you note that Hawaii has less poverty than

22   the national average and Mississippi has significantly

23   higher levels of poverty?

24     A.   Yes.  And I'd say that that was as of the date

25   I did the article, so things may have changed.  But

657fddd4-f0ef-43b0-bb10-e1f1abd7c8a1

White v. State Board of Election Commissioners                    David Arthur Swanson, Ph.D.

Page 47

1    you're reading this correctly for the dates that I had

2    the data.

3        Q.  You don't have any reason to think that that's

4    changed since this article was published?

5        A.  I don't know.

6        Q.  You don't have any to reason to think that it's

7    changed?

8        A.  I haven't looked at the question since then, so

9    I don't know.

10       Q.  And you ask -- and this is in this last

11   paragraph -- "What is it about these two states that

12   relates the number of multiracial people and health,

13   education, and income levels?"  Right?

14       A.  I do.

15       Q.  And you say:  "Historically, both states were

16   dominated by a small social economic elite, primarily

17   made up of white plantation owners.  But in Hawaii, this

18   domination occurred in the late 19th century whereas in

19   Mississippi, it was already part of the political fabric

20   when the territory was admitted to statehood in 1817."

21   Right?

22       A.  That's correct.

23       Q.  And you continue:  "Racism and labor

24   exploitation existed in Hawaii but they were neither as

25   extreme nor as embedded as they were in Mississippi

657fddd4-f0ef-43b0-bb10-e1f1abd7c8a1

White v. State Board of Election Commissioners                    David Arthur Swanson, Ph.D.

Page 48

1    where slavery preceded anti-miscegenation pro laws."
2    Right?
3         A.   Correct.
4         Q.   And you still agree that the embedded history
5    of extreme racism and exploitation contribute to
6    socioeconomic deficits that we see in Mississippi today?
7         A.   Yes.
8         Q.   And we can put this one away as well.   That
9    one, too.   Thanks very much.
10              So let's talk about this case.   You
11   understand that this deposition relates to litigation
12   brought under Section 2 the of Voting Rights Act?
13        A.   I don't know what section of the Voting Rights
14   Acts it is, but I understand it's a case about voting
15   rights.
16        Q.   Okay.   When did you first learn about this
17   case?
18        A.   A year ago.
19        Q.   How did you learn about it?
20        A.   Mr. Wallace contacted me.
21        Q.   Did you and Mr. Wallace know each other
22   previously?
23        A.   No.
24        Q.   Just curious.   What is your understanding of
25   the claims brought by the plaintiffs in this case?

657fddd4-f0ef-43b0-bb10-e1f1abd7c8a1

White v. State Board of Election Commissioners                     David Arthur Swanson, Ph.D.

Page 49

1      A.  You'd have to be more specific about what it is
2   you're asking me, because I don't follow the question
3   exactly.
4      Q.  What do you understand the plaintiffs to be
5   challenging about the Mississippi Supreme Court?
6      A.  What they seem to be challenging is the
7   counties that are within district 1 specifically.
8      Q.  What is your understanding about why the
9   plaintiffs would like district 1 to be configured
10  differently?
11     A.  I believe -- are you asking me specifically
12  about Dr. Burch's report?
13     Q.  I'm asking generally about the claims in the
14  case.  I mean, your reviewed Dr. Campbell's report;
15  right?
16     A.  Yes.  I spent more time with Dr. Burch's
17  report.
18     Q.  You reviewed Dr. Cooper's report?
19     A.  I did.
20     Q.  Excuse me.  Mr. Cooper's report?
21     A.  Yeah, Mr. Cooper.
22     Q.  Wouldn't want to unnecessarily promote
23  Mr. Cooper.
24            Having read a few reports in the case -- and
25  did you read the complaint that was filed in this case

White v. State Board of Election Commissioners                    David Arthur Swanson, Ph.D.

Page 50

1  by the plaintiffs?

2      A.  Probably, but I don't recall.

3      Q.  So I'm just asking you:  What's your

4  understanding of why the plaintiffs think that

5  district 1 should be redrawn?

6      A.  I think it's because they -- the idea is that

7  there should be a -- either a higher majority or a

8  straight-out majority of black voters in the district.

9      Q.  And what is your understanding of why

10 plaintiffs think that district should be redrawn so that

11 there's a higher majority or a straight-out majority of

12 black voters in district 1?

13     A.  I guess it would have to do with some

14 understanding of how black or white or other people

15 vote.

16     Q.  What's your understanding of what the term

17 "vote dilution" means?

18              MR. WALLACE:  That really is a legal

19 opinion, and I'll object to it for that reason.  He can

20 answer.

21     Q.  You can provide your understanding if you have

22 one.

23     A.  I don't know.

24     Q.  What's your understanding of what "racially

25 polarized voting" means?

657fddd4-f0ef-43b0-bb10-e1f1abd7c8a1

Page 51

1    A.   My understanding is that white people might

2  tend to vote in a block, black people might tend to vote

3  in a block, Chinese people might tend to vote in a

4  block, Japanese American might tend to vote in a block,

5  American Indians might to tend to vote in a block,

6  etcetera.

7    Q.   And so you would agree that if voting in a

8  particular area is racially polarized, black voters are

9  usually not going to be able to elect a candidate they

10  want to elect unless they form a majority in that area?

11        MR. WALLACE:   Object as facts -- object on

12  the basis based on facts not in evidence.   I was trying

13  to think whether it was bad law or bad facts, but I

14  object to the form because it's probably both.

15    Q.   You can answer the question.

16    A.   I don't know the answer to it.

17    Q.   Let me ask it again.   You would agree based on

18  your understanding of what racially polarized voting is,

19  that if you have an area where there is racially

20  polarized voting, black voters will usually not be able

21  to elect the candidate that they're voting for unless

22  they form a majority of the population in that district?

23    A.   Well I think what you're asking me is a

24  research question, so I can't offer an answer off the

25  top of my head without actually researching some

657fddd4-f0ef-43b0-bb10-e1f1abd7c8a1

White v. State Board of Election Commissioners                    David Arthur Swanson, Ph.D.

Page 52

1   specific condition.

2        Q.   Let me ask it one other way.  If white voters

3   are usually voting for one candidate and black voters

4   are usually voting for the other candidate and both

5   white and black voters are voting cohesively, then in an

6   area where voters are supposed to be either white or

7   black, where black voters are the minority, they're

8   usually going to lose the election?

9             MS. WALLACE:  Object to the form of the

10  question as seeking legal opinion on the meaning of both

11  "usually" and "cohesively."  But you may answer.

12       A.   I don't know.

13       Q.   You understand you're being proffered as an

14  expert in this case?

15       A.   I understand that.

16       Q.   What are you an expert in?

17       A.   Demography.

18       Q.   You're not an expert electoral mapping drawing?

19       A.   That's correct.

20       Q.   And you're not an expert in voting behavior?

21       A.   That's correct.

22       Q.   Do you know what the duties of an expert in a

23  federal law suit are?

24             MR. WALLACE:  Well, I'm going to object to

25  the form of that as being a legal opinion.  But he may

657fddd4-f0ef-43b0-bb10-e1f1abd7c8a1

White v. State Board of Election Commissioners          David Arthur Swanson, Ph.D.

Page 53

1   answer.

2        A.  Does it vary by judge or court?

3        Q.  Well let me ask it this way:  Do you think that

4   an expert is supposed to be objective?

5        A.  That I believe.  I think an expert should be

6   objective.

7        Q.  And when did you first learn you were going to

8   give a deposition in this case?

9        A.  Not too long ago.  Mr. Wallace might be able to

10  give an answer on that one.  I can't recall.

11       Q.  Unfortunately, I'm not deposing Mr. Wallace.

12       A.  Well, I -- a month ago?  A week ago?  I don't

13  recall.  Certainly wasn't a year ago.

14       Q.  And without going into the substance of any

15  conversations that you had with your attorneys, what did

16  you do to prepare for today's deposition?

17       A.  I went back and reviewed the surrebuttal report

18  I prepared.

19       Q.  How long did you spend preparing for today's

20  deposition?

21       A.  Since I knew about being deposed, probably

22  several hours.

23       Q.  Did you meet with anyone?

24       A.  Other than Mr. Wallace?

25       Q.  Other than Mr. Wallace.

657fddd4-f0ef-43b0-bb10-e1f1abd7c8a1

White v. State Board of Election Commissioners                    David Arthur Swanson, Ph.D.

Page 54

1    A.  No.

2    Q.  You met with Mr. Wallace?

3    A.  Yes.

4    Q.  Again without asking you about the substance of

5  any conversations you had, about how many times did you

6  meet with Mr. Wallace?

7    A.  This morning, yesterday.

8    Q.  Did you review any documents -- and I'm sorry,

9  was that your complete answer, was this morning and

10  yesterday?

11    A.  I believe so.  We maybe talked on the phone or

12  e-mail, but I can't recall that.  But in terms of

13  personally talking to him about it.

14    Q.  Did you review any documents to prepare for

15  this deposition?

16    A.  You asked me that question.

17    Q.  And you mentioned your surrebuttal.  Anything

18  else that you reviewed?

19    A.  Not that I really read or reviewed.

20    Q.  Did you take any notes during any of the

21  meetings or known calls that you had to prepare for this

22  deposition?

23    A.  No.

24    Q.  Did you take any notes when you were reviewing

25  documents to prepare the for deposition?

657fddd4-f0ef-43b0-bb10-e1f1abd7c8a1

White v. State Board of Election Commissioners                    David Arthur Swanson, Ph.D.

Page 55

1      A.  Not that I recall.

2      Q.  Did you do any highlighting or margin note

3  writing in any documents as you prepared for this

4  deposition?

5      A.  I generally don't review printed documents

6  because the printer at my house doesn't work, well --

7  I'm serious.  So what I generally do is look at things

8  on-line.

9      Q.  And you didn't make any marginal notes in any

10  digital documents you were reviewing?

11      A.  No.

12      Q.  I'm also in the faulty printer club, so I feel

13  your pain on that one.

14          Did you bring any documents with you to

15  today's deposition.

16      A.  No.

17      Q.  Okay.  I'd like to spend some time talking

18  about the January report that we've been looking at

19  starting with the demographic analysis that you

20  conducted.

21          MR. WALLACE:  Well at this point, I'm going

22  to state our position -- and it depends on what you're

23  looking at.  The court order authorizes you to examine

24  him on the surrebuttal report.  I don't doubt that there

25  are some things in the first report which may be

White v. State Board of Election Commissioners                    David Arthur Swanson, Ph.D.

Page 56

1  inextricably connected to the second report, so, you

2  know, I'll take it up an issue at a time.  But we do

3  believe this is a deposition on the surrebuttal report.

4  And with that, you may proceed.

5           MR. SAVITZKY:  Thank you, Mr. Wallace.  And,

6  you know, we understand your position.  Obviously, this

7  came up at the last deposition as well.  And, you know,

8  we disagree and think this is our opportunity to take a

9  deposition of defendant's experts, but we can hash that

10 out another time, and your object is certainly noted.

11 BY MR. SAVITZKY:

12     Q.  So with that, still looking at your January

13 report you should have in front of you, and it's marked

14 as Exhibit 2, I just wanted to get one point out of the

15 way.  You say a few times in your report, paragraph 13,

16 for example, that Mr. Cooper argues -- "argues that

17 Mississippi's Supreme Court district 1 is a minority

18 black district at 49.3 percent."  You can look at

19 paragraph 13 of your report to confirm that you say

20 this.  It is, I believe, the second full sentence.  You

21 characterize Mr. Cooper as arguing that district 1 is a

22 minority black district at 49.3 percent?

23     A.  I do.  I write that in here.

24     Q.  And you actually at paragraph 33, you say it

25 again, you say:  "Plaintiffs are relying on the any part

657fddd4-f0ef-43b0-bb10-e1f1abd7c8a1

White v. State Board of Election Commissioners                    David Arthur Swanson, Ph.D.

Page 57

1   black voting age population of the district to

2   characterize district 1 as being minority black."

3        A.  Yes.

4        Q.  And in paragraph 39 you say -- you

5   characterize:  "The claim that plaintiffs are making is

6   that district 1 'is a minority district' in need of

7   remediation."

8        A.  Yes.

9        Q.  Did you read Mr. Cooper's October report?

10       A.  I did.

11       Q.  Did you review the exhibits to the report?

12       A.  I did.

13            MR. SAVITZKY:  So I just want to mark the

14   October report now.  This'll be Exhibit 9.  Here's a

15   copy.  One for Mr. Wallace.

16   BY MR. SAVITZKY:

17       Q.  And just looking at page 19 of Cooper's October

18   report, just at the very top of the page, let me know

19   when you're there.

20       A.  I'm there.

21       Q.  He says:  "District 1 is only a 4 percentage

22   point plurality BVAP district; right?

23       A.  Yes, it does say that.

24       Q.  And that is the statement that you're pointing

25   to when you say that Cooper argues that Mississippi

657fddd4-f0ef-43b0-bb10-e1f1abd7c8a1

White v. State Board of Election Commissioners                    David Arthur Swanson, Ph.D.

Page 58

1    Supreme Court district 1 is a minority black district?

2              MR. WALLACE:  That's that fist question

3    you've asked him since I stated my objections, and I

4    object to it as being outside the scope of the order.

5    He may answer.

6         A.  Yes.

7         Q.  So what Mr. Cooper says he doesn't say

8    minority, he says plurality; he says it's plurality

9    black district; right?

10        A.  He says that.

11        Q.  So you think that paragraph 13 and those other

12   references in your report should be corrected?

13        A.  But 49.29 percent is not a majority.

14        Q.  Right.  But Mr. Cooper doesn't characterize it

15   as a minority black district, he characterizes it at a

16   plurality black district; right?

17        A.  You're correct.

18        Q.  But you say Mr. Cooper "argues that Mississippi

19   Supreme Court district 1 is a minority black district at

20   49.3 percent?

21        A.  I did.

22        Q.  He doesn't argue that, does he?

23        A.  That would be up to you.  When someone says

24   it's 49.29 percent, that to me is a statement that's a

25   minority.

White v. State Board of Election Commissioners                David Arthur Swanson, Ph.D.

Page 59

1      Q.  Are a minority and a plurality the same thing?

2      A.  A minority is when you're less than half,

3   depending on what the situation is.  And to me, that's a

4   minority.

5      Q.  A plurality would imply that you're the --

6   well, strike that.  We'll leave it there.

7           You don't dispute that the voting age

8   population based on the census is the traditional

9   standard for measuring population for purposes of

10  drawing an electoral map?

11          MR. WALLACE:  Objection as asking for a

12  legal opinion.  He may answer.

13     A.  I believe that's the case.

14     Q.  And then you look at American Community Survey

15  data as well to analyze the demographics of the

16  population in Mississippi in your report; right?

17     A.  Yes.

18     Q.  And, I mean, we can, I think, starting at

19  paragraph 39 of your report, if you'd like a place to

20  look, but -- and you -- strike that.

21          Unlike data from the census, the America

22  Community Survey is an estimate; right?

23     A.  It is.  It's a sample-based estimate.

24     Q.  Did you use the 2016, 2020 special tabulation

25  of the ACS?

657fddd4-f0ef-43b0-bb10-e1f1abd7c8a1

White v. State Board of Election Commissioners                    David Arthur Swanson, Ph.D.

Page 60

1      A.  I believe that's the case.  I'd have to look at

2  the actual report to see what I used, but that's the

3  most likely one.

4      Q.  And you say that using ACS estimates of CVAP or

5  citizens voting age population, the existing district 1

6  is majority black CVAP; right?

7      A.  I believe that's the case.  Can you point me to

8  the paragraph so I can see it?

9      Q.  Yeah.  I believe it's on paragraph 39.

10     A.  Yes.

11     Q.  Do you think that the existing district 1 is

12  reasonably configured?

13          MR. WALLACE:  Objection as calling for a

14  legal conclusion, but he may answer.

15     A.  I don't know.  And the sense of configured, in

16  what manner?  Geographically?  Socially?  Spacially?

17  Road-wise?  Communication?

18     Q.  Is existing district 1 compact?

19     A.  I'd have to look at the data to, again, recall

20  if that's the case.

21     Q.  Did you analyze the compactness and other

22  metrics of district 1 in conducting your opinions in

23  your January report?

24     A.  I haven't looked at this report for quite a

25  while that you're bringing up, so I'd have to go back

White v. State Board of Election Commissioners                    David Arthur Swanson, Ph.D.

Page 61

1    and review it.  I didn't review it prior to this

2    deposition.

3        Q.  And you don't conclude anywhere in your report

4    that the black population of Mississippi is not

5    sufficiently numerous and geographically compact to

6    allow for one black majority supreme court district?

7        A.  Again, I'd have to stress I'd have to go back

8    and look at the report because I haven't looked at it or

9    thought about it in a while.

10       Q.  I mean, you're welcome to review the

11   conclusions if you want or --

12       A.  If you want me to now, I can.

13       Q.  The question is whether you concluded anywhere

14   that the black population in Mississippi is not

15   sufficiently numerous and geographically compact to

16   support one majority black supreme court district?

17            MR. WALLACE:  Object to the form because

18   sufficiently numerous geographically compact requires

19   all kinds of legal conclusions.

20       A.  And my answer, again, is I'd have to go back

21   and review all those since I -- I didn't do that prior

22   to this deposition.

23       Q.  You don't conclude that it's not possible to

24   draw a compact majority black supreme court district in

25   Mississippi?

White v. State Board of Election Commissioners                    David Arthur Swanson, Ph.D.

Page 62

1          MR. WALLACE:  Same.  Objection he my answer.

2      A.  I don't have a conclusion about that at this

3  point in time because it's not in my head.

4      Q.  But you don't conclude that in your report

5  anywhere?

6      A.  I'd have to look back at the report to review

7  it.  I don't know.  As I said, I haven't looked at this

8  report for quite a while, so I can't recall exactly

9  what's in it.

10      Q.  So when calculating demographics of the

11  different districts, you also do some analysis to adjust

12  for prison population.  Do you recall that?

13      A.  I do.

14      Q.  And that's starting at paragraph 46 of your

15  report.  And you conduct this analysis by subtracting

16  the current populations of some of Mississippi's prisons

17  from the CVAP that you've calculated; right?

18      A.  I believe that's the case, but I'd have to look

19  specifically again at it to recall because I don't

20  recall off the top of my head.

21      Q.  Well, feel free to refresh yourself by looking

22  at paragraph 46 and neighboring paragraphs if you need

23  to before we proceed.  And let me know when you're

24  ready.

25      A.  I've looked at it.

657fddd4-f0ef-43b0-bb10-e1f1abd7c8a1

White v. State Board of Election Commissioners                David Arthur Swanson, Ph.D.

Page 63

1     Q.   Okay.  So you do this analysis of prison

2  populations by subtracting the current populations of

3  some of Mississippi's prison facilities from the CVAP

4  that you've calculated; right?

5     A.   Yes.

6     Q.   And specifically, you look at the three largest

7  prison facilities in the state of Mississippi; right?

8     A.   I believe those are the three largest, yes.

9     Q.   And you calculate the current population of

10  those three facilities that we looked at as 7,000

11  people?

12     A.   Can you point to me where the -- where I've got

13  the number in there?

14     Q.   Yeah.  I'm looking at Table III E-1 on page 25.

15     A.   And then what you're looking at is the right

16  hand total where it has 2,996 in private prisons and

17  4,050 in regional correction facilities to say it's

18  approximately 7,000?

19     Q.   So that's right.

20     A.   That's correct.

21     Q.   And just to be clear, the count that you have

22  here is a partial count of the population of

23  incarcerated persons in Mississippi, right, you didn't

24  include every incarcerated person?

25     A.   Such as in county jails and the like?

White v. State Board of Election Commissioners                    David Arthur Swanson, Ph.D.

Page 64

1      Q.   Sure.

2      A.   That's correct.

3      Q.   And your analysis shows that there is a

4  higher -- and I'm quoting you know according to

5  paragraph 48, you say:  "There's a higher proportionate

6  number of black prisoners in the three major prisons in

7  Mississippi than white prisoners overall and by gender."

8  Right?

9      A.   Yes.

10      Q.   And that table that we were looking at, Table

11  III E-1 indicates that black Mississippians are about

12  60 percent of the prison population even though they are

13  more like 36 percent of the voting age population?

14      A.   That's an accurate characterization.

15      Q.   And you know that in Mississippi, people with a

16  qualifying felony are disenfranchised for life not

17  merely when they are incarcerated?

18      A.   I knew they were disenfranchised, I did not

19  necessarily know it was for life, but I suspect I think

20  I somehow knew that, yeah.

21      Q.   And you don't try to estimate the number of

22  persons who are unable to vote, who are disqualified

23  from voting because of a qualifying felony conviction

24  but who are no longer incarcerated; right?

25      A.   That's correct.

657fddd4-f0ef-43b0-bb10-e1f1abd7c8a1

White v. State Board of Election Commissioners                    David Arthur Swanson, Ph.D.

Page 65

1    Q.  And you say, I think, on paragraph 36:

2  "There's no practical way to measure or locate these

3  demographically by district in a meaningful way."

4    A.  That's correct.  I stated that.

5    Q.  Did you review Mr. Cooper's rebuttal report

6  from February of 2023?

7    A.  I believe I did, but I'd have to look at his

8  report again to refresh my memory.

9          MR. SAVITZKY:  And we can mark that as well.

10  And we're on Exhibit 10.  Here you are.  And

11  Mr. Wallace.  Okay.

12  BY MR. SAVITZKY:

13    Q.  And looking at page 5 of this rebuttal report,

14  paragraph 9, Mr. Cooper discusses the study showing that

15  the total disenfranchised population based on qualifying

16  felony convictions in Mississippi that were rendered

17  between 1994 and 2017 is 56,000.  Do you see that?

18    A.  I do.

19    Q.  And do you have any reason to dispute that?

20          MR. WALLACE:  Now I will object as being

21  outside of the scope of the court order, but he may

22  answer.

23    Q.  Do you have any reason to dispute that?

24    A.  The only thing I question is, are they all in

25  Mississippi.

657fddd4-f0ef-43b0-bb10-e1f1abd7c8a1

White v. State Board of Election Commissioners                    David Arthur Swanson, Ph.D.

Page 66

1    Q.  Otherwise, you have no reason to dispute that's
2  an accurate assessment of the number --
3    A.  I have no reason to dispute that's an accurate
4  assessment.
5    Q.  And looking at the next paragraph, Mr. Cooper
6  says -- and sorry, one other point here before I move
7  on.  Mr. Cooper says that of that 56,000, black
8  Mississippians account for over 60 percent of that
9  number?
10          MR. WALLACE:  Same objection.  He may
11  answer.
12    Q.  Any reason to dispute that?
13    A.  Again, I'd have to go look at the exact data
14  that he pulled or other sources to answer it fully, but
15  I have no reason at this point to dispute it.
16    Q.  It's actually quite consistent with the number
17  that you found, isn't it?
18    A.  It is.
19    Q.  And that 56,000 represents convictions from the
20  23 year period 1994 to 2017?
21    A.  I believe that's correct.
22    Q.  And so Mr. Cooper then says in the next
23  paragraph, paragraph 10 on page 6 in his rebuttal
24  report:  "It's clearly within the realm of possibility
25  that after factoring in felony convictions going back to

White v. State Board of Election Commissioners                    David Arthur Swanson, Ph.D.

Page 67

1    1948, two additional 23-year periods, the adjusted

2    eligible black CVAP for voters in district 1 may drop

3    below 50 percent."  Do you dispute that that's within

4    the realm of possibility?

5              MR. WALLACE:  Same objection.  He may

6    answer.

7         A.  Many things are in the realm of possibly.  But

8    again, the question is how many people may have migrated

9    out of Mississippi or died.

10        Q.  So --

11        A.  All those numbers.

12        Q.  So you agree that it's possible that 51 percent

13   CVAP once you adjust for all the persons who may have a

14   qualifying felony conviction, it could be under 50

15   percent?

16             MR. WALLACE:  Same objection.  He may

17   answer.

18        A.  It could be either way depending on if they're

19   still alive or where they live.

20        Q.  So that's a yes, it could be under 50 percent

21   prison adjusted CVAP?

22        A.  That is a yes but it's qualified with the

23   follow-up study as I mentioned earlier, to follow up on

24   people who are in prison, discover where they're living

25   now, are they in Mississippi or out of Mississippi, are

657fddd4-f0ef-43b0-bb10-e1f1abd7c8a1

White v. State Board of Election Commissioners                    David Arthur Swanson, Ph.D.

Page 68

1    they alive?  Are they dead?  That may affect the answer.

2          Q.  You would agree that people -- that there are

3    likely people who were convicted of a qualifying felony

4    in 1960, 1970, still alive today?

5                MR. WALLACE:  Same objection.  He may

6    answer.

7          A.  Yeah, that's -- that's a possibility, yeah.

8    It's also a possibility that people from other states

9    may have moved there, there are a lot of possibilities.

10   This is a research question, as I stress.

11         Q.  Understood.  So just briefly, I want to look at

12   a different part of your demographic analysis.  I want

13   to turn back to paragraph 34 of your report.  You

14   mention -- well, let me just read it.  You say:  "A

15   useful way to look at the distribution of WNH" -- white

16   non Hispanic -- "total and any part black total

17   population across the three districts is to use the

18   coefficient of variation."  Do I have that right?

19         A.  You do.

20         Q.  And the coefficient of variation is the

21   standard deviation of the voting age population of the

22   three districts divided by the total voting age

23   population?

24         A.  Not the total, the mean.

25         Q.  Divided by the mean?

White v. State Board of Election Commissioners                    David Arthur Swanson, Ph.D.

Page 69

1      A.   That's correct.

2      Q.   And you say:  "The coefficient of variation

3  shows the extent of variation relative to the mean."

4      A.   It's normalized.  That's what the term is,

5  because you could have one population that has a really

6  high mean if you're comparing it to another population

7  that has a low mean.  And what you want to do is divide

8  the means into the standard deviation so you get a

9  relative basis for comparison.

10     Q.   And you say you do this for total but also

11  white VAP, black VAP, and you say:  "This shows that

12  white total is four times higher than that same per VAP

13  and black total is five times -- approximately five

14  times higher than that same VAP which serves to confirm

15  that white total and black total population are less

16  equally distributed across the three districts in total

17  VAP."

18     A.   And remind me what paragraph --

19          MR. WALLACE:  Which paragraph are we in?

20          MR. SAVITZKY:  Paragraph 34.

21          MR. WALLACE:  34?

22          MR. SAVITZKY:  Last sentence.

23  BY MR. SAVITZKY:

24     Q.   You say looking at the data in this manner

25  confirms that:  "White non Hispanic total and any part

657fddd4-f0ef-43b0-bb10-e1f1abd7c8a1

White v. State Board of Election Commissioners                    David Arthur Swanson, Ph.D.

Page 70

1    black total population are less equally distributed

2    across the two districts than the total voting age

3    population."  Right?

4         A.   That's correct.

5         Q.   Is that another way of saying that black and

6    white populations are not evenly distributed across

7    Mississippi geography?

8         A.   It would be.

9         Q.   And you would agree that large numbers of high

10   black VAP population are generally distributed north and

11   south along the Mississippi River in Mississippi?

12             MR. WALLACE:  Now I'm going to object to

13   that for the same objection.  He may answer.

14        A.   I -- if you're asking me what my -- I would

15   call it a research of hypothesis.  It's a good question

16   to ask as a starting point, but it's something you'd

17   have to investigate.

18        Q.   And let's just briefly -- let's put a pin in

19   this page, but turn to page 96 -- excuse me, not page

20   96, paragraph 96 of your report on page 49.  And just --

21   the second sentence of that paragraph, just take a look

22   at that and let me know when you're ready.

23        A.   And it's paragraph 99?

24        Q.   Paragraph 96, second sentence.  Just take a

25   look and let me know when you're ready .

657fddd4-f0ef-43b0-bb10-e1f1abd7c8a1

White v. State Board of Election Commissioners                    David Arthur Swanson, Ph.D.

Page 71

1          (Witness reviewing exhibit.)

2     A.  Yes.

3     Q.  You would agree that large numbers -- "Large

4  numbers of high percent any part black VAP population

5  are generally distributed north and south along the

6  Mississippi River; right?

7     A.  Yes.

8     Q.  Now having worked in Mississippi, studied

9  Mississippi demographics, you sort of know that's true

10 just from looking at the map and knowing the population,

11 there's a substantial amount of black population

12 concentrated in the Mississippi Delta and the capital

13 region; right?

14          MR. WALLACE:  Same objection, but he may

15 answer.

16     A.  Yes.

17     Q.  And that's why it's not especially difficult to

18 draw majority black supreme court districts and include

19 the Mississippi Delta and the capitol regions?

20          MR. WALLACE:  Same objection plus the

21 objection that is asking for a legal conclusion.  But he

22 may answer.

23     A.  I don't draw a congressional district, so I'm

24 not in a position to really answer that question.

25     Q.  And you don't draw supreme court districts,

657fddd4-f0ef-43b0-bb10-e1f1abd7c8a1

White v. State Board of Election Commissioners                    David Arthur Swanson, Ph.D.

Page 72

1   either?

2        A.   Yeah, that's correct.

3        Q.   So let's talk about the traditional districting

4   principles.  And we're now in a section of your report

5   starting at paragraph 56, page 29.  Are you familiar

6   with the principles that electoral map drawers consider

7   in drawing an electoral map?

8        A.   Somewhat.

9             MR. WALLACE:  Objection as to form as not

10  explaining what an electoral map drawer is.

11       Q.   Do you understand that an electoral map drawer

12  is a person who draws electoral maps?

13       A.   I do.

14            MR. WALLACE:  With political authority or

15  sitting in his basement with a pad?  Can you be more

16  specific.

17       Q.   So you rely in your report on a few different

18  sources to discern the principles that a person drawing

19  an electoral map would consider; right?

20       A.   Yes.

21       Q.   One of the sources you rely on is a report from

22  the congressional research service, it discusses

23  principles for congressional redistricting?

24       A.   I believe that's the case, yes.

25            MR. SAVITZKY:  And we'll just mark that.  We

657fddd4-f0ef-43b0-bb10-e1f1abd7c8a1

White v. State Board of Election Commissioners                    David Arthur Swanson, Ph.D.

Page 73

1    are on Exhibit 11.  Copy for you.  Copy for Mr. Wallace.

2    BY MR. SAVITZKY:

3         Q.  This is the report that you cite in your

4    January report?  Just confirming, this is the report

5    that you looked at.

6         A.  Give me a second here.  I'm still trying to

7    organize the main report you were going through --

8         Q.  Sure, sure.

9         A.  -- so I can find things when we go back to it

10   again.

11        Q.  And that's why, because we will certainly go

12   back here.

13             And this congressional research service

14   report is one of the sources that you relied on in your

15   January report too?

16        A.  It is.

17        Q.  And according to this report, and we can see on

18   page 3, page 3 of the document there -- the pagination

19   is at the bottom.  That's front matter.  There we go.

20   And just looking there, the report lists some of the

21   principles that map -- electoral map drawers consider;

22   right?

23        A.  It does.

24        Q.  And according to this source that you relied

25   on, those principles include assuring population

657fddd4-f0ef-43b0-bb10-e1f1abd7c8a1

White v. State Board of Election Commissioners                    David Arthur Swanson, Ph.D.

Page 74

1   equality among districts within the same state.  You

2   agree that's one of the principles to be considered?

3        A.   That's one of the principles listed.

4        Q.   You agree that's one of the principles listed

5   as traditional criteria for drawing electoral maps?

6        A.   That's what it says here, yes.

7        Q.   And another one that's listed is protecting

8   racial and language minorities from vote dilution while

9   at the same time not promoting racial segregation?

10       A.   Yes.

11       Q.   And another principle is promoting geographic

12  compactness and contiguity when drawing districts?

13       A.   Yes, sir.

14       Q.   And another principle is minimizing the number

15  of split political subdivisions and communities of

16  interests within districts?

17       A.   Yes.

18       Q.   And another principle is preserving historic

19  stability in the cores of previous districts?

20       A.   Yes.

21       Q.   And then looking at this list, the list

22  indicates that some of the considerations are more

23  widely adopted than others; right?

24       A.   In terms of?

25       Q.   How many states require them, how many states

657fddd4-f0ef-43b0-bb10-e1f1abd7c8a1

White v. State Board of Election Commissioners                    David Arthur Swanson, Ph.D.

Page 75

1   have adopted them, there are little parentheticals after

2   each one that say how many states consider --

3       A.  Yes, there's a different number of states

4   listed after some of these.

5       Q.  So contiguity appears to be expressly embraced

6   as a required consideration by 22 states but core

7   retention by only 7?

8       A.  Correct.

9       Q.  So when it's discussed in paragraph 58 and 59

10  of your January report, you also relied -- and we can

11  put this one to the side, but we may refer back to it

12  again.  You also relied on another multistate survey of

13  traditional districting principles from the National

14  Conference of State Legislators; right?

15      A.  Point me to that paragraph where I state that,

16  please?

17      Q.  Sure.  This is Footnote 21 on paragraph 58,

18  says:  "The National Conference of State Legislatures is

19  widely recognized, the nation's independence objective

20  and bipartisan authority of redistricting matters

21  published a series of principles that reflect

22  traditional districting principles that have both

23  informed -- that have been both informed by and adopted

24  by many states."  You cite the report in the footnote,

25  continue on, and you say:  "This guidance from the NCSL

White v. State Board of Election Commissioners                    David Arthur Swanson, Ph.D.

Page 76

1    is the basis of any assessment I make as an expert of

2    individual states or organizations, criteria, and

3    redistricting principles."  Right?

4        A.  Yes.

5        Q.  So this NCSL guidance is the basis for your

6    assessment of the compliance of an electoral map with

7    traditional districting principles?

8        A.  I use it as a guideline.

9        Q.  A guideline to assess compliance with

10   traditional districting principles?

11       A.  I use it as what's considered to use such as

12   core, retention, and so on, yes.

13           MR. SAVITZKY:  And we can just mark that

14   next, Exhibit 12.  Copy, copy.  Okay.

15   BY MR. SAVITZKY:

16       Q.  And just looking at the list of considerations

17   discussed right on this first page and then the bullets,

18   seems like a similar list of criteria to the one that we

19   just discussed; right?

20       A.  It does.

21       Q.  And so looking at right up on the first page,

22   we see the second paragraph, first sentence:  "All

23   states must comply with the federal constitutional

24   requirements related to population and

25   antidiscrimination."  Right?

657fddd4-f0ef-43b0-bb10-e1f1abd7c8a1

White v. State Board of Election Commissioners                    David Arthur Swanson, Ph.D.

Page 77

1      A.  I see that.

2      Q.  And then we say -- or we see:  "In addition to

3  population equality, Section 2 of the Voting Rights Act

4  prohibits plans to intentionally or inadvertently

5  discriminate on the basis of race which would dilute

6  that minority vote."

7      A.  I see that.

8      Q.  So then you agree those are considerations that

9  should be guidelines in assessing compliance of a map

10  with traditional districting principles?

11          MR. WALLACE:  Objection.  Again is asking

12  for a legal opinion.  But he can respond.

13      A.  My -- my answer is:  I use these as guidelines.

14      Q.  You use them as guidelines in forming any

15  opinions that you form about the compliance of the plans

16  offered in this case with traditional districting

17  principles?

18      A.  Yes.

19      Q.  And the NCSL report then says:  "Well beyond

20  that, states are allowed to adopt their own

21  redistricting criteria or principles for drawing plans;

22  right?

23      A.  Yes.

24      Q.  And then at paragraph 59 of your report -- I

25  think paragraph 59 of your report is basically a

White v. State Board of Election Commissioners                    David Arthur Swanson, Ph.D.

Page 78

1    verbatim recitation of the bottom of this first page of
2    the NCSL report?
3         A.  I believe it -- that's where I found the
4    materials so that's cited in there.  Is that the case?
5         Q.  Yeah.  It's -- it's certainly cited in the
6    footnote so I'm not trying to play gotcha.  I just want
7    to make sure this is basically what, you know, what you
8    have done here in your report you say the traditional
9    redistricting principles that have been adopted by many
10   states, and then you list --
11        A.  Yes.
12        Q.  -- the principles and the descriptions thereof
13   from the NCSL report?
14        A.  Yes.
15        Q.  And those include compactness?
16        A.  Yes.
17        Q.  And they include contiguity?
18        A.  Yes.
19        Q.  An include preservation of counties in
20   political subdivisions?
21        A.  Yes.
22        Q.  They include preservation of communities of
23   interest?
24        A.  Yes.
25        Q.  And they include maintaining the cores of prior

657fddd4-f0ef-43b0-bb10-e1f1abd7c8a1

White v. State Board of Election Commissioners                    David Arthur Swanson, Ph.D.

Page 79

1    districts to the extent possible?

2         A.   Yes.

3         Q.   And they include avoiding incumbent pairings?

4         A.   Yes.

5         Q.   And then the NCSL report goes on to indicate

6    that different states have adopted sort of different

7    subsets of these criteria; right?

8         A.   Yes.  I believe that's the case.

9         Q.   And we can look at page 10 of this document.

10            MR. WALLACE:  In Exhibit 12?

11            MR. SAVITZKY:  Correct.

12            MR. WALLACE:  Okay.

13        Q.   And we can see Mississippi is included there.

14   And just looking at the NCSL description of the criteria

15   adopted for redistricting of Mississippi, core retention

16   is not one of the criteria that the NCSL report that you

17   relied on identifies as being adopted in Mississippi;

18   right?

19        A.   We're in Exhibit 12; correct?

20        Q.   Yes, page 10.

21        A.   Thank you.  And your question was?

22        Q.   My question is:  Core retention is not one of

23   the criteria that the NCSL report that you relied on

24   says that Mississippi has adopted for redistricting?

25        A.   What I read here is require compact contiguous,

657fddd4-f0ef-43b0-bb10-e1f1abd7c8a1

White v. State Board of Election Commissioners                David Arthur Swanson, Ph.D.

Page 80

1    preserve political subdivision, preserve communities of

2    interest.

3        Q.  And core retention is not one of the criteria

4    that Mississippi has adopted according to the NCSL

5    report that you rely on?

6        A.  That would be correct.

7        Q.  And now looking at paragraph 60 of your

8    report -- and I think it's possible we'll rely on this

9    again, but we can put the NCSL report up for now.

10           Looking at paragraph 60 of your report, you

11   say:  "Mississippi code Section 53101," which also cited

12   in the NCSL report, "expressly identified a few criteria

13   for legislative districts."  Right?

14       A.  Yes.

15       Q.  And in your report, you summarized the statute

16   is requiring the districts be compact, contiguous, and

17   preserve political subdivisions; right?

18       A.  Yes.

19           MR. WALLACE:  Object to the form as saying

20   "districts."  It actually says "legislature districts."

21   But he may answer.

22       Q.  And just looking at the language that you quote

23   in the block vote right below paragraph 60, would you

24   agree it's a pretty strong emphasis on county lines in

25   that language?

657fddd4-f0ef-43b0-bb10-e1f1abd7c8a1

White v. State Board of Election Commissioners                David Arthur Swanson, Ph.D.

Page 81

1          MR. WALLACE:  Object to the form.  But he
2     can answer if he can.
3          A.  It reads:  "Districts shall be structured as
4     far as possible and within constitutional standards
5     along county lines."
6          THE REPORTER:  Sir, if you slow down,
7     please.
8          A.  It reads:  60B, districts shall be structured
9     as far as possible and within constitutional standards
10    along county lines, if county lines are fractured, then
11    election district lines shall be followed as nearly as
12    possible."
13         Q.  So this statute that you point to places the
14    emphasis on following county lines?
15         A.  That's how I would read that.
16         Q.  And you also in the last sentence of paragraph
17    60 which is the top of page 31, you also identify
18    communities of interest, preserving communities of
19    interest as a relevant consideration in drawing
20    districts in Mississippi.
21         A.  Yes.
22         Q.  And again just looking at that statute you
23    block quote there, core retention is not mentioned in
24    Mississippi's statute as one of the districting criteria
25    in Mississippi?

657fddd4-f0ef-43b0-bb10-e1f1abd7c8a1

Page 82

1      A.  Correct.

2      Q.  And you would agree that in considering the

3  different traditional districting principles drawing a

4  map, and electoral map drawer is going to have to

5  balance some of these different principles and

6  considerations?

7          MR. WALLACE:  Object to form once again for

8  failure to identify electoral map drawer and asking for

9  legal conclusions.  But you may -- and also being

10  waylaid under the court order.  But subject to all those

11  objections, he may answer.

12      A.  That would appear to be the case to me.

13      Q.  Sometimes if you're putting a map -- an

14  electoral map together, you're going to have to make

15  tradeoffs between these different principles.

16      A.  You have to make tradeoffs in anything we do in

17  life, correct.

18      Q.  Including these principles, which --

19      A.  Since it's such a generalized idea, I think

20  that you'd have to do that with these principles.

21      Q.  And would you agree that different map drawers

22  could employ different approaches, make different

23  tradeoffs and each draw a map that in the end is

24  consistent with the set of principles we've been talking

25  about?

657fddd4-f0ef-43b0-bb10-e1f1abd7c8a1

Page 83

1     MR. WALLACE:  Same objection as the last

2   one.  He may answer.

3     A.  In principle, that could happen.

4     Q.  So let's talk about the different criteria that

5   we've been discussing one by one starting with

6   population equality.  Why do you think population

7   equality, in your understanding, is an important

8   consideration in drawing an electoral map?

9     MR. WALLACE:  Same objections.  He may

10   answer.

11     A.  Well as one example, if you had 500 people in

12   an area, you don't want to put 499 of them in one and 1

13   person in the other and then equal -- have some sort of

14   equal representation, whatever government form it would

15   be.

16     Q.  Ever heard the expression one person, one vote

17   before?

18     A.  I have.

19     Q.  Population equality implements that principle;

20   is that right?

21     A.  I believe so.

22     Q.  And looking at Table III.D.1 on page 17 of your

23   report -- let me know when you're there?

24     A.  I'm sorry.

25     Q.  You report the population of the existing

657fddd4-f0ef-43b0-bb10-e1f1abd7c8a1

White v. State Board of Election Commissioners                    David Arthur Swanson, Ph.D.

Page 84

1   supreme court districts, these are the current districts

2   in Mississippi, right, the VAP.  Do you see that?

3        A.  I do.  I wouldn't say a report, the population

4   per se.  These are subsets of the population in

5   Mississippi.

6        Q.  Well you report the VAP in that first column

7   for each --

8        A.  That's correct.

9        Q.  -- of the three districts, the voting age

10  population.  And you say in a footnote, Footnote 14 that

11  your numbers correspond to the numbers in Mr. Cooper's

12  report with respect to the demographics of the

13  districts?

14       A.  I do.

15       Q.  And just generally, you don't anywhere indicate

16  that there's any discrepancy between the numbers that

17  Mr. Cooper reports based on the census and the numbers

18  that you report based on the census?

19       A.  I'd have to look through the full report, but I

20  believe that's the case.

21       Q.  Now, you don't report population deviations for

22  each of these districts; right?

23       A.  In the sense of?

24       Q.  You don't report how different the VAP of each

25  district is from the ideal population size or mean

657fddd4-f0ef-43b0-bb10-e1f1abd7c8a1

White v. State Board of Election Commissioners                    David Arthur Swanson, Ph.D.

Page 85

1    population size for all the districts?

2                    MR. WALLACE:  Objection.  Comparing VAP to

3    mean total population size or some other mean population

4    size?

5        Q.  The VAP of the district to -- to mean or ideal

6    VAP of the district.

7                    MR. WALLACE:  All right.  Objection as to --

8    as based on a faulty legal theory.  I don't think

9    there's a requirement for equality in VAP.  But go

10   ahead, he may answer.

11       A.  In -- so I'm not sure what you're getting at,

12   but in one sense, comparing deviations in the sense of

13   how much a number may vary from a mean across a number

14   of categories or districts, that's what your asking?

15                   MR. SAVITZKY:  You know what, I'll strike

16   that.  Mr. Wallace makes a good point.

17   BY MR. SAVITZKY:

18       Q.  You don't report population deviations to the

19   districts in terms of total population from the ideal

20   districts size?

21       A.  Well, I'm not sure what the ideal district size

22   is.  I mean in that sense, are you talking about a mean

23   or an average taken across a number of units?

24       Q.  If there were equally populated districts, you

25   don't report the deviation of these districts from the

Page 86

1    size of what an -- what an equally divided --

2        A.  Thank you for clarifying that.  Yeah, I

3    understand.  No, I don't.

4        Q.  You would agree that looking at that population

5    deviation is something that map drawers take into

6    account to asses that equal population principle that

7    we've been talking about?

8            MR. WALLACE:  Same objection as before.  He

9    may answer.

10       A.  I -- it may depend on the situation.

11       Q.  And we talked about that book that you -- that

12   Mr. Bryan and Mr. Morrison had written called

13   Redistricting, do you recall that?

14       A.  Yes, I do.

15       Q.  Is that another source that you relied on to

16   think about the different principles that mappers

17   consider?

18       A.  I probably have looked through the book, again,

19   when I was looking at this, but I don't recall

20   specifically if I did.

21       Q.  And let's just mark that.  So this is

22   Exhibit 13, Redistricting, a Manual for Analysts,

23   Practitioners, Citizens, published as we discussed

24   earlier by Springer.

25           MR. WALLACE:  This is exhibit which?

White v. State Board of Election Commissioners                    David Arthur Swanson, Ph.D.

Page 87

1          MR. SAVITZKY:  13.

2          MR. WALLACE:  13.

3   BY MR. SAVITZKY:

4       Q.  Okay.  And I just want to turn to page 47 of

5   this document here.  And you let me know when you're

6   ready.

7       A.  I'm there.

8       Q.  And we see on page 47 that the authors list

9   some of the same criteria that we've been talking about;

10  right?

11      A.  I do.

12      Q.  And they say:  "Substantial equality of

13  population has come to mean that the population

14  difference between the largest and smallest districts,

15  the total deviation may not exceed 10 percent of the

16  average district population."  Do you see that?

17      A.  Yes.

18      Q.  Do you agree with Mr. Morrison and Mr. Bryan

19  that for purposes of drawing an electoral map,

20  substantial quality of population means trying to stay

21  within a plus or minus 5 percent of the ideal of average

22  district size?

23          MR. WALLACE:  Objection as to asking for a

24  legal conclusion and for being outside the scope of the

25  court order.  But he may answer.

657fddd4-f0ef-43b0-bb10-e1f1abd7c8a1

White v. State Board of Election Commissioners        David Arthur Swanson, Ph.D.

Page 88

1       A.  I look at this as another guideline.

2       Q.  You agree it's a reasonable approach to

3  implementing the consideration of equal population?

4       A.  Well, it seems to be an approach to doing it,

5  yes.

6       Q.  And by the way, the next one that Mr. Bryan and

7  Mr. Morrison mention is minority representation?

8       A.  I see that.

9       Q.  Okay.  So looking back at your Table III.D.1 on

10  page 17 of your report -- and I understand this is only

11  VAP -- it does look like, at least looking at VAP for

12  now --

13       A.  And where was that again?

14       Q.  This is on page 17 of your report.

15       A.  Thank you.

16       Q.  And just looking at VAP, it looks like

17  district 2, almost 800,000 people district 1, 715,000.

18  So there's a significant difference in total voting age

19  population; right?

20       A.  I read that district 1 as being 7,000 --

21  716,000, not 715,000.

22       Q.  Right.  So -- but there's a significant about

23  80,000 person delta between the size of those two

24  districts in terms of VAP?

25       A.  There's a difference of approximately 80,000

657fddd4-f0ef-43b0-bb10-e1f1abd7c8a1

Page 89

1   people.

2       Q.  And looking at Mr. Cooper's October report

3   which is Exhibit 9, if we could pull that back out.

4   Here it is.  So looking over at Mr. Cooper's October

5   report --

6       A.  Thank you.

7       Q.  -- page 19, Figure 8, let me know when you're

8   there.

9       A.  I'm there.

10      Q.  So Mr. Cooper does report total population in

11  these districts in Figure 8; right?

12      A.  Yes.

13      Q.  And Mr. Cooper also reports the percent

14  deviation from the ideal district size or mean district

15  size or mean district size; right?

16      A.  If he calculated it, that would be the case.

17      Q.  And you don't dispute that looking at

18  Mr. Cooper's Figure 8, the population deviation under

19  the current scheme of supreme court districts is greater

20  than plus or minus 5 percent?

21          MR. WALLACE:  All right.  Same objections as

22  before.  Asking for a legal conclusion, not authorized

23  by the court order, and in addition, not relevant to any

24  issue raised in the complaint.  But he may answer.

25      A.  The -- there's one deviation that's minus 5.39

657fddd4-f0ef-43b0-bb10-e1f1abd7c8a1

Page 90

1    percent, and one -- another one that's plus 5.07

2    percent.

3         Q.  So then the population deviation range for the

4    existing supreme court district plan is greater than

5    plus or minus 5 percent?

6              MR. WALLACE:  Same series of objections.  He

7    may answer.

8         A.  Slightly greater than plus or minus 5 percent.

9         Q.  And that's sort of made sense when you consider

10   these districts haven't been changed since 1987?

11             MR. WALLACE:  Same series of objections.  He

12   may answer.

13        A.  I'm not equipped to answer other than looking

14   at what the population history is over the same period

15   of time.

16        Q.  And you reviewed Mr. Cooper's October report?

17        A.  Yes.

18        Q.  You reviewed the population statistics that he

19   provided for the illustrative plans?

20        A.  Yes.  And again, as I stressed, I haven't

21   looked at those in a long time, so I'm not going to be

22   able to speak off the top of my head.  So if we refer to

23   them, it might help refresh my memory.

24        Q.  Okay.  Well looking at page 27 of Mr. Cooper's

25   report which provides both a map and those population

657fddd4-f0ef-43b0-bb10-e1f1abd7c8a1

White v. State Board of Election Commissioners                    David Arthur Swanson, Ph.D.

Page 91

1   statistics for illustrative plan one?

2        A.   And the page number was?

3        Q.   Page 27?

4        A.   Thank you.

5        Q.   And looking there, you wouldn't dispute that

6   Cooper's illustrative plan 1 brings the population

7   deviation down under plus or minus 5 percent; right?

8             MR. WALLACE:  Same series of objections.  He

9   may answer.

10       A.   In what he labels a table as Figure 11, he has

11  district 1 as a minus 3.14 percent, district 3 as plus

12  3.02 percent.

13       Q.   So you wouldn't dispute that he brings the

14  population deviation down below plus or minus 5 percent

15  with his illustrative plan 1?

16       A.   Three percent is less than 5 percent.

17       Q.   But the range is down by four points overall?

18       A.   Yes.

19       Q.   And then looking at illustrative plan 2, page

20  30, you wouldn't dispute that for illustrative plan 2,

21  the population deviation is cut down to less than

22  3 percent total?

23            MR. WALLACE:  Same series of objections.

24  You may answer.

25       Q.   Plus or mine about point-and-a-half?

657fddd4-f0ef-43b0-bb10-e1f1abd7c8a1

Page 92

1    A.  In figure 14, he shows district 1 at minus 1.59

2  percent, district 2 at 1.05 percent, and district 3 at

3  0.53 percent.

4    Q.  So would you agree that illustrative plan two

5  significantly reduces account population deviation from

6  the existing plan?

7    A.  I would not use the term "significant"

8  necessarily.  It reduces it.

9    Q.  And then looking at the figures for least

10  change plan 1 on page 34, same questions.  Has

11  Mr. Cooper for this plan reduced the population

12  deviation for the supreme court districts below that

13  plus or minus that 5 percent threshold?

14          MR. WALLACE:  Same objections.  He may

15  answer.

16    A.  In district 1, he has minus 4.65 percent,

17  district 2, 1.2 percent, district three, 3.44 percent.

18    Q.  So the total deviation there is less than plus

19  or minus 5 percent?

20    A.  It is.

21    Q.  And then look at just the next page, we have

22  those figures for lease change plan 2, and again

23  Mr. Cooper has reduced the deviation range below plus or

24  minus 5 percent?

25          MR. WALLACE:  Same objections.  He may

White v. State Board of Election Commissioners                    David Arthur Swanson, Ph.D.

Page 93

1    answer.

2          A.   You're talking about Figure 18?

3          Q.   Correct.

4          A.   I have to ask a question why he's labels tables

5    and figures, but -- that's odd.

6          Q.   Back to you.

7          A.   I'll answer it, just -- hard to look at a table

8    that's labeled as a figure.  Okay.  So here he has

9    district 1 at minus 2.55 percent, district 2 is at 5.70

10   percent, district 3 is minus .2 -- 2.51 percent.

11         Q.   So deviation range is less than plus minus 5

12   percent?

13         A.   Well, in two of them.

14         Q.   The total range -- I would say total range is

15   less than 10 percent?

16         A.   You're talking about going from minus 2.5

17   percent to 5 percent, yes.

18         Q.   Correct.

19         A.   Yes.

20         Q.   Okay.  So with respect to the traditional

21   redistricting principle of population equality,

22   Mr. Cooper's plans all improve on the existing plan?

23              MR. WALLACE:   Same series of objections.   He

24   may answer.

25         A.   His plans show ranges that generally are below

White v. State Board of Election Commissioners                    David Arthur Swanson, Ph.D.

Page 94

1    plus or minus 10 percent.

2         Q.  Plus or minus 5 percent?

3         A.  Plus or minus 5 percent not exclusively, but

4    generally.

5         Q.  And just in terms of the idea of weighting

6    every vote equally, one person, one vote Mr. Cooper's

7    plans tends to weight every vote more equally than the

8    existing plan?

9              MR. WALLACE:  Same series of objections.  He

10   may answer.

11        A.  These are not voters, it's a total population.

12        Q.  They -- that is correct.  Mr. Cooper's plans

13   tend to weight the representation of persons in

14   Mississippi more equally than the existing plan?

15             MR. WALLACE:  Same objection and the

16   question is what does "representation" mean.  But he may

17   answer if he understands it.

18        A.  I don't understand it.

19        Q.  Mr. Cooper's plans adhere more closely to the

20   ideal of every person having an equal share of

21   representation?

22             MR. WALLACE:  Objection.  And he may answer.

23        A.  Mr. Cooper's plan shows the -- as you're

24   discussing, the ranges in terms of deviations from

25   ideals which I think are calculated by the means.  Is

657fddd4-f0ef-43b0-bb10-e1f1abd7c8a1

Page 95

1  that correct?

2      Q.  As I understand it.

3      A.  Yeah.  So if he's calculating the mean, he's

4  showing less deviation.  Now, let me ask you a question.

5  Would it be better to use the mean or the median?

6      Q.  I'm not going to answer your question while

7  we're on the record.

8      A.  Yes.  So there's -- and part of the issue about

9  using means is, what's the different between a mean and

10 a median?  What does one of them do that the other one

11 doesn't?  It's a question -- it's not fair to ask you

12 the question, I understand.  But it's a question that

13 you can see that I'm asking in general.  Why use a mean?

14 Means are subject to outliers.  If you've got outliers

15 in certain districts, it's going to weight the mean this

16 way or the other way.  So one question you could ask of

17 all this entire analysis is:  Why not use the mean.

18 That's my point.

19     Q.  Do you know whether courts in evaluating

20 compliance with the principle of population equality use

21 mean or median or what metric they use?

22     A.  I do not, not.  I can tell you as a

23 demographer, in certain cases I would use a median much

24 more than I'd use a mean.  It depends on what's going on

25 with outliers and observations and what the distribution

657fddd4-f0ef-43b0-bb10-e1f1abd7c8a1

White v. State Board of Election Commissioners                David Arthur Swanson, Ph.D.

Page 96

1   looks like.  If you have a skewed distribution, I
2   would -- and if you want to say this represents kind of
3   the average, I would select a median over a mean,
4   probably.
5       Q.  I'm tempted to ask you one question because it
6   is interesting.
7       A.  It is.  Please ask.
8       Q.  Well, I just -- I mean on the question of one
9   person, one vote which is, as we discussed, the ideal
10  that's -- that is implemented, would a median not --
11  would the use of a median to determine equal population
12  among districts not lead to situations where districts
13  were unequally populated?
14              MR. WALLACE:  He opened this, so I'll let
15  him answer that.
16      A.  It's possible.  What I would tend to look at
17  and with any kind of averages like this is, I would look
18  at what the distributions look like for them and then
19  maybe even display both of them.  They might give you
20  supporting answers, they might give you different
21  answers.
22      Q.  But relying on the mean allows you to ensure
23  that the actual population of each district is as equal
24  as possible?
25      A.  Again, that's one way to measure what averages

657fddd4-f0ef-43b0-bb10-e1f1abd7c8a1

White v. State Board of Election Commissioners                    David Arthur Swanson, Ph.D.

Page 97

1    are.  In not every case does it represent, you know,

2    where the bulk of the people are.  If you've got

3    something that's an extreme outlier -- income is a

4    classic -- a whole bunch of people have low incomes, one

5    person has a real high income, what does it do to the

6    mean?  It drives it way up.  So if you're saying here's

7    the mean income but 85 percent of the people are below

8    that mean, does that really characterize the whole set

9    of people?

10            And that's what gets back to my question

11   about maybe it's better to use the median in some of

12   these cases.  So that's why I have a difficult time kind

13   of answering some of your questions that it's -- are

14   they -- is more equal to do this, because it would, I

15   think, would require some more research, and that

16   research would involve looking at different types of

17   averages.  And whether or not courts use it, I don't

18   know the answer to that.

19        Q.  So you think it would be appropriate to use the

20   median population of each district to assess whether

21   population equality is --

22        A.  I would look at it as a -- possibly along means

23   and different types of means.  There might be a need for

24   a harmonic mean.  I don't know the answers in advance.

25   I look at is as a research question.  Do you follow me?

Page 98

1    I'm not saying one's better than the other, but it may

2    be the case -- again, depending on the distributions, if

3    you have a distribution where people are really

4    clustered around one point, a mean is probably going to

5    be good, and if symmetrical, the distribution.  If you

6    have a skewed distribution, it's not symmetrical, then

7    it may be the means is better.  But it's a case by case

8    situation where you have to evaluate what the data are

9    showing you.

10        Q.  So let's move on to the next districting

11   principle.  Minority vote dilution, you would agree

12   consistent with the sources you relied on that we've

13   discussed already that protecting against minority vote

14   dilution is another consideration that an electoral map

15   drawer has to think about?

16        MR. WALLACE:  Objection to vagueness,

17   objection as to asking for a legal conclusion, objection

18   as to being outside the scope of the court order.  But

19   he may answer.

20        A.  I'm not sure what a given map drawer would do.

21   But I think vote dilution would be a consideration and

22   something to do with redistricting.

23        Q.  For example, the congressional research service

24   report that you cite said protecting racial language

25   minorities from vote dilution is a consideration to be

Page 99

1   taken into account?

2        A.  Yes.

3        Q.  And you would agree that the existing Supreme

4   Court district 1 is 49.3 percent black voting age

5   population?

6        A.  I believe that's the case.  Point me to where

7   it's at in here again since I haven't reviewed this

8   report in a long time.

9        Q.  Well, we can look at Mr. Cooper's report on

10  page 17.  I believe those numbers are accurate.  Page

11  16, excuse me.

12       A.  Thank you.

13       Q.  Statistics of the current plan.

14       A.  I'm here.  So the question was?

15       Q.  The question was:  You'd agree that the black

16  voting age population of the current district 1 is 49.3

17  percent, 49.29?

18       A.  In 2020 it's 49.29 in district 1.

19       Q.  Uh-huh.  And you would agree -- and we can look

20  at those numbers -- for example, on page 27 of

21  Mr. Cooper's report, we start talking about the numbers

22  to the illustrative plans.  You would agree that

23  Mr. Cooper's plans increase the black voting age

24  population of district 1?

25       A.  Are you talking about Figure 11?

657fddd4-f0ef-43b0-bb10-e1f1abd7c8a1

White v. State Board of Election Commissioners                    David Arthur Swanson, Ph.D.

Page 100

1      Q.   Figure 11, Figure 13, the figures we talked

2  about.

3      A.   In --

4      Q.   Mr. Cooper's plans all increase the black

5  voting age population of district 1?

6      A.   In figure 7, it shows district 1 in 2020 as

7  having 49.29 percent; in Figure 11, illustrative plan 1,

8  2020 census, it shows district 1 with a percent 18 plus

9  black, which I'm assuming is the voting age population,

10  just stated a different way, is 55.31 percent.

11      Q.   So Mr. Cooper's illustrative plan 1 increases

12  the black voting age population of the district by just

13  6 points?

14      A.   That's correct.

15      Q.   And looking at Figure 14 on page 30,

16  illustrative plan 2 increases the black voting age

17  population of the district by a little under 5 points?

18      A.   You're asking about district 2 now?

19      Q.   District 1.  Excuse me.

20      A.   In district, Figure 14 shows it as being 54.19

21  percent.

22      Q.   All right.  So 4.9 percent increase in black

23  voting age population from 49.29; right?

24      A.   It's an increase from that, yes.

25      Q.   A 4.9 percent increase?

657fddd4-f0ef-43b0-bb10-e1f1abd7c8a1

White v. State Board of Election Commissioners                    David Arthur Swanson, Ph.D.

Page 101

1          A.   Approximately, yes.

2          Q.   So we talked earlier about racially polarized

3    voting.  Assuming the existence of cohesive racially

4    polarized voting patterns, increasing the black voting

5    age population at district by 5 or 6 points is going to

6    give black voters in that district a better chance of

7    electing their preferred candidate; right?

8               MR. WALLACE:  Objection to the form,

9    objection as to being outside the scope of any report,

10   and objection as to being outside the scope of the

11   court's order.  But he may answer if he can.

12         A.   Could you give me more hypotheticals on it?

13   Would this be assuming that all the race groups vote as

14   a block, for example?

15         Q.   Correct.  Assuming block voting by black

16   voters, block voting by white voters for different

17   candidate, if you increase the black voting age

18   population by 5 or 6 points as Mr. Cooper does, black

19   voters are going to have a better chance at electing

20   their preferred candidates?

21              MR. WALLACE:  Same objections.  He may

22   answer.

23         A.   So you're -- all else equal?

24         Q.   Yeah.

25         A.   Everything else equal, that's how you're asking

White v. State Board of Election Commissioners                    David Arthur Swanson, Ph.D.

Page 102

1    the question.  In block voting, etcetera, etcetera,

2    would appear that that would be the case.

3        Q.  Now let's talk about contiguity.  You don't

4    dispute that all the illustrative plans outlined in

5    Mr. Cooper's reports are contiguous, do you?

6            MR. WALLACE:  Same set of objections.  He

7    may answer.

8        A.  I'd have to go back and look at what he did

9    since I haven't reviewed this report and looked at it

10   for months until today.

11       Q.  What is "contiguity" in your understanding?

12       A.  It would -- meaning that you're trying to

13   retain some kind of existence over time as you go

14   through time.

15       Q.  If I --

16       A.  The characteristics would remain the same,

17   there's continuity.  It's not an abrupt change.

18            MR. WALLACE:  I think he asked about the

19   contiguity not continuity.

20       Q.  Correct.

21       A.   In that sense, it means geographic location of

22   people separated from one another.

23       Q.  Correct.

24       A.  Or units separated from one another.

25       Q.  Correct.  And in terms of geographic

657fddd4-f0ef-43b0-bb10-e1f1abd7c8a1

White v. State Board of Election Commissioners                    David Arthur Swanson, Ph.D.

Page 103

1  contiguity, all the districts in all Mr. Cooper's plans

2  are contiguous; right?

3      A.  I'd have to look, but I believe that's the

4  case.  What you're asking is, there's not a county, say,

5  in northeast Mississippi that's isolated and part of a

6  district 1, for example.

7      Q.  Yeah.  He didn't, like, just show Chickasaw

8  County in district 1 or something?

9      A.  That's correct.

10     Q.  Okay.  Same as the enacted plan, also

11 contiguous?

12     A.  I believe that's the case, yeah.

13     Q.  So let's talk about compactness.  Paragraph 72

14 of your report, page 38.  If you can turn there, that

15 would be advisable.  You say:  "Compactness is a tool

16 that can be used in redistricting to compare the

17 relative compactness of existing districts against new

18 districts to determine whether the new districts entail

19 minimal or large-scale changes from the existing

20 districts."

21     A.  And that's paragraph 72?

22     Q.  Yes.

23     A.  Thank you.

24     Q.  Starting with the words "compactness is a

25 tool."

White v. State Board of Election Commissioners          David Arthur Swanson, Ph.D.

Page 104

1        A.   I'm there.

2        Q.   You say:  "Compactness is tool a that can be

3    used in redistricting to compare the relative

4    compactness of existing districts against new districts

5    to determine whether the new districts entail minimum or

6    large-scale changes from the existing districts."

7        A.   Corrects.

8        Q.   What is the basis for that characterization of

9    what compactness is?

10              MR. WALLACE:   Same objection as being

11   outside the scope of the court's order, but he may

12   answer.

13       A.   In the sense of the legal requirements, what

14   compactness is, or some other kind of definition?

15       Q.   I just -- where did you get this

16   characterization of compactness that you offer up here?

17       A.   Are you asking me -- I'd have to go back and

18   look at my notes as to where I got it.  It's not on the

19   top of my head.  As I said, I haven't looked at this

20   report in months.

21       Q.   What does it mean to say that "compactness is a

22   tool that can be used in redistricting to compare the

23   relevant compactness of districts"?

24       A.   In that sense, it means how spread out are

25   they.

White v. State Board of Election Commissioners                David Arthur Swanson, Ph.D.

Page 105

1      Q.   When you say "compactness is a tool," are you

2  referring to the different compactness metrics like

3  Reock and Polsby-Popper and Schwartzberg?

4      A.   That's one of the ways of looking at it, what

5  the summary measures are that it might be.

6      Q.   Would you agree that compactness is a term that

7  refers to whether a district is regularly shaped?

8           MR. WALLACE:   Same objection plus legal

9  conclusion, he may answer.

10     A.   Yes.

11     Q.   And looking at a passage from the CRS report

12  that's Exhibit 11 -- do we still have that around here?

13  It should be under -- oh, right here.   There we go.

14           Looking back at Exhibit 11, page 11, let me

15  know when you're there.

16     A.   I am.

17     Q.   Okay.   That report from the CRS that you relied

18  upon says:   "From the geographic perspective,

19  compactness is usually defined by reference shapes, e.g.

20  most compact shape is a circle, followed by a square, a

21  rectangle or references to geographic measures such as

22  geographic dispersion perimeter measures or population

23  measures."   Do you agree with that?

24     A.   Yes.   It's consistent with what I answered

25  before, how distributed our points are.

657fddd4-f0ef-43b0-bb10-e1f1abd7c8a1

White v. State Board of Election Commissioners          David Arthur Swanson, Ph.D.

Page 106

1      Q.  And as you understand it, are there different

2  ways that someone evaluating a map can know whether a

3  district is sufficiently compact?

4      A.  You named some of the measures.

5           MR. WALLACE:  Same objections as before.

6  And person's evaluating a map is completely vague.  If

7  you're talking about a judge, I object to asking for a

8  legal conclusion.  You may answer.

9      A.  There are different measure for summarizing

10  what compactness is, as you listed before.

11      Q.  And there's no one particular method that's the

12  best method for assessing compactness?

13      A.  That was my understanding looking at the

14  different measures, they each have their own strengths

15  and weaknesses.  So in that sense, you're certain to

16  look at things like averages.

17      Q.  So, for example, in paragraph 73, you say:

18  "There's no professional consensus on the right measure

19  and every widely used measure works differently?

20      A.  Correct.

21      Q.  So there's no one definitive measure of

22  compactness?

23      A.  From the standpoint from what I could tell

24  looking at the literature, yes, that appears to be the

25  case.

657fddd4-f0ef-43b0-bb10-e1f1abd7c8a1

White v. State Board of Election Commissioners                    David Arthur Swanson, Ph.D.

Page 107

1    Q.  And Mr. Cooper in his responsive report on

2    page 8 -- and we can look at it or not, but I'll read

3    you the quote and you can --

4        A.  Just read it, sure.

5        Q.  But he says:  "Redistricting experts and map

6    drawers commonly employ an eyeball test to assess

7    whether a plan is reasonably compact."  Do you agree

8    with Mr. Cooper's statement there?

9        A.  I don't know what map drawers do commonly.

10       Q.  Because you're not a map drawer?

11       A.  Or -- that's correct.

12       Q.  You don't evaluate maps?

13       A.  Well, I don't know -- I don't know if people

14   who evaluate maps use an eyeball test or not routinely.

15   I don't know the answer to that.

16       Q.  You're not familiar with the eye test or the

17   eyeball test for measure compactness?

18       A.  What would the eyeball test be?

19       Q.  The eye test?

20       A.  You're just looking at somebody's -- how much

21   does it vary from being a circle, for example?

22       Q.  Yeah.  You're just looking with your eye to

23   assess the visual compactness of a district.

24       A.  I can understand people doing that, use a lot

25   of visual assessments in all sorts of things, but

White v. State Board of Election Commissioners                    David Arthur Swanson, Ph.D.

Page 108

1    whether that goes to the point where you're actually

2    going to say or use that in something or whether or not

3    you're going to use a metric, I don't know the answer to

4    that.

5        Q.  And let's just pull up what's been marked as

6    Exhibit 13.  This is that text that Mr. Bryan and

7    Mr. Morrison wrote.  And do you still have that,

8    Exhibit 13?

9        A.  Yeah, somewhere.

10           MR. WALLACE:  I'll give him mine if you can

11   give me the page number.

12           MR. SAVITZKY:  Page 48.

13           MR. WALLACE:  Okay.

14           MR. SAVITZKY:  And you tell me when you're

15   there.

16           THE WITNESS:  Thank you.

17   BY MR. SAVITZKY:

18       Q.  Do you see there's a paragraph about

19   compactness there?

20       A.  I do.

21       Q.  And the last sentence says:  "No one method is

22   best and the colloquial eyeball test of a district's

23   appearance and function may be germane."

24       A.  I see that.

25       Q.  So having reviewed the text written by

657fddd4-f0ef-43b0-bb10-e1f1abd7c8a1

Page 109

1   Mr. Morrison and Mr. Bryan, would you agree that the

2   eyeball test is one measure that is used to asses the

3   compactness of a district?

4           MR. WALLACE:  Same objection as asking for a

5   legal conclusion and being outside the scope of the

6   order.  The he may answer.

7       A.  And again, what I would stress is that they

8   wrote that as one possibility, but whether or not I

9   agree with the eyeball test being germane is not

10  necessarily my opinion.  I tend to look more at metrics

11  than eyeball test, but I understand there's a need for

12  things like that when you're -- when you don't have good

13  measures or you're initially looking at a project and

14  you need something qualitative to start off with.  So it

15  goes back to my answer being I'm not sure if it's

16  germane or useful or not or whether or not map drawers

17  use it all the time.

18      Q.  Okay.  Is it fair to say that a mapper who has

19  drawn many plans, a person who draws electoral maps and

20  has drawn many plans and looked at many districts is

21  going to sort of develop a better sense of whether a

22  district is compact visually?

23          MR. WALLACE:  Objection to the vagueness and

24  in addition to not knowing who a map drawer is, not

25  knowing what "better" is.

White v. State Board of Election Commissioners                    David Arthur Swanson, Ph.D.

Page 110

1     A.  I can't answer that question.  I don't know.

2     Q.  Is it fair to say that someone who reviews more

3  electoral districts is going to develop a sense of

4  whether a district is more or less visually compact?

5            MR. WALLACE:  Same objection.  He may

6  answer.

7     A.  And my answer again is I don't know.

8     Q.  On page 38, Footnote 29 of your report, you

9  cite a lecture by Gary King called "How to Measure

10  Legislative District Compactness If You Only Know It

11  When You See It."  Is that something that you rely on?

12     A.  And that's footnote?

13     Q.  29.

14            MR. WALLACE:  29 on page 38.

15            MR. SAVITZKY:  Yep.

16     A.  Yes, I recall.  Let me look at what I actually

17  put in the text for that.  Specifically, that says:  "In

18  contrast, academics have shown that compactness has

19  multiple dimensions and have generally many conflicting

20  measures."

21     Q.  And let's just mark as Exhibit 14 this is the

22  web page here.  And looking at the one, two, three --

23  third sentence -- the second sentence too.  Well

24  actually, take a look at it and then let me try to ask a

25  summary question.  Let me know when you've read the

657fddd4-f0ef-43b0-bb10-e1f1abd7c8a1

White v. State Board of Election Commissioners  David Arthur Swanson, Ph.D.

Page 111

1 first couple sentences.

2   A. Okay.

3   Q. So basically what they are saying is that

4 academics have developed many very complex measurements

5 of compactness but courts and other observers see

6 compactness as a sort of simple visual

7 you-know-it-when-you-see-it-type test. And they say

8 both of those are right, there are many complex and

9 multidimensional tests of compactness, but there is also

10 what they say is a particular unit dimensional ordering

11 that represents a common understanding of compactness in

12 the law across people. Am I accurately summarizing what

13 King is saying here?

14   A. And then he goes on to say that he's developing

15 a statistic model that predicts with high accuracy what

16 that is, yes.

17   Q. Based on this unidimensional sort of common

18 understanding that he's discerned?

19   A. Yes.

20   Q. And I just -- it's actually -- we're not going

21 to spend too much more time on it, but it totally's

22 fascinating. Did you look to the slides for the lecture

23 that King did?

24   A. I'd have to -- I don't recall. Like I said,

25 this is -- it's so long ago I did the report, I can't

657fddd4-f0ef-43b0-bb10-e1f1abd7c8a1

White v. State Board of Election Commissioners                    David Arthur Swanson, Ph.D.

Page 112

1   remember what I looked at now or not.

2        Q.  So I'm just going to mark the lecture slides as

3   Exhibit 15 here.  And again, I don't want to spend a ton

4   if time on it because this is a long, long lecture, but

5   if you can -- I'll point you to the page.  At 424, there

6   is a series of illustrating --

7        A.  Yes.

8        Q.  -- this unidimensional --

9        A.  Uh-huh.

10       Q.  -- you know it when you see it --

11       A.  Uh-huh.

12       Q.  -- metric; right?

13            MR. WALLACE:  Page 4 --

14            MR. SAVITZKY:  It's marked 424 at the

15   bottom.

16            MR. WALLACE:  4, slash, 24?

17            MR. SAVITZKY:  Correct.

18            MR. WALLACE:  Okay.  I was looking for 424.

19   Okay.

20       Q.  So you go down and each one is a click, you

21   click, click, click through --

22       A.  Yeah.

23       Q.  -- we see as we move through, once we see all

24   four districts there, this unidimensional ordering.  All

25   under the header:  "A simple single compactness

Page 113

1  dimension that you know when you see." Right? And as

2  we go on and see the text below, it says dimension is

3  intuitive; right?

4      A.  That's what he states.

5      Q.  Okay. And looking at this, does this give you

6  a sense of what the eyeball test is?

7          MR. WALLACE:  Well objection to the extent

8  the eyeball test is a legal test in which he has no

9  expertise.  But if he has an opinion on this report

10 subject to the fact that it's contrary to the court's or

11 order, he may answer.

12     Q.  And setting aside from whatever it might mean

13 as a legal matter, just --

14     A.  I have an opinion.

15     Q.  Yeah, go ahead.

16     A.  So if you look at the four figures on one of

17 these and since they all say 4/24, I'll have to point

18 this out to you.

19     Q.  Yes, I see it.

20     A.  Okay.  Suppose that the eyeball test I'm

21 looking at the first figure on the left, to the second

22 figure to the right of it, they're somewhere dissimilar.

23 If I look at the figure on the left to the far figure on

24 the far right, they're very dissimilar.  So these are

25 kind of simple examples of what could take place.  Is

White v. State Board of Election Commissioners                David Arthur Swanson, Ph.D.

Page 114

1   figure -- the third one to the right really different
2   than the fourth one to the right?  Is it more or less
3   compact?  Just eyeballing, it might be difficult to say.
4   And again, these are examples that he put up to
5   illustrate the point he's trying to make.
6            So in some cases, it may be that the eyeball
7   test doesn't work, and I could point to each of these
8   examples right here.  Is the figure, the third most
9   right one really more compact than the fourth most right
10  one?  You know, there would be questions from people
11  about that.  And as you get closer and closer, instead
12  of having these discreet illustrations, if you had more
13  of a continuous model and you're getting closer and
14  closer to the one on the far right, which one is more or
15  less compact?  It would be hard to answer, wouldn't it?
16       Q.  So looking at -- so would you agree if you're
17  visually with your eyes, you can make gross distinctions
18  but perhaps not fine distinctions?
19       A.  Or it may be the case that if you've got
20  something as extreme as what's on the far left here as
21  he examples and what's on the far right, then you can
22  say yes, it looks like the one on the far left is very
23  much more compact than the other ones.  And there's
24  going to other cases where I think the eyeball test is
25  going to be difficult to measure that.

657fddd4-f0ef-43b0-bb10-e1f1abd7c8a1

White v. State Board of Election Commissioners                    David Arthur Swanson, Ph.D.

Page 115

1     Q.  All right.  And Mr. Cooper states -- now we're

2    looking at -- going back to page 8 of his responsive

3    report.  This one we can definitely -- if you want to

4    keep a copy for later, it is a quite fascinating

5    lecture, but --

6     A.  Thank you.

7     Q.  Mr. Cooper states at page 8 of his rebuttal

8    report which I believe is Exhibit 10, which you should

9    have it there, he says --

10    A.  I've got 9.  Bear with me.

11    Q.  Yes.

12    A.  Thank you.  And where on Exhibit 10 are we

13   going?

14    Q.  Page 8.

15    A.  Thank you.

16    Q.  And he says:  "Using the eyeball test, the

17   illustrative plans and the least changed plans, I have

18   drawn are reasonably compact."  And you are not claiming

19   to dispute that statement, are you?

20            MR. WALLACE:  Objection as to being outside

21   the bounds of the court's order, but he may answer.

22    A.  And I was not asked to review this after he

23   wrote this report, so I can't give you an answer whether

24   or not I dispute at this point or -- or not at this

25   point.  I have to go back and reanalyze what he did.

White v. State Board of Election Commissioners                    David Arthur Swanson, Ph.D.

Page 116

1      Q.  I mean, you testified earlier that you did

2   review Mr. Cooper's rebuttal report.

3      A.  Yes, but I was not asked to actually do

4   something with it, to actually analyze it.  Do you

5   follow me?  So I looked at it, I read it, but I was not

6   tasked with or asked to go on and say something back in

7   regard to it.

8      Q.  And as you sit here now, you're not disputing

9   that statement?

10     A.  I can neither dispute or not dispute it at this

11  point.  Again, it's a research question, and I wasn't

12  asked to do that.

13     Q.  Well, I'm asking you as you sit here now, do

14  you dispute the statement Mr. Cooper makes that under

15  the eyeball test, the plans he drew are reasonably

16  compact?

17     A.  And again, I stress that since I haven't looked

18  at what he's arguing here with sufficient time ahead of

19  it to know, I can't answer that question directly.

20     Q.  Well, given that you're not saying you do

21  dispute it, can I take that to mean that you're not

22  currently disputing it?

23     A.  I -- I'm not saying that.  I don't have an

24  opinion at this time on it.  Would that be better?

25     Q.  That'll do.

657fddd4-f0ef-43b0-bb10-e1f1abd7c8a1

White v. State Board of Election Commissioners                    David Arthur Swanson, Ph.D.

Page 117

1      A.  Okay.

2      Q.  So getting back to the compactness analysis

3  that you did, we'll talk more about your report.  In

4  your report, you analyze compactness cores of the

5  illustrative plan supreme court districts that

6  Mr. Cooper drew, and you concluded that they are less

7  compact than the existing plan.  Is that generally --

8      A.  I believe that's the case, yes.

9      Q.  And you mentioned earlier this is -- Bryan

10  GeoDemographics did this analysis new?

11      A.  They did at my request, computed the scores,

12  put data together, that's correct.

13      Q.  And as far as you know, they used the ArcGIS or

14  ArcView program?

15      A.  I'm pretty sure that's what Tom Bryan used.

16      Q.  Were you able to verify the results that they

17  provided to you?

18      A.  In what manner?

19      Q.  I mean did you independently verify the results

20  that they gave you with respect to the compactness

21  scores of the district?

22      A.  You mean go ask somebody else who does GIS to

23  see if that's the case?

24      Q.  Sure, or do it yourself.

25      A.  I'm not capable of doing it myself in that

657fddd4-f0ef-43b0-bb10-e1f1abd7c8a1

White v. State Board of Election Commissioners                    David Arthur Swanson, Ph.D.

Page 118

1    regard since I didn't run GIS programs.  And no, I

2    didn't go ask anybody else to go review it.

3        Q.  And just looking at pages 40 to 43, we have

4    these various tables.  Did you design these tables in

5    this layout here or did Bryan?

6        A.  I asked him to put these together and then --

7    and give me information on them in regard to all these

8    measures of doing that, and that's what he did.

9        Q.  So Bryan GeoDemographics put these Excel tables

10   together?

11       A.  At my request, yes.

12       Q.  And after reviewing these various compactness

13   scores, you didn't conclude that the illustrative plans

14   are insufficiently compact in terms of adhering to

15   traditional districting principles, did you?

16           MR. WALLACE:  Objection to asking for a

17   legal conclusion on what's insufficient.  But he may

18   answer.

19       A.  That's correct.  Insufficient is not something

20   I can speak to.  They're just different from what the

21   existing plans were.

22       Q.  You're not offering an expert opinion on

23   whether the illustrative plans compactness scores are

24   insufficient to meet traditional districting principles?

25           MR. WALLACE:  Objection on -- objection to

657fddd4-f0ef-43b0-bb10-e1f1abd7c8a1

White v. State Board of Election Commissioners                    David Arthur Swanson, Ph.D.

Page 119

1  the extent traditional districting principles may be

2  incorporated into the law, and I'm not sure how much

3  that is, but I think you're still asking him for a legal

4  opinion.  But he may answer.

5      A.  Yeah, and insufficient is -- they're -- the

6  "scores" are not as good on average as the score of the

7  existing plan is my recollection on these in looking at

8  it.  Whether or not that means insufficiency, I don't

9  know.

10     Q.  You didn't offer -- you're not offering any

11 expert opinion that the compactness scores for the

12 illustrative plans mean that the districts plans are not

13 compact?

14             MR. WALLACE:  Objection to vagueness, but he

15 may answer.

16     A.  And again my answer is, they're -- the scores

17 in the sense of compactness are not as compact as what's

18 in the existing plan.

19     Q.  You didn't consider whether the compactness

20 scores of the illustrative plans are within the normal

21 or acceptable range of compactness for an electoral

22 districting map?

23             MR. WALLACE:  Objection to vagueness as to

24 normal and acceptable, but he may answer.

25     A.  I did not.

White v. State Board of Election Commissioners          David Arthur Swanson, Ph.D.

Page 120

1          MR. SAVITZKY:  And I'm now going to mark --
2     where are we at -- 16.  We're on the second binder.  I'm
3     now going to mark as Exhibit 16 a paper called
4     "Redrawing the Map on Redistricting" which was cited in
5     Mr. Cooper's rebuttal report.  There you go, copy for
6     Mr. Wallace.
7          MR. WALLACE:  16, you said?
8          MR. SAVITZKY:  Yes.
9          MR. WALLACE:  Okay.
10    BY MR. SAVITZKY:
11         Q.  So in looking at page 8 of Exhibit 16, we can
12    see that what the authors of this report did in their
13    Table 5 is, they looked at the mean compactness scores
14    for congressional districts in every state.  This is
15    following the 2010 redistricting cycle.
16         A.  What are the page numbers?
17         Q.  They are in very light gray at the bottom of
18    the page.
19         A.  Oh, wow.
20         MR. WALLACE:  There's something there.
21         A.  I see it okay.  And you're asking about page 8?
22         Q.  Yeah.
23         A.  The table, not the Figure 5.
24         Q.  Correct.  Table 5, exactly.
25         A.  Table 5.

657fddd4-f0ef-43b0-bb10-e1f1abd7c8a1

White v. State Board of Election Commissioners                    David Arthur Swanson, Ph.D.

Page 121

1    Q.  Exactly.  So looking at this table, we can see

2  in that the last round of congressional districting, the

3  mean Polsby-Popper score for congressional districts in

4  Mississippi was 23.33; is that right?

5    A.  I'm trying to go down and find Mississippi.  I

6  see it.  Thank you.  So they're ordered by rank of

7  score.  Okay.  23.33.

8    Q.  Is that right?

9    A.  Yes.

10   Q.  And the mean Schwartzberg score is 4758, .4758?

11   A.  47.58, yes.

12   Q.  And the mean Convex Hull score is 76.84?

13   A.  Yes.

14   Q.  And I just want to note for the record that

15  these are presented as whole numbers rather than

16  fractions, but I -- usually, I see them presented as

17  fractions between 0 and 1 or decimals between 0 and 1,

18  but I think we understand that we're referring to the

19  same range of between 0 and 1 or in this case between 0

20  and 100; is that right?

21   A.  I'd have to look to know that that's the case,

22  but I believe you, you have no reason to tell me

23  otherwise; right?

24   Q.  Yeah.  And then just looking at the Reock

25  score, we have mean Reock score of 38 --

657fddd4-f0ef-43b0-bb10-e1f1abd7c8a1

White v. State Board of Election Commissioners                    David Arthur Swanson, Ph.D.

Page 122

1      A.  That's correct.

2      Q.  -- 08?  Right.  So you didn't look at some type

3  of benchmark like this to assess the compactness scores

4  for Mr. Cooper's illustrative districts?

5      A.  I did not.

6      Q.  And just turning back to what again I think has

7  been marked as Exhibit 10, Mr. Cooper's responsive -- or

8  rebuttal report, that's right, Exhibit 10.  Or actually,

9  we can look at your report at page 40.  You list the

10 scores for illustrative district 1 right here or for all

11 of it, illustrative --

12          MR. WALLACE:  Hang on.  What page in --

13          MR. SAVITZKY:  Page 40 of your January

14 report.  And do keep what we marked as Exhibit 16 handy

15 because I want to just do a little quick head-to-head

16 look.

17 BY MR. SAVITZKY:

18     Q.  So looking at the scores, what I want to do is

19 compare the mean compactness scores for Cooper's

20 illustrative district 1 and mean compactness scores for

21 the Mississippi congressional districts that we were

22 looking at on page 8 of Exhibit 16.

23     A.  So we're comparing the supreme court district

24 scores to the congressional district scores.

25     Q.  Yes.  Mean, mean.  Exactly.

White v. State Board of Election Commissioners                    David Arthur Swanson, Ph.D.

Page 123

1          MR. WALLACE:  All right.  Let me objection

2     to the relevance of comparing a document -- a document

3     prepared by an expert witness with a plan ordered by the

4     United States District Court for the Southern District

5     of Mississippi, because Mississippi in 2012 was governed

6     by a plan written by Judge Kalley (phonetic), Judge

7     Wingate, and Judge Bramlette.

8          Q.  And I'll ask the question of the witness:  You

9     don't have any reason to think that the congressional

10    districting plan that was put into place in Mississippi

11    after the 2010 cycle was insufficiently compact or

12    didn't comply with traditional districting principles,

13    do you?

14         A.  I don't have an opinion on that.

15         Q.  Okay.  And what Mr. Cooper says when he cites

16    this report that we've introduced as Exhibit 16 is:

17    "Even in terms of compactness scores, the plans that

18    I've drawn are superior to many congressional

19    districting plans drawn in the past decade."  That's the

20    statement in his report.

21              MR. WALLACE:  And where it is in his report?

22              MR. SAVITZKY:  On pages 8 to 9, paragraph

23    19.

24              MR. WALLACE:  Okay.

25

657fddd4-f0ef-43b0-bb10-e1f1abd7c8a1

White v. State Board of Election Commissioners                David Arthur Swanson, Ph.D.

Page 124

1   BY MR. SAVITZKY:
2       Q.  So now looking at that, just looking at the
3   scores, the mean compactness scores that you report on
4   page 40 in Table III F.7.a and comparing those to the
5   mean compactness scores for this Mississippi
6   congressional district, we see Polsby-Popper score of
7   Cooper's illustrative plan 1 as .27 mean, so that's a
8   little higher than .23?
9                MR. WALLACE:  Objection to relevance and
10  objection as being outside the scope of the court's
11  order.  But he may answer if he can.
12      Q.  You would agree that that Polsby-Popper scores
13  are pretty similar?
14      A.  Given that they -- for supreme court districts
15  compared to congressional districts.
16      Q.  Yeah.
17      A.  They look fairly similar.
18      Q.  And the Convex Hull scores, also very similar,
19  Cooper's plan is just a little bit higher but basically
20  identical, .78 versus .6784?
21               MR. WALLACE:  Same objections.  He may
22  answer.
23      A.  I see the mean score Convex Hull here for
24  Mississippi as being in the congressional district,
25  76.84.

657fddd4-f0ef-43b0-bb10-e1f1abd7c8a1

White v. State Board of Election Commissioners          David Arthur Swanson, Ph.D.

Page 125

1        Q.  Yep.

2        A.  -- and then for Cooper's illustrative plan, I

3   see it at 78.

4        Q.  So Cooper's a little higher, but basically

5   identical?

6        A.  It's a little higher.

7        Q.  Okay.  And Reock, it's a littler lower, 37 for

8   Cooper's illustrative 1, .348 for the congressional

9   districting plan --

10       A.  Yes.

11       Q.  -- right?  So if you were to use Mississippi

12  congressional districts from last cycle as a benchmark,

13  Cooper's plans are in line with that benchmark?

14            MR. WALLACE:  Same objections, but he may

15  answer.

16       A.  It's difficult to say when you're crossing

17  districts like this and -- are they crossing points in

18  time as well whether or not they're suitable benchmarks?

19       Q.  But assuming that the benchmark is suitable,

20  they're comparable?

21       A.  It's a big assumption you're asking me to make

22  without knowledge of exactly, you know, all the details

23  in here.  But if you want me to say everything else

24  being equal, again, and assuming that it's all the same,

25  they're comparable.

657fddd4-f0ef-43b0-bb10-e1f1abd7c8a1

White v. State Board of Election Commissioners                David Arthur Swanson, Ph.D.

Page 126

1    Q.  Okay.  And looking at -- now we'll look at
2    Cooper's responsive report page 10, Figure 1.
3    Mr. Cooper does a compactness analysis, looks head --
4    the head-to-head comparison between the existing plan
5    and the illustrative plan 1.  Do you see that in
6    Figure 1?
7        A.  I do.
8        Q.  And with respect to the mean compactness, you
9    would agree that existing supreme court plan and
10   illustrative plan 1 are .01 apart on the Polsby-Popper
11   score; right?
12       A.  Yes.
13       Q.  And they're .01 apart on Convex Hull; right?
14       A.  Yes.
15       Q.  Cooper's a little higher on Convex Hull,
16   existing is a little higher on Polsby-Popper?
17       A.  Yes.
18       Q.  You would agree that a .1 difference is
19   basically identical?
20       A.  It depends on the contexts.
21       Q.  Okay.  You would agree they're substantially
22   similar?
23       A.  Again, depends on the context.  You know, if
24   you're looking at this from -- if you're doing a sample,
25   really large samples may have a very small difference in

657fddd4-f0ef-43b0-bb10-e1f1abd7c8a1

White v. State Board of Election Commissioners                    David Arthur Swanson, Ph.D.

Page 127

1    some measure you're looking at like income, and $10 is

2    enough to say it's different.  So I'm saying it depends

3    on the context.

4        Q.  In the context of evaluating compactness scores

5    like Polsby-Popper and Convex Hull, you would agree that

6    a difference of .01 is negligible?

7        A.  In general, that's what I agree with, yes.  So

8    in that context, yes.

9        Q.  Great.  And on the Reock -- oh, sorry.  And on

10   the Schwartzberg metric, the plans are exactly

11   identical?

12       A.  Yes.

13       Q.  So the two plans are either exactly or

14   essentially the same on three different metrics of

15   compactness?

16       A.  Yes.

17       Q.  And then with respect to the Reock score, the

18   mean Reock score for the existing plan is better at .51

19   versus .36?

20       A.  It's higher, yes.

21       Q.  Higher.  Excuse me.  But you don't conclude

22   that Reock is a better or more appropriate metric than

23   any of these other metrics, do you?

24       A.  One of the ways to look at them, because of all

25   these issues about it is to start looking at doing some

657fddd4-f0ef-43b0-bb10-e1f1abd7c8a1

Page 128

1   of an average of all the measures too since they all

2   have their strengths and weaknesses.

3        Q.  Are you aware of any instance in which the

4   different compactness metrics have been and or blended

5   together?

6        A.  Some of the work I've done, yes.

7        Q.  In the work that you've done, you averaged or

8   blended together compactness metrics like Polsby-Popper,

9   Reock, and Convex Hull?

10       A.  Or taking averages of them.  Is that in this

11  report that I did?  I'm just asking?  Since I haven't

12  looked at it in a long time, I just asking if I did

13  that.

14       Q.  I mean, I'll represent to you that I don't

15  recall your doing that in your report.

16       A.  Okay.  Then I may not have done it in is this

17  report.

18       Q.  Are you aware of any other person analyzing

19  compactness of district maps who's tried to blend or

20  average together the different metrics?

21       A.  Yeah, I think Tom Bryan has.

22       Q.  When did he do that?

23       A.  I don't recall, but I think he has.

24       Q.  Okay.  And looking at Figure 2 on the same page

25  of Mr. Cooper's report, he conducts a head-to-head

Page 129

1    comparison between existing district 1 and illustrative

2    plan district 1, right, so now he's looking at the mean

3    scores but at the compactness score for district --

4    district 1 in particular?

5         A.   Yes.

6         Q.   And identical Polsby-Popper scores for both

7    districts; right?

8         A.   Yes.

9         Q.   And on two of the remaining metrics, Convex

10   Hull and original Schwartzberg, the illustrative plan

11   district 1 is more compact than existing district 1;

12   right?

13        A.   It has higher scores in the Convex Hull and

14   lower score in the original Schwartzberg.

15        Q.   Has a lower score.  Okay.  Kind of got -- so

16   just stepping back, fair to say that on some of the

17   metrics, Mr. Cooper's illustrative plan one performs

18   better and on some of the metrics, the existing plan

19   performs better?

20        A.   In the sense of --

21             MR. WALLACE:  Objections -- same objections.

22   He may answer.

23        A.   Yes.

24        Q.   So let's talk about political subdivision

25   splits.  You agree that all of Mr. Cooper's illustrative

White v. State Board of Election Commissioners                  David Arthur Swanson, Ph.D.

Page 130

1   plans are drawn entirely on whole counties?

2       A.  I'd have to refresh my memory and look at his

3   report, but I believe that was the case.

4       Q.  You agree that necessarily because there are no

5   county boundaries split, the number of county splits is

6   zero?

7       A.  Correct.

8       Q.  And you agree the number of precinct or

9   election districts splits also necessarily zero?

10      A.  Since they're all within the same county, yes.

11      Q.  And so in terms of that metric of county and

12  precinct splits, plans are identical, existing plan,

13  Cooper's illustrative plans, all of them zero county

14  splits, zero precinct splits; right?

15      A.  Correct.

16      Q.  Let's talk about communities of interest.

17  What's your understanding of a community of interest?

18          MR. WALLACE:  Objection to the extent you're

19  asking for a legal opinion, but he may answer the

20  question.  Oh, and it's out of the court order, but

21  everything has been so far, so he may answer that.

22      A.  So there's a definition.  Do I have it in the

23  report somewhere of -- of that community of interest?

24  Is it in the report.

25      Q.  I'm not sure as I sit here whether you provide

657fddd4-f0ef-43b0-bb10-e1f1abd7c8a1

White v. State Board of Election Commissioners                    David Arthur Swanson, Ph.D.

Page 131

1    a comprehensive definition in your report but --

2         A.   And I don't recall if I did or didn't since I

3    haven't looked at it in a long time.

4         Q.   I mean, I ask you as someone who of offering

5    analysis of --

6         A.   So in general if you're asking me off the top

7    of head what it means, "community of interest," it

8    represents a lot of shared social and other

9    characteristics, economic characteristics.

10        Q.   You would agree it, basically, is a community,

11   a group of people that share some common resource or

12   interest or priority?

13        A.   Or social -- social, economic, and other

14   cultural characteristics, yes.

15        Q.   Got it.  You would agree there are many ways to

16   define a community of interest?

17        A.   There could be, yes.

18        Q.   So like a city or town could be a community of

19   interest?

20        A.   I guess it depends on the composition that's

21   their -- what criteria someone's specifically looking

22   at.

23        Q.   It could be a region or a group with a shared

24   history or culture?

25        A.   It could be.

657fddd4-f0ef-43b0-bb10-e1f1abd7c8a1

White v. State Board of Election Commissioners          David Arthur Swanson, Ph.D.

Page 132

1      Q.  Could be a region or a group of people with

2  shared policy interests or shared needs?

3      A.  It could be.  But I'd look at all those as

4  possible dimensions of something that could be even

5  broader if you're looking at community of interest.

6      Q.  So -- and is it fair to say when we talk about

7  communities of interest in the districting context, the

8  idea is that where reasonable, you should try to group

9  people with common interests in the same district?

10          MR. WALLACE:  Objection as seeking a legal

11  opinion, but he may answer.

12      A.  That's my picture of it.

13      Q.  And I'll represent to you that on page 48 of

14  that redistricting book which has been marked as Exhibit

15  13, Morrison and Bryan say:  "Respecting existing

16  communities of interest is often a proxy for ensuring

17  that people of common interests are grouped within the

18  same district."  Does that -- do you agree with that

19  statement?

20      A.  Yes.

21      Q.  Now, you don't analyze communities of interest

22  anywhere in your January report; right?

23      A.  I don't believe so.  I'd have to go back and

24  look in the sense of what the cluster analysis I did

25  was.

657fddd4-f0ef-43b0-bb10-e1f1abd7c8a1

White v. State Board of Election Commissioners                    David Arthur Swanson, Ph.D.

Page 133

1      Q.  Setting aside the cluster analysis, which we'll

2  talk about, you don't do any analysis that's relevant to

3  communities of interest?

4      A.  Not that I recall.

5      Q.  And you don't dispute that Mr. Cooper

6  considered Mississippi planning and development district

7  as a community of interest and evaluated that in his

8  report?

9      A.  I believe that he did.

10     Q.  And you don't dispute that a map drawer could

11 consider Mississippi's planning and development district

12 as a community of interest?

13          MR. WALLACE:  Same objection as to meaning

14 of "map drawer."  He may answer.

15     A.  It's possible.

16     Q.  As I think you point out in the beginning of

17 your report, Mississippi Supreme Court districts are

18 used for transportation, public service commission,

19 they're used for a number of appointed boards; right?

20     A.  They are.

21     Q.  So whether the interest of Mississippi's

22 various planning and development districts are fractured

23 or not by the designing of a plan could be important for

24 that reason as well?

25          MR. WALLACE:  Objection to the vagueness of

White v. State Board of Election Commissioners                David Arthur Swanson, Ph.D.

Page 134

1    the importance.  He may answer.

2         A.  It would be.

3         Q.  So in looking at -- and now we're back on

4    Mr. Cooper's October report, paragraph 35.  This is

5    Exhibit 9, I believe, yeah.

6              MR. WALLACE:  Paragraph what?

7              MR. SAVITZKY:  35.

8              MR. WALLACE:  Okay.

9              MR. SAVITZKY:  And I'll give you the page if

10   that would be helpful.  It is page 18.  And let me know

11   when you're there.  I'll just clear this out.

12             THE WITNESS:  Thank you.  I'm there.

13   BY MR. SAVITZKY:

14        Q.  And we can see on paragraph 35, Mr. Cooper

15   says:  "I show in the Figure 6 map" -- and if you want

16   to look at it, it's on me preceding page -- "the 1987

17   plan splits five of the ten regional planning

18   districts."  And then he lists them.  You don't dispute

19   that, do you?

20        A.  Let's see.  Let me go back here again.  So

21   you're talking about Figure 6?

22        Q.  Yeah.  Figure 6 is the existing plan overlaid

23   on those planning districts.  Mr. Cooper says five of

24   the ten districts -- planning districts are split in the

25   existing plan.  You don't dispute that, do you?

White v. State Board of Election Commissioners                    David Arthur Swanson, Ph.D.

Page 135

1      A.   No.

2      Q.   And he says:  "Supreme court district 1

3  contributes to each one of those splits, South Delta is

4  the only planning district entirely within supreme court

5  district 1."  You don't dispute that, do you?

6      A.   No.

7      Q.   And now turning to paragraph 51 of Mr. Cooper's

8  report, that would be on page 26, still on exhibit 9.

9  You don't dispute Mr. Cooper's statements in

10  paragraph 51 that:  "Illustrative plan 1 splits two

11  planning districts, North Delta and Central, rather than

12  five as in the 1987 plan?

13      A.   I believe that's correct.

14      Q.   And looking ahead to paragraph 56, you -- on

15  page 31, you don't dispute Mr. Cooper's statement the

16  illustrative plan 2 splits three planning districts

17  rather than five as in the enacted plan?

18      A.   That's correct.

19      Q.   Are you familiar with the Mississippi Delta?

20      A.   The Delta counties, the area?

21      Q.   Or the area that's the region in Mississippi

22  Delta?

23      A.   Yes, I am.

24      Q.   Is it fair to say based on your knowledge of

25  Mississippi that the Delta is a culturally,

White v. State Board of Election Commissioners          David Arthur Swanson, Ph.D.

Page 136

1  historically, demographically, socioeconomically

2  distinct region?

3          MR. WALLACE:  Objection to vagueness and

4  asking for a legal conclusion and being out of time

5  under the court's order, but he may answer.

6      A.  It certainly shares characteristics that are

7  common internally that are not common elsewhere in the

8  state of Mississippi.

9      Q.  And as someone who studied the demographics of

10  Mississippi, you would agree the Delta is culturally,

11  historically, demographically distinct?

12      A.  Of other places in Mississippi?

13      Q.  Yes.

14      A.  Yes.

15      Q.  And I would think it's fair to say that the

16  Mississippi Delta is one of the most culturally,

17  historically, demographically distinct geographic

18  regions in the entire South if not the nation.  Would

19  you agree with a that?

20          MR. WALLACE:  Same objection, but he may

21  answer.

22      A.  People in New Orleans might disagree.

23      Q.  Well, one of the most?

24      A.  Yeah.

25      Q.  Would you agree with that?

657fddd4-f0ef-43b0-bb10-e1f1abd7c8a1

White v. State Board of Election Commissioners                David Arthur Swanson, Ph.D.

Page 137

1      A.  Yeah, I believe it is.  Are you talking about a

2  personal opinion as opposed to a professional opinion?

3      Q.  Yeah.

4      A.  Absolutely.

5      Q.  Fair to say based on your knowledge of

6  Mississippi, that the Delta has distinct needs and

7  interests, for example, when it comes to health and

8  education?

9           MR. WALLACE:  Objection as to meaning of

10  distinct in addition to previous objections, but he may

11  answer if he can.

12      A.  It may or may not.  There's certain sections of

13  the state that are not in the Delta that may share some

14  of those characteristics and needs in common with Delta

15  counties.  So again, I would say it's a research

16  question, not something I can just answer off the top of

17  my head from a professional opinion.  As a personal

18  opinion, I would say yes, in general I think there are

19  issues like that that are common to a lot of Delta

20  counties, but they may be common with counties elsewhere

21  in Mississippi too.

22      Q.  But the concentration of those needs in the

23  Delta is somewhat unique?

24      A.  Again, it may be.  But part of the issue you're

25  talking about is rural.  Are rural areas of really

657fddd4-f0ef-43b0-bb10-e1f1abd7c8a1

White v. State Board of Election Commissioners                David Arthur Swanson, Ph.D.

Page 138

1   Northeast Missouri really different in the Delta in

2   terms of some of the needs?  That's -- again, I don't

3   know the answer to that off the top of my head of the --

4   looking at rural areas that are high in poverty that may

5   or may not have the same racial distributions, that may

6   or may not have the same access to resources.  So I

7   would suspect while there definitely are distinct areas

8   of interest in the Delta counties, I think they may

9   share some things with the counties elsewhere in the

10  State of Mississippi too.

11      Q.  You'd agree that the Mississippi Delta could be

12  considered a community of interest?

13      A.  It could be.  It depends on what kind of

14  criteria you're looking at.

15      Q.  Would you consider it a community of interest?

16      A.  Again, it depends on what someone was asking

17  me.  From the ecological standpoint?  From the cultural

18  standpoint?  From the music standpoint?

19      Q.  Sure.

20      A.  Yeah.  It could vary.  You know, there are

21  places on the Delta that would share a lot of common

22  history in terms of plantation stuff with the counties

23  over on the Alabama border, for example, and they're not

24  contiguous, they're different.  So if you look at the

25  counties in areas of Northeast Mississippi where they

657fddd4-f0ef-43b0-bb10-e1f1abd7c8a1

White v. State Board of Election Commissioners        David Arthur Swanson, Ph.D.

Page 139

1   sing not Delta Blues but Hill Blues.  You know, they're

2   different styles of music, so --

3      Q.  One aspect of the culturally distinct nature of

4   the Delta?

5      A.  That's one, yeah.

6      Q.  And the existing supreme court plan fractures

7   the Delta?

8         MR. WALLACE:  Objection to the meaning of

9   the word "fractures," but he may answer.

10      A.  I -- it's -- whether or not it fractures the

11   Delta, I can't say.

12      Q.  But we can just look briefly at page 16 of

13   Mr. Cooper's report right there --

14      A.  Sure.

15      Q.  -- and just looking at the map, the Mississippi

16   Delta is divided under the existing supreme court

17   districting plan; is that fair to say?

18      A.  Does page 16 show the supreme court districts

19   in colors, is that what you're saying?

20      Q.  Correct.

21      A.  And under the existing supreme court plan,

22   you're asking me how is it fractured?

23      Q.  I'm asking you if the existing plan divides the

24   Delta.

25      A.  Well, in what sense is divide the Delta?  Are

657fddd4-f0ef-43b0-bb10-e1f1abd7c8a1

Page 140

1   you --

2        Q.  Divides the Delta -- excuse me.  The plan

3   divides the Delta between multiple districts?

4        A.  So parts of the North Delta that are in here?

5   In the sense of these are, again, the planning districts

6   that are named in this map?  So from a planning district

7   standpoint, the North Delta district is in a separate

8   supreme court district than is the South Delta district.

9        Q.  And just setting aside the planning districts

10  for the moment, are you generally aware of which

11  counties are in the Mississippi Delta, the region, the

12  Mississippi Delta, as you understand it?

13       A.  I do.  You're talking about from Tunica down

14  towards Vicksburg generally?

15       Q.  And thinking about that region, that set of

16  counties from Tunica down to Vicksburg, the existing

17  supreme court plan divides that region between different

18  supreme court districts; right?

19       A.  If you're looking from the standpoint of Delta

20  counties, yes.

21       Q.  And we can just turn briefly to Mr. Cooper's

22  illustrative plan 1 on page 27.  And just looking at

23  that plan and thinking about the Mississippi Delta

24  region from Tunica Don to Vicksburg, Mr. Cooper's

25  illustrative district 1 unites the Delta in one

White v. State Board of Election Commissioners                    David Arthur Swanson, Ph.D.

Page 141

1  district; right?

2      A.  He also had some of the counties that I

3  wouldn't put in the Delta in that district, so it splits

4  off from other areas.  I mean, that's what it looks like

5  just looking at his map.

6      Q.  But in terms of the distinct region that we've

7  been talking about, the Mississippi Delta, it is kept

8  together in Mr. Cooper's configuration of the supreme

9  court map; right?

10      A.  You know, I'd have to think about DeSoto

11  County, whether or not it's really a Delta county or

12  not, that he's got on there, but that's one possibility.

13      Q.  Setting aside DeSoto County, the Delta is

14  united in Mr. Cooper's illustrative plan 1?

15      A.  Generally speaking, I would agree to that.

16      Q.  And just looking at page 30 of the report at

17  illustrative plan 2 -- are you on page 30?

18      A.  I am.

19      Q.  And you can see even if you include DeSoto

20  County, the Delta is united in this version of the plan;

21  right?

22      A.  Yeah, it varies again because now Lincoln

23  County is outside of it, and it was inside the Delta

24  initially.

25      Q.  Would you say that Lincoln County is in the

White v. State Board of Election Commissioners                David Arthur Swanson, Ph.D.

Page 142

1   Mississippi Delta?

2        A.   I'd have to look specifically, as I don't know

3   the answer to that, if it's a Delta county or not, if

4   I'd label it that way.  I don't know what all the

5   characteristics are in Lincoln County.  I can just see

6   looking at the two maps, that's one difference right

7   there.

8        Q.   Lincoln County is south of Vicksburg, isn't it?

9        A.   It's east.

10       Q.   South and east?

11       A.   Yeah.

12       Q.   Okay.  All right.  Let's talk about core

13  retention.  And turning back to your January report,

14  look at Table III.F.5 on page 37 of your January report.

15            MR. WALLACE:  On page what?

16            MR. SAVITZKY:  37.

17            MR. WALLACE:  Okay.

18  BY MR. SAVITZKY:

19       Q.   Oh, excuse me.  So your core retention analysis

20  begins on page 31, paragraph 62, but let's look at that

21  page 37, and look at that table that you have, it's the

22  core retention analysis by plaintiff's plan.  Let me

23  know when you're there.

24       A.   It may be a while since I have so many papers

25  here.

657fddd4-f0ef-43b0-bb10-e1f1abd7c8a1

White v. State Board of Election Commissioners                    David Arthur Swanson, Ph.D.

Page 143

1          MR. SAVITZKY:  When we take a break for
2     lunch, I'll come over and see what I can clean up there.
3     Page 37.
4          MR. WALLACE:  Now you're getting into
5     somebody else's report, that your problem.
6          THE WITNESS:  Yeah, that's it.
7          MR. WALLACE:  Is this yours?  We're missing
8     20 pages of it.
9          THE WITNESS:  It's in here somewhere.
10         MR. WALLACE:  I'll give you mine.
11         MR. SAVITZKY:  Do you mind if I come around
12    and sort things out or --
13         MR. WALLACE:  I can give him mine if you
14    want to get on with --
15         MS. SAVITZKY:  That's fine.  Yeah, during
16    the break, we can sort it out.
17    BY MR. SAVITZKY:
18         Q.  So just looking at Table III.F.5, your analysis
19    is that Cooper's illustrative plan 1 keeps
20    74.3 percent of Mississippians in the same district as
21    they were in in the existing supreme court plan; right?
22         A.  Yes.
23         Q.  And your analysis is that Cooper's illustrative
24    plan 2 keeps 66.8 percent of Mississippians in the same
25    district as they were in the existing plan; right?

White v. State Board of Election Commissioners                    David Arthur Swanson, Ph.D.

Page 144

1      A.  Correct.

2      Q.  And you say -- and we don't need to turn, I'll

3  represent to you -- you can turn there if you want.  But

4  I'll represent to you in the first instance in

5  paragraph 15 of your report you say:  "Core retention

6  for the illustrative plans is low."  You use the word

7  "low."  Do you recall that?

8      A.  I do.

9      Q.  What's the basis for your opinion that keeping

10  a supermajority of Mississippians in the same district

11  is a low level of core retention?

12          MR. WALLACE:  Objection as being outside the

13  scope of the court's order, but he may answer.

14      A.  It's just the drop-off in the percent of people

15  that are maintained.

16      Q.  Well I guess my question is:  Low compared to

17  what?

18      A.  Yeah, that's a good question.  Yeah.

19      Q.  I mean, did you compare this level of core

20  retention to --

21      A.  No.  And that's the case where just I used my

22  judgment and said it looked low.  I was comparing it

23  more and likely to what the existing plan was.

24      Q.  And --

25      A.  So it's lower.

657fddd4-f0ef-43b0-bb10-e1f1abd7c8a1

White v. State Board of Election Commissioners                David Arthur Swanson, Ph.D.

Page 145

1      Q.   And just -- so what is the basis for your
2   judgment that it's low?
3      A.   It would be comparing it to the existing plans.
4      Q.   Well, the existing plans are a hundred percent
5   the same as the existing plan.  So what's your basis for
6   saying that this level core retention is low as opposed
7   to, you know, relatively high?  Most of the population
8   is kept in the same district.
9      A.   I hear you.  I -- it just looked to me like it
10  was low when you get down to those numbers, that's all.
11  Just it's just my person opinion that it appeared to be
12  low.
13     Q.   Someone else could look and these numbers and
14  say that's a relatively high level of core retention?
15     A.   They could.
16     Q.   Now, in addition to looking at core retention
17  in terms of total population in the same district, you
18  also break down the differences in population
19  assignments by race between the existing plan and the
20  illustrative plans; right?
21     A.   Yes.
22     Q.   And what do you think is the purpose of that
23  analysis?
24          MR. WALLACE:  Same objection as to being
25  outside the scope of the court's order, but he may

657fddd4-f0ef-43b0-bb10-e1f1abd7c8a1

White v. State Board of Election Commissioners                    David Arthur Swanson, Ph.D.

Page 146

1   answer.

2         A.   Yeah, in the one sense that since the case is

3   about voting rights and specifically about black voting

4   rights, I thought it would be useful to look at that,

5   the issue of race.

6         Q.   So on page 33, just flip back a couple pages.

7   On page 33 top of the page you say -- and this is

8   discusses illustrative plan 1, by way of example, you

9   say:  "Only half of the white, non Hispanic population

10  from district 1 is retained, while 76.9 percent of the

11  any part black population is retained."  Right?

12        A.   Correct.

13        Q.   So is your point that the population -- is your

14  point that comparatively more white population has moved

15  out of the district?  Is that what you're saying?

16        A.   That's what the numbers show in a relative

17  sense, yes.

18        Q.   And what is -- is in your view, the relevance

19  of that in assessing these districts?

20             MR. WALLACE:  Objection as to asking A., out

21  of time; B., asking for a legal opinion.  He may answer

22  if he can.

23        A.   It just looks to me like their racial

24  differentiation was different in the sense of what

25  percent of one group is moved out, what percent of the

White v. State Board of Election Commissioners                David Arthur Swanson, Ph.D.

Page 147

1    other group that was moved out or stayed, that's all.

2        Q.   And discussed before that illustrative plan 1,

3    district 1 runs north to south on the western side of

4    the state encompassing the Delta, the counties along the

5    Mississippi River; right?

6        A.   Correct.

7        Q.   And that configuration is different from the

8    sort the Y-shaped configuration of the district 1 where

9    you have a band of counties going east towards Alabama

10   that are also included in existing district 1; right?

11       A.   That's correct.  All the districts generally

12   speaking in the existing plans run east to west

13   generally speaking.

14       Q.   So, I guess, doesn't it intuitively make sense

15   that comparatively, more white population would be moved

16   out of the district if you're moving that band of

17   counties stretching east to Alabama out of the district

18   and including the entire Mississippi Delta in the

19   district?

20            MR. WALLACE:   Objection to the vagueness of

21   'makes sense' in addition to the previous objections,

22   but he may answer if he can.

23       A.   Looking at race as a possible index of things

24   it would mean that some proportion of people may be

25   accustomed to having -- having things in common with

657fddd4-f0ef-43b0-bb10-e1f1abd7c8a1

White v. State Board of Election Commissioners                    David Arthur Swanson, Ph.D.

Page 148

1   elsewhere are now going to be put into whether they're

2   white or black in places that might have differences.

3   That's all.

4       Q.  I guess I just mean doesn't it sort of make

5   sense that you would see comparatively more white

6   population moved out of the district if you're

7   reconfiguring the district so that while maintaining

8   equal population, you're uniting the Mississippi Delta,

9   which --

10              MR. WALLACE:  Same objection.  He may

11  answer.

12      A.  My answer to that in general is that Northern

13  Delta may not have as much in common with the Southern

14  Delta as you think.  I'm just pointing out the fact that

15  you're moving differentially people by racial groups

16  around in doing this.

17      Q.  And just looking at page 28 of Mr. Cooper's

18  report, and that's Exhibit 9 just for the record.

19      A.  Page?

20      Q.  Excuse me.  Page 28, Figure 12.  Let me know

21  when you're there.

22      A.  I'm there.

23      Q.  So just looking at this map, you would agree

24  that this shows illustrative plan 1 overlaying with the

25  boundaries of congressional district 2, current

Page 149

1    congressional district 2; is that right?

2        A.   That what it appears to do.

3        Q.   And you would you agree that illustrative plan

4    district 1 was configured similarly to congressional

5    district 2 in the current congressional plan?

6             MR. WALLACE:  Objection, I guess, to the

7    vagueness of "similarly," but he can answer.

8        A.   It is similar.

9        Q.   All.  Now, is it -- and you can put that one

10   down for now.  Thank you.

11            So in addition to the illustrative plan, you

12   also did a core retention analysis of the least changed

13   plans.  And we're looking now again at your report --

14   your January report, page 37, that same chart that we

15   were looking that.  And that would be the summary table

16   of the core retention analysis.  And now looking at

17   the -- and when you're ready --

18       A.   I'm ready.

19       Q.   Looking at least change plans, your analysis is

20   that Cooper's least change plan 1 keeps 92.4 percent of

21   Mississippians in the same district as the existing

22   plan?

23       A.   Yes.

24       Q.   And in least change 2 plan, taking 95.8 percent

25   of Mississippians in the same plan as the existing plan?

White v. State Board of Election Commissioners                    David Arthur Swanson, Ph.D.

Page 150

1     A.  Yes.

2     Q.  And your analysis is:  "The changes in Cooper's

3  least change plans are 'minimal and not substantially

4  differentiated by race and ethnicity'"?

5     A.  Yes, I recall that.

6     Q.  So you would if that somebody wanted to

7  prioritize core retention, Cooper's least change plans

8  would demonstrate that this can be done while creating a

9  majority black voting age population supreme court

10  district 1?

11          MR. WALLACE objection to the -- objection to

12  the vagueness of "someone," but he can answer the

13  question.

14     A.  That appears to be the case.

15     Q.  And you have no basis to think that core

16  retention is, in fact, a consideration that a

17  Mississippi map drawer would consider?

18          MR. WALLACE:  Objection.  Once again, the

19  only map drawer of -- the only map drawer of Mississippi

20  supreme court districts in the last 200 years is the

21  legislature.  But he may answer.

22     A.  I -- I don't know.

23     Q.  And just stepping back, do you think it would

24  make sense to consider core retention in drawing -- in

25  redrawing districts that haven't changed for 35 years?

657fddd4-f0ef-43b0-bb10-e1f1abd7c8a1

Page 151

1          MR. WALLACE:  Objection to the vagueness of

2    makes sense, but he may answer.

3          A.  It's a principle regardless of how long they've

4    been around.  If you think, you know, these people have

5    something in common to politicians or whatever the case

6    may be that they're voting for, used to going certain

7    places, yeah.

8          Q.  When you say "used to going certain places,"

9    what do you mean?

10         A.  Well for example, if you're going to go vote,

11   you know, where the voting place is going to be and

12   things like that.

13         Q.  The supreme court lines don't affect where your

14   polling place is, do they?

15         A.  Well but you're -- if you're now in a new

16   district, that's what I'm getting at, now where your

17   vote is in a different district might be the case.

18         Q.  You mean, you wouldn't vote --

19         A.  If you're moving --

20         Q.  Your ballot would reflect a different district?

21         A.  Yeah, that's what I'm getting at.  And it might

22   be that you're not accustomed to people who are running

23   in that district, you don't know the history, things

24   like that; where as in the district you were in, you

25   would.  Just bring that up as a possibility.

White v. State Board of Election Commissioners                David Arthur Swanson, Ph.D.

Page 152

1      Q.  Looking at paragraph 68 of your report on page

2  36, you opine that your core retention analysis shows

3  that illustrative plans -- "shows that illustrative

4  plans 1 and 2 are significantly disruptive to large

5  numbers of Mississippians across the state in order to

6  achieve small increase in the percent APB in district 1.

7      A.  Correct.

8      Q.  So in addition to creating -- in addition to

9  increasing the percent APB in district 1 the changes in

10  illustrative plans also decrease the level of population

11  imbalance between the districts from the existing plan;

12  right?

13          MR. WALLACE:  Objection as out of time.  He

14  may answer it.

15      A.  I believe that was the case, yes.

16      Q.  And in addition to increasing the percent APB

17  in district 1, it changes in the illustrative plans,

18  also maintains a system with zero county splits and zero

19  precinct splits; right?

20      A.  That's correct.

21          MR. WALLACE:  Same objection.

22      Q.  And in addition to achieving small increases in

23  the percent APB in district 1, the changes in

24  illustrative plans also ensure that there are fewer

25  planning district splits right?

657fddd4-f0ef-43b0-bb10-e1f1abd7c8a1

White v. State Board of Election Commissioners                    David Arthur Swanson, Ph.D.

Page 153

1          MR. WALLACE:  Same objection and relevance

2    but he may answer.

3          A.  That appears to be the case.

4          Q.  And in addition to achieving small increases in

5    the percent APB in district 1, the changes in the

6    illustrative plans also unite the Mississippi Delta as a

7    communities of interest in the single supreme court

8    district; right?

9          MR. WALLACE:  Same objection, but he may

10   answer.

11         A.  If the entire Mississippi Delta is a single

12   community of interest that's a research question that

13   needs to be answered.

14         Q.  And assuming it is, then the answer to my

15   previous question is yes?

16         A.  If -- if that proved to be the case, that there

17   were enough commonalities to say that it is a community

18   of interest, it would be the case.

19         MR. SAVITZKY:  So I want to talk about your

20   cluster analysis next.  And I would be, you know,

21   just -- just stepping out of the questioning for a

22   second and in terms of our timing, I would be happy to

23   continue on discussing the January report and the sort

24   of mapping elements and then break and then discuss

25   voter turnout.  But if you folks would like to take a

657fddd4-f0ef-43b0-bb10-e1f1abd7c8a1

White v. State Board of Election Commissioners                 David Arthur Swanson, Ph.D.

Page 154

1    break earlier, we can stop here -- we're at the next

2    stopping place -- or any other time.

3              MR. WALLACE:  Whatever is convenient for

4    Dr. Swanson.  We've been going over three hours, but I'm

5    fine, we can break now or later, take your pick.

6              THE WITNESS:  So when would the break about

7    if it's not now?

8              MR. SAVITZKY:  Could be in 20 minutes, in 40

9    minutes, an hour.

10             THE WITNESS:  I prefer to do it now.

11             MR. SAVITZKY:  Okay.  That's why I asked.

12   So let's go off the record, then.

13        (A break was taken from 12:07 to 1:03 p.m.)

14             MR. SAVITZKY:  Back on the record.

15   BY MR. SAVITZKY:

16       Q.   Hope you had a good lunch, Dr. Swanson.

17       A.   It was.

18       Q.   Okay.  And you and Mr. Wallace didn't talk

19   about the substance of the case during lunch?

20             THE WITNESS:  Did we talk about the

21   substance of the case?

22             MR. WALLACE:  I --

23       A.   We had a long conversation and parts of it were

24   about things like that, but it was like a substantive

25   conversation, so what do you mean by a substantial

657fddd4-f0ef-43b0-bb10-e1f1abd7c8a1

Page 155

1    conversation?

2         Q.   Without get into the details of your

3    conversation, I just want to make sure there weren't any

4    sort of instructions about testimony or --

5         A.   Oh, no.

6         Q.   -- talking about the sort of -- about the

7    deposition?

8         A.   No.  He said -- the only thing he said to me,

9    said to answer questions as truthfully as you can.

10   That's about the instruction level I got.

11        Q.   Noted.  And I didn't want to elicit any

12   specific -- that is good advice.

13             MR. WALLACE:  We talked a lot about his

14   Indian cases.  If you want to talk about those, they're

15   probably in his CV too.

16             MR. SAVITZKY:  They are in the CV, but I

17   don't want to get into them.  All right.

18   BY MR. SAVITZKY:

19        Q.   So I think what we were -- we were just on the

20   cluster analysis.  So sticking with the January report

21   which you should still have in front of you, I'd like to

22   go to page 29 -- or excuse me, page 14, paragraph 19.

23   And before we get into the cluster analysis, just more

24   generally -- tell me when you're on paragraph 29.

25        A.   Yeah.

657fddd4-f0ef-43b0-bb10-e1f1abd7c8a1

White v. State Board of Election Commissioners                    David Arthur Swanson, Ph.D.

Page 156

1   Q.  So you say in paragraph 29:  "Compared to the

2   U.S. as a whole, Mississippi is not as diverse in terms

3   of race and ethnicity."  Do I have that right?

4   A.  Correct.

5   Q.  And what do you mean when you say "diversity"?

6   A.  The majority racial groups in Mississippi are

7   black and white.  And if you look at ethnicity -- and

8   you understand the way the census bureau uses ethnicity

9   as opposed to race; correct?

10  Q.  Yes.

11  A.  So the ethic distribution is not what you'd see

12  in a lot of other states as well.

13  Q.  So your point is that Mississippi is 36 percent

14  black, 56 percent white, relatively low percent of

15  Hispanic folks, so the vast majority of the population

16  is either black or white?

17  A.  Correct.

18  Q.  And where does that definition of diversity

19  come from?

20          MR. WALLACE:  Let me -- asleep at the switch

21  while I was drinking my coffee.  This is all outside of

22  the court's order.  And with that objection, he may

23  answer.

24  Q.  And where do you get that definition of

25  diversity?

White v. State Board of Election Commissioners                    David Arthur Swanson, Ph.D.

Page 157

1    A.   Racial diversity is a common one, start looking

2  at what the distribution is of people by race.

3    Q.   Well, would it be fair to say that if we

4  measured diversity by the percentage of nonwhite people,

5  non Hispanic white people, Mississippi would be one of

6  the more diverse states?

7    A.   If all you're looking at is two racial groups,

8  if you categorize and collapse everything into white and

9  nonwhite.

10   Q.   Yes.

11   A.   Then it would be a different story.

12   Q.   And looking at things that way, Mississippi

13  would be one of the more diverse states in the country?

14   A.   Yeah.  I -- I have trouble looking at diversity

15  from the standpoint of two categories.  I would use the

16  term "distribution" rather than "diversity."

17   Q.   How would you use the term "distribution"?

18   A.   Well, distribution.  So if you flip a coin, is

19  it 50:50 or is it an unbiased or a biased coin so it's

20  60:50?  So diversity in my head does not mean that

21  you're looking at what is the distribution between two

22  possible categories.  Diversity to me means there's more

23  than one or two categories.  Do you follow me?

24   Q.   I do.  And so your metric of diversity is how

25  many different categories are represented in the extent

657fddd4-f0ef-43b0-bb10-e1f1abd7c8a1

White v. State Board of Election Commissioners                    David Arthur Swanson, Ph.D.

Page 158

1    to which the population is distributed among many

2    different categories?

3         A.  Thank you.

4         Q.  Is that accurate?

5         A.  Yes.  That's more accurate than I think looking

6    at just two classes of whatever they might be.

7         Q.  Well, whether or not it's more accurate, that's

8    your definition of diversity?

9         A.  Yes.

10        Q.  And if we were to define diversity as what is

11   the percentage of people who are from racial and ethic

12   minority groups, then Mississippi is one of the more

13   diverse states?

14        A.  Then that would be your definition.  And that

15   what you just said, if we were to define it, so you

16   could define it that way.

17        Q.  And I know that --

18             MR. WALLACE:  And let me object to form.

19   Isn't somebody, everybody from a racial or ethic group?

20             MR. SAVITZKY:  Minority groups.

21             MR. WALLACE:  Oh, okay.

22   BY MR. SAVITZKY:

23        Q.  So -- and as someone who studies demographics,

24   reads about demographic issues, would you agree that

25   colloquially when people talk about the word

657fddd4-f0ef-43b0-bb10-e1f1abd7c8a1

Page 159

1   "diversity," they're generally referring to the amount

2   of people with the presence of members of racial

3   minority groups?

4        MR. WALLACE:  Objection to the vagueness and

5   irrelevance of colloquiality in a law court, but he may

6   answer.

7        A.  I'm not sure what they'd say in terms of

8   diversity in terms of colloquially.  It probably varies

9   from region of the U.S. to another region.  It certainly

10  would be probably very different in Hawaii than it would

11  be in Hawaii as opposed to in Mississippi or elsewhere.

12  So I'm not sure what to say in terms of a general

13  statement about that.

14       Q.  And looking at Exhibit 10, Mr. Cooper's

15  rebuttal report at paragraph 36.  And let me know when

16  you're there.  Do you see it?

17       A.  I do.

18       Q.  And do you dispute his assertion that:  "As

19  defined by the percentage of the state level population

20  that is not non Hispanic white, Mississippi is the 12th

21  most racially diverse state in the nation?"

22       MR. WALLACE:  You know, objection as to

23  being out of time, but you may answer.

24       A.  I just would not use the term "diversity" in

25  that sense.  He can, you know, and he says that whatever

657fddd4-f0ef-43b0-bb10-e1f1abd7c8a1

White v. State Board of Election Commissioners                    David Arthur Swanson, Ph.D.

Page 160

1    the ranking is and whatever he's computed it on, it's

2    the 12th most racially something in the -- I just

3    wouldn't use the word "diversity."

4          Q.   And so you would not dispute his assertion

5    that" "as defined by the percentage of the state level

6    population that is not non Hispanic white," using that

7    definition of diversity, "Mississippi is the 12th most

8    racially diverse state in the nation?

9          A.   Well, I don't know if it's the 12th most or

10   not.  That's another thing I would have to look up, so I

11   don't know the answer to it.

12         Q.   So you're not disputing it?

13         A.   Well, I can't say yes or no.  You're asking me

14   to state -- agree with the fact that I'm not sure if

15   it's 12th most racially diverse state in the county.

16   And what year?  Are we talking about the 2020 census?

17   The ACS?  I mean, there's a lot of places you could

18   measure this from.  I'm not trying to be obstructive,

19   but I'm just saying, you know, it's hard for me to

20   answer the statement just off the top of my head like

21   that.

22         Q.   And, I mean, looking at the paragraph, I think

23   Mr. Cooper says that it's looking at census data?

24         A.   Well, it couldn't be 2020 census data, was it?

25   I -- you know, I'm just asking.

White v. State Board of Election Commissioners                    David Arthur Swanson, Ph.D.

Page 161

1      Q.  Yes, 2020 census data.

2      A.  So he had 2020 census data when he wrote this

3  report?

4      Q.  Yes.

5      A.  Okay.

6      Q.  The report from October of 2022.

7      A.  Okay.  I mean, and it could be the case.  A lot

8  of information wasn't released that soon, but I'm -- I

9  don't know.  But the point is, I don't know if it's the

10  12th most diverse state in terms of whatever measurement

11  you've got or not because I don't know the source of his

12  data, I don't -- I haven't looked at a ranking like

13  that, so it's -- I can't answer the question.  I cannot

14  give you an opinion on it.

15      Q.  Have you ever seen your definition of diversity

16  used as a consideration in the electoral districting

17  context?

18          MR. WALLACE:  Objection.  I think it's

19  asking for a legal opinion, maybe it's a legal fact.

20  But I will allow him to answer.

21      Q.  I'm asking, to be clear, what you have

22  personally seen in your life and work in this area.

23  Have you seen this definition of diversity that you

24  proffered used in the electoral districting context?

25      A.  I don't know.

657fddd4-f0ef-43b0-bb10-e1f1abd7c8a1

White v. State Board of Election Commissioners                David Arthur Swanson, Ph.D.

Page 162

1      Q.  You can't recall any instance of it as you sit
2  here?

3      A.  No, I can't recall.

4      Q.  Does any source that you are aware of as
5  someone who's being proofed as an expert in this case
6  indicates that your definition of diversity is a proper
7  consideration in the electoral districting contest?

8            MR. WALLACE:  Same objection, but he can
9  answer it.

10     A.  So is it -- repeat that one again.

11     Q.  Well, let me ask it this way.  We looked at
12 that National Conference of State Legislatures report
13 that you relied on?

14     A.  Okay.

15     Q.  And we looked at that congressional research
16 service report that you relied on; right?

17     A.  Yes.

18     Q.  And we looked at that redistricting monograph
19 that Mr. Bryan and Morrison wrote?

20     A.  Yes.

21     Q.  And did any of those sources indicate that your
22 definition of diversity is an appropriate consideration
23 in the electoral districting context?

24     A.  Not that I recall.

25     Q.  And are you aware of any other sources that

657fddd4-f0ef-43b0-bb10-e1f1abd7c8a1

White v. State Board of Election Commissioners          David Arthur Swanson, Ph.D.

Page 163

1   indicate that your definition of diversity is an

2   appropriate consideration for the electoral districting

3   context?

4       A.  Not that I recall.

5       Q.  So if a map drawer -- and I'm asking you this

6   not as a legal conclusion but as someone who's being

7   proffered as an expert in this case -- if a map drawer

8   were to optimize for this definition of diversity that

9   you've laid out there, that would mean they would want

10  to spread the black population among the three

11  districts, right, so that they were maximally -- each

12  district was maximally diverse according to your

13  definition; right?

14              MR. WALLACE:  I adopt your objection to your

15  own question.  He can answer it.

16      A.  If you're looking at just a race, that's one

17  way you could do it, but there's other dimensions to

18  population composition beyond race.

19      Q.  Fair enough.  And so if a map drawer were

20  trying to optimize for racial diversity which is what

21  you were talking about when you said that Mississippi is

22  not as diverse in terms of race and ethnicity, if you

23  were trying to optimize for racial diversity, you would

24  spread the black population among the different

25  districts?

657fddd4-f0ef-43b0-bb10-e1f1abd7c8a1

Page 164

1          MR. WALLACE:  Same objection.  He may

2     answer.

3          A.  You mean in the sense of someone -- like you

4     said, a map drawer is trying to do something and looking

5     for diversity, and all you're looking at is black versus

6     one other racial category.

7          Q.  Yeah.  Or ir you're using your definition of

8     diversity to draw districts in Mississippi, if you were

9     trying to implement that definition and optimize for

10    racial diversity, you would spread the black population

11    across the districts so that all of them had black

12    population in them; right?

13         A.  Well, if you're just simply looking at the

14    categories, again, of where I told you white and black,

15    to me that's -- if you're using two categories, it's not

16    a good example of the use of the word "diversity."  So

17    you'd want to -- I'd introduce more elements than just

18    black -- distribution of the black population or the

19    white population or the Chinese population across all

20    the countries in Mississippi.

21         Q.  So would you say that your definition of

22    diversity or at least with respect to racial diversity

23    is not really something that an electoral map drawer in

24    Mississippi should factor in?

25         MR. WALLACE:  Same objection as before.

657fddd4-f0ef-43b0-bb10-e1f1abd7c8a1

White v. State Board of Election Commissioners                David Arthur Swanson, Ph.D.

Page 165

1      A.   I don't know.  It depends on the task, I guess.

2   I don't know.  I can't speak for other map drawers or

3   any map drawers.  I don't know.

4      Q.   Well speaking for yourself and a person who's

5   offering expert opinions about the qualities of

6   electoral maps in this lawsuit, are you saying that

7   one -- that you would consider the racial diversity of

8   different districts in evaluating the districting plans?

9      A.   Along with other measures of diversity, other

10  measures of how human beings vary.

11     Q.   And if you were optimizing for that definition

12  of racial diversity that you described, that would mean

13  drawing three black minority districts; right?

14     A.   Again, I stress that I'm not looking at it just

15  in terms of race.  So when looking at the human -- you

16  know, the composition of the population, you're looking,

17  as I did, beyond race and what diversity might

18  represent.

19     Q.   So you don't think it's a good idea to look at

20  racial diversity as you've described it?

21     A.   I didn't say that.  I said I would look at

22  things beyond that if I'm looking at diversity.

23     Q.   You wouldn't look just at racial diversity?

24     A.   That's correct.

25     Q.   Okay.  So let's -- and just -- let's go to

657fddd4-f0ef-43b0-bb10-e1f1abd7c8a1

White v. State Board of Election Commissioners                    David Arthur Swanson, Ph.D.

Page 166

1   paragraph 31, which I think we're basically on in your

2   report, your January report, excuse me.  This is pages

3   15 into 16.  Just briefly, you know that the supreme

4   court districts are also the districts that are used for

5   various other elective and appointive offices in

6   Mississippi; right?

7        A.  I do.

8        Q.  And what's the relevance of that in your

9   opinion as someone who's being proffered as an expert in

10  this case?

11           MR. WALLACE:  Objection to the extent you're

12  asking him for a legal opinion on relevance, but he may

13  answer.

14       A.  They're important in the sense that they --

15  that those districts determine a lot of other issues

16  that go on in the state like the institutes of higher

17  learning and appointments of boards and the bar and the

18  bar exam board.

19       Q.  Is it your opinion that having one of the three

20  supreme court districts be majority black voting age

21  population would decrease diversity in state government

22  in Mississippi?

23           MR. WALLACE:  Again, objection as outside

24  the scope of the court's order, but he can answer.

25       A.  And again, I'd stress that my answer is, it's

White v. State Board of Election Commissioners                    David Arthur Swanson, Ph.D.

Page 167

1   beyond race and it's not just affecting the government

2   in Mississippi.  So I think it's important in that

3   regard whether I was going to use diversity of the

4   population measuring a lot of dimensions.

5        Q.  And just on this point, you're not saying,

6   you're not opining that having one of the three supreme

7   court districts be majority black would decrease

8   diversity in state government?

9        A.  I don't know the answer to that question.  I

10  don't know if diverse -- when you say diversity in state

11  government, people who work for the state?  What's the

12  question you're asking?

13       Q.  People who are appointed to -- I mean, you --

14       A.  Okay.

15       Q.  We're talking in reference to these various

16  appointed and elected offices.

17       A.  Okay.  So you're talking about the appointive

18  offices, not people who are necessarily employes of the

19  State of Mississippi; right?

20       Q.  Right.  With respect to those offices that you

21  mentioned in this part of your report, you are not

22  opining that the occupants of those offices will be less

23  diverse if one of the three districts is majority black?

24       A.  I don't know the answer, yeah, and I haven't

25  opined on that, and I'm not in a position to do that

White v. State Board of Election Commissioners                    David Arthur Swanson, Ph.D.

Page 168

1  now.

2      Q.  Now, you mentioned The Institute of Higher

3  Learning, and I believe you note in your report that the

4  12-member body that's appointed by the governor of

5  Mississippi, 4 members for each of the three districts?

6      A.  I believe that's correct.  I'd have to look in

7  my record, but I believe that's correct.

8      Q.  Yeah, you say:  "In regard to IHL, 4 of the

9  12-member board of trustees for the state IHL are

10  appointed by the governor from each of the three supreme

11  court districts."  Do I have that right?

12      A.  You do.

13      Q.  And you say in paragraph 31, and you mention

14  this again later as well, you say:  "The board has a

15  diversity statement."

16      A.  It does.

17      Q.  And you cite Section 102.06 of the board's

18  policy manual, and you say it acknowledges the value of

19  the diversity for Mississippi.

20      A.  Yes.

21          MR. SAVITZKY:  And we'll just mark that.

22  Copy for you, copy for Mr. Wallace.

23          MR. WALLACE:  What number?

24          MR. SAVITZKY:  This is going to be -- oh.

25  Dr. Swanson, could I please that have back?  Thank you.

657fddd4-f0ef-43b0-bb10-e1f1abd7c8a1

Page 169

1    I was quick on the draw there.  Here you go, No. 17.

2    BY MR. SAVITZKY:

3        Q.  This is the IHL board of trustees' policies and

4    bylaws that you reference in your report.  And then

5    looking at pages 14 and 15 of this document, we see the

6    diversity statements that you reference there.  Let me

7    know when you're there and confirm that that's the

8    diversity statement that you're referencing?

9        A.  I'm there.

10       Q.  Okay.  And looking at this statement and

11   especially looking at on page 15, you would agree that

12   the board here adopts a set of goals for higher

13   education in Mississippi --

14       A.  Yes.

15       Q.  -- related to diversity?

16       A.  Yes.

17       Q.  And the goals they adopt are:  "One, to

18   increase the enrollment and graduation rate of

19   underrepresented students at our institutions"?

20       A.  Yes.

21       Q.  "Two, to increase the employment of

22   underrepresented individuals in administrative faculty

23   and staff positions?"

24       A.  Yes.

25       Q.  "Three, to enhance the overall educational

White v. State Board of Election Commissioners                David Arthur Swanson, Ph.D.

Page 170

1  experience through infusion of curricular content and

2  cocurricular programming that enhanced multicultural

3  awareness and understanding?"

4      A.  Yes.

5      Q.  "Four, to increase the use of unrepresented

6  professionals, contractors, and other vendors?"

7      A.  Yes.

8      Q.  Fair to say that the diversity goals adopted by

9  IHL focus on representation for "underrepresented

10 individuals"?

11     A.  Yes.

12     Q.  Not necessarily on -- strike that.

13         In your view, is anything about these goals

14 diminished by changing the supreme court district so

15 that one of them is majority black voting age

16 population.

17     A.  I don't know the answer to that question.

18     Q.  Do you offer any opinion that these goals,

19 these diversity goals, would be diminished in any way by

20 having one of the supreme court districts be majority

21 black?

22     A.  Are you talking about the four points that's

23 you just raised?

24     Q.  Yes.

25     A.  I don't know the answer to that.

Page 171

1      Q.   You don't offer an opinion on that?

2      A.   Not at this point in time.

3      Q.   And you can put that one aside right in this

4 pile here.

5          And now let's talk about your cluster

6 analysis going to paragraph 90 of your report, not page

7 90 --

8      A.   I understand.

9      Q.   -- which I just turned to. All right. So

10 beginning at paragraph 90 of your report, your January

11 report, you conduct what you call a diversity

12 evaluation; right?

13      A.   I do.

14      Q.   And you base that on what you call a cluster

15 analysis; right?

16      A.   Correct.

17      Q.   And you say that you conduct this cluster

18 analysis to evaluate the issue of population diversity?

19      A.   Socio and economic diversity is in that too.

20      Q.   Well just looking at that first paragraph 90,

21 the last sentence, you say --

22      A.   Population diversity, correct.

23      Q.   Right. And to do the cluster analysis, you

24 took county level data on a number of the different

25 indices of health and wellbeing from the 2017

657fddd4-f0ef-43b0-bb10-e1f1abd7c8a1

White v. State Board of Election Commissioners      David Arthur Swanson, Ph.D.

Page 172

1  Mississippi Health & Hunger Atlas?

2      A.  I did.

3      Q.  And before we talk about that, why didn't you

4  use ACS data?

5          MR. WALLACE:  All right.  Now that you've

6  asked a question, I'm going to ask -- I'm going to

7  object to that as being outside the scope of the Court's

8  order, but he may answer it.

9      A.  It's a consistent set of data which may or may

10  not include some census bureau data in there that goes

11  beyond what you can get from the ACS.

12      Q.  Oh, it includes --

13      A.  It may or may not.

14      Q.  -- the ACS data?

15      A.  It may or may not.  I'd have to go back and

16  look, but I'm sure it has census data of some sort in

17  there somewhere, but I have to go back and look and

18  refresh my memory.

19      Q.  Was there a more recent version of the

20  Mississippi Health & Hunger Atlas available?

21      A.  Not when I contacted people at Ole Miss.  I

22  got --

23      Q.  And you got -- I'm sorry.  Please finish.

24      A.  I got it from people at Ole Miss, my former

25  colleagues.

White v. State Board of Election Commissioners                David Arthur Swanson, Ph.D.

Page 173

1    Q.  And as far as you know, they gave you the most

2    recent version?

3    A.  The only version as far as I know.

4    Q.  So you say -- and I think this is in

5    paragraph 93 of your report on page 37, you say:

6    "Health and hunger are correlated with socioeconomic

7    status which in turn in correlated with race."  Is that

8    right?

9    A.  Correct.

10   Q.  And so in your view, the health and hunger

11   indices also serve as indices of race and socioeconomic

12   status?

13   A.  They're --

14        MR. WALLACE:  Same objection.  He may

15   answer.

16   A.  They're correlated.

17   Q.  Okay.  And just looking at the last sentence of

18   this paragraph, you say:  "These correlations support

19   the argument that the health and hunger indices also

20   serve as indices of race and socioeconomic status."

21   A.  Correct, right.

22   Q.  And just in layman's terms, is your point that

23   black Mississippians are worse off in terms of health

24   and hunger and other socioeconomic metrics than white

25   Mississippians?

657fddd4-f0ef-43b0-bb10-e1f1abd7c8a1

White v. State Board of Election Commissioners                    David Arthur Swanson, Ph.D.

Page 174

1          MR. WALLACE:  Same objection.  He can

2     answer.

3          A.  It was my point that any group is better or

4     worse off in terms of that, just some groups may be

5     higher in some indices and other ones lower in other

6     indices.  That's my point.

7          Q.  What do you mean when you say that:  "The

8     health and hunger indices also serve as indices of race

9     and socioeconomic status"?

10         A.  Well then in that case, generally speaking,

11    that if you're -- if you score low on one dimension,

12    you're probably going to -- it's going to be correlated

13    with a low score in another dimension.

14         Q.  So -- and specifically, if you score low on the

15    health and hunger indices in that data you looked at,

16    you would also be likely to score low on other

17    indicators of socioeconomic status?

18         A.  Yes.

19         Q.  And you would also be more likely to be black?

20         A.  It depends on the part of the state you're in.

21    There may be parts of the state where you have rural

22    white folks, for example, that would probably score

23    similarly if -- where you're looking at different parts

24    of state.  But yeah, in general, I'd say you're probably

25    more likely to be black.

White v. State Board of Election Commissioners                David Arthur Swanson, Ph.D.

Page 175

1      Q.  Let's talk about how you created these indices.
2  And I'm looking, for reference -- you can do too if you
3  want, but I'll ask you questions and see if you want to
4  look.  I'm looking, for reference, at page 48 in your
5  report in Exhibit III.H.1.  To create your need index,
6  you use nine different health need indicators like teen
7  pregnancy and adult obesity; is that right?
8      A.  This is what the people did who put the Hunger
9  Act list together, they -- the need indicators, this is
10  what they created, not me.
11      Q.  Okay.  So you used the indices sort of fully
12  formed as provided to you in the Health & Hunger Atlas?
13      A.  Correct.
14      Q.  Okay.  So you used a need index from the Health
15  & Hunger Atlas that includes nine different health need
16  indicators like teen pregnancy and adult obesity?
17      A.  I'd have to look to see exactly which ones I
18  used, but in general these were the variables that were
19  available to use as they categorize them from the
20  report.  But I don't recall which ones, if all of them I
21  used or some that were specific.  So we need to go
22  through that.
23      Q.  Well, let me ask you this:  Do you know how
24  these different indices were constructed by the folks
25  who put together the Health & Hunger Atlas?

657fddd4-f0ef-43b0-bb10-e1f1abd7c8a1

White v. State Board of Election Commissioners                David Arthur Swanson, Ph.D.

Page 176

1      A.  They wrote it up in the hunger atlas, and I
2  don't recall off the top of my head what they said.  I'd
3  have to go back and review the atlas.
4      Q.  And do you know the source of the different
5  metrics that they include in these indices?
6      A.  You'd have to go back and look at the -- it's
7  in there.  They have it documented.
8      Q.  Do you know that the sources that they used for
9  these indices are reliable?
10      A.  My general impression in my memory based on the
11  work they did and the people who did it, I don't think
12  they would pick indices and data that were from sources
13  that were not reliable.  But if you're asking if I went
14  back and independently verified it for myself, I didn't.
15      Q.  Do you know why they created this particular
16  index of metrics?
17      A.  I think it has to do with looking up
18  Mississippi.  So again, if you -- you need to look at
19  their report to see what they say in terms of what the
20  goals exactly of the report were.
21      Q.  And so you actually use a number of indices.
22  You have a need index, you also have a hunger -- sorry,
23  you have a health need index, and you also have a hunger
24  need index ; right?
25      A.  Well when you say I have, those, again, are how

657fddd4-f0ef-43b0-bb10-e1f1abd7c8a1

White v. State Board of Election Commissioners                    David Arthur Swanson, Ph.D.

Page 177

1    they classified the indicators they used.  So I would

2    say those -- this is a description of what they have in

3    the report and how they categorized it.

4         Q.  So you used the Health & Hunger Atlas's need

5    index and its hunger -- or excuse me, their -- yes,

6    their need index -- their health need index, excuse me,

7    and their hunger need index, you used both of those for

8    your diversity analysis?

9         A.  Yes.  I'd have to go back and see if I actually

10   pulled off the individual elements of each index or used

11   the index, because I don't recall off the top of my head

12   what I did.  Do you follow me?  I can't recall now that

13   if I used the index in itself or if I used the

14   individual indicators in there as part of the cluster

15   analysis.

16        Q.  So you don't know whether you used all the

17   different indicators that are listed here?

18        A.  As I said, the last time I read this report was

19   months and months ago, so I've haven't thought about it

20   until today when you started asking me questions on it.

21   So I need go back and look at how I aggregated.  So the

22   basics of that, I -- I would need to go back and review

23   what I did for it to see what's in there.

24        Q.  You say:  "These two indices form the input for

25   the cluster analysis."

657fddd4-f0ef-43b0-bb10-e1f1abd7c8a1

White v. State Board of Election Commissioners                David Arthur Swanson, Ph.D.

Page 178

1      A.   Okay.   Then -- then that's what it has, these
2  two indices.   Where are you at?
3      Q.   I'm looking the second to the last sentence in
4  paragraph 94.
5      A.   Then that's what I did.
6      Q.   And when you say "these two indices," you're
7  referring to the need index which includes both health
8  indicators and hunger indicators, and the second one is
9  the performance index which includes health and hunger
10 indicators; right?
11     A.   Yes.
12     Q.   And so you took all these different indicators
13 from these two indices, and those are the inputs for
14 your cluster analysis?
15     A.   Well, let's look at Appendix 2, because it says
16 I list them in Appendix 2.   J.
17     Q.   And that would be starting at page 94 of your
18 report?   Excuse me, page 93.
19     A.   Thank you.
20     Q.   Yep.
21     A.   Now I can see it.   Yeah, I used their indices
22 in need and the performance indices.   Thank you.
23     Q.   And again, you didn't select these different
24 indicators, you just used the two indices that the
25 Health & Hunger Atlas people put together?

White v. State Board of Election Commissioners                    David Arthur Swanson, Ph.D.

Page 179

1      A.  That's correct.

2      Q.  Someone could have selected a different set of

3  indicators to measure health and hunger in Mississippi?

4      A.  Well if there are data available, I guess they

5  could have and want to construct it.

6      Q.  You could have constructed one out of ACS data?

7      A.  I don't think you're going to get SNAP

8  enrollment and primary care physicians for 100,000

9  food-insecure individuals, you know, whatever else may

10  be in here that's necessarily in ACS data.  You may or

11  may not.  But if you did, you'd have to go to a lot of

12  different reports to find it.  And if that's what you're

13  asking me, and you may end up having to use ACS data

14  from different time points.

15      Q.  And to be clear, I'm not trying to knock you

16  for, you know --

17      A.  Yeah, I understand.

18      Q.  -- for not doing that, I'm just -- I want to

19  make sure this isn't the one definitive set of

20  indicators that one could use to measure health and

21  hunger, this is the one that the Mississippi Health &

22  Hunger Atlas people happened to choose; right?

23      A.  That's correct.  And relates directly to

24  Mississippi.  And in that sense, it was convenient in

25  the sense that it's all assembled in one place and

657fddd4-f0ef-43b0-bb10-e1f1abd7c8a1

Page 180

1    relates to the State of Mississippi?

2        Q.   Now, how does this -- how do these indicators

3    help you measure population diversity?

4        A.   From the correlations that I described there in

5    the report.  If you go back to what you just read

6    about --

7        Q.   Well --

8        A.   -- in paragraph 93.

9        Q.   Uh-huh.  So when you say population diversity,

10   you mean diversity with respect to health and hunger

11   needs and issues?

12       A.   And they're correlated with other forms of

13   diversity such as race and socioeconomic status.

14       Q.   And you say that this analysis:  "Enables us to

15   understand the geographic distribution of population

16   diversity beyond the raw percent any part black for each

17   county."

18       A.   Yes.

19       Q.   So doesn't it only enable us to understand the

20   geographic distribution of this particular definition of

21   diversity that you've constructed using the

22   Health & Hunger Atlas indices?

23               MR. WALLACE:  Object to the form as being

24   outside of the scope of the court's order, but he may

25   answer.

657fddd4-f0ef-43b0-bb10-e1f1abd7c8a1

White v. State Board of Election Commissioners                    David Arthur Swanson, Ph.D.

Page 181

1        A.   And to the extent, again, that they're

2   correlated with these other socioeconomic indicators

3   including race, I would say they represent a reasonable

4   index for doing that.

5        Q.   And your unit of analysis in conducting this

6   cluster analysis is the county; right?

7        A.   Correct.

8        Q.   So what you're seeing is the distrubution of

9   high or low need counties among the different districts;

10   right?

11        A.   Correct.

12        Q.   So I think you'd agree with me that there are

13   some counties in Mississippi that are small in

14   population and some that are very large in population;

15   right?

16        A.   The needs -- I think you'd have to took at the

17   report again, and I don't believe they're biased by the

18   number of people in the county, I believe the need

19   indicators are set up, and you can see it in here where

20   they're talking about percentages and rates.  So in a

21   sense you're trying to be dimensionalist, you're

22   certainly going to have a lot more people one category,

23   say, in Hinds County than you would in some other

24   smaller county.  But when you start looking at things

25   like rate, it means they're trying to be dimensionalist.

657fddd4-f0ef-43b0-bb10-e1f1abd7c8a1

Page 182

1    Q.  But I guess my point is just in terms of what

2    we can take from your analysis, it doesn't speak to the

3    distribution of population across the districts, it

4    speaks to distribution of counties with certain

5    characteristics across the districts?

6    A.  It speaks to the distribution of these

7    indicators across counties, and what that speaks to

8    going beyond the -- back to paragraph 93 is the

9    correlation that they have with socioeconomic and racial

10   categories.

11   Q.  Now, you could have designed some cluster

12   analysis that looks at the distrubution of population;

13   right?

14   A.  How would you do that?  Could you give me an

15   example?

16   Q.  Looking at the number of people with particular

17   health needs or hunger needs?

18   A.  Well that's what this does, but it looks at,

19   again, rates not numbers, so attempts to make it

20   dimensionalist so you're not affected by what the

21   population size is in a given county.

22   Q.  Right.  And you -- but you could have looked at

23   the number of people as opposed to the rates that you're

24   seeing in the particular need?

25   A.  Well, the number if people would be affected by

657fddd4-f0ef-43b0-bb10-e1f1abd7c8a1

White v. State Board of Election Commissioners                    David Arthur Swanson, Ph.D.

Page 183

1    the population counts in the counties then.

2         Q.  Right.  But your analysis looking at the

3    distribution of the counties of particular rates doesn't

4    indicate whether one supreme court district has a very

5    large county with high need and therefore there are more

6    unhealthy or hungry people in that district?

7              MR. WALLACE:  Object as being out of the

8    time and argumentative, but you may answer.

9         A.  Yeah.  Well my take is if you're looking at an

10   index of need, it's indicating need.  And I think that

11   my take on reading the report that the folks put

12   together is that they did a good job of putting those

13   things together.  They had good arguments.  And I would

14   direct you to go read their report to see whether or not

15   you think it's reliable.

16        Q.  And so in terms of the analysis you did, you

17   sort of grouped counties together into three groups,

18   high need, high performance, which means there's a lot

19   of health and hunger need, but also fairly strong access

20   to services or resources; is that --

21        A.  Correct.

22        Q.  -- right?

23        A.  Correct.

24        Q.  And then you have a medium need, medium

25   performance group, and that's about half the counties in

White v. State Board of Election Commissioners                    David Arthur Swanson, Ph.D.

Page 184

1    the state fall into that group?

2        A.   Correct.

3        Q.   Fair to say those counties are maybe a little

4    bit better off in the sense that somewhat less health

5    and hunger need?

6        A.   Than in cluster 3, the high need, low

7    performance.

8        Q.   And that's what I was getting to.

9        A.   Yeah.

10       Q.   You also have the high need, low performance

11   set of counties which means there's a lot of health and

12   hunger need, but not a lot of resources or access to

13   resources.  Do I have that right?

14       A.   You do.

15       Q.   So those counties are the worst off?

16       A.   Yes.

17       Q.   And just looking at that map on page 50 of your

18   report, those high need, low performance counties are in

19   purple; is that right?

20       A.   Yes.

21       Q.   And fair to say that many of them are in the

22   Mississippi Delta?

23       A.   Well, let's count them up.  If you're -- when

24   you say "many," you mean a majority or --

25       Q.   Looks like about half.  You can count them.

White v. State Board of Election Commissioners                David Arthur Swanson, Ph.D.

Page 185

1      A.   Well if you count Tunica, Coahoma, Washington,
2    they're -- those are definitely -- Bolivar, Sharkey,
3    Issaquena, those are definitely Delta counties, correct?
4    They're not there.  So I'm not sure it's even half, but
5    it's somewhere around that number.
6      Q.   And then the balance of your analysis is
7    basically looking at the distribution of these counties
8    in each of the supreme court districts; right?
9      A.   Correct.
10      Q.   And so looking at page 52 of your report,
11    Exhibit III-H-3X-c which is a little bar chart at the
12    bottom, you show that about half of the high need, low
13    performance counties are in district 3 under the
14    existing --
15      A.   Yes.
16      Q.   -- map.  And then the other half are divided
17    between districts 1 and 2?
18      A.   Yes.
19      Q.   And again, because what you're doing is looking
20    at the percentage of counties in each district, the
21    counties you used in the analysis -- and some counties
22    are larger than others, we don't actually know whether
23    district 3 or district 2 or district 1 has more hungry
24    or unhealthy people in it compared to the other --
25      A.   Well, if you did that comparison, as I answered

White v. State Board of Election Commissioners                    David Arthur Swanson, Ph.D.

Page 186

1    you before, you're obviously going to have, given that

2    all else is equal, in a county with a larger population,

3    you're going to have more in that county of a particular

4    characteristic.  Hence, they used rates in an attempt to

5    make it dimensionalist so it is comparable.  Is the rate

6    higher in one county or another regardless of the

7    population size.

8        Q.  But I guess my question is, you know, the unit

9    of analysis here is the county --

10       A.  Yes.

11       Q.  -- but now you're looking at the distribution

12   of counties in the supreme court districts and making

13   what I understand to be a statement about the population

14   diversity in the supreme court districts; right?

15       A.  That would be correct.  But in this sense what

16   you're looking at are the dimensionalist rates that

17   represent those populations.  So if you look at it from

18   the standpoint of where are needs the highest and the

19   performance the lowest, and you center correlated again

20   with socioeconomic status and race, that's what you're

21   looking at with maps.

22       Q.  And I guess what I'm trying to understand is,

23   looking at the existing plan, you see about half of the

24   counties you identified as high need and low performance

25   in district 3, but if they're all very small counties;

657fddd4-f0ef-43b0-bb10-e1f1abd7c8a1

White v. State Board of Election Commissioners                    David Arthur Swanson, Ph.D.

Page 187

1   and meanwhile district 1, you have a smaller percentage
2   of those counties, but Hinds County's in district 1.  It
3   may be that there's more health and hunger need in
4   district 1?
5        A.  Well there's always going to be a higher need
6   in a county that has a higher population.  That's not
7   what I looked at.
8        Q.  But the supreme count districts have not equal
9   but similar populations?
10       A.  I hear what you're saying.  And what this does
11  is look at it from a similar perspective.  When you're
12  looking at the rates across there, okay, what --
13  regardless of what population size is, what do the rates
14  look like at a county level?
15       Q.  Well, couldn't you aggregate the counties and
16  actually look at the rates among the population as a
17  whole?
18       A.  Let's see.  Why would I do that?
19       Q.  So that you can compare the populations of the
20  different districts.  If I want to look at teen
21  pregnancy or obesity rates or SNAP rates, I could
22  aggregate the information for each county up to the
23  district level, and I could see which of these districts
24  has higher rate of SNAP use.
25       A.  Now I see what you're getting at.  Okay.  So

657fddd4-f0ef-43b0-bb10-e1f1abd7c8a1

White v. State Board of Election Commissioners                    David Arthur Swanson, Ph.D.

Page 188

1  yeah, if I had the data.  And I didn't have the raw data
2  to be able to do that with the data are and the report
3  are given rates by county.  So without knowing what all
4  the numbers are in there, I'd have to go reconstruct and
5  put them up at the district level.  That's what you're
6  asking --
7       Q.  Yes.
8       A.  -- and I didn't do that.
9       Q.  And you didn't do that?
10      A.  That's correct.
11      Q.  So -- and without doing that, you can't speak
12  to the similarity or difference of the districts in
13  terms of those different metrics?
14           MR. WALLACE:  Objection.  Same objection as
15  before and objection as to vagueness, can't speak to the
16  differences, did you say?  I'm -- I lost your meaning.
17      A.  I think I follow your meaning.  But the point
18  is, I looked at counties.
19      Q.  So --
20      A.  And if you reaggregate the lines by county,
21  you're starting to see from the county perspective what
22  the numbers are by that is you can tell.
23      Q.  And looking at page 55, we're looking at
24  illustrative plan 1, same bar chart.  And you say that
25  under this illustrative plan 1:  "The majority of the

Page 189

1    high need, low performance counties are now in district

2    1 under Cooper's illustrative plan 1."

3         A.  Yes.

4         Q.  And that -- again, that makes sense because as

5    we've discussed, illustrative district 1 includes all

6    the Mississippi Delta, all the counties north, south

7    along the Mississippi River, and a lot of the high need,

8    low performance counties, some of which are very small

9    in population, are in that area.

10        A.  So as you asked before, it means it's

11   correlated with race and socioeconomic status, an

12   indicator of that.

13        Q.  And the result -- I mean, your analysis shows

14   that what -- one of the things that Mr. Cooper's map

15   does is that more of these counties with that high level

16   of need and low level of resources are being grouped

17   together in district 1?

18        A.  Correct.

19        Q.  So Mr. Cooper's illustrative plan 1 is grouping

20   together counties with similar socioeconomic needs and

21   interests?

22        A.  And making it less diverse.

23        Q.  But you agree he's grouping together counties

24   with similar socioeconomic needs and interests?

25        A.  I just said that.

657fddd4-f0ef-43b0-bb10-e1f1abd7c8a1

White v. State Board of Election Commissioners                David Arthur Swanson, Ph.D.

Page 190

1      Q.   And then just same question looking at your

2   page 58, again, you're showing 69 percent of the

3   counties in that high need, low performance category are

4   in district 1 under illustrative plan 2; is that right?

5      A.   That's correct.

6      Q.   And again, what we're seeing is that Cooper

7   illustrative plan 2 in grouping together counties with

8   similar socioeconomic needs and interests?

9      A.   Making it less diverse, yes.

10      Q.   And we talked about community of interest

11   before.  From a map drawing perspective -- I ask you

12   this as a person who is being proffered as an expert in

13   this case -- what do you think is more in line with

14   those districting principles that we discussed earlier?

15   What --

16           MR. WALLACE:  Well, I'm -- go ahead.  Let me

17   let you finish your question.  I thought you had, and

18   then you kept going so pardon me.

19      Q.   What do you think is more in line with the

20   districting principles we discussed earlier, grouping

21   together areas that share common needs and interests or

22   grouping areas together in a way that maximizes the

23   diversity and spread of those interests among different

24   defenses?

25      A.   To answer that question --

657fddd4-f0ef-43b0-bb10-e1f1abd7c8a1

White v. State Board of Election Commissioners                David Arthur Swanson, Ph.D.

Page 191

1          MR. WALLACE:  Let me get my objection in.

2    He's asking for -- first of all, he's vague; second of

3    all, he's asking for legal opinions; and third of all,

4    it's outside the scope of court's order.  And having

5    said that, you may continue your answer.

6          A.  As you said earlier, it -- there's a lot of

7    tradeoffs when you're looking at different metrics and

8    measurements in doing this.  And that might be one of

9    the tradeoffs you're looking at.

10          Q.  And having looked at some of those districting

11    principles and offered opinions about them in your

12    expert report in this case, what do you think is more

13    consistent with the principles that are reflected in the

14    Congressional Research Service Report, Redistricting

15    Manual, National Conference of State Legislatures?

16          MR. WALLACE:  Same objection.

17          A.  They emphasize more of the issues I think

18    you're getting at as opposed to the diversity issue.

19          Q.  They emphasis grouping together areas with

20    common interests and needs?

21          MR. WALLACE:  Same objection.  He may

22    answer.

23          A.  Yeah.  And I would again go -- aren't all those

24    groupings -- again, I use them as a guideline, but

25    aren't they generally for congressional districts; is

657fddd4-f0ef-43b0-bb10-e1f1abd7c8a1

White v. State Board of Election Commissioners                David Arthur Swanson, Ph.D.

Page 192

1    that the case?
2         Q.   The National Conference of State Legislatures
3    report that you cited related to considerations for
4    state legislative and other districts as well, didn't
5    it?
6         A.   That -- I mean, when I say congressional,
7    that's what I meant, state and federal.  I don't think
8    there's anything in there about a supreme court
9    district.
10        Q.   Right.  And the Redistricting Manual from
11   Morrison and Bryan, is that similarly applicable?
12        A.   Well again, I -- how many -- I didn't see
13   things specifically on supreme court cases in those
14   materials, so that's why I used them as a guideline.
15        Q.   And is there something about supreme court
16   districts that makes this diversity metric that you're
17   discussing more relevant than the legislature district?
18        A.   Well, you read it yourself --
19             MR. WALLACE:  Same objection.  He may
20   answer.
21        A.   You heard from the IHL, said their -- one of
22   the goals is to be more diverse.
23        Q.   I mean, did anything in the IHL statement
24   describe diversity in the way that you are discussing it
25   now?

Page 193

1      A.  One of -- the lead-in statement before it

2  listed the four points talked about cultural diversity.

3  And so cultural diversity covers a lot of ground.

4      Q.  Other than the IHL policies and bylaws that we

5  discussed, is there any other reason why this diversity

6  metric?

7      A.  Well there's --

8          MR. WALLACE:  Same objection.  You may

9  answer.

10      A.  There was the court case that I saw too on it.

11      Q.  The court case that used the word "diversity"?

12      A.  Yes.

13      Q.  And you don't know as you sit here whether that

14  court case was using the word "diversity" in the way

15  that you mean the word "diversity"?

16      A.  I do not know.

17      Q.  Anything else?

18      A.  Not that I can think of at this time.

19      Q.  So let's talk about your analysis of polling

20  places, and turning to the paragraph 81 of your report.

21  Starting at paragraph 81, you have a voting age

22  population polling place spacial analysis?

23      A.  Correct.

24      Q.  And in paragraph 81 you ask:  "What are the

25  differences in proximity, the differences in distance,

657fddd4-f0ef-43b0-bb10-e1f1abd7c8a1

White v. State Board of Election Commissioners                David Arthur Swanson, Ph.D.

Page 194

1  and the distance of black voting age population to
2  current polling stations compared to all voting age
3  population, and in a particular, white non Hispanic
4  voting age population."  Is that right?
5      A.  Correct.
6      Q.  And you say:  "My hypothesis for this question
7  was that if the black voting age population were being
8  systematically disenfranchised by the State of
9  Mississippi, a symptomatic indicator of that would be
10  seeing fewer of them close to polling places and more of
11  them of a greater distance from polling places."
12      A.  Correct.
13      Q.  How did you form that hypothesis?
14      A.  Just in general knowing what propensity, close
15  to things, mean.
16      Q.  Can you say more about that?
17      A.  Yeah.  So for example, I've done studies of
18  where graduates from high school go to college in the
19  State of Washington, and propensity is a big indicator
20  of it.  So many of the freshman or transfer students who
21  go to Western Washington here in Bellingham, Washington
22  are from Western Washington, they're not from Southeast
23  Washington.  Many of the students who --
24          MR. WALLACE:  Did you mean "propensity" or
25  "proximity"?  I'm looking at your --

White v. State Board of Election Commissioners          David Arthur Swanson, Ph.D.

Page 195

1      A.  Yeah, proximity.  I'm sorry.  Thank you.  So

2    that's what I mean.  So, you know, if you're close to

3    something, you're probably more likely to be able to do

4    it or go there.  And there's not -- I can't cite all the

5    literature off the top of my head, but there's a lot of

6    literature, probably in marketing and a lot of other

7    fields it's that.  That's one of the reasons why does

8    Target site stores in certain places.

9      Q.  Would you agree the decision to leave your

10   family for the first time and go to college somewhere

11   close to home rather than far away when you're away four

12   years is a little different than whether or not you're

13   going to go vote on a Tuesday; right?

14     A.  But it's a little different than deciding

15   whether you're going to go buy gasoline or clothes too,

16   but as I said, there's -- without being able to speak to

17   it all in my head, there's a lot of literature on how

18   relatively close you are to things that triggers whether

19   or not you're taking advantage or doing it.  That's the

20   point.  So yeah, there is a lot of variation of why

21   people are doing it, but you're close to something is a

22   determinant of whether or not you do it.

23     Q.  When you put up a Target store, there's a big

24   Target logo and a big sign that says Target on it;

25   right?

White v. State Board of Election Commissioners                David Arthur Swanson, Ph.D.

Page 196

1       A.   As far as I know there is, yeah.

2       Q.   But there isn't one on a polling place, is

3  there?

4       A.   No.  And I just said there's a lot of

5  differences in all these things, but the -- is the word

6  propinquity?  That might be it.  How close you are to

7  things is one of the determinants of whether or not you

8  take advantage or use them or don't.  It's not the only

9  thing, but it's one of them.

10      Q.   But you would have to know where something is

11  in order to -- in order for that logic to apply?

12      A.   Well I guess you could stumble across it if

13  you're doing a random search.

14      Q.   On a polling location, you'd have to stumble

15  upon it on a Tuesday in November; right?

16      A.   Do they move around all the time?

17      Q.   Well, that's my next question.  Do you know who

18  decides polling locations in Mississippi?

19      A.   No, I don't.

20      Q.   So when you say that --

21      A.   It's probably at the county level, but I'm, you

22  know, just saying I don't know.

23      Q.   So when you say that polling place proximity

24  could be evidence of systematic disenfranchisement,

25  that's despite the fact that locations of polling places

657fddd4-f0ef-43b0-bb10-e1f1abd7c8a1

White v. State Board of Election Commissioners                    David Arthur Swanson, Ph.D.

Page 197

1   is decided, you would think, at a local level?

2        A.  Yes.

3        Q.  And do you know whether there are racial

4   disparities in access to vehicles in Mississippi that

5   might affect the ability of Mississippians to get to the

6   polls on election day?

7            MR. WALLACE:  Same objection.  You may

8   answer.

9        A.  There might be, but people are people, so there

10  may be different ways to overcome some of those

11  disparities.

12       Q.  Well -- and just looking at Mr. Cooper's

13  responsive declaration, Exhibit 10, paragraph 34 --

14       A.  In exhibit?

15       Q.  It's Exhibit 10, but it's paragraph 34 of the

16  responsive declaration.  I just want to make sure you're

17  looking at the responsive declaration.

18       A.  That's Exhibit 9.  This is 12.

19       Q.  We want Exhibit 10.

20           MR. WALLACE:  This one?

21           MR. SAVITZKY:  You've got it.

22  BY MR. SAVITZKY:

23       Q.  And looking at paragraph 34 --

24       A.  Yes.

25       Q.  -- Mr. Cooper says:  "Statewide, 10 percent of

White v. State Board of Election Commissioners                David Arthur Swanson, Ph.D.

Page 198

1    black households do not have a car versus 4.3 percent of

2    white households."

3         A.  I see it.

4         Q.  Do you have any reason to dispute that?

5         A.  No.

6         Q.  He says:  "The racial disparity expands to

7    12 percent versus 4.5 percent in the Delta region."  Any

8    reason to dispute that?

9         A.  No.

10        Q.  Do you know if there are racial disparities

11   between who has the type of job where they can get off

12   work and vote on a Tuesday in Mississippi?

13        A.  I do not know.

14        Q.  Based on the discussion we've had about

15   socioeconomic indicators, is it likely that black

16   Mississippians are less likely to be able to take off

17   work and vote on a Tuesday?

18        A.  I'd look at it as a research question.

19        Q.  Do you know whether there are racial

20   disparities in Mississippi in terms of single-parent

21   households that might affect the ability to get to the

22   polls and vote on a Tuesday in light of work and

23   childcare obligations?

24        A.  Differentially than other population racial

25   groups?  Is that what you're asking me?

657fddd4-f0ef-43b0-bb10-e1f1abd7c8a1

White v. State Board of Election Commissioners                    David Arthur Swanson, Ph.D.

Page 199

1      Q.   Correct.  Are there more black single-parent
2    households than white single-parent households in
3    Mississippi?
4      A.   I don't know exactly if that's the case or not.
5      Q.   And just looking at that exhibit that we
6    just -- looking at Mr. Cooper's responsive report in
7    paragraph 33, he says:  "Other voters may have
8    responsibilities that make it impossible to walk.  51.4
9    percent of the black female head of households with
10   children live in poverty compared to 37.4 percent of
11   their white counterparts."  Any reason to dispute that?
12     A.   Does he give a source?  Again, I don't have any
13   reason to dispute it, but I just wonder what the sources
14   are and how consistent they are, that's all.
15     Q.   I can represent to you that it's all ACS data.
16     A.   Okay.  And then the question is, again, you
17   know, the sample sizes and whether or not they're
18   statistically different.  So if you just pull things off
19   the ACS and start comparing them, depending on where
20   you're at and depending what the census bureau does, I
21   would prefer not to answer that until I actually saw the
22   size of the sample, what the margins of errors are on
23   it, because it may be the case in some of these
24   comparisons that there's no statistically different --
25   significant difference.  Do you follow me?  So I don't

657fddd4-f0ef-43b0-bb10-e1f1abd7c8a1

White v. State Board of Election Commissioners          David Arthur Swanson, Ph.D.

Page 200

1   know in advance, just asked -- if you're asking about

2   the state as a whole and that's what he's arguing, for

3   the state as a whole, then it may be the case there is

4   one.

5       Q.  And by the way did you do a test of

6   significance, a T-test or something else to look at your

7   analysis of polling place proximity?

8       A.  No.

9       Q.  By the way, do you know if there are racial

10  disparities in Mississippi in terms of how long people

11  have to wait to vote at the polls in Mississippi?

12      A.  I don't know.

13          MR. SAVITZKY:  And we can mark right now --

14  it's a little out of order, but this is just where it

15  is.  This is Dr. Burch's rebuttal report, marking it as

16  Exhibit 18.  There should be a copy for you, Mike, but

17  I'm not seeing it.  Give you mine.

18  BY MR. SAVITZKY:

19      Q.  And looking at pages 12 to 13 of Dr. Burch's

20  rebuttal report -- let me know when you're there.

21      A.  I see it.

22      Q.  Looking at the bottom, she says:  "Further

23  analysis of the CES which I report shows that among

24  validated Mississippi voters, 18.9 percent of white

25  voters report they waited for more than 30 minutes to

657fddd4-f0ef-43b0-bb10-e1f1abd7c8a1

White v. State Board of Election Commissioners                    David Arthur Swanson, Ph.D.

Page 201

1    vote compared to 40.7 percent of black voters."  Any

2    reason to despite that?

3         A.  Yeah, there is.

4         Q.  Any reason other than the criticisms of the CES

5    that we'll talk about presently?

6         A.  That I don't know.  But definitely I'd start

7    with CES.

8         Q.  All right.  And we'll get to that.  And hang on

9    to -- you can put Dr. Burch's rebuttal aside, but don't

10   get let it get too far.

11            So you can't say whether the various racial

12   disparities we talked about including the ones that are

13   reflected in ACS might negate any theoretical advantage

14   in terms of polling place proximity for black

15   Mississippians?

16        A.  If you're asking me right off the top of my

17   head, my answers were, I think, pretty consistent saying

18   for the most part, some of them are research questions,

19   so they have to be looked into in order to answer the

20   full question.

21        Q.  And looking at paragraph 82 of your report, you

22   say:  "While each of Mr. Cooper's illustrative and least

23   change plan increases the percent of the black

24   population in district 1, I want to know if the

25   increases he achieved came at the expense of black voter

White v. State Board of Election Commissioners                    David Arthur Swanson, Ph.D.

Page 202

1   proximity to the polls."  What do you mean by that?

2               MR. WALLACE:  Same objection as to outside

3   the scope of the court's order, but he may answer.

4        A.  Yeah, it looks on average if you change the

5   counties around and you're moving black populations

6   around, what does it look like in terms of proximity to

7   the polls.

8        Q.  Well, why would putting different counties into

9   supreme court districts change the proximity to the

10  polling places which are intra county?

11       A.  Yeah.  Well, it's a question I asked.

12       Q.  Well, I guess my question is:  How could it

13  possibly change the proximity of people to polling

14  places to put them in one supreme court district or

15  another if all the supreme court districts are made up

16  of whole counties?

17       A.  It's a question that I asked.  So -- and again,

18  I stress that I don't know exactly where the -- how they

19  were placed initially.

20       Q.  Would you agree that whether a county is in one

21  supreme court district or another doesn't have any

22  bearing on where your polling place is?

23       A.  That I don't know.

24       Q.  You say:  "If Mr. Cooper's plans increase the

25  number and proportion of blacks but he moved close poll

White v. State Board of Election Commissioners                     David Arthur Swanson, Ph.D.

Page 203

1    proximity blacks out of district 1 and moved distant

2    poll proximity blacks into district 1, one could argue

3    that the actual impact of such plans would be to

4    increase black voter disenfranchisement and risk fewer

5    blacks actually turning out to vote."

6         A.  Yes.

7         Q.  What is the basis -- what is your basis for

8    suggesting that changing the supreme court lines to draw

9    a black majority district would increase black voter

10   disenfranchisement and risk fewer blacks actually

11   turning out to vote?

12        A.  Well maybe that the average citizen's in a

13   county, not in supreme court district 1, is different

14   than a county that is in supreme court district 1 that

15   has moved out of it.  So for example, what -- pick a

16   county.  In every county in every state are the polling

17   distances for any given population exactly the same,

18   they probably vary.  So urban areas are probably in a

19   closer proximity, correct, would you agree, than you

20   would be in rural areas.  So that's one example of how

21   they might change.  So even there it's at county level,

22   it may be the case that by moving them around, you've

23   now put people that were on average farther away from a

24   voting poll into this new district.

25        Q.  Did you do any analysis to demonstrate that

657fddd4-f0ef-43b0-bb10-e1f1abd7c8a1

Page 204

1  so-called close poll proximity blacks are more likely to

2  vote than so-called distant poll proximity blacks?

3       A.  No.

4       Q.  Now in your report, did you ever go back and

5  answer the question that you posed and offer an opinion

6  or a conclusion about whether the actual impact of

7  Mr. Cooper's illustrative plans would be to increase

8  black voter disenfranchisement and risk fewer blacks

9  actually turning out to vote?

10      A.  I'd have to look in the report again, so I

11 don't recall off the top of my head if I did.

12      Q.  It's not that many paragraphs, if you want to

13 just take a quick look.

14      A.  Sure, I'll look here.

15      Q.  It's the section between paragraphs 81 --

16      A.  Or even in the executive summary.

17      Q.  -- or 89.

18      A.  Yeah.  I'm looking at the executive summary.

19 Paragraph, what was it, 9?

20      Q.  81 through 89 is your discussion of this issue.

21      A.  Thank you.

22          (Witness reviewing exhibit.)

23      A.  So no, I didn't look at it by district, I

24 looked it on average for the state as a whole.

25      Q.  So you didn't go back and look at what you

657fddd4-f0ef-43b0-bb10-e1f1abd7c8a1

White v. State Board of Election Commissioners                    David Arthur Swanson, Ph.D.

Page 205

1    called "the question" of whether the increases Cooper

2    achieved came at the expense of black voter proximity to

3    the polls?

4         A.   That's correct, I did not.  Thank you.

5         Q.   Now let's talk about the analysis that you did.

6    How did you go about calculating the voting age

7    population living within a half mile of their polling

8    place?

9         A.   Let's see how it's described here.  This is

10   done using the geospacial stuff that Tom Bryan has

11   access to, and I asked him to give me ideas about how

12   far people were from polling places.  So when he got the

13   list of where they were located, then he could do the

14   GIS magic with VAPs and VAP by race within certain

15   distances of those places.  So that's how they're done.

16        Q.   So Bryan GeoDemographics did this analysis?

17        A.   Oh, absolutely.  Yeah.

18        Q.   What parameters did you give them?

19        A.   Just what I told you.  I said that I'd like to

20   see what the distances are to polling places and, you

21   know, if it's -- do you want to do categories on it that

22   make sense or if you want just give me average

23   distances, and we discussed it a bit, and I said, yeah,

24   those look good in terms of what percent might be within

25   a quarter mile, half mile, up to a mile or so.  And that

657fddd4-f0ef-43b0-bb10-e1f1abd7c8a1

White v. State Board of Election Commissioners                David Arthur Swanson, Ph.D.

Page 206

1    was done in conjunction with the data that were

2    available, how hard it was to assemble it and do it.

3        Q.  And did you count the population of any census

4    block that contains a polling place as living within a

5    half mile of the polling place?

6        A.  I can't remember the exact details and how it

7    was done.  When you're looking at census blocks, that's

8    the lowest geography you get and there are ways that I

9    know in GIS you split those using different algorithms.

10   And that's likely what he did to do it, but I don't

11   recall the details.

12       Q.  And the census block can be larger than a mile

13   around; right?

14       A.  It can, depending what the population of where

15   it's at, what makes up natural boundaries for one.

16       Q.  So if you count on the population of the census

17   block containing polling places, living within a half

18   mile of that polling place, some of the people in that

19   census block might actually live more than a half mile

20   away from the polling place?

21       A.  But again, I stress that there are algorithms I

22   know GIS people use that will try and accommodate that

23   so you're not just doing something that gross.  Do you

24   follow me?  And what they do exactly, I don't know.

25       Q.  And you don't know what Bryan GeoDemographics

White v. State Board of Election Commissioners                    David Arthur Swanson, Ph.D.

Page 207

1    did in this case?

2        A.  I don't.

3        Q.  You don't know whether he used an algorithm to

4    make that distinction between people in the census block

5    that are actually within the half mile and people who

6    are actually outside the half mile?

7        A.  I don't.

8        Q.  And let's just look at Mr. Cooper's responsive

9    report.  Again, it's Exhibit 10.  You should have it?

10       A.  On report 9 or 10?

11       Q.  10.

12       A.  Thank you.

13       Q.  I'm a little concerned that your Exhibit 10 has

14   gone missing here.

15           MR. WALLACE:  I have a 10 if you need it.

16           THE WITNESS:  Thank you.

17           MR. SAVITZKY:  Do you have it?

18           MR. WALLACE:  Yeah.  Tell me what paragraph

19   you want.

20           MR. SAVITZKY:  I'm looking at page 12.

21   BY MR. SAVITZKY:

22       Q.  And what Mr. Cooper does here in Figure 4 is,

23   shows the census blocks which are in blue and then the

24   half mile radii which are the circles there.  So you can

25   see there's significant amounts of those census blocks

Page 208

1    that are outside the half mile radius of the polling

2    place; right?

3        A.  Correct.  I can see that.

4        Q.  Okay.  And did you review Mr. Cooper's analysis

5    in his report of this polling place proximity analysis

6    that you did?

7        A.  I remember reading through this and putting it

8    aside.

9        Q.  All right.  And just starting at paragraph 24

10   on page 11 of Mr. Cooper's responsive report, Mr. Cooper

11   used geospacial analysis to calculate that actually

12   26.3 percent of black voters live within a half mile of

13   their polling place; right?

14       A.  That's what it says here in paragraph 24.

15       Q.  And do you dispute his analysis?

16       A.  I've got no reason to dispute or not dispute

17   it.

18       Q.  And Mr. Cooper conducted -- after conducting

19   this analysis said that the Bryan GeoDemographics

20   analysis erroneously does count the entire VAP living in

21   a given census block as being half mile from a polling

22   place?

23           MR. WALLACE:  Where does he say that?

24       Q.  Paragraph 25.

25           MR. WALLACE:  It's in 25?

657fddd4-f0ef-43b0-bb10-e1f1abd7c8a1

White v. State Board of Election Commissioners                    David Arthur Swanson, Ph.D.

Page 209

1      A.   Yeah, I saw it.

2      Q.   Okay.

3      A.   That's what he says.

4      Q.   And you don't have any reason to dispute that?

5      A.   Not at this time.

6      Q.   All right.  So just a few questions about

7   socioeconomic analysis performed by Mr. Cooper and

8   Dr. Burch.  Looking at Exhibit 9, Mr. Cooper's October

9   report and beginning on page 36, Mr. Cooper analyzes the

10  socioeconomic profiles of the State of Mississippi using

11  five year ACS data.  Let me know when you're there.

12     A.   I'm there.

13     Q.   You don't dispute any of his analysis with

14  respect to the ACS data there?

15     A.   Let me read through this.  So it appears it's

16  from the 2021 ACS data, singular data for the State of

17  Mississippi.  Okay.  No, I have no reason to dispute

18  that those are numbers he took from the single year 2021

19  ACS data.

20     Q.   Thank you.  And by the way, just because it

21  came up earlier, looking at the top of page 37, it does

22  like seem you get SNAP participation rates with the ACS?

23     A.   It looks like it, yes.

24     Q.   And in paragraph 64 of his report on page 36,

25  Mr. Cooper says:  "In Mississippi, African Americans

White v. State Board of Election Commissioners                    David Arthur Swanson, Ph.D.

Page 210

1    trail non Hispanic whites across most key indicators of

2    socioeconomic wellbeing."  Do you dispute that?

3         A.  Based on what's in the ACS, no.

4         Q.  And in paragraph 66 and 67 of Mr. Cooper's

5    report, there's the last two paragraphs, he explains

6    that he reviewed and prepared charts of the same ACS

7    data for counties and municipalities and that

8    socioeconomic disparities by race also exist at the

9    county and municipal levels throughout Mississippi.  Do

10   you dispute that?

11        A.  Well, that's one where because it's at the

12   county level and because of the sizes, I'd want to look

13   at what the margins of error are before I made those

14   statements.  I trust it at the state level that the

15   margins of error are sufficiently small, it's not an

16   issue, but you see it down some of the counties, it

17   could be.

18        Q.  You dispute that the ACS data reflects those

19   disparities?

20        A.  That I don't dispute, it's just a matter of how

21   you interpret it and if -- if the margins of error, if

22   they're 90 percent margin of error overlap the mean of

23   the other group, then there's no statistically

24   significant difference.  So you can't make the

25   statement.  Do you follow me?

657fddd4-f0ef-43b0-bb10-e1f1abd7c8a1

White v. State Board of Election Commissioners          David Arthur Swanson, Ph.D.

Page 211

1      Q.  Understood.  And setting aside whether or
2  not -- setting aside any issues with respect to the sub
3  sample size for counties or municipalities, with respect
4  to ACS data for Mississippi, you don't dispute that that
5  is what the ACS data is --
6      A.  No, I don't have any reason to believe
7  Mr. Cooper put down other data in there other than what
8  he took out of it.
9      Q.  And let's now mark -- we did it a little out of
10  order because her rebuttal is already marked, but the --
11  mark Dr. Burch's report now as Exhibit 19.
12      A.  I've got this piece of paper handed to me with
13  nothing on it.  I don't know what it is.
14      Q.  That's Dr. Burch's rebuttal report.
15      A.  Okay.
16          MR. WALLACE:  Have we got one marked?
17          MR. SAVITZKY:  Should be 18.  Here's 19.
18          THE WITNESS:  Here's 18.
19          MR. SAVITZKY:  Okay.
20          THE WITNESS:  That was just some other piece
21  of paper, same thing, I guess.  Okay.  That's.
22          MR. WALLACE:  We do have 19 for me?  I've
23  got 18.
24          MR. SAVITZKY:  19 for you, 19 for me.  All
25  right.  We all have 18 and 19 which we'll be looking at

Page 212

1    more presently.

2    BY MR. SAVITZKY:

3        Q.  But just for now looking at what's been marked

4    as Exhibit 19, on pages 3 through 10 of this report, Dr.

5    Burch analyzes educational markers like student test

6    scores and school district segregation, education

7    attainment by race.  You don't dispute her analysis of

8    racial disparities in education in Mississippi on that

9    front?

10            MR. WALLACE:  Objection to being outside the

11   scope of the court's order, but he may respond if he

12   can.

13       A.  In general, no.  I'd have to look at some of

14   the details on where she got the data and what she's

15   pulling off to make a definitive statement.  But in

16   general, no.

17       Q.  And looking at pages 10 to 13 of this report,

18   starting at page 10, Dr. Burch analyzes racial

19   disparities with respect to income, poverty and wealth

20   looking at, for example, household income, access to a

21   car, poverty, unemployment.

22       A.  I mean, again, I --

23            MR. WALLACE:  He didn't ask a question yet.

24       Q.  You don't dispute her analysis of those racial

25   disparities with respect to income and poverty?

657fddd4-f0ef-43b0-bb10-e1f1abd7c8a1

Page 213

1          MR. WALLACE:  And I have the same objection

2     to that question, and he may answer it.

3          A.  The answer is, there's no reason for me to

4     dispute what she's found from the current population

5     survey --

6          Q.  And I believe --

7          A.  -- American Community Survey, and so on.

8          Q.  And looking at pages 13 to 16, Dr. Burch

9     discusses racial disparities in housing, for example,

10    home ownership, looking at ACS data there for home

11    ownership by race.  You don't dispute her analysis of

12    racial disparities with respect to housing in

13    Mississippi?

14          MR. WALLACE:  Same objection.  He may

15    answer.

16          A.  Well, I don't -- I haven't -- I'm not looking

17    at her analysis in depth, but I don't dispute the data

18    she got from the American Community Survey as being

19    reasonably accurate.  The same from the Current

20    Population Survey for the state as a whole.

21          Q.  Or for example, I'm just drilling down on

22    page 16, the last sentence, last two sentences in her

23    report, she says:  "The 2019 report by the Mississippi

24    Home Corporation, a state entity, found that black

25    people in Mississippi were denied mortgage loans more

White v. State Board of Election Commissioners                David Arthur Swanson, Ph.D.

Page 214

1    frequently and faced discrimination in rental markets."

2              MR. WALLACE:  Where is that?

3              MR. SAVITZKY:  This is the second to the

4    last sentence in the second to the last paragraph on

5    page 16 of Exhibit 19, Dr. Burch's October report.

6              MR. WALLACE:  All right.  Same objection.

7    He may answer.

8        A.  No.  I've got no reason to dispute it.

9        Q.  And she goes on, she says:  "Other studies have

10   also shown that black Mississippi applicants faced

11   discrimination in home lending, discriminatory practices

12   affect ability of black renters to find rental housing

13   in Mississippi."  And that's from the National Fair

14   Housing Compliance, DOJ?

15             MR. WALLACE:  Same objection.  He may

16   answer.

17       A.  My answer is the same as the last time.

18       Q.  No dispute?

19       A.  No dispute.

20       Q.  Okay.  And looking at pages 16 through 18 of

21   Dr. Burch's report, she discusses racial disparities

22   with respect to health, for example, in heart disease,

23   access to healthcare, access to a primary doctor, health

24   insurance.  You don't dispute her analysis of racial

25   disparities with respect to health in Mississippi?

657fddd4-f0ef-43b0-bb10-e1f1abd7c8a1

White v. State Board of Election Commissioners                    David Arthur Swanson, Ph.D.

Page 215

1          MR. WALLACE:  Same objection.  He may

2    answer.

3       A.  If she's summarizing the data that is shown in

4    the tables given the sources that they're from, I have

5    no reason to dispute it.

6       Q.  And looking at pages 18 to 20 of her report,

7    Dr. Burch analyzes racial disparities with respect to

8    criminal justice.  And like you, she looks at the racial

9    makeup of the correctional facility populations and,

10   just looking at her chart here on page 19, looks like

11   she got a very similar result to you in terms of

12   60 percent of the prison population being black?

13          MR. WALLACE:  Same objection.  He may

14   answer.

15      A.  And again, based on the fact that her analysis

16   are really descriptive, verbal descriptions of what's in

17   the tables, I have no reason to dispute it.

18      Q.  You don't dispute the political science

19   literature discussed in Dr. Burch's report that voting

20   participation is generally correlated with socioeconomic

21   wellbeing?

22          MR. WALLACE:  Same objection, and perhaps

23   outside the range of a demographer's expertise, but he

24   may answer.

25      A.  Given my knowledge of it, I don't dispute it.

657fddd4-f0ef-43b0-bb10-e1f1abd7c8a1

White v. State Board of Election Commissioners                    David Arthur Swanson, Ph.D.

Page 216

1     Q.  You don't dispute that this letter -- this
2   literature shows generally that when a person has more
3   education, more income, more health, they're more likely
4   to vote and participate in politics?
5     A.  In general, I think that's -- I agree with
6   that.
7     Q.  And in light of that general rule, it would be
8   a reasonable hypothesis that if there was racial
9   minority group in a jurisdiction that had less
10  socioeconomic wellbeing, less education, less income,
11  less health, they would have lower levels of voting and
12  participation?
13        MR. WALLACE:  Same objection.  But he may
14  answer.
15    A.  And my answer to that again is that it depends
16  on what racial group and what part of country and when
17  and where you're looking at it.  It's a research
18  question.
19    Q.  In light of -- let me ask it differently, then.
20        It would be a reasonable hypothesis in light
21  of that general rule that the correlation between
22  socioeconomic wellbeing and voting and political
23  participation, that black voters in Mississippi who have
24  less socioeconomic wellbeing, less income, less
25  education, less health, less access to housing would

657fddd4-f0ef-43b0-bb10-e1f1abd7c8a1

White v. State Board of Election Commissioners        David Arthur Swanson, Ph.D.

Page 217

1  have lower levels of voting and political participation?

2             MR. WALLACE:  Same objection.  He may

3  answer.

4     A.  Again, it's -- it's not an easy question to

5  answer from the standpoint of it's still pretty general.

6  So it may be that certain areas of the state, people who

7  are in exactly the same condition vote at a much higher

8  rate than people very similar, exact same

9  characteristics elsewhere.

10    Q.  Well my question is:  Given all of this

11  information that we just discussed that you don't

12  dispute from the ACS, from other reputable sources

13  showing the racial disparities across many different

14  indicators and given the political science literature

15  that you don't dispute that socioeconomic wellbeing and

16  voting are correlated, it would be a reasonable

17  hypothesis that black voters in Mississippi vote less

18  and participate less than white voters in Mississippi?

19             MR. WALLACE:  Same objection, and he may

20  answer.

21    A.  And that's a reasonable hypothesis.

22    Q.  So let's now -- well first of all, I think

23  we're done talking about Mr. Cooper's reports at this

24  point, so we can move those to the side if that'll make

25  things a little easier for you before we start our next

657fddd4-f0ef-43b0-bb10-e1f1abd7c8a1

White v. State Board of Election Commissioners                    David Arthur Swanson, Ph.D.

Page 218

1    set of questions.  And these ones can go to the side as

2    well, actually.  And do you have Exhibit 10?  Are we

3    still --

4              MR. WALLACE:  I've got 10 if he doesn't.

5              MR. SAVITZKY:  We'll re-mark it if we have

6    to.

7              MR. WALLACE:  Is Cooper No. 10?

8              MR. SAVITZKY:  Yes.

9              MR. WALLACE:  Yeah, I've got it.  You don't

10   have it over there, is your problem; right?  She doesn't

11   have it.

12             MR. SAVITZKY:  Yeah, we'll --

13   it's floating around here somewhere.

14             MR. WALLACE:  We'll check it later.

15   BY MR. SAVITZKY:

16      Q.  So with that, I want to talk about the voter

17   turnout piece of this in your analysis of voter turnout

18   in Mississippi starting with the current population

19   survey.

20      A.  And is that from the initial report or from

21   another report?  Are you talking about the report that

22   we've been talking about here that you've given me, this

23   one?  That's what we're talking about?

24      Q.  I'm actually going to -- I'm talking about your

25   surrebuttal -- we'll eventually talk about your

657fddd4-f0ef-43b0-bb10-e1f1abd7c8a1

White v. State Board of Election Commissioners                    David Arthur Swanson, Ph.D.

Page 219

1    surrebuttal.

2         A.   Okay.

3              MR. SAVITZKY:   In fact, this is a great time

4    to mark your surrebuttal report.  Hold on.  All right.

5    So I'm now going to mark as Exhibit 20, I believe.

6              MS. JONES:   Yes.

7              MR. SAVITZKY:   Your -- oh, this isn't your

8    surrebuttal report.  I'm sorry.  Bear with me.

9              (Pause in the proceedings.)

10             MR. SAVITZKY:   Well --

11             MR. WALLACE:   Tell you what, I have to go

12   check out of the hotel.  You can keep digging while I'm

13   checking out of the hotel.  I'll be back in, you know,

14   ten minutes, and maybe you will have found it by then.

15             MR. SAVITZKY:   Thanks.  Let's go off the

16   record.

17        (A break was taken from 2:31 to 2:55 p.m.)

18             MR. SAVITZKY:   Back on the record.  So we

19   were marking Exhibit 20 which is your surrebuttal

20   report.  That's marked for you here.  Mr. Wallace, a

21   copy.  And I have that here.  Okay.

22   BY MR. SAVITZKY:

23        Q.   Now, before we sort of get into numbers and dig

24   into the details, let's start with the CPS.  What is the

25   CPS?

White v. State Board of Election Commissioners                David Arthur Swanson, Ph.D.

Page 220

1      A.   The Current Population Survey?

2      Q.   Yeah.

3      A.   It's a regular survey that's done by the census

4   bureau.  It's large scale survey, it has supplements in

5   it, so one of the supplements is a demographic

6   supplement.

7      Q.   Is it done by the census bureau?

8      A.   It's -- it's probably done for other agencies,

9   but the census bureau is the one that does a lot of

10  survey research, so the CPS is technically done, I

11  think, by the census bureau.

12     Q.   And the CPS includes a voting and registration

13  supplement?

14     A.   That's one of the supplements.

15     Q.   And that includes questions about whether the

16  respondent's registered and voted?

17     A.   Yes.

18     Q.   And no one goes back and asks the

19  respondents -- or sorry, strike that.

20          No one goes back and checks whether the

21  respondents actually are registered to vote.

22     A.   As far as I know, they don't.

23     Q.   No one goes back and checks if the respondents

24  actually voted?

25     A.   Just like everything else that's in there, they

Page 221

1  don't go back and check are you really this age?  Are

2  you really this ethnicity?  Yeah, so as far as I know,

3  it's -- they pretty much take the respondents' words as

4  given.

5       Q.  It's purely a survey, there's no sort of

6  external validation process?

7       A.  You mean in the sense of the answers --

8       Q.  Correct.

9       A.  -- they've given?

10       Q.  The veracity of the answers are not externally

11  validated?

12       A.  That's what I understand the case to be,

13  correct.

14       Q.  And then looking at your January report still

15  and a page 70, you have a table, Table IV.A.2 where you

16  looked at Mississippi voting by race and ethnicity using

17  CPS data; is that right?

18       A.  Yes.

19       Q.  And based on the data, you conclude that black

20  turnout in Mississippi in 2020 was 72.9 percent and

21  white turnout was 69.8 percent?

22       A.  Correct.

23       Q.  And this CPS data is the primary basis for your

24  conclusion that blacks vote at higher rates than whites

25  in Mississippi as a whole?

White v. State Board of Election Commissioners                David Arthur Swanson, Ph.D.

Page 222

1      A.  It is.

2      Q.  And looking at this table, you conclude overall

3 that the -- that 70 percent of Mississippians voted,

4 70.3 percent, I suppose, of Mississippians voted in the

5 2023 election?

6      A.  Yes.

7      Q.  And you agree, as you set out in your table in

8 that total voted column, that 70.3 percent turnout would

9 mean that 1.531 million people voted in Mississippi in

10 2020?

11      A.  Yes.

12      Q.  And just looking at Dr. Burch's rebuttal report

13 which was previously marked as Exhibit 18, and turning

14 to page 2 of that report --

15      A.  So we're on 18 again --

16      Q.  Yeah.

17      A.  -- or 20.

18      Q.  18.  Right here.  You have it right here.

19           And looking just at page 2, second full

20 paragraph Dr. Burch says:  "The official vote count

21 certified by the Mississippi Secretary of State show

22 that only 1,313,759 votes were cast or present, highest

23 participation rate in Mississippi in the November 2020

24 election."  Do you dispute that?

25      A.  No.

657fddd4-f0ef-43b0-bb10-e1f1abd7c8a1

White v. State Board of Election Commissioners                    David Arthur Swanson, Ph.D.

Page 223

1    Q.  So the CPS overstates the level of turnout in

2  Mississippi by about 200,000 people, 1.531 million

3  versus 1.313 million?

4    A.  Given the years where this is done and the fact

5  it's Mississippi, that appears to be the case.

6    Q.  I'm sorry, I just want to make sure, is that

7  answer qualified somehow?

8    A.  Well it's qualified with the data that are used

9  to do it.  In that sense, are the CPS data exactly for

10  the same year that the turnout data are for and things

11  like that.

12    Q.  Right.  And so --

13    A.  That's all the qualifications I'm making.

14    Q.  So with respect to the 2020 election --

15    A.  Yes.

16    Q.  -- and comparing that number from the official

17  vote count by the Mississippi Secretary of State, and

18  the CPS estimate you derived from the 2020 general

19  election turnout, the CPS overstates the level of

20  turnout by about 200,000?

21    A.  Yes.

22    Q.  And you agree, and you stated this at paragraph

23  149 of your report, page 83, that there is a "likelihood

24  of overreporting on the CPS voting and registration

25  supplement."

657fddd4-f0ef-43b0-bb10-e1f1abd7c8a1

White v. State Board of Election Commissioners                    David Arthur Swanson, Ph.D.

Page 224

1          MR. WALLACE:  I'm not sure I -- apparently,

2     he didn't hear a question, and I don't think I did

3     either.

4          Q.  You agree that there's a likelihood of

5     overreporting on the CPS voting and registration

6     supplement?

7          A.  I do.

8          Q.  And that -- meaning that when the respondents

9     get the survey questions to the CPS, when they

10    overreport, we mean they tend to say they registered or

11    they voted even when they aren't registered or didn't

12    vote?

13         A.  That's how I'd interpret overreporting.

14         Q.  And looking at paragraph 148 of your report on

15    page 83, you would agree that this issue of

16    overreporting of political participation is present with

17    any survey data related to voting?

18         MR. WALLACE:  This is in his original

19    report?

20         MR. SAVITZKY:  Correct.

21         MR. WALLACE:  Here it is.

22         A.  It could be.  I don't know enough about every

23    survey that's ever done to say whether or not they do

24    it, so of the ones I'm familiar with like the CPS, it's

25    looks like they overreport.

657fddd4-f0ef-43b0-bb10-e1f1abd7c8a1

White v. State Board of Election Commissioners                    David Arthur Swanson, Ph.D.

Page 225

1      Q.   Right.   And you say this caveat -- this is the
2   last sentence -- last sentence of this paragraph:  "This
3   caveat would not only apply to the SSRC survey data but
4   also the CPS, the APS, any other survey in the United
5   States that includes questions on voter registration" --
6      A.   And I stress it's a caveat.   But again, we
7   don't know exactly what's going on, but I'd be careful
8   if I was looking at voter registration survey
9   information and voting information.
10      Q.   And you wouldn't dispute that the CPS itself
11   says that respondent misreporting is a source of error
12   in the CPS estimates?
13      A.   Absolutely I would not dispute that.
14      Q.   And looking at paragraph 148 that we've been
15   looking at of your January report, you say with some
16   citations to the literature that:  "While both blacks
17   and whites tend to overreport voter registration, blacks
18   may do so at higher rates -- at a higher rate that white
19   as is also the case with voting."
20      A.   Correct.
21      Q.   And in the bibliography of your report, you
22   cite some literature going into detail on this, a 2021
23   piece called:  Vote Overreporting While Black:
24   Identifying the Mechanism Behind Black Survey
25   Respondents Vote Overreporting.   And let's just grab

657fddd4-f0ef-43b0-bb10-e1f1abd7c8a1

White v. State Board of Election Commissioners   David Arthur Swanson, Ph.D.

Page 226

1 that and mark it as Exhibit 21.  Copy, copy.  This is

2 the piece that was in your bibliography mark it as

3 Exhibit 21.

4    You reviewed this article in putting your

5 report together?

6  A.  I did.

7  Q.  And looking at page 3, I think right at the

8 top -- just let me know when you're there.

9  A.  That's the paragraph that starts:

10 "Overreporting among African Americans"?

11  Q.  Correct.  And the next sentence is:  "Perhaps

12 one of the most consistently documented aspect of

13 overreporting is that African Americans overreport at

14 higher rates than whites."

15  A.  That's correct.

16  Q.  Do you agree with that assessment?

17  A.  Yes.  Based on the evidence I've seen.

18  Q.  And in her rebuttal report, Dr. Burch also

19 pointed to another 2022 article by Ansolabehere and

20 Fraga and Shaffner in American -- I think it's in

21 American Politics Research specifically about

22 overreporting on the CPS.  Do you recall that?

23  A.  No.  I have to look at it, but it sounds

24 familiar, so --

25    MR. WALLACE:  It's in here, 18.

657fddd4-f0ef-43b0-bb10-e1f1abd7c8a1

White v. State Board of Election Commissioners                    David Arthur Swanson, Ph.D.

Page 227

1          THE WITNESS:  Thank you.  And where is it?
2    What page was it?
3          MR. SAVITZKY:  Well I was going to mark the
4    actual article, but I can -- I can refer you to the --
5    so it's cited on page 3, Footnote 6 of her report.  She
6    says:  "New research shows not only does the CPS
7    overestimate turnover for all groups, it does so
8    differentially by race such that it consistently
9    overestimates black turnout even more than white
10   turnout."
11        A.  Yes.
12        Q.  And she cites in an article that I'm now going
13   to mark as Exhibit 22 entitled The Current Population
14   Survey Voting and Registration Supplement Overstates
15   Minority Turnout.
16             MR. WALLACE:  Where is this cited?
17             MR. SAVITZKY:  This is cited in Footnote 6
18   of Dr. Burch's rebuttal report.
19   BY MR. SAVITZKY:
20        Q.  Do you agree that this is a paper by a
21   reputable political scientist in an academic journal for
22   the discipline?
23        A.  Well I don't know them personally, so if you
24   want me to attest to their reputations, I'm assuming
25   they're reputable, but yes, I agree that this is a --

657fddd4-f0ef-43b0-bb10-e1f1abd7c8a1

White v. State Board of Election Commissioners                    David Arthur Swanson, Ph.D.

Page 228

1    this is an article by academics that's published in an

2    academic peer-reviewed journal.

3         Q.  I'm just looking at the summary text on page 1

4    there, it says:  "We compare CPS estimates to official

5    voter turnout records from 2008 to 2018, document

6    consistent significant discrepancies that call into

7    question the reliability of CPS turnout statistics."  Do

8    you see that?

9         A.  I do.

10        Q.  And it states:  "Specifically, the CPS

11   overestimates black and Hispanic turnout relative to non

12   Hispanic whites whether relying on turnout rates as a

13   shared, eligible citizens or the racial ethnic

14   composition of the voting population."  Do I have that

15   right?

16        A.  You do.

17        Q.  And they say:  "Sampling error in commonly used

18   adjustments to CPS estimates do not account for or

19   correct the bias."

20        A.  All of it, correct.

21        Q.  And just looking at their conclusion in the

22   last page -- or excuse me, on page, I think, 4 -- oh,

23   no, it's on page 5, excuse me, of the document, yeah,

24   conclusion, states:  "The author suggests that CPS

25   should conduct a voter validation study akin to those

657fddd4-f0ef-43b0-bb10-e1f1abd7c8a1

White v. State Board of Election Commissioners                    David Arthur Swanson, Ph.D.

Page 229

1    undertaken by other surveys."  Do you see that?

2         A.  I do.

3         Q.  You agree with that?

4         A.  I do.

5         Q.  And they say:  "In the meantime, we suggest

6    that analysts uses caution when making inferences about

7    variation and turnout rates by racial or ethnic groups."

8    Right?

9         A.  They do.

10        Q.  Do you agree with their assessment?

11        A.  I think for the research at this point in time,

12   I think their assessment is well taken.

13        Q.  So given the fact that the top line CPS

14   estimate of voting in Mississippi shows overreporting by

15   about 200,000 -- I think it's 12 percent overage -- it

16   would be a reasonable hypothesis that this overreporting

17   would in particular overstate black turnout?

18        A.  That would be a reasonable hypothesis.

19        Q.  So let's go back to your conclusion.  You

20   conclude based on the CPS that blacks vote at higher

21   rates than whites in Mississippi as a whole?

22        A.  That's correct.

23        Q.  As we discussed, setting aside the issue of

24   overreporting, just assuming the CPS is reliable for the

25   moment, your analysis of the CPS data for 2020 shows a

657fddd4-f0ef-43b0-bb10-e1f1abd7c8a1

White v. State Board of Election Commissioners                    David Arthur Swanson, Ph.D.

Page 230

1   3 point difference between black and white turnout

2   rates, 72.9 versus 69.8; right?

3        A.  Correct.

4        Q.  So even a modest racial differential in

5   overreporting on the CPS would mean that black turnout

6   would, in fact, be lower than white turnout?

7             MR. WALLACE:  Object to vagueness of

8   "modest," but you may answer.

9        A.  It could be.

10       Q.  Particularly given of the fact that you have

11  overreporting at the level of 200,000 voters?

12       A.  It could be.

13       Q.  And you didn't run any type of t-test on those

14  two numbers 72.9, 69.8 to determine whether there's a

15  significant difference between them, did you?

16       A.  That's correct.  I did not.

17       Q.  And actually looking at that table we looked at

18  before on page 70 of your report?

19       A.  This is my original report?

20       Q.  Yeah, your January report.  Thank you.  Table

21  IV.A.2?

22       A.  Yes.

23       Q.  You report a margin of error for some of these

24  numbers --

25       A.  Yes.

Page 231

1    Q.  -- 4.1 for white non Hispanic turnout and 4.8
2    for black turnout; right?
3    A.  That's correct.
4    Q.  And what does the margin of error mean in this
5    context?
6    A.  The margin of error means that the percentage
7    points can go up and down over the mean, the percentage
8    which is the type of mean on that.  So as I recall,
9    the -- unlike the ACS, I think the CPS does 95 percent
10   confidence intervals, I believe.  I could be wrong,
11   but -- so what this is stating, then, is saying that
12   we're 95 percent certain that the true amount is within
13   plus or minus 4.8 percent of 72.9.
14   Q.  So fair to say that, again, just setting aside
15   the overreporting issue for the moment, assuming, you
16   know, the veracity of the responses, the real number for
17   self reported black turnout in Mississippi on the CPS
18   could be as low as 68.1 percent?
19   A.  It could be if you're looking at the -- if you
20   want to look at a 95 percent confidence interval.  So if
21   you look at it that way, there's a range of numbers and
22   we say we're 95 percent certain that it -- it's a range
23   estimate rather than a point estimate.
24   Q.  And what the CPS is telling us is that the
25   confidence interval is between 68.1 percent and 77.7?

White v. State Board of Election Commissioners                    David Arthur Swanson, Ph.D.

Page 232

1      A.  Give or take, yeah, that's what it's telling
2  us.  And I believe it is a 95 percent confidence
3  interval.
4      Q.  And then looking at the white turnout number of
5  69.8 percent, margin of error there is 4.1; meaning
6  that, again, setting aside overreporting, assuming the
7  veracity of the responses, the real white turnout number
8  could be as high as 73.9 percent, and that would be
9  within the confidence interval for the survey?
10     A.  Yes.
11     Q.  So 68.1, the lower bound of the confidence
12 interval for black turnout is lower than 69.8, the mean
13 white turnout number?
14     A.  Yes.
15     Q.  And 73.9, the high bound of that confidence
16 interval for white turnout is higher than 72.9, the mean
17 level of estimation of black turnout?
18     A.  Absolutely.
19     Q.  So these confidence intervals for black turnout
20 and white turnout in the CPS substantially overlap?
21     A.  Yes, they overlap.  The upper end of one
22 extends across the mean of the other one and vice versa.
23 In that sense, they overlap.
24     Q.  I mean, they don't overlap by just a little
25 bit, the mean of one is within the confidence interval

657fddd4-f0ef-43b0-bb10-e1f1abd7c8a1

Page 233

1   of the other?

2       A.  That's what I just said, I thought.

3       Q.  But not just over -- in other words, they don't

4   just -- it's not simply that the upper bound of one and

5   the lower bound of other cross a little bit, the mean

6   are within the confidence interval?

7       A.  That's the important part.  It's not the

8   confidence interval themselves that overlap, it's do

9   they cross over the mean of the other independent

10  sample.

11      Q.  And when the confidence intervals of the two

12  means overlap, that can indicate that the difference

13  between the two numbers is not statistically

14  significant?

15      A.  It's indistinguishable, that's correct.

16      Q.  And would you say that these numbers are not

17  statistically --

18      A.  From a statistical standpoint, that's correct.

19      Q.  So -- but your conclusion wasn't that black

20  voters and white voters vote at statistically similar

21  rates based on the CVS?

22      A.  That's correct.

23      Q.  Your conclusion was that blacks vote at higher

24  rates?

25      A.  Yes.

657fddd4-f0ef-43b0-bb10-e1f1abd7c8a1

White v. State Board of Election Commissioners                    David Arthur Swanson, Ph.D.

Page 234

1      Q.  But the CPS only supports the conclusion that
2  blacks and whites vote at statistically similar rates?
3      A.  Yeah.  If you take that into account, and in
4  this case I took the point estimates at face value
5  because it's a relatively large sample, even though the
6  confidence intervals, one end overlap the mean.  But
7  that's correct, you're absolutely correct.
8      Q.  So let's talk about the CES.  You would agree
9  that Dr. Burch in her rebuttal report analyzes turnout
10  using alternate data sources other than CPS, they're not
11  purely survey based?
12      A.  Yes.
13      Q.  And one of those is the CES, the Cooperative
14  Election Survey?
15      A.  Correct.
16      Q.  Actually, it's -- excuse me.  It's Cooperative
17  Election Study?
18      A.  Study, I think that's correct.
19      Q.  As you say in paragraph 11 of your surrebuttal
20  report which has been marked as Exhibit 20, you agree
21  the CES "has been available and has been used by experts
22  in the field for many years."
23      A.  That's paragraph 11?
24      Q.  Correct.
25      A.  Yeah, I'm pretty sure I said that in paragraph

657fddd4-f0ef-43b0-bb10-e1f1abd7c8a1

White v. State Board of Election Commissioners                    David Arthur Swanson, Ph.D.

Page 235

1   11.  Yes, I did.

2        Q.  And you agree with that still?

3        A.  Yes.

4        Q.  And you would agree that one aspect of the CES

5   is that political participation by voters who respond to

6   the CES is independently validated?

7        A.  Yes.

8        Q.  So I want to discuss how the CES works to make

9   sure we're on the same page.  And let's mark at this

10  point the technical documentation that you refer to in

11  your surrebuttal report, and we'll need one more sticky,

12  if you don't mind.  Are we at 23?

13            MS. JONES:  Yes.

14            MR. SAVITZKY:  I'm marking as Exhibit 23

15  Guide to the 2020 Cooperative Election Study.  And this

16  is the guide that you were looking at and referencing in

17  your surrebuttal report?

18       A.  It is.

19       Q.  Now you agree that with the CES, the first step

20  is that there's a preelection survey of adults that

21  includes demographic questions; right?

22       A.  Yes.

23       Q.  And in Mississippi, 462 adults responded to

24  that survey?

25       A.  Yes.

White v. State Board of Election Commissioners                    David Arthur Swanson, Ph.D.

Page 236

1      Q.   And in a 95 percent confidence level with a

2   5 percent margin of error, a sample size of 384 is going

3   to be representative of population of -- the population

4   of Mississippi?

5      A.   In general I would say that, but you've got

6   another -- it's another set of qualifications that goes

7   with it just like they would go with the CPS and

8   particularly the CES.  And that's involves the

9   weighting.

10     Q.   So setting aside weighting and talking only

11  about whether or not the sample size is sufficient to be

12  representative, a sample size of over 384 will be

13  sufficiently large to be representative?

14     A.   It depends on the purpose when you say that.

15  So I'll go slightly into lecture mode here, if that's

16  okay.  So it depends on what's going to be important in

17  terms of confidence intervals and how willing you are to

18  live with error.  So a sample size of 25, because it's

19  under what's called large sample theory might be

20  sufficient to answer questions for something and, you

21  know, they can deal with the confidence interval as they

22  come.  When you generally get up to a sample size of

23  around 400, the rule of thumb is that with that, you can

24  say you're 95 percent certain you're within plus or

25  minus 5 percentage points of what the true number is

657fddd4-f0ef-43b0-bb10-e1f1abd7c8a1

Page 237

1    excluding all sources of other issues.  But in general,

2    that's the case.

3              So when you say it's representative, a

4    sample, any sample, as long as it's taken scientifically

5    is designed to be representative of the population it's

6    taken from.  That, I think, you clearly understand.  So

7    the sample size simply makes your ability to refine

8    where the point estimates are and in general as long as

9    there's no change in variation, standard deviations, you

10   can then start to reduce the confidence intervals so

11   you're more certain where the actual true number lies in

12   the population when you're trying to infer to it.

13             So in that sense, every scientific sample

14   should be representative, I mean, that's the whole goal.

15   And what in particularly is important when it's

16   representative is the variation.  What you want is not

17   so much the mean in the sample to be the same as the

18   population mean, what you want out of the sample ideally

19   is that the variation of the sample if not exactly the

20   same, is very similar to what you get in the variation

21   of the population.

22   Q.  And that's why you use weighting; once you have

23   a sufficient sample size, you also need to do weighting

24   to make sure that the sample accurately reflects all the

25   different attributes of the population?

657fddd4-f0ef-43b0-bb10-e1f1abd7c8a1

White v. State Board of Election Commissioners                    David Arthur Swanson, Ph.D.

Page 238

1      A.  Yeah, I would not probably not describe it as

2   exactly that, but what you're trying to do is say, look,

3   we know we don't have enough people in this particular

4   category, you know, race, socioeconomic, age, whatever

5   it might be category, and so we know -- and they may be

6   differentially representative in the sample, so we're

7   going to say here's something that we think is a

8   population that would fit to it.  So it's post

9   ratification that's -- again, I'll go into slight

10  lecturing mode.

11           So you may have a sample survey and

12  60 percent of -- in a telephone survey, 60 percent of

13  the respondents say yes to a question.  It turns out

14  that 60 percent of the population's female, 40 percent

15  is male, and all 60 percent of the -- 60 of the females

16  would say yes and all males would say no.  So you've got

17  to readjust it -- do you follow me -- so that you've got

18  the right estimate of what you think the population

19  estimates are, because when you do that, then it looks

20  like it's going to be 50:50.  And that's what weighting

21  attempts to do.

22      Q.  And we'll talk a little bit more about

23  weighting, but I want to -- in terms of sample size --

24  and I believe it's the Krejcie and Morgan, you know,

25  formula originally, but we agree that once you get up

657fddd4-f0ef-43b0-bb10-e1f1abd7c8a1

Page 239

1    above 400, you should have a sufficient number of

2    respondents?

3        A.  But again, what I stress in that regard is that

4    what you're doing is, you're -- you can make a statement

5    such as I'm 95 percent certain that I'm within plus or

6    minus 5 percentage points of what might be the case.  If

7    you get up to 800, you can say I'm 99 percent certain.

8    So what it does is, it reduces the uncertainty around

9    the point estimate that you've gotten and the range

10   estimate.

11       Q.  And I think we're totally on the same page, let

12   me restate the question just for clarity.

13           For purposes of being able to speak to

14   something with 95 percent confidence and with a

15   5 percent margin of error, once you get to 400 or more

16   respondents on a survey, you will have a sufficient

17   number of respondents to speak to the question at that

18   level of confidence?

19       A.  Given that the survey was done on a scientific,

20   you know, random selection basis, given that you don't

21   have a whole lot of bias in the survey, given that

22   people -- there's not a lot of differential nonreporting

23   at the personal level, etcetera, etcetera, etcetera, all

24   else being equal, yes.

25       Q.  Okay.  And just looking briefly at Dr. Burch's

657fddd4-f0ef-43b0-bb10-e1f1abd7c8a1

White v. State Board of Election Commissioners                David Arthur Swanson, Ph.D.

Page 240

1    surrebuttal report which I think is -- oh, her rebuttal

2    report, excuse me, which is Exhibit 18, and looking at

3    page 4, Footnote 12 --

4              MR. WALLACE:  Page 4, Footnote 12.

5              MR. SAVITZKY:  Yep.

6    BY MR. SAVITZKY:

7         Q.  Let me know when your there.

8         A.  I'm there.

9         Q.  You would agree that 462 respondents sample for

10   Mississippi is above the minimum sample size to detect

11   small effects, co D equals .2 with a standard level of

12   statistical power pointing -- in a significance level of

13   .05?

14        A.  I agree, as I just said, when it's above that

15   number, then you've got a 95 percent chance of your

16   confidence -- your confidence intervals as stated, I'm

17   95 percent certain that the estimate that we're getting

18   is plus or minus 5 percent of what the true number of

19   the population is.

20        Q.  And you wouldn't dispute Dr. Burch's

21   characterization that this number, that 462 is above the

22   minimum sample size to attack small effect at that level

23   of statistical power and significance?

24        A.  Yeah, I would dispute that because there may be

25   small effects that that sample is not going to pick up

657fddd4-f0ef-43b0-bb10-e1f1abd7c8a1

White v. State Board of Election Commissioners                David Arthur Swanson, Ph.D.

Page 241

1   that large.  Do you follow me?  There could be really

2   minimal differences that are important in a certain

3   situation where a sample size of 400 is not large enough

4   to detect that it's a statistically significant

5   difference.  So in that sense, it depends on the

6   context.  And if you're asking about the context in

7   which we're talking about voting survey, then it

8   probably is adequate.  I think that's a question you

9   wanted to ask me.

10       Q.  Yes.  And specifically in the context of

11  analyzing voting by race in Mississippi?

12       A.  Yes.  And I would qualify my answer again,

13  everything else being equal, it should be.

14       Q.  So getting back to how the CES is done, we

15  talked about the first round of questions.  Then there's

16  a second postelection wave of questions that are asked

17  of the same respondents in a postelection second set of

18  questions; right?

19       A.  Yes.

20       Q.  And the postelection wave, post wave of

21  questions includes questions about whether or not the

22  person voted?

23       A.  Yes.

24       Q.  Not every voter responds to the second wave?

25       A.  That's correct.

White v. State Board of Election Commissioners                    David Arthur Swanson, Ph.D.

Page 242

1      Q.  Most of them do.

2      A.  (Nods head.)

3      Q.  And then in addition to the data from these two

4   waves of survey questions, there's also vote validation

5   information that is added to the dataset --

6      A.  Correct.

7      Q.  -- for all the respondents; right?

8      A.  I believe that's correct, for all the

9   respondents.

10     Q.  And the validation is done using state voter

11  history databases to check whether voters are registered

12  and whether according to their vote history they

13  actually voted?

14     A.  Yes.

15     Q.  And we can look at the CES documentation which

16  was marked as Exhibit 23?

17     A.  Yes, it's over here.  I've got it.

18     Q.  Looking at page 19 at the vote validation

19  variables, we can see -- so one of the variables is CL

20  voter status which reflects whether the voter is

21  registered; and if that's missing, then there was no

22  match on their registration record.  Does that sound

23  right?

24     A.  I think so.

25     Q.  And then if you have CL 2020 GVM which is

657fddd4-f0ef-43b0-bb10-e1f1abd7c8a1

Page 243

1    whether the respondent voted in the 2020 general

2    election; right?

3          A.  And how they voted.

4          Q.  And their method of voting?

5          A.  Yes.

6          Q.  And if there's no data for that variable, then

7    they were not validated as having voted?

8          A.  It's unknown, I believe, is what they put in

9    there.

10         Q.  They say:  "If missing, respondent did not have

11   a report of voting."

12         A.  Yes.

13         Q.  Okay.  And you would agree with the statement

14   on page -- the next page, page 20 of the documentation,

15   if a person has any nonmissing value for CL 2020 and

16   GVM, they have a validated vote record for that

17   election?

18         A.  Correct.

19         Q.  And you would agree that this validation

20   procedure was performed for every survey respondent

21   whether or not they responded to the second wave

22   questions?

23         A.  That's what the study states.

24         Q.  You would agree that the validation was

25   performed whether or not they say they voted?

657fddd4-f0ef-43b0-bb10-e1f1abd7c8a1

White v. State Board of Election Commissioners                    David Arthur Swanson, Ph.D.

Page 244

1      A.  That's what they state, so I have no reason to

2  disagree with what they state they did.

3      Q.  And so you'd expect in the data, there are some

4  respondents who did not answer the second wave of the

5  survey but can be and were validated as being registered

6  and having voted in the 2020 election?

7      A.  Yes, that could happen.

8          MR. SAVITZKY:  And just for completeness,

9  why don't we now mark two more exhibits.  I didn't end

10  up marking Krejcie and Morgan, but I could.  So what I'm

11  going to mark here, first with Exhibit 24, I'm going to

12  mark -- so I'm going to mark Exhibit 24, and you can

13  just look at that.  That is the raw data, not every

14  variable, the selection variables, otherwise, the raw

15  data for the Mississippi CES.

16  BY MR. SAVITZKY:

17      Q.  Can you just check that, see if you have any

18  reason to dispute that, and you can also confirm that it

19  has 462 rows.

20      A.  I confirm that.

21      Q.  Okay.  And I'm also marking as Exhibit 25 same

22  exact data but this one just for ease of use, we have

23  re-coded the raw data with the equivalent textual

24  information so it's legible to work with.

25      A.  Okay.

657fddd4-f0ef-43b0-bb10-e1f1abd7c8a1

White v. State Board of Election Commissioners                    David Arthur Swanson, Ph.D.

Page 245

1      Q.   Okay.  And we can see in these columns there's

2  a variable that says:  "Took post," do you see that?

3      A.   Yes.

4      Q.   Which means that they took the post wave

5  survey?

6      A.   Yes.

7      Q.   And then for those who didn't -- who have a no

8  for took post, they also have an N/A for their weight in

9  the common post weight weighting; right?

10     A.   I see that.

11     Q.   And we can see the CL voter status and CL 2020

12  GVM information is there as well?

13     A.   I do.

14     Q.   Okay.  And take my copy out too.

15          And just to confirm what we were talking

16  about earlier, looking at row 60, which is on the second

17  page --

18     A.   Of Exhibit 25, right.

19     Q.   -- of Exhibit 25, we can see this row 60 is a

20  respondent who did not take the postelection survey;

21  right?

22     A.   Yes.

23     Q.   And they're not weighted in the post weight

24  weighting metrics; right?

25     A.   That's correct.

657fddd4-f0ef-43b0-bb10-e1f1abd7c8a1

Page 246

1    Q.  But if we look at whether they're registered

2  and whether they voted, they're active and they had a

3  validated vote; right?

4    A.  Yes.

5    Q.  And if we look at row 108 on the next page,

6  another example, took post N/A, not weighted, if we look

7  at common post weight and VV weight?

8         MR. WALLACE:  What number are we on now?

9         THE WITNESS:  108.

10         MR. WALLACE:  108.  Okay.

11    Q.  Right, took post N/A, no weighting in common

12  post weight and VV weight; right?

13    A.  Correct.

14    Q.  But active with a registration record, and

15  their vote was validated?

16    A.  Correct.

17    Q.  I could actually go through a bunch of these,

18  but if I represented to you there are 29 such records

19  overall of voters who didn't take the post wave survey

20  but whose votes were validated, would you dispute that?

21    A.  I believe you.

22    Q.  All right.  So we may -- we my use these again,

23  we'll just set them aside for now.

24         So the last part of the CES I want to make

25  sure we're square on is the weighting system, and we

White v. State Board of Election Commissioners                    David Arthur Swanson, Ph.D.

Page 247

1   started talking about this a little already.  Generally

2   speaking, you would agree that weighting is used to make

3   statistics computed from the data more representative of

4   the population.

5        A.   That's the idea, yes.

6        Q.   And you would agree that using weights is more

7   or less ubiquitous in survey-based research?

8        A.   It is.

9        Q.   ACS is weighted?  CPS is weighted.

10       A.   (Nods head.)

11       Q.   You would agree that if the sample is not self

12  weighted, it's a good idea to use weights as often as

13  possible?

14       A.   I don't know if I can say that about any case,

15  but if you want to -- if you know the -- or have reason

16  to believe the sample is not representative of the

17  population in the sense you're talking about and that it

18  is a scientifically drawn random, even if it's a complex

19  random sample, then in general the idea would be you'd

20  want to use weights but you want to make sure the

21  weights represented the population in question too.

22       Q.   And as you explain in your report:  "The basic

23  idea of weighting in a survey is, you're assigning

24  weights to each of the responses in order to have the

25  attributes of the sample population more actively mirror

White v. State Board of Election Commissioners          David Arthur Swanson, Ph.D.

Page 248

1   the attributes of the overall population."

2        A.  Correct.

3        Q.  And for the CES -- and we can look at page 16

4   of that technical documentation that I believe was

5   marked as Exhibit 23 -- you would agree the CES samples

6   were weighted to match the distributions of the 2019 ACS

7   on gender, age, race, Hispanic origin, and education

8   level?

9        A.  And where's this?

10       Q.  This is on page 16.

11       A.  Thank you.

12            MR. WALLACE:  16?  Okay.  I thought you said

13  19.

14            MR. SAVITZKY:  16.

15  BY MR. SAVITZKY:

16       Q.  Last sentence of the first paragraph:  "The CES

17  sample was weighted to match the distributions in the

18  2019 ACS on gender, age, race, Hispanic origin, and

19  education level."

20       A.  Yes.

21       Q.  All right.  And that is the set of weights that

22  are used for the common weight and common post weight --

23       A.  Yes.

24       Q.  -- systems.  And then there's another set of

25  weights that was created, the VV weight and VV weight

657fddd4-f0ef-43b0-bb10-e1f1abd7c8a1

White v. State Board of Election Commissioners                    David Arthur Swanson, Ph.D.

Page 249

1    post that's only for respondents for whom there was a

2    validated voter registration number; right?

3         A.   Yes.

4         Q.   And those were matched to the demographic

5    attributes of registered voters according to the 2020

6    CPS?

7         A.   Yes.

8         Q.   Now staying on page 16 of this technical

9    documentation that we're looking at and looking down the

10   page, we can see the four weighting variables that we

11   talked about earlier; right?

12        A.   We can.

13        Q.   Common weight, common post weight, VV weight,

14   VV weight post?

15        A.   Yes.

16        Q.   And the idea is that because we have common and

17   VV weights that represent the whole population of adults

18   versus with the VV weights, only those with a validated

19   registration record, and then we have post versions that

20   should be used when talking about the second wave

21   questions?

22        A.   Correct.

23        Q.   Because the population that answer the second

24   wave is slightly different, so you need to use different

25   weights to true them up to either the ACS in the face of

657fddd4-f0ef-43b0-bb10-e1f1abd7c8a1

White v. State Board of Election Commissioners                    David Arthur Swanson, Ph.D.

Page 250

1    common most weight or the CPS in the case of VV wave

2    post?

3        A.    Correct.

4        Q.    And just continuing to refer to this discussion

5    of weighting in the technical documentation, you would

6    agree that the common weights are meant to ensure that

7    the sample is representative of all adults in

8    Mississippi in this case?

9        A.    Yes.

10       Q.    And the VV weights are meant to ensure the

11   samples are representative of all adult registered

12   voters?

13       A.    Yes.

14       Q.    And you would agree, as I think they say in the

15   technical documentation, common weight should be used

16   when you're characterizing the behavior of all adults?

17       A.    Yes.

18       Q.    And you would agree that common post weight

19   should be used when characterizing the behavior of all

20   adults but referring to variables from the second

21   postelection wave of questions?

22       A.    That would be the ones who actually voted or --

23   right?  They responded to the second wave, that's a

24   better way to say it, and reported whether they voted or

25   not.

White v. State Board of Election Commissioners                    David Arthur Swanson, Ph.D.

Page 251

1      Q.  So you should use common post weight when
2   referring to all adults but looking at responses to the
3   second wave questions?
4      A.  Yes.
5      Q.  And you would agree that VV weight should be
6   used when characterizing the behavior only of registered
7   voters in Mississippi?
8      A.  Yes.
9      Q.  And you'd agree that VV weight post should be
10  used for characterizing the behavior of only registered
11  adults and also looking through results of those second
12  wave, post wave questions?
13     A.  Yes.
14     Q.  And just sticking with the VV weights for a
15  moment, you would agree that by definition, the VV
16  weights exclude people who were not independently
17  validated as being registered to vote?
18     A.  I believe that's the case, yes.
19     Q.  Meaning that those responses were given a
20  weight of zero, so when you apply the VV weight
21  variable, they're not counted?
22     A.  I believe that's correct.
23     Q.  So if someone reported on the second wave of
24  questions that they had voted but in fact they weren't
25  even registered, that would be an instance of

White v. State Board of Election Commissioners                    David Arthur Swanson, Ph.D.

Page 252

1    overreporting; right?

2         A.  Yes.

3         Q.  But that instance of overreporting wouldn't

4    show up if you used a VV post, it would be excluded from

5    the sample?

6         A.  It could be, yes.

7         Q.  Well --

8         A.  Yes.  Well, if that's the weight you're using,

9    giving the weight of zero, that's what you're saying.

10        Q.  Yes.

11        A.  Yes.

12        Q.  So if you applied VV weight post, you would

13   exclude that instance of overreporting?

14        A.  Yes.

15        Q.  And that's because VV weight post only includes

16   people who were independently validated as registered?

17        A.  Yes.

18        Q.  And so if there are racial disparities in who

19   was validated is registered in the first instance, those

20   would all be masked when you use VV weight as well?

21        A.  They could well be masked, yes, depending on

22   how many people were not carried forward into survey,

23   but they could be, yes.

24        Q.  Well when you use VV weight or VV wait post,

25   you're only looking at voters who have a validated

Page 253

1    registration?

2          A.   I understand that.  But the issue is how many

3    of the initial sample were not followed up in that part

4    of the survey.  Do you follow me?  So if it's a pretty

5    high number, then you would be having some problems; if

6    it's not so high a number, you may not be.

7          Q.   I guess my question is:  If there are racial

8    disparities in who is registered to vote and you use VV

9    weight such that people who aren't registered to vote

10   with a validated registration are taken out, you're not

11   going to pick up those disparities?

12         A.   Right.  On a visual basis, yes.

13         Q.   And another item on the CES generally, in

14   looking at page 17 of this technical documentation,

15   there's a sort of discussion under the heading Accuracy

16   of the CES Sample with some discussion about validating

17   the sampling done in the CES by comparing survey results

18   to actual election results.  Do you see that?

19         A.   I do.

20         Q.   And the authors say:  "In the large sample, the

21   CES allows us to validate sampling by comparing the

22   state level samples within the survey with the actual

23   election results."

24         A.   I do.

25         Q.   You dispute that?

657fddd4-f0ef-43b0-bb10-e1f1abd7c8a1

White v. State Board of Election Commissioners                David Arthur Swanson, Ph.D.

Page 254

1      A.  No.

2      Q.  And the authors conclude that:  "Overall the

3   results from these analyses demonstrate the CES is a

4   reliable source of data on voting at both the national

5   and state level."  Do you dispute that?

6      A.  That's their conclusion.  I don't dispute it.

7      Q.  So let's look at your surrebuttal report, which

8   we marked as Exhibit 20?  Is that right?

9          MS. JONES:  Yes.

10      Q.  And looking at paragraph 11 of your report, you

11   say:  "Generally speaking, when a survey sample is being

12   used to analyze extremely small populations, the largest

13   sample possible is most beneficial."  Right?

14      A.  Correct.

15      Q.  Do you contend that Dr. Burch analyzed an

16   extremely small population in looking at black voter

17   turnout and white voter turnout in Mississippi?

18      A.  When you look at the black voters, they're in

19   the 462 sample set, it starts to look small, yes.

20      Q.  Do you know how many black respondents there

21   are of that 462?

22      A.  I'd have to go back and look.

23      Q.  If I represented to you that it's 160

24   respondents who were black?

25      A.  That's sounds correct, yeah.

657fddd4-f0ef-43b0-bb10-e1f1abd7c8a1

White v. State Board of Election Commissioners                    David Arthur Swanson, Ph.D.

Page 255

1      Q.   And is that an extremely small sample size?

2      A.   Well it depends again on the context of what

3   you're trying to do and what you need for confidence

4   intervals and margins of error and all that.  So it's

5   hard, again, in general to say this is an extremely

6   small sample size or not.  So in the context of this, it

7   may be the fact, and as I looked at it, that it could be

8   that it's a small sample.

9      Q.   Well just to be clear, you don't see it's a

10  small sample, you say:  "When a survey sample is being

11  used to analyze extremely small populations."  Do you

12  contend that black voters in Mississippi are an

13  extremely small population?

14     A.   No.  The statement there is general.  But what

15  goes on with the -- when you're using this, if you start

16  to get -- for example, if you're looking at Dr. Burch's

17  analysis, so let's look at somebody who might be, let's

18  say, black of a certain age, they're eligible to vote,

19  what their educational attainment is, you're starting to

20  drop the sample size down.  So from the 462, you're

21  starting to go get down to small numbers.

22     Q.   And did Dr. Burch analyze behavior by black

23  voters in a particular subregion with particular

24  educational and socioeconomic characteristics?

25     A.   Well for the sake of Mississippi, she did.

White v. State Board of Election Commissioners          David Arthur Swanson, Ph.D.

Page 256

1     Q.  She looked at black voters in Mississippi?

2     A.  Yes.  And that was the point I'm just making.

3  Given the state as a whole, you can get down to small

4  sample sizes.

5     Q.  And I just want to be clear.  You're not saying

6  that black voters in Mississippi are an extremely small

7  population?

8     A.  No, I'm not.

9     Q.  And you say -- and maybe this is getting to

10  what you were saying before -- "Rare populations that

11  have unique combinations and characteristics tend to

12  have high weights that carry the risk of significant and

13  may disproportionally impact any statistic using those

14  respondents."

15     A.  That's correct.  And I'll give you an example

16  of it right here in the exhibit you gave me labeled

17  No. 25.  Are you ready?

18     Q.  Sure.

19     A.  So let's look at the weights, and let's take

20  Case No. 320.  I need a ruler to make sure I'm staying

21  on the same line here.

22          MR. WALLACE:  Maybe this'll get you.

23          THE WITNESS:  Thank you.

24     A.  Let me know when you're ready.

25     Q.  I'm ready.

657fddd4-f0ef-43b0-bb10-e1f1abd7c8a1

White v. State Board of Election Commissioners                    David Arthur Swanson, Ph.D.

Page 257

1      A.   So Case 320.   The common weight is 7.2, the

2   common post weight is 14.298, the VV weight is 7.8, and

3   the VV weight post is 6.6.   Those are really high

4   weights, and they're indications to me of exactly what I

5   was saying about if you've got weights that high, you

6   get down to subcategories of people that are so small,

7   you're weighting them up really highly.   And that's

8   what's going on here.

9      Q.   And I guess my question is:   What are the

10  subcategories that you contend that Dr. Burch analyzed?

11     A.   Well if she analyzed anything with these people

12  in it, then they have these weights on it.   If she

13  analyzed Case No. 320, and I didn't see anything that

14  said she excluded it, that has a weight of 7.2.

15     Q.   But you agreed previously that we use weights

16  in order to make the surveys more accurate and to true

17  it up to the characteristics of the population?

18     A.   I understand that.   But the -- as we said

19  earlier too, there's a lot of tradeoffs in this.   And so

20  what you get is, if you've only got one person that fits

21  in certain categories and you have to weight that person

22  by a factor of 7 just on the common weight, it means

23  you're putting a lot of burden on that person.   What

24  you've got is an inverted pyramid.   So you've got one

25  person representing a whole set of people.   And that's

657fddd4-f0ef-43b0-bb10-e1f1abd7c8a1

Page 258

1    what I mean.  Whatever the categories were that they

2    took in detail that they decided they only needed to --

3    that they need to put a weight that big on the common

4    weight is really representative of the fact that there's

5    a lot of -- and this goes on and on throughout this

6    entire survey.  You can see it.  I mean, carry this one

7    over, you get into the common post weights for this

8    person, it's 14.  This person's representing 14 people.

9    And when you look at the diagnostics on Dr. Burch's

10   logistic regressions, you can start to see that the

11   diagnostics and the differences in the DF betas, they're

12   all indicating that you've got outliers scattered

13   throughout this dataset that if you took one of them

14   out, your results change.  And that's what that says,

15   and that's what the meaning of my statement is.

16       Q.  And we'll just get into this, but just to be

17   clear, when you talk about the diagnostics, those are

18   diagnostics that you ran using the VV weight?

19       A.  Or any other weights.  But you can see them on

20   here, I just ran the VV weights.  But using any other

21   weights, it's going to be very similar.  I can tell from

22   experience and looking at weights and running

23   regression, all those diagnostic things are not

24   exclusively logistic regression, they're used throughout

25   all kinds of regression analyses, and I've used them.

White v. State Board of Election Commissioners                    David Arthur Swanson, Ph.D.

Page 259

1   You start seeing the matrix Ds, the Cook distances, the

2   DFFITS, the DFBETAs -- I'm sorry for all the acronyms --

3   you start looking at those things, and you start to see

4   how many of them are fairly large and you go, my

5   goodness, you take -- so here's the simple example.

6   Picture a diagonal -- you know, a 45-degree angle line

7   like this, all right?  So you have a regression line,

8   all the data points on it, the R-squared on that's going

9   to be 1, you know, the X variable perfectly predicts the

10  Y variable.  You could have an outlier up here in one,

11  okay.  And so the regression line, the R-squared is not

12  going to be 1, it's going to be something else.  You

13  took that one point out of there, and all of a sudden

14  it's 1.  That's what these are indicating to you.

15          So there's a lot of -- because the case

16  sizes and whatever the categories are that the CES uses

17  are so small, however they did it, age, education,

18  whatever they all are that they weighted up to, whether

19  it's ACS or the CPS, you're looking at these weights

20  like this, my goodness, this -- you're putting a lot of

21  burden -- as I said, it's like an inverse triangle on

22  different people, such that if you took a few of these

23  cases out, you might get a totally different answer.

24  That is major problem I see with using the CES.  Whether

25  it's exclusively to Mississippi, I don't know.  So all

657fddd4-f0ef-43b0-bb10-e1f1abd7c8a1

Page 260

1    the arguments about the sample size being sufficient,

2    462, yes, in general you get what I said, 95 percent

3    confidence plus or minus 5 percent.  But you start

4    getting down to these weights -- and it crosses them.

5    Doesn't matter if you use common weights, common post

6    weights, the VV weight, the VV weight post, you're

7    starting to look at things and go, my goodness, what

8    this starts to indicate to me, not only do you get

9    differences in how the FITS are, but how the parameters

10   are.  The models can change dramatically, dramatically.

11   Sorry for the lecture mode.  That's one of the big

12   issues I see with it.

13        Q.   So -- and by the way, you referenced the CPS

14   and ACS.  Those are also weighted?

15        A.   Yeah, they're weighted themselves.

16        Q.   And --

17        A.   And then you're weighting to, you know -- so

18   it's becomes complex.  And however all the process was

19   done to get to the point -- and I think the people who

20   put this study together did the best job they could and

21   I don't have any reason -- they weren't trying to bias

22   anything, they're trying to make a good survey that

23   people can use.  But the point is, you get to things --

24   if all the weights were something like .094 and 2 and 1,

25   things like that across the board on all these, that

White v. State Board of Election Commissioners                David Arthur Swanson, Ph.D.

Page 261

1   might be something different.

2           But my goodness, when you start to see

3   weights like I just noted 7, there's another one.  So

4   No. -- I think it's No. 35, 7.39 common weight, 10 on

5   the common post weight, then it's 8 on the VV weight,

6   and it drops way down to 1 on this.  I mean, you get all

7   kind of variations in this.  And that really affects the

8   models and what you can do with it.

9       Q.  So I understand your opinion that the weights

10  are high.

11      A.  Well, it's not -- the weights are high.  It's

12  not my opinion.  When you run the diagnostics on the

13  logistic regression analysis, you can see it in the

14  diagnostic information.  As I said, what are called the

15  DFBETAs, the differential change in the coefficients in

16  the model, the DFFITS, DFFITS is what it's called, the

17  differential changes in the FITS.  In the Cook's

18  distance, how far are you moving away from something.

19  And they all apply, which indicates you've got a lot of

20  instability in the model.

21      Q.  So this is -- you're anticipating my next

22  question.  I had one other to ask, I'll go back and ask

23  you, but you run a Cook's distance test?

24      A.  They're all -- all that stuff is in the output

25  that I put on the appendix in my report.  It's all

Page 262

1   there.  I put up -- Dr. Burch did not put any of those

2   diagnostics in her report.  All those diagnostics are in

3   my report.

4       Q.  And you ran tests to measure the influence of

5   particular respondents on the survey?

6       A.  They show it.  That's what these lines are back

7   here.

8           MR. WALLACE:  What page you're looking?

9       A.  Well, pick one.  Pick page 85.  You know, I --

10  let me pick something that's -- let's go to page 77.

11  Are you ready?

12      Q.  Uh-huh.

13      A.  Page 77, top part, look at Case No. 460.  So

14  remember, Burch dropped 2 out of her test, right, so she

15  ended up with 460.

16      Q.  Correct.  Because those are non citizens.

17      A.  Right.  So look across here, it says Cook's

18  distance C and Cook's distance C bar --

19      Q.  Uh-huh.

20      A.  -- do you see those?  Look at the numbers on

21  these.  And these are not the only ones.  These start to

22  indicate to me that with these kinds of distances -- and

23  C means it's specific to.  If you take this out, what

24  kind of change do you get -- and the Cook's distance,

25  C bar is an aggregate of it, you're going to start

White v. State Board of Election Commissioners          David Arthur Swanson, Ph.D.

Page 263

1    getting big changes in what the parameters are.  And the

2    parameters would be -- let me go to the front where you

3    actually get logistic regression models.  Bear with me

4    while I go through page changes here.  So where it says

5    here regression coefficients --

6              MR. WALLACE:  Which page?

7        A.  Okay.  I'm sorry, page 21.

8              MR. WALLACE:  OKAY.

9        A.  So when you start -- these are the --

10   basically, this is her model that I replicated.  You

11   know, I'd have to look at this in detail.  But what I'm

12   talking about is in general, those numbers.  And that's

13   what generates the estimates.  Is this going to be in

14   category 1, the validated voter or not a validated

15   voter?  Those numbers can change dramatically.

16             And so I -- she didn't provide any of this

17   kind of residual analysis in her report -- let me

18   finish -- and when I ran them, it looked to me like

19   there's a lot of instability in the dataset itself and

20   it probably has to do a lot with the weights.  You know,

21   that's just my hypothesis at this point.  Such that if

22   you pull certain people out or if something changed

23   smally (sic), you can get a big change on what the model

24   looks like including the parameters, whether or not it's

25   statistically significant, all sorts of issues like

657fddd4-f0ef-43b0-bb10-e1f1abd7c8a1

White v. State Board of Election Commissioners          David Arthur Swanson, Ph.D.

Page 264

1   that.

2          And I didn't see anything in the literature

3   about any of these issues.  So when I looked at it

4   myself having had the experience with exactly doing this

5   with every form of regression analysis I run, you start

6   going, my goodness, this -- there's a lot of instability

7   in the dataset itself.

8       Q.  And just looking at page 21 here, what is it

9   here that you were relying on for the statement that if

10  you changed a few of the respondents, you'd get a

11  different result?

12      A.  What I'm saying is, see -- page 21, see where

13  it says odds ratios?  Where it says, independent

14  variables, see where it says intercept, black and other

15  race?  Those are the variables she used in her model.

16  Then move over, see where the column that says had

17  reduction coefficient, see where it says B and then in

18  parenthesis i, B1, B2, B3.  The intercept value is .25,

19  the black coefficient is minus 0.354, the other rates is

20  minus 1.24.  These are the ones that generate whether --

21  this is what generates are you going to be placed in the

22  category of the validated voter or a nonvalidated voter;

23  right?  But if you start getting the .25 because you

24  pull out of the real influential places on there, that

25  could change -- I'm just hypothetically making this up

657fddd4-f0ef-43b0-bb10-e1f1abd7c8a1

White v. State Board of Election Commissioners                    David Arthur Swanson, Ph.D.

Page 265

1  to show you -- that could change to .3 from .25, could

2  change to .4.  The minus 5.4 could change -- the point

3  I'm trying to make is, you could get number changes from

4  this that then put something in a different category.

5          That's what I mean by the dataset looks to

6  me with those kinds of weights -- and when I looked at

7  the residual analysis, that is diagnostics from all the

8  standpoints I know how to look at it from given that you

9  had a multidimensional problem, you've got an issue.

10 Here's another issue.  This is called a ROC curve --

11         MR. WALLACE:  Which page?

12      A.  I'm sorry.  Page 37.  Receiver operating

13 characteristics.  Do you follow me where it says rock

14 curves, combined and separate.  That diagonal line is if

15 there's no explanation in something as you're going on.

16 What the ROC curve shows you is as you start to get up

17 to certain probabilities of predicting correctly not

18 having a -- what's the term they use, a type 2 error,

19 there's another term they use in the medical profession,

20 but it's a probability -- it's mislabeled.  So you're

21 correctly predicting it's going to be head and it turns

22 out to be head.  But if you're correctly predicting a

23 head and it turns out to be tails, you've made an error.

24 Do you follow me?

25         So what you ideally want to see in a ROC

657fddd4-f0ef-43b0-bb10-e1f1abd7c8a1

White v. State Board of Election Commissioners                David Arthur Swanson, Ph.D.

Page 266

1   curve relative to this diagonal line is a line that's
2   almost vertical going up from zero here as high as it
3   goes and then goes across like this.  What that means
4   is, hey, I can get up to a real high probability of
5   being correct with still maintaining a low probability
6   of it going into the wrong category.  And what these ROC
7   curves show to me is that her model is not much
8   different than the diagonal, it's not doing that.  At
9   every level, she's getting probability of predicting
10  incorrectly, and she has probabilities of correctly
11  predicting.  That to me is not --
12      Q.  Well it's not equal, it's the same.  I think in
13  your report you say --
14      A.  If it would be equal, the same, but it is
15  almost the same.  You go back to the one point in my
16  report where I said her classification system only gets
17  something like 54, 50 percent.
18      Q.  You said 57 percent.
19      A.  Yeah.  That's not very good.
20      Q.  With one variable getting a --
21      A.  Well, her model --
22      Q.  -- heads or tails?
23      A.  -- right -- right there, just her model in
24  general, 57 percent.  I could flip a coin and say every
25  time I'm going to flip it, I'm going to get heads.  I'm

657fddd4-f0ef-43b0-bb10-e1f1abd7c8a1

White v. State Board of Election Commissioners                    David Arthur Swanson, Ph.D.

Page 267

1   right 50 percent of the time.  And if you look at people

2   who recommend using logistic regression, if you're down

3   to 50.57 your model does correctly, you look at the ROC

4   curves and everything else, it's suggests to me that the

5   model is not very good.  And I think it's not that she's

6   necessarily flawed on trying to run logistic

7   regression -- I don't know the answer to that -- but I

8   think it reflects a lot of problems in the stability of

9   the dataset.  Does that help?

10      Q.  You don't think that there's any reason why the

11  weighting that was applied by the CES is not accurate in

12  terms of trueing up this sample to the ACS or CPS?

13      A.  Again, I stress the fact when you get down to

14  categories of people.  What's their age?  What's their

15  race?  What's their educational attained?  Whatever else

16  they've collected in that survey, that's what they're

17  trying to match back to, all those characteristics in

18  either the CPS or the ACS.  And you start getting to

19  also, okay.  You have 462 people.  How many are black?

20  167.  How many have an educational attainment of --

21  okay, now you're down to 90.  How many have this, you're

22  down to 80.  How many have that, you're down to 50,

23  you're down the 40, you're down to 30.  You're down to

24  small numbers.  And you go, okay, to get it up correctly

25  so we have the right distribution of people relative to

657fddd4-f0ef-43b0-bb10-e1f1abd7c8a1

White v. State Board of Election Commissioners                David Arthur Swanson, Ph.D.

Page 268

1    what we see in the ACS or the CPS, we've got to assign a

2    weight.  In some cases, they're pretty low, they're not

3    much; but in some cases, in quite a few of them, you've

4    got some tremendous weights when you start looking at

5    them.  One person's representing 7 people?  And I think

6    one of them that I found when I looked through this

7    earlier had a weight of 14.

8        Q.  But again -- I just want to be clear on this --

9    you're not saying that weighting is inaccurate in terms

10   of doing what it is supposed to do and conforming the

11   characteristics of the sample to the characteristics of

12   the general --

13       A.  I'm not saying that.  The tradeoff in doing

14   that is, you get an unstable model when you're --

15   because of those weights that -- and I think -- I can't

16   attest to exactly that's the whole problem with it, but

17   when I looked at the diagnostics that I ran and saw what

18   I saw, I'm telling you there's a problem with the model.

19   And my guess is, it reflects the facts that you've got

20   what I would call influential outliers.  And those

21   influential outliers are the people with really large

22   weights.

23       Q.  Well, I mean you say that there are indictions

24   of instability in the model, but you also agreed that

25   the CES, I believe we said, is a reliable source of data

657fddd4-f0ef-43b0-bb10-e1f1abd7c8a1

White v. State Board of Election Commissioners          David Arthur Swanson, Ph.D.

Page 269

1  on voting at both the national and state level?

2     A.  Did -- when they designed the CES, did they

3  design it necessarily to run with logistic regression?

4  No.  What they designed those samples for is, they want

5  to be representative of the population.  Researchers are

6  out looking for datasets to use.  So when they go out

7  looking for datasets to use, they may not be expressly

8  designed for the datasets we're using.  Can I finish?

9  You look like you're yawning because I'm lecturing, or

10  else --

11     Q.  No, no, no.

12     A.  I couldn't tell.

13     Q.  I was opening my mouth.  Go ahead.

14     A.  Thank you.  So the datasets initially are not

15  designed for that, they're designed to say it's

16  descriptive, here's what we think is going in on the

17  United States or this state or some place at this point

18  in time.  The researchers have got to pull those

19  datasets out to use them.  And so again, I go back to

20  the point you've got tradeoffs.  Yes, we made it so it

21  represents a population and if you look at it just as it

22  is, we think it did a pretty good job.  We can say we're

23  95 percent certain within plus or minus 5 percentage

24  points.  Then you go and start to do for a research

25  question or a model building session, and all of a

Page 270

1  sudden you realize, I've got weights in here that are

2  1 person's equal to 14 or 7.  Well, that may or may not

3  be a problem until I run something I'm trying to do, and

4  then I'm looking at the diagnostics, as I've shown the

5  examples of, and the diagnostics I ran indicate to me

6  they're -- you've got a lot of instability, and I think

7  it comes -- stems from the weights that are on these

8  relative to the sample size.  And it's because you're

9  not using a sample that was designed to be -- all the

10  samples are designed to be somewhat representative of

11  the populations, but they're not necessarily designed

12  for people to run models on.

13      Q.  You talk about running models.  You would agree

14  that Dr. Burch did not only conduct a logistic

15  regression analysis but also arithmetically reported the

16  percentage of validated voters based on race in

17  Mississippi?

18      A.  I agree.

19      Q.  And her numbers reporting those arithmetically

20  are the same as the numbers that she obtained through

21  the regression analysis?

22      A.  They -- when you look at the -- when you look

23  at, like, the percent voters on the same, look at it

24  that way, how I would characterize that is, you didn't

25  have to go through the regression analysis to aggregate

657fddd4-f0ef-43b0-bb10-e1f1abd7c8a1

White v. State Board of Election Commissioners                    David Arthur Swanson, Ph.D.

Page 271

1   back up.  She had the data to start with in the

2   beginning.  She had it.  Just run a simple t-test on it.

3   Do you follow me?  You have the ability -- it'd be like

4   saying, okay, I've got household level data, income

5   level, all right, and I also have the income levels of

6   everybody in the household, six people.  I'm going to

7   build a model now that accurately estimates what their

8   incomes are, and I'm going to add that up to get the

9   household level data.  Why would you go through the

10  individual people if you already got the top.  And she

11  could have just done a t-test at the beginning, and I

12  believe had she done so, the results would have said,

13  yes, it looks like there's a higher percentage of white

14  voters than there are black voters that actually went

15  out to vote and all that.  But the results are

16  statistically not significant.  You can't tell the

17  difference on them because the margins of errors or so

18  wide.

19       Q.  And you didn't run that t-test?

20       A.  I did.

21       Q.  You didn't run t-test on top line numbers --

22       A.  Yes, I did.

23       Q.  -- that she obtained.

24       A.  I didn't put it in my report.  If you're asking

25  me if I ran one, I ran one at one point in time and said

Page 272

1   to myself why did she run a regression analysis to get

2   back up to this point?  Why didn't she just do a t-test?

3       Q.  And you did run a t-est.

4       A.  Yes.

5       Q.  You didn't include it in your?

6       A.  I didn't.

7       Q.  Why not?

8       A.  I just didn't think about it at the time, that

9   it was important.

10      Q.  Can you provide it?

11      A.  I can, yeah.

12      Q.  Okay.  And just while we're on the subject, you

13  talk about those four respondents that you identified

14  with those high weights?

15      A.  Well and there's more, I just picked them out

16  just glancing through the set.

17      Q.  And you say they form a potentially influential

18  set of cases in this small sub sample Dr. Burch's used

19  in her analysis?

20      A.  In the entire sample for State of Mississippi,

21  somebody with a weight of 14 or 7, the residual

22  analysis, that is, how good is the model analysis I

23  performed on her logistics model and looking at the

24  logistics model I ran indicate to me that in however you

25  want to look at it, this dataset is such that with those

657fddd4-f0ef-43b0-bb10-e1f1abd7c8a1

Page 273

1  high weights, you can really create some instability.

2  It's instable, the models you're getting.

3      Q.  And when you say "unstable" or "instability,"

4  what do you mean?

5      A.  I mean by this.  Again, I'll -- I have to

6  visualize this.  So you've got an X by Y grid.  So the X

7  values are down here in this dimension that you're using

8  to predict something.  This is standard just two

9  variable regression analysis.  If you've got a diagonal

10  line this like and all the dots on your observations fit

11  it, you've perfectly predicted Y from X.  If one of

12  those dots, though, is non on line, it's up here, it's

13  going to pull the regression line up.  It's influential.

14  Everything is along this line and that's way up here,

15  that's an influential observation such that it may say,

16  okay, now you're R-squared, your coefficient of

17  determination is, say, .87 let's say .85, whatever it

18  might -- you pull that observation out, and it's a 1.

19  And the coefficients will change dramatically.  I can't

20  visualize that because when you use two variables or

21  three, all of a sudden you're, you know, three space --

22  two space or three spaces or four space, so you can't

23  see it.

24        But what I'm saying is, all these

25  diagnostics in there, Cook's distance, DFBETAs,

White v. State Board of Election Commissioners                    David Arthur Swanson, Ph.D.

Page 274

1    DIFFITTs, different FITTs, there's saying there's a lot

2    of observations in here that if you take them out, all

3    of a sudden you're going to get some big changes in both

4    the model parameters and how well the data fit according

5    to the model which indicates to me there's a lot of

6    stability in the models.  If she decided or someone else

7    decided the people that were pulled out that were not

8    citizens, if for some reason one other thing -- one

9    other person was pulled out that had a high weight, the

10   model would look completely different.

11             So that's what I mean about I think the

12   dataset itself for Mississippi looks to me that it's not

13   really the best dataset to use to try and develop

14   models.

15      Q.  And understanding -- well, strike that.

16             Did you take out these four voters you

17   identified or some other respondents and sort --

18      A.  No.  Once --

19      Q.  -- of see what the effect would be?

20      A.  No.  Once -- well, I can see the effect, see it

21   already in here.  It's telling you what the effects are.

22   In general, it's the summary of what you're going to

23   see.  You're going to get dramatic changes in them.  And

24   I didn't pull them out and do that.  Once I looked at

25   the diagnostics, I could see, yes, this is -- these are

White v. State Board of Election Commissioners                    David Arthur Swanson, Ph.D.

Page 275

1   not good signs for building a model.

2        Q.  But you're not able to say what the precise

3   effect would be or if you used different weighting,

4   whether you --

5        A.  Well, you could say what the effects are going

6   to be in terms of the diagnostic measures, they're

7   telling you.  That's what they indicate.  But if I pull

8   them out, then that would be the next step.  So I can go

9   ahead and pull them out, but --

10       Q.  You didn't do that?

11       A.  No, I didn't do that.  There's a lot of them

12  that would end up pulling out because of the weights in

13  them to start looking at them.  And I could use this as

14  a guide to see which ones and see how much they change,

15  but I didn't do that.  But the indications are, I'll

16  stress, that you've -- and people read -- talk to

17  somebody else who knows something about regression

18  analysis, if you look at it, they're going to yes, the

19  potential is there that this model could really change

20  in parameters and/or the FITTS, the model estimates of

21  the data or both.  And that's not a good sign for a

22  model.

23       Q.  And again, you're referencing model.  When you

24  say "model," what you're talking about is using this

25  data in some type of regression?

657fddd4-f0ef-43b0-bb10-e1f1abd7c8a1

White v. State Board of Election Commissioners               David Arthur Swanson, Ph.D.

Page 276

1      A.  Like the two logistic regression analyses.

2      Q.  But again, Dr. Burch conducted other analyses

3  that were -- with the CS data that were not --

4      A.  Well, then --

5      Q.  -- logistic regression analysis?

6      A.  -- they -- whether or not that affects it, I

7  don't know enough about King's ecological inference

8  model, if that's what you're going to go to next.  But

9  that could be the case too.  I just don't know enough

10  about that model to diagnose it.

11      Q.  And I wasn't talking about that all -- we'll

12  get into it --

13      A.  Okay.

14      Q.  -- I again mean just sort of her arithmetically

15  calculating voter turnout by race, using the survey

16  responses in the weighting without --

17      A.  As opposed to what she did in her first report

18  wherein she included the population under 18 in her

19  numbers.

20      Q.  Yeah.  I mean --

21      A.  She's not made that kind of mistake here in

22  that regard other than the fact she put one county into

23  district 1 that shouldn't have been there and another

24  one out of it.  But yeah, it looks to me like she pulled

25  the dataset correctly.  And it's not her fault there, it

White v. State Board of Election Commissioners                    David Arthur Swanson, Ph.D.

Page 277

1    looks to me it's just a condition of the dataset.

2         Q.   When you say Dr. Burch concluded ignoring the

3    warning found at the CES study guide.  "We advise

4    caution when analyzing very small subsamples as random

5    measurement error may lead to faulty inferences about

6    analyzing very small subpopulations."

7         A.   Yeah.  And I may not have expressed that in the

8    best way, but what I'm getting at is the fact that what

9    I just said, there's -- some of these categories of

10   people of white, male, age 18 who has a less than a high

11   school education X, Y, Z, and you have the bond

12   (phonetic) to it, all of a sudden you're not at whatever

13   the white count was of voters, you're down to a really

14   small number.  And then they're trying to match that

15   either or both to the American Community Survey or the

16   Current Population Survey, and suddenly you've got a

17   really small number -- a sub sample that gets a

18   tremendous weight.

19        Q.   And so if you were analyzing that very small

20   subpopulation like a white, you know, person of a

21   particular age, education, you know, geographic

22   location, etcetera, that's where that warning that you

23   reference would come in?

24        A.   Yeah.  And then what happens is, in general

25   when you're modeling, you have those kinds of conditions

657fddd4-f0ef-43b0-bb10-e1f1abd7c8a1

Page 278

1   because weights are set on those small categories, the

2   subcategories, and you start seeing, okay, I can see it.

3    Whatever the categories were for that person, the fact

4   that you've got a weight of 14 or 7 or 9, says you're

5   dealing now with really small sub samples that are part

6   of your larger sample, and it's going to affect what

7   you're going to do because they've got these weights on

8   them.

9        Q.  But that isn't what this warning from the study

10  guide is talking about; right?  They're talking about

11  when you analyze the very small subpopulation, when you

12  break it out of the survey, not the mere fact that that

13  subpopulation is included among the larger population

14  that you're looking at?

15       A.  Well, you know, it's hard to say.  These people

16  run models, don't they, they built the study, you just

17  cited one of them in a study you showed me.  They're

18  building models.  So maybe they understand those issues

19  and maybe the way they worded it was not so great, and

20  what they're talking about is, you need to be careful

21  because of these issues, and that's their way of saying

22  that.  I can't speak to them.  You'd have to ask them.

23       Q.  So you don't know whether their meaning was the

24  one that you're interpreting?

25       A.  Right.  Or both.  You know, the way you're

White v. State Board of Election Commissioners                    David Arthur Swanson, Ph.D.

Page 279

1    interpreting or both, yeah, I don't know.
2         Q.   And just looking at the page that you're
3    referencing there when you look at that, this is on page
4    23 of the study guide.
5         A.   Of their study guide.
6         Q.   Of their study guide --
7         A.   Right.
8         Q.   -- right.
9         A.   Where they say be careful of the
10   subcategories --
11        Q.   Correct.
12        A.   -- that's what I'm referencing.
13        Q.   And they then say:  "Follow the link for more
14   information about this issue," and they cite an article.
15   Did you look at that article?
16        A.   Yeah, I can't remember if I did or not, no.
17             MR. SAVITZKY:  Well, let's mark it.  Getting
18   down to the end here.
19             MR. WALLACE:  On that subject, we started
20   before 9:00, we took out a little less than an hour for
21   lunch, and about ten minutes for me to check out.  So
22   giving you those breaks, I think we're done by 5:00.  If
23   you count it differently, let me know.
24             MR. SAVITZKY:  You tell me.
25             MS. JONES:  One hour and 11 minutes.  So

White v. State Board of Election Commissioners          David Arthur Swanson, Ph.D.

Page 280

1   almost one hour, ten minutes.

2           THE WITNESS:  That's 5:00.

3           MS. JONES:  And that's a rough.

4           MR. SAVITZKY:  Yeah, so probably closer to

5   5:20-something but --

6           MR. WALLACE:  No.  We started before 9:00,

7   but, you know, if you get there and we've got one

8   question left, that's one thing.  If you're starting a

9   new subject, we're going home.

10          MS. JONES:  So we -- can we go off the

11  record to talk about time?

12          MR. SAVITZKY:  Let's go off the record for

13  one second.

14          (Discussion held off the record.)

15          MR. SAVITZKY:  Back on the record.  And I'll

16  mark as Exhibit 26 the article that's linked there in

17  the study guide.

18      A.  Yeah.

19      Q.  And you looked at this article?

20      A.  Let me refresh my memory.  I did.

21          (Witness reviewing exhibit.)

22      A.  And in general, this article, again, goes to, I

23  think, the definition of small sample sizes, subsamples

24  that you were describing.  But the fact that these

25  people also built models in the same vein as logistic

657fddd4-f0ef-43b0-bb10-e1f1abd7c8a1

Page 281

1    models would suggest to me that they might even be

2    saying in there even though it's not stated that

3    precisely that you need to be careful using some of

4    these data because of the weights.  I mean, I found it

5    amazing, and I can't say I read every page exactly, but

6    I don't recall seeing a super warning anywhere in this

7    dataset about the fact you may run into high rates,

8    really large weights, and then being careful to use it.

9    Did I miss something?

10        Q.   No.  They represented it or they say they

11   trimmed the weights at 7 for the common and 14 for the

12   post, I think?

13        A.   Yeah, that might be it.  That's about it.  But

14   those are some big weights in a survey, in my opinion,

15   in my experience as with surveys.

16        Q.   But you're not saying that they're inaccurate

17   based on what they're trying to attribute --

18        A.   No.

19        Q.   -- to the population?

20        A.   No, no.

21        Q.   And just looking at the article that we just

22   marked as Exhibit 26, you would agree that what the

23   authors there talking about and what the warning that

24   you reference in your report is talking about is

25   analyzing the behavior of relatively rare individuals in

Page 282

1   a population; in other words, if you were looking at

2   black voters of a certain age, etcetera, etcetera, and

3   looking at that and looking at the behavior of that

4   subpopulation, not the mere presence of the

5   subpopulation in the sample?

6        A.  But -- well that gets to my point.  If they're

7   warning about looking at people like that that are

8   really a small sample and that's in your dataset and

9   they have a large weight, they could affect what you're

10  doing to build a model.  That goes back to the point I'm

11  making.  So maybe that's what they meant.  They didn't

12  state it precisely, so I can't speak to what they

13  thought they were saying.  But after running the

14  analysis and looking at all this, it sure indicates to

15  me that they've got weights in there that are so large

16  and they're so many people with such large weights that

17  you get a lot of instability in the models you're trying

18  to construct from if you're trying to do regression type

19  models.

20       Q.  If you're trying to do regression-type models?

21       A.  Yes.

22       Q.  But if you're not doing the regression-type

23  models, this instability is less of a concern?

24       A.  I don't know.  It depends on the context of

25  what you're trying to do with it.  It might be a

White v. State Board of Election Commissioners                    David Arthur Swanson, Ph.D.

Page 283

1  concern.  For example, if you're doing a t-test and if

2  one of the persons was pulled out of the sample, that

3  makes a difference in the test score, it could make a

4  big difference.

5      Q.  Now turning to Dr. Burch analysis of the CES in

6  her rebuttal report which was marked as 18, Exhibit 18,

7  and looking at page 5, she reports the CS team was able

8  to validate that 53 percent of the respondents voted in

9  the 2020 general election.

10     A.  I don't have it in the front of me, but I

11  believe you if that's what she said.

12             MR. WALLACE:  Which page?

13             MR. SAVITZKY:  Page 5, last paragraph.

14     Q.  And you don't dispute that using the common

15  weight weighting, that's accurate?

16     A.  No, I don't.

17     Q.  And you don't dispute that that's fairly close

18  to the 58.7 percent turnout reported by the secretary of

19  state in the official totals?

20     A.  That's correct.  I don't dispute that.

21     Q.  And on page 6 of her rebuttal report, Dr. Burch

22  reports that breaking this -- and this is the first

23  sentence on the top of that page:  "Breaking the CES

24  data down further by race, 60 percent of white

25  respondents and 46 percent of black respondents voted in

657fddd4-f0ef-43b0-bb10-e1f1abd7c8a1

Page 284

1   Mississippi in the 2020 election."  Again, you don't

2   dispute that using the common weight weighting, that's

3   accurate?

4        A.  That's correct.

5        Q.  And Dr. Burch reports that she conducted a

6   logit regression analysis, she said:  "My regression

7   analysis validated turnout by race, and the CES confirms

8   these percentages finding the same large statistically

9   significant gap between black and white Mississippi

10  voters."

11       A.  That's right.  Brings into play all the

12  criticism I have of the dataset when using logistic

13  regression.

14       Q.  But you don't dispute that that is the result

15  of the logit regression analysis run on the data?

16       A.  No, I don't despite that.

17       Q.  And you don't dispute that that matches up with

18  what simply arithmetically calculating the validated

19  voting for black and white voters in the --

20       A.  I don't dispute that.

21       Q.  Okay.  And looking at paragraph 29 of your

22  surrebuttal report, you say Dr. Burch does not describe

23  the fit of her model to the data and whether or not any

24  of the assumptions underlying logistic regression, it

25  would suggest the regression model was violated?

White v. State Board of Election Commissioners                    David Arthur Swanson, Ph.D.

Page 285

1      A.   Correct.

2      Q.   And you don't cite any support for the

3  suggestion that a goodness-of-fit test is required for a

4  binary login analysis?

5      A.   Well it's my oversight, but I assume that

6  anybody who runs a model understands that it should have

7  a good fit if you're going to use it.  So that was my

8  mistake in not citing a whole bunch of references saying

9  that you should use it, because my understanding with

10  every researcher, the idea is, you have a model and you

11  should report what it looks like.  I just thought that

12  would be common knowledge, so my error.

13      Q.   Would you agree that model diagnostics can

14  create as many problems as they solve?

15      A.   Well depends on --

16           MR. WALLACE:  I guess I'll object to the

17  form, but he my answer.

18      A.   I guess it depends on what the problem is.  So

19  if you're trying to build a model to argue something and

20  the diagnostics suggest you don't have a good model,

21  that would be a problem, if you follow what I'm saying.

22  And if you're trying to build a model that's exclusively

23  designed to do something and the model says this is not

24  very good at doing that, it's a problem, if it -- if it

25  means that.  You look at the diagnostics and it's going

657fddd4-f0ef-43b0-bb10-e1f1abd7c8a1

White v. State Board of Election Commissioners                David Arthur Swanson, Ph.D.

Page 286

1    to create other problems, more generally I would see the

2    problem that's being created and it's telling you you

3    should probably not use this model or look for other

4    variables or use some other different approach.

5         Q.   Would you agree that there's no distributional

6    assumption for a binary logistic model?

7         A.   I can't remember what the distributional

8    assumptions are on binary logistics models, if there are

9    ones or not, I just can't recall if it's assuming some

10   sort of distributional function.  And there may be

11   different algorithms through different approaches to

12   logistic regression that do assume them and some that

13   don't.

14        Q.   Would you agree --

15        A.   I don't know the answer to that off the top of

16   my head.

17        Q.   Would you agree that in a model where there's

18   no distributional assumption, it would make less sense

19   to use a goodness-of-fit diagnostic?

20        A.   No, I wouldn't agree to that.  I mean, any kind

21   of model would -- this is semi lecture mode.  So in any

22   model, you've got -- two out -- you're doing one of two

23   things, really.  You're trying to predict something or

24   you're trying to have a causal explanation as best you

25   can with the model what the determinants are on

White v. State Board of Election Commissioners                    David Arthur Swanson, Ph.D.

Page 287

1   something.  And it -- it looks like she's doing both in

2   some of these models.  But basically, it's -- the

3   overall focus is on prediction.  And if you're going to

4   predict something, that is, you're going to classify

5   people into one group or another group, then you need to

6   be very careful about how well your model fits.  It may

7   be less important if you're focus is on you're trying to

8   explain things.  It may be that you've got a really low

9   explanatory power in your model but it's sufficient to

10  say I think this variable, whether or not you've

11  completed high school, has a fairly large effect on what

12  your future income's going to be at age 50.  That's a

13  different story.  But if you're trying to put --

14  classify and correctly put things, you better have a

15  model that fits well; otherwise, you get things like

16  where it said right in here where I said classification

17  system's only .57, it's not better than just, you know,

18  randomly tossing a coin and saying every time I'm going

19  to say heads and I'm going to be right 50 percent of the

20  time.  And that part is definitely in the literature

21  about saying if you are not well over that, you don't

22  have a very good model.  And that's consistent with all

23  the diagnostic things I looked at, that the model is not

24  particularly good.

25              THE REPORTER:  I think we lost everybody on

657fddd4-f0ef-43b0-bb10-e1f1abd7c8a1

White v. State Board of Election Commissioners                    David Arthur Swanson, Ph.D.

Page 288

1   Zoom.

2                   MR. WALLACE:  Hold on.

3                   MR. SAVITZKY:  Let's go off for a second.

4                   (Discussion held off the record.)

5                   MR. SAVITZKY:  Back on the record.

6   BY MR. SAVITZKY:

7        Q.  And did you run those model diagnostics

8   yourself?

9        A.  Yes.

10       Q.  That's what you were talking about earlier?

11       A.  Yes.  The examples I pointed to are all models

12  I ran.  I replicated her model first and then said here,

13  if I put these different weights in, here's what you

14  get.

15       Q.  In your surrebuttal report, you say that

16  Dr. Burch's analysis was wrong because she should have

17  used the -- she should not have used the common weight

18  weighting?

19       A.  Yes, that's what I said.

20       Q.  Do you still agree with that?

21       A.  I -- I might revise that.  I think it's still

22  better to have used the weights that I ended up using in

23  the suggesting.

24       Q.  And you said in your report -- and again, if

25  you want to revise that and back off that statement, we

657fddd4-f0ef-43b0-bb10-e1f1abd7c8a1

Page 289

1   don't have to get into it, but --

2        A.   Yeah.   And I just said yes, I think she's not

3   as incorrect as I thought she was initially when I read

4   it.

5             MR. WALLACE:   Let's get what paragraph we're

6   talking about so we know what you're revising.

7        Q.   Let's talk about paragraph 37 in your rebuttal

8   report.   You say --

9        A.   Yes.

10       Q.   -- "Because Dr. Burch uses the validation

11  variable in her logistic model, she should have used the

12  common post weight weighting because she's reaching

13  across to the postelection wave with a validation of I

14  voted takes place."   Right?

15       A.   Correct.

16       Q.   But as we discussed, the validation is done

17  independently of the postelection wave questioning?

18       A.   That's correct.

19       Q.   There are numerous validated voters, as we went

20  through, who did not answer the postelection wave and

21  who are omitted from common post weight; right?

22       A.   Correct.

23       Q.   So Dr. Burch was not reaching across to the

24  postelection wave, she was analyzing a variable

25  validated voting that applies to the entire sample?

White v. State Board of Election Commissioners                    David Arthur Swanson, Ph.D.

Page 290

1        A.   That's correct.

2        Q.   And because she was looking at the entire set

3   of 462 or 460 minus the non-citizens respondents, common

4   weight which is used for all adults where none of the

5   variables from the postelection wave of questions being

6   studied was the correct weight to use?

7        A.   That is correct.

8        Q.   And that is what I was referring to which

9   should be corrected.

10             And turning back to Dr. Burch's rebuttal

11  report on page 6, she then discusses another analysis

12  where she looks into overreporting.  And we can --

13       A.   That's Exhibit 18 again?

14       Q.   Correct.  So Dr. Burch first looks at -- she

15  concludes that 60 percent of white respondents and

16  46 percent of black respondents voted in the city based

17  on the CES data, and then she also said:  "It's worth

18  noting the CES allows us to examine overreporting of

19  voting."  Right?  So she looks at what is turnout by

20  race, and she also looks at overreporting; right?

21       A.   I believe that's correct.  So we're on page 6;

22  right?

23       Q.   Page 6, the paragraph at the bottom under the

24  chart.

25       A.   Yes, yes.

657fddd4-f0ef-43b0-bb10-e1f1abd7c8a1

White v. State Board of Election Commissioners                    David Arthur Swanson, Ph.D.

Page 291

1     Q.  Right?  So she's -- having looked at sort of
2  what are the CES numbers show from (inaudible) she then
3  says we can use this data to examine overreporting of
4  voting by black voters and white voters; right?
5     A.  She states that, yes.
6     Q.  And she says the CES -- excuse me.  The CES
7  allows us to examine overreporting of voting by
8  comparing self reported voter turnout to validated voter
9  turnout; right?
10    A.  Correct.
11    Q.  Conceptually that makes sense; right?
12    A.  Yes.
13    Q.  So what she's doing, she's looking at
14 respondents who reported voting in the second wave of
15 questions, and she's seeing how many of those folks were
16 actually independently validated as having voted; right?
17    A.  That's, I believe, what she was doing, yes.
18    Q.  And because this time she's looking at a
19 variable from the postelection wave of questions, she
20 uses the common post weight weighting as she notes in
21 Footnote 22; right?
22    A.  Yes.
23    Q.  Okay.  And Dr. Burch reports that 74 percent of
24 white Mississippi respondents who said that they voted
25 in the second wave actually did so according to the

657fddd4-f0ef-43b0-bb10-e1f1abd7c8a1

White v. State Board of Election Commissioners                    David Arthur Swanson, Ph.D.

Page 292

1   independent validation; right?

2        A.   I believe that's correct, yes.

3        Q.   And you don't dispute that?

4        A.   No.

5        Q.   And she says that by contrast, 57 percent of

6   the black Mississippi respondents who said they voted on

7   the second wave were actually validated?

8        A.   That's correct.

9        Q.   You don't dispute her numbers on that?

10       A.   No.

11       Q.   And you replicated them, actually?

12       A.   Yes.

13       Q.   And you agree that using a common post weight

14   weighting, they're accurate?

15       A.   Yes.

16       Q.   Now, at pages 8 and 9 of your report, your

17   surrebuttal report, you say that:  "Rather than using

18   common post weight for this analysis comparing reported

19   voting to validated voting, Dr. Burch should have used

20   VV weighted post."  Do you also want to revise that

21   assertion?

22       A.   Yeah, I think she still should have used it,

23   but I think you're correct, that's a mistake I made.

24            MR. WALLACE:   It's on page what?

25            THE WITNESS:   8 and 9.

Page 293

1        MR. WALLACE:  Of yours.

2        THE WITNESS:  Correct.

3   BY MR. SAVITZKY:

4        Q.  Right.  And we discussed the VV weights only

5   include people who were independently validated as being

6   registered?

7        A.  Correct.

8        Q.  And that would mean excluding people who were

9   reported -- who reported that they voted on the second

10  wave of survey question but, in fact, weren't registered

11  and didn't vote?

12       A.  Correct.

13       Q.  And if you're trying to detect overreporting,

14  you're going to exclude potentially a lot of

15  overreporting that way?

16       A.  Correct.

17       Q.  And by the way, do you know if there were

18  respondents like that in the sample who reported voting

19  but in fact were not registered and were excluded from

20  the --

21       A.  I believe there were.  I would have to go back

22  and look, but I believe there were instances like that.

23       Q.  And we actually -- I mean, can look at them.

24       A.  We can.

25       Q.  Just briefly, we can pull back out what's

657fddd4-f0ef-43b0-bb10-e1f1abd7c8a1

White v. State Board of Election Commissioners                David Arthur Swanson, Ph.D.

Page 294

1    Exhibit 25.  And just starting with row 29.  Tell me
2    when you're ready?
3         A.  I'm ready.
4         Q.  And this is a person who on CC2401, the
5    question whether they voted, they said I definitely
6    voted; right?
7         A.  Yes.
8         Q.  Voter status N/A, no validated vote and the VV
9    weight given the zero weight --
10        A.  Yes.
11        Q.  -- and they are excluded?
12        A.  Yes.
13        Q.  47 is another one on this page, right, I
14   definitely voted.
15        A.  Yes.
16        Q.  No validated vote, no registration, no weight
17   in the VV weights?
18        A.  That's correct.
19        Q.  And we could go through those.  Would you
20   dispute it if I told you there are 45 respondents in the
21   Mississippi sample who said that they voted but whose
22   registration was not independently validated?
23        A.  No, I believe you.  I believe that that --
24             MR. WALLACE:  Registration or voting was not
25   validated?

657fddd4-f0ef-43b0-bb10-e1f1abd7c8a1

White v. State Board of Election Commissioners                    David Arthur Swanson, Ph.D.

Page 295

1              MR. SAVITZKY:  Well, neither.

2         A.   Neither, yeah.

3         Q.   You wouldn't dispute that it's 45?

4         A.   No.

5         Q.   And there were 15 instances that you found of

6    overreporting by respondents whose registration was

7    validated?

8         A.   I believe that's correct.

9         Q.   And you discuss in your report how with only I

10   think it was six white voters who over -- registered who

11   overreport and only 9 black voters who overreported,

12   that's a example of the small samples?

13        A.   Exactly.

14        Q.   But in fact, the total numbers of respondents

15   who overreported is not 15, it's 60?

16        A.   But even when you have the denominators in

17   there, I think I -- didn't I perform a t-test there?

18        Q.   Well, you performed a t-test on looking at that

19   six versus 9.

20        A.   Right.  But there's not -- there's a

21   denominator in there, that that's the key point.  That's

22   the 6 versus 9, so the sample is still small, and it's

23   indistinguishable.  It's not just the fact that it's 6

24   to 9 -- what's the paragraph number?  And I can be more

25   accurate on that.

657fddd4-f0ef-43b0-bb10-e1f1abd7c8a1

White v. State Board of Election Commissioners          David Arthur Swanson, Ph.D.

Page 296

1      Q.  I believe it's paragraph 25.

2      A.  Yes.  So the test is not 6 versus 9, it's 6 out

3  of 140 and 9 over 61.  That's the test.  That's what

4  gives you the percent, that's the mean.  And that --

5  when you ran that test with those numbers, 6 over 140

6  and 9 over 67 and run a t-test on it, are the means the

7  same, yields the result, you know, with a alpha level of

8  .05 that you cannot distinguish statistically between

9  the two groups.

10      Q.  But as we've established, the numerator and the

11 denominator are all based on the VV weight -- or rather,

12 the enumerator is based on the VV weight, and the

13 denominator is too.

14      A.  Yeah, I think it's consistent in this.  I'd

15 have to look at the details of it, but I ran it

16 consistently, I believe.  And so when you look at it

17 that way, it just says they're =not statistically

18 significant.

19      Q.  Right.  And my point is that you ran that

20 t-test using the weighting that excluded most of the

21 voters who overreported?

22      A.  I'd have to go back and look at it to -- but

23 you may be right.

24      Q.  Well, we just discussed that you used the VV

25 weight?

657fddd4-f0ef-43b0-bb10-e1f1abd7c8a1

White v. State Board of Election Commissioners                    David Arthur Swanson, Ph.D.

Page 297

1      A.   That's correct.

2      Q.   And that we just discussed the VV weight would

3   exclude 45 of the 60 respondents who overreported

4   voting?

5      A.   Yes.

6      Q.   So you ran your t-test on data that excluded

7   most of the people who overreported?

8      A.   And to answer the question -- to answer the

9   question you're asking, I -- we could run it again with

10   the different denominator and see what happens.  It may

11   be a different result or the same.

12      Q.   Well, let's answer the question I did ask.  You

13   ran your t-test on data that excluded most of the people

14   who overreported voting; right?

15      A.   That could be the case, yes.

16      Q.   I think a yes or no would be proper --

17      A.   Okay.  Yes.

18      Q.   -- to be objective.  Yes; right?

19      A.   I'll say yes.

20      Q.   Thank you.  And you didn't run a t-test on the

21   data using the common weight which would have included

22   most of the overreporting in the sample; right?

23      A.   That's correct.

24      Q.   So you don't know whether the level of

25   overreporting that Dr. Burch reports using the correct

657fddd4-f0ef-43b0-bb10-e1f1abd7c8a1

White v. State Board of Election Commissioners                    David Arthur Swanson, Ph.D.

Page 298

1    weighting is statistically significant?

2         A.  I don't know.

3         Q.  Almost done with the CES, couple other points.

4              First, you say in paragraph 28 of your

5    surrebuttal report:  "In her use of CES data because it

6    has validated voters, Dr. Burch analysis is again tied

7    to the CPS."  Right?

8         A.  Yes.

9         Q.  Dr. Burch didn't use the VV weights in her

10   analysis in the --

11        A.  Then that's incorrect.  So it's just tied to

12   the ACS.

13        Q.  So this statement that Dr. Burch's analysis is

14   tied to the CPS is not correct?

15        A.  That's correct.

16        Q.  And turning to pages 7 and 9 of Dr. Burch's

17   rebuttal report.  Dr. Burch uses CES data to analyze

18   eduction in voting; right?

19        A.  Where are we?

20        Q.  Starting at page 7 of Dr. Burch's rebuttal

21   report, which I believe is Exhibit 18.

22        A.  Okay.

23        Q.  Are you there?

24        A.  I am.

25        Q.  Okay.  And you don't discuss this analysis of

657fddd4-f0ef-43b0-bb10-e1f1abd7c8a1

Page 299

1    educational -- education voting in your surrebuttal

2    report, do you?

3        A.  But you -- one of her models in the logistic

4    modeling that she did is with this dataset, correct, her

5    model 2?

6        Q.  That's correct.

7        A.  So that I did analyze.

8        Q.  You don't dispute her analysis on page 7,

9    Figure 2 of page 8 that there's a small, not

10   statistically significant gap between black and white

11   validated voter turnout at each educational level?

12       A.  You're talking about what she's got in

13   Figure 2 and Figure 3.  No, I'm not disputing that.  The

14   only qualification I make to it, again, is even with

15   doing some descriptive statistics, she may run into

16   issues with the weighting if you looked at it.  But no,

17   I don't dispute it.

18       Q.  But you don't dispute that her analysis

19   indicates that education is the significant explanatory

20   variable in explaining the difference in turnout between

21   black and white voters?

22       A.  I think she's making a leap of faith in that.

23   Causal analysis is really hard to determine through

24   correlations.  They're correlated, but to say it's

25   specifically the causal effect is difficult.  And that's

White v. State Board of Election Commissioners                David Arthur Swanson, Ph.D.

Page 300

1    one of the things you run into with regression analysis

2    of any type or even descriptive analysis.

3          Q.  I'm looking at page 16 of her report.  I mean,

4    she reports that the P value on education is significant

5    at the .001 level for voting?

6          A.  But even that -- all that does it say the model

7    fits well, doesn't say that that's a consolation.

8          Q.  Understanding, I mean, all we can do in

9    statistics is what we can do here which is to show that

10   there is an extremely good fit between education and

11   voting in Mississippi.  You would agree with that?

12         A.  That I agree, that it's a -- it's a parameter

13   that helps fit the data -- the model to the data.  So in

14   the statistical sense, when you look at it, if you look

15   at the partial R-squareds and look at the standardized

16   coefficients, which she did not report, then you can see

17   what the effects were.  But she failed to report the

18   standardized coefficients.

19         Q.  But you don't dispute that result that she

20   arrives at?

21         A.  Not in that sense, no, I don't dispute it.

22         Q.  And you don't dispute the ACS data which is

23   reflected in the chart here on page 9, educational

24   attainment by race in Mississippi showing a large gap in

25   attainment of bachelor's degree or higher?

657fddd4-f0ef-43b0-bb10-e1f1abd7c8a1

Page 301

1     A.   That's correct.  I don't dispute that.

2     Q.   And you don't dispute Dr, Burch's conclusion

3  that:  "While black and white people with similar

4  educational backgrounds vote similarly, people with

5  lower educational attainment vote at lower rates overall

6  than people with higher educational attainment"?

7     A.   I don't dispute that.

8     Q.   And you don't dispute her conclusion that:

9  "Black Mississippians are more likely to have lower

10  educational attainment and thus lower voter turnout than

11  white Mississippians"?

12    A.   I don't dispute that.

13    Q.   And --

14         MR. WALLACE:  Objection to the form of

15  "thus," but otherwise he may answer.

16    Q.   And we can go now to the ecological inference

17  analysis in Dr. Burch's report.  I think it starts on

18  page 9, so we can just stay where we are for the moment.

19         Looking at page 9 of Dr. Burch's rebuttal

20  report, she explains that she conducted this ecological

21  inference analysis using of the voter file -- the

22  Mississippi voter file as a dataset to estimate voter

23  turnout by race; right?

24    A.   That's what she says, yes.

25    Q.   You don't disagree with that?

White v. State Board of Election Commissioners                David Arthur Swanson, Ph.D.

Page 302

1      A.   No.

2      Q.   So this is not the CES, this is the actual

3  voter history of voters in Mississippi?

4      A.   Yes.

5      Q.   And she aggregated turnout data from the voter

6  file up to the block group level and then married the

7  block group level turnout data with block group level

8  racial demographic data on non Hispanic white

9  population, nonwhite population, and then ran the EI

10 analysis; right?

11     A.   I think her definition of nonwhite included

12 Hispanics who were white among others and Indians.  So

13 as she puts in her report, it's nonwhite, so it's not a

14 comparison between white and black.  Is that correct?

15     Q.   We can get into it, but yes, she runs the EI

16 between non Hispanic white and other groups --

17     A.   Correct.

18     Q.   -- as a binary; right?  And she does that by

19 aggregating up the turnout data and the race data,

20 marrying them together into a dataset that can be used

21 for EI; right?

22     A.   That's correct.  And I -- again, I think under

23 the other or nonwhite category, however she described

24 it, she has, for example, people who might -- who say my

25 ethnicity is Hispanic but I'm white racially, and then

Page 303

1    she includes every other race, whether they're Choctaw

2    or Chinese or Vietnamese, etcetera, in that group, yes.

3         Q.  And by the way, just looking at page 11,

4    Footnote 31 -- do you see Footnote 31 there?

5         A.  I do.

6         Q.  -- Dr. Burch says:  "Performing the analysis

7    with non Hispanic, black alone or a combination and

8    nonblack as reference categories also produces estimates

9    of lower black turnout relevant to nonblack residents

10   both statewide and in the central district."  Do you see

11   that?

12        A.  Yes, but it wasn't in her original report, was

13   it?

14        Q.  I mean, it's in the surrebuttal report along

15   with the rest of her EI analysis; right?

16        A.  But that's in the surrebuttal report, that's

17   not the report that I was commenting on.  Did she have

18   it in her original report that I comment on, that's what

19   question I'm asking.

20        Q.  She had it in the rebuttal report that you

21   commented on in your surrebuttal report --

22        A.  Yeah.

23        Q.  -- right?

24        A.  Yeah.

25        Q.  Okay.  All right.  And by the -- well, we'll

657fddd4-f0ef-43b0-bb10-e1f1abd7c8a1

Page 304

1  get back to it in one second.  But going back to the EI

2  analysis.  Looking at pages 10 to 11 of Dr. Burch's

3  rebuttal report, she finds a significant racial turnout

4  gap both statewide and in supreme court district 1.  Do

5  you agree with that?

6      A.  And that's where?

7      Q.  Page 10, last paragraph:  "The estimates

8  obtained using the ecological inference show that

9  there's a statistically significant racial gap in

10 turnout in Mississippi."  Right?

11     A.  And where's the results of the statistical

12 test?

13     Q.  I don't -- I'm asking you if that's what she

14 found.

15     A.  Well that's what she says, but where's the

16 result of the statistical test, is my question.

17     Q.  Did you run a statistical test to confirm

18 whether those results are significant?

19     A.  I didn't.

20     Q.  Okay.  You had no basis to dispute --

21     A.  Well I can't answer whether or not -- what test

22 she did and how she ran it, so I don't -- I'm not in a

23 position to give an opinion on it right now.

24     Q.  You don't give an opinion on it?

25     A.  That's correct.  I don't know whether or not

657fddd4-f0ef-43b0-bb10-e1f1abd7c8a1

White v. State Board of Election Commissioners                    David Arthur Swanson, Ph.D.

Page 305

1  it's -- I can't agree with it, but I don't have an

2  opinion on it because I didn't run an independent

3  statistical test, and she doesn't show one here, she

4  just says she did.

5      Q.  She reports that her statewide EI analysis

6  shows that the white turnout was 58 percent, nonwhite

7  turnout was 42 percent, 16 point gap?

8      A.  She says that.

9      Q.  And in the central district turnout -- black

10 turnout is 44 percent white turnout 62 percent?

11     A.  She said that.

12     Q.  And by the way, when she runs well -- strike

13 that.

14          And Dr. Burch says in the next sentence at

15 the top of the page 11:  "The statewide and central

16 district estimates for each racial group produced using

17 EI and the CES are realistic given what we know about

18 the actual voter participation statewide in the central

19 district, in other words, they match up with the

20 benchmark reported by the secretary of state."  Do you

21 dispute that?

22     A.  Well, I didn't run an EI analysis myself to

23 look at what she did, so I'm not in a position to

24 dispute or not dispute it.

25     Q.  You don't claim that Dr. Burch didn't

Page 306

1    accurately report the results of her analysis?

2         A.  No, I'm not claiming that.

3         Q.  With respect to the EI analysis for district 1,

4    you say -- turning to paragraph 43 of your surrebuttal

5    report.  You say:  "Dr. Burch included Adams County

6    rather than Bolivar County in district 1"?

7         A.  That's correct.

8         Q.  Now assuming that's the case, do you have any

9    reason to think that the inclusion of Adams versus

10   Bolivar would have a material effect on the estimation

11   of turnout by race on a districtwide basis?

12        A.  I don't know the answer to that until I've

13   looked at what the results would be.

14        Q.  You didn't look at the results?

15        A.  I didn't.

16        Q.  Do you know the populations of those two

17   counties are nearly identical 28,000 versus 30,000?

18        A.  No, I didn't.

19        Q.  Did you know they're both black majority

20   counties?

21        A.  No, I didn't.

22        Q.  Would it stand to reason that in a district of

23   750,000 by voting age population including one

24   similarly-sized majority black county versus another is

25   not going to make a difference in terms of measuring the

657fddd4-f0ef-43b0-bb10-e1f1abd7c8a1

White v. State Board of Election Commissioners                David Arthur Swanson, Ph.D.

Page 307

1   districtwide turnout gap using EI?

2        A.   No, I'm not going to agree to that because I

3   don't know what she did in the EI, and I don't know what

4   other factors may have come into play.

5        Q.   But you didn't run an analysis yourself to

6   check?

7        A.   Yes, I didn't.

8        Q.   Have you received any further information about

9   whether or not Dr. Burch conducted -- looked at it with

10  Bolivar instead of Adams?

11       A.   I think she did and sent it on to the

12  attorneys, but Mike and I haven't looked at it.

13       Q.   Do you know what the overall result that she

14  obtained was?

15       A.   No, I don't.

16       Q.   If I told you the result was so similar that we

17  didn't have to change anything in the report, would you

18  dispute that?

19       A.   No, I wouldn't dispute it other than the fact

20  that someone had the wrong county in there.

21       Q.   Right.   But you wouldn't dispute that the

22  results don't actually change if I represented that to

23  you?

24       A.   No, I wouldn't.

25       Q.   You also say that because Dr. Burch coded

White v. State Board of Election Commissioners          David Arthur Swanson, Ph.D.

Page 308

1    racial demographic information as white and nonwhite,
2    more specifically not Hispanic white versus non -- non
3    Hispanic white, she is expressing an opinion about white
4    voters relative to nonwhite voters, not an opinion about
5    white voters relative to black voters?
6         A.   Correct.
7         Q.   All right.  But you would agree that in
8    Mississippi, the vast majority of nonwhite voters are
9    black?
10        A.   I would.
11        Q.   You would agree that black and white
12   Mississippians together form 96.5 percent of the
13   population of Mississippi?
14        A.   I'd have to look at it, but that sounds about
15   right to me.
16        Q.   Do you contend that the existence of a small
17   number of nonwhite, nonblack Mississippians means that
18   it's not possible to draw inferences about black
19   Mississippians' voting behavior based on the actions of
20   nonwhite Mississippians?
21        A.   The issue I have with it is more why not stay
22   with the black population?  Why change the racial
23   definitions for this part of the analysis?  That's the
24   problem I have with it.
25        Q.   But given that 4 percent of the state's CVAP is

657fddd4-f0ef-43b0-bb10-e1f1abd7c8a1

Page 309

1    nonblack or nonwhite or thereabouts, doesn't matter if

2    the turnout in that group is 0 percent or 100 percent?

3         A.  It's a question I can't answer without looking

4    at that data.  It might be just as with the cases of

5    some of these observations that are in the CES file

6    where they have large weights, there could be effects

7    that are like that.  So offhand, I'm not able to answer

8    that question without looking at the data.

9         Q.  I mean, even if the turnout among that small

10   number of nonblack potential voters who are included in

11   the nonwhite category for purposes of the EI analysis

12   was 0 percent, the implied black turnout rate would go

13   up by 4 percent?

14        A.  Again, it's a question that -- you can ask it

15   as many different ways as you can.  My point goes back

16   to:  Why didn't she look at black voters in the first

17   place?  And to answer the question that you're trying to

18   ask me, it could be that among those 4 percent are cases

19   that are -- that are going to be significant as found in

20   the CES file.  So I don't know, so I can't answer the

21   question.

22        Q.  And again, this isn't a survey, this is based

23   on the voter file itself, that's the dataset here.

24        A.  Yeah, and I'm not saying it's from a survey,

25   I'm saying again there's, you know, why switch the

657fddd4-f0ef-43b0-bb10-e1f1abd7c8a1

White v. State Board of Election Commissioners                David Arthur Swanson, Ph.D.

Page 310

1  definition?  And I can't answer the question without

2  knowing more of it or if I started looking deeper in the

3  analysis, which I haven't done.

4       Q.  And as we discussed, looking again at

5  Footnote 31 of Dr. Burch's report, she actually did look

6  at black versus nonblack turnout, and she found looking

7  again at that footnote that black turnout was estimated

8  to be

9  42 percent while nonblack turnout was estimated to be

10 57 percent.  Any reason to dispute that?

11      A.  Yeah, and then there's -- again, why is it

12 black versus nonblack, is the question.  Why isn't it

13 black versus white?

14      Q.  Right.  So the question is:  Do you dispute

15 that that's the result that she obtained?

16      A.  I believe that -- I believe whatever the

17 results she's pointing at, I think she's doing as

18 accurately as she can.  The issue is white versus black

19 and suddenly we're in white and nonwhite, and then we're

20 in black and nonblack.

21      Q.  Well, having estimated black turnout at

22 42 percent and having estimated white turnout at

23 58 percent, can you not look at both the EI analysis and

24 then say she did look at white turnout and black

25 turnout?

White v. State Board of Election Commissioners                    David Arthur Swanson, Ph.D.

Page 311

1     A.  My question is:  Why didn't she do it?  You

2  don't have to ask me that question, ask her why she

3  didn't stick with the same categories.  I don't know the

4  answer to that.

5     Q.  Right.  And --

6     A.  All I can say is that I'm looking at something

7  that says you're looking at these two categories and now

8  suddenly the categories are switched.  So it's difficult

9  for me to answer those questions.

10    Q.  Right.  My question --

11    A.  Regardless of what the numbers are or anything

12 else, it's why -- why change?

13    Q.  Well, I mean, I understand.  But my question

14 is:  It seems like she did do that, that looking at the

15 data, she ran the analysis both white versus nonwhite

16 and black Versus nonblack, and so she does provide that

17 information that you're looking for in her report.

18    A.  But it's not direct, it's not white versus

19 black.  And that's a problem because that's what most of

20 her analysis and that's what it seems everything in this

21 is based on.

22    Q.  Well, it's the same --

23    A.  No matter how many times you ask me this,

24 that's going to be my same answer.  I can tell you right

25 now.

White v. State Board of Election Commissioners                    David Arthur Swanson, Ph.D.

Page 312

1    Q.  Well, why can you not look --

2    A.  Because it's -- the problem is, why did someone

3  change the categories they're doing an analysis from

4  white to black to now it's nonblack and -- or nonwhite?

5  To me, I don't understand the reasons for the change.

6  And you have to wonder why it was done.  And could the

7  categories in the definitions by race in the voter file

8  be different than they are elsewhere?  Is that the

9  reason?  I don't know.  And it could be that -- you

10  know, it could be that there's lots of other issues

11  there, and I'm going on the voter file about race and

12  ethnic definitions that are not brought to the surface

13  here.  I don't know the answer to that.

14    Q.  Well again, the dataset for the EI analysis we

15  also discussed, the racial data comes from the census,

16  right, block group level census data on race; right?

17    A.  Yes.

18    Q.  That's the source of the data?

19    A.  Yes.

20    Q.  Okay.  So let's --

21    A.  But the source of the data is -- it's the

22  PL94171 data file.

23    Q.  Yes.

24    A.  Yes.  Okay.

25    Q.  So understanding that we're using census data,

657fddd4-f0ef-43b0-bb10-e1f1abd7c8a1

White v. State Board of Election Commissioners                    David Arthur Swanson, Ph.D.

Page 313

1    that it's the same dataset --

2         A.  I understand.  But in looking at that, another

3    issue that comes into play that she doesn't mention is,

4    what's the effected differential privacy when you get

5    down to that smaller end, the differential privacy

6    protections that the census bureau has placed on small

7    area data, which I believe are even in the public 94 --

8    the PL94171 data.

9         Q.  Do you have any reason to think that

10   differential privacy has an effect on the statewide or

11   central districtwide EI analysis of voter turnout by

12   race?

13        A.  When you're aggregating up to smaller levels,

14   up to some point they might.  The census bureau will

15   claim that's when you get to the state level or even

16   lower levels that the differences wash out, but I'm not

17   inclined to believe that that's necessarily the case,

18   and they certainly appear at smaller levels of

19   geography.

20        Q.  This isn't something you mention in your

21   report?

22        A.  No.

23        Q.  Is it something you're just thinking about

24   right now?

25        A.  It's -- it is something that I think can have

657fddd4-f0ef-43b0-bb10-e1f1abd7c8a1

White v. State Board of Election Commissioners                    David Arthur Swanson, Ph.D.

Page 314

1   an effect on it when you start using different datasets
2   like that and go down to small areas, yes.
3        Q.  And setting aside the punitive effect of
4   differential privacy, you would agree that using a
5   single dataset based on Mississippi voter data from the
6   secretary of state and race data from the U.S. census,
7   Dr. Burch measured using EI white turnout and black
8   turnout, and we can compare them?
9        A.  I don't agree with that statement at all,
10  because I don't know what the definitions are in the
11  Mississippi voter dataset, how they might vary, what
12  kind of matches you get between the two.  So the --
13  again, I can go back and answer you why switch from
14  white versus black to white, nonwhite and then black,
15  nonblack.  I just don't understand the basis for that.
16       Q.  What do you mean by definition in the
17  Mississippi voter data?
18       A.  Whatever -- how are people defined?  Is it self
19  reporting?  When -- what are the definitions of race
20  that are in the Mississippi voter data file?
21       Q.  The voter --
22       A.  It's not in there, is it?
23       Q.  I will tell you the voter data --
24       A.  Yeah.
25       Q.  -- In Mississippi does not --

657fddd4-f0ef-43b0-bb10-e1f1abd7c8a1

White v. State Board of Election Commissioners          David Arthur Swanson, Ph.D.

Page 315

1      A.  Not in there.

2      Q.  Which is why --

3           THE REPORTER:  Gentleman, one at a time,

4   please.

5      A.  That's the point I'm bringing up.  So that's

6   not there.  So what you're relying on -- totally on the

7   census bureau data for race.

8      Q.  Right.

9      A.  And again, if you've got the sentence data for

10  race, you've got black, you've got white, you've got all

11  the other race categories, why not use them?

12     Q.  We talked about how you used an EI type

13  analysis in the early nineties; right?

14     A.  That's current.

15     Q.  You haven't run an EI analysis since then?

16     A.  No.

17     Q.  Do you have much familiarity with the type of

18  EI analysis that Dr. Burch ran in this case?

19     A.  I can see Beijing type analysis.  I looked

20  through what's on the websites and some of the

21  documentation for the -- both the hard version, the easy

22  version of Brinnon (phonetic), and that's what I know.

23  And for example, one of the points I made in my report

24  about it, she didn't report any priors on what the

25  distributions are and assumptions.  And that's usually

657fddd4-f0ef-43b0-bb10-e1f1abd7c8a1

White v. State Board of Election Commissioners          David Arthur Swanson, Ph.D.

Page 316

1   common in a Beijing analysis.

2       Q.  And --

3       A.  But that still doesn't get to my question.

4   Why, if you've got the data for white and black and why

5   switch the racial categories?  I don't understand why

6   she would do that.

7       Q.  Are there reasons why if you're doing an

8   analysis like this, you would not want to include a

9   third group as a very small population?

10      A.  I don't know the answer to that.  I just -- my

11  question still is:  Why not look at black versus white

12  if you've got the data for it?

13      Q.  How would you go about looking at black versus

14  white?

15      A.  Well, she had it.  She's using the ACS;

16  correct?  They use those same racial categories,

17  correct, in her EI analysis.  That's in there; correct?

18  Where did she get the data for race if it's not from the

19  ACS?

20      Q.  From the U.S. census, from the PL --

21      A.  The PL9R, yeah.  My mistake.  So from that

22  dataset, they're in there too, white, black, any part

23  black, all those issues.  So why switch?

24      Q.  So you're suggesting that the EI analysis could

25  also have been run with many different racial categories

657fddd4-f0ef-43b0-bb10-e1f1abd7c8a1

White v. State Board of Election Commissioners                David Arthur Swanson, Ph.D.

Page 317

1    estimating the voter turnout not only of black voters
2    and white voters but also of American Indian voters and,
3    you know, Hispanic voters, understanding --
4         A.  That's not what I'm suggesting.  What I'm
5    suggesting is -- and I'm asking the question -- why
6    didn't she run that analysis?  Why did she switch the
7    categories from what she did elsewhere in her report
8    where it's white and black?  That's what's I don't
9    understand.
10        Q.  Right.  And I guess I'm asking:  How would you
11   run an EI analysis on more than two variables --
12        A.  It's not running more than two.
13        Q.  -- reference categories?
14        A.  How did she run it -- it's the same thing.
15   Here's white, nonwhite.  She ran that; correct?
16        Q.  Correct.
17        A.  Why didn't she run white, black?
18        Q.  Right.  And I'm asking the questions, I'm not
19   going to answer them.  But you don't -- you don't
20   know -- I think the answer is clearly you don't, but you
21   don't know of reasons why you would want to consolidate
22   voters into two reference groups in order to, for
23   example, not have part of your analysis be on very small
24   numbers of members of a particular racial group that's
25   not white and not black because the effects would be

657fddd4-f0ef-43b0-bb10-e1f1abd7c8a1

White v. State Board of Election Commissioners                David Arthur Swanson, Ph.D.

Page 318

1    less accurate?

2         A.  I didn't say she needed to run it on, say, the

3    Cherokee population.  I'm saying why didn't she just run

4    white versus black?  She didn't do that.  She ran white

5    versus, you know, non Hispanic white versus everybody

6    else.

7         Q.  Do you know whether it's possible to do the

8    thing you're suggesting using EI analysis?

9         A.  Why didn't she do it?  That's a question I'm

10   asking.  I can't answer that question.  I don't know

11   what's possible in the EI analysis.  My question is:

12   Why didn't she run white versus black?  Because

13   everything in the reports up to this point are -- uses

14   those two categories.  It's not nonwhite, did you report

15   to me something about, well, here's the nonwhite VAP in

16   a certain county, and they outnumber the white VAP.  No.

17   It was all white versus black.  So why is it suddenly

18   changing in the EI analysis to a new category of race?

19   That's my question.

20        Q.  And Dr. Burch found that white turnout was 58

21   percent statewide and 62 percent in district 1?

22        A.  Using the definition of white that she used in

23   the EI analysis?

24        Q.  Non Hispanic white as defined by the census?

25        A.  Yes.

657fddd4-f0ef-43b0-bb10-e1f1abd7c8a1

Page 319

1      Q.  And she found that non Hispanic black alone or

2  in combination turnout was 42 percent statewide and

3  43 percent in district 1?

4      A.  That's on -- where is that found again?

5      Q.  Footnote 31.

6      A.  That's what she says.  But again, why didn't

7  she just put that in her report?  And again, down here,

8  it says again it's -- it's black turnout is estimated

9  this while nonblack turnout was this.  Why didn't she

10  have black versus white even in this footnote?  That's

11  what I don't understand.  She has white, nonwhite, and

12  then down here she has black, nonblack.  And why the

13  switch?  To me, that's mystifying.

14      Q.  But you don't run an EI analysis, so you

15  wouldn't be able to say whether there's an

16  understandable reason to construct your analysis that

17  way?

18      A.  Well, no matter what analysis, I would be

19  running ones I was familiar with or not.  The question I

20  would ask is:  Why did someone switch these categories

21  in this way?  To me, that's -- it's not a good sign.

22  And whether or not it's -- it's okay that the numbers

23  are really small and everything turned out to be the

24  same; if that's the case, why not run it that way

25  instead of do this?

657fddd4-f0ef-43b0-bb10-e1f1abd7c8a1

Page 320

1    Q.  It's not a good sign because you don't
2  understand why she did it?
3    A.  Yes.  She doesn't give any explanation.  So
4  reading the reports that she does, white, black, white,
5  black, white, black.  So when we get to this point, it's
6  white, nonwhite, and even down here in the footnote it's
7  black, nonblack.
8    Q.  Because this is a different analysis, the EI
9  analysis?
10   A.  I understand.  But the whole function of the
11  report wasn't to suggest that it's black voters that are
12  turning out at a lower rate than white voters.  Isn't
13  that the intent of the entire exercise here?  I'm asking
14  you.  So all of a sudden, we have black and nonblack and
15  then white and nonwhite.
16   Q.  So it could be that she did it this way to
17  ensure the accuracy of her results?
18   A.  But if that's the case, why would that be more
19  accurate than saying white and black and black and
20  white?  I don't know the answer.  I can't answer what
21  she did in the analysis.  All I can do is read what she
22  said.  And what she says is not consistent with things
23  she said elsewhere up to this point in the report she's
24  done.
25   Q.  She constructed a different analysis

657fddd4-f0ef-43b0-bb10-e1f1abd7c8a1

White v. State Board of Election Commissioners                    David Arthur Swanson, Ph.D.

Page 321

1   differently?

2        A.   That's what it appears to be.  That's my

3   question, is, you know, why?  Doesn't seem to be the

4   topic.

5        Q.   So just zooming out and talking about your

6   surrebuttal report, how much time did you spend putting

7   that surrebuttal report together?

8        A.   It's quite a bit of time, especially starting

9   to look into the EI analysis which I was not familiar

10  with.  So I spent a fair amount of time doing that

11  thinking I don't want to have to learn R to do this, you

12  know, it looks painful.  I mean, I started down the path

13  to do it, but then when I started reading the report

14  again and said well, I see Dr. Burch now switched

15  categories, and I -- that to me is a problem right

16  there, I think I'll stop at that point.

17       Q.   And how much time do you think it was total?

18       A.   I'd have to look.  It's a lot of hours.

19       Q.   More than 40?

20       A.   I don't know.  Maybe.  Again I'd have to look.

21  Once I send the hours in, I don't keep track of it.

22       Q.   You sent them in?

23       A.   I have them -- I've got them posted.  If you

24  want to look at them, I've got an Excel spreadsheet.

25       Q.   You kept records --

White v. State Board of Election Commissioners                    David Arthur Swanson, Ph.D.

Page 322

1       A.   Yes.

2       Q.   -- contemporaneous of your hours?

3       A.   Oh, yes.  Sure.

4       Q.   Did you do any analyses that you left out of

5  your surrebuttal report?  You mentioned a t-test.

6       A.   No.  Other than that I did subsequently, as I

7  said, I don't think so.

8       Q.   You did the t-test subsequent to --

9       A.   Well, when I was doing the original analysis, I

10  just didn't put it in the report.

11       Q.   Okay.  And you can provide that to us?

12       A.   I can.

13       Q.   And --

14            MR. WALLACE:  We will take that under

15  consideration, and we'll let you know.  You've also

16  asked for a piece paper from the other expert and we're

17  in the process, we'll get back to you soon.

18            MR. SAVITZKY:  Thank you.

19  BY MR. SAVITZKY:

20       Q.   And any -- other than that t-test, any other

21  analysis that you sort of ran but didn't include in the

22  report?

23       A.   No.

24       Q.   How about for your initial report?

25            MR. WALLACE:  Same objection as to being out

White v. State Board of Election Commissioners                    David Arthur Swanson, Ph.D.

Page 323

1    of time.  He may answer if he remembers.

2         A.  I can't recall running different analysis that

3    are not in the report.

4              MR. SAVITZKY:  Just one second.  Can we take

5    three minutes, just go off.  Thank you.

6              MR. WALLACE:  Thank you.

7         (Short recess from 4:55 to 5:08 p.m.)

8              MR. SAVITZKY:  Back on the record.

9              That concludes my questioning for

10   Dr. Swanson at this point, so --

11             MR. WALLACE:  I have one statement I need to

12   make in response to your question about correcting

13   things at the front end, and if you want me to ask him

14   to swear to it, I will.  He has not testified in court

15   in the voting rights case.  That was his testimony.  It

16   was true, but in an abundance of caution, he has given a

17   deposition in the voting rights case in Louisiana.  And

18   I wanted to make sure you knew that -- I suspect you

19   already do, but I wanted to clarify it on the record.

20             MR. SAVITZKY:  And just -- that's in the

21   Ardoin case?

22             MR. WALLACE:  It is Ardoin, isn't it?

23             THE WITNESS:  It is.

24             MR. SAVITZKY:  Congressional redistricting

25   case?

White v. State Board of Election Commissioners                    David Arthur Swanson, Ph.D.

Page 324

1          MR. WALLACE:  Correct.  That all I've got.
2     We will read and sign.  And we'll respond to you once we
3     get it.
4          THE REPORTER:  So you're ordering the
5     transcript?
6          MR. SAVITZKY:  Yes, please.
7          THE REPORTER:  And you want a copy,
8     Mr. Wallace?
9          MR. WALLACE:  Oh, yes.
10         (Deposition concluded at 5:09 p.m.)
11         (Reading and signing was requested
12          pursuant to FRCP Rule 30(e).)
13
14
15
16
17
18
19
20
21
22
23
24
25

White v. State Board of Election Commissioners                David Arthur Swanson, Ph.D.

Page 325

1                         C E R T I F I C A T E

2

3    STATE OF WASHINGTON

4    COUNTY OF WHATCOM

5

6

7        I, Evelyn M. Adrean, RPR, a Certified Shorthand

8    Reporter in and for the State of Washington, do hereby

9    certify that the foregoing transcript of the deposition

10   of DAVID ARTHUR SWANSON, Ph.D., having been duly sworn

11   on OCTOBER 5, 2023, is true and accurate to the best of

12   my knowledge, skill, and ability.  Reading and signing

13   was requested pursuant to FRCP Rule 30(e).

14           IN WITNESS WHEREOF, I have hereunto set my hand

15   and seal this 20th day of October 2023.

16

17

18   _____

19           EVELYN M. ADREAN, RPR, CCR-WA

20

21

22

23

24

25

657fddd4-f0ef-43b0-bb10-e1f1abd7c8a1