# Dyamone White, et al. v. State Board of Election Commissioners, et al.

## Christopher Bonneau

## September 29, 2023

All depositions & exhibits are available for downloading at
<<www.brookscourtreporting.com>>
Please call or e-mail depo@brookscourtreporting.com if you need a
**Username** and **Password.**



**Mississippi - Louisiana - Tennessee - New York**
**1-800-245-3376**

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF MISSISSIPPI
GREENVILLE DIVISION


DYAMONE WHITE, ET AL.

                                        PLAINTIFFS


V.                        NO. 4:22-CV-00062-SA-JMV


STATE BOARD OF ELECTION
COMMISSIONERS, ET AL.

                                        DEFENDANTS


DEPOSITION OF CHRISTOPHER BONNEAU


Taken at the instance of the Plaintiffs at Wise,
Carter, Child & Caraway, 401 E Capitol, Suite 600
    Jackson, Mississippi 39201-2688, on Friday,
              September 29, 2023,
           beginning at 9:00 a.m.


REPORTED BY:

ROBIN G. BURWELL, CCR #1651

## Page 2

1  APPEARANCES:
2
3  MING CHEUNG, ESQ.
   ARI J. SAVITZKY, ESQ.
4  Destiny Ruiz
   American Civil Liberties Union of
5   Mississippi Foundation
   125 Broad Street, 18th Floor
6  New York, New York 1004
   mcheung@aclu.org
7
8  JOSHUA TOM, ESQ.
   American Civil Liberties Union of
9   Mississippi Foundation
   101 South Congress Street
10 Jackson, Mississippi 39201
   jtom@aclu-ms.org
11
12 LESLIE FAITH JONES, ESQ.
   Southern Poverty Law Center
13 111 East Capitol Street, Suite 280
   Jackson, Mississippi 39201
14 leslie.jones@splcenter.org
15
16 AHMED SOUSSI, ESQ.
   Southern Poverty Law Center
   150 E Ponce de Leon Avenue, Suite 340
17 Decatur, Georgia 30030
   ahmed.soussi@splcenter.org
18
19     COUNSEL FOR PLAINTIFFS
20
21 MICHAEL B. WALLACE, ESQ.
   Wise Carter
22 401 East Capitol Street, Suite 600
   Jackson, Mississippi 39201
23 mbw@wisecarter.com
24
25 CONT'D

## Page 3

1     REX M. SHANNON, III, ESQ.
      GERALD KUCIA, ESQ.
2     Special Assistant Attorney General
      Post Office Box 220
3     Jackson, Mississippi 39205
      rex.shannon@ago.ms.gov
4
5         COUNSEL FOR DEFENDANTS
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

## Page 4

1              INDEX
2   Style.......................................1
3   Appearances................................2
4   Index    ...................................4
5   Certificate of Deponent  .................169
6   Certificate of Court Reporter ............170
7            EXAMINATIONS
8   Examination By Mr. Cheung .................5
9   Examination By Mr. Wallace ...............167
10           EXHIBITS
11  Exhibit 1 January Report .................15
12  Exhibit 2 September Rebuttal Report .......15
13  Exhibit 3 Orey October Report ............87
14  Exhibit 4 Article ........................116
15  Exhibit 5 Alabama Transcript .............150
16
17
18
19
20
21
22
23
24
25

## Page 5

1          CHRISTOPHER BONNEAU,
2  having been first duly sworn, was examined and
3  testified as follows:
4  EXAMINATION BY MR. CHEUNG:
5      Q.  Good morning, Dr. Bonneau, my name is
6  Ming Cheung.  I'm an attorney with the ACLU.  I'm
7  here on behalf of the plaintiffs.  I'll let my
8  colleagues also identify themselves.
9          MS. JONES:  Leslie Faith Jones with
10 Southern Poverty Law Center, also for the
11 plaintiffs.
12         MR. TOM:  Hi, my name is Joshua Tom and
13 I'm with ACLU Mississippi for the plaintiffs.
14         MR. CHEUNG:  Anyone else for the
15 plaintiffs on the Zoom?
16         MR. SAVITZKY:  Yes, this is Ari
17 Savitzky.  I'm another attorney for the plaintiffs
18 for ACLU.  Good morning.
19         MS. RUIZ:  Hi, good morning.  My name is
20 Destiny and I'm paralegal at the ACLU.
21         MR. WALLACE:  As long as we're
22 introducing ourselves.  I'm Mike Wallace for the
23 defense.  Welcome to Wise Carter.
24         MR. SHANNON:  Good morning, I'm Rex
25 Shannon with Mississippi Attorney General's Office

2 (Pages 2 to 5)

Christopher Bonneau 9/29/2023

**Page 6**

1    here for the defendants.
2        MR. KUCIA:  Gerald Kucia with the
3    Mississippi Attorney General's Office for the
4    defendants.
5        Q.  (By Mr. Cheung)  So, Dr. Bonneau, I
6    believe you've been deposed before, but just in
7    case I'd like to spend a minute going over some
8    ground rules.  Your attorney might object to some
9    of the questions I ask, but in general unless he
10   instructs you not to answer on the basis of
11   privilege you still have to answer even if there
12   is an objection.  Do you understand that?
13       A.  I do.
14       Q.  Thank you.  Do you understand that your
15   answers today are under oath?
16       A.  I do.
17       Q.  And that means you must tell the truth
18   just as if you were testifying in court?
19       A.  Yes.
20       Q.  Is there any reason you cannot provide
21   complete and accurate testimony today?
22       A.  Not that I'm aware of.
23       Q.  And because the court reporter can only
24   take down verbal responses, do you understand that
25   you have to answer verbally instead of nodding or

**Page 7**

1    shaking your head?
2        A.  I do.
3        Q.  Thank you.  And I'm going to try not to
4    interrupt you today during your answers, you know,
5    so that we have a clean transcript.  I would also
6    appreciate you if you wait until I ask a -- finish
7    asking a question before providing your response.
8        A.  Sounds good.
9        Q.  Thank you.  And if you don't understand
10   a question, please let me know and I can try to
11   ask a better question.
12       A.  Okay.
13       Q.  All my questions are great from the
14   beginning.
15           If you need to take a break, please feel
16   to ask.  I would just ask you to finish answering
17   the question pending before you -- before we take
18   a break, if that's okay.
19       A.  Sure.
20       Q.  I'd also ask you not to discuss your
21   testimony with your attorneys during breaks unless
22   it's about the scope of privilege in your
23   responses.  Is that okay?
24       A.  Sure.
25       Q.  Any questions before we begin?

**Page 8**

1        A.  No.
2            MR. CHEUNG:  I think someone might have
3    jumped into the Zoom just now.
4            MR. SOUSSI:  Hi, this is Ahmed Soussi
5    with SPLC.
6        Q.  (By Mr. Cheung)  Dr. Bonneau, I just
7    have a few questions about sort of your
8    preparation for the deposition today.  How did you
9    prepare for this deposition?
10       A.  I read over my reports.  I met with the
11   lawyers for the state and I read over the reports,
12   particularly, the report by Dr. Orey.
13       Q.  And how much time would you say you
14   spent preparing for this deposition?
15       A.  So depends what you mean by preparing.
16   I would say that I've spent probably three hours
17   preparing, just reading over reports and talking
18   and meetings and so on.  If you consider
19   everything before this in the last two days, I
20   mean, it's obviously more.  But that's a good
21   ballpark.
22       Q.  What else did you spend time on?
23       A.  Well, as I was preparing my rebuttal
24   report, as well as my original report, I spent a
25   lot of time.  So if that counts as preparation for

**Page 9**

1    the deposition.  But in terms of since the report
2    has been filed to today, I would estimate about
3    three hours.
4        Q.  Okay.  Other than your reports and
5    Dr. Orey's report, did you review any other
6    documents to prepare for the deposition?
7        A.  Not that I -- no, not since I filed my
8    rebuttal report.
9        Q.  Okay.  Did you jot down any notes while
10   preparing for the deposition?
11       A.  No.
12       Q.  Apart from this case, how many times
13   have you been retained as an expert in a case?
14       A.  I have been retained twice besides this
15   case.
16       Q.  Which cases are those?
17       A.  One was the NAACP versus Alabama case.
18   And the other one is a pending case in Colorado,
19   Lopez versus The State of Colorado, I believe is
20   the title of that case.
21       Q.  Lopez versus Griswold, does that sound
22   right?
23       A.  Yeah, that's it.
24       Q.  So let's go through each one of those.
25   In the Alabama case, do you recall what opinions

3 (Pages 6 to 9)

Christopher Bonneau 9/29/2023

**Page 10**

1  you offered?
2       A.  I do.
3       Q.  What did you conclude in that case?
4       A.  I concluded that in the Alabama State
5  Supreme Court elections there was not a violation
6  of the Voting Right Act, that, in fact, African
7  American candidates performed better --
8  particularly African American Democratic
9  candidates performed better than white Democratic
10  candidates.  Unfortunately there were no African
11  American Republican candidates in there so we
12  couldn't do that comparison.  And so my conclusion
13  was it was party more so than race.
14       Q.  Were you deposed in that case?
15       A.  I was.
16       Q.  Did you testify in court?
17       A.  I did.
18       Q.  And were you qualified as an expert on
19  racially polarized voting?
20       A.  I was.
21       Q.  And specifically, were you qualified to
22  testify about whether racially polarized voting,
23  or RPV, whether it exists or what the causes were?
24       A.  So I did not conduct any independent
25  analysis of racially polarized voting.  I

**Page 11**

1  stipulated that the analysis that the plaintiffs
2  have done was correct.  And the question was what
3  were the reasons why behind the patterns they
4  observed.
5       Q.  And I know it's been -- it may have been
6  a couple of years since that case, but I pulled up
7  the Court's order related to your report.  I'm
8  going to read you a sentence from that order and
9  you can let me know if it sounds about right.  The
10  Court in the order wrote:  Dr. Bonneau was opining
11  that party not race leads to a defeat of African
12  American candidates.  He's not opining that
13  African American voters do or do not vote
14  cohesively.
15           Does that sound like an accurate summary
16  of your report?
17       A.  It does.
18       Q.  Does that accurately describe your work
19  in this case?
20       A.  Can you read it again?
21       Q.  Dr. Bonneau is opining a party not race
22  leads to defeat of African American candidates.
23  He is not opining that African American voters do
24  or do not vote cohesively.
25       A.  Yes, I mean the difference -- yes,

**Page 12**

1  that's a good summary.  I mean, there were some
2  differences between this case and the Alabama
3  case, but yes.
4       Q.  And let's talk about the Colorado case.
5  What was that case about?
6       A.  So in that case political candidates are
7  suing the State of Colorado over their campaign
8  finance restrictions, specifically the amount of
9  money that individuals can donate to political
10  campaigns.
11       Q.  And what opinions did you offer in that
12  case?
13       A.  I offered that the -- so my analysis
14  showed that Colorado has one of the lowest
15  campaign finance limits in the country, and that
16  these limits impede the ability of challengers to
17  successfully compete against incumbents.
18       Q.  Were you deposed in that case?
19       A.  Yes.
20       Q.  Did you testify in court?
21       A.  It's pending.  I'm supposed to, yes.
22       Q.  Okay.
23       A.  The case has not gone to trial yet.
24       Q.  But that case did not involve racially
25  polarized voting?

**Page 13**

1       A.  It did not.
2       Q.  Thank you.
3           Have you ever performed a racially
4  polarized voting analysis yourself?
5       A.  No.
6       Q.  Just to drill down on that, have you
7  ever conducted a homogenous precinct analysis?
8       A.  Not independently, no.
9       Q.  What about an ecological regression
10  analysis?
11       A.  Not in the context of voting rights
12  cases, no.
13       Q.  And ecological inference?
14       A.  So I mean, not in any published
15  articles.  So we're going back now to when I was
16  in graduate school 25 years ago.  I have
17  recollections of performing that as part of like a
18  class assignment in a methods class -- a political
19  research methods class, but nothing that I've ever
20  done my own research on or anything else.
21       Q.  So no publications on any of the three
22  methods that we just discussed?
23       A.  Correct.
24       Q.  And not as part of any expert work
25  you've done on a case?

**4 (Pages 10 to 13)**

Christopher Bonneau 9/29/2023

**Page 14**

1    A. Correct.
2    Q. And not part of any coursework that
3  you've taught?
4    A. That I've taught? I've taught the
5  theoretical concept of -- so the ecological
6  fallacies of pretty standard topic in political
7  methodology courses, so I teach graduate students
8  methods courses or philosophy of science courses.
9  We do talk about that theoretically. But I've not
10  taught the mechanics behind it, no.
11    Q. Got it. So let's turn to the reports in
12  this case. Did you prepare two reports?
13    A. I did.
14    Q. The first one was from January 2nd of
15  this year?
16    A. That sounds correct.
17    Q. And then the most recent one a
18  surrebuttal report from September 12th of this
19  year?
20    A. That sounds correct.
21    Q. I'm going to give you a copy of that
22  report just so you have it in front of you.
23    A. Great.
24    Q. I'm not trying to quiz you on anything
25  in it.

**Page 15**

1    A. That's fine.
2    (Exhibit 1 marked for identification.)
3    Q. (By Mr. Cheung) That's now been marked
4  as Exhibit 1. Dr. Bonneau, can you look at it and
5  confirm if that's your January report?
6    A. It appears to be the case.
7    Q. Thank you. Also handing your
8  surrebuttal report to Ms. Burwell for marking.
9    (Exhibit 2 marked for identification.)
10    Q. (By Mr. Cheung) Dr. Bonneau, does that
11  look like your September report, Plaintiff's
12  Exhibit 2?
13    A. It does.
14    Q. Do those reports accurately reflect your
15  opinions in this case?
16    A. They do.
17    Q. Do those reports omit any analysis that
18  you've conducted for this case?
19    A. They do not.
20    Q. Are there any corrections you're aware
21  of that you would like to make to the report?
22    A. Not at this time.
23    Q. Are there any updates to your CV since
24  January 2023?
25    A. There are.

**Page 16**

1    Q. Would you mind giving us some highlights
2  of the updates?
3    A. I am now chair of the Spanish and
4  Portuguese department.
5    Q. Oh, how did that come about?
6    A. How much time do we have? So the
7  department was placed into receivership by the
8  Dean, meaning they were no longer able to govern
9  themselves due to a variety of longstanding policy
10  violations and disputes. And so the Dean tasked
11  me with going in for a couple of years to run the
12  Spanish and Portuguese department.
13    Q. Any other updates?
14    A. I've got an article forthcoming about
15  teaching in prison and prison education that's
16  coming in an edited book. But I think those are
17  the only things that have really changed since
18  January.
19    Q. Okay. So no updates related to judicial
20  elections?
21    A. No, I've been busy with Spanish and
22  Portuguese.
23    Q. And, Dr. Bonneau, are you familiar with
24  the Gingles preconditions in voting rights cases?
25    A. I am.

**Page 17**

1    Q. What is your understanding of the
2  Gingles factors?
3    A. So my understanding is there are three
4  factors that are required. One has to do with
5  racially polarized voting, such that African
6  Americans are not able to elect candidates of
7  their choice -- or generally able to elect
8  candidates of their choice.
9    There's a factor about the totality of
10  circumstances that even if you establish racially
11  polarized voting, that doesn't necessarily mean
12  that there's a violation of the Voting Rights Act.
13  In fact, this has to lead to certain kinds of
14  outcomes.
15    And there's another factor that I --
16  escapes me at this moment.
17    Q. You're not a lawyer?
18    A. No, I am not.
19    Q. So not expecting a perfect recall of the
20  language from Gingles. But if I could read to you
21  some of the language from Gingles and you tell me
22  if that's consistent with your understanding.
23    A. That would be great.
24    Q. So Gingles one, the first factor, the
25  Court said: First, the minority group must be

**5 (Pages 14 to 17)**

Christopher Bonneau 9/29/2023

**Page 18**

1  able to demonstrate that it is sufficiently large
2  and geographically compact to constitute a
3  majority in a single-member district.
4       Does that sound right?
5       A.  That does sound right.
6       Q.  Gingles two, second:  The minority group
7  mush be able to show that it is politically
8  cohesive.
9       Does that sound right?
10      A.  Yes.
11      Q.  And third:  The minority must be able to
12 demonstrate that the white majority of votes
13 sufficiently as a block to enable it usually to
14 defeat the minority's preferred candidate.
15      Does that sound right?
16      A.  Correct.
17      Q.  And in your view, does "usually" in the
18 third condition mean most of the time?
19      A.  Well, I mean I wouldn't a percentage on
20 it.  I mean, you know, I think usually means
21 usually.  So if I say I usually do something, it
22 means more often than not.  I don't know if it
23 necessarily has to be -- if there's a certain
24 percentage threshold.  But, yeah, more often than
25 not.

**Page 19**

1       Q.  Were you asked to assess any particular
2  one of the Gingles factors for your report?
3       A.  No.
4       Q.  In paragraph 53 of your January report
5  you say, quote:  This does not support the third
6  precondition of Thornburg versus Gingles(1986).
7       Is that right?
8       A.  It does.
9       MR. WALLACE:  Which page is that?
10      THE WITNESS:  15.
11      Q.  (By Mr. Cheung)  Is it fair to say that
12 your reports do not dispute the existence of
13 Gingles' precondition one in this case?
14      A.  Correct.
15      Q.  And is it also fair to say that you do
16 not dispute the existence of Gingles two
17 precondition in this case?
18      A.  Remind me of what precondition two was.
19      Q.  The minority group must be able to show
20 that it is politically cohesive.
21      A.  That's correct.
22      Q.  And what is your understanding of
23 racially polarized voting?
24      A.  That voting is determined -- voting
25 breaks down on racial lines to a significantly

**Page 20**

1  high degree, such that in this case, that black
2  voters would not be able to elect their preferred
3  candidate because of the presence of white voters.
4       Q.  Is that the definition that you use in
5  your reports for this case?
6       A.  I don't think I give a definition in the
7  reports for this case.
8       Q.  Is that definition the one that you're
9  operating under as you're analyzing the facts of
10 this case?
11      A.  Well, in my report I don't really talk
12 much about the determinants of racially polarized
13 voting.  I take Orey's analysis as factual.  What
14 I do in this report is argue that even if it's
15 present, it does not lead to black preferred
16 candidates usually losing their elections.
17      Q.  Got it.  Thank you.
18      What do you think is the purpose of
19 assessing racially polarized voting in districting
20 cases?
21      MR. WALLACE:  If that's asking for a
22 legal opinion, I object to the form, but he may
23 respond as best he can.
24      THE WITNESS:  What do you mean, what is
25 the purpose?

**Page 21**

1       Q.  (By Mr. Cheung)  Why do you think
2  racially polarized voting is relevant in voting
3  rights cases?
4       MR. WALLACE:  That is a legal opinion.
5  I object to the form, and he can answer.
6       THE WITNESS:  Why is it relevant as a
7  practical matter or as a --
8       Q.  (By Mr. Cheung)  A practical matter,
9  yeah.
10      A.  So why is racially polarized voting --
11 well, so if you believe that individuals should
12 have -- that elections should allow for a fair
13 contest, the individuals have different beliefs
14 that if you have racially polarized voting it
15 could be a way, right, for disenfranchisement to
16 occur among a minority group.
17      Q.  Thank you.
18      I just have a few questions about the
19 sources that you use in your report.  Your January
20 report has an Appendix A of election results; is
21 that right?  That's on page 44.
22      A.  I'm not seeing the Appendix A.  On my
23 January report?
24      Q.  Yes.
25      MR. WALLACE:  Page 19.

**6 (Pages 18 to 21)**

Christopher Bonneau 9/29/2023

**Page 22**

1    THE WITNESS: Yes, it does.
2    Q. (By Mr. Cheung) And what sources did
3 you use to collect the data that you used for
4 Appendix A?
5    A. That's just public data from the
6 Mississippi Secretary of State's website.
7    Q. Nothing else?
8    A. Well, to determine, you know, which
9 candidates were African American, you know, I
10 Googled and looked at, you know, news stories and
11 other things about that.
12    Q. And in your academic work, do you
13 maintain any kind of database pertaining to state
14 court elections that you may have relied on for
15 reports here?
16    A. I do maintain that database and it's --
17 so I do have, like, a document with every State
18 Supreme Court election over the past 30 years. So
19 it's possible that I use that to identify, like,
20 what years to look at, because elections don't
21 occur every year in Mississippi. So that's
22 certainly possible.
23    Q. So I think in paragraph 6 of your
24 January report you reference a dataset, is that
25 dataset the one that you maintain in your academic

**Page 23**

1 work?
2    A. Yes.
3    Q. And what kinds of information is in that
4 dataset?
5    A. Well, that dataset has a bunch of stuff.
6 So, it has characteristics about the candidates.
7 So race, gender, incumbency, non-incumbency,
8 whether or not the candidate was originally
9 appointed to the bench versus originally elected
10 to the bench. It has results from primaries, has
11 results from general elections. It has campaign
12 spending where available, the amount of money
13 spent and raised by individuals. It has the
14 partisanship. So was the race was a partisan,
15 nonpartisan race; was it a district race versus
16 state wide race. So it basically has -- so if you
17 look at any of my previous articles, any of those
18 variables that are in those articles are in that
19 dataset.
20    Q. Yeah, I did try to make it through your
21 articles but you have quite a few of them.
22    A. Thank you.
23    Q. What time period does your dataset
24 cover?
25    A. So most of it is from '90 to about 2016.

