# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF MISSISSIPPI
# GREENVILLE DIVISION

| | |
|---|---|
| DYAMONE WHITE, et al., <br><br> Plaintiffs, <br><br> vs. <br><br> STATE BOARD OF ELECTION COMMISSIONERS, et al., <br><br> Defendants. | No. 4:22cv62-SA-JMV |

## RESPONSIVE DECLARATION OF WILLIAM S. COOPER

WILLIAM S. COOPER, acting in accordance with 28 U.S.C. § 1746, Federal Rule of Civil Procedure 26(a) (2) (B), and Federal Rules of Evidence 702 and 703, does hereby declare and say:

1. My name is William S. Cooper. I filed a declaration in this lawsuit on Oct. 3, 2022. I file this declaration in response to the Declaration of Dr. David Swanson dated January 6, 2023. I respond to Dr. Swanson's concerns in the order he has raised them: **(A)** Citizen voting age population ("CVAP"), **(B)** Core Retention **(C)** Compactness, **(D)** Polling place proximity, and **(E)** Diversity. In short, I find all of his concerns to be baseless.

**A. Citizen Voting Age Population**

2. Dr. Swanson's discussion of the voting-age-population (VAP) versus CVAP metrics only confirms my conclusion that the Black population in Mississippi is sufficiently numerous and compact to form a majority-Black district in a three-district system, thereby satisfying the first *Gingles* factor.

3. To start: Dr. Swanson claims that I rely on the use of the VAP metric to "argue that MS SCOMS District 1 is a *minority* Black district at 49.3% [VAP]," citing page 19 of my initial report. Swanson Report at 9 (emphasis in original); *see also id.* at 21, 23. That is not what my report says. As I explain on the cited page, under the current lines, Supreme Court District 1 is "a 4 percentage-point plurality BVAP district."

4. Dr. Swanson does not disagree with my demographic analysis. Rather, Dr. Swanson's main opinion is that Enacted 1987 Supreme Court District 1 currently contains a Black CVAP ("BCVAP") majority, and that the various illustrative and least-change plans are also BCVAP-majority (ranging from 57.0% to 53.8%).[1] Based on the 5-Year 2016-2020 ACS Supplemental Tabulation, from

---

[1] Dr. Swanson mistakenly reports NH DOJ BCVAP as AP BCVAP. The "NH DOJ Black CVAP" category includes voting age citizens who are either non-Hispanic single-race Black or NH Black and White. An "Any Part Black CVAP" category cannot be calculated from the 5-Year ACS Census Bureau Special Tabulation. The most current 5-year ACS data available

which CVAP figures are derived, that is true, *but it only confirms my ultimate conclusion*. The fact that the Black population in the current district is large enough to constitute a BCVAP majority, and that all of the alternative, whole-county Supreme Court plans that I have drawn are also BCVAP majority, only cements the fact that Plaintiffs have satisfied the *Gingles* 1 precondition, which asks whether the Black population in Mississippi is sufficiently numerous and geographically compact to allow for the creation of at least one majority-Black district. It undoubtedly is.[2]

5. Whether Supreme District 1 is ultimately "in need of remediation" (as Dr. Swanson puts it on page 21 of his report) is a larger question. It is my understanding that other experts in this case have concluded that Supreme Court District 1 also fails the racial bloc voting tests of *Gingles* 2 and *Gingles* 3, in that Black-preferred candidates are typically defeated by high levels of bloc voting by white voters. That is not the subject of my report and it is not covered in Dr.

---

is from the 2016-2020 ACS Special Tabulation, with a survey midpoint of July 1, 2018. It is available at: https://www.census.gov/programs-surveys/decennial-census/about/voting-rights/cvap.html.

[2] There is certainly no rule that I am aware of that *Gingles* 1 is not satisfied where the existing district is already majority-Black. To the contrary, in the *Thomas v. Bryant* Section 2 case where I was also the plaintiffs' map-drawing expert, the challenged state senate district in the Mississippi Delta was already over 50% BVAP (50.77%). Nevertheless, the Court found that *Gingles* 1 was met, and ultimately found in the plaintiffs' favor on liability.

