**Page 1**

```
 1         IN THE UNITED STATES DISTRICT COURT
           NORTHERN DISTRICT OF MISSISSIPPI
 2              GREENVILLE DIVISION
 3  DYAMONE WHITE, et al.           PLAINTIFFS
 4  VS.           NO. 4:22-cv-00062-SA-JMV
 5  STATE BOARD OF ELECTION
    COMMISSIONERS, et al.           DEFENDANTS
 6
 7
 8
 9  *****************************************
10  DEPOSITION OF JAMES FREDERICK "TED" BOOTH
11  *****************************************
12
13
14         Taken at Butler Snow,
        1020 Highland Colony Parkway, Suite 1400,
15           Ridgeland, Mississippi,
           on Friday, March 10, 2023,
16      beginning at approximately 9:29 a.m.
17
18
19
20
21
    *****************************************
22
           CATHY M. WHITE, CCR
23      Certified Court Reporter #1309
              Notary Public
24      cathywhitecsr@gmail.com
           Post Office Box 5658
25        Brandon, Mississippi  39047
```

**Page 2**

```
 1      A P P E A R A N C E S
 2
    LESLIE FAITH JONES, ESQUIRE
 3  leslie.jones@splcenter.org
    Southern Poverty Law Center
 4  111 East Capitol Street, Suite 280
    Jackson, Mississippi  39201
 5  601.948.8882
 6  JOSHUA F. TOM, ESQUIRE
    jtom@aclu-ms.org
 7  American Civil Liberties Union of Mississippi
    Foundation
 8  Post Office Box 2242
    Jackson, Mississippi  39225-2242
 9  601.354.3408
10  ARI SAVITZKY, ESQUIRE (via Zoom)
    asavitzky@aclu.org
11  MING CHEUNG, ESQUIRE (via Zoom)
    mcheung@aclu.org
12  KELSEY A. MILLER, ESQUIRE
    kmiller1@aclu.org
13  American Civil Liberties Union Foundation
    125 Broad Street, 18th Floor
14  New York, New York  10004
    212.549.2681
15
    AHMED SOUSSI, ESQUIRE
16  ahmed.soussi@splcenter.org
    Southern Poverty Law Center
17  150 East Ponce de Leon Avenue, Suite 340
    Decatur, Georgia  30030
18  470.521.6700
19      COUNSEL FOR PLAINTIFFS
20
    REX M. SHANNON III, ESQUIRE
21  rex.shannon@ago.ms.gov
    GERALD KUCIA, ESQUIRE
22  gerald.kucia@ago.ms.gov
    Office of the Attorney General
23  Post Office Box 220
    Jackson, Mississippi  39205
24  601.359.4184
25      COUNSEL FOR DEFENDANTS
```

**Page 3**

```
 1      A P P E A R A N C E S (Cont.)
 2
    P. RYAN BECKETT, ESQUIRE
 3  ryan.beckett@butlersnow.com
    B. PARKER BERRY, ESQUIRE
 4  parker.berry@butlersnow.com
    Butler Snow, LLP
 5  1020 Highland Colony Parkway, Suite 1400
    Ridgeland, Mississippi  39157
 6  601.948.5711
 7      COUNSEL FOR THE WITNESS
 8
    ALSO PRESENT:  Ayesha Ahsan (via Zoom)
 9          Brandon Johnson (via Zoom)
            Jake Heller (via Zoom)
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**Page 4**

```
 1              INDEX
 2
    Style . . . . . . . . . . . . . . . . . . . .   1
 3
    Appearances . . . . . . . . . . . . . . . . .   2
 4
    Index . . . . . . . . . . . . . . . . . . . .   4
 5
    Examination by Ms. Jones . . . . . . . . . . .  5
 6
    Certificate of Court Reporter . . . . . . . . 105
 7
    Certificate of Deponent . . . . . . . . . . . 106
 8
 9
10          EXHIBIT INDEX
11                     MAR
    Exhibit
12  1    Objections                  9
13  2    Stipulation                 9
14  3    1/6/23 Letter from Booth to Tom    45
15  4    Section 9-3-1              53
16  5    SJLCRR-000001 - 000005         61
17  6    House Bill No. 868           70
18  7    12/3/21 e-mail ffrom Collins to Booth,  76
         SJLCRR-000006 - 000008
19
20  8    Booth's notes               103
21
22
23
24
25
```

5

1 JAMES FREDERICK "TED" BOOTH,
2 having been duly sworn, was examined and testified as
3 follows:
4 EXAMINATION
5 BY MS. JONES:
6 Q. Good morning, Mr. Booth.
7 A. Good morning.
8 Q. My name is Leslie Faith Jones, and I'm an
9 attorney with the Southern Poverty Law Center in
10 Jackson, Mississippi.
11 A. Yes, ma'am.
12 Q. Our office in Jackson. And I represent the
13 plaintiffs in this case. I provided Ms. White with
14 the caption. And are you familiar with the case that
15 we're here for today?
16 A. I have some familiarity with it, yes.
17 Q. So then you know that we, as the plaintiffs,
18 are challenging the State's district maps for the
19 Mississippi Supreme Court.
20 A. Yes, I understand that.
21 Q. So before we go any further, can you please
22 spell your name for the record?
23 A. Okay. My name is James Frederick Booth,
24 F-R-E-D-E-R-I-C-K, Booth, B-O-O-T-H. I am commonly
25 called Ted Booth. It's a nickname I've had since

6

1 birth.
2 MS. JONES: Okay. So I am Leslie Faith Jones
3 with Southern Poverty Law Center, and I'm just going
4 to ask everyone to identify themselves for the record
5 and then we'll go to Zoom. Is that okay?
6 MR. BECKETT: Why don't you start?
7 MR. TOM: Sure. Joshua Tom with the ACLU
8 Mississippi on behalf of the plaintiffs.
9 MR. SOUSSI: Ahmed Soussi for the Southern
10 Poverty Law Center on behalf of plaintiffs.
11 MS. MILLER: Kelsey Miller, ACLU, on behalf
12 of the plaintiffs.
13 MR. KUCIA: Gerald Kucia on behalf of the
14 defendants from the Attorney General's Office.
15 MR. SHANNON: Rex Shannon with the
16 Mississippi Attorney General's Office for the
17 defendants.
18 MR. BERRY: Parker Berry with Butler Snow.
19 Standing Joint Legislative Committee on
20 Reapportionment and Redistricting, which is a nonparty
21 in this matter.
22 MR. BECKETT: Ryan Beckett with Butler Snow
23 also representing the Standing Joint Legislative
24 Committee on Reapportionment and Redistricting, a
25 nonparty in this matter.

7

1 MS. JONES: Can everyone on Zoom identify
2 themselves, please?
3 Can they hear us?
4 MR. BECKETT: Can I call the record, so they
5 don't --
6 MS. JONES: Sure.
7 MR. BECKETT: There's a Ming Cheung.
8 MR. CHEUNG: Yes, good morning. Ming Cheung
9 from the ACLU. I represent the plaintiffs.
10 MS. JONES: Anyone else?
11 MR. BECKETT: Yeah, I'm going to get there.
12 Ari?
13 MR. SAVITZKY: This is Ari Savitzky from the
14 ACLU just observing. My apologies for any (audio
15 distortion).
16 MR. BECKETT: Thank you, Ari.
17 Brandon?
18 MR. JOHNSON: Yes. Brandon Johnson also from
19 the ACLU, and I'm just observing.
20 MR. BECKETT: And then Jake. We have a Jake
21 Heller. He's still on mute. We'll come back.
22 And then --
23 MS. AHSAN: Sorry, the connection (audio
24 distortion), but my name is Ayesha Ahsan and I'm
25 with ...

8

1 MR. BECKETT: Ayesha, you're frozen. I
2 didn't touch it. I think we just lost it.
3 MR. SHANNON: I don't think all these folks
4 are attorneys. Can y'all represent that they're all
5 attorneys with ACLU?
6 MR. SOUSSI: Ayesha is an extern for the
7 Southern Poverty Law Center.
8 MS. JONES: And Jake Heller is an intern with
9 the ACLU.
10 (Discussion had off the record, not
11 reported.)
12 MR. BECKETT: Can I read my statement?
13 MS. JONES: Yes. I was going to have you go
14 next after folks identify themselves.
15 MR. BECKETT: I'm going to read a preliminary
16 statement into the record.
17 Mr. Booth is a lawyer and he represents the
18 Standing Joint Legislative Committee on
19 Reapportionment and Redistricting as staff counsel.
20 We've agreed to tender him for this deposition today
21 based on our objections and a stipulation agreed to by
22 the parties in this case.
23 Without objection, I'm asking the court
24 reporter to enter into this record as Exhibit 1 the
25 objections previously filed by the Standing Joint

Cathy M. White, CCR

9

1 Committee.
2         There are no objections?
3         MS. JONES:  No.
4         (Exhibit No. 1 marked.)
5         MR. BECKETT:  I'm also asking the court
6 reporter to enter into this record as Exhibit 2 the
7 jointly agreed stipulation signed by the parties.
8         (Exhibit No. 2 marked.)
9         MR. BECKETT:  By proceeding according to
10 these objections and stipulation, Mr. Booth and the
11 Standing Joint Committee do not agree to waive the
12 attorney-client privilege, the legislative privilege,
13 or any other evidentiary privilege available to them.
14         And with that, thank you, you may proceed.
15         MS. JONES:  Yes, sir.  Thank you.
16 BY MS. JONES:
17    Q.   Okay, Mr. Booth.  So you understand that you
18 are under oath today.  Correct?
19    A.   Yes, I do.
20    Q.   And this means that you're swearing to the
21 truthfulness and accuracy of your answers?
22    A.   Yes, I understand that.
23    Q.   And the oath that you took today will have
24 the same effect as if you were testifying in court?
25    A.   Yes, I understand that.

10

1    Q.   So thank you for taking the time to be with
2 us today.  And before we go any further, I just want
3 to go over a few ground rules.  Have you been deposed
4 before?
5    A.   I have never been deposed before.
6    Q.   Really?  Okay.  Well, as you can see, this
7 deposition is being transcribed by Ms. White.  Cathy
8 White is our court reporter today.  And it's important
9 that you answer audibly --
10    A.   Yes.
11    Q.   -- so that she can record what you say, as
12 opposed to shaking your head.
13    A.   Right.
14    Q.   Does that make sense?
15    A.   That makes sense.
16    Q.   All right.  And I'm going to ask you
17 questions in accordance with the stipulation that
18 Mr. Beckett read today as agreed by the parties in
19 this case.  And you're going to provide answers.
20    A.   That is correct.
21    Q.   Okay.  And you understand that you are to
22 answer my questions unless your attorney instructs you
23 not to answer?
24    A.   I understand that.
25    Q.   Okay.  And you choose to follow that

11

1 instruction.
2    A.   I will follow the instructions.
3    Q.   Do you understand that you must answer my
4 questions unless Mr. Beckett instructs you not to
5 answer?
6    A.   I understand that.
7    Q.   Okay.  To make it easier for Ms. White, we
8 will speak one at a time so that we don't speak over
9 each other.  Does that sound okay?
10    A.   I think that is appropriate.
11    Q.   All right.  And if you have a question about
12 any of the questions I ask, if you can't understand my
13 question, will you let me know?
14    A.   I will let you know.
15    Q.   All right.  And if you need to take a break,
16 please feel free to let us know.
17    A.   I will let you know.
18    Q.   I'm just asking that we refrain from taking a
19 break between a question and an answer.
20    A.   I understand that.
21         MR. BECKETT:  We agree to that.
22         MS. JONES:  Okay.
23 BY MS. JONES:
24    Q.   And if at any time during this deposition you
25 realize that you need to clarify an answer, you'll let

12

1 me know?
2    A.   I will let you know.
3    Q.   Okay.  And then we can get that clarified on
4 the record.  Sound good?
5    A.   We can do that, yes.
6    Q.   Thank you.  Do you have any questions about
7 anything that I've talked to you about so far?
8    A.   I have no questions.
9    Q.   Is there any reason that you cannot provide
10 accurate testimony today?
11    A.   I know of no reason why I cannot.
12    Q.   So just for the record, are you taking any
13 medications that might impact your ability to testify
14 today?
15    A.   I do not think any medication I have -- I
16 take would impair my ability to testify.
17    Q.   Okay.  Thank you.  So I'm going to start with
18 just a few background questions.  Where were you --
19 when were you born?
20    A.   I was born May 25th, 1955.
21    Q.   And where?
22    A.   In New Orleans, Louisiana.
23    Q.   Where do you live currently?
24    A.   I live in the city of Jackson, 1319 Poplar
25 Boulevard, 39202.

13

1 Q. And have you ever lived outside of
2 Mississippi or New Orleans?
3 A. I briefly lived in Evanston, Illinois, from
4 1980 to 1982, when I was a graduate student at
5 Northwestern University.
6 Q. And other than that, you've been a resident
7 of Mississippi?
8 A. Aside from I attended college and law school
9 at Tulane University in New Orleans, so I returned to
10 New Orleans for those. But aside from the time I
11 spent in New Orleans when I was a small child, when I
12 was a college student, law student, and the time I
13 spent at Northwestern, I've lived in Mississippi the
14 balance of my life.
