IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
GREENVILLE DIVISION

**DYAMONE WHITE; DERRICK SIMMONS; TY PINKINS; CONSTANCE OLIVIA SLAUGHTER HARVEY-BURWELL**  **PLAINTIFFS**

VS.  CIVIL ACTION NO. 4:22-cv-00062-SA-JMV

**STATE BOARD OF ELECTION COMMISSIONERS; TATE REEVES** *in his official capacity as Governor of Mississippi*; **LYNN FITCH** *in her official capacity as Attorney General of Mississippi*; **MICHAEL WATSON** *in his official capacity as Secretary of State of Mississippi*  **DEFENDANTS**

## REBUTTAL IN FURTHER SUPPORT OF DEFENDANTS' MOTION FOR PAYMENT OF FEES AND COSTS ACTUALLY INCURRED AS A RESULT OF PLAINTIFFS' IMPROPER EXPERT REBUTTAL DISCLOSURES

### INTRODUCTION

Defendants' motion to recover fees and costs should be granted in full because (1) Plaintiffs' expert rebuttal disclosures—which this Court previously found improper—will actually cost State taxpayers in excess of $120,000 in reasonable and necessary attorney and expert witness fees and expenses; and (2) all of Plaintiffs' arguments opposing Defendants' motion ring hollow given the sequence of events occasioned by Plaintiffs' errors.

Through no fault of Defendants, Plaintiffs substantially altered the voter turnout analyses of their expert, Dr. Traci Burch, well after Plaintiffs' expert designation deadline—forcing Defendants to expend significant time and monetary resources that Defendants would not otherwise have incurred. Plaintiffs pursued the continued option to present so-called "rebuttal"

1

opinions of Dr. Burch and, similarly, Dr. Orey, with the agreement that Plaintiffs would reasonably reimburse Defendants for the damage done. In their effort to escape the totality of that responsibility, Plaintiffs ignore the practical ramifications of their experts' improper rebuttal disclosures and wrongly blame Defendants for doing nothing more than defending Plaintiffs' do-over in the most reasonable manner available. For these reasons and those set forth herein, Defendants' motion should be granted in full.

## ARGUMENT

**I. PLAINTIFFS CONCEDE THAT THEY OWE DEFENDANTS AT LEAST $34,435.87 IN EXPERT WITNESS FEES.**

Plaintiffs acknowledge—as they must given their previous stipulation, Dkt. #143—that they "do not object to paying reasonable expert fees incurred in connection with the surrebuttal reports" of defense experts, as necessitated by the improper rebuttal disclosures two of Plaintiffs' expert witnesses, *viz.*, Dr. Burch and Dr. Orey. Dkt. #174 at 7 (p. 1). While Plaintiffs dispute the amount owed to Defendants, they concede that they owe Defendants the sum of at least $34,435.87 in recoverable expert witness fees pursuant to their previously-entered stipulation of record. Dkt. #173 at 3. *See also* Dkt. #143 at 2, ¶ 3. Thus, the Court should—at a minimum—award Defendants at least $34,435.87 in recoverable expert witness fees. But this figure grossly understates the approximately $120,000 that Defendants actually incurred solely as a result of the improper rebuttal disclosures of Dr. Burch and Dr. Orey.

**II. DEFENDANTS' MOTION FOR RECOVERY OF ATTORNEY'S FEES IS NOT FORECLOSED, AND ALL ATTORNEY'S FEES SOUGHT WERE THE SOLE CONSEQUENCE OF PLAINTIFFS' IMPROPER REBUTTAL DISCLOSURES AND WERE REASONABLY INCURRED.**

Plaintiffs argue that Defendants should be precluded from seeking recovery of attorney's fees because "attorneys' fees were neither sought by Defendants nor ordered by the Court pursuant

to Rule 37." Dkt. #174 at 17 (p. 11). Relatedly, Plaintiffs assert that "attorney's fees are not authorized under Rule 26(b)(4)(E)(i) and [were] never contemplated by this Court's Rule 37 order or Plaintiffs' stipulation." *Id.* at 15 (p. 9).

