THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
GREENVILLE DIVISION

DYAMONE WHITE; DERRICK
SIMMONS; TY PINKINS;
CONSTANCE OLIVIA SLAUGHTER
HARVEY-BURWELL                                                    **PLAINTIFFS**

VS.                                  CIVIL ACTION NO. 4:22-cv-00062-SA-JMV

STATE BOARD OF ELECTION
COMMISSIONERS; TATE REEVES
*in his official capacity as Governor of*
*Mississippi*; LYNN FITCH *in her*
*official capacity as Attorney General of*
*Mississippi*; MICHAEL WATSON *in*
*his official capacity as Secretary of*
*State of Mississippi*                                            **DEFENDANTS**

---

## DEFENDANTS' PRETRIAL BRIEF

---

### INTRODUCTION

Unlike Texas and several other states, Mississippi does not elect its Supreme Court Justices from the state at large.  From its earliest days, Mississippi has divided itself into three Supreme Court Districts stretching from the Mississippi River in the west to the Alabama border in the east. As new Justices have been added to the Supreme Court, Mississippi has not added new districts. Instead, it has added to the number of Justices elected from each district.  Since 1952, three Justices have been elected from each district.  1952 Miss. Gen. Laws ch. 468.

Plaintiffs' only claim is that "the district boundaries and/or districting scheme used by the State of Mississippi in electing the justices of the Mississippi Supreme Court [are] in violation of Section 2 of the Voting Rights Act," 52 U.S.C. § 10301. Amended complaint [Dkt. #133] at 47.

The relief they seek in ¶5 of the complaint is that "the district representing the center of the State -- District 1 -- could readily be redrawn in a manner consistent with traditional districting principles, to have a Black voting age majority, such that Black voters have an opportunity to elect candidates of choice."

This case is controlled by § 2 of the Voting Rights Act, 52 U.S.C. § 10301:

(a) No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color, or in contravention of the guarantees set forth in section 10303(f)(2) of this title, as provided in subsection

(b) A violation of subsection (a) is established if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. The extent to which members of a protected class have been elected to office in the State or political subdivision is one circumstance which may be considered: Provided, That nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population.

There are court decisions applying the statute, but the Court's job is to enforce the statute. The controlling question is whether black voters have equal opportunity. They do.

Defendants hereafter will address particular substantive and evidentiary issues that this Court is likely to confront during the course of this trial. In considering those issues, however, this Court should always keep in mind that § 2 guarantees to the black voters of the Central District an equal opportunity to participate and to elect Justices, not that their favored candidate will win every election.

I.  **THE BOUNDARIES OF MISSISSIPPI'S CENTRAL SUPREME COURT DISTRICT, TWICE APPROVED BY THE FIFTH CIRCUIT, CONTINUE TO PROVIDE EQUAL OPPORTUNITY TO BLACK VOTERS.**

The Supreme Court originally authorized the use of § 2 to divide election districts choosing multiple legislators or multiple executive officers into single-member districts in *Thornburg v. Gingles*, 478 U.S. 30 (1986).  In *Growe v. Emison*, 507 U.S. 25 (1993), the Supreme Court allowed single-member legislative districts to be challenged under § 2.  Neither the Supreme Court nor the Fifth Circuit has ever approved the use of § 2 to redraw districts employed in the election of judges. Indeed, the Fifth Circuit has refused to employ § 2 to require Texas to divide its multi-member judicial districts into single-member districts.  *League of United Latin American Citizens v. Clements*, 999 F.2d 831 (5th Cir. 1993) (en banc).  *Accord*, *Fusilier v. Landry*, 963 F.3d 447 (5th Cir. 2020).

That is not to say that § 2 has no application to judicial elections; the Supreme Court has held that judges are "representatives" within the meaning of § 2 for purposes of election. *Chisom v. Roemer*, 501 U.S. 380, 395-96 (1991).  It is to say that the application of § 2 to legislative districts, recently reaffirmed in *Allen v. Milligan*, 599 U.S. 1 (2023), has not been held to govern judicial elections in every respect.  Instead, *Clements* indisputably teaches that § 2 must be applied differently in some respects.

Here, however, it should not be necessary to determine the extent to which the application of § 2 differs from the law created in *Gingles*.  The Fifth Circuit has twice held that the boundaries of Mississippi's Supreme Court Districts do not violate § 2(b), which authorizes relief where "the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) in that its members have less opportunity than other members of the electorate to participate in the

political process and to elect representatives of their choice." In 1992, Judge Barbour found that the boundaries did not deny black voters an equal opportunity to elect Justices of their choice. *Magnolia Bar Ass'n, Inc. v. Lee*, 793 F. Supp. 1386 (S.D. Miss. 1992), *aff'd,* 994 F.2d 1143 (5th Cir. 1993), *cert. denied*, 510 U.S. 994 (1993). In 1999, Judge Lee similarly rejected a § 2 challenge to those same boundaries as used to elect members of the Public Service Commission and the Transportation Commission. *NAACP v. Fordice*, No. 3:92-cv-250-LN (S.D. Miss. July 7, 1999),[1] *aff'd,* 252 F.3d 361 (5th Cir. 2001). These appellate decisions are binding on this Court unless plaintiffs can demonstrate that something has changed so that boundaries which provided equal opportunity in 1992 and 1999 no longer do so. That is what they attempt to do in ¶¶48-49 of their amended complaint.

