**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
GREENVILLE DIVISION**

DYAMONE WHITE; DERRICK SIMMONS;
TY PINKINS; CONSTANCE OLIVIA SLAUGHTER
HARVEY-BURWELL,

        *Plaintiffs*,

        vs.

STATE BOARD OF ELECTION COMMISSIONERS;
TATE REEVES, *in his official capacity as Governor of
Mississippi*; LYNN FITCH, *in her official capacity as
Attorney General of Mississippi*; MICHAEL WATSON,
*in his official capacity as Secretary of State of
Mississippi,*

        *Defendants,*

**CIVIL ACTION NO.
4:22-cv-62-SA-JMV**

## PLAINTIFFS' PRE-TRIAL BRIEF

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................................. 1

DISCUSSION ..................................................................................................................... 4

I.      PLAINTIFFS WILL PROVE THEIR SECTION 2 CLAIM ............................................ 4

A.      Plaintiffs Will Prove the *Gingles* Preconditions. ................................................. 8

      1.      Plaintiffs will prove the first *Gingles* precondition.................................. 8
      2.      Plaintiffs will prove the second and third *Gingles* preconditions. ........................ 14

B.      Plaintiffs Will Prove a Section 2 Violation Based on the Totality of the Circumstances. 18

      Senate Factors 1 & 3:................................................................................. 19
      Senate Factor 2:........................................................................................ 23
      Senate Factor 5:........................................................................................ 29
      Senate Factor 6:........................................................................................ 32
      Senate Factors 4 & 7:................................................................................. 33
      Senate Factor 8:........................................................................................ 34
      Senate Factor 9:........................................................................................ 34

CONCLUSION.................................................................................................................. 35

# TABLE OF AUTHORITIES

## Cases

*Allen v. Milligan,*
  599 U.S. 1 (2023) ................................................................................... passim

*Alpha Phi Alpha v. Raffensperger,*
  --- F. Supp. 3d ----, No. 1:21-CV-05337-SCJ, 2023 WL 7037537 (N.D. Ga. Oct.
  26, 2023).............................................................................................. passim

*Bartlett v. Strickland,*
  556 U.S. 1 (2009) .......................................................................................... 8, 9

*Bolden v. City of Mobile, Ala.,*
  542 F. Supp. 1050 (S.D. Ala. 1982) ................................................................ 22

*Brawhaw ex rel. Hays v. Mariner Health Care, Inc.,*
  No. 06-CV-194-P-B, 2008 WL 2906620 (N.D. Miss. July 24, 2008)................ 12

*Brown v. Bd. of Sch. Comm'rs of Mobile Cnty., Ala.,*
  542 F. Supp. 1078 (S.D. Ala. 1982), *aff'd,* 706 F.2d 1103 (11th Cir. 1983), *aff'd
  sub nom. Bd. of Sch. Commissioners of Mobile Cnty., Alabama v. Brown,* 464
  U.S. 1005 (1983) .......................................................................................... 22

*Buending v. Town of Redington Beach,*
  No. 19-CV-1473-JSM-SPF, 2022 WL 17850781 (M.D. Fla. Oct. 18, 2022)......... 22

*Burton v. Am. Cyanamid,*
  No. 07-CV-0303, 2018 WL 3954858 (E.D. Wis. Aug. 16, 2018) .......................... 23

*Caster v. Merrill,*
  No. 21-CV-1536-AMM, 2022 WL 264819 (N.D. Ala. Jan. 24, 2022).............. 17, 18

*Chisom v. Roemer,*
  501 U.S. 380 (1991) ........................................................................................ 6

*Christian Ministerial All. v. Sanders,*
  No. 19-CV-402-JM, 2023 WL 4745352 (E.D. Ark. July 25, 2023) ....................... 12

*Clark v. Calhoun Cnty.,*
  21 F.3d 92 (5th Cir. 1994) ...................................................................... 3, 6, 19

*Clark v. Calhoun Cnty., Miss.,*
  88 F.3d 1393 (5th Cir. 1996) ................................................................... 20, 23

*Dempster v. Lamorak Ins. Co.,*
  No. 20-CV-95, 2020 WL 5500836 (E.D. La. Sept. 11, 2020) .............................. 22

*Estate of Manus v. Webster Cnty.,*
  No. 11-CV-149-SA-DAS, 2014 WL 3866608 (N.D. Miss. Aug. 6, 2014)...............11

*Ewing v. Monroe Cnty., Miss.,*
  740 F. Supp. 417 (N.D. Miss. 1990)................................................................. 6

*Fair Fight Action, Inc. v. Raffensperger,*
  No. 18-CV-5391-SCJ, 2020 WL 13561776 (N.D. Ga. Dec. 4, 2020) ...................... 22

*Fairley v. City of Hattiesburg,*
  662 F. App'x 291 (5th Cir. 2016) .................................................................. 23

*Ga. State Conf. of NAACP v. Fayette Cnty. Bd. of Comm'rs,*
  775 F.3d 1336 (11th Cir. 2015)................................................................ 6, 19

*Gonzaga Univ. v. Doe,*
  536 U.S. 273 (2002) ....................................................................................... 7

*Growe v. Emison*,
   507 U.S. 25 (1993) ........................................................................................... 5, 15

*In re Terrorist Attacks on Sept. 11, 2001*,
   No. 03-MD-1570, 2023 WL 3116763 (S.D.N.Y. Apr. 27, 2023) ........................... 22

*Jamison v. Tupelo*,
   471 F. Supp. 2d 706 (N.D. Miss. 2007) ............................................................ 21, 28

*Johnson v. De Grandy*,
   512 U.S. 997 (1994) ............................................................................................... 33

*Jordan v. Winter*,
   604 F. Supp. 807 (N.D. Miss. 1984), *aff'd sub nom. Mississippi Republican*
   *Exec. Comm. v. Brooks*, 469 U.S. 1002 (1984) ................................................. 32

*League of United Latin American Citizens, Council No. 4434 v. Clements*,
   999 F.2d 831, 850 (5th Cir. 1993) (en banc) ................................................ passim

*Lopez v. Abbott*,
   339 F. Supp. 3d 589 (S.D. Tex. 2018) ............................................................ 15, 33

*Martin v. Allain*,
   658 F. Supp. 1183 (S.D. Miss. 1987) ..................................................................... 7

*McCray v. MS State Bd. of Election Comm'rs*,
   No. 84-CV-131 (N.D. Miss. Feb. 15, 1985) .......................................................... 35

*Mo. State Conf. of the NAACP v. Ferguson-Florissant Sch. Dist.*,
   201 F. Supp. 3d 1006 (E.D. Mo. 2016), *aff'd*, 894 F.3d 924 (8th Cir. 2018) ...... 32

*Monroe v. Woodville*,
   881 F.2d 1327 (5th Cir. 1989) ............................................................................... 13

*Montana v. Talen Montana*, LLC,
   574 F. Supp. 3d 795 (D. Mont. 2021) .................................................................... 22

*MS NAACP v. State Board of Election Commissioners*,
   No. 22-CV-734-DPJ-HSO-LHS, 2024 WL 3275965 (S.D. Miss. July 2, 2024) ......... passim

*N.A.A.C.P. v. Fordice*,
   252 F.3d 361 (5th Cir. 2001) ................................................................................ 21

*NAACP, Spring Valley Branch v. E. Ramapo Cent. Sch. Dist.*, 462 F. Supp. 3d 368,
   381 (S.D.N.Y. 2020) .............................................................................................. 28

*Nairne v. Ardoin*,
   No. 22-CV-178-SDD-SDJ, 2024 WL 492688, at *15 nn. 158 & 159 (M.D. La.
   Feb. 8, 2024) ................................................................................................... passim

*Nipper v. Smith*,
   39 F.3d 1494 (11th Cir. 1994) (en banc) ............................................................... 24

*Patino v. City of Pasadena*,
   230 F. Supp. 3d 667 (S.D. Tex. 2017) .................................................................. 19

*Robinson v. Ardoin*,
   86 F.4th 574 (5th Cir. 2023) .......................................................................... passim

*Salas v. Southwest Tex. Jr. Coll. Dist.*,
   964 F.2d 1542 (5th Cir. 1992) ............................................................................... 14

*Singleton v. Merrill*,
   582 F. Supp. 3d 924 (N.D. Ala. 2022) ............................................................ 21, 22

*Steel Co. v. Citizens for a Better Env't*,
   523 U.S. 83 (1998) ................................................................................................. 7

iii

*Teague v. Attala Cnty., Miss.*,
  92 F.3d 283 (5th Cir. 1996) ........................................................................... passim
*Thomas v. Bryant*,
  366 F. Supp. 3d 786 (S.D. Miss. 2019) ....................................................... 13, 14, 20
*Thomas v. Bryant*,
  938 F.3d 134 (5th Cir. 2019, *vacated on reh'g en banc and appeal dismissed as
  moot sub. nom. Thomas v. Reeves*, 961 F.3d 800 (5th Cir. 2020)............................. 13
*Thornburg v. Gingles*,
  478 U.S. 30 (1986) ...................................................................................... passim
*United States v. Kantengwa*,
  781 F.3d 545 (1st Cir. 2015)........................................................................... 22
*United States v. Marengo Cnty. Comm'n*,
  731 F.2d 1546 (11th Cir. 1984) (Wisdom, J.)..................................................... 23
*Veasey v. Abbott*,
  830 F.3d 216 (5th Cir. 2016) (en banc) ............................................................ 34
*vonRosenberg v. Lawrence*,
  413 F. Supp. 3d 437 (D.S.C. 2019) .................................................................. 22
*Waite v. AII Acquisition Corp.*,
  194 F. Supp. 3d 1298 (S.D. Fla. 2016) ............................................................. 22
*Walden v. City of Chicago*,
  755 F. Supp. 2d 942 (N.D. Ill. 2010)................................................................ 22
*Whitcomb v. Chavis*,
  403 U.S. 124 (1971) ..................................................................................... 24
*Zimmer v. McKeithen*,
  485 F.2d 1297 (5th Cir. 1973), *aff'd sub nom. East Carroll Parish School Board
  v. Marshall*, 424 U.S. 636 (1976) ............................................................... 14, 19

