# EXHIBIT 5

1               IN THE UNITED STATES DISTRICT COURT
             FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
2                        NORTHERN DIVISION

3


4   MISSISSIPPI STATE CONFERENCE
    OF THE NAACP, ET AL.                          PLAINTIFFS
5

    VERSUS          CIVIL ACTION NO. 3:22-CV-00734-DPJ-HSO-LHS
6

    STATE BOARD OF ELECTION COMMISSIONERS, ET AL.   DEFENDANTS
7

8


9                    THREE-JUDGE PANEL TRIAL

10      BEFORE CHIEF DISTRICT JUDGE DANIEL P. JORDAN, III,
                  DISTRICT JUDGE SUL OZERDEN,
11          AND FIFTH CIRCUIT JUDGE LESLIE SOUTHWICK

            THAD COCHRAN UNITED STATES COURTHOUSE
12                    501 E. COURT STREET,
                     JACKSON, MISSISSIPPI
13

                     TRANSCRIPT VOLUME 1,
14                    FEBRUARY 26, 2024

15


16              (APPEARANCES NOTED HEREIN.)

17

18

19

20

21
    REPORTED BY:
22

        CANDICE S. CRANE, RPR, RCR, CCR #1781
23      OFFICIAL COURT REPORTER
        501 E. Court Street, Suite 2.500
24      Jackson, Mississippi  39201
        Telephone:  (601)608-4187
25      E-mail:  Candice_Crane@mssd.uscourts.gov

1    **APPEARANCES:**

2    FOR THE PLAINTIFFS:

3        ARI J. SAVITZKY, ESQ.
         JOSHUA F. TOM, ESQ.
4        JENNIFER NWACHUKWU, ESQ.
         JOHN PATRICK LAVELLE, JR., ESQ.
5        ROBERT B. MCDUFF, ESQ.
         CARROLL E. RHODES, ESQ.

6

7    FOR THE DEFENDANTS:

8        TOMMIE S. CARDIN, ESQ.
         MICHAEL B. WALLACE, ESQ.
9        REX M. SHANNON, III, ESQ.
         P. RYAN BECKETT, ESQ.
10       BRIAN PARKER BERRY, ESQ.
         DILLON PITTS, ESQ.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1               **TABLE OF CONTENTS**

2   Style and appearances.................................1-2

3   Motions.............................................. 11

4   OPENING STATEMENTS:

5       By Ms. Nwachukwu.................................. 32

6       By Mr. Cardin.................................... 50

7       By Mr. Wallace................................... 61

8       Joint Trial Exhibit 55 entered...................... 72

9       Joint Trial Exhibits 1-54 entered................... 73

10      Plaintiffs' Exhibits 1, 2, 4, 5, 6, 8, 9, 20, 21, 22,
11      23, 24, 25, 53, 54, 88, 98, 90, 91, 92, 93, 94, 95,
        96, 99, 101, 102, 109, 114, 115, 116, 117, 118, 119,
12      and 127 entered.................................. 73

        Defendants' Exhibits 1, 2, 3, 4, 12, 13, 16, 21, 22,
13      23, 24, 25, and 50 entered.......................... 74

14  WITNESS:  WILLIAM COOPER

15      Direct by Mr. Savitzky............................ 75

16      Cross by Mr. Cardin.............................153

17      Defendants' Exhibit 76 entered.....................168

18      Defendants' Exhibit 78 marked for ID................201

19      Defendants' Exhibit 77 entered.....................208

20      Cross by Mr. Wallace.............................218

21      Redirect by Mr. Savitzky.........................220

22  Certificate of Court Reporter.........................228

23

24

25

1           **IN OPEN COURT, FEBRUARY 26, 2024**

2

3        JUDGE SOUTHWICK:  Please be seated.

4          So I don't know if anybody has taken a roll, but

5 this is a pretty good crowd here.  Welcome to all of you.

6 Those of you who have appeared previously on this case, I

7 am the truant judge who is finally showing up.

8          As you are familiar with the statutes, preliminary

9 matters can be handled even by just one judge.  Three of us

10 will be here for the entirety of these proceedings now that

11 the evidence and argument is being presented.  We have a

12 lot to do.  We set aside two weeks to do it.  All of you

13 treated this case very seriously.  We will continue to do

14 so, so as this panel.

15          Among the things we want you to take very seriously

16 is to finish this case in two weeks.  I, for one, and

17 perhaps my colleagues as well, have judicial obligations to

18 start the following week.  So it's not a matter of just

19 keep going.  We need to finish this thing by Friday,

20 whatever that means, 10, 11 days from now.

21          My role in this case will not be to preside.  You've

22 already been told that.  It's probably a relief to a fair

23 number of you that you're going to have an experienced

24 district judge, Chief Judge Jordan, in charge of these

25 proceedings in this courtroom.  We'll do the best we can as

1    the other two panel members to let him rule on evidentiary

2    objections or other matters that would generally be handled

3    sort of as a matter of course, whatever those objections

4    might be.  He has assured us that if we want to confer on

5    something, he will allow us to confer.

6         With that, I'll turn this over to Chief Judge

7    Jordan, who has significantly more detail on what's ahead.

8         JUDGE JORDAN:  Thank you.  Good morning.

9         All right.  First, are the parties ready to proceed?

10         MR. SAVITZKY:  Plaintiffs are ready to proceed, Your

11    Honor.

12         MR. CARDIN:  Yes.  Defendants are ready, Your Honor.

13         JUDGE JORDAN:  All right.  Mr. Wallace, are you

14    ready to proceed?

15         MR. WALLACE:  He said defendants, that includes me.

16         JUDGE JORDAN:  Okay.  All right.  I do have some

17    housekeeping matters to take up.  First, I'll instruct

18    Ms. Powell at this point to docket the pretrial order.  I

19    do note the order reflected pending motion 188, and I would

20    just note for the record that since that time, 196 has been

21    docketed, and we'll take those up this morning.

22         Mr. Savitzky emailed me yesterday regarding

23    deposition transcripts for -- is it Lennep; is that right?

24         MR. SAVITZKY:  Yes, Your Honor, Lennep and

25    Mr. Kirkpatrick as well.

1      JUDGE JORDAN:  When you sent the email, you were

2  asking whether to bring a hard copy for the record, and

3  obviously I instructed you to do that.  Everybody was

4  copied on it.  I had not seen those two depositions, and I

5  was afraid that maybe I had missed it.  But I spoke with

6  Ms. Powell, and she hasn't seen it either.  So at some

7  point somewhere that got -- maybe on our end or your end,

8  I'm not sure.  But we have not seen it.

9      Were there objections in the depositions?

10      MR. SAVITZKY:  There are a few objections.  Not very

11  many, but there are a couple in there noted.  There's a

12  cover sheet that contains the designations,

13  counter-designations, and objections.  And those are also

14  noted in the format the Court prescribed in the transcript

15  excerpts themselves.

16      JUDGE JORDAN:  If you would please have somebody

17  email the PDF -- I think you said it was a PDF; is that

18  right?

19      MR. SAVITZKY:  Yes, You Honor.  It's a single PDF

20  with excerpts from both transcripts.  I do believe we

21  emailed the Court, and we can certainly email it again.

22      JUDGE JORDAN:  Thank you.  All right.  There were

23  requests to have, obviously, attorneys but also witnesses

24  bring phones with them.  We granted that, but I'm going to

25  remind everybody to check right now, make sure your phones

1    are on silent, make sure the vibration is off, too.  And I

2    would ask you to be mindful of that throughout the next two

3    weeks.  I also remind everybody that, you know, even though

4    you have phones here that there can be no recordings of the

5    proceedings, no video, no audio.  So everybody in the

6    courtroom here is advised of that in order to refrain from

7    any recording.

8         There was one member of the press that asked for

9    permission to use his laptop to take notes.  He's submitted

10   an affidavit acknowledging the Court's rules against

11   recording and signed that.  We would extend that same

12   opportunity to any other members of the press provided that

13   they also sign that affidavit and are aware that, again,

14   there can be no recordings whatsoever of the proceedings.

15        I will say -- and I apologize for being heavy handed

16   here, but that's a significant rule.  And I have had on one

17   occasion where a reporter broke that rule and put a

18   photograph of the court proceedings on the internet.  I did

19   send the U.S. Marshals.  It didn't happen again.  But it's

20   a privilege and a courtesy to have those devices in the

21   courtroom.  And if it's abused, then we will withdraw that

22   courtesy as to all the press.

23        All right.  I'll just remind you, and I know that

24   our court reporter, Ms. Crane, here will remind you as

25   well, but she is making a recording of the proceedings.

1    It's important, you know, in terms of having an accurate

2    record that the recording devices pick up what you're

3    saying.  So, you know, we will ask at all times that you

4    remain on microphone and make sure that your microphones

5    are turned on.

6         All right.  Now, with respect to evidentiary

7    objections, I will just kind of note upfront that this is a

8    bench trial.  There is no risk of tainting the jury.  There

9    are going to be objections where we have to hear the

10   evidence anyhow to determine whether or not, for example,

11   it's relevant.

12        It is likely that the Court will lean on Rule 104(b)

13   and admit the evidence.  If it turns out that the evidence

14   is -- has no weight or is not relevant, then it will not

15   impact the ultimate judgment of the Court.  Our final

16   opinion will identify the evidence upon which we relied.

17   And if there's something that it turns out that was not

18   relevant, then it just will not be considered.

19        I will note that we will essentially take the same

20   approach with respect to expert objections.  As we've all

21   discussed, there was, during the pretrial conference, a

22   discussion about whether the Republican Party had waived

23   objection to the plaintiffs' experts by not filing a

24   *Daubert* motion within the time allowed in our local rules.

25   Whether the party is allowed to object at this point really

1   doesn't impact the evidence.  I think that the intervenor

2   would still be allowed to cross-examine the witnesses as to

3   their qualifications and as to their methodology.

4   Essentially the Rule 702 type issues.  So it's not -- on

5   the other hand, we would want to hear from the experts to

6   determine -- because we have to either determine whether

7   they're qualified or the weight to give their testimony, so

8   we don't anticipate that that's going to impact the

9   evidence and whether or not they can raise an objection at

10  this point is something we can address at another time.

11      That said, the qualifications and methodology are

12  different from the objection to introducing the reports.

13  That's not something that our local rules would address.

14  Mr. Wallace, am I correct in reading the pretrial order and

15  your proposed findings of fact it appears this issue

16  applies only to Luckett and King; is that right?

17      MR. WALLACE:  Yes.  We've stipulated to the

18  admission of all the rest of the reports.  We don't think

19  you can waive a report into evidence, and we object to

20  Luckett and King.

21      JUDGE JORDAN:  All right.  As to that, we certainly

22  understand that it can be a time-saver, and it could be at

23  the end of the day that using the reports might save more

24  time for the defendants' case next week.  Having said that,

25  plaintiffs need to be prepared to put on that evidence if

1  we rule that you cannot offer the reports.

2       Frankly, the cases that the plaintiffs cited saying

3  that the Court can do that don't support the position.

4  They almost uniformly say if it's agreed to by the parties,

5  then you can offer the report.  But those very same cases

6  sustained objections to the admissions of the reports,

7  because they weren't agreed to.  They're hearsay.

8       So just in the interest of making sure you're

9  prepared and your witnesses are prepared, I'll let you

10 argue it when the time comes, but from what I've read so

11 far, I don't think that those reports should come in.

12      MR. SAVITZKY:  Understood, Your Honor, and we'll be

13 prepared to argue the issue and present the testimony.

14      JUDGE JORDAN:  All right.  Thank you.  All right.

15 With respect to objections, quickly, I'll probably rule on

16 objections as to the form of the question.  But, you know,

17 more substantive questions, we may confer.  And I think

18 we'll probably get into -- none of us have done this

19 before, but we'll probably get into a rhythm of how we

20 handle that.

21      Now, Mr. Savitzky, are you getting daily copies?

22      MR. SAVITZKY:  We are, Your Honor.

23      JUDGE JORDAN:  Okay.  I'm going to ask that you

24 provide what I've said and what Judge Southwick said to

25 your attorneys who are not here.

1       All right.  Do the parties wish to invoke the rule?

2       MR. CARDIN:  Yes, Your Honor, we do wish to invoke

3   the rule.

4       JUDGE JORDAN:  Okay.  The rule's been invoked.  I

5   don't know any of the witnesses, so the parties will need

6   to monitor that, and if there's somebody here in the

7   courtroom that shouldn't be, you can let me know.  Now,

8   with respect to that, I know -- go ahead.

9       MR. SAVITZKY:  Just on the issue, I believe the

10  parties have agreed that for expert witnesses, they would

11  be able to stay in the courtroom.

12      JUDGE JORDAN:  Yes, sir.

13      MR. CARDIN:  Yes, sir.  We're in agreement with

14  that.

15      JUDGE JORDAN:  All right.  Very good.

16      MR. SAVITZKY:  And, Your Honor, one other point of

17  clarification.  As I understand it, opening statements are

18  not evidence, so the rule wouldn't apply until after

19  opening statements.

20      JUDGE JORDAN:  All right.  Okay.  So we do have two

21  motions.  I emailed the parties on Sunday indicating that

22  we would take those up.  It's 188 and 196.  188 is the

23  defendants' motion for judicial notice of census data.

24  Who's going to argue that on behalf of the defendants?

25      MR. CARDIN:  Your Honor, may it please the Court,

1    Tommie Cardin, I'll make that argument.

2         JUDGE JORDAN:  Mr. Cardin, come on up.  And while

3    you are, I guess there are a couple of issues I want you to

4    address, and then you can address anything else that you'd

5    like to.

6         MR. CARDIN:  Okay.

7         JUDGE JORDAN:  All right.  From reading your briefs,

8    it seems to us that you are not asking the Court to take

9    judicial notice of the census data in the sense that you're

10   asking us to accept that it's true.  It feels more like

11   you're asking us to admit the census data, and then allow

12   the plaintiffs to put on evidence to show that it's in some

13   way inaccurate.  But I'm not sure that Rule 201 works that

14   way.

15        Under 201(f), if the Court takes judicial notice of

16   something, you have to instruct the jury that it's

17   established.  And so we can't take judicial notice the

18   census data is accurate, because you yourself said in your

19   motion that plaintiffs are entitled to put on their

20   evidence showing it's not.  So it doesn't seem like the

21   type of issue for which the Court takes judicial notice.

22   It sounds more like you're asking us to find that it's a

23   self-authenticating document under 902(5).

24        MR. CARDIN:  Your Honor, may it please the Court?

25        JUDGE JORDAN:  Yes, sir.

1    MR. CARDIN:  We do believe that this data qualifies

2 under Rule 201, because it's data that certainly is an

3 adjudicated fact.  There's no question about that.

4    But, secondly, with regard to the requirements in

5 the rule that its accuracy -- it has to be capable of

6 accurate and ready determination by resorting to sources

7 that can accurately -- whose accuracy cannot be questioned.

8 This is United States Census Bureau data.  This data is

9 collected every two years, and it's been collected every

10 two years for probably the past some-odd-60 years.  And

11 significantly, this is data that the U.S. Supreme Court in

12 *Shelby County* against *Holder* specifically cited and relied

13 upon in its holding of Section 4 of the Voting Rights Act

14 unconstitutional.  So we believe that the data in and of

15 itself, Your Honor, is not data that can be reasonably

16 questioned in terms of what's being reported.

17    JUDGE SOUTHWICK:  Counsel, I may be out of place as

18 an appellate judge, but I hope we can exchange some here.

19 It seems to me it's two different things.  It's

20 self-authenticating that this is the data developed by the

21 Census Bureau through its procedures.

22    MR. CARDIN:  Yes, sir.

23    JUDGE SOUTHWICK:  And if I understand this data

24 correctly, it's even acknowledged by the Census Bureau or

25 whoever made this statement in it, that it's not

1   necessarily accurate in the aspects that you in

2   particular -- not you, but the defense wants to rely on.

3   So it does seem to me two different things.  Yes, this is

4   the census data, and I think that the other side would

5   concede that.  But how we use it is an entirely different

6   question.

7          So *Shelby County*, I can't say I recall exactly how

8   it was used there.  But it's one thing to say, here are the

9   population figures, here are the way redistricting has to

10  be done among the states.  It's something else to say, in

11  the very granular way that you want to use this data, that

12  it's accurate enough.  And that's what the other side wants

13  to dispute.  What's wrong with that?

14         MR. CARDIN:  Well, Your Honor, we don't see any that

15  there's any issue with that because the Court as the fact

16  finder, as the trier of fact, the Court can assign whatever

17  weight it wishes to the reliability or the

18  trustworthiness --

19         JUDGE JORDAN:  How do you address 201(f) that says

20  in a jury trial when judicial notice is taken, you have to

21  instruct the jury that that fact has been conclusively

22  decided.  The other side is not allowed to put on contrary

23  evidence.

24         MR. CARDIN:  Well, first of all, Your Honor, this is

25  not a jury trial.

1          JUDGE JORDAN:  I understand.  But you understand the

2     policy behind the rule is the same.

3          MR. CARDIN:  Well, but with regard to that policy,

4     Your Honor, the facts that are being reported, the facts

5     that we're asking the Court to take judicial notice of, it

6     can't be questioned that those facts are reported regularly

7     by the Census Bureau.  And so in terms of anything further

8     than that, this Court as fact finder is free to consider

9     whatever objections there may be to the data --

10          JUDGE JORDAN:  So all you're asking -- and I'm sorry

11     to interrupt -- but all you're asking us to do is take

12     judicial notice that the census put these numbers out

13     there?

14          MR. CARDIN:  Essentially, yes, Your Honor.  That

15     those are numbers that are reported by the Census Bureau in

16     its regular course of business every two years.  And we

17     believe that that's proper for judicial notice, Your Honor,

18     because those are the facts that are out there and that are

19     reported.  And anything beyond that, certainly, the

20     plaintiffs are going to be free to present whatever

21     evidence they wish.

22          JUDGE SOUTHWICK:  Why is this -- it seems to me

23     you're saying that this is little more than

24     self-authentication.  That this document should be taken

25     for its purposes, which is the report by the Census Bureau

1   of its numbers.  And why isn't it enough for it to be

2   self-authenticating?  What are you trying to gain -- I'm

3   not trying to get into your inner workings, but what is the

4   extra that you're asserting you're entitled to by judicial

5   notice.

6        MR. CARDIN:  Well, Your Honor, this is evidence --

7   this is a critical piece of evidence with regard to a

8   significant issue in the case, and that is the degree of

9   voter registration and voter turnout that's taking place in

10   Mississippi now and that has over the past years.  And so

11   with regard to what we intend to achieve with that, we

12   believe that the data being official data from the Census

13   Bureau, coming from a governmental agency, and being

14   reported in the course of its business is data that is

15   informative.  And it's data that is relevant, and it's data

16   that's important to consider.  And we think that that is --

17   by offering that, we're putting that evidence before the

18   Court and then the determinations on anything beyond that

19   can be made by the Court as fact finder.

20        JUDGE JORDAN:  All right.  Anything else?

21        MR. CARDIN:  Your Honor, I don't believe I have

22   anything else other than we do believe there are

23   distinguishing characteristics between the cases that the

24   plaintiffs have cited in response to our motion, and we've

25   set those forth in the briefs.

1       Does the Court wish for me to respond to the other

2  motion or are you going to take that separately?

3       JUDGE JORDAN:  Take it separate.

4       MR. CARDIN:  Okay.  Thank you, Your Honor.

5       MR. SAVITZKY:  Good morning, Your Honors.  May it

6  please the Court, Ari Savitzky for the plaintiffs.  Your

7  Honors, the watchword of judicial notice of Rule 201 is the

8  fact reasonably disputed.  Is it subject to reasonable

9  dispute?  The accuracy of this CPS survey data -- and what

10  we're talking about here is data from a survey of a sample

11  of voters asking them did you register; did you vote?  It's

12  hotly contested.  The expert that the defendants ultimately

13  decided not to offer in this case said this is a

14  controversial issue in political science.  Multiple of the

15  experts in plaintiffs' case have said that this data is not

16  accurate.  And the reason the court in Georgia just

17  recently in a Section 2 case declined to take judicial

18  notice of this data is because it is not accurate.  It

19  didn't -- the number of voters who actually voted according

20  to the survey, if you took the survey at face value, was

21  deeply inconsistent with the numbers from the Georgia

22  Secretary of State.  And that is precisely the case in

23  Mississippi as well.

24       JUDGE JORDAN:  But what Mr. Cardin is -- in some

25  sense, y'all, your briefs are like two ships passing in the

1    night.  You may be correct that we can't take judicial

2    notice as to the accuracy of the data, but he's taken a

3    step back saying he's not asking us to do that.  He says

4    you can put on evidence.  All he's saying is we should take

5    judicial notice that this is what the Census Bureau said.

6         MR. SAVITZKY:  And, Your Honor, if the request was

7    to take judicial notice of the fact that the Current

8    Population Survey includes a question on voting and

9    registration, or a series of questions on voting and

10   registration, that would be a different matter.  I don't

11   think there's any dispute as to that.

12        But what defendants are asking -- and I believe

13   Mr. Cardin said that, that the defendants want you to

14   consider the accuracy of this data.  They want you to

15   consider that as a relevant piece of evidence in this case.

16   And the accuracy of the data is deeply, hotly disputed,

17   subject to more than reasonable dispute so --

18        JUDGE SOUTHWICK:  Excuse me.  Mr. Cardin referred to

19   *Shelby County*.  Was that just raw numbers, or do you know

20   how the *Shelby County* opinion used in this maybe not

21   equivalent data?

22        MR. SAVITZKY:  So as I understand it, the *Shelby*

23   *County* opinion did reference the Current Population Survey

24   data.  There's no indication in *Shelby County* that the

25   Court was taking judicial notice under Rule 201.  It

1    appears -- and, again, it's not totally clear to me, but it

2    appears as part of the record below and it was in the

3    parties briefs below.  So that's not an instance where you

4    have a court ruling pursuant to Federal Rule of Evidence

5    201, this is information -- and, again, if defendants had

6    wanted to present this information through an expert who

7    could discuss the accuracy of the data and explain why this

8    particular survey should be considered accurate,

9    notwithstanding the fact that these are just voter

10    statements of whether they voted and they're not

11    independently verified, that would be a different matter,

12    and then that would be in the evidentiary record in the

13    case.  But what you're being asked to do is to take

14    judicial notice of this particular -- the data and then to

15    consider its accuracy.

16        JUDGE SOUTHWICK:  Counsel, do you have any objection

17    to it being admitted as self-authenticating and the data is

18    what the data can be shown to be by expert testimony?

19        MR. SAVITZKY:  Well, I don't think there is any

20    expert testimony being offered to establish the accuracy

21    of --

22        JUDGE SOUTHWICK:  So the only testimony perhaps

23    would be from your side to show where it's wrong, but

24    there's no supportive testimony or witnesses from the

25    defense side?

1          MR. SAVITZKY:  Correct, Your Honor.

2          JUDGE JORDAN:  Are you taking the position that it's

3     not a self-authenticating document?

4          MR. SAVITZKY:  You know, Your Honor, the data is

5     reported by the CPS, and it says what it says.  But it's

6     not a self-explaining document, right?  I don't think -- we

7     do not question the authenticity of the numbers that are

8     reported in the survey.  What's disputed is the accuracy of

9     those numbers, and they're not what's relevant in the case.

10    There's no relevance to the mere fact the CPS publishes

11    these numbers.  The relevance of the numbers is the extent

12    to which they can be relied on as accurate.  And that is

13    precisely what the defendants want the Court to consider,

14    and it's precisely what the Court can't do through rule 201

15    and judicial notice.

16         JUDGE JORDAN:  All right.

17         MR. CARDIN:  May it please the Court, Your Honor,

18    just a couple of items.  With regard to the Georgia case

19    that counsel mentions, I think that that is fine example of

20    why we're asking for the Court to take judicial notice.  In

21    Georgia, Georgia actually records voter registration by

22    race, and so there are official state records that have

23    recordings to that effect that you have access to.

24    Mississippi does not, and so that's why this evidence is

25    important.  This data is important, at least to be before

1    the Court, for the Court to consider it.

2         With regard to *Shelby County* against *Holder*, the

3    United States Supreme Court specifically cited this very

4    table, table 4, the very table that we're seeking to

5    request judicial notice of, and pointed out that those

6    figures indicate that African-American voter turnout

7    exceeded white voter turnout in five of the six states

8    originally covered by Section 5, specifically citing

9    Mississippi in the table.  So, Your Honor, we think that --

10        JUDGE SOUTHWICK:  Can I stop you there, Mr. Cardin?

11   Your friend on the other side said he thought perhaps

12   there's more record development.  Do you know offhand if

13   that's true or will a witness testify that's true?

14        MR. CARDIN:  Your Honor, I'm not aware specifically.

15   I think it came up by way through motions, in terms of

16   summary judgment motion at the lower court level, but

17   specifically how it got there, I'm not exactly sure about

18   that.  But the point --

19        JUDGE JORDAN:  Isn't that a pretty big issue?  If it

20   was in the record below before it got to the Supreme Court

21   and it was properly in that record because there was a

22   witness who could testify as to those numbers, that's a

23   very different situation than asking us to take judicial

24   notice.

25        MR. CARDIN:  Your Honor, with regard to the actual

1    judicial notice of the data, the data in and of itself

2    appears in this opinion and is relied on by the U.S.

3    Supreme Court.  And so regardless of how it got there, it

4    is relied on for the very -- the very issue we're talking

5    about here.  And so we believe that that supports the idea

6    of affording judicial notice to it.

7        Now, I would say alternatively, Your Honor, if the

8    Court doesn't think that this should come in by way of

9    judicial notice, we would assert that it is

10    self-authenticating under Rule 902(5), and we think it

11    would be proper to be admitted into evidence in that

12    regard.

13        JUDGE JORDAN:  All right.  Thank you.

14        MR. CARDIN:  Thank you.

15        JUDGE JORDAN:  All right.  Who's going to argue the

16    plaintiffs' motion?

17        MR. SAVITZKY:  Your Honor, I'll argue the

18    plaintiffs' motion.  May it please the Court, the two

19    judicial notice motions before you are somewhat different

20    in the sense that the plaintiffs motion involves facts that

21    are uncontested, undisputed.  The plaintiffs' motion is

22    straightforward.  The facts we ask you to notice are,

23    first, some basic facts about how special elections are run

24    in Mississippi, set forth in the Mississippi Code;

25    Secretary of State's own documents, which defendants do not

1   and cannot dispute.  These are facts like the fact that

2   special elections are conducted on a nonpartisan basis to

3   fill vacancy, or that they can occur on as little as

4   60-days notice.

5       We ask the Court to take judicial notice of facts

6   about the occurrence of particular special elections in

7   2020 and 2021 to fill certain vacancies that arose in state

8   legislative seats.  Those facts are also not disputed.

9   They're set forth in writs of election issued by the

10  Governor, as well as newspaper articles indicating when

11  those elections occurred.

12      And, finally, we ask the Court to take judicial

13  notice of basic facts about the existence and function of

14  Mississippi's planning and development districts, which are

15  set forth in public documents issued by state agencies like

16  the Mississippi State Ethics Commission as well as the

17  website of the and the Mississippi Association of Planning

18  and Development Districts, which, again, the defendants

19  don't and cannot contest.  These are all facts of which

20  there is no reasonable dispute.

21      I think the argument on the other side with respect

22  to the facts about special election procedures is they're

23  nonadjudicative.  They are adjudicative facts.  The Court

24  at the pretrial conference was rightly concerned about

25  potential facts having to do with the ability to put a

1    remedy into place if we prevail on the merits.  While the

2    Court can certainly hear additional argument and evidence

3    about remedy, there's no reason why facts that go to remedy

4    and the ability to put a remedy in place cannot be

5    adjudicated now at trial.  And that would make sense, and

6    judicial efficiency would support doing it.

7        And with respect to the planning and development

8    document --

9        JUDGE SOUTHWICK:  It seems to me this first part,

10   not the PDDs but the special election piece, is a remedy

11   piece as you're acknowledging.  The statutes are there.  I

12   don't think we need to take judicial notice of the statutes

13   in the formal motion.  The rest of it is to show it's the

14   real deal, that Mississippi really has these elections.  I

15   don't see much relevance to your evidence of the conducting

16   of special elections.  I don't see what it adds to what we

17   ought to be considering, beyond knowledge that the statute

18   exists.

19       MR. SAVITZKY:  Well, Your Honor, I do think it

20   shows, as you say, it's the real deal.  In other words,

21   these procedures are followed, that they have been followed

22   recently.

23       JUDGE SOUTHWICK:  Will there be some question of

24   that beyond just knowing about the statute says?  Is that

25   why you want this evidence?  I'm a little concerned about

1    why this evidence needs to come in if it's only to show

2    this is an operative statute and not being used --

3         MR. SAVITZKY:  Well, I think not merely that it's

4    operative as a legal matter, but that it's been used

5    recently.  It's in practice.  It's a common practice that's

6    been used, that election administrators use these statutes

7    and procedures to hold these elections on these particular

8    timeframes and have done so in the recent past and have

9    experience with doing so.  And I think those facts can give

10   the Court comfort that there won't be any undue burden in

11   ordering a special election into place, and these

12   procedures are one option for the Court to do so.  So I

13   think it's relevant in that sense.

14        I certainly think it might not be necessary, and the

15   Court could take notice of the Code and rely on those.  But

16   those additional facts are helpful in providing evidence

17   that these procedures can, in fact, be used.

18        JUDGE SOUTHWICK:  I've heard enough in the expert

19   depositions and declarations to understand how your side is

20   using the Planning and Development Districts' blue lines

21   (indiscernible).  It does seem to me that their role in

22   this and their relevance, whether the generation of these

23   50 years ago -- I don't know if the boundaries have been

24   altered any -- has any current relevance in the compactness

25   of districts or cracking or packing minority populations.

1    I'm not sold yet, and I'm a little worried about taking

2    judicial notice of newspaper articles and some of the

3    things that are being offered as to why PDDs are useful in

4    the kind of analysis that we need to make.

5          If we were to take judicial notice, how far would

6    that take you?  We certainly can take notice they exist.

7    But if they're going to be relevant to your case, we need

8    to give that some importance to the existence of it, and

9    I'm not sure I see the purpose of these old districts that

10   were created for a different purpose that your experts

11   used.  I understand that, so it's very important to you.

12   But I don't understand why they used them.

13         MR. SAVITZKY:  Well, I mean, first of all, I would

14   point the Court to Exhibit L to our motion which shows

15   they're not merely sort of old districts that no longer

16   have a function.  They -- they play a role today.  They

17   administer different state -- different programs and

18   services.  They coordinate services, planning, and

19   development services in each of these different areas and

20   they tie these different counties grouped in these regions

21   together.

22         I think the particular way in which the -- the

23   plaintiff's mapper took those in to account just in

24   considering the demographics and distributions of the state

25   and the connections between different communities are --

1    will certainly come out when -- when plaintiff's expert

2    comes on but these are the -- the regional planning

3    districts for the state.  They're quasi-public entities.

4    They have been used in other cases, similar regional

5    commissions, just to reconsider the geography of the state

6    on a regional level, and I don't think there's anything

7    dispositive about it one way or another.  It's just another

8    way to look at the state.

9         Obviously maps are an incredibly important part of

10   these cases and thinking about the geography of the state

11   in different ways is -- is potentially relevant.

12        JUDGE JORDAN:  My concern is this: The motion was

13   filed late, not delinquent, but late in the day.  I

14   instructed the defendants to file a response over the

15   weekend, which they did, but, you know, I'm sure they were

16   preparing for trial.  It's a pretty generic response.  I'm

17   not sure in my mind that I have each fact that you're

18   asking us to take judicial notice of sort of squared up

19   with their arguments.

20        For example, the whole Section 2, a lot of that is

21   based on newspaper articles and the Fifth Circuit has said,

22   you can't take judicial notice based on a newspaper

23   article.  The PDD section, you rely heavily on Exhibit L,

24   but I don't know enough about that association to know

25   whether I can take judicial notice of its publication.

```
1          So that's my concern is you're asking us to take
2     judicial notice about 40 or 50 different things, but I
3     don't have a clear understanding of whether you're
4     entitled.  I don't know anything about PDDs, you know,
5     other than what you put in there from newspaper articles
6     and other stuff, but I don't know if that's enough for
7     judicial notice.
8          MR. SAVITZKY:  Well, Your Honor, I do think -- first
9     of all, we cited as well the Mississippi State Ethics
10    Commission dealing with PDDs indicating that they're
11    subject to ethics rules in the state because their
12    quasi-public bodies executive order on --
13         JUDGE JORDAN:  Sure.  But I don't know that that
14    gets to the heart of why you want this, and I'm not sure
15    you need it.  Cooper, I assume, is going to testify about
16    all this stuff, and so why should we take judicial notice
17    that his testimony is accurate?  And it would be more
18    appropriate for us to -- to argue this issue after he
19    testifies.
20         MR. SAVITZKY:  Well, Your Honor, I certainly think
21    you could reserve on the question of whether you want to
22    take judicial notice of these facts of the PDDs until after
23    you hear Mr. Cooper's testimony and consider whether you
24    need that in the record.  And I would agree with Your Honor
25    that nothing about the ultimate case on *Gingles* 1 turns on
```

1　the admission of this into evidence.  We think it's helpful

2　and relevant to provide that additional context, and if the

3　Court's concern is wanting to see how exactly it fits in on

4　*Gingles* 1, I think it would be appropriate to reserve on

5　that question and make a decision after Mr. Cooper

6　testifies.

