```
 1                    UNITED STATES DISTRICT COURT
                    NORTHERN DISTRICT OF MISSISSIPPI
 2                         GREENVILLE DIVISION

 3
        DYAMONE WHITE; DERRICK SIMMONS;
 4      TY PINKINS; CONSTANCE OLIVIA
        SLAUGHTER HARVEY-BURWELL                      PLAINTIFFS
 5
        VS.                                           NO. 4:22-CV-62
 6
        STATE BOARD OF ELECTION COMMISSIONERS;
 7      TATE REEVES, IN HIS OFFICIAL CAPACITY
        AS GOVERNOR OF MISSISSIPPI; LYNN FITCH,
 8      IN HER OFFICIAL CAPACITY AS ATTORNEY
        GENERAL OF MISSISSIPPI; MICHAEL WATSON,
 9      IN HIS OFFICIAL CAPACITY AS SECRETARY
        OF STATE OF MISSISSIPPI                       DEFENDANTS
10

11
                           NON-JURY TRIAL
12                             VOLUME 5

13
                    BEFORE HONORABLE SHARION AYCOCK
14                    UNITED STATES DISTRICT JUDGE

15
                         Oxford, Mississippi
16                        August 12, 2024

17

18                  (APPEARANCES NOTED HEREIN)

19

20

21

22

23
                PHYLLIS K. McLARTY, RMR, FCRR, CCR #1235
24                 Federal Official Court Reporter
                        911 Jackson Avenue East
25                       Oxford, MS  38655
```

```
 1   APPEARANCES:

 2   For the Plaintiffs:  ARI J. SAVITZKY, Esquire
                          MING CHEUNG, Esquire
 3                        VICTORIA OCHOA, Esquire
                          American Civil Liberties Union Foundation
 4                        125 Broad Street, 18th Floor
                          New York, NY  10004
 5

 6                        JONATHAN K. YOUNGWOOD, Esquire
                          JANET A. GOCHMAN, Esquire
 7                        Simpson Thacher & Bartlett
                          425 Lexington Avenue
 8                        New York, NY  10017

 9
                          V. NOAH BENJAMIN GIMBEL, Esquire
10                        KATE LAMBROZA, Esquire
                          Simpson Thacher & Bartlett
11                        900 G St. NW
                          Washington, DC  20001
12

13                        SABRINA S. KHAN, Esquire
                          Southern Poverty Law Center
14                        403 Washington Avenue
                          Montgomery, AL  36104
15

16                        BRADLEY E. HEARD, Esquire
                          Southern Poverty Law Center
17                        1101 17th St. NW, Suite 550
                          Washington, DC 20036
18

19                        AHMED K. SOUSSI, Esquire
                          Southern Poverty Law Center
20                        150 E. Ponce de Leon Avenue
                          Suite 340
21                        Decatur, GA  30030

22
                          JOSHUA F. TOM, Esquire
23                        AYANNA DENISE HILL, Esquire
                          ACLU of Mississippi
24                        P.O. Box 2242
                          Jackson, MS  39225-2242
25
```

```
1    For the Defendants:   CHARLES E. COWAN, Esquire
                           MICHAEL B. WALLACE, Esquire
2                          Wise Carter Child & Caraway, P.A.
                           P.O. Box 651
3                          Jackson, MS  39205-0651

4
                           JUSTIN LEE MATHENY, Esquire
5                          REX MORRIS SHANNON, III, Esquire
                           ELIZABETH WINDSOR USRY, Esquire
6                          Mississippi Attorney General's Office
                           P.O. Box 220
7                          Jackson, MS  39205-0220

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

# TABLE OF CONTENTS

| DEFENDANTS' WITNESSES | DIRECT | CROSS | REDIRECT | RECROSS | FURTHER REDIRECT |
|---|---|---|---|---|---|
| Christopher Bonneau, Ph.D. | 782 | 818 | 876 | 889 | 892 |
| David A. Swanson, Ph.D. | 893 | | | | |

*Bonneau - Direct*

1    (CALL TO ORDER OF THE COURT AT 1:34 P.M.)

2         **THE COURT:**  Okay.  So we're back on the record.

3         And are the defendants ready to call a witness?

4         **MR. WALLACE:**  We are, Your Honor.

5         **THE COURT:**  You may proceed.

6         **MR. WALLACE:**  We would call Dr. Christopher Bonneau to

7    the stand.

8    (OATH WAS ADMINISTERED BY THE COURTROOM DEPUTY.)

9         **COURTROOM DEPUTY:**  Thank you.  You may take the stand.

10        **MR. WALLACE:**  You ready?

11        **THE WITNESS:**  Let's go.

12        **MR. WALLACE:**  May I proceed, Your Honor?

13        **THE COURT:**  You may.

14   **CHRISTOPHER BONNEAU, Ph.D., DEFENDANTS' WITNESS, AFTER BEING**

15         **DULY SWORN, WAS EXAMINED AND TESTIFIED AS FOLLOWS:**

16                          **DIRECT EXAMINATION**

17   **BY MR. WALLACE:**

18   **Q.**   Would you state your name, please.

19   **A.**   Sure.  Christopher Bonneau.

20   **Q.**   What do you do for a living?

21   **A.**   I'm a professor of political science.

22   **Q.**   Where?

23   **A.**   At the University of Pittsburgh.

24   **Q.**   All right.  Before we go further with what you're doing

25   at Pittsburgh, can you give us the benefit of your educational

*Bonneau - Direct*

1  background up through the university system?

2  **A.**  I received my bachelor's degree from Valparaiso

3  University in 1997, with a major in political science, geology,

4  and humanities.

5  **Q.**  Before you go any further, is there anything in

6  particular that people in Oxford ought to remember about

7  Valparaiso University?

8  **A.**  Oh, I don't know.  Maybe -- I will say brushed through

9  with one of my residents when I was an RA in the residence

10  hall; so --

11  **Q.**  We won't hold it against you.  Proceed, please, sir.

12  **A.**  I then received a master's degree from Ball State

13  University, another master's degree from Michigan State

14  University, and a -- both in political science -- and a Ph.D.

15  in political science from Michigan State University.

16  **Q.**  Michigan State.  And after you received your Ph.D.,

17  where -- I presume you taught.  Where did you teach?

18  **A.**  I did.  I received a job at the University of Pittsburgh,

19  where I have been for the last 22 years.

20  **Q.**  All right.  I'm going to ask you, as part of your

21  academic research, to summarize the sorts of research you have

22  done regarding elections.  That may take a while, but give us

23  the high spots.

24  **A.**  My research is primarily in judicial elections,

25  specifically state supreme court elections.  I invoke -- I

*Bonneau - Direct*

1    utilize a quantitative approach.  That is, I collect data and

2    seek answers to questions that can be answered.  Such as, what

3    are the determinants of electoral competition?  What makes it

4    more likely incumbent would be contested?  What effects do

5    campaign spending have on elections?  And so that's kind of a

6    general gist.

7    **Q.**    What kind of records do you keep on judicial elections?

8    **A.**    Well, for -- for my dissertation, I started -- you know,

9    my research covers all judicial elections across all of the

10   states.  And so I started, you know, maintaining a database of

11   state supreme court elections beginning around 1996 that I

12   updated up until around 2016 or so.  And, then, for this case,

13   I went and collected additional years just for the state of

14   Mississippi.

15   **Q.**    And that's maintained in your database to this day?

16   **A.**    Correct.

17   **Q.**    Okay.  Have you done any -- the judicial elections in

18   Mississippi are nonpartisan.  Have you done any research on

19   nonpartisan elections?

20   **A.**    One of the important questions in political science is

21   are there differences between partisan elections and

22   nonpartisan elections.  And so, yes, I have looked at

23   nonpartisan elections as well as partisan elections.

24   **Q.**    And I'll ask you what you found when we get into the

25   substance of your testimony.  Have you ever been qualified as

*Bonneau - Direct*

1  an expert in any other litigation?

2  **A.**  I have.

3  **Q.**  And what case was that?

4  **A.**  Oh.  So I was qualified in Alabama in the case of *NAACP*

5  *versus State of Alabama,* which was about judicial districts.

6  And then I was also qualified in a campaign finance case in

7  Colorado, *Lopez versus Griswold.*

8  **Q.**  Okay.  We'll ask you a little more about that Alabama

9  case later on.

10  You have told us you have done a lot of research.  You

11  maintain a database.  Give us an idea of what sort of

12  publications you've produced relevant to judicial elections.

13  **A.**  Relative to judicial elections, I am the coauthor of two

14  books, as well as I have edited an additional book on judicial

15  elections.  I have also written numerous scholarly articles --

16  I want to say 12 to 15 -- on judicial elections, and as well as

17  some edited book chapters and so on.

18  **MR. WALLACE:**  Okay.  I'm going to ask you to put D-6

19  up on the screen, please.

20  **BY MR. WALLACE:**

21  **Q.**  Unfortunately, the way we did this, D-6 is sort of a

22  compound exhibit, but there's no objection to either part

23  according to the pretrial order.

24  What is that first page, Appendix A, of Exhibit 6?

25  **A.**  So that is a list of the elections in District 1 for

*Bonneau - Direct*

1  Mississippi State Supreme Court from 2000 to 2020.

2  **Q.**  Okay.  And you have identified incumbents, and you have

3  identified African Americans; is that right?

4  **A.**  Correct.  Incumbents are in bold.  African Americans are

5  in italics.

6  **Q.**  And that's just a summary of the returns you found in

7  your research?

8  **A.**  Exactly.

9      **MR. WALLACE:**  And would you go to the next page,

10  please, the next page with something on it.  All right.

11  **BY MR. WALLACE:**

12  **Q.**  Is that your CV?

13  **A.**  It is.

14  **Q.**  Okay.  And did you prepare that and submit it along with

15  your report?

16  **A.**  I did.

17  **Q.**  All right.

18      **MR. WALLACE:**  Your Honor, as I say, I apologize for

19  the compound exhibit, but we are going to ask for the admission

20  of Exhibit 6.  And we are going to ask that this witness be

21  qualified as an expert in political science.

22      **THE COURT:**  First, regarding Exhibit 6, is there any

23  objection?

24      **MR. CHEUNG:**  No objection, Your Honor.

25      **THE COURT:**  It will be received.

*Bonneau - Direct*

1    Any objection to him being received by this Court as

2  an expert?

3    **MR. CHEUNG:**  No objection, Your Honor.

4    **THE COURT:**  He will be received as an expert.

5    **MR. WALLACE:**  All right.  Let's go back to that first

6  page on the little chart, please.

7  **BY MR. WALLACE:**

8  **Q.**  These appear to be all of the elections of the 20th

9  century.  Can you just tell us generally what this shows?

10  **A.**  What this shows is it looks at District 1 State Supreme

11  Court elections, and it shows which candidates won, which

12  candidates lost, names of those candidates, as well as the

13  percentage of the vote received by the winning candidates.

14  **Q.**  And so -- so as I look at it, you have incumbents winning

15  and losing.  You have Black candidates winning and losing.

16  There isn't -- is there a consistent message that comes through

17  this summary?

18  **A.**  Well, the general message I believe, if I were to say, is

19  that the incumbents almost always win, with the exception of

20  the Kitchens/Smith election in 2008.  And when there is a

21  challenge, that is, when there are multiple candidates for a

22  race, it tends to be a pretty competitive race, again, with the

23  exception of the Waller/Grindstaff race in 2004.

24  **Q.**  Okay.  And Grindstaff apparently was White?

25  **A.**  Yes.

*Bonneau - Direct*

1  **Q.**   Okay.  Now, I want to get a little history, and then we
2  will put these elections in the context of the history
3  professor.

4  How long has Mississippi been electing judges?
5  **A.**   Mississippi has been electing judges since their
6  constitution in 1832.

7  **Q.**   Okay.  Was that an unusual thing in 1832?
8  **A.**   Well, Mississippi was the first state to elect all of its
9  judges, but the movement to start electing judges started
10 around the mid-1820s.  And so you see, when you look at states
11 who entered the Union around that time, those states tended to
12 have elections for their judges.

13 **Q.**   Okay.

14 **A.**   And so states previous to that had the appointment
15 system, similar to the federal system, and then there became
16 this movement to give the judges some independence from the
17 other branches of government and move directly to elections.
18 And then that's evolved over time.

19 **Q.**   And Mississippi was the first state to go whole hog and
20 elect them all?

21 **A.**   For all of its judges, yes.

22 **Q.**   I want to ask you about districts.  Mississippi elects
23 judges out of districts.  How common is that among the other
24 states where supreme courts are elected?

25 **A.**   So looking at supreme court elections only, state supreme

*Bonneau - Direct*

1  court elections -- because if we are looking at lower courts,

2  obviously those are districts -- Mississippi is one of four

3  states that elects judges not statewide in districts.

4  **Q.**  Okay.  And of those four states, how many are partisan

5  and how many are nonpartisan?

6  **A.**  So Mississippi, in many ways, is the only one of its

7  kind.

8      So if we look at the four, we have Louisiana, which

9  elects judges in partisan elections in districts.

10     We have Illinois, which uses partisan elections in

11  districts and then retention elections later on.  It's a bit of

12  a wonky system.  But in their districts, they have seven judges

13  on the state supreme court.  Three come from Cook County and

14  four spread out among the rest of the state.  So it's like a

15  packing system -- right? -- based on population.

16     Kentucky elects judges in seven districts.  They are

17  nonpartisan, and each district has one judge.

18     Mississippi, with nine members of the Court but only

19  three districts, has three judges from each of -- each

20  district.  So the system that Mississippi uses is in many ways

21  unique, even among those few states that utilize district

22  elections.

23  **Q.**  And in Illinois, Cook County has a district that elects

24  three separate justices?

25  **A.**  Correct.

*Bonneau - Direct*

1    **Q**.    But that's partisan?

2    **A**.    Correct.

3    **Q**.    Okay.  Everything I know about Illinois is partisan.

4    **A**.    Well, it's partisan initially, and then judges keep their

5    terms in retention elections.  So it is partisan, but then it's

6    not partisan for reelection.

7    **Q**.    And as you've done your research, do you see any

8    significant differences between states that elect on a

9    statewide basis and states like Mississippi that use districts?

10   **A**.    So if we're looking generally, what we see is that states

11   that utilize district-based elections tend to have less

12   electoral competition than states that utilize partisan

13   elections.  And they tend to -- people tend -- and they -- not

14   only are they less contested, but they are also less

15   competitive; that is, candidates tend to win with larger

16   percentages of the vote.

17   **Q**.    And that is statewide elections.  Those are less

18   competitive than district elections?

19   **A**.    No.

20   **Q**.    Oh, backwards.  Okay.

21   **A**.    Yeah.  Because districts, right -- because when you use

22   districts, right, most states -- if you look and say, for

23   example, the partisan breakoff states, it's much closer, right,

24   than it is in certain districts; right?

25        We can see this, for example, in legislative elections.

*Bonneau - Direct*

1   Like, why do we draw legislative districts, right, to pack

2   members of a certain party in one district as opposed to have

3   them more spread out?  We get all of these safe seats.

4        And so you end up getting in district elections much more

5   homogenous preferences.

6   **Q.**   Okay.  So districts tend to be less competitive?

7   **A.**   Correct.

8   **Q.**   All right.  What are the differences you see in judicial

9   elections between partisan and nonpartisan?

10  **A.**   Well, you have a couple of differences that are

11  important.  Partisan elections are almost always contested;

12  right?  Parties have an incentive to make sure there is more

13  than one -- that they nominate a candidate to run for that

14  race.

15       Historically, nonpartisan elections have been less

16  contested, but that's changing in recent years.  Now everything

17  seems to be competitive.  Partisan elections also seem to be

18  much more competitive.

19       They tend to be closer, the electoral margin.  Partisan

20  elections involve less ballot roll-off.  And what that means is

21  there is more voter participation in partisan elections

22  compared to nonpartisan elections.

23       And so those are the big -- the big differences between

24  the two.

25  **Q.**   I'll ask you a little more about roll-off later on.

1    As you have studied the Mississippi Supreme Court
2  elections, do our elections seem to fit along with the general
3  pattern for district and nonpartisan elections as best you can
4  tell?

5  **A.**    Yeah.  Mississippi has been interesting if you look over
6  the past, say, 20, 25 years, in the sense that Mississippi
7  oftentimes has competitive elections and contested elections,
8  as Appendix A shows at least in District 1.

9    In fact, Mississippi was ahead of a lot of other states
10  with nonpartisan elections in terms of having competitive
11  elections.  But in general, the patterns, yes, are the same.
12  **Q.**    Okay.  And there's been discussion in this case about the
13  effect of having been appointed to the Mississippi Supreme
14  Court.

15    Generally, in the world of elections, what is the effect
16  of getting appointed to a position mean to your prospects for
17  keeping that position?

18  **A.**    So nationwide, about -- about a third of state supreme
19  court justices are initially appointed to their positions.  So
20  we can think about this in terms of incumbency and the
21  advantage incumbents have over challengers.

22    So in state supreme court elections, there are two types
23  of incumbents.  There are incumbents who have previously won
24  election to their office.  So they have built a campaign.  They
25  have fundraised.  They campaigned in their district and so on.

1   And then there are incumbents who are on the bench but have not

2   yet done that because they have been appointed by the governor

3   to fulfill a vacancy.

4          Even though these candidates don't have all of the

5   advantages of an incumbent who has previously been elected,

6   there is still an important signal that is sent by the fact

7   that this judge is an incumbent, this judge is willing to keep

8   his or her job, and it sends a signal that this judge is of

9   sufficient quality and also is -- you know, clears the basic

10  bar of competency and qualifications and so on.

11         And so judges who are initially appointed have an

12  advantage relative to judges who -- relative to people who are

13  not on the bench, but their advantage is not as strong as, say,

14  judges who have previously won election to the bench.

15  **Q**.    And you say that an appointment sends a signal.  A signal

16  to whom?

17  **A**.    Well, it sends a signal to voters.  If you think about

18  campaigns and what judges can say when they are running

19  campaigns, if you are an incumbent, you can run a campaign or

20  reelect Justice Brown or keep Justice Brown on the bench;

21  right?  That's an incredible signal -- right? -- that campaigns

22  can send to voters.

23  **Q**.    Okay.  And you talked about you're an incumbent either

24  because you won or you got appointed.  As you look at the first

25  district, what does the effect of incumbency appear to be in

1  the outcome of these elections?

2  **A.**   Well, I would be careful.  I don't want to necessarily

3  say about effects because that requires a different kind of

4  analysis.  What I would say is, if you look at Appendix A here,

5  what you see is that, with one exception, incumbents win their

6  bids for reelection.

7  **Q.**   Okay.  One other question about -- about judicial

8  elections.  Does a candidate's prior judicial experience have

9  an effect on how well they're able to -- successfully they're

10  able to campaign?

11  **A.**   They do.  So one of my previous studies, what we did is

12  we looked at elections where an incumbent was running to keep

13  his or her position.  And then we looked at who was challenging

14  that incumbent.  And what we found was that challengers who had

15  prior judicial experience, that is, with lower court judges,

16  performed about 4.7 points better than challengers without such

17  experience when taking on incumbents.

18  **Q.**   Okay.  Now, I want to -- I want to talk now specifically

19  about particular elections in the Central District.

20       And as I understand it, Dr. Orey calculated Black support

21  for those candidates.  You don't dispute his math, do you?

22  **A.**   I do not.

23  **Q.**   Judge will be glad to know there is no math, then, in

24  this discussion.

25  **A.**   Well, not yet.

*Bonneau - Direct*

1    **Q.**   So taking his numbers, then -- then you would have

2    analyzed them.  And let me just begin with the 2016 race.

3         Do you -- do you remember who Dr. Orey found to be the

4    Black-preferred candidate in 2016?

5    **A.**   I believe it was Justice Kitchens.

6    **Q.**   Even though he is White?

7    **A.**   Correct.

8    **Q.**   Okay.  And I don't think he did the math on Justice

9    Graves back in 2004.

10        Given what you know about the district as being a heavily

11   Black district -- whether it's a majority or not is another

12   matter -- is there any reason to think that Justice Graves was

13   not the Black-preferred candidate in that race?

14   **A.**   I would presume that he was.

15   **Q.**   Okay.  All right.  So let me ask this question.  Supreme

16   court is not the only race on the ballot.  How have supreme

17   court candidates fared in the elections you have seen when

18   farther up the ballot there was a strong Black candidate or a

19   strong Democratic candidate?

20   **A.**   Yeah.  So we can look and see -- we can compare --

21   right? -- these elections with other things further up the

22   ballot.

23        So an example would be in 2012.  President Obama won the

24   Central District -- the counties in the Central District with

25   about 54 percent of the vote in 2012.

1  Earle Banks was running for the state supreme court

2  against Justice Waller in 2012. Did about ten percentage

3  points less than President Obama did.

4  In 2020, we can look at Mike Espy who was running for the

5  senate. In District 1, in those counties, Espy received

6  54.8 percent. So almost 55 percent of the vote. Latrice

7  Westbrooks, who was running for the state supreme court in that

8  same election performed about six percentage points less than

9  Espy did.

10  And so if we look at candidates who are running at the

11  same time, we see a difference between those candidates at the

12  top of the ballot and those for the down -- like the state

13  supreme court.

14  **Q.** And this lawsuit is about the boundaries, the district

15  lines of the Central District.

16  Was there anything about the district lines that kept

17  President Obama from carrying the district?

18  **A.** No.

19  **Q.** Or Mike Espy?

20  **A.** No.

21  **Q.** All right. So let's -- let's look a little further at

22  what happened to the supreme court candidates on the bottom of

23  the ballot.

24  You talked about roll-off a little while ago. What is

25  roll-off?

*Bonneau - Direct*

1  **A**.    So now we're going to get into some math, but we will
2  keep it simple math.

3      So roll-off is a measure of voter participation.  So
4  commonly, in elections, we think about voter turnout; right?
5  What's the turnout going to be?

6      When you are looking at down-ballot elections, turnout is
7  not a very important concept because nobody turns out to vote
8  for these elections.  I mean, the candidates' families probably
9  don't even turn out to vote for these elections.  But the
10  question is, given that a voter is voting already at the ballot
11  box, do they complete their ballots?  Do they vote for all the
12  races, including those down ballot?

13      So if we have a presidential election on the ballot and,
14  let's say, a hundred people vote for that presidential
15  election, and of those hundred people, 80 vote for state
16  supreme court, ballot roll-off would be 20 percent; right?
17  20 percent of the people who turned out to vote did not choose
18  to vote for the state supreme court election even though they
19  voted at the top of the ballot election.

20      So that's what we mean by roll-off.  It's a higher
21  roll -- sorry.  So higher ballot roll-off means less voter
22  participation.

23  **Q**.    And you say you have got the ballot in your hands.  From
24  what you know about elections around the country, is there any
25  barrier that keeps a voter from going all the way to the bottom

*Bonneau - Direct*

1  of the ballot?

2  **A**.  No.

3  **Q**.  Okay.  Let's -- let me ask you this question.  Is

4  roll-off more or less common when you're dealing with a

5  nonpartisan election down at the bottom of the ballot?

6  **A**.  Roll-off tends to be higher in nonpartisan elections.

7  **Q**.  And why is that do you think?

8  **A**.  Nonpartisan elections remove a very important cue from

9  voters, that is, the political party affiliation of the judge.

10  And I like to describe it this way -- and lawyers always

11  get uncomfortable with this; so this is fun -- that when

12  lawyers come to a courtroom and they see who the judge is, they

13  have a sense of, oh, it's going to be a good day or, ugh, this

14  is going to be an uphill battle because we know that judges

15  view the law differently.  And that's okay.

16  Conservative judges view the law differently than liberal

17  judges do.  That's part of our system, and there is nothing

18  wrong with that.  There is nothing unprincipled about that.

19  There is nothing unethical about that.  It's just how the law

20  is viewed.

21  And so when you take that cue away from voters, they're

22  not necessarily sure who to vote for.  And so they are less

23  likely to participate given that absence of relevant

24  information.

25  **Q**.  So if you have got two names you don't know at the bottom

1   of the ballot, it gives you information if you know which one

2   is the Democrat and which one is the Republican?

3   **A.**   Absolutely.

4   **Q.**   Okay.  All right.  Now, is there any evidence that you

5   know of that Black voters roll off in higher proportions than

6   White voters?

7   **A.**   Not that I'm aware of.

8   **Q.**   Okay.  And you talked about information.  Justice Lamar,

9   last week, talked about Congressman Thompson's sample ballots

10  that tell people who he supports.

11      Is that one way you can deal in a campaign with the lack

12  of information, is to get people to spread information about

13  you?

14  **A.**   Yes.

15  **Q.**   Okay.  I do want to ask you, because this may have an

16  effect on how elections turn out, what do you consider to be

17  competitive election?

18  **A.**   In political science, the general margin we look for is

19  the winner wins with no more than 55 percent of the vote.  So,

20  like, a 55/45 split in a two-person race is generally what's

21  considered competitive.  Some people broaden that and look at,

22  like, 60 percent to 40 percent, but somewhere in there, we

23  would consider that to be competitive.

