1
                     UNITED STATES DISTRICT COURT
                    NORTHERN DISTRICT OF MISSISSIPPI
2                         GREENVILLE DIVISION

3

DYAMONE WHITE; DERRICK SIMMONS;
4   TY PINKINS; CONSTANCE OLIVIA
SLAUGHTER HARVEY-BURWELL                          PLAINTIFFS
5
VS.                                              NO. 4:22-CV-62
6
STATE BOARD OF ELECTION COMMISSIONERS;
7   TATE REEVES, IN HIS OFFICIAL CAPACITY
AS GOVERNOR OF MISSISSIPPI; LYNN FITCH,
8   IN HER OFFICIAL CAPACITY AS ATTORNEY
GENERAL OF MISSISSIPPI; MICHAEL WATSON,
9   IN HIS OFFICIAL CAPACITY AS SECRETARY
OF STATE OF MISSISSIPPI                           DEFENDANTS
10

11

12                        NON-JURY TRIAL
                           VOLUME 4
13

14               BEFORE HONORABLE SHARION AYCOCK
                 UNITED STATES DISTRICT JUDGE
15

16                      Oxford, Mississippi
                        August 8, 2024
17

18

19                   (APPEARANCES NOTED HEREIN)

20

21

22

23
          ─────────────────────────────────────────
          PHYLLIS K. McLARTY, RMR, FCRR, CCR #1235
24            Federal Official Court Reporter
                911 Jackson Avenue East
25                Oxford, MS  38655

1   <u>APPEARANCES:</u>

2   For the Plaintiffs:   ARI J. SAVITZKY, Esquire
                          MING CHEUNG, Esquire
3                         VICTORIA OCHOA, Esquire
                          American Civil Liberties Union Foundation
4                         125 Broad Street, 18th Floor
                          New York, NY  10004
5

6                         JONATHAN K. YOUNGWOOD, Esquire
                          JANET A. GOCHMAN, Esquire
7                         Simpson Thacher & Bartlett
                          425 Lexington Avenue
8                         New York, NY  10017

9
                          V. NOAH BENJAMIN GIMBEL, Esquire
10                        KATE LAMBROZA, Esquire
                          Simpson Thacher & Bartlett
11                        900 G St. NW
                          Washington, DC  20001
12

13                        SABRINA S. KHAN, Esquire
                          Southern Poverty Law Center
14                        403 Washington Avenue
                          Montgomery, AL  36104
15

16                        BRADLEY E. HEARD, Esquire
                          Southern Poverty Law Center
17                        1101 17th St. NW, Suite 550
                          Washington, DC 20036
18

19                        AHMED K. SOUSSI, Esquire
                          Southern Poverty Law Center
20                        150 E. Ponce de Leon Avenue
                          Suite 340
21                        Decatur, GA  30030

