1

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF MISSISSIPPI
GREENVILLE DIVISION

2

3

DYAMONE WHITE; DERRICK SIMMONS;
TY PINKINS; CONSTANCE OLIVIA
SLAUGHTER HARVEY-BURWELL                          PLAINTIFFS

4

5

VS.                                              NO. 4:22-CV-62

6

STATE BOARD OF ELECTION COMMISSIONERS;
TATE REEVES, IN HIS OFFICIAL CAPACITY
AS GOVERNOR OF MISSISSIPPI; LYNN FITCH,
IN HER OFFICIAL CAPACITY AS ATTORNEY
GENERAL OF MISSISSIPPI; MICHAEL WATSON,
IN HIS OFFICIAL CAPACITY AS SECRETARY
OF STATE OF MISSISSIPPI                           DEFENDANTS

7

8

9

10

11

NON-JURY TRIAL
VOLUME 7

12

13

BEFORE HONORABLE SHARION AYCOCK
UNITED STATES DISTRICT JUDGE

14

15

Oxford, Mississippi
August 14, 2024

16

17

18                    (APPEARANCES NOTED HEREIN)

19

20

21

22

23

PHYLLIS K. McLARTY, RMR, FCRR, CCR #1235
Federal Official Court Reporter
911 Jackson Avenue East
Oxford, MS  38655

24

25

APPEARANCES:

For the Plaintiffs:    ARI J. SAVITZKY, Esquire
                       MING CHEUNG, Esquire
                       VICTORIA OCHOA, Esquire
                       American Civil Liberties Union Foundation
                       125 Broad Street, 18th Floor
                       New York, NY  10004


                       JONATHAN K. YOUNGWOOD, Esquire
                       JANET A. GOCHMAN, Esquire
                       Simpson Thacher & Bartlett
                       425 Lexington Avenue
                       New York, NY  10017


                       V. NOAH BENJAMIN GIMBEL, Esquire
                       KATE LAMBROZA, Esquire
                       Simpson Thacher & Bartlett
                       900 G St. NW
                       Washington, DC  20001


                       SABRINA S. KHAN, Esquire
                       Southern Poverty Law Center
                       403 Washington Avenue
                       Montgomery, AL  36104


                       BRADLEY E. HEARD, Esquire
                       Southern Poverty Law Center
                       1101 17th St. NW, Suite 550
                       Washington, DC 20036


                       AHMED K. SOUSSI, Esquire
                       Southern Poverty Law Center
                       150 E. Ponce de Leon Avenue
                       Suite 340
                       Decatur, GA  30030


                       JOSHUA F. TOM, Esquire
                       AYANNA DENISE HILL, Esquire
                       ACLU of Mississippi
                       P.O. Box 2242
                       Jackson, MS  39225-2242

```
For the Defendants:    CHARLES E. COWAN, Esquire
                       MICHAEL B. WALLACE, Esquire
                       Wise Carter Child & Caraway, P.A.
                       P.O. Box 651
                       Jackson, MS   39205-0651


                       JUSTIN LEE MATHENY, Esquire
                       REX MORRIS SHANNON, III, Esquire
                       ELIZABETH WINDSOR USRY, Esquire
                       Mississippi Attorney General's Office
                       P.O. Box 220
                       Jackson, MS   39205-0220
```

# TABLE OF CONTENTS

| DEFENDANTS' WITNESSES | DIRECT | CROSS | REDIRECT |
|---|---|---|---|
| Kyle B. Kirkpatrick | 1192 | 1258 | 1285 |

| PLAINTIFFS' WITNESSES | DIRECT | CROSS | REDIRECT |
|---|---|---|---|
| Marvin P. King, Jr., Ph.D. | 1291 | 1364 | |

| PLAINTIFFS' EXHIBITS | I.D. | ADMITTED |
|---|---|---|
| PX-52 | | 1306 |
| PX-53 | | 1306 |
| PX-54 | | 1306 |
| PX-55 | | 1293 |
| PX-74 | | 1327 |
| PX-111 | | 1342 |

| | PAGE |
|---|---|
| Plaintiffs Rest | 1416 |

1    (CALL TO ORDER OF THE COURT AT 9:01 A.M.)

2    **THE COURT:**  Okay.  Who do we call as our first witness

3    this morning?

4    **MR. SAVITZKY:**  Your Honor, if I may interject briefly

5    just on a scheduling matter.

6    As I understand it, after Mr. Kirkpatrick, Dr. King is

7    going to take the stand.  He will be our last witness.  And I

8    would strongly suspect that he will be on the stand into the

9    afternoon.  I think we have allotted, in total, about two and a

10   half hours for closing.  We'll certainly be prepared to proceed

11   right to closing if the Court would like.

12   I think, all things being equal, we would also be

13   happy to marinate on the evidence once all of the witnesses are

14   done, return for closing tomorrow morning at 9:00 a.m.  So I

15   wanted to raise the issue with the Court for planning purposes

16   and see if the Court had a preference.

17   **THE COURT:**  I had in my mind that we would do closing

18   on Thursday morning.  If I need to accommodate somebody with a

19   Wednesday afternoon or night -- in fairness to you, there is so

20   much that needs to be presented in a short period of time, that

21   would be helpful to me.  I would rather you do it on a fresh

22   morning.

23   **MR. WALLACE:**  We can do that, Your Honor.  Happy to

24   help you.

25   **THE COURT:**  Thank you.

*Kirkpatrick - Direct*

1      **MR. SAVITZKY:**  Understood, Your Honor.

2      **THE COURT:**  Okay.

3      **MR. MATHENY:**  Defendants would call Kyle Kirkpatrick,

4  Your Honor.

5      (OATH WAS ADMINISTERED BY THE COURTROOM DEPUTY.)

6      **COURTROOM DEPUTY:**  Thank you.  You may take the stand.

7      **MR. MATHENY:**  May I proceed, Your Honor?

8      **THE COURT:**  You may.

9    **KYLE B. KIRKPATRICK, DEFENDANTS' WITNESS, AFTER BEING DULY**

10            **SWORN, WAS EXAMINED AND TESTIFIED AS FOLLOWS:**

11                    **DIRECT EXAMINATION**

12  BY MR. MATHENY:

13  **Q.**  Good morning, Mr. Kirkpatrick.  Could you state your full

14  name for the record, please.

15  **A.**  Kyle Bennett Kirkpatrick.

16  **Q.**  And where did you grow up?

17  **A.**  I grew up in Gautier, Mississippi.

18  **Q.**  Could you kind of walk us through your educational

19  background, I guess, maybe starting after high school.

20  **A.**  Yes.  After high school, I attended the University of

21  Mobile and received a Bachelor's of Science in political

22  science.  Afterwards, I went to University of Ole Miss School

23  of Law and graduated and received my juris doctorate.

24  **Q.**  When did you graduate from Ole Miss law?

25  **A.**  2018.

*Kirkpatrick - Direct*

1  **Q.**  All right.  And are you a licensed attorney?

2  **A.**  Yes.

3  **Q.**  A member of the Mississippi Bar?

4  **A.**  Yes, sir.

5  **Q.**  Okay.  Are you a member of any other bar associations or

6  licensed in any other state?

7  **A.**  No, sir.

8  **Q.**  Now, kind of walk us through your work history, and I

9  guess best place to start would be -- I mean, what did you do

10  after you graduated law school?

11  **A.**  After graduating law school, I moved to Charleston, South

12  Carolina, and worked for Motley Rice, a law firm out there.

13  Afterwards, I moved to -- back to Mississippi in 2020, where I

14  began working with the Mississippi Secretary of State's Office

15  as a senior attorney and became the assistant secretary of

16  state for elections in May of 2021.

17  **Q.**  And what does -- generally speaking, what does the

18  assistant secretary of state for elections do?

19  **A.**  So the assistant secretary of state for elections

20  oversees the elections division and overseeing campaign finance

21  reporting into the office, developing training programs for

22  local election officials on federal and Mississippi election

23  law, oversees lobbying reporting into the elections division,

24  and generally provides advice and information to the secretary

25  of state on election procedures.

1  **Q.**   And how many folks work in the elections division besides
2  yourself?

3  **A.**   So we have a total of six -- a senior attorney, who will
4  assist me; my administrative assistant; a campaign finance
5  officer; a lobbying officer; a training officer; and an
6  independent contractor.

7  **Q.**   And are you the supervisor of the elections division, so
8  to speak, or who is the head -- head person in charge of the
9  elections division?

10  **A.**   Yes.  I supervise all employees.

11  **Q.**   I think you mentioned your -- your role and your duties
12  intersect with election laws.  I take it -- is that state and
13  federal election laws?

14  **A.**   Yes.  Mississippi has to comply with what federal
15  election laws have been passed as well as any Mississippi laws
16  that the Mississippi legislature has passed.

17  **Q.**   And we have heard some acronyms for election laws many
18  times over the past several days.  And we'll get into some
19  specifics, but I did want to ask you, like, for example, what
20  is the NVRA?

21  **A.**   The NVRA stands for the National Voter Registration Act
22  of 1993.

23  **Q.**   Are there any other -- I'm not asking you to tell us
24  every single one, but any other big federal acts that come up
25  in your kind of day-to-day at the elections division?

*Kirkpatrick - Direct*

1   **A.**   The Help America Vote Act of 2002 is another major

2   election law that really changed how we do elections in

3   Mississippi.  Of course, the Voting Rights Act and UOCAVA,

4   which is The Uniformed and Overseas Citizens Absentee Voting

5   Act.

6   **Q.**   Those may come up a little bit more as we talk more about

7   Mississippi elections, but I think a fair place to start is

8   this:  What is the State Board of Election Commissioners?

9   **A.**   So the State Board of Election Commissioners is a body of

10  the Governor of Mississippi, the Attorney General of

11  Mississippi, and the secretary of state that has certain roles

12  in qualifying certain candidates, certifying certain elections,

13  and preparing certain sample ballots.

14  **Q.**   Okay.  Well, let's unwrap that a little bit.  So three

15  members of the board.  Do the members of the board have

16  different roles and responsibilities?

17  **A.**   So the governor is the chair of the board, and the

18  secretary of state is the secretary of the board and will

19  prepare the minutes and prepare documents for the board.

20  **Q.**   And what does the attorney general do?

21  **A.**   The attorney general is a member of the board and will

22  vote accordingly.

23  **Q.**   And who is responsible for -- I take it -- you know, you

24  mentioned the secretary is the secretary, but who is

25  responsible for keeping up with all of the documents and other

*Kirkpatrick - Direct*

1  things that may accumulate in the course of the State Board of

2  Election Commissioners doing its job?

3  **A.**  The secretary of state's office and specifically the

4  elections division will keep records of the meeting, including

5  meeting minutes and any of the documents that were presented

6  during the meeting.

7  **Q.**  Now, you said that they -- they qualify certain

8  candidates.  Let's go into that a little bit.

9       What kinds of candidates have to be qualified through the

10  state board versus candidates that have to be qualified by

11  other, I guess, local entities?

12  **A.**  So, generally, officials that are -- people who are

13  seeking office for, you know, offices that cross county lines

14  of state district or statewide or federal offices will go in

15  front of the State Board of Election Commissioners to appear on

16  the general election ballot.

17  **Q.**  Okay.  Let me make sure that I understand that.  So would

18  a -- say, for example, would a legislator have to qualify

19  through the State Board of Election Commissioners?

20  **A.**  Yes.  A state representative, state senator would go in

21  front of the state board, or at least the paperwork would, to

22  appear on the general election ballot.

23  **Q.**  What about a local county circuit clerk?

24  **A.**  That would all be handled by the county election

25  commissioners.

*Kirkpatrick - Direct*

1  **Q.**  Okay.  And what about -- what's most important, I

2  suppose, for this case, where do judicial candidates -- who do

3  they have to qualify with in order to run for office?

4  **A.**  That will be with the State Board of Election

5  Commissioners.

6  **Q.**  And that includes Mississippi Supreme Court and Court of

7  Appeals justices and judges; is that right?

8  **A.**  Yes.

9  **Q.**  Let's focus in on those particular kinds of candidates.

10  Is there a -- and not a pop quiz here, but what are the basic

11  requirements in order to be able to qualify as a candidate for

12  the -- for, let's say, the Mississippi Supreme Court?

13  **A.**  Got to be a resident of the state and of the district

14  that they are seeking to represent.  They are required to be a

15  practicing and licensed attorney.

16  **Q.**  Okay.  And are those requirements about the same or the

17  same for Mississippi Court of Appeals judges?

18  **A.**  Yes, I believe so.

19  **Q.**  Okay.  And once a candidate for a judicial office

20  qualifies -- well, let me back up and put it this way.  Does

21  everybody who is going to -- who is a candidate to run for a

22  judicial office have to qualify through the SBEC?

23  **A.**  Yes.

24  **Q.**  So there are no candidates that automatically qualify

25  because of incumbency or some other reason?

*Kirkpatrick - Direct*

1   **A.**   No.   Everybody must file and go in front of the SBEC.

2   **Q.**   Okay.   That's what I thought.   Incumbents have to run for

3   election like anybody else?

4   **A.**   Yes.

5   **Q.**   And, to your knowledge, have any candidates for judicial

6   office ever been disqualified from running as a candidate by

7   the SBEC?

8   **A.**   I'm aware of two.   Now Court of Appeals Judge -- Judge

9   Westbrooks and a gentleman named Clay Caldwell have been

10  disqualified.

11  **Q.**   Okay.   And was that during your tenure with the secretary

12  of state's office, or when --

13  **A.**   Judge Westbrooks --

14  **Q.**   I'm sorry.   When were those?

15  **A.**   I believe Judge Westbrooks was early 2000s.   Around 2011

16  and 2012.   Mr. Caldwell was during my tenure in 2022.

17  **Q.**   Let's talk about kind of the election system, and I want

18  to -- we can start broadly and then drill down as need be.

19  But, I mean, broadly speaking, what is the structure of the

20  Mississippi election system?

21  **A.**   So Mississippi elections are what we call "bottom-up" in

22  that the local election officials are responsible for running

23  the election and all that entails.

24  **Q.**   Let's unpack that a little bit.   Who are the main local

25  election officials that are involved in running elections?

*Kirkpatrick - Direct*

1 **A.** So county elections are run with two different entities

2 that share some responsibilities. The county election

3 commissioners have the main thrust of the responsibilities,

4 including hiring poll managers and canvassing the elections and

5 getting ballots printed.

6 And the county circuit clerk is the register of voters.

7 They register voters, and they are in charge of keeping the

8 voting machines and also conducting absentee voting.

9 **Q.** Okay. And how many election commissioners are there in

10 each county?

11 **A.** There are five. One for each board of supervisor

12 district.

13 **Q.** Okay. And I take it one circuit clerk in each county;

14 right?

15 **A.** Yes.

16 **Q.** And which of -- of the election commissioners and the

17 circuit clerks, which of those is primarily responsible for

18 voter registration?

19 **A.** The county circuit clerk handles the voter registration.

20 **Q.** And what about -- we will get into this a little bit more

21 later, but who is responsible for voter roll maintenance?

22 **A.** So that is mainly going to be the county election

23 commissioners who are mostly charged with federal maintenance.

24 There are some pieces where the county circuit clerks may have

25 some responsibility under state statute, but it's primarily

1 county election commissioners.

2 **Q.** And what role, if any, does the elections division have
3 in training these local officials in how to carry out their
4 duties?

5 **A.** So under Mississippi law, county election commissioners
6 must be certified each year. So we will hold training seminars
7 somewhere between January and March to train local election
8 officials on their responsibilities, federal and state laws, so
9 they can be certified.

10 **Q.** And this "training," does it include circuit clerks and
11 election commissioners?

12 **A.** Many of the circuit clerks do attend training, which is
13 normally held at the election commissioners' annual meeting,
14 and will also attend the circuit clerks' conference and conduct
15 the training for circuit clerks as well.

16 **Q.** And I'm not -- you don't have to walk through every one,
17 but, I mean, what are the publications that the elections
18 division makes available to local officials to help assist them
19 in carrying out their duties?

20 **A.** So we will provide PowerPoints during trainings that will
21 cover the various topics that we are going to be discussing
22 during those times, and we also prepare a county election
23 handbook that local election officials can reference throughout
24 the year.

25 We provide various, you know, step-by-step guides, both

*Kirkpatrick - Direct*

1  for voters and for local election officials, different

2  checklists that maybe poll managers can use at the polling

3  place just to help facilitate and help with training.

4  **Q.**    And are many of those things or all of those things --

5  you tell me -- available through -- are they publicly available

6  through your website?

7  **A.**    Most are available on the website.  All of our

8  step-by-step guides.  The county election handbook is on the

9  office of the secretary of state's website.

10  **Q.**    What is the secretary of state's annual elections

11  calendar?

12  **A.**    So the annual election calendar is something we put

13  together to help the public as well as county election

14  officials on various important dates with the election.

15      That can include when absentee voting starts; when

16  Election Day is; when elections are certified; campaign finance

17  reporting requirements; when qualification begins, when it

18  ends; anything the public or the candidates or the election

19  officials may know as far as key dates will generally be on

20  that calendar.

21  **Q.**    And is that the sort of thing that is also available on

22  your website to the public?

23  **A.**    Yes.

24  **Q.**    What about this?  What is the elections hotline?

25  **A.**    So the elections hotline is a publicly available number

*Kirkpatrick - Direct*

that the secretary of state's election division has where a

person can call up and they will be able to get in touch with a

member of the elections division and will answer questions for

voters on what they may need to vote, what they may need to

register to vote, where they need to go vote, the candidates,

information about campaign finance, or, you know, whatever

questions somebody has about the elections, we will try and

answer it on that hotline.

**Q.**    And I think I understood this in your answer, but I want

to be sure.  Is the elections hotline only for election

officials, or can anybody use it?

**A.**    It's for absolutely anybody in -- I would say in

Mississippi, but we also get quite a few calls from out of

state.  So it's -- anybody who has the phone number can call

it.

**Q.**    And is that phone number available on your website?

**A.**    Yes.

**Q.**    I wanted to ask you about this.  Does the elections

division or I guess maybe the secretary of state's office more

generally -- do they administer grants to local officials to

assist in carrying out their elections duties?

**A.**    We do have several grants and/or funds that we distribute

to counties through different mechanisms, depending on what

kind of grant or fund it is.

**Q.**    Okay.  What would you consider to be, in your experience,

1  the biggest fund that you administer through your office?

2  **A.**  Probably the biggest fund is now the election support

3  fund.

4  **Q.**  Okay.  How does that work?

5  **A.**  So the election support fund is generated by any foreign,

6  meaning out of the state of Mississippi, LLC.  When they file

7  their annual business reports, they pay a $250 fee.  That fee

8  goes into the bucket that we call the election support fund.

9         And going forward now, it will be -- every single one of

10  those dollars will go down to the county local election

11  officials to be used to support elections, whether it's buying

12  new equipment, training local election officials, buying voting

13  equipment, buying equipment for their offices, whatever they

14  need to conduct their elections.

15  **Q.**  And how do you determine who gets how much money?

16  **A.**  That's going to be based off of population.

17  **Q.**  Okay.  So, for example, a larger county like Hinds

18  County, they are going to get a certain amount based upon what?

19  **A.**  Yeah.  Because they have the high population, we will

20  take that population and compare it against the total number

21  appropriated by the legislature, and they'll get a bigger

22  pot of the -- bigger slice of the pie because they are a larger

23  county, and the smaller counties will get less.

24  **Q.**  And I take it -- we don't have to go in -- through all of

25  them.  I take it that's not the only way that local officials

*Kirkpatrick - Direct*

1  get funding to run elections.  What -- in your experience, what

2  are some of the other ways that are sources of their funding?

3  **A**.    So besides any kind of local county budget appropriated

4  by the board of supervisors, we also have grants through the --

5  Help America Vote Act has provided grants that occasionally the

6  federal government will provide money down to.  Counties can

7  use that to purchase new equipment or improve election

8  security.

9  And there's also the Mississippi Voting Modernization

10  Act, which has been in effect for a couple of years, where

11  counties -- which is, again, another population-based grant or

12  precinct-based grant where they can reward money to purchase

13  new voting equipment.  If they already had new modern voting

14  equipment that used paper ballots, they could use that money

15  for other purposes, other election-related purposes.

16  **Q**.    So is it fair to say that there is a mixture of state and

17  local funding for local election officials to do their

18  election-related jobs?

19  **A**.    Yes.

20  **Q**.    This is another thing that we -- I think we have heard

21  about a lot in the past several days that we'll need to walk

22  through, but what enforcement authority does the secretary of

23  state's office have in order to ensure that the local officials

24  are doing their job?

25  **A**.    We don't have any enforcement authority.  We provide

### Kirkpatrick - Direct

1  training to the local election officials, and we have good

2  relationships with the local election officials, but we don't

3  have any oversight over them.

4  **Q.**  So, in your experience, I mean, what -- if there is a

5  local official that is not doing their job, how -- how would

6  someone go about getting that problem corrected?

7  **A.**  So if there is something happening on Election Day and we

8  get a call, say, to the elections hotline, we will call down

9  and let them know that the issue exists and ask them to go

10  check it out.  But, of course, they are under no obligation to

11  do what we say.

12       If they have election officials who aren't doing the job

13  that, I guess, they were elected to do, the remedy is hold

14  them -- you know, hold them accountable, go to meetings, or not

15  vote for them in the next election and vote them out.

16  **Q.**  All right.  Let's -- while we are talking about the

17  statewide -- we are talking about the system that we have here

18  in Mississippi on elections, another thing that has come up is

19  the Statewide Elections Management System.  What is that?

20  **A.**  So the Statewide Elections Management System, which we

21  call SEMS for short, is kind of the election hub in

22  Mississippi.  It kind of has two major components of it.  One

23  is federal registration, and another is election management.

24  **Q.**  We want to talk about both of those things, but before we

25  do, just one last thing on it.

*Kirkpatrick - Direct*

1  Is there a federal -- a federal law or particular federal

2  laws that require states to have things like the Statewide

3  Elections Management System?

4  **A.**  Yes.  So the Help America Vote Act of 2002 required a

5  centralized computerized federal registration list.

6  **Q.**  All right.  Well, let's go through -- I guess let's start

7  with the voter registration side of things.

8  Can you just kind of generally walk us through -- I mean,

9  what does a voter in Mississippi do to register to vote?

10  **A.**  So a voter who wants to register in Mississippi has a

11  couple of different avenues to register.  They can access the

12  mail-in voter registration form from our secretary of state's

13  website, fill it out on the computer and print it out, sign it,

14  and mail it in.  They can go in person to their clerk's office.

15  They can go to one of the several NVRA agencies or department

16  of public -- the DMV and, while they are doing any services

17  there, register to vote.

18  Any of those would allow someone to -- all they need to

19  do is complete a form, either mail it in or register in person,

20  and that would be it.

21  **Q.**  You mentioned NVRA agencies.  What are those?

22  **A.**  NVRA agencies are -- under Section 7 of the National

23  Voter Registration Act, are certain agencies states are

24  required to have voter registration allowed at those.  For

25  Mississippi, they are the Department of Health, Department of

*Kirkpatrick - Direct*

1  Mental Health, Department of Human Services, Department of

2  Rehabilitation Services, the Division of Medicaid, and, of

3  course, the DMV.

4  **Q.**  When you say "DMV," that's where you get your driver's

5  license?

6  **A.**  Yes.

7  **Q.**  Okay.  Are the forms that voters use to register to

8  vote -- are they NVRA compliant.  Or how does that work?

9  **A.**  So through the NVRA, the federal government has published

10  through the United States Election Assistance Commission a

11  standard NVRA mail-in voter registration form that has to have

12  certain questions on it required by law.

13  We have a Mississippi-specific form that is partially

14  modeled after those same questions that is required on that

15  federal form, but it does look a little bit different.  We

16  don't have quite all the same questions that they do or same

17  fields to be completed.

18  **Q.**  Well, what's the basic information that someone has to

19  provide on the form to register to vote?

20  **A.**  Name, address, driver's license -- driver's license

21  number, the last four of their social security number.  And

22  they will have to answer a question, such as, are they a U.S.

23  citizen, or are they 18 years of age or older?  And their date

24  of birth.

25  **Q.**  Does a voter who is filling out the registration form

*Kirkpatrick - Direct*

1  have to provide any demographic information, such as, say,

2  their race?

3  **A.**   No.  Mississippi does not require that.

4  **Q.**   Kind of walk us through what happens at -- let's say I

5  have completed my voter registration form.  Where does it go

6  next?

7  **A.**   So once you have completed your form and you have given

8  it back to your -- it's made its way to your circuit clerk's

9  office, they will take that form, and then they will go to the

10  computer and open up SEMS, and then, from that point, they will

11  start entering the information into SEMS to put you on that

12  statewide voter roll.

13  **Q.**   So that was going to be kind of my next question.

14      So on the voter registration side of SEMS, it basically

15  functions as a voter roll?

16  **A.**   Yes.  When someone registers to vote, they will be kept

17  and maintained on that statewide list of voters.

18  **Q.**   And is the voter roll feature of SEMS -- is that a

19  realtime system?

20  **A.**   Yes.  It's a -- for example, right now, if a clerk was

21  rushed to get a voter registration form in at the courthouse

22  here at the Square, they would put in their information.  We

23  would be able to see it in Jackson.  As soon as they click the

24  "save" button, we'd be able to see that that voter registered

25  to vote.

*Kirkpatrick - Direct*

1  **Q**.   What is the state voter file?

2  **A**.   So the statewide voter file is a -- the name for the

3  public record that we provide.  When people ask for the list of

4  voters in Mississippi, it is the file that we provide them.

5  **Q**.   Okay.  And so if someone requests the state voter file, I

6  mean, what is it that they get?

7  **A**.   So they will get that list of voters, their name, their

8  address.  And they will also get a second component, which is

9  voter history, which will be their name, their address, the

10  districts they live in, along with which elections they have

11  voted in.

12  **Q**.   So, as I appreciate it, kind of putting two of these

13  concepts you have mentioned together, when the voter file is

14  requested, it's the snapshot of what the voter roll looks like

15  at that particular point in time; is that right?

16  **A**.   Yes.  So we'll get a public records request, and that --

17  obviously, we will have to pull that from SEMS.  You know, if

18  we pull that at 10:00 a.m. and then a -- two new voters get

19  registered at 10:02, those aren't going to appear on that list

20  because we pulled it realtime and it would show the information

21  as it existed at 10:00 in the morning on that particular day.

22  **Q**.   What are active and inactive voters on the voter roll?

23  **A**.   So active and inactive voters are designations that a

24  voter can have.

25        An active voter is your really kind of what I call the

*Kirkpatrick - Direct*

1   bread-and-butter voter.  It's -- they are really most of the

2   1. -- or all the 1.9 million active voters we have in

3   Mississippi, those are people who can walk into the poll.  They

4   will be able to cast a ballot and then walk out of the voting

5   place.

6          Inactive voters are those who have been given that

7   designation because we have gotten what we call a triggering

8   mechanism under state law and the National Voter Registration

9   Act that they no longer live at that address.  They are made

10  inactive.  And when they go to the polling place, they'll be

11  required to vote by affidavit, and then if everything else

12  checks out, the election commissioners look at it, then their

13  vote may be counted.

14  **Q.**   Is there a way to get -- if you're on the inactive list,

15  what is the way that you end up back on the active list?

16  **A.**   So there are several ways you can make it back on the

17  active list.

18         The first and foremost is, under the NVRA, when someone

19  is made inactive, we send them what is called a confirmation

20  card.  This goes to their -- to their address.  It's

21  forwardable.  And they can fill that out and complete it and

22  say, yes, I'm still here, no, I'm not still here, and send that

23  back, and they'll update accordingly.

24         If it is -- if that doesn't get returned, they can go

25  register to vote.  And if they vote by affidavit, then when

*Kirkpatrick - Direct*

1   they vote by affidavit, when they put their address on there,

2   that can be used after an election to update their record.  And

3   if they move within the county, put them at a new address or --

4   put them back on the active roll.

5       If they, you know, update their registration through a

6   voter registration form, they will be put back on the active

7   list.  If someone signs a petition for a candidate, because

8   that is a signed writing that has your address on it, the

9   clerks will use that to put them back on the active voter roll

10  because it will be a signed writing showing that they still

11  live at a particular address.

12      There are multiple ways you can make it from inactive to

13  active.

14  **Q**.   Sounds like it.  And it also sounds like you are kind of

15  getting into voter roll maintenance, which is the next thing I

16  want to talk about, but let's start here with it.

17      What, if anything, does the NVRA require the state to do

18  in terms of voter roll maintenance?

19  **A**.   So the NVRA requires states to come up with a -- with a

20  general and standard way in which to conduct federal

21  maintenance and take people off who need to be taken off.

22  **Q**.   Well, that's -- maybe I should have started there, but, I

23  mean, let's just take a little bit of a step back.  I mean,

24  what is voter roll maintenance in your experience?

25  **A**.   So voter roll maintenance is the -- it's a process in

1   which our local and county election officials -- or county

2   election commissioners and circuit clerks do to, you know,

3   do exactly what -- maintain the voter rolls by making sure that

4   people who are no longer living in the county or the city or

5   who pass away or who are convicted of a disenfranchising crime

6   or any of the reasons to remove a voter under federal and

7   Mississippi law are removed from the voter rolls.

8   **Q**.   All right.  When someone is removed from the voter rolls,

9   does that mean that they are active or inactive or what?

10  **A**.   They will be moved into a status called purge in SEMS.

11  Purge is a little bit of a misnomer because we do not actually

12  remove someone from SEMS.  All that data will still be kept and

13  still be reviewed and looked at, but they won't be considered a

14  qualified voter anymore for voting purposes.

15  **Q**.   I think something that has come up previously in the

16  trial were some recent changes by the legislature to the voter

17  roll maintenance process.  What do you know about those?

18  **A**.   So there was legislation passed last year that -- part of

19  it codified existing procedures for voter roll maintenance,

20  such as return mail being a triggering event to make someone

21  inactive and send them a confirmation card.

22       A new process or a new, what we call, triggering event

23  was added, which is if someone does not vote for a period

24  starting in one presidential preference primary extending to

25  the next presidential general election that is not occurring in

*Kirkpatrick - Direct*

1  the same year as the period began can act as a triggering

2  event.

3      What that really means is, if you don't -- for example

4  purposes, if you don't vote in March of 2024, this election,

5  and then you do not vote in any election up until the

6  presidential general in 2028, then you can be made inactive.

7  **Q.**   Well, and you may need to go slow with this so that I can

8  follow you, but, I mean, practically speaking, how many

9  elections is somebody going to have to miss in order to even

10 possibly be taken off the rolls?

11 **A.**   It would be quite a few.  So you would have the

12 March 2024 presidential primary, the March -- the November 2024

13 general election, primaries for municipal elections next year,

14 general elections for municipalities next year, the primary for

15 the federal midterm, the primary -- the general election for

16 the federal midterm, statewide primaries, statewide generals in

17 2027, primary in 2028, and the general election in 2028, not

18 including any special elections that may or may not occur in

19 between.

20 **Q.**   I ran out of fingers counting that but, safe to say,

21 several elections.  But maybe more importantly, who is the

22 official that makes the final decision to take the voter off

23 the voter rolls or put them in the purged category?

24 **A.**   So the county election commissioners will be able -- will

25 be the authority who can -- only authority who can make someone

*Kirkpatrick - Direct*

1  inactive.  Some voters may be able to be -- are also removed by
2  the circuit clerk, but only election commissioners can make
3  someone inactive.

4  **Q.**  What role does the secretary of state's office have in
5  making that final decision to remove a voter from the active or
6  inactive into the purged?

7  **A.**  We will have SEMS, and through SEMS, we may set up
8  certain parameters under law to alert the local election
9  officials, but only officials who actually look at the
10 record -- they make that determination.  We will never change
11 someone on our own or ever.  That has to be the local election
12 officials.

13 **Q.**  Mr. Kirkpatrick, in your experience, what kinds of
14 problems can local election officials encounter if they don't
15 do sufficient voter roll maintenance?

16 **A.**  The first is, under the NVRA, there is a -- both a right
17 of action under the Attorney General of the United States or a
18 private citizen can file a lawsuit if they are not engaging in
19 voter roll maintenance because it is a federal requirement to
20 do so.

21      Of course, the voter rolls also feed into the jury
22 summonses.  So if there are -- voter rolls aren't clean and
23 they are just being added on, the clerk will send out jury
24 summonses.  Those will most likely not come back because they
25 are going to voters who are no longer there or may have passed

*Kirkpatrick - Direct*

1  away.

2       Two, it can affect several parts of just election

3  administration.  The way we generate ballots or how many

4  ballots need to be printed at a minimum under Mississippi law

5  is based on the number of active and inactive voters.  So, of

6  course, as that grows, that means the number of ballots that

7  need to be printed grows.  That increases the costs.  It also

8  increases -- if those voters are not there, they are not going

9  to be used and increases the amount of storage and cost of

10  storage that these local officials have to bear because they

11  are required to keep those materials for so many years.

12       So there are a lot of different ways that not engaging in

13  voter roll maintenance can negatively impact not only elections

14  but other facets.

15  **Q**.  Sounds like it.

16       What kind of problems, if any, can it cause for being

17  able to determine voter turnout at an election?

18  **A**.  So voter turnout is, you know, based off the number of,

19  you know, voters on the rolls versus voters who show up and

20  cast a ballot on Election Day.  If people who are -- should be

21  taken off are not, that number is going to be kind of

22  artificially high.  So when people come out to vote, it's going

23  to seem like less people came out to vote than actually should

24  have because people who should have been taken off were still

25  on the rolls.

1  **Q**.   Let's talk a little bit about something else that has
2  come up several times.

3       Based on your experience and knowledge, what felony
4  convictions can disqualify someone from voting in Mississippi?
5  **A**.   So there are several.  Some of the majors are listed in
6  the Mississippi Constitution:  murder, rape, burglary.  Those
7  set out in the Mississippi Constitution have been kind of
8  expounded upon by the Mississippi Attorney General opinions to
9  include a list of 22 disenfranchising crimes.  And the
10  Mississippi legislature has added additional through statute,
11  which is (inaudible).