**Page 24**

1 So I have complete data from '90 to 2016. I have
2 partial data before 1990, but a lot of stuff is
3 missing from it because it was so long ago. And
4 around 2016 I started doing some administrative
5 work. And the nature of my career has shifted,
6 and so I haven't been as diligent on updating it
7 since then. But I did update it for this case.
8 So the elections post 2016 here and 2020, I went
9 and collected that information, you know, for the
10 purposes of this case.
11    Q. Got it. So it would have a complete set
12 of Mississippi Supreme Court elections starting
13 from 1990?
14    A. Yes.
15    Q. What sources do you use for that
16 dataset?
17    A. So, variety of sources. Obviously the
18 best source is the Secretary of State's website
19 because it's official returns. I use newspaper
20 articles about -- so if I can't tell if a
21 candidate, you know, what race or gender is,
22 newspaper articles often do that. Sometimes you
23 can go to Judge PDO which is a website that has a
24 bunch of facts about judges. So a variety of
25 public information sources. Because all this data

**Page 25**

1 is public data.
2    Q. Is the dataset itself public?
3    A. Parts of it are. I mean, certainly I
4 can make it so. I mean, I've -- so if you go to
5 my data verse page, I've released datasets for all
6 of the articles I have published, which includes
7 both the dataset and the code book and the
8 instructions for running, rerunning analysis for
9 replication purposes. But I've never done
10 anything with, like, the full data, so the whole
11 thing is not --
12    Q. Would you be able to provide that
13 dataset to us?
14    A. Of course.
15    Q. Thank you.
16    A. Do you want just for the Mississippi
17 part or do you want -- you'd have to be clear
18 about what you wanted. I can easily do that.
19    Q. Just the Mississippi part will be fine.
20    Thank you. I think you nodded. Is that
21 okay?
22    A. Yes, that is fine. Sorry.
23    Q. Have you received any facts or sources
24 from your attorneys in this case?
25    A. Yes, I've been directed occasionally,

7 (Pages 22 to 25)

Christopher Bonneau 9/29/2023

Page 26

1  you know, because I'm not an expert in
2  Mississippi, generally, of something -- sometimes
3  some leads to pursue that would not have been
4  apparent to somebody from the outside.
5      Q.  Have you been asked to assume any fact
6  to be true in the preparation of your reports?
7      A.  I have not.
8      Q.  In paragraph 1 of your January report,
9  you mention having used voter registration data.
10  Do you see that?
11      A.  In paragraph 1.  So meaning the first
12  paragraph on Page 1.
13      Q.  Yes.
14      A.  I was retained -- based on Mississippi
15  state voter registration and election data.  Yes.
16      Q.  Did you receive that voter registration
17  data from the Secretary of State's website or some
18  other source?
19      A.  I don't recall, but I'm pretty sure it
20  was the Secretary of State's website.  That would
21  be usually where I would go.
22      Q.  Do you recall what you used the
23  registration data for?
24      A.  Well, I don't know if I -- no, I don't.
25  But if I read my report again, I probably could

Page 27

1  find out if I used it at all or what I used it
2  for.  But off the top, no.  I probably used it
3  for -- I don't know what I would have used it for.
4      I would have used it -- I would have
5  used voter data to calculate roll-off.  Right?
6  Sometimes the people who voted versus those who
7  voted for State Supreme Court so when we look at
8  rates.  But I don't recall using the voter
9  registration data.  But I'm happy to be corrected
10  on that.
11      Q.  I didn't see anything in your report,
12  which is why I'm asking about it.  Because you
13  cite the data, but I don't see any actual analysis
14  of voter registration in your reports.  Does that
15  sound right to you?
16      A.  It does, makes me gratified I'm not
17  missing something.
18      Q.  So as best as you recall you did not
19  performing any analysis of voter registration
20  rates?
21      A.  That's a fair statement.
22      Q.  I have a few questions about statistical
23  methods, generally.  In your academic work, do you
24  evaluate statistical analyses performed by other
25  scholars?

Page 28

1      A.  That's a hard question to answer.  Do I
2  evaluate?  So, yes, in a sense.  So when I'm asked
3  to review journal articles, my part of the job of
4  me as a peer reviewer is to evaluate, you know, do
5  the scholars or does the article, the submission,
6  is it reliable, does it answer the question.
7      When I was editor of a journal for six
8  years part of the decisions that we made, you
9  know, whether or not we would accept an article
10  for publication or not was the quality of the
11  empirical analysis, was the research design done
12  properly, were the methods used to analyze and
13  arrive at the conclusions the proper ones.  And so
14  in that sense, yes.
15      Q.  And so when you review articles for the
16  reliability of the empirical analyses, what are
17  the indicators that you tend to look at?
18      A.  So there are a couple of things.  The
19  first question is, is the design suitable to
20  answer the question.  That is, so if you want to
21  answer a question about -- I'll give you an
22  example -- of voters' perceptions on the economy
23  on the likelihood of voting for the president.
24  You've got to make sure that the data being used
25  in the way this study is designed actually allows

Page 29

1  you to answer that question.
2      The second thing is given the
3  distribution and nature of the data, are the
4  techniques used appropriate.  So if you have a
5  dichotomous dependent variable, a variable where
6  it's between zero and one, and you're using
7  regression, that's not appropriate.  That won't
8  give you bias results.  You have to use a
9  different technique.  So those kind of things.
10      I don't go in, though, and like look at
11  the dataset and make sure -- that's not part of
12  the peer review thing.  But it's basically, is the
13  design suitable to answer the question and then do
14  the results -- do the methods used to analyze the
15  data, are they appropriate given how the data is
16  distributed and the nature of the data.
17      Q.  And so do you look at things like
18  whether the sample is representative?
19      A.  Sure.
20      Q.  What about sample size?
21      A.  Sure.
22      Q.  How do you determine what the requisite
23  sample size is for reliability?
24      A.  Yeah, so that's -- I mean, that's a good
25  question.  I'm happy to talk about it.  So it

8 (Pages 26 to 29)

Christopher Bonneau 9/29/2023

Page 30

1  depends on the population, right, that you're
2  trying to make inferences about. And so generally
3  speaking for a nationwide survey or whatever,
4  you're looking at sample size of, like, 1500 or
5  so. It usually gives you pretty good results,
6  within plus or minus 3 percent margin of error,
7  assuming it's done randomly, a randomized sample.
8  But you can't always get a randomized sample.
9  What that means is, if you can't get a randomized
10  sample, you have to be very careful about the
11  inferences you're making from that sample. It
12  doesn't mean it's useless but it does mean that
13  your inferences are necessarily going to be more
14  imprecise.
15       So, you know, sample size is always --
16  obviously more is always better to a certain
17  point, then you get diminishable marginal returns.
18  But those are the kind of the general things. I
19  would not reject something because -- on the basis
20  of the fact that they only have a sample size of,
21  say, 500 people. It just means their estimates
22  are going to be less precise, which means you're
23  going to be less likely to find statistical
24  significance because your standard hours are going
25  to be larger. But you still actually can gain

Page 31

1  some good knowledge there and you still can, you
2  know, learn something.
3       Q. And do you have a specific view on what
4  a sample size should be when evaluating
5  Mississippi elections?
6       A. No. I mean, Mississippi is hard because
7  you only have elections every eight years, for
8  example, for State Supreme Court and there are
9  only, like, nine seats. So when you're looking at
10  eight years, basically every judge is up once a
11  decade. And so you're always going to have a
12  small sample size when you look within the state.
13  The same is true for any statewide office in any
14  state, actually.
15       I mean, if you look at state legislative
16  elections, okay, those are every couple of years.
17  Right? You'll get good samples. You've got to
18  work with the data that you've got. You can't
19  just make up elections that don't exist.
20       Q. And I think you mentioned earlier you
21  would look at error size?
22       A. Sure.
23       Q. Competence intervals?
24       A. Sure.
25       Q. Statistical significance?

Page 32

1       A. Yeah.
2       Q. What methods would you use to establish
3  causation?
4       A. So, there's another one. Causation is
5  really, really hard in social sciences. Because
6  isolating an independent fact requires
7  manipulation of an independent variable that you
8  can't always manipulate. So if I wanted to
9  establish a causation between, say, gender and
10  vote choice, I need to do that experimentally and
11  -- so the gold standard would be to do it
12  experimentally. But you can't randomly assign
13  somebody gender. And so if you can't have random
14  assignment, then you can't do a real experiment.
15  So you can try and get at it -- there are some
16  statistical techniques to try and get at. You
17  know, isolating causal factors through certain
18  designs. I tend to be skeptical of those, I
19  think. And I don't think it's always necessary to
20  show causality. I think when we can get causality
21  it's great, but a lot of times causality is
22  allusive because there are multiple causes to
23  things.
24       And I could show you, maybe, that gender
25  causes vote choice, but I can't tell you how that

Page 33

1  is relative to other causes. Because no one will
2  argue that it's the only cause. And so
3  experiments will allow us to isolate a cause, but
4  not necessarily assess the relative importance of
5  that cause relative to other things. That
6  requires more observational data.
7       And so saying all this to say that
8  establishing causality when possible is
9  allottable, it's not always possible. And just
10  because we can't establish it doesn't mean that we
11  can't advance knowledge.
12       Q. So in that example you just gave, how
13  would you demonstrate that gender is one of the
14  factors causing voter choice?
15       A. Well, see, I mean, it depends on what
16  you mean by cause. There's this big debate as to
17  whether or not you can actually use the word cause
18  outside of an experiment, within the discipline.
19  So you have what I would call the causal inference
20  mafia who argue that if you don't have an
21  experiment, you can't say anything about
22  causation. You can have that position. It's not
23  a majority position. It's an extreme position,
24  but it's intellectually defensible. Or you can
25  use observational data and try and isolate the

9 (Pages 30 to 33)

Christopher Bonneau 9/29/2023

**Page 34**

1  effects of other factors and talk about genders'
2  relative contribution to the vote choice. Now,
3  does that mean it causes it, no, but, you know, if
4  you control enough of the factors you can get to a
5  point where -- you can establish a relationship,
6  and then you can be pretty sure that there's
7  something, you know, going on there. And so I
8  think that sometimes is the best we can do. If
9  that makes sense.
10  Q. Yes, thank you.
11  I have a few questions about incumbency.
12  A. Sure.
13  Q. In your academic work, I think you've
14  studied the effect of incumbency on judicial
15  elections and election outcomes?
16  A. Correct.
17  Q. What advantages are generally associated
18  with incumbency?
19  A. In judicial elections specifically or in
20  elections generally?
21  Q. Let's talk generally and then judicial.
22  A. So generally incumbents have an
23  advantage for several reasons. One is they have
24  an established fundraising network. One is they
25  have increased name recognition. One is they can

**Page 35**

1  call a press conference or send mail, write to
2  their constituents to get their names out there
3  about policy positions they're doing or they can
4  position take. They have all kinds of perks like
5  that about --
6  And so for the incumbents there tends to
7  be -- you know, it's one of those paradoxes,
8  right, that everybody hates Congress but everyone
9  loves their congressperson. You see a
10  congressional reelection rate of 95 percent and
11  Congress's approval rating is, what, 19 or 18, and
12  honestly, that seems a bit high to me.
13  Now, in the State Supreme Court case the
14  incumbency advantage can improve a couple of
15  different ways. One is, again, you have an
16  established network, you've run statewide before,
17  presumably, or district-wide before. And because
18  of that you've got name recognition and you've run
19  a campaign. So you already have some donors lined
20  up, you already are able to tap into those funds.
21  While you can't, you know, call press conferences
22  and talk about how you'll decide on a case, you
23  can get your name out there by certain positions
24  you take. For example, if you write a themed
25  decent in a case or something like that or

**Page 36**

1  majority opinion or you get overruled by the US
2  Supreme Court, other things that will get the
3  public's attention. And in some states they'll
4  actually put whether you're an incumbent on the
5  ballot. And so when voters go into the ballot
6  booth it will say your name, and the next one will
7  be, like, incumbent or current judge. In other
8  states they don't. So that could potentially
9  signal to individuals, you know, which one is the
10  incumbent and give them an advantage.
11  Q. Is there an advantage to being able to
12  rely on prior experience on the job?
13  A. Yes, so -- but that's not unique to
14  incumbents, right? So in one of my articles we
15  showed that voter -- so if you're a lower court
16  judge running for the State Supreme Court, you
17  have an advantage over a candidate who has never
18  been a judge. And so there's no necessarily
19  increase by the fact that it's an incumbent, but
20  rather you'll do better with any kind of prior
21  judicial experience.
22  Q. Is there some kind of inherent appeal to
23  being an incumbent?
24  A. What do you mean by "inherent appeal"?
25  Q. Some comfort that voters might have that

**Page 37**

1  they're already doing the job, for example?
2  A. Sure.
3  MR. WALLACE: You mean lawyers might
4  have or voters might have?
5  MR. CHEUNG: Voters.
6  MR. WALLACE: I thought you said
7  lawyers. Did I hear it wrong? I'm sorry.
8  THE WITNESS: Yes, assuming the voters
9  approve of the incumbent.
10  Q. (By Mr. Cheung) So I know we were
11  talking about, first, incumbency generally and
12  then judicial candidates. What about Mississippi
13  Supreme Court candidates. What advantages do you
14  see in being an incumbent on the Mississippi
15  Supreme Court?
16  A. I don't see any differences on the
17  Mississippi Supreme Court compared to other
18  courts. I have no reason to think that incumbency
19  functions different here than it does otherwise.
20  Q. And generally it seems you're saying
21  incumbents are more likely to prevail compared to
22  challengers?
23  A. Correct, that's a fact.
24  Q. Have you done any empirical analysis to
25  determine the likelihood of judicial incumbents to

**10 (Pages 34 to 37)**

Christopher Bonneau 9/29/2023

**Page 38**

1  get reelected?
2      A.  I have.
3      Q.  How strong is incumbency in judicial
4  elections?
5      A.  So I think the last time I looked at
6  that was probably 15 years ago.  So 15 years
7  ago-ish, if my memory is correct, the incumbent --
8  about 85 percent of State Supreme Court incumbents
9  won reelection compared to 80 percent of
10  governors, 87 percent of US senators, and like 94
11  percent of US House of Representatives.  I'm
12  pretty sure those are the numbers.  It's in my
13  2005 article in American Politics Research.  Since
14  then, just, you know, eyeballing the data, those
15  trends seem to be the same in State Supreme Court
16  races that incumbents overwhelmingly win.
17      Q.  That 2005 article, is that entitled
18  Electoral Verdicts Incumbent Defeats at State
19  Supreme Court Elections?
20      A.  That's the one.
21      Q.  I think I pulled a sentence from there
22  where you say:  Incumbents in partisan district
23  state election have 55.6 chance of defeat compared
24  to 7.2 percent chance in a nonpartisan district
25  state.

**Page 39**

1          Does that sound right?
2      A.  That does.  What I would caution you
3  there is those aren't artifact or virtue
4  elections.  So who are the states that are
5  partisan district states?  Louisiana and Illinois,
6  that's it.  And in nonpartisan district states
7  you've got Kentucky and Mississippi.  So you don't
8  have a lot of states, right?  So those numbers --
9  it's a one defeat where I can throw out the
10  predictive probabilities significantly, right,
11  when you have a small number of cases.
12      Q.  And so you're saying that the sample of
13  nonpartisan district states consists only of
14  Kentucky and Mississippi; is that right?
15      A.  Of contested -- let me make sure.
16  Because Louisiana is partisan.  Who else -- those
17  are the only ones that have districts.  That is
18  correct.
19      Q.  Based on the data that you do have, you
20  would say that Mississippi judicial incumbents
21  almost never lose?
22      A.  That's right.  I think if you look over
23  the past 20 years there are two that have lost to
24  the Mississippi Supreme Court.
25      Q.  If that's your recollection.

**Page 40**

1      A.  Yeah, I think there were two.  I think
2  there was a chief justice in 2008 and -- well, I
3  can tell you from Table 1.  So since 2000 the only
4  loser, right, was Smith in 2008 in this district
5  here.
6      Q.  Thank you.
7          We've touched on this before, but, you
8  know, based on the prior academic work you've
9  done, do you believe that Mississippi system for
10  electing Supreme Court Justice creates an
11  incumbency advantage?
12      A.  Do I believe that creates incumbency?
13  No, I believe there is an incumbency advantage in
14  these elections just like any other elections.
15      Q.  Do you think that incumbency is a strong
16  advantage for candidates running for Mississippi
17  Supreme Court?
18      A.  Yes.
19      Q.  In the history of Mississippi, do you
20  know if any black candidate has been able to get
21  elected to the Mississippi Supreme Court without
22  an incumbency advantage?
23      A.  Without an incumbency advantage, I do
24  not know the answer to that question.
25      Q.  But you're not aware of any black

**Page 41**

1  candidate who has been able to win without being
2  an incumbent?
3      A.  Again, I don't have any recollection.
4  So if you tell me yes, then I would believe you.
5  If you tell me no, I would believe you.  I don't
6  know.
7      Q.  Do you know if any white candidates have
8  been able to get elected to the Mississippi
9  Supreme Court without being an incumbent first?
10      A.  Well, I do know at least Jim Kitchens
11  because I just told you he defeated Smith in 2008.
12      Q.  Anyone else?
13      A.  I think that's the last incumbent who
14  was defeated, at least in this district.  Yeah,
15  that was the last incumbent who was defeated.  So
16  one time in 20 years.
17      Q.  What about open seat elections?
18      A.  In District One, I don't see any open
19  seat elections.
20      Q.  Mississippi Supreme Court, generally?
21      A.  I only looked at District One for this
22  case.
23      Q.  I'd like to point you to paragraph 18 of
24  your January report.
25      A.  Yes.

11 (Pages 38 to 41)

Christopher Bonneau 9/29/2023

**Page 42**

1  Q. I think it's the third sentence where
2  you say: Currently, six of the nine justices on
3  the Mississippi Supreme Court obtained their
4  position by gubinatorial appointment.
5  A. Correct.
6  Q. Would that mean that the remaining three
7  first ascended to the bench through election?
8  A. Through open seat elections, that
9  would -- yes, that would be a reasonable
10 conclusion.
11 Q. And those three would consist of Jim
12 Kitchens, Josiah Coleman and Robert Chamberlain?
13 MR. WALLACE: Objection, assumes facts
14 not in evidence. You say Jim Kitchens got on with
15 an open seat election?
16 MR. CHEUNG: Without a prior
17 appointment.
18 MR. WALLACE: Okay. That's a different
19 thing. That's why I objected.
20 Q. (By Mr. Cheung) I can rephrase. So the
21 three justices that obtained their position on
22 Mississippi Supreme Court without a prior
23 appointment to the Court would be Jim Kitchens,
24 Josiah Coleman and Robert Chamberlain. Does that
25 sound right?