3

Swanson's either. *Gingles* 1 is one piece of the puzzle, and on that score Dr. Swanson's CVAP analysis doesn't change anything.

6. Dr. Swanson questions why I used the VAP rather than CVAP metric here. Notably, VAP is based on Census data, whereas CVAP is an estimate based on the ACS survey. For that reason, VAP is the traditional standard. I often use both in my Voting Rights Act work, but CVAP is typically more useful to consider where there may be larger non-citizen populations, or later in decennial Census cycle. As Dr. Swanson's own analysis shows, Mississippi does not have a large non-citizen population, and it is not late in the Census cycle. In a state like Mississippi, where the population is almost all either Black or white, the two metrics do not yield particularly different results, as Dr. Swanson's own analysis shows.

7. Dr. Swanson's prison-adjusted eligible voter would not change the bottom-line conclusion on *Gingles* 1 even if it were sound. However, the analysis is in any case deeply flawed. As I explained in my opening report (at pages 19 and 20) Black Mississippians are disproportionately disenfranchised on the basis of a felony conviction. Dr. Swanson does not contest that disproportionality. Rather, he minimizes it, adjusting his CVAP estimates to account for people who are rendered unable to vote because they are currently incarcerated, but omitting all of the thousands of people who have entered and left prison over the decades but remain

4

disenfranchised. *See* Swanson Report at 23 ("While it is widely recognized that Mississippi has numerous felons ineligible to vote who are not currently incarcerated, there is no practical way to measure or locate these demographically by district in a meaningful way.").

8. This omission results in a miscalculation that is an order of magnitude off the mark. Using current prison population statistics, Dr. Swanson's prison-adjusted eligible voter analysis subtracts a total of 7,003 people from the total citizen voting age population of the state because they are currently incarcerated. Swanson Report at 26-28.

9. A 2018 analysis of records from the State Administrative Office of Courts showed that the total number of persons ineligible to vote due to a felony conviction that occurred between 1994 and 2017 (i.e., a 23-year subset of the actual total population that excludes anyone convicted prior to 1994 and since 2017) is *over 56,000*, with Black Mississippians accounting for over 60% of that number.[3] Dr. Swanson's conclusion that accounting for felon disenfranchisement does not affect voting eligible CVAP in the Supreme Court districts is not the product of any credible analysis.

---

[3] Alex Rozier, *Racial disparity conspicuous among Mississippians banned from voting*, Mississippi Today (Feb. 22, 2018), https://mississippitoday.org/2018/02/22/racial-disparity-conspicuous-among-mississippians-banned-voting/.

5

10. It is clearly within the realm of possibility that, after factoring in felony convictions going back to 1948 (two additional 23-year periods), the adjusted eligible Black CVAP for voters in Supreme Court District 1 may drop below 50%.

**B. Core Retention**

11. Dr. Swanson claims that I do not analyze the Supreme Court districts using the principle of "core retention." His assertions on that score are irrelevant.

12. First, and as a general matter, the very nature of a Section 2 lawsuit means that if the plaintiffs prevail, district boundaries will change from their existing lines. This often means that core-retention scores are lower for the proposed illustrative plans in Section 2 litigation. In my experience, core-retention is a non-issue in Section 2 litigation because if there is a finding of liability, the State has the opportunity to offer a remedial plan that would maximize core-retention within the constraints of the court's ruling.

13. Moreover, core retention, when it is considered at all, usually involves comparing both a newly enacted districting plan *and* an alternate illustrative plan to the prior benchmark plan, to see which plan retains more of the district cores from the prior benchmark. This might happen in the context of post-Census legislative redistricting. But here, the State has not redrawn the districts at issue since 1987, and there is no newly enacted plan to consider, so the core retention analysis is especially inapposite.