15 Q. Okay. And you just mentioned Tulane. So you
16 went to Tulane for law school. Correct?
17 A. College and law school, yes.
18 Q. College and law school. And you also
19 mentioned Northwestern University.
20 A. For graduate school.
21 Q. For graduate school?
22 A. Yes, ma'am.
23 Q. Do you have any other degrees in higher
24 education?
25 A. I have no other degree.

14

1 Q. What degree did you obtain at Northwestern?
2 A. I took a master's degree in management. At
3 that time, they combined the public and MBA programs
4 into one master's program. I think they've since
5 separated them out.
6 Q. When did you get the master's degree?
7 A. 1982.
8 Q. And when did you graduate from law school?
9 A. 1978.
10 Q. Thank you. So I'm going to ask you a few
11 questions about your professional background.
12 A. Yes.
13 Q. So what's your current title?
14 A. I am executive director of the Joint
15 Legislative Committee on Performance Evaluation and
16 Expenditure Review, also known as the PEER Committee.
17 We are an audit and evaluation arm of the Mississippi
18 Legislature. We conduct reviews of state agencies and
19 other public bodies upon approval by the Committee or,
20 in some cases, by specific statutory authority. We
21 also do research projects on requests from
22 legislators.
23 Also, I function as staff counsel for the
24 Joint Committee on Legislative Reapportionment and the
25 Standing Joint Committee on Congressional

15

1 Redistricting. Those roles I took on in 1998, when I
2 was promoted to the position of general counsel.
3 Historically, the general counsel of the PEER
4 Committee has carried out those responsibilities.
5 When I moved to the executive director's position, I
6 retained them simply because we were so close to
7 deadlines for doing congressional and legislative
8 redistricting, I did not believe others on my staff
9 would be able to carry out my responsibilities. So I
10 retained them and retain them to this day.
11 Q. Yes, sir. So I'm going to asking you a few
12 questions about everything that you just shared.
13 A. Yes.
14 Q. So tell me again, what are PEER's
15 responsibilities broadly?
16 A. Once again, PEER is an audit and evaluation
17 committee. It does research projects, audit projects,
18 evaluations on state government programs and agencies.
19 The thrust of the projects generally are to determine
20 how agencies are spending money, are they efficient,
21 are they effective. In some cases, we conduct
22 compliance reviews of programs in the executive branch
23 of government. Sometimes we do reviews of local
24 governments. But, essentially, that's what PEER does,
25 audit and evaluation to determine whether programs and

16

1 agencies are spending their money efficiently,
2 prudently, effectively, and legally.
3 Q. And so is PEER responsible for producing
4 anything?
5 A. PEER produces reports.
6 Q. Okay.
7 A. Uh-huh.
8 Q. Anything other than reports?
9 A. Sometimes PEER produces memos to legislators
10 who ask specific research questions.
11 Q. How many reports has PEER produced?
12 A. My goodness. I would have to go back and
13 look at our files on that, but I believe in the area
14 of reports, we are somewhere up in the 700 range. I
15 haven't gone to look at the numbers on the files in
16 some time, but we produce a great number of reports.
17 We've been in existence for 50 years now, so you would
18 expect us to have produced a lot of reports.
19 Q. How many people currently work for PEER?
20 A. At this point in time, we've just had someone
21 leave, but we usually have about 20 people working in
22 employment positions with PEER.
23 Q. And in general, what are your
24 responsibilities as executive director for PEER?
25 A. To manage, control, and direct the staff in

**17**

1  their research activities, to engage in liaison
2  functions with the Legislature to discuss with them
3  their expectations respecting PEER, projects they
4  might want us to engage in. It's usual things that
5  you would expect of an executive director, to both
6  manage his organization and interact with his
7  environment.
8      Q. So who exactly do you supervise in your role
9  as executive director?
10     A. I supervise the executive -- or rather the
11  deputy directors. I have two deputy directors. I
12  have a number of analysts. I have editors who edit
13  reports. I have a business manager who makes sure
14  that we are processing purchase orders and invoices
15  properly. I have a chief information officer who
16  keeps our IT systems working. I also have -- I
17  manage, in my capacity as staff counsel, an employee
18  who is hired with funds appropriated to the Joint
19  Reapportionment Committee. I have Mr. Ben Collins,
20  who is a GIS operator. He understands how to do
21  mapping work.
22     Q. Okay.
23     A. Yeah.
24     Q. I'm going to ask you some questions about
25  that shortly with the mapping work.

**18**

1      A. Yeah.
2      Q. But with regard to PEER, does anyone at PEER
3  assist you with carrying out your duties?
4      A. Well, yes. I mean, my deputy directors
5  assist me. They have responsibilities for overseeing
6  the management of projects. We meet regularly to
7  determine how projects are progressing, whether we're
8  on -- whether we're working on our proper time lines.
9  We have deadlines for finishing projects. So my two
10  deputy directors assist me directly. I have, once
11  again, a chief information officer with whom I meet
12  regularly on issues regarding our computer systems. I
13  have a business manager with whom I work regularly
14  regarding the processing of invoices and purchase
15  orders and the like. So those people would be -- with
16  respect to PEER, would be my key staff that I work
17  with on a regular basis. Also, I work from time to
18  time directly with some of the analysts who are
19  working on assignments that I give them directly.
20     Q. So what are the names of your deputy
21  directors?
22     A. My deputy directors at PEER are Mr. Lonnie
23  Edgar, and Ms. Jennifer Sebren, S-E-B-R-E-N.
24     Q. And who is your chief information officer?
25     A. Dr. Kirby Arinder.

**19**

1      Q. And your business manager?
2      A. Gail Taylor.
3      Q. And you mentioned analysts.
4      A. Oh, I have a broad range, a number of
5  analysts. Do I need to go down the list and provide
6  you with the names? I can do that.
7      Q. We'll hold off on that.
8          MR. BECKETT: Yeah. We're getting -- I want
9  to be fair to you in background with PEER, but we're
10  not anywhere close to judicial redistricting at this
11  point.
12         MS. JONES: Yes. I'm moving along. Thank
13  you.
14  BY MS. JONES:
15     Q. So you mentioned the Standing Joint
16  Legislative Committee on Reapportionment and
17  Redistricting. So we have that as the SJLCRR.
18     A. Uh-huh.
19     Q. Is there another title by which I should call
20  that group?
21     A. There are two committees. There is the Joint
22  Legislative Committee on Reapportionment, which does
23  legislative reapportionment, and then there's the
24  Joint Congressional Redistricting Committee, which
25  develops congressional plans. The membership of the

**20**

1  two committees is identical.
2      Q. Okay. What I'm going to do is call it SJLCRR
3  for now.
4      A. And I will understand that's what you are
5  planning on doing.
6      Q. Okay.
7      A. Uh-huh.
8      Q. So what is the SJLCRR?
9      A. The Legislature created joint committees to
10  be responsible for carrying out the redistricting
11  functions after a decennial census comes out, and they
12  are made up of appointees from the existing
13  congressional districts. They also have some members
14  who serve by virtue of their positions as chairs and
15  vice chairs of the Elections Committee and the
16  Apportionment and Elections Committee.
17     Q. And what's the relationship between PEER and
18  SJLCRR?
19     A. Okay. Back in the late '80s -- and once
20  again, I want you to understand this, I was a very
21  junior person at PEER at the time. So I'm going to be
22  telling you what I have observed because, until 1998,
23  when I became general counsel, I had no responsibility
24  with respect to redistricting. But in the late '80s,
25  the Legislature decided, at the time when we were

21

1 beginning to increase the use of technology in
2 redistricting, that there needed to be a place where
3 there could be a staff providing support to the
4 redistricting effort and, for reasons that I am not
5 certain of, they placed the responsibility for
6 managing and overseeing this, or I should say they
7 co-located it, with PEER.
8        A decision was made and, once again, I was
9 not privy to the decision to make this -- the decision
10 to make the general counsel of PEER, who back in 1989
11 was a gentleman named Mr. Steven Miller, to -- it was
12 decided that he would function as the staff counsel
13 for the reapportionment efforts and redistricting
14 efforts, and that he would be solely responsible for
15 overseeing and managing computer operators, providing
16 work space for the legislators, to pay bills
17 associated with the operations of redistricting. The
18 executive director had no role -- the PEER had no role
19 in the process.
20        So what happened here was that the general
21 counsel became staff counsel for reapportionment.
22 Bills for -- to pay for, say, computer systems and
23 contractors and things like that ran through the PEER
24 business office, but -- and then eventually, the CIO
25 at PEER became responsible for making sure firewalls

22

1 properly operated to ensure security of the computers.
2        But those were the functions that PEER staff
3 had with respect to redistricting. Rank and file
4 analysts, the executive director, other staff with the
5 PEER Committee had no responsibility with respect to
6 redistricting.
7   Q.  So how long has SJLCRR been in existence?
8   A.  I would have to go back and check the source
9 line on the code for that, but I do know that our
10 involvement began when the Legislature was preparing
11 to engage in the round of redistricting following the
12 1990 census.
13   Q.  Okay.  And your current position with SJLCRR
14 now is staff counsel?
15   A.  When I perform functions for the
16 reapportionment, redistricting, I am still using the
17 title "staff counsel."
18   Q.  And have you held any other positions at
19 SJLCRR?
20   A.  No.
21   Q.  How long have you worked with the Mississippi
22 Legislature?
23   A.  I became an employee of the Mississippi
24 Legislature on November 19th, 1984.
25   Q.  Okay.  Have you held any other positions with

23

1 the Mississippi Legislature?
2   A.  I have always been within the PEER Committee.
3 So I've had various titles with the PEER Committee.  I
4 carried analyst titles and was general counsel, and
5 now executive director.  But I've not worked for any
6 other staff of the Mississippi Legislature.
7   Q.  Before joining SJLCRR, did you work on any
8 cases or matters related to redistricting?
9   A.  Before I became staff counsel in 1998, I
10 worked on a variety of things with PEER, but I do not
11 recall doing anything that touched on redistricting.
12   Q.  Have you had any other experience working on
13 redistricting on any issues outside of the Mississippi
14 Legislature?
15   A.  I have not engaged in any redistricting
16 activities, you would say.  I have done presentations
17 before for the National Conference of State
18 Legislatures, which has a redistricting and elections
19 committee where people who have roles similar to mine
20 meet and discuss things.  Once back a couple of years
21 ago, I was asked to appear before a committee in the
22 state of Louisiana to talk about how Mississippi does
23 redistricting.  That would be it.
24   Q.  Okay.  So you have no other experience
25 working on redistricting matters outside of

24

1 Mississippi?
2   A.  Not on any plans or anything like that, no.
3   Q.  Okay.  So do you understand why you're being
4 deposed today?
5   A.  I understand that there is a suit regarding
6 the districts, the Mississippi Supreme Court
7 districts, the three districts, and that you all are
8 trying to seek information on any activities that I or
9 my staff may have engaged in relative to the
10 development or the mapping of Supreme Court districts.
11   Q.  So you understand that the lawsuit that has
12 been brought by Dyamone White, Derrick Simmons, Ty
13 Pinkins and Constance Harvey-Burwell, are the
14 plaintiffs in this case, and that's who we represent.
15   A.  I understand that, yes.
16   Q.  So when I talk about plaintiffs, that's who
17 I'm speaking of.
18   A.  Yes, uh-huh.
19   Q.  And when I talk about this litigation, I'm
20 talking about the case that we're here on today --
21   A.  Yes.
22   Q.  -- challenging the Mississippi Supreme Court
23 district lines.
24   A.  Yes.
25   Q.  Okay.  When did you first hear about this

25

1  lawsuit?
2      A.  I first heard about this lawsuit when y'all
3  provided -- when we received our subpoena to produce
4  documents.  That was back in December, I believe.
5      Q.  Okay.  What did you think about it?
6          MR. BECKETT:  I'm going to object to that.
7  What did he think about the subpoena?  What did he
8  think about the lawsuit?
9  BY MS. JONES:
10     Q.  What do you think about the lawsuit
11 challenging the Mississippi Supreme Court district
12 lines?
13         MR. BECKETT:  I'm going to object to that.
14         MR. SHANNON:  Join in that.
15         MR. BECKETT:  Instruct him not to answer
16 that.
17         MS. JONES:  So you're instructing him on the
18 basis of privilege or some --
19         MR. BECKETT:  What does his opinion -- how is
20 his opinion relevant?  "What do you think" is asking
21 for his opinion.  We're here to talk about facts,
22 those things in that box.  His opinion of the lawsuit
23 is not relevant.  He's a lawyer.  He's not here to
24 offer a legal opinion.  I'm not going to let him do
25 that.

26

1          MS. JONES:  Right.  We're not asking him for
2  a legal opinion, just it was a general opinion based
3  on his experience about what he thought of the
4  lawsuit.
5          MR. BECKETT:  I'm going to instruct him not
6  to answer that on my stated objections.
7  BY MS. JONES:
8      Q.  Have you discussed this lawsuit with anyone
9  other than your attorneys?
10     A.  I have discussed this with my attorneys and,
11 when we were preparing responses, discovery responses,
12 I discussed this with Ben Collins, my GIS person,
13 because we had to go back in computer files and find
14 anything that we had done for a member of the
15 legislature related to Supreme Court districts.