Plaintiffs have cited no authority requiring Defendants to seek recovery, in the alternative, of yet-to-be-incurred attorney's fees contemporaneously with a motion to strike improper expert rebuttal disclosures. No rule of law or procedure requires that such requests for relief be made concurrently, on penalty of waiver or otherwise. Nor did this Court's order of April 14, 2023, see Dkt. #140, adjudicate any request for recovery of attorney's fees. Therefore, that order did not foreclose a subsequent motion for recovery of attorney's fees made pursuant to FED. R. CIV. P. 37(c)(1)(A),(C). Plaintiffs' argument that Defendants are somehow presently barred from seeking recovery of attorney's fees pursuant to Rule 37 is accordingly misplaced.

Plaintiffs further argue that "the vast majority" of Defendants' claimed attorney's fees "would have been incurred regardless of Defendants' sur-rebuttals, because Plaintiffs would have deposed Defendants' experts regarding their initial reports regardless." Dkt. #174 at 18 (p. 12). That assertion is inaccurate and does not comport with the procedural history of this case. At the time Defendants filed their motion to strike Plaintiffs' improper expert disclosures on March 10, 2023, three rounds of expert reports had been served (i.e., Plaintiffs' initial reports, Defendants' initial reports, and Plaintiffs' "rebuttal" reports). At that time, there was no discussion between the parties' counsel about the prospect of deposing experts. Plaintiffs did not insist on deposing Defendants' experts until after Defendants served their surrebuttal reports. Only then did they seek such depositions, as permitted by the Court's "Order Extending CMO Deadlines," which allowed "discovery *related to those experts' sur-rebuttals*." Dkt. #146 (emphasis added).

3

As Plaintiffs concede in their response, consistent with the terms of the stipulation that Plaintiffs entered to avoid exclusion of their improper rebuttal disclosures, "'Defendants did not oppose the extension of 'discovery relevant to expert witness *rebuttal/sur-rebuttal issues*,' but conditioned that 'discovery *will not be reopened generally*.'" Dkt. #174 at 10 (p. 4) (emphasis added). To fully quote Plaintiffs' own motion for continuance on this point, Plaintiffs acknowledged in that motion that "Defendants do not oppose the granting of such a continuance, subject to the understanding that any extension of the discovery deadline will only permit discovery relevant to expert witness rebuttal/surrebuttal issues made the subject of the Court's April 14 Order and that discovery will not be reopened generally." Dkt. #143 at 1, ¶ 1.

Thus, it was not the mutual understanding of the parties—and more importantly, not the intention of this Court—that the expert discovery deadline be extended to permit expert discovery relative to Defendants' experts *outside the scope of their surrebuttal reports*. Those reports were limited in scope to responding to Plaintiffs' improper rebuttal disclosures; they would never have been written in the first place had Plaintiffs not submitted the improper rebuttal reports of Dr. Burch and Dr. Orey. And the surrebuttal depositions of Dr. Swanson and Dr. Bonneau would never have occurred had this Court not extended the expert discovery deadline for that express purpose as necessitated by Plaintiffs' improper rebuttal disclosures.

All of the attorney's fees for which recovery is sought relate directly to defense counsel's work on surrebuttal report preparation and surrebuttal expert depositions. Therefore, all such work was causally related to Plaintiffs' improper expert rebuttal disclosures and is compensable under FED. R. CIV. P. 37(c)(1)(A),(C). To find otherwise, the Court would have to both (1) disregard Plaintiffs' own representations in their April 26, 2023, motion for continuance, see *supra*, Dkt.

4

#143 at 1, ¶ 1; and (2) misconstrue its own Order of May 9, 2023, see *supra*, Dkt. #146. This Court should do neither.

Plaintiffs further argue that defense counsel's travel expenses for the deposition of Dr. Swanson were unreasonable because, Plaintiffs contend, the deposition could have been defended remotely. But that argument ignores the realities of attempting to defend—from another location—an expert deposition involving reams of statistical data displayed over a Zoom interface on a laptop screen. Dr. Swanson is an applied demographer who resides in the State of Washington. His expert deposition produced a total of 26 exhibits, all of which Plaintiffs' counsel questioned him about over the course of a full seven hours during his deposition. Plaintiffs' examination of Dr. Swanson was not conducive to a deposition defended over a computer from another location. For instance, at one point during the deposition, Dr. Swanson was asked to comment on raw data presented in a document containing hundreds of lines of information; defense counsel and Dr. Swanson had to use a ruler to ensure that Dr. Swanson referenced the correct lines in response to Plaintiffs' counsel's questions.