It takes no detailed analysis of the facts or the law to determine that the boundaries of the Central District continue to provide the equal opportunity required by § 2(b). The three current Justices from the Central District are Leslie King, a black former Democratic legislator, James Kitchens, a white former Democratic district attorney endorsed by Representative Bennie Thompson and supported by a majority of black voters, and Kenneth Griffis, a white former Court of Appeals Judge originally appointed by Republican Governor Phil Bryant and elected in 2020. It is hard to imagine finding a more equal district anywhere in the country. Moreover, the same boundaries have been employed in the elections of Willie Simmons, a black candidate for the Transportation Commission elected in 2019 and 2023, and De'Keither Stamps, a black candidate for the Public Service Commission, elected in 2023.

To the extent that *Gingles* applies to judicial elections, it is ludicrous to suggest, as *Gingles* requires, that in District 1 "the white majority votes sufficiently as a bloc to enable it … usually to

---

[1] A copy of this opinion is submitted herewith as Exhibit 1.

defeat the minority's preferred candidate." 478 U.S. at 51. Plaintiffs allege in ¶54 that in 2020, the year of the last census, "[t]he Black voting age percentage of the population in District 1 was about 49%." The evidence will show that when non-citizens ineligible to vote are excluded from the census numbers , blacks make up 51% of the eligible voting age population. Plaintiffs cannot and do not explain how the white minority somehow votes as a bloc usually to defeat the preferred candidate of the black majority.

II.     **PLAINTIFFS MUST AND CANNOT PROVE THAT THE RESULTS OF ELECTIONS FOR SUPREME COURT JUSTICE ARE "ON ACCOUNT OF RACE OR COLOR," AS § 2(a) REQUIRES.**

In an opinion entered just last week, *Miss. State Conf. of the NAACP v. State Board of Election Commissioners*, No. 3:22-cv-734-DPJ-HSO-LHS [Dkt. 224], 2024 WL 3275965 (S.D. Miss. Jul. 2, 2024) ("*NAACP*"), the District Court (a three-judge panel) heard substantially the same evidence as this Court will hear concerning elections of Justices in the Central District of Mississippi and found it insufficient. There, plaintiffs' expert analyzed Supreme Court elections in order "'to rebut the contention that it could be party not race' causing these results, and she concluded polarization was present 'regardless of the fact that party was not on the ballot.'" *NAACP*, slip op. at 71, 2024 WL 3275965, at *31 (quoting testimony). That is crucial because the Fifth Circuit held in *Clements* that § 2 is not violated where election results are caused by party, not race. *Clements*, 999 F.2d at 854 ("failures of a minority group to elect representatives of its choice that are attributable to 'partisan politics' provide no grounds for relief"; "§ 2 is implicated only where Democrats lose because they are black, not where blacks lose because they are Democrats"). This distinction, compelled by the language of § 2(a) that plaintiffs prove that their alleged injury is "on account of race or color," and not something else, cannot be satisfied by plaintiffs here.

5

Examining elections for Supreme Court Justices, plaintiffs' expert in the *NAACP* case "found sharp racial polarization in the two contests in which the black candidate won in a district with a voting-age population fairly evenly divided between black citizens and white citizens." *NAACP*, slip op. at 70, 2024 WL 3275965 at *31. That district, of course, is the Central District under consideration here. Although party names do not appear on the ballot, the Court acknowledged the evidence of partisan participation in those elections, and concluded:

> We agree with the Plaintiffs that not all voters would be aware of the partisan alliances behind individual supreme court candidates. Nonetheless, a high-enough percentage of voters knows which party supports which judicial candidate for us to reject Dr. Handley's factual claims as to these elections.

*Id.*, at 71, *32. The factual claims rejected by the Court were that racial "polarization was present 'regardless of the fact that party was not on the ballot.'" *Id.*, at 71, *31 (quoting testimony).

Under *Gingles*, racial polarization is a prerequisite which must be proven before the Court begins to consider the statutory question of whether equal opportunity has been denied to blacks "on account of race or color." This Court will hear plaintiffs' expert contend that Supreme Court elections in the Central District are racially polarized, so as to satisfy that prerequisite. Defendants' expert will explain that those election results are due to party, not race. The Court in *NAACP* heard essentially the same evidence that is presented by the plaintiffs here and rejected plaintiffs' factual assertion. That finding did not end that dispute over legislative elections, but it ends this one. Because elections for Supreme Court Justices are not racially polarized, plaintiffs cannot prove that their supposed injury is "on account of race or color."

## III.  *ALLEN* NOW CONTROLS HOW *GINGLES* APPLIES IN LEGISLATIVE REDISTRICTING DISPUTES.

In *Allen*, five Justices refused to abandon the analysis developed by *Gingles*. 599 U.S. at 24. Five Justices, however, did not fully agree on what *Gingles* means and how it should be

applied.   Only four Justices joined Part III-B-1 of *Allen,* which discussed the use of illustrative

maps to establish the first *Gingles* consideration.  Those Justices acknowledged that, in showing

"that an additional majority-majority district could be drawn," *id.*, at 33, "the line between racial

predominance and racial consciousness can be difficult to discern." *Id.*, at 31.  They found that the

line had not been crossed in that case.

Justice Kavanaugh did not join that portion of the opinion and wrote a concurrence to

clarify his views.  He explained:

> *Gingles* requires the creation of a majority-minority district only when, among
> other things, (i) a State's redistricting map cracks or packs[2] a large and
> "geographically compact" minority population and (ii) a plaintiff's proposed
> alternative map and proposed majority-minority district are "reasonably
> configured" -- namely, by respecting compactness principles and other
> traditional districting criteria such as county, city, and town lines.