## Statutes

52 U.S.C. § 10301........................................................................................ 1, 3, 4
Miss. Code Ann. § 5-3-101 .................................................................................. 8

## Other Authorities

Fed. R. Evid. 702(a)........................................................................................ 22
Fed. R. Evid. 703 ........................................................................................... 12
L.U.Civ.R. 7(b)(2)(A) ......................................................................................... 7

iv

## INTRODUCTION

Black Mississippians are almost 40 percent of the State's adult population—the highest percentage of any state in the Nation. Yet there has never been more than a single Black justice on the State's nine-member Supreme Court, and no Black person has ever been elected to the State Supreme Court without first being appointed by the Governor. This is not mere happenstance. As a three-judge panel of Mississippi federal judges unanimously found following a recent trial, voting patterns in Mississippi are starkly polarized along racial lines, such that White voters vote in massive numbers against Black voters' preferred candidates. *MS NAACP v. State Board of Election Commissioners*, No. 3:22-CV-734-DPJ-HSO-LHS, 2024 WL 3275965, at *32 (S.D. Miss. July 2, 2024). And the electoral maps used to elect Supreme Court justices ("Enacted Plan"), which have not been changed since 1987, cut the Mississippi Delta in half and do not contain any majority-Black voting age districts where Black voters can elect preferred candidates despite the stark racial polarization of the electorate. That is vote dilution in a nutshell. Vote dilution in violation of Section 2 of the Voting Rights Act ("VRA"), 52 U.S.C. § 10301, occurs when district lines, racial polarization, persistent inequality, and other factors result in a situation where Black voters do not have an equal opportunity to elect candidates of their choice. On the facts as they stand today, as Plaintiffs will prove at trial, Mississippi's Supreme Court districts dilute Black voting strength.

Vote dilution is about *results*, not intent. The question is, do the challenged lines, and their interaction with voting patterns, history, and the totality of the circumstances, result in an inequality of opportunity for Black Mississippians with respect to electing Supreme Court justices? The Section 2 vote dilution test, first articulated in *Thornburg v. Gingles*, 478 U.S. 30 (1986), was reaffirmed just last year by the Supreme Court in *Allen v. Milligan*, 599 U.S. 1 (2023) and the Fifth

Circuit in *Robinson v. Ardoin*, 86 F.4th 574 (5th Cir. 2023). This Court must accordingly apply the *Gingles* vote-dilution test, as reaffirmed in *Milligan* and *Robinson* to the trial record.

The evidence the Court will hear is utterly typical for a Section 2 case, and consistent with the evidence that Plaintiffs presented in *Milligan* and *Robinson* and other successful Section 2 cases, including *MS NAACP*. Expert witnesses will testify about electoral map-drawing, racially polarized voting patterns, history, political science, and judicial politics. Fact witnesses will testify about the challenged district lines, the lines proposed by the Plaintiffs, and race and politics in Mississippi. All this evidence will establish vote dilution under the *Gingles* standard.

That standard operates as follows. A Section 2 vote dilution plaintiff must satisfy three preconditions, often called the *Gingles* preconditions. *E.g.*, *Milligan*, 599 U.S. at 17. First, the Black population in Mississippi must be "sufficiently large and geographically compact to constitute a majority in a reasonably configured district." *Id.* And it is: Plaintiffs will show that a compact Black-majority district, configured similarly to Congressional District 2 which the Legislature enacted just last year, can be easily created without splitting a single precinct or county. Second, the evidence must show that Black voters in Mississippi vote "cohesive[ly]." *Id.* And they do, as uncontested analysis of Mississippi election results will show. *E.g.*, *MS NAACP*, 2024 WL 3275965, at *31. Third, the White majority in Mississippi must "vote[] sufficiently as a bloc" to usually defeat the Black voters' preferred candidates. *Milligan*, 599 U.S. at 17. And they do: The evidence will show that White voters vote massively against Black-preferred candidates, and especially against Black-preferred *Black* candidates, making it nearly impossible for Black candidates to win elections in Mississippi outside of Black-majority districts. *E.g.*, *MS NAACP*, 2024 WL 3275965, at *32, 50.

These preconditions are the core elements of the vote dilution dynamic. Once met, they strongly indicate that the combination of district lines and racially polarized voting deprive Black voters of equal opportunities to elect candidates of choice. A liability determination typically follows in all but "the very unusual case." *Teague v. Attala Cnty., Miss.*, 92 F.3d 283, 293 (5th Cir. 1996) (quoting *Clark v. Calhoun Cnty.*, 21 F.3d 92, 97 (5th Cir. 1994)); *accord MS NAACP*, 2024 WL 3275965, at *33.

Beyond the *Gingles* preconditions, the Court must consider "the totality of the circumstances" to determine whether Supreme Court elections "are not equally open" to Black voters "in that [they] have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." 52 U.S.C. § 10301(b); *Robinson*, 86 F.4th at 589. This "totality of the circumstances" analysis relies on the so-called "Senate Factors," which include the history of discrimination in the State, the severity of racial polarization in voting, the level of racial inequality in areas like education, the use of racial appeals in political campaigns, and the lack of electoral success by minority candidates. *Gingles*, 478 U.S. at 44; *Robinson*, 86 F.4th at 589 & n.2. No particular number of Senate Factors must be proven, but the evidence here will show that the vast majority of them point towards a Section 2 violation. *E.g.*, *MS NAACP*, 2024 WL 3275965, at *52 (finding all applicable Senate Factors to "clearly . . . favor the Plaintiffs with two exceptions," which "only slightly favor[] the Plaintiffs"). Considering the totality of the circumstances, elections for Supreme Court under the now 37-year-old district lines result in unequal opportunities for Black Mississippians to participate in the political process and elect candidates of their choice.

Defendants will present little evidence in response, and the legal theories on which they appear to rely—asking this Court to change the law as it is and to narrow the VRA in various

ways—have been rejected by the Supreme Court and the Fifth Circuit and, most recently, the three-judge panel in *MS NAACP*. In the end, their main argument appears to be that, because these lines were challenged long ago, they cannot be challenged again today. But vote dilution is fundamentally about the results of the challenged lines *today, in 2024*. The evidence will show that the number of Black Supreme Court justices has not changed in decades, even though the population of the State has shifted, and that racial polarization in voting has *worsened in* the 30 years since the *Magnolia Bar* case was before Judge Barbour. On the facts as they stand today, the *Gingles* vote dilution test will be met at trial. And Plaintiffs' evidence will also show that fair Supreme Court lines, and more opportunities at the highest levels of government for the next generation of Black attorneys and leaders, will benefit all Mississippians. The VRA requires nothing less.

## DISCUSSION

## I.    PLAINTIFFS WILL PROVE THEIR SECTION 2 CLAIM

Section 2 of the VRA prohibits electoral districting plans that "result[] in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color." 52 U.S.C. § 10301(a); *see also Gingles*, 478 U.S. at 36. A violation of the statute is "established" where a plaintiff demonstrates, based on "the totality of the circumstances," that the "political processes" with respect to elections under the challenged plan in a particular area or areas "are not equally open to participation by members of [a racial minority group] . . . in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." 52 U.S.C. § 10301(b).

Section 2 vote-dilution liability "turns on the presence of discriminatory effects, not discriminatory intent." *Milligan*, 599 U.S. at 25 ("Congress has used the words 'on account of race or color' in the Act to mean 'with respect to' race or color, and not to connote any required

4

purpose of racial discrimination." (cleaned up)).  The Section 2 analysis *does not turn on the State's motives*.  If the *result* of the challenged scheme is unequal opportunities for Black voters, liability follows.  *E.g.*, *Gingles*, 478 U.S. at 35, 47, 63; *accord Robinson*, 86 F.4th at 589; *MS NAACP*, 2024 WL 3275965, at *35 ("Under Section 2 of the Voting Rights Act, though, we are concerned with whether there are discriminatory *effects*.").

To prevail on a Section 2 vote dilution claim, Plaintiffs must initially satisfy three preconditions: "'First, the minority group must be sufficiently large and geographically compact to constitute a majority in a reasonably configured district.' A district is reasonably configured when it complies 'with traditional districting criteria, such as being contiguous and reasonably compact.'  Second, the minority group must be politically cohesive.  Third, the white majority must be shown to vote sufficiently as a bloc to usually defeat the minority-preferred candidate."  *Robinson*, 86 F.4th at 589 (quoting *Milligan*, 599 U.S. at 18); *accord Gingles*, 478 U.S. at 50-51.

The three preconditions result in what the *Gingles* Court termed "vote dilution through submergence," whereby the combination of district lines and persistent patterns of racially polarized voting usually renders minority voters unable to elect candidates of choice, despite voting cohesively and being numerous enough to comprise a majority in a compact, reasonably configured district.  478 U.S. at 46-51, 59 n.28; *accord Milligan*, 599 U.S. at 18.  In such circumstances, the enacted lines submerge or "fragment[]" minority voters, such that White bloc voting against the minority group's preferred candidates will usually result in their defeat at the polls.  *E.g.*, *Growe v. Emison*, 507 U.S. 25, 40 (1993).[1]

---

[1] Such fragmentation, in the single-member-district context, can also be referred to as "packing and cracking," *i.e.*, the "[d]ilution of racial minority group voting strength" via "the dispersal of blacks into districts in which they constitute an ineffective minority of voters or from the concentration of blacks into districts where they constitute an excessive majority."  *E.g.*, *Gingles*, 478 U.S. at 46 n.11; *Nairne v. Ardoin*, No. 22-CV-178-SDD-SDJ, 2024 WL 492688, at *15 nn. 158 & 159 (M.D. La. Feb. 8, 2024).

Once the *Gingles* preconditions are established, vote dilution is presumed. *See Teague*, 92 F.3d at 293 (quoting *Clark*, 21 F.3d at 97; *MS NAACP*, 2024 WL 3275965, at \*33; *Nairne v. Ardoin*, No. 22-CV-178-SDD-SDJ, 2024 WL 492688, at \*36 (M.D. La. Feb. 8, 2024); *see also, e.g.*, *Ga. State Conf. of NAACP v. Fayette Cnty. Bd. of Comm'rs*, 775 F.3d 1336, 1342 (11th Cir. 2015). Courts determine liability based on "an intensely local appraisal" of the mechanism at issue, as well as a "searching practical evaluation of the 'past and present reality.'" *Milligan*, 599 U.S. at 19 (quoting *Gingles*, 478 U.S. at 79).