7　　　　One other point, Your Honor, just on the special

8　elections.  I mean, in addition to those newspaper

9　articles, there are writs of elections, and I would point

10　out as well that this is a case where no one disputes the

11　elections occurred.  No one disputes the timeframe and so

12　the dates that public events occurred is precisely the type

13　of facts the Courts do take judicial notice of.

14　　　　JUDGE JORDAN:  All right.  Thank you.

15　　　　MR. SAVITZKY:  Thank you, Your Honor.

16　　　　MR. CARDIN:  May it please the Court, Your Honor.

17　We do not believe that either of the categories that

18　they're seeking judicial notice of are proper under Rule

19　201.  First of all, for judicial notice, with regard to the

20　special elections, those special election statutes relate

21　to whether or not there's going to be a remedy, and there's

22　been no adjudication yet that a remedy is even going to be

23　proper.  And even if there's -- when there's an

24　adjudication of a remedy, if that happens, then the

25　question is going to be what's the remedy?

1          And so we think, A, it's not proper for judicial

2    notice at this juncture.  It's certainly premature to be

3    considering that when we haven't even gotten through the

4    liability phase yet.

5          With regard to the PDD information, Your Honor, the

6    PDD directory that they're seeking to get -- take judicial

7    notice of is a -- a directory by the Mississippi

8    Association of PDDs.  It's a trade association for the

9    PDDs, and that's just simply not an adjudicative fact that

10   meets the requirements for judicial notice under 201.  So

11   we don't think that either of the categories that they're

12   requesting the court to take judicial notice of are proper,

13   and we would request that their motion be denied.

14         JUDGE JORDAN:  All right.  Thank you.  Any rebuttal?

15         MR. SAVITZKY:  Just briefly, Your Honor, on the

16   question of remedy.  I mean, I do think it is -- it is

17   prudent given the timeframe that we are on to consider

18   facts that might go to remedy, to the extent they can be

19   adjudicated in this proceeding because if -- and of course,

20   we have not -- the evidence is not yet in.  But if we do

21   prevail, we've indicated that we will seek a special

22   election, and the timeframe on that is quite tight.

23         So I think it makes good sense to consider those

24   facts, and obviously both parties can -- can develop

25   evidence on that.  So I think whether or not it's an

1    adjudicative fact turns entirely on whether the Court

2    wishes to consider it as part of the record and if there

3    are facts that are potentially in dispute then that -- that

4    goes to issues the Court ought to decide then the Court

5    should consider them.

6         On the PDDs, I don't think that I have much to add.

7    The website and the directory contains facts that no one

8    disputes about which counties are in which PDD, the basic

9    functions of the PDDs and again, those are set out as well

10   in other state documents.

11        JUDGE JORDAN:  Okay.  Thank you.

12        MR. SAVITZKY:  Thank you, Your Honor.

13        JUDGE JORDAN:  Ms. Powell handed me a note that the

14   attorneys had not signed the pretrial order.  I guess, is

15   there any objection to attaching electronic signatures?

16        MR. SAVITZKY:  No, Your Honor.

17        MR. CARDIN:  No objection, Your Honor.

18        MR. WALLACE:  None, Your Honor.

19        JUDGE JORDAN:  Okay.  All right.  Are the plaintiffs

20   ready for their opening?

21        MS. NWACHUKWU:  Yes, Your Honor.

22        JUDGE JORDAN:  I think at the pretrial conference,

23   it would be 45 minutes; is that right?

24        MS. NWACHUKWU:  Yes, Your Honor.

25        JUDGE JORDAN:  Okay.

1     MS. NWACHUKWU:  Good morning, Your Honors, and may

2  it please the Court.  Before I begin, the plaintiffs have a

3  demonstrative slide deck that will be put on the screen.  I

4  also have paper copies of that slide deck if Your Honors

5  would prefer to have a paper copy to look at as well.  I'm

6  happy to provide that information to the courtroom clerk.

7     JUDGE JORDAN:  If it's not in our binders then I

8  would like to have a copy of it.

9     MS. NWACHUKWU:  It should be in those binders, but,

10  again, I'm happy to provide those copies as well.

11     JUDGE SOUTHWICK:  If we had what we need, that would

12  be helpful.

13     MS. NWACHUKWU:  Again, in order to be on the safe

14  side, it's probably best to provide those paper copies.

15  Thank you.  May I approach?

16     JUDGE JORDAN:  You may proceed.

17     MS. NWACHUKWU:  Again, good morning, Your Honors.

18  May it please the Court.  I am Jennifer Nwachukwu with the

19  Lawyers Committee for Civil Rights of Law on behalf of the

20  plaintiffs.  This is a case about the state's legislative

21  maps, but more importantly, it is a case about Black

22  Mississippians having a full and fair opportunity to

23  participate in the political process without their votes

24  being diluted.  As we will prove, the state's legislative

25  maps violate both Section 2 of the Voting Rights Act and

1    the Fourteenth Amendment.

2         While our claims cover a number of districts across

3    the state, they share very important characteristics.  The

4    challenged districts are located in areas of the state

5    where the Black population is concentrated and has actually

6    been growing faster than the white population, which has

7    actually decreased over the last decade.  Despite this, the

8    state has level-set the number of Black majority districts.

9    These maps dilute the votes of Black voters.  They fragment

10    sizeable concentrated Black communities and areas across

11    the state, areas where reasonably configured black-majority

12    districts can be drawn, and where pervasive,

13    racially-polarized voting will operate to submerge those

14    Black communities in districts where they will have no

15    opportunities to elect a candidate of choice.

16         In those areas, in those state legislative

17    elections, the political playing field is not equal, and

18    that is the essence of vote dilution.  Not only that, but

19    the state has also taken affirmative steps, such as

20    spreading Black voters across a number of districts to

21    dilute the power of their vote.  In some of these district,

22    the state subordinated traditional districting

23    principles --

24         THE REPORTER:  Slow down just a little bit for me,

25    please.

1       MS. NWACHUKWU:  Okay.  In some of these districts,
2   the state subordinated traditional redistricting
3   principles, like compactness and keeping communities whole
4   to racially consideration.  This violates the
5   constitutional prohibitions on unjustified uses of race.
6       Now, let's talk about how the evidence will prove up
7   these claims.  Starting first with our Section 2 claim, we
8   will show vote dilution in four areas in the state senate
9   map:  DeSoto County, Northern -- northeastern Mississippi
10  around Chickasaw and Monroe counties, South central
11  Mississippi, and the Hattiesburg area.  And we will also
12  show vote dilution in the three areas of the House map:  In
13  the Western Hinds County area near Clinton, again in
14  Northeastern Mississippi around the Chickasaw County and
15  Monroe County areas, and in east central Mississippi.
16      And the evidence will show that each of these areas
17  are areas where an additional reasonably configured
18  Black-majority district can be drawn.  We will produce
19  evidence that will meet the three preconditions established
20  in *Thornburg versus Gingles* for each of the challenged
21  areas, and we will demonstrate that the totality of the
22  circumstances shows that Black voters in those areas are
23  denied an equal opportunity to participate in the political
24  process and to elect candidates of their choice.
25      The Court will hear first from Mr. Bill Cooper, a

demographer with over 35 years of experience of drawing plans and in serving as a testifying expert on *Gingles* 1, including most notably in the *Milligan* case in Alabama.

Mr. Cooper has testified in over 55 federal court redistricting cases, including 10 cases right here in Mississippi, and he has drawn plans in scores of jurisdictions in Mississippi alone.

Now, I'll spare us going through the maps in a lot of detail because Mr. Cooper is the first witness, but I do want to briefly run through the areas of interest in this case.

So the first area of interest is the area around DeSoto County, which experienced the highest increase of Black population in the last decade and the highest increase of Black population of any county in the state. And it might be helpful for the Court, as it hears Mr. Cooper's testimony, for me to explain what this is and what the following maps will show.

The map that is on the left is entitled, "The 2022 Plan," and it shows the enacted plan districts here in the north delta area around Senate District 2, and each differently colored district represents a different district.

Now, in the 2022 plan, you will see a red -- a dark red line, and that is the border of Mr. Coopers'

1   illustrative Senate District 2, which is superimposed on

2   the left side of that image over the enacted map.  And if

3   you look at the image on the right side entitled,

4   "Illustrative Senate District 2," you'll see that the same

5   Illustrative District 2 is within Cooper's illustrative

6   plan.

7          Looking at these maps and as Mr. Cooper will

8   explain, the 2022 plan plots a growing and sizable Black

9   population in Horn Lake and DeSoto County.  By contrast,

10  and as shown on the right, Mr. Coopers' plan keeps more

11  communities whole and eliminates multiple county splits and

12  precinct splits all while adding a compact, new

13  Black-majority Senate District 2.

14         JUDGE JORDAN:  And I'm sorry to interrupt, but if

15  you go back for a second?

16         MS. NWACHUKWU:  Yes.

17         JUDGE JORDAN:  And I hate to sound dense, but

18  looking at the 2022 plan, I get the overlay, I get the

19  illustrative plan is overlaid on top of it.  But where is

20  the district under the plan?

21         MS. NWACHUKWU:  So the illustrative district that --

22         JUDGE JORDAN:  No, I got that part.  The '22 plan

23  district, where is that on the left?

24         MS. NWACHUKWU:  On the left of the 2022 plan, it's

25  up towards the top of the image.  If you can see around

1    where Horn Lake is, the district is in a question-mark

2    shape that's up at the top of that image.

3           JUDGE JORDAN:  The Senate District?

4           MS. NWACHUKWU:  Yes.  Yes, Your Honor.

5           JUDGE JORDAN:  And I'm sorry, so what color is the

6    Senate District in?

7           MS. NWACHUKWU:  The Senate District is in a light

8    green shade up at the top of the district, so the blue --

9           JUDGE JORDAN:  Go ahead.

10          MS. NWACHUKWU:  The blue district that is Senate

11   District 1.  Senate District 2 is right -- located right

12   above that.

13          JUDGE JORDAN:  And then it drops down to the left?

14          MS. NWACHUKWU:  In the 20 --

15          JUDGE JORDAN:  Into Tunica and that area?

16          MS. NWACHUKWU:  In the 2022 plan, the area that

17   drops down to the left is currently Senate District 11.

18   And this image indicates that the illustrative map that

19   Mr. Cooper has drawn, we have put an image of Mr. Cooper's

20   Illustrative Senate District 2 on top of this 2022 plan, so

21   that you can see where it's located.  And we also have an

22   image of that on the right side, so you can see exactly

23   where Illustrative Senate District 2 is.

24          So the second area of interest is in Hattiesburg

25   where there's a sizable and concentrated Black population.

1   The 2022 Senate plan splits Hattiesburg across a number of
2   districts, including one that stretches all the way up to
3   Jasper County.  By looking at the map on the right,
4   Mr. Cooper's plan adds a new majority-Black Senate District
5   9 that is compact and centered in Hattiesburg itself.
6           Next slide.  The third area of interest is in
7   northeastern Mississippi and the area around Chickasaw and
8   Monroe Counties, which also experienced an increase in the
9   Black population over the last decade.  Looking at the
10  illustrative plan on the right, Mr. Cooper adds a new,
11  compact Black-majority district in this area as well.
12          Next slide.  The fourth area of interest is in south
13  central Mississippi near Copiah, Simpson, Lincoln, and
14  Jefferson Davis Counties where there's a sizable and
15  concentrated Black population.  As shown on the right,
16  Mr. Cooper adds an additional compact Black-majority
17  district in this area while keeping Copiah County whole and
18  connecting communities like Crystal Springs and Hazelhurst
19  with Brookhaven going down I-55 and U.S. 51.
20          Next slide.  Turning to the house map, the fifth
21  area of interest is again near Chickasaw and Monroe
22  Counties, which experienced an increase in the Black
23  population over the last decade, and the evidence will show
24  that the 2022 plan cracks Black communities in areas like
25  Chickasaw County.  But looking at the illustrative plan on

1    the right, Mr. Cooper adds a compact additional

2    Black-majority district in this area.

3         Next slide.  The sixth area of interest is in the

4    Clinton area in western Hinds County, which has a sizable

5    and concentrated Black population.  Looking at the

6    illustrative map on the right, Mr. Cooper adds an

7    additional Black-majority district that is visually compact

8    and anchored in the diversified and growing community of

9    Clinton.

10        Next side.  The seventh area of interest is near

11   east central area of Mississippi near Newton, jasper, and

12   Clarke counties, which also have a sizable and concentrated

13   Black population.  Again, looking at the map on the right,

14   Mr. Cooper eliminates county splits while also adding a

15   compact Black-majority district.

16        Mr. Cooper will testify that in accordance with the

17   first *Gingles* precondition, the additional majority Black

18   districts that he has drawn in the areas of interest are

19   all reasonably configured.  He will explain how his

20   illustrative maps comply with traditional redistricting

21   principles, take into account communities of interest, and

22   even fare better than the state's maps on a number of

23   metrics, including compactness, county splits, precinct

24   splits, and more.

25        The Court will also hear from Dr. Lisa Handley on

1    the second and third *Gingles* conditions.  Like Mr. Cooper,

2    Dr. Handley has decades of experience conducting racially

3    polarized voting analyses required by those preconditions

4    and testifying in Section 2 cases, most notably in the

5    *Ardoin* cases in Louisiana.

6         Dr. Handley undertook a sophisticated and

7    comprehensive statistical analysis of over 40 different

8    elections, including statewide contests, state legislative

9    contests, nonpartisan judicial contests, and party

10   primaries.  She will explain how across all levels of

11   election contests, Black Mississippians coalesce and vote

12   cohesively around particular candidates, and white voters

13   usually vote in a block to defeat Black voter candidates of

14   voice outside of black-majority districts.

15        Dr. Handley will also testify about her

16   effectiveness analysis, which compares the state's enacted

17   plans to Mr. Cooper's illustrative plans for the challenged

18   areas.  Her testimony will confirm that Mr. Cooper's

19   illustrative maps provide Black Mississippians with

20   additional opportunities to elect their candidates of

21   choice in each of the seven areas of focus.

22        Now, establishing these preconditions goes a long

23   way, and it's the very unusual case where a Section 2

24   plaintiff proves up the *Gingles* precondition and shows the

25   dilution dynamic and yet does not ultimately demonstrate

1  liability.  But the *Gingles* preconditions are not the end

2  of the inquiry.

3       And moving on to the totality of the circumstances

4  inquiry, the Court will hear from additional experts

5  Dr. Robby Luckett, Dr. D'Andra Orey, and Dr. Marvin King,

6  all of whom will be testifying as to the various Senate

7  factors that *Gingles* deems relevant to Section 2

8  vote-dilution cases.

9       Dr. Robby Luckett is a tenured history professor and

10  the director of the Margaret Walker Center at Jackson State

11  University.  His academic research specializes in

12  African-American history and the modern Civil Rights

13  Movement with a specific focus on the state of Mississippi.

14  On Senate Factors 1 and 3, he will detail the horrific and

15  long history of discrimination against Black voters, some

16  of which continues to the present and includes voting

17  practices that range from all-white primaries in previous

18  instances to felony disenfranchisement.

19       On Senate Factor 5, he will demonstrate the gross

20  disparity in education between Black and white

21  Mississippians that continues to this day and that affects

22  Black voters participation.  Dr. Luckett is particularly

23  positioned to discuss this information with the Court as he

24  recently sat on the board for the Jackson Public School

25  District.

1        Dr. D'Andra Orey is a tenured professor of political

2   science at Jackson State, a former chair of the department,

3   the president-elect of the Southern Political Science

4   Association, and a quantitative scholar who has published

5   dozens of peer-reviewed articles, many focusing on race and

6   political participation.

7        As to Senate Factor 5, he will explain how Black

8   Mississippians bear the effect of discrimination in a

9   number of socioeconomic areas, including income, poverty,

10  education, and health.  Marshalling extensive scholarship,

11  establishing that these socioeconomic indicators affect

12  voters' ability to participate in politics.

13       Dr. Orey will demonstrate through multiple

14  statistical analyses that there was, in fact, at least a 10

15  percent gap between voter turnout in white and Black

16  Mississippians in the recent 2020 election, and he will

17  present an original statistical analysis empirically

18  demonstrating how the socioeconomic disparities that he

19  focused on are correlated with Black turnout in

20  Mississippi.  Dr. Orey's analysis will also confirm that

21  the needs of Black voters, as exemplified by the

22  disparities in the areas like health and education are

23  going unaddressed by policymakers in Mississippi.

24       And, finally, Dr. Marvin King is a tenured professor

25  of political science and African-American studies at Ole

Miss.  His academic research and coursework focuses on
subjects such as American and African-American politics,
voting, and redistricting.  He will provide additional
evidence under Senate Factors 1 and 3 as to the history of
discrimination in voting and Mississippi's voting practices
that enhance the opportunity for discrimination, racial
appeals in campaigns in accordance with Senate Factor 6,
the lack of success of Black candidates in Mississippi
politics in accordance with Senate Factor 7, and the
tenuousness of the state's justification for the challenged
redistricting plans in accordance with Senate Factor 9.

Dr. King will also testify about race and its
connection to partisanship and decisionmaking for Black
voters in Mississippi, refuting the suggestion that the
stark patterns of racially polarized voting in Mississippi,
which tilt the political playing field against Black voters
in the areas of interest, are some mere coincidence of
partisanship.

This case is ultimately about the voters, and this
Court will have the opportunity to hear from them.  We will
put on the stand eight Black voters from many of the areas
of the state that are implicated in this case, including
all of the areas that are at issue for the Section 2
claims.  Their testimony will not only provide further
context and support for the experts' testimony but will

1  also demonstrate the human impacts of these unfair and

2  unlawful districts.  They will testify about the

3  connections to their communities; where Black voters in

4  their community live, work, and play; the issues and needs

5  of their communities; and how the illustrative maps fare

6  better for their communities, and would also make the

7  political processes more equally open for Black voters.

8        All of this testimony, both expert and fact, will

9  ultimately support a finding of vote dilution based on a

10  preponderance of the evidence and a ruling that the

11  defendants violated Section 2 of the Voting Rights Act as

12  to each of the areas of interest.

13        The evidence will also support a finding that in

14  certain districts, race improperly predominated in the

15  drawing of those district lines.  And on that point, the

16  Court will hear from Dr. Jordan Ragusa who is the associate

17  chair of the political science department at the College of

18  Charleston.  Dr. Ragusa's academic research enforces focus

19  on American politics and quantitative methods.  His

20  analysis uses an improves upon a multivariate regression

21  analysis that he conducted in the *South Carolina NAACP*

22  *versus Alexander* case, in which a three-judge trial court

23  panel accepted and credited his findings in their

24  determination that a challenged congressional district was

25  an unconstitutional racial gerrymander.

1    Dr. Ragusa's testimony will show that race was a

2    significant factor in the design of Senate District 2,

3    Senate District 48, House District 22, House District 34,

4    and House District 64, even when controlling for

5    partisanship and various traditional redistricting

6    principles.

7    In each case, the state's actions including the

8    gratuitous movement of thousand and in some cases even tens

9    of thousands of voters led to large decreases in the Black

10   voting age of those districts.

11   So let's take a look briefly at those districts as

12   well.

13   In these maps, which were created by Dr. Ragusa and

14   which he will discuss with the Court, the purple area is

15   consistent between the prior legislative districting plan

16   and the 2022 plan.  The red areas were added in the 2022

17   plan and the blue areas were removed.

18   So let's turn back and talk about Senate District 2

19   in DeSoto County.

20   As mentioned before, DeSoto County experienced

21   considerable growth in the Black population over the last

22   decade and the enacted plan crafts the Black population in

23   Horn Lake across three Senate Districts and adds white

24   voters from Olive Branch and Hernando, reconfiguring the

25   district in a question mark shape while decreasing the

1   Black voting age percentage despite Black population growth

2   in that area.

3           Next slide.

4           The Gulfport area in Harrison County experienced one

5   of the largest increases in the Black population over the

6   last decade.  The enacted plan has a significant white

7   voters from across Bay St. Louis and Hancock County while

8   cutting Gulfport down the middle.

9           Next slide.

10          Mentioned before, the Chickasaw and Monroe County

11  area had experienced growth in the Black population over

12  the last decade.  The enacted plan removes Black voters

13  from areas with high Black population in Pontotoc and

14  Chickasaw counties and adds mostly white voters from Monroe

15  County cracking Chickasaw in three different places.

16          Next slide.

17          The Grenada area also has a significant

18  concentration of Black voters.  The enacted plan adds

19  population from Yalobusha and Lafayette and moved Black

20  voters to neighboring districts, decreasing the Black

21  voting age percentage of the district by over 30 points.

22          Next slide.

23          And finally, the eastern Hinds and Madison County

24  area has a significant concentration of Black voters.  The

25  enacted plan adds white voters from northeast Jackson and

1  Madison County elongating the district on both ends in
2  order to decrease the number of Black voters, and that is
3  not all.
4      Dr. Ragusa will also testify as to the changes in
5  the raw data of each district's Black voting age population
6  and the disproportionate movement of Black voters and split
7  precincts of each district, where more Black voters in
8  these split precincts were assigned to neighboring
9  districts, many of which were already majority-Black
10  districts.
11      His analysis of the racially differences in precinct
12  splits indicate that map makers could not have made the
13  granular decisions that they made without using race,
14  particularly when considering that the state's data on
15  partisan election results only go to the less granular
16  level of the precinct.
17      Dr. Ragusa's analysis will be largely undisputed.
18  The Court isn't going to hear testimony from the map makers
19  to explain their decision-making for the design of the
20  districts and the Court also isn't going to hear live
21  testimony from the legislators that voted in favor of these
22  maps either.
23      Not only that, Dr. Ragusa's analysis will be
24  supported by Mr. Cooper who used his substantial map
25  drawing skills to show how the plans in those areas could

1   have been drawn consistent with traditional redistricting

2   principles.  And Dr. Ragusa's analysis will also be

3   supporting by the testimony of Black voters who live in the

4   districts that we challenge as unconstitutional racial

5   gerrymander.  Their voices will lend important support to

6   our proof that race was the primary means of drawing the

7   districts that we challenge.

8          The evidence will show that race predominated over

9   traditional redistricting principles in the design of the

10  challenged districts, and that the state does not have a

11  compelling state interest or justification for the changes

12  made to the challenged districts in violation of the

13  constitution.

14         Again, this case is ultimately about Black

15  Mississippians not having an equal opportunity to

16  participate in the political process.  While we raise both

17  Section 2 and constitutional claims, the harm in a larger

18  sense is ultimately the same.  The wrongful dilution and

19  degradation of the votes cast by Black voters in

20  Mississippi, whether this occurs by way of failure to

21  comply with Section 2 of the Voting Rights Act and create

22  the required additional Black majority districts or by

23  cracking and packing the votes of Black voters by

24  districting on the basis of race, these unlawful practices

25  must be enjoined by this Court.

```
1              We look forward to presenting our proof to Your
2       Honors.  Thank you.
3              JUDGE JORDAN:  All right.  Thank you.  It's 10:15.
4       It's probably a good time for -- Mr. Cardin, you want to
5       say something?
6              MR. CARDIN:  No, sir.
7              JUDGE JORDAN:  It's probably a good time for our
8       midmorning break.  We will come back at 10:35.  Court's in
9       recess.
10                        (A brief recess was taken.)
11             JUDGE JORDAN:  All right.  Thank you.  You may be
12      seated.  Mr. Cardin.
13             MR. CARDIN:  Your Honor, may it please the Court,
14      I've already introduced myself.  I've had a opportunity to
15      visit with you earlier this morning.  My name is Tommie
16      Cardin, and it's my privilege to be here today and
17      represent the Defendant, State Board of Election
18      Commissioners, along with my cocounsel, Ryan Beckett,
19      Parker Berry, and Rex Shannon.
20             And, Your Honor, Mr. Mike Wallace, of course,
21      represents the Intervenor-Defendant, Mississippi Republican
22      Party, and he and I have agreed to divide the time for
23      opening statement if that's acceptable to the Court?
24             JUDGE JORDAN:  That's fine.  How do you want to
25      divide it?
```

1          MR. CARDIN:  Let's say 25/20.

2          JUDGE SOUTHWICK:  Any left over for him?

3          MR. CARDIN:  Y'all know Mr. Wallace, and I want to

4     be as generous as I possibly can.  Thank you, Your Honor.

5          Along these lines, as counsel has pointed out for

6     the plaintiffs, the plaintiffs assert two categories of

7     claims here: under Section 2 of the Voting Rights Act and

8     then claims under the Fourteenth Amendment of the United

9     States Constitution.  I certainly want to talk about what

10    we anticipate the proof is going to be with regard to those

11    claims, but before I do so, I'd like to just share with the

12    Court a brief synopsis of how we've gotten to this point,

13    how we've arrived to where we are today.

14         To do that, I want to go back and let's just touch

15    on the 2022 redistricting process that took place in the

16    Mississippi Legislature.  Typically, the census results are

17    released some time around February or March, after the year

18    of the census, which this time was 2020, and this time was

19    2020.  We all know what happened in 2020.  2020 was an

20    unusual year and everything got disrupted, including the

21    release of the census results.  Instead of being released

22    at the normal time period, they weren't released until

23    August of 2021.

24         Now, the legislature had to go ahead, though, and

25    start the redistricting process because of election

1    deadlines that were looming, first of all, with regard to

2    congressional races, and then, secondly, statewide races.

3    Congressional races were going to be in 2022.  Statewide

4    races were going to take place in 2023.

5         So what the legislature did is form the Standing

6    Joint Committee in June of 2021.  The Standing Joint

7    Committee is the joint legislative committee that the House

8    and Senate forms and is actually charged with the statutory

9    responsibility of redrawing districts.  Redistricting not

10   only state legislature House and Senate seats, but also

11   congressional seats.  So the legislature, after convening

12   that committee, the Standing Joint Committee, went ahead

13   and scheduled nine public hearings which would take place

14   all across the state.

15        Those nine public hearings weren't required by law,

16   but they used to be when Section 5 applied to the state.

17   But since Section 5 no longer applies, not necessarily law

18   you have to have public hearings anymore, but the

19   legislature decided to do it anyhow.  Thought it would be a

20   good thing to get input from the public with regard to the

21   process, so we scheduled nine public hearings across the

22   state.

23        In August of 2021, the census results came out.  And

24   so then that's when the legislature was able to share the

25   census results as part of the public hearings that remained

1    and really start looking at what the numbers actually were.

2    When the legislature, in January of 2022, their first order

3    of business was to go ahead and adopt a congressional

4    redistricting plan because of the congressional election.

5    Qualifying period was going to start March 1, and the

6    elections were going to be later that year, so something

7    had to be done with that with regard to the first order of

8    business.

9         After they adopted the congressional redistricting

10   plans, which was sometime in January of 2022, then the

11   legislature proceeded forward and adopted plans for both

12   the House and the Senate on March 29 of 2022, and those are

13   the plans that are before the Court today that are being

14   challenged.

15        Now, the legislature adopted those plans in March of

16   2022, but this lawsuit was not filed until December the

17   20th of 2022, which happened to be less than two weeks away

18   from when the qualifying period began for statewide

19   elections.  Statewide elections are going to be in 2023,

20   and so the qualifying period started then, elections were

21   going to be later.  This lawsuit was filed along those

22   lines.  So the lawsuit that was filed on December 20th,

23   that's us here today, and that's what -- that's what we're

24   being called upon to address.

25        So with regard to the claims that the plaintiffs are

making, they are making claims under Section 2 of the Voting Rights Act and then the Fourteenth Amendment, Equal Protection Clause of the United States Constitution. As you've heard with regard to the Senate map under Section 2, they are challenging two Senate Districts. I'm sorry, with regard to Section 2, they're challenging four of the 52 Senate Districts. And then they are challenging three of the 122 districts in the House.

As to their equal protection claims, they challenge two of the 52 seats in the Senate, and then they challenge of the three of the 122 seats in the House.

Now, those aren't many seats in comparison to the total number of seats in both chambers. But as this Court can appreciate, any change to one district has a ripple effect that affects many, many, many more districts than just the ones that are at challenge. And so given the districts that are under challenge, the important fact here is that of course the plaintiffs bear the burden of proof. The plaintiffs have the burden of proof to prove both the Section 2 claims and the equal protection claims.

The burden of proof with regard to the Section 2 claims follows the familiar *Gingles* analysis that the Court handed down years ago in the *Thornburg versus Gingles* case, and essentially there are three preconditions under *Gingles* that need to be met. Sometimes those are referred to as

1    prongs, prongs 1, 2, and 3.

2         And then there's the totality of the circumstances

3    analysis, and I'll talk about the proof with regard to

4    those in just a minute.

5         The other burden of proof that the plaintiffs have

6    is the burden of proof with regard to their Fourteenth

7    Amendment claims, and their burden of proof is a demanding

8    burden of proof there.  It is a burden to show that the

9    legislature subordinated traditional redistricting

10   principles to racial considerations.  We believe the proof

11   is going to be insufficient to meet that prong -- to meet

12   that particular burden.

13        But let's talk about the burden.  Let's talk about

14   the proof that we anticipate seeing with regard to prongs

15   1, 2, and 3 of *Gingles*.  With regard to prong 1, prong 1

16   says that there must be a sufficiently large minority

17   population, which means 50 percent plus under Supreme Court

18   law, in a reasonably compact geographic area, to constitute

19   a majority in a single-member district.

20        Now, the plaintiffs, as you've heard, will offer

21   Mr. William Cooper, a demographer.  He has drawn

22   illustrative plans for both the House and the Senate.  And

23   as you've heard, he has added four majority-Black districts

24   in the Senate, and he's added three in the House.  We

25   believe the evidence is going to show that Mr. Cooper

```
 1    arbitrarily selected planning and development district
 2    boundaries.  Planning and development district boundaries
 3    are questionable in terms of using for redistricting, but
 4    nonetheless he chose those.  And the focus when he chose
 5    those was concentrated on race in these particular areas.
 6         He didn't use all 10 Planning and Development
 7    Districts.  He only used five of the 10.  And of those
 8    five, we believe the proof is going to show that the focus
 9    was one more so on race than any other factor.
10         We will anticipate offering the testimony of Dr. Tom
11    Brunell.  Dr. Brunell is a political scientist at the
12    University of Texas at Dallas, and he has conducted -- he
13    just does a comparison.  He does a comparison of the
14    traditional redistricting principles that Mr. Cooper will
15    say he relied on and those that the legislature had.  And
16    when that comparison is conducted, we believe the proof is
17    going to show that Mr. Cooper's plans really fair no better
18    with regard to applying traditional redistricting
19    principles than the state's did.
20         And we believe this is particularly important in
21    light of what the proof will show, that Mr. Cooper had the
22    luxury of operating in a controlled environment.  He was
23    able to pick and choose the boundaries and the things that
24    he was going to do, and that was a far different exercise
25    than the legislature faced when it faced all the political
```

considerations it faced throughout that process and the things that it has to consider with regard to complying with all the legal principles as well.

We believe the evidence then is going to be insufficient, the plaintiffs' evidence, with regard to prong 1 of *Gingles* will be insufficient to meet that prong, and therefore that will fail.

The second prong of *Gingles* is the prong that deals with cohesiveness of the racial group, of the minority racial group. And with regard to that second prong, counsel has indicated they will offer the testimony of Dr. Lisa Handley, a political scientist, and they've indicated what they anticipate she will testify about.

We plan to offer the testimony of Dr. John Alford. Dr. Alford is a political scientist at Rice University and has extensive experience with regard to analyzing prongs 2 and 3 or *Gingles*. And we believe that his testimony is going to show that he takes the same data that Dr. Handley takes, and he uses the same methodology that Dr. Handley uses, and his conclusion is that that data, using her methodology, actually indicates that the polarization that is taking place today in Mississippi is partisan polarization. Polarization based on party and not race. That's very different than the requirement for racial polarization and the political cohesiveness in prong 2.

1   And we believe that Dr. Alford's testimony is going to set

2   forth that evidence, and we believe, then, that the

3   plaintiffs' proof with regard to Section 2 will be

4   insufficient.