24  **Q.**   And if I remember correctly, was -- was Representative

25  Banks somewhere in 44 point something or other in his race back

*Bonneau - Direct*

1   in 2012?

2   **A.**   Correct.

3   **Q.**   Close to being competitive anyway?

4   **A.**   Correct.

5   **Q.**   And what is the effect of a competitive election on -- I

6   guess on both turnout and roll-off?

7   **A.**   So there are two effects of competitive elections, one

8   short term and one long term.  The short term is competitive

9   elections tend to have higher levels of voter participation

10  because the candidates are out there campaigning.  There is a

11  vigorous campaign.  It's relatively close.  And so voters are

12  participating and are more engaged.

13      The longer-term effect is that competitive elections can

14  get competitive elections.  And so if you have an incumbent who

15  is winning with 70 percent of the vote, it's unlikely that

16  person is going to draw a challenge or a serious challenge in

17  her next election bid.  Why?  Because she is untouchable.

18      Whereas, if you have somebody who only wins with

19  55 percent of the vote, that's a signal that that person might

20  be vulnerable.  And so the next election cycle, you may have an

21  even stronger challenge or even more competitive election.  And

22  so it sends signals to other potential candidates, as well as

23  to, you know, voters, donors, interested parties, that there is

24  a real -- real shot at defeating this incumbent.

25  **Q.**   Well, let's look at an example of that.  Look back at the

*Bonneau - Direct*

1    2000 election. What percentage did Chief Justice Smith get in

2    2000?

3   **A.**   52 percent.

4   **Q.**   And that would be a competitive election?

5   **A.**   Yes.

6   **Q.**   What happened to him the next time he got on the ballot?

7   **A.**   He lost.

8   **Q.**   Okay. And you think that might be an example of a future

9    opponent being encouraged by a close race?

10   **A.**   It's certainly consistent with what I said, yes.

11   **Q.**   Okay. Thank you.

12      What happens -- what have you seen to be the result, in

13    any sort of office, when elections stop being competitive?

14   **A.**   Well, when elections aren't competitive, you have a real

15    issue of accountability to the electorate. That is, the

16    incumbent has no incentive to represent the interests of his or

17    her constituents because the incumbent has no real danger of

18    losing.

19      We see this in congressional elections all of the time;

20    right? You can see this -- you know, a second effect too has

21    to do with the polarization of the body in which the incumbents

22    are sitting.

23      So, again, if we look at Congress, what we see is we have

24    a lot of people who are ideologically extreme when compared to

25    the country. And the reason for that is because they have

*Bonneau - Direct*

1    these safe seats, and so they don't need to moderate toward the

2    middle.  They don't need to actually take the positions of

3    those who don't agree with them seriously because they know

4    they're going to win anyway.  And so that makes it --

5    incredibly ineffective policymaking, decisional behavior, and

6    so on.

7    **Q.**    Is there any reason to think that some of those -- that

8    some of those problems might -- might or might not present

9    themselves in a noncompetitive judicial election?

10   **A.**    Well, you know, the state supreme courts are collegial

11   institutions.  The judges need to work together to come up with

12   opinions, much like the U.S. Supreme Court does.  And so, like,

13   the most important number is five.  You need five people to get

14   together.

15        But you also -- for important cases, you want more than

16   that.  And you want a court where people are truly trying to do

17   the right thing, not simply pandering to what they think, you

18   know, the majority of their constituents want.  So it could

19   lead to disharmony.  It could lead to more ideological

20   infighting on state supreme courts.

21   **Q.**    Okay.  Now, you said Mississippi elections are

22   nonpartisan.  Did you investigate the extent to which members

23   of political parties get involved in supreme court elections in

24   Mississippi?

25   **A.**    Sure.  So elections in Mississippi are nonpartisan, but

1  in some ways they are nonpartisan in name only.  You have

2  candidates campaigning with partisan political figures.  You

3  have partisan political figures endorsing candidates for the

4  state supreme court.  And so they are sending a cue as to which

5  voter -- as to which party supports which candidate.

6      Now, that cue is unevenly received by voters, all right,

7  because when they go into the ballot, it's not there.  And so

8  if they haven't received that cue, if they haven't received

9  that message, they are not going to know, and they are less

10  likely to participate.

11      So one of my colleagues and I, we did an experiment where

12  what we tried to do is figure out exactly how well do voters do

13  in these nonpartisan elections.  And so what we did is we took

14  some real ads that were run in other states, and we gave them

15  to some folks in an experiment.  And in one condition, we

16  identified explicitly the partisanship of the candidates, and

17  in the other condition, we did not.  We simply ran the ad --

18  right? -- with no partisanship ascribed.

19      And what we found is, in that -- in the partisan

20  condition, Republicans were able to correctly identify their

21  co-partisan, the Republican candidate, and vote for them, like,

22  95 percent of the time.  And for Democrats, it was, like,

23  92 percent of the time.

24      But in nonpartisan elections, you would expect it to be

25  even; right?  If it was truly a nonpartisan race, it was truly

1  a nonpartisan ad, it should be about 50/50.  And what we find

2  is, on the Republican side, 70 percent of Republicans in our

3  experiment were able to identify the Republican candidate and

4  about 67 percent of Democrats were able to identify the

5  Democratic candidate.

6  So they made more mistakes -- mistakes defined as voting

7  for the candidate who doesn't represent their political party.

8  They made more mistakes in nonpartisan races, but they still

9  were -- the majority -- right? -- at least two-thirds of them

10  were able to identify just on the basis of, quote/unquote,

11  "nonpartisan ads."

12  And so the signal is more noisy in nonpartisan elections.

13  You get more roll-off.  You get more, quote/unquote,

14  "mistakes," but they are not non -- they are not completely

15  stripped of partisan content.

16  **Q.**  Okay.  And looking at the election in 2020 with Justice

17  Griffis and Judge Westbrooks, did you -- did you look to see

18  what sort of efforts were being made by Judge Westbrooks and by

19  Democrats to connect themselves to each other?

20  **A.**  Sure.  Well, if you look at --

21  **Q.**  Let me stop you and ask him to put -- I think it's D-7 up

22  on the screen, which is a -- which is an appendix to one of

23  your reports.

24  All right.  So pick up and go ahead.

25  **A.**  Sure.  So here we have a Face -- sorry -- a Twitter post.

*Bonneau - Direct*

1 **Q.** Twitter post by whom?

2 **A.** By Justice Westbrooks from her campaign account, posing

3 with Congressman Bennie Thompson.  And the text is "Team

4 Westbrooks is pleased to announce the endorsement of

5 Congressman Bennie G. Thompson.  There is much at stake, and

6 whatever you can do today will make a profoundly," I think --

7 "a powerfully important difference in November."

8 **Q.** Okay.  So that is something that Judge Westbrooks'

9 campaign put on her website?

10 **A.** Correct.  Her Twitter account, yes.

11 **Q.** Twitter account.  Which I guess is now X.  I can't keep

12 up.

13 **MR. WALLACE:** Will you go on to the next picture.

14 **A.** All right.  Appendix 2 is also another tweet by Latrice

15 Westbrooks, which is the letter that Congressman Thompson wrote

16 endorsing her to -- in saying -- you know, encouraging

17 recipients of that letter to vote for Judge Westbrooks.

18 **BY MR. WALLACE:**

19 **Q.** And I'm not going to ask you to read all of it, but I

20 think you have -- and, again, that is on the Westbrooks Twitter

21 account?

22 **A.** Correct.

23 **MR. WALLACE:** Let's go on to the next page.

24 **A.** All right.  Here we have another tweet with Judge

25 Westbrooks with then Vice President Biden and -- "It was an

*Bonneau - Direct*

1  honor to meet you, Vice President Biden.  I wish you very many

2  blessings in your journey."

3  **BY MR. WALLACE:**

4  **Q.**  Okay.  And, finally, what's the last thing, Appendix 4?

5  **A.**  So Appendix 4 is a flyer from the Westbrook --

6  **Q.**  I'm sorry.  I -- tell me what that is, and then there's

7  one more.  I have lost track.  What's that?

8  **A.**  All right.  So this is a flyer for a rally, a campaign

9  event with Judge Westbrooks along with Bennie Thompson --

10  Congressman Thompson and Mike Espy.

11  **Q.**  Uh-huh.  And she puts your picture on this, doesn't she?

12  **A.**  Correct.

13  **Q.**  Okay.  Once again, this is from her Twitter account?

14  **A.**  Correct.

15  **MR. WALLACE:**  All right.  Let's move on to the next

16  one.

17  **BY MR. WALLACE:**

18  **Q.**  All right.  What -- what's that?

19  **A.**  So this is what has -- what is affectionately referred to

20  as a, quote/unquote, "Bennie ballot," which is something that

21  Congressman Thompson points out.

22  You can see at the top it says, "Sample Official

23  Democratic Election Ballot."  He sends this out to whoever is

24  on his mailing list.  It might be everybody in his district.

25  I'm not sure who the intended audience is.  And it basically

*Bonneau - Direct*

1   gives his recommendations or his endorsements for who people

2   should vote for in the -- in the election; right?

3      And so here we can see we have Hillary Clinton.  And it

4   looks like there are pictures there as well, although I -- you

5   know, that's a scary looking picture.  Obviously, Bennie

6   Thompson thinks you should vote for Bennie Thompson.  He is

7   endorsing Jim Kitchens, and, finally, for the Court of Appeals,

8   he is endorsing Latrice Westbrooks.

9   **Q.**   And all of these people are on something called the

10  "Official Democratic Election Ballot"?

11  **A.**   Correct.

12  **Q.**   Now, is this the sort of thing that would provide a cue

13  that you think voters like to have when they get down to the

14  bottom of the ballot?

15  **A.**   Yes.  If you receive this and you are a Democrat, you

16  know who represents your views.  If you receive this as a

17  Republican, you know who doesn't represent your views.  And on

18  this ballot, there is a mix of partisan races and nominally

19  nonpartisan races.

20  **Q.**   And as far as roll-off is concerned, if you take this

21  into the polling place with you, you know how to vote all the

22  way down the ballot, don't you?

23  **A.**   Correct.

24  **Q.**   Okay.

25       **MR. WALLACE:**  All right.  I want to -- let's put up

1 that summary chart from the beginning again because I want

2 to -- there you go -- want to talk about some of those

3 elections.

4 **BY MR. WALLACE:**

5 **Q.** Did you take a look at the 2008 election? You have got

6 Kitchens and Smith up there, but there was another candidate,

7 wasn't there?

8 **A.** Correct. Ceola James.

9 **Q.** And do you know whether she was Black -- which she is.

10 She's running again this year. Do you know whether she is

11 Black or White?

12 **A.** She is Black.

13 **Q.** Okay. How did she do in that election?

14 **A.** So she received 10 percent of the vote.

15 **Q.** Does that indicate to you that she would have been the

16 Black-preferred candidate in the 40-some-odd percent Black

17 district?

18 **A.** No.

19 **Q.** All right. And who in that case would be the

20 Black-preferred candidate?

21 **A.** I would have assumed -- I mean, if I remember correctly,

22 Dr. Orey did not analyze this race; so I don't know for sure.

23 But if I were betting, say, a month of your salary, I would say

24 it was Justice Kitchens.

25 **Q.** Okay. That's fine. Now, there are other offices that

*Bonneau - Direct*

1  get elected from the Central District. Do you know whether any

2  of those commissioner positions have gone to Black candidates?

3  **A**.   They have.

4  **Q**.   And I guess we can start most recently and go backwards.

5  What happened in 2023?

6  **A**.   So in 2023, we had -- let's start with going back to

7  2019.

8  **Q**.   Okay.

9  **A**.   So for 2019, for the Public Service Commission, we had

10 De'Keither Stamps, who is African American, who was the

11 preferred candidate of Black voters.  He received 49 percent of

12 the vote and lost to Republican Brent Bailey, who is White.

13       In 2023, the same two candidates squared off.

14       **MR. CHEUNG:**  Excuse me, Your Honor.  It looks like

15 Dr. Bonneau is reading from something, but I'm not aware if

16 Mr. Wallace has --

17       **MR. WALLACE:**  It's his report.

18       **THE WITNESS:**  I'm sorry.  Yeah.  It's just my report.

19 I don't know if you want to --

20       **MR. CHEUNG:**  Okay.  Just making sure because I wasn't

21 aware of Mr. Wallace handing Dr. Bonneau anything.

22       **MR. WALLACE:**  No.  No.  I'm sorry.  He does have his

23 reports unmarked.  Sorry.

24 **BY MR. WALLACE:**

25 **Q**.   Thank you.  You may continue.

*Bonneau - Direct*

1  **A.**    Okay.  So in 2023, the same candidates faced off again,

2  and in this election, presumably, Stamps was still the

3  preferred candidate of Black voters.  The only difference in

4  2023 was that Stamps is now the incumbent, and given what we

5  know about incumbency advantage, Bailey should have been able

6  to do much better in this election; yet, in this election,

7  Stamps defeated Bailey in one of the seats.

8  **Q.**    May this be an example of the kind of an election where

9  one close election encourages another shot?

10  **A.**    Yes.

11  **Q.**    Okay.  And what about the Transportation Commission in

12  those years?

13  **A.**    Sure.  So, again, we will start in 2019 where we had

14  Democratic Willie Simmons, African American, defeated Butch

15  Lee, who is White, 51 to 49.  So a close election.  African

16  American candidate won.  In --

17  **Q.**    Let me ask, was either one of them an incumbent in 2019?

18  **A.**    No.

19  **Q.**    Just an open seat race?

20  **A.**    I believe -- yes.

21  **Q.**    Okay.  And then what happened in '23?

22  **A.**    So in 2023, Simmons was the incumbent, and he faced off

23  against Republican Ricky Pennington, Jr., who's White, and he

24  won by an even bigger margin, about 54 and a half percent to

25  45.6 percent.  So the Black-preferred candidate won by an even

*Bonneau - Direct*

1  higher margin in '23 than he did in '19.

2  **Q.**   Okay.  Let's talk a little more about the public service

3  elections.  Dr. Orey looked at Lynn Posey, who was the

4  Republican nominee in 2011, and he said Lynn Posey was not the

5  Black-preferred candidate.

6      Did you go back and look at the previous election in 2007

7  involving that seat?

8  **A.**   Yeah.  So the Lynn Posey election is interesting because,

9  previously, Lynn Posey ran for that seat in 2011 -- sorry --

10  in 20 --

11  **Q.**   '07.

12  **A.**   -- 2007 as a Democrat, and then Lynn Posey was a Democrat

13  in the state legislature before that.  And so while he was not

14  analyzed in that election by Dr. Orey, I would be willing to

15  wager that he was the Black-preferred candidate in 2007.

16  **Q.**   Who was he running against?

17  **A.**   He was running against Barbour; right?  He was running

18  against Charles Barbour, Haley Barbour's nephew.

19  **Q.**   So you would expect that Governor Barbour's nephew would

20  have gotten most of the White Republican vote?

21  **A.**   I would think so, given Governor Barbour's record, yes.

22  **Q.**   Leaving Posey with the Black.  So he got the Black vote

23  as Democrat and lost it as a Republican four years later?

24  **A.**   Correct.

25  **Q.**   Okay.  And I think the only other public service election

*Bonneau - Direct*

1  that Dr. Posey -- that -- Dr. Posey -- Dr. Orey looked at was

2  the Cecil Brown race in 2015.

3      Did you look at that?

4  **A.**    I did.    In 2015, Cecil Brown, who was a White Democrat,

5  defeated Bruce Burton, a Black Democrat, in the primary, which

6  suggests that if Brown was the preferred candidate of Black

7  voters in the primary, even once you hold the political party

8  and the candidates constant, you don't necessarily see that

9  Black voters prefer or necessarily favor Black candidates.

10     So there is a difference between a Black-preferred

11  candidate and a Black candidate.

12  **Q.**    Why might have -- why might Black voters preferred a

13  White Democrat over a Black Democrat?

14  **A.**    Well, there are a number of reasons.    It could be that

15  they thought the White Democrat had a better chance of winning.

16  It could be they thought the White Democrat was more qualified.

17     But there is an important distinction in the political

18  science literature between substantive representation and

19  descriptive representation.    And both forms of representation

20  are very important, and so I don't want to suggest that one is

21  less important than the other.

22     But when we talk about descriptive representation, what

23  we think about is a bench that looks like me.    And so if you

24  have 30 percent of the population African American, a bench

25  that is descriptively representative would have 30 percent of

1   the judges be African American.  And this can be important for
2   all kinds of things, such as role models, such as legitimacy,
3   and so on.  But that does not necessarily give you substantive
4   representation, which is how does a judge rule on issues that
5   are important to me in my community.

6       In this case, all right, you may not have substantive
7   representation even if you have descriptive representation.
8   And an easy example would be if Clarence Thomas were to take on
9   Jim Kitchens for the Mississippi Supreme Court.  If Clarence
10  Thomas would win, you can say, oh, that's a victory, you know,
11  for the Black community because we now have another Black judge
12  on the Mississippi bench.

13      Yet, substantively, that would be much worse for the
14  Black community because Clarence Thomas's views and his
15  decisions don't reflect issues -- the views of that community
16  and the issues that are important to that community.  And so
17  you can have substantive representation for the African
18  American community with White candidates.

19  **Q**.   So voters, as in the Brown race in 2015, have to consider
20  what kind of representation they really want and how likely
21  they are to get it?

22  **A**.   That's one factor, yes.

23  **Q**.   Okay.  All right.  I'm going to ask you -- I promised I
24  wasn't going to do any math, and I lied.  I'm going to ask you
25  just a couple of questions in a minute.  Before I get off on

*Bonneau - Direct*

1   that, you have gone through all of these elections we have

2   talked about.

3       What -- what conclusions do you tend to draw concerning

4   the opportunity of Black voters to participate and to elect

5   candidates of their choice?

6   **A.**   I conclude that they are able to do both.  There are no

7   impediments to participation that I looked at and that they are

8   able to elect candidates of their choice.

9   **Q.**   Okay.  And, again, I'm going to ask you, in your Alabama

10  case, did you look at the question of what was driving election

11  returns, race as opposed to party?

12  **A.**   Indeed, I did.  That was the focus of my analysis, and I

13  concluded that party was the more important factor.

14          **MR. CHEUNG:**  Objection, Your Honor.  I'm not sure what

15  the relevance of his work in Alabama was to this case.

16          **THE COURT:**  I'm sorry.  I cannot hear you.

17          **MR. CHEUNG:**  Objection.  I'm not sure what the

18  relevance is -- of his Alabama work is to this case.

19          **THE COURT:**  It's overruled.

20  **BY MR. WALLACE:**

21  **Q.**   And what -- you don't have to go into any detail.  What

22  did the Court do in that case?

23  **A.**   The Court agreed with my assessment, yes, my analysis.

24  **Q.**   Now, in Alabama, you have parties on the ballot, don't

25  you?

*Bonneau - Direct*

1  **A.**   Correct.

2  **Q.**   And we don't have that in Mississippi, do we?

3  **A.**   Correct.

4  **Q.**   Do we have enough other -- other evidence in Mississippi

5  to allow you to make -- to make the sort of analysis that you

6  did in Alabama?

7  **A.**   Yes.  I mean, as you can see from not only the campaign

8  ads but also from other reports that have been filed in this

9  case, that these races are nonpartisan, really, in name only.

10 And so you have more than enough information -- and this is

11 not -- this is true not only of Mississippi but also other

12 nonpartisans states.  Candidates can signal to voters which

13 party they are endorsed by, which party they are a member of

14 even without it being explicitly on the ballot.

15 **Q.**   And what conclusion did you reach about Mississippi?

16 What's driving the differences in voting?

17 **A.**   Political party.

18 **Q.**   Okay.  Now, there's been a -- there's been a form of

19 mathematical computation used in this case called King's

20 ecological inference, and I don't want you to try to explain it

21 in detail unless you want it, unless the Judge wants it.

22     But what does King's EI generally attempt to do?

23 **A.**   So what King's EI attempts to do is back out voter

24 preferences using the aggregate data or the precinct-level

25 analysis.  So it tries to figure out how individuals or

1   individual groups voted in elections; right?  You don't know

2   how they voted because those are private decisions, but you try

3   and back out estimates from precinct level and other forms of

4   data.

5   **Q.**   Is it a perfect form of calculation?

6   **A.**   No.  I mean, these are estimates, and they may be the

7   best estimates we can get, but they are not unproblematic in

8   the sense that the results are highly dependent upon how the

9   data are specified.  And some political methodologists have

10  done some studies using simulated data to show how -- depending

11  upon how different the actual data is from the assumed nature

12  of the data, can lead to why the varying results with the EI.

13  **Q.**   Okay.  And I think that's about all I want to know about

14  that.  It's as good as you have got, but it's not perfect?

15  **A.**   Yes.

16  **Q.**   Okay.

17          **MR. WALLACE:**  Your Honor, if I may consult my

18  colleagues for a moment?

19          **THE COURT:**  You may.

20          (CONFERRING OFF THE RECORD.)

21  **BY MR. WALLACE:**

22  **Q.**   I want to go back to the Stamps and Bailey elections.

23  There were two of them, and we're not exactly sure exactly what

24  you said about the first one.

25          In 2017, was either one of those an incumbent?

*Bonneau - Direct*

1 **A.** I don't believe so, but I could be mistaken.

2 **Q.** Okay. And in 2023, by that -- and in 2023, Bailey was an

3 incumbent but Stamps wasn't; is that right?

4 **A.** Correct.

5 **Q.** Okay. And I had asked you to explain your answers and

6 how you got them. Given the imprecision of academic research,

7 are these -- are these reasonably based in standard academic

8 proceedings and are they -- and are they offered in that

9 nature?

10 **MR. CHEUNG:** Objection, Your Honor. Question is

11 vague.

12 **THE COURT:** It's overruled.

13 **A.** Can you -- well, I find that -- can you rephrase that

14 one? What do you mean by "these things"?

15 **BY MR. WALLACE:**

16 **Q.** Yeah. I mean, are you following generally accepted

17 procedures and principles in social science?

18 **A.** In my research?

19 **Q.** In your research.

20 **A.** In this report? Yes.

21 **Q.** Yes. Okay. I think that's what I wanted to ask.

22 **A.** Okay.

23 **MR. WALLACE:** I don't think we have any other

24 questions. Thank you, Your Honor.

25 **THE COURT:** Cross-examination.

*Bonneau - Cross*

1    **MR. CHEUNG:**  Good afternoon, Your Honor.  Ming Cheung

2    with the ACLU for the plaintiffs.

3         May I proceed?

4         **THE COURT:**  You may.

5         **MR. CHEUNG:**  Thank you, Your Honor.

6                      **CROSS-EXAMINATION**

7    BY MR. CHEUNG:

8    **Q.**   Good afternoon, Dr. Bonneau.

9    **A.**   Good afternoon.  Good to see you again.

10   **Q.**   Yes.  We met at your deposition last September, I

11   believe.

12   **A.**   We did.

13   **Q.**   At the time, you had just become the head of the Spanish

14   and Portuguese department?

15   **A.**   I was.

16   **Q.**   Are you still head of the Portuguese and Spanish

17   department?

18   **A.**   I am.  Just don't ask me any questions in Spanish or

19   Portuguese.

20   **Q.**   Since we last met, you've also been deposed in another

21   redistricting case in Alabama, *Stone v. Allen*; is that correct?

22   **A.**   Correct.

23   **Q.**   Okay.

24        **THE COURT:**  I need you to slow down just a little bit.

25   BY MR. CHEUNG:

*Bonneau - Cross*

1   **Q.**    So turning to the work that you did in this case, you

2    submitted three reports in this case; is that right?

3   **A.**    Yes.

4   **Q.**    You submitted your first report on January 2nd, 2023?

5   **A.**    Yes.

6   **Q.**    And then you submitted a rebuttal report on

7    September 12th, 2023?

8   **A.**    Yes.

9   **Q.**    And then after your deposition in this case, you

10    submitted a supplemental report in December of 2023 addressing

11    new elections that had occurred this past November; is that

12    right?

13   **A.**    Correct.

14   **Q.**    And in each of those reports, you addressed the work done

15    by plaintiffs' expert, Dr. Orey?

16   **A.**    Correct.

17   **Q.**    And in preparing those reports, you have also reviewed a

18    report produced by Justice Oliver Diaz?

19   **A.**    Correct.

20   **Q.**    And other than Dr. Orey and Justice Diaz's reports, your

21    report does not mention any other plaintiffs' expert?

22   **A.**    I believe that's correct, yes.

23   **Q.**    So other than Dr. Orey's report and Justice Diaz's

24    report, you did not review any other plaintiffs' experts'

25    reports?