22
                          JOSHUA F. TOM, Esquire
23                        AYANNA DENISE HILL, Esquire
                          ACLU of Mississippi
24                        P.O. Box 2242
                          Jackson, MS  39225-2242
25

```
 1   For the Defendants:   CHARLES E. COWAN, Esquire
                           MICHAEL B. WALLACE, Esquire
 2                         Wise Carter Child & Caraway, P.A.
                           P.O. Box 651
 3                         Jackson, MS   39205-0651

 4
                           JUSTIN LEE MATHENY, Esquire
 5                         REX MORRIS SHANNON, III, Esquire
                           ELIZABETH WINDSOR USRY, Esquire
 6                         Mississippi Attorney General's Office
                           P.O. Box 220
 7                         Jackson, MS   39205-0220

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

# TABLE OF CONTENTS

| PLAINTIFFS' WITNESSES | DIRECT | CROSS | REDIRECT |
|---|---|---|---|
| Derrick Simmons | 681 | 719 | |
| Reuben V. Anderson | 732 | | |

| DEFENDANTS' WITNESSES | DIRECT | CROSS | REDIRECT |
|---|---|---|---|
| Ann H. Lamar | 751 | 772 | |

*Simmons - Direct*

1    (CALL TO ORDER OF THE COURT AT 8:59 A.M.)

2         **THE COURT:**  Okay.  Who would you call?

3         **MR. GIMBEL:**  Good morning, Your Honor.  The plaintiffs

4    call Senator Derrick Simmons.

5    (OATH WAS ADMINISTERED BY THE COURTROOM DEPUTY.)

6         **THE COURT:**  You may take the stand.

7    **DERRICK SIMMONS, PLAINTIFFS' WITNESS, AFTER BEING DULY SWORN,**

8              **WAS EXAMINED AND TESTIFIED AS FOLLOWS:**

9                   **DIRECT EXAMINATION**

10   **BY MR. GIMBEL:**

11   **Q.**   Good morning, Senator Simmons.

12   **A.**   Good morning.

13   **Q.**   Could you please state and spell your name for the

14   record.

15   **A.**   Derrick Simmons.  D-e-r-r-i-c-k.  Simmons, S-i-m-m-o-n-s.

16   **Q.**   How old are you, sir?

17   **A.**   47.

18   **Q.**   What do you do for work?

19   **A.**   I have a small law practice based in Greenville,

20   Mississippi, also an office in Ridgeland, a law practice

21   concentrating primarily on personal injury and criminal

22   defense, and I also have the privilege of serving Mississippi

23   Deltans in Coahoma, Washington, and Bolivar County in

24   Mississippi Senate.

25   **Q.**   Can you provide a brief overview of your educational

*Simmons - Direct*

1  background?

2  **A.**    I actually went to primary school and secondary school in

3  Greenville Public Schools in Greenville, Mississippi.  After I

4  finished up high school in Greenville, I went to Jackson State

5  University and majored in accounting.  I got a bachelor of

6  business administration in accounting.  Once I finished that, I

7  went to Washington, D.C., our nation's capital, to receive a

8  master's of business administration in accounting and finance.

9  And I guess I didn't want to get a real job, so I just

10  kept going to school.  Then I went to law school at Howard, and

11  I finished up at Howard before returning back to Mississippi.

12  **Q.**    And when you returned back, did you return to Greenville?

13  **A.**    I did.

14  **Q.**    So other than your higher education and college and grad

15  school, have you lived in Greenville your whole life?

16  **A.**    I have.

17  **Q.**    Are you a member of any professional organizations?

18  **A.**    Yes.  My fraternity, I'm actively involved in my

19  fraternity in Greenville, Mississippi, Alumni Chapter of Kappa

20  Alpha Psi.  A fraternity which I was initiated in at Jackson

21  State.  I'm also a member of the Greenville Rotary Club, and,

22  of course, I'm a member of the bars and associations, the

23  Mississippi Bar, of course, which is the bar that grants my

24  license.  I'm also a member of the D.C. Bar because I'm

25  licensed to practice in Washington, D.C.

The National Bar Association, which is the bar association for African-American judges and lawyers nationally. I'm a member of that.  Also the American Bar Association which is the majority bar nationally.

In the State of Mississippi, the parallel to the National Bar Association is the Magnolia Bar, which is the bar association for African-American judges and lawyers in the State of Mississippi.  I'm a member of that bar as well.

**Q.**    Have you held any leadership positions in any of these organizations?

**A.**    No.

**Q.**    Okay.  I would like to talk a little bit more about your background and your upbringing in Greenville.  So did you grow up with both parents in the household?

**A.**    I did.

**Q.**    And what did they do for work?

**A.**    My daddy was a factory worker.  I remember quite vividly having one family vehicle.  My dad will either drop my mom off at work before going off to a factory job.  He mainly worked 11:00 to 7:00 or 7:00 to 3:00 or 3:00 to 11:00 in factories in Greenville.

My mom would -- was a grocery store clerk, and she worked for Kroger Foods for 34 years before she retired after my dad passed in 2015.  She would walk us to school, and then she would walk to work because the grocery store that she worked at

Simmons - Direct

1 was close to our home. If not, she actually would catch a ride
2 with somebody.

3 **Q.** Did either of your parents attend college?

4 **A.** No. My mom didn't. My mom always wanted to go to
5 Jackson State, but she had my older brother, Zachary, at 15, so
6 she was unable. Because she had to take care of my brother
7 Zachary, she was unable to go to college even though she wanted
8 to.

9 My dad, he went to Mississippi Valley State. He was
10 really, really -- had an infinity for music. He played the
11 trumpet in high school, and he wanted to go to Mississippi
12 Valley State. He went one year before discontinuing his
13 studies at Valley to take care of family.

14 **Q.** Do you have any siblings?

15 **A.** I do. My older brother, Zachary, who is now in
16 Murfreesboro right outside of Nashville, Tennessee, and I have
17 an identical twin brother who I practice law with and who
18 happens to be the mayor of Greenville.

19 **Q.** And just in case he comes up later, what is your twin's
20 name?

21 **A.** Eric Simmons.

22 **Q.** Thank you. Where were you and Eric born?

23 **A.** We were born in Greenville in 1976, and we were born at
24 King's Daughters Hospital. Eric is seven minutes older. He
25 was born at 5:11 a.m. I was born at 5:18 a.m.

**Q.** What about your older brother, Zachary, where he was born?

**A.** My older brother, Zachary, who is five years older, was born in 1971. Unfortunately, he wasn't able to be born in Greenville because Black babies were not born in Greenville at that time. All Black babies had to be delivered in Mound Bayou, Mississippi, at Taborian Hospital. My mom has told us many stories of how he was rushed to Mound Bayou, Mississippi, which was roughly about 45 minutes to an hour away from Greenville for him to be delivered.

**Q.** Did you have an extended family in Greenville as well?

**A.** I did. My mom was one of nine, and my dad was one of four.

**Q.** What was your childhood in Greenville like?

**A.** It was -- we had modest means with, of course, my dad being a factory worker, my mom actually just being a grocery store clerk. A very strong religious background, going to church. Going to school. Actually playing, of course, in the neighborhood with the guys that we grew up with in the neighborhood. It was a wonderful experience.

**Q.** Did you ever have any jobs a child, Senator Simmons?

**A.** Yes. My first job was working at Payless Shoes in the Greenville Mall at the age of 16, and I was able to keep that job and transfer it to Jackson, Mississippi, where I actually worked at Payless Shoes when I was a student at Jackson State.

1  **Q**.    Did you ever do any jobs for your family?

2  **A**.    Before working at Payless Shoes at 16, I would credit my

3  first job being a job that I got from my grandfather, my

4  maternal grandfather, Jessie Bruce, cutting yards in the

5  Mississippi Delta.  And so my granddad would pick us up, my

6  brother Eric and I.  And my brother Zachary would go sometimes

7  as well.  And we would cut yards on the other side of town.

8       The yards were -- the homes looked totally different than

9  the homes that we actually lived in on one side of town.  The

10  yards were a whole lot bigger.  And so we would actually go to

11  that side of town, and we would cut yards with my grandfather,

12  and probably cut yards from 6:00 a.m. in the morning till about

13  4:00 in the evening.  And I would actually make a cool $5 for

14  that whole day.

15  **Q**.    Not too bad, I suppose, for a kid growing up.  And where

16  did you go to high school, Senator Simmons?

17  **A**.    I went to T.L. Weston High School, which was one of the

18  high schools in Greenville Public Schools at the time.

19  **Q**.    And what was that like?

20  **A**.    It was great.  The -- most of my teachers were -- it was

21  a mixture of Black teachers and White teachers.  The -- I went

22  to school with a lot of people that actually grew up in my

23  neighborhood.  We actually were bused to school.  And we

24  actually had a lot of Whites to go to school as well.  I

25  remember Jeremy and Jason King, actually playing with them and

Simmons - Direct

1 also going to their home, actually playing basketball at their

2 home.

3 **Q.** And were those White friends of yours?

4 **A.** They were. They were.

5 **Q.** And where did they live?

6 **A.** They lived on the other side of town, what we consider to

7 be on the other side of the track, right. And so when I grew

8 up, it was just known in Greenville that there were certain

9 areas for Blacks and certain areas for Whites, but we went over

10 there. The Kings were so nice to us. We were able to not only

11 play basketball with Jeremy and Jason, because they had things

12 that we didn't have, you know, a big yard, a basketball goal,

13 and so we played in their yard, played basketball.

14 The Kings allowed us to come inside the house, which was

15 great. We ate food out of their refrigerator. But the

16 neighbors, of course, they were not as welcoming until the

17 Kings established that we were there as their guests or their

18 invites.

19 **Q.** And what -- you might have said this, but what was the

20 racial makeup of the neighborhood where the Kings lived?

21 **A.** It was predominantly White.

22 **Q.** And what about the neighborhood where you grew up?

23 **A.** All Black.

24 **Q.** And what about the racial makeup of Weston High School?

25 **A.** The makeup of Weston at the time when I went there, from

1  '91 to about '95, was probably about 60 percent Black,

2  40 percent White.

3  **Q.**  Do you have a sense of the racial breakdown of

4  Greenville's population when you were growing up?

5  **A.**  It was close to the same racial makeup in the city, if

6  not probably more, 50/50.

7  **Q.**  Senator Simmons, were there -- was there any other public

8  high schools in Greenville when you were growing up?

9  **A.**  Yes.  Greenville High School was also another high school

10  in the Greenville Public School District, and then also there

11  were Western Line's School District, which is the school

12  district for the county schools, and so that was the other

13  school district in the Greenville area.

14  **Q.**  Do you know what the racial makeup of those other public

15  high schools was?

16  **A.**  Roughly the same, roughly the same.  The Western Line's

17  School District, the county schools were more so -- had more of

18  a White demographic than the city schools.  So roughly probably

19  more so closer to 50/50 in the Western Line School District as

20  opposed to the Greenville Public School District.

21  **Q.**  Were there any private schools in the Greenville area

22  when you were growing up?

23  **A.**  Yes.  We had Washington school, St. Joseph school,

24  Greenville Christian, so, yes, we had private schools in

25  Greenville when I grew up.

*Simmons - Direct*

1  **Q**.  Are you aware of the racial makeup of the student bodies

2  in those schools?

3  **A**.  Predominantly White.

4  **Q**.  And you testified that you attended college at Jackson

5  State?

6  **A**.  Yes.

7  **Q**.  Was it common for Weston High School graduates to go on

8  to college?

9  **A**.  I would say we graduated about 125.  I would -- I had the

10  privilege or the pleasure of graduating as valedictorian, so I

11  was number one in the class.  Of course, Eric was salutatorian.

12  I was the smarter twin.

13      About 33 percent.  About 33 percent or so went to

14  college.  The remaining percentage either stayed and picked up,

15  like, a trade, or they just -- they didn't go to college.

16  **Q**.  What about those private schools that you mentioned?  Do

17  you know if it was common for their graduates to go to college?

18  **A**.  100 percent of them.  It was known -- if you went to

19  St. Joe or Washington or Greenville Christian, you were going

20  to Mississippi State.  You were going to go to Ole Miss.  I

21  mean, it was almost guaranteed that you were going to college.

22  **Q**.  You talked a little bit about the housing in the

23  neighborhoods where White and Black families in Greenville

24  lived, which you visited.  Are you aware of economic

25  disparities between White Greenville residents and Black

*Simmons - Direct*

1  Greenville residents growing up?

2  **A.**  Yeah.  Certainly, the neighborhood.  I mean, the

3  neighborhoods, they looked totally different.  We -- we

4  commonly called it the "good side of town," you know, and so,

5  you know, it was always great.

6      Like, if we actually were traveling from our side of the

7  town to, like, the mall or to south Greenville, closer to where

8  a lot of the industry was that were not -- that was not

9  downtown, those -- that area of town really looked totally

10  different.  And we just loved to go and just look at that side

11  of town.

12      But -- but also disparity as far as the industry or the

13  people downtown who owned businesses or -- or, like, where my

14  mom worked -- I mentioned she was actually a grocery store

15  clerk for 34, 35 years.  And so when you go into, like, the

16  grocery stores, you will see all of the cashiers.  They were

17  Black.  The managers of the grocery stores, of course, were

18  White.

19      As far as industry, downtown Greenville, and also south

20  Greenville, the business owners, the bankers, everybody were

21  White, but then the people who were, like, the custodians in

22  the area, of course, they were Black.  So that was an apparent

23  observation of my childhood growing up in Greenville between

24  Black and White.

25  **Q.**  Moving on from Greenville for a moment, I would like to

1  ask you a couple of questions about your higher education and

2  professional career.  You mentioned you went to Howard.  Did

3  you work while you were attending Howard for your MBA?

4  **A**.    Yes.  My MBA program at Howard was a night program.  It

5  was from 6:00 to 9:00, Monday through Thursday.  We had Fridays

6  off.  And so I worked as an internal auditor for Northrop

7  Grumman.  Was an aerospace defense contractor based out of

8  Century City, California, but I worked in the Herndon,

9  Virginia, outfit as an internal auditor.

10        And I would work from, like, 6:00 a.m. -- sometimes I'd

11  get to work a little late, 7:00 a.m., and I worked from

12  7:00 a.m. until about 4:00 p.m. before driving from work to

13  Howard Business School for class at 6:00.  So for two years, I

14  worked as an internal auditor for Northrop Grumman in the

15  daytime, and I went to school at night before getting my MBA in

16  accounting and finance, master's of business administration.

17  **Q**.    And what about when you went on to law school at Howard,

18  were you working then?

19  **A**.    The first year at Howard Law, there was a prohibition

20  regarding work, so we couldn't work the first year.  After the

21  first year, I actually received a law clerkship working at

22  Baker Donelson and also Phelps Dunbar.  I worked at Baker

23  Donelson for six weeks during the summer after my first year of

24  law school and seven weeks at Phelps Dunbar, and that would

25  have been the summer of 2003 because my first year of law

1  school was 2002 to 2003.

2  **Q.**   Where were you working?  Was that in Washington, D.C.?

3  **A.**   It was in Jackson, Mississippi.

4  **Q.**   Okay.  And what about after your second year of law

5  school that summer?

6  **A.**   After my second year of law school for -- after my first

7  year of law school, entering my second year of law school, we

8  no longer had the prohibition against work.  So I worked at

9  Temple Law Offices in downtown D.C.  He was a big -- Donald

10  Temple -- constitutional law, civil rights lawyer.

11      He taught at George Washington and Georgetown and also at

12  Howard as an adjunct professor.  And so I worked at his firm

13  for two years, my second year and my third year.  And he

14  primarily did personal injury, constitutional, civil rights

15  law, and also criminal defense.

16  **Q.**   Starting with your first summer, you mentioned Baker

17  Donelson and Phelps Dunbar.  Did you receive a full-time offer

18  of employment from either of those firms?

19  **A.**   I did not.

20  **Q.**   Did you receive a full-time offer from Temple Law?

21  **A.**   I did.

22  **Q.**   Did you accept that offer?

23  **A.**   I did not.

24  **Q.**   Why not?

25  **A.**   I felt, certainly considering my background and my

1 experience and what I had achieved for my family and also the

2 community that I grew up in, that I would be more impactful by

3 returning not only to Mississippi but also to the Mississippi

4 Delta to be an inspiration to so many people who look like me

5 and who grew up in the Delta, but to also to try to change the

6 Delta that I grew up in.

7 **Q**.    And just one last question on your law firm experience.

8 During law school, were you compensated during that -- those

9 summer jobs?

10 **A**.    Yes.  I remember the 13 weeks during the summer of 2003,

11 I made more money in those 13 weeks than my mom and dad made

12 combined for the whole year.  And because my brother Eric and I

13 would always go to school off, like, scholarships and we'd get

14 money back as, like, work study students, it was very common

15 for us to send money back home.

16      We did it when we were at Jackson State.  We did it while