12  **Q**.   So it's not all felonies; is that right?

13  **A**.   No.  That's correct.

14  **Q**.   Okay.  And this is -- this is a point that sometimes I
15  think gets caught up in the wash, but what are the convictions
16  that count?  In other words, state, federal, what are the only
17  convictions that count?

18  **A**.   Only a state felony will count as disenfranchising.  A
19  felony in a federal court or a felony in another state will not
20  cause someone to be disenfranchised in Mississippi.

21  **Q**.   What information does SEMS maintain on persons that are
22  disqualified for reason of a felony conviction?

23  **A**.   So through SEMS and through these different voter roll
24  mandates from the federal government and the state legislature,
25  we have built in kind of tie-ins with other state agencies,

*Kirkpatrick - Direct*

1   including the Administrative Office of Courts.  So when they

2   receive something from a local court that someone has been

3   convicted of a disenfranchising crime, that is put in their

4   database.  That will be sent over to SEMS.

5       So we, of course, maintain -- we have that list that we

6   get.  And then if a voter who is on the rolls is removed from

7   the rolls because of a disenfranchising crime, they will be

8   moved to purge status for that, and that record will be kept in

9   SEMS that they are now in purge status, along with the reason

10  why they were moved to that status.

11  **Q.**   This information -- well, let me back up a little bit.

12  When you said "AOC," what is that?

13  **A.**   It's Administrative Office of Courts.  It is a branch of

14  the judiciary here in Mississippi that helps administer

15  court -- I don't know their full responsibilities, but I do

16  know we work with them on receiving information from local

17  courts on who's convicted of certain crimes.

18  **Q.**   This information from AOC, does it allow you to be able

19  to determine where persons who have been convicted of a

20  disqualifying felony live?

21  **A.**   No.  The information that we get from AOC will have their

22  name, their county of conviction --

23          **COURTROOM DEPUTY:**  Hang on.  It's shutting down for

24  some reason.  The system just shut down.

25          (PAUSE IN PROCEEDINGS.)

*Kirkpatrick - Direct*

1      **THE COURT:**  You may proceed.

2   **BY MR. MATHENY:**

3   **Q.**   One other thing I was going to ask about, felony

4   disqualifications.  We may get into it a little more later, but

5   do -- folks that are in jail but have not been convicted of a

6   disqualifying felony, do they vote in Mississippi elections?

7   **A.**   Yes.  If they are not convicted of a disenfranchising

8   crime, they are still eligible to vote.  And that is something

9   that the legislature just recently helped verify in that --

10  setting out a specific excuse -- for those persons who are in

11  jail or incarcerated who have not been convicted of a

12  disenfranchising crime, setting out a specific absentee excuse

13  for those persons.

14  **Q.**   We'll talk about the absentee excuses here in a second,

15  but before we do that -- and we're still talking about voter

16  registration -- what efforts does your office do to promote

17  voter registration?

18  **A.**   We have tried to do several different approaches at the

19  Mississippi Secretary of State's Office.  One of those is

20  our -- what we call our "Elections 101 Campaign," which is

21  general voter education, whether it's educating about the

22  process, educating about important deadlines, about the voter

23  registration deadline.  Do that for social media.

24      We have also done voter registration drives across the

25  state at multiple -- either county fairs or colleges and

1 universities.  We have also prepared -- based on kind of our

2 experience doing those drives, created a voter registration

3 toolkit, which we have available on our website.

4 So if someone wants to conduct a voter registration drive

5 themselves in their community, they can take that toolkit, look

6 at, you know, when important deadlines are, when they need to

7 be setting up, some kind of questions they may get asked, how

8 to respond to those.  Just we can help -- if someone wants to

9 do it on their own, we can help facilitate that.

10 Also through our SOS Ambassador Program, which is a -- it

11 is available to juniors going into their senior year of high

12 school.  We bring them into the office.  We educate them.  And

13 a part of that program is actually conducting -- they have to

14 conduct voter registration drives in their schools to help get

15 their fellow classmates scheduled.

16 I'll actually be speaking to that group, this upcoming

17 SOS ambassador class, next Monday, educating them on how to do

18 those drives so they can be doing their voter registration

19 drives and lead up to the November election.

20 **Q**.  And you said voter registration drive quite a bit in that

21 answer, but let's just say, when you go to a college or a

22 university to do a voter registration drive, how does that

23 work?  What does that look like?

24 **A**.  So sometimes we'll be asked by the college or university

25 to attend.  Other times we'll -- you know, we may reach out to

*Kirkpatrick - Direct*

1  them.

2      We'll go out there.  A lot of times we try and partner

3  with a group on campus, whether -- it may be, you know, the

4  student leadership or fraternity or sorority, whatever may

5  be -- some student organization and have them at the table with

6  us.  We found having, you know, students on campus makes it a

7  lot easier than having just a random 30-year-old, being me, at

8  a table trying to register voters.  It helps draw those --

9  other students are going to go up to them.

10      And we will pick a spot on campus, preferably high

11  traffic, such as the cafeteria, student union.  So we will

12  catch people as they are coming in from class, and we will just

13  sit there for several hours and talk to kids, talk to young

14  adults, register them to vote, answer any questions they may

15  have about voting, and try to get as many people registered as

16  we can.

17  **Q.**  What kind of handouts or forms and information do you

18  provide at these drives?

19  **A.**  So we will bring a couple different things with us and

20  what I call our "go box."  We have a box in the office with

21  these materials.  So if someone wants to do a drive, you know,

22  we don't have to spend time.  We can just drive out to wherever

23  we need to.

24      Of course, we'll have federal registration forms that we

25  bring, pens.  We have printed out little cards for Y'all Vote,

1  which is our kind of election information website with a Q-bar

2  code on it.  So someone can take it with them, and they can

3  scan that later, and it will take them to Y'all Vote, which has

4  a lot of different information about where you need to go vote,

5  how to vote absentee, if you have questions about registering

6  to vote as a college kid, what that means to residency versus

7  do you register at your parents' home versus do you register at

8  your school.

9       We also bring our voter information guides, which are

10  pamphlets that contain information about key election dates,

11  what elections are being held in which years, that they can

12  keep, look at over a couple different years and say, "Hey, this

13  year is governor.  Next year is president.  There's municipal,"

14  so on and so forth.

15  **Q.**    And in your tenure at the elections division, I mean,

16  which -- you don't have to name each one off, but, I mean,

17  which colleges and universities and schools have you done this

18  with?

19  **A.**    So we have done them at quite a few.  We have done them

20  up here at Ole Miss, Mississippi State, Southern Miss, Jackson

21  State, Tougaloo, Mississippi University for Women, Southwest

22  Community College, Northwest Community College, Northeast

23  Community College, Mississippi Gulf Coast Community College,

24  and then Delta State.  We have tried to go to everywhere we can

25  to do a drive.

*Kirkpatrick - Direct*

1 **Q.** Can you recall anybody that has ever asked you to come

2 out and do a drive and you had to turn them down?

3 **A.** I can't recall. There may have been one or two just

4 because of unfortunate scheduling conflicts, or there may have

5 been one or two after the voter registration deadline, in which

6 we do not want to confuse voters into thinking they were

7 registered and they would, you know, be able to vote in the

8 upcoming election. And if we did so, we would always offer to

9 come back at a later time.

10 **Q.** And since you have been with the elections division,

11 what's -- what's a rough number of the number of new voter

12 registrations that we have had in Mississippi?

13 **A.** I think we are about between 250- and 300,000 new voter

14 registrations. Not updates but new voter registrations.

15 **Q.** Right. What's the difference between a new voter

16 registration and an update like you just mentioned?

17 **A.** So in SEMS that we categorize, you know, if a voter moves

18 in Mississippi, their record moves with them. So if I was to

19 register -- I'm registered in Madison County, but when I grew

20 up, I was in Jackson county. So when I registered to vote in

21 Madison, all of my records went with me, including all of my

22 voter history. So that can be tracked and maintained.

23 Everything that has ever happened within the elections is kept

24 for review, if any needs to be reviewed.

25 New voters will be just brand new. There's no records.

*Kirkpatrick - Direct*

1   There's no existing information to pull because they are a
2   brand new voter in SEMS.
3   **Q.**   And that's the 250,000-plus number you just mentioned?
4   **A.**   Yes.
5   **Q.**   And that -- what time period are we talking about there?
6   **A.**   That is since the -- Secretary Watson has taken office,
7   January 1st of 2020, thereabouts.  Give it a couple of days.
8   **Q.**   I want to talk some about voting mechanics, you know, how
9   the actual voting goes.  Maybe let's start with this:  What is
10  a general election?
11  **A.**   So a general election is the election in which, when
12  someone wins, they will actually take office.
13  **Q.**   Okay.  And how is it different from other elections like
14  a -- well, you tell me.
15  **A.**   So one of the biggest differences in elections will be
16  between a general election and a primary election.  Under
17  Mississippi law, primary elections are run by the parties, and,
18  of course, if you win it, you don't actually take office.  You
19  just become the nominee and will appear on the general election
20  ballot in November or June, if it's a municipal election, to
21  have a chance to actually win and take that office.
22  **Q.**   When do the -- granted, it may not be all of them, but
23  when do most of the general elections take place?
24  **A.**   Three out of four years it's going to be November.  For
25  municipal, it's going to be a June general election.

*Kirkpatrick - Direct*

1    **Q**.    And I guess you hinted at this, three out of four years,

2    but, I mean, what are the different types of general elections

3    that are held in November?

4    **A**.    So we'll have a -- we just had, last year, our statewide

5    gubernatorial elections where we -- general election for our

6    governor, all the way down to, you know, our local county

7    district offices, you know, board of supervisors.

8         This year, of course, is going to be the presidential

9    general election and -- along with Senate, U.S. House, Supreme

10   Court will be on the ballot.

11        Next year, our municipal year, will be our county mayors,

12   city mayors, aldermen, councilmen.

13        And then, in 2026, we'll have federal midterms again.  We

14   will have, once again, U.S. Congressmen on the ballot.

15   **Q**.    Okay.  Now, of that array of types of general elections,

16   which ones typically include supreme court or court of appeals

17   contests?

18   **A**.    Those are going to be the even number years.  You know,

19   our presidential years are going to have those on -- Supreme

20   Courts on them.

21   **Q**.    Okay.  Presidential.  And then what about federal

22   midterms?

23   **A**.    So federal midterms, that's going to be along with U.S.

24   House of Representatives, U.S. Congress, maybe possibly Senate,

25   depending on the time frame.  They will be on those ballots as

*Kirkpatrick - Direct*

1  well.

2  **Q.**  And so if I'm understanding you correctly, the judicial

3  races don't usually appear on a statewide general election

4  ballot?

5  **A.**  No.

6  **Q.**  Can you just kind of generally walk us through what

7  election officials have to do to be able to get ready to have

8  one of these general elections?

9  **A.**  So election officials will -- the first thing is they are

10  going to need to know who the candidates are, which will be

11  making those final determinations on account of qualifying.

12  For an election like this, which crosses, obviously, county

13  lines and has a president on the ballot, that will -- they will

14  need to wait for the SBEC to release a list of presidential

15  candidates and senator candidates and House of Representative

16  candidates before they can proceed making the preparations,

17  which will be around September 11th.

18  **Q.**  And would that include -- when judicial officers are on

19  the ballot, that would include them too?

20  **A.**  Yes.

21  **Q.**  And I didn't -- I didn't mean to totally cut you off

22  there, but I think maybe we can cut to the chase fast with this

23  next question.  But this has come up a little bit here and

24  there, but, I mean, what does building the election mean to

25  you?

*Kirkpatrick - Direct*

1  **A.**  So building the election is the stages we have to do in
2  SEMS before we can ever get to the point of actually printing
3  our very first ballot.

4  So building the election will be getting those lists of
5  qualified candidates, entering them into SEMS, and then, from
6  that point, if it's a -- has anything that is a state district
7  or state or federal office, the secretary of state has to do
8  that first stage of putting the candidates in and release those
9  down to the counties.  And the counties will start putting
10  the local races they may have, any special elections, school
11  bond (sic) election, anything that may pop up, even -- that has
12  to go on the ballot.

13  And from there, they'll start having to export all of
14  that data in SEMS, including key election dates, precincts, and
15  multiple files.  That then has to go to their voting machine
16  vendor so they can start working on a ballot that can actually
17  work with that specific voting machine that county has
18  purchased.

19  **Q.**  Well, let's talk about the ballots specifically.  And,
20  again, I don't mean to cut you off.

21  But as I was appreciating what you are saying, I mean,
22  what is the sample ballot that is prepared by the secretary of
23  state's office?

24  **A.**  So the sample ballot will be a ballot prepared.  We'll
25  take all the -- once the SBEC meets and qualifies all of the

1  relevant candidates, we will take that information back to our

2  office, put those candidates -- that final list of candidates

3  in SEMS, and generate a sample ballot that we will publish on

4  our website for anybody to see.  That will have the full list

5  of candidates on there.

6      We will also release that to the local county election

7  officials.  They are required to, of course, follow that sample

8  ballot as closely as possible in form and, of course, along

9  with the names of the candidates, and they will use that as a

10  basis to build their local ballots.

11  **Q.**   Let's talk a little bit about the form.  For a

12  presidential election ballot, what order are the election

13  contests going to have to appear on the ballot?

14  **A.**   So president will always be at the top of the ballot, and

15  then we'll follow with senate, if there is a senate election

16  during the presidential year, U.S. House of Representatives.

17  Then we'll start getting into our state district offices, such

18  as supreme court, court of appeals.  And then below that will

19  be any local county races, either -- countywide, then county

20  district, in that order.

21  **Q.**   So the judicial races come after the federal races but

22  before any other races on the ballot?

23  **A.**   Yeah.  They will come after the federal but before any

24  kind of local county races.

25  **Q.**   And for a midterm election, that ballot would be even

*Kirkpatrick - Direct*

1  shorter, wouldn't it?

2  **A.**   Yes.  This is a much shorter ballot than what we see in

3  gubernatorial election years.

4  **Q.**   Right.  Okay.  Well, that was going to kind of be my next

5  question.  For the statewide elections, what's -- what is

6  generally the order that the election contests appear on the

7  ballot?

8  **A.**   So we'll have statewide at the top.  And, of course, we

9  are electing governor, attorney general, secretary of state,

10  lieutenant governor, the insurance commissioner, agriculture

11  commissioner, all of those -- auditor, treasurer, all of those

12  statewide offices that have to appear at the top of the ballot.

13       And then we'll have our senate and representatives,

14  state, district; transportation commissioner; public service

15  commissioner below the statewides.  Then we start having all of

16  our countywide, sheriff, circuit clerk, chancery clerk, all of

17  those.  And our county district follows those, which will be

18  all of our, you know, board of supervisors, justice court

19  judge, constables, will be there towards the bottom of the

20  ballot.

21  **Q.**   And those are the ballots -- the statewides are the ones

22  that don't usually have supreme court or court of appeals

23  contests on them; right?

24  **A.**   Yes.

25  **Q.**   Let's zoom in a little bit more on those ballots, and

*Kirkpatrick - Direct*

1    I've got a few questions specific about the supreme court and
2    court of appeals contests.

3         When those ballots come out, what do they say, if
4    anything, about who is the incumbent on the ballot?

5    **A.**   We do not place any kind of incumbent designation on our
6    ballots.

7    **Q.**   What order do the names of the candidates for supreme
8    court office appear on the ballot?

9    **A.**   So for supreme court they are going to appear
10   alphabetical by last name.

11   **Q.**   And this has been said over and over and over again.  I
12   hardly feel like we even need to, but just for record purposes,
13   what do the ballots indicate about the nonpartisan nature of
14   the supreme court and court of appeals elections contests?

15   **A.**   So it will have nonpartisan next to those candidates'
16   names.

17   **Q.**   Okay.  In your experience, do you know of any other
18   offices that we have here in Mississippi that run on a
19   nonpartisan election basis?

20   **A.**   So school board will also not have a party designation.
21   They do not go through the primary process.  So they do not
22   have a party designation next to their name either.  Now --

23   **Q.**   Any others you think of?

24   **A.**   County election commissioners don't go through party
25   primary process.  They can designate their name.  But school

1  board is the one that immediately pops up besides, of course,

2  supreme court, justice court, circuit and chancery court judges

3  all will have nonpartisan next to their names.

4  **Q.** Just to make sure I'm getting it right, what about

5  justice court judges?  Do they run on a partisan basis or not?

6  **A.** They will go in order.  They have just been added into

7  the Nonpartisan Judicial Election Act.

8  **Q.** Okay.  All right.  I told you we were going to talk about

9  absentee voting.  Can you just kind of give us a general

10  snapshot or overview of the absentee voting process?

11  **A.** So Mississippi has absentee-based absentee --

12  excuse-based absentee voting, where if you have -- you have to

13  qualify for certain excuses, and if so, you will be able to

14  vote either in-person absentee at the circuit clerk's office or

15  you can -- may qualify to voting by mail.

16  **Q.** What are the time frames -- or what are the important

17  time frames for absentee voting?

18  **A.** So absentee voting starts about 45 days out from the

19  election.  On that 45th day, under federal law, circuit clerks

20  are required to send out to UOCAVA voters those uniformed or

21  overseas citizens voting absentee.  Their ballot is that 45th

22  day.  About the 43rd day, they will start -- which is always

23  going to be a Monday -- that 45th day is, at least since I've

24  been here, always a Saturday.

25  **Q.** Is that a trick of the way that elections are held in

*Kirkpatrick - Direct*

1 November?

2 **A.** It's a trick of the Tuesday always being in November and

3 45 days out pretty much always being a Saturday. So that's

4 always a Saturday we work on. And so that Monday, the clerk's

5 office will be open. Our normal absentee voting will generally

6 start really occurring on that day because that's the first

7 business day of the absentee voting period.

8 **Q.** Okay. In that absentee voting period, you're mentioning

9 Saturdays. Are clerks' offices open on Saturdays?

10 **A.** They are not. They are open Monday through Fridays.

11 Under certain laws, they are required to be open for absentee

12 voting, which is going to be always the two Saturdays prior to

13 an election 8:00 to 12:00. But they are not mandated to be

14 open that 45th day, but they do come in to send out those

15 UOCAVA voters.

16 **Q.** Okay. You mentioned "UOCAVA" a couple of times. But

17 kind of generally speaking, what is that?

18 **A.** So UOCAVA is, under federal law, uniformed, meaning --

19 armed forces or overseas citizens who are living overseas have

20 a different provision to vote absentee under federal law.

21 Mississippi has expanded that a little bit to include

22 other categories of people, such as emergency response

23 providers who are responding to an emergency. They can submit

24 an application called a Federal Postcard Application under

25 federal law to request an absentee ballot. We'll proceed under

1 those federal laws to let them vote absentee.

2 **Q.** But that -- is that unique to military service members,

3 in other words, the postcards and other features?

4 **A.** Yes. Like, those federal postcards are unique to that --

5 those voters who fall under the UOCAVA provisions.

6 **Q.** You mentioned "excuses." I'm not going to quiz you on

7 all of them because I know there are several, but what are the

8 big excuses that can be used to vote absentee?

9 **A.** I think the ones that we really see probably the most of

10 is going to be temporary or permanent disability, out of --

11 temporarily outside of the county on Election Day, over

12 65 years of age or older, or maybe going to be working from

13 7:00 to 7:00 during Election Day are probably the ones we see

14 the most designations under.

15 **Q.** And I take it -- I mean, these are all a matter of

16 statute or code; is that right?

17 **A.** Yes. The excuses are specifically set out by the

18 Mississippi Legislature and our absentee voting laws.

19 **Q.** Is there an excuse that specifically covers folks like

20 college kids that may not -- may be temporarily residing

21 someplace other than where they are registered?

22 **A.** Yeah. If you are temporarily residing outside of your

23 county of residence, you can request an absentee ballot. And

24 that's actually one of the excuses to be able to vote by mail

25 if you're temporarily -- temporarily residing somewhere else.

*Kirkpatrick - Direct*

1  **Q.**    And as I appreciate it, the legislature passed a bill
2  this past session that changes some of the excuses in the
3  process a little bit.  What can you tell us about that?
4  **A.**    Yes.  So recently -- the bill went into effect July 1st.
5  So it does kind of two things.

6      The first is it changes the process up a little bit.
7  When you used to go in the clerk's office in prior elections or
8  even this past March, you would have been given an application
9  to fill out, and once you completed that, you would have been
10 given your ballot and a ballot envelope.  And once you fill in
11 your ballot, you would have put it in that ballot envelope and
12 deposited it into the ballot box with your application to be
13 reviewed later.

14     Now those are combined into a single document, where it
15 is going to be one big 8-by-12 or definitely 9-by-12 envelope.
16 It's going to have the application on the front side, and
17 the -- your attestations where you swear that no one, you know,
18 influenced you into doing this, or if you received assistance,
19 those would be on the back.  So you will have one document
20 where you will fill that out, drop your ballot in, put that in
21 the ballot box, and it will be counted and reviewed on Election
22 Day.

23     On the excuses part, the legislature added in, as we kind
24 of discussed a little bit earlier, on the disenfranchised
25 voters' piece of that, they can -- if you are not convicted of

*Kirkpatrick - Direct*

1  a disenfranchising crime, you are incarcerated, that you are

2  eligible to vote by mail.

3  And they also, on some of the work excuses, where if

4  you're required to work on Election Day and that prohibits you

5  from voting, they also added in that if you are on call on

6  Election Day and that may prevent you from going to the polls

7  because you are on call, then that also is a reason to vote

8  in-person absentee.

9  **Q.**  So accommodations for folks who have to work on Election

10  Day, you mentioned in there a specific excuse for someone who

11  is incarcerated.  I think that relates back to what we were

12  talking about earlier, but before that excuse came into being,

13  how did somebody that was incarcerated but eligible to vote --

14  how would they have voted from jail?

15  **A.**  From my understanding, the clerks would qualify them

16  under one of the other existing excuses.  I think probably the

17  most common was it was kind of viewed as maybe as a temporary

18  disability or temporarily residing outside the county of

19  residence.  So they would send them an absentee ballot by mail

20  under -- under one of those is my understanding of how clerks

21  operate.

22  **Q.**  Okay.  One other thing, because this came up previously,

23  but I just want to make sure that we're all clear on.  When

24  someone goes to vote absentee at the clerk's office, do they

25  have to take a notary with them?

*Kirkpatrick - Direct*

1 **A.** No.

2 **Q.** Why not?

3 **A.** The clerk, who is at the office, will be the official
4 authorized to administer that oath and will be able to sign
5 that absentee application and envelope to make that ballot
6 valid -- or that envelope valid. Sorry.

7 **Q.** Let's talk about actual voting at the polls on Election
8 Day a little bit. I expect that many and most everybody has
9 done that before, but we've got to make a record.

10 So could you tell us -- I mean, what is it like, in your
11 experience, for a voter, the process for how you go vote at the
12 poll on Election Day?

13 **A.** Unfortunately, it's been quite a few years since I have
14 been able to vote in person at the polling place because I'm at
15 the office at 6:00 a.m. until about 9:00 at night.

16 But as I experienced before I took on this role, you
17 drive up to the polling place, walk in, would provide the
18 check-in poll -- poll manager my name. They would find me in
19 the poll book. I would present my form of photo ID. I would
20 sign the receipt book, signing in my record that I was there.
21 They would hand me my ballot, and I would go vote and then
22 leave.

23 **Q.** Who decides where those polling places are located?

24 **A.** So the local county board of supervisors in each county
25 is actually responsible for selecting each polling place.

*Kirkpatrick - Direct*

1  **Q**.   So do those folks -- are they the ones that decide

2  whether -- decide where they are, but do they also decide other

3  things, like how many, or how -- how does it work?

4  **A**.   So -- and sometimes this gets kind of a little bit lost

5  in translation when we are talking about the legal status of

6  the names of things and the kind of popular names of things.

7       So the voting precinct, which is what we typically call

8  kind of the polling place, is actually the geographic

9  boundaries in a county on the lines of -- people in these lines

10 will go vote at their polling place.  So the county board of

11 supervisors will decide the voting precincts through the lines

12 of, if you live in these four corners, you are going to vote

13 also at the polling place that the county board of supervisors

14 decides.

15 **Q**.   And those county boards of supervisors, they are local

16 elected officials; right?

17 **A**.   That's correct.

18 **Q**.   Who are the folks that run the local polling place on

19 Election Day?

20 **A**.   So the poll managers will be the ones actually staffing

21 the polling place on Election Day that voters will go and meet

22 with and interact with on Election Day.

23 **Q**.   And, in your experience, what are some of the things that

24 may cause lines of voters to have to form up at polling places

25 on Election Day?

1 **A**.    So first and foremost is just going to be the interest in

2 the election.  You know, if it is a very hotly contested

3 election, you are going to have a lot more people show up.  And

4 they are generally going to probably show up during kind of

5 what we call "key voting times," which can -- if you have a lot

6 of people come at once, that will add congestion.

7     It can be things like the number of voters assigned to a

8 particular precinct by the board of supervisors, the number of

9 machines at a polling place.  All of those things can take --

10 factor in.  Or even the number of poll managers hired can all

11 weigh into the voter's experience and how those lines may form

12 on Election Day.

13 **Q**.    Okay.  And, in your experience, again, let's say that

14 lines are forming up at the polling place.  I mean, what can

15 the local election officials do in order to be able to try to

16 alleviate the problem?

17 **A**.    So that's going to come down to, I guess, what is causing

18 the problem.  If it is an issue with a -- maybe a machine went

19 down, they can get somebody out there to fix the machine or

20 bring a new machine to be properly tested out there.

21     If it is poll -- you know, needing additional poll

22 managers, we will generally have what we call alternate poll

23 managers on standby who are trained individuals who they may be

24 able to call.

25     If it is just a really high turnout, there may be very

1　little they can do other than trying -- maybe going and helping

2　their poll managers get through as quickly as possible.

3　**Q.**　And I guess, again, in your experience as head of the

4　elections division, I mean, can these sort of things happen

5　anywhere, or are there areas that you see these kind of

6　problems come up more than others, or how does it work?

7　**A.**　They can, of course, happen anywhere.  We're generally

8　going to see where more people are or live that you're

9　obviously going to have more people in those areas.  That means

10　more people going to polling places than, you know, in a county

11　with -- I think Issaquena County has 800 voters.  You're

12　probably not going to see a lot of lines there because

13　there's -- voters in Issaquena County versus -- Hinds, DeSoto,

14　Harrison, Jackson, our major population counties, are going to

15　see that probably more commonly than our more sparsely

16　counties -- populated counties.

17　**Q.**　So one other thing that has come up a lot, folks like to

18　talk about a lot, that has to do with voting at the polls, and

19　you mentioned it earlier, but we'll talk about voter ID.

20　　　When did Mississippi first implement voter identification

21　requirements?

22　**A.**　I was not at the office at the time.  My understanding is

23　it was passed about 2012 as a constitutional initiative and was

24　fully implemented about 2014, 2015.  And that -- voters were

25　actually required to provide that when they went to vote.

1  **Q.**   And based on your knowledge and experience -- you said

2  2012 -- was there a period in time there where the Department

3  of Justice precleared our voter ID system?

4  **A.**   Yes.  My understanding is, because we were still under

5  preclearance at the time, that it was precleared.

6  **Q.**   Okay.  And you mentioned how the process works, you know,

7  in conjunction with voting at the poll, but I want to make sure

8  that we are -- we are real clear on this.  What kind of photo

9  identification is acceptable?

10  **A.**   So there are about ten categories that are acceptable,

11  and some of those are part of kind of broader categories.  So

12  be a Mississippi driver's license, a passport, a photo ID from

13  an accredited university or school in Mississippi -- so, like,

14  a student ID that has a picture and face on it -- tribal IDs,

15  concealed carry permits.  Some of the broader categories are,

16  you know, just really any kind of official document from the

17  U.S. Government, another state even.

18       I personally voted because I -- when I first moved back,

19  with my South Carolina driver's license because I moved back in

20  January and I was a little delayed in going to the DMV.  So for

21  that March 2020 primary, I used my South Carolina driver's

22  license.

23       So there are quite a few acceptable forms.

24  **Q.**   That's a pretty wide range, but let me -- let me ask

25  this.  What kind of safeguards are in place for a situation

1  where, say, somebody doesn't have any of those kinds of

2  identifications?

3  **A**.    So if you're like me and you lose your wallet constantly,

4  you go to the polling place and you don't have your driver's

5  license or you don't have an acceptable form of photo ID on

6  you, you will be able to cast what is called an affidavit

7  ballot.

8          And from that point, you will have five business days,

9  which is just kind of by rule of thumb, typically the following

10  Tuesday after an election, to go to your county circuit clerk's

11  office, provide an acceptable form of photo ID, and then that

12  ballot could be counted.

13  **Q**.    And what kind of safeguards are there for -- I mean,

14  let's say somebody doesn't have a driver's license or a

15  passport or any of those things but needs to get an ID.  How

16  does that work?

17  **A**.    So if you do not have an acceptable form of federal ID,

18  the state will provide one for free.  You can go to your county

19  circuit clerk's office, apply for one.  They will take your

20  picture.  They will send the information up to the secretary of

21  state's office and will print that and mail it out to them.

22          If they do that within 45 days of election, we will print

23  out what we call, in shorthand, a TVID or a temporary voter ID

24  card, which is basically a receipt on thermal paper that for

25  whatever reason they're -- that kind of card -- that voter ID

*Kirkpatrick - Direct*

1  card does not get back to them in time, that they can use that

2  kind of receipt as an acceptable form of photo ID or acceptable

3  form of ID on Election Day to present to the poll managers and

4  still be able to cast a regular ballot.

5  **Q.**  Okay.  And to make sure that I'm understanding what you

6  said a few minutes ago, I mean, who, if anybody, is turned away

7  from the polls and not allowed to vote because they don't show

8  up with an ID?

9  **A.**  We train local election officials that no one should ever

10  be turned away from the polls; that if there is a question as

11  to not only whether they have a photo ID or not or whether they

12  are even registered or not, just let them cast an affidavit

13  ballot.  And then if they don't have a photo ID, they can

14  bring it back.  If there's a question about their registration

15  status, that can be reviewed after the election.

16  **Q.**  Something kind of similar to that just to kind of visit

17  another example.  What if a voter shows up at the wrong polling

18  place, how are they supposed to handle that?

19  **A.**  So we generally train, when we're training the election

20  commissioners on that, just to instruct the poll manager to

21  direct the voter to the correct precinct because they need to

22  be in the correct precinct for that affidavit ballot to count.

23       That goes to a lot of different reasons, such as ballots.

24  Different ballots, even from one precinct over to another, may

25  have different candidates on them.  And so they need to be

1  making sure they're writing for the proper ballot, the proper

2  candidate, so they need to go to their correct precinct.

3  Direct them to go to the correct precinct.

4      Sometimes there may be a voter that just refuses to

5  leave.  From what I've heard from local election officials,

6  that's occurred.  After they have instructed that voter where

7  they need to go and why, if that voter still refuses to do so,

8  they will still even provide that voter an affidavit ballot

9  after kind of instructing them of why they need to go, kind of

10 consequences of that, and, you know, still let that voter vote

11 by affidavit if they feel like, you know, need to stay at

12 that -- want to stay and vote at that precinct.

13 **Q.**   All right.  Does SEMS keep up with how many folks vote an

14 affidavit ballot because they show up without an ID at the

15 polls?

16 **A.**   Yes.  That information is recorded in SEMS.

17 **Q.**   And, in your experience, about how many affidavit ballots

18 usually get cast at a general election for somebody showing up

19 without an ID?

20 **A.**   It is a very, very low number, into a fractional

21 percentage of the total number of votes cast.

22 **Q.**   Next thing I wanted to talk about -- I mean, I think you

23 mentioned this at the outset, but what is the secretary of

24 state and the elections division's role in campaign finance

25 reporting?

*Kirkpatrick - Direct*

1  **A.**    So campaign finance reporting is broken up into a couple
2  of groups.

3      So the -- we will handle, just like we kind of -- it's
4  broken into the same groups for qualifying.  The same groups
5  that will qualify, say, for federal candidates with the SBEC
6  will file their reports with us.  So statewide candidates,
7  state district candidates, including court of appeals and
8  supreme court judges, state representatives, will file their
9  campaign finance reports with us.

10      County officials and municipal officials will file with
11  the county clerk and municipal clerk, respectively.

12  **Q.**    So there's a set of filings that get filed with the
13  elections division.  What I want to do is hone in on supreme
14  court elections and candidates.

15      But how does the process typically work for what supreme
16  court candidates have to do in terms of their reporting?

17  **A.**    So they will follow a set schedule that is set out by
18  Mississippi law on when certain reporting deadlines are due,
19  and those will be generally called periodic reports because
20  they're set for certain periods in federal court.

21      And they will report either what they spent or received
22  or -- I say "they."  For supreme court justices, that's
23  normally their committee.  They have certain rules about
24  whether they can personally campaign or not.  But their
25  committee will file periodic reports saying how much they

*Kirkpatrick - Direct*

1    received or spent.  And if those numbers need to be itemized or

2    not, they'll list out those itemizations according to

3    Mississippi law.

4    **Q.**    Okay.  These reports, who do they get filed with or how

5    do they get filed?

6    **A.**    So they can be submitted either in person or

7    electronically by e-mail.  At this point, we do not have our

8    online filing system operating right now.  But they will be

9    able to -- they can fax that, e-mail it, bring it over in

10   person to -- our campaign finance e-mail address or campaign

11   finance officer, or they'll e-mail me, and I'll get it over to

12   our campaign finance officer to be filed.

13   **Q.**    Does your office maintain these campaign finance filings

14   as public records?

15   **A.**    Yes.  Any campaign finance report we receive for a, you

16   know, state district or higher office will be publicly

17   available on the website.  So a person can even type in, you

18   know, a couple of keywords or -- or even just letters and find

19   multitudes of reports and go look at those.

20   **Q.**    So if I wanted to go on the website right here, right

21   now, I could go look at campaign finance reporting.  Am I

22   understanding that right?