**Page 43**

1  A. That sounds right. And only Kitchens is
2  with District One, if I remember correctly.
3  Q. Do you know of any other justices who
4  won election to the Mississippi Supreme Court
5  without prior appointment?
6  A. Do I know of any other justices? Not
7  that I can recall off the top of my head. It's
8  certainly possible in other districts. But,
9  again, I am limiting my analysis to District One.
10 Q. In terms of District One, does it sound
11 right that Chief Justice James Smith was elected
12 in 1992 without prior appointment?
13 A. In '92. So would be '92, eight-year
14 term -- yes, that sounds like it could be right.
15 Q. And William Waller was elected in '96 in
16 District One without prior appointment?
17 A. It's possible, sure.
18 Q. So assuming that's right, does the fact
19 that only white candidates have been able to win
20 elections without first being an incumbent tell
21 you anything about the overall ability of black
22 candidates to get elected to Mississippi Supreme
23 Court?
24 A. Well, it tells me a couple of things. I
25 mean, I'd want to do some more research. I do

**Page 44**

1  think the further back in time we go, you know, if
2  the demographics of the districts have changed
3  since '92 and '96, right, it may be a completely
4  different electorate. I don't know what the
5  population of the district was in terms of racial
6  breakdown before then. I don't know how many
7  African American candidates ran for open seats.
8  And so it could be that only white candidates have
9  won open seats because African American candidates
10 have not run in these open seats. And certainly
11 there haven't been a lot of open seats, right. So
12 we're talking about three seats since 1994. There
13 are a whole host of things, right. So it tells
14 me, I mean, I'd want to know more. But it
15 wouldn't cause me to make any kind of firm
16 conclusion on the basis of those numbers.
17 Q. So understanding that there are several
18 possible conclusions that you could draw from this
19 fact, would one reasonable suggestion be that
20 white candidates are able to win without
21 incumbency advantage, does that suggest that
22 they're generally in a stronger position than
23 black candidates?
24 A. I think it depends. Because if you look
25 at like the Jim Kitchens race, my understanding

**Page 45**

1  for whatever it is, is he was endorsed by Benny
2  Thompson and so he was actually the black
3  preferred candidate in that race. And he defeated
4  another white candidate. And I don't know the
5  specifics of the Waller case or anything else.
6  If those white candidates were actually
7  preferred by black voters, then that would tell me
8  something different than if that candidate was not
9  preferred. So at this point I don't have enough
10 information.
11 Q. Yeah. I understand that there's a
12 distinction between black candidates and black
13 preferred candidates because the two are not
14 necessarily the same. But looking exclusively at
15 the ability of black candidates to get elected to
16 the Mississippi Supreme Court, is it a
17 reasonable -- is it one of the reasonable
18 explanations to say that black candidates
19 typically need incumbency advantage, while white
20 candidates do not, to get elected to Mississippi
21 Supreme Court?
22 A. I wouldn't say typically. I would say
23 that that's possible. I would want to how many
24 black candidates ran for those open seats and
25 everything before I concluded. If all we have is

Christopher Bonneau 9/29/2023

---

**Page 46**

1   white candidates running for a seat, then we don't
2   know if blacks can win without incumbency.  So,
3   it's possible.  Again, I think we would need to
4   learn more.
5        Q.  Okay.  And if it's a fact that very few
6   black candidates even run for these seats, what
7   could be some explanations for that?
8        A.  Well, there's several explanations about
9   why.  One might be they don't think they could
10  one.  One might be, you know, they're not
11  interested.  One might be that the incumbent
12  already is doing a good job and so they feel like
13  there's no need to try and unseat an incumbent.
14       So there are a number of reasons why a
15  candidate may decide.  It may be the wrong time in
16  their life.  They may have serious headwinds,
17  right?  If you are a candidate running in a
18  presidential election here and you're a Democrat,
19  it's probably not a good time to run here in
20  Mississippi.  So there are a lot of factors, race
21  being one of them.  But party and incumbent size
22  (inaudible) and everything else would also be
23  factors.
24       Q.  I have a few questions about your work
25  around the design of judicial election and

---

**Page 47**

1   election systems.
2        A.  Sure.
3        Q.  In your work have you studied advantages
4   of electing versus appointing judges?
5        A.  Well, there's no way to quantify -- yes,
6   I have spoken about the relative advantages of
7   elections versus appointments.
8        Q.  And what are those relative advantages?
9        A.  So you start with the presumption that
10  there is no perfect system, right?  And so when
11  you're designing institutions, there are a number
12  of considerations to balance, one of them being
13  accountability versus independence, right?  So you
14  could design a system like the US federal system
15  where judges are maximally independent, right?
16  And for everyone who thinks judges should be
17  independent, I ask them how that's going because
18  it doesn't seem to be going too well.
19       So there are advantages to being
20  independent, right?  But being too independent,
21  actually, is bad because it means you can do
22  whatever the hell you want and you're not
23  constrained by the law or by anything else.  And
24  we can give all kind of examples from both sides
25  of the political aisle of the times, well, the US

---

**Page 48**

1   Supreme Court has decided, eh, we're not going to
2   really do that anymore.
3        Elections allow for voters to
4   participate and for voters to have a hand in how
5   the law is interpreted in their states.  And so
6   giving the voters a choice increases political
7   efficacy, increases the legitimacy of the
8   institution, and it allows voters to have a direct
9   say in the people who are making decisions that
10  affect the legal life in the state.
11       So there are problems as well and no
12  system is perfect.  But it's not clear to me
13  that -- I mean, the debate has tended to be that
14  elections are just these awful things.  And it's
15  not clear to me from the data that that's the
16  case.  That in fact voters do know what they're
17  doing, they do participate meaningfully, and they
18  are able to make choices.  And so this seems like
19  an option that a state could want to have.
20       I mean, if I were a design institution I
21  would not design what y'all have here.  I think
22  nonpartisan elections are awful, right?  But I
23  don't live here.  So y'all want to do that, go
24  ahead.
25       Q.  Why are nonpartisan elections awful?

---

**Page 49**

1        A.  Because they're ineffective.  They're
2   removing a meaningful queue from the voters.  And
3   so what you're doing is your unnecessarily shaving
4   off voter participation.  And so nonpartisan
5   elections you have people roll off because they
6   don't feel informed, right?  And we know that
7   Democratic judges view the law differently than
8   Republican judges.  Lawyers know this, right?  You
9   go in a courtroom, you know you're either happy or
10  you're, like, this is going to be a tough one.  We
11  know at the US Supreme Court level, we can predict
12  outcomes of cases really well.  Why would we tell
13  voters they can't have that information?  It seems
14  silly.
15       Q.  I can't confirm the reaction I have
16  walking into court, but...
17       A.  No.  This is the big difference between
18  political scientists and lawyers, right?  I can
19  say these things.
20       Q.  When you say remove a meaningful queue,
21  are you referring to the partisan designation on
22  the ballot?
23       A.  I am.
24       Q.  And you say voters do participate
25  meaningfully in judicial elections?

---

**13 (Pages 46 to 49)**

Christopher Bonneau 9/29/2023

Page 50

1    A. Yes.
2    Q. What do you mean by that?
3    A. Some people think voters don't know what
4  they're doing. Voters know enough. So for
5  example, voters, you know, can tell that they're
6  seeing a quality challenger, right, one with prior
7  judicial experience and one without. So if a
8  challenger between incumbent has prior judicial
9  experience, they do about five points better than
10  challengers without such experience.
11       If you take party ID out and you -- so
12  we did some experiments on this where we, you
13  know, manipulated whether or not party ID was
14  shown or not. I'm going to get the numbers here a
15  little bit, not precise. But in partisan races,
16  like Republicans went for the Republican candidate
17  that we told was the Republican 94 percent of the
18  time, and Democrats voted for the Democrat
19  candidate, like, 85 percent of the time. In that
20  scenario where we removed party ID by the same
21  descriptions of real ads that candidates have run,
22  what happens is Republicans voted for Republicans
23  70 percent of the time and Democrats were about
24  65. So you would expect without party ID those
25  things should be close to 50/50. That is, if

Page 51

1  party ID wasn't meaningful, if candidates were
2  running these ads, right, and there was no
3  partisanship to them and voters couldn't tell,
4  Republicans shouldn't be able to identify the
5  Republican candidate about 70 percent of the time.
6       So what does a nonpartisan election do?
7  It increases errors, right? It increases the fact
8  that Republicans would actually vote for the
9  non-republican even though if you gave them party
10  ID they would vote for the Republican, right?
11  It's what the manipulation allowed us to do. And
12  so you have fewer voters participating, and the
13  ones who do participate make more errors, that is
14  they vote for the candidate who they don't intend
15  to vote for. Who they wouldn't vote for if they
16  had the party ID. That seems like not a good way
17  to have elections. But that's, you know, again,
18  not my state.
19    Q. So those percentages you just cited, I
20  don't think they're in your report.
21    A. That's my book. The Voters' Verdicts
22  Book, 2015. I think it's chapter 4 or 5
23  something.
24    Q. Okay. And you also mentioned efficacy
25  earlier. Is that referring to how responsive the

Page 52

1  officeholders are to the voters?
2    A. No, without efficacy is referring to how
3  legitimate the voters feel the court is and how
4  much trust they have in the court. And so Jim
5  Gibson did a series of studies looking at dual
6  elections in (inaudible) legitimacy of the court.
7  And what he found is actually, you know, there are
8  some costs to contested elections, but there are
9  also a lot of benefits. When you look at the
10  whole cost benefit thing, it actually turns out
11  that elections are legitimacy enhancing. That is,
12  voters feel more positive about courts on average
13  after elections than they do in the absence of
14  elections. Again, it's not no say it's all
15  positives, but the positives outweigh the
16  negatives.
17    Q. But is responsiveness to voters, one of
18  the values that you think should be promoted by
19  judicial elections?
20    A. Well, responsiveness is hard. Because
21  what does that mean, responsiveness. And I want
22  to distinguish responsiveness from accountability.
23  Accountability means that, you know, voters will
24  decide, you know, when a judge is up for election
25  if that judge should be returned to office. And

Page 53

1  overwhelmingly the answer is yes.
2       Responsiveness implies that outside of
3  that, that judges should be like, you know,
4  figuring out what the public wants in terms of
5  decisions. And that kind of more, like, constant
6  update or constant evaluation, I think one can
7  argue is not a part of courts. I think one could
8  argue it could be. I don't take position on that.
9  That's outside -- I stick to the empirical data
10  and I really don't have anything to -- yeah.
11    Q. Got it.
12       So you mentioned that you wouldn't do
13  things the way that things are done in
14  Mississippi. Is that purely referring to the
15  nonpartisan valence of these elections or is there
16  something else?
17    A. I think there are -- again, if I were
18  designing an ideal system, would I have districts,
19  I would not, at least not this way. Because I
20  think the Supreme Court deals with all
21  Mississippians and all Mississippians should have
22  a chance to vote on the Supreme Court, as opposed
23  to carving it up into districts.
24       You know, I think -- so I would do that.
25  I think the terms of office are good. I might,

14 (Pages 50 to 53)

Christopher Bonneau 9/29/2023

**Page 54**

1  for example, in an ideal situation not allow for
2  reelection. I might allow for a single term but
3  not reelection. So if you're worried about the
4  corrupting effects of donors and everything else,
5  one way to do that, right, is not allow judges to
6  run for reelection. I'd probably publicly finance
7  elections. Again, if you want to get rid of the
8  stink of private contributions, go to public
9  financing. So there are things like that that I
10  think, you know, are -- no one does it that way.
11       So really, a hypothetical exercise. You
12  know, if Mississippi wants, you know, my advice on
13  that.
14       Q. When you say, you know, you would prefer
15  no districts or at least not this way, what do you
16  mean?
17       A. I think that districts for statewide
18  offices to -- so if you live in any district, you
19  can only vote for one-third of the justices on the
20  Mississippi Supreme Court. I think that's a
21  problem. But that's just my -- I mean, you know,
22  Kentucky has districts. Illinois has districts.
23  Of course, Illinois, Chicago has three of the
24  seven and the other four split down state. That's
25  problematic.

**Page 55**

1       In general, I think that having
2  district-based elections for statewide offices is
3  suboptimal. But, again, that's just from a purely
4  theoretical design standpoint.
5       My local school board elects regions,
6  right? We have nine members of the school board,
7  and there were three people from each region.
8  Which means when I vote for people for my school
9  board, I can't vote for two-thirds of them. Well,
10  if the other two regions are nuts, and they are,
11  like I can only ever hope to have a third of
12  reasonable common sense, you know, pro-teacher
13  school board members. So, again, that's a -- I
14  think most political scientists would agree that
15  from a design perspective it's suboptimal.
16       Q. But if you were to use districts, what
17  district design would you have?
18       A. There are a number of different ways. I
19  have no opinions as to which way is better. You
20  could carve it out into nine independent districts
21  and each district elects one. That's the Kentucky
22  model. You could do what Illinois does and
23  concentrate, like, based on population, not
24  necessarily geography. So Chicago gets three, or
25  Cook County gets three, and the others are split

**Page 56**

1  up down state. Even though that's still not
2  exactly with population because Chicago is more
3  than three-sevenths of the population of Illinois.
4  So they're still outweighed. It gives them a
5  little bit of a bonus but not as much as it
6  should.
7       You could do what Mississippi does and
8  have basically three districts and have three from
9  each. I don't have any opinion as to which is,
10  you know, better or worse. You know, that's -- I
11  haven't seen any anything -- I haven't seen any
12  research that's looked at the effects of those
13  different kinds of district elections on outcomes
14  or on -- I mean, you can't really look at
15  incumbency anywhere else because everything is
16  unique. You have one case of this, one case of
17  that, one case of this.
18       Louisiana has partisan elections in
19  districts. Kentucky, which does it the same,
20  right, but they're nonpartisan. So every case is
21  unique. And so it's hard to make any kind of
22  comparisons about across states because you have
23  no variation.
24       Q. What do you think are the consequences
25  of having three judges coming from a single

**Page 57**

1  district as opposed to nine districts with nine
2  judges?
3       A. It could be nothing. I don't know. I
4  don't think anyone knows.
5       Q. So in terms of the benefits of electing
6  judges, we talked about earlier, I think you
7  mentioned transparency, legitimacy,
8  accountability. Is that right?
9       A. Yes.
10       Q. Would those values be better served by
11  competitive elections versus noncompetitive
12  elections?
13       A. Yes.
14       Q. Which one would better serve?
15       A. Competitive elections.
16       Q. Why is that?
17       A. Competitive elections allow for
18  meaningful choice. Competitive elections allow
19  voters to actually, you know -- when you have
20  competitive elections it shows that candidates
21  have to be more accountable. They have to be more
22  aware. If you're never worried about losing, then
23  you're basically independent, right, and there's
24  no accountability mechanism. So in general
25  elections, right, to serve their functions should

15 (Pages 54 to 57)

Christopher Bonneau 9/29/2023

---

**Page 58**

1  be contested and competitive.
2      Q.  Does the competitiveness of a district
3  affect how responsive an officeholder is to their
4  constituents?
5      MR. WALLACE:  You're talking about
6  judicial officeholders or generally?  Object to
7  the form for that reason.
8      Q.  (By Mr. Cheung)  I would say generally
9  and then judicially.
10     A.  Generally, absolutely.  There's a lot of
11 evidence of that.  In fact, you can see it now.
12 Why has the US Congress gone off the rails?  Well,
13 you've seen a decline of competitive elections.
14 You know, there's no one in the middle anymore.
15 And so you've got people who don't have to worry
16 about actually being defeated.  They're more
17 worried about being defeated in the primary than
18 in general election.
19     So when you have an increase in one
20 party districts, it leads to increased
21 polarization.
22     In judicial elections, I don't know of
23 any evidence one way or the other.  I do -- so it
24 is true that there have been some studies in the
25 early '90s to show that judges change their

**Page 59**

1  behavior as they approached an election, right?
2      So (inaudible) and Melinda Gann Hall did
3  a series of studies looking at how judges vote on
4  death penalty cases as an election approach.  What
5  she found is that judges were more likely to
6  uphold death sentences as they approached their
7  reelection than otherwise.  But that -- what that
8  interpretation is, right, matters.  Is it that
9  judges are panning to elector or does it mean that
10 in fact, you know, they weren't doing their job
11 all along and this is finally reigning them in.
12 So we do have some evidence of that, but that
13 doesn't say anything about partisanship, doesn't
14 say anything about districts.  It's the presence
15 of elections more generally.
16     Q.  Thank you.
17     I'd like to point you to the 2005
18 article we talked about earlier entitled Electoral
19 Verdicts.  I think you have a quote there that
20 says:  The more serious the electoral threat, the
21 more constraints you will feel.  The same should
22 hold true for State Supreme Court incumbents.
23     Does that sound right?
24     A.  It does.
25     Q.  So is it your view that competitiveness

**Page 60**

1  or electoral threats does influence State Supreme
2  Court Justices' decision making?
3      A.  I think it should.  Whether it does or
4  not, right, I think is -- I think there's some
5  evidence that is and has.  How strong that is and has
6  it changed over time, I don't know.  But yeah.
7      Q.  Thank you.
8      Do you think it's important for the
9  judiciary to reflect the racial diversity of the
10 jurisdiction?
11     A.  So what do you mean by "important"?
12     Q.  Generally in terms of the values we just
13 discussed.
14     MR. WALLACE:  And I'll object to the
15 form until you define "reflect".
16     THE WITNESS:  So I'll answer.  I think
17 in a representative democracy it is better for our
18 institutions to reflect the makeup of their
19 constituents.  So I think we have evidence that,
20 you know, if you're looking at how legitimate
21 individuals feel their government is, if you look
22 at how perceptions in terms of role models and
23 everything else, it absolutely is.
24     Like, for example, we know that, you
25 know, when African American students come to a

**Page 61**

1  university and see all white professors, right,
2  that doesn't send a signal that that path is open.
3  So yes, I do.  I think descriptive representation
4  is incredibly important.  I also think substantive
5  representation is important as well.
6      I would submit that people who are
7  concerned with issues of race and social justice
8  would be better off with a liberal justice on the
9  US Supreme Court compared to Clarence Thomas.
10 That's not to minimize the descriptive importance
11 of Clarence Thomas on there, but he's also not
12 advancing the policy goals that one would think he
13 would advance.
14     But yes, descriptive representation is
15 important.
16     Q.  (By Mr. Cheung)  Thank you.  So we
17 talked before about how the difference between
18 nonpartisan and partisan judicial elections is the
19 designation of a party on a ballot.  Is that
20 right?
21     A.  It is.
22     Q.  Are there any other differences in terms
23 of how the elections are run between partisan and
24 nonpartisan elections?
25     A.  Well, in terms of how they are run -- so

16 (Pages 58 to 61)

Christopher Bonneau 9/29/2023

**Page 62**

```
1    we have -- there are nonpartisan elections and
2    then there are partisan elections.  So partisan
3    elections are pretty consistent.  The party ID is
4    on the ballot, you know what they are.
5    Nonpartisan elections oftentimes are coded, right,
6    in a sense that you can tell which candidate is
7    which.  And I'll point you to my 2015 book which
8    showed that, in fact, even when you remove the
9    party ID from the ballot and you just show voters
10   ads that are run, like, real ads, they can tell
11   which candidate is a Democrat and which candidate
12   is a Republican.  And so nonpartisan elections do
13   not remove partisan considerations from the
14   voters' minds.  In fact, in some ways they're just
15   as partisan.  Again, with more errors and lower
16   voter participation.
17       Q.  So those ads that you talked about, how
18   do you know if the voter is picking up on a
19   partisan queue as opposed to a policy queue or a
20   race queue or some other queue?
21       A.  Well, it wouldn't be a race queue.  I
22   mean there was nothing in there about race.  These
23   were vignettes that we gave -- we give them to
24   people not in the state they were in.  It
25   wasn't -- there was no way for voters to look up
```

**Page 63**

```
1    or whatever else.
2           Because the only difference is the
3    partisan.  Everything else is the same.  And so if
4    I give you a paragraph and Mike a paragraph, and
5    everything in that paragraph is the same, except
6    in yours I say it's a Republican and in Mike's I
7    say nothing, and there's a difference, well,
8    that's why there's a difference.  That's what the
9    experiment does.  It controls everything else.  So
10   if it was a policy, you're both responding to that
11   queue.  And so when you see these kinds of
12   differences, right, it's because of the
13   experimental manipulation.  It really allows us to
14   get a handle on what is going on.
15       Q.  I see.  And so I think I understand
16   better now.  That study was based on ads that you
17   created and not real-world ads?
18       A.  Correct, yes.
19       Q.  And so your study did not look at the
20   effect of the race on voter behavior?
21       A.  Correct.
22       Q.  What are some of the differences, if
23   any, in terms of voter behavior in nonpartisan
24   elections versus partisan elections?
25       A.  I think we've talked about them.  The
```

**Page 64**

```
1    two are that, one, fewer voters participate so you
2    have higher ballot roll-off.  People don't vote
3    for those elections.  They leave it blank.  And
4    the other is they tend to make more mistakes.  So
5    those who do vote, most of them are still able to
6    identify their co-partisan, the partisan.  Because
7    most candidates who are running in these
8    nonpartisan elections are clearly endorsed by a
9    party, and that's pretty clear from their ads and
10   everything else, also the things they say.  But
11   you'll have some low information voters who don't
12   get those queues and who still participate and
13   they vote what I would term incorrectly.
14   Incorrectly in the sense that they're voting
15   against the candidate that best reflects their
16   values and their interest.
17       Q.  They're not voting for the candidates
18   that they would have vote for if they had full
19   information?
20       A.  That is correct.
21       Q.  Do you know if nonpartisan elections are
22   more or less likely to be contested?
23       A.  Nonpartisan -- let me think,
24   historically.  Historically I think nonpartisan
25   elections were more likely to be uncontested, but
```

**Page 65**

```
1    that difference has gone away in recent years.
2    Now every seat is contested just about.  I mean,
3    on average.
4        Q.  In paragraph 10 of your January report
5    you say that:  Elections in nonpartisan states are
6    less likely to be contested than elections in
7    partisan states.
8        A.  Correct.
9        Q.  Is that still your position?
10       A.  Well, that's my position in those
11   articles which are older.  My looking at recent
12   elections, you know, just my off the top
13   recollection is that that difference has shrunk if
14   not disappeared entirely.  My recollection, I
15   could be wrong.  It certainly was true at the time
16   those articles were written looking at older
17   elections.  But in the past decade we've seen a
18   huge increase in both attention to and
19   contentiousness of State Supreme Court elections.
20       Q.  So the increased contestation, do you
21   know if that applies to Mississippi?
22       A.  It applies certainly to District One
23   based on Table 1, right, where every race was, in
24   fact, contested except for Justice Kent.
25       Q.  Do you know if the incumbency advantage
```

**17 (Pages 62 to 65)**

Christopher Bonneau 9/29/2023

**Page 66**

1    is stronger or weaker in nonpartisan elections?
2         A.  I know incumbents are more likely
3    defeated in partisan elections, historically.  So
4    that would suggest that in nonpartisan elections
5    they're more likely to lose.  In fact, I say in
6    paragraph 11 incumbent justices are more likely to
7    lose in nonpartisan district-based elections than
8    they are.  So in a system like Mississippi, the
9    incumbent justice is really more likely to lose,
10   based on my 2005 article.
11        Q.  Sorry, more or less likely to lose?
12        A.  Incumbent justices are more likely to
13   lose in nonpartisan district-based elections than
14   they are in nonpartisan statewide elections, yes.
15        Q.  Are you familiar with a recent law that
16   was passed in Mississippi, HB1020, concerning
17   selection of judges in Jackson?
18        A.  I read something about it like when it
19   was on New York Times or NBC News.  But I don't
20   recall the specifics.  I do remember it was a
21   controversy about changing the way judges are
22   selected in Jackson, but that's the best of my
23   recollection.
24        Q.  You gave a quote about that law to Yahoo
25   News and Digital Journal.  Do you recall that?