6

14. Core retention is also inapposite because Mississippi does not appear to consider it as a traditional districting consideration. According to the review of redistricting criteria for legislative redistricting by the National Conference of State Legislators that Dr. Swanson himself credits, core retention is mentioned in just 17 states—and Mississippi is not one of the 17.[4]

15. And if it mattered, Dr. Swanson's own analysis shows that Illustrative Plans 1 and 2 result in 74.3% and 66.8% voters remaining in their same Supreme Court districts, respectively—substantial majorities. Swanson Report at 37. Meanwhile, "Least Change" plans 1 and 2, which were offered *precisely to demonstrate* that whole-county Black-majority districts could be drawn while making more minimal changes to the existing lines, maintain 92.4% and 95.8% of voters in their existing Supreme Court districts, respectively. Swanson Report at 37.

16. I did not focus solely on core retention because, as I explained in my initial report, I drew the illustrative districts to follow whole counties and (to the extent possible) Mississippi Planning and Development district boundaries. These planning regions reflect county-level communities of interest that have been

---

[4] National Conference of State Legislatures, "Redistricting criteria," https://www.ncsl.org/redistricting-and-census/redistricting-criteria

7

expressly acknowledged and drawn into ten planning districts by the State of Mississippi.

17. Both Illustrative Plan 1 and Illustrative Plan 2 split fewer state-drawn Planning District boundaries than the 1987 Supreme Court Plan. Under the 1987 Plan (**Exhibit A-1**) five planning districts are whole, with ten planning district splits. Under Illustrative Plan 1 (**Exhibit A-2**) eight planning districts are whole, with four planning district splits. Under Illustrative Plan 2 (**Exhibit A-3**) seven planning districts are whole, with six planning district splits.

**C. Compactness**

18. Dr. Swanson also attempts to argue that the Illustrative Plans I have drawn are not compact. Swanson Report at 37-43. I reviewed compactness scores for the Illustrative Plans prior to filing my report. The scores are clearly within the norm. The plans are drawn at the county level, making it easy for candidates to run an election campaign and for voters to know the boundaries of the district they are in.

19. Apart from the use of compactness scores, redistricting experts and map-drawers commonly employ an eyeball test to assess whether a plan is reasonably compact. Under that approach, there is no serious dispute that the illustrative plans and least change plans I have drawn are reasonably compact. Even in terms of

compactness scores, the plans are superior to many congressional redistricting plans drawn in the past decade.[5]

20. Compactness is typically balanced with other factors, and an illustrative district need not be *the most* compact to demonstrate *Gingles* 1. *See Georgia State Conference of NAACP v. Fayette County Board of Commissioners*, No. 3:11-cv-123-TCB (N.D. Ga), May, 21, 2013 at pp. 31-36).[6] In my experience, the issue is whether the district drawn is reasonably compact. I am certain that these whole-county districts are.

21. And if a head-to-head numeric analysis were required, Illustrative Plan 1 (which, as noted in my original report, is based on the State's own congressional lines) is just as compact as the current map. As shown in **Figure 1**, there is virtually no difference between the 1987 Supreme Court Plan and Illustrative Plan 1 overall.

---

[5] *See* Azavea White Paper, "Redrawing the Map on Redistricting," (2012), https://redistricting.azavea.com/assets/pdfs/Azavea_Redistricting-White-Paper-Addendum-2012_sm.pdf.

[6] I served as the *Gingles* 1 expert for the Plaintiffs in the Fayette County, Georgia lawsuit.

**Figure 1: Compactness Scores (1987 Plan vs. Illustrative Plan 1)**

|  | Higher is better | | | Lower is better |
|---|---|---|---|---|
|  | **Polsby-Popper** | **Reock** | **Convex Hull** | **Original Schwartzberg[7]** |
| **1987 Supreme Court Plan** | 0.29 | 0.51 | 0.77 | 1.74 |
| **Illustrative Plan 1** | 0.28 | 0.36 | 0.78 | 1.74 |

22. Moreover, and as shown in **Figure 2**, there is no meaningful difference between the compactness scores for District 1 in the 1987 Supreme Court Plan versus Illustrative Plan 1.