16     Q.  Okay.  Are you aware of any other voting
17 rights redistricting cases in Mississippi?
18     A.  Well, there was a congressional case, there
19 is a case pending regarding the redistricting of the
20 Mississippi House and the Mississippi Senate.
21     Q.  Do you know of any others?
22     A.  Those are the ones that I know about.  Those
23 are the ones that I'm primarily interested in.
24     Q.  Okay.  You said you were involved in
25 preparation for discovery responses in this case?

27

1      A.  Yes.
2      Q.  What did you -- what did you prepare in
3  response to plaintiffs' discovery requests?
4      A.  There were some questions about any work that
5  my office may have done with respect to any plans or
6  proposals to make changes to the boundaries of the
7  Mississippi Supreme Court district lines.  I believe
8  we provided a couple of documents:  One produced in
9  2021, which dealt with Transportation Commission
10 boundaries, which are, of course, identical to Supreme
11 Court boundaries; and a document from 2016 regarding a
12 proposed change to the Supreme Court boundaries.  We
13 also provided you with information on electronic media
14 that we had stored in our offices from an older
15 computer system that we once had that we have not used
16 since 2007, and that media is in the box that's
17 sitting behind you.
18     Q.  Yes, sir.  So I just want to ask you a couple
19 of questions about the deposition today.  Without
20 going into any substance of conversations you had with
21 your attorneys, what did you do to prepare for the
22 deposition today?
23     A.  Looked back over some of the materials that
24 we had provided to you all.
25     Q.  Other than meet with your attorneys, did you

28

1  meet with anyone else?
2      A.  I talked to Mr. Collins.  He gave me a ride
3  out here today.  I don't drive.
4      Q.  Anyone else?
5      A.  No.  Well, let's see.  Well, my attorneys,
6  the three of us who were sitting in the room the other
7  day.  That's it.
8      Q.  Okay.  So with regard to Mr. Collins, how
9  long did you talk to him for your preparation?
10     A.  We just -- we rode up here today and I said
11 today I'm going up to answer -- to participate in a
12 deposition, and we're going to be talking in part
13 about some of those documents that you prepared at my
14 request from the files in our computers that were
15 responsive to their questions about proposals that we
16 worked on regarding the boundaries of those districts.
17     Q.  Okay.
18     A.  He needed to know why I was getting him to
19 drive me up here.
20     Q.  Did you discuss anything else?
21     A.  No, you know.
22     Q.  As it relates to this case.
23     A.  No, no.
24     Q.  I'm sorry.  As it relates to the case.
25     A.  Yeah, right.

29

1    Q.   And without going into any substance of the
2  conversation you had with your attorneys, you said
3  that you met with your attorneys to prepare for this
4  deposition?
5    A.   We did.
6    Q.   How long did you meet with them?
7    A.   Mr. Beckett came over at about 1:15
8  yesterday, and we talked, I think, probably until
9  about 3:25 maybe, 3:30.
10     MR. BECKETT:  That sounds about right.
11 BY MS. JONES:
12   Q.   Okay.  Did you take any notes during that
13 meeting to prepare for this deposition?
14   A.   I did not take any notes.  I just listened
15 carefully.
16   Q.   Did you review any documents?
17   A.   We talked about the documents that -- once
18 again, the documents that we had provided you
19 regarding some possible changes to the Supreme Court
20 boundaries.  We went over some of the filings that
21 Mr. Beckett had made regarding objections and some --
22 that kind of material, but that's what we were talking
23 about, and that's what we went over.
24   Q.   So it refreshed your memory to go over these
25 documents?

30

1    A.   Sure, sure.
2    Q.   Did you take any notes or mark up these
3  documents in any way?
4    A.   No, I did't mark up any documents.
5    Q.   Did you bring any documents with you today?
6    A.   I have a few documents with me.
7    Q.   What are they?  What did you bring?
8    A.   I brought copies of the two plans that we had
9  provided you all with the other day.  I brought with
10 me a couple of -- some rough notes that I put together
11 long before we sat down with Mr. Beckett yesterday on
12 things that I thought might be pertinent to what we
13 would be talking about today.
14     MS. JONES:  Okay.  Can we see those
15 documents?  Can we mark them as an exhibit?
16     MR. BECKETT:  On what basis?
17     MS. JONES:  Well, if he brought them with him
18 today in preparation for the deposition, we should be
19 able to see what those are.
20     MR. BECKETT:  Let's go off the record just a
21 minute.
22     (Discussion had off the record, not
23 reported.)
24     (Recess.)
25     MR. BECKETT:  You asked for his notes, and

31

1  these are the notes that he has represented to me --
2  they're not attorney-client privileged.  I don't claim
3  a privilege over them -- that he prepared for himself
4  in trying to create his timeline about what happened
5  in 2016 and 2021.
6      MS. JONES:  Okay.  And we can have access to
7  those?  Do you want to enter them as an exhibit now or
8  do you need to provide them for us later?
9      MR. BECKETT:  However you care to do it.
10 I mean, have you got another copy of this?
11     THE WITNESS:  Somewhere on my computer.
12     MR. BECKETT:  I can make copies of it.
13     MS. JONES:  I just know we have to give a
14 copy to you, to the court reporter.
15     MR. BECKETT:  Right.
16     MS. JONES:  We can proceed now and then do
17 that at a break, if that makes sense.
18     MR. BECKETT:  That will be fine.
19     MS. JONES:  That way, we can keep going.  Can
20 I just see that, just briefly?
21     MR. BECKETT:  You may.
22     MS. JONES:  Thank you.
23     MR. KUCIA:  After you get done, can we see
24 those?
25     MS. JONES:  Sure.  I'll just keep going.

32

1      MR. BECKETT:  If everybody wants, I can have
2  somebody make copies, but I don't want to disrupt your
3  deposition.  I appreciate the breaks.  I didn't know
4  what was in here, and I didn't want him to produce
5  anything that came from our meeting.
6      MS. JONES:  Yes, sir.  We understand.  And
7  we'll just keep going and it will get sorted out --
8      MR. BECKETT:  Sure.
9      MS. JONES:  -- in a moment.
10 BY MS. JONES:
11   Q.   And thank you, Mr. Booth.
12     So just really quick, you had testified that
13 you haven't been deposed before.  Correct?
14   A.   That is correct.
15   Q.   Have you ever testified in court before?
16   A.   I have never had to testify in court before.
17   Q.   Okay.  We are going to move along.  I want to
18 ask you a few more questions about PEER.
19   A.   Yes.
20   Q.   So speaking about PEER and redistricting in
21 general.
22   A.   Uh-huh.
23   Q.   What is the legislative process for
24 redistricting as you understand it?
25     MR. BECKETT:  Are we talking about with

33

1 respect to -- I don't want to object, but are we
2 talking about with respect to the Supreme Court
3 districts?
4    MS. JONES: With respect to the judicial
5 districts, yes, sir.
6    A. There are, to my knowledge, no statutes or
7 rules that pertain to the redistricting of the
8 Mississippi Supreme Court, that would deal with
9 legislative redistricting of the Mississippi Supreme
10 Court.
11 BY MS. JONES:
12    Q. So then with PEER's redistricting
13 responsibilities -- well, does PEER have redistricting
14 responsibilities?
15    A. Once again, PEER, per se, has no
16 redistricting responsibility except to provide its
17 counsel, to function as staff counsel, and to process
18 bills and invoices and the like, as I told you
19 earlier. PEER doesn't redistrict. The only
20 redistricting bodies, per se, that are established in
21 law are the Joint Committee for Legislative
22 Reapportionment and the Joint Congressional
23 Redistricting, yeah.
24    Q. So then explain to me, because I am trying to
25 understand, just one more time.

34

1    A. Sure.
2    Q. What are the redistricting functions that
3 PEER is responsible for?
4    A. Once again, PEER provides a counsel who
5 manages and overseas the functions for redistricting
6 for the Joint Committees and also processes bills and
7 provides administrative support. The person who
8 serves in the staff counsel's job is supposed to
9 assist the Joint Committees in doing their job.
10    Q. And how long has PEER played this role, since
11 when?
12    A. I believe I told you back in around 1989, if
13 I remember correctly. And as I said, I was not
14 involved. I worked for PEER, but I was not involved
15 in redistricting. I seem to recall that is when the
16 general counsel at PEER began to perform functions for
17 the reapportionment committees.
18    Q. And do you recall who was responsible for
19 these reapportionment functions, as I believe you're
20 saying, before PEER, who was responsible for these
21 functions before 1989?
22    A. I do not know.
23    Q. Do you know about the percentage of PEER's
24 work that is dedicated to this function that you've
25 described?

35

1    A. Well, what I would --
2    MR. BECKETT: Can I ask you just to give him
3 a time frame? Do you mean, like, in the years where
4 they're actually following decennial census,
5 or do you mean, like, over a 10-year span? Just if we
6 can clarify what years or what period of time.
7    MS. JONES: Thank you, Mr. Beckett.
8 BY MS. JONES:
9    Q. Can we do both? So to the extent, generally
10 speaking, what is PEER's -- what percentage of PEER's
11 work is geared towards this redistricting function?
12    MR. BECKETT: I'm sorry. Do you mean the
13 staff counsel? Because he's testified three times
14 that PEER does not do redistricting.
15 BY MS. JONES:
16    A. The staff counsel, the work that you just --
17    Q. Uh-huh.
18    Q. Yes, the staff counsel work.
19    A. It's going to depend on where we are in the
20 10-year cycle. When we are engaging in work --
21 redistricting work, preparing plans after the census
22 data comes out, it's entirely possible for me to spend
23 my whole workday and then some hours working on
24 redistricting. After we have developed plans, my
25 responsibilities with respect to PEER -- with respect

36

1 to redistricting often fall to as little as an hour a
2 day.
3    Q. So what plans are you referring to when
4 you -- when 100 percent of your time is focused on
5 this effort?
6    A. Legislative and congressional.
7    Q. And do any of those plans involve any of the
8 judicial districts?
9    A. When I'm working 100 percent, when I'm doing
10 working for the redistricting -- legislative
11 redistricting efforts and the congressional efforts, I
12 am not doing anything on redistricting but legislative
13 and congressional redistricting, yeah.
14    Q. Earlier you testified about PEER producing
15 reports. Is that correct?
16    A. Yes, the PEER committee produces reports.
17    Q. And I think you said it's been several
18 hundred reports.
19    A. Oh, it's been many, many reports, yes.
20    Q. Has PEER ever produced a report on
21 redistricting?
22    A. I do not remember PEER ever producing a
23 report on redistricting.
24    Q. Okay. Does PEER play any role in the
25 map-drawing process?

---

**37**

1    A.  Once again, PEER's role in the map-drawing
2  process is limited to the staff counsel directing
3  people who work for the Joint Legislative
4  Reapportionment Committee, Mr. Collins, for example,
5  or contractors who work for us who develop maps.  But
6  once again, PEER doesn't draw maps.
7    Q.  Does PEER have a relationship with the
8  Secretary of State's Office?
9    A.  A relationship?
10   Q.  For example, does PEER meet with the
11 Secretary of State's Office in the redistricting
12 process or for the redistricting process?
13     MR. BECKETT:  I'm going to object.  We
14 continue to ask what PEER does in redistricting, and
15 he's been very clear.  This is like four or five times
16 now that we've implied that PEER does redistricting,
17 and he's been very clear that it does not.
18     MS. JONES:  Yes, sir.
19 BY MS. JONES:
20   Q.  We're just trying to understand if there are
21 any other roles that PEER plays and interacts with any
22 other state agencies as it relates to redistricting.
23 I realize the role --
24   A.  Yeah.
25   Q.  -- that you've testified to and we're --

---

**38**

1    A.  Uh-huh.  Uh-huh.
2    Q.  -- just trying to clarify --
3      MR. BECKETT:  Let her --
4  BY MS. JONES:
5    Q.  We're just trying to clarify all the entities
6  and all the relationships so that we understand.
7    A.  Uh-huh.
8      MR. BECKETT:  And are we limited to judicial
9  redistricting, or are you asking him about all
10 redistricting?
11 BY MS. JONES:
12   Q.  So judicial redistricting, does PEER interact
13 at all with the Secretary of State's Office?
14   A.  No.
15   Q.  Does PEER exchange any data or information
16 with the Secretary of State's Office?
17   A.  With respect to judicial redistricting?
18   Q.  Yes, sir.
19   A.  No.
20   Q.  Has the Secretary of State's Office ever
21 requested information from PEER with regard to
22 redistricting?
23   A.  With respect to judicial redistricting, no.
24   Q.  Okay.  So I want to understand, better
25 understand, the SJLCRR.

---

**39**

1    A.  Uh-huh.
2    Q.  Earlier you testified that there are two
3  committees --
4    A.  Uh-huh.
5    Q.  -- I believe under that umbrella.
6    A.  Correct.
7    Q.  Can you explain that to me again?
8    A.  There's a Standing Joint Committee on
9  Legislative Reapportionment, which is responsible for
10 developing redistricting plans for the Mississippi
11 State House and the Mississippi State Senate.  There
12 is also a Standing Joint Congressional Redistricting
13 Committee, which is responsible for developing
14 congressional redistricting plans.