Anticipating issues of this nature and the practical problems inherent in defending an expert deposition remotely, defense counsel advised Plaintiffs' counsel prior to Dr. Swanson's deposition that if Plaintiffs insisted on deposing defense experts, Defendants would insist that Plaintiffs pay the reasonable travel expenses necessary to bring defense experts and defense counsel together for the experts' respective depositions. *See* Dkt. #173-3. As set forth *supra*, none of these travel expenses would have been incurred in the first place had these surrebuttal depositions not been necessitated by Plaintiffs' improper rebuttal disclosures. Defendants should not be forced to bear these expenses under the circumstances.

As a final point on attorneys' fees, Plaintiffs assert that Defendants have "failed to submit sufficient evidence on [the so-called *Johnson*] factors to carry their burden." Dkt. #174 at 22 (p. 16). But unlike Plaintiffs, Defendants are not seeking any lodestar adjustment based on the *Johnson* factors. Plaintiffs have cited no authority for the proposition that defendants must submit evidence on the *Johnson* factors where no upward adjustment of the fee award is sought under *Johnson*. Rather, as the "party advocating for the reduction of the lodestar amount," Plaintiffs "bear[] the burden of establishing that a reduction is justified" consistent with the *Johnson* factors. *See Louisiana Power & Light Co. v. Kellstrom*, 50 F.3d 319, 329 (5th Cir. 1995) (quotation marks omitted). Nor have Plaintiffs provided any evidence or authority supporting their requested arbitrary downward adjustment of the lodestar by 75% pursuant to *Johnson*. Such a sizeable reduction in the amount of attorney's fees actually incurred is unwarranted here—especially since two of three attorneys actively defending this case are salaried State employees for whom no fees are sought.

For these reasons and those set forth in Defendants' motion for recovery of fees and costs [Dkt. #166] and supporting memorandum of authorities [Dkt. #167], the Court should award Defendants the sum of **$29,621.40** in reasonable attorney's fees and expenses *actually incurred* by Defendants as a result of Plaintiffs' improper rebuttal disclosures.

### III. ALL OF THE SURREBUTTAL WORK PERFORMED BY DEFENSE EXPERTS WAS NECESSARY AND REASONABLE UNDER THE CIRCUMSTANCES.

#### A. All of the surrebuttal work performed by and at the direction of Dr. Swanson was necessary, reasonable, and within his total budgeted hours.

Plaintiffs argue that much of Dr. Swanson's work was unreasonable because he was, in Plaintiffs' words, forced "to learn a new subject solely for the purposes of this litigation." Dkt. #174 at 27 (p. 21). They further argue that "Dr. Swanson spent an inordinate number of hours

6

related to Dr. Burch's analysis of the CES dataset." *Id.* at 31 (p. 25). Plaintiffs accuse Defendants of "employ[ing] the wrong person for the job" and imply that Defendants should have retained a different expert to respond to Dr. Burch's improper rebuttal opinions regarding "King's Ecological Inference analysis" ("King's E.I."). *See id.* at 26-27 (pp. 20-21). Plaintiffs' arguments lose any force when one fairly considers the sequence of events related to Dr. Burch's substantial revision of her original opinions.

In her original report served in this case, Dr. Burch did not employ or reference King's E.I., nor did she utilize, analyze, or otherwise mention CES data. *See* Dkt. #119-3. Dr. Swanson was perfectly qualified to rebut the opinions contained in Dr. Burch's original report, as his 67-page CV will confirm. *See* Dkt. #119-6 at 35-101.[1] As this Court found in its Order entered April 14, 2023, Defendants "expended considerable time and financial resources to enable their applied demography expert, Dr. Swanson, to analyze and respond to the voter turnout opinion that Dr. Burch presented in her initial report." Dkt. #140 at 10. As this Court further found in its aforementioned Order, "While the initial opinion of Dr. Burch that White voter turnout exceeds Black voter turnout did not change, [her] rebuttal report is based on an entirely new set of data and analyses of that data that was occasioned by Dr. Burch realizing, after reading Dr. Swanson's expert report, that when properly analyzed, the CPS data actually supported the opposite of her opinion." Dkt. #140 at 7.