*Id.*, at 43 (Kavanaugh. J., concurring).  Because the concurrence explains Justice Kavanaugh's

controlling vote on this issue, these are the principles which this Court must apply in this case.[3]

Here, plaintiffs do not contend that the Legislature has packed an excessive number of

black voters into the Central District in order to avoid the creation of more black-majority districts

elsewhere.  Instead, they must establish that the Legislature cracked "a large and 'geographically

compact' minority population."  A classic example of cracking is found in *Kirksey v. Board of*

*Supervisors of Hinds County, Mississippi*, 554 F.2d 139 (5th Cir. 1977) (en banc), *superseded by*

---

[2] In *Thomas v. Bryant*, 919 F.3d 298, 310 (5th Cir. 2019), the Fifth Circuit defined "cracking" as "dividing minority voters among various districts to weaken their strength" and "packing" as "concentrating minority voters in one or a small number of districts where they make up an excessive majority and they reduce that group's influence in other districts."  Although the subsequent panel opinion, *Thomas v. Bryant*, 938 F.3d 134 (5th Cir. 2019), was vacated and the complaint dismissed as moot by the en banc Court, *Thomas v. Bryant*, 961 F.3d 800 (5th Cir. 2020) (en banc), these definitions remain useful for understanding cracking and packing.

[3] *See Marks v. United States,* 430 U.S. 188, 193 (1977) ("When a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, 'the holding of the Court may be viewed as that position taken by those Members who concurred in the judgment on the narrowest grounds ….'", quoting *Gregg v. Georgia*, 428 U.S. 153, 169 n. 15 (1976) (opinion of Stewart, Powell, and Stevens, JJ.).  *See also United States v. Mississippi*, 82 F.4th 387, 394 n. 11 (5th Cir. 2023) (stating that a "concurrence in the judgment on narrower grounds supplied the judgment's fifth and controlling vote," citing *Marks*).

*statute on other grounds as stated in Clements*, 999 F.2d at 866, where the geographically compact black neighborhoods of Jackson were divided into multiple parts and attached to districts extending through rural countrysides to the furthest limits of Hinds County. The Court described the county as being "divided into five single member districts of almost equal population" with each district being "a long corridor radiating outward from the city of Jackson, broader in the rural land mass perimeter, narrower in the Jackson urban area" and with each corridor cutting into the central area of Jackson where the county's black community was concentrated. *Id.*, at 141.

Here, plaintiffs appear to contend that the Supreme Court district lines cracked the Delta. Leaving aside the arguments about what and where the Delta is, the east-west configurations of Mississippi Supreme Court districts were first established almost two centuries ago, long before the Delta had much population at all. Thus, plaintiffs do not challenge the initial establishment of lines, as in the *Kirksey* case, but rather the continuation of lines notwithstanding changing demographic trends over the last two centuries. No precedent supporting such an approach has been identified.

In addition, it must be shown that plaintiffs' proposed maps are "reasonably configured." Justice Kavanaugh declared that such maps must respect "traditional districting criteria."[4] The traditional districting criterion applied to Mississippi Supreme Court districts for almost two centuries has been to divide the state from east to west. Some of the maps proposed by plaintiffs differ from that tradition significantly.[5]

---

[4] The four dissenting Justices in *Allen* concluded that plaintiffs must supply "an objective 'undiluted' benchmark" which "must be *race neutral*." 599 U.S. at 51, 52 (Thomas, J., dissenting) (emphasis in original). At the very least, they would agree with Justice Kavanaugh's position that a map must employ "traditional districting criteria."

[5] Plaintiffs have dropped their claim of intentional racial gerrymandering. There, it is important, but not mandatory, to present a map showing how the Legislature could have accomplished its goals "with greater racial balance." *Alexander v. South Carolina State Conf. of the NAACP*, 602 U.S. ____, 144 S.Ct. 1221, 1235 (2024). *See also Cooper v. Harris*, 581 U.S. 285, 318 (2017). Here, Judge Barbour has found that the State's purpose in drawing

Because neither the Supreme Court nor the Fifth Circuit has had further occasion to expound on Justice Kavanaugh's concurrence, not much more can be said about these two principles.[6]  It is not clear whether they present issues of law or issues of fact.  It is enough at this point to note that *Gingles* cannot force States "to group together geographically dispersed minority voters into unusually shaped districts, without concern for traditional districting criteria."  *Allen*, 599 U.S. at 43 (Kavanaugh J., concurring).  Whether it is a matter of fact or law, this Court must take this restriction into account in evaluating plaintiffs' proposed maps.

## IV.   SECTION 2 DOES NOT AND COULD NOT ALLOW COURTS TO CHANGE THE NATURE OF STATE JUDGESHIPS BY CHANGING DISTRICT BOUNDARIES.

Neither the Supreme Court nor the Fifth Circuit has ever held that § 2 authorizes a court to rearrange the boundaries of the districts from which state judges are elected.  Nor has either court ever considered whether Congress could constitutionally bestow such power upon the federal courts.  Certainly, *Allen* reaffirmed that Congress constitutionally authorized federal courts to revise the districts of legislative representatives.  This Court must determine whether Congress has

---

district lines from east to west was to diversify the population in each district so that no portion of the electorate could gain undue control over any Justice.  *Magnolia Bar*, 793 F. Supp. at 1411.  Plaintiffs should address whether and how any of their maps preserve that purpose.