Just last year, the U.S. Supreme Court reaffirmed the *Gingles* test and rejected the "argument[] that § 2 as interpreted in *Gingles* exceeds the remedial authority of Congress." *Milligan*, 599 U.S. at 41. It recognized and reaffirmed the power of federal courts, as they have done "for the last four decades," to apply the *Gingles* test and order "race-based redistricting as a remedy" for violations of Section 2. *Id.*; *Robinson*, 86 F.4th at 593. Applying *Gingles* and *Robinson*, the panel in *MS NAACP* unanimously ordered Mississippi to draw three additional legislative districts "in which Black voters [would] have an opportunity to elect candidates of their choice." *MS NAACP*, 2024 WL 3275965, at \*54. Defendants' suggestions to deviate from established Section 2 law must be rejected. Proposed Joint Pretrial Order ("JPTO"), Section 9(c), Question Nos. 3, 9.

Similarly, any suggestion that Section 2 and the *Gingles* standard do not apply to judicial districts is a non-starter. *See* JPTO, Section 9(c), Question Nos. 3, 5, 9. It has long been settled law that Section 2 of the VRA applies equally to judicial electoral districts. *Chisom v. Roemer*, 501 U.S. 380, 401 (1991) (holding that Section 2 applies to "judicial elections" in a case involving Louisiana State Supreme Court districts); *Ewing v. Monroe Cnty., Miss.*, 740 F. Supp. 417, 426 (N.D. Miss. 1990) (holding that Monroe County's districts for electing justice court judges violated

6

Section 2); *Martin v. Allain*, 658 F. Supp. 1183, 1200, 1204-05 (S.D. Miss. 1987) ("The use of the word 'representatives' in Section 2 is not restricted to legislative representatives but denotes anyone selected or chosen by popular election from among a field of candidates to fill an office, including judges.") (holding that multi-member, at-large system of electing judges in Mississippi diluted Black voting strength in violation of Section 2).

And although Defendants attempt to preserve the question of whether Section 2 of the VRA is enforceable by private litigants (JPTO, Section 9(c), Question No. 1), that question has been settled by the Fifth Circuit.[2] *Robinson*, 86 F.4th at 588 ("[T]here is a right for these Plaintiffs to bring these claims."); *MS NAACP*, 2024 WL 3275965, at *11 ("If a court now holds, after almost 60 years, that cases filed by private individuals were never properly brought, it should be the Supreme Court, which has the controlling word on so momentous a change. Regardless, we are bound by the Fifth Circuit *Robinson* opinion that the Plaintiffs may properly bring this suit to enforce their rights under the Voting Rights Act."). In any event, Defendants have not preserved the issue: They failed to raise the right-of-action argument—which is not jurisdictional—in a motion, and they therefore waived it. *See* L.U.Civ.R. 7(b)(2)(A); *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 89 (1998) ("It is firmly established in our cases that the absence of a valid . . . cause of action does not implicate subject-matter jurisdiction, *i.e.*, the courts' statutory or constitutional power to adjudicate the case.").

Under the *Gingles* test as reaffirmed in *Milligan* and *Robinson*, Plaintiffs will prevail at trial for the reasons explained below.

---

[2] Plaintiffs may also enforce the rights conferred under Section 2 via 42 U.S.C. § 1983. *See Gonzaga Univ. v. Doe*, 536 U.S. 273, 283-84 (2002).

**A. Plaintiffs Will Prove the *Gingles* Preconditions.**

    *1. Plaintiffs will prove the first* **Gingles** *precondition.*

The first *Gingles* precondition is typically proven through the offer of an illustrative districting plan or plans containing a proposed majority-minority district. The numerosity aspect of *Gingles* 1 is demonstrated via a district that is greater than 50% minority voting age population. *See, e.g.*, *Bartlett v. Strickland*, 556 U.S. 1, 12, 18-20 (2009). Compactness is demonstrated by showing that the illustrative majority-minority district is reasonably configured, in that it is consistent with traditional districting principles.[3] *See, e.g.*, *Milligan*, 599 U.S. at 18; *Robinson*, 86 F.4th at 589. Traditional districting principles include the districts' compactness, contiguity, maintaining communities of interest, and preservation of county and other political subdivision boundaries. *Milligan*, 599 U.S. at 18; *Robinson*, 86 F.4th at 590; *MS NAACP*, 2024 WL 3275965, at *13, 17; *see also* Miss. Code Ann. § 5-3-101 ("Every district shall be compact and composed of contiguous territory and the boundary shall cross governmental or political boundaries the least number of times possible."). The focus of *Gingles* 1 is on the *illustrative plans*, not on the plan enacted by the State, and Plaintiffs' plans do not have to outperform the challenged plan in a "beauty contest." *E.g.*, *Milligan*, 599 U.S. at 19-22 ("The District Court concluded—correctly, under our precedent—that it did not have to conduct a 'beauty contest[ ]' between plaintiffs' maps and the State's."); *Robinson*, 86 F.4th at 590, 592 (similar).

It is undisputed that a majority-Black Supreme Court district can be drawn. *See* PX-2 at

---

[3] There is no material distinction between the compactness of the minority *population* and the compactness of the illustrative majority-minority *district* in the area where that population lives. *See Robinson*, 86 F.4th at 590-91. Reasonably configured majority-minority districts are necessarily sufficient. *Id.* ; *MS NAACP*, 2024 WL 3275965, at *11, 14.

6-8, figs.10-14 (Plaintiffs' illustrative plans).[4]  Expert map-drawer, William Cooper, whose work has been relied upon by the U.S. Supreme Court, *see Milligan*, 599 U.S. at 20, has submitted multiple plans, each featuring a District 1 (sometimes referred to as the Central District) that has a Black Voting Age Population ("BVAP") greater than 50%.[5]  *See* PX-2 at 6-8.  Mr. Cooper's work is particularly probative given his decades of map-drawing experience, as he has testified in redistricting cases in Mississippi (and beyond) in every Census cycle since the 1990s.  PX-3 at 2-11.  Notably, Mr. Cooper's demographic analysis demonstrates that, since 1987, Mississippi has seen decades of statewide Black population growth and White population decline, making the lack of a majority-Black district even more glaring today.  PX-2 at 1.

Mr. Cooper's illustrative plans satisfy the first *Gingles* precondition:  Those plans are "reasonably configured" such that they "comport[] with traditional districting criteria."  *Milligan*, 599 U.S. at 18, 20.  First, the illustrative plans perform comparably to (or better than) the existing map with respect to the relevant objective metrics, such as equal population, mathematical compactness, and tallies of split counties and precincts.  PX-7 at 1 (compactness scores); PX-3 at 62 (population deviation).  Like the State's Enacted Plan, all of Mr. Cooper's plans follow county boundaries, meaning that there are no county or precinct splits whatsoever.  Visually, neither of Mr. Cooper's illustrative plans (Illustrative Plans 1 and 2) contains any "tentacles, appendages, bizarre shapes, or any other obvious irregularities."  *Milligan*, 599 U.S. at 20.  Plaintiffs' proposed District 1 approximates a rectangular shape, encompassing counties in the Delta and running north-

---

[4] Unless otherwise noted, all Plaintiffs' Exhibits ("PX") cited in this brief have been offered without any objection from Defendants, as identified in the proposed Joint Pretrial Order.

[5] Under longstanding Supreme Court precedent, the metric used to assess the racial composition of a district for *Gingles* purposes is voting age population.  *E.g.*, *Strickland*, 556 U.S. at 18 ("[T]he majority-minority rule relies on an objective, numerical test: Do minorities make up more than 50 percent of the voting-age population in the relevant geographic area?").

to-south along the western part of the State (pink district in Figures 10, 13 of PX-2 shown below).



In both instances, Mr. Cooper's illustrative District 1 is at least as visually compact as the

Enacted District 1 (pink district in Fig. 6 of PX-2 shown below).




Indeed, Illustrative District 1 largely traces Congressional District 2 (red outline in Fig. 12 of PX-2 above), which was just approved by the State during its 2022 legislative redistricting process.

Comparable performance to the existing plan with respect to objective metrics like compactness

10

and splits is highly indicative of a plan with reasonably configured districts. *See, e.g.*, *Milligan*, 599 U.S. at 20, 30-31; *Robinson*, 86 F.4th at 590-92; *Nairne*, 2024 WL 492688, at *21-25.

In addition, Mr. Cooper's plans respect communities of interest, another important traditional districting consideration. *See, e.g.*, *Milligan*, 599 U.S. at 20, 30-31; *Robinson*, 86 F.4th at 590-92; *MS NAACP*, 2024 WL 3275965, at *13; *Nairne*, 2024 WL 492688, at *21-25. Most importantly, Mr. Cooper's illustrative plans unify the Mississippi Delta region, a quintessential community of interest. Plaintiffs' fact witnesses at trial will further speak to the nature and character of the Delta as a community of interest, including the connections of history, culture, and family that tie Deltans together, and the shared challenges and issues faced by Delta residents. Illustrative Plans 1 and 2 also generally follow the State-defined regional Planning and Development Districts, which represent an administrative and governance connection that has existed between particular regional groupings of counties in Mississippi since the 1960s, and which are used to facilitate economic and community development.

Defendants will do almost nothing to contest the first *Gingles* prong. In the JPTO (Section 9(c), Question No. 13), they belatedly suggest that map-drawing is not an area of expertise, seeming to suggest a potential challenge to Mr. Cooper's status as an expert witness. While any timely challenge to Mr. Cooper's qualifications (which have been accepted by over 50 federal courts across the country, including the three-judge court in *MS NAACP*) would fail on the merits, this Court's deadline to file motions *in limine* or *Daubert* challenges has passed, and Defendants accordingly should not be heard on the issue. *See, e.g.*, *Estate of Manus v. Webster Cnty.*, No. 1:11-CV-149-SA-DAS, 2014 WL 3866608, at *7 (N.D. Miss. Aug. 6, 2014) (denying motion to exclude expert testimony on timeliness grounds and citing L.U.Civ.R. 7(b)(11), which provides that "[a]ny nondispositive motion served beyond the motion deadline imposed in the Case

Management Order may be denied solely because the motion is not timely served"); *Brawhaw ex rel. Hays v. Mariner Health Care, Inc.*, No. 2:06-CV-194-P-B, 2008 WL 2906620, at *1 (N.D. Miss. July 24, 2008) (denying untimely motions in limine seeking exclusion of expert testimony).