5           Prong 3.  Prong 3 is the majority group voting as a

6   block to usually defeat the minority preferred candidate.

7   Prongs 2 and 3 are sometimes read together, because they

8   are related in some form or fashion.  The proof for prongs

9   2 and 3 will consist of Dr. Handley and Dr. Alford again,

10  because those are closely related and closely aligned.

11  Again, we believe that when the comparison is made and the

12  weight of the evidence is measured with regard to what

13  Dr. Handley will testify about and then what Dr. Alford

14  will testify about, we believe that it will demonstrate

15  that the plaintiffs' proof is insufficient to satisfy

16  prongs 2 and 3 of *Gingles*.

17          Now, significantly with regard to the plaintiffs'

18  burden of proof, they must prove all three preconditions,

19  all three prongs first before we ever get to the totality

20  of circumstances analysis.  And so while we believe here

21  that their proof will be insufficient to meet those first

22  three prongs, nonetheless when you look at the totality of

23  circumstances analysis in this case, we believe that the

24  plaintiffs' proof will be insufficient to satisfy their

25  burden to meet the totality of circumstances analysis.

```
 1          What are the totality of circumstances?  It consists
 2    of what's known in many instances as "the Senate factors."
 3    These were factors that the United States Senate set forth
 4    when it reenacted the Voting Rights Act in 1982 as factors
 5    that were suggestive of consideration as part of an
 6    intensely local analysis of the particular jurisdiction at
 7    issue to determine really what's going on on the ground,
 8    what's taking place there not in theory, but in reality.
 9    And so there are like nine of those Senate factors, and
10    counsel for the plaintiff has gone through some of those.
11    I think he maybe went through all of them.  But this Court
12    and others have held that there are a few of those factors
13    that are really more important than others.
14          And two of the most important factors are the ones
15    that -- the Senate factor to the extent to which the
16    minority group members have been elected to public office
17    in the jurisdiction, and then the extent to which voting in
18    the state is racially polarized; and that's Senate factor
19    2, the extent of polarization.  And that's going to be a
20    significant point of disagreement that we're going to have
21    with the plaintiffs that will be borne out by the proof.
22          As I mentioned to you earlier, we anticipate that we
23    will provide the proof of Dr. John Alford, who has analyzed
24    the data, the methodology Dr. Handley used, and he finds
25    and his conclusions will be that what's driving voter
```

1   behavior in Mississippi today is party and not race.

2          As to the other Senate factors, the plaintiffs have

3   indicated they're going to offer testimony, extensive

4   testimony probably, about Mississippi history.  And there

5   are going to be parts of that Mississippi history -- and

6   none of us can deny our history.  We can't take that away.

7   But we can -- we can ask the question of what are things

8   like today in spite of the history and the things that may

9   have taken place that none of us are proud of, what's going

10  on today?  What's the relevant questions to be asking in

11  terms of where are we?

12         What does the evidence show with regard to

13  polarization?  Does the evidence indicate that we've now

14  matured politically, and that we've actually come to a

15  point where voting is being driven by partisan

16  consideration and not racial consideration?

17         And so what does the evidence show with regard to

18  access to voting and political participation by our

19  minority citizens as well as others?

20         We believe that the evidence in this case will

21  demonstrate that voter participation in terms of

22  registration and turnout really has reached the point of

23  almost parity between Black citizens and white citizens.

24  We believe that the testimony is going to demonstrate that

25  it's a new day when it comes to that in Mississippi.

1        The plaintiffs have indicated they're going to offer

2   the testimony of Dr. Byron D'Orey (sic) who conducted a few

3   tests on a single election.  The election in 2020.  And

4   based on that, we believe the proof is going to show that,

5   of course, he'll offer an opinion about turnout which we

6   will -- we will beg to differ when the time for the proof

7   comes.

8        In addition to Dr. Alford and Dr. Brunell, whose

9   testimony I've also mentioned, we plan to off the testimony

10  of Mr. Kyle Kirkpatrick.  He's an assistant secretary of

11  state in charge of the elections division, and we

12  anticipate that he will be able to testify about efforts

13  that the state of Mississippi makes with regard to voter

14  registration, voter turnout, and providing access to all

15  citizens to fair and free elections and political

16  participation.

17       So we believe that overall when the Court looks at

18  the body of evidence with regard to the totality of the

19  circumstances analysis, it will show several things.  The

20  proof will show, number one, voter polarization is being

21  driven in Mississippi now by party and not race.

22       Black citizens are getting elected to public office

23  in Mississippi, in the Senate and the House, in significant

24  numbers, and access to political participation and voting

25  is open to all, and the days of voter suppression and

1     intimidation are thankfully behind us and that we are --

2     we've made a lot of progress in Mississippi.

3         Along those lines, we believe the plaintiffs will be

4     unable to provide sufficient evidence to meet their burden

5     of proof, both under the Section 2 burden of proof and the

6     burden of proof for the Equal Protection Clause.  Along

7     those lines, plaintiffs mentioned, plaintiffs' counsel

8     mentioned, that they will offer the proof of Dr. Jordan

9     Ragusa to establish their claim for a violation of the

10     Equal Protection Clause.  While the plaintiffs will offer

11     Dr. Ragusa to opine on the methodology that he employs to

12     arrive at that conclusion, we will offer the testimony of

13     Dr. Tom Brunell, as I mentioned earlier.  And Dr. Brunell

14     has looked at Dr. Ragusa's model, and we believe his

15     testimony will provide evidence that Dr. Ragusa's model is

16     flawed and not a reliable model to rely upon in

17     establishing that the plaintiffs meet their burden of proof

18     on the Equal Protection claim.

19         So in conclusion, we believe that when it's all said

20     and done, when the evidence is all in, that the plaintiffs

21     will have failed to meet their burden of proof with regard

22     to their Section 2 claims and with regard to their Equal

23     Protection, Fourteenth Amendment claims.

24         Thank you, Your Honor.

25         MR. WALLACE:  May it please the Court, I'm Mike

1    Wallace, and this is as high as my tech gets.  I am

2    representing the Republican Party.  The Republican Party is

3    here because we are obliged to enforce the election laws

4    established by the legislature unless and until you order

5    us to do something else.  And I'm going to explain briefly

6    why I don't think you should order us to do anything else.

7         On page 16 of the pretrial order that you have just

8    entered, the plaintiffs clearly state that they do not

9    allege any invidiously racially discriminatory intent in

10    this case.  Because the Equal Protection Clause requires a

11    showing of invidious racially discriminatory intent, they

12    cannot carry the burden, because they haven't alleged what

13    they needed to do.

14         So I'm going to talk about Section 2, which is the

15    only thing that is left of their lawsuit.  The legislature

16    is presumed to have acted in good faith, and since they are

17    not alleging invidious intent on the legislature, that good

18    faith is unchallenged.  What they have to prove is that a

19    supremely innocent legislature, acting in unchallenged good

20    faith, somehow ran afoul of the words on these posters.

21    And I should say before we go any further, the Court has

22    been very attentive this morning.  I am used to answering

23    questions from judges, and if there's anything you want me

24    to talk about before I sit down, please feel free to ask.

25    But this is what I'm here to talk about, is what the

1    language actually says.  So in order to show the

2    legislature has somehow run afoul of the statute, we have

3    to look at what the statute says.

4         First what is it talking about?  It's talking about

5    qualifications are prerequisites to voting and a few other

6    words.  Justice Harlan and Justice Stevens have explained

7    why all those words are terms of art under the Voting

8    Rights Act.  There are justices on the Supreme Court who

9    still believe that.  But the majority say, no, they are

10   very broad words, they cover everything you could possibly

11   imagine that affects an elections, and that's the law

12   you'll be applying here today.

13        What -- the qualification they're challenging is

14   district lines.  District lines in a single member

15   legislative district.  And that's something you can

16   challenge, and that's what they've done.  Who are they

17   talking about in the statute?  It says the state.  The

18   state in this case because it's legislative redistricting

19   is the Mississippi Legislature.  They have sole authority

20   over redistricting.  The governor doesn't get a veto.  They

21   do it.  So you're looking at what the legislature did with

22   regard to these district lines.

23        They have challenged very few district lines under

24   Section 2.  You've been told four in the Senate, three in

25   the House.  That means out of 174 districts, 167 the

1    legislature did just fine.  The judges who sat on
2    legislative cases in the '50s and '60s would be delighted
3    by that record.  So we have a few, a handful of potential
4    problems that they're attacking.  What is it they say the
5    state Legislature has done with these lines?  Well, the
6    statute talks about denying and abridging the right to
7    vote.  Well, nobody's had their right to vote denied.  We
8    have plaintiffs here.  They vote all the time.  They
9    haven't had their vote denied.  What does it mean to be
10   abridged?  Well, that's a good question.  And that's a
11   question that members of Congress were asking in 1982.
12   They wanted to say that if we are getting away from the
13   constitutional discriminatory intent standard that the
14   Supreme Court says is imposed by the Fifteenth Amendment,
15   what are we doing instead?  And that language that you
16   looked at was not very helpful.  So Senator Dole and
17   Senator Kennedy came up with some different language, and
18   President Reagan agreed to sign it.  And that language is
19   right here in subsection (b), this is how you prove that
20   somebody's vote has been abridged under subsection 2(a).
21        And Senator Dole wrote about his understanding of
22   the compromise.  President Reagan in his signing statement
23   wrote about his understanding of the compromise.  Senator
24   Kennedy never did any such thing.  But it really doesn't
25   matter, because you don't care what they meant.  You care

1    what they say.  As Oliver Wendell Holmes told us over a

2    century ago, we determine not what the legislators meant

3    but what the statute means.  And so you need to pull out

4    your dictionaries, and let's look at what the statute

5    means.

6         What does it say you have to prove?  You have to

7    prove that political processes are not equally open to a

8    protected class.  Political processes is very broad, and

9    these district lines are part of the political processes.

10   Who is the protected class?  The protected class in this

11   case is Black voters in Mississippi.  It can be other

12   classes in other places, but that's what we're talking

13   about here.

14        So plaintiffs have to prove that the political

15   processes in Mississippi are more open to everybody else

16   than they are to them.  Well, how do you show that?

17   Section 2(b) says you have to prove two things, not one or

18   the other.  The word "and" is in there.  So you have to

19   prove that Blacks have less opportunity to participate and

20   less opportunity to elect representatives of their choice.

21        Now, we've already talked a little bit about turnout

22   this morning.  Twenty-five years ago Judge Lee determined

23   that Black and white turnout had reached parity in

24   Mississippi.  The Fifth Circuit affirmed his judgment.  The

25   Fifth Circuit agreed with his reasoning.  You can look at

1    their opinion, and they say we have parity in Mississippi.

2         Fifteen years after that, the Supreme Court in

3    *Shelby County* looked at the census data, and the Supreme

4    Court said Black participation has surpassed white

5    participation in Mississippi.  And they acted accordingly

6    when they negated the continuing effect of Section 4.

7         So to carry their burden of lack of participation,

8    they've got to come in here and show that all these courts

9    have been wrong for all these years.  How do they intend to

10   do it?  They have one expert who has examined one election,

11   a federal election in 2020, when there were no legislators

12   on the ballot.  This is a case about legislative elections.

13   They haven't looked at turnout in legislative elections.

14   One federal election 2020 that has already been observed,

15   2020 was a pretty unusual federal election for a lot of

16   reasons.

17        So we think when you hear all the experts go back

18   and forth, you'll conclude they haven't proved lower

19   participation.  But even if you believe their numbers from

20   2020, they're not all the way home on that point.  It's not

21   just you have lower participation, it's you have less

22   opportunity for participation.  If you have the opportunity

23   to vote and you choose not to do it, then there's no

24   violation of the Voting Rights Act.  So they've got to show

25   that somehow Black folks not only are under-participating,

1    but they don't have the opportunity to participate.

2          If you can solve that half of the two-prong puzzle

3    down there, then you have to look at whether or not they

4    have an equal opportunity to elect.  And we're talking

5    about state legislators, so you need to look at state

6    legislative elections.  And they have an expert who's done

7    that.  She looked at 19 out of 174 district elections in

8    2019, and that's their evidence that the 2023 lines deny an

9    opportunity to elect.

10         Now, if you try to challenge a statute before it's

11   enforced, you can look at old elections to do it.  You can

12   say this is the best evidence we've got; this is how people

13   participated.  We know the lines changed.  But we break

14   them down by precincts, and we think if you look under the

15   new lines, this is how people will perform.  That's not

16   this case.  Elections have been held under this line in

17   2023.  We don't have to reconstitute anything.  We know

18   what happened in 174 legislative districts in 2023.  And

19   plaintiffs will not present a single word of evidence about

20   that.  And how in the world they think they can carry their

21   burden of showing that 2023 lines deprive people of equal

22   opportunity when they have ignored every single election is

23   more than I can imagine, but I'm sure they're going to tell

24   you.

25         Now, if they prove those things, you're not done

1   yet.  You have to go back to subsection (a), and subsection

2   (a) says denial or abridged on account of race or color.

3   If they can prove everything in Section 2(b), they still

4   have to come back and prove that the reason it happened was

5   race or color.  And that's what Mr. Cardin was talking

6   about.

7        Do we have a problem with party?  Do we have a

8   problem with race?  It is not illegal for Blacks to lose

9   elections because they're Democrats.  That's been the law

10  since *Whitcomb v. Chavis* back in the '70s, and it's not

11  been challenged by anybody.  It may be illegal for

12  Democrats to lose because they're Black.  That's what

13  they've got to prove, is that race is driving results that

14  they don't like in this handful of seven districts.  There

15  will be testimony on that.  But I don't think you're going

16  to need to resolve it.

17       Now, why have I belabored the obvious this morning?

18  Of course, we're here to interpret a statute.  Everybody

19  knows that.  I do this because as their opening has

20  established, they're going to offer a week's worth of

21  evidence that has no relevance whatsoever to any of these

22  words.  They've told you they're going to offer evidence

23  about the Senate factors.  This is the Senate report.  You

24  know what a Senate report is, and you know it's not the

25  statutes at large.  This is not the law.  There are Supreme

1    Court cases and Fifth Circuit cases that have said over the

2    years that the Senate factors may be worth consideration

3    when you're looking at the totality of the circumstances.

4         And, sure, you can look at all of that stuff to see

5    if the current circumstances have any effect on modern

6    times and modern elections. But the circumstances change.

7    And the circumstances have changed tremendously since 1982.

8    The Supreme Court in *Shelby County* said you can't look at

9    circumstances in 1965 and continue to enforce federal law

10   on the basis of circumstances that no longer exist.

11        Fifth Circuit has recently said in the *Harness* case,

12   it doesn't matter what the circumstances were in 1890, you

13   have to look at what Mississippi has done with regard to

14   felony disenfranchisement since then. You have to base

15   your decision on modern circumstances, not old

16   circumstances. And circumstances have certainly changed.

17   And these plaintiffs, I think, have acknowledged that

18   circumstances have changed.

19        Way back 50 or 60 years ago, Frank Parker cooked up

20   the 65 percent rule, and that's been applied by this Court

21   and by other courts. And in those days, the rule was you

22   needed to have a 65 percent Black district in order for

23   Black candidates to win. Those circumstances have changed.

24   It made a difference. Registration has changed. Turnout

25   has changed.

1      Two years ago when we litigated the congressional

2  redistricting plan, the NAACP came into court and said

3  Congressman Thompson's 62 percent Black district was too

4  Black.  So the numbers have changed.  Mr. Cooper is going

5  to give you a bunch of maps on the stand.  I don't think

6  any of them get anywhere close to 65 percent.

7  Circumstances change, and the mere fact that something

8  seemed important to the Senate judiciary staff 42 years ago

9  is not enough to make it a relevant circumstance today.  So

10  this is what you will have to do.  You'll have to evaluate

11  the evidence.  You're going to have to consider --

12      JUDGE JORDAN:  I am going to ask a question.  Are

13  you saying we don't look at the totality of the

14  circumstance as the Supreme Court laid out?

15      MR. WALLACE:  You look at the totality of the

16  circumstances, but you look at the totality of the

17  circumstances in light of current conditions, which is what

18  the Supreme Court did in *Shelby County*.

19      JUDGE JORDAN:  Right.  I understand that.  But you

20  seem to be saying that we shouldn't look at the Senate

21  factors because they came from the Senate.  But the Supreme

22  Court incorporated that into the analysis, did it?

23      MR. WALLACE:  I think what the Supreme Court has

24  said is that the Senate factors weigh out things you may

25  consider in the course of considering the totality of the

1  circumstances, but you do not treat them like holy writ.

2  They are simply what the judiciary committee staff thought

3  was relevant in 1982, and you've got to apply it -- and I'm

4  going to tell you right now how it's going to come up in

5  this case.  They're going to put somebody on the stand, and

6  they're going to ask him about the 1875 Clinton Massacre.

7  And I'm going to object.  And they're going to say Senate

8  Factors.  And I'm going to say, so what?

9       Unless there's evidence that the descendants of the

10 Redeemers are roaming around Hinds County looking to

11 bushwhack Black voters, it doesn't mean anything.  It's not

12 a circumstance that affects the issue in the case.  Do

13 these district lines deprive anybody of the right to vote

14 or abridge their right to vote?  That's what we'll be

15 arguing about this week.

16      I think you will find it very difficult to come up

17 with any evidence in this case that show these lines deny

18 anybody an equal opportunity to participate or deny anybody

19 an equal opportunity to elect.  And for those reasons, I

20 think you're going to dismiss this complaint with

21 prejudice.  Thank the Court.

22      JUDGE JORDAN:  All right.  Thank you.  Call your

23 first witness.

24      MR. SAVITZKY:  Thank you, Your Honor.  Before I call

25 the first witness, a couple of preliminary matters with the

1  Court's indulgence.  The stipulations that -- you can take

2  the slides down for now.  The stipulations included with

3  the joint pretrial order, we would move their admission

4  into the trial record at this time.  And I have one

5  scrivener's error that we notices that I can note in the

6  record as well.  I'm happy to hand up a copy.

7          JUDGE JORDAN:  All right.  Please do.  I assume

8  there's no objection to the stipulations.

9          MR. CARDIN:  No objection, Your Honor.

10          MR. WALLACE:  No.

11          MR. SAVITZKY:  And I'll note the scrivener's error

12  for the record is in paragraph 118, the last paragraph.  It

13  should say Shanda Yates represents House District 64.

14          May I approach?

15          JUDGE JORDAN:  You may.  Do we want to I guess mark

16  that as JTX055?

17          MR. SAVITZKY:  Yes, Your Honor.  That would be the

18  next in the joint exhibit series.

19          JUDGE JORDAN:  Okay.  All right.  It's admitted.

20              (Joint Trial Exhibit 55 entered.)

21          MR. SAVITZKY:  And, Your Honor, while we're on the

22  subject of the admission of exhibits, we would move at this

23  time for the admission of all joint exhibits, 1 through 54.

24          JUDGE JORDAN:  I assume no objection to that?

25          MR. CARDIN:  No objection, Your Honor.

```
1          JUDGE JORDAN:  Joint exhibits are admitted.

2          (Joint Trial Exhibits 1 through 54 entered.)

3          MR. SAVITZKY:  Thank you, Your Honor.  And lastly on

4   this point, we would also, to streamline the proceedings,

5   ask the Court to admit at this time all of the exhibits

6   from plaintiffs' and defendants' exhibit list to which no

7   objection was lodged.

8          JUDGE JORDAN:  All right.  Any objection to that?

9          MR. CARDIN:  No objection, Your Honor.

10         MR. SAVITZKY:  And if it please the Court, I'll read

11  the particular exhibit numbers in the record at this time.

12         JUDGE JORDAN:  That would be fine.

13         MR. SAVITZKY:  For plaintiffs' exhibit list, we have

14  Exhibit 1, 2, 4, 5, 6, 8, 9, 20, 21, 22, 23, 24, 25, 53,

15  54, 88, 89, 90, 91, 92, 93, 94, 95, 96, 99, 101, 102, 105,

16  109, 114, 115, 116, 117, 118, 119, 127; and that is it from

17  the plaintiffs' list.

18         I'm happy to read the exhibits from defendants' list

19  of which no objection has been lodged into the record at

20  this time.

21         JUDGE JORDAN:  Just to break it up, I won't repeat

22  all the numbers, but the unobjected-to exhibits on the

23  plaintiffs' list are admitted.  Mr. Cardin?

24         MR. CARDIN:  No objection, Your Honor.

25         JUDGE JORDAN:  You were about to say something?
```

1    He's about to read your exhibits.

2         MR. CARDIN:  I'm fine with him reading our exhibits

3    into the record.

4         JUDGE JORDAN:  Very good.

5         MR. SAVITZKY:  I figured it would be prudent to seek

6    defense counsel's permission to do that.  So defendants'

7    Exhibits 1, 2, 3, 4, 12, 13, 16, 21, 22, 23, 24, 25, 50.

8    And I believe that's it unless --

9         MR. CARDIN:  That's accurate, that's it.

10        JUDGE JORDAN:  All right.  Those exhibits are

11   admitted as well.

12        MR. SAVITZKY:  And thank you, Your Honor.  And one

13   other housekeeping point if I may?  The Court had mentioned

14   the deposition designations.  We have emailed those along,

15   and I think it makes sense for me to re-raise those after

16   the Court's had a chance to review, if that makes sense for

17   the Court.

18        JUDGE JORDAN:  I'm sorry to re-what?

19        MR. SAVITZKY:  We have sent the deposition

20   designations in a PDF, and so I can re-raise that in the

21   morning if that makes sense.

22        JUDGE JORDAN:  That's fine.  We'll need an

23   opportunity to look at the objections.  Those were both

24   defense depositions; is that right?

25        MR. SAVITZKY:  Plaintiffs took both of those

1    depositions.

2         JUDGE JORDAN:  Both of them.  You were going to call

3    them, but they were their witnesses; is that not right?

4         MR. SAVITZKY:  One of them is one of their

5    witnesses, that's correct.

6         JUDGE JORDAN:  Okay.  All right.  Well, obviously

7    we'll need some time to look at the objections.

8         MR. SAVITZKY:  Understood, Your Honor.  And at this

9    time, the plaintiffs would call William Cooper to the

10   stand.

11        JUDGE JORDAN:  All right.

12                         **WILLIAM COOPER,**

13            **having been first duly sworn, was examined and**

14   **testified as follows...**

15                    **DIRECT EXAMINATION**

16   **BY MR. SAVITZKY:**

17   Q.    Good morning, Mr. Cooper.

18   A.    Good morning.

19   Q.    Now, there should be a large binder in front of you,

20   and I don't see it there.  So if I may approach the witness

21   and grab the trial binder?

22        JUDGE JORDAN:  You may.

23        MR. SAVITZKY:  Thank you very much.

24        JUDGE SOUTHWICK:  Is this the same binder you

25   provided to us, volume one?

 1       MR. SAVITZKY:  Correct.  Volume one containing

 2  plaintiffs' Exhibit 1, which has just been admitted into

 3  evidence.

 4       JUDGE SOUTHWICK:  Have you read all of this?

 5       MR. SAVITZKY:  Your Honor, unfortunately I have.

 6       And I'd point out that large binder to you,

 7  Mr. Cooper.  It contains what's been marked as plaintiffs'

 8  Exhibit 1.  It should be, and we'll confirm it in a second,

 9  your August 28, 2023, declaration and the exhibits thereto,

10  which have been admitted into evidence.

11       And, Your Honors, I also have a copy of a PowerPoint

12  presentation that we're going to do with Mr. Cooper.  I'm

13  happy to hand out copies of those as well if that would be

14  helpful?

15       JUDGE JORDAN:  Sure.

16  BY MR. SAVITZKY:

17  Q.     How are you this morning, Mr. Cooper?

18  A.     Fine, thank you.

19  Q.     Mr. Cooper, were you retained as an expert by the

20  plaintiffs in this case?

21  A.     I was retained by the plaintiffs.

22  Q.     And you prepared a report in this case?

23  A.     I have.

24  Q.     And is that report the document marked as

25  plaintiffs' 1 that you have in front of you?

1    A.      I believe so.

2    Q.      Now, have you noticed any errors or typos in your

3    report?

4    A.      I've noticed a couple of typos here and there.  I

5    don't think they're really material, though.

6    Q.      Any of that affect the substance of your analysis or

7    conclusions?

8    A.      No.

9    Q.      And now turning to Exhibit A of your report, this is

10   on PTX01 at page 81, is that a summary of your work

11   history?

12   A.      Yes, as of August of 2023.

13   Q.      Now, let's talk about that.  Starting at a high

14   level, Mr. Cooper, how would you describe your job?

15   A.      Well, I provide consulting services to nonprofit

16   organizations, occasionally to local governments, focusing

17   on demographics, and applying mapping technology to

18   demographics.  I do it all over the country.  I'm from

19   Virginia, but most of my work has been in the southeast and

20   somewhat in the Rocky Mountain West, so-called Indian

21   Country.

22   Q.      How much of that work involves the drawing of

23   electoral maps?

24   A.      Close to 95 percent of the time, I think.

25   Q.      Mr. Cooper, what types of data do you typically use

1    when you conduct demographic analysis and draw electoral

2    maps?

3    A.    I overwhelmingly rely on census data from the U.S.

4    Census Bureau.  But I also obtain data sometimes from state

5    agencies or from local agencies, so those would be my key

6    sources.

7    Q.    And, Mr. Cooper, you mentioned census data.  The

8    U.S. census PL94171 file, which is in evidence already as

9    joint Exhibit 1, is that a dataset that you work with when

10   you conduct your demographic analysis and draw maps?

11   A.    Yes.  For redistricting purposes, I routinely use

12   the PL94171 file, both present day and going back in time.

13   Q.    Do you use any particular type of software or

14   platform to draw electoral maps?

15   A.    I use a mapping software program called Maptitude

16   for redistricting, that is relied upon by many state

17   governments around the country to develop their

18   redistricting plans as well as local jurisdictions.  I've

19   been using Maptitude for redistricting since it first came

20   out in early 2001, I think.

21   Q.    And, overall, how long have you been doing this

22   redistricting and map-drawing work?

23   A.    I've been doing it for about 35 years.  Started

24   sometime in 1987, and I've continued it.  And there hasn't

25   been a year where I haven't done redistricting plans and

1    numerous redistricting plans every year.

2    Q.    Mr. Cooper, when you started doing this work in 1987

3    or so, were you using a computer program at that time?

4    A.    I was, but not to visualize it on a computer in

5    terms of a map.  I was working off of paper maps and then

6    running the calculations through a macro-driven Lotus 1-2-3

7    spreadsheet.  If you folks remember those maybe.  But that

8    was the fast way to get calculations on the total

9    populations in the districts I was drawing.

10   Q.    Now, Mr. Cooper, have you testified in federal court

11   as a redistricting expert in any recent cases?

12   A.    Yes.  Since 2021 when the census data was released,

13   I think I've testified in about ten redistricting cases.

14   And in a couple of instances on multiple occasions

15   specifically in Georgia and some other place maybe.  That

16   may be it for multiple occasions.

17   Q.    You testified in Georgia on multiple occasions.

18   What are some of the other federal cases you've testified

19   in recently?

20   A.    I testified in -- the first one out of the gate was

21   *Alabama v. Milligan* or *Milligan v. Alabama*.  I'm not sure

22   how that works.  But after that, then I developed three

23   different plans and testified in a lawsuit in Baltimore

24   County, Maryland.  Also, I testified in a congressional

25   lawsuit in Georgia and a legislative lawsuit in Georgia.

1   All of those cases took place in 2021.

2          In 2022, I testified in a congressional case

3   involving Louisiana.

4          In 2023.  I've revisited Georgia again, in December

5   of 2023.  But earlier in the year, I testified in the

6   *Galveston County, Texas* case.  I testified in -- recently,

7   not long ago, in the Louisiana legislative case.  And I may

8   have left out something, but those are the -- probably the

9   big ones.

10  Q.     And, Mr. Cooper, overall, over the course of your

11  time doing this work, how many times have you testified as

12  an expert witness in a federal court redistricting case?

13  A.     I think about 55 times.

14  Q.     And how many of those are Section 2 cases?

15  A.     At least 95 percent.

16  Q.     And did you draw illustrative redistricting maps in

17  each of those cases?

18  A.     I believe so.  I don't recall any that I didn't.

19  Q.     And you mentioned that you were a testifying expert

20  in the *Allen versus Milligan* case.  Is that the same case

21  that went to the United States Supreme Court last year?

22  A.     Yes.

23  Q.     Now, Mr. Cooper, has a court ever ordered a change

24  to a state or local redistricting plan in a case where you

25  testified as an expert?

1    A.    Yes.

2    Q.    About how many times roughly would you say that's

3    happened?

4    A.    At the state level, I recall the court ordered the

5    plan I developed, the state legislature plan, for both

6    House and Senate in South Dakota in place as presented at

7    trial as the illustrative *Gingles* 1 map.  There have been

8    other situations at the local level where the courts have

9    ordered my plan in place.

10   Q.    And what you're saying is a court has directly

11   adopted you illustrative plan into --

12   A.    Into a working election plan.

13   Q.    Now, Mr. Cooper, when you draw illustrative

14   districting plans in a Section 2 case, are there particular

15   principles or methods you apply?

16   A.    Yes.  I apply what are known as traditional

17   redistricting principles.

18   Q.    And, Mr. Cooper, we'll talk about those more.  Do

19   you ever draw electoral districting maps outside the

20   litigation context?

21   A.    Yes.  I've worked for local governments, state

22   governments, and oftentimes for local citizens groups and

23   state and national civil rights organizations.

24   Q.    All in all, about how many different jurisdictions

25   have you drawn electoral maps for over the years?

1    A.      If you go all the way back to 1987, I would

2    calculate somewhere in the range of 750 for the separate

3    governing bodies.  I would, of course, stress many of those

4    were the one-and-done type, where someone asked me to

5    produce a plan, and that was as far as it went.

6            But many of them lasted for years and years and

7    years.  The Montana case I was involved, involving the

8    Salish and Kootenai reservation and the Blackfeet

9    reservation in western Montana lasted for 11 years.  And

10   the Indigenous trials tend to go for a long time.

11           The most recent case I did in San Juan County, Utah

12   started in 2011 and finally finished in 2018, so was eight

13   years.  That's the longest running currently in recent

14   times.

15   Q.      And, Mr. Cooper, turning your attention to

16   Mississippi, have you ever worked in Mississippi before?

17   A.      Yes, I have.  I have testified in several cases in

18   Mississippi going back to the early '90s.

19   Q.      And let's just put the next slide on the screen.

20   And I'm putting up a list of some of the Mississippi cases

21   that you indicate you testified in from Exhibit A in your

22   report.  Does that list look right to you?

23   A.      Almost.  The case captioned *Gunn v. Chickasaw*

24   *County*, the caption may be correct in terms of the start of

25   the case and the initial federal court ruling.  But I

1    testified when that case was on remand, and I think that
2    was sometime in the mid 1990s, '94, '95.
3    Q.    So the testimony you offered was sometime after
4    1989?
5    A.    Right.  The case was going back and forth at the
6    appellate level for several years.
7    Q.    These are all federal court cases where you -- did
8    you offer expert testimonies in these cases?
9    A.    Yes.
10   Q.    And, Mr. Cooper, did any of these cases involve
11   redistricting the Mississippi State Legislature?
12   A.    No.  Well, actually, the *Thomas v. Reeves*, of
13   course, the state Senate in 2019.  That was one single
14   district, District 22, involving Warren and Yazoo County,
15   and a couple of other districts and counties.
16   Q.    And you drew a state illustrative plan in that case?
17   A.    I did.
18   Q.    And looking at the *City of Hattiesburg* case there,
19   did you draw illustrative plans in the City of Hattiesburg
20   as part of that case?
21   A.    Yes, I did.
22   Q.    And looking at the *City of Tupelo* case there, you
23   drew illustrative plans for the City of Tupelo as part of
24   that case?
25   A.    Yes, I did.

1    Q.    And you drew illustrative plans for Newton County as
2    part of the *Newton County* case that's listed there?
3    A.    Yes, I did.
4    Q.    And you drew illustrative plans for the City of
5    Okolona, which is in Chickasaw County in the *City of*
6    *Okolona* case?
7    A.    Yes.
8    Q.    And were you qualified as an expert mapper in all
9    those cases?
10   A.    I believe so.
11        MR. SAVITZKY:  Your Honors, at this time the
12   plaintiffs would offer Mr. Cooper as an expert in
13   redistricting, demographics, and census data to the Court
14   under Rule 702 of the Federal Rules of Evidence.
15        MR. WALLACE:  May I be heard?  Tommie, do you want
16   to go first?
17        MR. CARDIN:  Mine will be easier.  Your Honor, no
18   objection.
19        MR. WALLACE:  Your Honor, I didn't object to his
20   dropping his report in the record, because I think what he
21   wants to say is admissible.  But I do object to his
22   qualification as an expert, because I don't think the Court
23   needs one, and I don't think he is one.  *Gingles* says you
24   need maps.  They don't say you need to have them drawn by
25   an expert.  This Court has drawn maps in redistricting

1   litigation.  The northern district has drawn maps in

2   redistricting litigation.  His maps can come in, and Rule

3   701 is broad enough that his lay opinions can come in.