*Bonneau - Cross*

1   **A.**   I believe I might have read Dr. King's report, but I

2   didn't engage in any meaningful way, and I couldn't tell you

3   what it said.

4   **Q.**   Okay.   Thank you.

5          So I would like to begin by walking through Dr. Orey's

6   work with you and confirming the parts that you don't dispute

7   and which parts that you may disagree with.

8   **A.**   Sure.

9   **Q.**   At a high level, I understand your opinion to be that

10  racial polarization does not usually lead to the defeat of

11  Black-preferred candidates in District 1 --

12  **A.**   Right.

13  **Q.**   -- but you accept Dr. Orey's empirical analysis as true

14  and accurate.   Is that fair?

15  **A.**   That's fair.

16  **Q.**   And so to further break that down, you do not dispute the

17  accuracy of the data that Dr. Orey used?

18  **A.**   Correct.

19  **Q.**   And you do not dispute Dr. Orey's implementation

20  of ecological inference in terms of the code he used?

21  **A.**   Correct.

22  **Q.**   And you generally don't dispute the accuracy of his

23  computations?

24  **A.**   Correct.

25  **Q.**   And as part of your analysis, you take to be true the

*Bonneau - Cross*

1 estimates that Dr. Orey generated using ecological inference?

2 **A.** Correct.

3 **Q.** You also agree that ecological inference is generally

4 considered to be the most reliable method for assessing

5 racially-polarized voting?

6 **A.** Correct.

7 **Q.** And you also agree that ecological inference is widely

8 used and accepted by the courts to assess voting patterns?

9 **A.** I do.

10 **MR. WALLACE:** Your Honor, I'm going to object to that

11 one as asking for a legal opinion. I'm not sure he knows what

12 courts do.

13 **THE COURT:** It's sustained.

14 **BY MR. CHEUNG:**

15 **Q.** In terms of the potential flaw or shortcoming with EI

16 that you discussed earlier with Mr. Wallace, you mentioned that

17 some methodological experts have pointed out that the

18 specifications of the data need to be correct for EI to be

19 perfectly accurate; is that right?

20 **A.** It is.

21 **THE COURT:** I am having trouble hearing you. See if

22 you can pull that microphone just a little bit closer to you.

23 **BY MR. CHEUNG:**

24 **Q.** For that ecological point, your report cites an article

25 from, I believe, 1998 by Cho, et al.; is that right?

*Bonneau - Cross*

1   **A.**   Correct.

2   **Q.**   You do not rely on any authorities post-1998?

3   **A.**   I also talk about the Elmendorf, et al, 2016 article,

4   which also points out issues with King's EI.  Those are the two

5   that I relied on, yes.

6   **Q.**   Elmendorf is a law review article; is that right?

7   **A.**   It is.

8   **Q.**   And Elmendorf, you would not characterize it as an

9   empirical study?

10  **A.**   Well, it depends on how you define -- it's not a

11  theoretical study, but it doesn't -- it's not a peer-reviewed

12  study.  It does examine data -- right? -- and the way to

13  analyze data.  So I don't know if I would characterize it that

14  way.

15  **Q.**   Okay.  And in terms of the flaw that you had -- potential

16  flaw you identified with EI, you don't know whether or not it

17  would result in an overestimate or an underestimate of

18  racially-polarized voting?

19  **A.**   Correct.

20  **Q.**   And since the publication of the 1998 article by Cho,

21  et al, courts and experts have continued to use ecological

22  inference in voting rights cases?

23  **A.**   I mean, yes, I believe that's true.

24  **Q.**   Okay.  And you are also aware of academic research

25  showing that exit polls corroborate the result of an estimate

*Bonneau - Cross*

1 obtained from ecological inference?

2 **A.** Correct.

3 **Q.** And you would agree that that corroboration provided by

4 exit polling is an indication that ecological inference is a

5 valid method of estimating voter turnout?

6 **A.** I would agree that it gives us another piece of evidence

7 that -- that -- yes, that EI is -- is -- yes, that EIs can be

8 accurate, yes. Uh-huh.

9       **MR. CHEUNG:** Your Honor, I'd like to show Dr. Bonneau

10 an academic article that has been pre-marked as PX-82. May I

11 approach?

12       **THE COURT:** You may.

13 **BY MR. CHEUNG:**

14 **Q.** Dr. Bonneau, do you recognize PX-82?

15 **A.** I do.

16 **Q.** Is it an academic article evaluating the use of

17 ecological inference in voting rights cases?

18 **A.** Yes.

19 **Q.** Do recall reviewing this article at your deposition last

20 year?

21 **A.** I do.

22 **Q.** And the iterative EI and EI-R x C methods mentioned in

23 the article were also used by Dr. Orey in his reports; correct?

24 **A.** Correct.

25 **Q.** And does that article appear in the peer-reviewed journal

*Bonneau - Cross*

1  called *Sociological Methods & Research*?

2  **A.**   It does.

3  **Q.**   The two lead authors are Matt Barreto and Loren

4  Collingwood; is that right?

5  **A.**   It is.

6  **Q.**   And you are generally familiar with Barreto and

7  Collingwood's academic work?

8  **A.**   I am.

9  **Q.**   And you know Barreto and Collingwood to be reputable in

10 the field of political science?

11 **A.**   I do.

12       **MR. CHEUNG:**  Your Honor, at this time, I would offer

13 PX-82 as a learned treatise under Federal Rules of Evidence

14 803(18) and request permission to ask Dr. Bonneau to read

15 selective portions from the article.

16       **MR. WALLACE:**  Your Honor, I think under the learned

17 treatise exception, he is entitled to cross him on it and

18 entitled to have him read parts of it, but it's still hearsay,

19 and I don't think the article itself comes into evidence.

20       **MR. CHEUNG:**  Your Honor, we are not seeking admission

21 of the entire article, just for selected portions to be read by

22 Dr. Bonneau, which I believe are now under 803(18).

23       **THE COURT:**  You may ask him about selected portions.

24       **MR. CHEUNG:**  Okay.

25 BY MR. CHEUNG:

*Bonneau - Cross*

1  **Q.**    Dr. Bonneau, I believe if you flip through it, there will
2  be highlighted portions --

3  **A.**    Uh-huh.

4  **Q.**    -- of the article.

5  **A.**    Yes.

6  **Q.**    Would you mind reading the highlighted portions to us?

7  **A.**    Sure.

8          Page 274.  "Across the 78 candidates and 193 vote
9  choices -- vote choice scenarios we analyzed, there is no
10 convincing evidence that either iterative EI or R x C is biased
11 toward or against findings of RPV.  For social sciences and
12 legal scholars interested in analyzing RPV when only ecological
13 data are present, both approaches can be relied upon as they
14 lead to substantively similar conclusions about the presence or
15 absence of RPV."

16         Page 275.  "Beyond this, we demonstrate that both the
17 iterative EI and the R x C methods produce results in line with
18 individual-level exit poll data."

19         Page 283.  "We also did not find any convincing evidence
20 that EI will lead analysts to reach conclusions in favor of
21 RPV."

22         Page 290.  "Our findings demonstrate that not only do EI
23 and R x C produce remarkably similar estimates, but that the
24 results match -- closely match the individual-level estimates
25 from the *LA Times* poll.  More specifically, the EI method

1  estimates Villaraigosa receiving 83 percent of the Latino vote

2  and only 44 percent of the Anglo vote; the R x C method

3  estimates Villaraigosa receiving 82 percent of the Latino vote

4  and just 48 percent of the Anglo vote.  If the task is to

5  evaluate a pattern of RPV, both methods closely match the

6  conclusion one would draw from the exit poll, which reports

7  that an estimated 84 percent of Latinos voted for Villaraigosa,

8  while only 50 percent of Anglo voters made the same choice.

9  Moreover, the EI and R x C estimates are all within the margin

10  of error of the individual-level data reported by the *LA Times*

11  exit poll.  In sum, this comparison provides additional

12  evidence that both methods may be useful in evaluating RPV in

13  VRA cases."

14      Now I can see why you asked me about Spanish.

15  **Q**.   Thanks for reading that.  There's one other sentence that

16  hasn't been highlighted but I would like to direct your

17  attention to as well.

18      Can you turn to page 276 of that article?

19  **A**.   Yes.

20  **Q**.   Can you read that first complete sentence, beginning with

21  "Since the late 1990s"?

22  **A**.   "Since the late 1990s, EI has been the benchmark method

23  courts rely upon to evaluate RPV patterns in voting rights

24  lawsuits."

25  **Q**.   Okay.  Thank you.

*Bonneau - Cross*

1    And, Dr. Bonneau, you have no reason to disagree with any

2    of the passages you have just read from this article; right?

3    **A.**    No.

4         **MR. CHEUNG:**  Ms. Ruiz, can we please pull up PX-11.

5         PX-11 contains the results of Dr. Orey's ecological

6    inference analysis and has been admitted into evidence.

7    **BY MR. CHEUNG:**

8    **Q.**    Dr. Bonneau, does this appear to be Dr. Orey's results?

9    **A.**    It does.

10   **Q.**    And do you recall that Dr. Orey initially looked at 17

11   biracial elections involving a White candidate running against

12   a Black candidate in District 1?

13   **A.**    Sounds familiar.

14   **Q.**    And then after the 2023 election, Dr. Orey looked at the

15   two additional races in District 1 involving a Black candidate

16   running against a White candidate; is that right?

17   **A.**    I believe so.

18   **Q.**    And in those 19 elections in total, Dr. Orey found out

19   Black voters typically voted for the Black candidate about

20   90 percent of the time.  Is that fair?

21   **A.**    Yes.

22   **Q.**    And in those same 19 elections, Dr. Orey found that White

23   voters typically voted for the Black candidate less than

24   15 percent of the time?

25   **A.**    Yes.

1    **Q.**   And Dr. Orey's estimates for how Black and White

2    Mississippians voted are consistent with your understanding of

3    voting patterns among Black and White voters.  Is that true?

4    **A.**   I believe so, yes.

5    **Q.**   And so is it fair to say that you do not dispute that

6    Black voters in Mississippi vote cohesively for one set of

7    candidates while White voters in Mississippi vote cohesively

8    for another set of candidates?

9    **A.**   I think it's clear that Black voters in Mississippi vote

10   cohesively for one set of candidates.  I'm not sure I would

11   agree with the second part, that White voters vote -- at least

12   they don't vote as cohesively as Black voters do.

13   **Q.**   Not as cohesively but, nonetheless, cohesively?

14   **A.**   I don't know if I can comment on that.  I don't see --

15   yeah.

16   **Q.**   Okay.  But in terms of -- you would agree that White

17   Mississippians typically support candidates from the Republican

18   party?

19   **A.**   Yes.

20   **Q.**   And you would agree that the level of support that

21   Republican candidates receive from White voters is pretty high?

22   **A.**   Yes.

23   **Q.**   And you would agree that virtually everyone knows that

24   Black and White voters tend to support different candidates?

25   **A.**   Yes.

*Bonneau - Cross*

1  **Q.**   And Dr. Orey broke down the elections that he examined

2  into three categories.  Do you recall that?

3  **A.**   I do.

4  **Q.**   And those categories were endogenous elections,

5  quasi-endogenous elections, and exogenous elections?

6  **A.**   Correct.

7  **Q.**   And just to make sure we understand those terms and are

8  on the same page, an endogenous election refers to an election

9  that takes place within the district lines being challenged for

10  the same political office as the one at issue in the case?

11  **A.**   Yes.

12  **Q.**   And so in this case, an endogenous election refers to

13  past supreme court elections?

14  **A.**   Correct.

15  **Q.**   And within Dr. Orey's analysis, going back to 2011, there

16  were only two supreme court elections involving Black and White

17  candidates?

18  **A.**   I believe that's correct.

19  **Q.**   And in both of those supreme court elections, the Black

20  candidate lost?

21  **A.**   Only if you omit the uncontested races.

22  **Q.**   Yes.  In elections involving a Black candidate and a

23  White candidate?

24  **A.**   Okay.  Yes.  So if we are only looking at those subset of

25  data, then, yes.

*Bonneau - Cross*

1 **Q.** And looking at the 2020 race, which is shown on the

2 screen here, Judge Westbrooks lost the election after earning

3 about 90 percent of the Black vote and about 6 percent of the

4 White vote; is that right?

5 **A.** That is.

6 **Q.** And overall, she earned 48 and a half percent of the

7 vote?

8 **A.** Correct.

9 **Q.** Given the level of cohesion among Black voters, you would

10 agree that, all else being equal, increasing the BVAP of the

11 district by 1 percent would typically increase the

12 Black-preferred candidate's vote share by about .9 percentage

13 points; is that right?

14 **A.** Possibly. I mean, depending upon turnouts, depending

15 upon a whole bunch of other factors. So, sure, that's

16 possible.

17 **Q.** If turnout were constant?

18 **A.** If turnout were constant, then, yes.

19 **Q.** Okay. Thank you.

20 And if you increase the BVAP of District 1 by, say, 3 to

21 4 percentage points and voter turnout and polarization remain

22 constant, Judge Westbrooks likely would have won in 2020?

23 **A.** I mean, assuming those things are held constant is a big

24 assumption, but if we make that assumption, then, yes.

25 **Q.** So let's look at Table 2 on the same PX-11. Here,

*Bonneau - Cross*

1 Dr. Orey reports a series of quasi-endogenous elections.

2 Do you see that?

3 **A.** I do.

4 **Q.** And those elections refer to elections that use the same

5 district lines as those being challenged but where the lines

6 are being used to elect a different political office?

7 **A.** Yes.

8 **Q.** And so in this case, a quasi-endogenous election refers

9 to commissioner elections in District 1?

10 **A.** Yes.

11 **Q.** At the time that Dr. Orey wrote his initial report, there

12 were five commissioner elections involving Black and White

13 candidates?

14 **A.** Correct.

15 **Q.** And since his report, there have been two more

16 commissioner elections involving Black and White candidates,

17 making a total of seven?

18 **A.** Yes.

19 **Q.** And in those seven quasi-endogenous elections, Black

20 candidates prevailed three times?

21 **A.** Yes.

22 **Q.** And I think you testified earlier that Commissioner

23 Simmons was one of those Black commissioner candidates.

24 Initially won in 2019 and won again in 2023 as the incumbent?

25 **A.** Yes.

*Bonneau - Cross*

1  **Q.**  And De'Keither Stamps won in 2023 after losing in 2019?

2  **A.**  Correct.

3  **Q.**  Dr. Bonneau, you discussed earlier that Commissioner Lynn

4  Posey is an example of why partisanship matters in these

5  elections; right?

6  **A.**  I think it's an example, right, of how political party is

7  a dominant factor, yes.

8  **Q.**  And you note that, in 2007, Posey was probably the

9  candidate preferred by Black voters when he ran against a

10  Democrat -- when he ran as a Democrat against Charles Barbour?

11  **A.**  Correct.

12  **Q.**  And then in 2011, you say Black voters preferred Posey's

13  opponent, not agreeing when Posey ran as a Republican?

14  **A.**  Correct.

15  **Q.**  You would agree with me that Posey's opponent in 2007,

16  Charles Barbour, was White?

17  **A.**  Oh, yes.

18  **Q.**  And you agree with me that Posey's opponent in 2011,

19  Addie Green, was Black?

20  **A.**  Yes.

21  **Q.**  There is no empirical analysis of racially-polarized

22  voting for the 2007 election; right?

23  **A.**  No.

24         **MR. CHEUNG:**  Can we scroll down to the second page of

25  PX-11.

*Bonneau - Cross*

1  **BY MR. CHEUNG:**

2  **Q.**  So on to the final category of elections that Dr. Orey

3  examined, an exogenous election refers to election results

4  within the challenged district but for statewide elections; is

5  that right?

6  **A.**  It is.

7  **Q.**  And so in this case, an exogenous election would include

8  results within District 1 for races like president, governor,

9  and attorney general?

10  **A.**  Yes.

11  **Q.**  And you agree that, when we are looking at elections

12  for -- different elections for different positions than the

13  office we are analyzing, there may be different political

14  dynamics that affect voter behavior?

15  **A.**  Yes.

16          **THE COURT:**  Could you repeat that?

17          **MR. CHEUNG:**  Sure.

18          **THE COURT:**  I didn't hear it.

19  **BY MR. CHEUNG:**

20  **Q.**  You would agree that, when we are looking at elections

21  for different positions than the office we are analyzing, there

22  may be different political dynamics that affect voter behavior?

23  **A.**  Sure.

24  **Q.**  And one difference is that, for these statewide

25  elections, winning District 1 doesn't mean that the candidate

*Bonneau - Cross*

1 wins elected office; right?

2 **A.** Well, right. They may lose statewide but won District 1.

3 **Q.** And so going back to 2011, there have been ten statewide

4 elections involving Black and White candidates; right?

5 **A.** Correct.

6 **Q.** And in those ten statewide elections, the Black candidate

7 won in District 1 six times?

8 **A.** Correct.

9 **Q.** And all six of those ten Black candidates who won

10 District 1 still lost statewide?

11 **A.** That's -- I guess. I don't know. I just look at

12 District 1. I'm assuming.

13 **Q.** So looking at this chart, do you see any candidate that

14 you believe won Mississippi?

15 **A.** I do not.

16 **Q.** And so just to sum up the results from the three tables,

17 if we look only at supreme court judicial elections in which a

18 Black candidate is competing against a White candidate, then

19 Black candidates won zero out of two?

20 **A.** Yes. But I would say we are not looking at all of the

21 relevant data for that; so...

22 **Q.** And if we look at all biracial elections in District 1

23 going back to 2011 -- well, let me take a step back. If we

24 look at both supreme court and commissioner elections, then

25 Black candidates won three out of nine elections?

*Bonneau - Cross*

 1 **A.** Again, if we are only looking at elections involving a

 2 Black candidate and a White candidate.

 3 **Q.** And if we look at all biracial elections in District 1

 4 going back to 2011, then Black candidates won 9 out of 19?

 5 **A.** Subject to the same caveat, yes.

 6 **Q.** And you're aware of the *Gingles* factors that are used in

 7 voting rights cases?

 8 **A.** I am.

 9 **Q.** And your understanding of the third *Gingles* factor is

10 that it asks whether White voters vote sufficiently as a bloc

11 to usually defeat the minority's preferred candidate?

12 **A.** Yes.

13 **Q.** And you understand the term "usually" to mean more often

14 than not?

15 **A.** Yes.

16 **Q.** So going back to the elections where the Black candidate

17 won within District 1 --

18 **A.** Uh-huh.

19 **Q.** -- Black and White voters continued to be voting

20 cohesively against each other in those races as well?

21 **A.** From Table -- from Tables 1 and 2, yes.

22 **Q.** And what about Table 3?

23 **A.** Yes.

24 **Q.** And in the report that you prepared for this case, you do

25 not dispute Dr. Orey's opinion that, when assessing voter --

1  voting patterns, endogenous elections are generally considered

2  the most probative data points?

3         **MR. WALLACE:**  Your Honor, I object.  He is asking for

4  a legal opinion.  It's what's most relevant to a Court.

5         **THE COURT:**  Let me read this again.

6         **MR. CHEUNG:**  I'm sorry, Your Honor?

7         **THE COURT:**  I want to read it again, please.

8      (PAUSE IN PROCEEDINGS.)

9         **THE COURT:**  It's overruled.

10  **A.**   Can you repeat the question, please?

11  **BY MR. CHEUNG:**

12  **Q.**   Sure.

13         In your reports for this case, you do not dispute

14  Dr. Orey's opinion that, when assessing voting patterns,

15  endogenous elections are generally considered the most

16  probative data points?

17  **A.**   The most probative, yes.

18  **Q.**   And in terms of level of probity, that would be followed

19  by the quasi-endogenous elections and then exogenous elections?

20  **A.**   Correct.

21         **MR. WALLACE:**  Same objection.

22         **THE COURT:**  Overruled.

23  **BY MR. CHEUNG:**

24  **Q.**   And based on all of the data that you have -- that you

25  have reviewed for this case, you do not have an opinion as to

*Bonneau - Cross*

1 whether or not the third *Gingles* precondition has been proven?

2 **A.** Correct.

3 **Q.** Earlier today you testified it's possible that the voting

4 patterns that Dr. Orey observed could be explained by partisan

5 reasons as opposed to racial reasons; is that right?

6 **A.** That is.

7 **Q.** And I think you already testified that you believe Black

8 voters in Mississippi vote overwhelmingly for Democratic

9 candidates?

10 **A.** Correct.

11 **Q.** And you also believe that White voters in Mississippi

12 typically vote for Republican candidates in very high numbers

13 as well?

14 **A.** Yep.

15 **Q.** And in terms of why Black voters are more likely to vote

16 for Democrats, you believe there are historical and current

17 policy reasons for that; right?

18 **A.** Correct.

19 **Q.** Those reasons would include the Democratic party passing

20 the Civil Rights Act and the Voting Rights Act in the 1960s?

21 **A.** That's one reason.

22 **Q.** The Civil Rights Act ended racial discrimination in

23 places of public accommodation?

24 **A.** Yes.

25 **Q.** And the Voting Rights Act removed a lot of the

*Bonneau - Cross*

1  impediments to voting that Black Americans faced?

2  **A.**  Indeed.

3  **Q.**  And another reason why Black voters tend to support a

4  Democratic party is that the party tends to promote social

5  policies that address issues like educational disparities?

6  **A.**  Yes.

7  **Q.**  Another reason why Black voters support Democrats is

8  because the Democratic party has been much more open in terms

9  of nominating and electing Black candidates?

10  **A.**  Absolutely.

11  **Q.**  And in terms of why White voters are more likely to vote

12  for Republican candidates, one of the reasons is that the

13  Republican party has done a really good job of appealing to a

14  time in the past when White people were more prominent; right?

15  **A.**  Yes.

16  **Q.**  And would you agree that, at the state level, the

17  Republican party of Mississippi has consistently held the

18  governorship and the majority of both houses of the legislature

19  over at least the last decade?

20  **A.**  Over the last decade, yes.

21  **Q.**  Are you aware of any legislation that was enacted by

22  Mississippi last year that took away the ability of voters in a

23  predominantly Black city to elect certain judges and

24  prosecutors?

25  **A.**  I believe you are referring to the bill involving

*Bonneau - Cross*

1  Jackson, Mississippi.  Yes.

2  **Q.**  And that law was called HB 1020; is that right?

3  **A.**  Sounds right.

4  **Q.**  And you gave a quote about HB 1020 to Yahoo! News?

5  **A.**  That you reminded me of at our deposition, yes.

6  **Q.**  HB 1020 specifically created appointed judges in Jackson;

7  is that right?

8  **A.**  Yes.

9  **Q.**  And the quote that you gave was, "But what makes this

10  Mississippi situation abnormal is that the legislature is

11  proposing a different way of selecting prosecutors and judges

12  but for only one part of -- one area of the state."

13      Does that sound right?

14  **A.**  It does.

15  **Q.**  And you added, "And all of the local representatives from

16  that area object to it"?

17  **A.**  I did.

18  **Q.**  That quote you provided to Yahoo! News later appeared in

19  an article with the headline "Mississippi House Bill Will

20  Create White-Appointed Court System for Blackest City in

21  America."

22      Do you recall that?

23  **A.**  I recall, yeah, that's the headline.  I hasten to add, it

24  was not written by me.

25  **Q.**  But that headline is consistent with your understanding

*Bonneau - Cross*

1   of HB 1020?

2   **A.**   Yes.

3   **Q.**   In your decades-long career as a political scientist

4   focusing on state courts, you have almost never seen a

5   situation like HB 1020 before, if at all?

6   **A.**   Correct.

7   **Q.**   And based on those facts, you can certainly see why

8   officials from Jackson would feel like HB 1020 is

9   discriminatory against a majority Black city?

10  **A.**   Yes.

11  **Q.**   I want to turn to other historical events related to

12  political alignment in Mississippi.

13        In terms of the party alignment, historically, it wasn't

14  always the case that Black voters were Democrats and White

15  voters were Republicans; is that right?

16  **A.**   Correct.

17  **Q.**   There was a party realignment that resulted in Black

18  voters becoming Democrats and White voters becoming

19  Republicans?

20  **A.**   Correct.

21  **Q.**   And in your mind, there is no question the passage of the

22  Civil Rights Act and the Voting Rights Act contributed to that

23  realignment and the current configuration of the parties today?

24  **A.**   Correct.

25  **Q.**   You also agree that, because those laws were enacted in

*Bonneau - Cross*

1   the 1960s, it was not that long ago that Black voters faced

2   institutionalized oppression where they were not treated as

3   full citizens of this country?

4   **A.**   Yes.

5   **Q.**   You would also say it's naive to assume that the vestiges

6   of that institutionalized discrimination no longer exists

7   today?