17 we was at Howard and certainly the summer of 2003 where I made

18 a lot of money.  I think my check was about $1,400 a week.  We

19 were able to send money back home to help my mom and dad who

20 were trying to make ends meet.

21 **Q**.    So you didn't work at Temple after law school.  What did

22 you do after law school?

23 **A**.    I actually got a clerkship working for a circuit court

24 judge, Margaret Carey-McCray.  She is still on the circuit

25 court bench in the Fourth Judicial District, which covers

*Simmons - Direct*

1   Leflore, Sunflower, and Washington counties in the Mississippi

2   Delta.  Judge McCray, she lives in Greenville.  So I clerked

3   for her until I passed the bar.

4       And then after that, I became the assistant public

5   defender for Washington County in Mississippi.  There are about

6   five or six full-time public defender offices in Greenville,

7   Washington County.  Washington County is one of those full-time

8   public defender offices, and I actually started off as the

9   assistant public defender there.

10  **Q.**  You represented criminal defendants?

11  **A.**  Many.

12  **Q.**  And what was the racial makeup of your clientele?

13  **A.**  95 percent Black or more.

14  **Q.**  I would like to turn now to your other hat that you wear

15  as a state senator.  So in that capacity, do you belong to a

16  political party?

17  **A.**  I do.

18  **Q.**  Which party?

19  **A.**  The Democratic party.

20  **Q.**  What drew you to the Democratic party?

21  **A.**  The -- the Democratic party aligns closely with my values

22  and my beliefs, and it, in my opinion, speaks to the struggles

23  that I saw in my family and the struggles that I saw in my

24  community, and it seems as if the Democratic party is more so

25  for the employee, as opposed to the employer.  It's more so for

1  the little man as opposed to the big man, if you will, and

2  it -- the Democratic party, in my opinion, tries to or seeks to

3  try to build a better place, whether it's Mississippi or

4  America, from the bottom up as opposed to the top down.

5      And so that's who I am, a small-town little guy and

6  always trying to help those who were the least among us to try

7  to improve their conditions.

8  **Q.**  Focusing just on Mississippi, does race play any factor

9  in political party affiliation?

10 **A.**  Certainly.  The Democratic party, there's almost a

11 positive correlation with being Black and being Democrat and

12 then being White and Republican in Mississippi.

13 **Q.**  You mentioned that you -- when did you first run for the

14 state senate?

15 **A.**  Governor Haley Barbour in January of 2011 called a

16 special election in my senate district, Senate District 12.  My

17 predecessor was Attorney Johnnie Walls, Senator Johnnie Walls,

18 who held the seat for about two decades, and he vacated the

19 senate seat to take the bench in the Delta.

20     And so after the Governor Barbour declared a special

21 election in January, the election was set for March the 1st of

22 2011.  I ran for that vacant seat, and there were two

23 challengers who also sought the office.

24 **Q.**  And why did you decide to run for that office?

25 **A.**  When I got back from school and started practicing law, I

1  remember roughly from 2005, '6 until 2011 -- I became a member

2  of the school board in 2009.  So I served on the Greenville

3  Public School Board from 2009 until 2011, and a lot of people

4  saying, "You should run for senate.  You should run for house."

5      But Attorney Walls or Senator Walls was a mentor of mine.

6  We grew up -- we actually used to spend the night at his house,

7  played with his son Kwasi Walls.  And when he vacated the seat,

8  I just actually ran for the seat.  I always knew I wanted to do

9  something more than impactful than on the school board.  And I

10 just thought that was a great opportunity for me to do more for

11 the community, be, like, a catalyst of change in the Delta.

12 **Q.**  Did you fundraise for that election?

13 **A.**  I did.  I did.

14 **Q.**  How -- where did you raise funds from?

15 **A.**  Well, I got maybe 5 or $10 from my mom and dad.  My aunts

16 and my uncles, probably their contributions was, like, cooking

17 at some of the rallies I had.  But for the most part, I raised

18 about $22,000, and about 90 percent of that, if not more, came

19 from law school buddies or people outside of the State of

20 Mississippi who were just investing in me.

21 **Q.**  Who staffed your campaign?

22 **A.**  My family.  My campaign manager was Eric, my twin

23 brother, and everyone else were, like, family and church

24 members.

25 **Q.**  And what sorts of campaign activities did you do?

*Simmons - Direct*

1   **A.**    Well, we certainly did door-to-door canvassing.  We had
2   rallies at, like, the park, local parks to try to encourage
3   people to get out and vote.  I remember -- which was very novel
4   at the time.  I actually instituted a text message campaign.  I
5   don't know how effective that was, but we actually tried to
6   communicate via text, and so we did that as well.

7            **THE COURT:**  Excuse me just a second.  Get just a
8   little bit closer to the mike.

9            **THE WITNESS:**  Yes.  Yes.

10  **BY MR. GIMBEL:**

11  **Q.**    Senator Simmons, what was the result of that 2011
12  campaign?

13  **A.**    I won 76 percent of the total vote, and my two
14  challengers, they shared 24 percent.

15  **Q.**    And were you re-elected subsequently after that?

16  **A.**    Yes.  In 2015, I ran unopposed, and in 2019, I had a
17  challenger who ran as an independent, and when you run as an
18  independent in the State of Mississippi, you don't have to
19  actually have a primary fight.  The primary election is always
20  in August, and the general election is in November.  So he was
21  an independent from Greenville.  He worked in construction.  He
22  was a White male funded by the Republican party against me.

23  **Q.**    And any other elections since then?

24  **A.**    The last election was last year in 2023, and I was
25  unopposed.

*Simmons - Direct*

1  **Q.**   And in those years that you ran unopposed, did you

2  campaign for other candidates?

3  **A.**   I did.  I campaigned for statewide candidates as well as

4  candidates in the Delta.

5  **Q.**   I would like to ask a couple questions about your

6  district.  Can you delineate the geographical boundaries of

7  your senate district?

8  **A.**   Washington County, which is the -- the county seat is the

9  City of Greenville.  My senate district goes from Washington

10  County.  It goes northwest to Bolivar County, and then a little

11  further north to Coahoma County.  And the district stretches

12  about 95-miles long from Greenville, Mississippi to Lula,

13  Mississippi.

14  **Q.**   I believe you have already testified this, but do you

15  consider Greenville to be part of the Mississippi Delta?

16  **A.**   Certainly.

17  **Q.**   And what about the rest -- sorry.  Were you going to say

18  something else?

19  **A.**   No.

20  **Q.**   All right.  What about the rest of your district?

21  **A.**   Yeah, the rest of my district is in the Mississippi

22  Delta, in the areas around my senate district also.

23  **Q.**   What do you mean when you say the "Mississippi Delta",

24  first in geographic terms?

25  **A.**   Geographically, I would say the Mississippi Delta, from

*Simmons - Direct*

1 Tunica, which is north, and coming all the way down to, like,

2 Yazoo, which is, like, more so central, the south part before

3 you start going into Hinds County, which is like Jackson or the

4 capital city or the county where the capital city is.

5 **Q.** What about culturally?

6 **A.** Culturally? The Delta is concentrated with Blacks.

7 Agriculture area. I remember stories of my mom and dad and my

8 aunts and certainly my grandfather and grandmother talking

9 about working in the cotton fields on Saturday to make

10 additional money. The blues, good food, good entertainment,

11 that's the Delta.

12 **Q.** Okay. Do you travel to other parts of the Delta?

13 **A.** I do.

14 **Q.** You travel, for example, to Cleveland?

15 **A.** Yes.

16 **Q.** And Clarksdale?

17 **A.** Yes. And Cleveland is the county seat for Bolivar

18 County, and Clarksdale is the county seat for Coahoma County,

19 both of those counties being in my senate district.

20 **Q.** Okay. How often do you travel around the Delta to other

21 communities outside of Greenville?

22 **A.** Quite a bit. A lot during the campaign season, but I

23 attend events even when I'm not campaigning throughout the

24 Delta.

25 **Q.** Do you have family in other parts of the Delta?

1   **A.**   I have family throughout the Delta.

2   **Q.**   Can you name a couple of examples of places?

3   **A.**   Leflore County, which is like Greenwood is the county

4   seat there.  Indianola being the county seat of Sunflower

5   County.  Bolivar County, Coahoma.  And I even have family up in

6   DeSoto County in the Tunica area as well.

7   **Q.**   How about in your law practice, does that ever bring you

8   to other parts of the Delta outside of Greenville?

9   **A.**   Yes.  I practice law throughout the -- the Delta.  I --

10  Eric primarily leads up the personal injury aspect of our firm,

11  and I primarily do the criminal defense.  So I practice before

12  this honorable court in the Northern District of Mississippi.

13  And so I practice criminal defense on the federal side as well

14  as on the state side, but that actually causes me to practice

15  throughout the Mississippi Delta.

16  **Q.**   And you mentioned that you also campaign in other parts

17  of the Delta.

18          Do you have a rough estimate of how many Deltans you have

19  interacted with on the campaign trail around the Mississippi

20  Delta?

21  **A.**   Countless.  I hate to give a number.  10,000.  I mean,

22  countless.

23  **Q.**   Do you find that there are similarities between different

24  parts of the Delta that you visit?

25  **A.**   Yes.  The struggles in the Delta, the things that I seek

*Simmons - Direct*

1   to try to address as a state senator are all the same

2   throughout the Delta.

3   **Q.**   And what sorts of things are those?

4   **A.**   Full funding for schools.  Our schools are woefully

5   underfunded.  T.L. Weston, which was my high school, is now a

6   middle school in the Greenville Public School District.  My mom

7   and dad graduated from Greenville High School, and now in the

8   Greenwood Public Schools, there is one high school.  When I

9   went there, it was two, T.L. Weston and Greenville High.  But

10   Greenville High now is the high school for the entire

11   Greenville Public School District.

12       The building -- the facilities are roughly the same as

13   when my mom and dad went there.  My dad graduated in '69.  My

14   mom graduated in '74.  I graduated in '95.  And all of the

15   buildings are the same.  We don't have a new bond issue or a

16   new school.  And that basically is the case throughout the

17   Delta with the school buildings being substandard or subpar.

18       Healthcare is a big issue in the Mississippi Delta;

19   limited to no access to health care.  There is no neonatal

20   intensive care unit anywhere in the Mississippi Delta.  There

21   is only one pediatrician for every 4,000 children.  So a lot of

22   my constituents and a lot of people that I represent, I know

23   that they actually -- in talking to them, certainly, they use

24   the emergency room as their primary health provider.

25       Infrastructure.  Until recently, we have had an infusion

*Simmons - Direct*

1 of federal dollars regarding repairing our roads and bridges in

2 the State of Mississippi, and the Mississippi Delta has

3 benefited from that. But we have not seen a state

4 comprehensive plan, even though I know I advocated for it at

5 the state level, for maintaining our roads and bridges. So

6 infrastructure is a problem, so, yeah.

7 Education, healthcare, and infrastructure certainly being

8 those issues that plague the Mississippi Delta, and those

9 struggles are the same struggles throughout the Mississippi

10 Delta, even outside of the three counties that I represent in

11 the Delta.

12 **Q.** What about economic development?

13 **A.** Economic development. We have not had a major economic

14 development project in the Mississippi Delta in 30 years. And

15 I advocate in Jackson at the state capital. If you invest even

16 in healthcare -- even though we don't get the industry, like,

17 Nissan or Continental Tires or Amazon, which we actually had a

18 big funding project this year for Amazon that is going to,

19 like, Madison County. If you invest in healthcare, that would

20 be commensurate to our Nissan or our Continental Tires, but we

21 haven't had that investment either.

22 So no major economic development. A lot of industry has

23 left. A lot of the population has left. So the Delta is

24 certainly struggling even more than what it was when I actually

25 graduated in 1995 until now.

1   **Q**.    As a state senator, do you hold any committee
2   assignments?

3   **A**.    Yes.  The lieutenant governor, last term, I had the
4   pleasure or the privilege of having his support to be the
5   chairman of municipalities.  This term was started after we won
6   in November of '23.  It's a four-year term from '24 to '28.  He
7   actually appointed me as the chairman of county affairs, which
8   is the chairman of the board of supervisors.

9       I work closely with all of the 82 counties to try to come
10  up with legislation to help all of our counties in the state.
11  I'm the vice chairman of constitution.  I serve on both
12  judiciary committees, Judiciary A, which is the committee that
13  primarily focuses on civil law.  Judiciary B primarily focuses
14  on criminal law, and I'm a member of the finance committee,
15  and -- because Greenville is a port city or we have Greenville
16  and Rosedale both being port cities, I have the honor of
17  serving on the Ports and Marine committee as well.

18  **Q**.    Okay.  You also mentioned that you are -- do you hold any
19  leadership positions within the Democratic caucus in the state
20  senate?

21  **A**.    Yes.  I'm the senate minority leader, and I have had that
22  position since 2017.

23  **Q**.    What does that entail?

24  **A**.    Well, certainly, we caucus as senate Democrats, but also
25  it places me in leadership to work with the lieutenant

*Simmons - Direct*

1    governor, the senate pro temp, senator Dean Kirby, on

2    conversations or when we try to have policy, whether it's

3    sponsored by Democrats and/or republicans, to see if we can

4    reach an agreement bipartisan early if we could, and if not,

5    republicans do what they normally do to us, they just run over

6    us.

7    **Q.**    What's the racial makeup of the Democrat caucus in the

8    state senate in Mississippi?

9    **A.**    The Mississippi Senate, there are 52 members of the

10   Mississippi Senate.  36 are Republican, all White.  16 are

11   Democrats, and out of the 16 Democrats, 14 are Black, and 2 of

12   the Democrats are White; Senator Hob Bryan and Senator David

13   Blount.

14   **Q.**    As minority leader, do you campaign for other candidates?

15   **A.**    Yes.

16   **Q.**    Do you coordinate campaign activities?

17   **A.**    I do.

18   **Q.**    You coordinate campaign activities among the 14 Black

19   state senators?

20   **A.**    I do.

21   **Q.**    How much focus do their campaigns put on majority White

22   areas?

23   **A.**    Not much.

24   **Q.**    Why is that?

25   **A.**    When we campaign, the whole goal is to try to increase

1   Black voter turnout, and you do that by focusing on the area in
2   which you represent.  And in Mississippi, I mean, just quite
3   frankly, the majority of Blacks, I mean, they just in the
4   Democratic areas, and when you go to heavily Republican
5   districts, the majority of the people are, in fact, White.

6       So it's a greater return on our investment to try to
7   increase our own numbers to affect the outcome of elections as
8   opposed to going to areas where it's almost certain that you
9   are not going to get the support, because those areas are White
10  and Republican.

11  **Q.**   What do you do to try and increase voter turnout among
12  Black Mississippians?

13  **A.**   Well, there's a big voter education piece.  A lot of
14  Blacks, whether they are my constituents or whether they are
15  people that I have represented who have made mistakes, they
16  believe that if you have made a mistake and that has resulted
17  in a conviction, then you automatically have lost your right to
18  vote.

19      And so we have to spend time educating them that in
20  Mississippi, there are only 22 disenfranchising felonies that
21  affect your right to vote.  And all felonies, because you are a
22  convicted felon, you don't automatically lose your right to
23  vote.  Sometimes we have circuit clerks who, if a person misses
24  jury duty, will just remove a person from the voter rolls.  We
25  have to work on those situations to try to get people back on

1   the voter rolls.

2       Registration is always an issue to try to encourage those
3   of voting age to actually register to vote.  And even as we get
4   into actual elections, there are a lot of transportation issues
5   throughout the Delta.  And so we try to help people to exercise
6   their right to vote but also getting them to the polls, who may
7   have challenges in actually getting to the polls on election
8   day.

9       And then also for those who are not going to be actually
10  in town on election day, we try to get them to vote absentee if
11  at all possible.

12  **Q.**  Are these activities similar in your district versus
13  other parts of the Delta?

14  **A.**  They are similar throughout the Delta.

15  **Q.**  And why do you think that these issues persist in the
16  Delta with respect to voter turnout?

17  **A.**  There's a lot of voter apathy.  There's a lot of --
18  there's a disconnect between voters feeling as if voting in an
19  election is really going to have an effect on their current
20  condition.  And so those issues that I mentioned from
21  infrastructure, healthcare, education, when you go from 20 to
22  30 years of not seeing a change in your school buildings and
23  you are fighting for funding for schools or when you go from
24  the healthcare actually declining over the last 20, 30 years