23   **A.**    Yes.  You would be able to go to our website, go to our

24   campaign finance, and go to the search function and look -- see

25   every report that has been filed for several years on our

*Kirkpatrick - Direct*

1  website.

2  **Q.**  Based on your experience, can you ballpark for us about

3  how much money a candidate raises in a supreme court election

4  contest?

5  **A.**  It can obviously vary.  It's going to vary on the

6  candidate and the level of support they have and sometimes how

7  hotly contested the race is.  It can be from a couple hundred

8  thousand to -- about 100-, 200-, to 4- to 500-, 600,000 is kind

9  of the range I've seen.

10  **Q.**  The next thing that I wanted to talk about -- I guess we

11  have walked through the registration and the voting, and now

12  let's talk about results.

13       How do the results of an election get determined and

14  transmitted?

15  **A.**  So that would be done in a couple of different stages.

16  The first is always going to be the local county results.

17       So depending on what type of election we are having, it

18  can be -- for a primary, it can be the county executive

19  committee for the party will get the results, tabulate those,

20  and they will sign what we call the official recapitulation

21  report, which will be the results in that county by precinct

22  and how many votes each candidate got in those specific

23  precincts and --

24  **Q.**  Let me stop you there, and let me make sure we're -- take

25  it slowly and focus on the right thing here.

*Kirkpatrick - Direct*

1    For a general election, this process of compiling the

2  returns, who does the initial count?

3  **A**.    The county election commissioners.

4  **Q**.    Okay.  And then what do they do next in a general

5  election situation?

6  **A**.    So after they receive those results, they will upload

7  them into SEMS.  From their voting machine vendor hardware,

8  they will be able to upload those results.  Once those are

9  uploaded in SEMS, they will be able to print out their official

10  recapitulation or official recap report with all of those

11  results on there.  They will review it.  And then a quorum will

12  sign that, and that will be the official results of the county.

13  **Q**.    And this is -- what you're describing, is this a

14  document, the election return?

15  **A**.    Yes.  It will be a cover page that will kind of have some

16  statutory language saying, you know, what we are signing, the

17  date of the election that it is being signed for, and they will

18  have a spot for the election commissioners, the election

19  officials to sign it.  And then the remaining pages will be the

20  actual results by office, by candidate, and by precinct of how

21  many votes were cast for each precinct and the total amount in

22  that county.

23  **Q**.    I want to make sure we are clear on -- this is a

24  county-by-county thing; right?  So there's 82 -- for a general

25  election, there is going to be 82 sets of election returns.  Is

*Kirkpatrick - Direct*

1  that about right?

2  **A.**   That's correct.

3  **Q.**   What kind of time frame are we talking about in terms

4  of -- let's say we've had Election Day.  What's the timeline on

5  getting the election returns done?

6  **A.**   So once we have had the election, we have ten days from

7  the date of the election for those results to be certified.

8  **Q.**   And when do the results -- just kind of put it in

9  colloquial terms, I guess.  When do the results become

10  official?

11  **A.**   Once they are signed by the local election officials,

12  those are the official results of the county.

13  **Q.**   And that's about ten days?

14  **A.**   Yes.  Sometimes it may be quicker, depending on how much

15  has to be done, but ten days is the deadline.

16  **Q.**   How do the local officials turn in their election

17  returns?

18  **A.**   So they can send a copy of their official recap via

19  e-mail.  They will also send in -- send it via mail.  We

20  generally prefer it come through e-mail because that allows us

21  to immediately put it on the website for the public to see.

22  **Q.**   And this is -- I know this could be a tricky detail, but

23  we kind of touched on it earlier.  But what's the distinction

24  between election returns that have to be sent to the elections

25  division, the secretary of state's office, versus ones that go

*Kirkpatrick - Direct*

1   to the SBEC?

2   **A**.   So all election returns will come to us as a matter of

3   law.   Some of those will need to go further on to the SBEC to

4   be certified further.   And these are kind of our supreme court

5   and court of appeals races that are -- obviously, they cross

6   county lines.   So a single county cannot certify the final

7   results for a supreme court district.   So those will go to the

8   SBEC to compile those results and certify the total number

9   amongst all of the counties or the district.

10  **Q**.   Okay.   And so it sounds like to me that it's kind of --

11  it all gets to kind of the same place -- right? -- because you

12  have got the secretary of state's office that receives the

13  returns, and the SBEC receives returns, and then the secretary

14  of state is the secretary of the SBEC.

15       So that's a long way of me getting to this -- of asking

16  you, in your experience, how are all of these election returns

17  maintained for past elections?

18  **A**.   We keep a copy of those records, and we -- anything from

19  2003 onwards we make sure is displayed on the website.   So if

20  anybody wants to see the official returns, they can go simply

21  download that -- view it on the website or download it and have

22  a copy of it themselves.

23  **Q**.   Okay.

24       **MR. MATHENY**:   At this point, Mr. Shorter, will you

25  pull up DX-8.

*Kirkpatrick - Direct*

1  BY MR. MATHENY:

2  **Q.**   All right.  Mr. Kirkpatrick, we have put DX-8 up on your

3  screen there.  Can you tell us what that is?

4  **A.**   It looks to be a summary of the Public Service

5  Commissioner Central District election from 2003.

6  **Q.**   And it actually may be easier for your reference --

7       **THE COURT:**  Mr. Matheny, would this be a good time to

8  take a break, or are you close to the end of your direct?  I

9  know we are trying to accommodate this witness to get to

10  Jackson.

11       **MR. MATHENY:**  That's right.  I do have some more

12  things and some more --

13       **THE COURT:**  Let's take a short break.

14       **MR. MATHENY:**  -- evidence I need to work on.  So it

15  may be good to do that.

16       **THE COURT:**  Okay.  Let's take a short break at this

17  time.

18     (RECESS TAKEN.)

19       **MR. MATHENY:**  Your Honor, may I approach the witness?

20       **THE COURT:**  You may.

21  BY MR. MATHENY:

22  **Q.**   Mr. Kirkpatrick, I have handed you what's been marked as

23  DX-8.  And before we took a break, it occurred to me that it

24  might be a little bit easier if I gave you something that you

25  could thumb through rather than just look at on the screen.

*Kirkpatrick - Direct*

1  But could you tell us -- take a look at it and tell us,
2  what is DX-8?

3  **A.**  It appears to be a Summary of Election Returns from the
4  Public Service Commission, Transportation Commission, and
5  Supreme Court Central Districts from 2003 to 2023.

6  **Q.**  Okay.  So that's about 20 years' worth of election
7  returns for the Central District or so.  About how many paper
8  documents or copies of paper documents would you think that
9  that would be?

10  **A.**  That could be easily over a thousand, couple thousand
11  pages of actual physical election returns, those official recap
12  reports.

13  **MR. MATHENY:**  Your Honor, at this time, we would offer
14  DX-7 (sic) into evidence as a Rule 1006 summary used to prove
15  content of voluminous writings.  And I would note that, both in
16  our submission to the Court digitally and to the plaintiffs, we
17  provided the -- the underlying documents.

18  **THE COURT:**  Any objection?

19  **MR. TOM:**  No objection.

20  **THE COURT:**  Thank you.  It will be received.

21  **MR. MATHENY:**  And to make sure the record is clear,
22  it's DX-8, Your Honor.  Not DX-7.

23  **THE COURT:**  Okay.  DX-8 is right.

24  **BY MR. MATHENY:**

25  **Q.**  All right.  I really -- I have got one -- one more little

1   topic area for us to go over, Mr. Kirkpatrick, and -- but

2   before we do that, I did want to mention one more thing about

3   local election officials.

4       I think you had testified earlier that local election

5   officials are responsible for certain tasks in conjunction with

6   running elections; right?

7   **A**.   That's correct.

8   **Q**.   Okay. And when it comes to -- to certain tasks -- maybe

9   let's just go by way of an example. When it comes down to

10   marking, you know, who voted at the polls in a particular

11   election, who is it that's responsible for doing that?

12   **A**.   So for making out a voting history that someone has

13   voted, that would be done by either the election commissioner

14   or the circuit clerk and physically taking that poll book -- or

15   if it's an electronic poll book, uploading those results into

16   SEMS to give those voters that history that they appeared to

17   vote in this given election.

18   **Q**.   And if one of those local election officials, let's say,

19   just marks the wrong person and that gets into SEMS, what can

20   the secretary of state's office do, if anything, to correct the

21   error?

22   **A**.   We won't change a record. If, for whatever reason, you

23   know, we may be informed of something, we will alert the local

24   election officials and -- you know, so they can go further

25   investigate and look at the actual original document, meaning

*Kirkpatrick - Direct*

1  the poll book or the data from the electronic poll book and

2  review.  But we don't change records at the secretary of

3  state's level.

4  **Q.**   Okay.  So is it fair to say that if -- if an error like

5  that starts with the local election officials, they have to be

6  the ones to fix it?

7  **A.**   That would be correct.

8  **Q.**   The last thing I wanted us to talk about -- I guess

9  it's -- may be -- may be the most important thing we're all

10  here about, but I want to talk about the district lines for the

11  supreme court and the three different districts.

12      My question is this -- the first one is this:  Based on

13  your knowledge and experience with Mississippi and federal

14  election law, is there a state law requirement that you know of

15  to adjust judicial districts on the basis of population

16  changes?

17  **A.**   For certain judicial districts -- the circuit court and

18  chancery court districts have a Mississippi constitutional

19  requirement to be redrawn within five years of the Census.

20  That's the only requirement I'm aware of for judicial districts

21  in Mississippi.

22  **Q.**   Okay.  And based on your knowledge, is that -- does that

23  extend to supreme court districts?

24  **A.**   No.  Those districts are separate.

25  **Q.**   And I'm sorry if I missed this, but what -- as far as the

*Kirkpatrick - Direct*

1  timing goes, when is the timing important in terms of when they

2  have to be redrawn, these local lines?

3  **A.**  My understanding for the circuit court and chancery is

4  that they have to be redrawn within five years of the latest

5  federal census.

6  **Q.**  Okay.  Are you aware of any state or federal law

7  requirement to redistrict the supreme court districts based on

8  population changes?

9  **A.**  Not that I'm aware of.

10  **Q.**  Based on your experience having worked in the elections

11  division, do you know what the "one-person, one-vote principle"

12  is?

13  **A.**  My understanding is that's a principle from the 14th

14  Amendment that certain representative districts need to be

15  within certain population thresholds.

16  **Q.**  Right.

17      **MR. TOM:**  Objection.  This is -- it calls for a legal

18  opinion.

19      **THE COURT:**  It's overruled.

20  **BY MR. MATHENY:**

21  **Q.**  And I'm asking for your understanding of this.  I know

22  the Judge can look up the law, but are you aware of any federal

23  ruling that has said that the one-person, one-vote principle

24  applies to judicial districts?

25  **A.**  Not that I'm aware of.

*Kirkpatrick - Direct*

1  **Q.**   What is your understanding of the state interest that's

2  served by the use of the current configuration of the three

3  supreme court districts?

4  **A.**   My understanding, in kind of looking through prior

5  Mississippi cases like *Magnolia Bar vs. Lee*, is that there's a

6  significant interest in fostering judicial independence by

7  forbidding --

8       **MR. TOM:**  Objection, Your Honor.  There is no

9  foundation for this.

10      **MR. MATHENY:**  Your Honor, it's his understanding based

11  upon his experience.

12      **THE COURT:**  Let me just read it again.

13      **MR. MATHENY:**  I'm sorry.

14      **THE COURT:**  He does need to lay a foundation.  It's

15  sustained.

16  **BY MR. MATHENY:**

17  **Q.**   Mr. Kirkpatrick, in conjunction with this lawsuit, at one

18  point, were you asked to provide discovery responses on behalf

19  of the secretary of state's office?

20  **A.**   Yes.

21  **Q.**   And in conjunction with those discovery responses, did

22  you have to look into the issue of the state interests --

23  **A.**   Yes.

24  **Q.**   -- served by the current supreme court districts?

25  **A.**   Yes.

*Kirkpatrick - Direct*

1  **Q.**   And you provided responses to the plaintiffs --

2  **A.**   Yes, I did.

3  **Q.**   -- on that issue under oath; correct?

4  **A.**   Yes.

5  **Q.**   Well, let me ask you just straight up the way they asked

6  you.

7       Can you identify and describe any state or public

8  interest served by the use of the three at-large voting

9  districts as currently drawn for the election of Mississippi

10  Supreme Court justices?

11  **A.**   Yes.  The public interest that we have --

12       **MR. TOM:**  Objection.  I'm not sure what the basis for

13  this witness to offer these opinions are.

14       **THE COURT:**  I'm not either.  I need to understand what

15  part he plays in making this determination and is he authorized

16  to state what the public's interest is.

17       **MR. MATHENY:**  And I would -- I would ask, Your Honor,

18  that I could ask him what -- what his understanding of the

19  public interest is and based on his experience with Mississippi

20  election law.

21       **THE COURT:**  You're asking him to identify and describe

22  any state or public interest served by the use of the three

23  at-large voting districts as currently drawn?

24       **MR. MATHENY:**  Based on --

25       **THE COURT:**  And how does he know what these interests

*Kirkpatrick - Direct*

1    are?  What's the basis of the information of the secretary of

2    state's office that enables him to testify to this state or

3    public interest?

4    **BY MR. MATHENY:**

5    **Q.**    Mr. Kirkpatrick --

6          **MR. MATHENY:**    I think I can clear it up, Your Honor.

7    Thank you.

8    **BY MR. MATHENY:**

9    **Q.**    Mr. Kirkpatrick, in conjunction with responding to the

10   interrogatories that the plaintiffs asked the secretary of

11   state's office for, did you do any research or look into state

12   interests served by the current Mississippi Supreme Court

13   Districts?

14   **A.**    Yes.  And working with counsel, yes.

15   **Q.**    And do you also have experience in Mississippi election

16   laws generally?

17   **A.**    Yes.

18   **Q.**    And isn't it true that the supreme court district

19   lines -- they are used in supreme court elections; right?

20   **A.**    That's correct.

21   **Q.**    Are they also used for other things?

22   **A.**    Yes.  The transportation commissioner and public service

23   commissioner follow the same supreme court lines.

24   **Q.**    Okay.  Do you -- are you aware of any other things

25   that -- appointments or other things that the supreme court

*Kirkpatrick - Direct*

1 districts are used for?

2 **A.** There may be various other governmental appointment that

3 follow the line, but I'm only familiar with the transportation

4 and public service commission elections.

5 **Q.** So based upon your research and study and your

6 experience, can you identify and describe any state or public

7 interests served by the use of the three at-large voting

8 districts as currently drawn for the election of Mississippi

9 Supreme Court justices?

10 **MR. TOM:** Same objection, Your Honor. These districts

11 were drawn by policymakers that, you know, this witness has no

12 basis to state an opinion on.

13 **THE COURT:** I'm going to overrule it. It certainly

14 will go to weight.

15 **A.** My understanding, based on the research and work with

16 counsel, is that there are public interests in creating

17 judicial independence. And that was done through -- by having

18 these judges elected over a wide area, both geographically and

19 population-wise. That prevents a -- maybe a single case or

20 single ruling from causing a judge to find his favor in that

21 district, which would cause him to lose an election, which

22 could then maybe factor into that judge's decisionmaking on

23 that case. So it creates a safeguard for judicial

24 independence.

25 **BY MR. MATHENY:**

*Kirkpatrick - Cross*

1   **Q.**   And are you aware of any prior cases where those sort of

2   issues have come up?

3   **A.**   Yes.  I believe this came up in *Magnolia Bar vs. Lee*.

4           **MR. MATHENY:**  If I could have a minute, Your Honor, to

5   confer?

6           **THE COURT:**  Certainly.  Yes.

7      (CONFERRING OFF THE RECORD.)

8           **MR. MATHENY:**  I'll tender the witness for cross, Your

9   Honor.

10          **THE COURT:**  Thank you.

11          Cross-examination?

12          **MR. TOM:**  Yes, Your Honor.

13          **THE COURT:**  Before you get started, you must go slow.

14          **MR. TOM:**  Okay.

15          **THE COURT:**  Okay?

16          **MR. TOM:**  Of course.

17          **THE COURT:**  This is important, and I want the

18  transcription to be one that I can read and understand.  Okay?

19          **MR. TOM:**  Yes, Your Honor.

20          **THE COURT:**  Okay.

21          **MR. TOM:**  Joshua Tom for the Plaintiffs.

22                       **CROSS-EXAMINATION**

23  BY MR. TOM:

24  **Q.**   Good morning/afternoon, Mr. Kirkpatrick.

25  **A.**   Good morning.

*Kirkpatrick - Cross*

1  **Q.**   How are you?

2  **A.**   Doing well.  How about yourself?

3  **Q.**   I'm good.

4       I took your deposition for this case in January of 2023

5  at the Attorney General's Office.  Do you remember that?

6  **A.**   Yes, sir.

7  **Q.**   So it's good to see you again.

8       So before you were talking about registering to vote and

9  the ways that people can register to vote in Mississippi.  Do

10 you remember that?

11 **A.**   Yes, sir.

12 **Q.**   You would agree that there is no online voter

13 registration in Mississippi; right?

14 **A.**   A person cannot fully submit their voter registration

15 online, but they can access and mostly complete a voter

16 registration application off of our website and print that off.

17 **Q.**   And then, after that, they either have to mail it or take

18 it to the circuit court clerk; right?

19 **A.**   That's correct.

20 **Q.**   So unlike other states which allow online voter

21 registration fully online, Mississippi doesn't offer that, does

22 it?

23 **A.**   That's correct.

24 **Q.**   And there is no same-day registration at the polling

25 place on the day of the election, is there?

*Kirkpatrick - Cross*

1 **A.** No. There is no same-day registration.

2 **Q.** In fact, in Mississippi, you have to register in advance

3 at least 30 days before Election Day; right?

4 **A.** That's correct.

5 **Q.** Let's talk about purging of voter rolls. You had

6 discussed that with Mr. Matheny.

7 You said that, quote, "purging is a misnomer because that

8 voter's information stays in SEMS."

9 Do you remember that?

10 **A.** Yes.

11 **Q.** But a purged voter is removed from the voting rolls;

12 correct?

13 **A.** Yes.

14 **Q.** And while a purged voter who goes to the polls may be

15 able to vote by affidavit ballot, that ballot is not counted,

16 is it?

17 **A.** If they are not a qualified elector and they were not

18 wrongfully removed from the rolls, then an affidavit ballot may

19 not count.

20 **Q.** So a person who is purged, unless they validly reregister

21 to vote, they can't vote, can they?

22 **A.** That's correct. If they are purged and do not

23 reregister, then they would have to reregister to vote.

24 **Q.** So you talked about some of the reasons that people can

25 be purged from the voting rolls. Do you remember that?

*Kirkpatrick - Cross*

1 **A.** Yes.

2 **Q.** One reason you can be purged is under the confirmation

3 card process; right?

4 **A.** Yes.

5 **Q.** And that means that if a county election commissioner

6 believes that a voter has changed residence, that voter can be

7 placed on, quote, "inactive status" and sent a confirmation

8 card; right?

9 **A.** There are certain triggering events; so I don't know if I

10 would say "believes." There are certain actions that need to

11 occur first before that confirmation card is sent. But if

12 those, what we call, triggering events are met, then a

13 confirmation card is sent out.

14 **Q.** And what are the triggering events?

15 **A.** It can be a returned jury summons. In 2028, the

16 nonvoting provision, where if you don't vote from 2024 to 2028.

17 If they receive reliable information from another state, such

18 as if we get information from, let's say, Tennessee that a

19 voter has registered there, if that does not come along with

20 the actual signed application from the voter, then they will

21 not immediately be removed, but they will go on an inactive

22 status because we have been notified by another state that that

23 person has moved out of state.

24 **Q.** And so after the triggering event and after the sending

25 of a confirmation card, if a voter doesn't return the

*Kirkpatrick - Cross*

1   confirmation card, she remains on inactive status for two

2   federal elections; right?

3   **A.**   Yes, for that period containing two federal -- general

4   elections.

5   **Q.**   If she doesn't vote in either of those, then she can be

6   purged from the voting rolls; right?

7   **A.**   That's correct.

8   **Q.**   And in 2023, the Mississippi legislature passed a law

9   that voters can be purged for failure to vote; right?

10  **A.**   They can be made inactive for failing to vote.  As a

11  triggering event, we send a confirmation card.

12  **Q.**   And after that -- but they could eventually be purged --

13  right? -- for failing to vote?

14  **A.**   Yes.

15  **Q.**   And so can you explain how that happens again?

16  **A.**   So if they don't vote from -- without getting into all

17  the lengthy legal jargon, for example, from the March 2024

18  primary to the federal general election in 2028 or any election

19  in between or really have no contact with the clerk's office,

20  they can be made inactive.

21       And then, from that point, once you're made inactive,

22  they have two more federal general elections, which, because of

23  the design of the law, ultimately should be another four years,

24  which would be the federal general election in 2032.  They can

25  be removed from the rolls.

*Kirkpatrick - Cross*

1 **Q.** And so this triggering event is simply failing to vote;
2 right?

3 **A.** Yes.

4 **Q.** And this 2023 voter purge law was passed as part of a
5 voter roll maintenance program under the National Voter
6 Registration Act of 1993; right?

7 **A.** Yes.

8 **Q.** And that's the NVRA?

9 **A.** Yes.

10 **Q.** In your understanding, does that the NVRA require that
11 voters be purged for failure to vote?

12 **A.** No. It requires the states to develop a general program
13 to conduct voter roll maintenance.

14 **Q.** Mississippi has chosen to implement the NVRA in this
15 fashion; right?

16 **A.** That's my understanding of the Mississippi legislature's
17 bill.

18 **Q.** Have you ever heard of people being removed from voter
19 rolls if they missed jury duty?

20 **A.** Not necessarily missed jury duty, but if they have
21 received a -- if a summons came back as undeliverable to their
22 address.

23 **Q.** Does the secretary of state have any efforts to make sure
24 local officials don't remove people from the voter rolls when
25 they miss jury duty?

*Kirkpatrick - Cross*

1  **A**.   We conduct training on voter roll maintenance and what is
2  required under federal and state law.

3  **Q**.   And does that include information about whether people
4  should be removed from voter rolls when they miss jury duty?
5  **A**.   Yes.  Simply what the law requires.  When people can't
6  (inaudible), remove from the rolls based on triggering events
7  under Mississippi law.

8  **Q**.   So is that "yes" or "no"?  Does this educational
9  information that the secretary of state provides include
10  information about whether to remove somebody for missing jury
11  duty?

12  **A**.   I don't know if we ever specifically covered missing jury
13  duty.  I would have to review the training materials.  But we
14  would tell them if they receive a jury summons that was
15  unreturnable -- or returned undeliverable, that that would be
16  an actual triggering event.

17  **Q**.   So you mentioned that since you have been at the
18  secretary of state's office -- and correct me if I'm wrong --
19  there have been around 250,000 new voter registrations?

20  **A**.   That's correct.

21  **Q**.   And you would agree that, as new voters are entering the
22  system through new registrations, there are also voters exiting
23  the system through purges; right?

24  **A**.   Yes.

25  **Q**.   And over the last several years, the total number of

*Kirkpatrick - Cross*

1  registered voters in Mississippi is around 1.9 million; isn't

2  that right?

3  **A.**   That's correct.

4  **Q.**   And that number has stayed relatively constant even as

5  new people have registered to vote because other people have

6  been purged from the voter rolls; right?

7  **A.**   That's correct.

8  **Q.**   And you talked to Mr. Matheny about how the secretary of

9  state doesn't keep any data about the race of the voters;

10  right?

11  **A.**   Yes.  We don't have any racial data in SEMS.

12  **Q.**   And you mentioned your outreach efforts, including at

13  colleges and universities?

14  **A.**   Yes.

15  **Q.**   You have registration drives on college campuses; right?

16  **A.**   Yes.

17  **Q.**   Would you agree that the secretary of state's main

18  efforts for voter registration is on college campuses?

19  **A.**   I don't know if that was, say, our main thrust.  We have

20  certainly done quite a few.  We are just trying to register all

21  voters wherever we can.

22  **Q.**   Does your office identify areas where voter registration

23  rates are low?

24  **A.**   We have not used that in deciding where we go to conduct

25  federal registration drives.

*Kirkpatrick - Cross*

1  **Q.**  So you don't hold registration drives in areas where
2  voter registration is low?
3  **A.**  I'm not saying we haven't held voter registration drives
4  where they are low.  Just simply that we try and just get out
5  wherever someone will have us.
6  **Q.**  And you don't focus on areas that are rural to do
7  registration drives, do you?
8  **A.**  No.
9  **Q.**  And you don't focus on areas that are poor for voter
10  registration drives, do you?
11  **A.**  No.
12  **Q.**  And so the secretary of state does outreach efforts to
13  encourage voter registration and turnout among all
14  Mississippians; correct?
15  **A.**  Yes.
16  **Q.**  There are not any special or additional outreach efforts
17  that are conducted by the secretary of state to encourage
18  minority voter registration or turnout, is there?
19  **A.**  No.  Once again, we are focusing registration on
20  Mississippians.
21  **Q.**  And so before you were talking with Mr. Matheny about
22  what could happen with, quote, "you know, insufficient or
23  improper voter roll maintenance."  Do you remember that?
24  **A.**  Yes.
25  **Q.**  Would you agree that if someone is inappropriately purged

*Kirkpatrick - Cross*

1   from the voter rolls that it can result in someone not being

2   able to vote who should be able to vote?

3   **A.**   Yes, that would be a possibility.

4   **Q.**   And the secretary of state's office tracks voter turnout;

5   right?

6   **A.**   Yes.

7   **Q.**   But the secretary of state does not track voter turnout

8   by age, does it?

9   **A.**   No.

10   **Q.**   Nor by gender; right?

11   **A.**   No.

12   **Q.**   And, of course, we talked before. And neither by race;

13   right?

14   **A.**   That's correct.

15   **Q.**   And would you characterize the voter turnout in

16   Mississippi over the last several years as low?

17   **A.**   There have been several elections that have had low

18   turnout.

19   **Q.**   And do you remember what the voter turnout was in 2022?

20   **A.**   I don't remember the exact number. It was certainly

21   below, like, gubernatorial and presidential elections.

22   **Q.**   If I represent that voter turnout in 2022 was 32 percent,

23   does that sound right?

24   **A.**   That sounds correct.

25   **Q.**   And would you agree that that's low?

*Kirkpatrick - Cross*

1   **A.**   Yes.

2   **Q.**   And last year, in 2023, there were races for statewide

3   offices, including governor, secretary of state, and some state

4   legislative seats; right?

5   **A.**   Yes.

6   **Q.**   Do you remember what the voter turnout was in the

7   primaries in 2023?

8   **A.**   Again, I don't remember the exact turnout.

9   **Q.**   If I represent that the primary turnout was 30 percent,

10   does that sound correct?

11   **A.**   That sounds about correct.

12   **Q.**   And would you agree that that's low?

13   **A.**   Yeah.  That's -- we would, of course, like to see turnout

14   across the board higher for all elections.

15   **Q.**   But 30 percent is low; right?

16   **A.**   Yes.

17   **Q.**   And do you remember how many people voted in the general

18   election in 2023?

19   **A.**   It would have been about 42 percent; so about probably --

20   roughly 821,000, around there.

21   **Q.**   So about 800 and how many thousand?

22   **A.**   21-.

23   **Q.**   821,000 people voted in 2023, and that's out of a total

24   number of registered voters of 1.9 million; right?

25   **A.**   Yes.

*Kirkpatrick - Cross*

1  **Q.**  And so that's around 42, 43 percent?

2  **A.**  Yes.

3  **Q.**  And would you consider that low?

4  **A.**  I would certainly like to see that number higher.

5  **Q.**  Would you consider it low?

6  **A.**  Yeah.

7  **Q.**  Mississippi holds elections for state legislature and

8  statewide offices on off years, like 2023 and 2019; right?

9  **A.**  Yes.

10  **Q.**  And turnout in off-year elections is typically lower than

11  in presidential years, isn't it?

12  **A.**  Our gubernatorial elections do have lower turnout than

13  presidential election years.

14  **Q.**  Are off-year elections -- is the turnout for off-year

15  elections typically lower than in presidential years?

16  **A.**  Yes.

17  **Q.**  So before you talked about absentee balloting -- absentee

18  balloting.  Do you remember that?

19  **A.**  Yes.

20  **Q.**  And to use an absentee ballot in Mississippi, you have to

21  meet certain criteria, don't you?

22  **A.**  Yes.

23  **Q.**  But you're aware that other states offer no-excuse

24  absentee mail-in balloting; right?

25  **A.**  I'm aware of states that do that, yes.

*Kirkpatrick - Cross*

1  **Q.**  And you talked before about how Mississippi currently

2  disenfranchises people convicted of certain crimes; right?

3  **A.**  That's correct.

4  **Q.**  Is it your understanding that there are twenty-two

5  categories of crimes that result in permanent

6  disenfranchisement?

7  **A.**  Twenty-two based off the Constitution and stuff like AG

8  Opinions, and there's another that was added under statute.

9  **Q.**  People convicted of any other crimes remain eligible to

10  vote; right?

11  **A.**  Yes.

12  **Q.**  Does the secretary of state do any education efforts for

13  people convicted of crimes to make sure that they know whether

14  they are, in fact, disqualified from voting?

15  **A.**  We do provide the list on the website for anybody to go

16  look at and review.

17  **Q.**  Besides providing the list, does the secretary of state

18  do any other education efforts to make sure people who have

19  been convicted of crimes are aware of whether they appear

20  eligible to vote or not?

21  **A.**  No.

22  **Q.**  And in 2024, the legislature passed a law that changed

23  the absentee ballot process.  You talked about that.  Do you

24  remember?

25  **A.**  Yes, sir.

*Kirkpatrick - Cross*

1   **Q.**   And you talked about how, as long as someone is not
2   convicted of a disenfranchising crime and if they are in jail,
3   they can vote absentee?

4   **A.**   That's correct.

5   **Q.**   Did you know that before 2024 the Mississippi Attorney
6   General interpreted the absentee ballot statute to mean that,
7   if you are in jail, you only qualify for an absentee ballot if
8   you happen to be incarcerated outside of your county of
9   residence?

10   **A.**   My understanding of the opinion, that it was not only you
11   could qualify, it was speaking to a specific reason and that
12   the Attorney General's opinion provided that, if you were
13   incarcerated in your county of residence, you did not
14   necessarily qualify for an absentee excuse for temporarily
15   residing outside your county of residence.  It did not speak to
16   all particular absentee ballots.  You said it was specific to
17   the case.  One of the -- one of the excuses.

18   **Q.**   I see.  So -- but under that interpretation of the law, a
19   person who lives in Jackson -- which is in Hinds County; right?
20   **A.**   Yes.

21   **Q.**   A person who lives in Jackson and was arrested and sent
22   to the local Hinds County Jail, there would be certain
23   situations where they would not be eligible for an absentee
24   ballot even though they were never convicted of a
25   disenfranchising crime; right?

*Kirkpatrick - Cross*

1  **A.**   Once again, we're kind of talking about a very specific
2  excuse, and there are multiple.  So based on that opinion, it
3  focused on a very specific excuse.

4       Kind of as I talked about earlier, in my experience with
5  working with circuit clerks, I don't know of a clerk who has
6  denied someone to be able to vote who is incarcerated.  If they
7  felt like they could not go under that specific excuse, they
8  may have put it under -- felt like it was a temporary
9  disability.

10      So in working with clerks, I don't know of a clerk who
11 has denied someone the right to vote absentee because of their
12 incarceration.  If they didn't operate under that excuse, they
13 may have operated on what they felt was another.

14      This law just gives a clear avenue for clerks to say
15 there's a very specific excuse.  "Stop.  You're not able to go
16 forward."

17 **Q.**   And have you done a comprehensive questionnaire of all
18 the circuit clerks in the state about how they implement the
19 absentee ballot statute for people who are in jail?

20 **A.**   No.  I have not done an extensive questionnaire, but I
21 regularly communicate with all of the circuit clerks through
22 our elections hotline.  We talk pretty regularly.

23 **Q.**   So you have talked with every circuit clerk in the state
24 about how they implement the absentee ballot statute for people
25 who are in jail?

*Kirkpatrick - Cross*

**A.**    I don't know if it's all 82, but I can imagine it's a
quite sizable amount.

**Q.**    So you mentioned before about how, if you're requesting
an absentee ballot, you don't need a notary if you apply for
the absentee ballot in person; right?

**A.**    That's correct.

**Q.**    But to request an absentee ballot by mail, such as would
be necessary for someone in jail, the application must be
signed by an official authorized to administer an oath, such as
a notary public; right?

**A.**    Yes.  A notary is one of those individuals who can
administer an oath.

**Q.**    Do you know if people in jail have access to notary
publics?

**A.**    I don't know to the extent to what access anyone in jail
may or may not have.

**Q.**    Well, let's assume that somebody in jail doesn't have
access to a notary public.  It may be practically impossible
for them to get an absentee ballot; right?

**A.**    They could still receive an absentee ballot.  I would
have to review the statute on who is authorized to administer
oaths, Mississippi Code 11-1-1, to see who would have access to
that, but --

**Q.**    If someone in jail does not have access to an official
authorized to administer an oath, they would not be able to

*Kirkpatrick - Cross*

1 access an absentee ballot; correct?

2 **A.** That would be a requirement for the ballot envelope to be
3 considered valid, yes.

4 **Q.** So the answer is yes?

5 **A.** Yes.

6 **Q.** So you would agree that in that situation, practically
7 speaking, some people in jail would be unable to vote even if
8 they have not been convicted of a disenfranchising crime?

9 **A.** If they did not have access to an official authorized to
10 administer oaths to complete that, then they would not be able
11 to fully complete their absentee ballot envelope.

12 **Q.** And they would not be able to vote absentee; right?

13 **A.** They would be able to send it in, but that ballot would
14 ultimately be rejected.

15 **Q.** And so they would not be able to vote absentee; right?

16 **A.** Yes.

17 **Q.** So there was a change in the absentee ballot law in 2023
18 to restrict who can provide assistance to disabled voters.

19     Do you remember that?

20 **A.** Yes.