**Page 67**

1         A.  Oh.  I do now.  I'm sure I did.  What
2    did I say?
3         Q.  Would it help to show you the article?
4         A.  If you want or you can just read me what
5    I said.
6         Q.  So this is an article from February 15th
7    of this year.  Your quote was:  But what makes
8    this Mississippi situation abnormal is that the
9    legislature is proposing a different way of
10   selecting prosecutors and judges but only for one
11   area of the state and all the local
12   representatives in that area object to it.
13        A.  Yes.  Yeah, I said that.
14        Q.  Is that still your opinion?
15        A.  Yes, unless the bill has changed.  I
16   haven't obviously thought about it since I gave
17   that quote.  But yeah, that's -- yeah, that sounds
18   like me.
19        Q.  Could you say more about why this
20   situation is unusual or abnormal?
21        A.  Well, yeah, because it's not -- when
22   you -- if you think there's a problem with the way
23   judges are selected or prosecutors are selected,
24   that's fine, right, and the legislature certainly
25   can change that.  But when you're only signaling

**Page 68**

1    out some of them, that's unusual, right, and so
2    then you have to ask why, you know, are we
3    signaling out some and not others and where the
4    criteria end and why is one method of selection
5    good for some areas of the state and not for
6    others.  That's unusual.  You don't see that a
7    lot, if at all.
8         Q.  So I think the title of that article
9    that you were quoted in was:  Mississippi House
10   Bill Will Create White Appointed Court System for
11   Blackest City in America.
12        Does that sound right to you?
13        A.  It might.  I mean, I will say I did not
14   write the headline.
15        Q.  Do you have a view on the headline?
16        A.  Do I have a view on the headline?  The
17   headline is provocative.
18        Q.  Do you agree with it, factually?
19        A.  Do I agree with it?  House Bill Would
20   Create -- that sounds consistent with the
21   objections that were raised by local officials in
22   Jackson.  So I'm not -- I don't live in Jackson.
23   I don't follow the thing in the ground.  But that
24   is consistent with what I read about the
25   objections to this bill.

**Page 69**

1         Q.  Do you have any reason to disagree with
2    those objections or characterizations?
3         A.  I have no reason to opine.  If that's
4    how the local officials feel, and I certainly can
5    see why they feel that way.
6         Q.  Thank you.
7         Is there anything else that you would
8    find notable about HB1020?
9         A.  Not that comes to the top of my head.
10        If we can get a chance, I'd like a
11   drink/bathroom break.  Whenever you get done with
12   this line of questioning.
13        Q.  Now is a great time for a break.
14        (Off the record.)
15        Q.  (By Mr. Cheung)  Dr. Bonneau, have you
16   conducted any empirical studies of the levels of
17   racial diversity on state courts?
18        A.  The levels of racial diversity.  Yes, I
19   think I have.
20        Q.  I think that was a 2000 article titled:
21   Composition of State Supreme Courts.
22        A.  Yeah, that was my first journal article.
23        Q.  Do you recall what you did in that
24   article?
25        A.  I believe in that article I simply

**18 (Pages 66 to 69)**

Christopher Bonneau 9/29/2023

Page 70

1    compared how many justices, like, were black or
2    women or nonwhite by selection type.
3         Q.  Is there a reason why you have studied
4    the level of racial representation on state
5    courts?
6              MR. WALLACE:  Object to the form.  I
7    don't think he said anything about racial
8    representation the way you talked about it
9    previously, but go ahead.
10        Q.  (By Mr. Cheung) Or racial diversity.
11        A.  Yeah, I mean I was in graduate school at
12   the time and I was, like, oh, this will be
13   interesting to see if there are any differences.
14   Because one of the allegations is that, you know,
15   to get a more diverse bench then elections will
16   lead you to have a less diverse bench.  And so
17   it's an empirical question and it's an important
18   question so, you know, I collected some data and
19   just did a little descriptive piece.
20        Q.  Why do you think it's an important
21   question?
22        A.  Well, we talked earlier about
23   descriptive representation, right, and how
24   descriptive representation is important.  And so
25   if it's true that one method of selection

Page 71

1    systematically gives you less diversity than other
2    methods, that's something that should be part of
3    the conversation.  That's something that should go
4    into the decision about should you change your
5    method of selection, should you not, whatever.
6    It's an important piece.  And if it's not true,
7    then we don't need to worry about that when we're
8    talking about best practices.
9         Q.  And I know earlier we used the terms
10   "descriptive representation" and "substantive
11   representation."  What do you mean by those terms?
12        A.  Sure.  So descriptive representation is
13   simply you look out and you see, oh, it's a
14   diverse bench, right?  And you see, oh, if there's
15   30 percent women in a state and you have a state
16   legislature is 30 percent female, then you're
17   like, okay, that's pretty good descriptive
18   representation.  That is it's properly reflective
19   of the demographics, the characteristics of the
20   population.
21              Substantive means, though, that you
22   represent the dominant interest of that group in
23   your behavior.  So for example, you can have
24   female legislatures who don't support women's
25   rights or don't support some of the causes that

Page 72

1    are advocated by a lot of women and so -- but you
2    can have men who do.  And so that's a more
3    substantive representation.
4              So substantive representation gets into
5    policy, gets into are the policies reflective of
6    the different groups.  Whereas descriptive
7    representation is simply when you look out, does
8    it look like, you know, the population.
9         Q.  And have you looked at using judicial
10   evaluations in the context of selecting judges?
11             MR. WALLACE:  Object to the form, until
12   you explain what judicial evaluations mean.
13             THE WITNESS:  Yeah, can you tell me what
14   you mean by judicial evaluations?
15        Q.  (By Mr. Cheung) I believe in your past
16   work you've analyzed a system of electing judges
17   by using assessments or evaluations of judicial
18   performance.  Do you recall that?
19        A.  I don't.
20        Q.  Okay.
21        A.  What article was that?
22        Q.  I'm not sure if it's a published article
23   but I think you've spoken about the topic of using
24   judicial evaluations.
25        A.  I've spoken about judicial performance

Page 73

1    evaluations and certainly I think in one of my
2    edited books there was a chapter by a colleague
3    talking about some of her work on judicial
4    performance evaluations.  But it's not something
5    that I've conducted independent research on.
6         Q.  Okay.  Got it.  And what do you know
7    about judicial performance evaluations?
8         A.  So judicial performance evaluations vary
9    across states.  Sometimes they're just simple
10   surveys of the bar, sometimes they also involve
11   litigants, sometimes the involve whatever, right.
12   And in some places they're published, right, and
13   so whether a judge is -- there are scores on
14   certain things like temperament or fairness and so
15   on.  And they can be given to voters in advance of
16   elections.  In other areas it's much more of than
17   internal thing that's done by the bar.  So there
18   are a lot of variations about, you know, how they
19   are.
20        Q.  Are you aware of any literature about
21   biases in judicial elections?
22        A.  Judicial elections?
23        Q.  Judicial evaluations, I'm sorry.
24        A.  Yes.
25        Q.  And what do you know about those?

Christopher Bonneau 9/29/2023

Page 74

1      A.  So one of my colleagues at UNLV has done
2  a lot of studies, Rebecca Gill, on that.  And
3  basically it's similar to what you see in student
4  performance evaluations, like when you survey
5  students in class.  Women tend to be judged more
6  harshly, white men are perceived as being more
7  competent.  And so the same kinds of things you
8  see in nonlegal circles, right, from what I've
9  read are also present in these judicial
10  evaluations as well.
11      Q.  Are racial biases present in judicial
12  evaluations?
13      A.  I don't recall that specifically, but
14  I'm not saying no.  I don't recall from my
15  reading.
16      Q.  A few questions about redistricting.
17  From what you know, when does redistricting
18  typically occur?
19      A.  After -- well, the federal level, after
20  a census.
21      Q.  And what about at the state level?
22      A.  I think it depends on the state
23  constitution, right?  In some states -- I mean, it
24  depends on the office too, right?  So if it's a
25  federal office, right, like US House,

Page 75

1  redistricting has to occur every 10 years after
2  the census.  If it's a state district, I suspect
3  it varies based on the state, but I have not done
4  any work on that.
5      Q.  Do you think it's important to
6  redistrict after each census?
7      MR. WALLACE:  At this point I think I'm
8  going to object.  The order authorizes you to talk
9  about his surrebuttal report, and I know you're
10  entitled to go into his background as a scholar,
11  but if he hasn't done any scholarship on that,
12  what's the relevance to what the Court is allowing
13  you to do today?
14      MR. CHEUNG:  Are you asking him not to
15  answer the question?
16      MR. WALLACE:  I'm asking you to explain
17  why you think you're entitled to ask it.
18      MR. CHEUNG:  Well, Mike, I think you're
19  entitled to ask him not to answer it if you think
20  the question is privileged.
21      MR. WALLACE:  I'm not going to tell him
22  not to answer it, but the judge has given you a
23  limited authority here, and pulling out political
24  science questions from thin air to ask him about
25  is I would think outside the scope of her order.

Page 76

1  But I'm not going to tell him not to answer it.
2      MR. CHEUNG:  Okay.  Your objection has
3  been noted.  Thank you, Mike.
4      THE WITNESS:  Can you please repeat the
5  question?
6      Q.  (By Mr. Cheung)  Is it important to
7  redistrict after each census?
8      A.  What do you mean by "important"?
9      Q.  Well, why do you think redistricting
10  occurs after a census?
11      A.  Well, it's required by the Constitution.
12      Q.  Does that make sense to you?
13      A.  Does that make sense to me?  Well, sure,
14  it makes sense because it's required by the
15  Constitution.  Does the Constitution make sense to
16  me on that front?  I've never really thought about
17  it.  I mean, I would say that sure, that if
18  populations change or things shift significantly
19  then, you know, if we believe that one person's
20  vote should equal as much as another, it should.
21      Now, it doesn't make a lot of sense in
22  context of the Constitution because our electoral
23  system with its electoral college ensures that, in
24  fact, one person's vote doesn't equal the same as
25  another's.  But, you know, I don't know if you

Page 77

1  want to go down that path.
2      Q.  But you would agree that it's important
3  for districts to reflect the existing population
4  of the jurisdiction?
5      A.  Yeah, generally, that's right.  Among --
6  I will say there are other factors, too.  Like,
7  you know, for example, not splitting up towns or
8  historical -- the general redistricting principles
9  that the US Supreme Court has set out about
10  compactness and continuity and communities of
11  interest and whatever else.  I mean, yeah, that's
12  reasonable.
13      Q.  Yeah.  I just mean in the broad sense
14  that redistricting should occur on the basis of
15  the most updated population data that we have.
16  Would you agree?
17      A.  Within certain limits, yes.
18      Q.  Do you know the last time redistricting
19  occurred with the Mississippi Supreme Court
20  districts?
21      A.  I do not.
22      Q.  I can represent to you that the last
23  time it happened was 1987.  Do you know how many
24  times the census has been taken since 1987?
25      A.  Well, it's every 10 years, so that would

20  (Pages 74 to 77)

Christopher Bonneau 9/29/2023

Page 78

1  be three times -- four times, right?  2000,
2  2010 -- no.  '87.  So, '90, 2000, 2010, '20.
3      Q.  Can you -- based on your understanding
4  of judicial election systems around the country,
5  do you know of any other judicial district that
6  has not been updated in the past 35 years?
7      A.  I don't, but I don't know of any that
8  has either.  And so I'm trying to think of the,
9  the other four states -- the other three states
10  that have judicial elections.  I'm not aware of
11  any times they've redistricted their districts.
12  That doesn't mean it doesn't happen -- it hasn't
13  happened.  I'm just not aware of it.
14      Q.  Can you think of any reason for not
15  updating districts after four census cycles?
16      A.  Yes.
17      Q.  What are those reasons?
18      A.  There hasn't been significant population
19  change, there's no way to draw them in a way
20  that's more reflective of the state.  So those are
21  a couple.
22      Q.  Any other reasons?
23      A.  Any other reasons, I think those are --
24  if you don't have a significant population -- if
25  you feel like the current districts are good

Page 79

1  representations of the state, right, and there's
2  not been meaningful deviations then, yeah, those
3  would be the ones that come to mind off the top.
4      Q.  Do you know if there has been or has not
5  been population change in Mississippi since 1987?
6      A.  Since '87?  I'm trying to think of my
7  electoral map.  I want to say y'all have increased
8  one electoral vote since '87, but I'm not sure.  I
9  defer to people who -- I mean, '87 is a long time
10  ago.  I wasn't even able to vote then.
11      Q.  I wasn't born then.
12      A.  I don't -- I can't answer that.  I don't
13  know.  You can tell me anything and I'd believe
14  it.
15      Q.  In your work as a political scientist,
16  have you become familiar with what people refer to
17  as the Black Belt?
18      A.  I refer to Black Belt -- yeah, in
19  Alabama particularly, yes.
20      Q.  What is your understanding of the Black
21  Belt?
22      A.  So my understanding of the Black Belt,
23  is really interesting.  That basically it's the
24  part -- at least in Alabama -- of like the middle
25  of the state where the soil was rich, the soil was

Page 80

1  black, and so there's a lot of agricultural
2  interest.  And it tended to be heavily nonwhite
3  communities now because of the history of the soil
4  and the farming.
5      Q.  Do you know if the Black Belt extends
6  into Mississippi?
7      A.  I don't.
8      Q.  Are you familiar with the Mississippi
9  Delta as a region?
10      A.  I am.  That's the part down by the -- in
11  the south, right, by the Gulf -- no.  I guess I'm
12  not.
13          MR. SHANNON:  You're not.
14      Q.  (By Mr. Cheung)  As a political
15  scientist, have you considered the extent to which
16  black voters might have similar interests due to a
17  shared history?
18      A.  Have I personally considered, no, but
19  that's a pretty common finding among others.
20      Q.  I think you have an article from 2009
21  titled:  Impartial Judges, Race, Institutional
22  Context.  Does that sound right?
23      A.  Yes.
24      Q.  You have a quote here that says:  Given
25  the history of African Americans in the United

Page 81

1  States, African American judges might be more
2  sympathetic to less fortunate people.
3      A.  Yes.
4      Q.  Do you agree with that assessment?
5      A.  Yes, and I think I have a bunch of
6  citations after that, too.  Because that's not
7  something I would have said without citation.
8  But, yes.
9      Q.  You also said:  Since most criminal
10  defendants are either poor or racial minorities,
11  it is not hard to imagine that African American
12  judges would be more sympathetic to defendants
13  because of their own negative experiences in
14  society.
15      A.  Correct.
16      Q.  What is that history and that negative
17  experience referring to?
18      A.  Well, I think it's referring to the fact
19  that for years African Americans were not treated
20  as full citizens of this country.  For years they
21  weren't citizens at all.  Then they were, you
22  know, partial citizens.  And then, you know, even
23  after, you know, the Civil War and the passages of
24  13th, 14th and 15th amendments, we still had
25  institutionalized oppression where individuals,

21 (Pages 78 to 81)

Christopher Bonneau 9/29/2023

**Page 82**

1   African Americans, were not treated the same as
2   whites, until we got to the Civil Rights Act and
3   Voting Rights Act. Those vestiges are still
4   there. That's not all that long ago. You know,
5   that's my parents' generation. And so I think
6   it's -- you know, I think it's naive to assume,
7   right, that those vestiges don't still permeate
8   throughout in terms of available opportunities, in
9   terms of a whole bunch of things.
10      Q. So I'd like to turn to racially
11  polarized voting. In your work as a political
12  scientist, have you observed any patterns in terms
13  of which parties or candidates black and white
14  voters tend to support?
15      A. Oh, yeah, I think everyone knows. Yes,
16  black voters support the Democratic party.
17      Q. When you say everyone knows that, are
18  you referring to political scientists or what are
19  you referring to?
20      A. Everyone. I think if you walk out in
21  the street and ask five people they would tell you
22  that. So it's been established by scholars but
23  it's also -- I mean, you can look at, like, any
24  graph, you know, in any newspaper or anything
25  else.

**Page 83**

1       Q. Roughly speaking, do you know what
2   percent of black voters tend to vote for
3   Democrats?
4       A. It's upwards of 90.
5       Q. 90 percent?
6       A. Yeah.
7       Q. What about the percent of white voters
8   that vote for Republicans?
9       A. Well, that varies based on state. It's
10  not 90 percent. But I don't have a hand --
11  there's a lot more variations too, in terms of
12  college-educated whites versus noncollege-educated
13  whites. So a lot more factors, right, among white
14  voters that help predict voter turnout that aren't
15  as present with black voters.
16      Q. And what about white Mississippians?
17      A. What about white Mississippians?
18      Q. In terms of their level of support for
19  Republican party candidates?
20      A. Well, I'm assuming it's pretty high
21  because Republicans always win the elections in
22  Mississippi. At least in statewide elections,
23  right. Presidential elections, Senate elections.
24  So yeah, that's my assumption.
25      Q. In the upwards of 90 percent of black

**Page 84**

1   voters supporting Democrats that you mentioned
2   earlier, do you know if that pattern is true in
3   Mississippi?
4       A. I have no reason to think it's not.
5       Q. Do you know if the contrast between
6   white and black voters is more or less stark in
7   Mississippi compared to other states?
8       A. I do not.
9       Q. In your review, what makes African
10  Americans more likely to be Democratic voters?
11      A. Well, I think the Democratic party is
12  the party that helped pass the Civil Rights Acts
13  and the Voting Rights Act and also tends to
14  promote bigger government, more social policies
15  that help individuals, right, who need social
16  services, who improve education, you know, for all
17  kinds of reasons.
18          And the Democratic party, I think, is
19  not -- has been much more open in terms of
20  nominating and electing African American
21  officials. And so I think there are historical
22  reasons and also current reasons, policy reasons.
23      Q. So you mentioned the Civil Rights Act,
24  the Voting Rights Act. At the risk of asking a
25  very obvious question, but why would those laws be

**Page 85**

1   relevant to you by Democrats -- why black lawyers
2   support the Democratic party?
3       A. Sure. Well, the Civil Rights Acts
4   allowed -- ended public discrimination in places
5   of accommodation. So all of a sudden now, you
6   know, you couldn't discriminate in hotels,
7   restaurants, other things, right, against black
8   citizens. Voting Rights Act removed a lot of the
9   impediments to black voters registering to vote
10  and actually exercising their right to vote.
11          And so those kinds of policies, right,
12  that improved the lives of black Americans, you
13  know -- it wasn't just the Democrats who did that.
14  Obviously, as you know, we had party realignment
15  and whatever else. But it was -- the way things
16  have sorted out is Democrats now.
17      Q. What is that partisan realignment that
18  you're referring to?
19      A. Well, so in the -- I mean, right, the
20  Democrats, right, in the south, right, are
21  different than Democrats in the north back then.
22  Same thing with Republicans. And so it was a
23  time, right, where you'd have, you know, southern
24  Democrats voting much more so with southern
25  Republicans, and northern Republicans and northern

Christopher Bonneau 9/29/2023

**Page 86**

1 Democrats. But now those have aligned. So just
2 like the -- you know, the Democrats and Democratic
3 party in the south has largely been diminished,
4 the same thing is true with the Republicans in the
5 northeast, right? I mean, you don't have
6 northeast Republicans anymore. I mean,
7 occasionally you'll get someone like a Charlie
8 Baker in Massachusetts, but that's, you know, the
9 exception not the rule. I'd say that's sorting.
10 Q. What caused that realignment?
11 A. A number of factors caused that
12 realignment. I think preferences of individuals.
13 I think political parties, right, and so seeing
14 opportunities. I mean, in the northeast, right,
15 you see some Republicans who vote for you, you
16 know, maybe 50 percent of the time and Democratic
17 parties -- again, we get a Democrat in here would
18 vote 80 percent of the time. So you start
19 targeting those individuals and electing more
20 co-partisans and the American electorate become
21 much more polarized. There are a number of causes
22 that have led to that.
23 Q. Did the passage of the Civil Rights Act
24 and the Voting Rights Act contribute to the
25 realignment?