**Figure 2: Compactness Scores for District 1 (1987 Plan vs. Illustrative Plan 1)**

|  | Higher is better | | | Lower is better |
|---|---|---|---|---|
|  | **Polsby-Popper** | **Reock** | **Convex Hull** | **Original Schwartzberg** |
| **1987 Supreme Court Plan** | 0.15 | 0.42 | 0.65 | 2.22 |
| **Illustrative Plan 1** | 0.15 | 0.32 | 0.74 | 2.15 |

---

[7] Based on the original Schwartzberg compactness score. The original Schwartzberg measure is appropriate because it simplifies the complicated shorelines of the Mississippi River. Dr. Swanson uses the Alternative Schwartzberg measure, which ignores the simplification step.

From the *Maptitude for Redistricting* documentation:

"The Schwartzberg test is a perimeter-based measure that compares a simplified version of each district to a circle, which is considered to be the most compact shape possible. This test requires the base layer that was used to create the districts. The base layer is used to simplify each district to exclude complicated coastlines.

The alternate version of the Schwartzberg test is a perimeter-based measure that compares each district to a circle, ignoring the district simplification step used by the original test."

**D. Polling Place Proximity**

23. Dr. Swanson employs a flawed methodology to estimate voter proximity to polling places. *See* Swanson Report at 42-46. The number of active registered voters who live within a half mile of their polling place is much smaller than Dr. Swanson suggests.

24. As shown in **Figure 3** and described in more detail *infra*, I estimate that 26.3% of active registered Black voters live within a half mile of *their* polling place – not 52% as Dr. Swanson asserts.

**Figure 3: Estimated Voters Living within a Half-Mile of their Polling Place**

| Radii | Registered | % of Statewide Registered | Black Registered | % Black Registered | % of Statewide Black Registered |
|---|---|---|---|---|---|
| ½ mile or less | 372,518 | 19.2% | 177,263 | 47.6% | 26.3% |
| >1/2 mile | 1,572,622 | 80.8% | 497,511 | 31.6% | 73.7% |
| Statewide | 1,945,140 | 100.0% | 674,774 | 34.7% | 100.0% |

25. Apparently, Dr. Swanson has erroneously counted the entire VAP living in any census block that is wholly or partly within a half mile radius of *any* polling place in his total of persons within the half-mile radius. That seems to be the only way to generate a VAP half-mile proximity number as high as 972,324. *See* Swanson Report at 45, Table III.G.1.

26. In order to demonstrate the flaws in Dr. Swanson's analysis, I overlaid a statewide census block shapefile with Census 2020 data and created half-mile radii

11

around 1,762 polling place locations, the geocoded locations of which were provided by the Defendants.

27. **Figure 4** shows that many of the census blocks (the light blue blotches) that are wholly or partly within the half-mile radii around the polling place (the small black circles) also extend well into outlying populations far outside the half-mile radii.

**Figure 4: Half-mile Radii and Adjacent Blocks**



28. By my count, the statewide VAP in the blue areas adds up to 970,535, almost matching Dr. Swanson's statewide count of 972,324. Statewide, the light blue areas (partially depicted in **Figure 4**) cover a land area of 8,312 square miles – about six times the land area encompassed by the 1,384 square miles taken up by 1,762 half-mile radii.

29. To properly estimate the number of active registered voters by race living within a half-mile of their polling place, I employed a 3-step methodology. **Step 1**: I geocoded a statewide voter file (dated June 6. 2022) with the *Maptitude for Redistricting* software. Of the 1,915,005 active voters listed in the voter file, the Maptitude software geocoded with precision 1,845,035 active voters (96.3%). **Step 2**: To estimate active Black voters, I assigned a weight to each voter based on the 2020 BVAP percentage of the census block where they reside. **Step 3**: To avoid over-counting voters who live within a half-mile of one or more polling places other than their own (a fairly common occurrence in urbanized areas), I assigned voters in each radius only to the VTD where they actually vote.