15   Q.  So if we are focused on the --
16   A.  Uh-huh.
17   Q.  -- Legislative Reapportionment Committee on
18 the Mississippi --
19   A.  Uh-huh.
20   Q.  -- State and Senate --
21   A.  Uh-huh.
22   Q.  State house and senate side.
23   A.  Uh-huh.
24   Q.  Is there a name for that committee that's
25 separate from the congressional side?  I'm just trying

---

**40**

1  make sure --
2    A.  Yeah.
3    Q.  -- we're talking about the same thing when we
4  talk about --
5    A.  The statutes create two different committees
6  and, once again, the membership of them is the same,
7  but there is a Joint Congressional Redistricting
8  Committee and then there is the Standing Joint
9  Committee on Legislative Reapportionment.
10   Q.  So the Standing Joint Committee --
11   A.  Yeah.
12   Q.  -- would be the name for the Mississippi
13 side, for the state House and Senate?
14   A.  The legislative side, yes.
15   Q.  So the Reapportionment Committee --
16   A.  Uh-huh.
17   Q.  -- if I say that, then we're talking about
18 the same thing?
19   A.  Yeah, yeah.
20   Q.  I just want to make sure.
21   A.  Sure, sure.
22   Q.  Okay.  I'm going to say Reapportionment
23 Committee.
24   A.  Okay.  Good.
25   Q.  And you'll understand what I mean when I say

---

41

1  that?
2     A.  Yes, I will.
3     Q.  Okay.  And I think I will understand, also.
4  So you've testified, it's my understanding that you've
5  testified that the Reapportionment Committee --
6     A.  Uh-huh.
7     Q.  -- overseas the appropriation that's made to
8  PEER.  Is that correct?
9     A.  The appropriation is made to the Joint
10  Reapportionment Committee.  PEER manages it.
11     Q.  Okay.  So PEER manages the appropriation
12  that's made --
13     A.  Right, uh-huh.
14     Q.  -- through the Joint Reapportionment
15  Committee?
16     A.  Right, right.
17     Q.  And is that appropriation funded on an annual
18  basis?
19     A.  That is funded on an annual basis.
20     Q.  And who is the staff person who is funded
21  through that appropriation?
22     A.  I pay the salaries of Mr. Ben Collins, who is
23  my GIS operator, with those appropriated funds.
24     Q.  How long has that position existed?
25     A.  I'm going to have to -- back before I took

42

1  over, there was a person who was a salaried staff
2  person who was a GIS operator.  So that's going back
3  to the early '90s, yeah.
4     Q.  Was anyone in that role prior to the early
5  '90s, that you know of?
6     A.  There were some contractors, the Mississippi
7  Automated Resource Information System, MARIS, which is
8  an arm of the college board.  Mississippi Institutions
9  of Higher Learning provided contractors who did the
10  drawing of the lines back in the early '90s.
11     Q.  Okay.
12     A.  Uh-huh.
13     Q.  So other than contractors and the one person
14  that you --
15     A.  Yeah.
16     Q.  -- mentioned, has anyone else served in that
17  role?
18     A.  As I said, there was an employee in the early
19  '90s.  And then, in the early 2000s, I had a
20  contractor working with me who wanted to stick around
21  a little while longer, so I moved him into an
22  employment position.  So for a couple of years, I had
23  two GIS employees working for me.
24     Q.  And who were those employees?
25     A.  I had --

43

1     MR. BECKETT:  Can I ask how this relates to
2  Supreme Court redistricting?
3     MS. JONES:  We're going to be talking about
4  the role of Mr. Collins, I believe, and with respect
5  to the responses to that you all provided to our request
6  for documents and information.  So I'm just trying to
7  establish the position, who's held it, so when we ask
8  the questions, we have a basis for doing so.
9     MR. BECKETT:  Okay.  Well, I'd like to see us
10  get back to Supreme Court redistricting at some point.
11     MS. JONES:  Yes, sir.
12     MR. BECKETT:  Because we have a stipulation
13  that says that's what we're here to talk about.
14     MS. JONES:  Yes, sir.
15     MR. BECKETT:  And this was not supposed to be
16  everything that PEER does.  PEER's not even being
17  deposed.  I've been trying to be lenient, but this is
18  getting very detailed about PEER, which is not in our
19  stipulation.  The relationship between PEER and the
20  Standing Joint Committee has been fully explored, and
21  I'd ask that we at least try to get back to Supreme
22  Court redistricting, because that was the agreement
23  that we had.
24     MS. JONES:  We are actually -- I'm about to
25  ask specific questions about the responses.  Mr. Booth

44

1  signed a cover letter.  I'm about to get into that and
2  offer the responses on PEER letterhead.  So we're also
3  just trying to understand the connection between PEER
4  and the Joint Reapportionment Committee, which is --
5     MR. BECKETT:  He's explained that --
6     MS. JONES:  -- why we're asking these
7  questions.
8     MR. BECKETT:  He's explained that four or
9  five times at this point.
10     MS. JONES:  Yes, sir.
11  BY MS. JONES:
12     Q.  So, Mr. Booth --
13     A.  Yes.
14     Q.  -- turning your attention, we are going to
15  talk about the documents that we received.
16     A.  Yes.
17     Q.  And I'm going to show them to you.
18     A.  Sure.
19     Q.  And offer them as an exhibit.
20     A.  Uh-huh.
21     Q.  And to your counsel.
22     A.  Uh-huh.
23     Q.  So with respect -- there you go, sir.
24     MR. BECKETT:  And as I mentioned to you, he
25  may need a little extra time to read.

45

1      MR. BECKETT:  Yes.
2 BY MS. JONES:
3      Q.  And I actually caught myself when I was about
4 to go on, so please take your time.
5      A.  Thank you.
6      MR. TOM:  Do we need to mark this as an
7 exhibit, Leslie?
8      MS. JONES:  I was going to mark it once they
9 identified it to say, but I wanted him to say what I'm
10 showing him.  And we can --
11     A.  This is the letter I sent you.
12     MS. JONES:  Yes, sir.  So we want to mark
13 this as -- I guess this will be Exhibit 1.
14     MR. TOM:  We've had Exhibit 1 and 2 already,
15 the objections and the stipulation.  This will be 3.
16     MS. JONES:  Yes, I'm sorry, 3.  I apologize.
17     (Exhibit No. 3 marked.)
18 BY MS. JONES:
19     Q.  All right.  So I'm showing you what's been
20 marked as Exhibit 3, Mr. Booth.
21     A.  Yes, uh-huh.
22     Q.  Do you recognize this document?
23     A.  I do.
24     Q.  What is it?
25     A.  It is a letter that I sent you all with

46

1 respect to -- in response to your subpoenas that made
2 clear what I've been saying in testimony, that PEER's
3 relationship, operational relationship, with respect
4 to drawing redistricting boundaries really is limited
5 to the staff counsel supervising the staff, the GIS
6 staff, computer staff, other consultants, that PEER,
7 per se, does not do redistricting studies, maps, or
8 plans.
9      Q.  So as staff counsel --
10     A.  Uh-huh.
11     Q.  -- for the Reapportionment Committee --
12     A.  Yes.
13     Q.  -- do you have any formal authority over any
14 Reapportionment Committee members?
15     A.  Committee members are legislators.
16     Q.  Yes.
17     A.  And I do not have authority over members.  I
18 work for the members.  If I -- so that's -- I have no
19 authority over members.
20     Q.  Speaking of redistricting and the census, you
21 testified earlier, I believe, that certain offices are
22 redistricted every 10 years because of the census.
23     A.  Legislative seats and congressional, uh-huh.
24     Q.  And what's your understanding for why this
25 happens every 10 years?

47

1      A.  Well, aside from -- well, it's in the
2 Constitution and it's required.  It is required
3 constitutionally for us to do that.
4      MR. BECKETT:  Are we talking about
5 legislative redistricting?
6      MS. JONES:  I'm about to ask those questions.
7      MR. BECKETT:  Because I'm not going to let
8 him testify about legislative and congressional
9 redistricting.
10 BY MS. JONES:
11     Q.  So, Mr. Booth, do all state offices get
12 redistricted?
13     A.  All state offices, to my knowledge, do not
14 get redistricted.
15     Q.  Do the Supreme Court districts get
16 redistricted?
17     MR. SHANNON:  Object to the form of the
18 question.
19     MR. BECKETT:  Object to the form.
20 BY MS. JONES:
21     Q.  You can still answer.
22     MR. BECKETT:  You can answer.
23 BY MS. JONES:
24     Q.  Do Supreme Court districts get redistricted
25 every 10 years according to the census?

48

1      A.  To my knowledge, no.
2      Q.  Do you know why not?
3      MR. BECKETT:  Object to the form.
4      MR. SHANNON:  Join.
5 BY MS. JONES:
6      Q.  You can still answer.
7      A.  Restate your question.
8      Q.  Do you know why the Supreme Court districts
9 don't get redistricted every 10 years?
10     A.  I do not.
11     Q.  Do the Public Service Commission districts
12 get redistricted?
13     A.  They do not.
14     Q.  Do you know why the Public Service Commission
15 districts don't get redistricted every 10 years?
16     A.  I do not.
17     Q.  Do the Transportation Commission districts
18 get redistricted?
19     A.  They do not.
20     Q.  Do you know why they do not get redistricted
21 every 10 years?
22     A.  I do not.
23     Q.  Are the redistricting processes the same for
24 the congressional, legislative, and judicial districts
25 in Mississippi?

49

1      MR. BECKETT: Object to the form.
2      MR. SHANNON: Object to the form of the
3  question.
4      A.  Once again, I know of no processes for
5  Supreme Court, Transportation or PSC districts.  I do
6  know about the form for congressional and legislative.
7  BY MS. JONES:
8      Q.  Do you know when the Supreme Court districts
9  were last redrawn?
10     A.  I do not.
11     Q.  Who would be responsible for redrawing those
12  districts?
13     MR. BECKETT: Object to the form.
14     MR. SHANNON: Join.
15     A.  The Legislature establishes them, so
16  presumably the Legislature would be responsible for
17  making changes should they desire to make changes.
18  BY MS. JONES:
19     Q.  Do you know what the population deviation is
20  for those districts?
21     A.  I do not know the population deviation for
22  those districts.
23     Q.  Would the Joint Reapportionment Committee
24  review population deviation for the Supreme Court
25  districts?

50

1      A.  The Committee would not review deviations for
2  those districts.  The Committee works on legislative
3  redistricting.
4      Q.  So who would be responsible for reviewing the
5  population deviation for those districts?
6      MR. BECKETT: Object to the form.
7      A.  I do not know who would be responsible for
8  that.
9  BY MS. JONES:
10     Q.  Is the population deviation of Supreme Court
11  districts an issue of interest for the Joint
12  Reapportionment Committee?
13     MR. BECKETT: Object to the form.  Instruct
14  him not to answer.
15     MS. JONES: So, Mr. Beckett, it's my
16  understanding you can only instruct him not to answer
17  for matters of privilege.  There are no other
18  objections -- if there's not a privileged matter here,
19  then he is required to answer my questions.
20     MR. BECKETT: He is staff counsel to that
21  Committee and, to the extent these questions are
22  asking him to testify as to the advice he would give
23  to members of the Committee with respect to any
24  redistricting, that's attorney-client privilege, and
25  it enjoys a legislative privilege.

51

1      MS. JONES: Okay.  So on the basis of
2  privilege, you're telling him not to answer.
3      MR. BECKETT: To the extent you're asking him
4  what he does with respect to -- I'm sorry.  Can you
5  read the question back?
6      (The court reporter read pending question.)
7      MR. BECKETT: Okay.  I'm just going to object
8  to the form.  I'm not going to instruct him not to
9  answer.  I withdraw the instruction.
10     MS. JONES: Thank you, sir.
11     MR. BECKETT: But I do object to the form.
12     A.  I know of no instance where the Joint
13  Committee, Reapportionment Committee, has questioned
14  me about population deviations.
15  BY MS. JONES:
16     Q.  During your time with the Mississippi
17  Legislature, do you recall how often the subject of
18  changing the Supreme Court Districts has been
19  discussed?
20     MR. SHANNON: Object to the form of the
21  question.
22  BY MS. JONES:
23     Q.  With legislators and the Joint
24  Reapportionment Committee.
25     A.  I do not recall the number of times that the

52

1  matter of Supreme Court redistricting has been
2  discussed.
3      Q.  Who would have been -- let me strike that.
4  I'll go back.
5      Do you know when the Mississippi Supreme
6  Court districts were last redrawn?
7      A.  I do not.
8      Q.  If I said it was in 1987, would that refresh
9  your recollection at all?
10     A.  Once again, I do not remember when they were
11  last redrawn.
12     Q.  Okay.  I'm going to show you one -- I'm just
13  presenting the statute to you.
14     A.  Uh-huh.
15     Q.  Mississippi Code Annotated Section 9-3-1.
16     A.  Uh-huh.
17     Q.  I'll show you a copy.
18     A.  Okay.
19     Q.  Take your time.  So we're going to enter this
20  as an exhibit.  I just handed you a document.