---

[1] Dr. Burch's belated substitution of CES data for U.S. Census data for purposes of analyzing voter turnout was unforeseeable. The U.S. Supreme Court was content to rely on U.S. Census data in comparing black turnout to white turnout when it declared the Voting Rights Act's § 4 "coverage formula" unconstitutional in *Shelby County, Ala. v. Holder*, 570 U.S. 529, 548 (2013) (citing Census Bureau's November 2012 "Reported Voting and Registration, by Sex, Race and Hispanic Origin, for States (Table 4b)"). The referenced "Table 4b," which may be found at https://www.census.gov/data/tables/2012/demo/voting-and-registration/p20-568.html, confirms in cell A577 that the data source is "U.S. Census Bureau, Current Population Survey, November 2012." Defendants were not obliged to staff this case at the outset on the supposition that Plaintiffs would attack both the Supreme Court and the Census Bureau. When they did, defense counsel and Defendants' experts had to scramble to adjust.

Having employed "an entirely new data set and new means of analysis" in her rebuttal report, *id.*, Dr. Burch fundamentally changed the character of the voter turnout analysis presented in her original report. Specifically, she substituted CPS data with CES data, which this Court noted "is a set of data that is nowhere used or identified in Dr. Burch's initial report." *Id.* at 3. She also "present[ed] 'a second method of estimating the racial gap in turnout'"—namely, King's E.I. *Id.* at 4. As this Court further noted, "[n]o such EI analysis appears in Dr. Burch's initial report." *Id.*

Confronted with these new data and voter turnout analyses in Dr. Burch's rebuttal report, Defendants had two choices. They could either (a) attempt to engage an entirely new expert familiar with CES data and skilled in King's E.I., yet unfamiliar with the instant litigation; or (b) rely on their existing experts to perform the work needed to address these newly-presented matters.

Hiring a new defense expert in midstream was not feasible for two reasons. First, any new expert would have been forced to get up to speed on this complicated, expert-driven Voting Rights Act case from scratch, reviewing all of the reports and data that Dr. Swanson had, by then, already reviewed in detail. And any new expert would almost certainly not have had the familiarity that Dr. Swanson—having spent part of his professional career in Mississippi—already had with Mississippi's relevant demographic features. Second, from a practical standpoint, attempting to retain a new expert quickly would have been extremely challenging. The ACLU attorneys driving this litigation on the plaintiffs' side have the benefit a ready bench of "experts" who routinely testify in redistricting litigation across the country. No such stable of experts exists on the defense side of Voting Rights Act litigation. Coupled with the typical reluctance of most academics to break ranks with peers and testify against the interests of the ACLU in favor of the State of Mississippi, this dearth of experts puts Defendants at a sizeable disadvantage in terms of speed and flexibility where expert review is concerned. Weighing these considerations in the balance,

8

the more efficient and pragmatic course was for Defendants to rely upon their existing experts to do the work necessary to address Dr. Burch's improper rebuttal disclosures. Under the circumstances, Defendants did not act unreasonably in doing so.

With regard to expert costs incurred in connection with Dr. Burch's newly-disclosed King's E.I. analysis, Defendants asked both of their experts—Dr. Swanson and Dr. Bonneau—to review Dr. Burch's King's E.I. analysis. Defense counsel had no way of knowing which of Defendants' experts 'knew what' or could 'learn what' relative to King's E.I. until posing the question to them both. Dr. Bonneau, a political scientist retained to rebut the opinions of Dr. Orey, is generally familiar with King's E.I. and its recognized limitations, see Dkt. #164-7 at 29-31 (depo. pp. 108-15); however, he has not conducted an ecological inference analysis himself since graduate school, *id.* at 5 (depo. p. 13), and does not consider himself "methodologically sophisticated enough to dig under the hood" where King's E.I. is concerned, see *id.* at 30 (depo. p. 112). Dr. Swanson, on the other hand, was retained for the purpose of rebutting Dr. Burch and had the requisite academic training as a demographer to get up to speed on King's E.I. with appropriate study. Accordingly, Defendants determined that the most reasonable course under the circumstances was to rely on Dr. Swanson to educate himself on these new issues that Dr. Burch belatedly injected well after Plaintiffs' expert designation deadline. All of this work was reasonable and made necessary solely as a result of Dr. Burch's improper rebuttal disclosures.