[6] Last week, the three-judge panel in *NAACP* found that Justice Kavanaugh's concurrence had no effect on the first prerequisite of *Gingles*, which requires that "the 'minority group must be sufficiently large and [geographically] compact to constitute a majority in a reasonably configured district.'"  *NAACP*, slip op. at 26, 2024 WL 3275965, at *13, quoting *Allen*, 599 U.S. at 18, quoting *Wisconsin Legislature v. Wisconsin Elections Comm'n*, 595 U.S. 398, 400 (2022) (brackets in original).  The Court reasoned, "It is difficult to interpret anything else Justice Kavanaugh wrote as being an alteration of what he accepted as the majority's understanding of precondition one."  *NAACP*, slip op. at 26, 2024 WL 3275965, at *13.  It is true that Justice Kavanaugh joined Part II-A of the majority opinion, but it is equally true that he rejected Part III-B-1 of the plurality opinion.  There, Alabama argued that maps submitted to satisfy the prerequisite of *Gingles* could not be "'based' on race."  599 U.S. at 30, quoting Brief for Alabama 56.  After announcing his summary of the two prerequisites to the first requirement of *Gingles*, *Allen*, 599 U.S. at 43 (Kavanaugh, J., concurring), he continued: "To ensure that *Gingles* does not improperly morph into a proportionality mandate, courts must rigorously apply the 'geographically compact' and 'reasonably configured' requirements."  *Id.* at 44 n. 2 (Kavanaugh, J., concurring).  Thus, while Justice Kavanaugh joined the majority's short description of the first prerequisite of *Gingles,* he explained in more detail how that description must be applied to the evidence actually before the Court.

9

3003834v8

authorized it to revise the boundaries of judicial districts and, if so, whether the Constitution grants Congress that power.

Judges are different from legislative representatives. Legislative representatives are supposed to be responsive to the people who elect them, and *Gingles* explains that the courts considering § 2 actions can take responsiveness into account. 478 U.S. at 45. The job of judges, however, is to administer the law impartially, not to be responsive to the views and desires of the voters who elect them. That analysis is as true today as it ever was.[7]

In *Chisom v. Roemer*, 917 F.2d 187 (5th Cir. 1990), *rev'd*, 501 U.S. 380 (1991), the Fifth Circuit, applying its decision in *LULAC v. Clements*, 914 F.2d 620 (5th Cir. 1990), *rev'd sub nom. Houston Lawyers' Ass'n v. Attorney General of Texas*, 501 U.S. 419 (1991), ordered the dismissal of all Voting Rights Act claims because, in *LULAC*, the Court had concluded that judges were not representatives in the same sense as those in the legislative and executive branches. *LULAC*, 914 F.2d at 622. This decision was reversed by the Supreme Court. But the Supreme Court in *Chisom* did not disagree with the Fifth Circuit's understanding of a judge's responsibility and even stated that "[t]he *LULAC* majority was … entirely correct in observing that … ideally public opinion should be irrelevant to the judge's role because the judge is often called upon to disregard, or even to defy, popular sentiment." 501 U.S. at 400.

Nevertheless, the Court reasoned that the language Congress adopted in 1982 to broaden the reach of § 2 beyond the Fifteenth Amendment could not have been intended to remove judicial elections from its scope. Were that the case, States could prevent blacks from voting altogether in

---

[7] Less than two weeks ago, Justice Gorsuch explained at length the distinction between judges and the officers of the other branches of government. *Loper Bright Enterprises, Inc. v. Raimondo*, 603 U.S. ___, No. 22-451, No. 22-1219, 2024 WL 3208360 (June 28, 2024) (Gorsuch, J., concurring). He observed that judges should not "usurp lawmaking powers vested in periodically elected representatives," but should be "a neutral party 'to interpret and apply' the law without fear or favor in a dispute between others." Slip op., at 6, 2024 WL 3208360, at *25 (Gorsuch, J., concurring) (citation omitted). *Cf. Trist v. Child*, 88 U.S. 441, 453 (1874) ("The law is no respecter of persons."). Neutrality necessarily precludes any obligation to be responsive to the electorate or any portion of it.

judicial elections.  *See Chisom*, 501 U.S. at 398 ("If the word 'representatives' did place a limit on the coverage of the Act for judicial elections, it would exclude all claims involving such elections from the protection of § 2.").  Accordingly, judges were held to be "representatives" within the language of § 2,[8] but the Supreme Court did not hold that they should be considered representatives for all purposes under the common meaning of that term.

Although neither the Supreme Court nor the Fifth Circuit has ever done so, plaintiffs ask this Court to treat elected judges exactly like legislative representatives.  Instead of dividing communities of interest, as Judge Barbour held Mississippi has always attempted to do, *Magnolia Bar*, 793 F. Supp. at 1411, 1417, they insist that what they regard as a community of interest be gathered into the Central District so that black voters can invariably control the outcome of elections.  It is one thing to unite supposed communities of interest so that those communities may expel legislative representatives who are not deemed responsive to their needs.  But that is a threat that Mississippi has not chosen to hang over the heads of Supreme Court Justices, who are supposed to be neutral and impartial.

Plaintiffs' objective, then, is to change not only the boundaries of the Central District but the jobs of the Justices elected therefrom.  Instead of being servants of the law, the Justices would be servants of the voters who elect them, and those voters, according to plaintiffs, must be black. If either the Fourteenth or Fifteenth Amendments required judges to be responsive to black voters, that requirement would exist for appointed judges as well as elected judges.  Defendants are aware of no case suggesting that such a constitutional requirement exists, and neither the Supreme Court nor the Fifth Circuit has ever imposed such a requirement on elected judges.  Defendants know of

---

[8] *See Chisom*, 501 U.S. at 399 (Court determines that "the better reading of the word 'representatives' describes the winners of popular elections" and states that "[i]f executive officers, such as prosecutors, sheriffs, state attorneys general, and state treasurers, can be considered 'representatives' simply because they are chosen by popular election, then the same reasoning should apply to elected judges").

no case suggesting that either the Fourteenth or Fifteenth Amendment empowers Congress to create such a requirement by statute. This Court should reject plaintiffs' contention that Congress intended to exercise a power it does not have.