Moreover, as Mr. Cooper's decades of redistricting work and trial testimony illustrate, a mapmaker is the quintessential expert in redistricting cases and is helpful to the factfinder by drawing illustrative plans and analyzing existing maps, a process that requires a deep understanding of traditional redistricting principles and the use of specialized software to analyze Census and geographical data. *See* Fed. R. Evid. 703; PX-3 at 2 ("Since 1986, [Mr. Cooper has] prepared proposed redistricting maps of approximately 750 jurisdictions for Section 2 litigation, Section 5 comment letters, and for use in other efforts to promote compliance with the Voting Rights Act of 1965."). In 2022 alone, Mr. Cooper "testified at trial in seven Sec. 2 lawsuits: Alabama (Congress), Arkansas (Supreme and Appellate Courts), Florida (voter suppression), Georgia (State House, State Senate, and Congress), Louisiana (Congress) and Maryland (Baltimore County Commission)." PX-3 at 2 As a federal court found last year, "Mr. Cooper has qualified as an expert witness on redistricting and demographics in federal courts in approximately forty-five voting rights cases in eighteen states, having been retained by both civil rights plaintiffs and government entities." *E.g.*, *Christian Ministerial All. v. Sanders*, No. 4:19-CV-402-JM, 2023 WL 4745352, at *2 (E.D. Ark. July 25, 2023) ("Mr. Cooper is qualified to serve as an expert witness in redistricting and demographics."). Defendants' argument that map-drawing is not an area of expertise is unsupported by any legal authority, flatly contradicted by four decades of judicial precedent, including the Supreme Court's *Milligan* decision, which cited Mr. Cooper's expert testimony, and the unanimous ruling in *MS NAACP*, which accepted and relied on Mr. Cooper "as an expert in redistricting, demographics, and census data." *Milligan*, 599 U.S. at 31;

*MS NAACP*, 2024 WL 3275965, at *15.

Defendants propose that Dr. David Swanson be allowed to offer testimony about electoral map-drawing, but as explained in Plaintiffs' timely *Daubert* motion, he lacks any proper qualification to offer such testimony. *See* ECF Nos. 164, 165, 172. And in any case, to the extent he understands the traditional districting principles, he does not offer any analysis showing that Mr. Cooper's illustrative plans do not comport with them.

Defendants and Dr. Swanson seek to make the point that, if one were to use the estimated Black Citizen Voting Age Population ("BCVAP") metric, as opposed to BVAP, the current Supreme Court District 1 is already majority-Black. *See* JPTO, Section 9(c), Question No. 7. But that only confirms that the first *Gingles* precondition—the possibility of a majority-Black district—is satisfied. *See Thomas v. Bryant*, 938 F.3d 134, 157 (5th Cir. 2019) ("[P]laintiffs need not show more than a simple majority at the first step of the *Gingles* analysis to open the gate to further Section 2 inquiry." (citation omitted)), *vacated on reh'g en banc and appeal dismissed as moot sub. nom. Thomas v. Reeves*, 961 F.3d 800 (5th Cir. 2020). Indeed, regardless of the metric used, the fact that a challenged district is already majority-Black district, standing alone, is no defense against a Section 2 claim. As one Court explained in finding a Section 2 violation as to a Mississippi State Senate district that was already majority-Black by population, "[u]nimpeachable authority from [the Fifth C]ircuit has rejected any per se rule that a racial minority that is a majority in a political subdivision cannot experience vote dilution." *Thomas v. Bryant*, 366 F. Supp. 3d 786, 809 (S.D. Miss. 2019) (citing *Monroe v. Woodville*, 881 F.2d 1327, 1333 (5th Cir. 1989)); *see also Thomas*, 938 F.3d at 157 ("[T]he creation of majority-minority districts with simple majority representation does not necessarily close the gate to a potential finding of vote dilution." (cleaned up)). Courts have repeatedly found Section 2 violations even when the challenged district

13

has a majority BVAP. *E.g.*, *Zimmer v. McKeithen*, 485 F.2d 1297 (5th Cir. 1973) (district with 58.7% found to violate Section 2), *aff'd sub nom. East Carroll Parish School Board v. Marshall*, 424 U.S. 636 (1976); *Thomas*, 366 F. Supp. 3d at 809 (district with 50.8% BVAP found to violate Section 2). By Dr. Swanson's calculation, District 1's BCVAP is 51.0%, which is similar to the BVAP in the unlawful district in *Thomas* and far lower than the district in *Zimmer*.

Defendants also misread *Salas v. Southwest Tex. Jr. Coll. Dist.*, 964 F.2d 1542 (5th Cir. 1992). *Salas* involved a district where minority voters comprised a majority of *registered voters*, not all adult citizens, as Defendants propose with the BCVAP metric. *Id.* And in any case, the Fifth Circuit *rejected* the district court's "absolute" rule that such a majority-minority district cannot violate Section 2. *Id.* Instead, *Salas* found that the *Gingles* preconditions were satisfied, as it proceeded to analyze the totality of the circumstances. *See id.*

The trial record will show that it is undoubtedly possible to create a reasonably configured, majority-Black Supreme Court district—including one that unifies the Delta and largely follows lines that the State has already adopted for congressional districts. *Gingles* 1 will be satisfied.

### 2. *Plaintiffs will prove the second and third* **Gingles** *preconditions.*

The second and third *Gingles* preconditions concern the behavior of voters and the electoral outcomes that result from racially polarized voting behavior. They identify those instances where the risk of dilution-by-submergence is at its highest, namely "'where minority and majority voters consistently prefer different candidates' and where minority voters are submerged in a majority voting population that 'regularly defeat[s]' their choices." *Milligan*, 599 U.S. at 17-18; *accord MS NAACP*, 2024 WL 3275965, at *11 ("[T]he minority group must be politically cohesive," and "the white majority must be shown to vote sufficiently as a bloc to usually defeat the minority-preferred candidate."). As *Milligan*'s emphasis on *voter* behavior and electoral outcomes makes clear, any inquiry into *why* voters are polarized, and the relative role of partisanship in contributing to racially

14

polarized voting behavior, is part of the totality-of-the-circumstances inquiry, not the *Gingles* 2 and 3 analysis.[6]

Each prong addresses a different aspect of voter behavior. The second *Gingles* prong asks whether Black voters are voting cohesively for preferred candidates, such that Black voters would in fact elect representatives of choice if drawn into a majority-Black single member district. *Milligan*, 599 U.S. at 18-19. The third prong considers the interaction between Black and White bloc voting, and, when proven, demonstrates that "'the challenged districting thwarts a distinctive minority vote' at least plausibly on account of race." *Id.* at 19 (quoting *Growe*, 507 U.S. at 40); *see also Robinson*, 86 F.4th at 596. Together, *Gingles* 2 and 3 provide a complete picture of how racial polarization operates in the relevant area. Both will be met here.

On *Gingles* 2, Dr. Byron D'Andra Orey, who is a tenured professor and former department chair of political science at Jackson State University, found extremely high levels of cohesion among Black voters in Mississippi. In particular, Black voters in District 1 express a clear preference for the same candidate and vote cohesively for that candidate, typically at a rate of more than 90% and never below 81%. PX-11 at 1-2. This was true for elections in District 1 regardless of the office being contested, including Supreme Court justice. *Id.* Relying on similar evidence (namely, ecological inference analysis of voting by race in recent Mississippi elections), the panel in *MS NAACP* unanimously found that there were no "significant regional polarization variations in Mississippi" and that "racial polarization among voters in Mississippi is quite high." 2024 WL 3275965, at *27, 33.

---

[6] *See Nairne*, 2024 WL 492688, at *36, 38 and *Alpha Phi Alpha v. Raffensperger*, --- F. Supp. 3d ----, No. 1:21-CV-05337-SCJ, 2023 WL 7037537, at *56 n.45 (N.D. Ga. Oct. 26, 2023) (both applying *Milligan* to hold that the partisanship issue is properly analyzed in the context of totality of the circumstances); *Lopez v. Abbott*, 339 F. Supp. 3d 589, 612-613 (S.D. Tex. 2018) (considering issue at the totality-of-the-circumstances phase).

On *Gingles* 3, the undisputed evidence will show that White support for Black-preferred candidates (sometimes called "crossover" voting) is minimal, and that Black-preferred candidates will typically be defeated by White bloc voting outside of Black majority districts. Overall, Dr. Orey found that the Black candidates preferred by Black voters usually earned less than 10 percent of the White vote—and never more than 16.4 percent. PX-11 at 1-2. Of the nine contested District 1-specific elections (for Supreme Court justice, Transportation Commissioner, or Public Service Commissioner), the Black candidate prevailed only three times, none of them in Supreme Court elections—Transportation Commissioner Willie Simmons prevailed twice, and Public Service Commissioner De'Keither Stamps won once. *Id.* at 1; PX-17 at 1-2. No Black candidate for the Mississippi Supreme Court has ever won election without first being appointed by a White governor, securing their tacit endorsement and the incumbency advantage that come with it. As explained below in the Senate Factor 2 discussion, however, White candidates have been able to prevail without a prior appointment.

As the Supreme Court explained in *Gingles*, Defendants may defeat Plaintiffs' showing on the third *Gingles* prong if Black candidates prevail in the challenged districts because of "a diminution in usually severe white bloc voting." 478 U.S. at 54. By contrast, when White bloc voting usually results in the defeat of Black candidates, or when victories by Black candidates are more often due to "special circumstances, such as incumbency and lack of opposition," then Plaintiffs will have met their burden. *Id.* at 50, 54; *see also MS NAACP*, 2024 WL 3275965, at *28, 43 ("Under Senate Factor 2, 'proof that some minority candidates have been elected does not foreclose a § 2 claim.'" (quoting *Gingles*, 478 U.S. at 75)). Here, the evidence is that Black candidates for the Supreme Court simply do not prevail without the advantage of incumbency, and even though a few Black candidates have prevailed in District 1 in non-Supreme Court elections,

the amount of White crossover voting has remained extremely low in those elections: Commissioners Simmons (an incumbent) and Stamps earned between 11.4%-16.2% of the White vote in 2023. PX-17 at 1-2.