4        They've told you in opening what he wants to do is

5   to say that his maps are better than the legislature's

6   maps, and he bases it on traditional redistricting

7   principles.  That's not a fact question, and it's not an

8   expert question.  This Court -- it's a legal question for

9   you to decide what redistricting principles may be applied

10  in Mississippi.  You need to tell that to him.  He doesn't

11  need to tell that to you.  I have no objection to his

12  evidence.  I do object to his qualifications for that

13  reason.

14       JUDGE JORDAN:  In what way are his qualifications

15  insufficient under 702?  His specific qualifications.  I

16  understand what you're saying that you don't think they

17  need an expert, but how is he not qualified as an expert?

18       MR. WALLACE:  He's perfectly qualified to draw a

19  map.  I don't see anything that entitles him to give you

20  legal comparisons of which maps are better than others.

21  Those are legal questions for the Court, not for the

22  witness.

23       JUDGE JORDAN:  All right.  All right.  Objection's

24  overruled.  He's qualified as an expert.  The objections

25  really go to the weight of the evidence, and he will be

1    accepted by the Court as an expert in the tendered field.

2         You may proceed.

3         MR. SAVITZKY:  Thank you, Your Honor.

4    BY MR. SAVITZKY:

5    Q.    Mr. Cooper, let's start with the big picture.  What

6    were you asked to do in this case?

7    A.    Well, I was asked to take a look at the state of

8    Mississippi and examine the demographics and determine

9    whether it might not be possible to draw additional

10   majority-Black House and Senate Districts under the 2020

11   census after examining the 2022 House Plan and the 2022

12   Senate Plan.

13        So I was asked to prepare a report that would

14   provide background demographics and then an illustrative

15   plan suggesting different ways to draw additional majority

16   Black district that would adhere to traditional

17   redistricting principles.

18   Q.    And, Mr. Cooper, staying with the very big picture

19   for now, what was your overall high-level conclusion about

20   whether additional black-majority districts could be drawn

21   consistent with traditional redistricting principles?

22   A.    It's just glaringly obvious that additional

23   majority-Black districts can be drawn both by Senate and

24   House, according to the 2020 census.  To me, it's no

25   contest.  My nonlegal opinion, of course; no contest.

1    Q.      Understood.  And, Mr. Cooper, did you end up

2    producing illustrative Senate and House plans showing those

3    additional majority-Black districts that you drew?

4    A.      Yes.

5    Q.      And, Mr. Cooper, what was your overall high-level

6    conclusion about the demographics of the state of

7    Mississippi based on your analysis?

8    A.      I looked at the population in the state of

9    Mississippi in the year 2000, and compared that with the

10   Census Bureau's report from 2010 and again in 2020, and

11   could easily see that the Black population has been

12   climbing over that 20-year period while the white

13   population has stagnated and even declined.

14          The Black population is up by -- I'm not looking at

15   the table; I think it's around 88,000 people maybe since

16   2000, and the white population has fallen by about 82,000.

17   Q.      And, Mr. Cooper, as part of your analysis, did you

18   include the socioeconomic characteristics of the population

19   of Mississippi?

20   A.      Yes.  Although I -- I reversed that, I think.  The

21   Black population is 82,000 since 2000, and the white

22   population has dropped by about 88 or 89,000.

23          What was your question?

24   Q.      As part of your demographic analysis, did you also

25   consider the socioeconomic attributes of the population?

1    A.      Yes.  I looked at the 2021 American Community Survey

2    that was released in September 2022.  At the time, that was

3    the most current survey available from the American

4    Community Survey for statewide comparisons of the Black

5    population and white population.  And it's clear that the

6    white population benefits and outpaces the Black population

7    in terms of socioeconomic well-being.

8    Q.      And, Mr. Cooper, we've been using the term "majority

9    Black."  What does it mean when you say a district or an

10   area is majority Black?

11   A.      Well, first of all, it would mean that it is at

12   least 50-percent-plus-one Black voting age.  And then the

13   other side of the coin is how do you define Black?  And

14   according to the *Ashcroft v. Georgia* ruling in 2002 or so,

15   maybe 2004, by the Supreme Court, the proper measure is any

16   part Black, which would include all persons who are

17   single-race Black or some part Black and some part some

18   other race.

19   Q.      That any-part Black definition, is that what you

20   used for purposes of your analysis and your illustrative

21   plans?

22   A.      Yes.

23   Q.      Mr. Cooper, let's talk a little bit about your

24   demographic analysis.  And to start, I'm going to pull up a

25   graph based on figure 2 on page 11 of your report.  PTX001

1    for reference.  Mr. Cooper, can you give us a high-level

2    description of the demographic growth patterns in the state

3    of Mississippi over the last two decades?

4    A.    Well, yes.  Again, looking at just voting-age

5    population as opposed to total population, which I

6    previously discussed, the Black voting-age population has

7    been increasing each decade.  It's gone from 688,994

8    persons in 2000 to 823,080 in 2020.

9          The white population, by contrast, has actually

10   declined over that 20-year period from about 1.32 million

11   to 1.315 million.  It's a slight decline, but it's there.

12   Q.    And, Mr. Cooper, I notice there that you're looking

13   at demographic change from 2000 to 2010 to 2020.  Why are

14   you looking back to 2000 and not just to 2020?

15   A.    Well, because I wanted to capture the time period

16   that would reflect the total number of majority-Black

17   districts that were set.  Today we have 42 House districts

18   that are majority Black under the 2022 House plan and 15

19   majority-Black Senate seats.  So I went back and looked at

20   the benchmark plan of 2011, which would have been the 2002

21   House Plan and 2002 Senate Plan I think based on the 2010

22   census.  And at that time, there were 41 majority-Black

23   House districts and 14 majority-Black Senate districts.  So

24   we're up one on house in terms of the majority-Black

25   districts and up on one on Senate in terms of the

1  majority-Black Senate districts.

2       The 15th Senate District has only been around for

3  six years now.  The district that was at issue in the case

4  I've previously mentioned, *Thomas v. Reeves*, the Senate

5  seat for an area that is in the south Delta area including

6  Yazoo County and Warren County and Holmes County and a

7  couple of other areas that actually was drawn by the state

8  after the Court ruled in favor of the plaintiffs.

9  Q.    All right.  Mr. Cooper, I'm going to pull up a map

10 that appears on figure 3 of page 14 of your report for

11 reference.  Can you tell us what this map is showing us?

12 A.    This shows the counties of Mississippi.  The

13 coloring indicates the percentage Black, ranging from under

14 10 percent of course in the northeast borderline

15 Appalachian area.  And then of course heading over into the

16 Delta and further south, you see there are a number of

17 districts or counties in the 60 to 80 percent or actually a

18 couple, even four, that are in the 80 to 90 percent Black

19 category.

20 Q.    And, Mr. Cooper, why did you look at these planning

21 districts or PDDs as you were considering the demographics

22 of the state of Mississippi?

23 A.    Well, it is a way to organize the state in regions.

24 These are regions that actually matter today.  They are

25 contemporary regions, because each one of these planning

1    districts has a special responsibility to work in the

2    region that is delineated, and that would involve bringing

3    together some of the adjacent counties on all sorts of

4    issues running from agencies of aging to economic

5    development initiatives.  It just -- it just runs the

6    spectrum of the various programs which these Planning and

7    Development Districts are involved in.  And they have

8    boards of directors that are made up of local government

9    officials, that are made up of private business persons,

10   community leaders, maybe associated with nonprofits, so

11   they actually do represent a community of interest.

12        And one traditional redistricting principle which I

13   may have glossed over is community of interest, which is

14   kind of a fuzzy term.  But if anything represents a

15   community of interest, it would be the Planning and

16   Development Districts.

17   Q.    Okay.  Mr. Cooper, we can talk about that.  For now,

18   I want to pull up the next figure.  This is figure 6 from

19   page 18 of your report.  Can you tell us what this chart is

20   showing?

21   A.    Well, yes.  This is similar to the initial figure we

22   look at, figure 1, just showing the population change in

23   those planning districts over the past 20 years.  And you

24   can see there was growth in some of them in terms of total

25   population, and in others, there was big loss.

1      The planning districts that actually grew

2   significantly over that 20-year period would be Central,

3   North Delta, Southern, and to some extent Three Rivers, and

4   then East Central was more or less stable.  Others

5   experienced significant population loss.  That would

6   include districts like East Central -- I'm sorry, that

7   would include planning districts like South Delta and some

8   of the others that are not in boldface.

9      South Delta's population fell by almost 200,000

10  people between -- I'm sorry.  South Delta fell by about

11  78,000 people between 2020 and -- between 2000 and 2020.

12      JUDGE JORDAN:  I'm sorry.  Is that total population

13  or voting-age population?

14  A.    That's total population.  These charts are total.

15  BY MR. SAVITZKY:

16  Q.    And, Mr. Cooper, how did examining Black population

17  growth change at this regional level inform your

18  consideration of whether potential additional

19  majority-Black districts could be drawn in Mississippi?

20  A.    Well, I looked at the total population change, and I

21  also looked at Black population change.  And there was

22  significant growth in the Black population in several of

23  these Planning and Development Districts, notably North

24  Delta, Central, and Southern.

25  Q.    And how does it -- how does your analysis of where

1    on a regional level there might be Black population growth

2    inform whether or not you may be able to draw an additional

3    majority-Black district?

4    A.    Well, if you look at, say, North Delta, the Black

5    population in 2000 was 105 -- I'm sorry.  I lost my place.

6    120,499 -- again I've lost my place -- 80,626 and it has

7    now grown to 120,419.  So there's a big jump in the Black

8    population in the North Delta region for one, and that's

9    where the Senate district that was kind of focused on in

10   earlier discussions here has been drawn from my

11   perspective.

12   Q.    And you mentioned by the way that East Central

13   planning development district region, the Black population

14   was stable there.  What's been happening with the white

15   population in that area?

16   A.    Declining.  It's dropped by 22,000 persons, almost

17   23,000 persons since 2000 from a population of 142,721 down

18   to 119,855.  So that's another area that could be examined

19   for new potential majority-Black district, given the white

20   population loss.

21   Q.    And why is that?  What would happen to the Black

22   population in that region if you have stable Black

23   population and decreasing white population?

24   A.    Well, if the Black population in that region goes

25   up, it's more concentrated to a higher percentage.

1  Q.    And, Mr. Cooper, let's look at the next slide.  This

2  is figure 5, page 17 of your report.  Across the five

3  regions that we just talked about, about approximately how

4  much has the Black population grown over the last two

5  decades?

6  A.    I think it's about 120,000.

7  Q.    Now, based on -- looking at the next slide, based on

8  the 2020 census, did you calculate the ideal population

9  size of a Senate seat and a House seat in Mississippi?

10 A.    Yes.  As the state would have done when drawing

11 those state's districts.  The ideal is Senate district size

12 is almost 57,000 people, and the idealistic House size is a

13 little over 24,000.

14 Q.    And you mentioned the Black population overall grew

15 by about 120,000 over the last two decades.  Assuming

16 districts that are 100 percent Black, how many state Senate

17 districts would that level of growth equal out to?

18 A.    Well, it would be two districts comprised entirely

19 of Black persons.

20 Q.    And what about for the House, how many House

21 districts would that equal out to?

22 A.    It would be five House districts comprised entirely

23 of Black persons.  100 percent Black, so that just cries

24 out for additional Black-majority districts.

25 Q.    Well, I was going to ask you -- you don't actually

1  draw 100 Black districts.

2  A.     Of course not.

3  Q.     So why is that yardstick, you know, helpful?

4  A.     It just suggests -- it doesn't guarantee that it

5  would be very easy to draw additional majority-Black

6  districts in the state of Mississippi in these specific

7  areas in particular: in the Central Planning Development

8  District, North Delta, Southern, and Three Rivers.

9  Q.     And, Mr. Cooper, let's move on and talk about the

10  benchmark plans, the 2022 enacted plans I should say, and

11  your analysis of those.  Did you examine the Senate and

12  House plans that were passed by the state in 2022?

13  A.     Yes.

14  Q.     And for the record, I would note that the Block

15  Equivalency Files that represent those plans are in

16  evidence already as Joint Exhibit 4 and 5 for the Senate

17  and House plans, respectively.

18         Now, Mr. Cooper, did you examine the prior plans

19  that were in effect before the 2022 plans were put into

20  place?

21  A.     Yes.  There are maps that zoom on the benchmark

22  plans for the House and the Senate, 2019 Senate and the

23  2011 House, because the House plan was not changed over the

24  course of the decade, unlike the Senate plan.

25  Q.     And for the record, I would note the Block

1    Equivalency Files, the digital files representing those

2    prior plans are also in evidence already; that's Joint

3    Exhibit 2 for 2019 Senate plan.  Joint Exhibit 3 for the

4    2012 House plan.

5         JUDGE JORDAN:  I'm sorry.  You trailed off at the

6    end.  What did you say?

7         MR. SAVITZKY:  Joint Exhibit 3 for the 2012 House

8    Plan that had previously been in place before the 2022.

9    BY MR. SAVITZKY:

10   Q.    Now, Mr. Cooper, we can go to the next slide.  Let's

11   take a look at the state Senate map first, and for

12   reference, I'm pulling up figures from pages 23 and 25 of

13   your report.  How many black-majority districts did you

14   count in the 2019 Senate plan that was in place prior to

15   this?

16   A.    Well, there were 15 according to the 2020 census.

17   Q.    And how many black-majority districts do you count

18   in the 2022 plan?

19   A.    Fifteen.

20   Q.    There has been no change in the number of

21   Black-majority districts in the Senate?

22   A.    No change.

23   Q.    In your estimation, does the 2022 Senate plan

24   staying with 15 black-majority districts reflect the

25   population change patterns that we see in the 2020 census?

1    A.      No.

2    Q.      Now, Mr. Cooper, I'm going to pull up figure 18,

3    page 50 of your report for reference.  What does this

4    figure that we're looking at comparing?

5    A.      Well, I think this is a interesting table.  It shows

6    the percentage of the Black voting-age population that

7    actually resides in a majority-Black Senate district under

8    both the 2022 Senate Plan and also under the illustrative

9    Senate plan that I drew in the second row.

10           And you can see that under the 2022 Senate plan,

11   barely half of the Black voting-age population lives in a

12   district that is majority Black.

13   Q.      And how does that compare to the percentage of white

14   voters in white-majority districts?

15   A.      Interesting almost -- well, almost 84 percent of the

16   white population lives in a majority-white Senate district,

17   so there is a gap there of almost 34 percentage points

18   between the percentage of Blacks and Whites in respective

19   districts that would be their race.

20   Q.      And what does this disparity between Black voters in

21   Black-majority districts and white voters in white-majority

22   districts mean as a practical matter?

23   A.      It would, again, suggest that perhaps districts

24   could be drawn in addition to the 15 in the state Senate

25   Plan.  No guarantee, but it is an indicator.

1  Q.    And, Mr. Cooper, you mentioned earlier -- let's look

2  at the next slide.  You mentioned your illustrative plan

3  contains four additional Black-majority districts.  How

4  does the addition of those majority-Black districts affect

5  this disparity you noted?

6  A.    It removes the gap by about half.  So under the

7  illustrative Senate Plan, about 58 percent of the Black

8  voting-age population would be in a majority-Black

9  voting-age district, and about three-quarters of the white

10  population would be in a majority-white district.  So the

11  gap there is 17 percent, roughly half of the present-day

12  34 percent.

13  Q.    And turning to the next slide and looking at the

14  House Plan for just a second, how many Black-majority

15  districts do you count in the 2012 Benchmark House Plan?

16  A.    I counted 42 under the 2020 census.

17  Q.    And how many are there in the 2022 plan?

18  A.    Twenty-two.

19  Q.    Twenty-two?

20  A.    I'm sorry.  42 under the 2020 census.  Excuse me.

21  Q.    And so there is no change in the number of

22  majority-Black House Districts either?

23  A.    No change.

24  Q.    In your estimation, does the 2022 House Plan staying

25  with 42 Black-majority districts reflect the population

1  change patterns we see in the 2020 census?

2  A.    It does not.  Particularly if you go back to the say

3  the Benchmark Plan during 2011 redistricting based on the

4  2010 census, there were 41 House District, so one

5  additional district has been added since the mid2000s.  I

6  don't know if that was just organic.  Perhaps one of the

7  districts in DeSoto County became majority Black with the

8  increase in the Black population up there.  But there has

9  been one -- one House District has been added since the

10 2001 redistricting.

11 Q.    And, Mr. Cooper, I'm going to pull up -- go to the

12 next slide.  Is this the same analysis that you did

13 comparing Black voters in Black-majority districts with

14 white voters in white-majority districts for the House side

15 of the equation?

16 A.    Yes.

17 Q.    And did you notice a gap between Black voters in

18 Black-majority districts and white voters in white-majority

19 districts for the House as well?

20 A.    Yes, there is still a gap.  The percentage of the

21 Black population living in a -- or the Black voting-age

22 living in a majority-Black House district is a little over

23 62 percent versus 83 percent using the same metric for the

24 non-Hispanic white voting-age population in majority-white

25 districts.  So that is a 20-percentage-point gap.

```
 1    Q.     And, Mr. Cooper, the by the way, did you also look
 2    at this comparison of Black voters in Black-majority
 3    districts versus white voters in white-majority districts
 4    at the regional PPD level as well?
 5    A.     I did.
 6    Q.     And did you find that this same gap existed in this
 7    metric in some of those regions as well?
 8    A.     Yes.  In some places, it's more severe.
 9    Q.     Let's move ahead two slides and talk about the
10    illustrative plans that you drew.  Mr. Cooper, I'm going to
11    call them the illustrative Senate Plan and the illustrative
12    House Plan, if that works for you?
13    A.     Yes, sir.
14    Q.     And before getting into the substance, I want to
15    talk about the process you used to draw these maps.  In
16    drawing these plans --
17           JUDGE JORDAN:  I tell you what, it's almost noon,
18    and that sounds like a good place to stop, is it?
19           MR. SAVITZKY:  It is a perfect place to stop.
20           JUDGE JORDAN:  Yeah.  All right.  So it's 11:55.
21    The Court will be in recess until 1:10, an hour and 15
22    minutes.  The Court will be in recess until 1:10.
23           You're in the middle of your testimony, so don't
24    talk to anybody associated with the case during the break.
25           Is there anything before we adjourn?
```

1        MR. SAVITZKY:  Nothing from the plaintiffs, Your

2   Honor.

3        MR. CARDIN:  Nothing, Your Honor.

4        JUDGE JORDAN:  All right.  The Court's in recess.

5   Thank you.

6        MS. POWELL:  All rise.

7             (A lunch recess was taken.)

8        JUDGE JORDAN:  Thank you.  You may be seated.

9        All right.  Before we start -- excuse me -- we are

10  going to take the plaintiffs' motion for judicial notice

11  under advisement.  With respect to the defendants' motion,

12  to the extent the defendants are asking for judicial notice

13  that the Census Bureau produces statistics, the Court can

14  take judicial notice of that.  But the Court cannot take

15  judicial notice of the actual data because the accuracy of

16  the data is disputed.  The census itself indicates as much

17  as well as the other sources listed in the plaintiffs'

18  response.  Under Rule 201, if we were to take judicial

19  notice of the data, then it would have to be considered

20  conclusive, and that's not the case.

21       Having said that -- and we're making this ruling now

22  because it could be that the defendants -- I think the

23  defendants need to know that before their cross-examination

24  here but it does seem to us that the -- and we can address

25  this more fully later -- but that the census data is a

1   self-authenticating document under 902(5).  I recognize

2   there could be other issues, but the defendants' motion is

3   denied except to the extent the Court would take judicial

4   notice the Census Bureau routinely produces these

5   statistics.

6           All right.  Anything before we resume with

7   Mr. Cooper?  Doctor?  Is it doctor or mister?  I'm sorry.

8           THE WITNESS:  Mister.

9           JUDGE JORDAN:  Okay.  You may proceed.

10          MR. SAVITZKY:  Thank you very much, and good

11  afternoon, Your Honors.

12          JUDGE JORDAN:  Good afternoon.

13                  **CONTINUED DIRECT EXAMINATION**

14  **BY MR. SAVITZKY:**

15  Q.     Good afternoon, Mr. Cooper, and I believe we were on

16  slide number 20.  Picking it up and talking about the

17  illustrative plans that you drew, the illustrative Senate

18  Plan, and the illustrative House Plan we see on the left

19  and right here and the images are from -- Mr. Cooper,

20  before we get into the substance of your plans, I want to

21  talk about your process.  In drawing the illustrative

22  plans, what did you use as a starting point?

23  A.     The enacted plans.  The enacted 2022 plans.

24  Q.     And so having used the enacted plans as a starting

25  point, are there any districts that are identical between

1   the 2022 plan and your illustrative plans?

2   A.     Yes, I think there are 11 districts that are

3   identical in the illustrative Senate Plan and 89 in the

4   illustrative House Plan.

5   Q.     And, Mr. Cooper, did you conduct any analysis of the

6   overlap in population between the 2022 plans and the

7   illustrative districts plan?

8   A.     Yes.  I think that in changing the districts, I

9   tried to keep some subgroups of each district together to

10  the extent possible, and determined that I believe it is

11  75 percent of the population in the enacted plans stays

12  together with the largest subset of the district they were

13  in, if that makes sense.

14         So your neighbors, people that would be part of your

15  community and neighbors would still be together, but they

16  might be shifted into another district with a different

17  district number.

18  Q.     And you mentioned 75 percent of people would be in

19  the same grouping, in the Senate Plan in the House Plan.

20  What's the number there in terms of the percentage of

21  folks?

22  A.     There, it's very high because we're only changing

23  three districts, so I think the sum total is a little bit

24  over 94 percent of the population would stay together.

25  Q.     Now, earlier we talked about how you identified

1    particular regions based on those planning development

2    districts where you were seeing large Black population

3    growth or increased concentration.  You mentioned some of

4    those.  How did your identification of those regions inform

5    your efforts in drawing the illustrative plans?

6    A.    Well, by looking at the population change since the

7    year 2000, as I think I had sort of mentioned earlier, some

8    of the planning district areas really jumped out at me like

9    North Delta, like Central, and like Southern.  Those three

10   had very significant Black population growth over that

11   20-year period.

12   Q.    And, Mr. Cooper, when you were drawing the

13   illustrative plans, were you treating those regions as hard

14   boundaries you needed to stay within?

15   A.    Oh, no.  No, I was simply using Planning and

16   Development Districts as a contemporary way to, more or

17   less, arrive at what would be a community of interest in

18   certain parts of the state, and they are certainly not hard

19   lines that cannot be crossed.  Obviously, I've crossed them

20   a number of times, as has the state, and you have to in

21   order to meet population equality of plus or minus five

22   percent.  There's no way around crossing the lines.

23   Q.    Mr. Cooper, in drawing your illustrative plans, did

24   you consider the guidelines that the state's joint

25   committee adopted in drawing the plans?

1  A.      Yes.  I think the state's joint committee mentioned

2  population equality and also trying to keep municipalities

3  and precincts together.

4  Q.      And, Mr. Cooper, you mentioned earlier the

5  traditional districting principles.  Did you follow those

6  principles in constructing these illustrative plans?

7  A.      I believe so.

8  Q.      And let's talk about the traditional districting

9  principles.  Without yet getting into the details, we'll

10  talk about each one with more specificity.  Can you just

11  sort of enumerate what are the traditional districting

12  principles?

13  A.      Well, perhaps foremost is population equality.  One

14  person, one vote.  The state of Mississippi and the

15  legislature determined that plus or minus five percent

16  range compared to the ideal population size would be

17  sufficient to meet population equality.  I agree with the

18  legislature on that point.  So I stayed within plus or

19  minus five percent.

20          And the next important traditional redistricting

21  principal would be congruity.  You have to make sure the

22  districts you draw are together and not separated,

23  generally speaking.  Certainly in Mississippi, there's no

24  reason to have two parts of a district in different

25  districts.  It might be the case that you would argue that

1    be the situation in a state with a big river running down

2    the middle of it or something.

3         The other important redistricting principal is

4    drawing districts that are reasonably shaped and relatively

5    compact.  There are ways to analyze those numerically,

6    quantitatively and I've done that in the report with three

7    measures out of probably at least 12 to 15 that are

8    available in the Maptitude For Redistricting Software.

9    I've used the most common measures, the Reock and the

10   Polsby-Popper, and supplemented that with the Convex Hull

11   compactness measure which tends to discount for some of the

12   weird lines that may crop up because of twists and turns in

13   the Mississippi River or odd municipal lines.

14   Q.    Mr. Cooper, is adhering to county or precinct lines

15   a traditional redistricting principal?

16   A.    Yes.

17   Q.    And I see you list some of them on pages 19 and 20

18   of your report.  Is -- you note minority vote dilution.  Is

19   that a traditional redistricting principal?

20   A.    Absolutely.  Absolutely.

21   Q.    And you note incumbent as a traditional.  Is that

22   one you've considered as well?

23   A.    Well, that's sort of in the background but I don't

24   know if it's actually considered to be a traditional

25   redistricting principal in the sense that you absolutely

1    have to keep all incumbents in separate districts.

2    Sometimes it's just simply not possible.

3        And unfortunately, I was never able to obtain

4    complete information about all of the incumbents in terms

5    of where they lived from campaign finance filings, the ACLU

6    analytic staff got a number of addresses and the state

7    legislature actually posted addresses also of some

8    incumbents at least their home towns, so I used those two

9    sources to determine whether or not incumbents were paired,

10   and that was based on incumbents as they existed in the

11   summer of 2023, not taking in to account the recent

12   election.

13   Q.   Now, Mr. Cooper, stepping back.  What's the function

14   of these different criteria, these traditional districting

15   principles, for a map drawer?

16   A.   Well, one must constantly balance all these.  Some

17   are very, very important.  Like one person, one vote in a

18   non-dilution of a majority voting struggle but all of those

19   factors are constantly in my mind as I'm drawing a plan and

20   I really don't make any of them predominant, except perhaps

21   for the plus or minus five percent rule.  That's pretty

22   hard and fast.

23   Q.   And Mr. Cooper, let's talk a little more

24   specifically about some of those considerations.  You

25   mentioned population equality as a traditional

1    redistricting principal.  Did you consider population

2    equality here?

3    A.     Yes.

4    Q.     Okay.  And do all of the districts in your

5    illustrative plans stay within that plus or minus five

6    percent deviation that you mentioned?

7    A.     Yes, based on the 2020 census.

8    Q.     Now, we talked about non-dilution of minority voting

9    strength as a principal you consider.  Say just a little

10   bit more, what is that?

11   A.     Well, that just means that when you're drawing a

12   plan, whether it be a state legislature or a city counsel

13   seat, one should take into account where the minority

14   population lives and try to avoid putting everybody in a

15   single district and avoid splitting neighborhoods up that

16   are predominant minority and placing them in different

17   districts.

18          The first category would be packing or

19   overconcentration.  The second would be cracking or

20   fragmenting the minority voting strength and that would

21   include in this case, the African-American population but

22   in other states, in other places, it might be the Latino

23   population or the Indigenous population.

24   Q.     So Mr. Cooper, does that mean you considered race as

25   one of the considerations when you were drawing the

1    illustrative plans?

2    A.    I considered race.  Certainly, the *Gingles* 1 inquiry

3    requires you to show that a district can be created that is

4    50 percent plus one of the minority at issue so I'm aware

5    of race.  It just did not predominate.

6    Q.    Well, Mr. Cooper, as a practical matter, what

7    analytical tools did you use as you were drawing these

8    plans to determine where the Black population or where it

9    was more substantial?

10   A.    Well, I tried to work strictly at the precinct level

11   so I had on screen a map of the state with the current

12   population by legislature district color coded by district

13   and I overlaid that on to a map showing precincts, and put

14   little dots over precincts that were racially diverse.  In

15   other words, plus three percent or more, so that allowed me

16   to at least kind of know where the minority population

17   lived in some parts of the state where I was not familiar.

18   Q.    And Mr. Cooper, do you always have those dots

19   visible over the precincts, 30 percent plus Black

20   population?

21   A.    Not always but I mean, it's -- generally, I do

22   because I'm working on a statewide plan.

23   Q.    And Mr. Cooper, do you ever use racial shading maps

24   where you look at precincts or some other -- some other,

25   you know, precinct geography with shading that shows

1   different colors for different levels of Black population,

2   ten, 20, 30, 40, 50, 60 percent?

3   A.      Never ever.  The closest I come to that is when I

4   show the minority population by county.  When I am drawing

5   a plan, I never look at districts that are shaded in this

6   manner that I think some of the experts for the defense try

7   to claim that I use.  I never have and I never will.

8   Q.      And Mr. Cooper, you mentioned that you sometimes

9   have dots over precincts that are 30 percent plus Black

10  voting age population.  Why not use 50 percent?

11  A.      Well, I mean, you could but then you'd be cutting

12  out significant populations perhaps, significant areas that

13  are racially diverse and would fit into a majority minority

14  district.

15  Q.      And what about sub-precinct geography?  Do you ever

16  go down and use those dots -- when you were drawing the

17  illustrative Senate Plan and House Plans, did you see those

18  dots or the racially information at a level below the

19  precinct level?

20  A.      No, I didn't because I rarely -- I didn't go down to

21  the block level unless I had to, to more closely align with

22  the municipality or for some reason, split a precinct to

23  protect an incumbent.  And in those cases, I just looked at

24  the blocks and I oftentimes would put the total population

25  of the block on the map of that particular area, so that I

1    can, you know, make sure I'm within plus or minus five

2    percent but I did not use any kind of racial shading or

3    even dots once I got down to the level because frankly, a

4    lot of the splits of precincts are embedded in the enacted

5    2022 plans.  So the fact that a lot of precincts are split

6    is not my work.  It's the work of the legislature.

7    Q.    And we can talk about that more.  For now, I want to

8    talk about another traditional districting principal that

9    you mentioned, compactness.  How did you consider

10   compactness in drawing your illustrative Senate and House

11   Plans?

12   A.    Well, a large part was visually examining the

13   districts as I was drawing them but I also had at my

14   disposal the Maptitude For Redistricting Software which

15   will generate a compactness score on command within a

16   couple of seconds.

17         So I did look at that occasionally as I was drawing

18   the plans because sometimes if the score is real low, you

19   need to move in the other direction as quickly as you can

20   in the sense that you want to keep the score higher, if

21   possible.

22   Q.    And did you visually examine the districts in your

23   illustrative plans to make sure they are compact?

24   A.    In my opinion, they are reasonably compact.

25   Q.    And you mentioned some of those compactness metrics

1   that you can run as well.  Did you run metrics for

2   compactness in the illustrative plans as well as the 2022

3   plans?

4   A.    Yes, I did.

5   Q.    Let's pull up the next slide.  These are from page

6   69 of your report, figure 27, summarizing those metrics and

7   Mr. Cooper, can you tell us how did the compactness -- in

8   terms of those metrics, how does compactness of your

9   illustrative Senate Plan compare to the 2022 Senate Plan?

10  A.    A little bitter.  A little better.  Not a lot but a

11  little.  You wouldn't expect it to be a lot because I was

12  trying to keep a large portion of the population together

13  from the enacted plan and you'll see, if you just look at

14  the majority Black districts, there, I think there is a

15  significant district both in the Reock and certainly also

16  in the Polsby-Popper scores but especially in the Reock

17  score which is an area based measure looking at the score

18  after you draw a circle around the district.

19  Q.    And looking at the House Plan, how does the

20  compactness in terms of these metrics of your illustrative

21  House Plan compare to the 2022 House Plan?

22  A.    There's very little difference.  They're almost the

23  same and that's no surprise because 89 of the 122 districts

24  did not change.

25  Q.    Now, Mr. Cooper, you mentioned -- and we can go to

1    the next slide -- and there we go.  You mentioned

2    contiguity.  Did you consider contiguity in drawing your

3    illustrative plans?

4    A.    Yes, and there's an automated module in Maptitude

5    that tells you whether or not the districts are contiguous.

6    Q.    And all your districts are contiguous in both your

7    plans?

8    A.    Yes, according to Maptitude.

9    Q.    And now, we talked also about splitting political

10   subdivisions.  How, if at all, did you take splitting

11   political subdivisions in to account in drawing your

12   illustrative plans?