8   **A.**   I would.

9   **Q.**   And you would agree that the effects of that historical

10  discrimination continue to permeate life today in terms of the

11  opportunities available to Black people?

12  **A.**   Indeed.

13  **Q.**   And that history of discrimination continues to be

14  visible in other aspects of life today, such as disparities in

15  education and health?

16  **A.**   Yes.

17  **Q.**   Relying on political science research that you have cited

18  in your past publications, you have written that, "Because of

19  the history of discrimination that African Americans in the

20  United States have faced, there is a perception that, quote,

21  'African-American judges might be more sympathetic to less

22  fortunate people.'"  Is that right?

23  **A.**   I did write that.

24  **Q.**   You have also written in an academic publication that,

25  quote, "Since most criminal defendants are either poor or

*Bonneau - Cross*

1　racial minorities, it is not hard to imagine that

2　African-American judges would be more sympathetic to defendants

3　because of their own negative experiences in society"?

4　**A.**　Correct.

5　**Q.**　Earlier, you discussed two examples of Black voters --

6　two instances of Black voters who supported a White candidate

7　over a Black candidate in District 1, specifically the election

8　involving Ceola James and another election involving Cecil

9　Brown; is that right?

10　**A.**　Yes.

11　**Q.**　In the case of Ceola James, you testified that she earned

12　about 10 percent of the vote and came in third place behind two

13　White candidates in 2008?

14　**A.**　Yes.

15　**Q.**　And in the Cecil Brown example, that involved a

16　Democratic primary for Public Service Commissioner in 2015 in

17　which the White candidate, Cecil Brown, defeated the Black

18　candidate, Bruce Burton?

19　**A.**　Yes.

20　**Q.**　And you cite those examples to say that Black voters

21　don't always support Black candidates; is that right?

22　**A.**　Yes.

23　**Q.**　You agree that, in the context of a primary election,

24　voting patterns cannot be explained by partisan affiliation?

25　**A.**　Well, right.  Party is held constant in a primary

*Bonneau - Cross*

1  election.

2  **Q.**   And that Democratic primary example involving Cecil Brown

3  you would say is evidence that Black voters in District 1 are

4  not being driven by racial bias when choosing their preferred

5  candidate?

6  **A.**   I would say it suggests that that is not what is at issue

7  there, yes.  It's one case.  I don't want to -- you know, I'm

8  not going to bet my house on it.  But it's one case.  It's an

9  illustrative example.

10  **Q.**   But you have not found any examples of White voters

11  supporting Black candidates in the Republican primary in

12  District 1?

13  **A.**   Correct.

14  **Q.**   And you are not aware of any Black conservatives winning

15  elections in District 1?

16  **A.**   I am not aware.

17  **Q.**   And so in terms of why Black voters might prefer White

18  candidates like Jim Kitchens and Cecil Brown over a Black

19  candidate, you would agree that voters often know what they are

20  doing when they participate in elections and often behave

21  strategically?

22  **A.**   Those two things are not necessarily the same.  I would

23  say the voters often know what they are doing.  They may intend

24  to behave strategically.  They may not always successfully

25  behave strategically.  So I would separate those two constants

*Bonneau - Cross*

1 out. Voters often -- I would say voters do participate

2 meaningfully, yes.

3 **Q.** And so Black voters may decide not to vote for a Black

4 candidate if they perceive a candidate to not be viable?

5 **A.** They could, sure.

6 **Q.** And in the context of a primary election, Black voters

7 may nominate a White Democrat over a Black Democrat because

8 they view the White Democrat as being more electable in the

9 general election?

10 **A.** Sure.

11 **Q.** And it's possible that Black voters may think that a

12 White Democrat is a better messenger on issues of racial

13 equality than a Black candidate?

14 **A.** Absolutely.

15 **Q.** It's also possible that a White Democrat is better

16 aligned with Black voters on issues of racial equality?

17        **THE COURT:** You've got to slow down. Let me do this.

18 I've not heard the last two questions. I want to go back and

19 read.

20        **MR. CHEUNG:** Okay.

21 **BY MR. CHEUNG:**

22 **Q.** So it's also possible that Black voters may think that a

23 White Democrat is a better messenger on issues of racial

24 equality as compared to a Black candidate?

25 **A.** Yes. That goes to the issue of substantive

*Bonneau - Cross*

1  representation compared to descriptive representation that I

2  talked about earlier.

3  **Q**.    And it's also possible that a White Democrat is better

4  aligned with Black voters on issues of racial equality as

5  compared to a Black Democrat?

6  **A**.    Correct.  Same answer.

7  **Q**.    And so the fact that Black voters sometimes vote for

8  White candidates does not rule out the possibility that Black

9  voters may be selecting those White candidates for reasons

10 related to race?

11 **A**.    See, I would characterize it as policy positions, not

12 race.  And so in those examples you just gave, if they are

13 talking about substantive representation, that is, the White

14 candidate is better to represent the interests of the Black

15 community or -- that's a policy reason.  That's not a racial

16 reason.

17 **Q**.    But some of those policy reasons may be racially salient,

18 you would agree?

19 **A**.    Yes, they're racially salient, but they are independent

20 of the race of the candidates; right?  So these are -- these

21 are -- yes.

22 **Q**.    You testified earlier about the topic of incumbency?

23 **A**.    I did.

24 **Q**.    And in your academic work, you've studied the effect of

25 incumbency on judicial elections and election outcomes?

*Bonneau - Cross*

1   **A.**   I have.

2   **Q.**   And as you testified earlier, you found that judges who

3   are incumbents overwhelmingly win their elections?

4   **A.**   They do.

5   **Q.**   And in the state supreme court elections you have looked

6   at, incumbents win about 85 percent of the time?

7   **A.**   That sounds about right.

8   **Q.**   And specific to the Mississippi Supreme Court, you would

9   similarly say that judicial incumbents almost never lose?

10   **A.**   Correct.  Especially in recent times.

11   **Q.**   And you also mentioned that incumbents have a number of

12   advantages when running for office, including name recognition

13   and fundraising networks?

14   **A.**   Correct.

15   **Q.**   And you also testified earlier that incumbent justices

16   are more likely to be defeated in partisan elections than in

17   nonpartisan elections?

18   **A.**   That is true.

19   **Q.**   And you do not dispute that in the entirety of

20   Mississippi's history there have been a total of four Black

21   justices who have served on the Mississippi Supreme Court?

22   **A.**   Sounds right.

23   **Q.**   And all four of them were initially appointed by a

24   governor before they had to compete in an election for their

25   seat?

1 **A.** I believe that's true of almost all judges on the

2 Mississippi Supreme Court in recent times. They almost all --

3 there have been very few open seats, especially in District 1.

4 **Q.** But you believe that to be true of the four Black

5 justices on the supreme court?

6 **A.** Yes.

7 **Q.** Okay.

8 **MR. CHEUNG:** Ms. Ruiz, could we please pull up PX-130.

9 For the record, PX-130 has already been admitted into

10 evidence.

11 **BY MR. CHEUNG:**

12 **Q.** Dr. Bonneau, does PX-130 appear to be a dataset of

13 Mississippi Supreme Court elections that you put together?

14 **A.** It does.

15 **Q.** And it shows all Mississippi's Supreme Court elections

16 going back to the year 2000 in all three supreme court

17 districts?

18 **A.** Yes.

19 **Q.** Can you walk us through the variables of the top row and

20 what they mean?

21 **A.** Sure. So Year is the year of the election. District is

22 the district in which the election was held. Election Code is

23 just the counter. So each election has its own unique code.

24 Those numbers are taken from -- I believe from my dataset,

25 which is why they're not sequential.

Winner is the last name of the winner.  Loser is the last name of the loser.  Runoff is whether or not the election was decided in a runoff, because, as you know, in Mississippi, if you don't get over 50 percent, you advance to a runoff.  Winner Inc is whether or not the winner was an incumbent.  Loser Inc is whether the loser was an incumbent.

Open seat is whether or not the seat was open.  There was no incumbent.  As you can see, in this dataset, there is only one open seat election.  And that was in 2012 in District 3.

Winner Votes is the number of votes received by the winner.  Loser Votes, number of votes received by the loser.  Total Votes is winner plus loser equals total.  Win Percentage is the percentage of votes received by the winner.

Winner Black is whether the winner was Black.  And Loser Black is whether the loser was Black.

**Q.**   Okay.  Thank you.  There are several fields here that contain either a one or a zero.  One means yes, and zero means no?

**A.**   Correct.

**Q.**   And I count 26 elections on the spreadsheet.  Does that sound right?

**A.**   Sure.

**Q.**   And of the 26 elections you identified going back to 2000, a Black candidate won three of them, according to the Winner Black column?

*Bonneau - Cross*

1   **A.**    I only see two, but it should be -- right?

2   **Q.**    There's a blank next to Justice King.

3   **A.**    King. Yes. Right. Yes. So it's three, yes.

4   **Q.**    And so Justice Graves won in 2004, and Justice King won

5   unopposed in 2012 and 2020?

6   **A.**    Correct.

7   **Q.**    And if we look at White candidates who are preferred by

8   Black voters, Justice Kitchens won in 2008 and 2016?

9   **A.**    Correct.

10   **Q.**    So in total, it appears that candidates preferred by

11   Black voters won 5 times out of 26 elections in the last

12   24 years?

13   **A.**    That's in all of the districts, not just in District 1.

14   **Q.**    Right. So you would agree that, looking at all three

15   districts, the Black-preferred candidate won 5 times out of 26?

16   **A.**    Yes. I did not analyze those other ones. I focused on

17   District 1 and the lines on District 1. So if we look at

18   District 1, we have Justice King winning twice, Justice Graves,

19   and Justice Kitchens. So that's four in District 1 out of

20   however many there are -- three, six -- out of nine.

21   **Q.**    Okay. But you have no reason to doubt the reliability of

22   the data for the other districts?

23   **A.**    Well, no. I collected it; so, no. I would hope not.

24   **Q.**    And looking at the Loser Inc column, there were five

25   elections in which the incumbent lost; is that right?

1  **A.**   Correct.  And one in District 1.

2  **Q.**   Okay.  And that one would be when Jim Kitchens beat the

3  incumbent, Justice Smith, in 2008?

4  **A.**   That is correct.

5  **Q.**   All five of the incumbent justices who lost reelection

6  were beaten by a White challenger?

7  **A.**   All five -- well, yeah.  But in District 1, there

8  hasn't -- yes, that's right.  In District 1, there was one,

9  but, yeah, the rest of the state, sure.

10  **Q.**   Okay.  And your chart shows three examples of an

11  incumbent justice being challenged by a Black candidate, and

12  all three of the Black challengers lost?

13  **A.**   Correct.  There was two within District 1, Westbrooks and

14  Banks, and then one in District 2.

15  **Q.**   And that would be Shareef --

16  **A.**   Correct.

17  **Q.**   -- in District 2?  Yes?

18  **A.**   Yes.  Sorry.  I thought I answered.

19  **Q.**   And so you would agree that these results provide support

20  for the theory that White candidates do not need incumbency or

21  a gubernatorial appointment to win a supreme court seat;

22  whereas, Black candidates do?

23  **A.**   I do not.  There was only one open seat.  And so since

24  there is only one open seat here and that is in District 3, I

25  don't think we can say that at all.  We don't have any

*Bonneau - Cross*

1  variation on that.

2  **Q.**  But you have examples of White challengers beating an

3  incumbent?

4  **A.**  Right.

5  **Q.**  But you do not have any examples of Black challengers

6  beating an incumbent?

7  **A.**  Correct.

8  **Q.**  And so those results would be consistent with the theory

9  that Black candidates need to be appointed in order to win?

10  **A.**  The word "need" is a very determinative word that I don't

11  think is supported by the relatively small number of cases that

12  we have in the data.

13  **Q.**  But all the elections that you have in your dataset going

14  back to 2000, you have no counterexamples to that?

15  **A.**  Correct.

16  **Q.**  So going back to some of Dr. Orey's election results that

17  we discussed, you agreed with me earlier that Black candidates

18  who are preferred by a majority of Black voters generally earn

19  about 10 percent of the White vote in District 1?

20  **A.**  Sounds right.

21  **Q.**  You have also discussed Justice Kitchens, who was a White

22  candidate that was preferred by a majority of Black voters when

23  he ran in 2016?

24  **A.**  Yes.  And in 2008.

25  **Q.**  Okay.  And you would characterize Justice Kitchens as a

*Bonneau - Cross*

1 Democrat just like you would all of the other Black candidates

2 preferred by Black voters in District 1?

3 **A.** Yes.

4 **Q.** You do not dispute Dr. Orey's results showing that

5 Justice Kitchens won about 40 percent of the White vote in

6 2016?

7 **A.** No. Sounds right.

8 **Q.** And those voting patterns are consistent with the theory

9 that in District 1 a White Democratic candidate is capable of

10 earning a higher level of White support than Black Democrats?

11 **A.** Well, depends on how you count Justice King, who was

12 never challenged. So I would argue Justice King received

13 100 percent support from White Democrat -- from Whites in

14 District 1 because they all vote for him because -- so the

15 number -- the context is important.

16 **Q.** But you would agree that, in an unopposed election, the

17 candidate always wins 100 percent of the vote?

18 **A.** Unless there are write-ins or some kind of independent

19 campaign, but, yes. But people are not uncontested randomly.

20 They are uncontested or -- these are not just random. It is

21 not, like, luck. It's just not.

22 So I would agree with your statement insofar as we're

23 just looking at Justice Kitchens, but I think there's more to

24 the story.

25 **Q.** So just to be clear, you agree that, looking at Justice

*Bonneau - Cross*

1   Kitchens's level of support as compared to Black candidates'

2   level of support in District 1, that is consistent with a

3   theory that, in District 1, a White Democratic candidate is

4   capable of earning a higher level of White support than Black

5   Democrats?

6   **A.**   That is consistent, yes.

7   **Q.**   And I believe you testified earlier that you have closely

8   studied state supreme court elections all around the country?

9   **A.**   I have.

10  **Q.**   And the subject of state supreme court elections is one

11  of your main areas of expertise?

12  **A.**   It is.

13  **Q.**   And you also testified earlier that Mississippi is one of

14  only a few states in the country to use districts to elect

15  supreme court justices?

16  **A.**   Yes.

17  **Q.**   You identified Illinois, Kentucky, and Louisiana as the

18  only other states that use districts --

19  **A.**   Yes.

20  **Q.**   -- to elect judges to the supreme court?

21  **A.**   Yes.

22  **Q.**   And is that list of states still accurate, to the best of

23  your knowledge?

24  **A.**   Yes.

25  **Q.**   And are you aware that Illinois, Kentucky, and Louisiana

*Bonneau - Cross*

1  have all updated their supreme court districts since the 2020

2  census?

3  **A**.    If you tell me that, I have no reason to think you're

4  misrepresenting it.

5        **MR. CHEUNG**:  Your Honor, I would like to show

6  Dr. Bonneau what has been pre-marked as Plaintiffs' Cross --

7  PC-24 for identification.

8        May I approach, Your Honor?

9        **THE COURT**:  You may.

10       **MR. WALLACE**:  Your Honor, before we proceed, I don't

11  see this on the -- in the pretrial order.  This is PC -- PC-24.

12  There is a PX-24.  I don't know what PC-24 is.

13       **MR. CHEUNG**:  Your Honor, this is purely a cross

14  exhibit.  I do not intend to seek admission of the exhibit.

15       **THE COURT**:  Okay.  You may proceed.  It's not going to

16  be admitted.

17  **BY MR. CHEUNG**:

18  **Q**.    Dr. Bonneau, does PC-24 appear to be an Illinois statute,

19  Public Act 102-0011?

20  **A**.    It does.

21  **Q**.    And does that Public Act appear to define new districts

22  for the Illinois Supreme Court?

23  **A**.    Let me read it.  (Peruses document).  It does.  It looks

24  like they are updating for the first time since 1963 on the

25  basis of population shifts where the First District had over 5

*Bonneau - Cross*

 1  million residents and the Fifth District had, like,

 2  1.2 million.

 3  **Q.**   And if you look on the last page, do you see an effective

 4  date of June 4th, 2021?

 5  **A.**   I do.

 6  **Q.**   Do you have any reason to dispute the information on

 7  PC-24?

 8  **A.**   No.

 9          **MR. CHEUNG:**  Your Honor, I would like to show

10  Dr. Bonneau what's been pre-marked as PC-25 for identification.

11          **THE COURT:**  You may.

12          **MR. WALLACE:**  Your Honor, I have the same objection.

13  Neither of these are being offered into evidence.  They are

14  simply asking the expert to read them.  They are not impeaching

15  anything.  I don't see how this comes to the attention of the

16  Court.

17          **THE COURT:**  I am concerned that the first document was

18  not really used to impeach.  That's where I thought you were

19  headed, but he agreed with everything; so...

20          **MR. WALLACE:**  Then I raise it on the next document,

21  Your Honor.

22          **THE COURT:**  I'm sorry?

23          **MR. WALLACE:**  I object to it as improper impeachment

24  on the second document, then, Your Honor.

25          **THE COURT:**  Sustained.

*Bonneau - Cross*

1 **BY MR. CHEUNG:**

2 **Q.** Okay. Dr. Bonneau, if I represent to you that Kentucky

3 redistricted its supreme court seats with an effective date of

4 January 18th, 2022, under Kentucky Revised Statutes, Chapter

5 21A, Section 10, would you have any reason to dispute that?

6 **MR. WALLACE:** Your Honor, I think you just said it was

7 improper impeachment, and it's irrelevant to anything in this

8 case, I think.

9 **THE COURT:** It may not be irrelevant. I'm going to

10 overrule it.

11 You may ask your question.

12 **A.** Could you please repeat it?

13 **BY MR. CHEUNG:**

14 **Q.** Sure. Dr. Bonneau, if I represent to you that Kentucky

15 redistricted its supreme court districts with an effective date

16 of January 18th, 2022, pursuant to Kentucky Revised Statutes,

17 Chapter 21A, Section 10, would you have any reason to dispute

18 that?

19 **A.** I would not.

20 **Q.** And if I represent to you that Louisiana enacted SB255 to

21 redistrict its supreme court seats after the 2020 census, would

22 you have any reason to disagree with that?

23 **MR. WALLACE:** Same objection, Your Honor.

24 **THE COURT:** You may answer it if you know.

25 **A.** I have no reason to dispute that.

*Bonneau - Cross*

1 **BY MR. CHEUNG:**

2 **Q.** And the Louisiana enactment created a second majority --

3 Black-majority district.  Do you have any reason to dispute

4 that?

5 **A.** I don't know; so -- I trust that you're not lying.

6 **Q.** Okay.  So shifting to a topic of nonpartisan elections,

7 which you discussed on direct earlier.  For nonpartisan

8 elections, like those in Mississippi, there is no partisan

9 primary that takes place in advance of the general election; is

10 that right?

11 **A.** Correct.

12 **Q.** And the ballots themselves do not identify any political

13 party affiliation for the candidates?

14 **A.** Correct.

15 **Q.** Your view is that, even without the partisan designation

16 on the ballot, many voters know which party each candidate is

17 aligned with due to things like campaign messaging?

18 **A.** The empirical evidence suggests that's unquestionably

19 true.

20 **Q.** But you also agree that some voters may not see the

21 partisan messaging being put out by the candidates?

22 **A.** Correct.  The signal is more noisy.

23 **Q.** But every voter who receives a ballot sees the omission

24 of the party affiliation?

25 **A.** That is correct.

*Bonneau - Cross*

1  **Q.**  On direct, I believe you discussed an experiment with

2  Mr. Wallace in which you showed voters ads that may have been

3  used in races around the country?

4  **A.**  Correct.

5  **Q.**  That experimental design assumes that voter sees the ad

6  with the messaging?

7  **A.**  Well, yes.  When we experiment, we know they see the ad

8  because we are controlling it.  But, yes, if you are talking

9  about to what extent does the experiment generalize to a

10  political campaign or to, you know, the world, then that's a

11  concern, yes.

12  **Q.**  And you would say that you have studied the differences

13  between partisan and nonpartisan elections pretty extensively?

14  **A.**  I would.  I could back up to the last one as well.

15       The -- we also, you know, confirm the experiment using

16  observational data.  So we also looked at validated vote

17  choices from individuals and matched it up with how they voted

18  in both partisan and nonpartisan elections.  So we have both

19  the experimental data but also some observational data, and so

20  I feel pretty confident that what we found is actually real.

21       I apologize.  Can you ask it or --

22  **Q.**  Sure.  I said, based on the academic work you have done,

23  you would say that you have studied partisan and nonpartisan

24  elections and the differences between them pretty extensively?

25  **A.**  Yes.

1 **Q.** And you would -- and you believe that nonpartisan

2 elections are "awful"?

3 **A.** I believe I used that word.

4 **Q.** And you think that nonpartisan elections are "awful"

5 because the omission of partisan affiliation from the ballot

6 removes a meaningful piece of information that voters use to

7 decide who they should vote for?

8 **A.** Yeah. I mean, what I would say is the juices are worth

9 the squeeze. And so with nonpartisan elections, what you're

10 trying to do is take the party out; right? You're trying to

11 focus, like, on the candidates or on the issues and not on

12 political party.

13 The problem is they are ineffective. They are

14 ineffective because, as we have seen, candidates can signal and

15 message to voters where they stand. And so you are not getting

16 any benefits, or you are not taking partisanship out. The

17 other thing you are doing is you're causing fewer voters to

18 participate, because removing that important cue, some voters

19 won't participate in the election.

20 So you have lower voter participation. The voters that

21 do participate, as we talked about with the experiment and

22 stuff, make more errors. And you are not getting rid of

23 politics. So you are paying some pretty significant costs in

24 terms of voter participation and meaningful voter participation

25 and not getting anything in return.

*Bonneau - Cross*

So, again, that fits my definition of "awful."  But you guys can do what you want in Mississippi.

**Q.**   So because the partisan cue is missing, some voters skip the nonpartisan election on the ballot entirely because they don't feel informed about the candidates?

**A.**   Correct.

**Q.**   And when voters leave the nonpartisan judicial race blank, even though they are voting in the election for other races on the ballot, that's what you refer to as ballot roll-off?

**A.**   Correct.

**Q.**   And you testified earlier that there is more ballot roll-off in nonpartisan supreme court elections as compared to partisan elections?

**A.**   Correct.

**Q.**   And so one of the effects of nonpartisan elections is, in your view, the unnecessary reduction in voter participation?

**A.**   Correct.

**Q.**   And this is discussed in a book that you published in 2015 called *Voters' Verdicts*?

**A.**   Yes.

**Q.**   And in Chapter 1 of that book, you examined the effect of nonpartisan elections and various voter characteristics on voter participation in down-ballot supreme court elections?

**A.**   Sounds right.

*Bonneau - Cross*

1  **Q.** Is your book, *Voters' Verdicts*, a scholarly publication?

2  **A.** It is.

3  **Q.** Has it been peer-reviewed?

4  **A.** It has. Even won an award.

5  **Q.** Yeah. I was going to get to that.

6  So your coauthor, Dr. Damon Cann, is a professor at Utah

7  State University and the head of the department of political

8  science there?

9  **A.** He is.

10 **Q.** And as you stated, your book won a best book award from

11 the American Political Science Association?

12 **A.** It did.

13 **Q.** And that was for best book within the last three calendar

14 years?

15 **A.** I believe that's right, yes. Uh-huh.

16 **Q.** And do you consider *Voters' Verdicts* to be a reliable

17 source regarding supreme court elections?

18 **A.** I don't know how I can answer no. Yes.

19 **MR. CHEUNG:** Your Honor, I have a highlighted version

20 of what was pre-marked as PX-234, which I would like

21 Dr. Bonneau to identify.

22 **THE COURT:** Is PX-234 admitted already?

23 **MR. CHEUNG:** It has not been admitted.

24 **THE COURT:** Has not?

25 **MR. CHEUNG:** Has not.

*Bonneau - Cross*

1        **THE COURT:** Okay. Go ahead.

2        **MR. CHEUNG:** Your Honor, plaintiffs would offer

3 PX-234 -- well, let me back up.

4 **BY MR. CHEUNG:**

5 **Q.** Dr. Bonneau, do you recognize PX-234 to be an excerpt

6 from your book?

7 **A.** I do.

8 **Q.** And, specifically, Chapter 1 as well as the related

9 appendix?

10 **A.** Yes.

11        **MR. CHEUNG:** Your Honor, plaintiffs would offer PX-234

12 as a learned treatise under 803(18) and request permission for

13 Dr. Bonneau to read the highlighted portions of Chapter 1.

14        **MR. WALLACE:** I don't object to the reading. I don't

15 think it's admissible.