25  and not really improving, when you go to finally seeing in just

1    a short one or two years infrastructure regarding improvements
2    on roads and bridges, they just feel like, what is voting going
3    to do?

4         So that's just one of the challenges that we have to deal
5    with, and we try to education them that there are different
6    levels of government.  The people that you elect, your mayors,
7    your council, your supervisors, they are there to try to --
8    they are closer to you, closer to the people.  So they are the
9    ones that you will see every day, the ones that really is going
10   to have more of a direct impact on your condition.

11        But a person like me at the state level, I'm trying to do
12   everything I can to get funding down to the local level so that
13   those local elected officials can do what they need to do to
14   try to improve your condition.  And in certain -- like this
15   year, we have a presidential election.  Currently, Bennie
16   Thompson is on the ballot.  We try to help them get out to vote
17   and understand that this is his congressional district.  What
18   he does in Washington, D.C., is try to get federal dollars back
19   to the State of Mississippi to help the entire State of
20   Mississippi, but that also helps the Delta.

21   **Q.**   You mentioned that you sit on the finance committee.
22   Does that -- do you interact in that capacity with the
23   allocation of funds throughout the State of Mississippi?
24   **A.**   Yes.  I work on the finance committee where we actually
25   bond on behalf of the state to try to get money to support

1    special projects throughout the State of Mississippi.

2    **Q**.    And have you had success in getting state funds allocated

3    to the Delta?

4    **A**.    I have had success.  Have certainly improved success

5    since I have been there, but comparatively, the legislative

6    will is not there, or the votes are not there to send money to

7    the Mississippi Delta or to really Democratic parts of the

8    state, because those areas are predominantly Black areas.

9    **Q**.    What gives you hope for the future in having these

10   conversations with voters?

11   **A**.    There is always hope, I believe, in any struggle.  And I

12   believe when people struggle long enough and when you get

13   basically just to the bottom, then there is no other way to go

14   other than up.  And so as a practicing lawyer in the Delta, and

15   as a state senator in the Delta, I believe, at some point, that

16   we all will basically get to a point or they will join me in

17   still being optimistic and hopeful for the Delta.  I really

18   believe the Delta can bounce back.

19         I think the Delta could be like the Mississippi Gulf

20   Coast if we make the right investments and we get the people as

21   engaged as we need them to be engaged.  If we can get the state

22   to start investing in the Delta like the state invests in the

23   other parts of the state, I think the Delta could be like a

24   DeSoto County or a Hattiesburg area, but it takes my working in

25   the capacity that I work and also appealing to those in charge,

*Simmons - Direct*

1  the majority, which in the legislative body that I work in is

2  Black -- I mean is White and Republican to understand that the

3  Delta is part of Mississippi too.

4  **Q.**  I would like to return to Greenville for a moment.  You

5  testified that you have lived there your whole life,

6  representing the senate.  Your brother is the mayor.

7       Do you know the Greenville community pretty well?

8  **A.**  I do.

9  **Q.**  And you testified earlier about what your experience was

10  like growing up in Greenville.  How has the city changed since

11  your childhood there?

12  **A.**  A lot of population loss.  There's been more of White

13  flight, more of the White population leaving at a higher or

14  concentrated rate, but there has also been Blacks to leave as

15  well.  So the population has declined tremendously.  The

16  factories -- my daddy worked at Davis Steel, utility products,

17  and then also waste management were, like, three good factory

18  jobs that he had.  All of those companies have left the Delta.

19       Industry certainly has left.  Population, and, of course,

20  those things that I mentioned, the healthcare, education, those

21  things have -- issues have actually worsened in the Delta.

22  **Q.**  Have those -- have other parts of your district

23  experienced similar changes?

24  **A.**  Yes, certainly.  Coahoma County as well.  Bolivar County

25  where Delta State is.  Because of the college town, you'll see

*Simmons - Direct*

1   downtown Cleveland looking a little different than other parts

2   of the Delta.  But where Mississippi Valley is, which is like

3   out in the county part of Leflore County, there is not really a

4   lot of industry but Greenwood, which is close by, but overall

5   the Delta has changed, and the Delta looks totally differently

6   than it looked in the '90s and the 2000s.

7   **Q.**   You touched on this, but there -- have there been

8   demographics changes in the Delta?

9   **A.**   Yes.  The Delta is more Black -- is more concentrated

10  with Black people than it was when I actually finished high

11  school in '95 and when I was in college in 2000.

12  **Q.**   I know you walked us through some of your committee

13  assignments.  Have you ever been on any legislative committees

14  dealing with redistricting?

15  **A.**   Yes.  The lieutenant governor appointed me to the

16  legislative redistricting and reapportionment committee in

17  which in 2022, we drew new lines for the congressional

18  districts and also new lines for the legislative districts.

19  **Q.**   What prompted those redistricting?

20  **A.**   Every ten years.  Every ten years, according to the

21  Constitution, we have to redistrict.  And so we did that

22  regarding our four congressional districts as well as the 52

23  districts in the senate and the 122 districts in the house.

24  **Q.**   Did those changes account for the demographic changes

25  that you discussed?

*Simmons - Direct*

1   **A.**   Certainly.

2   **Q.**   I would like to turn now to the Mississippi Supreme

3   Court.  You mentioned you're a lawyer?

4   **A.**   Yes.

5   **Q.**   Are you barred to practice in Mississippi?

6   **A.**   I am.

7   **Q.**   You passed the bar exam?

8   **A.**   I did.

9   **Q.**   And in the course of studying for the bar, did you learn

10  about the state court system?

11  **A.**   I did.

12  **Q.**   You -- what do you understand to be the role of the State

13  Supreme Court in Mississippi?

14  **A.**   The Mississippi Supreme Court is the highest court in the

15  land as it relates to the boundaries of Mississippi, and the

16  Mississippi Supreme Court decisions are binding on all courts.

17        And so I practice primarily at the trial level, and so,

18  of course, in researching the law, I made decisions in my

19  practice as it relates to accepting and rejecting cases.  You

20  look at the set of facts that are before you and make a

21  determination on what the current law is and make a decision

22  regarding that case, whether you accepted.  And they also --

23  when you are practicing law, you use those same -- go through

24  the same process when you are doing a reasonable inquiry into

25  the law and the facts of trying to make decisions on a

1  particular case.

2  **Q.**    In your experience as a trial lawyer, can the race of the

3  judge have any impact on how a case plays out?

4  **A.**    Well, for me as lawyer, my position is the judges are

5  impartial.  The race of a judge should not matter, should not

6  affect any particular outcome of a case.  However, with the

7  people that I represent, they have a level of distrust in the

8  system altogether based upon the dark past of Mississippi,

9  based upon lived or learned experiences that they may have.

10     So you have to have conversations with them about the

11  different roles of individuals in the system, whether it's the

12  prosecutor or the criminal defense lawyer, whether it's the

13  judge on the civil side, plaintiff versus defendant, but

14  growing up in Mississippi and with the majority of the people

15  that I represent looking like me, they inevitably have a

16  feeling that race matters even in the judicial system because

17  race has mattered in other parts of their lives.

18  **Q.**    You mentioned you're a member of the Magnolia Bar.  How

19  long have you been a member?

20  **A.**    Since I have been practicing law, since 2006.

21  **Q.**    Do you attend meetings?

22  **A.**    Yes.

23  **Q.**    How frequently?

24  **A.**    We have an annual convention, and then also when we are

25  not at a convention, we actually have, you know, seminars, and

*Simmons - Direct*

1  we have CLEs, continuing learning experiences, opportunities

2  for the members of the Magnolia Bar to get their CLE

3  requirements, and that requirement is roughly 12 in the state.

4  So I have a lot of interaction within that -- that association

5  with the Black lawyers and the Black judges.

6  **Q.**  Does your membership lead to other networking

7  opportunities with other Black lawyers in the state?

8  **A.**  Yes.

9  **Q.**  Do you network with other Black lawyers in the state

10  frequently?

11  **A.**  Yes, I do.  And we actually use it as a resource as well,

12  so that networking is certainly invaluable to me as a small

13  practitioner or partnership in the Delta.  And, of course, you

14  know, we try to assist each other as we deal with legal issues

15  or deal with cases that we represent, and so --

16  **Q.**  Do you ever discuss the Mississippi Supreme Court?

17  **A.**  Certainly.

18      **MR. SHANNON:**  Object to the hearsay, Your Honor, to

19  the extent he is going there.

20      **THE COURT:**  Sustained.

21  **BY MR. GIMBEL:**

22  **Q.**  Do you follow the Mississippi Supreme Court elections

23  yourself, Senator Simmons?

24  **A.**  I do follow the Mississippi Supreme Court elections.  And

25  as a member of the Magnolia Bar, I personally have had interest

*Simmons - Direct*

1   in the Mississippi Supreme Court and as an association of being

2   involved in those annual conventions in those other times that

3   we meet throughout the year.  I have personally been present

4   where there has been expressed interest in the Mississippi

5   Supreme Court.

6   **Q.**   Among Black lawyers in the state?

7   **A.**   Along Black lawyers in the state.

8   **Q.**   Has -- so in your following of the Supreme Court

9   elections, has -- are there any Black justices on the

10   Mississippi Supreme Court?

11   **A.**   Yes, one Supreme Court justice.  He's from Greenville.

12   Justice Leslie King, and he, in the history of the Mississippi

13   Supreme Court, is the fourth Black justice of the Mississippi

14   Supreme Court.  He is one of nine justices.

15   **Q.**   Do you know have there ever been more than one Black

16   justice at a time on the Mississippi Supreme Court?

17   **A.**   Yes.  Based upon Mississippi history and, of course, you

18   know, I believe Black history is Mississippi history or

19   American history.  The first justice were -- was Reuben

20   Anderson, and then after Reuben Anderson, Justice Fred Banks.

21   And after Justice Fred Banks, Justice James Graves and, of

22   course, he went to the federal bench.  And then after that was

23   Justice Leslie King.

24        And those justices all were appointed, and then actually

25   didn't -- they were not challenged, and certainly members of

Simmons - Direct

1    the Magnolia Bar supported those justices and would love to see

2    more justices like that on the Mississippi Supreme Court.

3    **Q.**    Just to clarify the record, did any of those four Black

4    justices ever serve concurrently on the Mississippi Supreme

5    Court?

6    **A.**    No.  They only served separate terms and along with the

7    other eight remaining justices for a total of nine, so one out

8    of nine each time those four justices served.

9    **Q.**    Are you aware of any Black attorneys who have run for the

10    Mississippi Supreme Court besides those four justices?

11    **A.**    Yes.  Latrice Westbrooks.

12    **Q.**    And when did she run?

13    **A.**    She ran in two -- it would have been 2020, if I'm not

14    mistaken.

15    **Q.**    Did you campaign for Judge Westbrooks?

16    **A.**    I did.

17    **Q.**    What was that campaign like?

18    **A.**    Well, I led up the effort in the Delta, and, again, when

19    you campaign in the Delta, you are trying to increase Black

20    voter turnout.  And she was unsuccessful in District 1, which

21    is the current lines for -- for that district.

22    **Q.**    Did you campaign hard for Judge Westbrooks?

23    **A.**    Extremely hard.

24    **Q.**    In your experience and based on your extensive campaign

25    experience, did she campaign hard for that seat?

*Simmons - Direct*

1 **A.** She did. But the reality of it is, there is interest for

2 African-American lawyers in that district, but there is really

3 no opportunity for success.

4 **Q.** You're a plaintiff in this case; right?

5 **A.** I am.

6 **Q.** And this case revolves around the electoral map of the

7 Supreme Court. So you mentioned District 1. Are you familiar

8 with the Supreme Court district map?

9 **A.** I am.

10 **Q.** Are you familiar with district maps used in other state

11 elections in Mississippi?

12 **A.** I am.

13 **MR. GIMBEL:** And, Your Honor, if I may, I would like

14 to show the witness the current Supreme Court map. This is in

15 evidence at PX-2 on page 4 of that exhibit.

16 **THE COURT:** You may.

17 **MR. GIMBEL:** May I approach?

18 **THE COURT:** You may.

19 **BY MR. GIMBEL:**

20 **Q.** Do you recognize this map?

21 **A.** I do.

22 **Q.** Have these district lines ever been redrawn during your

23 tenure on the state senate?

24 **A.** I have been on the state senate since 2011, and, no.

25 **Q.** Okay.

1    **MR. GIMBEL:**  Page 4.  There we go.

2  **BY MR. GIMBEL:**

3  **Q.**    Has there ever been any attempt to redraw these district

4  lines during your tenure on the state senate?

5  **A.**    Yes.  In 2016, there was a legislation that originated in

6  the house to change, I think it was, Simpson County.  I think

7  it was to try to reduce the BVAP, which is the Black voting-age

8  population, in that -- in that district.  That legislation

9  successfully passed the house, but we killed it in the senate.

10  **Q.**    Why?

11  **A.**    I mentioned, for Black lawyers, the way this district is

12  drawn, that there is a lot of interest to become a member of

13  the Supreme Court, but there is no opportunity.  If that change

14  would have passed the senate and was signed by the governor and

15  became law, then there would have been less than an

16  opportunity.  It would have reduced the BVAP in District 1.

17  **Q.**    Do you know when these district lines were drawn?

18  **A.**    In 1987, when I was 11 years old.

19  **Q.**    Have demographics changed since 1987?

20  **A.**    Certainly.

21  **Q.**    Okay.  And you mentioned that other electoral maps have

22  been updated during your tenure in the senate?

23  **A.**    As recently as two years ago and in -- every ten years

24  before that, for legislative lines and also congressional

25  lines.  So since this time, probably about three -- three times

*Simmons - Direct*

1  with congressional lines and at least three times with

2  legislative lines.

3  **Q.**    Looking at the current map before you, how does it treat

4  the Mississippi Delta?

5  **A.**    It splits or separates the Delta.  In fact, it splits or

6  separates my senate district itself.  My senate district is

7  Bolivar County, which is the most northwest part of this

8  district, but north of Bolivar is Coahoma.  My senate district

9  is Washington, Bolivar, and Coahoma.  So it not only splits the

10  Delta, but it also splits my senate district.

11  **Q.**    Senator Simmons, I would like to show you now Plaintiffs'

12  Illustrative Plan 1.

13         **MR. GIMBEL:**  Your Honor, this is PX-2 at page 6.  This

14  is already in evidence.  May I approach the witness?

15         **THE COURT:**  You may.

16         **MR. GIMBEL:**  Thank you.

17         **THE WITNESS:**  Thank you.

18  **BY MR. GIMBEL:**

19  **Q.**    Senator Simmons, if this map had come to your attention

20  as a legislator who has experienced redistricting, would you

21  have found it to be reasonable?

22  **A.**    I would have.  In fact, the way this illustrative plan is

23  drawn, it's similar to what the Mississippi legislator did in

24  2022 with Congressional District 2 by actually taking the

25  northwest part of the state almost from the Tennessee line all

*Simmons - Cross*

1  the way down to the Louisiana line for Congressional

2  District 2.

3  **Q.**  Looking at this map, how does this map treat the

4  Mississippi Delta?

5  **A.**  The Mississippi Delta is all intact.

6  **Q.**  As a Black lawyer in Mississippi, what would it mean to

7  you if a map like this were put into place?

8  **A.**  For me, it means that there is even more interest in

9  becoming a member of the Mississippi Supreme Court, but there

10  is certainly an opportunity as well.

11          **MR. GIMBEL:**  Your Honor, Court's indulgence.

12      (CONFERRING OFF THE RECORD.)

13          **MR. GIMBEL:**  No further questions, Your Honor.

14          **THE COURT:**  Thank you.  Cross-examination?

15          **MR. SHANNON:**  Yes, Your Honor.

16          May it please the Court.

17          **THE COURT:**  You may proceed.

18                    **CROSS-EXAMINATION**

19  **BY MR. SHANNON:**

20  **Q.**  Good morning, Senator Simmons.

21  **A.**  Good morning.

22  **Q.**  I'm Rex Shannon.  I'm with the attorney general's office.

23  We met just a moment ago before court started this morning.  I

24  think you and I both grew up in the same neck of the woods, and

25  we are both the same exact age, we found out, and we both share

*Simmons - Cross*

1  a love of the Delta, sir.

2  **A.**  Yes.

3  **Q.**  But I didn't know, until you testified this morning, that

4  we both started out cutting yards in the Mississippi Delta.  So

5  I have a new-found respect for you there.

6  **A.**  Yes, sir.

7  **Q.**  Senator, when were you first elected to the Mississippi

8  Legislature?