21 **Q.** And that was Senate Bill 2358?

22 **A.** Yes.

23 **Q.** And you understand that Senate Bill 2358 was enjoined by
24 a federal court; right?

25 **A.** Yes.  My understanding is that it has been sent up to

*Kirkpatrick - Cross*

1  appeal and that it -- based on legislative changes since, in

2  this past session, that may be rendered -- the enjoinment may

3  be rendered moot.

4  **Q.**  But let's go back to Senate Bill 2358 briefly.

5  Do you understand that Senate Bill 2358 was enjoined

6  because the district court found it likely violated the Voting

7  Rights Act?

8  **A.**  Certain provisions about ballot assistance, yes.

9  **Q.**  And you just mentioned this law that was passed in 2024

10  that listed who can assist disabled voters with an absentee

11  ballot; right?

12  **A.**  Yes.

13  **Q.**  And that 2024 law was passed to resolve SB 2358's

14  conflict with the Voting Rights Act?

15  **A.**  Yes.  I can't always say exactly why the legislature

16  passed it, but it did clarify the language in that particular

17  bill to mirror federal law.

18  **Q.**  And you would agree that many states have early voting

19  where polling places are open not just on one day but on

20  multiple days; right?

21  **A.**  Yes.  I can't say that they're always at the polling

22  place.  Some of them may be at a central location, but I'm

23  aware some states do have early voting.

24  **Q.**  But there is no early voting in Mississippi, is there?

25  **A.**  No.

 1 **Q.** The only day the polls are open is Election Day; right?
 2 **A.** That's correct.
 3 **Q.** Now, you talked about voter ID. Do you remember that?
 4 **A.** Yes.
 5 **Q.** And you talked with Mr. Matheny about how you thought
 6 Mississippi had obtained Section 5 preclearance for voter ID
 7 law?
 8 **A.** That's correct.
 9 **Q.** And are you sure about that? If I told you that the
10 voter ID law in Mississippi was, in fact, not precleared, would
11 you dispute that?
12 **A.** I would have to go back and look at the record on that.
13 **Q.** So if I told you that, in fact, the State of Mississippi
14 and the Department of Justice engaged in extensive
15 back-and-forth during 2012 and 2013 over the voter ID law,
16 would you dispute that?
17 **A.** No.
18 **Q.** Are you familiar with the U.S. Supreme Court *Shelby*
19 *County* decision?
20 **A.** Yes.
21 **Q.** What's your understanding of that decision?
22 **A.** Essentially, that it struck down the Section 5
23 preclearance requirement and that Mississippi was no longer
24 required to obtain preclearance for election changes.
25 **Q.** And so if I told you that the Department of Justice had

*Kirkpatrick - Cross*

1  not precleared Mississippi's voter ID law when *Shelby County*

2  was decided, would you dispute that?

3  **A.**   I would have to go back and look at the record to be able

4  to dispute that.

5        **MR. TOM:**   Your Honor, I would like to hand

6  Mr. Kirkpatrick a document that could, I believe, refresh his

7  memory about this preclearance issue.

8        **THE COURT:**   Yes, you may.

9        **THE WITNESS:**   Thank you.

10  **BY MR. TOM:**

11  **Q.**   So, Mr. Kirkpatrick, I just handed you a law review

12  article titled "Not Our Grandfathers' Mississippi Anymore:

13  Implementing Mississippi's Voter Identification Requirement."

14  It's published in the *Mississippi Law Journal*.  It's written

15  by, at the time, Secretary of State Delbert Hosemann.

16        Do you see that?

17  **A.**   Yes.

18  **Q.**   So at the bottom there, it says, "Copyright 2017, Office

19  of the Mississippi Secretary of State"?

20  **A.**   Yes.

21  **Q.**   And then if you turn the page, there's a photo and a

22  little letter here by Delbert Hosemann, Secretary of State?

23  **A.**   Yes.

24  **Q.**   So turn to page 1073, if you will.

25  **A.**   All right.  I'm there.

1  **Q.**   Okay.  And do you understand -- and this is just for

2  background.  Do you understand Initiative 27 to be the law that

3  enacted voter identification in Mississippi?

4  **A.**   Yes.

5  **Q.**   So on page 1073, I want to read you a passage.

6        It says, "Because Mississippi was a covered jurisdiction

7  under Section 5 at the time Initiative 27 was passed, the state

8  had to prepare its own administrative submission for

9  preclearance before implementing its voter identification law.

10  To obtain preclearance, Mississippi bore the burden of showing

11  the proposed voting change lacked both, one, a racially

12  discriminatory purpose and, two, a retrogressive effect on the

13  position of racial minorities."

14        Do you have any reason to think that I read that

15  incorrectly?

16  **A.**   No, sir.

17  **Q.**   Now, if you look at 1073 to 1074, I'll read you another

18  section.

19        "The Office of the Mississippi Attorney General had

20  submitted the constitutional amendment to the Department of

21  Justice on January 4th, 2012, after the official declaration of

22  the vote for Initiative 27.  The Department responded it would

23  review all supplemental submissions" --

24            **THE COURT:**  Slow down.

25  **BY MR. TOM:**

*Kirkpatrick - Cross*

1  **Q.**   -- "simultaneously once the enabling legislation and any

2  additional implementation procedures were submitted."

3       Did I read that correctly?

4  **A.**   It appears so.

5  **Q.**   Now turn to page 1077, please.

6  **A.**   I'm there.

7  **Q.**   So the first paragraph here, it says, "Between January

8  and June of 2013, the Department of Justice and the Secretary

9  of State traded correspondence as the department requested more

10 information regarding Mississippi's implementation plans and

11 intent.  Clearly, Mississippi's application was under close

12 scrutiny."

13      I read that correctly; right?

14 **A.**   Yes.

15 **Q.**   So turn to page 1080, please.

16 **A.**   (Complies.)

17 **Q.**   And if you look at the last paragraph on page 1080, it

18 says, "In the wake of the *Shelby County* decision, the

19 Department of Justice advised, with respect to administrative

20 submissions under Section 5 which were pending as of June 25th,

21 2013, no determination would be made by the Department of

22 Justice on the proposed changes.  The Department further noted

23 this was not a determination on the merits and, therefore,

24 should not be construed as a finding regarding whether the

25 specified change complied with any federal voting rights law."

*Kirkpatrick - Cross*

1     Did I read that correctly?

2 **A.**   Yes.

3 **Q.**   Now, lastly, let's look at page 1081. And it's the first
4 paragraph on this page.

5     It states, "After careful review and consideration of the
6 *Shelby County* decision, Mississippi decided its voter
7 identification requirement would be enforced for the June 3rd,
8 2014, congressional primary election."

9     Did I read that correctly?

10 **A.**   Yes.

11 **Q.**   So based on what we just reviewed, would you agree that
12 the voter ID law was not precleared and that it came into
13 enforcement without preclearance after the *Shelby County*
14 decision?

15 **A.**   Yes. That would appear so based on this law journal.

16 **Q.**   Now, you talked about -- you know, we are talking about
17 voter ID. Would you agree that the vast majority of voters
18 rely on driver's licenses to meet the voter ID requirement?

19 **A.**   My understanding -- the number or type of photo ID that
20 is used at a given polling place is not reported to the
21 secretary of state. But based on my host of communications
22 with election commissioners and circuit clerks, my
23 understanding is that it is a majority of the photo ID used.

24 **Q.**   You talked before with Mr. Matheny about the photo voter
25 ID card that the secretary of state issues?

*Kirkpatrick - Cross*

1 **A.** Yes.

2 **Q.** You would agree that less than 9,000 voters have obtained

3 a photo voter ID card from the secretary of state; right?

4 **A.** Yes.  We have got approximately, I believe, about 8,500

5 requests from voters for those and have provided those out.

6 **Q.** And that's out of a total voter registration of 1.9

7 million; right?

8 **A.** Yes.

9 **Q.** You mentioned about how, if an affidavit ballot is issued

10 at a polling place, that statistic is kept in SEMS; is that

11 right?

12 **A.** Can you repeat the question one more time?

13 **Q.** If someone attempts to vote and is given an affidavit

14 ballot, the fact that they were given an affidavit ballot is a

15 statistic that is kept in SEMS; right?

16 **A.** Yes.

17 **Q.** What happens if someone tries to go vote and, say, they

18 went to the wrong polling location or they had the wrong photo

19 ID and they were not given an affidavit ballot?

20 **A.** That would not be kept in SEMS.

21 **Q.** So the secretary of state does not keep statistics of the

22 number of registered voters who were turned away at the polls

23 because they were unable to present a voter ID and were not

24 given an affidavit ballot, does it?

25 **A.** No.

*Kirkpatrick - Cross*

1 **Q.** So you talked before about the secretary of state's

2 hotline that, amongst other things, the secretary of state

3 answers questions about elections; right?

4 **A.** Yes.

5 **Q.** People call in about where they can vote?

6 **A.** That's correct.

7 **Q.** They call in about why their polling place was changed?

8 **A.** We have received calls, yes.

9 **Q.** So the secretary of state is aware of voters' concerns

10 about polling place locations; right?

11 **A.** Generally, yeah.

12 **Q.** And you talked about why lines may form at a polling

13 location. Do you remember that?

14 **A.** Yes.

15 **Q.** The secretary of state's office has not undertaken any

16 efforts to determine whether lines occurred disproportionately

17 at polling places where the majority of voters are Black, has

18 it?

19 **A.** No.

20 **Q.** And the secretary of state's office has not undertaken

21 any efforts to determine whether there are any particular

22 trends in where lines at polling places form, has it?

23 **A.** No.

24 **Q.** Sir, are you familiar with run-off elections in

25 Mississippi?

*Kirkpatrick - Cross*

1  **A.**   Yes.

2  **Q.**   Mississippi has run-off elections, doesn't it?

3  **A.**   That's correct.

4  **Q.**   And when is a run-off election required?

5  **A.**   It can vary depending on the type of election that is

6  occurring.  For primaries, if someone doesn't get a majority of

7  the vote, or for certain general elections, if a person does

8  not receive a majority of the vote, then an election may be

9  required.

10  **Q.**   What offices may have a run-off election?

11  **A.**   Statewide offices are now required to have a run-off

12  election, and judicial offices are required to have a run-off

13  election.  County school board and election commissioners are

14  required to have run-off elections.

15  **Q.**   So you testified that voter rolls contain some voters who

16  are in what you call "purge" status; right?

17  **A.**   That's correct.  Voter --

18  **Q.**   And -- I'm sorry.

19  **A.**   Purge -- voters who are purged on -- voters who are on

20  purge status are kept as a record in SEMS.

21  **Q.**   And I think you testified that maybe there are voters in

22  there who should have been removed but have not been?  In SEMS.

23  **A.**   Yes.

24  **Q.**   And I think your testimony was that, because these voters

25  are in there, if you calculated turnout including them in the

*Kirkpatrick - Cross*

1 denominator, it might look lower; right?

2 **A.** That's correct.

3 **Q.** But you would agree that if you thought about turnout

4 among all adults, then we would just divide the number of

5 voters by the total population; right?

6 **A.** It can be calculated different ways, and there are

7 different things that need to be considered when looking at

8 turnout. When you talk about all voters or all people of adult

9 age, what does that include, especially in regards to people

10 who are eligible or not, that can, you know, maybe skew or go

11 one way or the other on the turnouts. There are different

12 considerations on that.

13 **Q.** So that issue you mentioned, it wouldn't matter if you

14 were thinking about turnout among all adults and not among

15 registered voters; right?

16 **A.** I think some of the concerns would come from looking at

17 all adults because not all adults may necessarily even be

18 allowed or qualified to vote, depending on the populations that

19 are included in all adults.

20 **Q.** So remember when you were talking about how candidates

21 appear on the ballot?

22 **A.** Yes.

23 **Q.** Have you -- has the secretary of state done any studies

24 on ballot roll-off?

25 **A.** We have not done any studies. I have read some.

*Kirkpatrick - Redirect*

1 **Q.** Has the secretary of state done any studies on ballot

2 roll-off in supreme court elections?

3 **A.** No.

4      **MR. TOM:** Your Honor, can I confer with my counsel?

5      **THE COURT:** You may. Uh-huh.

6      (CONFERRING OFF THE RECORD.)

7 **BY MR. TOM:**

8 **Q.** So before when we were talking about run-offs, a run-off

9 occurs when no candidate gets a majority of the votes; right?

10 **A.** Yes.

11 **Q.** So before you talked about Mississippi Supreme Court

12 Districts having to do with judicial independence. Do you

13 remember that?

14 **A.** Yes.

15 **Q.** Now, is it your testimony in any way, shape, or form that

16 having one of those three large supreme court districts be

17 majority Black would somehow compromise judicial independence?

18 **A.** No.

19      **MR. TOM:** No further questions, Your Honor.

20      **THE COURT:** Redirect.

21               **REDIRECT EXAMINATION**

22 **BY MR. MATHENY:**

23 **Q.** Just a couple more questions, Mr. Kirkpatrick.

24      Mr. Tom asked you about the lack of being able to

25 register for the first time online to vote. Can you go online

*Kirkpatrick - Redirect*

1 and change your voter registration?

2 **A.** Yes. If you are already registered to vote, through

3 Mississippi law, there is a process in which you can update

4 your existing registration and either move that within the same

5 county or move that to an existing county.

6 **Q.** Where do you go online to do that?

7 **A.** You will go to yallvote.ms, and that will take you to our

8 Y'all Vote web page. And on there we just have a big red

9 button that says "Update your existing voter registration."

10 You'll click that, and it will walk you through the process.

11 **Q.** If you are worried that you might have been purged, is

12 there a way to go online and figure out if you are on or off

13 the voter rolls currently?

14 **A.** Yes. We do have a voter registration lookup where you

15 will be able to go online, type in some key identifying

16 information, name, social security number, birth date,

17 Mississippi driver's license number, and take a look at your

18 record to see if you are on the voter rolls.

19 **Q.** If you didn't have access to broadband, could you call

20 the circuit clerk's office and ask for that information?

21 **A.** Yes.

22 **Q.** Okay. Could you go down to the circuit clerk's office

23 yourself?

24 **A.** Yes. You could also call our office.

25 **Q.** Mr. Tom asked you about several elections and whether or

*Kirkpatrick - Redirect*

1  not turnout was low.  One particular one I wanted to ask

2  about -- he asked you about the 2023 primary elections.

3      Is turnout different in primaries from general elections

4  generally?

5  **A.**   It can be lower in primaries.  One of the biggest things

6  for turnout is obviously the draw of the candidates.  And if

7  they are -- if you have a large number of unopposed candidates

8  on the ballot, that is always going to negatively impact

9  turnout.

10     And, generally, I think we saw a large number of

11  uncontested elections that year on both sides of the primary,

12  where candidates generally automatically advanced into the

13  general election without much choice for a voter to have.

14  **Q.**   Mr. Tom also asked you about Senate Bill 2358.  That's

15  the bill about the -- Section 208 of the Voting Rights Act.

16     Do you know why the legislature passed the change to that

17  statutory process?

18     **MR. TOM:**  Objection, Your Honor.  I'm not sure there

19  is any basis for this witness to know that.

20     **THE COURT:**  It's sustained.

21     What's his knowledge?

22  **BY MR. MATHENY:**

23  **Q.**   I think you did mention, though, that there is a case

24  that is pending in litigation currently on Senate Bill 2358; is

25  that right?

*Kirkpatrick - Redirect*

1 **A.** Yes.

2 **Q.** The other thing I wanted to ask you about, Mr. Tom handed

3 you a law review article.

4 Do you still have it up there with you?

5 **A.** Yes, sir.

6 **Q.** Could you give us the citation for that in case somebody

7 wanted to go read that article.

8 **A.** I'm trying to find a citation here.

9 **Q.** Let's do it this way. This might be easier. It looks to

10 me like it's a *Mississippi Law Journal* article?

11 **A.** Yeah. Sorry. I was looking for -- yes, it's from the

12 *Mississippi Law Journal*.

13 **Q.** And it looks to me like it's Volume 85:6?

14 **A.** Yes.

15 **Q.** What's the title of the article?

16 **A.** "Not Our Grandfathers' Mississippi Anymore: Implementing

17 Mississippi's Voter Identification Requirement."

18 **Q.** Based on your experience in elections, what's the

19 difference between the Department of Justice's preclearance of

20 a submission and the Department of Justice's failure to object

21 to a submitted change?

22 **A.** To be honest, because I came in after the *Shelby County*

23 preclearance, I have not had much experience with the

24 preclearance requirement because it was already removed by the

25 time I began working for the secretary of state's office.

*Kirkpatrick - Redirect*

1  **Q.**   Okay.  Well, the last thing I wanted to ask you about

2  is -- if you could turn over to page 1073 of what he provided

3  you.

4  **A.**   (Complies.)

5  **Q.**   He asked you about a passage there at the bottom of the

6  page discussing the submission on January 4th, 2012.

7       Do you see that there on page 1073?

8  **A.**   Yes.

9  **Q.**   Okay.  He asked you about a sentence there that runs over

10  to the next page, and then he cut you off where it picks up

11  there and kind of explains why there were delays.

12       What does the article say there over on the next page

13  starting with "Because"?

14  **A.**   "Because of Mississippi's pending submission, it was

15  particularly troubling when reports surfaced alleging a

16  Department of Justice Voting Rights Section employee" --

17            **THE COURT:**  Slow down.

18            **THE WITNESS:**  Sorry, Your Honor.

19  **A.**   -- "made degrading comments about Mississippi in

20  May 2012.  The Secretary feared the comments, while a

21  submission was pending for Mississippi, were indicative of a

22  culture within the Department's Voting Rights Section against

23  Mississippi's submission.  The Secretary immediately made a

24  request for the employee to be removed from all reviews of

25  state election laws under Section 5 of the Voting Rights Act.

*Kirkpatrick - Redirect*

1   Congressmen Alan Nunnelee, Gregg Harper, and Steven Palazzo

2   also contacted the Department of Justice demanding the same.

3   The employee was ultimately removed from handling Mississippi's

4   administrative submissions."

5           **MR. MATHENY:**  Thank you, Mr. Kirkpatrick.

6           May I consult with counsel?

7           **THE COURT:**  You may.

8       (CONFERRING OFF THE RECORD.)

9           **MR. MATHENY:**  No further questions, Your Honor.

10          **THE COURT:**  Thank you.  Now, may this witness be

11  excused?

12          **MR. MATHENY:**  Yes, Your Honor.

13          **THE COURT:**  Okay.  You're excused.

14          **THE WITNESS:**  Thank you, Your Honor.

15          **THE COURT:**  That's almost perfect timing.

16          Okay.  We'll take a lunch break and come back with who

17  I understand will be Dr. King --

18          **MR. CHEUNG:**  Yes, Your Honor.

19          **THE COURT:**  -- at 1:30.  Thank you.  We are in recess.

20      (LUNCH RECESS TAKEN.)

21          **THE COURT:**  Okay.  Who would you call?

22          **MR. CHEUNG:**  Good afternoon, Your Honor.  Plaintiffs

23  call Professor Marvin King.

24          **THE COURT:**  Thank you.

25          Mr. Cheung, you are going to go slow.

*King - Direct*

1      **MR. CHEUNG:**  Yes.

2      **THE COURT:**  I'm going to give you a sign that says

3  you've got to slow down.

4      **MR. CHEUNG:**  Yes.

5      **THE COURT:**  Okay?  Because it's important.  And I know

6  that Phyllis is struggling with some of it, so please.

7      **MR. CHEUNG:**  Understood, Your Honor.

8      **THE COURT:**  Particularly when we get into numbers and

9  particularly when you are reading things, go slow.  You tend to

10  speed up.

11      **MR. CHEUNG:**  Yes.

12     (OATH WAS ADMINISTERED BY THE COURTROOM DEPUTY.)

13      **COURTROOM DEPUTY:**  Thank you.  You may take the stand.

14      **MR. CHEUNG:**  May I proceed, Your Honor?

15      **THE COURT:**  Yes.

16      **MR. CHEUNG:**  Before we get started, I have copies of

17  the PowerPoint deck I will be using.  Would the Court like a

18  copy?

19      **THE COURT:**  I would love a copy, yeah.

20      **MR. CHEUNG:**  Your Honor, I also have a small binder

21  for Dr. King consisting of his report and related exhibits.

22      **THE COURT:**  You may.

23      **MARVIN P. KING, JR., Ph.D., PLAINTIFFS' WITNESS, AFTER BEING**

24        **DULY SWORN, WAS EXAMINED AND TESTIFIED AS FOLLOWS:**

25              **DIRECT EXAMINATION**

*King - Direct*

1 **BY MR. CHEUNG:**

2 **Q.** Good afternoon, Dr. King.

3 **A.** Good afternoon.

4 **Q.** How are you doing today?

5 **A.** I'm doing well.

6 **Q.** Dr. King, could you begin by telling us your current

7 title?

8 **A.** Associate professor of political science in African

9 American Studies at the University of Mississippi.

10 **Q.** Are you based here in Oxford?

11 **A.** Yes.

12 **Q.** How long have you been living in Oxford?

13 **A.** Since 2005.

14 **Q.** Are you tenured at the University of Mississippi?

15 **A.** Yes.

16 **Q.** Do you recall when you received tenure?

17 **A.** 2011.

18 **Q.** So I would like to talk a bit more about your academic

19 and professional background.  Could you please take a look at

20 what's been marked as PX-55.

21 **A.** Yes.

22 **Q.** Do you recognize PX-55?

23 **A.** Yes.  It is my CV.

24 **Q.** And is this an updated version of your CV compared to the

25 version that is attached to your report?

*King - Direct*

1   **A.**   Yes.

2   **Q.**   And at a high level, what does your CV contain?

3   **A.**   It has my university service, research, and teaching.

4   **Q.**   Does the CV contain the academic publications you have

5   that are related to your field?

6   **A.**   Yes.

7   **Q.**   And does the CV contain the courses you teach that are

8   related to your field?

9   **A.**   Yes.

10  **Q.**   And, in general, does the CV reflect your professional

11  and academic qualifications?

12  **A.**   Yes.

13          **MR. CHEUNG:**   Your Honor, at this time, plaintiffs

14  would offer PX-55, which is Dr. King's CV, into evidence.

15          **THE COURT:**   Any objection?

16          **MR. COWAN:**   No objection, Your Honor.

17          **THE COURT:**   It will be admitted.

18          **MR. CHEUNG:**   Thank you, Your Honor.

19      (EXHIBIT NO. PX-55 ADMITTED INTO EVIDENCE.)

20  **BY MR. CHEUNG:**

21  **Q.**   Dr. King, where did you obtain your undergraduate degree?

22  **A.**   University of Texas at Austin.

23  **Q.**   And what did you study at the University of Texas?

24  **A.**   Government.

25  **Q.**   What year did you graduate?

*King - Direct*

1  **A.**    2001.

2  **Q.**    And after you graduated from University of Texas, did you

3  go on to earn any postgraduate degrees?

4  **A.**    I received a Ph.D. from the University of North Texas

5  with a focus in political science.

6  **Q.**    And did you complete a dissertation as part of your Ph.D.

7  program?

8  **A.**    Yes.   The dissertation was on African American voting

9  behavior.

10  **Q.**    What research questions did you examine as part of your

11  dissertation?

12  **A.**    Who do Blacks vote for and why?

13  **Q.**    And what did you find out as to why Black voters vote the

14  way they do?

15  **A.**    That even though the critical inflection point of the

16  civil rights movement had passed from the 1960s, that the

17  underlying dynamics of Black partisanship had not sufficiently

18  changed, and so we were seeing new generations of Black voters

19  continue to identify with the Democratic Party.

20  **Q.**    And did you successfully defend your dissertation?

21  **A.**    I did.

22  **Q.**    What year did you graduate and receive your Ph.D.?

23  **A.**    2005.

24  **Q.**    And did you become a professor at the University of

25  Mississippi after receiving your Ph.D.?

*King - Direct*

1  **A.**    I did.

2  **Q.**    What are your responsibilities as an associate professor?

3  **A.**    A lot.  Teaching, research, and service.

4  **Q.**    And when you say "service," what do you mean?

5  **A.**    It could mean all sorts of things.  So we have service to

6  the discipline, so political science, but also service to the

7  university and also service to the community.

8  **Q.**    And which academic departments do you belong to?

9  **A.**    I have a joint appointment, which means I am in both the

10  political science department and the African American Studies

11  program.

12  **Q.**    And within political science, do you specialize in

13  African American politics?

14  **A.**    Yes, I do.

15  **Q.**    Why is there a distinct subfield called "African American

16  politics"?

17  **A.**    So in political science, we have lots of subfields and --

18  so within American politics, there are many different

19  subfields, and African American politics is one of them because

20  the political and legal experience of African Americans is

21  sufficiently distinct that it is worthy of study.

22  **Q.**    And what makes the African American political experience

23  distinctive?

24  **A.**    A lot.  Specifically, slavery, Jim Crow, and then many of

25  the laws that were required to allow for full political

*King - Direct*

1  participation by African Americans.

2  **Q.**  So let's discuss some courses that you teach at the

3  University of Mississippi.  A selection of the coursework

4  appears on the slide here.  It's taken from page 5 of PX-55.

5  Dr. King, do you teach a course called Political Science

6  609:  Politics of the American South?

7  **A.**  Yes.

8  **Q.**  Is that a graduate-level course?

9  **A.**  It is.

10  **Q.**  What topics do you cover in Politics of the American

11  South?

12  **A.**  That class, as well as the undergraduate equivalent of

13  that class, focuses on partisanship.  So specifically we're

14  looking at the realignment in the South of partisanship.  So

15  for the longest time, the South was a one-party Democratic

16  region, and then it shifted to Republican dominance.  And so

17  the class mainly focuses on how that occurred, why that

18  occurred, and when that occurred.

19  **Q.**  And at a high level, why did that alignment occur?

20  **A.**  So the most compelling research says there was a

21  race-based realignment in the 1960s due to the events in

22  legislation from the civil rights era, from the 1960s.  And so

23  this led to a shifting of realignment where we saw White

24  Southerners move their identification from Democrats to

25  Republicans, and we saw Blacks largely identify with the

*King - Direct*

1  Democratic Party.

2  **Q.**   Do you also cover racially-polarized voting as part of

3  that course?

4  **A.**   Yes.

5  **Q.**   And what is racially-polarized voting?

6  **A.**   Racially-polarized voting is when you have majorities of

7  one race vote against majorities of another race.

8  **Q.**   And why is racially-polarized voting a relevant topic to

9  cover in your Southern Politics class?

10  **A.**   Depending on the population dispersion in a state, if you

11  have racially-polarized voting, your election outcomes are

12  going to be fairly predictable.  And so in terms of political

13  winners and losers, it's important to understand why some

14  groups win more elections and why some lose and then what are

15  the consequences therein that flow from that polarization.

16  **Q.**   And can you also tell us about the African American

17  Politics class that appears on the slide here?

18  **A.**   Sure.  So in that class -- in all of my classes but

19  especially in this class, I take a chronological approach to

20  the African American political experience.  So we will start

21  with the Constitution.  We'll look at any relevant clauses that

22  might have affected African Americans in particular.  And then

23  we work our way through the Civil War, reconstruction, Jim

24  Crow, civil rights movement, and into contemporary American

25  political issues.

1 **Q.** And does that course cover the ability of Black
2 candidates to get elected to public office?

3 **A.** It does.

4 **Q.** Does that course also cover the topic of felon
5 disenfranchisement?

6 **A.** Yes, it does.

7 **Q.** What do you cover about felon disenfranchisement?

8 **A.** So, for instance, in the African American Politics class,
9 we focus on the whole country, but because we are here in
10 Mississippi, I often use Mississippi as a case study.

11 So Mississippi has the -- based on 2023 numbers, the
12 second-highest incarceration rate, and so more Mississippians
13 are in jail relative to other states. And given that a
14 disproportionate amount of them are African Americans, that is
15 going to affect the ability for significant numbers to be able
16 to vote. So that's going to be relevant in terms of one group
17 being able to elect their candidate of preference.

18 **Q.** Thank you. I would like to turn next to your
19 publications.

20 Does the list that appears on page 2 of your CV, PX-55,
21 contain a list of your peer-reviewed publications?

22 **A.** Yes.

23 **Q.** A few of them appear on the slide here. Could you tell
24 us about the piece titled "The Electoral Geography of Black
25 Electoral Success"?

*King - Direct*

1   **A.**   So it's no secret that Blacks seem to have greater

2   success at getting elected to various levels of office,

3   depending on the state they live in.  So this research was

4   trying to understand where Blacks might have more success than

5   in other places and why that might be the case.

6   **Q.**   And do any of your publications relate to

7   racially-polarized voting?

8   **A.**   Certainly the first one but also the second one,

9   "Political Racial Cycles."  So looking at the electoral cycles

10  in racial polarization in the 2006 senate election.  So there

11  we were looking at how party polarization and racial

12  polarization are distinct concepts and how that can affect

13  electoral outcomes in a primary.

14  **Q.**   And how did you determine that partisan polarization and

15  racial polarization are distinct concepts?

16  **A.**   So myself, you know, in my research, and a preponderance

17  of the political science research that exists does show that

18  racial polarization predates party polarization, that they are

19  distinct concepts.  So, in other words, the foundation of

20  polarization is based on race.  Like, that's what caused the

21  parties to polarize.  So the race as a dividing issue comes

22  prior to the party split.

23  **Q.**   And what kinds of elections did you study for that

24  article to determine that racial polarization is distinct from

25  party polarization?

*King - Direct*

1  **A.**    Primary.

2  **Q.**    Primary elections?

3  **A.**    Yes.

4  **Q.**    Can you also tell us about the "African Americans and the

5  Right to Vote" piece?

6  **A.**    Yes.  So that was looking at how the Voting Rights Act

7  affected Black political participation before and after.

8  **Q.**    And what effect did the Voting Rights Act have on Black

9  participation?

10  **A.**    Strong argument can be made that the Voting Rights Act

11  was the singularly most important piece of legislation that has

12  positively benefited Black political participation.

13  **Q.**    Zooming out a bit, Dr. King, how would you describe

14  political science as an academic subject?

15  **A.**    You know, so our job is to answer questions related to

16  government and politics.  We have lots of different tools at

17  our disposal.  There's lots of different methods, quantitative

18  as well as qualitative; so -- you know, but, fundamentally, we

19  are trying to answer these questions with rigor.

20       We'll test theories with data.  And then sometimes you

21  might write a report, for instance, where you take together

22  these -- the existing knowledge and kind of write a report and

23  say, Okay.  Well, what is all of this research telling us;

24  right?  What conclusions can we draw based on all of this

25  evidence?

You know, so it's -- you know, at the university level, every discipline will have different approaches.  We might ask similar questions, but we all kind of have different approaches.

**Q.**   You mentioned earlier that you have a joint appointment between political science and African American studies.  How are the two subjects different or similar?

**A.**   So African American studies here at the University of Mississippi is an interdisciplinary program; and so in that program, we have faculty from political science, history, English, music.

We are doing a job search right now to hire someone in psychology because we recognize that, as I said earlier, the African American experience is sufficiently distinct that the academic community believes it's important to study subgroups.  No different than in medicine you have pediatric medicine because a child's body is different than an adult's body.

So you have to approach different populations differently to make sure that you fully understand the issues at hand.

**Q.**   And does the university also have a separate department of history?

**A.**   Of course.  Yes.

**Q.**   And in what ways are political science and history different?

**A.**   Historians tell us what happened.  So they go back and do

1    the -- you know, a lot of that original archival research, and

2    so they tell us what happened.  And what political scientists

3    like to do is take all of that information and, if we can, turn

4    it into data.  You can't turn everything into data.  Sometimes

5    you don't have enough observations.  And so you might write a

6    qualitative report about something if there's not enough data;

7    right?

8         So if you wanted to write a paper about American Black

9    presidents, you only have one, so not a lot of data you can do,

10   but you could still take all of the theories that we know about

11   presidential life or actions and see if the way Obama, for

12   instance, was president, if it kind of aligned with what our

13   theories expect.

14        But a lot of times we will take -- if there is sufficient

15   data, we like to take that information and then draw

16   conclusions based on what data is telling us.

17   **Q.**    And as a political scientist, do you rely on historical

18   sources and materials to perform your work?

19   **A.**    We rely on whatever we think is required to be able to

20   make those conclusions but certainly published research.

21   **Q.**    And as compared to someone who has not had academic

22   training, why are you better equipped to analyze and opine on

23   historical events?

24   **A.**    I believe I have been studying one question for about

25   20 years; so I have a lot of experience teaching this,

*King - Direct*

1  researching it, keeping up with it, and also seeing how it's

2  applied in real life.  And so I believe I am qualified to

3  answer these questions.

4  **Q.**  Turning to the work that you did for this case, what

5  kinds of sources did you rely on for your report?

6  **A.**  Political science sources, sources from historians, but

7  also some of the contemporary -- contemporaneous records, like,

8  where there is not data available, you know; so then you might

9  rely on contemporary newspaper accounts to tell you what

10  happened at a particular moment in time.  And then, you know,

11  I'm trying to apply the political science theories and

12  knowledge as we best know them to those contemporaneous

13  accounts.

14  **Q.**  And are the sources that you relied on in this case

15  typical of the sources that would be used by a political

16  scientist or a scholar of African American studies?

17  **A.**  Certainly for a report of this nature, I don't -- I don't

18  know how else to do it.  I don't know how else anyone would do

19  it.

20  **Q.**  I would like to talk briefly about your work in other

21  cases.  Have you offered expert testimony in any other

22  redistricting case?

23  **A.**  Yes.

24  **Q.**  Which cases would those be?

25  **A.**  So *Nairne vs. Ardoin* in Louisiana, which is a Section 2

*King - Direct*

1   Louisiana legislative redistricting case.  And there,

2   specifically, I was asked to discuss racial versus party

3   polarization.

4   **Q.**   In that Louisiana case, were you accepted as an expert?

5   **A.**   Yes, I was.

6   **Q.**   Did the Court ultimately rely on your testimony in that

7   case?

8   **A.**   The Court did.

9   **Q.**   Did you also testify in a case called *Mississippi*

10  *NAACP vs. State Board of Election Commissioners*?