**Page 87**

1 A. I think without question.
2 Q. And in your view what makes white people
3 more likely to be Republican voters?
4 A. What makes white people more likely to
5 be Republican voters? Well, again, there are a
6 number of things. I think white people tend to --
7 I think the Republican party has done a really
8 good job of appealing to a time where white people
9 were, I say, more prominent, right, and had better
10 economic fortunes than they do now, where you
11 didn't need a college education to have a good
12 middle class life and so on. So I do think
13 there's a economic interest. This is particularly
14 true for lower income, lower educated whites. You
15 know, and the Republican party does a good job of
16 appealing to these individuals. Religion is part
17 of it, you know. I mean, there are a lot of
18 things.
19 Q. Let's move on to Dr. Orey's report. I
20 can give you a copy of that.
21 A. Sure.
22 Q. I'm handing you a copy of the October
23 report, 2022.
24 (Exhibit 3 marked for identification.)
25 Q. (By Mr. Cheung) That's now been marked

**Page 88**

1 as Plaintiff's Exhibit 3, I believe.
2 Dr. Bonneau, can you confirm that that's
3 the initial report from Dr. Orey that you reviewed
4 and responded to?
5 A. It looks to be the case.
6 Q. Let's turn to Pages 12 through 14 of the
7 report, and if you wouldn't mind taking a moment
8 to review those pages.
9 A. Okay.
10 Q. So I think your testimony earlier was
11 that you have concerns about the inferences that
12 Dr. Orey can draw from these results, but you take
13 his factual findings or his results to be true.
14 Is that right?
15 A. I take the estimates that he has using
16 the ecological inference, yes.
17 Q. So your reports do not dispute
18 Dr. Orey's implementation of ecological inference
19 in terms of the accuracy of its code?
20 A. Correct.
21 Q. You don't dispute the accuracy of the
22 data that he uses?
23 A. Correct.
24 Q. And you don't dispute the accuracy of
25 his computations?

**Page 89**

1 A. Correct.
2 Q. Based on those tables on pages 12 to 14,
3 did Dr. Orey find that black voters typically
4 support the black candidate about 90 percent of
5 the time?
6 A. That's fair.
7 Q. For example, I think in Table 1 if we
8 look at the Westbrooks election, Dr. Orey
9 estimated that Ms. Latrice Westbrooks earned about
10 90.46 of the black vote in 2020; is that right?
11 A. That is correct.
12 Q. And white support, according to
13 Dr. Orey's estimates, for black candidates was
14 typically below 15 percent?
15 A. Typically, that's correct.
16 Q. And in the, again, the Westbrooks'
17 example from 2020, she received less than
18 10 percent of the white vote?
19 A. Correct.
20 Q. Are those estimates consistent with your
21 understanding of voting patterns among black and
22 white voters?
23 A. Yes.
24 Q. In paragraph 37 of your January report
25 you said that it is highly unlikely these

23 (Pages 86 to 89)

Christopher Bonneau 9/29/2023

Page 90

1    candidates lost because they are African American?
2        A.  Correct.
3        Q.  Would it be fair to say that those
4    African American candidates lost because the
5    majority of white voters voted for a different
6    candidate?
7            MR. WALLACE:  I'm going to object to any
8    questioning on paragraph 37.  It's outside the
9    scope of the order.  I will not tell him not to
10   answer, but we'll deal with it if you ever offer
11   it in court.  Proceed.
12           THE WITNESS:  Please repeat the
13   question.
14       Q.  (By Mr. Cheung) Would it be fair to say
15   that those African American candidates lost
16   because the majority of white voters voted for a
17   different candidate?
18       A.  Because of the white -- I would say it
19   differently.
20       Q.  How would you say it?
21       A.  I would say that those African American
22   candidates lost because -- because they didn't get
23   enough votes, likely because they were Democrats.
24       Q.  And they were Democrats, and they lost
25   because they did not earn the votes of more white

Page 91

1    voters?
2        A.  Of more Republicans, or as their
3    opponents.  I mean, so they could have, right,
4    gotten more black voters, as well.  So they didn't
5    lose -- like, if they lost because -- they could
6    have lost because they didn't get more white
7    voters; they could have lost because they didn't
8    get more black voters.  They could have lost
9    because they were Democrats.
10       Q.  Do you know if there were enough black
11   voters in the district to put them over the top,
12   given that, you know, someone like Ms. Westbrook
13   is already earning over 90 percent of the black
14   vote?
15       A.  I don't know how many black voters voted
16   in that election.
17       Q.  And overall as to District One, is it
18   your conclusion that racial polarization exists
19   but not to the extent that black candidates are
20   unable to win election to Mississippi Supreme
21   Court?
22       A.  I think, yeah, I stipulate to that.
23       Q.  Those black candidates that did win
24   election to Mississippi Supreme Court, they're all
25   appointees running with an incumbency advantage;

Page 92

1    is that correct?
2        A.  Well, and then there were incumbents
3    after that, like Justice King.
4        Q.  Right.  But at the time of their
5    election, they had already been in office?
6        A.  I think I said earlier that I wasn't
7    sure if any African American candidate had ever
8    successfully run not as an appointee, so I will
9    stick to that.  But certainly the ones I looked at
10   for my report, that is true.
11       Q.  Your view is that District One, as
12   currently configured, black voters can already
13   elect their preferred candidate?
14       A.  Correct.
15       Q.  Is that in most cases, in some cases?
16       A.  I would say -- in most cases, I would
17   say two of the three justices in District One are
18   the black preferred candidates.
19       Q.  Based on your understanding of these
20   voting patterns, would you agree that a district
21   that has a majority African American population
22   has a greater chance of electing someone preferred
23   by African American voters than a district that is
24   minority African Americans?
25       A.  Sure.

Page 93

1        Q.  Do you know what percentage of the
2    voting age population of District One is black?
3        A.  I do not.
4        Q.  I can represent to you that it's about
5    49 percent --
6            MR. WALLACE:  I'm going to object to the
7    form of the question, assumes facts not in
8    evidence.
9        Q.  (By Mr. Cheung) Can you assume that
10   fact to be true for purposes of this deposition?
11       A.  I've -- can I assume that fact to be
12   true?  I mean, if we're talking about
13   hypotheticals, we can talk about a hypothetical
14   district where blacks are 49 percent of the vote,
15   sure, I can stipulate that for the next few
16   questions.
17       Q.  Thank you.  Let's turn to Appendix A of
18   your report.  In Appendix A did you identify
19   Ms. Westbrooks as a black candidate who lost her
20   election in District One in 2020?
21       A.  I did.
22       Q.  Based on your table, did Ms. Westbrooks
23   win about 48-and-a-half percent of the vote?
24       A.  Yes.
25       Q.  Given that the district is 49 percent

Christopher Bonneau 9/29/2023

Page 94

1  black voting age population, as we assumed, and
2  that Ms. Westbrooks won 48-and-a-half percent of
3  the vote, do you think it's a fair estimate to say
4  that if we added another point of black voting age
5  population to a district it's likely to increase
6  her vote share by a little bit less than
7  one percent?
8      A.  Yes, and also if you added more
9  Democrats as well.
10     Q.  As we discussed earlier, Ms. Westbrooks,
11  according to Dr. Orey's estimates earned about
12  90 percent of the black vote?
13     A.  Correct.
14     Q.  Given that she's earned 48-and-a-half
15  percent of the vote shared, she's about 1.6
16  percent short of winning the majority of the
17  election in 2020?
18     A.  Correct.
19     Q.  And taking the fact that she's earned
20  about 90 percent of the black vote, would you
21  agree that if the black voting age population in
22  District One had been three to four points higher,
23  she likely would have won in 2020?
24     A.  I don't know if I can say that because I
25  don't know what the voting turnout was.  I don't

Page 95

1  know if that extra percentage would have turned
2  out to vote or -- so I can't say that.
3      Q.  What if we assume that voter turnout
4  remains as it is in District One?
5      A.  Well, I think it's -- I mean, it's hard
6  to say, right, because again, right, she was going
7  up against an incumbent, and we've already talked
8  about how incumbents overwhelmingly win.  And
9  there was another incumbent in 2020, Justice King,
10  who no one even bothered to challenge.  And so
11  it's hard to say if adding that extra percentage
12  of the vote would have been enough to overcome the
13  incumbency advantage.  You're assuming that extra
14  percent of vote would have voted in the same
15  percentages as the population of the vote that's
16  already there.  I mean, yeah, it's possible.  It's
17  possible you might need to add 10 percent.  I
18  don't know.  But I think there are a lot of -- I
19  think concluding that would require a lot of
20  assumptions that I don't think the data support
21  make it.
22     Q.  The point about an incumbency, that did
23  not prevent 90 percent of the black voters from
24  supporting Westbrooks in that election?
25     A.  Correct.

Page 96

1      Q.  And so do you have any reason to think
2  that other black voters would react to incumbency
3  differently if they were added to District One?
4      A.  No, I mean -- no, but, again, I mean,
5  you're assuming, again, the same kinds of turnout
6  rate and participation rate and everything else,
7  yes.
8      Q.  Right.  So if we assume the same turnout
9  and participation rate, do you think that if the
10  black voting age population of District One had
11  been 3 to 4 percentage points higher,
12  Ms. Westbrooks likely would have won in 2020?
13     A.  What I'm saying is if you added 3 to 4
14  percent of black voters to District One and these
15  voters behaved the same way as the voters who are
16  already in District One, then that likely would
17  have led to Ms. Westbrooks winning her race.
18     Q.  Just to sum up.  In 2020, Ms. Westbrooks
19  lost even though District One had 49 percent black
20  voting age population and she had 90 percent of
21  that black support.
22     MR. WALLACE:  Once again, object to the
23  making of assumptions with facts not in evidence.
24     THE WITNESS:  And I would also point
25  that Justice King won with 100 percent of the

Page 97

1  vote, black and white.
2      Q.  (By Mr. Cheung)  Justice King was not
3  contested in his reelection?
4      A.  Correct, which I would argue is
5  important, but we can talk about that later.
6      Q.  We'll get to that later.  Appreciate
7  your answers, Dr. Bonneau.
8      So I'd like to turn to paragraph 49 of
9  your January report.  Point out the fact that
10  Ceola James came in third place even though she
11  was the only African American candidate in that
12  race?
13     MR. WALLACE:  Same as the prior
14  objection.  It's outside the scope of the court
15  order.  I will not tell him he can't answer it.
16     THE WITNESS:  Correct.
17     Q.  (By Mr. Cheung)  What is the
18  significance of the fact that James was not the
19  preferred candidate of black voters?
20     A.  Well, she might have been, I don't know.
21  What I said was if she was the preferred candidate
22  of black voters and there was a three-person race,
23  given what you've just described as demographics
24  of that district, she would have advanced to the
25  runoff, with the two white canceling the white

25 (Pages 94 to 97)

Christopher Bonneau 9/29/2023

**Page 98**

1    vote.  But, in fact, it turns out she probably
2    wasn't the preferred candidate of -- so just
3    because, you know, you have a black candidate does
4    not mean that candidate is the black preferred
5    candidate.  Which I think is the assumption that
6    is made in a lot of Orey's.
7    Q.  So you're not sure if Ms. James was the
8    black preferred candidate or not?
9    A.  It's hard for me to think that she was
10   if she only got 10 percent of the vote.
11   Q.  Okay.  So your conclusion is that she
12   likely was not the preferred black candidate in
13   this case?
14   A.  Correct.  Well, if 49 percent of the
15   district is African American and you have three
16   candidates, to only get 10 percent would suggest
17   that she was not the preferred candidate of
18   African Americans.
19   Q.  What is the significance of that fact?
20   A.  That black candidates are not
21   necessarily black preferred candidates.
22   Q.  Why is that relevant to your analysis?
23   A.  Well, it's relevant, right, because in
24   the Orey report, right, he talked a lot about the
25   black candidate, right?  So if you look at

**Page 99**

1    Table 1, black candidate.  Table 2, black
2    candidate.  A black candidate is not synonymous
3    with black preferred candidate.  A black preferred
4    candidate could be Jim Kitchens, could in fact be
5    a white candidate.  And so we can't simply look
6    and see how African American candidates do, we
7    have to look at how African American preferred
8    candidates do.
9    Q.  And so in this particular race in 2008,
10   were black voters voting cohesively for Kitchens?
11   A.  I don't have that -- I don't know.  I
12   don't see that in -- I don't know if they were or
13   not.  I can tell you they almost certainly were
14   not voting cohesively for James.
15   Q.  And what do you think white voters
16   were -- who white voters were voting for?
17   A.  My assumption is they were voting for
18   the Republican incumbent, Smith, but, again, I
19   don't know.
20   Q.  And in that election, Kitchens won?
21   A.  Correct.
22   Q.  And so do you think in all likelihood
23   Mr. Kitchens was the preferred candidate of black
24   voters?
25   A.  I do.

**Page 100**

1    Q.  Similarly, I think in your September
2    report in paragraph 7 you point out that a black
3    Democrat, Cecil Brown -- you point out that a
4    black Democrat lost to the white Democrat in the
5    2015 primary for public service commissioner.
6    A.  Correct.
7    Q.  And is the significance of the fact the
8    same as what we just discussed?
9    A.  Correct.  That if Brown was the
10   preferred candidate to black voters in the
11   primary, which again, which is likely given the
12   margin of his victory, even holding a political
13   party of that candidates' constant, black voters
14   don't necessarily favor black candidates.
15   Q.  And so your view is that because black
16   voters did not necessarily prefer the black
17   candidate, black voters, at least in the
18   Democratic primary, are not being driven by racial
19   bias?
20   A.  Correct.
21   Q.  Are you aware of any similar evidence
22   showing that white voters are not being driven by
23   racial bias in their choice of candidates?
24   A.  I don't think that's been analyzed.  I
25   mean, I haven't seen anything in either Orey's

**Page 101**

1    report or -- that looked at that.
2    Q.  But there's nothing in your report that
3    goes to that?
4    A.  Correct.
5    Q.  Would you agree that in the Democratic
6    primary context that partisan affiliation cannot
7    explain why black and white Democrats choose
8    different candidates?
9    A.  Well, yes, because the party is held
10   constant as I say in paragraph 7.
11   Q.  If black voters don't have a stronger
12   preference for black Democrats over white
13   Democrats, in your view does that preclude a
14   finding of racially polarized voting?
15   MR. WALLACE:  Would you repeat that?  I
16   think you're asking him for a legal opinion.
17   Q.  (By Mr. Cheung)  If black voters don't
18   have a stronger preference for black Democrats
19   over white Democrats in your view does that
20   preclude a finding of racially polarized voting?
21   MR. WALLACE:  I think that's probably
22   not a legal opinion so I think you can answer it.
23   THE WITNESS:  Does it preclude it no,
24   but it makes it more difficult because it suggests
25   that party is what's really working here, not

**26 (Pages 98 to 101)**

Christopher Bonneau 9/29/2023

## Page 102

1  racial analyst.
2     Q.  (By Mr. Cheung)  Is it possible that
3  black voters supported the white Democrat for
4  reasons related to race?
5     A.  Is it -- sure, it's possible that black
6  Democrats supported a white Democrat, sure.
7     Q.  What are some reasons that would fit
8  that pattern?
9     A.  Well, if they thought that the white
10 Democratic candidate was more aligned with their
11 views, with the voters' views on certain issues.
12    Q.  And by issues you mean issues that have
13 a racial component to them?
14    A.  Yeah, issues that are salient to the
15 black community.  I mean, they may not have a
16 racial component to them, but they may be of
17 interest, or of higher interest.
18    Q.  Is it possible that black voters
19 nominate white Democrats because they view white
20 Democrats as being more electable in the general
21 election compared to black candidates?
22    A.  That's possible, sure.
23    Q.  Is it possible that a white Democrat is
24 better aligned with black voters on issues of
25 racial equality as opposed to a black candidate

## Page 103

1  elected in a primary?
2     A.  Yeah, in a given primary, sure, it's
3  possible.
4     Q.  Is it possible that black voters think
5  that the white Democratic is a better messenger on
6  issues of racial equality as compared to a black
7  candidate?
8     A.  Possibly.
9     Q.  Is it possible that black voters support
10 a white Democrat over a black Democrat because the
11 white Democrat is endorsed by prominent black
12 individuals?
13    A.  Sure.
14    Q.  Did you consider those possibilities
15 when reaching a conclusion that black voters
16 support white Democrats and therefore their vote
17 preference is non-basis of race?
18    A.  Well, I think those things confirm what
19 I said, right, that they're making this choice,
20 this strategic choice, as opposed to based on any
21 number of factors.  I have no -- unless we go out
22 and we have survey data of what these voters, you
23 know, what they said their preferences were in
24 these elections, I don't think we can eliminate
25 anything.  But certainly I think there are more

## Page 104

1  factors that the candidate ends up being the
2  candidate preferred by blacks.  So the black
3  preferred candidate, the race of that candidate is
4  one factor among several others that go into that
5  calculation for people.
6     Q.  And so you agree that just because that
7  the race of the candidate does not determine who
8  black voters vote for does not mean that those
9  voters are making decisions independently of race?
10    A.  Making decisions independently.  Say
11 that again, please.
12    Q.  Would you agree that the fact that black
13 voters are not choosing candidates on the basis of
14 race, that does not preclude black voters from
15 selecting candidates for reasons related to race?
16    A.  Yes, that does not preclude that.  They
17 certainly could be doing that as well.
18    Q.  And so in your reports here you do not
19 conduct any analysis to rule out the possibility
20 that black voters support candidates because of
21 their views on race issues?
22    A.  Correct.
23    Q.  I have a few questions about your
24 experience with racially polarized voting, which
25 we talked a little bit about earlier.  Could you

## Page 105

1  give me a brief overview of the experience you
2  have with the subject of racially polarized
3  voting?
4     A.  My experience as a professor?
5     Q.  As a professor or as an expert.
6     A.  Sure.  So my experience is I have read
7  the articles that have used or have examined
8  racially polarized voting.  I'm familiar with the
9  reason those analyses are conducted, and -- yeah,
10 I have consumed scholarship.
11    Q.  Have you taught courses about racially
12 polarized voting?
13    A.  Racially polarized voting would not be
14 the topic of a class.  It might be something
15 that's done in a class.  And, no.
16    Q.  Have you discussed it as a topic within
17 a class?
18    A.  Not that I recall.
19    Q.  And have you written any articles about
20 racially polarized voting?
21    A.  No.  Unless you tell me I did.
22    Q.  Have you given any talks about racially
23 polarized voting?
24    A.  No.
25    Q.  Have you ever done any racially

27 (Pages 102 to 105)