30. The bottom line estimate shown in **Figure 3** *supra* is that 47.6% of active voters living within a half mile of their polling place are Black, which is a minority of voters living within a half-mile of their polling place. These half-mile radii Black voters represent just 26.3% of active Black voters.

31. Stepping back, the presumption that polling place proximity translates into greater participation is in any case flawed, because numerous socio-economic factors contribute to the ease of access of one's polling place.

32. For example, a number of voters (of all races) have a disability and may not be able to walk to their polling place at all. *See* Exhibit L-1– p.23, Cooper Declaration October 3, 2022.

33. Other voters may have responsibilities that make it impossible to walk (e.g., 51.4% of Black female-headed households with children live below poverty compared to 37.4% of their white counterparts). *See* Exhibit L-1– p.4, Cooper Declaration October 3, 2022.

34. More to the point, for voters who cannot walk to a polling place (whatever their geographic proximity as the crow flies), it helps to have a car. And that is where the small half-mile proximity advantage Black voters may hold in Mississippi evaporates. Statewide 10% of Black households do not have a car vs. 4.3% of white households. *See* Exhibit L-1– p.17, Cooper Declaration October 3, 2022. And the racial disparity expands to 12% vs. 4.5% in the Delta region of the state (largely encompassed by Congressional District 2 in the 2010s).[8] *See* Exhibit

---

[8] Corresponding statistics for the 2022 Enacted Congressional District 2 will not be available until the release of the 1-Year 2022 ACS in September 2023.

M-1– p.17, Cooper Declaration October 3, 2022.

**E. Diversity**

35. Dr. Swanson's cluster analysis of county-level "diversity" has no place in the Section 2 context.[9] *See* Swanson Report at 46-66. One necessary requirement in a Section 2 redistricting lawsuit is to be able to *create* a majority-minority district by including minority populations in a single district in a manner that satisfies the first prong of *Gingles*. But Dr. Swanson's cluster analysis necessarily prioritizes spreading (also known as "cracking") Black voters across three majority-white Supreme Court districts, ostensibly in the name of optimizing "diversity." That analysis is incompatible with the *Gingles* test. Indeed, optimizing for Dr. Swanson's diversity cluster analysis score would run counter to a key, non-negotiable traditional redistricting principle – avoiding the dilution of minority voting strength. In fact, I have never seen anyone attempt to analyze a districting map in this way in my decades of Voting Rights Act work.

---

[9] Dr. Swanson's cluster analysis is based on an outdated version of the *Mississippi Health and Hunger Atlas (2017),* which relies on ACS 2011-2015 ACS data. He does not explain why he chose to use old information rather than the more current 2021 *Mississippi Health and Hunger Atlas* available at: https://cps.olemiss.edu/wp-content/uploads/sites/183/2021/11/Mississippi-Health-and-Hunger-Atlas-2021.pdf/.

The 2021 version relies *on* ACS 2015-2019 – the last ACS release unaffected by the COVID-19 pandemic years of 2020 and 2021.

For socio-economic contrast charts (Black, Latino, and NH White) that I prepared by county and municipality, based on the 5-Year 2015-2019 ACS see: http://www.fairdata2000.com/ACS_2015_19/Mississippi/.

36. Moreover, Dr. Swanson never explicitly defines his use of the term "diversity," which appears to take on different meanings at various parts of his report, some of them highly unnatural. For instance, unrelated to his diversity cluster analysis, Dr. Swanson opines that Mississippi (which is a greater percentage Black than any other state in the country) is *less diverse* than the United States as a whole because 92% of Mississippi is either Black or white. Swanson Report at 14-15. He does not address his own analysis showing that the majority ethnic group in Mississippi—the "White Alone" category"—is a smaller share of the State's population compared to the United States as a whole, and he implicitly (and severely) discounts Black Mississippians' contribution to the diversity of the State. As defined by the percentage of the state-level population that is not non-Hispanic White, Mississippi is the 12th most racially diverse state in the nation.

Executed on February 4, 2023.

_____<br>
WILLIAM S. COOPER