21     A.  Yes.
22     Q.  And it is a copy of a statute.
23     A.  Yes.
24     Q.  Is that what I gave you?
25     A.  Yes, yes.

53

1   Q. I'm trying to establish that is what I gave
2 you.
3   A. Yes, you did. You gave me 9-3-1.
4   Q. Yes, Mississippi Code Annotated Section
5 9-3-1. What is the title of this section?
6   A. It says "Districts."
7   Q. Okay. And it gives the three Supreme Court
8 districts as outlined by the counties. Is that
9 correct?
10   A. It does.
11   Q. And towards the bottom of the page, under
12 "Credits," it says that this law became effective
13 December 14th, 1987.
14   A. The source line says that, yes.
15   Q. Is that correct?
16   A. That is correct.
17   MS. JONES: Okay. So we're just going to
18 enter this as Exhibit 4.
19   (Exhibit No. 4 marked.)
20 BY MS. JONES:
21   Q. So with the current boundaries for the
22 Mississippi Supreme Court being in 1987, would there
23 have been a study of any kind related to those, that
24 districting plan?
25   MR. SHANNON: Object to the form.

54

1   MR. BECKETT: Object to the form.
2   A. I know now of no study.
3 BY MS. JONES:
4   Q. So who would have been responsible for a
5 study, if there had been one?
6   MR. BECKETT: Object to the form.
7   MR. SHANNON: Object to the form.
8   A. I do not know who would have been responsible
9 for it.
10 BY MS. JONES:
11   Q. So would anyone have been responsible for
12 assessing any potential costs as relates to these
13 district lines?
14   MR. BECKETT: Object to the form.
15   MR. SHANNON: Join.
16   A. I do not know who would have been responsible
17 for making assessments of costs.
18 BY MS. JONES:
19   Q. Would anyone have been responsible for
20 collecting data from the decennial census as it
21 relates to these lines?
22   MR. BECKETT: Object to the form.
23   MR. SHANNON: Join.
24   A. I don't know who would be responsible for
25 collecting census data and reviewing it with respect

55

1 to these districts.
2 BY MS. JONES:
3   Q. Do you know if anyone would have been
4 responsible for addressing any alternative district
5 lines for the Mississippi Supreme Court?
6   MR. BECKETT: Object to the form.
7   MR. SHANNON: Join.
8   A. I do not know who would have been.
9 BY MS. JONES:
10   Q. Do you know if anyone would have been
11 responsible for proposing any alternative districting
12 scheme for the Mississippi Supreme Court?
13   MR. BECKETT: Object to the form.
14   MR. SHANNON: Join.
15   A. Once again, as we said a moment ago, the
16 Legislature establishes them. The Legislature could
17 change them. So a member of the Legislature could.
18 BY MS. JONES:
19   Q. What role does the Joint Apportionment
20 Committee play in the map-drawing process?
21   MR. BECKETT: Object to the form. Can you be
22 more specific? Are you talking about in 1987 with the
23 Supreme Court districts?
24   MS. JONES: I'm talking about generally at
25 the moment, and then I will be more specific.

56

1 BY MS. JONES:
2   Q. So, generally, what role -- and I'm talking
3 about the Joint Apportionment Committee --
4   A. Uh-huh.
5   Q. -- under the SJLCRR, making sure I'm on the
6 right path here.
7   A. Yes.
8   Q. What role, if any, does that Committee play
9 in the map-drawing process?
10   MR. BECKETT: For judicial or for
11 legislative? I just need you to be more specific.
12   THE WITNESS: Yeah.
13 BY MS. JONES:
14   Q. Well, I was going to ask about specifically
15 for Mississippi Supreme Court, but I also just want to
16 understand the process, just generally. It's my
17 understanding we can ask you general questions about
18 the process so then we can understand the basis for
19 our specific Mississippi Supreme Court district. So
20 generally speaking, what role does the Joint
21 Apportionment Committee play in the map-drawing
22 process?
23   MR. BECKETT: Object to the form.
24   You can answer.
25   A. Okay. As we told you before, I believe the

57

1  Joint Reapportionment Committee, in developing maps
2  for the redistricting of the Mississippi House and the
3  Senate, develops maps that are made or that are
4  developed as part of an overall plan to redistrict the
5  House and Senate.  And likewise, such maps and reports
6  are produced for congressional redistricting.
7  BY MS. JONES:
8      Q.  Can you recall any meetings that the Joint
9  Reapportionment Committee has had with legislators
10  during the map-drawing process for the Mississippi
11  Supreme Court districts?
12      A.  Okay.  The Committee, the Joint Committee, to
13  my knowledge, has had no meetings on the subject of
14  Supreme Court redistricting plans and maps.
15      Q.  Has the Joint Reapportionment Committee met
16  with any legislators during the map-drawing process
17  for the Public Service Commission?
18      A.  I know of no meetings that the Committee
19  would have had with other legislators respecting PSC
20  districts.
21         MR. TOM:  Is it clear when we're talking
22  about -- can we take a break?
23         MR. BECKETT:  Yeah, that's fine.
24         (Recess.)
25  BY MS. JONES:

58

1      Q.  Mr. Booth, I just want to make sure I clarify
2  our understanding of one thing, and I know I've asked
3  before, so I apologize.
4         The SJLCRR has two components.  I think
5  you've testified that there is the Mississippi
6  legislative side with the House and the Senate, and
7  the U.S. congressional side.  Is that correct?
8      A.  That is correct.
9      Q.  Okay.  So I'm going to call it the
10  Mississippi legislative side and the U.S.
11  congressional side.
12      A.  Okay.  Good.
13      Q.  So before the break, I asked you questions
14  about the map-drawing process for the Mississippi
15  Supreme Court districts.
16      A.  I remember that, yes.
17      Q.  Okay.  So I just want to go back to that
18  point and then we'll move on.
19      A.  Okay.
20      Q.  So does the Mississippi Joint Reapportionment
21  Committee for the Mississippi legislative -- the
22  Mississippi Legislative Committee of the SJLCRR, are
23  any of those legislators involved in the map-drawing
24  process for the Mississippi Supreme Court districts?
25      A.  Legislators are not involved in the

59

1  map-drawing process from the Joint Committee for
2  Mississippi Supreme Court districts.
3      Q.  And is the U.S. congressional side of the
4  SJLCRR involved in the map-drawing process for the
5  Mississippi Supreme Court districts?
6      A.  Members on the congressional committee for
7  redistricting are not involved in the map-drawing
8  process for the Mississippi Supreme Court.
9      Q.  And does that also include the Public Service
10  Commission?
11      A.  That is correct.
12      Q.  And the Transportation Commission?
13      A.  Correct.
14      Q.  Is there anyone in the SJLCRR who is
15  responsible for map-drawing for the Mississippi
16  Supreme Court?
17         MR. BECKETT:  Object to the form.
18      A.  If a member of the legislature would like to
19  consider a plan to modify a district of the Supreme
20  Court, or the PSC, or the Department of
21  Transportation, that member could request staff
22  assistance to make those map changes, to change a map,
23  to draw a map.
24  BY MS. JONES:
25      Q.  Is there anyone else that would be

60

1  responsible for map-drawing?
2         MR. BECKETT:  Object to the form.
3      A.  I do not know if anyone else draws maps for
4  Supreme Court, Transportation, PSC.
5  BY MS. JONES:
6      Q.  I'm going to show you something else.  I'm
7  going to show you --
8         MR. BECKETT:  Are we done with 3 and 4?
9         MS. JONES:  For the moment, yes.
10         MR. BECKETT:  I didn't mean forever.  I just
11  wanted to get them out of his way.
12         MS. JONES:  No problem.  Thank you.
13  BY MS. JONES:
14      Q.  So I'm just turning your attention --
15      A.  Yes.
16      Q.  -- to what was previously labeled as
17  SJLCRR-000001 --
18      A.  Yes.
19      Q.  -- through 000005.
20      A.  Yes.
21      Q.  And take your time, sir.  I just --
22      A.  Uh-huh.
23         MR. BECKETT:  Just when you're ready.
24  BY MS. JONES:
25      Q.  Yes.  Take your time, please.

61

1    A.  I recognize the documents.
2    Q.  Okay.  You recognize those?
3    A.  Yes.
4    Q.  What is it?
5    A.  This is a map that was drawn by my GIS staff
6  person, Ben Collins, at the request of a member of the
7  Legislature that shows the configuration of the
8  districts, Supreme Court districts, if Simpson County
9  had been moved from the Southern Supreme Court
10  District to the Central District.
11    MS. JONES:  So we're going to mark this
12  before we move forward any further.  I think this will
13  be Exhibit 5, and then I'll ask you a few questions,
14  if that's okay.
15    (Exhibit No. 5 marked.)
16  BY MS. JONES:
17    Q.  So I just wanted to ask you some basic
18  questions about this document.
19    A.  Yes.
20    Q.  When was it prepared?
21    A.  This was prepared in 2016 by my GIS staff
22  person, and I'm looking here, and I'm having a hard
23  time finding the date, but I -- wait a second.  It
24  looks like it was 2/26/16, yeah.
25    Q.  And you say that --

62

1    A.  Yeah.
2    Q.  Who was it addressed to?
3    A.  This was to Representative Baker, who at the
4  time was a member of the Mississippi House of
5  Representatives.
6    Q.  And the title in the e-mail refers to the
7  Supreme Court districts.  Correct?
8    A.  Correct.
9    Q.  And it references a base plan?
10    A.  Yes.
11    Q.  And also says "Simpson Option HB 868."  Is
12  that correct?
13    A.  Yes.
14    Q.  So you testified already that Ben Collins is
15  the GIS operations coordinator?
16    A.  That is correct.
17    Q.  And who determines his tasks?
18    A.  I am his supervisor.
19    Q.  Okay.
20    A.  And I told him that, if people called over
21  here and wanted to take advantage of our computer
22  system, our ability to draw things, that if they're
23  members of the Legislature, he should provide them
24  with assistance.
25    Q.  So members of the Legislature can make

63

1  requests to Mr. Collins.  Is that correct?
2    A.  They can.
3    Q.  Can anyone else make requests of Mr. Collins?
4    A.  I prefer that legislators do.  Sometimes
5  legislators may make a request for another person, but
6  that's between the legislator and that other person.
7    Q.  Are there any other kinds of data requests
8  that can be made of Mr. Collins?
9    A.  Mr. Collins is in the business of drawing
10  maps and providing data associated with the maps.  If
11  Mr. Collins were asked for something other than
12  mapping or data associated with a map, I would have to
13  sit down with him and talk about whether somebody else
14  would be better suited to do the job.
15    Q.  Okay.  So the map-drawing and the data as it
16  relates to the maps are the substance of Mr. Collins'
17  job?
18    A.  That is correct.
19    Q.  Okay.  And there are four e-mails, I mean --
20  I'm sorry.  There are four attachments to this --
21    A.  Uh-huh.
22    Q.  -- we'll call it e-mail.  Is that correct?
23    A.  Yes.
24    Q.  And what are they?
25    A.  Well, what we have here are, one, a map of

64

1  the current configuration of the courts.
2    MR. BECKETT:  Could you identify that by the
3  Bates number at the bottom?
4    A.  Okay.  I'm looking at -- I should probably go
5  and -- it's zero -- the series of zeros ending in 4
6  would be the existing plan.  I know that for a fact
7  because it shows Simpson County in the Southern
8  District.  The document 5 preceded by several zeros is
9  a proposed modification, which moves Simpson County to
10  the Central District.  Then we have statistics on
11  this.  And what -- we have statistics on the sheet
12  that is a number 2, which shows certain statistics
13  respecting the three Supreme Court districts as
14  currently configured, and then we have another one
15  over here ending in 3, which shows -- I'm having --
16  this is so small, I'm having a very difficult time
17  reading this.
18    MS. JONES:  We can go over it together, if
19  that's --
20    MR. BECKETT:  Would you allow me to assist
21  him?
22    MS. JONES:  Sure.
23  BY MS. JONES:
24    Q.  Well, I did have a plan to go over it
25  quickly, so you've sufficiently identified the

65

1 documents.
2    A.  Okay.
3    Q.  So you're comfortable moving forward with
4 these documents?
5    A.  Once again, I cannot read 3.
6    Q.  Okay.  We have your counsel who can verify
7 that I'm not steering you wrong.  How about that?
8    A.  Okay.  All right.
9    Q.  You've got backup.
10   A.  Okay.
11   Q.  So the tables -- so we're talking about the
12 documents ending in 02 and 03.
13   A.  Yes, uh-huh.
14   Q.  They offer total population deviation
15 figures?
16   A.  Yes.
17   Q.  And total percentage -- total and percentage
18 values for white and Black populations in each
19 district?
20   A.  Correct.
21   Q.  Total and percentage values for the 18 and
22 over population?
23   A.  Correct.
24   Q.  And total and percentage values for the 18
25 and over population by race?

66

1    A.  Correct.
2    Q.  And the 18 and over population is equivalent
3 to voting age population.  Is that correct?
4    A.  That is correct.
5    Q.  Okay.  And the 2016 data shows the districts
6 have population deviations.  Yes?
7    A.  I believe it does, yes.
8    Q.  What do you understand population deviation
9 to mean in this context?