Plaintiffs further argue that Defendants should not be entitled to recover for expenses incurred for computational work performed by Dr. Swanson's data support contractor, Bryan GeoDemographics. Dr. Swanson's initial report candidly acknowledged that calculations upon which Dr. Swanson offers opinions in this case were made by Bryan GeoDemographics on his behalf. *See* Dkt. #119-5 at 40. It is not atypical for demographers to employ quantitative analysts

9

to provide data computations in connection with projects on which demographers have been engaged to offer their professional services. Plaintiffs offer no authority for the proposition that Defendants, who are responsible for paying these expenses, should be prohibited from recovering them from Plaintiffs under the circumstances. Plaintiffs knew or reasonably should have known—when they allowed Dr. Burch to fundamentally alter her opinions in this case—that Defendants' surrebuttal of those opinions would require additional work by Bryan GeoDemographics.

While Plaintiffs attack the credibility of opinion testimony offered in other cases by Tom Bryan, principal of Bryan GeoDemographics, neither Plaintiffs nor the courts in the cases they cite have attacked the reliability of his *calculations*. When it comes to factual, data-driven work product like that performed by Bryan GeoDemographics in this case, at least one federal district court recently found Mr. Bryan to be "an eminently believable witness" who "credibly testified" about his quantitative work product. *See Petteway v. Galveston County*, No. 3:22-cv-57, 2023 WL 6786025, at *27 (S.D. Tex. Oct. 13, 2023). Plaintiffs have no basis for objecting to Dr. Swanson's delegation of some computational work when they do not contest the results. Nor should they be exempted from paying for this work. All of Mr. Bryan's work in support of Dr. Swanson's surrebuttal report was reasonable and made necessary solely as a result of Dr. Burch's improper rebuttal disclosures.

As a final point about the surrebuttal work performed by Dr. Swanson and Bryan GeoDemographics: The 182.70 hours of surrebuttal report work for which Defendants seek recovery in connection with Dr. Swanson's work is consistent with the estimate that he provided in his declaration supporting Defendants' motion to strike Dr. Burch's improper rebuttal disclosure. *See* Dkt. #119-14 at 8, ¶ 16 ("In total, I estimate that it would take *between 164 and 180 person-hours* to critically examine the results found in Dr. Burch's rebuttal and write up the

results. This would be *added to the eight person-hours* it has already taken in reading her rebuttal, assessing it, and writing up this declaration.") (emphasis added). Plaintiffs previously criticized this estimate through a declaration from Dr. Burch, see Dkt. #130-1, whose admitted errors largely caused this dispute in the first place. But Plaintiffs never insisted—at any time, and certainly not prior to stipulating to the payment of reasonable expert fees with full knowledge of Dr. Swanson's estimate, Dkt. #143 at 2, ¶ 3—that Defendants should hire someone else to perform this work. For all these reasons, the Court should award Defendants the sum of **$81,621.54** in reasonable fees and expenses *actually incurred* by Defendants in connection with Dr. Swanson's surrebuttal work as a result of Plaintiffs' improper rebuttal disclosures.

**B. Plaintiffs offer no valid reason not to compensate Defendants for Dr. Bonneau's three-hour charge for deposition preparation.**

Plaintiffs concede that they "do not contest Dr. Bonneau's billing, except for 3 hours of his deposition preparation time," Dkt. #174 at 13 (p. 7), on the grounds that Dr. Bonneau "failed to distinguish between his own deposition preparation from time spent meeting with defense counsel," the latter of which Plaintiffs contend is not compensable, *id.* at 26 (p. 20).