## V. BECAUSE THE BLACK REGISTERED VOTER MAJORITY IS NOT ILLUSORY, NO RELIEF CAN BE GRANTED.

The undisputed evidence will show that 51% of the population of voting age citizens in the Central District are black. Because Mississippi's voter rolls do not identify registered voters by race, there can be no actual count of racial percentages among the registered voters in the Central District. However, undisputed surveys by the United States Census Bureau show that blacks register at a slightly higher rate than whites in Mississippi. It follows that the black majority of eligible voters in the Central District necessarily constitutes a black majority of registered voters. Where black voters constitute a voting majority in a district, it is very hard to see how they can have "less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice," as § 2(b) requires.

The Fifth Circuit has squarely held that plaintiffs may carry their burden of proof only when they "prove, for example, that [the protected class's] registered voter majority is illusory." *Salas v. Southwest Tex. Jr. Coll. Dist.*, 964 F.2d 1542, 1555 (5th Cir. 1992), *reh'g denied*, 973 F.2d 927 (5th Cir. 1992). There, Hispanic voters claimed to have been denied equal opportunity by the "use of the at-large system as opposed to single member districts." *Id.*, at 1543. Although plaintiffs here do not seek to divide a multi-member district into single-member districts, the principles of *Salas* should be no less controlling. When the Supreme Court applied § 2 to single-member districts for the first time, it noted that single-member districts carry less danger than at-large systems of denying equal opportunity. *Growe*, 507 U.S. at 40. The Court held that plaintiffs should

12

carry at least as heavy a burden of proving a § 2 violation in such circumstances as in attacking an at-large system. *Id.*, at 40-41.

In *Salas*, the Court rejected two different arguments by plaintiffs that their majority was illusory. First, the plaintiffs "attempted to prove that a significant portion of the Hispanic population was unavailable to vote on the date of the election, because of migrant work." 964 F.2d at 1556. However, they failed to prove the number of people actually absent on election day or "the inadequacy of absentee voting procedures to allow migrant workers absent from the District to vote." *Id.* Second, they argued that "low turnout at elections was the result of prior official discrimination." *Id.* There was some evidence that Hispanics turned out to vote at a rate lower than other voters, but "they offered no evidence directly linking this low turnout with past official discrimination." *Id.* The Court added that "the high incidences of Hispanic *registration* in the District is persuasive evidence that Hispanic voters are not deterred from participation in the political process because of the effects of prior discrimination." *Id.* (emphasis in original).

Here, Plaintiffs have made no attempt to address the standards set forth in *Salas*. They do not contend that a significant portion of their voter majority is absent from the Central District when general elections are held in November. They acknowledge that Census Bureau statistics, upon which the Supreme Court of the United States relied in *Shelby County, Ala. v. Holder*, 570 U.S. 529, 535 (2013), show that black turnout regularly exceeds white turnout in Mississippi. They rely on one survey to allege that white turnout exceeded black turnout in a single election, the 2020 general election, but three other sources are consistent with the Supreme Court's finding in *Shelby County*. More importantly, even if black turnout may have dipped in the single election addressed by plaintiffs, they do not challenge the finding of the Census Bureau that black registration rates

exceed those of whites. That factor was crucial to the holding in *Salas* that Hispanic voters were not denied equal opportunity, and it is controlling here.

Three and a half decades ago, the Fifth Circuit reasoned that § 2 could, in a proper case, authorize the division of an at-large system into single-member districts notwithstanding a black population majority. *Monroe v. City of Woodville*, 881 F.2d 1327 (5th Cir. 1989), *modified on reh'g*, 897 F.2d 763 (5th Cir.), *cert. denied,* 498 U.S. 822 (1990). The Court questioned, without deciding, whether the third prerequisite of *Gingles* – "whether the white bloc vote is legally significant, *i.e.*, whether it usually operates to defeat the black candidate" – could apply in a black majority district. 881 F.2d at 1333. Because plaintiffs' proof failed in other respects, the Court affirmed the denial of relief without resolving that issue. In so doing, the Court expressly declared its expectation that any such possibility would be overcome in the future:

> As *de jure* restrictions on the right to vote mercifully recede further into the historical past, we should expect it to be increasingly difficult to assemble a *Zimmer*-type voting rights case against an at-large electoral district where a minority-majority population exists.

*Id.*, citing *Zimmer v. McKeithen*, 485 F.2d 1297 (5th Cir. 1973) (en banc), *aff'd sub nom. East Carroll Par. Sch. Bd v. Marshall*, 424 U.S. 636 (1976). The Court in *Salas* took that guidance into account in holding that the Hispanic majority had failed to make a case.

The Fifth Circuit has had no occasion to retreat from *Salas* in subsequent years. Indeed, the Supreme Court strengthened the reasoning underlying *Salas* when it issued *Bartlett v. Strickland*, 556 U.S. 1 (2009). As the Fifth Circuit recognized in *Fusilier,* the objective of a § 2 suit is to provide the remedy of a majority-minority district. "[T]he majority-minority rule relies on an objective numerical test: Do minorities make up more than 50 percent of the voting-age population in the relevant geographic area?" 963 F.3d at 456, quoting *Bartlett*, 556 U.S. at 18. Of course, the Supreme Court has recognized that a voting age majority might disappear where non-

14

citizens are discounted, as they must be. *LULAC v. Perry*, 548 U.S. 399, 429 (2006). But that is not the case here. Here, after discounting non-citizens, blacks have a voting age majority. That majority is by no means illusory.

Applying the binding holding of *Salas* to the facts of this case mandates the common-sense conclusion that the 51% black voting majority does not and cannot have less opportunity than the remaining 49% of the electorate. All the expert testimony in the world cannot overcome the simple truth of grade-school math. The boundaries of the Central District do not deny equal opportunity to the black voters residing therein.