The evidence and analysis that Plaintiffs will present, based on the analysis of Mississippi election results[7] conducted by Dr. Orey using a standard technique called ecological inference, is again completely typical of Section 2 cases. The same type of evidence supported a finding of legally significant racially polarized voting for purposes of the second and third *Gingles* preconditions in *Milligan*, *Robinson*, *MS NAACP*, *Nairne*, and other cases. In *Milligan*, for example, the evidence was that, "on average, Black voters supported their candidates of choice with 92.3% of the vote" while "white voters supported Black-preferred candidates with 15.4% of the vote" and "that the candidates preferred by white voters in the areas that he looked at regularly defeat the candidates preferred by Black voters." 599 U.S. at 22. In *Robinson*, the evidence similarly showed that Black voter cohesion was 83.8% on average, and that White crossover voting was between 11.7 percent and 20.8 percent—and the court concluded this was sufficient to show legally significant polarization. 86 F.4th at 597; *see also Robinson*, 605 F. Supp. 3d at 801. The numbers were similar in *Nairne* as well. 2024 WL 492688, at *31. The evidence of racial polarization in Mississippi is at least as strong, and Plaintiffs' evidence will establish the *Gingles*

---

[7] Dr. Orey primarily examined so-called "biracial" elections, which involve a Black candidate competing against a White candidate, because those elections are widely considered by courts and experts, on both sides, to be the "most probative." *E.g.*, *MS NAACP*, 2024 WL 3275965, at *27 ("Dr. Handley primarily focused on contests that included both black and white candidates because courts have found these biracial elections to be more probative than contests with only white candidates for a *Gingles* polarized-voting analysis."); *Nairne*, 2024 WL 492688, at *31 ("This Court finds—and both Defendants' expert and additional courts agree—that biracial statewide elections are the 'most probative' for determining racial polarization."); *Caster v. Merrill*, No. 2:21-CV-1536-AMM, 2022 WL 264819, at *27 (N.D. Ala. Jan. 24, 2022) ("Dr. Liu first examined seven biracial endogenous elections . . . based on case law indicating that evidence about biracial elections and endogenous elections is more probative of racially polarized voting than is evidence about other kinds of elections."), *aff'd sub nom. Milligan*, 599 U.S. at 9.

17

2 and 3 preconditions.[8]  *See MS NAACP*, 2024 WL 3275965, at \*29-32.

Defendants, in their pretrial brief, ECF No. 211 at 6, misread the holding in *MS NAACP* regarding judicial elections in Mississippi.  The racial polarization expert in *MS NAACP* offered analysis of Supreme Court elections, which are formally nonpartisan, "solely to rebut the contention that it could be party not race" causing polarization in Mississippi.  2024 WL 3275965, at \*31 (citation omitted).  The panel "agree[d]" that judicial elections are less partisan than other contests because "not all voters would be aware of the partisan alliances behind individual supreme court candidates," but the court concluded that those elections, standing alone, are not so thoroughly nonpartisan as to conclusively rule out the potential effects of partisanship in all Mississippi elections.  *See id.* at \*32.  And the panel then relied on historical and other evidence— evidence that applies equally to this case and is discussed in the Senate Factor 2 section below, including the testimony of Dr. Marvin King—to hold that polarization in Mississippi is a product of race, not merely partisanship.  *See id.* at \*32 ("[U]ltimately the evidence does not support that racial polarization has become partisan divisions.  For detailed reasons we set out in our analysis of Senate Factor 2, we find that . . . the Defendants have not rebutted the Plaintiffs' showing" of racial polarization.).

**B.  Plaintiffs Will Prove a Section 2 Violation Based on the Totality of the Circumstances.**

By proving the three *Gingles* preconditions, Plaintiffs will necessarily demonstrate that the combination of the existing district lines and persistent White bloc voting against Black-preferred

---

[8] Defendants rely on the fact that certain top-of-ballot, statewide candidates, such as President Barack Obama, have won a majority of the votes in District 1, but those races were also racially polarized (e.g., President Obama won 12.1% of the White vote in District 1 in 2012, compared to 92.7% of the Black vote), and there are obvious differences between those partisan contests and down-ballot, nonpartisan races for the Supreme Court.  PX-11 at 2.  Courts, including the district court in *Milligan*, have generally held that "endogenous elections," *i.e.*, elections involving the office and district at issue, are "more probative" than other elections.  *E.g.*, *Merrill*, 2022 WL 264819, at \*27; *see also MS NAACP*, 2024 WL 3275965, at \*27 (agreeing that endogenous elections are "the most probative").

candidates operates to disempower substantial numbers of Black voters who could otherwise be included in a Black-majority district. That is the fundamental dilution or submergence dynamic that *Gingles* and its progeny recognize. *E.g.*, *Gingles*, 478 U.S. at 46-57 & n.11. And looking to the totality of the circumstances, including the Senate Factors,[9] this is not the "'very unusual case'" where, despite the evidence of dilution-by-submergence, liability does not follow. *See Teague*, 92 F.3d at 293 (quoting *Clark*, 21 F.3d at 97); *MS NAACP*, 2024 WL 3275965, at * 33 (same). Rather, the evidence is fundamentally similar to the evidence that supported liability in recent cases like *Milligan*, *Robinson*, and *Nairne*—and virtually indistinguishable from the record in *MS NAACP*.

The ultimate question for a liability determination is whether Black voters "have an equal opportunity in the voting process to elect their preferred candidate under the challenged districting map." *Robinson*, 86 F.4th at 589. The Senate Factors are a non-exclusive guide to that inquiry, and no set number needs to be satisfied for a finding of vote dilution. *E.g.*, *Ga. State Conf. of NAACP*, 775 F.3d at 1342; *Patino v. City of Pasadena*, 230 F. Supp. 3d 667, 676 (S.D. Tex. 2017) ("There is no requirement that every factor be met, that 'any particular number of factors be proved, or that a majority of them point one way or the other.'" (citation omitted)). Those factors, and especially Senate Factors 2 and 7, confirm that Black voters do not have an equal opportunity to elect candidates of their choice under the Enacted Plan.

**Senate Factors 1 & 3:** On Senate Factors 1 and 3, there is no dispute that Mississippi has a long history of voting-related discrimination, including the use of numerous mechanisms that enhance the opportunity for voting discrimination, as courts have repeatedly acknowledged. *See, e.g.*, *MS NAACP*, 2024 WL 3275965, at *35 (finding no dispute "that Mississippi has a long and

---

[9] The Senate Report that accompanied the 1982 Voting Rights Act reauthorization drew on the factors identified in the Fifth Circuit's decision in *Zimmer*, 485 F.2d at 1305. *See Robinson*, 86 F.4th at 589; *accord Gingles*, 478 U.S. at 36-37 & n.4.

dubious history of discriminating against blacks" (cleaned up)); *Thomas*, 366 F. Supp. 3d at 807, *vacated as moot, Thomas*, 961 F.3d at 801; *see also, e.g.*, *Teague*, 92 F.3d at 293-94; *Clark v. Calhoun Cnty., Miss.* ("*Clark II*"), 88 F.3d 1393, 1399 (5th Cir. 1996). Dr. James Campbell, a tenured professor of history at Stanford University, and Dr. Marvin King, a tenured professor of political science at University of Mississippi, will each discuss that history and its relevance to the political landscape today. In addition to their testimony, the 173 U.S. Department of Justice voting determination letters issued prior to 2013 vividly demonstrate the extent to which discriminatory voting practices continued into the modern era. PX-27, PX-28, PX-29, PX-112 (subject to relevance objections). Individual voters' testimony at trial will also show that the history of exclusion still influences the lives of Black Mississippians, and, for some, represents their lived experience. That the very worst discriminatory voting rules were eradicated after 1965 is not a defense to vote dilution, as recent Section 2 merits determinations in Alabama (*Milligan*, 599 U.S. at 22-23), Georgia (*Alpha Phi Alpha v. Raffensperger*, --- F. Supp. 3d ----, No. 1:21-CV-05337-SCJ, 2023 WL 7037537, at *9 (N.D. Ga. Oct. 26, 2023)), Louisiana (*Nairne*, 2024 WL 492688, at *2), and Mississippi (*Thomas*, 366 F. Supp. 3d at 807 and *MS NAACP*, 2024 WL 3275965, at *39) demonstrate.

Moreover, the record will show that certain voting rules and procedures that enhance opportunities for discrimination in voting and burden the right to vote disproportionately for Black Mississippians remain in place, and in some cases have been expanded. These include lifetime felony disenfranchisement; restrictions on absentee voting, including new restrictions imposed in the last year; a strict voter ID law; a new voter purge law, beyond what federal law requires, that will lead to less frequent voters being taken off the active list and subjected to additional barriers; odd-year state legislative elections that lead to lower turnout and more voter fatigue, especially

among less educated voters; and a lack of early voting, mail-in voting, or same-day registration, or other practices that might make it easier to vote and ameliorate the effects of past discrimination and socioeconomic disparities. *MS NAACP*, 2024 WL 3275965, at *34-39 (finding that Senate Factors 1 and 3 weigh in plaintiffs' favor because Mississippi's felon disenfranchisement regime and other measures disproportionately harm Black voters). Redistricting itself has been used to deny political opportunity to Black voters, including during the 2020 legislative redistricting cycle, as the court found in *MS NAACP*. *Id.* at *38, 53. Such restrictive policies are relevant whether or not they are lawful or intentionally discriminatory, as both the expert and fact witness testimony will show that the burdens imposed by restrictive voting rules fall disproportionately on Black voters. *See, e.g.*, *id.* *35 ("Under Section 2 of the Voting Rights Act, though, we are concerned with whether there are discriminatory effects."); *Nairne*, 2024 WL 492688, at *36-39; *Jamison v. Tupelo*, 471 F. Supp. 2d 706, 714 (N.D. Miss. 2007); *Alpha Phi Alpha*, 2023 WL 7037537, at *64 n.54; *see also Singleton v. Merrill*, 582 F. Supp. 3d 924, 1021 (N.D. Ala. 2022).[10]

Rather than dispute history, Defendants appear to question whether "history" is a subject that is appropriate for expert testimony at all. JPTO, Section 9(c), Question No. 11. This suggestion fails out of the gate for the reasons noted above: Defendants failed to file any motion to disqualify Dr. Campbell and Dr. King as experts, and any attempt to preclude them from testifying now is untimely and should be denied on that basis alone. *See supra* Section I.A.1 (Defendants' similarly untimely argument as to Mr. Cooper's expertise). And in any case, their position flies in the face of decades of Section 2 precedent as well as the Federal Rules of Evidence.