13   A.    Well, I had on screen the boundaries for cities and

14   towns in the state so I was aware of situations where I

15   might be splitting a city or a town.  I also had, of

16   course, boundaries showing the precinct lines and

17   sometimes, you have to make a decision.  Is it better to

18   split a precinct or split a town?  And it can go either way

19   just depending on the circumstances.

20   Q.    How about county boundaries, were you minding those?

21   A.    Oh, of course.  Yes.

22   Q.    And Mr. Cooper, did you run any metrics evaluating

23   the way your plans and the 2022 plans split those various

24   political subdivisions?

25   A.    Yes, as I always do in the state legislative plans.

1   Q.      Let's now go to the next slide, and look at

2   summaries from pages 47 and 71 of your reports of those

3   splits reports.  Looking first at the Senate, that chart at

4   the top, how does your -- how does your 2022 Senate Plan

5   stack up compared to the -- or excuse me.  How does your

6   illustrative Senate plan compare to the 2022 plan with

7   respect to county splits?

8   A.      Better.  It splits 34 counties as opposed to 43 in

9   the 2022 Senate.  Perhaps an more important column is total

10  county splits which would include all the times you split a

11  county, not just one time.  And in that sense, it's a

12  little bit closer.  52 for the illustrative Senate and 58

13  for the 2022 Senate.

14  Q.      And, Mr. Cooper, how about precinct splits, how do

15  your plans compare on precinct splits?

16  A.      A little better.  They are 38 in the illustrative

17  Senate and 41 in the 2022 Senate.

18  Q.      And what about municipal splits?

19  A.      Even better.  253 of the municipalities in the state

20  are not split versus 244 in the 2022 Senate.  And if you

21  look at, again, multiple splits of municipalities, the gap

22  or advantage to illustrative Senate widens.  There are 110

23  municipal splits in the illustrative Senate versus 128 in

24  the state Senate.

25  Q.      And by the way, I see "VTD splits".  VTD, is that a

1    precinct?

2    A.     That would be the Census Bureau's designation of

3    what constituted a precinct at the time of the 2020 census.

4    It may not reflect -- and I'm sure it doesn't after

5    county-level redistricting.

6    Q.     And, Mr. Cooper, just looking briefly at the House,

7    how does your illustrative House Plan compare to the 2022

8    House Plan with respect to county splits?

9    A.     Same number of county -- same number of split

10   counties, but total county splits, it is better.  There are

11   167 county splits versus 179.  Another way to look at it is

12   just the number of unique county district splits and so

13   you -- I mean, you just tally them up and -- and the --

14   you'll have 167, so you don't have to look at a map and

15   just count them.  And there are tables in my report that

16   identify those splits.

17   Q.     And, Mr. Cooper, how about on precinct splits, how

18   does your illustrative plan compare to the 2022 House Plan?

19   A.     What was that question?

20   Q.     On precinct splits, how do the two House plans

21   compare?

22   A.     Oh, for the two House plans, 160 -- I'm sorry.  228

23   VTD splits in the illustrative House and 255 for the 2022

24   House.

25   Q.     And on municipalities plans, how would you

1    characterize the difference between the plans?

2    A.    A slight edge.  The total municipalities split would

3    be -- the total municipal splits would be 225 in the House

4    Plan and 221 in the illustrative plan.  And municipalities

5    not split is about the same, 216 in the House and 218 in

6    the illustrative House.

7         Again, you would not expect there to be much

8    variation, because I am only drawing three additional House

9    districts -- or three additional majority-Black House

10   Districts.

11   Q.    And yet there is a reduction of over 20 county

12   splits -- or 20 VTD splits?

13   A.    Right.  But there is the ripple effect involved in

14   the -- so more districts have changed as I mentioned than

15   just the three.

16   Q.    Now, Mr. Cooper, let's go on to the next slide and

17   talk about communities of interest, which you mentioned as

18   another districting consideration.  Generally speaking, how

19   did you go about considering communities of interest in

20   drawing your plans?

21   A.    Well, I was aware of various regions in the state

22   that aren't really displayed on the map, like the Delta

23   running from Catfish Row in Vicksburg up to the Tennessee

24   state line or the Peabody Hotel in Tennessee.  And -- and,

25   you know, northwest -- northeast Mississippi is Appalachian

1    really.  I mean, part of the Appalachian Regional

2    Commission Highway System goes into -- I don't know if I'm

3    pronouncing this right, Tishomingo County.  How do you say

4    that?

5         JUDGE JORDAN:  Tishomingo.

6    A.    Okay.  So that's just one example of a part of the

7    state that has very few Black people in it.  And so I was

8    looking at factors like that as I was drawing the plan, and

9    the planning districts, I believe are a perfect

10   contemporary indicator of communities of interest.

11   BY MR. SAVITZKY:

12   Q.    Well, what about municipalities, are those a

13   community of interest?

14   A.    Oh, of course.  And then they are even more

15   important than planning district commissions frankly.

16   Q.    And how about counties, are counties communities of

17   interest?

18   A.    Absolutely.

19   Q.    Let's talk about some of the communities of interest

20   that you looked at.  You've already talked about

21   municipalities and how your plans stacked up in terms of

22   municipalities split.  I see in your report you also did an

23   analysis of school district splits.  Are school districts a

24   community of interest?

25   A.    Oh, absolutely.  They are a very important community

1   of interest, because the legislature makes many decisions

2   that impact school districts and individual schools and the

3   students themselves.  So that's -- that's a clear community

4   of interest.

5   Q.    And looking at the next slide just at a very high

6   level, how do your plans stack up with respect to school

7   district splits?

8   A.    Significantly better interestingly enough.  The 2022

9   Senate has 59 school districts that are not split.  The

10  illustrative Senate has 74, and you see the same

11  significant difference with total school district splits.

12  181 for the 2022 Senate and 151 for the illustrative

13  Senate.  The 2022 Senate splits 56 majority-Black school

14  districts versus 38 in the illustrative Senate.

15  Q.    And, Mr. Cooper, moving to the next slide, did you

16  consider the census designated metropolitan-micropolitan

17  statistical areas as a potential community of interest?

18  A.    I did.  Those boundaries are established by the

19  Office of Management and Budget Federal Agency in

20  consultation with the Census Bureau, and those boundaries

21  do change over time.  I think last decade there was

22  probably three different iterations.  The latest iteration

23  from the office of management and budget for metropolitan

24  and micropolitan areas was released in late July of 2023.

25        I have yet to see a Census Bureau map of those

1   areas, but they're identified.  You can get that from the

2   internet.  And I think probably later in the decade, there

3   will be another change.  It's based on commuting patterns

4   primarily between different counties.

5   Q.    And, Mr. Cooper, did you run any metrics reports

6   looking at splits of metropolitan and micropolitan

7   statistical areas?

8   A.    Yes.

9   Q.    And did you run reports looking at splits of those

10  planning and development district regions?

11  A.    Yes.

12  Q.    And let's look at those very briefly.  Pulling up

13  the slides --

14      MR. CARDIN:  Your Honor, may it please the Court.

15  I'm going to object to the relevance of this line of

16  questioning.  It -- PDD split, metropolitan statistical

17  errors, micropolitan statistical errors have no relevance

18  to any of the issues in this case.

19      JUDGE JORDAN:  Response?

20      MR. SAVITZKY:  Your Honor, Mr. Cooper's analysis is

21  already in evidence.  His report is in evidence, only

22  talking about how the plans fare.  He's discussed these are

23  potential communities of interest.  Obviously, there are

24  many different communities of interest and he's comparing

25  how the plans stack up on them, so we will address this

1  very briefly and then keep moving on.

2         JUDGE JORDAN:  All right.  I'm going to overrule.

3  The information is already in the record.  It's part of the

4  basis of how he drew the lines.  I think it's probative.

5  You may not agree it's correct but it's what he did so

6  overruled.  Go ahead.

7         MR. SAVITZKY:  Thank you, Your Honor.

8  BY MR. SAVITZKY:

9  Q.     And Mr. Cooper, very briefly, how do your plans,

10  your illustrative plans stack up with respect to PPDs

11  metropolitan and micropolitan statistical areas?

12  A.     A little better on planning district splits in the

13  Senate and House.  A little better on MSA splits in the

14  Senate but in the House, it's a dead heat, 74/74, and the

15  smaller areas, MPSAs are generally single counties but they

16  can be, I think, more than one county.

17         And in that instance, well, MPSAs, micropolitan

18  areas must have an urban area that is of at least 10,000 to

19  50,000 people and the metropolitan statistical areas would

20  have an urban area that is over 50,000 people and so these

21  MPSA splits amount to 29 in the illustrative Senate versus

22  28 in the -- excuse me -- 2022 Senate so one better in that

23  instance.

24  Q.     All right.  And Mr. Cooper --

25  A.     One better for the state.

1   Q.     Understood.  And Mr. Cooper, just thinking about

2   some of those other communities of interest.  Did you

3   consider transportation connections between different areas

4   in working on your illustrative plans?

5   A.     Yes.  When I had the map on screen, I had available

6   at my disposal a straight level information but also all

7   the major highways.  And as I zoomed out, generally, I was

8   looking more at the primary roads as opposed to secondary

9   roads but that information is there.

10   Q.     And to the extent you were aware of them, did you

11   consider historical connections between different areas or

12   communities as you were drawing your plans?

13   A.     Yes, I think oftentimes the U.S. Highway System as

14   opposed to the interstate system often shows long standing

15   communities of -- of interest and connections between

16   different parts of one county or another, because you're

17   driving right through the county instead of up on a level

18   looking down from the interstate.

19   Q.     And Mr. Cooper, to the extent you were aware of

20   them, did you consider socioeconomic connections or

21   commonalities between different areas as you were

22   constructing your plans?

23   A.     Yes, I went beyond just the statewide information

24   from the ACS, and it produced a set of tables, that are

25   included I think on a CD with my testimony, that breaks out

1    the socioeconomic characteristics of the Black population,

2    non-Hispanic white population, and Latino for every single

3    county in the state and all municipalities that are at

4    least, I believe 20 percent Black with populations that

5    over 2500 total population so it doesn't include all

6    municipalities but many of them.

7         And it breaks out the same kind of measures that you

8    see in the 2021 ACS but it's from the five-year American

9    Community Survey published by the Census Bureau on an

10   annual basis.  I am using the 2015-2019 ACS that was

11   released in the fall of 2021.  I'm doing that because the

12   pandemic kind of skewed things there for a couple of years.

13   Q.    And Mr. Cooper, to the extent you're aware of them,

14   did you consider whether people in particular areas might

15   have any shared interest as you were constructing the

16   plans?

17   A.    Yes.  Well, I then prepared, in addition to the

18   county and municipal charts, a whole other set of charts

19   that are at the planning district level for general

20   information since we have kind of focused on planning

21   districts.  That is not quite as comprehensive as you get

22   at the county level because certain pieces of information

23   at the county level can't be merged together at -- up to

24   the planning district level, like median numbers, and mean

25   averages, and that sort of thing.

1    Q.     And Mr. Cooper, moving along.  You also mentioned as

2    a -- as a factor pairing incumbents.  Were you able to

3    take, to the extent you had information on it, incumbent

4    locations or addresses in to account as you were

5    constructing these plans?

6    A.     I tried but again, some of them were PO boxes and so

7    I think I am fairly certain that as of August 2023, I had

8    paired four incumbent in the House and two in the Senate

9    but things have changed since that time.

10   Q.     Now, Mr. Cooper, that's a lot of different factors

11   to consider.  How do you manage to factor all of these in

12   as you're drawing a plan?

13   A.     Well, the name of the game is balancing all of these

14   factors as you're drawing a plan.  No one factor should

15   really predominate except perhaps for one person, one vote

16   and the non-dilution of minority voting strength.

17   Q.     Well, Mr. Cooper, do the criteria ever conflict?

18   A.     Oh, they conflict all the time.  Yes.  There are

19   conflicts for sure.

20   Q.     How do you balance when they conflict?

21   A.     I just did the best I can.  I, you know, make a

22   decision.  These -- clearly, you can create four more

23   Senate districts and three more House Districts, but the

24   plans could be configured in a different fashion with that

25   same result.

1    Q.    And were you able, in your opinion, to balance all

2    these different factors in drawing these illustrative

3    plans?

4    A.    In my opinion, yes.

5    Q.    Now, Mr. Cooper, you referenced this a little bit

6    already.  Do any factors get special weight when you're

7    doing this balancing?

8    A.    No, except for one person, one vote which is

9    automatically available and it's really to determine

10   whether you're in that plus or minus five percent range.

11   Q.    And when you said about drawing these illustrative

12   plans, did you have a maximum or minimum number of Black

13   majority districts in mind?

14   A.    No, I was not asked to produce a set number of

15   districts nor did I attempt to produce a set number of

16   districts based on some analysis that I had done prior to

17   this beginning the project.

18   Q.    Were you trying to maximize the total number of

19   Black majority districts in the plans?

20   A.    No, I was not.  And you know, there -- yeah, I just

21   was not trying to maximize the number.

22   Q.    And Mr. Cooper, the balancing approach that you've

23   described, is this the same approach that you took in

24   drawing the plans that were at issue in *Allen versus*

25   *Milligan* case?

1    A.      Yes, I really focused on not splitting counties and

2    keeping precincts whole while at the same time being aware

3    of the way the legislature had drawn those districts, so I

4    didn't want to make more changes than necessary.

5    Q.      All right.  Well, let's talk about the illustrative

6    districts that you drew starting with Senate District 2.

7    You identify this as a new Black majority district.  I'm

8    pulling up two images from Exhibit P1 and P2.  It's page

9    381 to 385 of your report.  They show the 2022 plan on the

10   left.  Illustrative plan on the right.  First, can you tell

11   us --

12          JUDGE SOUTHWICK:  Question about this report.  Tell

13   us, what is the Senate District as enacted on this

14   left-hand side?

15   A.      It is Senate District 11.

16          JUDGE SOUTHWICK:  It's a two and a --

17   A.      Part of it.  Yeah, the two represents the numbering

18   scheme that I have assigned to the illustrative plan but

19   under the enacted plan, Senate District 11 is the district

20   that goes from down around Quitman County up through Tunica

21   County.

22          JUDGE SOUTHWICK:  Is it basically what's in green?

23   A.      Yes, well, yes.  That is District 11.  Right.

24          JUDGE SOUTHWICK:  Does it flip over the blue

25   turquoise DeSoto as the top right hand corner also?

1    A.      Yes, the blue district is --

2           JUDGE SOUTHWICK:  No, no.  The green.  The top left

3    corner of your right hand chart.

4    A.      That is also part of District 11.  Oh, the top right

5    corner.  Excuse me.  Yes, that is -- I wish I had the

6    number in front of me.  It's kind of hidden behind the

7    legend.

8    BY MR. SAVITZKY:

9    Q.      Mr. Cooper, looking at the 2022 --

10          JUDGE JORDAN:  I'm sorry.  I do want to get an

11   answer to that.  On the left side, are we correct that's a

12   different color green than the top right?

13   A.      Yes, you are correct and I can get you that number.

14   I can get you the actual district number because it's just

15   covered by the legend.

16          JUDGE JORDAN:  That's okay so the bottom line is the

17   '22 plan it is the same District 11 and it's the green that

18   runs down sort of the western boundaries picking up Quitman

19   and --

20   A.      Tate.

21          JUDGE JORDAN:  And the section that's below the

22   blue.  It's all that green -- that color green?

23   A.      Right.

24          JUDGE JORDAN:  And that's a different green on the

25   right.

1 A.  Yes, I guess after printing it out -- it was a

2 little more evident from my computer screen and now, it's

3 not so evident but it is a different green district.

4    JUDGE JORDAN:  All right.  That's helpful.

5 A.  I think we're going to zoom in maybe at some point

6 showing how the majority Black city of Horn Lake is divided

7 and there you will see this other district I believe that

8 we're talking about.  Well, yeah, I think you will.

9    MR. SAVITZKY:  And we can also -- if you'd like to

10 take a look at the 2022 map, we can look at PTX1 at page 31

11 and take a closer look at that map in particular.

12 A.  And there are maps produced by the state in my

13 declaration.  Those are excellent maps so you can also use

14 that to refer to.

15 BY MR. SAVITZKY:

16 Q.  And looking a little more closely at this map,

17 Mr. Cooper, the plans in different shades of green here at

18 the top -- or the districts in different shades of green at

19 the top in the 2022 plan.

20 A.  Yes.

21 Q.  Are those districts 11, 2, and 19 under the 2022

22 plan?

23 A.  Well, it's 11, 2, and 1, isn't it?  The blue

24 district.

25 Q.  The blue district.  The one to the right of the blue

1    district, that's under the legend?

2    A.    That's 2.

3    Q.    And we can zoom in here.

4    A.    You can see, if you really zoom in, you can see it's

5    2.  The other thing I'll point out, there's a link to an

6    online map of the illustrative plan with an overlay of the

7    enacted plan and you can click those lines on and off

8    depending.  It shows municipal boundaries, shows county

9    boundaries.  It shows planning district boundaries.  It can

10   be clicked on and off.  You can -- if you go to legend and

11   look for the caliber base map, you can click off roads and

12   see aerial imagery and you see the whole state all at once

13   and it's a heck of a lot easier than flipping through all

14   these exhibits.  That's available for both the Senate and

15   the House Plan.

16   Q.    And in your exhibits in your report, do you also

17   have these maps at the regional level that could be

18   examined?

19   A.    At the regional level.  Right.  Right.

20   Q.    And now, Mr. Cooper, let's look at -- well, let's

21   get our bearings a little more.  This red outline that

22   we're seeing -- focusing still on the 2022 plan -- is that

23   the area of the additional Black majority district that

24   you've drawn in the illustrative plan?

25   A.    Yes.

1    Q.    And I see dotted lines or maybe they're sort of

2    Black lines in here.  What lines are those?

3    A.    Those are the county lines.  I'm sorry.  The Black

4    lines in the 2022 plan that you see there are lines

5    demarcating the 2022 plan districts actually in some

6    instances I think.  But on the other hand, yeah, that has

7    to be but there's also some dotted lines showing counties

8    that sometimes are skewered, so it's not as evident on this

9    map as it would be on other.  If you look at the

10    illustrative map, you can see how the dotted line, it's

11    really a dotted line I think that separated Panola from --

12    from Tate county.

13    Q.    And is the red outline here sort of the same in both

14    of these maps overlaid on the 2022 plan?

15    A.    Yes, it's identical.  It shows the illustrative

16    district that I drew in the same area where the state drew.

17    The illustrative district -- excuse me -- enacted District

18    11, which is majority Black, but failed to include

19    significant parts of the Black population in DeSoto County

20    who live around Horn Lake and Southaven.

21    Q.    And what's happening demographically in this region

22    that we're looking at here?

23    A.    Well, I think it's the fastest growing part of the

24    state.  At least it has been since the year 2000, I

25    believe.  Apart from the area around the coast and the

1    southern planning district area.

2         It's certainly the fastest growing Black population

3    in the state.  I think I may have mentioned this.  The

4    DeSoto County Black population in the year 2000 was

5    12 percent.  Not even 12 percent.  As of this 2020 census,

6    it is about 31, 32 percent and I seen recent estimates from

7    the Census Bureau that were released in the late summer of

8    2023 that indicate that the population in DeSoto County has

9    grown by about 7500 people since the 2020 census and the

10   Black population in DeSoto County has grown by about 8500

11   people.  So that's showing that the Black population in

12   absolute numbers is contributing more to the total

13   population than any other race.

14   Q.    All right.  Well, Mr. Cooper, let's zoom in over the

15   next slide and zoom in on the illustrative district that

16   you drew.  Can you describe the district that you drew in

17   this area?

18   A.    In the area of Tunica County and DeSoto County?

19   Q.    Yeah, just describe the additional majority Black

20   district you drew.

21   A.    Yeah, it's a simple district because it includes all

22   Tunica County which is in the north delta area.  It is also

23   part of existing Senate District 11 so it's certainly

24   appropriate to include Tunica with DeSoto County but beyond

25   Tunica County, I then went into DeSoto County and -- at the

1  precinct level.

2      I drew some additional parts of western DeSoto

3  County that are not in enacted House District -- Senate

4  District 11 around Horn Lake and in so doing, I was able to

5  create a new majority Black Senate District 2 -- majority

6  Black Senate District 2 while at the same time, maintaining

7  Senate District 11 as majority Black but focused further

8  south, as you can see on this map, so that Senate District

9  11 now, which is majority Black, is -- is more rural and

10 includes Panola -- all of Panola, all of Quitman and all of

11 Coahoma, and even further south.

12 Q.    Now, Mr. Cooper is the additional district you drew

13 here, District 2, compact?

14 A.    Oh, absolutely.  It's compact visually.  There's a

15 clear transportation corridor running right from Coahoma

16 County along the county line all the way up to Walls and on

17 to the Tennessee line, and that's Highway 61.  Obviously,

18 an important highway.  So, yeah, it's compact, reasonably

19 shaped, and the transportation corridor makes it ideal for

20 an illustrative majority-Black district.

21 Q.    And to what extent did municipal lines play a role

22 in your configuration of this district?

23 A.    I tried to follow municipal lines around Horn Lake.

24 Horn Lake is split three ways in the enacted Senate Plan,

25 and I was able to draw a plan, this plan in particular,

1   that only splits Horn Lake two ways.

2   Q.    And, Mr. Cooper, did keeping counties whole figure

3   into your configuration of this district?

4   A.    Well, yes.  Because I did it this way, I was able to

5   eliminate the split in Tate County, and I think maybe I

6   eliminated a split elsewhere.  I'm not sure exactly where,

7   but certainly the Tate County split was removed.  Maybe

8   Panola County is also fixed.

9   Q.    And, Mr. Cooper, let's go to the next slide looking

10   at a figure from page 383 of your report.  You mentioned

11   Horn Lake before.  Just tell us a little bit about how Horn

12   Lake is configured in the enacted 2022 plan?

13   A.    Yes.  Here you can see enacted Senate District 11,

14   which is majority Black, just picks up a little tiny part

15   of Horn Lake in the northwest area and relegates the rest

16   of Horn Lake to majority-white District 1 and

17   majority-white Senate District 2.

18        Now, Horn Lake is I think 50 percent Black, and it's

19   got about 27,000 people.  So I can't think of any reason to

20   split it three ways.

21   Q.    And in your report, you describe the drawing of this

22   area as "cracking".  What did you mean by that?

23   A.    Well, the Black population of Horn Lake has been

24   submerged into majority-White Districts 1 and 2 by -- as a

25   result of this three-way split.

1    Q.      And moving on to the next slide.  Why does it make

2    sense to connect Horn Lake with the rest of DeSoto County

3    and Tunica County in your opinion?

4    A.      Well, it's -- it's an area that the state has

5    included, at least in parts, in the legislative plan that

6    was adopted in 2022.  It's in western DeSoto County, and

7    it's just a stone's throw from Walls, which is a town

8    that's been there for a long time that's majority Black.

9    And it's a straight shot by Highway 61 to Tunica Resorts.

10   Once you get there, that's most of the population of the

11   district, because further south, obviously Tunica takes on

12   a more rural appearance.  But overall, it's a very compact

13   district.  It just cries out to be considered as a good

14   option for *Gingles* 1, I think.

15   Q.      All right.  And let's move on and talk about the

16   next additional majority-Black district in your report.

17   We're looking at pages 392 and 394 from your report.  '22

18   plan on the left.  Illustrative plan on the right.  And

19   just to be clear, is this the same sort of type of map that

20   we were looking at previously?

21   A.      Yes.  Just the Senate Plan and zooming in on the

22   Hattiesburg area with the same styling, yes.

23   Q.      And you mentioned this is the Hattiesburg area.  Can

24   you just describe what happens to the Hattiesburg area

25   under the 2022 Senate Plan?

1     A.      Well, you can see the different colors here, that

2     you've got basically five Senate Districts kind of

3     converging on the Hattiesburg area.   That would include

4     both Lamar County and where most of the population is

5     really over in Forrest County.   And so as I drew Senate

6     District 9, which is majority Black, I was able to keep

7     most of Hattiesburg in a majority-Black district.   And most

8     of the district is in Forrest County, but it does spill

9     over a little bit into Lamar County.

10    Q.      And I noticed a turquoise district there in the 2022

11    plan.   How far up, if you know, does that district extend?

12    A.      That has sort of an odd shape.   It goes up though

13    Jones County and then into Jasper.   It picks up all or part

14    of Laurel, I believe.

15    Q.      Now, let's focus on your plan, and we can go to the

16    next slide.   Can you describe the illustrative Senate

17    District 9, Black-majority district that you drew in this

18    area in Hattiesburg?

19    A.      Yes.   It's drawn to include as much as Hattiesburg

20    as I could, basically at the precinct level.   I do think

21    there is an incumbent somewhere in all of this that had

22    some impact on the final version of the district that I

23    drew.   And it includes, as I say, Hattiesburg and then a

24    separate jurisdiction called West Hattiesburg, which is in

25    Lamar County, and another one that is a municipality called

1    Arnold Line.  But, basically, it is a district that is, at
2    least from the standpoint of population, dominated by the
3    city of Hattiesburg.
4    Q.    And were you minding municipal lines when you were
5    constructing this district?
6    A.    By and large, yes.  I think some of Hattiesburg is
7    split, but I was following precincts, generally speaking,
8    to the extent that I could.  And you can see that I
9    followed, I believe, the municipal boundary there between
10   Petal, which is a smaller city, and Hattiesburg.
11   Q.    And, Mr. Cooper, is this district compact?
12   A.    Oh, absolutely.  It's -- I mean, you can look at the
13   legend and see the -- that it's -- I don't have a way to
14   measure it now, but it's extremely compact.  It's only in
15   -- in Hattiesburg and West Hattiesburg, Arnold Line, and a
16   few other communities in Forrest County and Lamar County.
17   And it doesn't go way north to pick up pieces of Jones
18   County and Laurel and then on into Jasper county.
19   Q.    And we can look at the next district.  Turning from
20   pages 386 and 388 of your report, looking at illustrative
21   Black-majority District 17.  Again, 2022 plan, left.
22   Illustrative plan on the right.
23         Now, can you describe the area that we're looking at
24   here, Mr. Cooper?
25   A.    Well, on the left, we're looking at part of the

1   Golden Triangle Planning District and part of the Three

2   Rivers Planning District.  You can see Tupelo in the north,

3   which is actually part of the illustrative Senate District

4   I've drawn outlined in red there.  The city of Columbus and

5   that area is slightly off the map.  You can't really see

6   it.  But that's the area that I've included.

7       I looked at Three Rivers because there's never been

8   any piece of a Senate District, as best I can tell, that is

9   majority Black that is in Three Rivers Planning District or

10  in that part of the state I should say, because I don't

11  want people to think that I'm hung up on planning

12  districts.  But it's quite clear that you can easily draw a

13  district that starts down around Clay County and goes all

14  the way up to the southern part of Tupelo, and basically

15  follows the Tennessee-Tombigbee Waterway for much of the

16  distance in to Amory and then following precinct lines into

17  southern Tupelo.

18      It's only Highway 45 running out of West Point up to

19  Tupelo is like a -- it's 45 miles, 45 minutes.  There's

20  no -- nothing about it that would suggest this is not a

21  reasonably compact district.  What more is there to say?

22  Q.    I won't ask you any more questions about it then.

23  But I will ask you this, Mr. Cooper, just stepping back.

24  We've been looking at some of these different maps, and I

25  notice that generally they seem to be displayed in very

1  vivid colors.  Is that how they look in that Maptitude

2  program when you're drawing the districts?

3  A.    Yes.  Sometimes I have different colors and then

4  finalize it with a different version of colors to try to

5  make sure I'm not placing two districts with the same color

6  together.  I understand that maybe I didn't make a strong

7  enough distinction between Senate District 2 and Senate

8  District 11.  But still I think the difference can be seen.

9  Q.    And, Mr. Cooper, why do you like to work in such

10  bright colors for your districts?

11  A.    Because I like to see what the district looks like.

12  I don't know how anyone can tell what districts look like

13  if all they are looking at is, like, ten different colors

14  of gradations -- ten different colors of gradation of Black

15  on a map and zoom out.  You can't really see the districts,

16  and you've got this rush of colors that just make no sense

17  really.  So I don't know where the defendants' experts

18  get -- get the -- get the belief that I'm using racial

19  shading, because I just don't.  It's too confusing.

20  Q.    All right.  Let's look at the next Black-majority

21  district that you've drawn in your illustrative plans.  The

22  T-Series pages 396 through 398 of your report, and I'm

23  pulling it up for reference.  And can you just generally

24  describe what's the area of the state that we're looking at

25  here?

1    A.      Okay.  Well, this is in the -- to the south of

2    Jackson.  Copiah and Simpson are actually still part of the

3    Jackson metropolitan statistical area.  The districts that

4    I've drawn includes Copiah and Simpson, and also part of

5    Lincoln County as well as Jefferson Davis County.  That's

6    on the right side.

7           On the left side, you can see what it looks like

8    under the 2022 plan where there is no majority-Black

9    district.  And you see that Copiah County is split and

10   Lawrence County is split.  And I don't have the actual

11   Black population percentage in front of me, but it's not a

12   district that would be performing for a Black candidate, I

13   don't believe.  But I'm not the *Gingles* 2 or 3 expert, so I

14   will go no further with that.

15   Q.     Let's focus on the district that you drew.  Tell us

16   about the additional Black-majority district that you

17   configured in this area?

18   A.     Well, I took a look and noticed it would not be

19   difficult to include all of Copiah County but split Simpson

20   County and also include Jefferson Davis County, as the

21   state has done in their plan, and in addition, add in a

22   part of Lincoln County that extends from Brookhaven back up

23   to the Copiah County line.

24   Q.     Mr. Cooper, did you consider connections between

25   communities when you were configuring this district?

1   A.    Yes.  I was working at the precinct level in general

2   I think.  I'm not sure -- I don't think I split any

3   precincts.  It's in the exhibits if I did.  I don't have a

4   photographic memory on stuff like this.  But, yeah, I was

5   aware that -- that one could get from, say, Wesson down to

6   Brookhaven via Highway 51 right through the middle of the

7   area that I identified had a significant Black population.

8        I'm also aware of the fact that the Lincoln County

9   is actually part of what is known as a combined statistical

10  area identified by the Census Bureau as being not part of

11  the Jackson MSA, but an area that as a result of commuting

12  patterns, would kind of fit into the Jackson MSA.  Unlike

13  Lawrence County, which is not part of that combined

14  statistical area.

15  Q.    And, Mr. Cooper, in your opinion, is illustrative

16  Senate District 35 sufficiently compact?

17  A.    I believe so.  Compactness scores are the same or

18  better, right, compared to the 2022 plan.  I don't have it

19  in my head, but it's in the -- I'm almost sure they're the

20  same or better.

21  Q.    And, Mr. Cooper, let's move on to one more Senate

22  District.  You also identify in your report what you call a

23  Hypothetical Minority Opportunity Senate District.  I'm

24  putting it on the screen now.  This is from page 53 of your

25  report.  And first of all, just what is the area we're

1    looking at here?

2    A.    Well, we're looking at part of Harrison County,

3    specifically, the city of Gulfport, and you can see Long

4    Beach down there.  You can see there are Senate Districts

5    that kind of go into the city:  49, 48.  If we looked at a

6    House map covering the same area, you would see there are

7    two majority-Black House Districts in Gulfport.

8          And so when I looked at it, I considered, well, as

9    drawn, there's no district in or around Gulfport at the

10   Senate level that has more than 30 percent or so Black

11   population.  So it was clear to me that you just combine

12   the existing House districts that are there, add in four

13   precincts, and bingo; you've got a Senate District that's

14   in the low 40s Black voting-age population, not a majority.

15   And it's not part of the illustrative plan that I've drawn,

16   which is for *Gingles* 1 purposes.  But this is one that I

17   think has a constitutional challenge, and I was asked to

18   produce it or see what I could do in that area.  And this

19   was the result.  I believe Dr. Ragusa will have more to say

20   about this.  I don't know.

21   Q.    Just focusing on what you did --

22   A.    Yeah, I have no connection to Dr. Ragusa.  I'm not

23   even sure if I'm pronouncing his name right.

24   Q.    Indeed.  When you drew this hypothetical district --

25   I believe you started to describe it, but you said you

1    combined two House Districts?

2    A.    Yes.

3    Q.    And you mentioned it was one of them or both of

4    them?

5    A.    Both of them are in Gulfport or -- or the vicinity.

6    Q.    Mr. Cooper, how does your -- and just to be clear,

7    the hypothetical district you're talking about is this red

8    line that we're looking at?

9    A.    Yes.

10   Q.    Now, how does your configuration of the Gulfport

11   area compare with the 2022 plan in the Senate in terms of

12   traditional districting principles?

13   A.    Well, it has fewer county splits.  I believe it has

14   fewer VTD splits and it would split -- I believe it would

15   split Gulfport three ways instead of four, or maybe it's

16   two instead of three.  I can't recall, but it -- it

17   performs better on splits.