16        **THE COURT:** It's not admissible. You're wanting to

17 read it. Are you saying his book?

18        **MR. CHEUNG:** Yes.

19        **THE COURT:** Yes. You may proceed on the excerpts.

20 **A.** Do you want me to read all of the highlighted parts?

21 **BY MR. CHEUNG:**

22 **Q.** I'm sorry but, yes.

23 **A.** Okay. Well --

24        **THE COURT:** And read slowly for the court reporter.

25        **THE WITNESS:** Oh, I will. This will be good. Put

*Bonneau - Cross*

1  y'all to sleep.

2  **A.**    All right.  Page 18.

3         **THE COURT:**  Let's do this.  Let's take a break.

4         **THE WITNESS:**  Yeah.  Good idea.

5         **THE COURT:**  We'll take a 15-minute break.

6      (RECESS TAKEN.)

7         **THE COURT:**  You may proceed.

8         **MR. CHEUNG:**  Thank you, Your Honor.

9         **THE COURT:**  Go slow.

10 **BY MR. CHEUNG:**

11 **Q.**    Dr. Bonneau, I think we left off with PX-234.  Could you

12 kindly read the highlighted portions of your book in PX-234.

13 **A.**    I will.  Do you want me to pause after each asked

14 question or just keep going?

15 **Q.**    Let's read all of the excerpts, and then we can talk

16 about it.

17 **A.**    Okay.  Page 18.  "In this chapter, we seek to answer a

18 simple yet unanswered question:  What factors influence an

19 individual's decision to participate in a state supreme court

20 election?  More specifically, we are interested in the

21 differences between partisan elections and nonpartisan

22 elections.  Do partisan elections increase voter participation

23 compared to nonpartisan elections?"

24      Page 19.  "Our results indicate that the factors that

25 predict general turnout differ to some extent from those that

*Bonneau - Cross*

determine the participation in judicial elections.  We show that state institutional factors, particularly the partisan format of the election, as well as individual factors, such as education, gender, and union membership, are strong predictors of participation in judicial elections.  In sum, consistent with primary work and contrary to some claims, voter participation in state supreme court elections is affected by voter characteristics, the context of the election, and the rules under which the election occurs.

"The debate over the effects of partisanship on voter participation dates back to the early 20th century.

"However, removing partisan affiliation from the ballot deprives voters of a key piece of meaningful information."

Page 20.  "Due to the removal of an important piece of information from the ballot, voters may lack enough information to feel sufficiently informed to cast a vote.  When voters feel uninformed, participation will decrease.

"Schaffner, Streb, and Wright (2001) find evidence consistent with this.  They find lower levels of voter participation when a nonpartisan ballot is used compared to a partisan ballot (see Tables 4 and 6.)  In judicial elections, Dubois -- Dubois (1979) was the first to find that there was higher participation in partisan elections compared to nonpartisan elections.  More recently, Hall (2007) and Bonneau and Hall (2009) document that, on average, there are higher

*Bonneau - Cross*

amounts of ballot roll-off (lower amounts of voter
participation) in states that utilize nonpartisan elections
versus partisan elections.  In addition to the aggregate data,
Bonneau and Hall (2009) examine two states that recently
switched from partisan elections to nonpartisan elections
(Arkansas and North Carolina.)  They find that voter
participation decreased significantly in both states after the
move to nonpartisan elections.

        "Thus, there are good theoretical and empirical reasons
to suspect that nonpartisan elections serve to decrease voter
participation."

        Page 21.  "Another method of judicial selection is
nonpartisan elections.  In these states, multiple candidates
run in contested elections; however, the partisan
identification of the candidates is not provided on the ballot
to the voters.  Indeed, it is possible for both candidates to
be from one political party in these states.  This lack of
information leads us to expect that voters will be less likely
to participate in these elections compared to partisan
elections."

        Page 22.  "The presence or absence of partisan labels in
judicial elections is, at its core, an informational problem.
From among the host of individual-level variables that predict
voter turnout generally, the individual voter characteristics
that we expect will have the greatest impact on turnout will be

1   those that are related to voters' levels of information.  For

2   example, we would expect education to influence participation

3   in judicial elections more than homeownership because education

4   has more direct bearing on a person's level of information than

5   home ownership.

6        "In sum, we have hypothesize:

7        *H1.1*:  A voter is more likely to participate when he or

8   she is provided with partisan affiliations of candidates.

9        *H1.2*:  Individual-level factors related to the level of

10  information of citizens will have larger effects than

11  individual-level factors that are simply demographic in nature.

12       "To better understand the dynamics of voter participation

13  in judicial elections, we utilized data from the 2012 and 2010

14  Cooperative Congressional Election Study (CCES.)  The CCES is a

15  national stratified matched sample of voters that is

16  administered through a web-based platform on computers or other

17  web-enabled devices.  Cross-validation of the CCES against mail

18  and random-digit dial telephone methods suggests that the CCES

19  provides a nationally representative sample (Ansolabehere and

20  Shaffner, 2011.)"

21       Page 23.  "The failure to vote in a down-ballot race

22  after voting for higher offices is known as ballot roll-off.

23  For example, if one hundred people turn out to vote for

24  president and ninety of these people vote in the state supreme

25  court race, ballot roll-off is 10 percent.  Higher levels of

*Bonneau - Cross*

ballot roll-off reflect lower levels of voter participation.

"We can take an initial look at the data as a simple test of HI.I by simply showing the proportion of individuals in each election format who voted in a race for higher office (using verified turnout) but who did not report voting in a judicial race.

"Consistent with the findings of previous studies, our survey results suggest that nonpartisan elections have the highest rates of ballot roll-off of the three election formats we consider, with nearly one-fifth of voters opting not to participate in a judicial election in spite of voting for higher offices.

"The evidence from the 2012 CCES is strongly supportive of the hypothesis that nonpartisan elections depress participation."

Page 25. "Recognizing that few, if any, voters are driven to the polls solely out of interest in a judicial race, though, we conceptualize participation in judicial elections as a two-stage process where initially citizens choose to vote an up-ballot race for president, governor, U.S. House, and/or U.S. Senate and then choose whether to participate in a particular judicial election. For the turnout variable, we use the validated measure of electoral participation rather than the self-reported measure (Ansolabehere and Hersh 2012).

"In terms of voter characteristics, education stands out

1   among demographic factors as a particularly important predictor

2   of turnout.  More educated citizens are more likely to vote

3   than those with less education, likely due to the fact that

4   education lowers informational costs associated with voting.

5       "We measure education by whether or not the individual

6   has earned a college degree, and we expect that more educated

7   individuals are more likely to turn out.

8       "Historically, African Americans and other minorities

9   have faced unique impediments to registration and voting;

10  studies have shown that Caucasian voters continue to have

11  higher rates of participation than minorities, even controlling

12  for other factors.  Consistent with this, we hypothesize that

13  White individuals are more likely to vote than nonwhite

14  individuals.

15      "Along the lines of community connectedness, homeowners

16  are more likely feel a stake in their community, to have an

17  interest in the long-term future of their community and state,

18  and to believe they will be in a location long enough to make

19  it worthwhile to register and determine the appropriate voting

20  location.  These types of characteristics make homeowners more

21  likely to vote."

22      Page 27.  "Beyond the general competitiveness of a state,

23  a close race for major offer -- major office can boost turnout.

24  As such, we include dichotomous indicators for a close

25  gubernatorial race in a state and a close U.S. Senate race in a

*Bonneau - Cross*

state.

"Individuals in states with close races for senate or governor are more likely to turn out.

"Once a voter has decided to participate in the higher-profile races that draw voters to the polls, voters must decide whether to vote in a state supreme court election. If they do not, they are said to roll-off. As ballot roll-off increases, voter participation decreases. To some extent, we expect the factors that affect turnout to affect roll-off as well. In the same way that education reduces the information costs of voting generally, it may decrease roll-off in judicial elections by reducing information costs in judicial elections specifically."

Page 28. "Beyond the factors that influence turnout, there are a number of factors unique to judicial elections that may influence roll-off in these elections.

"The presence of a partisan cue gives voters enough specific information about the candidates to make them feel as though they can make an informed decision. As such, we expect partisan election states to have higher voter participation than nonpartisan states."

Page 29. "The results of the model appear in 1.1.

"The turnout equation has few surprises, with college-educated citizens, regular church attendees, and homeowners being more likely to turn out in both 2010 and 2012.

*Bonneau - Cross*

1  The presence of contested up-ballot races exerts influence as
2  well, through gubernatorial races in 2012 and senate races in
3  2010 (though turnout was modestly lower in states with close
4  senate races in 2012)."

5      Page 31.  "Looking at the equation of primary interest,
6  the second-stage estimates of factors affecting roll-off in
7  state supreme court elections, there are a number of
8  interesting findings.  First and foremost, the importance of
9  partisan cues should not be understated.  Voters in partisan
10 election states are significantly less likely to roll off than
11 those in nonpartisan election states."

12     Page 32.  "Respondents with college degrees have
13 predicted probabilities of roll-off about 0.04 lower than those
14 with college degrees, showing that education" --

15 **Q**.  I'm sorry.  I think we may have misread "without" and
16 "with."  Could you read that again.

17 **A**.  "Respondents with college degrees have predicted
18 probabilities of roll-off about 0.04 lower than those without
19 college degrees, showing that education is not only a factor
20 that drives individuals to the polls but that it also plays a
21 role in whether they complete the entire ballot.  Homeownership
22 and weekly church attendance are statistically significant,
23 though their effects are relatively modest, with homeowners
24 having a reduction in the probability of roll-off of about
25 0.035 and union membership diminishing the probability of

*Bonneau - Cross*

1    roll-off by about 0.1."

2    **Q.**   I'm sorry. 0.01.

3    **A.**   Yes. 0.01.

4    Page 33. "Removing partisanship from the ballot reduces

5    the pool of voters who feel adequately informed to cast a

6    ballot. This finding is consistent with prior aggregate-level

7    studies of this issue.

8    "This chapter not only allows us to confirm the canonical

9    finding that education increases turnout but also to

10    demonstrate that more educated individuals are more likely to

11    vote in down-ballot judicial elections once they have already

12    come to the polling place."

13    Thus, end of the reading.

14    **Q.**   Thank you, Dr. Bonneau.

15    Do you disagree with anything you just read from your

16    book?

17    **A.**   No.

18    **Q.**   And just to summarize, you concluded that nonpartisan

19    judicial elections deprive voters of key information about

20    candidates on the ballot?

21    **A.**   Yes.

22    **Q.**   And you would agree that voters with less access to

23    information, particularly those with lower levels of

24    educational attainment, are less likely to overcome the

25    informational costs associated with nonpartisan elections?

*Bonneau - Cross*

1 **A.** Yes.

2 **Q.** And so voters with lower educational attainment are less

3 likely to vote in supreme court elections even when they do

4 show up to cast a ballot on election day?

5 **A.** Yes.

6 **Q.** And in performing that analysis, you relied on a survey

7 called the CCES or Cooperative Congressional Election Study?

8 **A.** Yes.

9 **Q.** As part of that research, you collaborated with

10 Dr. Stephen Ansolabehere and others to field questions about

11 judicial elections for the survey?

12 **A.** Correct.

13 **Q.** In 2020, the CCES was renamed the CES or Cooperative

14 Election Study; is that right?

15 **A.** Sure.

16 **Q.** The CES or CCES is a dataset commonly relied upon by

17 political scientists to study elections and turnout?

18 **A.** Yes.

19 **Q.** The CES or CCES is weighted to ensure a representative

20 sample?

21 **A.** It is.

22 **Q.** You use those weights when relying on the CCES?

23 **A.** Correct.

24 **Q.** The CES is an ongoing cumulative dataset, and the name

25 change did not affect the reliability of the data?

*Bonneau - Cross*

1  **A.**    As far as I know.

2  **Q.**    Your book also mentions that you used validated voting

3  data that is checked against state voting records; is that

4  right?

5  **A.**    Yes.

6  **Q.**    And you chose to use that instead of self-reported voting

7  history?

8  **A.**    Yes.  Self-report -- we know people lie, basically.  So

9  if you use self-reported data for voting, people will say they

10  vote when they didn't.

11        So one of the things that the CES does is they go back in

12  and validate; right?  So if you say you voted, they are going

13  to go and check.

14        And so there are two variables in there.  One is did you

15  say you voted?  And one is did you actually vote?  And for this

16  reason, whether they actually voted.

17  **Q.**    Okay.  Those are all the questions I have about the book.

18  Appreciate your patience.

19        You also testified earlier about descriptive versus

20  substantive representation; is that right?

21  **A.**    It is.

22  **Q.**    The very first journal article you ever published was in

23  2000, I believe, called "Composition of State Supreme Courts"?

24  **A.**    It was.

25  **Q.**    And in that article, you studied the racial demographics

*Bonneau - Cross*

1   of state supreme court judges; is that right?

2   **A.**   I did.

3   **Q.**   And I think, as you explained earlier, you use the term

4   "descriptive representation" to refer to the degree to which

5   the demographics of elected officials reflect the demographics

6   of their constituents?

7   **A.**   Correct.

8   **Q.**   And another term for descriptive representation is

9   diversity; is that right?

10  **A.**   I wouldn't use the two interchangeably.  I mean, in

11  the -- in the academic world, descriptive representation is a

12  pretty clear definition.  Diversity can mean a lot of different

13  things.  And so if we are talking about representation of the

14  court, I think descriptive representation is a more precise and

15  accurate term.

16  **Q.**   What would you say the difference is?

17  **A.**   I mean, diversity can be a lot of things.  It could be

18  diversity of demographics.  It could be diversity of thought.

19  It could be diversity of backgrounds.  Whereas, descriptive

20  representation, I think it's pretty clear, like, are we

21  comparing, you know, the population to the -- of the state to

22  the population of the bench.

23         And so, I mean, if you want to use them interchangeably,

24  that's fine.  I wouldn't in -- in academic work.

25  **Q.**   Okay.  So descriptive representation would be demographic

*Bonneau - Cross*

1   diversity?

2   **A.**   Yes.

3   **Q.**   And you wrote that article in 2000 because you thought it

4   was important to know if different methods of selecting judges

5   lead to more or less demographic diversity on the bench; is

6   that right?

7   **A.**   That's right.

8   **Q.**   And overall, you would say that having a representative

9   judiciary is incredibly important?

10   **A.**   I would.

11   **Q.**   And why is that?

12   **A.**   I think for a number of reasons, you know, some of which

13   I alluded to earlier.

14       I think for the purposes of legitimacy; that when you

15   have a judiciary that looks like the population, it tends to

16   give more legitimacy to the decisions and to the institution.

17       I think it's important from a role modeling perspective.

18   If we want to, you know, show people that, in fact, certain

19   avenues or certain professions are not closed off to them, then

20   we ought to have people in those positions.

21       And so I think there's, you know, a number of different

22   reasons that having a representative bench is a good thing.

23   **Q.**   Thank you.

24       **MR. CHEUNG:**   Your Honor, may I have a moment to

25   confer?

*Bonneau - Redirect*

1    **THE COURT:**   You may.

2    (CONFERRING OFF THE RECORD.)

3    **MR. CHEUNG:**   No further questions, Your Honor.

4    **THE COURT:**   Thank you.

5    Redirect.

6    **MR. WALLACE:**   If it please the Court.

7    **THE COURT:**   You may proceed.

8                              **REDIRECT EXAMINATION**

9    BY MR. WALLACE:

10   **Q.**   I'm going to try to go through some of the things

11   Mr. Cheung went over with you in the order that he did.

12       He started out with some questions about King's EI, and

13   he asked about two different -- an article that had two

14   different versions of it.  And if I understood what you read,

15   it said that both of those versions gave you a result close to

16   the exit polls by the *Los Angeles Times*.  Is that -- is that

17   what they said?

18   **A.**   Let me go back and look.  Maybe I'll read some.

19       Yes.  So the exit polls for the 2005 LA mayoral runoff

20   election, and I believe they are -- I believe they are *LA*

21   *Times*.

22   **Q.**   All right.  And so my question is:  The article

23   establishes that King's EI is as good as the *LA Times*.  To

24   understand how good King's EI is, wouldn't you have to know how

25   good the *LA Times* exit poll was?

*Bonneau - Redirect*

**A.** Well, you would, right, because it's a comparison. So if the -- to the extent that the *LA Times* exit poll is not a good exit poll or is not scientifically valid, of which I have no opinion on, that would -- I mean, the comparison is still valid, but whether or not that valid comparison is actually a measure of accuracy, you know, it would depend upon, right, that.

**Q.** And he didn't ask you to read anything in the article that said how good the *LA Times* poll was, did he?

**A.** No.

**Q.** All right. Now, while we are on the subject of empirical analysis, he asked you whether you have done any empirical analysis of the 2007 election between the White Democrat, Lynn Posey, and the White Republican, Charles Barbour.

Do you really need King's EI to tell you that Blacks are more likely to vote for a White Democrat than for Haley Barbour's nephew?

**A.** Well, not knowing those candidates personally or whatever else, I think we have established, both in my testimony and in the testimony of others, that African Americans overwhelmingly vote for Democratic candidates.

**Q.** Okay. And you don't have to analyze every single race with a computer to figure that out, do you?

**A.** No.

**Q.** Okay. A couple of other things.

*Bonneau - Redirect*

1    **MR. WALLACE:**  Would -- Brent, will you put up the
2    first page of Exhibit 6 again.

3    **THE COURT:**  Can I ask, just a moment, for
4    clarification?  Posey was a Democrat?

5    **MR. WALLACE:**  In 2007, Posey was a Democrat.  In 2011,
6    Posey was a Republican.

7    **THE COURT:**  Okay.  Thank you.

8    **BY MR. WALLACE:**

9    **Q.**   Now, Mr. Cheung asked you about the endogenous elections,
10   he called them, involving Chief Justice Waller and
11   Representative Banks and Justice Griffis and Judge Westbrooks.
12   And he asked you if you agreed with him on some point, and you
13   said, "Yes.  But you are not looking at all of the relevant
14   data."

15       Is there any other relevant data on that chart that you
16   ought to pay attention to when you are thinking about
17   endogenous elections?

18   **A.**   Well, sure.  So Justice King has had two elections over
19   this time period, and both times Justice King, the one
20   African-American justice on the supreme court, has not been
21   contested.  So nobody has even challenged him for his -- for
22   his seat.

23   **Q.**   And in your experience of studying supreme court
24   elections, what are some of the reasons that incumbents don't
25   get challenged?

*Bonneau - Redirect*

1  **A**.    There are a number of reasons.  Like, the most common
2  reason is people don't think they can win, and so a lot of
3  times you'll have difficulty recruiting a decent candidate or
4  even any candidate if you don't think there is any chance that
5  you can defeat the incumbent.

6  **Q**.    And he asked you -- again, I think it was with regard to
7  the race between Justice Griffis and Judge Westbrooks.  What
8  would be the effect of increasing the Black voting-age
9  population by one or two percent?  Does it matter where you
10  find the new Black people?

11  **A**.    I mean, it could in terms of if it's urban versus rural.
12  It also would matter your levels of education.  There are a
13  number of things that would matter, which is why, when I
14  answered, I -- you have to make a lot of assumptions of holding
15  things constant.

16  **Q**.    Yeah.

17  **A**.    And I'm -- to what extent that represents a realistic
18  world, I'm skeptical.

19  **Q**.    And you testified in Alabama about the Black Belt
20  counties, did you not?

21  **A**.    I did.

22  **Q**.    And, again, knowing what you know about the Black Belt,
23  is it possible that Black voters in the Black Belt counties on
24  the Mississippi side of the line would vote differently from
25  Black voters in the center of Jackson or up in the Delta?

*Bonneau - Redirect*

1  **A.**  Yes.

2  **Q.**  Okay.

3  **A.**  It's possible.

4  **Q.**  So adding new -- adding new Black voters, it makes a

5  difference where you get them?

6  **A.**  It could.

7  **Q.**  Okay.  He also asked you whether it was possible, looking

8  at these -- I get my Greek confused but quasi-endogenous

9  elections.  He asked you, "Isn't it possible that different

10  elections for different offices may have different dynamics?"

11  I think I got that right.

12     Do you remember that question?

13  **A.**  I do.

14  **Q.**  Now, for all of these elections, do they have the same

15  district lines in common?

16  **A.**  Yes.

17  **Q.**  When you're trying to look at something to determine why

18  it came out differently, would you be inclined to focus on the

19  factors that they have in common or the factors that are

20  different?

21  **A.**  Well, if you are trying to explain differences, you have

22  to look at factors that are different, not in common.  You

23  can't explain a variable with a constant.

24  **Q.**  Okay.  So the fact that there are differences in

25  different offices doesn't tell you a thing about the effect

*Bonneau - Redirect*

that the district lines are having on the election, do they?

**A**.   Right.  Because the district lines are the same in all of these elections.

**Q**.   Okay.  Now, he went on a great deal about House Bill 1020, and, you know, I understand, if a reporter calls you on the phone, you are inclined to answer the question.

But have you studied House Bill 1020 any particular measure before you answered the question?

**A**.   I mean, I did some basic searching and, you know, generally familiar with it, but had I gone through the specifics line by line or -- no, I had not.

**Q**.   And some other judge is going through the specifics out line by line, but your criticism was that they were setting judgeship selection rules for one area of the state that they weren't applying to other areas of the state; is that right?

MR. CHEUNG:  Your Honor, objection.  Leading.

MR. WALLACE:  Well, I'm --

THE COURT:  Sustained.

MR. WALLACE:  -- just trying to clarify his prior answer, Your Honor.  So if he'd do that for me, I'd appreciate it.

THE COURT:  You may clarify.

**A**.   Yeah.  What I would say is my concerns with that bill -- or my objections is that here you have a state legislature intervening to change -- or methods of selection in one area,

*Bonneau - Redirect*

1  in one city, when -- over the objections of local officials

2  when they are not doing it anywhere else in the state.  I think

3  that, from an institutional perspective, from a, you know, we

4  should respect local control, we should respect institutions,

5  is problematic.

6  **BY MR. WALLACE:**

7  **Q.**    And as far as you know, are the election procedures used

8  in the Central District of Mississippi the same as used in the

9  other two districts of Mississippi?

10 **A.**    Yes.

11 **Q.**    Okay.  You told Mr. Cheung that vestiges of

12 discrimination probably still exist in Mississippi.  Have you

13 done any study to determine exactly what those vestiges are?

14 **A.**    I have not.

15 **Q.**    And we have had Dr. Campbell testify about that, and I'm

16 not going to repeat his -- his testimony.  But you wouldn't

17 have anything, as you sit here, to add to what his testimony

18 may have been about vestiges of discrimination?

19 **A.**    I don't know what his testimony was, but I don't have

20 anything to add --

21 **Q.**    Okay.  That's fine.

22 **A.**    -- no matter what it was.

23 **Q.**    I wasn't trying to set you up against him.

24       And by the way, in one answer you said that party is held

25 constant in a party primary.  I wonder if you know that any

*Bonneau - Redirect*

1  voter can vote in any party primary in Mississippi?

2  **A.**  I do.

3  **Q.**  And does that really hold things constant when you may

4  have multiple party members participating in a primary?

5  **A.**  So there's been some --

6  **MR. CHEUNG:**  Objection.  Leading.

7  **THE COURT:**  I'm sorry?

8  **MR. CHEUNG:**  Objection.  Leading.

9  **THE COURT:**  Sustained.

10 **BY MR. WALLACE:**

11 **Q.**  If -- what effect, if any, does the participation of

12 nonparty members have in your ability to understand the party

13 primary?

14 **A.**  So there has been some political science research on

15 that, and this whole notion of, like, strategic voters, they

16 will crossover and vote in the other party's primary just to

17 kind of -- so if you are a Democratic, you might vote in a

18 Republican primary to kind of get a less desirable candidate,

19 there is very, very little evidence that that happens.

20 Voters simply don't behave that way.  And, I mean, we're

21 talking, like, single -- low single-digit percentages have been

22 found to do that.  And so it might be, like, a strategy.  It

23 might be something that people say they are going to do, but it

24 doesn't really happen.

25 So in that case, I'm -- I'm pretty -- yeah, pretty

*Bonneau - Redirect*

confident about that.  Most of the people voting in a
Democratic primary are self-identified Democrats.

**Q.**    In a close election, could single digits make a
difference?

**A.**    Well, in a close election, yeah, absolutely.  Everything
could make a difference in a close election but, yes.

**Q.**    Thank you.

    Now, Mr. Cheung found a chart that you keep on your
dataset about Mississippi Supreme Court elections; is that
right?

**A.**    It is.

**Q.**    And as I understood it, it covers 26 elections going, I
guess, back to the beginning of this century; is that right?

**A.**    I believe that's right.  I believe it was -- 2000 is when
it started, yeah.

**Q.**    Okay.  And in getting ready for this case, did you study
in any detail the supreme court elections in the other two
districts?

**A.**    No.

**Q.**    So you would not be able to say who was the
Black-preferred candidate in any of those elections in any of
those districts?