9  **A.**  2011.

10  **Q.**  Okay.  And have you been in the state senate that entire

11  time?

12  **A.**  Yes, sir.

13  **Q.**  And I understand, since 2017, you served as a senate

14  minority leader; is that right?

15  **A.**  Yes, sir.

16  **Q.**  And I understand you have been a member of the Democratic

17  party the entire time you have been in the state legislature;

18  is that right?

19  **A.**  Yes sir.

20  **Q.**  You are a member of the NAACP; correct?

21  **A.**  That's correct.

22  **Q.**  And given somebody who is as politically active as you

23  are, being a member of the state legislature, I'm assuming you

24  are somebody who votes every chance you get.  Is that fair?

25  **A.**  That's fair.

*Simmons - Cross*

1  **Q.**  That's in both state and federal elections?

2  **A.**  Yes, sir.

3  **Q.**  Now, I'm assuming you probably been voting that way ever

4  since you could vote.  Is that fair?

5  **A.**  That's fair.

6  **Q.**  Have you ever run for office as a judge yourself?

7  **A.**  I have not.

8  **Q.**  Okay.  You have never run for the Mississippi Supreme

9  Court?

10  **A.**  No, sir.

11  **Q.**  Okay.  And I heard you testify -- I'm aware that two of

12  the counties in your district are actually in District 1 of the

13  Mississippi Supreme Court; correct?

14  **A.**  That's correct.

15  **Q.**  That's Bolivar and Washington County, right?

16  **A.**  Yes, sir.

17  **Q.**  And I believe you said here this morning, one of the

18  Supreme Court justices who is on the court now, elected from

19  District 1, actually resides in your district in Greenville;

20  right?

21  **A.**  That's correct.

22  **Q.**  And that's presiding Justice Leslie King; right?

23  **A.**  That's correct.

24  **Q.**  And Justice King, of course, is Black; right?

25  **A.**  Yes, sir.

*Simmons - Cross*

1 **Q.** And I'll represent to you, Senator, that Justice King was

2 first appointed to the Supreme Court in 2011 --

3 **A.** Uh-huh.

4 **Q.** -- By Governor Haley Barbour, and then if I'm not

5 mistaken, he was reelected twice after that. You don't have

6 any reason to disagree with that, do you?

7 **A.** No, sir, he was unopposed both times.

8 **Q.** That was my next question, so I appreciate it. Do you

9 personally think Justice King has done a good job while he has

10 been on the Supreme Court?

11 **A.** Yes.

12 **Q.** Was there anything wrong with Governor Barbour appointing

13 Justice King?

14 **A.** Not at all. And the governor appointing Justice King was

15 similar to how the other three Black justices got on the court,

16 by an appointment by the governor.

17 **Q.** Yes, sir. Yes. And was -- in your view, was anything

18 wrong with any of those justices being appointed by the

19 governor?

20 **A.** No. Other than the fact that if you are from District 1,

21 there were no elections that -- they got there by the

22 electorate for the people first. They got there by an

23 appointment, and getting there by appointment is easier for

24 those justices to remain or stay there because certainly Blacks

25 in the Delta or in that district will support them having been

*Simmons - Cross*

1  named by the governor to the court as opposed to what justice

2  Latrice Westbrooks did, which is try to become a member by

3  election.

4  **Q.**  Well, that's a good one.  Let me ask you this.  In terms

5  of Justice Anderson and Justice Graves and Justice Banks, do

6  you have the same feelings about all of them having done a good

7  job while they were on the court?

8  **A.**  Absolutely.  Yes, sir.

9  **Q.**  As one of Justice Kings's constituents now, Senator, why

10  do you think nobody has ever run against Justice King as a

11  challenger to his Supreme Court seat?

12  **A.**  As a member of the Magnolia Bar, who are extremely proud

13  as a group that we have a member of our association on the

14  Supreme Court, as a group, we wouldn't challenge that.  We

15  support that, and we would like to see more of that.  So we

16  wouldn't challenge that seat just to replace one of nine.  What

17  we would like to see is to have more than one of nine on the

18  Supreme Court that was Black.

19  **Q.**  And, Senator, during the most resent legislative session,

20  it's my understanding that the Mississippi Senate actually

21  honored Justice King with Concurrent Resolution 516, which

22  recognized him as Mississippi's longest-serving appellate

23  judge; is that right?

24  **A.**  I sponsored the legislation.

25  **Q.**  You sponsored it.  And I'll represent to you, if I'm not

*Simmons - Cross*

1  mistaken, that the vote on that Concurrent Resolution was

2  unanimous?

3  **A**.    It was.

4  **Q**.    That was 50 to nothing; right?

5  **A**.    Yes, sir.

6  **Q**.    Senator, you testified this morning about some of the

7  problems that the Delta faces.  You mentioned underfunding of

8  education, access to healthcare, economic development issues.

9  And I understand those are all issues that the body that you

10  are a representative in, the legislature, can certainly take up

11  and address.

12       But my question is, what, if anything, can the

13  Mississippi Supreme Court do about those problems?

14  **A**.    I will say having a justice on the Supreme Court who --

15  who has roots to the Delta or who has more of an understanding

16  about those issues -- and I certainly understand the Supreme

17  Court is a court where they just look at errors of law, and I

18  understand your question as it relates to my job legislatively,

19  and then the separation of the powers, I certainly understand

20  that.

21       But I will say that having more justices who could

22  identify and relate to the issues of Black Americans, it just

23  creates more of a court that's diversified or looks like the

24  State of Mississippi.

25  **Q**.    And, Senator, obviously the Mississippi Supreme Court can

*Simmons - Cross*

1  only consider the cases that come before it; right?

2  **A.**  That's true.

3  **Q.**  It doesn't have any roaming inquisitory ability to go out

4  and take cases itself; right?

5  **A.**  That's true.

6  **Q.**  And the Supreme Court has to look at the facts and the

7  evidence that come before it for an appellate matter; right?

8  **A.**  That's correct.

9  **Q.**  And they're -- they are limited to those facts.  That's

10  all they can look at to review; right?

11  **A.**  Yes.

12  **Q.**  And the Supreme Court of Mississippi is supposed to be a

13  fair and impartial court; correct?

14  **A.**  That's correct.

15  **Q.**  And you're not here today to testify that the Supreme

16  Court of Mississippi is not a fair and impartial court, are

17  you?

18  **A.**  Not at all.  Only to the extent that being a party to

19  this suit, that the Mississippi Supreme Court, in my view or my

20  opinion, should look more like the State of Mississippi.  And

21  with having roughly 40 percent African Americans and district

22  lines that have not been drawn since I was 11 years old and the

23  effect of only having one out of nine Supreme Court justices

24  being -- looking like me, it certainly is problematic for me

25  and problematic for the people that I represent in the Delta.

1 **Q**. But, Senator, you are not saying that there is something

2 the Mississippi Supreme Court got wrong that they would have

3 gotten right had they had more Blacks on the Supreme Court, are

4 you?

5 **A**. I believe that our justices on the Mississippi Supreme

6 Court, they follow the law, and they make decisions based off

7 the law. And I think Justice King, being one of nine, has

8 followed the law. But having more Justice Kings on the court

9 does not say that those more Justice Kings or more Justice

10 Andersons or Banks or Graves, that they would not follow the

11 law, but it would certainly have -- be a court that is

12 representative of the State of Mississippi.

13 **Q**. Senator, let me ask you this. You testified earlier

14 about campaigning for Judge Westbrooks when she ran for the

15 Supreme Court, and I believe I heard you say what you did was

16 campaign for her in the Mississippi Delta?

17 **A**. Uh-huh.

18 **Q**. Is that right?

19 **A**. Yes, sir.

20 **Q**. And your objective there was to increase Black voter

21 turnout; correct?

22 **A**. Yes, sir.

23 **Q**. Senator, I believe I heard you say earlier that Black

24 voters who are your constituents -- some Black voters, may

25 distrust certain Black judges; is that fair?

*Simmons - Cross*

1  **A.**  Black judges?

2  **Q.**  That Black voters distrust White judges.

3  **A.**  Yeah, based off their background and experience.  And I

4  have to spend time as an advocate and as an advisor trying to

5  help them understand that race should not matter in our

6  criminal justice system.

7  But based off their learned experiences or based off the

8  dark past of Mississippi, they indelibly believe that when they

9  go in certain settings where the only two Black people

10  sometimes in the room may be me, them, and the bailiff, that

11  the situation may be different for them as opposed to other

12  settings where they go in and more people in the courtroom,

13  including the judge, looks like them.

14  **Q.**  Senator, you are familiar with Justice Jim Kitchens on

15  the Supreme Court, aren't you?

16  **A.**  I am.

17  **Q.**  And Justice Kitchens, of course, is White; correct?

18  **A.**  He is.

19  **Q.**  And he has been supported in the past by your party;

20  correct?

21  **A.**  Yes.

22  **Q.**  And is there any -- are there any Black candidates

23  running against Justice Kitchens right now for -- he is running

24  for reelection right now; correct?

25  **A.**  He is.

*Simmons - Cross*

1  **Q**.   Are there any Black candidates, that you know of, who are

2  running against him?

3  **A**.   I'm not familiar.  I know my colleague, Senator Jenifer

4  Branning, a White Republican female, is challenging him.  If

5  there are some other candidates, I may not know, but I think

6  the race is going to be between Justice Kitchens and Jenifer

7  Branning.  That's the top two.

8  **Q**.   Senator, shifting gears a little bit.  You are the only

9  plaintiff in this lawsuit who is a member of the Mississippi

10  legislature; correct?

11  **A**.   Yes, sir.

12  **Q**.   And you are aware that the only claim being made in this

13  lawsuit is a Section 2 Voting Rights Act claim; correct?

14  **A**.   I am aware of the claim.

15  **Q**.   There is no intentional discrimination claim being

16  asserted here.  You are aware of that?

17  **A**.   I am aware of that.  And my understanding of Section 2 of

18  the Voting Rights Act, it's the actual effect of the lines.

19  **Q**.   And, Senator, I'll represent to you that Section 145 of

20  the Mississippi Constitution, which I'm sure you are very

21  familiar with, provides that Supreme Court districts in this

22  state should be determined by the Mississippi legislature; is

23  that correct?

24  **A**.   That's correct.

25  **Q**.   In filing this lawsuit, Senator, you are asking a federal

1  court to do something that the Mississippi Constitution says

2  should be done through the state legislative process; correct?

3  **A.**    State legislature that has failed to do it, yes.

4  **Q.**    And, sir, the Mississippi legislature is currently -- and

5  I believe you testified earlier to this -- is currently

6  controlled by a Republican majority; is that right?

7  **A.**    That's right.

8  **Q.**    As a plaintiff in this lawsuit, Senator, you are asking

9  for the lines to be redrawn in District 1, the Central

10  District; correct?

11  **A.**    Yes, for the lines to be drawn.

12  **Q.**    Okay.  And I believe you were asked some questions

13  earlier.  You were shown some maps.  And one of those maps was

14  one of the illustrative plans that your map drawer, Mr. Cooper,

15  who was here earlier this week, testified about.  And it --

16  it's been described as looking similar to Congressional

17  District 2.  I believe you testified to that today; is that

18  right?

19  **A.**    Yes, sir.

20  **Q.**    And Congressional District 2, that office is currently

21  held by Congressman Bennie Thompson; correct?

22  **A.**    That's correct.  And we redrew those lines in 2022, the

23  legislature.

24  **Q.**    Yes.  And Congressman Thompson has been consistently

25  reelected out of that district; correct?

*Simmons - Cross*

1    **A.**    He has been consistently reelected out of Congressional

2    District 2 before it was drawn in 2022.

3    **Q.**    And there's no reason to believe he won't be consistently

4    reelected out of the current congressional District 2 for as

5    long as he wants to hold that seat; correct?

6    **A.**    We will find out certainly in November, but I believe he

7    will be successful in the newly drawn congressional district.

8    **Q.**    I do too.  And my question is this:  Since you are asking

9    for the Supreme Court District 1, the Central District, to be

10   redrawn in a fashion that fairly traces the lines of

11   Congressional District 2, isn't what you really want a

12   guarantee that candidates that your party supports will hold

13   all three Mississippi Central Supreme Court district seats?

14   **A.**    No.  I would like to see the lines drawn that have not

15   been drawn since I was 11 years old to create more than just an

16   interest for Black lawyers but also an opportunity.  And I

17   believe the illustrative map that I was shown would do that.

18   **Q.**    Senator, are you any kin to Mississippi Transportation

19   Commissioner, Willie Simmons?

20   **A.**    I'm not.

21   **Q.**    Okay.

22            **MR. SHANNON:**  With the Court's indulgence, one moment.

23            **THE COURT:**  Yes.

24       (CONFERRING OFF THE RECORD.)

25   **BY MR. SHANNON:**

*Simmons - Cross*

1   **Q.**  Senator, just one more question for you.

2   **A.**  Yes, sir.

3   **Q.**  Did you vote for the plan that implemented the current

4   Congressional District 2?

5   **A.**  No.

6   **Q.**  Okay.  You voted against that?

7   **A.**  Yes.

8   **Q.**  Okay.

9          **MR. SHANNON:**  Thank you, Senator.

10          I have no further questions, Your Honor.

11          **MR. GIMBEL:**  No redirect, Your Honor.

12          **THE COURT:**  May this witness be finally excused?

13          **MR. GIMBEL:**  He may.

14          **THE COURT:**  Thank you.  We'll take a break at this

15   time.

16      (RECESS TAKEN.)

17          **THE COURT:**  Who would plaintiffs call first?

18          **MR. TOM:**  Your Honor, the plaintiffs call Justice

19   Reuben Anderson to the stand.

20      (OATH WAS ADMINISTERED BY THE COURTROOM DEPUTY.)

21          **COURTROOM DEPUTY:**  Thank you.  You may take the stand.

22          **THE WITNESS:**  Good morning, Your Honor.

23          **THE COURT:**  Good morning.

24          **MR. TOM:**  May it please the Court?

25          **THE COURT:**  You may proceed.

*Anderson - Direct*

**REUBEN V. ANDERSON, PLAINTIFFS' WITNESS, AFTER BEING DULY**

**SWORN, WAS EXAMINED AND TESTIFIED AS FOLLOWS:**

**DIRECT EXAMINATION**

BY MR. TOM:

**Q.**   My name is Joshua Tom.  I represent the plaintiffs.

Good morning, Justice Anderson.

**A.**   Good morning.

**Q.**   Can you state your -- can you state your full name for

the record?

**A.**   Yes.  Reuben Anderson.  R-e-u-b-e-n V. -- Vincent --

Anderson.

**Q.**   Where were you born?

**A.**   Jackson, Mississippi.

**Q.**   Where did you grow up?

**A.**   Jackson, Mississippi.

**Q.**   Can you tell me about your educational background?

**A.**   I went to the public schools in Jackson, Tougaloo

College, Ole Miss Law School.

**Q.**   Can you tell me a little about your experience as a law

student at Ole Miss?

**A.**   I went to Ole Miss Law School in 1965.  Just like

everywhere else in Mississippi, Oxford was segregated, and Ole

Miss was segregated pretty much.  I think there were five

students on campus during that time, African-American students.

**Q.**   And you were the first Black person to graduate from Ole

*Anderson - Direct*

1  Miss Law School; right?

2  **A.**  I was.

3  **Q.**  Are you registered to vote?

4  **A.**  I am.

5  **Q.**  How long have you been registered to vote?

6  **A.**  Since 1963.  Back then, you had to be 21 years of age to

7  register to vote; and soon as I turned 21, September 1963, I

8  registered to vote.

9  **Q.**  Can you tell me a little bit about your experience

10  registering to vote?

11  **A.**  To vote?

12  **Q.**  Can you tell me about your experience registering to

13  vote?

14  **A.**  Yeah.  I was at Tougaloo College, and they had a

15  professor who encouraged everybody, as soon as you turned 21,

16  to go vote.  So there were about five or six of us who went to

17  Hinds County Circuit Clerk's Office, and we didn't have to tell

18  how many bubbles were in a bar of soap, but we had to answer a

19  lot of questions.  Big challenge was probably paying the $2 to

20  vote, to register at least.

21  **Q.**  And at that time, did you successfully register to vote?

22  **A.**  I did.

23  **Q.**  Can you tell me about your early legal career?

24  **A.**  Yes.  I -- in 1976, the mayor of the City of Jackson

25  appointed me as a municipal court judge.  In 1977, Governor

1  Cliff Finch appointed me as a county court judge for Hinds

2  County.  In 1981, Governor William Winter appointed me as a

3  circuit judge for the Seventh Circuit which encompassed Hinds

4  County and Yazoo County.  And in 1985, Governor Bill Allain

5  appointed me a justice on the Supreme Court.

6  **Q**.  So is it accurate to say that all the courts that you

7  have sat on, you were first appointed to?

8  **A**.  That's correct.

9  **Q**.  Now, sir, let's back up a little bit.  Before you became

10  a judge, what did you do after you graduated law school?

11  **A**.  I was sworn in as a lawyer at the Square here on a Sunday

12  in June, June 4th of 1967.  I left and went to Columbus,

13  Mississippi, and tried a case the next day.  And for the next

14  five years, I was in most courts in Mississippi trying cases

15  in -- most of those cases, they were school desegregation

16  cases.

17  **Q**.  What other types of cases did you do besides school

18  desegregation?

19  **A**.  I, along with Mel Leventhal and Fred Banks, primarily

20  represented all of the school desegregation cases, plaintiffs

21  and school desegregation cases through Mississippi.

22      As I look on the wall, most of those cases were tried