11  **A.**   Yes, I did.

12  **Q.**   Was that a case before a panel of three judges in

13  Jackson, Mississippi?

14  **A.**   Yes, it was.

15  **Q.**   Do you recall what that case was about?

16  **A.**   It was about state legislative districts in Mississippi.

17  **Q.**   Did the panel ultimately accept you as an expert?

18  **A.**   Yes, they did.

19  **Q.**   And did they rely on the testimony that you provided?

20  **A.**   Yes, they did.

21  **Q.**   How does your testimony in that other Mississippi case

22  differ or relate to the testimony that you plan to give in this

23  case?

24  **A.**   It is similar.  We're talking about different districts.

25  Of course, here, this is about our supreme court districts, but

*King - Direct*

1    it's a very similar question otherwise.

2    **Q.**    Has the Court ever found you not qualified to testify as

3    an expert?

4    **A.**    No.

5    **Q.**    And did you apply the same level of rigor to your work as

6    you did in your other cases?

7    **A.**    Yes, I did.

8    **Q.**    And are all of your opinions in this case based on a

9    reasonable degree of certainty in the field of political

10   science and African American studies?

11   **A.**    Yes, they are.

12          **MR. CHEUNG:**  Your Honor, at this time, the plaintiffs

13   would offer Dr. King as an expert in political science, African

14   American studies, and racial polarization.

15          **THE COURT:**  Any objection?

16          **MR. COWAN:**  No objection, Your Honor.

17          **THE COURT:**  He will be received in those areas as an

18   expert.

19          **MR. CHEUNG:**  Thank you, Your Honor.

20          Plaintiffs would also offer PX-53 and 54 into

21   evidence.   These are tables and figures from Dr. King's report.

22   And I believe, according to the joint pretrial order, the

23   defendants do not object to the admission of these exhibits

24   upon Dr. King's admission as an expert.

25          **THE COURT:**  Thank you.

*King - Direct*

1  (EXHIBIT NOS. PX-53 AND PX-54 ADMITTED INTO EVIDENCE.)

2  **MR. CHEUNG:** And, also, Your Honor, consistent with

3  the other plaintiffs' expert reports, plaintiffs would also

4  offer PX-52, which is Dr. King's report, into evidence as well.

5  **THE COURT:** Any objection?

6  **MR. COWAN:** Yes, Your Honor, on the same basis. It's

7  been asserted for every single one of the experts' reports

8  admitted into evidence. We would just reurge those for Your

9  Honor's consideration.

10  **THE COURT:** Thank you. The Court will receive the

11  report. It's admitted.

12  **MR. CHEUNG:** Thank you, Your Honor.

13  (EXHIBIT NO. PX-52 ADMITTED INTO EVIDENCE.)

14  **BY MR. CHEUNG:**

15  **Q.** Dr. King, just to give us a high-level roadmap, what

16  opinions did you reach in this case?

17  **MR. COWAN:** Your Honor, just if I may interject here.

18  We do have an objection to Dr. King offering testimony on

19  Senate -- the Senate Factors 1, 2, and 3 on at least two

20  different bases.

21  **THE COURT:** Okay.

22  **MR. COWAN:** The first is Dr. King produced a report in

23  this matter which Your Honor just accepted into evidence. In

24  that report, he does not state that he is offering any opinions

25  on Senate Factors 1, 2, and 3. He makes very -- expresses in

1  his report that he is offering opinions on 6, 7, 8, and 9.

2          But I -- the defendants did not learn that Dr. King

3  intended to offer an opinion on Senate Factors 1, 2, and 3

4  until we received a copy of the demonstrative today from

5  opposing counsel.  So I think we have a disclosure issue there

6  with the contents of his report.

7          The second objection would be that the plaintiffs

8  offered Dr. Orey and Dr. Campbell as prior experts in this

9  matter.  And Dr. Orey testified extensively on Senate Factors 2

10 and 3, and Dr. Campbell testified extensively on Senate Factors

11 1, 2, and 3.

12         And so those two experts have already testified about

13 the very three factors that were disclosed to us last night

14 that he intended to offer an opinion on.  So it would just be

15 cumulative in that sense.  We would object to him testifying

16 about those three particular factors.

17         **THE COURT:**  When did you say you learned that he would

18 be offering an opinion on 1, 2, and 3?

19         **MR. COWAN:**  So pursuant to an agreement in the

20 pretrial order, they produced the slideshow that they intended

21 to present today.  This slide that has come up is a summary of

22 his expert opinions where it's summarizing that he intends to

23 offer an opinion on Senate Factors 1, 2, and 3, which were not

24 asserted in his report.  And Section 6, 7, 8, and 9 are in his

25 report, and that's what we expected -- prior to disclosure of

1   the demonstrative, to expect to hear testimony on.

2       (CONFERRING OFF THE RECORD.)

3           **MR. COWAN:**  Yes.  Oh, last night.  I'm sorry.

4           **THE COURT:**  Your response?

5           **MR. CHEUNG:**  Sure, Your Honor.

6           Your Honor, I believe the objection as to whether or

7   not Dr. King refers to explicitly Senate Factors 1, 2, and 3 in

8   the report -- it's a formalistic distinction.  The Senate

9   Factors, at the end of the day, are part of a legal framework

10  that this Court is applying.

11          What Dr. King is offering are facts and factual

12  analyses.  That is up to the Court to determine which senate

13  factor they go under.  For purposes of the demonstrative and

14  the presentation, we have affixed labels of Senate Factors 1,

15  2, and 3 to help organize the concepts.

16          But if you look at Dr. King's report -- I would point

17  the Court to PX-52 at page 6, for example.  The section is

18  titled "A Brief History of Race and Democracy in Mississippi."

19  And the first sentence says, "Mississippi's political history

20  is characterized by consistent efforts to minimize the voting

21  power of the state's Black population."

22          The substance of that conclusion directly tracks

23  Senate Factors 1 and 3.  So I don't think the factual content

24  of what Dr. King is prepared to testify to is any different

25  than if we had called it explicitly Senate Factors 1 and 3.

*King - Direct*

1      Senate Factor 2 relates to racial --

2      **THE COURT:**  But you admit you did not call it, in the

3  report that he was going to render, opinions on 1, 2 and 3.  As

4  I understand your argument, the contents are there, but you did

5  not label it as such?

6      **MR. CHEUNG:**  Yes, Your Honor.

7      **THE COURT:**  Okay.

8      **MR. CHEUNG:**  And, similarly, with Senate Factor 2,

9  which pertains to racial polarization, there are various

10 references throughout Dr. King's report regarding racial

11 polarization and how that has evolved over time.

12     That's the same testimony that Dr. King provided in

13 the other trial in Jackson in *Mississippi NAACP*.

14 Substance-wise, it's the same there, and the Court -- the panel

15 there allowed Dr. King to testify to the senate factors.  And I

16 believe Mr. Wallace was present at that case representing, with

17 the other attorneys, the same side as the state.

18     **THE COURT:**  So let me understand.  What you refer to,

19 Mr. Cowan, that you did not receive until last night is this

20 (indicating)?

21     **MR. COWAN:**  Yes, Your Honor.

22     And to be clear, they did follow proper procedure on

23 disclosing that to us.  I have no complaint about its late

24 production.  The context is that's when I learned that they

25 were going to -- they were going to testify -- Dr. King was

*King - Direct*

1    going to testify, "I have this opinion about Senate Factor 1; I

2    have this opinion about Senate Factor 2; and I have this

3    opinion about Senate Factor 3."

4         And I think he has tried to address the disclosure

5    issue, but we still don't have any response to the cumulative

6    nature of Dr. King's testimony on those three factors.

7         **THE COURT**:  So you have had his report.  I'm thinking

8    about in what manner you may have been prejudiced by not having

9    it pointed out in the demonstrative evidence that he was not

10   going to give -- that he was going to give an opinion on 1, 2,

11   and 3.  You've had the report for some time.  The report covers

12   the content of what you know addresses 1, 2, and 3?

13        **MR. COWAN**:  Covers is a -- I think -- it does discuss

14   history of Mississippi.  It does discuss in very -- two brief

15   paragraphs racial polarization, and it has a brief discussion

16   of factors that may come into play with Senate Factor 3.  But

17   if you read pages 2 and 3 of his report, he outlines, "These

18   are the senate factors I'm offering expert testimony on."

19        **THE COURT**:  Let me see that report.

20        **MR. COWAN**:  Yes, Your Honor.  It's PX-52, I believe,

21   for the record.  I would hand you my copy, Your Honor, but it's

22   got my handwriting on it.

23        **THE COURT**:  Mr. Cowan, let me be clear.  The report

24   itself has not changed since you received it and reviewed it

25   months ago?

*King - Direct*

1    **MR. COWAN:**  No, Your Honor.

2    **THE COURT:**  Okay.  But you did not receive the

3    PowerPoint until last night, and it's the PowerPoint that you

4    contend really puts you on notice that he was going to do a

5    summary of and give an opinion on 1, 2, and 3?

6    **MR. COWAN:**  Yes.  Yes, Your Honor.

7    **THE COURT:**  Okay.  Let me see what the report says.

8    (PAUSE IN PROCEEDINGS.)

9    **MR. CHEUNG:**  Your Honor, if I may briefly add one

10   point.

11   **THE COURT:**  Yes.

12   **MR. CHEUNG:**  Professor Campbell, who was accepted as

13   an expert and his report was admitted, his report also does not

14   identify by name any particular senate factor.

15   **THE COURT:**  What's troubling to me about this one in

16   particular is that on the -- in the report, on page 3,

17   paragraph 2, titled "General Overview," he says in this report,

18   "I address Senate Factors 6, 7, 8, and 9."  And then he goes

19   on to say in greater detail, "In Section 4, I review Senate

20   Factor 6.  In Section 5, I review Senate Factor 7."  So on.

21   There is no mention in the contents or the General Overview of

22   1, 2, and 3.

23        Mr. Cheung, can you address -- obviously don't know

24   what he is going to testify to.  Can you address Factors 6, 7,

25   8, and 9 as proposed in the report without kind of commingling

*King - Direct*

1  the evidence with 1, 2, and 3 factors?

2     **MR. CHEUNG:**  Your Honor, I think the reason why

3  Dr. King included a section on historical context is because

4  the historical context is necessary to understanding his

5  testimony on the other factors.

6     **THE COURT:**  I am not going to permit him to render an

7  opinion on 1, 2, and 3.  If he needs historical context to lay

8  the foundation for his opinions in 6, 7, 8, and 9, he may

9  testify to that because that's what's been disclosed to the

10 defendants.  But, no, he cannot render an opinion on 1, 2,

11 and 3.

12    **MR. CHEUNG:**  Okay.  Understood, Your Honor.  We will

13 skip the parts of the presentation where Dr. King provides a

14 conclusion or an opinion on Senate Factors 1, 2, and 3.

15    **THE COURT:**  As to the objection based on it being

16 cumulative, that is overruled in light of the need to lay a

17 predicate for 6, 7, 8, and 9.

18    You may proceed.

19    **MR. CHEUNG:**  Thank you, Your Honor.

20 **BY MR. CHEUNG:**

21 **Q.**  So, Dr. King, skipping the first two bullets on this

22 slide, could you give us an overview of what you concluded as

23 to Senate Factor 6?

24 **A.**  Racial appeals are a feature of political campaigns in

25 Mississippi.

*King - Direct*

1  **Q.**   And could you also summarize for us your conclusions as

2  to 7, 8, and 9?

3  **A.**   Sure.

4       Black candidates have, in fact, fared poorly in

5  Mississippi outside of majority Black districts.  They are

6  underrepresented in public office.

7       For Senate Factor 8, elected officials in Mississippi are

8  generally not responsive to the policy concerns of Black

9  voters.

10       Senate Factor 9, the maps adopted in 1987 do have a

11  tenuous policy justification.

12  **Q.**   So in terms of the historical context, your report begins

13  with the Civil War and the succession of Mississippi from the

14  Union.  Why did you begin there?

15            **THE COURT:**   You may.

16            **THE WITNESS:**   I may?  Okay.

17  **A.**   Could you repeat that, please?

18  **BY MR. CHEUNG:**

19  **Q.**   Why does your report begin with the onset of the Civil

20  War as you are providing historical context?

21  **A.**   It's relevant to know why Mississippi fought the Civil

22  War because the foundation of Mississippi's party polarization

23  rests in the cause of the Civil War.

24       Specifically, Mississippi and its Mississippi succession

25  ordinances stated that they left the Union for the preservation

1    of the institution of slavery.  And so partisanship following

2    this -- well, actually, Republicans because it was the party of

3    Lincoln because of the Emancipation Proclamation and then

4    following with the 13th, 14th, and 15th Amendments.

5    **Q.**    And after your discussion of the Civil War, you turned to

6    the 1868 Constitution.  Why did you do that?

7    **A.**    Because to understand the 1890 Constitution that we

8    utilize today, you have to know what it was a reaction to.  And

9    it was a reaction to the 1868 Constitution, which was written

10   by a biracial delegation of Black and White delegates.  It

11   allowed for voting rights for Black men, public schools for all

12   children, and allowed Black citizens to serve in public office.

13   The 1890 Constitution restricts much of this.

14   **Q.**    I believe the Court has already heard some of the

15   historical testimony about this era, but could you give us a

16   high-level overview of what the state's reaction was to the

17   rights granted to Black voters under the 1868 Constitution?

18   **A.**    There was a strong resistance, specifically something

19   known as the Mississippi Plan.  This was an organized effort to

20   persuade and dissuade and intimidate Blacks from participating

21   in the political process, both through physical intimidation

22   but also nonviolent intimidation.

23         Classic example of a violent intimidation was the Clinton

24   Massacre in 1875.  Long story short, by the mid-1880s, there

25   were no Black legislators remaining in the Mississippi

1   legislature.

2   **Q.**   Your report then moves on to discuss the 1890

3   Constitution.  What was the stated purpose of the 1890

4   Constitution?

5   **A.**   To make sure Blacks could no longer participate in

6   Mississippi politics.

7   **Q.**   And what mechanisms did the 1890 Constitution employ to

8   achieve that?

9   **A.**   Poll tax, literacy tests, White primary, felon

10   disenfranchisement.

11   **Q.**   And regarding felon disenfranchisement, earlier today

12   Mr. Kirkpatrick testified for the state that not all felonies

13   prevent convicted persons from voting.  Do you recall that

14   testimony?

15   **A.**   Yes, I do.

16   **Q.**   How was it determined which felonies would be

17   disqualified?

18   **A.**   There is clear historical evidence that the authors of

19   the 1890 Constitution selected crimes that they believed were

20   Black crimes.  So, for instance, in the 1890 Constitution,

21   murder was not actually a disqualifying felony.  That was

22   considered a White crime at the time.  And so they chose crimes

23   that they believed Blacks were more likely to commit.

24   **Q.**   Has that list of crimes changed over time?

25   **A.**   It has.

*King - Direct*

1  **Q.**   To what extent does the felon disenfranchisement regime

2  continue to disproportionately affect Black voters?

3  **A.**   Tens of thousands are disenfranchised today.

4  **Q.**   And for those who are disfranchised due to a criminal

5  conviction --

6          **MR. COWAN:**  Your Honor, I have to state an objection

7  because I think this goes directly to Senate Factor 3.  And in

8  his report, there -- they would have to point me to any

9  discussion of the felon disenfranchisement laws and the crimes

10  that are encompassed within it and it's, in fact, on Black

11  citizens.  So I don't see that.  So I have another objection

12  based on the same ruling you made earlier.

13          **THE COURT:**  Well, it would go to that factor.  It's

14  sustained.

15  **BY MR. CHEUNG:**

16  **Q.**   Turning next to the Jim Crow era, which is covered in

17  your report, what is the Jim Crow era?

18  **A.**   This was a period where Blacks existed in a state of

19  second-class citizenship from -- really, it started during

20  reconstruction, and it lasted through the Voting Rights Act,

21  1965.

22  **Q.**   And what political opportunities were available to Black

23  voters during this time?

24  **A.**   In the South, very few.

25  **Q.**   Your report also contains an example from the Jim Crow

*King - Direct*

1  era pertaining to former justice of the supreme court Tom P.

2  Brady.  Could you discuss what the significance of that example

3  was?

4  **A**.  Sure.

5      So following *Brown vs. Board of Education*, Tom Brady, who

6  at the time was a judge in Brookhaven, Mississippi, wrote a

7  small book called *Black Monday*, and in it he described how he

8  believed that the supreme court had exceeded its authority and

9  that Blacks were not fit to integrate schools with Whites.

10     He later was then appointed to the Mississippi Supreme

11  Court and then reelected to a term in the 1960s, and I believe

12  he served in the 1970s.

13  **Q**.  And moving ahead to the civil rights era, how did the

14  systems that you discussed -- like, racial segregation and poll

15  taxes, literacy tests, how did those regimes end?

16  **A**.  Federal intervention through the Civil Rights Act of 1964

17  ending legal segregation in places of public accommodation,

18  among other parts of the Civil Rights Act, and in the Voting

19  Rights Act, which made it possible for Blacks to be able to

20  register to vote and actually vote.  And, importantly, that

21  then allowed -- we started to see Black candidates run for

22  office again in Mississippi.

23     Opposition typically -- as just one example, typically

24  revolved around the idea that the civil rights legislation

25  violated states' rights and sovereignty.  So you would see this

*King - Direct*

1  in many election campaigns as a way to attract voters who were

2  against this federal intervention.

3  **Q**.  Turning next to a later section of your report where you

4  discuss the cost of voting, what do you mean by "Cost of

5  Voting"?

6  **A**.  So there is ample political science research that helps

7  us understand why voter turnout is lower in some places than

8  others.  Anecdotally, you can observe across the 50 states that

9  voter participation varies widely from some states to the

10  other.  So the political science approach would be to look at

11  the different rules and laws and procedures in these different

12  states to see why do some states consistently have higher

13  turnout than in others.

14          Mississippi is typically last or next to last in the cost

15  of voting index.  It's very consistently at the bottom because,

16  what we see, the procedures here in this state are not

17  conducive to high turnout.

18  **Q**.  And when you say "at the bottom of the index," does that

19  the mean of cost of voting in Mississippi is high or low?

20  **A**.  It's higher here.  So what we know in political science

21  is that the more obstacles you put in front of a voter, the

22  less likely they are to turn out to vote.  So for each

23  additional obstacle, your turnout is going to go lower.  So

24  states that remove these obstacles and barriers consistently

25  have higher turnout.

*King - Direct*

From a comparative perspective -- earlier we were talking about the different political science subfields.  So comparative politics, they look at governments in other countries and compare them not only to the United States but to other countries.  And we typically see higher turnout in similar countries around the world because their voting practices and procedures are different than ours, and they tend to get higher turnout.

Here in Mississippi, I teach a class called American Federalism.  So that's looking at the states and -- so this is something that we cover.  It's, like, Well, why does voting look -- why is participation lower in Mississippi than in other states?  So we would talk about all of these things.

I know -- if I could reference the prior witness, Mr. Kirkpatrick, he mentioned all of the different elections.  That's typically one of the reasons why you have lower turnout because there is something called "voter fatigue."  When you ask voters to vote often, they get tired of it.  They get burned by it.  It's additional work on their behalf.

And so states with higher levels of voting, they tend to -- they don't have as many elections.  So then each election is relatively more important because there's more things on the ballot, and you tend to get higher turnout.

So, for instance, we have -- like, our mayoral elections are in June, you know, right when summer vacation has started.

1  So you are not going to get a high turnout with that because of

2  the run-off election, the majority vote requirement.  So you

3  are going to have an election, and then if you only have a

4  plurality but not a majority, well, you're going to have

5  another election three weeks later.  And so you are going to

6  have turnout go lower.

7         And then as Mr. Kirkpatrick mentioned, there's lots of

8  restrictions on absentee voting.  Most -- let me rephrase that.

9  Many states, they have what's known as no-excuse absentee

10  voting.  You don't have to demonstrate to the government why

11  you need a ballot.  You just ask for a ballot, and they send

12  you one.  And then, of course, many other states have early

13  voting.

14         So all of those things, in combination, lead to higher

15  voter turnout.  And here in Mississippi, we don't have those,

16  and so we have lower turnout consistently.

17  **Q**.    Thank you.

18         Dr. King, in your report, during the course of discussing

19  civil rights era legislation, you mentioned how the different

20  political parties responded to that legislation.  Could you say

21  more about that?

22  **A**.    So if I can put a date on it, in the 1948 Democratic

23  National Convention, the Democratic Party made a concerted

24  effort to become the party of civil rights.  And there was a

25  distinct rejection of that by the Mississippi delegation.

*King - Direct*

1    One of the delegates from South Carolina -- his name was

2 Strom Thurmond, and he led a walkout during one of the speeches

3 by Hubert Humphrey, who would later become a vice president.

4 And they said, "No, we don't want the Democratic Party to be

5 the party of civil rights."

6    So Strom Thurmond ran for president under the State's

7 Rights Independent Party.  The reason this is important is

8 that, in 1964, Strom Thurmond switched parties, and he became a

9 Republican because he said, "The Republican Party is the party

10 of states' rights.  Democratic Party is the party of civil

11 rights."

12    This is one of those key moments when we begin to see

13 this realignment of partisanship of Southern Whites away from

14 the Democratic Party into the Republican Party, and we see

15 Blacks abandon the party of Lincoln full sail and become

16 Democrats.

17 **Q**.    Your report also discusses the significance of the race

18 of political candidates in the context of comparing the support

19 among White voters for John Kerry versus Barack Obama.  What's

20 the significance of that comparison?

21 **A**.    We consistently see, even in cases where Black Democrats

22 win, that there's support from White voters, even what we would

23 call "co-partisans."  So they may not all be Democrats.  But

24 you tend to see less support among White Democrats for Black

25 candidates, even if that Black candidate still manages to win.

*King - Direct*

1  And so this is what I showed in the Louisiana case earlier, for
2  instance.

3  And so, you know, here in Mississippi, support among
4  White voters was lower for Obama than it was for John Kerry,
5  for instance.  They both lost, but Obama did relatively worse
6  among White voters here in the state.

7  **Q.**  And on page 25 of your report, as part of that
8  discussion, you note the impact of President Obama's election
9  on racial polarization in Mississippi.

10  Did racial polarization increase or decrease in
11  Mississippi after President Obama's campaigns?

12  **A.**  It increased.

13  **Q.**  To what extent does that tell you anything about whether
14  the race of a candidate matters in elections in Mississippi?

15  **A.**  It matters significantly.  As a political scientist, race
16  is so important that, when we're putting together our datasets,
17  the first variable is race.  It's always race.  You want to
18  know the race of the voters.  You want to know the race of the
19  candidates.  It's always the most predictive and valuable
20  indicator.

21  **Q.**  And when you say that the race of the candidate matters,
22  does that mean that Black voters always prefer a Black
23  candidate over a White candidate?

24  **A.**  No.  There's lots of reasons why Black voters might
25  choose a White candidate.  You have lots of

1  election-specific and candidate-specific factors.  We talked

2  about something known as candidate viability, candidate

3  quality.  So Black voters, White voters, they are going to look

4  at a candidate's experience, their ability to raise money,

5  their background.

6      And you might have unqualified Black candidates who can't

7  raise much money, who are maybe what we call "perennial"

8  candidates.  They put their name on every ballot.  People may

9  not take them seriously, Black or White, and so Blacks may not

10  choose them.

11      So there is no doubt Blacks vote for White candidates;

12  they vote for Black candidates.  But, nonetheless, race still

13  is extremely significant.

14  **Q.**  Okay.  Thank you.

15      So let's turn and focus on Senate Factor 6.  Could you

16  briefly remind us what Senate Factor 6 is about?

17  **A.**  Sure.  So this is whether political campaigns have been

18  characterized by overt or subtle racial appeals.

19  **Q.**  And what conclusion did you reach as to Senate Factor 6?

20  **A.**  In Mississippi, political campaigns have been

21  characterized by overt and subtle racial appeals.

22  **Q.**  And what exactly is a racial appeal?

23  **A.**  A racial appeal is signaling to potential voters that a

24  candidate has preferences or beliefs revolving around race, and

25  they are trying to signal to voters that they are in alignment

*King - Direct*

1  or agreement on their attitudes and values as it relates to

2  race.

3  **Q.**  And, in general, have you come across racial appeals that

4  rely on negative racial stereotypes?

5  **A.**  Yes.

6  **Q.**  What are some common stereotypes about Black candidates

7  or Black voters that you have observed to be used in racial

8  appeals?

9  **A.**  So, typically, these would be stereotypical tropes

10  related to criminal justice, welfare.  You know, those are

11  probably the two most common.

12      And when we say "welfare," the idea that someone is

13  either bilking the system, that they're undeserving.  There's a

14  lot of political science research about the deserving and

15  undeserving.  And so anything that kind of plays off that trope

16  of people are not deserving of -- of being in that position or

17  that they have somehow abused the government in some way.

18  **Q.**  And you discussed that there are overt appeals and

19  implicit appeals.  What is the purpose of using an implicit

20  appeal as opposed to an overt one?

21  **A.**  So it's evolved.  It's evolved.  We are past the days of

22  Strom Thurmond and George Wallace where you can run an overt

23  racialized campaign.  That's unlikely to be successful.

24      And so we have moved to what the research considers to be

25  uses of implicit appeals, also known as "dog whistle politics."

1  They'll use coded messages.

2  So they might refer to welfare.  They might refer to
3  urban or inner city or ghetto.  The implication is they're
4  referring to Black, but they don't say Black.  So they'll use
5  those terms to get out -- to make that message or intention
6  clear.

7  **Q.**   And in talking about implicit racial appeals, your report
8  cites an individual named Lee Atwater.  Who is Lee Atwater, and
9  what is his relevance to this discussion?

10 **A.**   So he was an important policy and campaign director in
11 the Ronald Reagan White House, and there's this very
12 illuminating interview he gave where he talked about this
13 evolution of racial appeals and how you can't use overt racial
14 terms anymore.  That's not going to work.  People are too
15 sophisticated for that now.  But -- so, instead, you have to
16 talk about race in a different way.

17 So as he says here, "Now you are talking about cutting
18 taxes, and all these things that are economic, and a byproduct
19 of them is Blacks get hurt worse than Whites."  The idea is to
20 send a signal to voters that they are going to pick up on and
21 let them know that, you know, here's my true preference points.
22 I can't say it out loud, but here's what I want.

23 **Q.**   So let's dig into a few examples of racial appeals.  On
24 page 16 of your report, you cite an example of a racial appeal
25 by a person named Lester Carpenter from 2015.  Who is Lester

*King - Direct*

1  Carpenter?

2  **A.**   He's a state representative from Tishomingo County.

3  **Q.**   And did you review the video of Representative

4  Carpenter's remarks that you believe to be a racial appeal?

5  **A.**   Yes, I did.

6  **Q.**   Is the video embedded on a slide that you see on the

7  screen here?

8  **A.**   It appears it is, yes.

9          **MR. CHEUNG:**   Your Honor, the video of Representative

10 Carpenter's remarks were previously marked as PX-74, and it's

11 part of this slide here.  We would request permission to play

12 an excerpt of the representative's remarks.

13         **THE COURT:**   You may do so.

14         **MR. CHEUNG:**   Thank you.

15     (PLAYING VIDEO, EXHIBIT NO. PX-74.)

16         **MR. CHEUNG:**   Pause that.

17         Your Honor, just for clarity of the record, we played

18 Exhibit PX-74 starting from the three-minute mark of

19 Representative Watson's remarks.

20 **BY MR. CHEUNG:**

21 **Q.**   Dr. King, what did we just hear from Representative

22 Carpenter?

23 **A.**   That, to me, sounded like a racial appeal, specifically

24 because he called out the race of the jurist.  So it sounded

25 like, A, he seemed to have an issue with the role of the

*King - Direct*

1　judiciary; but, B, the fact that he mentioned the hypothetical

2　race of a judge and also that he hypothetically -- not

3　hypothetically -- that he -- out of all of the towns to mention

4　in Mississippi, he mentioned Rolling Fork, which is in the

5　Delta, predominantly a Black community, you know, to me, that

6　would be an example of a racial appeal.

7　**Q.**　Do you know if Representative Carpenter is still serving

8　in the legislature today?

9　**A.**　He is.  District 1.

10　　**MR. CHEUNG:**  Your Honor, plaintiffs would also offer

11　the video itself, PX-74, into evidence.

12　　**THE COURT:**  Any objection?

13　　**MR. COWAN:**  Your Honor, I would object to it as

14　hearsay.

15　　**THE COURT:**  I'm sorry?

16　　**MR. COWAN:**  I object to it as hearsay.  I don't know

17　of any exception to hearsay of Representative Carpenter giving

18　a speech.  He is not here in court.  He is not testifying.

19　　**MR. CHEUNG:**  Your Honor --

20　　**THE COURT:**  It will be overruled.  It's not offered

21　for the truth of the matter other than just an example.  It

22　will be overruled and received.

23　　**MR. CHEUNG:**  Thank you, Your Honor.

24　　(EXHIBIT NO. PX-74 ADMITTED INTO EVIDENCE.)

25　　**THE COURT:**  Can I ask you something?  Initiative 42

*King - Direct*

1  was what?

2  **BY MR. CHEUNG:**

3  **Q.**   Dr. King, could you say more about what Initiative 42 was

4  about?

5  **A.**   Yes.  It was about education funding and the -- I believe

6  it had to do with the formula.

7          **THE COURT:**  Okay.  Thank you.

8  **BY MR. CHEUNG:**

9  **Q.**   So turning to page 15 of your report, you discuss Senator

10  Cindy Hyde-Smith's posting of some photos on social media.

11  What did the senator post?

12  **A.**   This is a photo of her at Jefferson Davis's museum or

13  home, and she's in Confederate garb.

14  **Q.**   And do you recall if the photos were accompanied by a

15  post that said, in part, "Mississippi history at its best"?

16  **A.**   Yes, that is what it said.

17  **Q.**   What history do you understand the Senator to be

18  referring to?

19  **A.**   This seems to refer to the Confederacy, as I mentioned

20  earlier, when Mississippi left the Union to defend the

21  institution of slavery.

22  **Q.**   Do you consider the reference to the Confederacy to be a

23  form of racial appeal?

24  **A.**   Yes, it is.

25  **Q.**   And why do you consider the use of confederate history

1 and symbols to be a form of racial appeal?

2 **A**.    Again, given the purpose of the -- of why Mississippi

3 left the Union to fight the Civil War, given -- if we skip

4 ahead to efforts in the state to change the state flag, who

5 generally supported it, who generally was against it, the use

6 of the Confederate imagery by certain racial White supremacist

7 groups when -- for instance, in 1948 when the Mississippi

8 delegation left and they joined the Dixiecrats, their -- you

9 know, Confederate Flag was their emblem.  And so there is a

10 long history of Confederate imagery being associated with

11 states' rights and anti-civil rights preferences.

12 **Q**.    Also showing on the slide here is a mailer from your

13 report depicting Representative Espy -- former Representative

14 Espy.

15 **A**.    Uh-huh.

16 **Q**.    Dr. King, why did you include this mailer as an example?

17 **A**.    So Mike Espy was indicted.  He was not convicted.  The

18 use of the bars is going to -- I would argue, for the vast

19 majority of voters, they are going to see this and believe that

20 he was, in fact, a criminal.

21      I don't know this, but I strongly believe that the

22 average person receiving this mailer is not necessarily going

23 to know what "indict" means as a legal term and that they are

24 just going to see bars and a Black man, and they are going to

25 assume that he is a criminal.  I believe that was the intent of

*King - Direct*

1 this.

2 **Q.** And does this mailer make use of any stereotypes?

3 **A.** Well, the stereotype of a Black criminal.

4 **Q.** Turning to the next example involving Senator Hyde-Smith

5 in 2018, what does Senator Hyde-Smith say in that example?

6 **A.** "If he invited me to a public hanging, I'd be on the

7 front row."

8 So this is a reference to lynchings. More Americans were

9 lynched in Mississippi than any other state during the Jim Crow

10 era. Lynchings were the primary tool of violent repression and

11 intimidation to discourage Blacks from seeking political rights

12 and political participation. So to so bleakly use that sort of

13 rhetoric, to me, is very much a racial appeal.

14 **Q.** And at the time that she made those remarks, was Senator

15 Hyde-Smith running a campaign?

16 **A.** She was running for the U.S. Senate against Mike Espy.

17 **Q.** And just for the record, who is Mike Espy?

18 **A.** He is a former congressman from the Second Congressional

19 District. He was also Secretary of Agriculture under the Bill

20 Clinton -- in the Bill Clinton Administration.

21 **Q.** And was Representative Espy Mississippi's first Black

22 congressperson since reconstruction?

23 **A.** Yes. One of two.

24 **Q.** Turning to the next example, you have a photograph from

25 2014 that's shown on Slide 30 here. Can you explain what we're

1  looking at?

2  **A.**  Sure.

3      Racial appeals, just like speech itself, can be symbols.
4  And so here we have got the Confederate Flag in the background.
5  And as I mentioned earlier in my remarks about the meaning of
6  the Confederacy, we have Chris McDaniel, who is running for the
7  U.S. Senate at the time, with a Confederate Flag in the
8  background.

9      So, to me, this is an example of a subtle racial appeal.
10  It doesn't have to be people shouting from the rooftops "Black,
11  Black, Black" to send an appeal or a signal to potential
12  voters.

13      I would also say that racial appeals -- it's a two-way
14  street.  So not only is it an appeal to some voters, but it
15  also might be a way of distancing away other supporters.  Like,
16  this is my people, sort of, that I want to vote for me, and if
17  you don't like the flag, then don't vote for me.

18  **Q.**  Turning to the next example, you have one from 2015 by
19  Representative Gene Alday.  Could you say more about what Gene
20  Alday's remarks were?

21  **A.**  Sure.

22      So he represents Tunica County, which is a majority Black
23  county -- I believe he's in Tunica, the city, which is actually
24  majority White, but then the county is majority Black.

25      And so he says here, "I come from a town where all the

1  Blacks are getting food stamps and what I call 'welfare crazy

2  checks.'"