Christopher Bonneau 9/29/2023

|   | Page 106 |
|---|---|
| 1 | polarized voting analyses to determine whether it |
| 2 | exists in a given jurisdiction? |
| 3 | A. Again, thinking back to some of my |
| 4 | methods classes it's possible I did an assignment |
| 5 | that looked at it, but I can't recall any |
| 6 | specifics or anything. |
| 7 | Q. Would you consider yourself an expert on |
| 8 | racially polarized voting? |
| 9 | A. Would I consider myself on expert on |
| 10 | racially polarized voting? I would say that's not |
| 11 | my scholarly identity, no. |
| 12 | Q. Do you happen to know Dr. Orey either |
| 13 | personally or professionally? |
| 14 | A. I do. |
| 15 | Q. Have you ever met with him? |
| 16 | A. I know Dr. Orey very well. |
| 17 | Q. Could you tell me more about your |
| 18 | relationship with Dr. Orey? |
| 19 | A. Sure. I mean, D'Andra and I for years |
| 20 | scored advanced placement governing exams |
| 21 | together. We were in leadership there. And I |
| 22 | occasionally see him at conferences. And so, you |
| 23 | know, yeah, I know D'Andra professionally. We |
| 24 | don't have a personal relationship outside of |
| 25 | casual acquaintances. |

|   | Page 108 |
|---|---|
| 1 | inference. We mentioned earlier the three types |
| 2 | of ecological -- sorry, the three types of |
| 3 | empirical methods that have been used to |
| 4 | demonstrate racially polarized voting analyses. |
| 5 | Ecological inference, ecological regression and |
| 6 | homogeneous precinct analysis. Do you recall |
| 7 | that? |
| 8 | A. I do. |
| 9 | Q. Do you know which of the three methods |
| 10 | is considered to be the most reliable in courts in |
| 11 | voting rights cases? |
| 12 | A. My under -- |
| 13 | MR. WALLACE: That is a legal opinion |
| 14 | when you've get to courts, and I object to the |
| 15 | form for that reason. |
| 16 | THE WITNESS: My understanding is it's |
| 17 | ecological inference. |
| 18 | Q. (By Mr. Cheung) Does your report |
| 19 | identify any empirical methods that would be more |
| 20 | reliable than ecological inference? |
| 21 | A. It depends what you're asking. So it |
| 22 | depends on what questions you're asking. If |
| 23 | you're trying to get at racially polarized voting, |
| 24 | no, my report does not identify anything that |
| 25 | would be more reliable than ecological inference. |

|   | Page 107 |
|---|---|
| 1 | Q. Have you spoke to him before? |
| 2 | A. Sure, I've spoken to him. |
| 3 | Q. Have you spoken to him about this case? |
| 4 | A. No, but so -- we were both at a |
| 5 | conference together in March and we ran into each |
| 6 | other on the elevator, and he said something like, |
| 7 | oh, I see we're going up against each other. I |
| 8 | said, oh, yeah. And that was basically the extent |
| 9 | of it. It was a very casual -- I didn't mention |
| 10 | anything. He just brought it up kind of like to |
| 11 | break the tension, I guess or whatever. Then I |
| 12 | ran into him at the hotel bar later on and just |
| 13 | had conversation about how he's doing, his health, |
| 14 | the great undergraduate program he's running at |
| 15 | Jackson State. |
| 16 | Q. Did you say anything to him about this |
| 17 | case? |
| 18 | A. Not besides what I just told you. |
| 19 | Q. Did you discuss racially polarized |
| 20 | voting analyses? |
| 21 | A. No. |
| 22 | Q. Anything else you can think of from that |
| 23 | conference encounter? |
| 24 | A. Not that I can recall. |
| 25 | Q. Okay. I'd like to turn to ecological |

|   | Page 109 |
|---|---|
| 1 | That does not mean the ecological inference, |
| 2 | though, is the right way to approach the analyses |
| 3 | in this case or in all cases, and it also does |
| 4 | not, you know, mitigate any of the criticisms of |
| 5 | ecological inference that other scholars have |
| 6 | noted. |
| 7 | Q. Do you know of any empirical methods |
| 8 | that would be better at generating racially |
| 9 | polarized voting estimates compared to ecological |
| 10 | inference? |
| 11 | A. I do not. |
| 12 | Q. So in your September report you identify |
| 13 | some general concerns with EI -- with ecological |
| 14 | inference as a method in the racially polarized |
| 15 | voting context; is that right? |
| 16 | A. That is right. |
| 17 | Q. Did you raise those methodological |
| 18 | concerns in your January report? |
| 19 | A. In my January report I did not do any |
| 20 | work regarding ecological inference. |
| 21 | Q. Dr. Orey also used ecological inference |
| 22 | in his original October 2022 report; is that |
| 23 | right? |
| 24 | A. I believe that's correct. |
| 25 | Q. Is there a reason why your January |

**28 (Pages 106 to 109)**

Christopher Bonneau 9/29/2023

Page 110

1  report didn't address methodological concerns with
2  ecological inference?
3      A.  I wasn't focused on that.  I was focused
4  on other things.
5      Q.  In paragraph 13 of your September
6  report, you discuss a concern with ecological
7  inference methods because they assume that
8  minority voters behave similarly across different
9  precincts; is that right?
10     A.  Correct.
11     Q.  You then go on to say that that
12 assumption is, quote, untenable; is that right?
13     A.  Correct.
14     Q.  Do you cite any authority for that
15 conclusion?
16     A.  That it's untenable?
17     Q.  Yes.
18     A.  That minorities are relatively
19 affluently racially integrated precincts and
20 treated as distinguishable -- that assumption is a
21 fact, right?  So no, -- so my conclusion that it's
22 an untenable assumption is that the proportion of
23 white and minority voters who support each
24 candidate is the same at each precinct.  We can
25 debate whether or not that's a tenable

Page 111

1  consumption.  In my opinion that's a completely
2  untenable assumption at each precinct.  Are there
3  no differences between precincts, right, regarding
4  the minority and white support?  I don't know
5  anybody who would argue that that's a tenable
6  assumption.
7      Q.  Then in paragraph 14 of your September
8  report you discuss an issue about using Ordinary
9  Least Squares regression in question to estimate
10 vote shares.  Do you see that?
11     A.  I do.
12     Q.  Do you know if Dr. Orey used Ordinary
13 Least Squares in his analysis?
14     A.  My understanding is he used King's
15 ecological inference.
16         So the Ordinary Least Squares, right, is
17 a way to show -- a way to show how the ecological
18 inference technique run by King, which is based on
19 some of the same assumptions is -- can lead to
20 biased parameters.  The conclusion that the
21 solution addresses the limitation.  But assumes
22 that the distribution in unimodel, but the data,
23 of course, are bimodal.  So that undermines one of
24 the key assumptions.  So EI might work, but
25 there's no way you asses whether or not it works

Page 112

1  because you can't test the key assumption.
2      Q.  So you said a lot there and I just want
3  to break it down.
4          In paragraph 14, like you said, Dr. Orey
5  said that King's solution overcomes this
6  limitation about variation across precincts?
7      A.  Correct.
8      Q.  Do you agree that EI overcomes this
9  precinct variation issue, at least King's method
10 of EI?
11     A.  I'm not sure.  I have correspondence
12 from one of the authors of the criticism that says
13 that that assumption still applies to King's
14 method as well.  But I'm not -- I'm not
15 methodologically sophisticated enough to dig under
16 the hood and determine that for myself.
17     Q.  Do you know -- if the precinct variation
18 assumption is problematic, do you know what effect
19 that has on the estimates here?
20     A.  Sure, because if it's -- if the precinct
21 assumption is -- it invalidates the estimates
22 because you're making assumptions about voters and
23 you're implying that a voter in a district here in
24 Jackson, the same factors, you have the same
25 percentage of the precinct here in Jackson as you

Page 113

1  would a precinct down in the suburbs.  That
2  assumption would lead to biased estimates.
3      Q.  Do you know if that bias leads to an
4  overestimate or an underestimate?
5      A.  I do not.
6      Q.  You did not perform any analysis in your
7  report to determine whether the bias would be an
8  underestimate or an overestimate?
9      A.  Correct.
10     Q.  In paragraphs 14 and 15 you cite this
11 1998 article from Wendy Cho; is that right?
12     A.  I do.
13     Q.  Could you walk me through what Dr. Cho's
14 critique of ecological inference?
15     A.  Sure.  Dr. Cho's critique is that in
16 order for ecological inference to be correct and
17 appropriate, right, the specification has to be
18 correct.  That is the model specification has to
19 be spot on.  Because otherwise what will happen --
20 I give an example that she gives.  The parameters,
21 once again, right, are biased.  So the big
22 problem, though, is we don't really know if we
23 have a specification proper -- proper
24 specification.  We don't know whether or not the
25 model we're estimating is actually the true model.

29 (Pages 110 to 113)

Christopher Bonneau 9/29/2023

**Page 114**

1  And so given that, it's hard to evaluate whether
2  or not the model we estimate is accurate or not.
3      Q.  And so Dr. Cho's discussion in paragraph
4  14, that's based on a hypothetical dataset where
5  she set some level of precinct level variation; is
6  that correct?
7      A.  That's correct, right, to see what the
8  bias would be.  So in a simulation, she knows the
9  true values.  What we're trying to do with data,
10  is recover the true values, right, recover data we
11  don't have from data we have.  But one way to test
12  whether or not we can do that accurately is to
13  generate our own data and run simulations and then
14  we can do comparisons, which is what she does.
15      Q.  But for your report, you did not look at
16  the underlying data to test the assumption?
17      A.  Correct.
18      Q.  And so you wouldn't know if -- to the
19  extent that there is a bias, whether that results
20  in an underestimate versus an overestimate of
21  racially polarized voting?
22      A.  Correct.
23      Q.  On this unimodel assumption point, does
24  your report cite any academic publications after
25  1998?

**Page 115**

1      A.  It does not.
2      Q.  Is there a reason for that?
3      A.  I didn't see any.
4      Q.  Do you know if ecological inference has
5  continued to be used to estimate racially
6  polarized voting since 1998?
7      A.  It has.
8      Q.  Do you know whether ecological inference
9  has been accepted by courts as a reliable method
10  since 1998?
11      A.  My understanding is it has.
12      Q.  Are you familiar with recent scholarship
13  showing that ecological inference estimates of
14  racially polarized voting could generate results
15  that are similar to that of exit polls?
16      MR. WALLACE:  Similar to what?
17      MR. CHEUNG:  Results from exit polls.
18      MR. WALLACE:  Oh, okay.
19      THE WITNESS:  I'm vaguely aware of that,
20  yes.  Not specifics, but yes.
21      Q.  (By Mr. Cheung)  Does that tell you
22  anything about the accuracy of EI as a method in
23  racially polarized voting context?
24      A.  Well, I think it -- I think that's
25  evidence that you give as some consolation.  And

**Page 116**

1  so I would say it's -- you know, that would be
2  kind of external validity for the kind of
3  measures.
4      I want to point out that neither of my
5  reports really hangs on this ecological inference
6  issue, but yes.
7      Q.  Okay.  I'd like to show you one of those
8  articles.
9      A.  Sure.
10      (Exhibit 4 marked for identification.)
11      Q.  (By Mr. Cheung)  Do you have what's now
12  been marked as Exhibit 4?
13      A.  I do.
14      MR. WALLACE:  Is it 4 or is it 5?  I
15  thought we had two reports from him, two reports
16  from Orey.  This should be 5?
17      MR. CHEUNG:  We only showed him the
18  first Orey report.  We didn't show him the second
19  one.
20      MR. WALLACE:  We have not marked the
21  second.  Thank you.
22      Q.  (By Mr. Cheung)  Would you like to take
23  a moment to review that article?
24      MR. WALLACE:  A moment or a week?
25      THE WITNESS:  I will skim it.

**Page 117**

1      Q.  (By Mr. Cheung)  Let me know when you're
2  ready to talk about it.
3      A.  All right.
4      Q.  Thank you for reviewing for the pop
5  quiz.
6      I'd like to turn to page 274 of that
7  article, which I think is where the first
8  highlighting is.
9      A.  Yes.
10      Q.  Do you see the first highlight where it
11  says:  There is no convincing evidence that either
12  iterative EI or RxC is biased toward or against
13  findings of RPV.
14      A.  I do.
15      Q.  Do you have any reason to disagree with
16  that finding?
17      A.  No.
18      Q.  If we turn to the next highlight at the
19  bottom of that page going to the top of 275, could
20  you read that sentence for us?
21      A.  "For social scientists and legal
22  scholars interested in analyzing RPV when only
23  ecological data are present, both approaches can
24  be relied upon as they lead to substantively
25  similar conclusions about the presence or absence

Christopher Bonneau 9/29/2023

Page 118

1  of RPV."
2  Q. Do you have any reason to disagree with
3  that sentence?
4  A. No.
5  Q. And if I could trouble you to read the
6  next highlighted sentence on 275.
7  A. Here we go. "Beyond this, we
8  demonstrate that both the iterative EI and the RxC
9  methods produce results in line with individual
10  level exit poll data."
11  Q. I'd like to turn to the next page, 276.
12  I think I may have missed the highlight in here.
13  Do you see this first complete sentence of that
14  first paragraph beginning with: Since the late
15  '90s?
16  A. I do.
17  Q. Could you read that sentence for us?
18  A. "Since the late 1990s, EI has been the
19  benchmark method courts rely upon to evaluate RPV
20  patterns in voting rights lawsuits."
21  Q. Is that consistent with your
22  understanding of the use of EI?
23  A. It is.
24  Q. And I believe I may have forgotten to
25  ask you on 275, that sentence that begins with:

Page 119

1  Beyond this we demonstrate that both...
2  A. I read that.
3  Q. Do you agree with that sentence?
4  MR. WALLACE: Agree with? Object to the
5  form of that.
6  THE WITNESS: I agree it's what it says,
7  yeah.
8  Q. (By Mr. Cheung) Do you have any reason
9  to disagree with that conclusion?
10  A. I do not.
11  Q. Thank you. Just one more on 283. Can
12  you read that highlighted sentence on 283?
13  A. "We also did not find any convincing
14  evidence that EI will lead analysts to reach
15  conclusions in favor of RPV."
16  Q. Do you disagree with that sentence?
17  A. No.
18  Q. And so just to sum up here of the
19  highlighted -- of the sentences that you've read
20  from this article, you don't have any reason to
21  disagree with those findings?
22  A. Correct.
23  Q. Do you know if Dr. Orey's report used
24  the two EI methods, iterative and RxC, described
25  in this article?

Page 120

1  A. I don't recall.
2  Q. Can you turn to Appendix 2 of Dr. Orey's
3  report, I think is page 44, to confirm.
4  A. Yes, it appears he did use both EI and
5  RxC.
6  Q. And in terms of that article I just
7  showed you of Plaintiff's Exhibit 4, do you know
8  the authors of this article?
9  A. I've met Barreto and Collingwood I think
10  maybe once, but it was a very, like, in passing at
11  a conference thing. I don't know them, know them.
12  Q. Are you familiar with their work?
13  A. I am.
14  Q. Do you know if those authors are
15  reputable in the field?
16  A. They are.
17  Q. In paragraph 4 of your September report,
18  I think you identify a different issue that you
19  say can have serious implications for any analysis
20  using ecological inference. Do you see that?
21  A. I do.
22  Q. You include a quote here. Would you
23  mind reading that to us?
24  A. Sure. "For example, if white voters
25  tend to be conservative and most potential

Page 121

1  minority candidates are very liberal, strong
2  minority candidates may elect not to run because
3  they are ideologically out of step. A court that
4  inferred disparate treatment from white voters'
5  lack of support for minority Democrats relative to
6  white Democrats would be doubly in error: White
7  voting patterns may reflect ideological as well as
8  valence differences between minority candidates
9  and the white candidates whom the court treats as
10  counterfactuals."
11  Q. Thank you.
12  And that quote is from a 2016 article by
13  Elmendorf?
14  A. Correct.
15  Q. Do you consider that Elmendorf article
16  to be a reliable source?
17  A. I do.
18  Q. So taking a look at the first part of
19  that quote about minority candidates electing not
20  to run because they may be ideologically out of
21  step. Could you explain why a strong black
22  minority candidate who is a conservative would
23  decide not to run in Mississippi?
24  A. Who's a conservative?
25  Q. Uh-huh. (Affirmative response.)

31 (Pages 118 to 121)

Christopher Bonneau 9/29/2023

## Page 122

1   A.  No.
2       Q.   And so if racially polarized voting did
3   not exist, a black conservative likely would
4   choose to run because they can win the white
5   conservative votes?
6       A.   Maybe.  But also if there was no
7   incumbent, if there was an open seat, my hunch is
8   that a black conservative against any Democrat
9   would win regardless -- regardless of -- with the
10  incumbency advantage no open seats.  I'd love to
11  see that election.
12      Q.   And so do you disagree with this quote
13  that says:  Strong minority candidates may elect
14  not to run if white voters tend to be
15  conservative?
16      A.   Strong minority candidates may elect not
17  to run if -- can you say that again?
18      Q.   Yeah, please take a look at the first
19  sentence of that quote.
20      A.   "If white voters tend to be conservative
21  and most potential minority candidates are very
22  liberal, strong minority candidates may elect not
23  to run because of their ideological --
24      So what you're asking, then, is what?
25      Q.   Do you agree with that sentence or do

## Page 123

1   you disagree with it?
2       A.   Yeah, I agree with that sentence.
3       Q.   And so why would strong minority
4   candidates elect not to run if white voters are
5   conservative and minority candidates are liberal?
6   I don't understand that.  I'd like for you to
7   explain the sort of causation or the thinking
8   behind this quote.
9       A.   Because they're not likely to win.  And
10  so the assumption is that the white voters are
11  conservative and aren't going to vote for a black
12  candidate.  And so the -- and so they're going to
13  take a pass because they know they have no chance
14  of winning.
15      Q.   Why would a black conservative candidate
16  not have a chance of winning?
17      A.   A black conservative candidate would
18  have a chance of winning, sure.  But this is
19  talking about if white voters are conservative in
20  most potential minority candidates are very
21  liberal.  Strong minority candidates may elect not
22  to run.
23      Q.   And so the assumption here is that the
24  minority candidate would be liberal?
25      A.   That's the assumption in the quote.

## Page 124

1       Q.   Are you aware of any black conservatives
2   being elected to the Mississippi Supreme Court?
3       A.   No.
4       Q.   Are you aware of conservative black
5   candidates winning elections in Mississippi,
6   generally?
7       A.   Winning elections, I don't know about
8   generally.  I can tell you not in District One.
9       Q.   Is it also possible that candidate's
10  strategic decision making might result in an
11  underestimation of the level of racially polarized
12  voting?
13      A.   Well, I don't know, I mean, because if
14  they're not on the ballot they can't be voted for.
15  So I don't know how you estimate voting without
16  voting.  So I don't know how to answer that.
17      Q.   Is it possible that candidate's
18  strategic decision making, such as electing not to
19  run, might result in an underestimation of the
20  level of white voter discrimination?
21      A.   Well, again, if they're not running --
22      MR. WALLACE:  Object to the form.  I'm
23  not sure that white voter discrimination is a term
24  that's been used in this deposition so far.  So I
25  believe it's vague.

## Page 125

1       THE WITNESS:  Sure, please clarify the
2   vagueness.
3       Q.   (By Mr. Cheung)  Sure.  Is it possible
4   that candidate's strategic decision making such as
5   electing not to run might result in an
6   underestimation of the level of racial bias among
7   white voters?
8       A.   I'm not aware of -- I'm not aware of
9   evidence that shows racial bias among white
10  voters, so I don't know how to answer that
11  question.
12      Q.   Okay.  I have a copy of the Elmendorf
13  article.  I can provide you a copy of it if you'd
14  like to see it, or I can read you a quote from it.
15      A.   You can read me a quote.
16      Q.   In that Elmendorf article it says:
17  Candidate's strategic behavior in anticipation of
18  white voter discrimination may lead courts to make
19  grave errors about who is a high quality or low
20  quality candidate and then consequence to badly
21  understate white voter discrimination.
22      A.   Okay.
23      Q.   Do you have any reason to disagree with
24  that statement?
25      A.   No.

32 (Pages 122 to 125)

Christopher Bonneau 9/29/2023

**Page 126**

1    Q.  So you would agree that strategic
2  behavior by candidates may lead to an
3  underestimate of racial bias among voters?
4    A.  May lead.
5    Q.  In work that you've done outside of this
6  case, have you used regressions or other
7  statistical methods?
8    A.  Like in my scholarly research?
9    Q.  Yes.
10    A.  Yes.
11    Q.  And in reports you've prepared for other
12  cases?
13    A.  I'm trying to think.  I used -- did I do
14  regression in Alabama?  I don't think so.  In
15  Colorado, I think we did do some analysis in
16  Colorado but that was the campaign finance case.
17    Q.  Do your reports in this case utilize
18  regressions or any other statistical methods?
19    A.  I don't believe I do, no.
20    Q.  Did you perform any statistical analyses
21  that you've omitted from the report?
22    A.  I did not.
23    Q.  I'd like to turn to sort of the partisan
24  balance, if any, of nonpartisan elections?
25    A.  Can I use the bathroom first?

**Page 127**

1    Q.  Sure.
2      (Off the record.)
3    Q.  (By Mr. Cheung)  Dr. Bonneau, we
4  mentioned earlier that the ballots for Mississippi
5  Supreme Court elections don't identify the
6  partisan affiliation of Supreme Court Justice
7  candidates; is that right?
8    A.  That is correct.
9    Q.  You also testified earlier about how
10  that omission of partisan information may lead to
11  some voters misidentifying the candidate and
12  voting for the wrong candidate; is that right?
13    A.  Correct.
14    Q.  And so in your January report, you
15  include a quote that says -- I think paragraph 41:
16  Folks who tend to vote Republican have found a way
17  to learn the identity of judicial candidates
18  favored by Republicans, and the same has been true
19  for Democratic voters.
20      Do you see that?
21    A.  That's a quote from Salter, yes.
22    Q.  Salter 2017 is an op-ed, right?
23    A.  Correct.
24    Q.  Do you know what evidence Salter uses to
25  back up that claim?