10   A.  In the judicial context, I do not -- I do not
11 know.  It makes sense to me in other context, but not
12 in that.
13   Q.  What context does it make sense to you?
14   A.  Well, in the most general sense, when we talk
15 about deviation, it means difference in population
16 between the districts, in the most general sense.
17   Q.  So turning your attention to the document
18 ending in 02.
19   A.  Yes.
20   Q.  The Central District has a negative 2.83
21 percent deviation.  Is that correct?
22   A.  I'm looking for that.
23   Q.  It's a highlighted section.
24       MR. BECKETT:  It's in the pink.  Can you read
25 that?

67

1       THE WITNESS:  I can't read the pink.
2 BY MS. JONES:
3    Q.  Okay.
4    A.  Wait a second.  Wait a second.  It looks like
5 I've got a 2 point -- it looks like 2.8 -- yeah, 2.83.
6    Q.  Okay.  And the Southern District has a 2.79
7 percent deviation?
8    A.  Let me check that.  Looks like it, yeah.
9    Q.  And the Northern District has a 0.05 percent?
10   A.  Correct.
11   Q.  Okay.  And just looking at the maps -- and
12 you started to describe those for us.
13   A.  Uh-huh.
14   Q.  We mentioned Simpson County --
15   A.  Uh-huh,
16   Q.  -- earlier.
17   A.  Correct.
18   Q.  And that these maps are a configuration for
19 Simpson County --
20   A.  Uh-huh.
21   Q.  -- being added to the Central District.  Is
22 that correct?
23   A.  Correct.
24   Q.  And then finally, the demographic data
25 tables --

68

1    A.  Uh-huh.
2    Q.  -- correspond to data for both the Supreme
3 Court districts --
4    A.  Uh-huh.
5    Q.  -- the Public Service --
6    A.  Uh-huh.
7    Q.  -- Commission and Transportation Commission
8 districts, as well.  Correct?
9    A.  They follow the same boundaries, so, yes, I
10 believe they would.
11   Q.  All right.  So I think you've testified that
12 a directive from someone in the Mississippi
13 legislature would be required for Mr. Collins to
14 compile this kind of data?
15   A.  We would have to have a member ask for it,
16 yes.
17   Q.  To your knowledge, how did -- I believe we
18 established, I'm sorry, that this was addressed to a
19 member of the legislature on the first page --
20   A.  Yes.
21   Q.  -- on the page ending in 01?
22   A.  Uh-huh, yes.
23   Q.  And who was that legislator?
24   A.  As I recall, that was representative Mark
25 Baker.

69

1  Q.  To your knowledge, do you know how
2  Representative Baker made this request?
3     A.  As I recall, he contacted Mr. Collins
4  directly.
5     Q.  When you say he contacted Mr. Collins
6  directly, do you know how he -- is there a procedure
7  for that?
8     A.  No.  It could be done by e-mail, it could be
9  done by telephone.  Usually, people use telephone.
10    Q.  Okay.  Are there any formal logs or recording
11  procedures for these requests that are made?
12    A.  No.
13    Q.  Would you have any way of knowing who made
14  the request, as Mr. Collins' supervisor?
15    A.  Mr. Collins tells me when somebody makes a
16  request like this, so that's how I know.
17    Q.  In terms of this data, has the Joint
18  Reapportionment Committee, for either the state
19  legislative side or the U.S. Congressional side, ever
20  compiled data like this on its own accord?
21    A.  I know of no instance where the Joint
22  Reapportionment Committee or the Congressional
23  Redistricting Committee have ever requested or
24  obtained data like this for the Supreme Court
25  districts.

70

1     Q.  Do you know why?
2     A.  No.
3     Q.  All right.  I just want to show you.  You can
4  set that aside for a second.  All right.  I'm passing
5  to you and your counsel a document.  This says House
6  Bill 868 on it.  And take your time.
7     A.  Sure.
8     Q.  Do you see that okay?
9     A.  It is House Bill 868.
10    Q.  Okay.  And this is from the regular session
11  of 2016.  Is that correct?
12    A.  That is what it says.
13    Q.  From the Mississippi Legislature?
14    A.  Yes.
15    Q.  And it looks like it is authored by
16  Representative Baker?
17    A.  Yes, it says that.
18    Q.  And would that be Representative Mark Baker?
19    A.  I believe it would be.
20       MS. JONES:  Okay.  I'm going to ask you just
21  a couple of questions about this, so I want -- this
22  will be Number 6.
23       (Exhibit No. 6 marked.)
24  BY MS. JONES:
25    Q.  So, Mr. Booth, the title of this bill is An

71

1  Act to Amend Section 9-3-1 of the Mississippi Code to
2  Revise the Supreme Court District Boundaries.
3  Correct?
4     A.  That is correct.
5     Q.  And I previously showed you the code section
6  that's Exhibit 4 --
7     A.  Uh-huh, yes.
8     Q.  -- that establishes the three districts of
9  the Supreme Court.  Correct?
10    A.  Correct.
11    Q.  And the text of House Bill 868 describes the
12  counties within the three Supreme Court districts.
13  Correct?
14    A.  That is correct.
15    Q.  And it looks like, on the first page, Simpson
16  County is underlined at line 12.  Correct?
17    A.  That is correct.
18    Q.  And this would be a part of the first
19  district as outlined in this document.  Is that
20  correct?
21    A.  Wait a second.  Let me check.
22    Q.  And, please, take your time.
23    A.  Oh, yes, yes, yes.  That's part of the first
24  district.
25    Q.  And going -- I apologize.  I didn't mean to

72

1  speak over you.
2     A.  No.  Go ahead.
3     Q.  And going back to what was marked as Exhibit
4  4, just this document here, if we compare those two
5  documents --
6     A.  Uh-huh.
7     Q.  -- House Bill 868 --
8     A.  Uh-huh.
9     Q.  -- is adding Simpson County to the first
10  district.  Correct?
11    A.  Correct.
12    Q.  And the original text from Exhibit 4 that
13  went into effect in 1987 does not include Simpson
14  County.  Correct?
15    A.  Correct.
16    Q.  Okay.
17       MR. BECKETT:  She's going back to Exhibit 4.
18       THE WITNESS:  Oh, okay.
19  BY MS. JONES:
20    Q.  I'm just making sure that the two say
21  something different.
22    A.  Okay.
23    Q.  Yes?
24       MR. BECKETT:  We'll stipulate that they do.
25  BY MS. JONES:

73

1    Q.   Okay.  Are you personally familiar at all
2  with House Bill 868?
3    A.   No, I am not.
4    Q.   Do you recall discussing this modification
5  for the Supreme Court districts with Representative
6  Baker back in 2016 during the session?
7    A.   I do not recall discussing House Bill 868
8  with Mr. Baker.
9    Q.   Were you working as SJLCRR staff counsel in
10 2016?
11   A.   I was.
12   Q.   Did you assist with this work in any way for
13 Mr. Baker?
14   A.   All we -- all our staff did was draw the map
15 that Mr. Collins prepared.
16   Q.   Do you remember discussing House Bill 868
17 with any members of the SJLCRR?
18   A.   I do not remember discussing House Bill 868
19 with any members of the Committee.
20   Q.   So that includes members on the state
21 legislative side?
22   A.   I do not remember discussing this bill with
23 any members of those Committees.
24   Q.   Including also the U.S. Congressional side of
25 the SJLCRR?

74

1    A.   That's correct.
2    Q.   Any other legislator outside of the SJLCRR?
3  Did you have a conversation with any of them about
4  this?
5    A.   No, I do not recall any conversation.
6    Q.   And House Bill 868 did not pass.  Is that
7  correct?
8    A.   That's what I understand.
9    Q.   Do you know why?
10   A.   No, I do not.
11       MR. BECKETT:  Object to the form.
12 BY MS. JONES:
13   Q.   And Section 9-3-1 of the Mississippi Code
14 that is Exhibit 4 is still in effect today.  Is that
15 correct?
16       MR. BECKETT:  If you know.
17   A.   Well, once again, by interpreting the source
18 line, the latest change on the source line is 1987.  I
19 would think that it hasn't changed since 1987.
20 BY MS. JONES:
21   Q.   Yes, sir.  Thank you.
22       Okay.  I'm going to show you one more set of
23 documents.
24       MS. JONES:  And, yes, these are -- I think
25 we're good on this for the moment.

75

1        MR. BECKETT:  We can sort them out later?
2        MS. JONES:  Yes.
3        (Discussion had off the record, not
4  reported.)
5  BY MS. JONES:
6    Q.   I'm showing you, you and your counsel, what
7  has been -- what was previously marked as SJLCRR
8  000006 --
9    A.   Correct.
10   Q.   -- through 000008.
11   A.   Yes.
12   Q.   Do you recognize these documents?
13   A.   I do recognize these documents.
14   Q.   What are they, or what is it?
15   A.   In 2021, we received, or Mr. Collins
16 received, a request from Senator Sarita Simmons to do
17 some work on the first and second Supreme Court
18 districts, Transportation districts, Public Service
19 Commission districts, and he developed these maps in
20 response to that request.
21   Q.   Okay.  So the subject here is, "Simmons
22 legislative assistance."  Correct?
23   A.   Correct.
24   Q.   And in the body of the e-mail -- and that's
25 e-mail from Mr. Collins, as you said?

76

1        MR. SHANNON:  Counsel, can you reference a
2  Bates number just for the record?
3        MS. JONES:  I apologize.  I don't think I
4  actually did the exhibit, so thank you for -- yes.
5        These documents previously marked as
6  SJLCRR-000007 through 000008, we will mark as Exhibit
7  7.
8        (Exhibit No. 7 marked.)
9  BY MS. JONES:
10   Q.   Okay.  So turning your attention now to
11 Exhibit 7, this is an e-mail from Ben Collins to you.
12 Is that correct?
13   A.   This was -- yes.
14   Q.   And this was dated Friday, December 3rd,
15 2021?
16   A.   Correct.
17   Q.   Okay.  And I think I said already, the
18 subject is "Simmons legislative assistance"?
19   A.   Correct.
20   Q.   And then attached, it says, "attached are the
21 two geographic components of the legislative
22 assistance request from Sen. S. Simmons."
23   A.   Uh-huh.
24   Q.   "Yes"?
25   A.   Correct.

77

1    Q. And then attached, as we see, the document
2 ending in 07 is Central Transportation District with
3 Tallahatchie and Leflore additions?
4    A. Correct.
5    Q. It's a map. And then the document ending in
6 08 is the Central Transportation District, current?
7    A. Correct.
8    Q. Okay. So as it relates to this Exhibit 7,
9 are you familiar with this legislative assistance
10 request referred to in this e-mail?
11    A. I do recall, yes.
12    Q. Who is Sen. S. Simmons?
13    A. That is Sarita Simmons, who is a member of
14 the state Senate.
15    Q. And how did your office originally receive
16 this request?
17    A. As I recall, she contacted -- I believe she
18 did contact Ben and I told him to proceed with this
19 the way he would proceed with any request like this
20 from a legislator.
21    Q. And when you said for him to proceed, are
22 there any policies or procedures for what that means?
23    A. Well, if this person says would you prepare a
24 map for me that does X, Y, Z, they will prepare a map
25 that does X, Y, Z.

78

1    Q. And when he prepares that document in
2 response to that request --
3    A. Uh-huh.
4    Q. -- does he review that with you?
5    A. He tells me what he has prepared and I will
6 say, did the person requesting it want you to do the
7 things you did here, and they said yes, and I will say
8 very good.
9    Q. Is there any other analysis that you and
10 Mr. Collins do with regard to these requests?
11    A. The usual and customary source of things, as
12 you see over in the margin, we provide statistical
13 information on the districts. It's something that we
14 will -- we always provide on maps when anyone is
15 proposing making some changes in a district.
16    Q. Okay. Well, turning your attention to the
17 map, we will start with Central Transportation
18 District with Tallahatchie and Leflore additions.
19    A. Yes.
20    Q. So would you interpret this map to be adding
21 Tallahatchie and Leflore Counties to the Central
22 District?
23    A. I interpret it to be adding those two
24 counties to the Central District.
25    Q. And which districts would those two counties

79

1 have been originally a part of?
2    A. They were -- under the existing plan, they're
3 part of the Northern Supreme Court District.
4    Q. And the existing plan is the map ending in
5 08. Correct?
6    A. Correct, uh-huh.
7    Q. Okay. So for the map ending in 07, it shows
8 a 2020 total population for the Central District?
9    A. Uh-huh, yes.
10    Q. With the addition of the two counties.
11 Correct?
12    A. Correct.
13    Q. And that would be 974,895. Correct?
14    A. That is correct.
15    Q. What would be the source for this population
16 data?
17    A. This would have been using the 2020 census
18 data that we had received.
19    Q. This map also shows a district-wide BVAP.
20 Correct?
21    A. Correct.
22    Q. And BVAP, B-V-A-P, stands for Black
23 voting-age population. Correct?
24    A. Correct.
25    Q. And that says 49.07 percent?

80

1    A. Correct.
2    Q. If we compare the map ending in 07 and 08 --
3    A. Uh-huh, yes.
4    Q. -- the original plan, the BVAP for the
5 original plan ending in 08, the map ending in 08, is
6 48.33 percent. Correct?