The total deposition preparation time claimed by Dr. Bonneau was three hours. *See* Dkt. #166-6. Defendants submit that as a matter of course in this complicated Voting Right Act case, Dr. Bonneau should be afforded three hours of compensable deposition preparation time by default. Defendants would not have incurred this surrebuttal deposition-related expense at all but for the improper rebuttal disclosure of Dr. Orey and Plaintiffs' insistence on deposing Dr. Bonneau. *See* discussion *supra*, Part II. Defendants' request for reimbursement of three hours' deposition preparation time by Dr. Bonneau is reasonable under the circumstances. Accordingly, the Court should award Defendants the sum of **$9,206.33** in reasonable fees and expenses *actually*

11

*incurred* by Defendants in connection with Dr. Bonneau's surrebuttal work as a result of Plaintiffs' improper rebuttal disclosures.

## CONCLUSION

Plaintiffs filed this action challenging Mississippi's duly-enacted Supreme Court district lines under federal law. Plaintiffs knew from the outset that their § 2 Voting Rights Act claim would be expert-intensive. Plaintiffs alone bear the burden of proof. Solely as a result of avoidable legal and expert work caused by the improper rebuttal disclosures of two of Plaintiffs' experts, Mississippi taxpayers stand to be saddled with over $120,000 in actual fees and expenses that Defendants would not otherwise have incurred. Under the circumstances, it is only fair that the totality of these costs be laid at the feet of Plaintiffs.

For these reasons and those set forth in Defendants' memorandum of authorities [Dkt. #167], the Court should grant Defendants' motion and order Plaintiffs to tender payment, within 10 days of entry of this Court's order granting this motion, of the sum of $120,449.27 to the law firm of Wise Carter Child & Caraway, P.A., in payment of the aforesaid fees and costs actually incurred by Defendants as a result of Plaintiffs' improper expert rebuttal disclosures.

THIS the 9th day of January, 2024.

    Respectfully submitted,

    STATE BOARD OF ELECTION COMMISSIONERS, TATE REEVES, IN HIS OFFICIAL CAPACITY AS GOVERNOR OF MISSISSIPPI, LYNN FITCH, IN HER OFFICIAL CAPACITY AS ATTORNEY GENERAL OF MISSISSIPPI, AND MICHAEL WATSON, IN HIS OFFICIAL CAPACITY AS SECRETARY OF STATE OF MISSISSIPPI, DEFENDANTS

    By:    LYNN FITCH, ATTORNEY GENERAL
            STATE OF MISSISSIPPI

By: s/Rex M. Shannon III
REX M. SHANNON III (MSB #102974)
Special Assistant Attorney General

REX M. SHANNON III (MSB #102974)
GERALD L. KUCIA (MSB #8716)
STATE OF MISSISSIPPI
OFFICE OF THE ATTORNEY GENERAL
CIVIL LITIGATION DIVISION
Post Office Box 220
Jackson, Mississippi 39205-0220
Tel.: (601) 359-4184
Fax: (601) 359-2003
rex.shannon@ago.ms.gov
gerald.kucia@ago.ms.gov

MICHAEL B. WALLACE (MSB #6904)
WISE CARTER CHILD & CARAWAY, P.A.
Post Office Box 651
Jackson, Mississippi 39205-0651
Tel.: (601) 968-5500
Fax: (601) 944-7738
mbw@wisecarter.com

ATTORNEYS FOR DEFENDANTS STATE BOARD OF ELECTION COMMISSIONERS, TATE REEVES, IN HIS OFFICIAL CAPACITY AS GOVERNOR OF MISSISSIPPI, LYNN FITCH, IN HER OFFICIAL CAPACITY AS ATTORNEY GENERAL OF MISSISSIPPI, AND MICHAEL WATSON, IN HIS OFFICIAL CAPACITY AS SECRETARY OF STATE OF MISSISSIPPI

**CERTIFICATE OF SERVICE**

I, Rex M. Shannon III, Special Assistant Attorney General and one of the attorneys for the above-named State Defendants, do hereby certify that I have this date caused to be filed with the Clerk of the Court a true and correct copy of the above and foregoing via the Court's ECF filing system, which sent notification of such filing to all counsel of record.

THIS the 9th day of January, 2024.

s/Rex M. Shannon III
REX M. SHANNON III