## VI. THE RESULTS TEST OF § 2 IS NOT VIOLATED UNLESS BLACK PARTICIPATION IN THE POLITICAL PROCESS IS NOT EQUAL TO THAT OF OTHER VOTERS.

To secure relief under § 2(b), plaintiffs must prove that black citizens "have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." When the boundaries of the Central District were previously reviewed by the Fifth Circuit, that Court declared that plaintiffs "bore the burden to demonstrate that the African-American citizens of Mississippi 'do not in fact participate to the same extent as other citizens.'" *Fordice*, 252 F.3d at 368, quoting *Clements*, 999 F.2d at 866. Evidence of participation in other contexts is not sufficient; rather, plaintiffs must show "that minority voters *in this case* have failed to participate equally in the political process." *Clements*, 999 F.2d at 867 (emphasis in original).

Here, Plaintiffs seek to carry this burden by proving that whites voted in the 2020 election at a rate higher than non-whites.[9] Of course, the Census Bureau, on which the Supreme Court

---

[9] Remarkably, although plaintiffs' proposed expert Dr. Traci Burch also found that non-black voter participation exceeded black participation, she never directly compared black and white voter turnout. In the close races that are typical in the Central District, the participation of Choctaws, Hispanics, and Delta Chinese may

3003834v8

relied in *Shelby County*, and two other sources contradict plaintiffs' testimony, but it should not be necessary for this Court to resolve that conflict. The Fifth Circuit has reversed a finding of § 2 liability where plaintiffs did not prove a general history of depressed participation. "[E]vidence of one or two elections may not give a complete picture as to voting patterns within the district generally." *Rangel v. Morales*, 8 F.3d 242, 246 (5th Cir. 1993).

It should be noted that the one election plaintiffs chose to examine for turnout purposes was hardly typical. This Court can take judicial notice of the orders it posted on its doors to restrict access during the COVID-19 pandemic. Many voters may have been as cautious about going outside as this Court was about permitting them inside. A single survey of a single election conducted during a national disaster is hardly sufficient to meet the requirement of *Rangel* to prove general inequality of opportunity.

## VII. PLAINTIFFS' HISTORICAL EXPERTS' "EVIDENCE" IS OF LITTLE OR NO RELEVANCE.

Plaintiffs intend to offer two supposed experts in history and political science to discuss official discrimination in voting going back to 1890. There are two problems with this approach. First, laws established in 1890 have very little relevance to a statute adopted in 1987 and held valid as recently as 1999. Second, in the unlikely event that any of that history might be relevant to the boundaries of the Central District today, academic testimony is not the way to prove it. Defendants are entitled to challenge the admissibility of the evidence at trial.

### 1. Relevance

The Fifth Circuit has already established that history has very little effect on the operation of the challenged statute today. In *Clements*, 999 F.2d at 866, the Court noted that "Texas' long

_____

be important. Plaintiffs have never suggested that candidates favored by blacks lack equal opportunity to compete for the votes of those groups.

history of discrimination" was not disputed by the parties and that the "plaintiffs' assertion that disparities between whites and minority residents in several socioeconomic categories are the tragic legacies of the State's discriminatory practice" was not questioned. The Court, however, agreed with the defendants "that these factors, by themselves, are insufficient to support the district court's 'finding' that minorities do not enjoy equal access to the political process absent some indication that these effects of past discrimination *actually hamper the ability of minorities to participate*." *Id.* (emphasis added). *See also Fordice*, 252 F.3d at 368 ("Absent an indication that these facts 'actually hamper the ability of minorities to participate,' they are, however, insufficient to support a finding that minorities suffer from unequal access to Mississippi's political process."), quoting *Clements*, 999 F.2d at 866.

The Court in *Clements* admitted that it had held in cases before amendments to § 2 that "evidence of decreased participation among minorities was unnecessary on grounds that '[i]nequality of access is an inference which flows from the existence of economic and educational inequalities,'" but that "[t]his standard … was challenged by some of our later cases … and was decisively rejected by Congress in 1982." 999 F.2d at 866, quoting *Kirksey*, 554 F.2d at 145. The Court went on to quote from the Senate Report as follows:

> The courts have recognized that disproportionate educational, employment, income level and living conditions arising from past discrimination tend to depress minority political participation. Where those conditions are shown, *and where the level of black participation in politics is depressed*, plaintiffs need not prove any further causal nexus between their disparate socio-economic status and the depressed level of political participation.

*Clements*, 999 F.2d at 866-67 (quoting S.Rep. 417 at 29 n. 114, *reprinted in* 1982 U.S.Code Cong. & Admin.News at 207 n. 114) (emphasis by Court). The Court thus held that the district court's holding—*viz.*, "that socioeconomic disparities and a history of discrimination, without more,

sufficed to establish" two of the *Zimmer* factors—"employed the wrong legal standard." *Clements*, 999 F.2d at 867.

Accordingly, evidence must "properly link the effects of past and current discrimination with the racially disparate effects of the challenged law." *Veazey v. Abbott*, 830 F.3d 216, 246 (5th Cir. 2016) (en banc). In establishing such a link, "contemporary examples of discrimination are more probative than historical examples," and "long-ago evidence of discrimination has less force than more contemporary evidence." *Id*., at 257-58. Plaintiffs in the pretrial order complain of "at-large voting, felon disenfranchisement, and restrictions on early voting and absentee voting." Unlike Texas, Mississippi does not elect Supreme Court Justices at large, and, unlike their predecessors in *Magnolia Bar*, plaintiffs here do not ask this Court to divide the state into nine districts instead of three. The en banc Fifth Circuit has held that Mississippi's felon-disenfranchisement laws do not unconstitutionally discriminate on the basis of race. *Harness v. Watson*, 47 F.4th 296 (5th Cir. 2022) (en banc), *cert. denied*, 143 S. Ct. 2426 (2023). Finally, plaintiffs' amended complaint does not claim that there is anything illegal or unconstitutional about the provisions for early voting and absentee ballots, which apply to Mississippi voters of all races.