---

[10] Moreover, to whatever extent required, Plaintiffs will pair their evidence regarding Mississippi's official history of discrimination with a showing that Black Mississippians "do not in fact participate to the same extent as other citizens." *N.A.A.C.P. v. Fordice*, 252 F.3d 361, 368 (5th Cir. 2001) (quoting *Clements*, 999 F.2d at 866).

Rule 702 requires that "the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702(a). Here, Senate Factors 1 and 3 specifically call for historical analysis, and historians and political scientists are uniquely suited to assist the Court by, among other things, identifying authoritative and relevant sources, analyzing competing evidence and arguments, contextualizing historical facts and trends, and explaining the prevailing view among scholars in those fields. Historians and political scientists have specialized knowledge within the meaning of Rule 702 and thus routinely testify as experts in Section 2 cases, including most recently in the *MS NAACP* case. 2024 WL 3275965, at *35.[11] Courts also routinely qualify experts to provide historical analysis outside of the Section 2 context.[12] In doing so, courts have rejected attempts to exclude a historian's work as insufficiently technical. *E.g.*, *vonRosenberg v. Lawrence*, 413 F. Supp. 3d 437, 451 (D.S.C. 2019). Courts have also rejected the exact argument that Defendants seek to make here—that any

---

[11] *See also, e.g.*, *Singleton*, 582 F. Supp. 3d at 982-84; *Robinson v. Ardoin*, 605 F. Supp. 3d 759, 807-12 (M.D. La. 2022); *Alpha Phi Alpha*, 2023 WL 7037537, at *42-44; *Fair Fight Action, Inc. v. Raffensperger*, No. 1:18-CV-5391-SCJ, 2020 WL 13561776, at *3 (N.D. Ga. Dec. 4, 2020); *Brown v. Bd. of Sch. Comm'rs of Mobile Cnty., Ala.*, 542 F. Supp. 1078, 1090-91 (S.D. Ala. 1982), *aff'd*, 706 F.2d 1103 (11th Cir. 1983), *aff'd sub nom. Bd. of Sch. Commissioners of Mobile Cnty., Alabama v. Brown*, 464 U.S. 1005 (1983); *Bolden v. City of Mobile, Ala.*, 542 F. Supp. 1050, 1075 (S.D. Ala. 1982).

[12] *See, e.g.*, *United States v. Kantengwa*, 781 F.3d 545, 562 (1st Cir. 2015) ("Dr. Longman thus fulfilled the historian's role of surveying a daunting amount of historical sources, evaluating their reliability, and providing a basis for a reliable narrative about the past." (cleaned up)); *In re Terrorist Attacks on Sept. 11, 2001*, No. 03-MD-1570, 2023 WL 3116763, at *6 (S.D.N.Y. Apr. 27, 2023) (qualifying historian whose methodology "involves assembling material sources, identifying comparators, and making judgments supported by the available information"); *Buending v. Town of Redington Beach*, No. 8:19-CV-1473-JSM-SPF, 2022 WL 17850781, at *1 (M.D. Fla. Oct. 18, 2022) (denying motion to exclude historian as expert witness); *Montana v. Talen Montana, LLC*, 574 F. Supp. 3d 795, 819 (D. Mont. 2021) (similar); *Dempster v. Lamorak Ins. Co.*, No. 20-CV-95, 2020 WL 5500836, at *6 (E.D. La. Sept. 11, 2020) ("Dr. Norrell has extensive experience as a history professor, researcher, and published author. Thus, he is qualified to testify as to historic information and the historical evolution . . . ."); *Waite v. AII Acquisition Corp.*, 194 F. Supp. 3d 1298, 1310 (S.D. Fla. 2016) (denying motion to exclude historian whose "curriculum vitae . . . reveals that [his] level of education, training, and experience far surpasses casual research"); *Walden v. City of Chicago*, 755 F. Supp. 2d 942, 951 (N.D. Ill. 2010) (qualifying expert on history of relations between African Americans and Chicago police department).

layperson is as capable of reading history as a trained scholar. *E.g.*, *Burton v. Am. Cyanamid*, No. 07-CV-0303, 2018 WL 3954858, at *4 (E.D. Wis. Aug. 16, 2018) ("Even when the words on the face of an historical document are comprehensible to [the factfinder], a trained historian can contribute tremendously to the accuracy and completeness of the [factfinder's] understanding by situating the document in its historical context.").

**Senate Factor 2:**

The second Senate Factor is "'the extent to which voting … is racially polarized.'" *Nairne*, 2024 WL 492688, at *38 (quoting *Gingles*, 478 U.S. at 37). Along with the seventh Senate Factor (the extent to which members of the minority group have been elected to office), it is often considered especially important, because it is directly indicative of whether Black voters are being submerged in districts where they lack the opportunity to elect candidates of choice due to White bloc voting against their preferred candidates. *E.g.*, *Fairley v. City of Hattiesburg*, 662 F. App'x 291, 296 (5th Cir. 2016) (quoting *Clark II*, 88 F.3d at 1397-98); *MS NAACP*, 2024 WL 3275965, at *52 ("Senate Factors 2 (racially polarized voting) and 7 are considered 'the most important' factors in a totality-of-the-circumstances analysis." (quoting *Gingles*, 478 U.S. at 48 n.15)).

Dr. Orey's analysis will show that the degree of racial polarization in Mississippi is very stark. Such proof creates an inference of racial bias in the electoral system. *See Teague*, 92 F.3d at 290 ("Plaintiffs are to present evidence of racial bias operating in the electoral system by proving up the *Gingles* factors."); *accord United States v. Marengo Cnty. Comm'n*, 731 F.2d 1546, 1566-67 (11th Cir. 1984) (Wisdom, J.) (racially polarized voting is "the surest indication of race-conscious politics"). Relying on similar facts as what Dr. Orey will present, the panel in *MS NAACP* recently found that racial polarization in Mississippi is "stark" and "that Black-preferred candidates are consistently unable to win elections unless running in a majority-minority district." *MS NAACP*, 2024 WL 3275965, at *32. The panel further elaborated that "it is almost impossible

23

for a black-preferred candidate to prevail [where Black voters are a minority] because crossover voting is nearly non-existent." *Id.* at *41.

In the face of this stark and pervasive racial polarization, Defendants may claim that partisan factors rather than race are at work. Any such arguments will fail. A Section 2 plaintiff does not have "the burden of negating all nonracial reasons possibly explaining" voting patterns that are starkly polarized along racial lines. *Teague*, 92 F.3d at 295; *accord Nairne*, 2024 WL 492688 at *38. Rather, when stark patterns of racial polarization in the electorate are present (as is the case here based on Dr. Orey's uncontested empirical results), it is for the defendant to "try to rebut plaintiffs' claim of vote dilution via evidence of 'objective, nonracial factors.'" *See Teague*, 92 F.3d at 292 (quoting *Nipper v. Smith*, 39 F.3d 1494, 1513 (11th Cir. 1994) (en banc)); *MA NAACP*, 2024 WL 3275965, at *40.

In the few instances where defendants have succeeded with such a defense, there has been record evidence that "indisputably proves that partisan affiliation, not race, best explains the divergent voting patterns among minority and white citizens." *League of United Latin American Citizens, Council No. 4434 v. Clements*, 999 F.2d 831, 850 (5th Cir. 1993) (en banc). For example, in *Clements*, the evidence showed very high levels of White crossover voting in Texas judicial elections for minority candidates, between 30 and 40 percent. *Id.* at 861. In addition, both political parties "aggressively recruited" minority candidates, successfully nominated them, and elected them with White support, such that there was a track record of minority candidates winning elections repeatedly and "without fail" with support primarily from White voters, including in contests against White candidates.[13] *Id.*

---

[13] Similarly, in *Whitcomb v. Chavis*, both parties were consistently nominating and electing Black candidates, and doing so with White support. 403 U.S. 124, 149-53 & nn. 29-30 (1971). Justice White

In a case like *Clements*, the facts could support the conclusion that the polarization of the electorate might be partisan rather than racial in nature because White voters were consistently *voting for and electing to office* minority candidates, both by "crossover" voting for minority voters' preferred candidates in significant numbers, and by consistently voting for minority nominees from their own preferred party. Where that is the case, it might be said that partisan affiliation "best explains" polarization, even if the racial composition of the two parties' is different. *Clements*, 999 F.2d at 850.

As the evidence will show, "[t]his case is different." *MS NAACP*, 2024 WL 3275965, at *40. As the panel in *MS NAACP* recently held, "[n]one" of the facts in *Clements* are present in Mississippi today: "There is no proof that whites constitute a majority of the Democratic Party, that Republicans aggressively recruit and unfailingly support black Republican candidates, or that elected white officials respond to black constituents as they did in Texas." *Id.* The record here will show, once again, that race best explains the polarization of the electorate along racial lines. *Accord Nairne,* 2024 WL 492688 at *38.