18        I did not include a table of metrics with this

19   particular hypothetical plan, partly not to confuse things.

20   But that information is in an exhibit identifying the

21   number of precinct splits and the municipal splits.  I

22   think I used a cluster of maybe a couple of counties to do

23   that.

24   Q.    And I believe in your report, those are exhibits Z1

25   and Z2?

1    A.      That would sound about right.

2    Q.      And, Mr. Cooper, let's talk about your illustrative

3    House Plan.  Moving on to the next slide.  Again, we're

4    looking at a map with the 2022 plan on the left, the

5    illustrative plan on the right, and a red boundary showing

6    both the area of the additional majority Black district.

7    Would you tell me about the area we're looking at here?

8    A.      Yes, we're looking basically at Chickasaw County,

9    and parts of Monroe County and Clay County.  And what I

10   attempted to do here was to shift existing House majority

11   district 22 further north and shift existing House

12   District -- is that -- 36 further south and in doing so, I

13   could create a brand-new additional majority Black district

14   that would only be in Chickasaw County and Monroe County,

15   and that is what would be new majority Black 22.

16   Q.      And how does this area compare to the area that we

17   were talking about with respect to your illustrative Senate

18   District 17?

19   A.      It covers much of the southern portion of existing

20   or illustrative Senate District 17.

21   Q.      And focusing on the left side, that 2022 plan for a

22   moment.  I see in your report that you say that the 2022

23   plan, cracks Black population in the midsection of

24   Chickasaw and Monroe Counties.  What do you mean by that?

25   A.      Well, you can see that Chickasaw County, which is

1    about 45 percent Black, and Monroe County has a lower

2    percentage than Chickasaw, but both of those districts are

3    majority white and they could be areas that would be in an

4    additional House seat that would be majority Black.

5         And it would join eastern Chickasaw County with --

6    with Monroe and -- and the city of Okolona in the north

7    would also be in that district which has a significant

8    Black population.

9    Q.    Now, Mr. Cooper, how would you describe the way that

10   the enacted '22 plan treats county boundaries?

11   A.    It has more splits for sure.  You can see that House

12   District 36 goes in to both Monroe and Chickasaw.  I

13   eliminated that so that now House District 36 is in --

14   entirely in Clay and areas further south, and the same

15   holds true for majority Black 22, which I've shifted

16   further north allowing for all of Chickasaw and -- or most

17   of Chickasaw, I should say and part of Monroe to go into a

18   majority Black House District.

19   Q.    And you say majority Black 22, I believe is that

20   District 16 in the pink there on the left side?

21   A.    I'm sorry?

22   Q.    Just looking on the left side for a second, the pink

23   district.

24   A.    Oh, that would be 16.  Yeah, that's right.

25   Q.    And let's focus on your illustrative House District

1    22 for a second.  Is this district compact in your opinion?

2    A.    Yes.  Yeah, I'm following county lines to the south

3    as you go up the east side.  I'm following the

4    Tennessee-Tombigbee for most of the distance and then at

5    the very end, I think, I'm following precincts as it winds

6    back towards Okolona.

7    Q.    And Mr. Cooper, let's talk about the next district.

8    Page 819, 921 from your report.  Same configuration of '22

9    illustrative plan being shown here on the screen.  Tell us

10   about the area we're looking at now.

11   A.    We're looking at an area that's not too far from

12   here.  In fact, it might even be on the map.  It's the

13   western part of Jackson and extending up in to Madison

14   County at the top of the -- of the page, and you can see

15   that the plan -- the district that I've suggested, House

16   District 56 would bring in neighborhoods in the western

17   part of Jackson and join them with parts of Clinton to

18   create an extremely compact district.

19          It couldn't be more than ten or 15 miles from one

20   end to the other and it would be a majority Black district

21   as opposed to the existing majority Black district -- I

22   mean as opposed to the current House District 56 which

23   extends in to Clinton and then goes way north and it's

24   majority white.

25   Q.    And the district you're just describing from the

1    2022 plan, is that the pink district 56 that's extending

2    north?

3    A.     Yes.

4    Q.     You're saying it extends even further north?

5    A.     Yes, you'd have to look at a zoomed out map to

6    really see the full extension.

7    Q.     And we can actually look at that, and go to PTXOO1,

8    page 571.  And zoom in right in the center of that image

9    there.

10   A.     Yes.

11   Q.     And is that the pink district you're referring to?

12   A.     Yes, it goes up deep in to Madison County picking up

13   Flora and some other places as well.

14   Q.     Let's go back to the slide deck and move ahead.  Now

15   Mr. Cooper, you mentioned compactness already.  Any other

16   traditional districting principles that you were -- that

17   were top of mind in term of your considerations for drawing

18   this district?

19   A.     I think it reduces VTD and county splits.  I'd have

20   to go back and look at the exhibits but the intention was

21   to follow in this case, it was very easy to follow the

22   interstate for much of the distance in the south end and

23   major thorough fairs further north in part of Clinton.

24   Q.     Let's move on to the last of the illustrative House

25   Districts.  Page 815, 817 from plaintiffs' 1, your report.

1  Tell us, first of all, what's the general area we're

2  looking at here?

3  A.    Well, this is the East Central Planning District

4  area that includes counties like Jasper, and Newton, and

5  Clarke.  It's the area that's had a tiny population growth

6  of the Black population over the last years but a big loss

7  in the white population, so it seems to be -- seems to me

8  to be an area you could create an additional majority Black

9  district.

10        I'm sorry.

11 Q.    Moving ahead one slide and focusing on the

12 illustrative House District that you drew, majority Black

13 district that you drew, what are some of the principles you

14 consider in configuring this district?

15 A.    I was working with old precincts and tried to

16 minimize the county splits so --

17 Q.    And --

18 A.    -- this is the result.

19 Q.    And in your opinion, is this a compact district?

20 A.    Yes.

21 Q.    Now, let's finish off the discussion of some of the

22 districts you drew by focusing on some additional -- some

23 hypothetical minority opportunity districts in the House

24 Plan and we can go to the next slide.

25        So first looking at page 77 of your report.  You

1   drew what you describe as two hypothetical minority

2   opportunity districts in the area around Grenada which you

3   call 34 and 36.  First, just to be clear, these are not

4   part of the illustrative *Gingles* 1 plan, right?

5   A.      Right.

6   Q.      Tell us what you were doing here?

7   A.      Well, I was trying to draw two districts that were

8   regularly shaped and had fewer municipal splits and fewer

9   county splits.  You can see the colors are kind of

10  overwhelming on this map but there are ways to draw a

11  District 36 and 34 that are much more regularly shaped.

12  Q.      And moving on, in the next slide, let's look at

13  again the Jackson area.  This is from page 78 of your

14  report what you term hypothetical House District 64.  Tell

15  us about the area that we're looking at and about the

16  hypothetical district you configure here.

17  A.      Okay.  Well, this is in eastern Hinds County right

18  along the Madison County line, and you can see that -- and

19  the hypothetical district is the bright red line

20  overlaying, of course, the 2022 House -- and you can see

21  how existing 64 starts further south than the hypothetical

22  district that I've drawn.

23          Goes way up into Madison County in a very odd way

24  and I was able to create a district that has a more regular

25  shape to it, following at least in the western boundary of

1    the interstate and the county line to the north between

2    Hinds and Madison Counties.

3    Q.    And how does the -- your configuration of the plan

4    compare -- or how does your configuration of this

5    hypothetical House District 64 compare to the enacted plan

6    with respect to traditional districting?

7    A.    Oh, it's superior because it's much more compact,

8    much more regularly shaped.  I don't have the compactness

9    scores for House 64 at my disposal immediately but just

10   looking at it -- you don't need to look at the compactness

11   score.  You can see it has a very odd shape.

12        JUDGE JORDAN:  I'm sorry.  House District 64 from

13   the 2022 plan is where?

14   A.    It's the pink district and the red line is the

15   hypothetical district that I've drawn overlaying the 2022

16   plan.

17        JUDGE JORDAN:  Which shade of pink?

18   A.    Oh.  Well, you know, I think that House District 59

19   would be more of a rose color but I'm not an artist.  I --

20   it's -- the reason why the pink changes colors is because

21   I've shaded the boundaries for the municipalities in the

22   state in these maps and because we're in Jackson -- or

23   close to it, most of that area is shaded so it does take on

24   a different color of pink until you get on the Madison

25   County line before it gets in to Ridgeland.  It's a

1  brighter pink, if that helps.  Does that help?

2      MR. SAVITZKY:  Mr. Cooper.  If I may.

3      JUDGE JORDAN:  It doesn't.  I'm sorry.  Go ahead and

4  see if you can --

5  BY MR. SAVITZKY:

6  Q.    Mr. Cooper, looking at this map, it appears that

7  there's a brighter, what you call, rose color district 59

8  and a sort of duller pink color 64 which --

9      JUDGE JORDAN:  That's what I'm getting at.  There's

10  a big 64 right in the middle.  Is that his new number or

11  the existing number?

12  A.    It's both actually, I think.  But in my -- in this

13  hypothetical district, 64 is this red line.  This thick red

14  line.

15     JUDGE JORDAN:  Right.  I understand that.

16  A.    Yeah, but enacted 64 crosses the county line in to

17  Madison and then kind of winds it's way up to --

18     JUDGE JORDAN:  All right.  I'm clear.  I only saw

19  one 64 on the map and that's why I'm trying to find the

20  original 64 but you're telling me there's only one.  You

21  used 64 twice here for the same -- for the old and the new?

22  A.    Yeah.

23     JUDGE JORDAN:  Okay.

24  A.    And the color, again, kind of a pink has over --

25  shading indicating municipal areas would be the 2022 House,

1    and the red lines that are out -- that you see would be a

2    hypothetical 64 that would have a Black population that is

3    somewhere in the 40s compared to existing 64, which is

4    somewhere in the low 30s, I believe.

5         JUDGE SOUTHWICK:  If I may ask a continuation of

6    that.  When you go north of the county line, the 64 you're

7    representing, you go up in to Madison.  How much of those

8    different shades of purple and pink are the Senate

9    District?  It changes color.  You said yours is more

10   compact.  Is it just that first pink right above the county

11   line?

12   A.    Well, the existing plan, the pink area, it is in

13   that pink area just above the county line.  The reason why

14   the colors are changing -- maybe it confuses things -- but

15   the shading, this kind of gray shading overlaying the

16   colors represents areas that are part of a municipality.

17        You can see if you go out further to the north

18   east -- or north west in Madison County, that turquoise

19   blue becomes much more apparent because it's not part of

20   Ridgeland.  It's a rural area, not in an incorporated.

21        JUDGE SOUTHWICK:  Does District 64 extend all the

22   way east of your number 58?

23   A.    Yes.  It goes all the way up there.

24        JUDGE SOUTHWICK:  That's all I needed to know.

25   A.    You're seeing the full extent of 64 under the

1    enacted plan.

2            JUDGE JORDAN:  It may be helpful to us.  You can

3    tell us straight.  For example, I think what you're telling

4    us 64 runs up.

5    A.       Exactly.

6            JUDGE JORDAN:  Like that?  It's all this lavender

7    color.

8    A.       Yes, that's it.

9            JUDGE JORDAN:  You can erase that on your end.

10           JUDGE SOUTHWICK:  Good work.

11   BY MR. SAVITZKY:

12   Q.       Lavender and rose are more descriptive terms for the

13   colors here than pink.  All right.

14           Mr. Cooper, that's the last House District.  I think

15   we should sum up and we can go to the next slide.

16           Did you form an opinion on whether the Black

17   population is sufficiently numerous and compact to comprise

18   a voting age majority additional state House and state

19   Senate District?

20   A.       Yes.

21   Q.       What's your opinion?

22   A.       My opinion is that, at a minimum, four additional

23   majority Black Senate Districts can be drawn that adhere to

24   traditional redistricting principles and meet the *Gingles* 1

25   inquiry, and three additional House Districts can be drawn

1    that are over 50 percent plus one Black and are drawn to

2    adhere to the traditional redistricting principles.

3    Q.    And Mr. Cooper, do your illustrative plans

4    illustrate those districts?

5    A.    I believe they do.  Those are not necessarily the

6    only way to do it but one good example for the Senate and

7    one good example for the House.

8    Q.    All right.  And you mentioned this already but just

9    to confirm one more time.  Did you adhere to traditional

10   districting principles in drawing the illustrative plans?

11   A.    Yes, I did.

12   Q.    And Mr. Cooper, based on all your experience and in

13   your opinion, are your additional Black majority Black

14   districts in the Senate and House Plans reasonably

15   configured?

16   A.    They are reasonably configured.

17   Q.    Mr. Cooper, in your view, did considerations of race

18   predominate over other principles in constructing these

19   plans?

20   A.    No, I was balancing all factors.  I was aware of

21   race but I was balancing all of the redistricting

22   principles, including some things that may be in the

23   background, like, where I believe incumbents live and

24   certainly changes could be made to take into account that

25   and I believe you could still get the same number of

1   majority Black -- new majority Black House and Senate

2   Districts.

3   Q.      And Mr. Cooper, if the Court ultimately found that

4   there was vote dilution in the areas that we've been

5   focused about today, could your plans be put in to effect

6   to address and ameliorate vote dilution?

7   A.      I believe so.  They do not split as many VTDs or as

8   many counties, so it would be simpler to administer, I

9   would think.

10          MR. SAVITZKY:  I have no further questions for

11  Mr. Cooper at this time.

12          JUDGE JORDAN:  All right.  Thank you.  Cross?

13          MR. CARDIN:  May it please the Court?

14          JUDGE JORDAN:  Yes, sir.

15                      **CROSS-EXAMINATION**

16  **BY MR. CARDIN:**

17  Q.      Mr. Cooper, my name is Tommie Cardin.  And you and I

18  have had the pleasure of meeting before, haven't we?

19  A.      Yes, we have.

20  Q.      It's nice to see you again.

21  A.      Nice to see you.

22  Q.      I want to start, Mr. Cooper, with your testimony of

23  your use of the planning and development district

24  boundaries.  And you decided on your own to use the PDD

25  boundaries in developing your illustrative plans, didn't

1   you?

2   A.    I did.  In order to describe various parts of the

3   state, that seemed like a very rational decision on my

4   part.

5   Q.    And the PDDs, they are not public civil divisions

6   for which the Census Bureau actually reports census

7   population data, are they?

8   A.    Well, they don't separate it out like they would say

9   MSAs, metropolitan statistical areas, but you can readily

10  calculate what the population count is in those areas

11  because they involve whole counties.  So that's what I've

12  done in this case and you can also -- as I've done -- look

13  at the socioeconomic data because the PDs are built off of

14  whole counties.  Actually derived some comparisons by

15  planning district based on socioeconomic wellbeing.

16  Q.    That's right.  As a matter of fact, you have to

17  reaggregate the population among the counties in the PDDs

18  to arrive at a total population figure for the PDDs, don't

19  you?

20  A.    That's true.

21  Q.    Right.  And that's because the Census Bureau reports

22  population data at the county level; correct?

23  A.    Right.

24  Q.    Okay.  And now, I believe that you would agree with

25  me that the PDDs are actually Mississippi private nonprofit

1  corporations, aren't they?

2  A.    I understand they're 501 C-3s, right, but they're a

3  special breed of 501 C-3s.  They involve local leaders

4  working on different projects that would benefit not just

5  one county but several counties across the board in terms

6  of things that a region can do to enhance economic

7  activity.

8        I've mentioned, I think I've seen one of the

9  planning districts operates an agency on aging.  So there's

10  so many different things that each planning district can do

11  to foster community wellbeing that goes beyond county

12  lines, so I don't really understand why you don't like

13  planning district.  They're a good idea, I think.

14  Q.    Well, Mr. Cooper, I haven't said I don't like them.

15  A.    Well, you don't like me using them.  And I am not

16  using them --

17  Q.    I am just ask you about them, Mr. Cooper.

18        JUDGE JORDAN:  Gentlemen, we have to go one at a

19  time.

20  BY MR. CARDIN:

21  Q.    Along those lines, if we might pull up, then,

22  Exhibit DX16.  It's been introduced into evidence.

23        And so I would direct your attention, Mr. Cooper,

24  you see that on the screen.  This is the copy of the

25  articles of incorporation for the central Mississippi

```
1   planning and development district.  And at the very
2   beginning there, the very beginning paragraph, if you could
3   read that for me.
4         Back up.  There you go.
5   A.    Central Mississippi Planning and Development
6   District Inc. is a voluntary nonprofit corporation
7   chartered by the state of Mississippi.
8   Q.    All right.  Thank you, Mr. Cooper.  And I would
9   represent to you that there are also the similar articles
10  of incorporation that are included in this that cover the
11  five PDDs you considered.  You didn't consider all ten
12  PDDs, did you?
13  A.    Oh, yes, I did but then I honed in on those PDDs
14  where there has been significant Black population growth
15  but certainly, I had all ten -- all ten PDDs on screen and
16  was aware of where they are, and it was just a very
17  convenient way to organize the state in to regions as I was
18  drawing the plan but it's not absolutely essential.  I
19  mean, I believe the *Gingles* 1 is answered even if you
20  eliminate PDDs altogether and just ignore that they even
21  exist but, you know, PDDs are --
22  Q.    But your report doesn't indicate that, does it,
23  Mr. Cooper?  Your report indicates you used PDDs and you
24  relied on those to develop your plans; correct?
25  A.    I used them as a way to provide a -- a framework for
```

1    taking in to account the different regions of the state

2    because the northeast part of the state is very different

3    from Gulfport, wouldn't you say?

4         So it makes sense to have regions in the state and I

5    wanted to cover the whole state when I did that regional

6    framework and planning districts are perfect.  You can't

7    use MSAs or even MPSAs because they are regions, but they

8    don't encompass the whole state.  Rural areas aren't part

9    of that.

10   Q.    We'll get to this in a minute but you used MSAs and

11   MPSAs, didn't you?

12   A.    I was aware of them, right.

13   Q.    Okay.  Now, I want to direct your attention,

14   Mr. Cooper, to an exhibit that has been stipulated into

15   evidence as a joint pretrial order Appendix A, stipulation

16   55.  I want to represent to you, Mr. Cooper, that what

17   follows there is part of stipulation 55 is the actual

18   statute, the Mississippi statute which provides the

19   apportionment, guidelines, and standards for the

20   legislature to follow in redistricting.  You've reviewed

21   this statute before, haven't you?

22   A.    I think I did early on.

23   Q.    And now, in reviewing that statute here today, it

24   does not mention PDD boundaries in that statute, does it?

25   A.    No, it doesn't and that's okay.  I don't -- again, I

1    don't understand the problem with considering PDDs as a way

2    to describe regions in the state.  I could have -- there's

3    a map on Senator Hyde's website that divides the state in

4    to eight regions that wouldn't be all that different from

5    the ten I've shown via the PDDs.

6    Q.    Now, that raises a good point.  You could've chosen

7    those regions, couldn't you?

8    A.    And I would've come out with the same result,

9    basically.

10   Q.    Well, you might or you might not.  The point is you

11   made the decision to choose those boundaries to identify

12   certain regions, didn't you?

13   A.    I did but I'm also stressing that I could have

14   identified the regions in a more morphous manner and still

15   drawn the exact same districts.

16   Q.    But you did treat the PDDs as regional communities

17   of interest, didn't you?

18   A.    Well, yes and on that, I hold fast.  That is a clear

19   community of interest without argument.  Yeah, the -- the

20   Three Rivers PDD, I realize, it's a 501 C-3 but if you look

21   at their website, you'll find at the end a listing of all

22   the board members and other important agencies in the

23   county, and then they have a list of all the legislators

24   that represent the county.

25        Now the Tupelo YMCA isn't going to put the

1   legislators on there, obviously, so I mean, it's a broad

2   based community of interest that goes beyond one small

3   group in Tupelo maybe associated with the YMCA.

4   Q.     But you can acknowledge that the state of

5   Mississippi does not confine community of interest for

6   purposes of redistricting, does it?

7   A.     I don't believe it does and it's not easily defined

8   frankly.

9   Q.     I think you indicated that in your report

10  specifically, didn't you?

11  A.     What?

12  Q.     That the state of Mississippi does not define

13  community of interest.

14  A.     I may have.  I don't recall.

15  Q.     I would direct your attention to footnote 15 of your

16  report but --

17  A.     I believe you.

18  Q.     Now as you went about developing your illustrative

19  plans, you focused on planning districts that had

20  substantial Black population that had experienced double

21  digit Black population growth since 2000; correct?

22  A.     Correct.

23  Q.     And then conversely areas with stable Black

24  population where there's been a double digit decline in the

25  white population since 2000; correct?

1    A.    Right.  We don't have to say -- I focus on regions

2    and areas.  You can eliminate the concept of planning

3    districts and still come up with something similar.

4    Q.    Okay.  And so your focus then was on the planning

5    and development district areas where you felt it was likely

6    you could develop additional majority Black districts;

7    correct?

8    A.    Yes.

9    Q.    Now, I believe you testified that you -- in

10   developing your illustrative plans, you built them using

11   precincts, didn't you?

12   A.    By and large, although sometimes it was necessary to

13   split precincts to follow municipal line in lieu of a

14   precinct, or sometimes it was necessary to get down to the

15   block level to try to avoid pairing incumbents.

16   Q.    Right.  And I believe you testified that you used

17   Maptitude software, did you not?

18   A.    I did.

19   Q.    And you used a feature on Maptitude that would put

20   little dots over precincts that had 30 percent more Black

21   voting age population; is that correct?

22   A.    30 percent or more.  In other words, precincts that

23   are in the range of 25, 30, 25 percent are racially diverse

24   so it would make sense to add some of those areas in to

25   what would be a majority Black district.

1   Q.      And so that -- that shows, those dots would show

2   where concentrations of Black population are in the

3   different areas; correct?

4   A.      Yes.

5   Q.      Now, Mr. Cooper you testified a good bit about your

6   use of trading redistricting principles and you set forth

7   several of those that you considered to be traditional

8   redistricting principles.  I think you mentioned county

9   splits; correct?

10  A.      Right.  It's a good way to quantify community of

11  interest.  The county -- to the extent, you should try to

12  keep counties whole.

13  Q.      Okay.  Municipal boundaries?

14  A.      Same deal.

15  Q.      Same deal.

16  A.      Way to quantify a community of interest which would

17  be a municipal in and of itself.

18  Q.      Same way with precincts?

19  A.      Yes but to a lesser extent because precincts are

20  ever changing and people do have a certain preference for

21  their usual polling place but, you know, there's sort of a

22  trade off between the polling place and a precinct boundary

23  versus the municipality itself.

24  Q.      And the -- I believe that you testified to that

25  precincts are also known as VTDs, that's voter tabulation

1    districts; is that correct?

2    A.    Yes, that's a Census Bureau term and what they do at

3    the -- what the decennial census gets information from the

4    state of Mississippi about the existing precinct lines and

5    then try to follow those lines provided they follow what

6    would be the 2022 census blocks, and those lines would

7    represent what are called voting tabulation districts.

8         And over the course of the decade, the precinct

9    boundaries in Mississippi obviously will change as a result

10   of local redistricting or some other state redistricting

11   like the congressional plan, that sort of thing.

12   Q.    So I believe you also testified you made a

13   comparison of other splits that you measured that you used

14   as metrics; correct?

15   A.    Yes.

16   Q.    And that was school districts?

17   A.    Right.

18   Q.    Planning and Development Districts?

19   A.    (Nods head affirmatively).

20   Q.    Metropolitan statistical areas?

21   A.    Yes.

22   Q.    Micropolitan statistical areas?

23   A.    Right.

24   Q.    So that's four additional metrics in terms of splits

25   that you've added to what's set forth in the statute;

1  correct?

2  A.    Yes, I need to look at the statute again.  The

3  statute, I believe, talks about counties and doesn't it

4  talk about municipalities?

5  Q.    Well, let's go look and see.

6  A.    I mean, it doesn't -- those are traditional

7  redistricting principles.

8  Q.    Yeah.

9  A.    There's no requirement that you not go beyond what

10 the legislature set forth in this -- in this legislation.

11 Q.    Right.  And I believe you testified, Mr. Cooper,

12 that you really had to balance a lot of different

13 interests, didn't you?

14 A.    Yes, you did.

15 Q.    And so by introducing this additional criteria,

16 that's just that many more sets of boundaries that you've

17 got to try to balance among everything else you're doing;

18 correct?

19 A.    Well, that's correct.  That's correct.

20 Q.    And you would agree with me that it's hard enough to

21 balance all of these criteria when you're doing this on

22 your own as opposed to when you're trying to do it in a

23 legislative body of 122 people?

24 A.    Well, there would be some people who would have

25 their own thoughts about how the plans should be drawn.

1    That's for sure.

2    Q.    And probably 122 different thoughts, wouldn't it?

3    A.    Maybe.

4    Q.    And in the Senate, 52 people would have 52 different

5    ideas as well?

6    A.    Right but the bottom line is you have to meet one

7    person, one vote.  You cannot dilute the minority -- the

8    minority voting strength, and these guidelines themselves

9    show that the districts should be reasonably compact and

10   shall cross governmental political boundaries the least

11   number of times possible.  That's an interesting

12   requirement.

13   Q.    It is an interesting requirement.  Now I think

14   you've emphasized and you would agree with me that the one

15   person, one vote requirement is very important, isn't it?

16   A.    Well, yes.  It's -- it's almost cast in stone.

17   There may be occasional instances where you would go beyond

18   that for one reason or other, like if there's a mountain

19   range but there's no mountain range in Mississippi that

20   would get in the way of drawing plus or minus five percent

21   districts.

22   Q.    And you are aware of the criteria -- the criteria

23   adopted by the Standing Joint Committee and that was one of

24   the criteria that they had, wasn't it?

25   A.    Yes.

1    Q.    The plus or minus five percent?

2    A.    Right.

3    Q.    So let's just stop here, Mr. Cooper.  Let --

4    describe for us then exactly what you mean by plus or minus

5    five percent deviation.  What -- what -- just describe that

6    for us in simple terms?

7    A.    Well, you have the ideal population size in

8    Mississippi of a House District, which is 24,000, so you

9    can't go beyond 5 percent of 24,000 to the up side or the

10   down side.

11   Q.    Right.  Five percent above or below whatever the

12   ideal district size is; correct?

13   A.    Right.

14   Q.    Okay.  And I think you commend the legislature for

15   adopting that standard, didn't -- don't you?

16   A.    I do because some states have like plus or minus one

17   percent which forces splits of municipalities and

18   precincts, and it just seems to be so unnecessary so I do.

19   I applaud Mississippi for plus or minus five percent.

20   Q.    And you believe that was a wise decision on the

21   legislature's part?

22   A.    I do.

23   Q.    And now it's -- as you just said though earlier, I

24   believe, it's inevitable that you're going to have to split

25   some areas, some cities, some counties, some precincts

1   simply because of all the interests you're trying to

2   balance; correct?

3   A.      Absolutely, and I split a number of counties, and a

4   number of VTDs, and a number of municipalities but I also

5   managed to create five additional Senate districts that are

6   majority Black -- excuse me -- four and three additional

7   majority Black House districts.

8   Q.      And there can be a variety of reasons that a

9   governing body would split boundaries or precincts, can't

10  there?

11  A.      Sure.

12  Q.      As a matter of fact, I think you've drawn plans for

13  governing bodies yourself before haven't you?

14  A.      Yes.

15  Q.      And have you ever had an incumbent come to you and

16  express preferences on what kind of territory he or she

17  might want in his or her district?

18  A.      I have.

19  Q.      And when that happens, what do you try to do?

20  A.      I will try to consider that and -- and maybe make a

21  change to a plan.  I would not consider it though if it

22  diluted minority voting strength.

23  Q.      Right.  And it's -- it's nice, though, to be able to

24  draw a plan without having to take those considerations in

25  to play, isn't it?

1    A.    Well, you mean a consideration like the non-dilution

2    of minority voting strength?

3    Q.    No, Mr. Cooper.  Having to satisfy incumbents and

4    their preferences?

5    A.    Well, it's not as traumatic as it would be for

6    somebody sitting over in the legislature.

7    Q.    Sure.

8    A.    Right.  But that's their job.

9    Q.    Along those lines -- indeed it is, Mr. Cooper.

10   Along those lines, I'd like for us to talk about what the

11   legislature actually considered in drawing its plans.

12        MR. CARDIN:  And at this time, Your Honor, I'd like

13   to ask that what's been premarked as Exhibit DX76, which is

14   the video of the floor debate of the House -- I mean, the

15   Senate.  It's the Senate floor debate.  There's a House

16   floor debate, too.  But this is DX76 and it's the video of

17   the Senate floor presentation which I would like to bring

18   up and play.

19        And, Your Honor, for purposes of timing, this is

20   about 13 minutes and if the Court is thinking about in

21   terms of when you want to take a break, I just raise that

22   because it's about -- that's about how long it is.

23        JUDGE JORDAN:  All right.  We might want to take a

24   break after that.

25        MR. CARDIN:  Okay.

1          JUDGE JORDAN:  Is there an objection to -- I'm

2    sorry.  You said 76?

3          MR. CARDIN:  Yes, Your Honor.  DX76.

4          MR. SAVITZKY:  Your Honor, I believe the transcripts

5    of these floor debates and presentations are already in

6    evidence so the presentation and the video may be somewhat

7    cumulative but we certainly -- I think our main objection

8    would be it's cumulative and the Court can refer to the

9    transcript and there are provisions of the transcript to

10   which Mr. Cardin wants to direct Mr. Cooper, that would be

11   a more efficient use of the Court's time.

12         JUDGE JORDAN:  All right.  Just one second.

13         All right.  Objection's overruled.  You can -- DX76

14   will be admitted.  I think that while we may have a

15   transcript, the transcript doesn't reflect tone so it's not

16   strictly cumulative in that sense so you may proceed.

17         MR. CARDIN:  Thank you, Your Honor.  Okay.  Brent,

18   do you want to bring it up?

19              (Defendants' Exhibit 76 entered.)

20              (Video playing in open court.)

21   BY MR. CARDIN:

22   Q.    All right.  Thank you, Brent.

23         So Mr. Cooper, you just saw the video presentation

24   of the presentation that Senator Kirby made in the Senate

25   for the Senate Plan.  And in that, he indicated there had

1    been significant population shifts in the state; correct?

2    A.    Correct.

3    Q.    Yeah.  And there had been -- and as a result of

4    those population shifts, they had to move or collapse a

5    district in south west Mississippi and move it, didn't

6    they?

7    A.    He did say that.

8    Q.    Okay.  That district that they collapsed, Senate

9    District 36, you wouldn't happen to know whether it elected

10    a Republican or Democrat, would you?

11    A.    I would not.

12    Q.    And as a result, this resulted in the only incumbent

13    pairing in the Senate Plan according to Senator Kirby;

14    correct?

15    A.    Correct.

16    Q.    And Senator Kirby also indicated that the

17    legislature maintained districts 37 and 38 in that area in

18    an effort to try to comply with Section 2 of the Voting

19    Rights Act; correct?

20    A.    I think he said something to that effect.

21    Q.    And he talked about the importance of trying to

22    comply with Section 2 of the Voting Rights Acts, didn't he?

23    A.    He did.

24    Q.    And he also talked about traditional redistricting

25    principles, such as compactness and county and precinct

1    splits and then he mentioned political performance at the

2    end, didn't he?

3    A.    He did say political performance.

4    Q.    Okay.  I'd like to now look at -- let's look at the

5    map the Senate actually adopted as a result of that debate,

6    if we could.

7         MR. CARDIN:  Could we pull that up?  That should

8    be -- it's been introduced into evidence, Your Honor, as

9    JTX47 if you could pull this up.

10        JUDGE JORDAN:  If this is going to start a new line

11   of questioning, it might be a good time for a break.

12        MR. CARDIN:  It would be a great time for a break,

13   Your Honor.

14        JUDGE JORDAN:  Okay.  Let's see.  Let's come back at

15   3:25.  Court's in recess.

16              (A brief recess was taken.)

17        JUDGE JORDAN:  Thank you.  You may be seated.

18        MR. CARDIN:  May it please the Court, Your Honor?

19        JUDGE JORDAN:  Yes, sir.  Thank you.

20   BY MR. CARDIN:

21   Q.    Okay.  Let's see.  Mr. Cooper, I think we've -- when

22   we left off for the break, I wanted to pull up the actual

23   Senate map that the Senate adopted during that floor debate

24   that we just watched.  And that map is now on the screen

25   and I want to represent to you it looks like we've zoomed

1  in on the DeSoto County area.

2      Do you see that?

3  A.    Yes.

4  Q.    You're generally familiar with that area having

5  drawn your map; correct?