**A.**    Correct.

**Q.**    Okay.  Now, you told him that you had no example of a
Black candidate beating an incumbent, but from looking at your

*Bonneau - Redirect*

1 Appendix A, are there any examples of Black-preferred

2 candidates beating an incumbent?

3 **A.** Yes. Kitchens in 2008.

4 **Q.** Okay. Now, you had discussions of whether or not -- you

5 know, of the effect of not having party names on a ballot in

6 nonpartisan races.

7 In any race, for any office, does the ballot tell you the

8 race of the candidate?

9 **A.** Not that I'm aware of.

10 **Q.** How does that information get around?

11 **A.** Well, I would -- I mean, it gets around by campaigns, by

12 commercials, flyers, the typical means of campaigns.

13 **Q.** And as an example of that, your Exhibit D-7 has Bennie

14 Thompson's Official Democrat Sample Ballot.

15 How does he show the race of the candidate on his ballot?

16 **A.** Let me go -- so if you go to his ballot --

17 **Q.** It's about a seventh-generation copy, but what are those?

18 **A.** Well, I'm assuming he does it by the pictures of the

19 candidates. I don't see any text that would indicate race.

20 **Q.** Okay. So whether it's race or party, somebody has to

21 spread the news around?

22 **A.** Correct.

23 **Q.** Okay. Now, I want you to go back to this article -- I'm

24 sorry -- that you so patiently read for us. And I want you to

25 go to page 32, and at the end of the highlighted section about

*Bonneau - Redirect*

1  what causes roll-off, there's one last unhighlighted section

2  you didn't read to us.

3      Would you read that last sentence, please.

4  **A.**    "Race and gender do not exert significant effects on

5  roll-off rates in either year of our analyses."

6  **Q.**    So does that mean that you -- that you don't see any

7  evidence that Blacks or Whites roll off more than the other?

8  **A.**    Correct.

9  **Q.**    Okay.  And one last question, I think, about Blacks

10  versus Whites.  You did say that sometimes self-reported

11  surveys have a problem because people lie.

12      Is there any reason you have discovered, in your

13  experience, why Black respondents would lie more than White

14  respondents?

15  **A.**    Not that I have seen.

16      **MR. WALLACE:**  Your Honor, if I may consult with my

17  colleagues.

18      **THE COURT:**  You may.

19     (CONFERRING OFF THE RECORD.)

20      **MR. WALLACE:**  We have no further questions, Your

21  Honor.

22      **THE COURT:**  Thank you.

23      **MR. CHEUNG:**  Your Honor, may I ask some brief

24  follow-up?

25      **THE COURT:**  I want to ask a question of the witness,

*Bonneau - Redirect*

1 and then I'll entertain what you are asking me.

2 So just here since our break, you testified that

3 different elections -- on redirect, different elections for

4 different offices could have different dynamics.  And when you

5 were talking about those differences, does that tell you --

6 does that tell you that these differences would -- does this --

7 I can't read my notes -- does it not tell you these would make

8 a difference?  I want -- do you remember that line of

9 testimony?

10 **THE WITNESS**:  I do.

11 **THE COURT**:  Would you go back and tell me what you

12 said again and give me a little bit more understanding about

13 it.

14 **THE WITNESS**:  All right.  So let me answer what I

15 think you are asking, and then if I'm not, we can dig down.

16 So the issue is voters can have -- can consider

17 different factors depending upon the office that they are

18 running for.  So characteristics in a candidate they may find

19 desirable as a judge, they may not want as a president or vice

20 versa.

21 And so if I'm filling out my ballot, even though I am

22 voting for governor and senator and state supreme court judge,

23 it's possible that the factors that I want -- all right.  So in

24 voting for a senator, I may want, like, someone who's, you

25 know, a real bulldog -- not Mississippi State Bulldog.  I know

*Bonneau - Redirect*

1    where I am -- but a real bulldog or a real fighter or someone

2    who's really contentious, you know, who's going to be

3    pugilistic.

4        I don't necessarily want that in a supreme court

5    judge; right?  So I might vote for Mike for senator, but I'm

6    not going to vote to put him on the state supreme court because

7    the characteristics that I want in those candidates is

8    different.

9        Is that, I think, what you are -- so even though we

10   are on the same district lines, whatever else, voters in the

11   aggregate could choose some candidates and not others based on

12   a variety of factors.

13       **THE COURT:**  And does race play into those factors?

14       **THE WITNESS:**  It's unclear.  Certainly, I think it

15   could.  To what extent it does or how prominent it is, it is an

16   empirical question that I don't think we know the answer to.

17       **THE COURT:**  Thank you.

18       You wanted to follow up with a question?

19       **MR. CHEUNG:**  Yes.  Just briefly about Mr. Wallace's

20   question about the extent to which race affects --

21       **THE COURT:**  You need to get near a microphone.

22       **MR. CHEUNG:**  Sorry.  Yes, Your Honor.  Just briefly

23   about the line that Mr. Wallace pointed out in the book about

24   the relationship between race and ballot roll-off and also to

25   Your Honor's question about the differences in dynamic between

*Bonneau - Recross*

1    races on the ballot, if I may.

2         **THE COURT:**  You may.

3         I'll give you an opportunity, Mr. Wallace, if there is

4    anything you need to re-cross on -- redirect on.  Excuse me.

5         **MR. WALLACE:**  Thank you, Your Honor.

6                        **RECROSS-EXAMINATION**

7    BY MR. CHEUNG:

8    **Q.**    Hello again.

9    **A.**    Hello.

10   **Q.**    So Mr. Wallace asked you to read a line from your book

11   indicating that race and gender do not exert significant

12   effects on roll-off rates in your book.

13        Do you recall that?

14   **A.**    I do.

15   **Q.**    So to the extent that Black voters are less likely to

16   participate in a down-ballot race due to disparities in

17   education, the fact that your model includes the education

18   variable would render the race variable insignificant; correct?

19   **A.**    To the extent that there are -- so you are asking a

20   question about multicollinearity; so -- all right.  Let me put

21   on my, like, teaching hat again.

22        So if those two variables are highly correlated --

23   right? -- it means you can't distinguish between the effects of

24   one absent the other; right?  So in a regression, what happens

25   is we look for the effects of A and then the separate effects

*Bonneau - Recross*

1  of B.

2      If A and B are tightly together, we are not going to be

3  able to, like, just toss that out, and we'll have -- right? --

4  multiple -- what we call multicollinearity, and we would be

5  prone to insignificance.  But we would be prone to

6  insignificance on both the education variable and the race

7  variable.

8      And so I don't recall what the correlation coefficient is

9  between race and education, but if they were correlated, I

10  would say, .9, then I think, you know, that would be -- that

11  would be an issue.  But, again, I don't recall that off the

12  top.

13  **Q**.  Let me try to ask it another way.

14  **A**.  Okay.

15  **Q**.  So to the extent that there are racial disparities in

16  turnout and those disparities are fully explained by

17  disparities in education, does the inclusion of the education

18  variable in your model -- would that render the race variable

19  insignificant?

20  **A**.  If they were fully accounted for by that, like you said,

21  then the model would not estimate, and one of those would drop

22  out because the model would not be able to get an estimate

23  because the two things -- you have two variables measuring

24  exactly the same thing.  So the fact that they are both in

25  there and they didn't drop out means that it is not fully

*Bonneau - Recross*

1  accounted for.

2  **Q.**  Mr. Wallace also asked you earlier about differences

3  in -- I'm sorry.  The Judge asked you earlier about differences

4  in political dynamics between different political offices on

5  the ballot.  Do you recall that?

6  **A.**  I do.

7  **Q.**  And, here, this goes back to your comparison of President

8  Obama running at the top of the ticket versus a candidate for

9  judicial office running in the same election; right?

10  **A.**  Yes.

11  **Q.**  A candidate like President Obama would have different

12  levels of name recognition and fundraising capacity as compared

13  to a down-ballot candidate like a supreme court justice?

14  **A.**  Yes.  If they ran -- if we're comparing independent

15  resources, yes.  If they were running together, like, if the

16  down-ballot state supreme court candidate was hitching his or

17  her wagon to, you know, the Obama campaign and kind of running

18  as a group as we saw in the Westbrook ad where it's Westbrook

19  and Espy and Bennie Thompson all doing, like, a "get out and

20  vote thing" together, then it wouldn't matter.

21  **Q.**  But as we discussed earlier, there is a ballot roll-off

22  effect between the top of the ballot and the bottom of the

23  ballot?

24  **A.**  Correct.

25  **Q.**  And that ballot roll-off, you found it related to

*Bonneau - Further Redirect*

1   educational attainment?

2   **A.**   It is one of the factors, yes.

3           **MR. CHEUNG:**   Thank you, Your Honor.

4           **THE COURT:**   Mr. Wallace, any more questions?

5           **MR. WALLACE:**   I think just one, Your Honor.

6                   **FURTHER REDIRECT EXAMINATION**

7   **BY MR. WALLACE:**

8   **Q.**   In answer to Her Honor's question, you explained some of

9   the things -- the differential factors that might cause your

10  vote at the bottom of the ballot to differ from the top of the

11  ballot.

12          Is there anything about district lines that is

13  differential in any way?

14  **A.**   Well, no.  The district lines are the same.

15  **Q.**   So whatever the reason for the change further with the

16  ballot, it's not the district lines?

17  **A.**   Correct.

18          **THE COURT:**   Okay.  Thank you.  That's the word I

19  couldn't read in my notes.  "Lines."

20          **MR. WALLACE:**   Glad I could help, Your Honor.

21          **THE COURT:**   Does not tell you these lines would make a

22  difference.

23          **MR. WALLACE:**   Thank you.  I have got nothing further.

24          **THE COURT:**   Okay.  Anything more of this witness?

25          **MR. WALLACE:**   As far as we're concerned, he may be

*Swanson - Direct*

1  excused, Your Honor.

2  **THE COURT:**  Thank you, sir.

3  **MR. WALLACE:**  Your Honor, what we would like to do, we

4  would like to call Dave Swanson.  I think at this point in the

5  day we are going to be able to get through his qualifications

6  as an expert.  If Your Honor wants to work late, we can work

7  late, but I at least would like to get the qualifications into

8  the record before we go home tonight.

9  **THE COURT:**  Good.  We have got time.  You may call

10  your next witness.

11  **MR. WALLACE:**  Yes.  We would call Dr. Dave Swanson.

12  (OATH WAS ADMINISTERED BY THE COURTROOM DEPUTY.)

13  **COURTROOM DEPUTY:**  Thank you.  You may take the stand.

14  **DAVID A. SWANSON, Ph.D., DEFENDANTS' WITNESS, AFTER BEING DULY**

15  **SWORN, WAS EXAMINED AND TESTIFIED AS FOLLOWS:**

16  **DIRECT EXAMINATION**

17  **BY MR. WALLACE:**

18  **Q.**  Would you state your name, please, sir.

19  **A.**  David A. Swanson.

20  **Q.**  And where do you live?

21  **A.**  Bellingham, Washington.

22  **Q.**  And what is your profession, or what do you do for a

23  living at this stage in your life?

24  **A.**  I'm an emeritus professor from the University of

25  California-Riverside, and I do some consulting work and

*Swanson - Direct*

1  academic work.

2  **Q.**    In what field?

3  **A.**    Demography.

4  **Q.**    All right.  And you say you live in Bellingham.  Are you

5  from Bellingham?

6  **A.**    No.

7  **Q.**    What part of -- what part of the state are you from?

8  **A.**    I grew up in Southeastern Washington state in the

9  semiarid desert, an area called Kennewick, the city.  It's near

10  the Hanford atomic plant on the Columbia River.

11  **Q.**    Okay.  And where did you go to high school?

12  **A.**    Kennewick High School.

13  **Q.**    Okay.  And tell us a little bit about your educational

14  experiences after you left high school.

15  **A.**    My first educational experience was I went in the Army.

16  **Q.**    And what did you -- this question could give you a very

17  broad answer, but what did you learn from the Army that might

18  be relevant to where we are now?

19  **A.**    The first thing I learned was -- after I got out of the

20  Army, is I wanted to go to higher education because I didn't

21  want to go out and pick up cigarette butts at 5:00 a.m. in the

22  morning while people screamed at you.  So I was highly

23  motivated.

24         But, in addition, I mean, it's partly somewhat true, but

25  I went to field -- or after basic training at Fort Hood, Texas,

*Swanson - Direct*

1  I went to Fort Sill, where I was trained in field artillery

2  operations and intelligence, which is fire direction control.

3  **Q.**  And in fire direction control, is it important to get the

4  math right?

5  **A.**  Absolutely.

6  **Q.**  What happens if you don't?

7  **A.**  Well, the United States Army is known for very highly

8  accurate artillery firing capabilities; so they work hard at --

9  they worked at hard at us -- with us at learning how to do

10  that.

11  **Q.**  Okay.

12  **A.**  Subsequent to that, if you are asking more about the

13  Army, I went to basic airborne training at Fort Benning.  After

14  I finished jump school, I was assigned to Fort Campbell, the

15  101st Airborne Division.  When I got there -- I didn't know it

16  at the time.  Neither did the rest of the 40 or so of us who

17  went up from Benning to Fort Campbell by bus -- that the 1st

18  Brigade was preparing to go over to Vietnam.

19      So the 326th Medical Battalion, which had a shortage of

20  medics, got permission to come into the replacement depot and

21  looked at records of people who came in, select people, and ask

22  us if we wanted to become medical corpsman at Fort Sam Houston

23  in San Antonio, Texas, and I volunteered.

24  **Q.**  And is that the capacity in which you served in Vietnam?

25  **A.**  I didn't serve in Vietnam.

*Swanson - Direct*

1  **Q.**  Okay.

2  **A.**  But that's the capacity in which I served.  When I

3  finally got out of the Army, I was -- I was discharged from

4  Madigan Army Hospital in Tacoma, Washington, near my home.

5  **Q.**  And what did you do when you got out of the Army?

6  **A.**  I went to a local community college because I really

7  needed to learn how to study.  And that was back in my

8  hometown.  It was actually in Pasco, Washington, Columbia Basin

9  College.

10  And then from there, after two quarters, I transferred to

11  Western Washington University.  And in 1972, I got my

12  bachelor's of science degree in sociology, which meant I also

13  had a minor in math in computer science.

14  **Q.**  Where is Western Washington University?

15  **A.**  Where I live.  Bellingham, Washington.

16  **Q.**  Got it.  So that's how you got to Bellingham?

17  **A.**  It is.

18  **Q.**  Okay.  Now, after you -- after you finished your

19  undergraduate work at Western Washington, where all did you go

20  for more study?

21  **A.**  Skipping some of the things I did in between, such as

22  backpacking around Europe and visiting my relatives in Sweden,

23  I went to the University of Stockholm for a year.  I received a

24  graduate diploma and basically three years of instruction in

25  Swedish in a single year.

1    After I finished that, then I went to the University of

2    Hawaii where I eventually received a master's degree and a

3    Ph.D.  And I mainly worked, when I was there, at the East-West

4    Center.  The East-West Center had the east-west population; so

5    it was a demography center.

6    **Q.**   Okay.  And after your Ph.D. in Hawaii, did you begin to

7    teach at that point?

8    **A.**   No.

9    **Q.**   What did you do?

10   **A.**   My -- I have been in private sector -- the public sector

11   in academics.  My first job was with the Governor's Budget

12   Office in Washington State.  They had a unit there called the

13   Population Enrollment and Economic Studies Division.  So I was

14   hired as a demographer, and that's where I really learned my

15   craft as to how to do population estimates.

16        Also learned a lot about doing on-the-ground data

17   collection.  We actually went out and did census counts and

18   supervised census counts.  Cities that thought they were

19   undercounted in the census had the option of being recounted.

20   And we would train them and supervise them.

21        Washington State allocated money through formulas based

22   on population.  So it was important to cities to make sure

23   they -- they had the right kind of population numbers.  So I

24   learned a lot about primary data collection and even survey

25   registering that point in my life where I stayed for

*Swanson - Direct*

1  approximately four years.

2  **Q**.   Okay.  And after you finished working for the Washington

3  government for four years, where did you go on from there?

4  **A**.   I became Alaska's first state demographer.

5  **Q**.   All right.  And what does the Alaska state demographer

6  do?

7  **A**.   We do population projections.  We do population

8  estimates.  We redid -- again, like we did in Washington, some

9  of the cities, such as Ketchikan, Kenai Peninsula Borough, were

10 unhappy with the 1987 census count; so we go back and recount

11 them.  And we set it up so that the census would not change the

12 '80 census numbers from our counts.

13        But they were recognized by the Population Estimates

14 Division in the Census Bureau such that they would then use

15 those numbers carried forward for federal revenue sharing

16 purposes.  So it was important to get, again, good numbers from

17 that.

18        We did surveys in the larger towns where we did

19 on-the-ground sample surveys in Fairbanks.  And we also did

20 them in Anchorage.  But in smaller towns, we did full-on census

21 counts.

22 **Q**.   And in a state as big and sparsely populated as Alaska,

23 are there particular challenges in getting the demographics

24 right?

25 **A**.   Absolutely.  Among other things, many places don't have

*Swanson - Direct*

1 street address systems. So if you are doing a census count,

2 you have got to really do a lot of things to make sure you are

3 doing things correctly.

4 **Q**. And you said "on-the-ground surveys." How do you take an

5 on-the-ground survey?

6 **A**. You go out and initially map the area so that you can

7 divide it into what would be, in the Census Bureau definitions,

8 enumerator areas. So we would divide the work up. We would do

9 estimates with the number of housing units that were there. We

10 would assign people to go through and do the work on the

11 housing units. We do the nonresponse follow-up. If someone

12 wasn't there when we knocked on the door, we would go back and

13 repeat until we got some information.

14 And at the end of every census cycle, when we got to the

15 end, there were always some small percentage of places we just

16 couldn't get information on and we believe they were occupied

17 housing units. So then we would use what the Census Bureau

18 does. And that's imputation methods to try and estimate what

19 the characteristics were of the households that were missing.

20 **Q**. And is knocking on people's doors a better way of

21 conducting the survey than some other ways of conducting the

22 survey?

23 **A**. It is, but it's expensive.

24 **Q**. Uh-huh.

25 **A**. So the Census Bureau, for example, still uses personal

1  interviews.  They have an information system called the Master

2  Address File that they will take sample frames from, but they

3  also use CATI, computer-assisted telephone interviewing.  But

4  they still use personal interviewing in some of their surveys.

5  **Q.**   Okay.

6  **A.**   Other ones they use, mail out, mail back.

7  **Q.**   All right.  Anything else important to -- I'm sure there

8  is a lot important about what you did in Alaska, but for the

9  issues here, is there anything else that's particularly

10  pertinent to what you are hearing in this courtroom?

11  **A.**   It would be -- just in general, when I went back into

12  academics, I was the director of a survey research lab.  I've

13  been the director of a populations studies unit.

14       When I was -- when I lived in Little Rock, I was the --

15  basically the Arkansas state demographer.  And we were in the

16  School of Business, and we were directly tied to the Arkansas

17  Institute for Economic Advancement.  So it was important that

18  we do population estimates, then characteristics of the

19  population for the state because they would use that

20  information to go out and recruit companies like Nissan to

21  build an assembly plant somewhere in Arkansas.

22  **Q.**   Well, let's step back a minute.  When you were in Alaska,

23  how long were you there?

24  **A.**   Three years.

25  **Q.**   And after that, where did you go?

*Swanson - Direct*

**A.**   After I was in Alaska, I accepted -- there was an interim
point where I went to -- I was a consultant survey research
statistician for Pacific Gas & Electric in San Francisco for a
year.

**Q.**   Okay.

**A.**   But I also knew that I was going to go to an academic job
at Bowling Green State University in Ohio.

**Q.**   What did PG&E need the demographer for?

**A.**   They mainly used me for my survey research background.
And what we did were what were called end-use energy surveys.

**Q.**   Okay.

**A.**   So PG&E would contract with a commercial company that was
in Berkeley to do interviews, but we had to then match the
interview information on the households to the records that
PG&E had so that we could see what kind of energy use they had.
So we could see, do you have a gas appliance that heats your
house, or is it electric?  Do you have an electric stove or
gas?  And we could then match things up.

   And the idea was they wanted to do short and long-term
forecasts so they could look at what energy demand was going to
be and then also use it for rate cases when they went before
the commission in California that decided on what kind of a
quasi public, quasi private company was going to do for rates.

**Q.**   And after you finished with Pacific Gas & Electric, I
think you said you were planning to go to Bowling Green?

Swanson - Direct

**A.**    I did.  I went to Bowling Green State University and was an assistant professor there.

**Q.**    Now, there are two Bowling Greens, in my mind, one in Kentucky and one in Ohio.  Is it the university in Ohio?

**A.**    The one -- the one in Kentucky is Western Kentucky University.

**Q.**    Okay.

**A.**    The one in Ohio is Bowling Green State University.

**Q.**    Okay.  And tell us what you were doing at Bowling Green State.

**A.**    I was director of the -- codirector of the population research unit, and I was an assistant professor.  And we also put together the first applied demography conference that had ever been done in the U.S., as far as I know, but it was certainly the first one in Ohio.  We got money from the governor's office to put on the conference.

**Q.**    So what is applied demography?

**A.**    Like most fields in academics, the audience for academics is other academics.  If you're doing applied work, your audience would be the general public, clients, people who are just generally interested.  And so your audience is very different and how you work is very different.

       Academics generally will try and -- if you look at it from the standpoint of you have got three dimensions -- cost, time, and precision/accuracy -- academics will do anything to

 1   get -- they will pay high cost, spend a lot of time to really

 2   push accuracy up.  And in an applied setting, what you do is

 3   you have to take into account of the fact that you might be

 4   working for a client that has got a limited budget.

 5       So we try to do it and kind of optimize among the three

 6   dimensions.  You want to reduce time; you want to reduce cost;

 7   and you want to come up with a solution that is adequate.  It

 8   doesn't have to be perfect, but it has to be adequate.

 9       So as an example on the school district forecasting I

10   have done, went back and evaluation of -- and did an evaluation

11   of Hillsboro, Oregon's School District, and we found that --

12   again, using those principles, that we kept cost low, the time

13   spent on doing the work was relatively low, and we gave them

14   sufficiently and accurate information that was needed to --

15   should they build a new middle school, a new undergraduate

16   school, or a high school.  And we -- the information that we

17   gave them to do, they did.  And that turned out to be the right

18   information.

19   **Q.**   And we might-- we are going to talk about schools anyway.

20   We might as well talk about it here.

21       What -- and it may be completely obvious, but how does

22   demography help a school district decide whether they need a

23   new middle school or they need a new high school?

24   **A.**   You do the forecast by age and by attendance cells.  And

25   so -- and many times -- well, I was involved in a school

1    district forecast for Harrison County, Mississippi, and we did

2    revisions of the attendance cells at the same time.

3    **Q.**    Was that before or after Katrina?

4    **A.**    That was after Katrina.

5    **Q.**    So you would have to make projections of who is going to

6    move back, I guess?

7    **A.**    That was part of it.

8    **Q.**    Okay.

9    **A.**    Harrison wasn't quite as impacted as parts of Hancock

10   County were, and Jackson County kind of got out of it, but

11   Harrison was definitely impacted.

12   **Q.**    As long as we are down on the Gulf Coast, you were

13   working in the school system in Harrison after Katrina.  What

14   other demography work were you doing on the Gulf Coast after

15   Katrina?

16   **A.**    As part of a cooperative group, we had a National Science

17   Foundation grant to study the effects of Katrina on the

18   Mississippi Gulf Coast.  Other groups had grants from the NSF

19   to do it in Louisiana.  And still others, including Dr. Tammy

20   Henderson, who is at Meharry Medical College in Nashville, she

21   was one of the teams that looked at where people were going and

22   what was the impact, say, of refugees from the Mississippi Gulf

23   Coast and New Orleans on Baton Rouge and Houston.  And so we

24   did that work.

25            We actually did that in conjunction.  We did most of the

1  training of our interviewers.  Again, it was on the ground.  We

2  used the Social Science Research Center at Mississippi State to

3  do the training for the interviewers and went down and set up

4  the census areas.  We designed it just like you do a full-on

5  census count.  We'd go through, and this house is no longer a

6  house, but we could see it.  So we counted everything.

7      And we actually had a team from the U.S. Census Bureau

8  from their geography division that came down.  They wanted to

9  GPS all of the units because they wanted to do some updates on

10  their Master Address File.  And they found it useful to work

11  with us, and it was useful for us to see what they were doing

12  with the GPS.

13  **Q.**  So you did door-knocking surveys when you could find

14  doors to knock on?

15  **A.**  That's right.  Otherwise, we didn't ignore the houses

16  that were gone or uninhabitable.  We classified them all as

17  part of the studies.