23  before those judges in the courthouse across the street over

24  there.  Most of the cases were in the Northern District.  The

25  Southern District, we couldn't get any plaintiffs because the

1  Klan was so strong in southwest Mississippi. We did represent

2  Hattiesburg and Biloxi, but we couldn't secure plaintiffs in

3  southwest Mississippi.

4      I did that practice for five years, did a private

5  practice for five years, and that's when I was appointed a

6  county court judge.

7  **Q.**   Now, you mentioned that you sat on the Mississippi

8  Supreme Court, and you were the first Black justice to sit on

9  the Mississippi Supreme Court; correct?

10 **A.**   That's correct.

11 **Q.**   How did you become a justice on the Mississippi Supreme

12 Court?

13 **A.**   The governor at that time, Bill Allain, called me and

14 asked me would I come over to the mansion? And I did. And he

15 asked me was I interested, or would I take the position on the

16 State Supreme Court?

17     I told him I didn't want it, that I knew a lot about it.

18 The work was too hard. And likewise, told him Fred Banks, who

19 was my law partner, was a lot smarter than I was, and that he

20 should appoint Fred. And he knew Fred too. I knew Governor

21 Allain fairly well. He was an assistant US -- an assistant

22 state attorney general, and he was responsible for the school

23 desegregation cases.

24     So whenever we were in court, Bill Allain was there. We

25 knew each other fairly well. In fact, we had dinner here in

*Anderson - Direct*

1  Oxford on many occasion.  In fact, most of our cases were here
2  in Oxford, in the other courthouse.

3        I knew Bill Allain well enough to tell him that I didn't
4  want that job.  I had a great job.  A trial judge is the best
5  job you can have.  You're your own boss, and I thoroughly
6  enjoyed being involved in big cases with good lawyers.  And the
7  Seventh Circuit, at that time, encompassed Yazoo City, Yazoo
8  County.

9        And Yazoo County didn't have any business, so three times
10  a year for three weeks, I was pretty much free.  But I couldn't
11  convince Governor Allain to appoint Fred.  At the time, Fred
12  was on the national board of the NAACP, and he was likewise
13  president of the Jackson branch of the NAACP.  So Bill Allain
14  made it clear that it was me that he would appoint.

15        So I went home, talked to my wife about it, and I decided
16  to accept it.

17  **Q.**   What is your view on whether you could have made it to
18  the Mississippi Supreme Court without being first appointed by
19  the governor?

20  **A.**   In 1985?

21  **Q.**   Yes.

22  **A.**   I wouldn't have even considered running.

23  **Q.**   So do you think that you could have made it to the
24  Mississippi Supreme Court without first being appointed?

25  **A.**   No.

*Anderson - Direct*

1   **Q.**   Why do you say that?

2   **A.**   If I had ran in 1985, at least in 1986 for the Supreme

3   Court, I would not have gotten elected.  And I have been around

4   politics a long time to know that losing a race ain't no fun.

5   **Q.**   Do you think that you could not have been elected to the

6   Supreme Court in 1985 because you were Black?

7   **A.**   Because of what?

8   **Q.**   Because you're Black.

9   **A.**   Yes.  In 1985, I don't think there were any African

10   Americans elected to any district-wide office such as the

11   Supreme Court district.

12   **Q.**   Have you run for election to the Mississippi Supreme

13   Court?

14   **A.**   I ran in 1986.

15   **Q.**   Who was your opponent?

16   **A.**   Richard Barrett.

17   **Q.**   What was your experience running for the Supreme Court in

18   1986 against Richard Barrett?

19   **A.**   Well, he was running against me.  I was the sitting

20   judge.  He is deceased now, and I don't want to say anything

21   negative about him, but he was an out-and-out racist and a

22   Klansman.

23   **Q.**   And so it's fair to say that Richard Barrett's campaign

24   included racial appeals?

25   **A.**   Yes, it did.

*Anderson - Direct*

1 **Q.** Do any come to mind?

2 **A.** There were many occasions where he and I were in the same

3 meetings, at least meeting with the lawyers, and he made it

4 clear that he was superior to me in every way. And in addition

5 to that, he didn't mind letting it be known that he was a

6 racist.

7 **Q.** What kind of support did you have in your race for

8 Mississippi Supreme Court in 1986?

9 **A.** I missed that. What kind of what?

10 **Q.** Support.

11 **A.** Oh, okay. I'm sorry. I left the law firm that I was

12 with a little over a year ago, but they let me keep my office.

13 And I was in there yesterday, and I run across a list of my

14 campaign supporters, and it included two governors, the heads

15 of all of the large law firms in Jackson, the two richest men

16 in Mississippi. So I had a huge amount of support that

17 Mr. Barrett could not get.

18 **Q.** And those people that you just mentioned that supported

19 you, the governors, the wealthy businessmen, are all of those

20 people White?

21 **A.** Yes, they were -- well, not all of them. My co-chair was

22 Dr. John Peoples, who was the president of Jackson State. And

23 as I looked at my list, it was probably 50/50 Black and White

24 people.

25 **Q.** Uh-huh. But it's fair to say that you had support from

*Anderson - Direct*

1   White people, including sitting and former politicians?

2   **A.**   Yes.

3   **Q.**   And White people who were prominent businessmen?

4   **A.**   They were.

5   **Q.**   Do you remember how many counties you won in 1986?

6   **A.**   All but one, and I can't recall the county that I lost.

7   Maybe that's intentional.

8   **Q.**   Do you remember what percentage of the vote you won?

9   **A.**   I think it was in the 70s.  I don't know exactly.

10  Probably 72 or 3 percent.

11  **Q.**   There's a 1992 opinion out of the Southern District of

12  Mississippi.  It's called Magnolia Bar.  In that opinion, it's

13  written that you won approximately 73 percent of the vote.

14        Does that sound right?

15  **A.**   I didn't look it up, but they did.  So I trust them.

16  **Q.**   What was the importance of having the backing of sitting

17  Governor Allain and other politicians and businesspeople in

18  your campaign for Mississippi Supreme Court in 1986?

19  **A.**   I didn't want to lose, and I needed to raise money.  As I

20  recall, I raised $86,000, which is no money for an election for

21  the Supreme Court today, but I raised $86,000.  I remember

22  that.

23  **Q.**   Do you think having all of that supporting -- having the

24  backing of current and former politicians and prominent

25  business people was important in your 1986 race?

*Anderson - Direct*

1  **A.**  It was.

2  **Q.**  And why do you say that?

3  **A.**  Well, I think two things.  One, nobody wanted Richard

4  Barrett to be on the Supreme Court, and the other was I thought

5  I -- and I felt that I was well thought of in my community.

6  **Q.**  Who succeeded you on the Mississippi Supreme Court?

7  **A.**  Fred Banks.

8  **Q.**  Did you have any role in securing Justice Banks'

9  appointment to replace you on the Mississippi Supreme Court?

10  **A.**  I don't necessarily know I had a role, but I -- when I

11  left the court, the governor at that time, I think, was a young

12  fellow.  I can't think of his name right now.  But I went and

13  told him I was leaving the court.  And I told him I wouldn't

14  leave unless he appointed Fred, and he thought about it, and he

15  appointed Fred.

16  **Q.**  Did Justice Banks subsequently run for Mississippi

17  Supreme Court?

18  **A.**  He did, and I chaired his campaign.

19  **Q.**  What year was that race?

20  **A.**  You stumped me.

21  **Q.**  Well, I will represent that it was 1991.  Does that sound

22  right?

23  **A.**  Yeah.  That's when I left the court, '91.

24  **Q.**  Do you remember who Justice Banks' opponent was?

25  **A.**  Yes.  Chet Dillard, the Chancery Judge in Hinds County.

*Anderson - Direct*

1  **Q.**   Now, you said that you were the chair of Justice Banks'

2  1991 campaign?

3  **A.**   I was.

4  **Q.**   And what did you do in that role?

5  **A.**   I tried to get the people who supported me to support

6  Fred, help him raise money.  I did everything that I could to

7  make sure he was elected.  He's a first-class guy who I have

8  known since we were in the fifth grade.  He was always the

9  smartest guy in any class I was in.

10 **Q.**   Do you remember any racial appeals in the Banks-Dillard

11 contest?

12 **A.**   Yes, there was.

13 **Q.**   Can you tell me what you remember?

14 **A.**   As I recall, most of the things that Chet did -- and I

15 think Chet is deceased now, so I don't want to say many

16 negative things about him, but what I would say was that he had

17 push cards that had his picture and had Fred's picture,

18 obviously showing that Fred was an African American.  He had

19 posters that were plastered through the district that showed

20 that he was White and Fred was Black.

21 **Q.**   I would like --

22 **A.**   I never heard him say anything negative, however, about

23 Fred.

24 **Q.**   I would like to show you what's been marked as

25 Plaintiffs' Exhibit 77.  This has already been admitted into

*Anderson - Direct*

1  evidence.  You should be able to see it on your screen, Justice

2  Anderson.

3  **A.**    Oh, yeah, I have seen that before.

4  **Q.**    So you recognize this?

5  **A.**    I do.

6  **Q.**    And what is it?

7  **A.**    It's a -- it's a poster that was circulated by Chet

8  Dillard and his office and his campaign office that pretty much

9  said that I'm a White man; Fred is a Black man, and it's time

10  to get tough on crime.

11  **Q.**    So your understanding of this ad is that the photos of

12  Justice Banks and Judge Dillard are there to highlight the

13  two's race?

14          **MR. SHANNON:**  Object to the leading, Your Honor.

15          **THE COURT:**  That's sustained.

16  BY MR. TOM:

17  **Q.**    What is your understanding of why the photos are in this

18  ad?

19  **A.**    At the time, as a part of Fred's campaign, we knew what

20  it was, and that was that Chet was what you would say "playing

21  the race card," saying to his constituents and to everybody in

22  the district that I'm a White man.  You should vote for me over

23  a Black man.

24  **Q.**    So you see on the ad underneath each man's photos, it

25  says, Fred Banks.  You see that?

*Anderson - Direct*

1   **A.**   Yeah.

2   **Q.**   And then under the other photo it says, Judge W.O. "Chet"

3   Dillard.  You see that?

4   **A.**   Yeah.  And I remember that distinctly, that Fred was

5   never referred to as a Supreme Court justice.

6   **Q.**   When this -- when this ad was put out, Justice Banks was

7   a sitting Supreme Court justice, wasn't he?

8   **A.**   He was.

9   **Q.**   And had Justice Banks had prior judicial experience

10  before he was -- he sat on the Supreme Court?

11  **A.**   Yeah.  He was a circuit judge.  He replaced me when I

12  went to the Supreme Court.

13  **Q.**   How long was he a circuit judge?

14  **A.**   From 19 -- you stumped me again, but when I left -- when

15  I left the circuit court bench, which I guess was 1985, he

16  replaced me, and the governor that I couldn't think of was Ray

17  Mabus.

18  **Q.**   So do you think the language underneath the photos in

19  this ad is a racial appeal?

20          **MR. SHANNON:**  Objection to the leading, Your Honor.

21          **THE COURT:**  Sustained.

22          Be careful with your leading.

23  **BY MR. TOM:**

24  **Q.**   How would you characterize how the people in this ad are

25  named?

1 **A.** You know, I made a mistake and forgot to wear my hearing

2 aids, so you are going to have to repeat some of them. I

3 didn't get that question at all.

4 **Q.** Sure. How would you characterize how the two men in this

5 ad are named?

6 **A.** How they are named?

7 **Q.** Yes. How it says Fred Banks.

8 **A.** Yeah.

9 **Q.** And the other one says Judge W.O. "Chet" Dillard.

10 **A.** Well, the inference is that he wants to take advantage of

11 the fact that he's a judge, and although Fred was a Supreme

12 Court justice, he was going to ignore that altogether and hope

13 that his constituents would too.

14 **Q.** What is your understanding of Justice Banks' strategy to

15 win in his race against Judge Dillard?

16 **A.** Judge Banks' campaign was a lot more difficult than mine.

17 In fact, I think he just won by one or two percentage points.

18 And the law firms and -- in my district couldn't support Fred

19 as openly as they supported me, mainly because Judge Chet was a

20 sitting chancellor, and they could very well have had cases

21 before him.

22 Fred was in no way involved in the business committee

23 community as I was. I was on the board of the Jackson Chamber

24 of Commerce, and I was very always active in the business

25 community.

*Anderson - Direct*

1  **Q.**   So do you have an understanding of what Justice Banks'

2  strategy was in his race against Judge Dillard?

3  **A.**   You are going back a long time.  I don't remember what

4  his strategy was.  I was chair of his campaign, and he had a

5  lot of other people involved, but as far as his strategy, I

6  think it was to convince voters that he had the experience to

7  do the job.

8  **Q.**   Was there anything else he did to try to win his race

9  against Judge Dillard?

10  **A.**   Do like anybody else that is running for a Supreme Court

11  position, and that is take time away from your job and get out

12  and meet and shake hands with people.

13  **Q.**   So you see this ad here, Plaintiffs' Exhibit 77, which I

14  showed you, and that's one of Judge Dillard's ads, isn't it?

15  **A.**   It is.

16  **Q.**   And in this ad, it obviously has the pictures of Justice

17  Banks and Judge Dillard; right?

18  **A.**   Right.

19  **Q.**   Was Justice Banks putting out ads with photos of himself?

20  **A.**   No.

21  **Q.**   Why?

22  **A.**   I think it was obvious that he didn't want to make it a

23  racial campaign in any respect.

24  **Q.**   So do you think Judge Banks was trying -- can you explain

25  any further why Judge Banks, Justice Banks may not have wanted

*Anderson - Direct*

1  to put his photo in campaign ads?

2  **A.**   I would just have to assume that he thought it would not

3  have been beneficial to him with White folks.

4  **Q.**   And that's because he is Black; right?

5  **A.**   That's right.

6  **Q.**   Do you think that Dillard's strategy was effective?

7  **A.**   To some degree, I would think it was.

8  **Q.**   You mentioned that the Banks-Dillard race was pretty

9  close.  I'll represent from the same Southern District of

10  Mississippi opinion, Magnolia Bar, says Banks received

11  51 percent of the vote.

12     Does that sound right?

13  **A.**   I didn't know it was that close, but I'll take your word

14  for it, and, likewise, that case that you are quoting from.

15  **Q.**   Does that sound right based on your understanding?

16  **A.**   I knew it was real close, but I didn't know it was

17  51 percent.

18  **Q.**   How important was race in the Banks-Dillard contest?

19  **A.**   How important was race?  I think it was very important.

20  Fred had a lot of experience, very capable man, and I think

21  what Chet Dillard attempted to do was to use race to get

22  elected.

23  **Q.**   Do you remember any prominent White Mississippians

24  backing Justice Banks?

25  **A.**   Yes.  He had a whole lot of support from prominent

*Anderson - Direct*

1 people.

2 **Q.** Any former politicians you remember?

3 **A.** You know, I just can't remember who was his primary

4 supporters, but he had a lot of the same support that I did. I

5 know he raised more money than I did.

6 **Q.** Do you know how much White support Justice Banks ended up

7 getting in his race against Judge Dillard?

8 **A.** No, sir, I don't know.

9 **Q.** The Magnolia Bar opinion, which I have referenced before,

10 says that Justice Banks received approximately 30 percent of

11 the White vote. Does that sound right to you?

12 **A.** Yeah. That would be reasonable.

13 **Q.** Have you had involvement in civic life and institutions

14 since leaving the bench?

15 **A.** Have I had any involvement in what?

16 **Q.** Civic life and institutions.

17 **A.** Civil rights?

18 **Q.** Civic.

19 **A.** Oh, oh, yeah. You name it, I have been involved in it.

20 **Q.** Can you give me some highlights?

21 **A.** Well, I have served as president of the Mississippi Bar.

22 I served as president of the State Chamber of Commerce. I

23 served on the board of directors of many Mississippi

24 corporations, Trustmark, Mississippi Chemical. I have been

25 active and involved in my community since 1967.

*Anderson - Direct*

1  **Q.**  In your opinion, does racial polarization in electoral

2  politics still exist in Mississippi?

3  **A.**  It does.

4  **Q.**  Why do you say that?

5  **A.**  I'm just telling you what my experience and my

6  understanding and my belief is.

7  **Q.**  What is the importance of race in Mississippi politics?

8  **A.**  It's number one.

9  **Q.**  When you say it's number one, it's number one what?

10  **A.**  In politics.  Wherever political conversation or

11  discussion takes place, the first thought is race.  And that's

12  driven by the leaders we have in Mississippi and always have

13  had in Mississippi but for William Winter.

14  **Q.**  What is your impression of whether there continue to be

15  racial appeals in Mississippi politics?

16  **A.**  It does.

17  **Q.**  What is your view on whether racial polarization in

18  Mississippi can change in the future?

19  **A.**  Well, that it will continue in the future.

20  **Q.**  What is your view on whether racial polarization in

21  Mississippi can change in the future?

22  **A.**  I was always hopeful that an African American would be

23  elected statewide office in Mississippi.  It won't happen in my

24  lifetime.  Hopefully, it will happen in my daughter's and my

25  grandson's lifetime, but I'm not particularly optimistic.

*Anderson - Direct*

1   **Q**.   What is the importance of Black representation in high

2   political offices in Mississippi, especially the Mississippi

3   Supreme Court?

4   **A**.   Having served as a justice on the Mississippi Supreme

5   Court, I think it is extremely important. I guess the example

6   that I can give you is that one of my law clerks is a United