3       So, again, to me, this is an example of a subtle appeal

4  about, you know, I come from a place where Black people are on

5  welfare.  That's what they do.  They are getting all of these

6  crazy welfare benefits.  The implication is maybe that they are

7  undeserving and that they may be exploiting the state.

8  **Q.**   You also have an example from Representative Karl Oliver.

9  What was Representative Oliver's remarks, and how do you view

10 it?

11 **A.**   So he says, "If those behind the removals" -- and here we

12 are talking about Confederate statuary -- "want to burn books

13 or destroy historical monuments of our history, they should be

14 lynched."

15      So, again, to everything else I have said about lynching

16 and knowing that the targets of lynchings were Blacks who were

17 pushing for civil rights or in some way violated the racial

18 status quo or even their White allies, but it was always those

19 who were -- it was almost always those who were supporting the

20 civil rights.

21      And, you know, we have a history of anti-lynching

22 legislation being opposed on the basis of states' rights or

23 it's violating state sovereignty.  And so this tends to be

24 antithetical to civil rights.  So that's a -- to me, a very

25 strong racial appeal.

*King - Direct*

1  **Q.**   Now, your report also cites 2019 remarks from
2  Representative Mark Baker about the Voting Rights Act.  Could
3  you explain that example to us?

4  **A.**   Well, he said that the Voting Rights Act was a violation
5  of state sovereignty.

6       So I teach a class on federalism, and that's interesting
7  because, of course, no -- no law can pass Congress without
8  going through the U.S. Senate.  And that's relevant because, of
9  course, each state has equal representation in the senate, you
10  know.  So unless a majority of states have approved it, you
11  know, via their representation in the senate, you know, it
12  couldn't have happened.

13       So that, to me, is a very similar sort of coded messaging
14  we've heard for a long time from the anti-civil rights
15  perspective, going back to Strom Thurmond, George Wallace
16  again, Barry Goldwater, that anything that promotes civil
17  rights is an automatic violation of states' rights; but, of
18  course, that also ignores, then, the rights that individuals
19  have.

20  **Q.**   So turning to racial appeals specifically in judicial
21  elections, were racial appeals used against the first Black
22  justice, Justice Reuben Anderson?

23  **A.**   That's right.

24       So his opponent claimed that, you know, Reuben Anderson
25  was a quota maker.  This is important -- if I could just pause

*King - Direct*

1   here -- because, during the 1980s, this is when affirmative

2   action was a very important and prevalent public policy issue.

3   And so the idea of quota makers, the implication was that

4   undeserving Whites -- Blacks were taking White jobs and that

5   Whites were burdened by Blacks advancing.  So that's the

6   specific value of this term "quota makers."

7   And then he says he is "running against reserving a seat

8   on the Mississippi Supreme Court for the NAACP."  NAACP, of

9   course, is the nation's oldest civil rights organization that

10  has a long and distinguished history of arguing for civil

11  rights cases in front of the court, especially the supreme

12  court.  And so the implication is that the NAACP or any

13  affiliation with it, it's disqualifying to serve on the Court.

14  And so that's a very subjective argument to make that,

15  Oh, you can work for any other prior organization or have

16  anything else in your professional background, but if you've

17  worked for the NAACP, that's disqualifying.

18  **Q**.   Let's turn to the campaign against Justice Fred Banks,

19  the second Black justice on the Mississippi Supreme Court.

20  The Court has heard testimony on this photograph before.

21  So, just briefly, Dr. King, what did you observe in terms of

22  the ad against Justice Banks?

23  **A**.   So I don't know if judges are the same as professors.  We

24  like to have our titles in front of us.

25  And so we see here with Fred Banks that his title is not

1   used, and, you know, it's an earned honorific.  And so to not

2   have that title used is, I believe, both misleading and

3   insulting to Fred Banks.  And by putting Judge Chet Dillard, he

4   is giving the implication that he is actually the incumbent

5   when it's the other way around.

6       And then also Fred Banks's face is -- the image is

7   darkened to make him look darker.  And so judicial races are

8   nonpartisan.  There is no law requirement that says you have to

9   have your image in any campaign material, but Dillard said he

10  did, and I think he wanted to inject race into the race -- into

11  the campaign.

12  **Q.**   Let's turn to the campaign against Justice James Graves,

13  the third Black justice on the Mississippi Supreme Court.

14      Were any racial appeals used against him?

15  **A.**   Sure.

16      So this phrase "one of us" has, in fact, been accepted by

17  a three-judge federal court that the use of that phrase

18  specifically is a clear racial appeal because it is sending a

19  signal to voters that "us" is a distinct group.  And the

20  implication then is that the right "us" was this White opponent

21  and the wrong "us" was this Black justice.

22      And so "one of us" is -- in a lot of different

23  literature, both in political science, political psychology,

24  sociology, we talk about "others," this concept of the "other."

25  And so Graves's opponent was trying to say that Graves is an

*King - Direct*

1  "other."  He is not one of us.  He is somehow different.  And
2  in the context of this race at this time, the unwanted "other"
3  meant Black.

4  **Q.**  Let's look next at Judge Latrice Westbrooks's campaign in
5  2020.

6  **MR. COWAN:**  Your Honor, I'm going to state an
7  objection to Dr. King's testimony on this.  This wasn't
8  anywhere in his report.  This particular racial appeal was
9  nowhere discussed in his report.  All of the other ones today
10  have been, but this one was not.

11  **THE COURT:**  You're speaking of Graves's has not?

12  **MR. COWAN:**  The next slide, which deals with a PAC ad
13  relative to Judge Latrice Westbrooks.

14  **THE COURT:**  Okay.  Was this included in the report?

15  **MR. CHEUNG:**  No.  This ad was marked as PX-146, and it
16  was admitted into the record a couple of days ago.  I'm just
17  showing it to Dr. King to ask him for his opinion on it.

18  **THE COURT:**  Already in the record?

19  **MR. CHEUNG:**  Yes.  This exhibit is already in the
20  record.

21  **THE COURT:**  It's overruled.

22  **BY MR. CHEUNG:**

23  **Q.**  Dr. King, this slide here contains an image from PX-146.
24  Can you describe to us what you are seeing here?

25  **A.**  So, specifically, those bullet points, I guess, diverting

1  funding to criminal defendants, questionable criminal justice

2  reform, judicial neutrality, the implication is -- is that she

3  is pro-criminal.  So I believe, again, this is tying into the

4  stereotypical trope of Black support on -- Black attitudes

5  toward crime but also that she would not be able to be

6  objective in her rulings.

7  **Q**.    Dr. King, based on your understanding of elections and

8  campaigns, what is the purpose of using a racial appeal?

9  **A**.    So the first thing they teach you in government and

10  political science is the number one goal of elected officials

11  is reelection.  And this is regardless of office, and this is

12  regardless of district.  So the number one goal is reelection.

13       So campaigns and candidates are going to make appeals to

14  voters that will help them get more votes.  They might also

15  make appeals to voters that might dissuade other people from

16  participating.  So candidates will not make these racial

17  appeals unless they feel that there's an audience for them and

18  it will help with their reelection prospects.

19  **Q**.    I believe earlier you alluded to the effects of racial

20  appeals on different audiences.  Could you say more about that?

21  **A**.    Sure.

22       So candidates in campaigns, they want to encourage their

23  voter base to come out in large numbers, anything to help them

24  get over the threshold required to win.  And so these racial

25  appeals are going to appeal to different groups differently.

1  For some White voters, these appeals might galvanize them to
2  vote where they would not otherwise vote, and for some Black
3  voters, these appeals might discourage them from voting.

4      Given what the earlier witness, Mr. Kirkpatrick,
5  testified on the large number of unopposed elections but also
6  our low voter turnout, these racial appeals very much play into
7  why we get the turnout that we get.  These also can affect the
8  sort of candidates you get.

9      So looking specifically here at the supreme court, you've
10  had five Black supreme court justices, and I was able to
11  identify four that had racial appeals thrown at them.  So if
12  I'm a potential supreme court justice candidate and I know that
13  80 percent of Blacks who ran before me had to deal with racial
14  appeals, that might very well dissuade me from running, making
15  me think that I don't want to have to go through that to get
16  elected, and there's a high probability that I'm going to have
17  to deal with these racial appeals.  So there can be a lot of
18  immediate but also downstream effects of the use of racial
19  appeals.

20      It also, I think, speaks to the political culture in the
21  state that these sort of appeals are repeated.  And we see them
22  in a variety of different races; right?  Judicial races but
23  also legislative races and federal offices; right?  So it's not
24  just limited to a small corner of Mississippi and county
25  commissioner races; right?  This is widespread and consistent

1 over decades and decades.

2 **Q.** And based on what you know about racial polarization, is
3 there a relationship between the use of racial appeals and the
4 level of racial polarization in Mississippi?

5 **A.** There is no doubt that there is a -- when we look at who
6 is using these and which candidates they're directed at, that
7 there is a linkage as it relates to polarization, you know. So
8 when we, again, think about what racial polarization is, which
9 is the majority of one race voting against the majority of
10 another race, these racial appeals are going to help entrench
11 that polarization.

12 **Q.** Dr. King, could you just go over a brief summary of your
13 conclusion as to Senate Factor 6.

14 **A.** Sure.

15 So racial appeals do continue to pervade Mississippi
16 politics, including judicial elections. And these appeals
17 signal to racially conservative voters and reinforce racial
18 polarization.

19 **Q.** If we can turn next to Senate Factor 7.

20 Dr. King, could you remind us what Senate Factor 7 is
21 about.

22 **A.** Of course.

23 The extent to which members of the minority group, in
24 this case, Black Mississippians, have been elected to public
25 office in the jurisdiction.

*King - Direct*

1  **Q.**  And what is your overall opinion as to Senate Factor 7?

2  **A.**  There's definitely evidence that the ability for Black

3  Mississippians to get elected has limits here in the state.

4  **Q.**  And, in general, how well do Black candidates do outside

5  of Black majority districts?

6  **A.**  They do not do well at all.  They do poorly, abjectly

7  horrible.

8  **Q.**  Let's look at statewide elections.  Was there a period of

9  time when Black candidates were able to win statewide office in

10  the past?

11  **A.**  Prior to the 1890 Constitution, during that brief period

12  when the state was governed by the 1868 Constitution and also

13  during reconstruction and there was a presence of Union troops

14  here.

15  **Q.**  When was the last time a Black person has been elected to

16  statewide office in Mississippi?

17  **A.**  1875, Blanche Bruce.  He served until 1881 in the U.S.

18  Senate.  So 140 years ago, something like that.

19  **Q.**  Let's turn next to representation in Congress for

20  Mississippi.  How many Black Mississippians have served in

21  Congress since the end of reconstruction?

22  **A.**  Two.  Mike Espy and Bennie Thompson.

23  **Q.**  And were Representatives Espy and Thompson elected from a

24  majority Black district?

25  **A.**  Yes, they were.

*King - Direct*

1 **Q.** Was it the same district?

2 **A.** Yes. Yes, it was. The area comprising what is commonly

3 referred to as the "Mississippi Delta."

4 **Q.** And if we look at Mississippi history in total, how many

5 Black Congress members have been elected for Mississippi,

6 including the reconstruction era?

7 **A.** We've had 5 out of 130, which is roughly 3.2 percent.

8 **Q.** And based on your work in the Mississippi *NAACP* case, are

9 you aware of underrepresentation in terms of Black legislators

10 in the state house and senate?

11 **A.** Yes. The case I testified on in earlier this year, the

12 three-judge district panel did rule that there had been Black

13 vote dilution in the Mississippi legislature.

14 **Q.** Turning to underrepresentation on Mississippi's highest

15 court, how much success have Black candidates had getting

16 elected to a Mississippi Supreme Court?

17 **A.** So I think that should be qualified because all four were

18 first appointed before they then were elected on their own

19 right. So in the absence of the beneficence of the sitting

20 governor, we would not have seen any get elected first. So

21 they all had to have been appointed first.

22 So just 4 out of 125, and all of them have been selected

23 to the same Supreme Court District 1, Place 1, same seat. So

24 we have had 4 consecutive Black justices on one seat going back

25 to the 1980s; so for about 40 years now.

*King - Direct*

1  **Q.**   And I apologize if you have already mentioned this, but

2  approximately how many justices have served on the highest

3  court in Mississippi?

4  **A.**   So 125.  And 4 have been Black.

5  **Q.**   Dr. King, can you please turn to Tab 111 in your binder.

6  Do you see what's been marked as PX-111?

7  **A.**   I do.

8  **Q.**   And, Dr. King, do you recognize PX-111?

9  **A.**   Yes.

10 **Q.**   What is it?

11 **A.**   This is a list of supreme court justices since 1965.  It

12 includes their race and their method of appointment.

13 **Q.**   And is PX-111 accurate to your knowledge?

14 **A.**   To my knowledge, yes, it is.

15       **MR. CHEUNG:**  Your Honor, plaintiffs offer PX-111 as a

16 summary table of Mississippi's Supreme Court justices and their

17 method of selection from 1965 to the present under Federal

18 Rules of Evidence 1006.

19       **THE COURT:**  Any objection?

20       **MR. COWAN:**  No objection, Your Honor.

21       **THE COURT:**  It will be received.

22     (EXHIBIT NO. PX-111 ADMITTED INTO EVIDENCE.)

23       **MR. CHEUNG:**  Ms. Cami, could you please pull up

24 PX-111.

25 **BY MR. CHEUNG:**

*King - Direct*

1 **Q.** Dr. King, does PX-111 start in the present and work
2 backwards chronologically?

3 **A.** Yes.

4 **Q.** Looking at the first page of the exhibit, who is the most
5 recent Black supreme court justice?

6 **A.** Justice Leslie King, who was appointed by Governor
7 Barbour starting in 2011.

8 **Q.** And let's look down until we get to the Black justice
9 preceding Justice King. Who would that be?

10 **A.** Sure.

11 So it looks to be a ten-year increment. And here we have
12 Justice James Graves appointed by Governor Musgrove starting in
13 2001.

14 **Q.** And let's turn to the next page. Who is the next Black
15 justice preceding Justice Graves?

16 **A.** Justice Fred Banks appointed by Governor Ray Mabus in
17 1991. And then, prior to that, you had, in 1980 -- let me make
18 sure I got it right here -- 1985, Justice Reuben Anderson
19 appointed by Governor Bill Allain in, yeah, 1985.

20 **Q.** And would those four justices be all of the Black
21 justices who have served on the Mississippi Supreme Court?

22 **A.** That is the totality of Black service on Mississippi
23 Supreme Court.

24 **Q.** And based on the count you just did, are there any Black
25 justices who have joined the bench without first being

*King - Direct*

1  appointed?

2  **A**.  No.  That seems to be the only way.  I would just say, in

3  political science, we look at trends.  We don't make a whole

4  lot of hay in political science about one election or one

5  district because sometimes those are just one-off outliers.  We

6  look at the long-term trends.  The long-term trend is that

7  never has a Black justice, their method of appointment, been

8  election first.  It's never happened.

9  **Q**.  Let's go back to page 1 of PX-111.

10  Dr. King, based on what you see here in PX-111, have

11  there been White supreme court justices who have joined the

12  bench without first being appointed?

13  **A**.  Several, yes.

14  **Q**.  Who are some of the examples of White justices who won

15  their election without initial appointment?

16  **A**.  Sure.  So I'll just do three here.  2017, you had Robert

17  Chamberlin.  2013, you have Justice Josiah Coleman.  And in

18  2009, you had James Kitchens, Justice James Kitchens.

19  **Q**.  Are there additional justices in this exhibit following

20  that pattern?

21  **A**.  There are several, yes.  So the pattern, the trend is

22  different for White justices than it is for Black justices.

23  **MR. CHEUNG:**  Ms. Cami, can we please go back to the

24  PowerPoint.

25  **BY MR. CHEUNG:**

*King - Direct*

1  **Q.**  Dr. King, Slide 44 here shows a table, Table 2 from your

2  report.  What do you show in this table?

3  **A.**  So these are supreme court elections involving a Black

4  candidate.

5  **Q.**  So does this table show the four Black justices we just

6  talked about who have served on the supreme court?

7  **A.**  Yes, it does.

8  **Q.**  Does it also show three candidates -- three Black

9  candidates who have run for a supreme court seat and then lost?

10  **A.**  That is correct.

11  **Q.**  And who are those three?

12  **A.**  So we have Earle Banks in 2012.  You have Michael Shareef

13  in 2016.  You have Latrice Westbrooks in 2020.

14  **Q.**  And were Banks and Westbrooks in District 1?

15  **A.**  Yes, they were.

16  **Q.**  What district was Shareef from?

17  **A.**  District 2, Place 2.

18  **Q.**  So you mention place.  You have a column here for

19  "Place."  What does that refer to?

20  **A.**  So with each of the supreme court districts, there are

21  three places.  So there is a total of nine supreme court

22  justices.

23  **Q.**  Do you notice any patterns in terms of the place number

24  and the race of the judge holding the seat?

25  **A.**  The pattern I see is that all four Black justices that

*King - Direct*

have ever served on the Mississippi Supreme Court all are from

District 1, Place 2.

**Q**.    And what happens when a Black candidate runs for a

different place?

**A**.    They do not win.

**Q**.    And based on what you know of elections and political

science, what effect, if any, does a prior appointment have on

a candidate's electoral prospects?

**A**.    So the best factor, the best predictor of reelection is

incumbency.  And so once appointed, your ability to get

reelected is greatly -- to get elected, reelected is greatly

increased.

So without the incumbency advantage, the judicial

literature in political science shows fairly conclusively that

judicial elections are a low-information environment.  Most

voters don't know much about judicial elections, especially

when they are nonpartisan.

Partisanship is a cue to voters.  If they know you are an

"R" or a "D," then they know something about you, but in

nonpartisan elections, they don't know that.

So then incumbency becomes the next most valuable cue.

And that's very valuable.  We see incumbents reelected at much

higher levels than challengers for all levels of election.

And so being an incumbent is a signal to a lot of voters

that, if this justice was really awful or terrible, I would

*King - Direct*

1 have heard about it in the media.  But unless I have heard

2 something in these low-information environments, I am going to

3 vote for the incumbent.

4     But as we see here, in Mississippi's history, only four

5 Blacks have, you know, received that "privilege," I suppose is

6 one way of putting it.

7 **Q.**    And specific to supreme court elections in Mississippi,

8 what kind of benefit do Black candidates receive by being

9 appointed by a White governor, in your view?

10 **A.**    Well, it's just going to make their ability to get

11 reelected possible, but, otherwise, without it, they just

12 wouldn't serve.  We just don't have -- there is no evidence

13 that Blacks can win otherwise.  That's the trend.

14 **Q.**    And what practical effect, if any, does that reliance on

15 a gubernatorial appointment have on Black voters' ability to

16 elect their preferred candidate?

17 **A.**    Well, so this is interesting because Black voters, all of

18 the evidence suggests, certainly since the last four or five,

19 six election cycles, their preferred candidate for governor has

20 lost.  And so, effectively, the ability for Black voters to

21 have any say in who the justices are via the gubernatorial

22 appointment process is very limited because their preferred

23 candidate is not winning.

24 **Q.**    Your report also summarizes on election results for

25 public service and transportation commissioner --

1 **A.**　　Yes.

2 **Q.**　　-- elections in District 1.  What is your conclusion as

3 to the ability of Black commissioner candidates to get elected

4 from District 1?

5 **A.**　　My conclusions there are the same as with the supreme

6 court.  You have a grand total of one Black who has been

7 elected to the public service commission and one elected to the

8 transportation commission.

9 　　　　From a political science perspective, those are outliers.

10 You know, you need to see something happen over multiple

11 election cycles in multiple districts and places to raise

12 evidence that the trend has changed.  Otherwise, the trend is

13 what the trend is.

14 　　　　And, you know, in statistics, you just say it's an

15 outlier.  And outliers happen sometimes.  So, anecdotally, you

16 can say, "Oh, Blacks can get elected.  Things are different

17 now."  It just means that one Black has achieved it.  That's

18 not a trend.  That's a singular outlier.

19 **Q.**　　At the time that you wrote your report, Commissioner

20 Simmons had won as a Black candidate in 2019; is that right?

21 **A.**　　I believe so, yes.

22 **Q.**　　Since then, Commissioner Simmons has been reelected, and

23 Commissioner Stamps has been elected in 2023.  Do those

24 election results change your conclusion as to the electoral

25 opportunity for Black candidates in District 1?

*King - Direct*

1   **A.**   No.  You know, Simmons then had the advantage of

2   incumbency, which I talked about earlier; and then Stamps, we

3   have seen him get elected.  Again, until we see multiple Blacks

4   get elected in multiple districts and places, what you are

5   looking at are individual outliers.

6   **Q.**   Do you know if commissioner elections are partisan in

7   Mississippi?

8   **A.**   Yes, they are -- I believe they are.  If I'm wrong,

9   someone will correct me.

10  **Q.**   Are judicial elections for the supreme court partisan or

11  nonpartisan?

12  **A.**   Nonpartisan.

13  **Q.**   Based on your scholarship and work in this case, why

14  don't Black candidates get elected with greater frequency in

15  Mississippi, in your view?

16  **A.**   There's lots of reasons.  I think most relevant to this

17  particular case is the way the district lines are drawn.

18          As I talk about in a later senate factor, by bisecting

19  the Mississippi Delta, the district lines are not drawn in a

20  way conducive to Black opportunity.  We know voter turnout is

21  depressed if voters believe, regardless of who the candidates

22  are, that their preferred candidate is going to lose because

23  the districts are drawn in such a way that they are at a

24  significant numerical majority.  We know that that depresses

25  turnout.  We see that across the country.

1    And this can affect both Republican voters and Democratic

2  voters, both Black voters and White voters.  That -- how the

3  district lines are drawn itself affects turnout.

4  **Q.**   Earlier you had testified to the high cost of voting --

5  **A.**   Uh-huh.

6  **Q.**   -- in Mississippi.  Does the high cost of voting affect

7  Black and White voters equally in Mississippi?

8  **A.**   It doesn't.  So Black voters, minority voters in

9  particular, Black voters especially here in Mississippi, are

10  especially burdened.

11    So the best predictors of voter turnout are education and

12  income.  Blacks have lower levels of educational attainment,

13  lower levels of income.  They are going to vote less.  They are

14  more likely to have jobs that are hourly wages as opposed to

15  salary, and so they are more likely to have financial burdens

16  that they are going to have to contend with when it comes to

17  vote.

18    And, then, as I mentioned earlier, the lack of early

19  voting deprives Black Mississippians ways to vote that might

20  exist in other states, just as an example.  And so the cost of

21  voting does have a disproportionate effect on Black

22  Mississippians.

23  **Q.**   And given the fact that cost of voting had a disparate

24  impact on Black voters, do those policies affect the number of

25  Black residents you need in a district in order to create an

1  electoral majority for Black voters?

2  **A.**   Yes.   Again, the evidence overwhelmingly supports the

3  idea that the larger the district, geographically speaking and

4  in terms of population, the more difficult it will be for

5  Blacks to win unless the district has a Black majority.

6        So if you look at our congressional delegation, for

7  instance -- I'm mentioning this just because it's come up

8  already -- Mike Espy and Bennie Thompson representing the same

9  district that largely contains the area known as the Delta,

10  there you are able to see Blacks get elected, but in the other

11  districts, we have not seen Blacks get elected, ever.   And

12  because of that -- sorry.   This is political science.   I've got

13  to say it.   Because of that, it really affects candidates who

14  run.

15        When -- there's a lot of research on the decision to run

16  for office, and the ability to have a district that you can

17  win, that even exists, drives a lot of candidate

18  decision-making.   And so if the district itself is not

19  conducive, you just have a lot of qualified people who just

20  choose not to run.

21  **Q.**   Could you give us a brief recap of your opinion as to

22  Senate Factor 7.

23  **A.**   Sure.   So Black candidates in Mississippi fare poorly

24  outside of majority Black districts because of

25  racially-polarized voting.   Black Mississippians are

*King - Direct*

1  underrepresented in public office across the board, in

2  significant part due to the state's failure to create districts

3  with a majority minority population.

4      **MR. CHEUNG:**  Your Honor, I'm happy to proceed to

5  Senate Factor 8, but we can also take a break here.

6      **THE COURT:**  Let's take a break.  All right.  We'll be

7  in recess for 15 minutes.

8      (RECESS TAKEN.)

9      **THE COURT:**  You can continue.

10      **MR. CHEUNG:**  Thank you, Your Honor.

11  **BY MR. CHEUNG:**

12  **Q.**  Dr. King, before we get into Senate Factor 8, there was

13  just one part of your other testimony where I may have

14  misheard, but for clarity of the record, I would like to

15  briefly revisit.

16      Towards the end of the discussion of racial appeals in

17  supreme court elections, you mentioned that four out of five

18  had faced racial appeals during their campaigns.

19      Do you recall that?

20  **A.**  Yes.

21  **Q.**  Was five referring to the number of Black candidates for

22  supreme court who had faced opposition in District 1?

23  **A.**  Yes.  Some of them were uncontested once they were

24  running for reelection but in the contested races, yes.

25  **Q.**  Okay.  Thank you.

*King - Direct*

1    So on to Senate Factor 8, could you briefly remind us
2    what Senate Factor 8 is about?

3    **A.**    Sure.  So this is whether or not the political system is
4    responsive to the particular needs of a minority group.

5         **MR. CHEUNG:**  Sorry.  We're having some technical
6    difficulties.  There we go.

7    **BY MR. CHEUNG:**

8    **Q.**    Dr. King, at a high level, what particularized needs do
9    Black Mississippians have as a group?

10   **A.**    So this is where we look at some of the more obvious
11   disparities on policy outcomes.  So, for instance, educational
12   attainment, health care outcomes, income and wealth.  There's
13   many others, but those would be, at a high level, three
14   important examples.

15   **Q.**    So turning, first, to education, what challenges do Black
16   Mississippians face as a group in education?

17   **A.**    So Mississippi public schools remain segregated, in fact.
18   And so the funding mechanism for schools in the states, we have
19   seen a long-term trend for the state legislature not to fully
20   fund public schools as required under state law.

21        And so because a majority of Mississippi's public school
22   students are Black students, this is going to have a
23   disproportionate impact on them.  So as an example, in the
24   entire state, there is one majority Black school district that
25   is rated as an A in Clinton, Mississippi, and the vast majority

*King - Direct*

1  are in school districts rated D or F.

2  **Q.**  Have you observed any educational disparities specific to
3  the Delta?

4  **A.**  Yes.  So as an example, the high school graduation rate
5  is lower in the Delta than in the rest of the state by about
6  nine points.

7  **Q.**  And to what extent has the State of Mississippi addressed
8  the racial disparities in education that you have identified?

9  **A.**  I'm not sure I would characterize it as having "addressed
10  the disparities."  Four times since 1997 the state has fully
11  funded public school based on the Mississippi Adequate
12  Education Plan.

13  So, again, looking at the long-term trend, the long-term
14  trend is -- it's far more likely for the state to not fully
15  fund public schools than it is to fund public schools.  So
16  these massive funding disparities have been linked to
17  educational achievement outcomes.

18  **Q.**  Have you observed a meaningful trajectory of the
19  disparities improving over time?

20  **A.**  No.  The disparities are quite constant.

21  **Q.**  Turning next to health care, are there racial disparities
22  in Mississippi in terms of health and health care?

23  **A.**  Sure.  So one issue that most people are interested in is
24  living a long time, and in the Mississippi Delta, we see that
25  you're less likely to be able to live a long life.  So the

1  mortality rates for both men and women is less in the Delta

2  than in the -- than outside the Delta.

3  **Q.**  Has the State of Mississippi failed to implement any

4  policies that could have addressed some of the racial

5  disparities in health?

6  **A.**  So the Affordable Care Act, commonly known as

7  "Obamacare," was passed in 2010.  As I have in my report, there

8  were more than 60 different specific pieces of language in that

9  law that addressed racial disparities in health care.

10  And so Mississippi, along with nine other states, has yet

11  to expand Medicaid.  The point of that was to expand health

12  care access.  The reason that is important is because health

13  care access provides more people with access to preventative

14  health care measures so that they can, in fact, live a longer

15  life.

16  Mississippi has not done this, and so the uninsured rate

17  remains higher in Mississippi and remains higher for Black

18  Mississippians.  And so Black Mississippians have less of an

19  ability than people in other states to access preventative

20  health care, and they live less.

21  **Q.**  Turning next to income, to what extent are there racial

22  disparities in income in Mississippi?

23  **A.**  So it's significant.  So Black households, on average, at

24  least when I looked it up at this point when I was writing this

25  report, about $45,000, which is 60 percent of median White

*King - Direct*

1  household income.  It's also the same with poverty.  Close to

2  19 percent of Black Mississippians are in poverty, which is two

3  and a half times the White poverty rate.

4       I would also just briefly say that this, of course, is

5  connected to the health care.  Because with less income and

6  less insurance access, it's harder for Blacks to be able to

7  access and pay for the health care that they might need.

8  **Q.**   And in terms of the Delta specifically, have you observed

9  any disparities in income?

10 **A.**   Considerable -- yes.  Considerable wages in the

11 Mississippi Delta are less than across the state by about $174

12 a week, which is roughly about 20 percent less than the state

13 overall.

14 **Q.**   And, relatedly, did you observe any wealth disparities

15 between Black and White Mississippians?

16 **A.**   Yes.  So across the country, home ownership is the number

17 one means of wealth accumulation for most families.  And what

18 we see here is that only 51 percent of Black Mississippians own

19 their home, which is far less than what we see with White

20 Mississippians.  And as a result, Black Mississippians' median

21 household wealth of 24,100 is 13 percent of White household

22 wealth.  Again, this will then play a role in health care

23 access, educational attainment, all sorts of important issues.

24 **Q.**   Is there a disparity in the rate of home ownership

25 between Black and White Mississippians?

1    **A**.    Yes.  So it's 51 percent for Blacks and 78 percent for

2    Whites.  So far fewer Mississippians are able to generate

3    wealth through home equity.

4    **Q**.    And are there any policy solutions that could help

5    address some of these income and wealth disparities?

6    **A**.    There are many policy issues that could address these.

7    In particular, one that has broad support from Black voters

8    would be increasing the minimum wage.  Mississippi does not

9    actually have a minimum wage; so we use the federal minimum

10   wage standard, which, of course, has not been raised since

11   2009.

12        And so that plays a role in lower income.  With lower

13   incomes, you're going to have lower savings rates, making it

14   harder for Blacks to own a home and accumulate wealth through

15   home ownership.

16        And then also with the education funding, we see that --

17   to the best of our knowledge, Black support fully funding the

18   school education funding formula.  The state legislature has

19   recently changed the funding formula.  As far as I know --

20   that's happened since I wrote this report, but as far as I

21   know, the actual dollars going to school has not changed to the

22   extent that it would eliminate any of these disparities.

23   **Q**.    Your report also discusses political science experiments

24   that have been run regarding responsiveness.  What does that

25   research tell you about responsiveness to Black voters?

1　**A.**　So what we see repeatedly is that constituents with

2　Black-sounding names are responded to less than constituents

3　with White-sounding names.

4　　So these are controlled experiments where researchers

5　will send messages, e-mails, mail to constituent offices.  And

6　the substance of the letters are the same.  The only difference

7　is the name.  And what we see are that constituents with

8　White-sounding names are more likely to get responded to than

9　constituents with Black-sounding names.

10　　So the conclusion is legislators are less responsive to

11　Blacks.  The exception is Black legislators.  They are more

12　likely to respond to Black constituents than White legislators.

13　**Q.**　Thank you.

14　　And have you also reviewed any research showing a

15　connection between responsiveness and voter participation?

16　**A.**　Yes.  So there's a concept known as "efficacy," and this

17　is the ability for people -- this kind of helps us explain why

18　people participate.  Efficacy means that your participation

19　matters.  And so what we see is that people are less likely to

20　participate if they believe that elected officials aren't

21　responsive to them, if they don't represent their policy

22　preferences.

23　　And so there is a lot of political science evidence

24　demonstrating that participation goes up among minority groups,

25　also among women, when they are represented by people

*King - Direct*

1 descriptively like them because there is more responsiveness.

2 **Q.** Dr. King, could you briefly recap for us your opinion as
3 to Senate Factor 8.

4 **A.** Sure.

5 So Black Mississippians, especially those in the Delta,
6 they do face disparities in education, health care, and income.

7 The State of Mississippi has failed to respond to these
8 needs. They have not -- the state has not fully funded
9 education. The state has denied expanding access to Medicaid
10 nor instituting a state minimum wage higher than the federal
11 minimum wage.

12 **Q.** And I'm turning to the final senate factor in your
13 report, Senate Factor 9. Could you remind us what Senate
14 Factor 9 is?

15 **A.** Sure. So this is whether the policy underlying the state
16 or political subdivision's use of such voting qualification,
17 prerequisites to voting, or standard, practice, or procedure is
18 tenuous.

19 **Q.** And what is your overall opinion as to the justification
20 underlying the current supreme court district lines?

21 **A.** It -- I believe it is tenuous.

22 **Q.** Your report mentions population equality as one of the
23 justifications offered for these lines. What is population
24 equality?

25 **A.** So as Mr. Kirkpatrick referenced earlier, it's the idea

1  that districts are supposed to have roughly -- within

2  parameters -- accepted parameters, roughly the same population

3  in each district.

4  **Q.**    And in your view, does the need to maintain population

5  equality explain the current district lines?

6  **A.**    No.    It would be very easy to maintain population

7  equality with different district lines for the supreme court

8  districts, yes.

9  **Q.**    And do you have reason to believe that it's possible to

10  create a majority Black district while complying with

11  population equality requirements?

12  **A.**    Sure.    I don't think you have to look any further than

13  Mississippi's congressional districts to see how that is

14  possible.    There you've got four -- four districts instead of

15  three, but mapmakers were able to draw a majority Black

16  district and I -- yes.

17  **Q.**    Your report also talks about the Delta as a region of the

18  state.    In your opinion, does the Delta constitute a distinct

19  community in Mississippi?

20  **A.**    I think you could make a very strong and compelling

21  argument that the Mississippi Delta is one of the most

22  recognizable and cohesive political areas in the entire

23  country, much less the state, because of its unique history

24  going back to really the settling of the state but certainly

25  the Civil War and Jim Crow.