**Page 128**

1    A.  I do not.  But that quote is consistent
2  with my research, right, which I talked about
3  earlier, that even though voters make more
4  mistakes in nonpartisan elections, they're still
5  able, overwhelmingly, to identify the correct
6  candidate.
7    Q.  That research you just mentioned, that's
8  not cited in your report?
9    A.  It is.  It's paragraph 40.
10    Q.  That's the Bonneau and Cann source for
11  2015?
12    A.  Correct.  And so the Salter paragraph
13  just says that the general thing that my co-author
14  and I found in that book is also a perception that
15  happens in this state as well.
16    Q.  And so your 2015 piece does not look at
17  Mississippi in particular?
18    A.  It looks at all states that have
19  elections.  So Mississippi is part of it.
20    Q.  That's the same source that we discussed
21  earlier in which you ran an experiment using ads
22  that you created?
23    A.  Well, it wasn't a -- yes, that's a
24  book -- so there are several chapters in that
25  book.  So we embedded surveys into -- we embedded

**Page 129**

1  experiments into national surveys, and so we have
2  a nationwide survey that we bought time on to
3  insert our own questions.  And so there are
4  Mississippians in that survey.  How many, I can't
5  tell you.
6    Q.  So you don't know the sample size of the
7  Mississippians in that study?
8    A.  Correct.
9    Q.  Okay.  And in that study you did not
10  look at voters' awareness of partisan
11  affiliations of candidates running for the
12  Mississippi Supreme Court?
13    A.  Not specifically that, no.
14    Q.  In paragraph 3 of your September report
15  you discuss some efforts by Latrice Westbrooks'
16  campaign to associate herself with Benny Thompson,
17  Joe Biden and Mike Espy; is that right?
18    A.  I do.
19      MR. WALLACE:  Paragraph what?
20      MR. CHEUNG:  Three of the September
21  report.
22    Q.  (By Mr. Cheung)  You then conclude that
23  it was clear to those following the race that
24  Judge Westbrooks was a member of the Democratic
25  party and her campaign was assisted by high

Christopher Bonneau 9/29/2023

Page 130

1    profile Mississippi Democrats.  Do you see that?
2         A.  I do.
3         Q.  Is that conclusion based on those
4    campaign materials that you identify or is there
5    something else to that?
6         A.  No, my conclusion about how she tried to
7    align herself with high profile Democrats is based
8    on the evidence cited there how she associated
9    with high profile Democrats.
10        Q.  Do you agree that there are voters who
11   cast a ballot in the 2020 election who may not
12   have seen that messaging?
13        A.  Sure.
14        Q.  But every voter who receives a ballot
15   sees the omission of a party affiliation next to
16   the candidate's name.
17        A.  Correct.
18        Q.  And in terms of the Mississippi
19   Democrats that you identified Ms. Westbrooks as
20   associating herself with, were they themselves the
21   preferred candidate for black voters in their
22   races?
23        A.  I don't know that.  I'm assuming, but I
24   don't know.
25        Q.  Do you have any reason to doubt that?

Page 131

1         A.  I do not.
2         Q.  One thing earlier, I think you mentioned
3    some correspondence you had with someone about
4    whether or not there are criticisms of the EI
5    method that persist?
6         A.  Correct.
7         Q.  Are you able to provide that
8    correspondence to us?
9         A.  I think I can, yeah.  I e-mailed --
10        MR. WALLACE:  We will take it under
11   consideration.  I think you're probably entitled
12   to have it but we need to talk about that.
13        MR. CHEUNG:  Okay.  Thanks, Mike.
14        Q.  (By Mr. Cheung) I'd like to turn to
15   paragraph 5 of your September report.  I think
16   there you discuss an example of a candidate named
17   Lynn Posey.  Do you see that?
18        A.  I do.
19        Q.  What is the significance of this
20   example?
21        A.  Well, to me this shows how it's -- how
22   party is a pretty important factor.  So if we take
23   this race here.  We have Lynn Posey who defeated
24   Addie Green.  And Professor Orey talked about how
25   Green was the preferred candidate of the black

Page 132

1    voters, which I think is a given.  But four years
2    prior, Posey ran as a Democratic candidate and
3    defeated Haley Barbour's nephew, and he won as a
4    Democrat each time he served in the State Senate.
5         So if Orey had analyzed the 2007 race,
6    he probably would have found that Posey was the
7    black preferred candidate.  But then four years
8    later, all of a sudden, Posey is not the black
9    preferred candidate.  Same dude, same preferences,
10   the only difference is one year he was a Democrat,
11   the other year he was a Republican.  Which, to me,
12   shows the importance of political party, when you
13   have somebody who's no different except the party
14   ID after their name.
15        Q.  And so you're saying that because Posey
16   was a black preferred candidate in '07 as a
17   Democrat and then he suddenly lost black voter
18   support in 2011 as a Republican, partisanship must
19   be the reason.  Why?
20        A.  It's the most likely reason.
21        Q.  You stand by your conclusion that the
22   only difference in the two elections was his
23   political party?
24        A.  As far as I know, unless someone can
25   tell me there was another difference between the

Page 133

1    two elections.
2         Q.  Is Posey a white candidate?
3         A.  Yes.
4         Q.  In 2007, his opponent, Charles Barbour,
5    was he white?
6         A.  Yes.
7         Q.  In 2011, Addie Green, was she black?
8         A.  Yes.
9         Q.  So the races of the candidates, of the
10   opponent, also changed between 2007 and 2011?
11        A.  Correct.
12        Q.  Can you rule out the possibility that
13   black voters voted for Addie Green because she was
14   a black candidate?
15        A.  Well, that would have to assume that the
16   black preferred candidate, Posey, all of a sudden
17   would not have been black preferred, right?  So
18   what would cause him to lose that preference.  I
19   would argue, right, that it's party.  That had
20   Posey run as a Democrat in 2011, he would have
21   been the black preferred candidate.  But because
22   he ran as a Republican, he was not.
23        Q.  Do you have any reason to think that if
24   it were a primary race between Green and Posey,
25   that Posey would have won the votes of black

34 (Pages 130 to 133)

Christopher Bonneau 9/29/2023

Page 134

1 voters?
2     A.  Well, he did in 2007.  So unless you can
3 tell a story why he would all of a sudden lose
4 them.  I mean, to me, this gets into the whole
5 black candidate versus black preferred.  Posey was
6 a white candidate.  He was the black preferred
7 candidate in 2007.  If he were running in a
8 Democratic primary, my assumption would be he
9 would still be the black preferred candidate.
10 This is akin, I think, to the Ceola James
11 situation, where she was a black candidate but she
12 was not the black preferred candidate.  Again,
13 it's hypothetical.  We don't know.  But what we do
14 know is Posey had a history of being a member of
15 the Democratic party, of winning as a Democrat,
16 winning with black support, then all of a sudden
17 now he loses in.
18     Q.  And so between 2007 and 2011, Posey's
19 party affiliation changed?
20     A.  Correct.
21     Q.  You would also agree that the race of
22 his opponent also changed?
23     A.  Well, no, the race of his opponent
24 stayed the same.  But he was running against a
25 black candidate in 2011 rather than a white

Page 135

1 candidate in 2007.
2     Q.  All right.
3     A.  But Addie Green's race did not change
4 between '07 and '11.
5     Q.  And when candidates switch parties, do
6 their positions on policy issues typically change?
7     A.  You know, not really.  I mean, the
8 evidence that I've read suggests that basically
9 it's a -- they're just realigning, right, to be
10 either more similar, right, to the party that
11 represents their views or because they think it's
12 an electoral advantage.
13         But, you know, when Jim Jeffreys went
14 from a Republican independent, his party positions
15 didn't change.  If Joe Manchin would change from
16 Democrat to an independent Republican, his
17 position wouldn't change.  He would just feel like
18 it was either, A, to his electoral advantage to do
19 that, or because he feels that the new party that
20 he changed into better reflects his views.
21     Q.  So even if the candidate's actual policy
22 views don't change, does the change in party
23 affiliation signal to voters that their policy
24 positions may have changed?
25     A.  It might.  I don't think we can

Page 136

1 necessarily assume that.  You know, I think that's
2 a -- I think party changes like that, voters tend
3 to be pretty cynical about.  If Joe Manchin would
4 have changed, right, people would be like, oh,
5 yeah.  Well, he's already that anyway.
6         So I don't know if I -- I mean, it's
7 possible for some voters, sure, but I don't know
8 if that's a widespread thing.
9     Q.  So your view is that if Joe Manchin
10 became a Republican, he wouldn't lose any
11 Democratic votes?
12     A.  He would lose some Democratic votes,
13 sure.  But he'd do it, right, because he knows he
14 can't win as a Democrat so he wouldn't care.
15     Q.  In paragraph 7 of your September report,
16 you note that racial polarization did not prevent
17 a black candidate from winning the Democratic
18 primary?
19     A.  Correct.
20     Q.  But winning the Democratic primary
21 doesn't mean that the candidate ultimately wins
22 elected office, right?
23     A.  Correct.
24     Q.  And so a black preferred candidate can
25 win the Democratic primary and still ultimately be

Page 137

1 unsuccessful because of opposition from white
2 voters in the general election?
3     A.  Yes.
4     Q.  In paragraph 8 you have a quote about
5 racial polarization in the primary.  Can you
6 explain the significance of that quote, please?
7     A.  Sure.  So what that quote does, is it
8 talks about how -- you're talking about preference
9 for one candidate relative to the other, so it's
10 all relational.  It's not necessarily about any
11 kind of absolute support.  So it's not a signal of
12 how much minority voters like the preferred
13 candidates, it's just how much do they like the
14 preferred candidate relative to who that preferred
15 candidate is running against.
16     Q.  Why is that fact relevant to your
17 report?
18     A.  Well, I think that it's relevant to
19 report because it suggests that the candidates
20 matter, that it's not just some kind of racial
21 signal, right?  So it's not just whether or not
22 you have a black candidate, right, but it's about
23 who it is relative to their opponents.
24     Q.  But that point about relative preference
25 is true of all elections, right, not just

35 (Pages 134 to 137)

Christopher Bonneau 9/29/2023

**Page 138**

1  primaries?
2      A.  True.
3      Q.  I just want to make sure I'm
4  understanding.  Are you suggesting that we
5  shouldn't look at election results to measure
6  racial polarized voting?
7      A.  No.
8      Q.  I'd like to turn to your January report
9  for a moment, in paragraph 38 in particular.
10     A.  Okay.
11     Q.  You cite a source from 1960 for the
12  proposition that one of the best predictors of how
13  individuals will vote is partisan identification.
14  Do you see that?
15     A.  I do.
16     Q.  Do you know how the authors of that 1960
17  source reached that conclusion?
18         MR. WALLACE:  All right.  I'm going to
19  interpose the same objection as being outside the
20  scope of the Court's order, but he may respond.
21         THE WITNESS:  Let me just say, it's an
22  EG, right?  So, for example, this is as a
23  canonical study of voting, right, of the American
24  voter was done through survey research, was a
25  large national survey.  Everything that's come

**Page 139**

1  since that canonical site has found the same
2  thing.  So it looks weird because it's 1960.  When
3  I was writing the report it was a convenient
4  citation that I had off the top of my head as
5  opposed to saying what the newest one was that
6  found that same that they did in 1960.
7      Q.  (By Mr. Cheung) Thank you.  Appreciate
8  that.  But do you know how the authors came to
9  that conclusion?
10     A.  Surveys.
11     Q.  Surveys asking who?
12     A.  Of voters, right, of asking voters like
13  party ID, who did you vote for, things like that.
14     Q.  Do you know if the authors considered
15  the possibility that partisan identification
16  itself is related to a voters race?
17     A.  Partisan -- I'm sure they did.  I can't
18  remember the specifics.
19     Q.  Do you know if the authors of that
20  survey compared the strength of partisanship
21  versus race as a predictor?
22     A.  No, I mean, they wouldn't have done
23  that.  If they did, it would have been, you know,
24  using data that is now 70 years old.  So, of
25  limited utility.

**Page 140**

1      Q.  Okay.  And since 1960, as we discussed
2  earlier, black and white voters have essentially
3  switched parties and affiliation?
4      A.  They have.
5      Q.  And after that switch in party
6  identification, black and white voters continued
7  to vote in separate blocks; is that right?
8      A.  For different political parties.  Well,
9  blacks overwhelmingly vote for the Democratic
10  party, whites are more split, yes.
11     Q.  Does that history tell you anything
12  about why the parties are split along racial lines
13  today?
14         MR. WALLACE:  I think it's asked and
15  answered, but go ahead.
16         THE WITNESS:  Does what history tell me?
17     Q.  (By Mr. Cheung) The fact that the
18  parties are still divided by race despite the
19  change in party identification.
20     A.  I don't know that I would say the
21  parties are divided by race.  I would say that
22  blacks are overwhelmingly members of and vote for
23  the Democratic party and whites are more mixed.  I
24  think that's consistent.
25     Q.  I'd like to turn back to Dr. Orey's

**Page 141**

1  report again, pages 12 to 14 that you reviewed
2  earlier.
3      A.  Okay.
4      Q.  I think you testified earlier that you
5  don't dispute Dr. Orey's calculations and his
6  data; is that correct?
7      A.  Correct.
8      Q.  Do you agree that in these by biracial
9  general elections that Dr. Orey sampled, he
10  correctly identified which candidates were black?
11     A.  Yes.
12     Q.  And do you agree that he correctly
13  identified the candidates that were preferred by
14  black voters?
15     A.  Yes.
16     Q.  And do you agree that in these general
17  elections in which a black candidate ran against a
18  white candidate, black voters generally prefer the
19  black candidate?
20         MR. WALLACE:  Object to the form
21  generally as vague, but he may answer.
22         THE WITNESS:  Yes.
23     Q.  (By Mr. Cheung) Black voters usually
24  preferred the black candidate?
25     A.  Yes.

Christopher Bonneau 9/29/2023

**Page 142**

1    Q.  Did white voters usually prefer the
2  white candidate?
3    A.  Yes.
4    Q.  And in most of these elections involving
5  black and white candidates, did the candidate
6  preferred by black voters lose?
7    A.  In which tables?
8    Q.  Looking at all three tables, Tables 1,
9  2, and 3.
10   A.  Well, in Tables 1 and 2, yes.  But in
11  Table 3, it's much more split.
12   Q.  What if we look at all three tables in
13  the aggregate?
14   A.  Well, in the aggregate -- so we have two
15  elections, then we have five, so it's seven.  So
16  we have one and seven there.
17      So 5 out of 10 and 1 out of 7, so that's
18  a total of 6 out of 17.
19   Q.  Could you do that count for me again?
20   A.  Sure.  In Table 1 we have 0 out of 2.
21   Q.  Right.
22   A.  In Table 2 we have 1 out of five, so 1
23  out of 7.  In Table 3 we have 10 elections and I
24  count 5 out of 10.
25   Q.  And that's the number of instances of --

**Page 143**

1    A.  The black candidate winning.
2    Q.  So in most of the 17 elections, the
3  black candidate lost?
4    A.  In more than half, yes.
5    Q.  In paragraph 28 of your January report
6  you say that incumbents overwhelmingly win their
7  seats and it's only the white judges who could
8  potentially lose their seats because they're being
9  challenged.  You see that?
10   A.  I do.
11   Q.  Is that conclusion based on Justice King
12  running unopposed in his reelections?
13   A.  Yes.
14   Q.  Is there any other fact you're relying
15  on for that conclusion?
16   A.  Well, no, because only the white judges
17  are being challenged.  So if you're not challenged
18  you can't lose your seat.
19   Q.  Is your view that black incumbents have
20  no electoral risk?
21   A.  If they do, I haven't seen it.
22   Q.  What are some factors that influence
23  whether or not a challenger emerges?
24   A.  Whether or not they can win.
25   Q.  Anything else?

**Page 144**

1    A.  Well, if they're satisfied with the
2  incumbent.
3    Q.  Any other considerations?
4    A.  Not that I can think of off the top.
5  Usually if you have an incumbent who's vulnerable,
6  they will be challenged.  And what makes an
7  incumbent vulnerable could be an incumbent who's
8  out of step with the electorate, an incumbent who
9  can't do their job well or anything else.
10   Q.  But it's not because the incumbent is
11  black that there wouldn't be a challenge.
12   A.  I don't understand how that would work.
13   Q.  Right.  I'm just trying to understand
14  your answer that black incumbents are not at risk
15  of losing their seats?
16   A.  Not in District One, at least they
17  haven't been.
18   Q.  So your view is that black incumbents in
19  District One have no risk of being challenged?
20   A.  Well, there's always a risk of being
21  challenged, they just have never been challenged.
22   Q.  And that's based on a sample of how many
23  elections?
24   A.  Three or four.
25   Q.  Would you agree that unopposed judicial

**Page 145**

1  elections are not that unusual?
2    A.  Would I agree -- yes, I would.
3    Q.  And it's especially --
4    A.  No, no, sorry, I would disagree with
5  that, that uncontested races are not the --
6  contested races are the norm.
7    Q.  What about specifically in the context
8  of nonpartisan elections in which there's an
9  incumbent?
10   A.  I believe contested races are still the
11  norm.
12   Q.  So in a 2006 article that you wrote
13  titled Does Quality Matter, you provide the rate
14  of uncontested elections from 1990 to 2000.  And
15  you say that the rate for uncontested nonpartisan
16  elections is 42.02 percent.  Does that sound right
17  to you?
18   A.  Yes.  That data is 22 years old.
19   Q.  Now talking about Justice King,
20  specifically.  We talked about the fact that he
21  didn't draw a challenger, maybe in part because a
22  challenger thought they would lose, right?
23   A.  He's never drawn a challenger.
24   Q.  Could part of that be because Justice
25  King is perceived as a strong candidate?

**37 (Pages 142 to 145)**

Christopher Bonneau 9/29/2023

## Page 146

1  A.  Yes.
2  Q.  Also potentially because he's an
3  incumbent?
4  A.  Sure, just as Justice Griffis was.
5  Q.  When he was up for reelection, was
6  Justice King always the only black justice on
7  Mississippi's Supreme Court?
8  A.  I believe that's true.
9  Q.  Is it possible that there was a
10  reluctance to be perceived as mounting a campaign
11  to make the Mississippi Supreme Court an all white
12  court?
13  MR. WALLACE:  Object to the form.
14  Reluctance by whom?
15  THE WITNESS:  That was going to be my
16  question.
17  Q.  (By Mr. Cheung)  By candidates or
18  parties endorsing candidates, relevant political
19  actors.
20  A.  No.  If you think you can win you run.
21  I don't -- if I'm a lower court judge or I want to
22  be on the Mississippi Supreme Court and I think I
23  can win, then I'm going to win.  I'm going to go
24  run and win.
25  Q.  You testified earlier that a judicial

## Page 147

1  candidate, although nonpartisan, often receives
2  the backing of a political party.
3  A.  Correct.
4  Q.  And so is it possible that a political
5  party might be reluctant to support a campaign
6  that makes the Supreme Court an all white court?
7  A.  Well, maybe the party of Justice King,
8  the Democratic party would be, but I don't
9  understand why a Republican party would care about
10  that.  It's about winning elections.  It's not
11  about how it looks.
12  Q.  You use the Justice King example, the
13  contrast with Justice Smith who lost his
14  reelection in 2008, right?
15  A.  Correct.
16  Q.  Justice King's elections were in 2012
17  and 2020.
18  A.  Correct.
19  Q.  In terms of the likelihood of there
20  being a challenger emerging, could be there some
21  meaningful differences between 2008, 2012 and
22  2020?
23  A.  Sure, but when Justice King was on the
24  ballot in 2012 and 2020, he was on the ballot with
25  another person who did draw a challenge.  So in

## Page 148

1  2012 Justice Waller drew a challenge, and in 2020,
2  Justice Griffis drew a challenge.
3  Q.  And those candidates who drew a
4  challenge, they still won, right?
5  A.  Yes.
6  Q.  Okay.  But are there differences between
7  2008, 2012 and 2020 that could influence whether
8  or not a challenger emerges?
9  A.  Sure, yeah.
10  Q.  Some of that might be candidate-specific
11  characteristics, because we're talking about
12  different incumbents?
13  A.  Sure.
14  Q.  Macro-environment conditions like crime
15  rates might be different?
16  A.  Yep.
17  Q.  You did not control for those
18  differences in your comparison of Justice King to
19  Justice Smith?
20  A.  No.  But again, we also have Justice
21  Waller and Justice Griffis who were the same
22  years.  So those things would be the same.  The
23  only difference is the candidates.
24  Q.  We talked earlier about, you know, the
25  issue of sample size.  Do you have a view on how

## Page 149

1  many elections to look at would be a sufficient
2  sample size for you to be able to draw conclusions
3  from these patterns?
4  A.  I would like to -- I mean, I analyzed
5  all of the elections.  I would love there to have
6  been more elections, but I can't analyze elections
7  that aren't there.
8  Q.  But with the elections that you do have,
9  in terms of Justice King's reelections not drawing
10  a challenger, the fact that we're only talking
11  about three, maybe four elections, does that
12  affect the confidence you have in the patterns
13  that you're noticing?
14  A.  No, because it's the only patterns I can
15  observe.  So I -- you know, if we have another 10
16  years of data might my conclusions change, sure.
17  I mean that's what happens when you get more data
18  and you get more elections.  But, you know, when
19  you're looking at Appendix A, what you see is
20  every incumbent wins except for one, and every
21  incumbent is challenged except for Justice King.
22  Now, I think that's informative.
23  Q.  You testified earlier that you were
24  deposed in the Alabama case?
25  A.  I was.