7    A. That is correct.
8    Q. So the map ending in 07 has an increase in
9 BVAP. Correct?
10    A. Correct.
11    Q. Okay. Still on 07, the left-hand side
12 towards the bottom, there is an 18-plus percent BVAP
13 written in blue. Can you see that? I know it's
14 small.
15    A. I am having a very difficult time reading
16 that.
17    MR. BECKETT: Can I read it to him?
18    MS. JONES: Yeah, that's fine.
19    MR. BECKETT: Just so you know, this says
20 percentage 18 plus, underscore, Black population
21 (BVAP). Did you understand that?
22    THE WITNESS: Yes, I understood what you
23 read.
24 BY MS. JONES:
25    Q. And directing your attention to the map

---

81

1 itself, when you look at Tallahatchie and Leflore
2 Counties on the map, and Mr. Beckett --
3     A.  He may be able to see that.
4     Q.  They're showing a majority BVAP for 18 and
5 over population for Tallahatchie and Leflore Counties.
6 Correct?
7     A.  Correct.
8         MR. BECKETT:  Can you see that?  May I read
9 it to him?
10        MS. JONES:  Yeah, yeah.  Absolutely.
11        MR. BECKETT:  I don't want to interrupt
12 your --
13        MS. JONES:  No, no.
14        MR. BECKETT:  Tallahatchie, and it says 55.54
15 percent.
16        THE WITNESS:  Yeah.  That's the bottom
17 number.  Right?
18        MR. BECKETT:  And then Leflore says -- it's
19 in blue, which is why you probably can't see it as
20 well, 71.19 percent.
21        THE WITNESS:  Correct.
22 BY MS. JONES:
23     Q.  Do you recall reviewing this data at all?
24     A.  When you said "reviewing it," he told me what
25 he produced and he showed it to me.

---

82

1     Q.  And did you have any further conversation
2 with Mr. Collins about any of this?
3     A.  I don't remember having any further
4 conversations.
5     Q.  Did you have any conversations with Senator
6 Simmons about this?
7     A.  I just told him, you need to provide the
8 information.
9     Q.  Did you have any conversations with the
10 SJLCRR about this?
11     A.  No.
12     Q.  So that's the state legislative side of
13 SJLCRR.
14     A.  No.
15     Q.  And the U.S. congressional side of SJLCRR?
16     A.  No.
17     Q.  Was this data transmitted to anyone other
18 than you?
19     A.  Well, ultimately, Mr. Collins would have
20 provided this to the requester.
21     Q.  And that would be Senator Simmons?
22     A.  Yeah, uh-huh.
23     Q.  Did you receive any feedback from Senator
24 Simmons about this data?
25     A.  No.

---

83

1     Q.  Or about this request at all?
2     A.  No.
3     Q.  Do you know if Mr. Collins received any
4 feedback, as his supervisor?
5     A.  I do not know.
6     Q.  Do you recall any other conversations of this
7 analysis with adding Tallahatchie and Leflore Counties
8 to the Central District?
9     A.  I do not.
10    Q.  In any other context?
11    A.  I do not.
12    Q.  Okay.  I just want to ask one other quick
13 question about the map ending in 008, so the current
14 map.
15    A.  Uh-huh.
16    Q.  The right-hand side, it shows the total
17 Central District populations for 2020 and 2010.
18 Correct?
19    A.  Let's see.  That shows -- yes, 2020 and 2010.
20    Q.  Okay.  And so for -- it also shows that there
21 was a change in population for 2020 to -- from 2010,
22 excuse me, to 2020.  Is that correct?
23    A.  It does reflect a change.
24    Q.  And that change is a decrease in population
25 of 27,231 people?

---

84

1     A.  I don't do arithmetic that quickly, but it's
2 certainly --
3         MR. BECKETT:  It's here at the bottom.
4     A.  Oh, there it is.  Yes, it does.  Yeah, there
5 it is.
6 BY MS. JONES:
7     Q.  Yes, I apologize.  I just identified -- and
8 that percentage, not to ask for your math skills, is a
9 decrease or a negative 2.91 percent?
10    A.  Correct.
11    Q.  You know lawyers love math, Mr. Booth.
12        So I just want to ask just a couple of
13 follow-up questions to both the 2016 and 2021 request.
14    A.  Yes.
15    Q.  First, do you recall if Mr. Collins received
16 any other data requests other than 2016 and 2021?
17    A.  With respect to --
18    Q.  With respect to --
19    A.  Judicial?
20    Q.  -- Supreme Court districts, yes.
21    A.  I do not know of any that he ever received
22 other than these.
23    Q.  Do you know of any requests that he received
24 for the public service transportation -- I'm sorry.  I
25 mean, the Public Service Commission?

85

1   A.  Any of those dis- -- no.
2   Q.  Or for the Transportation Commission?
3   A.  No.
4   Q.  And has anyone else at SJLCRR on the state
5   legislative side reviewed any analysis -- reviewed any
6   data other than these legislative requests?
7   A.  Well --
8       MR. BECKETT:  Let me object to the form.
9       MS. JONES:  I can ask again.  I'm sorry.
10  BY MS. JONES:
11  Q.  Let me ask again.  I apologize.  Do you
12  recall if Mr. Collins or anyone else under your
13  supervision --
14  A.  Uh-huh.
15  Q.  -- received any other requests other than
16  2016 and 2021 --
17  A.  I do not --
18  Q.  -- for the Supreme Court districts?
19  A.  I do not know of any.
20  Q.  Or for the Public Service Commission?
21  A.  I do not know of any.
22  Q.  Or for the Transportation Commission?
23  A.  I do not know of any.
24  Q.  And no one on the legislative, state
25  legislative side of SJLCRR, made any requests or asked

86

1   for any of this information in any way?
2   A.  I know of no requests for the information.
3   Q.  And the same with the U.S. congressional side
4   of SJLCRR?
5   A.  It would be the same for the congressional
6   side.
7       MS. JONES:  Okay.  I'm going to ask if we
8   could just take a quick break.
9       MR. BECKETT:  Sure.
10      (Recess.)
11  BY MS. JONES:
12  Q.  So, Mr. Booth, I just want to ask a few
13  clarifying questions, and then we're going to get to
14  the box.
15  A.  Okay.
16  Q.  So before the break, we were talking about
17  the legislative assistance request.
18  A.  Yes.
19  Q.  And we spoke about Representative Baker and
20  Senator Simmons.
21  A.  Correct.
22  Q.  Back in 2016, was Representative Baker a
23  member of the SJLCRR?
24  A.  I am trying to remember.  I believe he was,
25  if I remember correctly, in the early part of that

87

1   decade.  What happens sometimes during the years after
2   redistricting, the Committee goes dormant and doesn't
3   reorganize.  So because of that, they don't meet, and
4   I can't remember if he had actually been named to the
5   Committee.  Because after they had completed the
6   redistricting in 2012, they didn't meet anymore.
7   Q.  So when you say they didn't meet anymore
8   after 2012, when would it have been reconstituted?
9   A.  For the next round of redistricting.
10  Q.  So that would have been --
11  A.  First part of this decade, the current
12  decade.
13  Q.  Okay.  So not until the 2020 --
14  A.  Yeah.
15  Q.  -- redistricting cycle?
16  A.  Right, yeah.  And once again, he may have
17  been named, but the Committee did not reorganize after
18  we did the redistricting in that first part of the
19  decade.
20  Q.  And just to clarify --
21  A.  Sure.
22  Q.  -- are we talking about Mr. Baker being on
23  the state legislative side of the SJLCRR or on the
24  U.S. congressional side?
25  A.  Membership is usually identical for those.

88

1   Q.  Okay.
2   A.  I can't remember when it's not.
3   Q.  Okay.  So if he was on the Committee --
4   A.  Yeah.
5   Q.  -- it would have been around 2012 on both
6   sides of the Committee?
7   A.  Correct.
8   Q.  For Senator Simmons, was she a member of the
9   SJLCRR in 2021 when she made the request?
10  A.  Senator Sarita Simmons was not a member of
11  the Committee.
12  Q.  Has she ever been a member of the Committee?
13  A.  No, she has not.
14  Q.  We have discussed a number of different
15  committees today.
16  A.  Yes.
17  Q.  So just for clarity, with respect to your
18  time with the Mississippi Legislature since 1984 --
19  A.  Uh-huh.
20  Q.  -- have any other committees ever conducted
21  any redistricting of the Supreme Court Districts?
22  A.  I have no personal knowledge of other
23  committees' work in the area of redistricting.  I only
24  know about what my committees have done.  So I can't
25  answer that with any certainty.

89

1   Q.  So that would -- would that be the same
2   answer for the Public Service Commission?
3   A.  Correct.
4   Q.  And the Transportation Commission?
5   A.  Correct.
6   Q.  As far as you know, have any of these
7   committees ever been assigned by law to redraw the
8   Supreme Court districts?
9   A.  I know of no instance when that has happened.
10  Q.  Has any committee ever been assigned by law
11  to redraw the Supreme Court districts?
12  A.  I know of no instance of that happening.
13  Q.  Is that the same for the Public Service
14  Commission?
15  A.  Correct.
16  Q.  And the Transportation Commission?
17  A.  Correct.
18  Q.  Do you know of any committee that we have
19  talked about today, since 1984, that has conducted
20  redistricting of the Supreme Court districts?
21  A.  I know of no committee that has conducted a
22  redistricting of the Supreme Court districts.
23  Q.  Is the same true for the Public Service
24  Commission?
25  A.  To my knowledge, I know of no committee, no

90

1   committee of the legislature that has effected a
2   change in those districts.
3   Q.  Is that also true for the Transportation
4   Commission?
5   A.  That would be true for the transportation
6   districts, also.
7   Q.  Okay.  Mr. Booth, I'm going to ask you just a
8   few more questions.
9   A.  Uh-huh.
10  Q.  I want to talk about -- ask you about the
11  computer systems that PEER houses for the SJLCRR.
12  A.  Correct.  Okay.
13  Q.  So what are those computer systems?
14  A.  All right.  At first, you're going to have to
15  forgive some imprecision because I am not an IT
16  person.  So I'm going to explain to the best of my
17  ability what we use.  We currently use and have used,
18  since late 2007, PCs that run a software known as
19  Maptitude, which is a redistricting GIS software, and
20  that's what we have been -- we have used for the last
21  couple of rounds of redistricting.
22  Q.  Who manages your computer system?
23  A.  Mr. Collins, as my GIS staff person,
24  maintains and operates those computers.  My CIO at
25  PEER has limited responsibility, not for operating the

91

1   systems, but making sure that the firewall is secure.
2   Q.  And who's your CIO again?
3   A.  Dr. Kirby Arinder.
4   Q.  Thank you.  Who has access to the computer
5   systems?
6   A.  Mr. Collins has access to the computer
7   system.  I have physical access to the computer
8   system, but I do not use the system, so I would not be
9   able to do anything with the system.  We have had
10  contractors before to -- from the Mississippi
11  Automated Resource Information System who have helped
12  us during redistricting, and they help us and have
13  access to the computers.
14  Q.  And how often are these -- is this computer
15  system used?
16  A.  Well, the computer system is used when we do
17  redistricting.  It is used when people make requests
18  of Mr. Collins, like the couple of things we've talked
19  about here.  And from time to time, a member may ask
20  us to please print out a copy of their district map,
21  the computers we use to bring up district maps.  So
22  they get used a great deal.
23  Q.  Is there any other data on these systems
24  besides the -- or I guess let me ask this:  What is
25  the data on the computer systems?

92

1   A.  We have the -- well, obviously, we have the
2   census data in the computer system, and we have the
3   Maptitude software in the computer system.
4   Q.  Is there any other data?
5   A.  I can't remember any other data we have in
6   there.  We also have another software program called
7   ArcView that runs on that computer that we use from
8   time to time for other purposes, other mapping
9   purposes, but I can't think of -- and, obviously, the
10  data for those maps, other maps, might be in there.
11  Q.  And when you say maps for other purposes,
12  what other purposes do you mean?
13  A.  If Mr. Collins has downtime and the PEER
14  Committee is working on a project that needs a map, I
15  will ask him to sit down and help the staff work up a
16  map.
17  Q.  And have any of those downtime map projects
18  involved redistricting?
19  A.  No.
20  MR. BECKETT:  Just to clarify, you mean at
21  the Supreme Court districts or the related districts.
22  Right?
23  MS. JONES:  Yes, with regard to the Supreme
24  Court districts.
25  A.  Right.

93

1 BY MS. JONES:
2    Q.   Does the SJLCRR have any computer systems
3 housed by any other entity other than PEER?
4    A.   I know of -- we have no other computers
5 housed off-site, meaning our office.
6    Q.   Okay.  So all of your computers are within
7 your office?
8    A.   Our computers are in our office.
9    Q.   Okay.  What is the Sun server?
10   A.   Okay.  Back in the late '90s, we acquired a
11 Sun computer.  This was before we were using PCs.
12 That was programmed by our contractors at the
13 Mississippi Automated Resource Information System out
14 at the Board of Trustees of the Institutions of Higher
15 Learning to help us draw maps.  It did for us, in the
16 early 2000s, what these PCs running Maptitude do for
17 us now.