As discussed further below, plaintiffs cannot show that the level of minority political participation in Supreme Court Central District elections is depressed. In fact, Judge Lee found 25 years ago that black and white political participation in Mississippi had reached parity. *Fordice*, Exhibit 1, at 30; *see also Fordice*, 252 F.3d at 368 (plaintiffs' own expert "acknowledged that in recent years Mississippi's African-American and white citizens have maintained virtual parity in voter turnout"). Indeed, black registration rates exceed white voters according to the Census Bureau, and multiple studies have found that black turnout tends to exceed white turnout in Mississippi elections. Without being able to show depressed levels of participation, plaintiffs'

evidence as to historical discrimination is simply not relevant. *See Clements*, 999 F.2d at 867 ("Plaintiffs have offered no evidence of reduced levels of black voter registration, lower turnout among black voters, or any other factor tending to show that past discrimination has affected their ability to participate in the political process.").

## 2. Academic testimony

Other courts have reached diverse decisions on whether the opinions of supposed academic experts will help the Court understand the evidence or determine a fact in issue. While authorizing a witness to testify as an expert historian, one Court of Appeals nevertheless noted that "[t]he appropriate way to deduce factual details of specific past events is, where possible, through persons who witnessed those events." *United States v. Kantengwa*, 781 F.3d 545, 561 (1st Cir. 2015) (approving expert testimony), quoting *Marvel Characters, Inc. v. Kirby*, 726 F.3d 119, 136 (2d Cir. 2013) (excluding expert testimony). The Court approved "expert testimony accessing a particular historical detail (not others' states of mind) in light of the consistency of that detail and testimonial accounts and other corroborative sources about an otherwise contentious historical event, and in light of the narrative consistency of that particular historical detail with other political events in the historical record." *Kantengwa*, 781 F.3d at 562-63. The Court noted that such evidence "may be especially helpful 'in cases involving complicated or unfamiliar historical issues.'" *Id.*, at 562. Applying those principles, the Court admitted an expert opinion was "about the existence and timing of the Hotel Ihuriro roadblock" during the Rawandan genocide which was "largely based on conversations with the people he knew in Butare, twenty to twenty-five formal interviews (not all relevant), and the work of collaborators." *Id.*, at 561.

Nothing in their expert reports suggests that Dr. King or Dr. Campbell has interviewed any Mississippians or conducted any original research, relying instead entirely on hearsay sources,

such as academic journals. Moreover, this Court is entirely familiar with the historical issues, many of which have been litigated frequently in the federal courts of this State. To the extent history since the adoption of the statute in 1987 may have some effect on its present enforcement, it will be found in official records such as legislative journals and court proceedings. The opinions of supposed academic experts add nothing to what this Court can determine for itself from primary sources offered into evidence.

### 3. Objections to Expert Evidence

Plaintiffs argue that defendants have waived the right to object to the admission into evidence of all of the reports of their proffered experts for failure to file a motion challenging those experts. Nothing in the Local Rules or any order of this Court justifies such a result. Rule 7(b)(11) provides, "Any nondispositive motion served beyond the motion deadline imposed in the Case Management Order may be denied solely because the motion is not timely served." No order of this Court provides that failure to file any motion waives anything. *Hamburger v. State Farm Mut. Auto Ins. Co.*, 361 F.3d 875, 877 (5th Cir. 2004), which addressed the Court's authority to enforce a pretrial order entered under FED. R. CIV. P. 16(e), does not apply here because no order authorizes a finding of waiver. By the same token, the standards for amending the scheduling order set forth in *Squyres v. Heico Companies, L.L.C.*, 782 F.3d 224, 237 (5th Cir. 2015), do not apply here because there is no order to amend.

Nor is admission of these reports supported by Rule 7(b)(2)(D), which provides, "Unless otherwise ordered by the Case Management Order, all case-dispositive motions and motions challenging an opposing party's expert must be filed no later than fourteen calendar days after the discovery deadline." This rule on its face governs the filing of motions, and it does not state that the failure to file a motion before trial precludes the assertion of those positions at trial. Even where

a party does not file "case-dispositive motions" before trial, that party retains the right to move for a directed verdict at trial. "[M]otions challenging an opposing party's expert" should be treated exactly like the "case-dispositive motions" mentioned in the same sentence. Because, under the doctrine of *noscitur a sociis*, the two types of motions must be treated exactly alike, the failure to file a pretrial motion "challenging another party's expert" does not preclude the adverse party from challenging that expert's testimony at trial.

The only provision of the Local Rules which mentions waiver is Rule 26(a)(3), which provides in relevant part: "Challenges as to inadequate disclosure of expert witness(es) must be made no later than thirty days before the discovery deadline or will be deemed waived." No defendant has objected or could have objected that the reports by Professor King and Campbell comprising 121 total pages inadequately disclose the evidence they hope to present. The absence of such a motion does not entitle plaintiffs to admit the reports in their entirety without having to establish admissibility under Rules 401, 403 and 702.