For one, the data shows that the race of the candidate matters in Mississippi elections: Completely unlike in *Clements*, White voters vote against Black candidates almost uniformly, in election after election. In *Clements* and similar cases, there were consistently high levels of White crossover voting. *E.g.*, *Clements*, 999 F.2d at 861 (discussing example of Black candidate who received 77% of the White vote while running against a White opponent). But as Dr. Orey's unrebutted calculations show, White crossover voting is persistently low, typically falling below 10% and nearly always below 15%. PX-11 at 1-2. In *Clements*, both parties were also consistently

---

described a similar scenario in his *Gingles* concurrence, in which both parties were nominating racially mixed slates of candidates, such that White voters were supporting and electing Black candidates and vice versa. 478 U.S. 30, 83 (White, J., concurring). That has not happened in Mississippi.

nominating minority candidates. *E.g.*, *Clements*, 999 F.2d at 878. Here, there is not a single instance in which the Republican Party (*i.e.*, the party typically favored by White voters) has nominated a Black candidate for the Mississippi Supreme Court (or commissioner, or any other statewide office since Reconstruction). And perhaps most importantly, in *Clements*, White voters were voting for *and electing* minority candidates to office. *E.g.*, *id.* at 885-87, 891-92. In Mississippi, there has not been a Black candidate—Republican or Democrat—elected statewide since more than 100 years ago during the Reconstruction, even though White Democrats (such as Jim Hood) have won statewide office in the recent past. *See* DX-31B at 621 (results of Hood defeating Scott Newton in Attorney General's race in 2003); DX-28A at 553, 649 (results of Hood's reelection as Attorney General in 2015). The *MS NAACP* panel is correct: "Race matters." *MS NAACP*, 2024 WL 3275965, at *31 (explaining that Jim Hood received "almost 18 percent of the white vote" in 2019, while a Black Democratic candidate, Johnny DuPree, received only 8.4% of the White vote).

The disadvantage faced by Black candidates is especially stark in Supreme Court elections. In particular, Justice Kitchens—a White candidate supported by the Democratic Party—prevailed against Kenny Griffis after winning over 40% of the White vote in District 1 in 2016; by contrast, when Latrice Westbrooks, a Black candidate supported by the Democratic Party, ran against Griffis in the same district in 2020, she received approximately 6% White support. PX-11 at 1; PX-14; PX-17. The greater electoral success enjoyed by White candidates associated with the Democratic Party, as compared to Black candidates associated with the same party, indicates that race does in fact matter for electoral success, including and especially in non-partisan Supreme

Court elections.[14]

Moreover, whereas no Black candidate for the Supreme Court has ever won (in any of the three districts) without a gubernatorial appointment and the associated incumbency advantage, White candidates in all three Supreme Court districts have prevailed without being an incumbent. PX-130 (Justice Kitchens in 2008 in District 1; Justice Dickinson in 2002 in District 2; Justice Pierce in 2008 in District 2; Justice Easley in 2000 in District 3; Justice Chandler in 2008 in District 3; and Justice Coleman in 2012 in District 3). Thus, historically, Black voters, even when they have been able to elect a Black candidate, have been limited to electing the options pre-determined for them by the Mississippi governor—an office that has never been occupied by a Black person in the history of the State. Nor does the limited success experienced by Commissioners Simmons and Stamps, whose victories despite intense racial polarization are the exceptions to rule, alter that basic reality: Commissioner races are for a different office, with different political dynamics, and, unlike judicial elections, are expressly partisan. *See supra* note 8.

And the history of race and politics in Mississippi also makes plain that the division of voters along racial lines is not an accident of partisan alignment but is driven by race. Dr. Campbell and Dr. King—whose testimony was considered and credited by the *MS NAACP* panel—will explain that race and racial issues played a critical role in shaping the partisan alignment of Black and White voters that we see today. As Black voters in Mississippi and across the South gained the franchise after the passage of the VRA in 1965, they began voting Democratic—and in the election cycles after that, White voters responded by moving to the Republican Party. *MS NAACP*,

---

[14] Data from a partisan primary, where candidates have the same partisan identification on the ballot, show that racial polarization continue to persist even in the absence of partisanship: In the 2011 Democratic gubernatorial primary, over 92% of the Black voters supported the Black candidate, who earned only 7.7% of the support from White Democrats. PX-14.

2024 WL 3275965, at *44 & n.10 (finding no dispute that "racial division and the Democratic Party's association with civil rights 'definitely played a role' in party realignment"). Mississippi voters realigned over time, in significant part, based on the parties' and candidates' positions with respect to racial equality and civil rights—a fact that no expert for the defendants has attempted to contradict. *See id*. at *44 n.10 ("We do not hold—nor need we—that realignment was solely race-based or that every Republican is motivated by it. But the evidence is undisputed that race plays a role."). The fact "[t]hat Mississippi voters have been separated by race even when most black voters were Republicans and white voters were Democrats" confirms that "racially polarized voting best explains the divide." *Id*. at 44. This realignment "undercuts the argument that the vote is polarized along party lines and not racial lines."[15] *Nairne*, 2024 WL 492688, at *38. The salience of race in Mississippi politics therefore cannot be clearer.

In sum, "there is no question that racial division is still part of what's going on in politics today." *MS NAACP*, 2024 WL 3275965, at *43 (cleaned up). Racial polarization remains stark and persistent; it is historically prior (and has helped to shape) the present partisan affiliation of Black and White voters; and it operates in all types of elections, even absent partisan cues, especially with respect to White voters' persistent opposition to Black candidates. As a result,

---

[15] In addition, judicial races in Mississippi are non-partisan, which means there is no partisan cue on the ballot. Defendants may argue that partisanship exerts some influence on nonpartisan judicial contests, and that Black voters typically support Democratic candidates, while White voters are associated with Republicans. But even in the context of partisan elections, courts have repeatedly rejected arguments that the mere correlation between race and partisanship, without more, can negate or diminish evidence of stark racial polarization among voters. *Robinson*, 605 F. Supp. 3d at 840-41. *See also Nairne*, 2024 WL 492688 at *38; *Alpha Phi Alpha Fraternity Inc. v. Raffensperger*, 587 F. Supp. 3d 1222, 1305-06 (N.D. Ga. Feb. 28, 2022); *NAACP, Spring Valley Branch v. E. Ramapo Cent. Sch. Dist.*, 462 F. Supp. 3d 368, 381 (S.D.N.Y. 2020); *cf. Clements*, 999 F.2d at 860-61 (holding it "entirely correct . . . that courts should not summarily dismiss vote dilution claims in cases where racially divergent voting patterns correspond with partisan affiliation"). That argument should be rejected here as well, especially where there is no partisan cue on the ballot. *See also Jamison*, 471 F. Supp. 2d at 713-14 ("The reasons that black and white voters vote differently have no relevance to the central inquiry of § 2…..").

Black candidates nearly always lose outside of Black-majority districts. Senate Factor 2 weighs extremely strongly in favor of the Plaintiffs.

**Senate Factor 5:** Courts have repeatedly recognized that, because of past discrimination, Black voters in Mississippi suffer from significant socio-economic disadvantages in areas such as education, income, and health that impede their ability to participate in the political process. *See, e.g.*, *Teague*, 92 F.3d at 294; *MS NAACP*, 2024 WL 3275965, at *49; *Thomas*, 366 F. Supp. 3d at 807.

Those substantial (and ongoing) disparities can hardly be undisputed: Poverty rates among Black Mississippians are nearly three times that of Whites; educational attainment, especially with respect to higher education, is significantly lower; rates of disease and lack of access to private medical coverage are significantly higher. *See, e.g.*, PX-36, PX-40. And as Dr. Traci Burch, a tenured professor of political science at Northwestern University, will testify, the empirical link in the political science literature between political participation and socioeconomic factors like income, poverty, educational attainment, and health is strong. *See*, *e.g.*, PX-40; *Gingles*, 478 U.S. at 69 ("[P]olitical participation by minorities tends to be depressed where minority group members suffer effects of prior discrimination such as inferior education, poor employment opportunities, and low incomes."); *Nairne*, 2024 WL 492688, at *39-41 (crediting analysis that disparities in these factors depress turnout).

On the same facts, the court in *MS NAACP* found "that voting and political participation has economic costs such that whether individual voters participate is influenced by financial resources, leisure time, and education," and that "[B]lack Mississippians suffer socioeconomic disparities that impair their ability to participate in the political process." 2024 WL 3275965, at *45 ("Black Mississippians are significantly worse off in terms of income, poverty,

unemployment, educational attainment, internet access, vehicle ownership, and health-insurance coverage . . . . [I]ncome and poverty have been significant factors influencing voter participation, generally and specifically in Mississippi.").

Contrary to Defendants' suggestion,[16] even if there were not a large turnout gap between Black and White Mississippians, these socioeconomic disparities alone would suffice to show that the burden or cost of voting is higher for Black Mississippians and that Senate Factor 5 favors Plaintiffs. *See MS NAACP*, 2024 WL 3275965, at *49 ("Irrespective of the size or even existence of turnout discrepancies, we find that the record establishes black Mississippians' ability to participate effectively in Mississippi politics is hindered by racial gaps in education access, financial status, and health. Senate Factor 5 thus weighs in favor of the Plaintiffs."). And in fact, Dr. Burch, who has published significant work in her field on voting behavior, will explain using two different analytical methods—both of which rely on verified voting data—that Black voter turnout was 14-16% points lower than White turnout in the 2020 general election, including and especially in Supreme Court District 1.

Dr. Burch's first method relies on a nationwide survey called the Cooperative Election Study ("CES"), which contains a representative sample of Mississippi voters; the study verifies survey respondents' actual voting behavior by obtaining state voting records, thereby eliminating known errors and biases that make self-reported polls and surveys unreliable as a source for estimating voter turnout by race. *MS NAACP*, 2024 WL 3275965, at *46 (identifying the CES as a "generally accepted method" of analyzing turnout). The results of the CES study show that an estimated 60% of White voters in Mississippi cast a ballot in 2020, compared to 46% of Black voters. PX-40 at 1. The second method, ecological inference, merges race data from the U.S.

---

[16] JPTO, Section 9(c), Question No. 15.

Census Bureau with turnout data in Mississippi's official voter file and uses statistical methods to estimate turnout by race. *MS NAACP*, 2024 WL 3275965, at *46 (identifying ecological inference as a second "generally accepted method" of analyzing turnout). This method, which again uses official turnout data reported by the Secretary of State, shows that 58% of White voters cast a ballot in the 2020 general election, compared to 42% of non-White voters; and specific to District 1, White turnout was 62%, while Black turnout 44%. PX-40 at 4.