6  A.    Yes.

7  Q.    Now, I want to point out to you on this map,

8  Mr. Cooper, I represent to you that it looks like that

9  there are precincts indicated on this map.

10     Do you see those precinct names?

11 A.    Yes.

12 Q.    And so the state map has precincts on its map but

13 the excerpts of the illustrative districts we've seen that

14 you testified to earlier, you didn't have precincts on

15 those -- on your maps, did you?

16 A.    I did not display the precincts on those maps but I

17 was working with precincts as I drew the plan, and I also

18 list which districts which precincts are in which districts

19 so it's clear I was using precincts as I was drawing the

20 plan.

21 Q.    You were, weren't you?  You were using precincts and

22 I think you -- you provided us about 350 exhibits, didn't

23 you?

24 A.    I don't know.  Those Maptitude reports --

25 Q.    They do --

1          JUDGE JORDAN:  Just for the record.  Is this -- I

2     assume this is J47, joint Exhibit 47?

3          MR. CARDIN:  Yes, sir, Your Honor.  This is JTX47.

4          May it please the Court?

5          JUDGE JORDAN:  Yes, sir.

6     BY MR. CARDIN:

7     Q.    So, Mr. Cooper, and, again, none of those exhibits,

8     none of the maps you provided ever depicted the actual

9     precinct boundaries on a map, did they?

10    A.    They did not but I could certainly produce those if

11    need be.

12    Q.    Now, on this map, we're looking at the Senate

13    adopted, we do see the precincts.  I think we also see the

14    county lines.

15         Mr. Cooper, do you see it's those gray lines that

16    are kind of --

17    A.    Yes.

18    Q.    -- dotted?

19         So looking here at DeSoto County, if I'm looking at

20    this correctly, I see three whole Senate Districts:

21    District 1, 2, and 19 in the DeSoto County boundaries; is

22    that correct?

23    A.    No.

24    Q.    Okay.  Tell me why it's not.

25    A.    Because well, there's also another district,

1    District 11 that extends into the county but there are

2    three whole precincts -- there are three whole districts.

3    Q.    Right.  That's what I -- that's my point.  There are

4    three whole districts contained in DeSoto County and then a

5    partial part of the district, Senate District 11.  That's

6    also in DeSoto County; correct?

7    A.    Right.

8    Q.    And I believe that we've heard testimony -- I think

9    you've indicated that there was population loss in this

10   area.  Would that have been in the area that -- what area

11   would the population loss have been in geographically here

12   on this map?

13   A.    Certainly not DeSoto County.  I think that Tunica

14   County has held its own due to casinos.  The population

15   loss -- and I have a county by county break out of

16   population change between 2010 and 2020 as one of my

17   exhibit.  I'm fairly certain Tate and Panola lost

18   population but I don't have those numbers in front of me.

19   Q.    Well, I tell ya, Mr. Cooper, this might be easier.

20         MR. CARDIN:  Brent, if you could zoom out, so we

21   could get a broader view of this whole region.

22         A little bit.

23         More keep on zooming out.

24         Keep on.  Keep on.  Okay.  Okay.  A little bit more.

25         All right.  There we go.  All right.

1　BY MR. CARDIN:

2　Q.　So Mr. Cooper, let's look at -- on this map, we're

3　looking at in DeSoto County.  We've agreed there's Senate

4　Districts 1, 2, 19, and then we have 11 which is in the

5　orange on the western side going up from down -- it's going

6　from DeSoto County down to Quitman County; correct?

7　A.　Yes.

8　Q.　Okay.  And along those lines, on this Senate

9　District 11 that the Senate drew, now if I'm looking at

10　this map correctly, part of western DeSoto County is in

11　Senate District 11, isn't it?

12　A.　Yes, a fairly thinly populated area in DeSoto County

13　is in District 11.  It looks like maybe five precincts.

14　Q.　So in this map then the Senate Districts are

15　depicted by different colors drawn on precinct boundaries,

16　aren't they?

17　A.　Yes.

18　　MR. CARDIN:  Now, let's look, if we can -- Brent,

19　let's pull up the Benchmark over under which is JTX-54,

20　pages 13 and 14.  And this has been introduced into

21　evidence, Your Honor, as joint Exhibit 54.

22　　JUDGE JORDAN:  Thank you.

23　BY MR. CARDIN:

24　Q.　Okay.  Mr. Cooper, this is the Benchmark data for

25　the Senate Plan in terms of the population.

1    A.     Okay.

2    Q.     It lists --

3           MR. CARDIN:  Well, go down a little bit, Brent.

4    Just a little bit.  Bring it down some.  There you go.

5           You see at the top -- want to see at the top, Brent.

6    Want to see the title.  Up further.

7    BY MR. CARDIN:

8    Q.     Benchmark Senate summary 2020.  Okay.  So this is

9    a -- and this is -- and what's your understanding of a

10   Benchmark plan, Mr. Cooper?

11   A.     Well, it would be the plan in place before a new

12   plan would be developed based on the 2020 census.  I

13   actually have the same numbers in my declaration in an

14   exhibit.

15   Q.     Exactly.  So now in regard to this.  Now we saw

16   Senate District 11 and 12 kind of south of DeSoto County

17   coming up through the delta, didn't we?

18   A.     Yes.

19   Q.     And here on the Benchmark, it looks like to me --

20   looking at the deviation column -- that Senate District 11

21   was minus 11.92 percent which means it was underpopulated

22   by that much; correct?

23   A.     Correct.

24   Q.     And then on Senate District 12, it indicates that it

25   was underpopulated 17.99 percent, doesn't it?

```
 1        MR. SAVITZKY:  And Your Honor, just looking at, this
 2   it looks like we're talking about House Districts and not
 3   Senate Districts, so I just -- before we go any further on
 4   the record, those numbers appears to correspond to House
 5   District 11 and House District 12.
 6        JUDGE JORDAN:  It does --
 7        MR. CARDIN:  Population numbers, though, would be
 8   Senate District numbers -- it's mislabeled --
 9        JUDGE JORDAN:  One of your at a time.
10        MR. CARDIN:  It's mislabeled, Your Honor.  It's
11   Senate Districts and actually, if you go down through --
12   keep on going down through where it says, Senate District,
13   those districts up there are the majority minority
14   districts brought out of the chart and they are just put on
15   at the beginning so you can see what the majority minority
16   districts are and then the rest of the chart are all of
17   those districts.
18        JUDGE JORDAN:  All right.  So I guess lay a
19   foundation with this witness.  What you're telling me is
20   that first table is mislabeled House.  It should say
21   Senate?
22        MR. CARDIN:  Yes.  Yes.
23   BY MR. CARDIN:
24   Q.   So Mr. Cooper, you see that first column there
25   labeled House District?
```

1   A.      Yes.

2   Q.      It should be labeled Senate District, shouldn't it?

3   A.      Right.

4   Q.      Thank you very much, sir.

5           All right.  With regard to we've gone through 11 and

6   12 and Senate District 13 is underpopulated by how much?

7   A.      Well, 10.3 percent rounding off to the nearest

8   tenth.

9   Q.      Now, let's look at Senate District 24, Mr. Cooper.

10  That is underpopulated as well by 10.87 percent, isn't it?

11  A.      Yes.

12  Q.      Now, on the flip side, we saw that there were two of

13  the Senate Districts that were contained wholly in DeSoto

14  County, that would have been Senate Districts 1 and 2;

15  correct?

16  A.      I think so.

17  Q.      And the deviation in Senate District 1 is

18  23.22 percent overpopulated; correct?

19  A.      Yes.

20  Q.      And District 2 was 7.28 percent overpopulated;

21  correct?

22  A.      Correct.

23          MR. CARDIN:  Okay.  All right.  Let's go back,

24  Brent, to the JTX54013 -- no.  I'm sorry -- the JTX47,

25  which was the Senate map.

1   BY MR. CARDIN:

2   Q.      So looking at this Senate map, Mr. Cooper, in terms

3   of how the Senate ended up drawing districts, would you

4   agree with me that it looks like the Senate kind of

5   migrated northward with Districts 11 and 13 and then --

6   A.      I don't see 13 on this map.

7   Q.      But it looks like they went northward with Senate

8   District 11?

9   A.      This is a 2022 Senate Plan.

10  Q.      That's right.  It is.  And so you would agree with

11  me that the Senate took Senate District 11 on up northward.

12  It looks like in an effort to gain population, doesn't it?

13  A.      I believe so.  The Benchmark plan only went as far

14  as Tunica.  I'm not looking at the map but maybe that's

15  true.

16  Q.      That's right.  And -- right.  So now, what I'd like

17  to do now, Mr. Cooper, is turn our attention to your

18  illustrative Senate Plan which is the full map.  PTX --

19  it's plaintiffs' Exhibit 1.  It's been introduced into

20  evidence as that.

21          And that is -- that's your illustrative plan.  Your

22  statewide plan; correct?

23  A.      Yes, overlaying the 2022 Senate Districts.

24  Q.      Okay.

25  A.      The red lines are the 2022 Senate Districts in this

1    instance.

2    Q.     Good.

3           MR. CARDIN:  Let's do -- okay.  Brent, let's zoom in

4    up in that DeSoto County area again.

5    BY MR. CARDIN:

6    Q.     Okay.  So explain to us, Mr. Cooper --

7           MR. CARDIN:  And if you can, Brent, let's move this

8    over so that this -- there we go.  Thank you.

9    BY MR. CARDIN:  All right.  So explain to us then -- so

10   what do these wide red lines on this map indicate?

11   A.     That would be the 2022 Senate.

12   Q.     That's the overlay of the 2022 Senate map, what we

13   just looked at; correct?

14   A.     I believe so.  You can click it off if you don't

15   want to look at those lines.

16   Q.     Oh, sure but in terms of what we're looking at here

17   now that's what that represents; correct?

18   A.     I believe so.

19   Q.     And -- and so then the shaded colors on this map,

20   what do those represent?

21   A.     Those are the illustrative districts I've drawn.

22   For example, District 2 which is just over -- I don't have

23   the numbers in front of me -- low 50s percent BVAP, any

24   part Black voting-age population.

25   Q.     That's right, exactly.  Okay.  So --

1  A.     One thing I will say is that the Maptitude online

2  does not allow you to label these districts with numbers

3  that are with a green background as I did in the

4  illustrative plan PDFs that are in my exhibit.  You're just

5  stuck with plain old Black labels.

6       MR. CARDIN:  Okay.  Let's go in a little bit closer

7  there, Brent.  Oh, right there, in DeSoto County.

8  BY MR. CARDIN:

9  Q.     Okay.  So we're looking there, Mr. Cooper, at --

10       MR. CARDIN:  Zoom out just a little bit, Brent.

11 There we go.  Thank you.

12 BY MR. CARDIN:

13 Q.     All right.  So, Mr. Cooper, the county line for

14 DeSoto County then on this map is going to be represented

15 by, is it the broad, the wide red lines on the southern

16 part there?

17 A.     Yes, that's -- that would be, I think, the county

18 line.

19 Q.     All right.  Let's do --

20 A.     Yeah, it's overlaying -- it's overlaid by the

21 enacted plan that has a district in that area -- that has a

22 part of a district in DeSoto County.

23 Q.     Mr. Cooper, I want to represent to you that I just

24 used courtroom technology that I learned about a few

25 minutes ago and so hopefully, this will be an aid rather

1    than a hindrance.  So the -- what I've circled there in

2    red, that's the southern boundary of DeSoto County;

3    correct?

4    A.    I think so.  I mean, you could click off the 2022

5    Senate line and we could probably determine that.

6    Q.    Okay.  But you have no reason to dispute that's

7    the --

8    A.    I don't think so.

9    Q.    Okay.  All right.  And then it follows on up.  It

10   goes on up this way; correct?

11   A.    Yes.

12   Q.    And then goes across there, the county line?

13   A.    I'm not so sure about that but it might.  I'd need

14   to look at another map maybe to determine that.

15   Q.    I'll represent to you that it does, Mr. Cooper and

16   you have no reason to dispute that, would you?

17   A.    It actually -- it would be the county line because

18   there's Tunica Resorts so that's the county line with

19   DeSoto further north on the other side.

20   Q.    So now it looks like to me then, Mr. Cooper, that

21   you have changed the districts in your illustrative plan so

22   that now there are only two districts that are wholly

23   contained in DeSoto County rather than three; is that

24   correct?

25   A.    No.  I think I've got district -- well, District --

1    District 19 and 1 are wholly in the county and District 2

2    is by and large in the county but it would add, I'm

3    guessing, maybe 10,000 people from Tunica what is the

4    county's --

5    Q.    That's correct.

6         MR. CARDIN:  Zoom out a little bit, Brent and get

7    south of Hernando.  Whoa.  Whoa.  Whoa.  There you go.

8    BY MR. CARDIN:

9    Q.    So it looks like to me, Mr. Cooper, what you've done

10   in is in your redrawn Senate District 1, you've taken

11   territory that is Hernando and Eudora and you've combined

12   that with Tate County below; is that correct?

13   A.    Yes.

14   Q.    Okay.  And then your Senate District 1 now basically

15   swaps territory from Olive Branch and north of Hernando

16   area; is that correct?

17   A.    Yes, it goes in to -- you're saying Senate District

18   1?

19   Q.    Yes, sir.

20   A.    Yeah, it's around Olive Branch and part of

21   Southaven.

22   Q.    That's right.  I believe you testified also that

23   part of this western part of DeSoto County that's now in

24   your Senate District 2 was also included in the Senate

25   District 11 under the Senate Plan; correct?

1  A.     Part of it but only a small part of the city of Horn

2  Lake.  There's a little north west corner there that's in

3  majority Black District 2 or rather District 2 or District

4  11 in the Senate Plan whereas I've included a big chunk,

5  most of Horn Lake in Senate District 2.

6  Q.     And why did you do that?

7  A.     It is an area that has a substantial minority

8  population for one thing.

9  Q.     That brings up a question, Mr. Cooper.  When you're

10  looking at the compactness for prong 1 of *Gingles*, do you

11  look at the compactness of the minority community within

12  the district or the compactness of the minority district as

13  a whole?

14  A.     The district as a whole.

15  Q.     And so you don't look at the compactness of the

16  minority community within the district?

17  A.     I'm aware of where the minority community lives

18  within that district and almost all of it lives in the west

19  end of DeSoto County.

20  Q.     But your measures of compactness that you provided

21  in all of your reports are measures of compactness of the

22  districts as a whole, not the minority communities within

23  the district; correct?

24  A.     Yeah, I've never seen a compactness measure of just

25  the minority communities in any case I've ever been in.

1  I've never actually seen one.  I've seen one that was maybe

2  methodologically flawed but even those don't show a

3  compactness measure but they just show a map of areas that

4  are supposedly disparate but it's hard to say that Tunica

5  Resorts would be a great distance from Horn Lake.

6  Q.    So do you have an opinion as to whether or not the

7  compactness should be measured of the minority community

8  within the district or the district itself?

9  A.    It's the district itself unquestionably.  I know

10  there's a group of attorneys out there that think

11  differently, I'm not an attorney but I do not think that

12  you need to show that the Black population is compact using

13  some measure.  If the district itself is reasonably compact

14  then the minority community is in a reasonably compact

15  district, just as the white population may be in a

16  reasonably compact district but not necessarily all bunched

17  up in one corner as some folks seem to think is necessary

18  to have a compact district.

19      JUDGE JORDAN:  Mr. Cardin, I'm going to ask because

20  I'm a little confused.  If you would clarify this for me.

21      MR. CARDIN:  Yes, sir.

22      JUDGE JORDAN:  But as I read the Robertson opinion

23  and it addressed this issue.  It indicated compactness

24  is -- can be viewed in a few different ways.  There's more

25  than one component to compactness.

1          MR. CARDIN:  Yes, sir.

2          JUDGE JORDAN:  It can be geographic compactness.  It

3    can be other forms of compactness and so I want to make

4    sure that you and the witness are talking about the same

5    thing when you use the term "compactness".

6          MR. CARDIN:  Thank you, Your Honor.  I'll clarify

7    that.

8    BY MR. CARDIN:

9    Q.    With regard to geographic compactness, Mr. Cooper,

10   is the opinion you stated the same?

11   A.    Yes.

12         MR. CARDIN:  Okay.  Brent, let's zoom in now on that

13   Southaven area --

14         JUDGE JORDAN:  I'm sorry, Mr. Cooper, when he's

15   asking you whether you're looking at the compactness of the

16   district as a whole, how are you defining compactness?

17   A.    I'm defining compactness as the district as a whole

18   using the measures I previously discussed that are included

19   in my exhibit, the Reock score, and the Polsby-Popper, and

20   the convex hull.  There are other measures but I truly

21   believe that one should rely on the compactness of the

22   district as a whole as opposed to trying to figure out some

23   way to measure where part of the Black population lives

24   versus another part.  That's a very strange, almost

25   nonsensical approach to drawing redistricting plans.

```
 1          JUDGE JORDAN:  Thank you.

 2          MR. CARDIN:  Thank you, Mr. Cooper.  Your Honor, if

 3   I may?

 4          JUDGE JORDAN:  You may.

 5   BY MR. CARDIN:

 6   Q.     Okay.  Mr. Cooper, now, we've zoomed in on the

 7   boundaries that you've drawn in your illustrative plan

 8   between Senate Districts 2 and 1.  And if I can pull this

 9   up again...

10          I'm looking at this area right here, Mr. Cooper,

11   that I've circled in red.  Okay?

12   A.     Yes.

13          MR. CARDIN:  And so let's zoom in a little closer,

14   Brent.

15   BY MR. CARDIN:

16   Q.     Mr. Cooper, do you see Highway 51 north on the map?

17   A.     I see part of it.  It gets kind of hidden behind the

18   legend there.

19   Q.     Okay.  But --

20   A.     You can actually -- if you move the map to the east,

21   I guess, we'd see more of Highway 51 right in this area.

22   Q.     Well, it looks like to me Highway 51 is going north

23   run north and south, isn't it?

24   A.     Yes.  I guess there's two -- there's an alternate

25   Highway 51 also.
```

1  Q.      Yeah.  So Mr. Cooper, you would agree with me -- I

2  think you testified earlier that you tried to follow

3  natural boundaries when you drew your plans; correct?

4  A.      Well, above all, I was trying to precinct lines

5  which often follow natural boundaries.

6  Q.      Along those lines, coming down Highway 51 there, if

7  you're coming from the north and you take that curve, and

8  instead of continuing to go down Highway 51 north with your

9  boundary, you take a right turn and include a notch of

10  territory over on the western side of Highway 51, don't

11  you?

12  A.      Yes.  Are you talking about District 1 and the area

13  there that is on the west side of Highway 51?

14  Q.      Yes, sir, I am.  I'm talking about this right here.

15  A.      I'm pretty sure it's an entire precinct.

16  Q.      You're pretty sure it's what?

17  A.      I'm pretty sure it's an entire precinct but I'm not

18  looking at the precinct data, so...

19  Q.      In that regard, Mr. Cooper, if I represented to you

20  that was the Colonial Hills precinct, you would have no

21  reason to dispute that, would you?

22  A.      But I would have no reason to affirm it either.

23  Well, I'll take you at your word, though.

24  Q.      Thank you, Mr. Cooper.  So do you know why you drew

25  Colonial Hills precinct the way you did?  Why you didn't

1  put it in Senate District 1 as opposed to Senate District

2  2?

3  A.    I don't know offhand.  It could have had something

4  to do with an incumbent.  It could have had to do with

5  deviation in District 1.  There could have been any number

6  of reasons why I made that decision and there probably are

7  ways to include that precinct in District 2, if need be,

8  and make a change elsewhere.

9  Q.    Matter of fact --

10  A.    These illustrative plan are not cast in stone.

11  They're just illustrative.

12  Q.    They are illustrative.  And yes, I understand what

13  you're talking about.

14  A.    I mean, you will recall in the 2019 Senate District,

15  I had an illustrative plan, and the state drew something

16  very different.  But it was a 50-percent-plus-one district

17  and it was put into place.

18  Q.    If I represented to you, Mr. Cooper, that this

19  Colonial Hills precinct if you switch it and put it in

20  Senate District 2 instead of Senate District 1, it makes

21  the deviation in your redrawn Senate District 2 almost

22  perfect.  It's about ten people off of the ideal district

23  size.  You would have no reason to dispute that, would you?

24  A.    I would not.  But I would tell you the population in

25  DeSoto County is rapidly growing, and that's one reason why

1    I like plus or minus five percent deviation.  I realize

2    that District 2 is underpopulated by four percent, but as I

3    indicated earlier, the population and in particular the

4    Black population in the county is growing fast.  And so

5    I've left some room for that district to expand without

6    going beyond plus five percent on the upside by doing a

7    minus four percent district.

8    Q.    And if I represented to you if we made that switch,

9    it would reduce the Black voting-age population in your

10   redrawn Senate District 2 below 50 percent to

11   49.76 percent, you'd have no reason to dispute that, would

12   you?

13   A.    I would not offhand, but I have no way of confirming

14   it.

15   Q.    Okay.  Now, if we could -- Brent, let's call up

16   Exhibit D3.  Your Honor, Exhibit D3, appendix two has been

17   admitted into evidence as part of Dr. Brunell's report.

18        So, Mr. Cooper, I believe you've seen these

19   before --

20   A.    Well, I've glanced at them.  This is not what I

21   normally look at when I'm drawing a plan, so I did not

22   review them in great detail.  It just doesn't mean much to

23   me.

24   Q.    I understand that.  And I'll represent to you that

25   this is a screenshot of a Maptitude drawing of the

1    districts that -- your redrawn districts in your area, the

2    DeSoto County area, identifying the precincts.  And the

3    legend in the lower right-hand corner indicates the percent

4    voting age -- Black voting-age population in each of those

5    precincts.  You see that, don't you?

6    A.    Yes.

7    Q.    And you see that the legend indicates that basically

8    anything green or yellow is going to be 50 percent plus

9    BVAP.  Anything dark blue and purple is essentially

10   30 percent below BVAP.  Do you see that?

11   A.    Yes, roughly.

12   Q.    And so looking up at this map, you see Highway 51 as

13   it's labeled on that map?

14   A.    Yes.

15   Q.    And that would be what we were just looking at in

16   your illustrative plan, and I think that precinct you see,

17   that precinct right there is Colonial Hills, isn't it?

18   A.    I see the one that was Colonial Hills, right.

19   Q.    Everything on the western side -- not everything,

20   but a good portion of the precincts on the western side

21   look like they're 50 percent BVAP plus, aren't they?

22   A.    Yes.  But I also see some that are 10 percent to

23   20 percent or even less, blue ones there along the southern

24   border between District 2 and District 16.

25   Q.    Yeah.  And that notch of Colonial Hills coming off

1    of 51, its's 30 percent or less BVAP, then, isn't it?

2    A.    Yes.  But you can see that I also included some

3    other precincts that are 30 percent or less, and I did not

4    include all of Northwest Community College, which that

5    precinct is -- is over 50 percent.

6    Q.    It looks like to me, Mr. Cooper, the precincts that

7    you've included that are blue are split?

8    A.    May be.  I was following a main road there.  I'm not

9    sure.  I mean, I don't know if I split them or not.  I

10   can't tell from this map.

11   Q.    Okay.  Let's go back to the -- Mr. Cooper's map,

12   Brent, the PTX-001.  All right.  Mr. Cooper, let's go to --

13   let's zoom out, Brent, let's get the general area.  All

14   right.  Very good.

15         Okay.  So, Mr. Cooper, I want to just look at the --

16   this general area in and around Hernando.  I think we may

17   have covered most of this, but the two things I want -- you

18   testified that you did try to respect incumbency when you

19   were drawing your plan; correct?

20   A.    Yes.  But I have to stress that I just did not have

21   a dead-certain listing of all 52 senators.  I mean, I had

22   addresses in some cases.  I had PO boxes which indicated

23   maybe a hometown.  And that might work great if it's Tunica

24   Resorts, but if you live in Southaven and you have a PO box

25   in Southaven, exactly where you live in Southaven, I can't

1  tell.  It would be very useful for the -- if there is ever

2  a remedial plan in this case, for the plaintiffs to access

3  to nothing more than a precinct file indicating where all

4  52 senators live -- not where they live in the precinct,

5  just which precinct they live in, which would make it much

6  easier to avoid pairing senators.

7  Q.     Well, Mr. Cooper, we did provide you with an address

8  list for the addresses that we were able to provide;

9  correct?

10  A.     I don't know what.  I got was from the attorneys,

11  and I believe it did have some -- some information that you

12  had provided.  But it was incomplete, and so that's the

13  problem.  In some cases I may have been trying to protect

14  an incumbent, but my understanding of where that incumbent

15  lived based on a PO box may be a different interpretation

16  than what I should have had.  Whereas at the state level,

17  whoever is drawing the maps for the legislature would have

18  had a better idea.

19  Q.     Thank you.  I want to represent to you, Mr. Cooper,

20  that the address list we provided has been introduced into

21  evidence as joint Exhibit 9.  And there are -- we did

22  provide the address of the incumbent in Senate District 1

23  at the time and Senate District 2.

24       And so, Brent, could you put the address in of the

25  incumbent in Senate District 1.

1        Okay.  I'll represent to you, Mr. Cooper, that you

2   see that pinpoint on your map of the address of the

3   incumbent in Senate District 1 as drawn by the legislature.

4        Zoom out, Brent, and we'll see that you've placed

5   that incumbent in a new district with new territory,

6   haven't you?

7   A.    I have.  Hopefully, though, I have not paired that

8   incumbent.

9   Q.    Okay.

10  A.    But there are lots of options, you know, if that

11  individual needs to be back in District 1, there may be

12  ways to accomplish that.

13  Q.    Okay.  So without going through the exercise,

14  Mr. Cooper, I'll represent to you that we put in the

15  address for the incumbent of Senate District 2, Senator

16  Parker, and he is now in your new redrawn Senate District

17  1.  You have no reason to dispute that, do you?

18  A.    I'll take your word for it.

19  Q.    So zoom out, Brent.  All right.  So then if I

20  understand correctly, what you've done is you -- in terms

21  of the changes you've made in your illustrative plan in the

22  DeSoto County area versus the Senate Plan, you've reduced

23  the number of whole Senate Districts within the county from

24  three to two; correct?

25  A.    But also eliminated splits in Panola County and Tate

```
 1    County.
 2    Q.    I understand.  But I'm asking about DeSoto County.
 3    A.    Yes.  But I'm saying --
 4          JUDGE JORDAN:  I'm sorry, sir, you need to answer
 5    the question he asks.
 6    A.    Yes, sir.
 7    BY MR. CARDIN:
 8    Q.    So with regard to DeSoto County, so you have reduced
 9    the number of whole Senate Districts wholly within the
10    county from three to two; correct?
11    A.    Correct.
12    Q.    And you now have two Senate Districts wholly within
13    the county and two that are partially within the county;
14    correct?
15    A.    Correct.
16    Q.    Okay.  And so let's zoom out a little bit further,
17    Brent.  I want to look, Mr. Cooper -- yeah, there you go.
18    Stop right there.
19          I want to look now at kind of the effect on the
20    broader geographic area.  We saw during your direct
21    testimony some snippets of the individual districts you've
22    drawn, but I want us to look at the broader area here.  So
23    your new Senate District 15, that's the territory that you
24    pull out of the existing Senate District 1 and you combine
25    that with the Tate County; correct?
```

1    A.      Yes.

2    Q.      And then as we move southward, your new Senate

3    District 11, which is in the green there; correct?

4    A.      Yes.

5    Q.      It looks like that Senate District now really runs

6    east and west rather than having parts of north and south

7    districts in it; correct?

8    A.      Yes.  It also, as you can see, eliminates another

9    county split so.

10   Q.      And it also -- it also separates the cities of

11   Oxford and Batesville from being in the same Senate

12   District, doesn't it?

13   A.      It would.

14   Q.      Okay.  And then you go on over to Oxford, and it

15   looks like you've split the city of Oxford; correct?

16   A.      I believe I did.  That may have something to do with

17   an incumbent.

18   Q.      Okay.  Because those city limit lines there would be

19   in gray; correct?

20   A.      Yes.

21   Q.      Okay.  So there's some pretty significant geographic

22   changes that you've made in these Senate Districts even

23   going southward, isn't there?

24   A.      Well, there are the -- same holds for the plan you

25   developed based on the 2019 plan.  Changes had to be made.

1     You changed 51 of 52 Senate districts.  You, the state

2     legislature.

3     Q.     I was going to say, Mr. Cooper, I would appreciate

4     the compliment, but I can't take credit for it.  Now up in

5     this area, Mr. Cooper, so this Oxford Senate District was

6     in Senate District 9 under the Senate map; correct?

7     A.     Not sure.  If you query it, I think we get a --

8     Q.     I'll represent to you that it was, Mr. Cooper.

9     A.     Okay.

10    Q.     But now it's Senate District 43; correct?

11    A.     Yes.  Number changed.

12    Q.     And so you did -- why did you do that?

13    A.     You know, you could have different numbering system.

14    I started, I guess, with the Senate's enacted plan and 43,

15    I believe, maybe was the district that went down into the

16    Quitman County area, and I just used that instead of 9.

17    Q.     Okay.  All right.  Brent, let's go on down over to

18    the Golden Triangle.  There we go.

19           So Mr. Cooper, I'm moving now to your redrawn Senate

20    District 17 that you testified about earlier.  Now, again,

21    what's depicted on this map are -- the red boundary lines

22    are the overlay of the Senate map onto your redrawn

23    boundaries; correct?

24    A.     Yes.

25    Q.     Now, did you pair any incumbents in this area?

1    A.    I don't think so.  I avoided pairing an incumbent, I

2    believe, who lives in West Point.  So I did split the city

3    of West Point specifically to protect an incumbent.

4    Q.    You split the city of West Point and you also

5    crossed two planning district boundaries, didn't you?

6    A.    I did.  But prom your perspective, that's okay;

7    right?

8    Q.    I'm not the one testifying, Mr. Cooper.

9    A.    Okay.

10    Q.    So you split Amory in your redraw of Senate District

11    17, didn't you?

12    A.    Yes.  I think I was following precinct lines.  So

13    there you get the dilemma do I follow precinct lines or

14    split a municipality.

15    Q.    I represent to you, Mr. Cooper, we put the address

16    in for an incumbent in Senate District 7, Senator Hob

17    Bryan, and based on your redraw he is now in your redrawn

18    Senate District 17.  You have no reason to dispute that, do

19    you?

20    A.    I don't.  I do know that there were incumbents in

21    that area that also could have been paired and I tried

22    avoid pairing them.

23    Q.    And likewise, the incumbent in District 17, Senator

24    Chuck Younger, we put his address in and he is now in your

25    redrawn Senate District 7?

1   A.      Oh, good.  You know, there are many different ways

2   to draw plans, but I'm glad that I didn't pair two

3   incumbents.

4   Q.      Well, you didn't pair two incumbents, but you

5   certainly changed the geography particularly for the

6   incumbent in Senate District 7 pretty significantly, didn't

7   you?

8   A.      We could get to the bottom of that in one of the

9   exhibits.  But I will take your word for it that the

10  geography was changed.

11  Q.      I'm just looking at the map here.

12  A.      Yes.  That's right.  It appears to have been

13  changed.

14  Q.      Do you know how long the city of Amory has been

15  whole in a Senate District over the years?

16  A.      I do not know that.

17  Q.      Okay.  And in the adopted plan in the Senate Plan

18  Senate District 7 had a deviation of just like minus

19  .91 percent.  You have no reason to dispute that, do you?

20  A.      No.

21  Q.      And in your redrawn plan, I think, your Senate

22  District 7 now has a deviation of minus 4.62 percent; is

23  that correct?

24  A.      I'll take your word for it.

25  Q.      Now, in your report, Mr. Cooper, you indicated that

1    Clay County was also linked to Chickasaw, Lee, and Monroe

2    County via high school sports.  And I think you cited the

3    Mississippi High School Activity Association District 1

4    includes Chickasaw, Clay, Lee, and Monroe Counties; is that

5    correct?

6    A.    I did reference that; right.

7    Q.    So this is yet another criteria that you're adding

8    to your analysis, and that is an assessment of district

9    divisions of the Mississippi High School Activity

10   Association?

11   A.    No.  That --

12         MR. SAVITZKY:  Objection, Your Honor, to the

13   question as mischaracterizing Mr. Cooper's testimony as

14   high school sports being a criterion for districting.

15         JUDGE JORDAN:  He can explain it.  You want to ask

16   the question again.

17         MR. CARDIN:  Yes, I will.

18   BY MR. CARDIN:

19   Q.    So Mr. Cooper, it appears as though you're adding

20   yet another criteria to the criteria you used in developing

21   your plan, and that is district divisions of the

22   Mississippi High School Activity Association; is that

23   correct?