18  **Q.**  Okay.  So let me get back to Bowling Green.  You did that

19  work at Bowling Green.  How long were you there?

20  **A.**  I was there for three years.

21  **Q.**  And where did you go from Bowling Green?

22  **A.**  Pacific Lutheran University in Tacoma, Washington.

23  **Q.**  Pacific Lutheran.  All right.

24      And what kind of work did do you at Pacific Lutheran?

25  **A.**  I was director of the survey research center and

1  associate professor.

2  **Q.**   And what sort of survey research did you do when you were

3  head of the center?

4  **A.**   We did contract surveys with different groups.  And we

5  always had an annual survey we did for Pierce County, which is

6  where Tacoma is located.  So they kicked in a fair amount of

7  funds every year.

8     We could supplement with other questions, other people

9  that wanted to tag onto it.  So we could -- much like the CPS

10  has supplements for the voting rights or voting surveys and the

11  economic social survey supplements they do, we would do things

12  like that with our Pierce County surveys.

13  **Q.**   Explain how that tagalong works.  You say we are doing

14  this and some other people wanted to jump in with us.  How does

15  that work?

16  **A.**   You just add more questions, and you make sure that they

17  are consistent with what they want, what you are doing

18  originally for the survey questionnaires.

19  **Q.**   And so you are asking their questions, and are they

20  helping financially to get it out?

21  **A.**   Yes.

22  **Q.**   Okay.  And how long were you at Pacific Lutheran?

23  **A.**   Five years.

24  **Q.**   Okay.  From Pacific Lutheran, you went where?

25  **A.**   I received a phone call out of the blue one day from Gary

1 Chamberlin, who is the director of the institute at the

2 University of Arkansas, Little Rock, that was in School of

3 Business that was associated with The Art and Science Institute

4 for Economic Advancement.  He offered me a huge pay raise and

5 said that "We need a demographer in Arkansas."  So we moved.

6 **Q**.    And when you got to Arkansas, what sorts of things did

7 you do?

8 **A**.    Population forecasts.  We did studies of small towns in

9 Arkansas where there was a lot of economic issues going on.  So

10 we tried to work out plans both demographically and from the

11 economic standpoint.

12      And when I say that, it wasn't just me.  It was the

13 economist and other people that were in the institute as well,

14 the "What can we do to develop these places?"

15      As I said earlier, one of the tasks was we would provide

16 information to companies the state was trying to recruit or

17 companies that, on their own, were thinking of locating to

18 someplace in Arkansas.

19 **Q**.    And did you do some of those local surveys, I guess, in

20 Southeast Arkansas just across the river from the Delta?

21 **A**.    We did.

22 **Q**.    Okay.  Are conditions in Southeast Arkansas somewhat

23 similar to conditions in the Mississippi Delta?

24 **A**.    My experience being in the Delta in Mississippi and in

25 the Delta in Arkansas is that they are very similar.

*Swanson - Direct*

1  **Q.**   Okay.  After your time in Arkansas, where did you go?

2  **A.**   Well, from there, I -- let me think about where I was.  I

3  went to Portland State University.

4  **Q.**   Okay.

5  **A.**   So I received another absolutely call out of the blue.  I

6  was pretty happy living in Little Rock, so was my wife and our

7  daughters.  But it was back home, and they said they needed

8  somebody to replace somebody who had left.

9  **Q.**   Okay.  And how long were you there?

10  **A.**   I was only there for two years.

11  **Q.**   And what took you away from Portland State?

12  **A.**   I knew I was -- I was starting to teach part-time at the

13  Helsinki School of Economics and Business Administration in

14  Finland, and at one point, I knew I was going to be going there

15  to work as a dean.  And so I started setting the groundwork for

16  that.

17      And at the same time, I was doing a lot of consulting

18  work for the high-level nuclear waste repository in Yucca

19  Mountain, Nevada, which, again, involved survey research,

20  demographic estimates.

21      We had to gather information that would go into the

22  Nuclear Regulatory Commission's impact zone maps.  And they

23  would have a circle like this (indicating) with smaller circles

24  in it and then pie cross lines.  I thought it was very odd, but

25  we needed to set the information that we gathered for

*Swanson - Direct*

1   on-the-ground surveys and census work, essentially, and other

2   estimates into those zones.

3   **Q.**    And what did the nuclear regulatory people need to know

4   about who lived in those slices?

5   **A.**    One of the things they needed because -- when the plan

6   was to build the high-level nuclear waste repository, there

7   were both natural elements and human-made elements that were

8   going to protect really highly radioactive long-lived elements

9   for a long time.  And it was pretty clear that at some point,

10  maybe thousands of years in the future, it was going to leak

11  into the Amargosa Valley of Nevada.

12          So we did a lot of research on what people in the

13  Amargosa Valley did in terms of, did they grow their own local

14  food?  Were they drinking out of wells?  How deep were the

15  wells?  Because eventually the radiation was going to leak

16  there.  So we had to do studies that we would turn over to

17  other members of the team to see what the human factors might

18  be in the long-run in terms of what the impacts were going to

19  be.

20  **Q.**    So after that work, where did you go next?

21  **A.**    The Helsinki School of Economics --

22  **Q.**    Helsinki.  That's right.

23  **A.**    -- and Business Administration.  I was actually in the

24  city of Mikkeli.  They had a branch campus here where I was

25  dean, and we had bachelor of science programs and MBA programs

*Swanson - Direct*

1  there.

2  **Q.**   How long were you there?

3  **A.**   Four years.

4  **Q.**   And what brought you home?

5  **A.**   Grandchildren.  My wife -- we had a couple of them, and

6  my wife said, "It's time to go home."

7  **Q.**   And when you came home, where did you go to work?

8  **A.**   Here.

9  **Q.**   At Ole Miss?

10 **A.**   At Ole Miss.

11 **Q.**   Okay.  And what was your position at Ole Miss?

12 **A.**   I was a professor and the -- and the chair of the

13 department of sociology and anthropology.

14 **Q.**   All right.  And how long did you do that?

15 **A.**   I did that for four years.

16 **Q.**   Okay.  And in addition to your teaching and

17 administrative responsibilities, what sort of professional

18 demographic work were you doing?

19 **A.**   We had a Center for Population Studies.  So we would --

20 Max Williams was the person who set that up.  And I also worked

21 cooperatively with Art Cosby, who was the director of the

22 Social Science Research Center in Starkville.  So we did a lot

23 there.  There were actually more demographers there than there

24 were at Ole Miss.  But we got the population center kind of

25 going.

1    I had dinner Saturday night with a person who they hired

2  who got his Ph.D. at UT-San Antonio, Jamiko Deleveaux, who is

3  originally from the Bahamas, who's in the department as a

4  demographer, and then Lynn Woo, Chinese Delta person, who came

5  here as a student.  And I thought she'd like demography and

6  would do pretty well.  So she has been the staff person there

7  ever since I left, and things are going well for them.

8    They got the official recognition from the federal

9  government to be the Federal-State Cooperative Program for

10  Estimates representative for the state of Mississippi, the

11  state data center representative for the state of Mississippi

12  for the Federal Census Bureau, and the State-Federal

13  Cooperative Program For Population Projections.

14  **Q.**  And you talked about Chinese Delta for a minute.  I don't

15  think you were talking about rivers in China.

16    What is Chinese Delta in this part of the world?

17  **A.**  It means that -- the Chinese people who came here and

18  settled in the Delta.  They kind of followed the railroads, I

19  think were here.  So there's a contingent of Chinese people

20  that have been here -- ethnic Chinese people who have been here

21  for quite a while.

22  **Q.**  Okay.  Were you still at Ole Miss when you were doing

23  some of this post-Katrina work?

24  **A.**  I was.  And then, again, the West Coast back in -- job

25  offer to go to the University of California-Riverside.

*Swanson - Direct*

1 **Q.** Before you go there, I want to ask a question about

2 schools because you talked about Harrison County during your

3 Ole Miss days.

4 When you are working to help schools plan, do you work

5 with maps?

6 **A.** Yes, we do.

7 **Q.** Okay. Why do you use maps when you are working?

8 **A.** Because we have district boundaries, and they don't

9 necessarily correspond to Census Bureau statistical boundaries,

10 such as tracts, blocks. It corresponds to blocks -- maybe

11 block groups more or less, but you have got to do the

12 adjustments and use ArcInfo and techniques like that so you can

13 allocate properly when you are subdividing Census Bureau

14 pieces, statistical geography, for which you have population

15 and permission.

16 **Q.** So you are familiar with who and what is inside of the

17 boundaries on a map?

18 **A.** Yes.

19 **Q.** Okay. Now, I think you were about to tell me you got an

20 offer too good to refuse from California. What was that?

21 **A.** That was at the University of California-Riverside.

22 **Q.** And what did you do there?

23 **A.** I was a professor.

24 **Q.** Okay. Were you still doing research?

25 **A.** Absolutely.

1 **Q.** Okay. And how long were you at Riverside before you

2 retired?

3 **A.** Eleven years.

4 **Q.** Okay. And after you retired, what did you do?

5 **A.** I kept up academic publications, and I ended up doing

6 consulting work. Again, peoples -- we get phone calls. I

7 wasn't actively pursuing it.

8 So I got a phone call from you out of the blue. I got a

9 phone call from the U.S. Department of Justice out of the blue

10 to do work on forecasting populations for Indian reservations,

11 the Yurok and the Coeur d'Alene.

12 **Q.** And have you been involved in litigation about -- about

13 those Indian reservations?

14 **A.** I have. With the Hopi Reservation, I was hired directly

15 by the Hopi Tribe. So I was involved in the first part of the

16 case, which was basically against everybody else in the State

17 of Arizona. And the second part of the case was *Hopi v.*

18 *Navaho*. So I was involved in -- five years in that case.

19 **Q.** Okay. And I want to ask you -- well, one other thing,

20 and then I've got one last question.

21 Give me an idea of some of the publications you have done

22 that are relevant to what your testimony is going to be in this

23 case.

24 **A.** Well, at least several of the books I have published

25 would be. That would be *Subnational Population Estimates* where

we talk about the use of -- we're using GIS information and mapping.  We also discuss that issue in one of the forecasting books I published.

In terms of academic journal refereed articles, one of the recent ones was published in *Spatial Demography*, which obviously is a clue that it's involving geography.  We did forecasts for the Greenville Water District in Greenville, South Carolina.  And we used maps and expert judgment, combined with Census Bureau information, so that we could get a good handle on what areas of the water district were likely to boom because of new construction and what areas were likely to maybe even downturn but not change because they are already filled in.

So we had set up all of the maps so that people could visualize the engineers that were involved in the case and city planners and the water district people, obviously.  So we developed a process so we could score once we looked at the geography and history, and we could see them from Google Maps online, what was going on.  Some cases you could actually see the roads coming in and the lots being plotted.  Other places, you could see housing under construction.

So we can then score it and say, "Is this going to be high growth, low growth, no growth?"  It did the job.  Since it was so recent, we haven't had a chance to evaluate what the results are.

1   **Q**.   And you have mentioned the Census Bureau several times.

2   Can you describe some of the things you have done with and for

3   the Census Bureau over the years?

4   **A**.   I served on the Census Bureau Scientific Advisory

5   Committee for six years and chaired that committee for two.  I

6   was involved in the initiation of the American Community

7   Survey, which started in 2000.  When I was at Portland State

8   University, we were selected as one of the test sites.

9        So we were actually involved in setting up the ACS and

10  evaluating it against the long-term information in the census

11  count from the 2000 census.  And that work continued when I

12  served on the Census Advisory Committee.  So I was actually

13  appointed when I was here at Ole Miss, and then I stayed on

14  through my time at UCR through the whole six years.

15       We would -- the Census Bureau does a lot of internal

16  quality control.  I wouldn't say it's quite as rigorous as what

17  we did with the Nuclear Regulatory Commission and the

18  Department of Energy.  That was the most rigorous quality

19  control I have ever done working on the Yucca Mountain project,

20  where you had to go through layers of reviews for everything

21  you did.

22       But the Census Bureau has an in-house system.  They also

23  give advice from a range of committees, including the committee

24  I was on, about how to change the -- if they needed the

25  questionnaires, what they should do for terms of processes, how

*Swanson - Direct*

1   they collect data, what they should do for things like, how do

2   we ask questions about race and ethnicity?

3       And, then, beyond that, the Census Bureau people usually

4   participate in professional organizations, particularly

5   American Statistical Association, with which it has a long

6   history.  They will present papers on the results of their

7   findings.  If we make this change to the order of the question

8   on race in the ACS, will that change the answers that people

9   make?

10      So they will actually then go out and get feedback from

11  the peers at the conferences and eventually some of those

12  publications -- or some of those papers during the publication.

13  So they have got a long review process for their work.

14  **Q**.    And I want to focus on something you just said.

15  Sometimes -- sometimes the nature of the question may, in some

16  way, influence the nature of the answer you get.  Is that what

17  you said?

18  **A**.    That's correct.  So one of the things I discovered is

19  about the order, are you Hispanic or not, which is the race --

20  the ethnic question you typically use, and where they placed

21  that relative to what race would you say you are.  And then

22  they had to work a lot on that when they started moving to

23  multiple race choices, when they went from just picking one and

24  only one to saying, are you multiracial, and you pick off one.

25      So the order of the questions affected the answers that

1   people got.  I don't remember the exact details, but I know

2   that's just one of many things that affect the Census Bureau.

3   And they take a lot of time trying to get things right in terms

4   of their surveys and the -- and the same with census on those

5   questions.

6   **Q**.   That was going to my question.  If somebody suggests to

7   the Census Bureau that they are getting something wrong, what

8   do they try to do about it?

9   **A**.   They try and correct it.  It may be slow.  It may be

10  involved.  One of the things I heard best from a talk given by

11  an associate director of the Department of Commerce many years

12  ago, who is in charge of the census, was he described the

13  Census Bureau as a "blind tailor."

14          **MR. SAVITZKY**:  Objection, Your Honor, just to the

15  hearsay from what someone told him.  I agree it is a

16  fascinating anecdote potentially.

17          **THE WITNESS**:  Well, I can --

18          **THE COURT**:  It's sustained.

19          **THE WITNESS**:  -- I can give you the third position

20  myself.

21          **MR. WALLACE**:  I think he thinks it's 5:00.

22          That objection having been sustained, Your Honor, at

23  this point, I would offer Dr. Swanson as an expert in the field

24  of demography.

25          **THE COURT**:  Any objection?

*Swanson - Direct*

1    **MR. SAVITZKY:**  Your Honor, no objection to his being

2    an expert in the field of demography.

3        Two points.  First of all, as the Court knows, we made

4    a partial *Daubert* motion.  I would preserve that for the

5    record, understanding the Court has issued a decision.  There

6    is one issue that I think is left open by the *Daubert* ruling,

7    and I would potentially inquire with some short voir dire if he

8    is going to be offering testimony on the issue.

9        **THE COURT:**  You may.

10       **MR. WALLACE:**  I'm not sure what the issue is, but he

11   can have voir dire as far as I'm concerned.  Thank you.

12       **MR. SAVITZKY:**  May I proceed, Your Honor?

13       **THE COURT:**  You may.

14       **MR. SAVITZKY:**  Thank you.

15                    **VOIR DIRE EXAMINATION**

16   **BY MR. SAVITZKY:**

17   **Q.**    And good afternoon, Dr. Swanson.

18   **A.**    Hello.

19   **Q.**    I'm Ari Savitzky.  I represent the plaintiffs in this

20   matter.  We met before, once in person in Bellingham and once

21   on Zoom for your deposition.  Do you recall that?

22   **A.**    I do.

23   **Q.**    Good to see you again.

24       So, Dr. Swanson, you are not an electoral map drawer;

25   right?

*Swanson - Direct*

1   **A.**   That's correct.

2   **Q.**   You haven't ever drawn an electoral map before?

3   **A.**   That's correct.

4   **Q.**   And you're not an expert in electoral map drawing?

5   **A.**   I have never drawn electoral maps.

6   **Q.**   And you're not an expert in electoral map drawing?

7   **A.**   Could you define what you mean by an "expert in electoral

8   maps"?  Does it mean being able to read a map?  Does it --

9   **Q.**   Whatever it means to you.

10  **A.**   Well, I have worked with electoral maps, and I have

11  worked with school district maps that are very similar to

12  electoral maps.

13  **Q.**   Is your testimony that you are an expert in electoral map

14  drawing?

15  **A.**   I didn't say that, but you asked me to explain what I

16  meant.  And I said, I have worked with maps, both electoral

17  district maps and other types of maps.

18  **Q.**   And I'm asking if you would consider yourself an expert

19  in electoral map drawing.

20  **A.**   Not in electoral map drawing.

21  **Q.**   Okay.  And you haven't testified in court about electoral

22  maps before?

23  **A.**   That's correct.

24  **Q.**   And understanding that you have analyzed the population

25  that exists within different maps and electoral districts, you

1  don't claim to have any expertise in visually assessing the

2  shapes of electoral districts?

3  **A.**   In the sense of why the shape of an electoral district

4  necessarily be different than the shapes of other types of

5  districts and -- I'm not sure what you are asking me in the

6  sense of the shapes of them.

7  **Q.**   Just the boundaries of the -- assessing the boundaries of

8  a district.  You don't have any special expertise in

9  assessing --

10  **A.**   Are you asking me if I know how to interpret compactness

11  scores?  Is that what you are asking?

12  **Q.**   Let's stick with the question.  Just assessing the

13  boundaries of an electoral district.  You don't have any

14  special expertise or training in assessing what the boundaries

15  look like?

16  **A.**   The way you are phrasing the question, I would say I

17  don't.

18  **Q.**   And you don't work with any geographical or geospatial

19  map drawing software personally?

20  **A.**   That's correct.

21  **Q.**   Okay.  You don't work with a software program called

22  Maptitude?

23  **A.**   I don't work with GIS software, whether it's ArcInfo or

24  Maptitude or anything directly.

25  **Q.**   You would agree that compactness is a term that refers to

1   whether an electoral district is regularly shaped?

2   **A.**   Compactness -- the most compact form of areas is

3   generally considered to be a circle.  So many of the

4   compactness scores involve circles, but some involve other

5   types of geography.

6   **Q.**   You would agree that compactness is a term that refers to

7   whether a district is regularly shaped?

8   **A.**   That's part of the definition.

9   **Q.**   You don't know if people who evaluate the shape of

10  electoral maps or the shape of electoral districts routinely

11  use an eyeball test to assess whether districts are reasonably

12  compact?

13  **A.**   Given my experience in doing a lot of empirical work,

14  which also involves judgmental work, my -- my approach to doing

15  that would be use quantitative measures.

16  **Q.**   And you don't know if people who evaluate maps routinely

17  use an eyeball test to do so?

18  **A.**   I don't know what people who evaluate a lot of maps use,

19  whether it's electoral or otherwise, in terms of eyeball tests.

20  **Q.**   You're aware that there are certain mathematical metrics

21  for measuring the compactness of electoral districts?

22  **A.**   I am.

23  **Q.**   And you did a report in this case and included some of

24  those tables showing those mathematical compactness metrics.

25  Do you recall that?

*Swanson - Direct*

1   **A.**   I do.

2   **Q.**   Okay.  And you would agree that whether the scores in

3   your report mean that the illustrative plans that are being

4   offered in this case are insufficiently compact is not

5   something you can speak to?

6   **A.**   I can -- I can speak to what the scores mean and where

7   they head.  For example, if you look at the Polsby-Popper

8   score, if it tends toward zero based on the way it's measured,

9   it's not as good as one that tends high towards one.  Zero is

10  the theoretical lower boundary, and one is the absolute

11  empirical boundary.

12          And it's a measure that is derived by taking the diameter

13  of the dimensions of what the area is in question, the district

14  in question, and then making a circle whose circumference

15  matches that.  And then you divide the area of the circle into

16  the area of the district in question to get a ratio, and that

17  leads you to that compactness score.

18  **Q.**   Understanding some scores may be derived in that way, you

19  would agree that whether the scores in your report mean that

20  the illustrative plans being offered are insufficiently compact

21  is not something you can speak to?

22  **A.**   I can speak to the fact that most of the scores look like

23  they were not as good as the scores of the existing district.

24  **Q.**   But whether they mean that the plans offered are

25  sufficiently compact is not something you can speak to?

1    **MR. WALLACE:**  Your Honor, I'm going to object to the

2    word "sufficiently."  I think that's a legal question he is

3    asking this witness.

4    **MR. SAVITZKY:**  And, Your Honor, if I may be heard.

5    To the extent that the witness is being tendered as

6    someone who can offer opinions on the compactness of electoral

7    district shapes, he can answer the question based on his own

8    views of sufficiency, if he has them.  If he doesn't, then the

9    answer is, no, he can't speak to it.

10   **THE COURT:**  He may answer.

11   **A.**   Again, my answer is that I can look at a score when it's

12   there and say, is it close -- for the Polsby-Popper score, is

13   it close to one or close to zero?  And I can do the same for

14   the other metrics that are involved with it.

15   **BY MR. SAVITZKY:**

16   **Q.**   So is your testimony that you can speak to whether

17   electoral districting plans, the plans offered here, are

18   sufficiently compact?

19   **A.**   "Sufficiently" is the one word that bothers me in this.

20   I can speak to the degree of compactness based on the

21   quantitative scores.

22   **Q.**   But sufficient is not something you can speak to?

23   **A.**   It depends on what people mean by "sufficient."  And so,

24   for example, if a plan was offered and it said .9 on the

25   Polsby-Popper score was one of the scores and .7 was the score

1 in another map that was drawn or the way the district was drawn

2 or redrawn, I would say the .9 was better than the .7. Whether

3 or not it's sufficient, I can't answer that question.

4 **Q.** All right. You can't answer because sufficiency is not

5 something you can speak to?

6 **A.** Well, I just tried to frame it in the context in which I

7 answered your question.

8 **Q.** Okay. Now, the compactness scores we are talking about,

9 you didn't produce those yourself, did you?

10 **A.** That's correct.

11 **Q.** And you didn't compute the underlying scores that are in

12 your report?

13 **A.** That's correct.

14 **Q.** As far as you know, they were produced using one of those

15 geospatial software programs that we talked about?

16 **A.** Specifically, they were produced by ArcInfo with

17 additions that would allow one to do the kinds of calculations

18 that are needed in the iterate proportional fitting routines

19 and other algorithms that are needed to do that.

20 **Q.** And the person who -- but to be clear, you are not the

21 one who produced the scores --

22 **A.** That's correct.

23 **Q.** -- with that program?

24 The person who produced the compactness scores in your

25 report is a man named Tom Bryan?

*Swanson - Direct*

1  **A.**    That's correct.

2  **Q.**    Mr. Bryan produced all of the tables in your report that

3  contained compactness scores?

4  **A.**    He did.

5  **Q.**    And he actually is the one who computed the scores,

6  meaning all of the data in those tables?

7  **A.**    He did compute them.  I would like to say here, though,

8  that over the long time I have worked with him, I worked with

9  him initially on advising him as a consultant on statistics on

10  how to set up some of those scores, in fact, and he has gone on

11  and used them since then.

12      So I have worked with him for a long time.  So if you're

13  kind of implying that I don't know anything about how the

14  scores are set up and the work he does, that's not true,

15  because I have worked with him as a consultant on other cases

16  and helped him define his business that he does.

17  **Q.**    But you weren't involved in producing the scores that are

18  in your report?

19  **A.**    That's correct.

20  **Q.**    And Mr. Bryan produced other geospatial analysis for you

21  that you put in your report as well; correct?

22  **A.**    That's correct.

23  **Q.**    Okay.  For example, he produced a spatial analysis of the

24  location of polling places and their proximity to voting-age

25  population by race and ethnicity.  Do you recall that?

*Swanson - Direct*

1    **MR. WALLACE:**  Your Honor, I have an announcement that

2    may save some time.  Dr. Burch, when she was on the stand,

3    said, "My concern about distance to polls is not absolute

4    distance that Blacks are farther away.  It's that they may not

5    have cars."

6           And if she doesn't -- since there is no evidence about

7    the polls being farther away, we don't need to offer and we do

8    not intend to offer Dr. Swanson's work on how convenient

9    polling locations are relatively for Blacks and Whites.  That

10   is not going to be part of our case.

11          **MR. SAVITZKY:**  And, Your Honor, if I may be heard

12   briefly.

13          I don't intend to inquire in great detail about the

14   substance of the analysis, but as I think will be made clear,

15   the accuracy of the analyses provided by Mr. Bryan to Mr. -- or

16   excuse me -- to Dr. Swanson are relevant to the issue in which

17   I'm conducting the voir dire.

18          **THE COURT:**  You may continue to voir dire.

19          **MR. SAVITZKY:**  Thank you, Your Honor.