7   States District Court judge now. One of my law clerks was a

8   United States Magistrate. Two of my law clerks were trial

9   judges. That in itself has a huge impact on the State of

10   Mississippi.

11       When I was on the Supreme Court, my full-time job was

12   deciding cases, but I spent a huge amount of time giving

13   graduation speeches here at Ole Miss, all over the State of

14   Mississippi, encouraging other young people to seek public

15   office, to seek involvement in their community, and to be

16   lawyers. It's important that we have lawyers in our state.

17   Lawyers do more for Mississippi than anybody else, more than

18   engineers, doctors, and for some reason, lawyers give more back

19   to their community than any other profession.

20       **MR. TOM:** Your Honor, may I confer with my co-counsel?

21       **THE COURT:** You may.

22     (CONFERRING OFF THE RECORD.)

23       **MR. TOM:** No further questions, Your Honor.

24       **THE COURT:** Cross-examination.

25       **MR. SHANNON:** One moment, Your Honor.

1    (CONFERRING OFF THE RECORD.)

2        **MR. SHANNON:** Your Honor, we have no

3    cross-examination.

4        **THE COURT:** Didn't you get lucky?

5        **THE WITNESS:** Thank you, Your Honor. So good to see

6    you again.

7        **THE COURT:** Good to see you.

8        **MR. TOM:** Thank you, sir.

9        **THE WITNESS:** Yes, sir.

10       **MR. SAVITZKY:** Your Honor, Justice Anderson was the

11   last witness that we will call this week. We have one next

12   week as previously noted, but for now, we have no further

13   witnesses to call. I believe we discussed Justice Lamar coming

14   this afternoon.

15       **MR. WALLACE:** When they finally do rest, we will have

16   a motion, but they haven't rested, and Justice Lamar plans to

17   be here at 1:30 as Your Honor said yesterday.

18       **THE COURT:** Okay. We will be in recess until 1:30.

19   Thank you all.

20   (LUNCH RECESS TAKEN.)

21       **THE COURT:** Okay. So we're going to call a witness

22   out of order, and you may call that witness.

23       **MR. WALLACE:** Thank you, Your Honor. We call Justice

24   Ann Lamar.

25   (OATH WAS ADMINISTERED BY THE COURTROOM DEPUTY.)

*Lamar - Direct*

1    **COURTROOM DEPUTY:** Thank you. You may take the stand.

2    **MR. WALLACE:** May I proceed, Your Honor?

3    **THE COURT:** You may.

4    **ANN H. LAMAR, DEFENDANTS' WITNESS, AFTER BEING DULY SWORN, WAS**

5    **EXAMINED AND TESTIFIED AS FOLLOWS:**

6    **DIRECT EXAMINATION**

7    **BY MR. WALLACE:**

8    **Q.** Good afternoon. Thank you for coming over.

9    **A.** Thank you.

10   **Q.** Will you state your name, please, ma'am?

11   **A.** My name is Ann Hannaford Lamar.

12   **Q.** And where are you from?

13   **A.** Senatobia, Mississippi.

14   **Q.** Born and raised thereabouts?

15   **A.** Born and raised there.

16   **Q.** And what do you do for a living?

17   **A.** I am retired.

18   **Q.** Don't you keep place in the law office anymore?

19   **A.** I do. I am of counsel with the firm of Lamar &

20   Hannaford. That is where I practiced many years ago when I

21   first got out of law school. I'm of counsel, and I do some

22   cases, but I retired from Court in 2016.

23   **Q.** All right. Thank you, ma'am. Tell us a little bit --

24   starting with graduating from high school and give us an idea

25   of your education after that.

*Lamar - Direct*

**A.**    I graduated from Senatobia High School.  Attended
Northwest Community College and then Delta State.  Received my
degree from Delta State University.  I was out of school for a
few years and then went back to law school in 1979 at the Ole
Miss School of Law.  Received my degree there in 1982.
Returned to Senatobia, practiced law with my husband in
Senatobia, law firm of Lamar & Lamar.  And then you asked about
education; right?  There you go, I covered it.

**Q.**    You're braver than I am.  My wife and I were in our 50s
before we dared to practice together.  And when you got home to
practice law in Senatobia, how long were you in private
practice?

**A.**    About five years.

**Q.**    And what did you do next?

**A.**    I went to the district attorney's office.  In our
five-county circuit district, I was Assistant DA, and that was
in 1987.

**Q.**    Tell me a little about the district.  Five counties is
pretty big, I would think.

**A.**    We covered DeSoto, Tate, Panola, Yalobusha, and
Tallahatchie County.

**Q.**    Okay.  What was your responsibility in the -- in the
district attorney's office in those days?

**A.**    Well, if anybody knows anything about that part of the
state, you know how much it has grown since 1987.  At the time

1  that I went, there was elected district attorney, Bobby

2  Williams.  One other Assistant DA, and basically Robert and I

3  split all of the cases in that five-county district between the

4  two of us.

5      Today, there are -- I don't even know how many -- five,

6  six, or seven assistants just in DeSoto County, and I did a

7  little bit of everything.

8  **Q.**  Okay.  And at some point, how -- where or how did you

9  move on from your job assisting the district attorney?

10 **A.**  I left the DA's office in 1993.  Was a bit burnt out, I

11 suppose, and ready for a bit of a change.  I went back home to

12 Senatobia and practiced law again for about three years.  And

13 my children were at an age where I felt like they needed me at

14 home.  So then, in 1997, I suppose, I went back to the district

15 attorney's office.

16 **Q.**  Okay.

17 **A.**  I stayed at the district attorney's office then until '99

18 when our district attorney retired from practice.  And in '99,

19 I ran for DA, was elected as DA in that same five-county

20 district.  I --

21 **Q.**  And let me interrupt you for just a second.  In those

22 days and in these days, district attorney is a partisan

23 contest, is it not?

24 **A.**  Correct.

25 **Q.**  And what party did you run in in 1999?

*Lamar - Direct*

1 **A.** In 1999, I ran as a Democrat.

2 **Q.** All right. You were going ahead with what you did after

3 that. I just wanted to clarify that point.

4 **A.** I actually was not in that position for very long. I

5 took office at the beginning of 2000. In November of 2001, I

6 was appointed as circuit judge in that five-county district.

7 **Q.** And that would have been Governor Musgrove, I would

8 think?

9 **A.** That was Governor Musgrove. That's correct.

10 **Q.** Okay. And what were your responsibilities as circuit

11 judge in that five-county district?

12 **A.** Well, we had three circuit judges at the time, and we --

13 just those cases were randomly assigned, and so I was doing

14 whatever a circuit judge was doing during that time. It's a

15 very busy district. It was a very busy district at that time,

16 and it is today.

17 **Q.** Off the side for a minute, but Judge Anderson told us

18 this morning being a trial judge was the best job in the world.

19 Would you agree with that?

20 **A.** I don't know. I kind of liked being Assistant DA, you

21 know. I always said you get all of the fun being in the

22 courtroom, and then when things go bad, you just point at the

23 DA. Let them take the press conference. But, yes, being a

24 judge is -- was fun.

25 **Q.** And at some point, you moved on from being a circuit

Lamar - Direct

1  judge.  Tell us how that happened, please, ma'am.

2  **A.**    I was circuit judge from November of 2001.  So I was DA

3  for a little less than two years, from 2001 until my

4  appointment to the Supreme Court in May of 2007.  I think I ran

5  two races as a -- for reelection to the circuit bench, both

6  without opposition.

7  **Q.**    And those are nonpartisan races?

8  **A.**    That's correct.

9  **Q.**    Okay.  And how did you come to be appointed to the

10  Supreme Court?

11  **A.**    Governor Barbour, at the time, made that appointment.

12  Kay Cobb was retiring from the court.  Had been there for a

13  number of years.  And I -- I truly don't remember much about

14  the process.  I wasn't really that involved in it.  He had a

15  committee that he worked with during that time for judicial

16  appointments that made recommendations, and I don't really

17  remember whether someone on that committee called or how -- how

18  they contacted me, but he made that appointment in May of '07.

19  **Q.**    And everybody in the courtroom knows it, but in case

20  somebody needs -- reads this transcript some day, Judge Barbour

21  is a Republican?

22  **A.**    That's correct.

23  **Q.**    Governor Barbour is a Republican.  So you were appointed

24  by governors of both parties?

25  **A.**    That's correct.

*Lamar - Direct*

1 **Q.** Okay. Now, when you got into the Supreme Court -- let me

2 drop down from going through your career for a minute -- give

3 us an idea of what the court was like when you got there.

4 What -- you know, how did you spend your days? How did you get

5 along? What was the work like?

6 **A.** Well, it was quite different from what I had been doing

7 previously.

8 **Q.** Uh-huh.

9 **A.** I will say that. And I knew I had a lot to learn. It

10 was a congenial court, but there were -- there were some

11 issues, I remember, at the time. That was '07.

12 **Q.** Uh-huh.

13 **A.** The new building was under construction at that time and

14 nearly complete. We moved into the new building -- the new

15 Carroll Gartin building in 2008, so that was one of the issues

16 that we were dealing with. You know, they kind of just put you

17 in there and say, go.

18 And I remember the first -- we would vote cases. On a

19 certain day of the week, those votes were due. And I remember

20 them just handing me a stack of cases, you know, to read, and I

21 thought, oh my goodness, you know. And I remember a bill of

22 complaint the first time I was there, and I said, we had X

23 number of cases, and Judge Graves -- Justice Graves said, oh,

24 it's a light week, you know, just -- and I thought, well, not

25 for me.

*Lamar - Direct*

1  What I later learned was that those cases had maybe

2  circulated a number of times.  They were familiar with them.

3  They had read them, or they had been on panel, or they had

4  already voted, but to me, it was brand new.  So there was a lot

5  to learn.

6  **Q.**  And although not every judge sits on the panel for every

7  case, but every judge has to read the opinion and vote on it.

8  Isn't that the way it work?

9  **A.**  Well, let's hope they read the opinion if they put their

10  name on it.  Yes, I hope so.

11  **Q.**  Okay.  How did folks get along?

12  **A.**  Really pretty well.  Justice Carlson was on the court,

13  George Carlson.

14  **Q.**  Right.

15  **A.**  I had worked in front of Judge Carlson for many years.

16  In fact, when he vacated the circuit -- his circuit court

17  position to go to the Supreme Court, that's when I was

18  appointed to the circuit court position.  So I had followed him

19  on to the circuit court, had known him for many years and

20  worked with him for many years, and I'll say that helped, I'm

21  sure, because they were all helpful to me.  I knew him, and I

22  think most of the others, I probably met when I got there.  I

23  can't remember having much of a relationship with many of them

24  until I got to the court.

25  **Q.**  And we'll talk about campaigns in a minute, but inside

*Lamar - Direct*

1 the court when y'all are working with each other, did

2 Republican or Democrat make a difference in any way?

3 **A.** Really did not.

4 **Q.** And you mentioned Judge Graves. Did being Black or White

5 make a difference in any way?

6 **A.** Did not.

7 **Q.** Okay. So you got to the court. You broke yourself in.

8 And how soon did you have to qualify to run for office?

9 **A.** I went in May of '07, and '08 was election year.

10 **Q.** Uh-huh.

11 **A.** So I had some, what, eight months maybe to wrap my head

12 around that. You got to understand that once that appointment

13 came, it happened pretty quickly. Within a week, I was sworn

14 in at the Supreme Court. So there wasn't a lot of time, you

15 know, ahead of time to think about it but to get ready and gear

16 up for that -- for that campaign. The campaign was in 2008.

17 **Q.** Yep.

18 **A.** And I took my first full office in January of 2009.

19 **Q.** And what did you do to prepare to run for office? That's

20 a broad question, but you'd run local races before. This is a

21 much broader area. What did you do to get ready?

22 **A.** Well, I, of course, talked with many of my judge friends

23 and justices who were on the court who had already had to run

24 this race, in particular Justice Carlson. They suggested to me

25 that I needed to have a professional, someone to help me with

1  that race.  I had never done that in my local races.  I had

2  always just -- just handled the races myself.  But I did hire

3  someone who helped me with that race, and he guided me through

4  the initial steps of all of that.

5  **Q.**  Okay.  Who was your opponent in 2008, if you remember?

6  **A.**  I think his name was Jean Barton.

7  **Q.**  Okay.  And let's talk about your district.  This is the

8  Northern District of Mississippi?

9  **A.**  Correct.

10  **Q.**  And I'd just like you to describe it any way you can, by

11  people, by geography, by economics, anything you think makes

12  sense to help us understand the Northern District.

13  **A.**  Usually when I would explain it to people, I would say

14  it's northern and 33 counties in the state.  It's not exactly

15  right.  It's not a straight line across the state.  We took in

16  Tunica, Coahoma County, did not take in Bolivar County, but we

17  did take in Leflore, a few counties in the Delta.  But for the

18  most part, it was those two northern Delta counties and then

19  all the way across the state.  Ran, of course, to the Tennessee

20  line, and it ran to the Alabama line down to around Monroe

21  County or those areas.

22  **Q.**  Did you have all of your circuit district within the

23  Northern District?

24  **A.**  Mine?  Yes.

25  **Q.**  All of your five counties?

*Lamar - Direct*

1 **A.** Yes.

2 **Q.** Okay. And what were the counties like to the east of
3 your district going over to Alabama?

4 **A.** Well, the east part of the state, the west part of the
5 state are quite different actually.

6 **Q.** Uh-huh.

7 **A.** I knew some of those attorneys because they had appeared
8 before me, you know. It's not unusual for attorneys from
9 Oxford or Tupelo area to be in court, particularly in DeSoto
10 County but in our district. I had very little contact with
11 attorneys south of there, you know. Amory and Columbus and
12 those areas, we knew some of those attorneys but not many of
13 them. I had a lot of people to get out and meet because there
14 were an awful lot of areas that I did not have contacts.

15 **Q.** And you mentioned that the east and west parts are very
16 different. Other than the fact that you didn't know a lot of
17 people over in the eastern part, what are some of the
18 differences between the counties on the river and the counties
19 heading over toward Alabama?

20 **A.** Well, the northeast I found was -- well, I don't know
21 exactly how to describe that. They are much more interested in
22 politics over on that side of the county than they are in the
23 northwest part of the county -- I mean, northwest part of the
24 state. I was -- and I was, I guess, glad to know that -- that
25 somebody was interested that there was an election going on at

1 home.  It didn't seem to be that much interest in it.

2 There just has never been quite the political force on

3 that side of the state, I don't think.  It was a -- and it

4 varies from up toward the line.  The Tennessee line, there are

5 some pretty rural areas up there and then, you know, Tupelo and

6 Columbus and some of those areas.  Oxford, a little more

7 sophisticated than some of the more rural areas.  The -- my

8 district included Tallahatchie County, my circuit court

9 district --

10 **Q**.   Right.

11 **A**.   -- which is the western part of Tallahatchie County.

12 It's considered to be part of the Delta.  So I had spent, you

13 know, a fair amount of the time in the Delta.

14 As a circuit judge, I was appointed for some special

15 cases in the Delta and had spent some time down there as well.

16 So it's just different.  I used to say that in my circuit court

17 district, my five counties were as diverse as any counties in

18 our state, I suppose, when you went from DeSoto County to

19 Sumner, Mississippi.

20 **Q**.   And leave it with your circuit district for just a

21 minute.  As a circuit judge, was it a good thing for you to

22 have a diverse group of people in your cir -- and I don't know

23 what "good" means in that context, but what were the

24 ramifications of having that diverse group of people?

25 **A**.   It was interesting.  It did keep things interesting.  I

1    enjoyed it. I mean, I did from one end to the other, but it

2    was different. I knew that when I was prosecuting cases.

3    Sometimes you would approach cases differently in one area and

4    in another. You just get to know your -- you know your people,

5    and nothing right or wrong about any of it. Just different.

6    **Q**. Economically -- and we have heard a lot about the Delta

7    in testimony this week, but what -- what was the economic

8    mainstay of the Delta counties in your district?

9    **A**. It was mostly agricultural. There were some very rural

10    areas. There were some pretty impoverished areas in

11    Tallahatchie and in other parts of the Delta as well.

12    **Q**. And you have already talked about the sophisticated

13    places of the eastern part of the county -- eastern part of

14    your district, but what -- what economically was going on

15    around the eastern part of your district?

16    **A**. It was economically much more progressive than, of

17    course, it was over in -- on the Delta side and some of the

18    more rural sides I would say.

19    **Q**. Okay. I want to ask you, now, having talked about the

20    district and your lack of familiarity with the eastern part,

21    tell me how you went about campaigning for office. How did you

22    try to meet and appeal to all of these people?

23    **A**. Well, you just get out in the counties. That's what you

24    do. I can remember making a list of all 33 counties and just

25    brainstorming to figure out who I might have known in any of