1    So its unique political history but also from a cultural

2   perspective if you think of the Delta as the birthplace of the

3   blues.  It's also worth asking why the blues were created in

4   the Delta.  And so that is a unique cultural heritage that

5   is -- that is distinctly recognizable.  I think of The Blues

6   Trail that exists here in the state.

7    And then, of course, as we just mentioned talking about

8   Senate Factor 8, all of the disparities that are more

9   pronounced in the Delta.  So then since there are a lot of

10  policy needs in the Delta that are distinct from the rest of

11  the state.

12  **Q.**   Based on everything you have reviewed related to this

13  case, are you aware of any justifications that the legislature

14  has provided for splitting the Delta community when they

15  enacted these supreme court districts?

16  **A.**   From a political science perspective, I can't think of a

17  better way to have the election outcomes we have than

18  bifurcating the Mississippi Delta.  So any justification -- I

19  have not seen any justification from the state legislature that

20  I wouldn't describe as tenuous.

21  **Q.**   Earlier today, Mr. Kirkpatrick testified that judicial

22  independence may have been a consideration in drawing the

23  current district lines.  Do you recall hearing that testimony?

24  **A.**   I do.

25  **Q.**   Based on the materials you have reviewed for this case,

*King - Direct*

1   have you seen any indication that the 1987 legislature was

2   concerned about judicial independence at the time it created

3   these districts?

4   **A.**   Honestly, I had a hard time understanding that particular

5   argument.  To me, it kind of indicates that jurists can't

6   maintain their independence regardless of how the justice --

7   how the lines are drawn.  So I -- I just didn't understand that

8   argument.

9   **Q.**   And if the goal were to maximize judicial independence,

10  would one have a system of elected judges?

11  **A.**   No.  It's -- sorry.  From a political science

12  perspective, electing judges violates the whole principle of

13  judicial independence.  That's why the federal judges are --

14  you know, this is federal.  This is checks and balances and

15  separation of powers 101 -- right? -- that you -- the executive

16  branch nominates.  The legislative branch appoints, but then

17  they serve for life specifically to be independent of the

18  branches.

19       Here, we have a system where many of our justices are

20  appointed by the executive, but then they have to run for

21  reelection.  For all elected officials, intentional or not,

22  independence is corroded when they have to raise money from

23  people that may have business in front of courts in general;

24  right?  No different than legislators also having to raise

25  money.

1   So that's not to say that judges aren't independent, but
2   the fact that they have to do this at the state level is very
3   different than our federal model.  And our federal model is
4   generally considered a great example of how to achieve judicial
5   independence.  And that's not what we do here in Mississippi.

6   So, you know, by the -- the standards as how we would
7   define judicial independence, it is not having to run for
8   reelection.

9   **Q.**   And as you understand the idea of judicial independence,
10  do you have any reason to believe that a judge elected from a
11  Black majority district would be less independent than a judge
12  elected from a White majority district?

13  **A.**   No.  I see no reason -- I wouldn't assume that just
14  because someone is elected from a Black district that they are
15  going to be beholden to Black voters any more than I would
16  expect a justice elected from a White majority district would
17  be beholden to White voters.

18  The whole assumption, to me, assumes that justices can't
19  be independent.  The issue is having to run for reelection and
20  having to raise money.  That is -- that's a critical issue that
21  is different.  But you have to trust that qualified judges, you
22  know, can adequately rule on the law.

23  **Q.**   Dr. King, could you give us a brief summary of your
24  conclusion as to Senate Factor 9.

25  **A.**   Yes.  So population equality alone can't justify this

 1 | failure to create a majority Black district.  The Mississippi
 2 | Delta is the most distinctive community of interest in
 3 | Mississippi and I think you could argue the entire country.
 4 | And the Mississippi legislature has not offered any
 5 | justification for splitting the Delta.
 6 | **Q.**   And just to wrap up, as to Senate Factors 6, 7, 8, and 9
 7 | that you have examined, how many of those four factors, in your
 8 | view, indicate that political opportunity is not equally
 9 | available to Black voters in Mississippi?
10 | **A.**   All four of them.
11 | **MR. CHEUNG:**  Thank you, Dr. King.  I have no further
12 | questions at this time.
13 | **THE COURT:**  Thank you.
14 | Cross-examination.
15 | **MR. COWAN:**  May it please the Court.
16 | **THE COURT:**  Thank you.  You may proceed.
17 | **CROSS-EXAMINATION**
18 | BY MR. COWAN:
19 | **Q.**   Dr. King, my name is Charles Cowan.  I'm one of the
20 | attorneys representing the defendants in this case.  I can say
21 | I've met you before.  And I talked to you out in the hall
22 | earlier, and I think maybe I took a couple of classes from you
23 | when I was in college.
24 | **A.**   That is -- that is correct.  I remember.
25 | **THE COURT:**  Did he pass?

*King - Cross*

1     **THE WITNESS:**  FERPA regulations prevent me from

2  responding on a student's behavior.  I can say that Charles was

3  a strong student.

4  **BY MR. COWAN:**

5  **Q.**   So your report indicated that you were going to offer

6  expert testimony on Senate Factors 6, 7, 8, and 9, and I plan

7  to ask you some questions about those factors in that order.

8     But, first, if you would, explain to me your

9  understanding -- I understand you're not a lawyer -- of the

10  *Gingles* fact -- how those senate factors play any role in a

11  Section 2 violation.

12  **A.**   Sure.  So from the *Gingles vs. Thornburg* decision, these

13  senate factors were developed as a way for courts to determine

14  if -- under the totality of the circumstances, if these factors

15  were present, there could be a violation in the sense that a

16  minority's voting rights were diluted.

17  **Q.**   So you would agree with me, in looking at each of these

18  factors, which are supposed to be objective, that you have to

19  look at what the effect of evidence of those factors might be?

20  **A.**   Yes.

21  **Q.**   All right.  And we're talking about the effect on voting

22  in the challenged jurisdiction; is that right?

23  **A.**   Yes.

24  **Q.**   And I want to talk, first, about Senate Factor 6 and the

25  racial -- the evidence of racial appeals you talked about

*King - Cross*

1  today.

2      Would you agree with me that, in the context of racial

3  appeals, the most important ones relevant to us today in

4  analyzing District 1 with respect to Mississippi Supreme Court

5  races are those that hindered the Black citizens' ability to

6  participate effectively in the political processes and elect

7  the candidates of their choice in more recent eras?

8  **A.**    So let me just restate the question to make sure I

9  understand it.  So the question is we should be most concerned

10 with recent evidence of racial appeals?

11 **Q.**    Yes.  I mean, that's the question I'm asking you.  I

12 guess if -- is evidence of more recent racial appeals, I guess,

13 more impactful on Black voters' ability right now to elect

14 preferred candidates?

15 **A.**    I wouldn't completely agree with that, and the reason is,

16 even though the supreme court seats are nonpartisan,

17 partisanship itself is -- becomes hardwired.  It becomes deeply

18 entrenched, as do our -- and this is why the polarization makes

19 a difference -- as do voters' associations of which people are

20 with which party.

21      So once those appeals are made and are connected to race,

22 then it becomes entrenched with the voters, and it just kind of

23 sits there for years and years and, in fact, generations.

24 That's why the context is so important to know how did we get

25 this racial polarization because, once it's there, then

*King - Cross*

1    additional racial appeals just kind of help further demonstrate

2    why Whites and Blacks tend to vote for different parties.

3        So, to me, the recent appeals are important, but those

4    recent appeals are just extras on top of the foundation that

5    has been laid over generations.

6    **Q.**   So I take it that's your explanation for why racial

7    appeal, for example, the mid-1980s with Justice Reuben

8    Anderson, has any impact in looking at District 1 here today?

9    **A.**   Sure.  Because what it shows me is that Black supreme

10   court justices repeatedly over time have to deal with these

11   racial appeals.  It's, you know, one after the other.  You've

12   got a very small number that you are dealing with, of course,

13   but it's, as I said earlier, four out of the five.

14       So there does seem to be this trend of Black supreme

15   court justices running in competitive seats, in fact, have to

16   deal with these racial appeals.

17   **Q.**   And I think with opposing counsel you clarified that

18   Justice King has never, to your knowledge, faced a racial

19   appeal because he has run unopposed for his seat?

20   **A.**   Correct.  That's right.  Yes.

21   **Q.**   All right.  So I think in your testimony earlier that the

22   latest racial appeal relevant to a Black supreme court justice

23   was -- running for that seat was Judge Latrice Westbrooks; is

24   that right?

25   **A.**   Correct.

*King - Cross*

1  **Q.**  And before that, you testified about a racial appeal you

2  alleged was made against Judge Graves in 2004; is that right?

3  **A.**  Correct.

4  **Q.**  And that pertained to an assertion by Judge Graves's

5  opponent that -- using the "one of us" kind of terminology; is

6  that right?

7  **A.**  That's correct.

8  **Q.**  Okay.  And you referenced an instance back in the '80s, I

9  think, where Robert Clark ran against Chet Dillard for a seat

10  in Congress where a court had found that that was an instance

11  of racial appeal?

12  **A.**  Correct.  I'm not sure if it was Clark, but, yes, that

13  appeal was made, yes.

14  **Q.**  And --

15  **A.**  And --

16  **Q.**  Go ahead.

17  **A.**  That language was used.  Whether it was that specific

18  one, I'm not quite sure.  I would have to look it up.  But,

19  yes, in general, I agree with the assertion you're making.

20  **Q.**  And I guess you pretty closely monitored the 2012

21  election between Barack Obama and Mitt Romney?

22  **A.**  I did follow it, yes.

23  **Q.**  All right.  Are you aware that President Obama ran an ad,

24  a very prominent ad, where he broadcasted in that ad that

25  Romney was "not one of us"?  Do you remember that

*King - Cross*

1   advertisement?

2   **A.**   I don't, but I'll accept your characterization of it.

3   **Q.**   All right.  In that instance, do you think that was a

4   racial appeal by President Obama?

5   **A.**   Nothing that I have said says that Black candidates may

6   not also be guilty of making racial appeals.  The issue in this

7   case is the differences when you are talking about who the

8   majority group is and who the minority group is.

9         So it's going to have different impacts when Whites are

10  the majority making that appeal as opposed to when Blacks are

11  the minority and making that same appeal.  It's going to have a

12  very different outcome -- effect on the election outcomes.

13  **Q.**   All right.  So I think that ties into your testimony

14  earlier where you said candidates make racial appeals because

15  they think they will be successful in furthering their

16  campaigns or political interests; is that right?

17  **A.**   Yes.

18  **Q.**   All right.  And so I guess you can assume that if a

19  candidate says something that you might -- someone might

20  perceive to be a racial appeal, they are doing so because they

21  think it will help them win?

22  **A.**   Yes.  If I -- if I could watch that ad, I'm almost fairly

23  certain that Obama's use of the phrase "one of us" was a

24  class-based usage as opposed to a race-based usage, if you'll

25  remember Romney's "47 percent" comment.

*King - Cross*

1    And so I think they were trying to paint Romney as an
2    economic elite who puts dogs on his roofs -- on his car when he
3    is driving across the country and he's got his elevator -- car
4    elevator in the San Diego house.  So I think that was a
5    reference to Romney's economic elitism.

6    Obama was running a class-conscious campaign.  But since
7    you brought it up, we know very much that in 2008 Obama tried
8    to de-emphasize race in much of his campaign.

9    So I would -- you can use the same exact term, but it can
10   mean different things depending on the context.  So, again, I
11   would have to see that specific ad, but, to me, placing it in
12   the context of that 2012 campaign, that would be my
13   understanding of why he was using that phrase.

14   **Q.**   All right.  So that appeal, not based on race, could be
15   based on class?

16   **A.**   I believe so.

17   **Q.**   All right.  One of your examples that you testified
18   earlier about was an October 2015 statement made by
19   Representative Bubba Carpenter to the Tishomingo County
20   Republicans where he commented on Initiative 42; is that right?

21   **A.**   Correct.

22   **Q.**   All right.  And you know where Tishomingo County is
23   geographically located in the state?

24   **A.**   Northeast Mississippi, yes.

25   **Q.**   And we are talking about extreme Northeast Mississippi?

*King - Cross*

1    **A.**    Borders Alabama and Tennessee, I believe.

2    **Q.**    So it's safe to say that county and that group he was

3    speaking to is pretty far from District 1?

4    **A.**    Well, I think he -- wait. Which -- you mean Supreme

5    Court District 1?

6    **Q.**    Yes.

7    **A.**    Because Carpenter represents House District 1.

8    **Q.**    I see your confusion there. Yes, I'm talking about

9    Supreme Court District 1.

10    **A.**    Yes, that is correct. He is very far removed from

11    Supreme Court District 1, yes.

12    **Q.**    And can you explain to me how a statement Representative

13    Carpenter made to a small group of -- I'm just going to call it

14    Tish County Republicans because I know Tishomingo County people

15    and that's what they refer to --

16    **A.**    Uh-huh -- yes.

17    **Q.**    -- Tish County Republicans had any bearing on the races

18    for seats for any of the elected positions in District 1 that

19    year?

20    **A.**    No. But he was talking about the initiatives

21    specifically, which was a statewide initiative.

22    **Q.**    Okay. And how did Bubba Carpenter's -- Representative

23    Carpenter's statement have any effect on Black citizens'

24    ability in District 1 that year to elect preferred candidates

25    of their choice?

*King - Cross*

1 **A.**    Well, it was a racial appeal.  So racial appeals don't

2 have to be successful to be made.  You know, so the senate

3 factor just asks are racial appeals made.  That's it.  The

4 senate factor, as far as I know -- that specific senate factor

5 doesn't ask for anything else other than are racial appeals

6 made.

7     So we just wanted to demonstrate that racial appeals were

8 made.  And what was -- what I thought was unique about that one

9 was that his specific references to a Black judge when I don't

10 see a reason why the race of the judge matters.

11 **Q.**    So I think we agreed earlier, though, that these factors

12 are important to examine the effect on Black voters in the

13 jurisdiction at issue -- right? -- in the geographic area we're

14 looking at that is being challenged in this case?

15 **A.**    Correct.  But I would note that, because Justice

16 Carpenter is a member of the Mississippi legislature, which

17 will have the ability to vote on the districts, if you have an

18 elected official who is casting doubt on the ability of a Black

19 jurist to independently adjudicate, then, yes, I think it's

20 very relevant that -- his attitudes towards Black jurists.

21     He may not think it's -- again, I haven't interviewed

22 him, but just based on this clip, it seems that he does not

23 think that Black jurists in Hinds County -- a supreme court

24 justice who would represent District 1, Place 1, pretty good

25 odds would come from Hinds County.

*King - Cross*

1  **Q.**   And, Dr. King, I think I can accept your premise as it

2  pertains to Representative Carpenter running for reelection in

3  District 1 to the Tishomingo County area.  I'm --

4  **A.**   But -- so -- I'm sorry.  I don't want to interrupt.

5  **Q.**   No.  Go ahead.

6  **A.**   So then that racial appeal might help Carpenter then get

7  reelected, but because he has a very real say on how these

8  districts will get drawn, that then is relevant even though it

9  might be 2- or 300 miles away.

10  **Q.**   And do you know any of the races that took place in

11  2015 -- the fall of 2015 in District 1 -- Supreme Court

12  District 1 races -- well, the public service commissioner,

13  transportation commissioner, supreme court?

14  **A.**   I would have to look it up, but if you have numbers for

15  me, I will happily accept them.

16  **Q.**   All right.  I was just curious if you knew or not.

17  **A.**   Not offhand, but -- I might have something here but, no.

18  **Q.**   The next example you used was Senator Cindy Hyde-Smith

19  taking a picture in Confederate garb.  Do you know when that

20  picture first got attention?

21  **A.**   I know she posted it on Facebook, and so it was during

22  that campaign for her first campaign for senate.

23  **Q.**   Okay.  And it's on your slideshow.  You can see -- it

24  credits what year the photo originated from.  Say it's 2014.

25  Do you have any reason to believe that that wasn't posted on

*King - Cross*

1   her Facebook in 2014?

2   **A.**   I'll take your word for it, yes.

3   **Q.**   And you just testified that you think that that

4   photograph surfaced in the runoff to her first race against

5   Mike Espy?

6   **A.**   That's when, to the best of my knowledge, the mass public

7   became more aware of it, yes.  Of course, she was secretary

8   of -- or excuse me -- agriculture commissioner; so she would

9   have had a 2015 election.  So if she posted it in 2014, she was

10  still probably using it for the same purposes, a statewide

11  election.

12  **Q.**   All right.  And do you know -- so you also testified

13  about some comments she made at a campaign event where she

14  referenced to being in the front row of a public hanging;

15  right?

16  **A.**   Yes.

17  **Q.**   And do you know in which order the general public came to

18  have knowledge of each -- the Confederate garb situation and

19  then the statement regarding the public hanging?

20  **A.**   Not offhand, no, I do not.

21  **Q.**   So do you have any knowledge that -- when the photograph

22  of her in Confederate garb was published, that it was any

23  effort by her to influence voters in her -- the election

24  between her and Mike Espy?

25  **A.**   Political scientists consider campaign Facebook pages to

*King - Cross*

1  be nothing but campaign material outreach to the mass public.

2  So as soon as it's posted, it's an effort to appeal to the

3  public.

4  **Q.**  All right.  But would it surprise you if I told you that

5  the Confederate garb photo originated from *Politico* that first

6  picked up on the four-year-old photograph after she made the

7  public hanging comments?

8  **A.**  I'll accept it.

9  **Q.**  All right.  Let's talk about her comment that she made

10  about support of a campaign event in 2018.  And you are aware,

11  I think, because you commented on it in some public arenas,

12  about a great deal of the facts surrounding that particular

13  situation, both politically and, you know, what she said and

14  those details?

15  **A.**  Yes.

16  **Q.**  All right.  And you were asked to comment upon that

17  situation a pretty good bit by some media outlets, weren't you?

18  **A.**  You know, earlier I mentioned service, and some of the

19  service we did at -- and for us specifically as political

20  scientists, reporters calling every time something happens to a

21  politician, especially election season.  They are like, "What

22  do you think about this?  What does that mean?"

23      So I have given, honestly, hundreds of interviews; so I

24  probably was asked --

25  **Q.**  Yeah.

1    **A.**    -- at the time.

2    **Q.**    Okay.  Well, that's consistent with what I know and then

3    having looked at, you know, your various comments and media

4    publications over the years as a political science professor at

5    Ole Miss.

6         Are you aware that Senator Hyde-Smith disclaimed any

7    racial intent, express or implied, in making that statement?

8    **A.**    I believe she said -- and I'm paraphrasing because I know

9    she commented a lot about this, and her campaign manager at the

10   time was another student of mine.  And he -- they put out a

11   statement saying that there was no racial animus.  Again, I'm

12   paraphrasing here.  Yes, I believe that's how she followed up

13   once this became public.  Yes.

14   **Q.**    All right.  And -- well, I think I know the answer to

15   this question, but do you believe her?

16   **A.**    Whether I believe her or not is irrelevant to whether or

17   not the appeal is made.  So I believe there is a difference

18   between racism and racial conservatism.  Those are different

19   concepts.

20        But, to me, what's important here is just strictly

21   from -- what the senate factor asks is are racial appeals made.

22   To me, the answer is yes.  She can honestly believe that it was

23   not a racial appeal, and I can accept that, but I can also

24   still accept that a racial appeal was made.  She just may not

25   define it or see it as a racial appeal.

1    And so she can honestly and sincerely believe that it was

2  not a racial appeal, and I'll accept her logic.  But from a

3  political science perspective, the why is irrelevant.  And I

4  don't think why is a factor in -- is a condition of senate

5  factors.  It's just whether or not it was made.

6  **Q.**    All right.  You testified earlier that the candidates

7  make racial appeals because they think it will help them in

8  their candidacy?

9  **A.**    That's right.

10  **Q.**    But --

11  **A.**    So she may have unintentionally made this racial appeal,

12  but it was still made.

13  **Q.**    All right.  Do you think that racial appeal, as you have

14  described it, was effective in her race against Mike Espy in

15  2018?

16  **A.**    You know, so that's an interesting question.  How much

17  any single campaign ad or speech affects voters in the

18  aggregate is complicated, and it's hard to understand how much

19  it makes.

20    So what we're looking at is, like, the general themes.

21  Does a candidate make these sorts of appeals more than once?

22  More than twice?  How is their campaign conducted?  Where do

23  they go to campaign?  Who do they speak in front of?  So you

24  put it all in context.

25    So whether that helped her win, in my formed opinion, she

1 campaigned using techniques that she thought would help her

2 win.  And, to me, that's what's important here.

3 **Q.**   Okay.  But it actually harmed her campaign, didn't it?

4 **A.**   She did not get the most positive media attention from

5 it, but that's not necessarily evidence that it harmed her.

6 And what I mean by this is you have a lot of people who

7 don't vote in every election.  They just kind of -- as our

8 earlier witness talked about, you have some who might only vote

9 sporadically.  So it's also possible that there were some

10 voters who were dormant, latent voters, and this may have

11 appealed to them to come out and vote.

12 It may have cost her some voters too, but I don't have

13 evidence of the specific efficacy in this specific instance.

14 But, to me, that's not -- again, not what the senate factor is

15 asking for.  It's are these appeals made.

16 **Q.**   All right.  You were quoted in a *Mississippi Today*

17 article in 2020 where you were asked to comment upon her race

18 with Mike Espy in 2020.  And you testified earlier you have

19 given a lot of interviews.

20 **A.**   Yes.

21 **Q.**   And I don't have to put that article in front of you

22 because I'm not going to ask you, you know, to comment upon

23 what you said except just generally.

24 Would it surprise you if I told you that *Mississippi*

25 *Today* published an article about how poor her fundraising

*King - Cross*

1   efforts were in 2020 against Mike Espy?

2   **A**.   I do remember that article.

3   **Q**.   And would you have any reason to disbelieve me if I said

4   that you commented upon how -- the effects of the comments she

5   made in 2018 had greatly hampered her ability to fundraise for

6   her 2020 election?

7   **A**.   So it may have negatively affected her ability to raise

8   funds.  It did not negatively affect her ability to win the

9   election.  And, ultimately, it's the votes that count.

10  **Q**.   Okay.  So the article you were quoted in reported that

11  she had raised less money in the 2020 campaign cycle than any

12  sitting U.S. Senator who wasn't retiring?

13  **A**.   She -- I think you could -- I mean, if we are going to

14  bring back the 2020 election, there also would have been

15  contemporaneous news stories about her efficacy as a senator

16  those first two years and that there were reasons why

17  Republican donors were reluctant.  I guess what I'm saying is

18  she wasn't -- she was raising a low amount before these; right?

19       So from a social science perspective, you could see those

20  comments as an intervening period, but I would look at, well,

21  was she at the top of the mountain raising money before the

22  comments and then she dropped off?  In fact, I think she was at

23  the bottom the whole time.  So how much these comments affected

24  her raising money -- she seemed to certainly have a problem.

25  But that quote sounds like I gave it before the actual election

*King - Cross*

1  outcome.

2      So political scientists, we can update our understanding,
3  you know, as evidence unfolds.  What I'm seeing now, now that
4  you are asking me is, well, she still won; so it didn't harm
5  her that much.  And then she's been re- -- no, I think that
6  was -- she hasn't run since.  Yeah, that was 2020.

7  **Q.**    The article you were quoted in gave a list of large
8  corporations and entities that had donated to her in 2018, some
9  of whom asked for their money back after she made those
10  comments and then did not donate to her in 2020.  Would it
11  surprise -- do you have any response to that?

12      **MR. CHEUNG:**  Your Honor, if we are going to keep
13  asking questions about the substance of that article, I would
14  ask that a copy of that article be provided.

15      **MR. COWAN:**  I can put it on the screen for Dr. King to
16  view.

17  **A.**    Was that -- let me just ask you this.  Was that after
18  June 1st of 2020 or before?

19  **BY MR. COWAN:**

20  **Q.**    Let's go back to the first page.

21  **A.**    August -- so it looks like you had an important
22  intervening event, which was the murder of George Floyd, when
23  you saw lots of corporations reengage on the matters of race at
24  that time.  So political candidates who are making comments
25  that might have been seen as a racial appeal probably suffered.

*King - Cross*

1  I doubt Cindy Hyde-Smith was the only one.

2       And so that would have been an important intervening

3  event that could have played a role in how corporations felt

4  about sponsoring -- or not sponsoring but donating to her

5  candidacy at that time.

6  **Q**.  Okay.  We'll scroll to the section where you are quoted

7  in the article.  I will then just let you read it.  I don't

8  want you to have to testify about it.

9       **MR. COWAN**:  If you will scroll to the highlighted part

10  of the page.  Excuse me.  Keep going.  I apologize.  Different

11  section.

12  **BY MR. COWAN**:

13  **Q**.  And just let me know when you're finished reading,

14  Dr. King.

15  **A**.  (Peruses document.)  Could you move it to the next page?

16  Well, I'm ready for it to move on.  I don't know if other

17  people --

18       **MR. COWAN**:  Yeah.  Go ahead.

19  **A**.  Okay.  So that was the end of it?

20  **BY MR. COWAN**:

21  **Q**.  Yeah.

22  **A**.  Okay.

23  **Q**.  All right.  You referred to the fact that companies took

24  away their donations in 2018?

25  **A**.  Or that they asked for a refund, yes.

*King - Cross*

1 **Q.** And she didn't give it to them?

2 **A.** Apparently not.

3 **Q.** Okay. Now, your ultimate conclusion is, here, that the

4 racial appeal was successful because she won? She ultimately

5 won?

6 **A.** It didn't harm her enough to lose the election. That, to

7 me, would have been real evidence that it harmed her if she had

8 lost.

9 **Q.** All right.

10 **THE COURT:** Go back a page. Go back to the

11 highlighted, please, sir. Thank you.

12 **BY MR. COWAN:**

13 **Q.** And, Dr. King, I want to ask you about a comment that you

14 testified about -- House Rep. Gene Alday made to a

15 *Clarion-Ledger* reporter in 2015. He's the gentleman from

16 Tunica County, House Representative. It's referred to in your

17 report and in your testimony today.

18 Do you know the context in which he made that statement?

19 **A.** I would need a refresher, but I believe it had to do with

20 education funding.

21 **Q.** Yeah. And you're right. So I think -- would it surprise

22 you if I told you that Alday lost his primary that fall after

23 having made that statement that particular year?

24 **A.** It wouldn't surprise me given Tunica County's racial

25 makeup.

*King - Cross*

1  **Q.**   And are you aware of what major leaders in the state said
2  about Alday's comments at the time they were made?

3  **A.**   I do not think they were pleased.

4  **Q.**   So would it surprise you if I told you that his statement
5  was a decry about former speaker Philip Gunn and Republican
6  Party Chairman Joe Nosef?

7  **A.**   Well, I think this also just helps illustrate the
8  difference between overt appeals and subtle appeals.  Overt --
9  excuse me.  Overt appeals are more politically toxic, and so
10  you will see people distance themselves.  They may not want to
11  be allied with somebody making those sorts of overt appeals.

12  **Q.**   And so would it surprise you that, when these stories
13  were published about Alday's death in 2016, they referenced
14  this statement and his subsequent political loss?

15  **A.**   I didn't know that.  That makes me sad that that
16  happened.

17  **Q.**   Well, I want to ask you a question about what you are
18  calling racial appeals versus simply saying something that
19  could be conceived as racist.

20         You're saying that everything in every statement made by
21  a politician that could be conceived as racist is automatically
22  a racial appeal for campaign purposes?

23  **A.**   There -- I would not agree with that.  I believe there is
24  a distinction between racism and racial conservatism but that
25  these -- these sorts of appeals are designed to appeal to

1 voters who are predisposed.

2 So this isn't going to appeal to every voter; right?  You

3 can be -- if I could briefly describe the difference between

4 racism and racial conservatism, that might help.

5 So someone who is racist believes that there's -- a

6 racial group is inferior, that they are inherently inferior,

7 and other groups might be superior to them.  A racial

8 conservatism, that's more of an ideological construct related

9 to the size and scope of government.  What should government

10 do, and how much of it should it do?

11 So someone can be racially conservative and certainly not

12 a racist.  That just means that they don't believe that the

13 government maybe should solve certain problems or should have a

14 limited role in addressing these problems.  So that would be a

15 racial conservative.  So you can certainly be a racial

16 conservative and not at all be racist.

17 These sorts of racial appeals are designed to appeal to

18 voters who are thinking about race and are more prime to

19 believe that some voters are going to appreciate or like this

20 sort of message.  So you have all sorts of voters, and so I

21 would never, ever lump all voters in with an "all voters are

22 this" or "all voters are that."  So these appeals are going to

23 appeal to a subset of the population.

24 But, again, the senate factors don't ask us that they

25 appeal to all voters or all people of a particular party.  It's

*King - Cross*

1    just are these appeals made.

2    **Q.**   So let's talk about the Espy mailer you testified about a

3    little while ago.

4         You testified in the state legislature redistricting

5    case; is that right?

6    **A.**   Yes.

7    **Q.**   All right.  And that was back in March?

8    **A.**   Yes.

9    **Q.**   And did you testify about racial appeals in that case?

10   **A.**   Yes, I did.

11   **Q.**   All right.  And did you read the Court's very lengthy

12   opinion in that case?

13   **A.**   I read the portions I think that mention Dr. King.

14   **Q.**   And you're aware that that panel of judges looked at your

15   contention that the Espy mailer was a racial appeal and

16   rejected it; right?

17   **A.**   I'll accept your contention that they did.  I don't know

18   that, but I'll accept it.

19   **Q.**   All right.  Well, fair enough.  Our -- obviously, I know

20   you have been paying attention to the upcoming presidential

21   election that will take place this November; is that right?

22   **A.**   Correct.

23   **Q.**   All right.  And one of our candidates -- I say "our

24   candidates" -- well, one of the two candidates placed in front

25   of us has been indicted for crimes; right?

*King - Cross*

**A.** Correct.

**Q.** All right. Would it surprise you if I told you that the Democratic Party and other Democratic political groups have fundraised off of President Trump's indictments?

**A.** That is correct.

**Q.** All right. And how do you draw a distinction between Democratic groups fundraising off the candidate's indictments versus Republicans, here in this instance, the party, putting out a mailer with Mike Espy stating he's been indicted?

**A.** Sure. So the difference, again, just goes to the stereotypical trope of the Black criminal, the stereotypical trope of -- there's not really the same stereotypical trope of a White criminal. There might be a stereotypical trope of Donald Trump, but there is not one of the White man in general; right? That stereotypical trope is African Americans.

**Q.** All right. And so if Mike Espy had been White and he was a Democrat running against Cindy Hyde-Smith, you don't think the party would have put out an almost identical mailer?

**A.** I think the appeal of it would have been different. So they may have, but I think the appeal -- so, as I said earlier, the exact same language in different contexts can have very different effects.

**Q.** You testified about 1991 and 1996 racial appeals in campaigns against Justice Banks. He won both of those elections, didn't he?

*King - Cross*

1   **A.**   Yes.

2   **Q.**   And the critical of an advertisement -- well, first of

3   all, let me stop you -- let me stop myself and ask you.

4        We talked about a lot of racial appeals, and seems like

5   the vast majority of them have not been successful.  Is that a

6   fair characterization?

7   **A.**   I would have to go back and add them up one by one, but,

8   you know, Hyde-Smith won her elections.  Carpenter has been

9   reelected in his elections.  So I would have to go back and

10  look at all of them.

11       But, again, the senate factor doesn't ask who wins or

12  loses.  It's just whether or not the appeals are made.

13  **Q.**   Okay.  So you're not necessarily concerned with the

14  effect of the appeals?

15  **A.**   You know what?  I guess what I'm concerned is, is that

16  four out of the five Black supreme court justices that have --

17  that have run for office in competitive races, even if they

18  won, they still had to deal with it.

19       And so these racial appeals still have a big effect on

20  just the number of Black candidates that might be willing to

21  run.  A lot of people don't want to have to deal with that, and

22  so they just choose not to run.

23       We see the same thing in women in politics literature

24  about why you see fewer women run for office.  So those sorts

25  of gender appeals, for example, dissuade a lot of women from

*King - Cross*

1  running for office.

2  **Q.** So -- but these racial appeals haven't prevented -- as we

3  sit here today, four out of the five seats --

4  **A.** So you're kind of asking me to prove a negative.  So it's

5  hard to go back in time and see how many Blacks never chose to

6  run.

7  **Q.** All right.  Well, I'll get to that in just a moment

8  because I want to talk about that relative to this particular

9  senate factor.

10  The last question I have about the racial appeals was the

11  advertisement from PAC called "Improve Mississippi," PAC that

12  ran relative to the 2020 race between Judge Westbrooks and

13  Justice Griffis.

14  **A.** Yes.

15  **Q.** And it's your contention that it's a racial appeal, it

16  was my perception, for two reasons.  One, it uses her

17  photograph; and the second, it accuses her of being soft on

18  crime?

19  **A.** Yes.

20  **Q.** Okay.

21  **A.** Correct.

22  **Q.** And you're aware, when that particular ad ran in 2020,

23  that civil justice reform was a -- I mean -- excuse me --

24  criminal justice reform was probably one of the hot-button

25  political topics during that time frame?

*King - Cross*

1   **A**.   It could have been.  I'll accept it, yeah.

2   **Q**.   And so you don't think its inclusion of a candidate as

3   being soft on crime had anything to do with taking a policy

4   position on what's favorably viewed by Mississippi voters or

5   not?

6   **A**.   I think, given the preponderance of the evidence, given

7   that Mississippi has the highest -- or second highest

8   incarceration rate in the state, indicates that -- and, again,

9   tied together with the stereotypical trope of a -- of the Black

10  criminal, that portraying a Black supreme court justice

11  candidate as soft on crime is designed to play into those

12  stereotypes.

13  **Q**.   Well, do you have any -- do you have any knowledge

14  connecting that PAC to Justice Griffis's campaign?