38 (Pages 146 to 149)

Christopher Bonneau 9/29/2023

Page 150

1    Q.  Do you recall testifying in that case,
2  quote:  When we are dealing with a small number of
3  elections, many of which can be decided on
4  idiosyncratic factors, I don't think we can make a
5  conclusion like that.
6    A.  Well, I don't know what "like that"
7  meant, what that's referring to.  In general, that
8  is something I would say depending upon what the
9  conclusion is.
10    Q.  I'm happy to show you the transcript if
11  you would like for you to see the context.
12    A.  If you want to, that's up to you.
13      (Exhibit 5 marked for identification.)
14    Q.  (By Mr. Cheung)  So that's now
15  Plaintiffs' Exhibit 5.  I'd like to point you to
16  page 37 of the transcript.  Starting from line 16
17  and going down to page 38, line 11.
18    A.  Okay.
19    Q.  Would you agree in the Alabama case you
20  concluded that there wasn't enough information to
21  draw a conclusion about patterns in a small sample
22  size of elections?
23    A.  In that case -- hold on.  I've got to go
24  back further here.  So the question is:  Does
25  that -- taken in isolation, does that suggest that

Page 151

1  the differential in that particular race was not
2  party because they were in the same party, but the
3  differentiator or one differentiator was race?
4      I said:  I don't think we have enough
5  information to conclude.
6      I don't think we have enough information
7  to conclude what the differentiator is.
8    Q.  What do you see as a difference between
9  the Alabama example and your ability to draw
10  conclusions about Justice King's reelection?
11    A.  Well, I believe we have one -- we're
12  looking at one election, or in the Alabama case at
13  this part -- we have an example of race where
14  there are four candidates.  So I think there are
15  fewer elections when I made that there.
16      And, again, that's right, it could be
17  any number of things.  I think I say the same
18  thing in the report here.  It could be any number
19  of things that differentiates candidates.  I think
20  the evidence is the most consistent with party.
21  But, yeah, I mean, given the small number of
22  elections it's impossible to say.  Just like it's
23  impossible to say it's race, it's impossible to
24  say it's gender.  The smaller the number of races
25  we have the more difficult it is to establish

Page 152

1  patterns with conclusiveness.  So, again, if I had
2  10 more years of data and we had this case 10
3  years from now, might my conclusions be different,
4  sure.
5    Q.  Do you know if apart from Justice King
6  other black justices on the Mississippi Supreme
7  Court have been challenged on their reelection
8  campaigns?
9    A.  Yeah, Justice Graves was challenged in
10  2004.
11    Q.  And what about before that?
12    A.  I only go back to 2000 in this report.
13  I mean, I have data going back further than that,
14  but I didn't use it for this report, so I can't --
15    Q.  In preparing your reports in this case,
16  did you also review the report prepared by Justice
17  Diaz?
18    A.  I did.
19    Q.  In his report he noted that Justice Fred
20  Banks ran in contested elections in '91 and '96.
21  Does that sound right to you?
22    A.  Yes.
23    Q.  So you mentioned Justice Graves drawing
24  a challenger in 2004; is that right?
25    A.  Yes.

Page 153

1    Q.  I think in paragraph 3 of your January
2  report you said that a black justice has not been
3  challenged since 2000.
4    A.  That should be 2004.  That is a typo.
5    Q.  Okay.  Thank you.  And then in the
6  paragraph after that, in paragraph 31 of the
7  January report, you say that black candidates
8  challenging an incumbent receive an average of
9  46-and-a-half percent of the vote while white
10  challengers receive an average of 42-and-a-half
11  percent.  Do you see that?
12    A.  Uh-huh.  (Affirmative response.)
13    Q.  Just for clarity of the record, which
14  elections did you draw those numbers from?
15    A.  That is from the 2000 and 2020.
16    Q.  Did you perform any statistical analysis
17  here to determine whether that difference is
18  statistically significant?
19    A.  I did not.
20    Q.  You did not run a T test or any other
21  type of test?
22    A.  No, my hunch is that there's not enough
23  cases to get any kind of precision.
24    Q.  And so you're saying given the sample
25  size if you had run a test on the difference, the

39 (Pages 150 to 153)

Christopher Bonneau 9/29/2023

Page 154

1    result likely would not be statistically
2    significant?
3        A.  Well, I mean, so we can talk about
4    statistical significance in the context of
5    universe of cases.  So statistical significance is
6    used, right, to make inferences from a sample to a
7    population.  How likely is it that the data we
8    have in our sample is reflective of the broader
9    population.  Here we have the full population.  We
10   have every election in District One.  So we don't
11   need use an inferential statistic like statistical
12   significance because we observe all the data, and
13   so that is a true data point.  We're not trying to
14   take these elections and say how reflective are
15   they of this larger thing.  So that does not -- so
16   statistical significance doesn't really apply here
17   because it is significant because it is true.
18       Q.  So how do you know the difference here
19   is not just random noise?
20       A.  Well, it can't be random noise because
21   I'm not making -- I'm not inferring from a sample
22   of elections to a larger population.  That's when
23   you're worried about random noise, right, when
24   you're trying to do -- I've got 100 people here.
25   I want to know are these 100 people reflective of

Page 155

1    1,000 people.  We have eight elections, or however
2    many elections we have here.  That's all we have.
3    We're not trying to generalize to other elections.
4    And so it's actual data.  It can't be random
5    noise.
6            Now, the causes -- we can talk about the
7    causes.  But the fact that African Americans
8    states with (inaudible) candidates in District One
9    received this percentage of the vote and white
10   candidates received that percentage of vote is
11   true.  It's fact.  There's nothing to infer.
12       Q.  But you would agree that there would be
13   some natural variation in results even if it's the
14   same candidates running against each other?
15       A.  Sure, but that doesn't change the fact
16   that these are true figures.  Sure, over time or
17   over different elections vote totals vary.  They
18   go up, they go down.  But from 2000 to 2020, the
19   fact is that African American candidates who
20   challenge incumbents do better than white
21   candidates who challenge incumbents.
22       Q.  We may be talking in circles here.  I'm
23   trying to understand here why you think this
24   difference is of a sufficient magnitude to be
25   notable when there's not a statistical test

Page 156

1    assigned to it.
2        A.  But there can't be a statistical test
3    assigned to it.  So it's notable because it's, I
4    guess -- you could say 4 percent is not notable.
5    That's -- okay.  We can quibble about that, that,
6    that's fine.  But you can't say that, like, this
7    difference isn't real, because it is real.
8        Q.  I guess my question is how do you
9    determine whether or not that difference is real?
10       A.  Because it's all the cases we have.  So
11   let me -- all right.  So let me back up here.  All
12   right.  So let's think about -- thought this was a
13   nonteaching day.
14           So let's think about when we sample
15   things.  We use T tests and inferential
16   statistics, right, when we're trying to take
17   things from a sample to the broad population,
18   which I've said.  So I'm trying to understand --
19   I'm going to ask 100 people a question, you know,
20   is the country on the right track or wrong track.
21   And I'm going to get some data, and that data is
22   going to be 56 percent say wrong track, 40 percent
23   say right track, 4 percent say off track or
24   whatever.  Now, my question is, I know that's the
25   rate among these 100 people, because I've asked

Page 157

1    them and I've calculated that.  That's what I've
2    got here, right, with these data.  Now if I want
3    to infer to a national sample or to the State of
4    Mississippi or to something outside that, now I
5    need to know how representative are these 100
6    people of that population.  And if they're
7    representative, then we can make an inference.  If
8    they're not representative, then we can't or we'll
9    have a less precise inference.  These election
10   results are those 100 people.  Like, we know the
11   differences there.  That 58 percent I get applies
12   to those 100 people without question.  It's a real
13   number.  It's a real difference.
14           So because we're dealing here with the
15   population where I've done every election over
16   this time period, there's no statistical test
17   because this difference is an actual difference.
18   You can say it's small, you can say it's not
19   relevant, but you can't say it's not true.  Does
20   that make sense?
21       Q.  And so -- I feel like part of what
22   you're saying here is that you think this
23   difference is predicative of future elections?
24       A.  No.
25       Q.  Are you saying that?

Jackson                 Brooks Court Reporting              Meridian
Gulfport                   1-800-245-3376               New Orleans

Christopher Bonneau 9/29/2023

Page 158

1      A.  No.  What I'm saying is that exactly
2  what I said, in the elections in these districts,
3  African American candidates who challenge
4  incumbents do four points better than white
5  candidates who challenge incumbents.  So if the
6  argument is that incumbents have such a huge
7  advantage, right, and we would agree there's an
8  incumbency advantage, what ends up happening is
9  actually a black candidate challenging an
10  incumbent does better than a white candidate
11  challenging an incumbent.
12      Which shows, one, that incumbency is
13  powerful.  But it also shows that, you know, race
14  probably isn't as powerful.
15      Q.  And so you're now relying on this
16  difference to make a judgment about the likelihood
17  of black candidates winning in District One in the
18  future.
19      A.  I didn't say that, no.
20      Q.  And about sort of the size of the
21  difference, are you saying that this difference is
22  notable, of 4 percent?
23      A.  Yes.
24      Q.  How do you determine whether or not the
25  difference is notable?

Page 159

1      A.  It's 4 percent.  Again, we can quibble.
2  It's just the opinion.  But you can say 4 percent,
3  whatever, that's nothing.  But you've going from
4  42 to 46, who cares.  I would say, well, the
5  standard for competitive elections in political
6  science tends to be elections that are decided by
7  55 percent or less.  And so what you're doing here
8  is you're going from an election that's less
9  competitive to election that's more competitive.
10  When you have a more competitive election, that
11  gives the challenger a better chance of winning
12  than in a less competitive election.  And if you
13  look at over time when you see competitive
14  elections, competitive elections beget other
15  competitive elections.  So if you have a history
16  of competitive elections in a district, you're
17  more likely to see competitive elections in the
18  future, right?  Because it signals other
19  candidates that there's actually a shot of taking
20  this person.  We might be able to win.  You don't
21  get that, right, when you always are in the area
22  where you're not getting competitive elections
23  where the challenge of the incumbents is getting
24  their butt kicked.
25      Q.  In your report you did not compare that

Page 160

1  4 percent difference to variations or differences
2  in other elections to assessment magnitude?
3      A.  No.
4      Q.  Okay.  I think in the paragraph after
5  that, paragraph 32, you say that you compared the
6  vote share, I think, of similarly situated African
7  American candidates to white candidates.
8      A.  That's just a summary of paragraph 31.
9      Q.  Okay.  How did you determine that the
10  African American candidates were similarly
11  situated?
12      A.  They were all challenging incumbents.
13      Q.  But you did not control for other
14  differences in their elections?
15      A.  No, they were all challenging
16  incumbents.
17      Q.  So by similarly situated -- I just want
18  to confirm, similarly situated just means the fact
19  that they were challenging the incumbent?
20      A.  Correct.
21      Q.  I'd like to turn to paragraph 50 of the
22  January report.  You note that Banks and
23  Westbrooks lost even though Obama and Espy won the
24  majority of the vote in District One.  Do you see
25  that?

Page 161

1      A.  I do.
2      Q.  Would you agree that in general for
3  purposes of measuring racially polarized voting,
4  it's more useful to look at election data
5  pertaining to the actual office being challenged?
6      A.  State that again.
7      Q.  In general, would you agree with the
8  view that for purposes of measuring racially
9  polarized voting, election data from the actual
10  office being challenged is more useful than
11  election data from other races?
12      A.  Paragraph 50 doesn't talk about racially
13  polarized voting.  It talks about just election
14  results and how people perform.  So I don't have
15  an opinion on racially polarized voting and the
16  offices looked at.
17      Q.  Would you agree that in terms of
18  elections for different offices there may be
19  different political dynamics that affect voter
20  behavior?
21      A.  Yes.
22      Q.  And so Obama was running nationally and
23  statewide in Mississippi?
24      A.  Correct.
25      Q.  And Espy was running statewide?

41 (Pages 158 to 161)

Christopher Bonneau 9/29/2023

Page 162

1      A.  Correct.  But you know there's a great
2   literature about coattails and about how the top
3   of the ticket can influence down ballot races.
4   Particularly, presidential coattails.  And so the
5   fact that in District One that President Obama won
6   53.9 percent of the vote, you would have expected,
7   right, that he would have helped down ballot
8   tickets.  The same thing with Mike Espy.
9      So there are different dynamics in those
10  races, but you have a lot of people who come in
11  and -- you know, a rising tide lifts all boats.
12     Q.  You also testified earlier that because
13  the Supreme Court races are nonpartisan, there is
14  a ballot dropoff effect?
15     A.  There is.
16     MR. WALLACE:  Object to the form as
17  mischaracterizing.  I don't think he said that
18  before, but I may be wrong.
19     THE WITNESS:  Well, there is ballot
20  roll-off.  There is ballot roll-off.  And you do
21  have more ballot roll-off in nonpartisan elections
22  compared to partisan elections.  But what the --
23  the effect of that, right, I think I would quibble
24  with because you don't necessarily know, like, is
25  it 20 percent of one party or certain demographics

Page 163

1   or not.  That we don't know.
2      Q.  (By Mr. Cheung)  And you would agree
3   that Obama, Espy, Banks, Westbrooks, they're all
4   different candidates in terms of name recognition?
5      A.  Yes.
6      Q.  They likely differ in terms of
7   fundraising capacity as well?
8      A.  Yes.
9      Q.  They also differ in terms of incumbency
10  advantage?
11     A.  Obama in '12 was an incumbent, Banks was
12  an incumbent -- no, that was a different Banks.
13     MR. WALLACE:  Different Banks.
14     THE WITNESS:  Different Banks, okay.
15  Espy was not an incumbent and neither was
16  Westbrooks.  So the only incumbent was Obama.
17     Q.  (By Mr. Cheung)  So going back to how we
18  defined the third Gingles precondition about white
19  block voting overcoming black block voting.  Is it
20  your conclusion that Gingles three is not
21  satisfied in this case in part because black
22  incumbents like Justice Graves and Justice King
23  have won in District One?
24     MR. WALLACE:  I'm going to object to the
25  form of that because it does ask for a legal

Page 164

1   conclusion about the Gingles case.  He may answer
2   if he understands it.
3      THE WITNESS:  Well, I say in paragraph
4   53, the evidence does not support the third
5   precondition that the majority group does not vote
6   as a block such that likely -- such that will
7   usually defeat the minority group's preferred
8   candidate.  In fact the mixed success of African
9   American candidates in District One elections
10  strongly suggest that voters, both white and
11  black, are making decisions based on suitability
12  of the candidates themselves.
13     Q.  (By Mr. Cheung)  And I'm saying
14  underlying that conclusion in paragraph 53, are
15  you relying on the fact that Justice King was not
16  challenged in his reelections and the fact that
17  Justice Graves won his reelection?
18     A.  I rely on the fact that African American
19  candidates in District One elections for the State
20  Supreme Court win and sometimes aren't even
21  challenged.
22     Q.  And so your view is that in evaluating
23  Gingles three, we have to take into account the
24  fact that Justice King was not challenged in his
25  two reelections?

Page 165

1      MR. WALLACE:  Again, that's a legal
2   question -- a legal opinion.  I may object to the
3   form.  He may answer.
4      THE WITNESS:  I would say that when you
5   have a competitive legal environment and you have
6   justices challenged all the time, except for one
7   justice, that suggests that that justice is doing
8   something right.  And I'm not aware of a story
9   that one can tell that you'd have a political
10  party or candidate say oh, you know, I'd love to
11  have that seat, but I'm not going to do it because
12  it would look bad.  That's just not how politics
13  works in the way that I'm familiar with.  And so
14  the fact that, yeah, he's not even challenged and
15  that he's winning is, I think, really important.
16  Because he might -- you know, District One, right,
17  Justice Kitchens is a Democrat, too.  So Justice
18  King if he were challenged would likely win.  No
19  one is even bothering.
20     Q.  (By Mr. Cheung)  Do you agree that
21  Justice Graves won in part because he was an
22  incumbent at the time?
23     A.  Well, if you look at Appendix A, then
24  yeah, we only have one incumbent who lost.  So
25  looking at those elections, I would say that him

**42 (Pages 162 to 165)**

Christopher Bonneau 9/29/2023

**Page 166**

1 being an incumbent was certainly helpful.
2     Q.  And so would it change your conclusion
3 if I told you that in the Gingles case the Supreme
4 Court ruled that we should disregard special
5 circumstances such as victories by black
6 candidates when they run unopposed or when they
7 have an incumbency advantage?
8         MR. WALLACE:  Object to the form, since
9 you're asking him about a Supreme Court opinion,
10 but he may respond.
11         THE WITNESS:  Would it change my
12 conclusion?  No.  I would say that that -- I mean,
13 that may be their conclusion, but as a matter of,
14 like, social science or whatever, that's nonvalid.
15     Q.  (By Mr. Cheung)  Okay.
16     A.  I mean at that point we're eliminating
17 useful information.
18     Q.  But in paragraph 53 where you cite the
19 third precondition of Gingles, are you purporting
20 to faithfully apply the Gingles factor?
21     A.  I'm purporting to say that based on the
22 data, African American candidates in District One
23 elections win.  That's what I'm saying.
24     Q.  You don't have an opinion on whether or
25 not your data disproves the existence of the third

**Page 167**

1 Gingles precondition?
2     A.  I do not.
3     Q.  Okay.  All right.  I'm done with my
4 questions for now.
5         (Off the record.)
6         MR. WALLACE:  We're back on the record.
7 What worried us is tendering the witness "for
8 now."  I have a very few questions about questions
9 that you asked earlier.  And if any of these
10 questions cause you to come back with anything
11 about these questions, I think you've got a right
12 to do it.  But I don't think you've got a right to
13 come back and ask anything else.  And if you were
14 intending to suggest you may have other questions
15 later, then I would ask you to go ahead and ask
16 them now.  I've got two or three questions about
17 what he's already said and then we're done.
18         MR. CHEUNG:  Okay.  Appreciate that,
19 Mike.
20         MS. JONES:  I think we're done.
21         MR. WALLACE:  You're done as far as --
22         MR. CHEUNG:  Yes.
23         MR. WALLACE:  If any of this sets you
24 off, you have a right to --
25 EXAMINATION BY MR. WALLACE:

**Page 168**

1     Q.  Dr. Bonneau, you were asked a few
2 questions some time ago about House Bill 1020
3 because you talked to Yahoo News.  Do you have any
4 personal knowledge regarding the enactment of
5 House Bill 1020?
6     A.  I do not.
7     Q.  Have you undertaken any study or
8 analysis regarding the enactment of House Bill
9 1020?
10     A.  I have not.
11     Q.  And are you here today to offer any
12 expert opinions regarding the enactment of House
13 Bill 1020?
14     A.  Not that I'm aware of.
15         MR. WALLACE:  We've got nothing further.
16         (Time Noted:  12:39 p.m.)
17         SIGNATURE/NOT WAIVED
18 ORIGINAL:  MR. CHEUNG, ESQ.
19 COPY:  MR. WALLACE, ESQ.
20
21
22
23
24
25

**Page 169**

1     CERTIFICATE OF DEPONENT
2 DEPONENT:  CHRISTOPHER BONNEAU
  DATE:  September 29, 2023
3 CASE STYLE:  DYAMONE WHITE, ET AL. vs. STATE BOARD
  OF ELECTION COMMISSIONERS, ET AL.
  ORIGINAL TO:  MR. CHEUNG, ESQ.
4     I, the above-named deponent in the
5 deposition taken in the herein styled and numbered
  cause, certify that I have examined the deposition
6 taken on the date above as to the correctness
  thereof, and that after reading said pages, I find
7 them to contain a full and true transcript of the
  testimony as given by me.
8     Subject to those corrections listed below,
  if any, I find the transcript to be the correct
9 testimony I gave at the aforestated time and place.
  Page    Line          Comments
10 ____  ____  _____
11 ____  ____  _____
12 ____  ____  _____
13 ____  ____  _____
14 ____  ____  _____
15 ____  ____  _____
16 ____  ____  _____
17
18 This the ____ day of _____, 2023.
19
      _____
20    CHRISTOPHER BONNEAU
  State of Mississippi
  County of _____
21
  Subscribed and sworn to before me, this the
22 ____ day of _____, 2023.
  My Commission Expires:
23 _____
24
      Notary Public
25

**43 (Pages 166 to 169)**

Christopher Bonneau 9/29/2023

Page 170

```
 1          CERTIFICATE OF COURT REPORTER
 2          I, Robin G. Burwell, Court Reporter and
 3    Notary Public, in and for the State of Mississippi,
 4    hereby certify that the foregoing contains a true
 5    and correct transcript of the testimony of
 6    CHRISTOPHER BONNEAU, as taken by me in the
 7    aforementioned matter at the time and place
 8    heretofore stated, as taken by stenotype and later
 9    reduced to typewritten form under my supervision by
10    means of computer-aided transcription.
11          I further certify that under the authority
12    vested in me by the State of Mississippi that the
13    witness was placed under oath by me to truthfully
14    answer all questions in the matter.
15          I further certify that, to the best of my
16    knowledge, I am not in the employ of or related to
17    any party in this matter and have no interest,
18    monetary or otherwise, in the final outcome of this
19    matter.
20          Witness my signature and seal this the
21    11th day of October, 2023.
22
23          _____
            ROBIN G. BURWELL, #1651
24          CRR, RPR, CCR
      My Commission Expires:
25    April 6, 2025
```