18   Q.   So do you personally recall any redistricting
19 data being saved to the Sun server?
20       MR. BECKETT:  With respect to judicial?
21 BY MS. JONES:
22   Q.   With respect to the judicial --
23   A.   I recall --
24   Q.   -- districts.
25   A.   I recall no project, no request occurring

94

1 when we were using the Sun system to make changes in
2 Supreme Court districts.
3    Q.   So none of the data on the Sun servers is
4 related to the Mississippi Supreme Court districts?
5    A.   I cannot remember anything that would have
6 required us to make changes to Mississippi Supreme
7 Court districts that would have been saved in the Sun
8 system.
9    Q.   Would that also be true of the Public Service
10 Commission?
11   A.   That would be true of PSC.
12   Q.   And the Transportation Commission?
13   A.   That would be true of Transportation
14 Commission, also.
15   Q.   So in accordance with the stipulation that I
16 think is Exhibit 1 --
17       MR. BECKETT:  It's Exhibit 2.
18 BY MS. JONES:
19   Q.   Exhibit 2.  I'm not going to get the numbers
20 correct today.  You and your counsel previously -- you
21 identified, as SJLCRR staff counsel, there are 28
22 individual eight millimeter data tapes, seven
23 individual half-inch data tapes, one CD ROM and four
24 Sun hard drives.
25   A.   That is what we identified, yeah.

95

1    Q.   What do you know about the content or the
2 contents of these media storage devices?
3    A.   Well, as I said, the Sun system was the
4 system that we were using for the post-2000 census
5 rounds of redistricting.  So they would have work
6 plans associated with the various activities that we
7 carried on, but they would have nothing, as I recall,
8 on Supreme Court redistricting.
9    Q.   And these media storage devices date back to
10 the early 1990s, you testified?
11   A.   No.  This would have been in the early 2000s.
12 These were the drives for the computer that we used in
13 the first -- in the 2000, post-2000 census
14 redistricting.
15   Q.   So who owns these media storage devices?
16   A.   Well, the computer was owned by the Joint
17 Reapportionment Committee.  The storage devices are,
18 likewise, owned by the Joint Reapportionment
19 Committee.
20   Q.   And who maintains them?
21   A.   Well, I maintain them in a file cabinet.
22       MR. BECKETT:  It's super sophisticated.
23       MS. JONES:  And highly classified.
24 BY MS. JONES:
25   Q.   And you are testifying today that the data on

96

1 these media storage devices is limited to
2 redistricting?
3       MR. BECKETT:  Legislative.
4 BY MS. JONES:
5    Q.   Legislative redistricting.
6    A.   Nothing on the Supreme Court.
7    Q.   Or the Public Service --
8    A.   Correct.
9    Q.   Public Service Commission?
10   A.   Correct.
11   Q.   Or Transportation Commission?
12   A.   Correct.
13   Q.   Okay.  So is anyone -- have you or anyone
14 else at PEER or SJLCRR accessed any of this data since
15 the 2000 redistricting cycle?
16   A.   The computer, the Sun system that we had
17 began to malfunction in the late 2000s, around 2007.
18 I had already decided that we were going to conduct
19 all of our new redistricting activities on PCs running
20 Maptitude.  So when we began to have problems with the
21 computer, we just ceased using it.  We took all the
22 tapes, the drives, and the CDs.  We saved them, stored
23 them away, and retired the computer.
24   Q.   Are there any other media storage devices in
25 PEER's possession --

97

1    A.  I know --
2    Q.  -- for any other redistricting cycles?
3    A.  I know of none.
4    Q.  Are there any other media storage devices in
5  SJLCRR's possession for any other redistricting
6  cycles?
7    A.  I know of none.
8       MR. BECKETT:  Again, we're talking about
9  judicial.  Right?
10      THE WITNESS:  Judicial, right.  Yeah.
11  BY MS. JONES:
12   Q.  Yes.  As it relates to both the Mississippi
13  state legislative side of the SJLCRR and the U.S.
14  congressional legislative side of SJLCRR, because you
15  told me there's two separate sides.  And neither of
16  them have any --
17   A.  Yeah.
18   Q.  -- storage devices, media storage devices, in
19  their possession regarding the Mississippi Supreme
20  Court district lines?
21   A.  I know of none in anyone's -- in the
22  possession of either of those computers or any of the
23  staff that deal with Mississippi Supreme Court
24  redistricting.
25   Q.  Okay.  So, Mr. Booth, considering everything

98

1  we've covered today, do you know anyone else at PEER
2  who may have any relevant knowledge about the matters
3  we've discussed?
4       MR. BECKETT:  Object to the form.
5    A.  Once again, at PEER, PEER staffers, no.
6  BY MS. JONES:
7    Q.  Do you know anyone on the Mississippi
8  legislative side of SJLCRR who may have any relevant
9  knowledge for the matters that we discussed today?
10   A.  Mr. Ben Collins is the only person that I can
11  think of that's a staff person.
12      MR. BECKETT:  I think she was talking -- if I
13  may.
14      You're talking about the members.  Right?
15      THE WITNESS:  Members?
16  BY MS. JONES:
17   Q.  Anyone.  Anyone connected to the Mississippi
18  state legislative side of the SJLCRR.  Does anyone
19  have any relevant knowledge, outside of Mr. Collins?
20      MR. SHANNON:  Object from the standpoint it
21  calls for speculation.
22      MR. BECKETT:  I object to form.
23      You can answer.
24   A.  I know of no one else who would have
25  information.

99

1  BY MS. JONES:
2    Q.  And with regard to the SJLCRR U.S.
3  congressional legislative side of the Committee, do
4  you know of anyone who has any relevant knowledge of
5  the matters we discussed today?
6       MR. BECKETT:  Object to the form.
7    A.  I do not.
8  BY MS. JONES:
9    Q.  Do you know of anyone outside of PEER or the
10  SJLCRR who has any information about any of the
11  matters that we've discussed today, any relevant
12  information?
13      MR. BECKETT:  Same objection.
14   A.  I do not.
15      MS. JONES:  All right.  I have one last
16  general -- two last general questions, but if we can
17  take one last break.
18      (Discussion had off the record, not
19  reported.)
20      MS. JONES:  Okay.  You brought notes today,
21  Mr. Booth, and we just need to figure out what we're
22  going to do about those, Mr. Beckett.  And then the
23  only other question is the box.  It's our
24  understanding that we've already -- the box is
25  sufficiently within the record both through the

100

1  stipulation, through the subpoena responses.  We may
2  not do anything with the box at this second, and
3  that's -- we think that's okay.  The box has been
4  established as a part of the case and if we need to --
5       MR. SHANNON:  Are we on the record right now?
6       MR. BECKETT:  We are on the record.
7       MS. JONES:  Yes, sir, Mr. Shannon.  Is that
8  okay?
9       MR. SHANNON:  Sure, sure.
10      MS. JONES:  I guess what I'm saying is, we
11  want to just reserve our right to access the box
12  at a later time, if necessary.
13      MR. BECKETT:  Yeah.  I mean, that's fine.  I
14  mean, we're not going to turn over physical custody of
15  it, as we've discussed, but the -- to the extent that
16  -- I mean, I think he's testified that, to the best of
17  anybody's knowledge, there's nothing related to
18  Supreme Court, the Public Service Commission, or the
19  Transportation Commission that's on those records.
20      To the extent that they have to be accessed
21  and you make that decision, then we will be happy to
22  go find a forensic data specialist who has equipment
23  that goes back, you know, 20-plus years, that can
24  access these, these materials, without us potentially
25  spoliating them.  That's my big concern, is that I

101

1 don't want us to open something, 20-year-old records,
2 to blow up. Right? So if we have to get a specialist
3 to make -- to put them into a manageable, readable,
4 usable, sharable format, then we'll have to conduct a
5 privilege review of that, and we would provide the
6 parties with an estimate of what that costs in terms
7 of the data specialist and the privilege review.
8      So the -- but I'm happy to -- if you want to
9 put the photographs in the record, he can verify the
10 photographs that we provided to you as being
11 reflective of the materials that are in the box.
12 Would that help?
13      MS. JONES: Sure. We weren't sure if you --
14      MR. BECKETT: We'll be happy to.
15      MS. JONES: -- were okay with the
16 photographs. That's why we relied on the
17      MR. BECKETT: The photographs, they came from
18 Mr. Booth, so he can authenticate the photographs, if
19 you want him to.
20      MS. JONES: Okay. I don't think I have a
21 copy of the photographs.
22      MR. SOUSSI: I have them.
23      MS. JONES: Oh, you do?
24      MR. SOUSSI: Yeah.
25      MS. JONES: We have a copy of the

102

1 photographs. All right. Well, we'll do that and then
2 talk about the notes.
3      MR. BECKETT: And let's use what he -- I
4 think you have what he sent. I sent some other stuff
5 to Josh, but I don't want to be a witness, and he and
6 I had an agreement that that wouldn't be the case.
7      MS. JONES: Right. And that's why we stayed
8 away from the photographs. So maybe I didn't realize
9 Mr. Booth had also produced photographs.
10      MR. BECKETT: We produced --
11      MR. SOUSSI: There's 10 there and the two
12 hard drives.
13      MR. BECKETT: Let me see if that's -- can we
14 go off the record?
15      (Discussion had off the record, not
16 reported.)
17      MR. BECKETT: As we discussed when we went
18 off the record, we will supplement this record with
19 the photographs that --
20      Did Mr. Collins take them?
21      THE WITNESS: I believe Ben took a set of
22 photos.
23      MR. BECKETT: So at Mr. Booth's direction, he
24 took a set of photographs, and I will provide those to
25 you.

103

1      MS. JONES: Okay. Thank you. We appreciate
2 that.
3      And I think the final thing were the notes.
4 I know there were copies circulating --
5      MR. BECKETT: I think they got swept up in
6 there.
7      MS. JONES: Right. So let's find --
8      MR. BECKETT: Yeah, that's them.
9 BY MS. JONES:
10      Q.  So these are the notes that you prepared in
11 anticipation of the deposition. Correct? Or in
12 preparation for the deposition?
13      A.  I prepared these notes before I sat down with
14 Mr. Beckett. I was beginning to get my thoughts in
15 order about the subject matter that I believed you all
16 would be questioning me on today.
17      MS. JONES: Yes, sir. And we are asking then
18 that these notes be entered as our, I guess, our final
19 exhibit.
20      THE WITNESS: Typos and all.
21      MR. BECKETT: We object to it, but we
22 understand.
23      MS. JONES: Yes, sir.
24      (Exhibit No. 8 marked.)
25 BY MS. JONES:

104

1      Q.  All right. Mr. Booth, thank you for your
2 time today and for speaking with us and answering our
3 questions.
4      A.  Thank you.
5      Q.  We have nothing further at this time.
6      A.  Thank you.
7      MR. BECKETT: No redirect.
8      MR. SHANNON: We have no questions.
9      (Whereupon the deposition was concluded at
10 12:01 p.m., the same day.)
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

105

CERTIFICATE OF COURT REPORTER

1
2       I, Catherine M. White, CSR, and Notary Public
3   in and for the County of Rankin, State of Mississippi,
4   hereby certify that the foregoing pages, and including
5   this page, contain a true and correct transcript of
6   the testimony of the witness, as taken by me at the
7   time and place heretofore stated, and later reduced to
8   typewritten form by computer-aided transcription under
9   my supervision and to the best of my skill and
10  ability.
11      I further certify that I placed the witness
12  under oath to truthfully answer the questions in this
13  matter under the power vested in me by the State of
14  Mississippi.  I further certify that I am not in the
15  employ of or related to any counsel or party in this
16  matter, and have no interest, monetary or otherwise,
17  in the final outcome of the proceedings.
18      Witness my signature and seal this the 21st
19  day of March, 2023.
20  _____
21      CATHERINE M. WHITE, CSR No. 1309
22  My Commission Expires:
    February 1, 2026
23
24
25

106

DEPONENT'S CERTIFICATE

1
2       I, James Frederick "Ted" Booth, the deponent
3   in the foregoing deposition, certify that I have read
4   the foregoing pages 5 - 104, being the total number of
5   pages relating to my testimony, as to the correctness
6   thereof, and that after reading said pages and subject
7   to any corrections I may have reflected below, I
8   certify that this testimony is true, correct and
9   complete and that the transcript thereof is true and
10  correct.
11  _____
                James Frederick "Ted" Booth
12  STATE OF _____
13  COUNTY OF _____
14      SWORN TO AND SUBSCRIBED before me on this the
15  _____ day of _____, 20____.
16  _____
17          NOTARY PUBLIC
18  My Commission expires: _____
19  PAGE | LINE | CORRECTION     | REASON
        |   |               |
20  _____|___|_____|_____|_____
        |   |               |
21  _____|___|_____|_____|_____
        |   |               |
22  _____|___|_____|_____|_____
        |   |               |
23  _____|___|_____|_____|_____
        |   |               |
24  _____|___|_____|_____|_____
        |   |               |
25  _____|___|_____|_____

Cathy M. White, CCR

cathywhitecsr@gmail.com                                   601.405.3762