The Fifth Circuit does not appear directly to have addressed whether objections to expert testimony can be entertained at trial in the absence of a pretrial motion. However, it did consider that factual situation in the unreported and therefore nonprecedential decision of *United States v. Bates*, 240 F.3d 1073, 2000 WL 1835092 (5th Cir. 2000). There, defendant had filed a motion challenging the expert, but then withdrew it. *Id*, at *3. On cross-examination at trial, defendant's attorney "asked the government's expert witness about the scientific reliability of handwriting analysis," but the Court told him that it was too late to raise the issue. *Id.*, at *3 & n.2. The Fifth Circuit explained that the District Court nevertheless had an obligation to determine the admissibility of expert evidence:

> However, the trial court has no discretion to abandon its role as gatekeeper. *See* [*Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 119 S. Ct.

1167,] 1179 [(1999)] (Scalia, concurring). When a party objects to an expert's testimony, the court "must adequately demonstrate by specific findings on the record that it has performed its duty … ." *Goebel v. Denver and Rio Grande Western R.R. Co.*, 215 F.3d 1083, 1088 (10th Cir. 2000).

2000 WL 1835092 at *3. *Accord*, *Vargas v. Lee*, 317 F.3d 498, 501 n.4 (5th Cir. 2003) (notwithstanding the late filing of the motion, the trial court had to apply "the evidentiary standard for the admission of the expert testimony under Rule 702"). The Court in *Bates* ruled that the defendant had waived his objection, not because he withdrew his motion before trial, but because he "passed the witness" without "object[ing] to the admission of the evidence." 2000 WL 1835092 at *3. Other Courts of Appeals have declared that "the appropriate time to raise *Daubert* challenges is at trial," *Marbled Murrelet v. Babbitt*, 83 F.3d 1060, 1066 (9th Cir. 1996), *cert.* denied, 519 U.S. 1108 (1997), and that "an objection during trial," *Goebel*, 215 F.3d at 1087, will suffice. *Goebel* recognizes that a District Court may prescribe a different procedure, *id.*, but this Court has not done so. Here, although there was no pretrial motion, defendants will properly object to the reception of expert reports into evidence and to particular aspects of expert testimony at trial.

Moreover, a critical distinction must be made between expert *testimony* and expert *reports*. Plaintiffs identify no rule or controlling authority which permits the admission into evidence of an entire expert *report* under any circumstances. "Generally, expert *reports* are inadmissible hearsay because they are out-of-court statements offered to prove the truth of the matter asserted and fall within the definition of hearsay in [FED. R. EVID. 801(c)]." *Balfour Beatty Rail, Inc. v. Kansas City S. Ry. Co.*, 173 F. Supp. 3d 363, 413 (N.D. Tex. 2016), *aff'd as modified and remanded*, 725 F. App'x 256 (5th Cir. 2018) (emphasis added). FED. R. EVID. 702 governs the admission of expert *testimony*, not expert *reports*. According to the Advisory Committee notes accompanying the 1983 amendment, the purpose of the expert report requirement in FED. R. CIV. P. 26(a)(2)(B) is so "that opposing parties have a reasonable opportunity to prepare for effective cross examination." An

22

opposing party cannot cross-examine a report. The only recourse would be to interrogate the author of an admitted report line by line on its contents. This hardly seems calculated "to secure the just, speedy, and inexpensive determination of every action" as required by FED. R. CIV. P. 1. It is far preferable that the proffering party question the expert consistent with the relevance requirement of FRE 401, the hearsay prohibition of FRE 802, and the limitation on cumulative testimony under FRE 403—so that the opposing party need only cross-examine the witness on live testimony and evidence found admissible.

<u>**CONCLUSION**</u>

Consistent with the arguments set forth above, Defendants respectfully submit that Plaintiffs cannot meet their burden of proof in what is now the third iteration of this Section 2 Voting Rights Act case involving the Supreme Court Central District lines. At the conclusion of trial, Defendants will be asking this Court to enter judgment for Defendants and against Plaintiffs.

This the 8th day of July, 2024.

Respectfully submitted,

ATTORNEYS FOR DEFENDANTS STATE BOARD OF ELECTION COMMISSIONERS, TATE REEVES, IN HIS OFFICIAL CAPACITY AS GOVERNOR OF MISSISSIPPI, LYNN FITCH, IN HER OFFICIAL CAPACITY AS ATTORNEY GENERAL OF MISSISSIPPI, AND MICHAEL WATSON, IN HIS OFFICIAL CAPACITY AS SECRETARY OF STATE OF MISSISSIPPI

/s/*Michael B. Wallace*
MICHAEL B. WALLACE (MSB #6904)
CHARLES E. COWAN (MSB #104478)
WISE CARTER CHILD & CARAWAY, P.A.
Post Office Box 651
Jackson, Mississippi 39205-0651
Tel.: (601) 968-5500
Fax: (601) 944-7738
mbw@wisecarter.com

chc@wisecarter.com

REX M. SHANNON III (MSB #102974)
BETH WINDSOR USRY (MSB #99267)
JUSTIN L. MATHENY (MSB #100754)
STATE OF MISSISSIPPI
OFFICE OF THE ATTORNEY GENERAL
CIVIL LITIGATION DIVISION
Post Office Box 220
Jackson, Mississippi 39205-0220
Tel.: (601) 359-4184
Fax: (601) 359-2003
rex.shannon@ago.ms.gov
beth.usry@ago.ms.gov
justin.matheny@ago.ms.gov

## **CERTIFICATE OF SERVICE**

I, Michael B. Wallace, one of the attorneys for the above-named State Defendants, do hereby certify that I have this date caused to be filed with the Clerk of the Court a true and correct copy of the above and foregoing via the Court's ECF filing system, which sent notification of such filing to all counsel of record.

THIS the 8th day of July, 2024.

s/*Michael B. Wallace*
MICHAEL B. WALLACE

3003834v8