Defendants will claim that there is parity between Black and White turnout by relying on self-reported surveys, which, as noted, are known to be incorrect because survey respondents often report having voted even when they did not. Defendants attempt to rely on a self-reported survey known as the Community Population Survey ("CPS"), which suffers from well-known biases and understates the turnout gap between Black and White voters, to claim that Black turnout is no lesser than White turnout in Mississippi. *See* DX-9.

Defendants also seek to rely on a non-peer-reviewed report posted online by the Brennan Center that is not specific to Mississippi, does not actually report estimated turnout numbers for Mississippi, and does not make public for review its underlying code, datasets, or raw results. *See* DX-5. And notably, the Brennan Report reaffirms that the CPS—Defendants' primary source for their argument about the racial turnout gap—is unreliable and understates the racial turnout gap, and it further found that, in 2022, Black turnout in Mississippi was lower than White turnout, and that the racial gap is widening over time. *See* DX-5 at 5.

In sum: The most reliable estimates of voter turnout by race in Mississippi show that Black Mississippians vote at lower rates than White Mississippians. And that gap is consistent with the massive socioeconomic disparities between Black and White Mississippians, especially with respect to educational attainment, which is highly correlated with voting behavior, resulting on

31

disparate burdens to political participation for Black Mississippians.

**Senate Factor 6:**  The record will also show a persistent use of "overt or subtle racial appeals" in political campaigns in Mississippi.  *Gingles*, 478 U.S. at 37.  These include, as Dr. King has found, advertisements and political messages that invoke discriminatory tropes about Black candidates or imagery and symbols signaling nostalgia for the Confederacy and an era when racial violence and oppression were widespread and accepted.  *See MS NAACP*, 2024 WL 3275965, at *49 (finding that use of Confederate flag "was seeking white-voter support"); *Jordan v. Winter*, 604 F. Supp. 807, 813 n.8 (N.D. Miss. 1984) (slogan "one of us" and images of confederate monuments in advertisements signaled racial appeals), *aff'd sub nom. Mississippi Republican Exec. Comm. v. Brooks*, 469 U.S. 1002 (1984).  Such appeals have occurred in a wide range of elections in Mississippi, including in judicial races for the Supreme Court, prominent top-of-ticket campaigns for federal office, and contests for the state legislature.  Examples have included a disparaging reference to decisions that a "Black judge" may issue, *MS NAACP*, 2024 WL 3275965, at *49 ("Similarly appealing to white voters, a sitting state representative in 2015 urged 'voters to vote against a ballot initiative because, if it passed, it would allow a Black judge to decide what happens with public schools.'"), and false portrayals of Black judicial candidates as criminals.  Others include more coded references, which, as Dr. King will explain, typify a strategy to utilize dog-whistles with enough plausible deniability to avoid alienating some voters.

The very existence of these racial appeals shows that race continues to be highly salient in Mississippi politics and that campaigns believe racial appeals are effective in motivating and polarizing voters.  *See, e.g.*, *MS NAACP*, 2024 WL 3275965, at *50 ("The evidence supports that some candidates continue to make racial appeals.  We find that Senate Factor 6 weighs in favor of the Plaintiffs."); *Mo. State Conf. of the NAACP v. Ferguson-Florissant Sch. Dist.*, 201 F. Supp. 3d

1006, 1078 (E.D. Mo. 2016) (finding the Factor 6 weighs in plaintiffs' favor because of existence of "subtle" racial appeals), *aff'd*, 894 F.3d 924 (8th Cir. 2018).

**Senate Factors 4 & 7:** Senate Factor 7 concerns the extent to which minority candidates have been elected to public office in the state, while Senate Factor 4 relates to the existence of an exclusive candidate selection process. Today, Black Mississippians continue to be underrepresented in public office in Mississippi, despite being nearly 40% of the State's population. *See Gingles*, 478 U.S. at 37; *MS NAACP*, 2024 WL 3275965, at *50 ("[P]roportionality 'is a relevant fact in the totality of the circumstances to be analyzed when determining whether members of a minority group have 'less opportunity . . . to participate in the political process.'" (quoting *Johnson v. De Grandy*, 512 U.S. 997, 1000 (1994))). "[T]here has not been a black candidate elected to statewide office since the end of Reconstruction 150 years ago," *id.* at *50, and Black legislators are under-represented in both the state house and state senate. Black candidates in Mississippi are almost exclusively elected only from Black-majority districts. There has never been more than one Black justice serving on the nine-member Supreme Court.

In addition, no Black candidate has ever won an election to the Mississippi Supreme Court without a prior appointment to the court by a governor—all of whom have been White. Even the governors who have appointed a Black justice consistently do so to replace a departing Black justice—effectively designating one Black seat on the State's highest court. Because incumbency has a determinative effect on the ability of Black candidates to be elected to the Supreme Court, the appointments process effectively operates as an exclusive process for selecting viable candidates and is a relevant consideration under Senate Factor 4. *See Lopez v. Abbott*, 339 F. Supp. 3d 589, 615 (S.D. Tex. 2018) (explaining that judicial appointments process that excludes minority candidates may constitute informal slating process for Senate Factor 4 purposes).

Finally, "[b]ecause a black-majority district is a virtual prerequisite for black candidates' success in Mississippi politics," the decision of the legislature to leave the districts "unchanged . . . despite substantial increases in the black population and corresponding losses in the white population" also weighs in Plaintiffs' favor for purposes of Senate Factor 7.  *MS NAACP*, 2024 WL 3275965, at *50.  The electoral challenge that Black candidates typically experience due to a lack of White support is a result of the high level of racially polarized voting in Mississippi and "the degree to which vestiges of discrimination continue to reduce minority participation in the political process."  *Veasey v. Abbott*, 830 F.3d 216, 261 (5th Cir. 2016) (en banc) (citing *Gingles*, 478 U.S. at 45).

**Senate Factor 8:**  As to Senate Factor 8, the trial record will demonstrate a "lack of responsiveness on the part of elected officials to the particularized needs" of Black Mississippians, *Gingles*, 478 U.S. at 37, including a lack of responsiveness to the significant racial disparities in the educational funding and quality and, to pervasive health disparities, both of which are substantial concerns for Black Mississippians that have not been addressed by State leaders.  *MS NAACP*, 2024 WL 3275965, at *52 ("Plaintiffs' examples of a lack of responsiveness include shortfalls in funding for education and the failure to expand Medicaid, the redistricting plan itself, and the failure of some white legislators to participate in black-community events. We find Senate Factor 8 favors the Plaintiffs.").  All this is consistent with the evidence that, outside of Black-majority districts, elected officials in Mississippi have little political incentive to appeal to Black voters' needs.  *See id.* at *41 ("We are more persuaded, though, by witnesses . . . who all testified—without contradiction—that their elected officials ignore the black community.").

**Senate Factor 9:**  The evidence will also show that the rationale for the Enacted Plan is "tenuous."  *Gingles*, 478 U.S. at 37.  The claimed justification for the 1987 revisions to the

Supreme Court district lines was population equality: The previous lines, which had been unchanged since 1890, had become too unequal in population and had come to violate the "one person, one vote" principle. PX-107 at 1-6 (decision in *McCray v. MS State Bd. of Election Comm'rs*, No. 84-CV-131 (N.D. Miss. Feb. 15, 1985)). However, four Censuses have come and gone since then, and no redrawing has occurred in the decades since, despite significant changes in Mississippi's population, including in the most recent Census cycle. *MS NAACP*, 2024 WL 3275965, at *50. Indeed, the population deviation range for the challenged districting plan is now again greater than 10%, which is presumptively inconsistent with the constitutional "one person, one vote" population equality requirement. The original rationale for the challenged plan is thus no longer valid, and instead would require the districts to be revised.

## CONCLUSION

The "political process is not 'equally open' to minority voters" in Mississippi, particularly for Black voters in the Delta. *See MS NAACP*, 2024 WL 3275965, at *41. The Court should issue an order determining that Defendants are liable for vote dilution under Section 2 of the VRA and enjoin the use of the current district lines to elect justices to the Mississippi Supreme Court pending a lawful remedial plan.

This the 8th day of July, 2024.

/s/ *Joshua Tom*
AMERICAN CIVIL LIBERTIES UNION
OF MISSISSIPPI FOUNDATION
Joshua Tom (Miss. Bar No. 105392)
101 South Congress Street
Jackson, MS 39201
(601) 354-3408
*JTom@aclu-ms.org*

ACLU FOUNDATION
Ari J. Savitzky*
Ming Cheung*
Victoria Ochoa*
Sophia Lin Lakin*
125 Broad Street, 18th Floor
New York, New York 10004
(212) 549-2500
*asavitzky@aclu.org*
*mcheung@aclu.org*
*vochoa@aclu.org*
*slakin@aclu.org*

* Admitted *pro hac vice*

SOUTHERN POVERTY LAW CENTER
Jade Olivia Morgan (Miss. Bar No. 105760)
Leslie Faith Jones (Miss. Bar No. 106092)
111 East Capitol Street, Suite 280
Jackson, MS 39201
(601) 948-8882
*jade.morgan@splcenter.org*
*leslie.jones@splcenter.org*

Bradley E. Heard*
Ahmed Soussi*
Sabrina Khan*
150 E Ponce de Leon Avenue, Suite 340
Decatur, GA 30030
(470) 521-6700
*bradley.heard@splcenter.org*
*ahmed.soussi@splcenter.org*
*sabrina.khan@splcenter.org*

SIMPSON THACHER & BARTLETT LLP
Jonathan K. Youngwood (Miss. Bar No. 106441)
Noah Gimbel*
Kate Lambroza*
425 Lexington Avenue
New York, NY 100017
(212) 455-2000
*jyoungwood@stblaw.com*

*Attorneys for Plaintiffs*

36

**<u>CERTIFICATE OF SERVICE</u>**

I, Joshua Tom, hereby certify that on July 8, 2024, I electronically filed the foregoing with

the Clerk of the Court using the ECF system which sent notification of such filing to all parties on

file with the Court.

This the 8th day of July, 2024.

<u>*/s/  Joshua Tom*_____</u>
Joshua Tom