24   A.    No.  That's just another way to look at that general

25   region and consider whether there are communities of

1    interest between the Clay County area and further north

2    going up towards Tupelo.  And one community of interest

3    would be high school sports.  That's pretty important.  So

4    I mentioned that.  But if you look at a footnote, I also

5    mentioned an article in the Encyclopedia of Mississippi

6    which describes Clay County as being part of a cluster of

7    counties in northeast Mississippi including Chickasaw and

8    Lee County and a couple of the others, as part of the

9    Blackbelt Prairie, kind of a crescent shape that extends

10   into Alabama.  And it's not only a feature that is

11   referenced as being a geologic connection, it also very

12   specifically mentions there are cultural similarities that

13   makes those counties more like the Alabama Blackbelt,

14   maybe, than some of the other north Mississippi counties.

15   Q.    But you didn't look how schools that are members of

16   the Mid-South Association of Independent Schools are

17   aligned in that area, did you?

18   A.    No.  You've told me that's a private sports league,

19   so I did not look at that.

20   Q.    Why not?

21   A.    I did not know it was there.

22   Q.    Mr. Cooper, I want to direct your attention --

23   Brent, if you could pull up Mr. Cooper's deposition.

24         MR. CARDIN:  Your Honor, may it please the Court,

25   I'd ask that Mr. Cooper's deposition be marked for

1    identification purposes.

2         JUDGE JORDAN:  Give me just one second.  Would that

3    be D78 for ID?

4         MR. CARDIN:  Yes, Your Honor.

5         JUDGE JORDAN:  All right.  This will be marked for

6    identification as D78.

7      (Defendants' Exhibit 78 marked for identification.)

8    BY MR. CARDIN:

9    Q.    Mr. Cooper, I want to direct your attention to page

10   108 of your deposition.  So, Brent, if we can go there.

11        Okay.  Mr. Cooper, you see at the bottom of that

12   page I asked you the question, you looked at the divisions

13   of the Mississippi High School but I'm asking you about the

14   divisions of the Mid-South Independent School Association.

15   Next page.  Top of the next page, Brent.  Top of the page.

16        I said, did you look at those?  And you asked --

17   your answer was -- line 2, what's your answer?

18   A.    Line 2?

19   Q.    Yes, sir.

20   A.    Are those private schools?

21   Q.    And my response was yes, line 4.  And then I asked

22   the question on line 5, and why not.  And read your answer

23   on lines 9 through 9.

24        MR. SAVITZKY:  And, Your Honor, to the extent that

25   this is impeachment, I don't think it's proper impeachment

1  to the extent that Mr. Cooper's statement is not

2  inconsistent with anything he said on the stand today.

3       JUDGE JORDAN:  It seems inconsistent.  He testified

4  that he didn't do it because he didn't know about those

5  schools.  This suggests he said something different in his

6  deposition.  Overruled.

7  BY MR. CARDIN:

8  Q.  So, Mr. Cooper, your answer, lines 6 through 9?

9  A.  Well, I did not consider the private schools.  I

10  didn't know what --

11  Q.  If you will just read your answer, Mr. Cooper, that

12  I've asked you to read, lines 6 through 9?

13  A.  Okay.  Well, frankly, it's unlikely that there would

14  be high percentages of Black kids attending private

15  schools.  I hate to say that, but I think it's probably

16  true.  I'm from the south.  I kind of know what private

17  schools represent.

18  Q.  Okay.  Thank you, Mr. Cooper.  All right.  Brent

19  let's pull up now Exhibit DX3.  It's been introduced into

20  evidence Your Honor as Exhibit DX3.  It's the Maptitude

21  screenshot for illustrative Senate District 17, page 42.

22       Okay.  Mr. Cooper, here is another Maptitude

23  screenshot of the northern area of your redrawn Senate

24  District 17.  Again, the legend is the same, green and

25  yellow, 50 percent plus BVAP.  Dark blue, purple,

1   30 percent less BVAP.  So are you with me.  You testify

2   you've got Highway 45 going right up through the center,

3   don't you?

4   A.      Right.

5   Q.      And the red boundary lines are the lines of your

6   redrawn district.  And so most of the precincts that I'm

7   seeing within the boundaries are green and yellow.  Is that

8   what you're seeing?

9   A.      That's correct.

10  Q.      And outside are dark blue and purple; correct?

11  A.      Right.

12  Q.      All right.  Let's go back to Mr. Cooper's

13  illustrative map --

14  A.      Can I have a second to explain that a little better?

15  I did include areas that were generally within the two

16  majority Black wards in the city council for the city of

17  Tupelo.  And you may note that I was involved in a Section

18  2 lawsuit involving city council in Tupelo back around 2006

19  or 2007, where I testified and presented an illustrative

20  plan and where the Court found Section 2 violation

21  requiring the creation of the second majority Black

22  district in Tupelo.

23  Q.      So you're very knowledgeable with the geography in

24  that Tupelo area and the demographics in that geography,

25  aren't you?

1    A.    Up to a certain extent, yes.  I did look at the city

2    council plan in that area.

3    Q.    Let's go back to Mr. Cooper's map, PTX-001.  We're

4    going to move now down to Senate District 9.  I think your

5    testimony earlier was that's down in the Hattiesburg area.

6    And I think you've explained the changes.  And do you know

7    whether you split any precincts in drawing Senate District

8    9?

9    A.    I'm sure I did.  I had to do some splitting to

10   protect an incumbent.

11   Q.    Let's shift real quickly to the Maptitude screenshot

12   on this district, Exhibit DX3, appendix C, page 46.  So

13   here's the Maptitude screenshot of your redrawn Senate

14   District 9, Mr. Cooper.

15   A.    Yes.  But just a reminder, this is not my Maptitude

16   screenshot.  I never look at maps like this.

17   Q.    I understand.  So it looks like to me a good portion

18   of the precincts that are within the boundaries of your

19   redrawn 45 are in the 50 percent plus BVAP category, aren't

20   they?

21   A.    Probably.  There are different -- they are different

22   colors though.  I see 50 percent, but I also see some that

23   are in the 30s, even some that are in the 10 percent to

24   20 percent range out in the western part of that particular

25   district, some of which may not even be in Hattiesburg.

1    Q.    Okay.  And I think down in the southeastern corner,

2    that dark blue precinct is the Sheeplo precinct, isn't it?

3    A.    I don't know the name.  I have heard the name.  I'm

4    not sure where I heard it, though.

5    Q.    Well, it's printed there.

6    A.    Oh, yes.

7    Q.    Yeah.  That's Sheeplo.  And it looks like you split

8    it, didn't you?

9    A.    Again that may have been an area where there was an

10   incumbent issue.  You know, these maps were drawn back in

11   almost, you know six, probably eight months ago or more and

12   there is a incumbent issue somewhere in Hattiesburg which

13   required me to make some changes to the initial draft that

14   I had.  But I don't recall specifically where that

15   incumbent is.  I kind of think he is in that Sheeplo area.

16   Q.    Thank you, Mr. Cooper.

17         All right.  Brent, let's go back to Mr. Cooper's

18   map, the PX001.

19         All right.  Mr. Cooper, now we're back on your map,

20   and, again, your map, the illustrative plan, the color

21   shading of your redrawn districts, overlay of what the

22   Senate did is in the bold red boundaries; correct?

23   A.    Yes.

24   Q.    All right.  I want to direct your attention to your

25   redrawn Senate District 35, which you testified about

1  earlier.  Now, it looks like to me, Mr. Cooper, you've

2  crossed two different -- or three different planning and

3  development district boundaries to redraw this district; is

4  that correct?

5  A.    That would be correct.  I have included Copiah and

6  Simpson which are in the capital area, and I have included

7  Lincoln County which is in the southwest, and then

8  Jefferson Davis which is in the southern.

9  Q.    And Lincoln County was whole in the Senate Plan,

10 wasn't it?

11 A.    Lincoln County was whole.  I've swapped out and in

12 this instance I've kept Lawrence County whole.

13 Q.    Yeah.  And so you crossed the boundary between --

14 over in to Lincoln County right there at Wesson.  And I see

15 that territory that's going down in to Brookhaven.  Now you

16 extended that territory down in to Brookhaven because it

17 has a significant Black population; correct?

18 A.    There is some Black population at Brookhaven, right.

19 Q.    And you actually split Brookhaven as well?

20 A.    I was following precinct boundaries.  And

21 Brookhaven, the municipality is split.  But I followed

22 precinct lines, I think.

23 Q.    Brent, let's go to, quickly, DX3.  This is the

24 Maptitude screenshot, Mr. Cooper.  And we see particularly

25 that area down where you just testified about in

1  Brookhaven, and we checked the legend on that and it's

2  almost exclusively precincts that are BVAP 50 percent or

3  more.  Matter of fact, there's one that's 100 percent down

4  at the bottom; correct?

5  A.    100 percent and above.  I don't know what to think

6  of that.  How do you get above 100 percent Black?  I don't

7  know.  I was not -- like I said, these maps are foreign to

8  me.  I'm not looking at the percentages.  So to me it was

9  just another precinct at the south end of town that was

10 racially averse, clearly over 30 percent Black.  And I knew

11 that Brookhaven was -- I think Brookhaven may be about

12 50 percent Black.

13 Q.    All right.  Mr. Cooper, let's turn our attention now

14 to the House Districts.  And did you have an understanding

15 of the redistricting criteria used by the House in

16 developing its plans?

17 A.    I'm sorry.  I missed that.

18 Q.    Did you have an understanding of the redistricting

19 criteria used by the House in developing its plan?

20 A.    I thought that was basically the same as the section

21 of the legislation that we looked at earlier this

22 afternoon.

23        MR. CARDIN:  Okay.  All right.  Along those lines at

24 this point, Your Honor, I'd like to call up the House floor

25 presentation, which is the video of the floor debate in the

1    House.  It's Exhibit DX77.  I'd like to request that that

2    be played like we played the Senate one.  It's

3    approximately 13 minutes.

4         JUDGE JORDAN:  Any objection?

5         MR. SAVITZKY:  Your Honor, for the record, same

6    objection.  That it's cumulative, and I would also note to

7    the extent it discusses topics other than the criteria used

8    by the legislature, it might not be relevant.  But I

9    understand the Court has already ruled on an extremely

10   similar exhibit, so just noting it.

11        JUDGE JORDAN:  All right.  Overruled.  D77's

12   admitted.

13        MR. CARDIN:  Thank you, Your Honor.  Brent.

14             (Defendants' Exhibit 77 entered.)

15             (Video playing in open court.)

16        MR. CARDIN:  Okay.  Okay.  Thank you, Brent.  May I

17   proceed, Your Honor?

18        JUDGE JORDAN:  Yes.

19   BY MR. CARDIN:

20   Q.    So Mr. Cooper, in his presentation Chairman Beckett

21   mentioned several different criteria, didn't he?

22   A.    Yes.

23   Q.    He mentioned the criteria adopted by the Standing

24   Joint Committee, which I think you were aware of; correct?

25   A.    Yes.

1    Q.    He mentioned several districts were collapsed due to

2    population changes.  I think he mentioned one in the Monroe

3    County area, didn't he?

4    A.    I think he may have, yes.

5    Q.    House District 20.  And that's kind of the same

6    general geographic area that you drew an additional

7    majority minority district in, isn't it?

8    A.    Yes.

9    Q.    He also mentioned moving House District 33.  And I

10   heard him say they moved one to the DeSoto area and one to

11   the coast?  Is that what you heard?

12   A.    I believe I did hear that one went to DeSoto and one

13   went to the coast.

14   Q.    He talked about incumbent pairings.  He mentioned

15   contiguity, didn't he?

16   A.    Yes.

17   Q.    He mentioned Section 2 compliance.  He also

18   mentioned compactness and split counties and precincts,

19   didn't he?

20   A.    Yes.

21   Q.    And he also mentioned at the end, political

22   performance, didn't he?

23   A.    He did.

24   Q.    Brent, I'd like to pull up now JTX48.  Your honor,

25   that's been admitted in to evidence as joint Exhibit 48.

1    And I'll represent to you that it is the JR1, the
2    House Plan that was adopted as a consequence of that floor
3    debate.  You've reviewed this before, haven't you?
4    A.    This particular map?
5    Q.    Yes, sir.
6    A.    I haven't looked at it.  I was mainly just working
7    off the information that I had from the GIS files onscreen
8    using my own software.
9    Q.    And Brent, zoom in just a little bit real quickly.
10   So this map is really designed the same way the Senate map,
11   isn't it, Mr. Cooper?
12   A.    Yes.
13   Q.    It's got the precincts on it, and the districts are
14   drawn based on the precinct boundaries, just like it is in
15   the Senate map; correct?
16   A.    Well, except the districts aren't necessarily drawn
17   based on precinct boundaries, but you do show precinct
18   lines.
19   Q.    Right.  It looks like to me, though, that all the
20   districts follow precinct lines in most places that I'm
21   looking at on the map.  Would you agree?
22   A.    Well, there are quite a few precinct splits.  That's
23   in my report.
24   Q.    There may be precinct splits, but my point is in
25   this map, the districts are generally along precinct lines,

```
 1    aren't they?

 2    A.    You know, I haven't measured the map boundaries.  I

 3    think you're probably correct.  But I can't really say with

 4    certainty that that's the case.

 5    Q.    Let's bring up Mr. Cooper's map, Brent, his

 6    illustrative House Plan which is Exhibit PTX001, page 60.

 7          Okay.  Mr. Cooper this is what's been admitted into

 8    evidence as PTX001, and this is the illustrative House Plan

 9    that you drew.  Do you recognize that map?

10    A.    Yes.

11    Q.    Okay.  So on this map, Mr. Cooper, then how do you

12    depict the districts you redrew versus the districts that

13    the House adopted?

14    A.    Well, the House Plan is shown in red lines

15    throughout, just like the other online map.

16    Q.    Same as the Senate map; correct?

17    A.    Right.

18    Q.    Brent, let's go in, zoom in on House District 22,

19    which is going to be in that Monroe, Chickasaw County area;

20    right?  Golden Triangle, kind of northwest there.  There we

21    go.  Right there.  The purple one.  Okay.  There we go.

22          Okay.  Mr. Cooper, so I'm going to direct your

23    attention to the -- what's the number, 022, there what does

24    that represent on your map?

25    A.    Well, that is 22.  House District 22.
```

1   Q.      That's your redrawn 22?

2   A.      In the illustrative plan, yes.

3   Q.      So that redrawn plan is depicted in that kind of

4   lavender purple color; is that correct?

5   A.      Yes.  And the House District boundaries in the 2022

6   plan are red lines, and you can see those.

7   Q.      Got you.  Now you do recall Chairman Beckett

8   mentioning moving a district in the Monroe County area to

9   DeSoto County due to the population loss in that area and

10  the gain in DeSoto County.  Do you recall him mentioning

11  that?

12  A.      I do recall him moving a district from that area to

13  DeSoto County.  I'm not sure if the population loss has

14  been terribly significant in that area but that's what the

15  House did.

16          MR. CARDIN:  All right.  Brent, let's call up the

17  Maptitude screenshot.  Exhibit DX3.  It's been introduced

18  in evidence as Exhibit DX3.

19  BY MR. CARDIN:

20  Q.      And Mr. Cooper, this is another screenshot,

21  Maptitude map, of your redrawn House District 22.

22          As you can see, the -- your boundaries are the

23  boundaries in red and same legend precincts 50 percent plus

24  BVAP green and yellow.  30 percent less BVAP dark blue and

25  purple.

1        And you see the precincts that are depicted in that

2   map within your redrawn district, don't you?

3   A.    Yes.

4        MR. CARDIN:  All right.  Let's go back then to

5   PTX001, Mr. Cooper's map, Brent.  Let's go to House

6   District 84 that he redraws which is going to be in and

7   around Quitman, Mississippi which is going to be right down

8   below Meridian.  There we go.  Okay.  That's it.  All

9   right.  Zoom out a little bit more.  A little bit more.

10  We've got to catch that territory jutting out up at the

11  top.

12       Okay.  All right.

13  BY MR. CARDIN:

14  Q.    Mr. Cooper, on this map, your redrawn 84 appears in

15  blue; is that correct?

16  A.    Yes, in a light blue.

17  Q.    And I think what you did here was that you split the

18  city of Quitman in your redraw; correct?

19  A.    Probably following a precinct line.

20       MR. CARDIN:  All right.  Let's pull up now, Brent,

21  the DX3 and appendix 2, page 52.  Here's that map we've

22  been looking at same type of map as the other ones.  Again,

23  we see the red boundaries which are your redrawn boundaries

24  and we note the green and yellow precincts that are within

25  your boundaries as opposed to the dark blue and purple on

1    the outside of those boundaries.

2    A.     Yes and again, I stress this is not the kind of map

3    I'm looking at when I'm drawing districts.  I do see the

4    precinct lines but I do not see this barrage of colors.

5           MR. CARDIN:  Okay.  PTX60.

6    BY MR. CARDIN:

7    Q.     Okay.  Mr. Cooper, this is the last one and it is

8    your redrawn House District 56.

9           MR. CARDIN:  All right.  Let's -- all right.  Brent,

10   this is a little more difficult to see.

11   BY MR. CARDIN:

12   Q.     Mr. Cooper, but over on the western side of Hinds

13   County, do you see the existing House District 56?

14   A.     Yes, you can see how it extends from south of the

15   interstate there in Clinton going all the way north in to

16   Madison County up to Flora and beyond.

17   Q.     Right.  And Mr. Cooper, are you aware that that was

18   the district, the former speaker of the House Philip Gunn

19   was elected from?

20   A.     You might have mentioned that to me at the

21   deposition but I don't know.  I knew where an incumbent

22   lived.  I think I put him or I put that -- I don't think I

23   paired incumbents there but it is somewhat problematic in

24   Hinds County due to a lot of people uses PO boxes.

25          MR. CARDIN:  Okay.  Brent, let's -- let's zoom in a

1   little bit closer there on -- go down below so we can get

2   the City of Clinton in there.  All right.

3   BY MR. CARDIN:

4   Q.     So your redrawn 56 on the map there, Mr. Cooper, is

5   that area that's -- it has the word "central" and right

6   above, it is the number 056.  There we go.

7   A.     Right.  Right.  These numbers are reflecting the

8   district numbers in the illustrative plan.

9   Q.     Right.

10  A.     You can query the map to get the actual number for

11  the House District at any point on the map under the 2022

12  plan.

13  Q.     So now it looks like to me, Mr. Cooper, what you've

14  done in your redrawn House District 56 is you have still

15  split the city of Clinton, haven't you?

16  A.     Yes.

17  Q.     And it looks like you've split it with I20 as being

18  the boundaries; is that correct?

19  A.     Yes.

20  Q.     Are you familiar with the city of Clinton and its

21  geography, Mr. Cooper?

22  A.     I think I've been around it but not very much.

23  Q.     Do you know where the commercial corridors in the

24  city of Clinton are?

25  A.     No.

```
1   Q.     Do you know -- would it be -- in your opinion, do
2   you think the city of Clinton -- and strike that.
3          Looking at your map that you've redrawn, Mr. Cooper,
4   it looks like you've taken the city of Clinton and in
5   addition to splitting it, it's migrated in to west Jackson;
6   is that correct?
7   A.     That's correct.
8   Q.     All right.  In your opinion, does the city of
9   Clinton have -- is it a community of interest with west
10  Jackson?
11  A.     They're right next door to one another.
12  Q.     That's not what I asked you, Mr. Cooper.  I asked
13  you do you think that the city of Clinton and west Jackson
14  constitute a community of interest?
15  A.     Potentially, yes, because they're so close to one
16  another.  They could be -- it's an urban area, so there
17  could be all sorts of common side relating to roads and
18  highways.  You name it so --
19  Q.     I believe you also --
20  A.     This District 56 is like 15 miles long.
21  Q.     I believe you also testified earlier, though, in
22  your direct that there were other factors that you
23  considered in determining whether or not there's a
24  community of interest, socioeconomic factors, geographic
25  factors, a variety of factors other than being close to one
```

1    another?

2    A.    Well, that's true.  That's true.  But in this case,

3    it's only 15 miles long, so it's just really indisputable

4    that it's a compact district.

5    Q.    Do you know anything about the city of Flora,

6    Mr. Cooper?

7    A.    I do not.  I know it's Madison County.

8    Q.    Okay.  So you wouldn't be in a position then to give

9    me an opinion as to whether or not the cities of Flora and

10   Clinton have more in common than the city of Clinton and

11   west Jackson then?

12   A.    Well, the city of Clinton, I think, is more suburban

13   perhaps than some of the parts of west Jackson but it is

14   also an area that has seen a significant increase in the

15   Black population over the past couple of decades.

16   Q.    But my question to you, Mr. Cooper, involved the

17   city of Flora and whether or not you would have an opinion

18   as to whether the city of Clinton and the city of Flora

19   would have more in common with each other than the city of

20   Clinton and west Jackson?

21   A.    I can't answer that but Flora would clearly have --

22   in my plan, you can see Flora is in a district that is

23   largely in Madison County so one could say that there's a

24   community of interest drawn around that area.

25          MR. CARDIN:  Thank you, Mr. Cooper.  Your Honor, I

1    have no further questions at this time.

2           JUDGE JORDAN:  Mr. Wallace?

3           MR. WALLACE:  Your Honor, you asked me to coordinate

4    with Mr. Cardin.  I suggested some questions to him and he

5    thought I would do them better myself, so I have three

6    questions.

7           JUDGE JORDAN:  You may proceed.

8                            **CROSS-EXAMINATION**

9    **BY MR. WALLACE:**

10   Q.     Mr. Cooper, plaintiffs hired you to draw

11   Black-majority districts because that's what the first

12   point of *Gingles* requires; isn't that right?

13   A.     They asked me to develop -- to analyze the

14   demographics of the state and to determine whether or not

15   it might be possible adhering to the traditional

16   redistricting principles to draw additional majority Black

17   House or majority Black Senate Districts.

18   Q.     And you've put those into the record?

19   A.     Right.

20   Q.     And the Supreme Court also says that those districts

21   have to be reasonably configured and you've spent the

22   afternoon talking to Mr. Cardin about why you think the

23   districts you've drawn are reasonably configured; is that

24   right?

25   A.     That's right.  There's absolutely no question in my

1  mind that they are reasonably configured and follow

2  traditional redistricting principles.

3  Q.     And mindful of the danger of asking you a legal

4  question.

5  A.     Very dangerous.  I'm not a lawyer so dangerous on my

6  side, not your side.

7  Q.     But you have listed at great length all sorts of

8  things you have taken into consideration from high school,

9  sports schedules to Planning and Development Districts and

10 my question to you is:  Does the Supreme Court in its

11 *Gingles* jurisprudence require you to consider any of those

12 things?

13     MR. SAVITZKY:  And, Your Honor, I will just object

14 to the question based on (inaudible) --

15     MR. WALLACE:  That's why I objected to him, Your

16 Honor, and you said it would go to the weight.  I'd like to

17 hear his answer.

18     JUDGE JORDAN:  That's a different question.  I mean,

19 you can ask him if he -- I'm sorry?  Turn your microphone

20 on.

21     MR. SAVITZKY:  I have nothing further, Your Honor.

22     JUDGE JORDAN:  Okay.  It's a different angle on the

23 question.  He can answer whether he relied on it, but

24 you're asking him for a legal opinion about what *Gingles*

25 says.  That would be -- that objection's sustained.

 1          MR. WALLACE:  Okay.  No, Your Honor, I'll leave it

 2    to you.  You heard what he said he relied on, and we'll

 3    talk before the case is over about whether it had anything

 4    to do with *Gingles*.  So I guess I only had two questions.

 5          Thank you, Judge.

 6          JUDGE JORDAN:  All right.  Thank you.

 7          Redirect?

 8          MR. SAVITZKY:  Very briefly, Your Honor.

 9                    **REDIRECT EXAMINATION**

10    **BY MR. SAVITZKY:**

11    Q.    Good afternoon again, Mr. Cooper.

12    A.    Good afternoon.

13    Q.    Just a few questions for you.  First of all, do you

14    still have a copy of what's been marked as defendants' 78,

15    your deposition in front of you?

16    A.    Yes.  Well, no.  No, I do not have a copy of that in

17    front of me.  It was on screen; right?

18    Q.    Oh, it was on screen?

19    A.    Yes.

20          MR. SAVITZKY:  Your Honor, can I approach the

21    witness and just share a hard copy with him?  It's two

22    questions on that issue.

23          JUDGE JORDAN:  Sure.

24          MR. SAVITZKY:  Thank you, Your Honor.

25    BY MR. SAVITZKY:

1    Q.    I'm going to hand you your deposition.  Just a quick

2    question looking at the exchange that starts at, I believe,

3    107 and continues on 108 about Mississippi school sports

4    associations.  Take a minute to look at it before we --

5    look at Mr. Cardin's question and your answer to it.

6         So tell me when you're ready.

7    A.    I guess I should go up a little further on this.

8    Q.    Just tell me when you're ready.

9    A.    Okay.  I'll let you know.

10        Okay.  I looked at it.

11   Q.    Thanks, Mr. Cooper.  I now have my own copy.

12        Now, prior to Mr. Cardin asking you about the

13   Mid-South Independent Schools Association, had you ever

14   heard of that sports association before?

15   A.    No, I did not see a map indicating where the

16   students come from in that particular division.  I don't

17   know if they're -- you know, if it's a public school, it's

18   very clearly defined as to which counties and cities are in

19   a public school district, right?  With private schools

20   oftentimes, they go to those schools for pay and maybe

21   necessarily they don't have to be in a particular part of

22   the county.  Their parents would get them there one way or

23   the other.

24   Q.    And so when you then said later on -- looking at

25   page 108 -- that it's unlikely there would be high

 1   percentages of Black attending public schools, were you

 2   indicating you looked at that and decided to disregard this

 3   Mid-South Independent School Association or was it an

 4   off-the-cuff assessment?

 5   A.     It was an off-the-cuff assessment.  I -- it's the

 6   first time I'd ever heard of Mid-South Independent School

 7   Association.  If there's a map, I'd like to look at it and

 8   maybe I can make adjustments in a future map if need be.

 9          MR. SAVITZKY:  May I approach the witness?

10          JUDGE JORDAN:  You may.

11   BY MR. SAVITZKY:

12   Q.     Now, Mr. Cooper, if it's possible to bring up that

13   URL.  Looking at the screen here, we talked about Senate

14   District 2 and I just want to zoom in here right where we

15   were before and then right here.

16          And then Mr. Cooper, I see over here we're looking

17   at Senate District 2 which you looked at with Mr. Cardin,

18   and there's a gray boundary.  What's that gray boundary

19   that we see running east to west?

20   A.     That would be a precinct line I believe.

21   Q.     And --

22   A.     No, it's not a pre -- go back to the layers.  Do I

23   have precincts in there?

24   Q.     Let me ask you this question.  Yeah, you can show

25   the layers.

1    A.    Go to the layers.  No, there's no precincts in

2    there.  That's -- that's the Horn Lake municipal boundary.

3    Q.    Okay.  And so those lines there with that Colonial

4    Hills on one side in one district and your SD-2 in the

5    other is that following the municipal line for Horn Lake in

6    that area?

7    A.    Yes, it is.

8          MR. SAVITZKY:  And we can take this down.  And let's

9    look at plaintiffs 001, page 386, and we can zoom in on the

10   top of that image.

11   BY MR. SAVITZKY:

12   Q.    Mr. Cooper, is this the 2022 Senate Plan with your

13   illustrative district 17 overlaid?

14   A.    Yes.

15   Q.    And Mr. Cooper, you talked with Mr. Cardin about the

16   portion of your district that is of Tupelo that's included

17   in your illustrative Senate District?

18   A.    Yes.

19   Q.    And so is the portion of Tupelo that's contained in

20   your illustrative Tupelo 17 also contained in a separate

21   Senate District 7 which is in a different district from

22   other portions of Tupelo in District 6?

23   A.    Yes, there is a large part of District 7 that dips

24   in to Tupelo and north.

25   Q.    And does your District 17 and the state's District

1   7, do they follow the same lines in that Tupelo area?

2   A.    Well, not completely but in large part, they do

3   except for the southeast corner.

4        MR. CARDIN:  And we can take that one down and

5   actually, we can go to plaintiffs 001 at page 398.  398.

6   BY MR. SAVITZKY:

7   Q.    And now looking at district 35 illustrative district

8   35 and thinking about inclusion of Brookhaven in this

9   district, was the Black population in Brookhaven the only

10  reason to connect it with communities in Copiah County?

11  A.    Well, no.  As I've already mentioned, the Census

12  Bureau has already indicated that the Brookhaven

13  micropolitan area, which is basically just Lincoln County,

14  is part of a -- what is known as a combined statistical

15  area that would include all of the MSA of Jackson, and that

16  decision or determination by the Census Bureau and the

17  office of budget and planning at the federal level takes in

18  to account commuting patterns between the smaller

19  micropolitan area with the more urbanized -- further north

20  any way -- Jackson MSA.

21        And if roughly 15 percent of the commuting pattern

22  is journey in to work in to the Jackson MSA, which would

23  include Copiah, then that area is considered to be combined

24  statistical area.  So there is a neutral definition that

25  would put Brookhaven and Lincoln County in general with the

1    central planning district.  Of course there are other

2    regions that one could take into account as well like high

3    school sports leagues, and there again, I think I mentioned

4    that in my declaration.  Lincoln County is associated with

5    the same high school sports league as Copiah and Jefferson

6    Davis.

7    Q.    And I believe in your direct testimony you had

8    mentioned a transportation connection there as well?

9    A.    Well, yes.  There's Highway 51 just a straight shot

10   from the southern end of Copiah County in to Brookhaven.

11         MR. CARDIN:  And we can take this image down.  Just

12   a couple of more questions.

13   BY MR. SAVITZKY:

14   Q.    We looked at a couple of videos of the legislature

15   during your conversation with Mr. Cardin and -- and you

16   discussed specifically this idea of political performance.

17   As you understand it, are the requirements adopted in

18   the -- the official written guidelines in Mississippi

19   for -- for drafting -- or for creating legislative

20   districts, do those include political performance?

21   A.    I don't think so.  If they do, then I overlooked

22   that.  I did not consider political performance.

23   Q.    But as far as you're aware, is political performance

24   one of those officials guidelines?

25   A.    Well, no, and I've never done political performance

1  for any *Gingles* 1 plan I draw.  That's just not something I

2  take into consideration.

3  Q.    And now one other question, Mr. Cooper.  Having

4  watched those videos of legislators discussing the

5  different criteria that they used to develop the 2022 plan,

6  anything that you see change your conclusion about whether

7  your plans added additional Black-majority districts that

8  are reasonably configured and consistent with traditional

9  districting principles?

10  A.    Those speakers were, in some ways, well intentioned

11  but there's actually nothing they said that would in any

12  way change my opinions.

13      MR. SAVITZKY:  No further questions, Your Honor.

14      JUDGE JORDAN:  All right.  Thank you.  You can step

15  down.  All right.  It's 5:00.  It's a good time to stop.

16      Let me mention one thing.  Mr. Savitzky, when I

17  first ruled on whether that first video was cumulative,

18  there had been a discussion about some floor debate and

19  that's what I thought I was going to see.  That's why I

20  said the tone might matter but obviously, that's not what

21  it was.

22      I will say this, though, it does give me a little

23  pause that volume one of four from the plaintiffs are over

24  a thousand pages long, and they are full volumes and I have

25  a lot of volumes from defense as well.

1    And I don't want any of us to be in the situation in

2  three weeks where we're asked to look at thousands of pages

3  of documents that haven't been referenced in court.  So it

4  is easier for us, on something like that, if it is brought

5  to our attention as opposed to later on, you give me a 182

6  page, you know, proposed findings mentioning a 300-page

7  document that's never been mentioned.

8    So it is going to be easier for us at the end of the

9  day if these things are mentioned in court, so I just want

10  to let both sides know that that is a concern of mine.

11  It's going to be a heavy lift regardless.

12    MR. SAVITZKY:  Understood, Your Honor, and

13  appreciated.

14    JUDGE JORDAN:  All right.  All right.  Thank you.

15  We will reconvene tomorrow at 9:00.  Thank you.

16  *************************************************************

17

18

19

20

21

22

23

24

25

**CERTIFICATE OF COURT REPORTER**

I, Candice S. Crane, Official Court Reporter for the United States District Court for the Southern District of Mississippi, do hereby certify that the above and foregoing pages contain a full, true, and correct transcript of the proceedings had in the forenamed case at the time and place indicated, which proceedings were stenographically recorded by me to the best of my skill and ability.

I further certify that the transcript fees and format comply with those prescribed by the Court and Judicial Conference of the United States.

THIS, the 26th day of February, 2024.


/s/ Candice S. Crane, RPR, RCR, CCR

Candice S. Crane, RPR, RCR, CCR #1781
Official Court Reporter
United States District Court
Candice_Crane@mssd.uscourts.gov