20   **BY MR. SAVITZKY:**

21   **Q.**   So Mr. Bryan produced a spatial analysis of the location

22   of polling places and their proximity to voting-age population

23   by race and ethnicity using that geospatial mapping software

24   you included in your report?

25   **A.**   Yes.  Uh-huh.

*Swanson - Direct*

1  **Q.** And you wouldn't dispute that Mr. Bryan's polling place

2  proximity analysis erroneously miscalculated the number of

3  people living within a half mile of their polling place?

4  **A.** I would have to go back and look at it. I haven't looked

5  at it in a while; so I can't answer your question.

6  **Q.** You wouldn't dispute that the polling place proximity

7  analysis that Mr. Bryan conducted and you put in your report

8  erroneously miscalculated the number of people living within a

9  half mile of their polling place?

10  **A.** My answer is, again, I would have to go back again and

11  look at the report.

12  **Q.** You don't recall whether --

13  **A.** No, I don't.

14       **MR. SAVITZKY:** Ms. Ruiz, could we just pull up what is

15  marked as Plaintiffs' 6 and go to page 11.

16       Plaintiffs' 6 is in evidence.

17  **BY MR. SAVITZKY:**

18  **Q.** Look at Paragraph 25. And the first sentence here --

19  this is Mr. Cooper's responsive report -- he writes,

20  "Apparently, Dr. Swanson has erroneously counted the entire VAP

21  living in any census block that is wholly or partly within a

22  half-mile radius of any polling place in his total of persons

23  within the half-mile radius."

24       Do you dispute Mr. Cooper's statement in there?

25       **MR. WALLACE:** Your Honor, I do object to the question.

*Swanson - Direct*

1  I know the Court allowed this paper into evidence, but

2  Mr. Cooper didn't testify to any of that.  So we didn't have

3  the opportunity to cross-examine him on any of that.  I don't

4  think that's a proper line of questioning on an issue that

5  isn't in the case.

6       **THE COURT:**  Sustained.

7  **BY MR. SAVITZKY:**

8  **Q.**   And, Dr. Swanson, shifting gears slightly, you don't

9  dispute that courts in other cases have deemed Mr. Bryan's work

10  to be unreliable?

11  **A.**   I can't speak to that.

12  **Q.**   So you wouldn't dispute that Chief Judge Dick in the

13  Middle District of Louisiana wrote that Mr. Bryan's work in a

14  redistricting case was poorly supported?

15  **A.**   I can't speak to that.

16  **Q.**   You don't dispute that Chief Judge Dick wrote that,

17  quote, "Bryan's analysis lacked rigor and thoroughness, which

18  further undermines the reliability of his opinions"?

19  **A.**   I can't speak to that.

20       **MR. SAVITZKY:**  For the record, the citation is

21  605 F. Supp. 3d 759 at page 824.

22  **BY MR. SAVITZKY:**

23  **Q.**   So after Mr. Bryan gave you the compactness scores and

24  tables you included in your report, you didn't have anyone

25  independently verify the information he gave you for accuracy,

*Swanson - Direct*

1   did you?

2   **A.**   I didn't.  You can talk to Mr. Bryan about who he did.

3   **Q.**   And you're not capable of verifying the compactness

4   scores for yourself?

5   **A.**   How soon would you want the evaluation?  So I wouldn't

6   say I'm incapable of it.  It's just a matter of how much time

7   it would take and what I'm doing otherwise.

8   **Q.**   Your testimony is you are capable of doing it yourself?

9   **A.**   I could be, yes.

10   **Q.**   Okay.  Dr. Swanson, you recall that you gave a deposition

11   on October 5th, 2023, in Bellingham, Washington?

12   **A.**   I do.

13   **Q.**   And you were under oath in that deposition?

14   **A.**   Yes.

15   **Q.**   And you had a chance to read the transcript afterward and

16   review your statements that you made there?

17   **A.**   Yes.

18   **Q.**   Okay.

19        **MR. SAVITZKY:**  Your Honor, may I approach the witness?

20        **THE COURT:**  You may.

21   **BY MR. SAVITZKY:**

22   **Q.**   Dr. Swanson, I'm going to hand you a copy of your

23   deposition.  It's been marked for identification as PC-09.

24   Could you please turn to page 118.  And it's paginated at the

25   bottom.

*Swanson - Direct*

And I'm just going to read a statement, and you can let me know if it's correct, if I read it correctly.

"Question:  I mean did you independently verify the results that they gave you with respect to compactness scores of the district?

"Answer:  You mean go ask somebody else who does GIS to see if that's the case?

"Question:  Sure, or do it yourself.

"Answer:  I'm not capable of doing it myself in that regard since I didn't run GIS programs."

Did I read that correctly?

**A.**   You did, but I also would add to what I said.  I could be and if I spent enough time on it.  So my answer in context with that was, if you are asking me right then and there if I could do it, I couldn't.

**MR. SAVITZKY:**  So, Your Honor, based on Dr. Swanson's responses to my questions, we would submit that he doesn't have sufficient expertise, knowledge, or training under Rule 702 to offer expert opinions evaluating the shape, visual, or mathematical compactness of electoral district boundaries.

I understand he can testify about the demographic characteristics of electoral districts and other portions of geography, but I think he has disclaimed any special knowledge or training to perform the analysis.  He testified that he doesn't have sufficient basis and experience or training to

*Swanson - Direct*

1  assess the shapes of the districts themselves.

2  So we would ask that his expertise not include that

3  area and he not be able to offer testimony in that particular

4  area.

5  **THE COURT:**  Your response?

6  **MR. WALLACE:**  Your Honor, never in my life have I had

7  to do redirect on voir dire, but I think it's permitted, and I

8  would like to ask him a couple of questions before you rule.

9  **THE COURT:**  You may.

10  Let me ask something just so that when you ask these

11  questions I'll make sure I'm understanding.  So in Document

12  Number 214, you mentioned earlier that there was a plaintiffs'

13  motion filed to partially exclude Dr. David Swanson's

14  testimony.  And the gist of our order there was that his

15  testimony should be limited to his opinions as to the maps that

16  Cooper has drawn, number one, because he is not a map drawer --

17  **MR. WALLACE:**  Right.

18  **THE COURT:**  -- and that his opinions pertaining to

19  Cooper's maps, which goes to the compactness -- and do I

20  understand that whatever information Bryan gave Swanson in

21  writing his report, that Bryan's -- you contest that Bryan's

22  underlying data is not correct?  Which I think honestly has to

23  come out on cross-examination.

24  I'm not sure that I understand, Mr. Wallace.  Is it

25  your intention to ask Dr. Swanson what opinion he has regarding

1  the compactness of those two maps?

2      **MR. WALLACE:**  I think I'm going to ask him to do

3  exactly what he just did, which is to say that a .9 score is

4  better than a .7 score as a matter of mathematics.  He does

5  understand the compactness tests, and I think he can say, if

6  one of them is .9, that's better than if another one is .7.

7  I'm --

8      **THE COURT:**  I don't need an expert to tell me that.

9      **MR. WALLACE:**  Actually, you do because on some of them

10  zero is good, but this -- on this one --

11      **THE COURT:**  Okay.  So I take that back.  I guess where

12  I'm having some trouble is figuring out if your motion filed

13  trying to limit his testimony spoke to what you're now voir

14  diring about, or is this something different?

15      **MR. SAVITZKY:**  So, Your Honor, I took the resolution

16  of the motion to leave this specific question open, in that

17  part of the response to the motion was, well, he's not a map

18  drawer.  He is not testifying about maps.

19      And I understand that, again, the demographic

20  qualities of these districts are something that -- he's a

21  demographer -- he can speak to, and to the extent that we

22  contest the accuracy of some of those figures, we can discuss

23  it on cross.

24      But the specific question of compactness of districts

25  and district shapes is, I would contend, something that is

1 really for a map drawer and someone who is an expert in map

2 drawing.  So we are not talking about population of the

3 districts.  We are talking about shapes of the districts

4 themselves.

5 And what I think we have heard in the testimony is he

6 doesn't have any particular expertise or training.  He relied

7 completely on someone else to produce the information.  The

8 scores are already in the record, and he doesn't have the

9 ability to offer any testimony about what those scores mean.

10 **THE COURT:**  So he is completely -- your contention is

11 that he is completely relying upon -- is it Bryan or Ryan?

12 **MR. WALLACE:**  B-r-y-a-n.

13 **THE COURT:**  Okay.  He is completely relying upon

14 Bryan's underlying data that he will form an opinion of whether

15 or not a particular shape, especially Dr. Cooper's maps, are

16 sufficiently compact?

17 **MR. SAVITZKY:**  Yes, Your Honor.  I mean, I think our

18 contention is that the only basis for any opinions or testimony

19 that he would offer characterizing the compactness of the

20 districts that Mr. Cooper drew is the analysis that he just

21 indicated he didn't do himself --

22 **THE COURT:**  He didn't do himself.

23 **MR. SAVITZKY:**  -- and is incapable of producing.

24 **THE COURT:**  Okay.  Ask your questions on voir dire,

25 and then let's get back to what is allowed and what's not.

*Swanson - Direct*

**VOIR DIRE EXAMINATION**

BY MR. WALLACE:

Q.   In the academic world, is it common for a lead researcher
to solicit the assistance of subordinate researchers to do
particular tasks?

A.   It is.

Q.   As a -- as a professor, would you sometimes use graduate
students to do calculations for you?

A.   Yes.

Q.   Did they figure out what you wanted calculated, or did
you tell them what you wanted calculated?

A.   I told them what I wanted them to do, and then we would
go over it.

Q.   Okay.  How long have you known Tom Bryan?

A.   He was a graduate student that I trained at Portland
State University.

Q.   So you taught him how to carry out your instructions?

A.   Yes.  And he did it very well.

Q.   How long have you been working together?

A.   On different projects, virtually ever since he was a
graduate student.  That would be circa 1995, '96.  So --

Q.   And --

A.   -- pushing 30 years now.

Q.   And are you confident in the work he has done for you
over 30 years?

1  **A.**    Yes.  And I'm confident in the work that I have consulted

2  him in when I have assisted him on helping some of these scores

3  and indices that he uses in his work.

4  **Q.**    And given particularly that you are retired, is it more

5  convenient for someone that does a full-time computing business

6  to do it than for you to figure out how to do it at your house?

7  **A.**    And I would add to that the fact that he has got all of

8  the data files set up, and he has all of the algorithms that

9  you need to do -- for example, if you are going to change

10  counties, as in the case here, are not as rigid, that are

11  difficult to deal with in terms of shapes and things like that

12  to try and allocate populations as you would if you went into

13  the legislative districts, for example.

14        And he has got all of the algorithms, iterative

15  proportional fitting, for example; so you get good allocations

16  of populations with his pieces.  With the counties, it's a

17  pretty straightforward job to do it.  And I'm well aware of

18  what he does and what datasets he has and the algorithms he has

19  used because I have assisted him with some of those in the

20  past.

21  **Q.**    And I think he said your testimony was in October of

22  2023.  Since then, have you seen any calculations from anybody

23  else that suggest Tom Bryan got it wrong?

24  **A.**    Not for this, no.

25  **Q.**    Okay.  Now --

*Swanson - Direct*

1        **THE COURT:** Did you have any additional questions for

2  voir dire?

3        **MR. SAVITZKY:** Your Honor, no. We only wanted to voir

4  dire on this particular subject. And, I mean, if counsel has

5  further questions --

6        **MR. WALLACE:** I do have one question, and, you know,

7  it's the difference between map drawing and map using.

8  **BY MR. WALLACE:**

9  **Q.** When you were helping school districts draw district

10  lines, did -- did you assist them in helping to get the most

11  convenient lines they could get?

12  **A.** We did. And if I could speak to that. It involves Tom

13  Bryan.

14        When -- he was part of the project that did the Hillsboro

15  School District, and it was one of the first times anybody in

16  the country had ever used ArcInfo GIS to actually put it on the

17  screen. We developed it with the assistance of the school

18  district's superintendent, a local committee of people that we

19  would show different plans to. They gave us criteria they were

20  looking for. They wanted to have relatively equal distribution

21  across the districts and into the schools, people by race,

22  social economic status, and things related to that. They also

23  wanted to minimize transportation routes.

24        So when one of the -- we came up with the initial plan

25  initially, like the screens here (indicating), we could project

1    the district boundaries and the attendance on boundaries

2    relative to overlays on the transportation lines and how the

3    buses would go, and we would present that to the people.  They

4    would say, "Well, if you do that, you are going to include this

5    housing project here, and that may change some things, and it's

6    going to be difficult for a bus line to get to."

7         So Erena Sharkova, who has a Ph.D. from the Moscow

8    Institute of Geography, worked on that, and Tom was at her

9    side.  So she would project -- she immediately drew it right

10   then and there.  She would make the changes, put it up, and we

11   would see the result in the attendance on populations of the

12   students themselves on what's going on.

13        So Tom learned from that experience and I learned from

14   that experience because it was my first experience working

15   actively as you go along with this sort of thing.  I mean,

16   right in real time, we would have changes on the maps up, and

17   people would respond to it.

18        And that eventually led us to the plan we had for what we

19   recommended to the Hillsboro School District was going to have

20   in terms of total forecast, what they were going to have by

21   these attendance zones of the different schools, and then also

22   what kind of racial socioeconomic status mix they were going to

23   have in the schools relative to what kind of transportation and

24   the bus routes.

25   **Q.**   So you're not claiming to have drawn the lines, but you

1 helped the responsible people get the information they needed?

2 **A**.    That's correct.  And I could help line up the people who

3 knew how to do that.

4        **MR. WALLACE**:  I don't think I have anything else, Your

5 Honor.  And I still think he ought to be accepted without

6 equivocation as an expert in demography.

7        **MR. SAVITZKY**:  And, Your Honor, I think what we have

8 heard is additional testimony that Dr. Swanson is able to speak

9 to the characteristics of populations within given district

10 lines.  We don't disagree with that.  There's lots of analysis

11 along those lines in his report, and, obviously, it's a subject

12 of cross-examination.

13        The question isn't whether he can offer opinions about

14 the demographic or other population qualities within district

15 lines.  The question is whether he can offer himself, whether

16 he has the training or expertise himself to offer opinions

17 about the shape of the lines themselves, not the population

18 within them but their shapes and whether the shapes are

19 compact.  And that I don't think has been further established

20 by counsel's question.

21        **THE COURT**:  Have you relied upon Bryan's underlying

22 data in giving expert opinions to courts previous to today?

23        **THE WITNESS**:  I worked with him on a different case in

24 Louisiana.  And I have worked with him as a consultant where I

25 have worked with him on different cases that he has done in

*Swanson - Direct*

1  terms of trying to develop indices and other types of measures.

2  For example, the cluster analysis I used here, he and

3  I turned that into an academic article, not the Mississippi

4  cluster analysis but the use of cluster analysis in

5  redistricting if you are trying to look at communities of

6  interest.  So that has been published as an academic article by

7  working with him.  So I think it reflects the long work I've

8  done with him spatially.

9  And then looking at the work we did in Greenville,

10  that's also published in the *Journal of Spatial Demography.*  We

11  did something similar to what I talked about like we did in

12  Hillsboro.  We had a group of experts to bring up things, and

13  we could start to change lines, and we could look at them.  And

14  as the shapes -- I mean, I -- I can look at the standard

15  different shapes of different things and get an idea of how

16  compact it is.  When he says "eyeballing it," it gives you a

17  relatively good idea.

18  But I would also say again, it's not a legislative

19  redistricting case.  The supreme court, the boundaries are the

20  counties.  So I don't see any really extreme shapes coming out

21  of any of the Cooper plans that I have seen in terms of, you

22  know, what the shapes of the areas would look like for

23  different proposals that Cooper has made, for example.  It is

24  pretty straightforward.  They are counties, just aggregating

25  different districts.

1      **THE COURT:**  Mr. Wallace, let me ask you, other than

2    compactness, what would you anticipate that he would testify to

3    wherein he has relied upon Bryan's underlying data?

4      **MR. WALLACE:**  I mean, I think he has asked Mr. Bryan,

5    you know, to push the button on the adding machine for various

6    calculations, but it's just a question of doing the math.  He

7    has got a whole lot of charts that have been in his report that

8    were produced by Mr. Bryan's company under his direction, but

9    it's -- you know, it's a pure calculation thing.  He's not --

10   he's not relying on particularly abstract opinions.  Like he

11   said, .9 is bigger than .7 is the sort of thing that he is

12   going to be talking about.

13     **THE COURT:**  You gentlemen understand this so much

14   better than I do because you can anticipate what he is going to

15   testify to and how you are going to cross that information.

16   And it may be necessary for me to get to that point before I

17   truly understand whether or not his opinions, using Bryan's

18   underlying information regarding compactness, ought to be

19   admitted or not.

20         For purposes of right now, I'm going to accept him as

21   an expert.  I'm acknowledging that, per our order, we said his

22   opinions would be limited to maps Cooper has drawn and his

23   opinions pertaining to them, which opens up a big door about

24   what opinions is he going to give pertaining to Cooper's maps,

25   one of which is compactness.  And I think I have got to hear

1   more about whether or not he has the expertise on compactness

2   and space.

3       **MR. WALLACE:**  We will be happy to develop that

4   testimony when we get to it, Your Honor.

5       **MR. SAVITZKY:**  Understood, Your Honor.

6       **THE COURT:**  Doesn't give you much to go on, but you

7   just know the case better than I do.  I'm curious about how

8   deep that dive is into compactness.  I'm kind of interested in

9   this eyeball theory.  I sure want something more than an

10  eyeball on whether or not this is -- you know, this would be an

11  appropriate -- well, it's not even whether or not it would be

12  an appropriate map.  It's whether or not this map would meet

13  the eligibility to be a non-diluting map.  I want to hear that.

14      **MR. WALLACE:**  Your Honor, if -- I think I heard a

15  ruling admitting him subject to reconsideration when you hear

16  the testimony.

17      **THE COURT:**  When I hear those specific questions, I --

18  it may be -- it may be calling for him to make conclusions and

19  give opinions that are greater than what his expertise is.  And

20  I will depend on you to make those -- obviously, those

21  objections so that you see what is forthcoming and I don't.

22      **MR. SAVITZKY:**  Understood, Your Honor.  And I was

23  about to say, we reserve the ability to stand up and let the

24  Court know at the appropriate time during the questioning.

25      **THE COURT:**  Could I ask a question just in general?

1  What is the goal of compactness?

2  **MR. WALLACE:**  When we get to closing arguments, you

3  will hear quite a bit about the importance of maps under the

4  *Allen* opinion where Justice Kavanaugh did not join the

5  majority -- he joined it on everything except things relating

6  to maps.  And that is going to be lawyer talk.  You are not

7  going to hear anything from him about that.

8  But the -- so the point of compactness is simply to

9  say, is this -- is this a district that is reasonably

10  configured under the circumstances?  And compactness is part of

11  that consideration.  And so he is going to tell you raw scores

12  on compactness and which is better and which isn't, but it's

13  going to be a legal question for you whether it's a reasonably

14  configured district at the end of the day.

15  **THE COURT:**  Uh-huh.

16  **MR. WALLACE:**  Have I misstated it, Mr. Savitzky?

17  **MR. SAVITZKY:**  You know, actually, Your Honor, I

18  don't -- I don't completely disagree with what Mr. Wallace said

19  in terms of compactness being one of those -- sometimes called

20  traditional districting principles that goes into the question

21  of, are the illustrative plans reasonably configured?  So it's

22  one of those considerations.  I do agree with that.

23  And I think for purposes of -- you know, when you have

24  a mapping expert or an expert who's talking about some of the

25  different principles that might apply in assessing a map,

1   certainly, some of them have to do with the qualities of
2   population.  Dr. Swanson just said communities of interest,
3   clearly something that I think he does have the training to
4   talk about as an expert.

5        But the compactness of the district is the shape of
6   those lines as one of those considerations that goes into the
7   overall question, is the plan reasonably configured?  It's
8   something that is really, I would contend, the domain of a map
9   drawer or ultimately a court thinking about these issues.

10            **THE COURT:**  Uh-huh.

11            **MR. SAVITZKY:**  But that requires someone who really
12  draws the lines to be able to assess.  I think anyone can
13  report the scores.  The scores are in the record.  But to
14  assess, what do these scores mean?  What can they tell us?
15  What can they tell us about the sufficient compactness?  Which
16  is the question that the -- that you ultimately have to think
17  about.

18            **THE COURT:**  So this is a question that you all know
19  the answer to all too well and I don't.  So you say --

20            **MR. WALLACE:**  And, Your Honor, he has told you today
21  and he has told you in his deposition he is not going to try to
22  tell you what is insufficient and what is sufficient.  You are
23  going to have to figure that out from reading the case law.
24  But he can tell you which scores better on the mathematical
25  scores and which doesn't.

1      **THE COURT:**  Which is the question I was about to ask.

2      You used the example .7 or .9.  He is going to be the

3  guy that tells me mathematically .9 is better; is that right?

4      **MR. WALLACE:**  That's right.

5      **THE COURT:**  The higher figure is better in this case?

6      **MR. WALLACE:**  In this particular test, yes.

7      **THE COURT:**  Analysis.  Okay.  I think where I am right

8  now, just talking about how -- thinking about how important or

9  not his testimony is, is does it matter if it's .9 or .7 if he

10  testifies that they are both compact?

11      **MR. WALLACE:**  All I can say is that it may.  I think

12  in light of Justice Kavanaugh's concurrence, the role of maps

13  is not completely solid in the jurisprudence at the moment, and

14  I think it helps you to know more rather than less.

15      **THE COURT:**  Okay.

16      **MR. SAVITZKY:**  And, Your Honor, if I could just -- I

17  don't disagree, but I think that is why this is the subject of

18  expert testimony.  There was testimony from Mr. Cooper on the

19  subject, and he has obviously testified, you know, dozens and

20  dozens of times and drawn hundreds and hundreds of maps.

21      So there was testimony from him about, what does it

22  mean for these scores to be different?  What does it mean to be

23  .9 versus .7?  What is the cutoff below which you would start

24  to say, that's troubling to me; right?

25      So that is the type of testimony that someone who has

1  the experience, who is qualified under Rule 702 by -- based on

2  their experience, can offer the Court, but if you don't have

3  that experience, then you can't offer an opinion on it.

4      **THE COURT:**  I understand.

5      **MR. WALLACE:**  And that was exactly the basis of my

6  objection to Mr. Cooper.  What you need to know is not what is

7  troubling to Mr. Cooper.  It's what is troubling to Justice

8  Kavanaugh.  That -- that is where ultimately you are going to

9  have to come down.

10     **MR. SAVITZKY:**  And I think on that we might part ways

11  because I think this is fundamentally a fact question for the

12  Court to resolve.

13     **THE COURT:**  Because I'm just kind of interested about

14  the fact that, you know, I think Dr. Cooper's testimony had a

15  whole lot to do with telling me that, given the numbers, one or

16  more maps -- he indicated many -- could be drawn.  Is it

17  important at this stage which one of those maps is better than

18  the other?

19     **MR. SAVITZKY:**  I don't think it's necessarily

20  important whether -- which one of the illustrative plans or

21  which of the plans that are offered.  I do think one question

22  for the Court is whether at least one of the illustrative plans

23  offers a reasonably configured additional Black-majority

24  district.  And one consideration, thinking about is the

25  district reasonably configured as -- is the compactness of the

*Swanson - Direct*

1  district and the equality of the lines.

2  **THE COURT:** Mr. Wallace, will he ultimately offer an

3  opinion of whether it is reasonably configured?

4  **MR. WALLACE:** He and I have never talked about

5  reasonably configured. That is a legal concept that I look

6  forward to talking with Your Honor about.

7  **THE COURT:** Okay. I don't mean to confuse, but I

8  needed to have a little clarity on where he is headed with this

9  testimony.

10  So, yes, he'll return in the morning to testify as an

11  expert. You will put me on notice of when you think he has

12  crossed the line of his expertise.

13  **MR. SAVITZKY:** Yes, Your Honor.

14  **THE COURT:** Okay?

15  **MR. WALLACE:** Thank you, Your Honor.

16  **THE COURT:** Any other matters?

17  **MR. SAVITZKY:** No, Your Honor.

18  **THE COURT:** I will see you at 9:00 in the morning.

19  Thank you.

20  (RECESSED AT 5:44 P.M.)

21

22

23

24

25

CERTIFICATE

I, Phyllis K. McLarty, Federal Official Realtime Court Reporter, in and for the United States District Court for the Northern District of Mississippi, do hereby certify that pursuant to Section 753, Title 28, United States Code, that the foregoing pages, 778-946, Volume 5, are a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

Witness my hand, this 20th day of August, 2024.

/s/ Phyllis K. McLarty
PHYLLIS K. McLARTY, RMR, FCRR, CCR #1235
Federal Official Court Reporter