1 those areas. I had someone that worked with me that kept up

2 with appointments because you have to remember I was working a

3 full shift at the court at the same time. We had four justices

4 that ran for election -- stood for reelection in 2008; so it

5 was a very busy time at the court.

6 And so these people that were -- were helping me would

7 schedule whatever they could find. If there was -- if there

8 was a campaign event going on somewhere or a watermelon

9 festival going on in Water Valley or whatever was going on,

10 whether there were rotary clubs that were interested in hearing

11 from someone, we would schedule that and just wherever you

12 could find to meet people. Eventually, I had people in all

13 different parts of the county that hosted events so that I

14 could meet local people and have a chance to speak with them.

15 **Q**. What sort of groups did you speak to? You have talked

16 about, you know, one-on-one handshaking, getting introduced to

17 folks. Did you speak to groups around your district?

18 **A**. Oh, sure. Anybody that would listen really. I was in

19 many rotary clubs, many other clubs. Particularly on the

20 eastern part of the state, there are a lot of women's groups.

21 **Q**. Uh-huh.

22 **A**. Republican women groups, others that are very interested

23 in politics, you know, and they would invite you to speak, and

24 we did.

25 **Q**. Okay. And how -- how much so on the western part of the

*Lamar - Direct*

1  district in the Delta?  What sort of groups were you able to

2  speak to over there?

3  **A**.    Some of the same.

4  **Q**.    Uh-huh.

5  **A**.    Some of the same.  I can remember being at Rotary in

6  Leflore County and some events in Tunica County when someone

7  had us over there, you know.

8  **Q**.    Uh-huh.

9  **A**.    As they say, where two or more are gathered, you know, I

10  would be there.

11  **Q**.    And you mentioned Republican women's clubs.  By law, you

12  do not campaign as a member of any party?

13  **A**.    Correct.  That is correct.

14  **Q**.    What did members of the parties do to be involved in the

15  campaign?  You said the Republican women would invite you, and

16  you would talk to them?

17  **A**.    Yeah.  We tried to be careful about that, but I -- you

18  know, I can remember having conversations about how appropriate

19  any -- what events would be, you know, but I always took the

20  position I -- you know, I can't count how many rotary clubs I

21  appeared at, but it didn't make me a Rotarian.  Okay.  I'm not

22  a member of the Rotary Club, never was, and I think the same

23  way with these other groups.  You know, if they were interested

24  in hearing about the campaign and the issues and what is going

25  on with the court, I was glad to talk to them.

*Lamar - Direct*

**Q.**   And while speaking to the republicans doesn't make you a Republican, what did you perceive the attitude of the republicans to be toward you?

**A.**   I felt like, for the most part, they were supportive.  I had been appointed to the court by Haley Barbour, which was a very popular Republican governor.  I say popular, popular with the republicans anyway I'll say, and so, you know, just funny. For some of them, that's all they really needed to know, you know.

**Q.**   And what about the Democrats in your district?  What kind of interaction did you have with some of them?

**A.**   You know, I had -- you know, Mississippi, in 2008, what are we talking about, 16 years ago?  You know, it's changed a lot, but there was a time when -- when most of your local politics were on the Democratic side.  And in parts of my district and in parts of that 33-county district, it's mostly Democrat.  I remember appearing at the -- speaking at the -- I think it was the Voters League is what it was called in Leflore County, which is a very democratic group in Leflore County and spoke with them one night.

**Q.**   Uh-huh.  And so you were willing to meet any kind of group anywhere they would have you?

**A.**   (Nods head up and down.)  Yes.

**Q.**   Okay.  I want to ask -- by the way, do you know if the Republican party endorsed you?  Sometimes, they do.  I don't

*Lamar - Direct*

1 know.  Do you remember what happened in 2008?

2 **A**.    I do not know whether they endorsed.  I really don't

3 remember that.

4 **Q**.    Okay.  The other question I was going to ask.  To the

5 extent there are issues in the Supreme Court election, and you

6 know that may be questionable, but what were the issues that

7 you saw that tended to dominate your election that year?

8 **A**.    You know, there was still a lot of issues at the time

9 about -- you know, you remember we're right in the aftermath of

10 the tort reform debate in our state and the passing of tort

11 reform; so that business/plaintiff question was always brought

12 up.  There was a lot of that.

13       I mean, you have got to remember in 2008 when I ran four

14 justices were up, which is unusual.  It's usually just three,

15 but there comes an odd time when there are four up.  This year

16 is one of them.  But all four sitting justices had opposition.

17 Three of those were defeated.  Three incumbents were defeated.

18 I was not.  So it was an active time, I guess is what I'm

19 saying, of interest in the court and what was going on there.

20 **Q**.    Since you mentioned that, were those three incumbents

21 defeated?  Were they spread across the three districts?

22 **A**.    They were.

23 **Q**.    Okay.  Was your opponent perceived as being friendly to

24 one side or the other of the tort reform debate?

25 **A**.    Yeah.  I think he, you know, aligned with the plaintiffs

*Lamar - Direct*

1  group, but, frankly, I had -- I had a number of trial lawyers

2  that I know that I -- you know, have appeared before me and

3  been friends, and they supported me as well.  I don't remember

4  how actively they got involved on his behalf, but that group

5  got very involved statewide that year, and I think most of

6  their attention was focused on the coast, Justice Diaz's race,

7  and in the Central District, Justice Smith's race.

8  **Q.**   Okay.  And just to complete the list, was it Justice

9  Easley running in the Northern District?

10 **A.**   Justice Easley in the Northern District and was defeated

11 by Chandler.

12 **Q.**   Okay.  All right.  So being an incumbent doesn't

13 necessarily mean you are safe?

14 **A.**   Not necessarily.

15 **Q.**   Okay.  The -- the reason you are here is the Voting

16 Rights Act guarantees equality of opportunity to participate in

17 elections.  So I want to ask you if you saw any difficulties

18 for Black voters to participate in elections in your district?

19 **A.**   Not that I'm aware of.  I did not.  I mean, I cannot

20 remember who was -- yes, I do.  Was that the year that Obama

21 was elected?  Was he elected in '08?

22 **Q.**   Yes, he was.

23 **A.**   That's right.  And so there was a pretty active campaign

24 to get out the vote during that period of time.  And there

25 was -- there was a lot of turnout.  You know, there was

*Lamar - Direct*

1  always -- you would often see that.  Transportation provided.

2  I mean, there -- it was active as far as getting people to the

3  polls.  I don't know of any problems.  You know, there

4  certainly may have been some, but I wasn't aware them, but I

5  don't know of any.

6  **Q.**   And you mentioned transportation provided.  Is part of

7  the western part of your district in Congressman Bennie

8  Thompson's district?

9  **A.**   I'm not sure exactly what his district encompasses, but

10  he was active in -- well, in the Supreme Court district, yes,

11  on this, but in my circuit district as well, he was often

12  active.

13  **Q.**   And you mentioned providing transportation.  Is that

14  something he tried to do?

15  **A.**   Yes.  You would often see that.

16  **Q.**   Okay.  All right.  By the way, did you ever see a sample

17  ballot distributed by Congressman Thompson?

18  **A.**   I did.

19  **Q.**   Okay.  And he does that pretty regularly, doesn't he?

20  **A.**   He does.  He does.

21  **Q.**   Okay.  Tells who he is for.

22  **A.**   Yes.

23  **Q.**   Okay.  Now, we have gotten through the election.  I want

24  to get back to the job of being a justice for a few minutes.

25  As a justice, what did you consider your role to be with regard

1 to the constituents that elected you.

2 **A**. I never saw myself as representing any constituency when

3 I was on the court. I think we pledged -- you've got to hope

4 we're going to do justice to the law and justice to the facts

5 and justice to the individual cases that come before us, but I

6 think most of us considers ourselves to be a state official,

7 you know.

8 And I heard just as many cases from Laurel and Gulfport

9 probably as I did from Hernando or Tupelo. The cases are not

10 distributed in any way relative to geographic location. It

11 just really doesn't play a part once you get there and those

12 cases are assigned.

13 **Q**. Okay. And was that a common attitude among all nine of

14 the justices?

15 **A**. Yes, it's what I perceived.

16 **Q**. Okay. Now, you do have constituents. Did you ever feel

17 any tension or pressure or pushback from any of your

18 constituents on a case?

19 **A**. No.

20 **Q**. Okay. Are you --

21 **A**. To the extent that I -- not pressure, but familiarity

22 sometimes, you know, brings a problem, and it's something you

23 always have to be aware of. You would not want the perception

24 of any wrongdoing on a case. You are always aware of that,

25 but, no, I didn't feel the pressure. We -- I mean, you can't

1   help but know what is going on and what is being said out

2   there, but we were fairly isolated from much of that.

3   **Q.**   Okay.  Without getting into pressure, are there types of

4   cases that your Delta counties might be more interested in than

5   your eastern counties?  You have got all kinds of cases up

6   there.

7   **A.**   Well, there are.  I, you know, immediately think of the

8   Katrina cases which just consumed us for a while after -- after

9   that.  It was much more interest in that on the coast than

10  there was on the other part of the state, and it is the same

11  with all sorts of other cases.  You know, we -- annexation

12  cases, utility cases, death penalty cases.  Oftentimes,

13  criminal cases that have a high level of notoriety, if you

14  will, you know, will -- will get people really in a stir.

15  **Q.**   More so in one place than in another place?

16  **A.**   Certainly.  Certainly.  It's local to them.

17  **Q.**   You mention utility cases.  Does the Supreme Court hear

18  rate appeals and utility cases?

19  **A.**   That's correct.  I think that is one of the categories

20  that we automatically retain jurisdiction over.

21  **Q.**   If you had a rate appeal from Entergy, would the folks in

22  the western part of your district be particularly interested in

23  that?

24  **A.**   Yeah.  The west would be interested.

25  **Q.**   And why is that?

1  **A.**    The east would not care because they're covered by TVA

2  for the most part.  In Tate County where I live -- let me

3  see -- Entergy has the west part of the county; and TVA, the

4  east part of the county; and TVEPA runs right up through the

5  middle of the county.  But for the most part, Entergy is -- is

6  west of there.

7  **Q.**    Okay.  So that might be a huge case to somebody, and the

8  rest of your district wouldn't care about it at all?

9  **A.**    True.

10 **Q.**    The map -- the first alternative map they have proposed

11 to Judge Aycock would run a district all the way from Tunica

12 all the way down the river to -- to Louisiana covering the

13 entire Entergy district.  If you had an Entergy case, do you

14 think that would interest everybody in that district?

15 **A.**    I'm sure that it would.

16 **Q.**    Okay.  And so I've just got one last question.  We have

17 talked about what you did and how you did it and how you got

18 there.  You have got a large and diverse district that goes

19 across north -- across North Mississippi.  For what you do in

20 your job, what are the ramifications of having a district that

21 covers a large area with lots of different types of people?

22 **A.**    I'm not sure exactly what you are referring to,

23 Mr. Wallace, but what I think about when I think about a

24 diverse district such as one that we had --

25 **Q.**    Uh-huh.

*Lamar - Cross*

1   **A.**    -- I think it is -- it is helpful so that you are not

2   beholding to any one particular group or any one particular

3   region of people.  You know, there can be pressure to bear on

4   some of those, and we hope that that doesn't affect the

5   decisions, but -- but it would be difficult, I think, or maybe

6   more difficult when you're thinking about having any smaller

7   area or a particular area that is -- is only focused -- you

8   know, might be focused on one area.

9        I mean, I just think about my circuit court district.  It

10  covered five counties and just had to be much more careful in

11  those areas of potential recusals or familiarities or pressures

12  from those -- that small area.  I don't think you want that on

13  your -- with your supreme court justices.

14  **Q.**    All right.  Thank you.  I don't know what I wanted

15  either.  That's why I was trying not to lead.  I appreciate the

16  answer.

17             **MR. WALLACE:**  I have no further questions, Your Honor.

18             **THE COURT:**  Thank you.  Cross-examination.

19             **MR. YOUNGWOOD:**  May I proceed, Your Honor?

20             **THE COURT:**  You may.

21                         **CROSS-EXAMINATION**

22  BY MR. YOUNGWOOD:

23  **Q.**    Good afternoon, Justice Lamar.  My name is Jonathan

24  Youngwood.

25  **A.**    Good afternoon.

1  **Q.**    Nice to meet you.  I know you were deposed earlier in the

2  case, but I was not present at that.  So I don't think we have

3  ever interacted before.  Pleasure to meet you.  I don't have

4  very many questions.

5       First, you spent some time with counsel talking about the

6  election of 2008.  That's the last time you stood for election;

7  correct?

8  **A.**    That's correct.

9  **Q.**    You haven't been involved as a candidate since then in

10  any election?

11  **A.**    That is correct.  I retired at the end of that term, the

12  end of '16.

13  **Q.**    Okay.  So you don't have experience as a candidate in

14  subsequent elections from 2008?

15  **A.**    No.

16  **Q.**    Okay.  You would agree with me that Black people are

17  underrepresented on the Mississippi Supreme Court?

18  **A.**    There is one Black justice on the Supreme Court.  I

19  suppose you could say that.  I don't know if you mean

20  underrepresented with reference to population.  Women are

21  pretty underrepresented down there as well.  There have been

22  four of -- four women to serve on that court as well.  There's

23  one right now.  So I guess you could say that.

24  **Q.**    Okay.  And you would agree with me that all judges should

25  be fair and impartial?

*Lamar - Cross*

1  **A.**  Sure.

2  **Q.**  And I think you have covered a little bit of this on the

3  direct, but when you were on the court, there may have been

4  differences of opinion, but it was a professional discourse

5  among colleagues.  Fair to say?

6  **A.**  It really was.  I -- that was my experience and

7  throughout my time there.

8  **Q.**  Okay.  And the exchange of ideas was a healthy exchange?

9  **A.**  Correct.

10  **Q.**  Okay.  You mentioned Judge Graves, and I don't think you

11  mentioned Judge King, but you served with both of them;

12  correct?

13  **A.**  Yes.

14  **Q.**  And you believe that both of them were fair and

15  impartial?

16  **A.**  Absolutely.

17  **Q.**  You would agree that both White and Black judges alike

18  can be fair and impartial?

19  **A.**  Yes.

20  **Q.**  And you would agree that judges can be fair and impartial

21  if they are elected from White majority districts?

22  **A.**  Repeat that question.

23  **Q.**  If -- your district was a White majority district --

24  **A.**  Right.

25  **Q.**  -- correct?  And you and the other judges elected from it

*Lamar - Cross*

1 could be fair and impartial; correct?

2 **A.**   Yes, I think so.

3 **Q.**   And if there were judges elected from a Black majority

4 district, you believe those judges could also be fair and

5 impartial?

6 **A.**   I would hope so, yes.

7 **Q.**   Well, you would think they would be?

8 **A.**   You know, fair and impartial, I suppose, is an individual

9 thing with the justices, but I would like to believe that

10 anybody that gets to that point in their career and is elected

11 by the people of this state will go to that court to be fair

12 and impartial.

13 **Q.**   You don't think it would be a disadvantage being fair and

14 impartial from being elected from a Black majority district?

15 **A.**   No.

16         **MR. YOUNGWOOD:**   Thank you.

17         **THE COURT:**   Redirect?

18         **MR. WALLACE:**   None, Your Honor.   Thank you very much.

19         **THE COURT:**   Okay.   May this witness be finally

20 excused?

21         **MR. WALLACE:**   She certainly may, Your Honor.

22         **THE COURT:**   Thank you.

23         Okay.   So I know we are going to recess for the day.

24 Are there any matters that we need to take up before we

25 reconvene on Monday morning?

1          **MR. WALLACE:**  Nothing comes to mind, Your Honor.  As I

2   think I told you, we have a couple of expert witnesses we will

3   put on Monday and Tuesday and maybe a fact witness, but that's

4   our plan for the beginning of next week.

5          **MR. SAVITZKY:**  And nothing from the plaintiffs, Your

6   Honor.  We look forward to seeing the Court and Counsel on

7   Monday.

8          **THE COURT:**  Okay.  Very well.  We'll be in recess

9   until Monday morning, 9:00.  Thank you.

10      (CONCLUDED AT 2:03 P.M.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

## CERTIFICATE

I, Phyllis K. McLarty, Federal Official Realtime Court Reporter, in and for the United States District Court for the Northern District of Mississippi, do hereby certify that pursuant to Section 753, Title 28, United States Code, that the foregoing pages, 677-776, Volume 4, are a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

Witness my hand, this 11th day of August, 2024.

/s/ Phyllis K. McLarty
PHYLLIS K. McLARTY, RMR, FCRR, CCR #1235
Federal Official Court Reporter