15  **A**.   No.  It was -- it was an independent PAC.  Although if

16  you want to get into what independent means in the campaign

17  finance world, it's not quite the same independence as we might

18  see, like, with the judiciary.

19      So independent PACs are well-known to be aligned with the

20  campaigns that they are supporting.  Legally, they may not be,

21  but for all intents and purposes, they tend to run the ads that

22  the candidates don't want to run themselves.  So they'll have a

23  PAC do it for them.

24  **Q**.   You don't have any evidence connecting Justice Griffis to

25  this particular PAC?

*King - Cross*

1    **A.**   No, I don't.  That's just based on many, many years of

2    political science research.

3    **Q.**   Something has been bothering me, Dr. King, because I

4    don't think anyone who has discussed this ad has talked about

5    this particular fact.  I just want to see what you have to say

6    about it.  It involves the ad that Chet Dillard ran against

7    Justice Fred Banks.

8    **A.**   Yes.

9    **Q.**   I believe that was in 1991, if I remember correctly.

10   That's on page -- these are double-sided, so one moment.

11   **A.**   I have found it.

12   **Q.**   Okay.  So you represent this is probably a typical

13   example of a racial appeal, and I have heard your testimony on

14   it.  And it's your contention that Chet Dillard here was making

15   several -- maybe not overt but implied racial appeals --

16   nonexpressed racial appeals to attract the White vote?

17   **A.**   That is correct.

18   **Q.**   All right.  Do you know why Chet Dillard -- I say bragged

19   but lauded the fact that when he was head of Public Service --

20   excuse me -- the Department of Public Safety that he

21   commissioned the first Black officers in the highway patrol?

22   **A.**   I did not know that.

23   **Q.**   Well, I mean, it's here on the ad.  I'm just -- if

24   you're -- I wanted to see what you had to say about --

25   **A.**   It's hard for me to read.  I need -- but I'll accept it.

*King - Cross*

1 **Q**.    Well, it says "Tough on law enforcement" on the

2 advertisement, and then it says --

3 **A**.    Oh, sure.

4 **Q**.    -- towards the end, "Commissioned first Black officers in

5 the highway patrol."  That sounds like he's bragging or lauding

6 the fact that he promoted diversity on the highway patrol.

7 **A**.    That is the case, and I -- I am -- I can't remember if

8 this was exactly in Mississippi, but I also believe -- wasn't

9 there a lawsuit for Blacks to be able to finally be appointed

10 as -- so what I don't know is was his appointment only after

11 there had been a lawsuit requiring it.

12 **Q**.    We would have to ask Mr. Wallace, who probably has a

13 great knowledge of --

14 **A**.    Yeah.  I don't remember if that was exactly here in

15 Mississippi, but I know that's been the case in many states.  I

16 can't remember if that's -- so, in other words, if he was

17 just -- if this was just flowing from a lawsuit to diversify

18 law enforcement in the state --

19 **Q**.    It doesn't seem like a very -- a great way to get

20 racially conservative White voters to -- as you described, to

21 vet for your campaign to brag about having commissioned Black

22 officers on the highway patrol, does it?

23 **A**.    You can be racially conservative and still support Black

24 law enforcement officers.  The two aren't exclusive.

25 **Q**.    All right.  So I want to move to Senate Factor 7, which

*King - Cross*

1  examines the extent to which members of the minority group have
2  been elected to public office in the jurisdiction.

3      You didn't conduct any analysis of the current percentage
4  of Blacks in the State House of Representative seats within
5  District 1, did you?

6  **A.**  No, I did not.

7  **Q.**  All right.  So if we took the counties that make up
8  District 1 and we take the State House seats that sit within
9  the confines of that District 1, you don't know what percentage
10 of those members of the House of Representatives are Black
11 versus White?

12 **A.**  I do not.

13 **Q.**  And let's ask the same question for State Senate seats.

14 **A.**  I do not.

15 **Q.**  Okay.  All right.  Fair enough.  And you didn't conduct
16 any analysis of what percentage of -- of local officials in the
17 counties that make up District 1 are Black, did you?

18 **A.**  I did not.

19 **Q.**  All right.  And so you have no knowledge of -- let's
20 talk -- let me rephrase that question.

21     I want to preface it by saying, let's talk about
22 elections for the county-governing bodies within the counties
23 that make up District 1.

24     You didn't conduct any analysis of what percentage Black
25 the boards of supervisors of the counties that make up

*King - Cross*

1 District 1 are, did you?

2 **A.** I did not.

3 **Q.** And I could ask the same question for every local elected

4 official position, like sheriff, circuit clerk, chancery clerk,

5 et cetera, for the counties. In District 1, you didn't perform

6 any analysis of that, did you?

7 **A.** Correct. The answer would be the same. I would also

8 argue it wouldn't matter. I would be happy to explain why, but

9 I did not conduct that analysis.

10 **Q.** Well, I have a feeling your answer to that question would

11 be because many of these jurisdictions may be majority Black?

12 **A.** That would be one thing I would say, but there is

13 something else also important to it, which is that the larger

14 the jurisdiction, the less likely, as I demonstrated earlier,

15 Blacks are able to get elected, which is why we haven't had any

16 Blacks elected to any statewide office since the 1870s. So the

17 larger the district is, Blacks have a harder time winning.

18 And so, to your point, yes, all of those districts where

19 Blacks are from the State Senate, State House, they are going

20 to be majority minority. So that also just kind of, to me,

21 illustrates the point of how important it is how districts are

22 drawn for Blacks to have opportunities.

23 **Q.** All right. Would you agree with me that Bennie Thompson,

24 a Black man, is the most influential political figure in

25 District 1 on political races occurring solely within

*King - Cross*

1  District 1, party or race aside?

2  **A.**    I don't know if I would use the word -- yes.  Yes, he's

3  probably the most influential.  Yes.

4  **Q.**    And you testified about this earlier.  With respect to

5  elected officials in District 1, you do understand the current

6  public service commissioner and transportation commissioner are

7  Black?

8  **A.**    Correct.

9  **Q.**    And they are both Democrats; correct?

10  **A.**    I believe that those are partisan races and that the

11  supreme court is nonpartisan; so, yes, that does sound correct

12  to me.

13  **Q.**    And you don't have any reason to dispute that both of

14  those gentlemen are Black-preferred candidates for those two

15  seats?

16  **A.**    To my knowledge, yes, that is correct.

17  **Q.**    And you would agree with me that, for the three available

18  supreme court positions for District 1, one of the three

19  candidates, Leslie King, is Black, and one of the other

20  candidates is the Black-preferred candidate, Jim Kitchens?

21  **A.**    That is correct.

22  **Q.**    All right.  So we have two out of three seats in

23  District 1 for supreme court.  Two out of the three are

24  occupied currently by Black-preferred candidates?

25  **A.**    That is correct.

*King - Cross*

1    **Q.**    So taking -- bringing in our public service commissioner

2    and transportation commissioner.  So of the five possible seats

3    available for Black-preferred candidates, as we sit here today,

4    in District 1, four are occupied by Black-preferred candidates?

5    **A.**    One of which was first appointed, yes.

6    **Q.**    All right.  But -- I'm not great at math like

7    Mr. Wallace, but I can count and say that 75 percent of our

8    current available elected officials' position -- seats in

9    District 1 are occupied by Black-preferred candidates; is that

10    right?

11    **A.**    And it -- yes.  And it -- it's all a function of how

12    those districts are drawn.  So it could be seven out of seven

13    if they had been drawn differently.

14    **Q.**    All right.

15    **A.**    I mean -- yes.

16    **Q.**    Did you perform any analysis on the court of appeals --

17    Mississippi Court of Appeals makeup relative to Senate

18    Factor 7?

19    **A.**    I was not asked to.  I did not.

20    **Q.**    And you're aware -- are you aware that two -- two of the

21    members of the Mississippi Court of Appeals are Black females?

22    **A.**    I'll accept your characterization.

23    **Q.**    Looking back at your report -- well, actually, I was

24    looking at your slide discussing Senate Factor 7, your summary.

25         And you said that "Blacks are underrepresented in public

King - Cross

1  office across the board," but you limited that to only

2  statewide-elected offices in the Mississippi Supreme Court,

3  which are elected via districts, and no other type of elected

4  office; is that right?

5  **MR. CHEUNG:** Objection. Mischaracterizing the

6  evidence.

7  **MR. COWAN:** Well, let me -- I need to add to that

8  question.

9  **THE COURT:** Go ahead.

10 BY MR. COWAN:

11 **Q.** As well as members of Mississippi's senate delegation

12 correction poll allegation; is that right?

13 **A.** You're asking me if my characterization that Blacks are

14 underrepresented was limited to those?

15 **Q.** In this case, yes.

16 **A.** Yes. I do not know the exact numbers across the board

17 for, like, all levels of elected office. The last relevant

18 data I have seen, I believe I can make a strong case that it

19 is, in fact, across the board at all levels. It's -- but I

20 don't have that data; so that is from historical references but

21 not a particular dataset right in front of me.

22 **Q.** Your summary slide -- and I don't know if this is

23 attributed to you or whoever prepared the slide. I wanted to

24 know if you agree with this.

25 You say that "The state's failure to create districts of

1 majority" -- excuse me -- you attribute the failure across the

2 board for Blacks to be elected to statewide-elected office "is

3 the failure" -- you attribute the failure -- "the state's

4 failure to create districts with a majority minority

5 population."

6     Do you agree with that?

7 **A.**   Sure.  I -- I believe that was the conclusion of the

8 Court in the last trial I testified at.

9 **Q.**   You do realize, as we sit here today, that District 1, in

10 fact, has a majority Black citizen voting-age population?

11 **A.**   I would have to see those numbers specifically in front

12 of me, a BVAP -- excuse me -- a Black voting-age population

13 analysis to feel comfortable agreeing with that statement.

14 **Q.**   All right.  Well, if I told you it was 51 percent, would

15 you have any reason to dispute that?

16 **A.**   Perhaps.  It might depend on how -- there's different --

17 this also came up at the last trial.  It depends on how the

18 Black population is counted.  So, again, I would just have to

19 see the specific -- the specific data for that.

20 **Q.**   Okay.  Well, it seems to me your opinion is that

21 District 1 needs to be a majority minority population, but you

22 don't know whether, in fact, it is one right now?

23 **A.**   My understanding is that it's not a Black majority

24 district.

25 **Q.**   I have heard your testimony about Senate Factor 8, moving

1   along, which asks whether there is a significant lack of

2   responsiveness on the part of elected officials to the

3   particularized needs of the members of the relevant minority

4   group.

5        What needs is the Mississippi Supreme Court supposed to

6   respond to?

7   **A.**   Well, the Mississippi Supreme Court would have appellate

8   jurisdiction over all manner of issues addressed by the

9   Mississippi legislature.  So because the Mississippi

10  legislature can address education, health care, for instance,

11  criminal justice, felon disenfranchisement, the Court will rule

12  on this, but because we elect our officials, it's a bit of a

13  different story here.

14       And so, because the Black-preferred candidate for

15  governor repeatedly loses, Blacks don't really have any say in

16  who those appointed judges are.  And so until we actually see

17  Blacks get elected to the supreme court without having to rely

18  on a -- an appointment, they're harmed.

19       But because the supreme court has appellate jurisdiction

20  over, you know, laws passed by the legislature, this

21  responsiveness -- you know, all three branches have to be

22  responsive to the public.  It's -- sure, the legislature writes

23  the law, but the executive enforces the law, and the judiciary

24  interprets the law.  That's all part of responsiveness.

25  **Q.**   Are you aware of any specific examples -- you talked a

1  lot -- about a lot of examples where you say the legislature

2  has not been responsive to Mississippi citizens' needs.

3      Do you have any examples of those with the Mississippi

4  Supreme Court?

5  **A**.   Well, I believe that, you know, school funding has

6  reached the courts, and we still seem to have a system where

7  the schools are not adequately funded.  The supreme court -- I

8  am not a lawyer, but the supreme court could enjoin the

9  legislature to fund schools differently.  We have seen that in

10  other states.  So that, to me, would be an example.

11  **Q**.   All right.  Well, you talked about education funding, and

12  you mentioned, offhand, the passage of a law since you authored

13  your report in 2022; right?

14  **A**.   Correct.

15  **Q**.   And that House Bill 4130, you're aware that it provided

16  an additional $218 million to education funding in Mississippi

17  public schools for this next -- fiscal year 2025 -- excuse

18  me -- upcoming fiscal year?

19  **A**.   Correct.  But it is also my understanding that that

20  itself would still be below what the old MAEP formula would

21  have required.  And that also would not actually -- you know,

22  until that happens and the gaps are narrowed, you know,

23  that's -- it -- that doesn't -- it's conjecture.

24      So it's still less than what the old law would have

25  required.  So it's just a different formula, but that doesn't

*King - Cross*

1  mean that the results are going to change.

2  **Q.**   All right.  Well, does it show any effort on the part of

3  the legislature to respond to education funding issues?

4  **A.**   That could be a function of a whole host of things.  You

5  know, if you look at the Mississippi legislative -- you know,

6  the annual budget, money tends to go to a handful of things --

7  education, roads, jails, some hospitals.  You know, so that's

8  what most money goes to.

9       So some of this -- you know, so just because more money

10  is spent on something, you would have to look at it in the

11  context of the entire budget.  And so if you have spent

12  5 percent more, say, on education but then 10 percent more on

13  other things, then you may have increased it because maybe

14  there was additional tax revenue, but it doesn't mean that

15  they're being more responsive.  It just might mean they have

16  more money at that moment in time in the -- in the budget.

17  **Q.**   All right.

18  **A.**   So, to me, I would just say, going back to 1997, since

19  MAEP, only four times was it fully funded.  That seemed to fail

20  so spectacularly, they were like, well, let's try something

21  else, but it's still not what the MAEP would have required.  So

22  it's more, but it's not even -- and I would also just say, if

23  the goal was adequate, that's not really going to close

24  disparities.

25  **Q.**   You mentioned -- nowhere in your report is there any

1 discussion about how the Mississippi Supreme Court is going to

2 be responsive to policy interests or matters that Mississippi

3 citizens or Black citizens in District 1 encounter.

4 And you just told me an example of -- you said some

5 lawsuit -- or they should do something relative to education

6 law, enforce the legislature to pay more money to fund

7 education.  Is that what you're saying?

8 **A.**   Well, for the legislature.  And then it would be up to

9 the judiciary to determine if what -- you know, the actions of

10 the legislature are legal or constitutional or not.

11 **Q.**   So with all due --

12 **A.**   And I would say I don't know all of the things that the

13 judiciary will consider when making their decisions.  That's

14 the job of the judiciary.  So I can only just assume that the

15 judiciary will consider everything that needs to be considered,

16 whatever that might be.

17 **Q.**   All right.  I heard you talk about Senate Factor 9 and

18 asked whether the policy underlying the state's use of this

19 procedure -- that there are three districts running east to

20 west.  Its justification is tenuous, and you testified that it

21 was your opinion that it was?

22 **A.**   Correct.

23 **Q.**   All right.  Are you aware that these same supreme court

24 district lines were challenged back in the late '80s or

25 early -- or excuse me -- the early '90s?

*King - Cross*

1    **A.**   Yes, I -- yes, I am aware of that.

2    **Q.**   Have you ever read Judge Barbour's opinion in that case?

3    **A.**   I have not.

4    **Q.**   All right.  And are you aware that he analyzed certain

5    state policies underlying the manner in which 1987 districts

6    were drawn?

7    **A.**   I'll accept your characterization of his opinion.

8    **Q.**   So what would you -- I guess you have already tried to

9    respond to Judge Barbour's conclusion that the districts were

10   drawn to foster independence on the supreme court so that the

11   individual justices would not be beholden to the interests of a

12   small geographic area.

13        You reject that conclusion; is that right?

14   **A.**   Yes.

15   **Q.**   Are you familiar with the term "judicial

16   distinctiveness"?

17   **A.**   Why don't you describe it to me.

18   **Q.**   Well, I know you teach -- you may still teach Political

19   Science 101.  Maybe you've advanced far enough you no longer

20   have to teach that class.

21   **A.**   They like me in that class.  I teach it more than I --

22   yes.

23   **Q.**   And you are very familiar with the separation of powers;

24   right?

25   **A.**   Yes.

*King - Cross*

1  **Q.**   All right.  So I think that -- that idea -- inherent idea

2  is constitutional principles of an independent, objective, fair

3  judiciary; right?

4  **A.**   Okay.

5  **Q.**   That serves as a check and balance on both our

6  legislative and executive branches?

7  **A.**   That sounds reasonable and correct.

8  **Q.**   You agree with me that these -- that the supreme court

9  races are nonpartisan?

10 **A.**   Correct.

11 **Q.**   Do you know why that is?

12 **A.**   Probably to make them independent of the political

13 parties.

14 **Q.**   All right.  And you testified earlier that these

15 positions are elected, and you thought that the fact that they

16 are elected is contrary to maintaining their independence?

17 **A.**   At least compared to other federal judiciaries selected

18 and appointed, as well as their tenure in office.

19 **Q.**   Let me ask you this question, Dr. King:  Would you prefer

20 that they not be elected and be appointed instead by the

21 governor?

22 **A.**   You're asking my opinion?

23 **Q.**   Yes.

24 **A.**   One hundred -- wait.  Say that --

25 **Q.**   Listen to my question closely.

*King - Cross*

1   **A.**   Appointed by whom?

2   **Q.**   The governor, as it is in many other states.

3   **A.**   Approved by the legislature?

4   **Q.**   With the advice and consent of the legislature.

5   **A.**   Are they -- I mean, there's a lot of hypotheticals here;

6   so -- but then you would get into are they ABA endorsed, you

7   know. So I would look at a lot of other qualifications there

8   just to assume some minimum standard of, like, judicial

9   quality. So are we assuming in this hypothetical that all of

10   that is a part of it as well?

11   **Q.**   We -- I'll take -- I'll take away the question.

12   **A.**   Please don't, actually.

13   **Q.**   We might go down -- too far down a rabbit trail.

14   What I'm -- what I'm asking is it was your opinion that

15   the fact that they are elected is antithetical to independence

16   of the judiciary; is that correct?

17   **A.**   Yes. Specifically because of having to raise money.

18   Even for judges with the best intentions, it's a difficult

19   process to have to ask people for money, especially if they

20   might have business. Then you end up getting into

21   controversies about whether or not a judge has to recuse

22   themselves. And so that does challenge our notion of

23   independence.

24   Many judges, of course, how they raise their money, it

25   has no bearing, but it's the perception. And so in terms of

1 typical models of good governance and transparency, we don't

2 ask judges to have to raise money from, you know, legal groups,

3 law firms, yes.

4 So in the ideal world, which is slightly different than

5 the question you asked me, in the ideal world, I would prefer

6 judges not to have to be elected.

7 **Q.** I want to -- shifting gears here just briefly, I want to

8 ask you a question about your CV in this case.

9 You gave testimony in the state legislative redistricting

10 case, and I noticed you have some information in your CV in

11 that case that is not in this case. And I'm just wondering

12 about that -- the purpose in adding it.

13 Just let me ask my question.

14 So you are a member of the Democratic Party; is that

15 right?

16 **A.** Not anymore. I mean, and by "member," do you mean, like,

17 the county executive committee or anything like that or just

18 registered?

19 **Q.** I think membership in a statewide party is probably --

20 again, Mr. Wallace could tell me better than I know, or perhaps

21 even Mr. Matheny, but perhaps you register -- at the time you

22 register to vote?

23 **A.** I have voted mainly Democratic primaries, but I've also

24 voted in a Republican primary.

25 **Q.** Well, you have had leadership positions in the

*King - Cross*

1  Mississippi Democratic Party; is that right?

2  **A.**   Yeah.  It's been about ten years.  I have kind of walked

3  away from all of that.

4  **Q.**   All right.  Well --

5  **A.**   In the past, yes.

6  **Q.**   -- what positions did you hold in it?

7  **A.**   I was on the -- here in Lafayette County, on the

8  executive committee, and then for one term I was on the -- I

9  was selected to serve on the state executive committee.  And

10  I -- I stopped because it was one of the more useless endeavors

11  of my life.  So I didn't want to do it anymore.

12  **Q.**   So you produced your report -- or you authored your

13  report in this case in 20 -- October 2022.  Does that sound

14  right?

15  **A.**   Yes, that sounds about right.  Yes.

16  **Q.**   And your report in the state legislative redistricting

17  case was produced later in time; is that right?

18  **A.**   Correct.

19  **Q.**   All right.  I'll represent to you -- and you tell me if

20  you disagree with this, but your CV in the 2023 state

21  legislative redistricting report contained your membership and

22  leadership positions in the Democratic Party but were not in

23  your CV produced in this case.  Do you know why you added it?

24       **THE COURT:**  Do you have an objection?

25       **MR. CHEUNG:**  I don't know if it's helpful to clarify

1   this, but in the redistricting case -- in the other

2   redistricting case, there were also two versions of the CV, one

3   that was attached to the original report and an updated one

4   that was used for trial.

5          For this trial, the updated CV is the exact same

6   updated CV that was used in the redistricting trial.  It may

7   look different from the original one attached to Dr. King's

8   initial report.

9   **A**.   We did do our best to -- we were made aware of that, and

10  so we did make our best to update it.

11         To be honest, I have several floating versions of my vita

12  just based on the audience that -- you know, so you might send

13  one to academic groups, or if you are speaking to the League of

14  Women Voters, you will give them, you know, a shortened

15  version.  So I just have different versions.

16         And I'm not as organized as you guys; so I literally

17  think I just sent a wrong updated version.  Because then I was

18  working on some published work, and so then I updated it, and I

19  think I may have omitted some stuff.

20         But as Counsel says, when we were made aware of that at

21  the last trial, we then updated it accordingly.  So any -- any

22  inconsistency would be mine but completely accidental.  Because

23  as we have just discussed here, yes, that -- I do have that --

24  that background, and we are certainly not trying to hide that.

25

*King - Cross*

1    BY MR. COWAN:

2    **Q.**   All right.  You were a delegate to the 2012 Democratic

3    National Convention?

4    **A.**   Yes.

5    **Q.**   And you wouldn't have any bias in furthering any

6    political goals of the Mississippi Democratic Party as we sit

7    here today?

8    **A.**   You know, as I have said, it's been ten years since I

9    have been actively involved in party politics; so, you know,

10   that's no longer an area I do any work in.

11   **Q.**   Now, you testified that you testified in two other Voting

12   Rights Act cases; is that right?

13   **A.**   Correct.

14   **Q.**   All right.  And both of those were for the plaintiffs

15   challenging district lines in Section 2 cases?

16   **A.**   Yes.

17   **Q.**   I want to ask you a question about some of your comments

18   about racial polarization.

19         In the Louisiana case, did you offer an opinion on racial

20   polarization?

21   **A.**   Yes, I did.

22   **Q.**   Okay.  And you actually -- you performed an EI analysis

23   in that case, didn't you?

24   **A.**   Correct.

25   **Q.**   All right.  You didn't perform an EI analysis in this

1    case; right?

2    **A.**    I was not asked to.  I did not.

3    **Q.**    So you didn't perform, in this case, any quantitative

4    analysis to support your opinion of racially-polarized voting

5    in this case?

6    **A.**    I was not.  I believe that plaintiffs' counsel had other

7    experts doing that work.  I was not asked to do that.

8    **Q.**    But you could have performed one if you had asked -- been

9    asked to?

10   **A.**    If I had been asked to, yes.  Not every single

11   district -- not every single unit of analysis is appropriate

12   for that.  So I'm going to qualify the yes with it depends on

13   the available data that exists.

14        And because -- what I was looking at in Louisiana was a

15   primary; whereas, we don't have those in these.  I can't

16   promise you that I could make a one-to-one equivalent analysis.

17   And so that could have been why I wasn't asked to do it.

18        But, again, I'm not sure exactly what any other

19   witness -- this is the only day I have been here; so I'm not

20   really sure what any other witness conducted.

21   **Q.**    You testified earlier that the conditions in District

22   1 -- I'm using your words -- were not conducive to encourage

23   Black candidates to run for office for the seats that lie

24   within the electoral district lines of District 1 for the

25   various races.  Do you stand by that testimony?

1    **A.**    I probably would have qualified it a little differently,

2    just, again, based on the results that we have seen. Without a

3    prior appointment, we're not seeing Blacks win.

4    **Q.**    All right. And you were asked about a chart that

5    plaintiffs' counsel prepared that summarized the race of

6    Mississippi Supreme Court justices and the method by which they

7    were elected -- well, not elected -- but the method they came

8    onto the court?

9    **A.**    That's right. PX-111, yes.

10    **Q.**    And so by my count, a quick glance, that chart shows that

11    seven out of the ten justices on the supreme court were first

12    appointed to the supreme court?

13         **MR. CHEUNG:** Objection, Your Honor. I believe I heard

14    ten justices on the supreme court.

15    **BY MR. COWAN:**

16    **Q.**    Excuse me. Nine. Seven of the nine -- or excuse me.

17    Six of the nine.

18         **THE COURT:** Is that -- I don't know.

19    **BY MR. COWAN:**

20    **Q.**    Let me go back to my notes. One moment.

21         **MR. COWAN:** Which exhibit -- PX --

22    **A.**    I'm seeing five of nine of the -- of the nine most

23    recent.

24    **BY MR. COWAN:**

25    **Q.**    Five of nine were first appointed rather than elected?

*King - Cross*

1    **A.**    Yes.

2    **Q.**    And it's your contention that -- that because Black

3    justices have been appointed first and then won election, that

4    that presents a hurdle to Black candidates being elected to the

5    supreme court in District 1?

6    **A.**    The difference is we also see Whites who are able to get

7    elected first and don't need to require appointment.

8        So, again, political scientists will update once we see

9    different outcomes.  So once we see Blacks get elected

10   independent of any appointment, then we would happily update

11   and say, "Okay.  Maybe now attitudes or conditions have

12   changed."  We haven't seen that.  But we have seen Whites get

13   elected without having to need the appointment.

14       And also because of the length of judicial terms and the

15   fact that you have a lot of turnover on the supreme court is

16   going to necessitate an appointment.  Justices leave the

17   supreme court for a variety of reasons.  Some get moved to

18   federal courts.  And so the governor has to appoint someone.

19       So I think just the raw number of appointments isn't

20   really how to look at it.  It's whether or not Blacks can get

21   elected.  And we're not seeing that.

22   **Q.**    Willie Simmons and De'Keither Stamps did not require

23   appointments to their seat to win elections to the public

24   service commissioner or transportation commissioner, did they?

25   **A.**    You know, to be honest, I'm not sure what happens if

*King - Cross*

1  there is a vacancy on the PSC or the transportation commission,

2  if that's automatically filled with an appointment or if it's

3  vacant until the next election.  So I don't want to comment on

4  that specifically just because I don't know the alternative to

5  getting elected for those specific --

6  **Q.**  Just a couple more questions --

7  **A.**  -- political bodies.

8  **Q.**  Just a couple more questions, Dr. King, and I'll be

9  finished.

10  Does your report identify anyone who has been deterred

11  from running -- from running for office in District 1 because

12  of the district lines?

13  **A.**  So, again, I think I referenced this earlier.  To me,

14  that's proving a negative.  The research tells us that the

15  number of qualified candidates declines based on -- or who to

16  choose to run based on how district lines are drawn.  Do I know

17  of a specific individual?  No.  But if I could go back in time

18  and talk to qualified people who may have had the opportunity

19  to run and if they decided not to run, I'm fairly certain there

20  would be a number.

21  But, again, that's -- that there would be people, but, of

22  course, that's a hypothetical.  But I've -- based on my

23  research and knowledge of the situation, I feel comfortable

24  making that assertion.

25  **Q.**  If Justice King were not to fill out the rest of his term

1 and that seat became open, not appointed but open for election,

2 it's your testimony here today that Black candidates would be

3 deterred from running for that seat?

4 **A**.    Because of the racial appeals that we have seen that they

5 have had to endure; as well as the fact that, without the

6 incumbency advantage of having been appointed, they haven't

7 been able to win.

8       One reason for this -- we've talked about it before; so I

9 will just bring it up again -- is, in all levels of elected

10 office, we see Black candidates raise less money than White

11 candidates.  And so, because these judicial elections require

12 money, that could also be a reason why, because of the way the

13 line ares drawn; whereas, if they were drawn differently, it

14 might be easier for Black candidates to raise money.

15       So there's -- the conditions as a whole -- I guess

16 totality would be the word to use -- right? -- are not

17 conducive.  When we start seeing Blacks get elected without an

18 appointment, then maybe the totality of the circumstances have

19 changed.

20 **Q**.    So the PSC and transportation commissioners in 2019 and

21 2023 are not representative examples to potential Black

22 candidates that they can win?

23 **A**.    Well, you know, voters look at -- I was just reading an

24 article about this yesterday.  Voters judge candidates.  You

25 can take the same candidate, but they will be judged

*King - Cross*

1   differently depending on the office that they are running for.

2      So as an example of service, I have been on our park

3   commission here and our planning commission.  People might see

4   that I'm competent for mayor or supervisor because I have local

5   political -- local governing experience, but that doesn't make

6   my qualified to be governor or president.

7      So what the research shows is that voters tend to peg

8   people for certain races.  You see that Blacks do better on,

9   like, state -- or excuse me -- school board elections, but the

10   higher up, they tend to have less success.  This is also why we

11   tend to see fewer women in governor's mansions, because the

12   perception among many voters is their competence may not extend

13   that high, and so they're penalized.

14      So the reason that matters is voters will look at the

15   office differently.  So it might contain the same district

16   geographically speaking, but the supreme court is a

17   fundamentally different job than a public service commissioner

18   and a transportation commissioner.  So you might be using the

19   same lines, but the office makes a difference.

20   **Q.**   And you didn't perform any sort of analysis to compare

21   those positions; right?

22   **A.**   I did not.

23   **Q.**   And do you know what the public service commissioner even

24   does?

25   **A.**   They regulate the state utilities.

1   **Q.**   What about the transportation commissioner?

2   **A.**   I'm assuming that they regulate transportation.

3   **Q.**   Does your report identify anyone who has been deterred

4   from voting because of any factor discussed in your report?

5   **A.**   No.  But to piggyback on the earlier witness's testimony,

6   we have very low turnout in the state because of that cost of

7   voting index that we referenced earlier.  So it is likely

8   that -- given the fact that Mississippi voter turnout is 49

9   through 50th, depending on the year, that there is a sizable

10  population of people not voting for those reasons.

11              **MR. COWAN:**  May I confer with counsel one moment?

12              **THE COURT:**  Yes.

13          (CONFERRING OFF THE RECORD.)

14              **MR. COWAN:**  No further questions.

15              **THE COURT:**  Thank you.

16          Redirect?

17              **MR. CHEUNG:**  No redirect, Your Honor.

18              But I want to clarify for the record, according to the

19  stipulations in the joint pretrial order, paragraph 27, there

20  are six of the nine current supreme court justices who were

21  originally appointed to the Court.  The confusion, I believe,

22  comes from the fact that in PX-111, the summary chart, the nine

23  most recent members to have joined the bench, not all of those

24  nine are currently serving.

25              And one of the -- the longest serving justice, Justice

1  Michael Randolph, was originally appointed in 2004, and he's

2  further down the chart.  That's why we were jumping between

3  five and nine and six and nine.  But according to the

4  stipulation, it is six out of nine.

5          **THE COURT**:  Six out of nine.  Okay.

6          May this witness go home?

7          **MR. CHEUNG**:  Yes, Your Honor.  Thank you.

8          **THE COURT**:  Thank you.

9          **MR. SAVITZKY**:  Your Honor, plaintiffs have no further

10  witnesses.  We would rest at this point in terms of our

11  presentation of the evidence.

12          **THE COURT**:  Thank you.

13          **MR. WALLACE**:  Your Honor, we move for judgment on the

14  basis of the evidence.  I suspect we will argue that tomorrow,

15  but I think I'm obliged to make the motion now.

16          **THE COURT**:  Make your motion now.  It's preserved for

17  in the morning.  We'll start back at 9:00.  I'll hear any

18  argument that you have on the motion and any opposition to that

19  motion, and then we will go into your closing arguments.  Okay?

20          **MR. SHANNON**:  Your Honor, just to be clear, we have

21  not yet rested.  We do expect to have one -- potentially, one

22  more evidentiary submission.  No further witnesses.  But we

23  will make that after our argument tomorrow.

24          **THE COURT**:  Did you say no further witnesses but a

25  submission?

1     **MR. SHANNON:**  Yes, Your Honor.

2     **THE COURT:**  Okay.  Very well.

3     **MR. SHANNON:**  Thank you.

4     **MR. SAVITZKY:**  And, Your Honor, just to clarify.  So

5     the Court would like oral argument on the motion followed by

6     separate closing arguments?

7     **THE COURT:**  Yes.

8     **MR. SAVITZKY:**  Understood.

9     **THE COURT:**  Yes.  We'll briefly take up the motion,

10    and then -- I don't mean to say "briefly" because I'm not

11    trying to cut you off, but we will take up the motion, deal

12    with it, and then I will allow you to make your closing

13    arguments.

14    **MR. WALLACE:**  I can promise a short argument, Your

15    Honor, so we can get --

16    **THE COURT:**  If that motion is not sustained, we'll

17    have -- we'll have closing arguments.  Okay?

18    Okay.  Well, good evening, and I will see you at 9:00

19    in the morning.

20    (RECESSED AT 5:35 P.M.)

21

22

23

24

25

1

## CERTIFICATE

2

3      I, Phyllis K. McLarty, Federal Official Realtime Court

4 Reporter, in and for the United States District Court for the

5 Northern District of Mississippi, do hereby certify that

6 pursuant to Section 753, Title 28, United States Code, that the

7 foregoing pages, 1187-1417, Volume 7, are a true and correct

8 transcript of the stenographically reported proceedings held in

9 the above-entitled matter and that the transcript page format

10 is in conformance with the regulations of the Judicial

11 Conference of the United States.

12      Witness my hand, this 1st day of September, 2024.

13

14                    /s/ Phyllis K. McLarty
                   PHYLLIS K. McLARTY, RMR, FCRR, CCR #1235
                   Federal Official Court Reporter

15

16

17

18

19

20

21

22

23

24

25