1    UNITED STATES DISTRICT COURT
     NORTHERN DISTRICT OF MISSISSIPPI
2    GREENVILLE DIVISION

3
     DYAMONE WHITE; DERRICK SIMMONS;
4    TY PINKINS; CONSTANCE OLIVIA
     SLAUGHTER HARVEY-BURWELL                      PLAINTIFFS
5
     VS.                                           NO. 4:22-CV-62
6
     STATE BOARD OF ELECTION COMMISSIONERS;
7    TATE REEVES, IN HIS OFFICIAL CAPACITY
     AS GOVERNOR OF MISSISSIPPI; LYNN FITCH,
8    IN HER OFFICIAL CAPACITY AS ATTORNEY
     GENERAL OF MISSISSIPPI; MICHAEL WATSON,
9    IN HIS OFFICIAL CAPACITY AS SECRETARY
     OF STATE OF MISSISSIPPI                       DEFENDANTS
10

11
                    NON-JURY TRIAL
12                    VOLUME 8

13
              BEFORE HONORABLE SHARION AYCOCK
14             UNITED STATES DISTRICT JUDGE

15
                   Oxford, Mississippi
16                  August 15, 2024

17

18            (APPEARANCES NOTED HEREIN)

19

20

21

22

23
              PHYLLIS K. McLARTY, RMR, FCRR, CCR #1235
24               Federal Official Court Reporter
                    911 Jackson Avenue East
25                   Oxford, MS  38655

```
 1   APPEARANCES:

 2   For the Plaintiffs:  ARI J. SAVITZKY, Esquire
                          MING CHEUNG, Esquire
 3                        VICTORIA OCHOA, Esquire
                          American Civil Liberties Union Foundation
 4                        125 Broad Street, 18th Floor
                          New York, NY  10004
 5

 6                        JONATHAN K. YOUNGWOOD, Esquire
                          JANET A. GOCHMAN, Esquire
 7                        Simpson Thacher & Bartlett
                          425 Lexington Avenue
 8                        New York, NY  10017

 9
                          V. NOAH BENJAMIN GIMBEL, Esquire
10                        KATE LAMBROZA, Esquire
                          Simpson Thacher & Bartlett
11                        900 G St. NW
                          Washington, DC  20001
12

13                        SABRINA S. KHAN, Esquire
                          Southern Poverty Law Center
14                        403 Washington Avenue
                          Montgomery, AL  36104
15

16                        BRADLEY E. HEARD, Esquire
                          Southern Poverty Law Center
17                        1101 17th St. NW, Suite 550
                          Washington, DC 20036
18

19                        AHMED K. SOUSSI, Esquire
                          Southern Poverty Law Center
20                        150 E. Ponce de Leon Avenue
                          Suite 340
21                        Decatur, GA  30030

22
                          JOSHUA F. TOM, Esquire
23                        AYANNA DENISE HILL, Esquire
                          ACLU of Mississippi
24                        P.O. Box 2242
                          Jackson, MS  39225-2242
25
```

```
 1   For the Defendants:   CHARLES E. COWAN, Esquire
                           MICHAEL B. WALLACE, Esquire
 2                         Wise Carter Child & Caraway, P.A.
                           P.O. Box 651
 3                         Jackson, MS   39205-0651

 4
                           JUSTIN LEE MATHENY, Esquire
 5                         REX MORRIS SHANNON, III, Esquire
                           ELIZABETH WINDSOR USRY, Esquire
 6                         Mississippi Attorney General's Office
                           P.O. Box 220
 7                         Jackson, MS   39205-0220

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

<u>TABLE OF CONTENTS</u>

                                                            <u>PAGE</u>

Motion                                                      1423

Defendants Rest                                             1445

Closing Argument by Plaintiffs                              1447

Closing Argument by Defendants                             1506

Closing Argument Rebuttal by Plaintiffs                     1555


<u>DEFENDANTS' EXHIBITS</u>          <u>I.D.</u>      <u>ADMITTED</u>

      DX-14                       1445

1    (CALL TO ORDER OF THE COURT AT 9:04 A.M.)

2    **THE COURT:**  Good morning, everyone.

3    So we want to get started this morning with your

4    arguments, the motion made by the defendants yesterday

5    afternoon.

6    You may proceed.

7    **MR. WALLACE:**  May it please the Court.

8    I haven't made a directed verdict argument in so long

9    I don't even know what you call it anymore, but my colleagues

10   tell me it's Rule 52(c).  Whatever you call it, it's the same

11   principle it's always been.  I have got to show you that, on

12   undisputed evidence, their issues are flawed and entitle us to

13   judgment in the case.

14   There are two of those.  The first is that a district

15   with a Black voting majority is not entitled to relief under

16   Section 2.  And the second is relief can't be granted under

17   Section 2 without proof of depressed minority political

18   participation.

19   Five years ago, the Fifth Circuit took both of those

20   issues *en banc* in the *Thomas vs. Bryant* case to try to

21   straighten them out for this circuit.  In oral argument, the

22   appellees stood up and announced they would like to have their

23   judgment vacated and their complaint dismissed, which was a

24   strange thing to happen in an oral argument.  And that's why

25   the Fifth Circuit has not answered those questions and have

1   left them for Your Honor this morning.

2           Let me address the first one.  The Supreme Court, in

3   the *Bartlett* case, says that you only get to the *Gingles*

4   calculation where an election district could be drawn in which

5   minority voters form the majority, but such a district is not

6   drawn.  That's 556 U.S. at 18.  The recent *Allen vs. Milligan*

7   case says basically the same thing.

8           So the question is whether additional minority --

9   majority minority districts can be drawn, 599 U.S. 31.  They

10  both say, if you have already got a minority district, you

11  never get started with *Gingles*.

12          Plaintiffs have stipulated that the census data shows

13  this to be a 51 percent citizen Black voting-age majority

14  district.  That means the proportion of the eligible voters in

15  the district is 51.  They can't deny 51 percent is enough to

16  satisfy Section 2.

17          In the legislative redistricting case, they persuaded

18  the three-judge court to create a new senate district in

19  Northeast Mississippi, which is only 50.9 percent.  This

20  district is bigger than that.  If 50.9 percent is good enough,

21  so is 51.

22          On cross-examination, they tried to get Dr. Swanson to

23  admit that there may be enough former criminals running around

24  to bring this down below 50 percent.  But he didn't agree with

25  them.  He pointed out that -- when Mr. Savitzky was deducting

1    Black -- potential hypothetical Black felons from the

2    numerator, he was forgetting to deduct them from the

3    denominator.  And when you deduct them in both places, you are

4    still up above 50 percent.

5         They don't have a single witness who has sworn to this

6    Court that this is a Black minority district.  Mr. Cooper said

7    he didn't do the math.  Nobody else did the math.  This is

8    clearly a Black majority district.

9         Now, the Fifth Circuit in the *Salas* case says it is

10   possible that a district in where minorities form a majority of

11   the voters could go forward under Section 2 if you demonstrate

12   that the majority is illusory.  That's the language the Fifth

13   Circuit used in *Salas*.

14        In that case, Hispanics in Texas had a registration

15   majority, but they argued that their majority was illusory

16   because those folks wouldn't come out and vote.  This is what

17   the Fifth Circuit said.

18        "Obviously, the protected class is not entitled to

19   Section 2 relief merely because it turns out in a lower

20   percentage than Whites to vote.  Further, the high incidence of

21   Hispanic registration in the district is persuasive evidence

22   that Hispanic voters are not deterred from participation in the

23   political process because of the effects of prior

24   discrimination, including unemployment, illiteracy, and low

25   income."  That's 964 F.2nd at 1556.

1    So all of those things are bad, but if you have got a
2    voter registration majority and you don't use it, you are not
3    entitled to relief.

4    Now, *Shelby County* found that Black registration in
5    Mississippi exceeds White registration by 3.8 percent.  And the
6    CPS docket -- the CPS numbers, which we have admitted, show
7    that that carries on today.  No witness has said that Blacks
8    overreport their registration.  It's a different question did
9    you turn out on a particular day as opposed to what you usually
10   do.

11   Your Honor usually sees that evidentiary problem in
12   reverse.  Somebody shows up and says this is what I usually do
13   in order to prove what they did do on a particular case in
14   question.  This is the only -- this is the other direction.
15   They say, "Well, this is what we did in 2020 to prove what they
16   usually do."  Mississippi State asked the question, and Blacks
17   exceed Whites in saying that they usually vote.

18   So the parity that Judge Lee found 25 years ago
19   between Black and White participation still existed under
20   *Shelby County*.  It still exists today.  And under *Salas,*
21   because Blacks have a lead in registration, the fact that they
22   are not getting out to take advantage of it is not a Section 2
23   violation.

24   The second issue is whether they can recover where
25   there is depressed -- unless there is depressed Black

1   participation.  And that language comes from the senate staff
2   report.

3          I think *Salas* decides this one too.  Where you have a
4   Black registration majority, the failure to turn out is not
5   attributable to past discrimination that depresses turnout.
6   You have got the -- you have got the majority.  You don't use
7   it.  The participation is on the front end.  Are you
8   registered, and can you do it?  Not whether you bother to do it
9   at the end of the day.

10         So -- but if you get to the turnout issue, if you get
11  past *Salas* and say, "Well, I'm going to look to see what the
12  turnout is," I don't think they have enough proof.  The Fifth
13  Circuit in both *Rangel* and *Fordice*, cited in our briefs, say
14  that one election, in this case, 2020, isn't enough to
15  establish a Section 2 violation.

16         And Dr. King quite candidly agreed with that
17  yesterday.  What he said is, "In political science, we don't
18  make a lot of hay out of one election."  In voting rights law,
19  we don't make a lot of hay out of it either.  And all they have
20  got is one election.

21         So the Fifth Circuit and their own expert say that's
22  not enough.  They haven't proven depressed participation, and
23  for that additional reason, we believe defendants are entitled
24  to judgment.

25         We thank the Court.

1    **THE COURT:**  Thank you.  Any argument on behalf of the
2    plaintiffs?  Response?

3            **MR. SAVITZKY:**  May it please the Court, Your Honor.

4            **THE COURT:**  You may proceed.

5            **MR. SAVITZKY:**  Your Honor, a few points in response to
6    Mr. Wallace, but I think the first thing I would say is, having
7    heard evidence over the last two weeks, the rule allows the
8    Court to reserve on the motion and proceed to close the case.
9    I think that's standard and typical.

10           And I think it makes particular sense in this case
11   where, under Section 2, we make an intentional local appraisal.
12   We look at past and present reality, and in the end, we talk
13   about it and we think about it and make a decision based on the
14   totality of the circumstances.

15           I understand Mr. Wallace is offering a legal argument
16   and arguing that there's some legal ground to not address the
17   facts in the case.  I don't think there is any legal basis for
18   that position.

19           Certainly, if you look at *Bartlett Against Strickland*
20   or you look at *Ashcroft* or any of the cases that talk about
21   what it means to have a Black voting-age majority, what
22   *Bartlett* says is, when you draw an illustrative plan for
23   *Gingles* 1, we look at the illustrative plan.  We say, Is the
24   illustrative plan over 50 percent plus one census Black
25   voting-age population; right?

1    On *Gingles* 1, we are looking at the illustrative plan.
2    We are not asking about the existing district.  We are not
3    measuring the BVAP of the existing district.  There is no case
4    that does that.  There is just nothing in the law that applies
5    to that.

6    On *Gingles* 1, we look at the illustrative plan.  And
7    what *Bartlett* said was plaintiffs can't come in and offer an
8    illustrative plan that is 40-something percent, which is not
9    what is happening here.  All of our illustrative plans are over
10   50 percent.

11   Now, on *Gingles* 3, now we look at what happens with
12   the existing plans.  And the question isn't what's the
13   population composition of the district.  The question is
14   whether Black voters, despite voting cohesively, are usually
15   defeated in light of White bloc voting against the preferred
16   candidates.  That's how we consider the effectiveness of the
17   Black population in that district, whether it's a BVAP
18   plurality district or a CVAP majority district.

19   And, again, the numbers being referenced by
20   Mr. Wallace, CVAP, are estimates.  They are not the census
21   estimates that the cases require us to use when we think on
22   *Gingles* 1 about the population of the district.  And, again, we
23   look at the illustratives there.

24   But *Gingles* 3 is where we look at the existing
25   district, and there we are looking at election results.  We are

1    not looking at the population of the district.  And *Salas,* as
2    far as I can tell, doesn't say anything to the contrary.

3         We talked about it a little bit in our pretrial brief.
4    But it -- it doesn't contain any such rule that, where there is
5    some numerical characteristic of the existing district, then
6    there is a legal defense and we don't engage in the totality of
7    the circumstances inquiry.  Nothing like that.

8         And *Salas*, as I understand it, involved a case where
9    there was a Black registration or a minority registration
10   majority.  There is no evidence of that here.  Rather, what the
11   evidence is, is that while the district -- District 1 --
12   current District 1 is Black voting-age plurality and just over
13   CVAP majority using those CVAP estimates, once we start to
14   think about the tens of thousands of Black voters -- Black
15   potential voters who are disenfranchised based on a
16   disqualifying conviction, that number goes down.

17        Mr. Cooper testified unequivocally that it's going to
18   go down under 50 percent.  We can talk about that in closing.

19        Dr. Swanson didn't disagree, and I have to tell you,
20   as far as I understand how you do the extremely simple
21   calculation that we walked through when he was on the stand,
22   you don't subtract from the numerator and the denominator.  You
23   keep the denominator the same.  And that's what he did when he
24   did his adjusted calculation, and then his arithmetic started
25   to change when he didn't like the results that we were getting.

 1          So, Your Honor, I don't think there is a legal

 2 argument here to walk away and not do the analysis that

 3 Section 2 requires because of some characteristic of the

 4 existing district.  You need to look at the elections, look at

 5 the results, look at the effects for Black voters, which is

 6 what Section 2 requires.

 7          So unless the Court would like to hear more on any of

 8 the points that Mr. Wallace raised, I look forward to

 9 presenting closing argument.

10          **THE COURT:**  Thank you.

11          Have any rebuttal, Mr. Wallace?

12          **MR. WALLACE:**  One thing, Your Honor.

13          **THE COURT:**  Thank you.

14          **MR. WALLACE:**  Your Honor is going to have to read

15 *Bartlett* and *Allen* and *Salas* to see what they all mean, and I'm

16 not going to try to tell you this morning, but I will remind

17 you of one fact.

18          Mr. Cooper said he did not do the math.  It was his

19 speculation that there may be enough released felons wandering

20 around the third district.  Didn't have any evidence of where

21 they were or whether they were still alive or how many, and he

22 speculated that they might bring it down below 50 percent, but

23 he admitted he didn't do the math.

24          We have done the math from the census data.  It's

25 51 percent.  And unless they can find somebody to say it goes

1   below 50 percent, we have got a Black majority district here,

2   and I think under *Allen* and *Bartlett,* you stop right there.

3          Thank the Court.

4          **THE COURT:**   Thank you.

5          Okay.  Mr. Shannon.

6          **MR. SHANNON:**   Good morning, Your Honor.

7          **THE COURT:**   Good morning.

8          **MR. SHANNON:**   Good morning.  Before the defense rests,

9   we do have one additional evidentiary submission to make.

10          **THE COURT:**   Yes, sir.

11          **MR. SHANNON:**   At this time, the defendants would offer

12  into evidence what has been marked for identification as DX-14.

13  That is the U.S. District Clerk's file for the case of *Magnolia*

14  *Bar Association, Inc. vs. Lee* in the U.S. District Court for

15  the Southern District of Mississippi, Number J90-0413(b), as in

16  Bravo.

17          Your Honor, DX-14 is the complete court file for the

18  Southern District Clerk for the first time this case was tried

19  back in February of 1992.  It is relevant to multiple issues of

20  fact delineated in the pretrial order and raised during the

21  course of this trial, including the defendants' view of the

22  third *Gingles* precondition as well as Senate Factor 9

23  specifically as it relates to the policy justifications for the

24  east/west configuration of the Mississippi Supreme Court

25  District lines.

1   Your Honor, we would offer DX-14 pursuant to the
2   hearsay exception for ancient documents set out in Rule 803.16.
3   And, Your Honor, DX-14 is authenticated pursuant to Federal
4   Rule of Evidence 901(b)(8), the court file being more than
5   20 years old and no objection being raised to authenticity in
6   the pretrial order.

7   **THE COURT:**  Any objection?

8   **MR. SAVITZKY:**  Yes, Your Honor.  We would object.  We
9   don't think that the ancient document exception can apply to
10  get this entire 900-page case file into the record here.  A few
11  points, just at a high level.

12  This is a trial record from a different case.  It
13  contains declarations by witnesses, expert reports by experts
14  who weren't disclosed in this case, didn't testify, weren't
15  subject to cross-examination.  So it's clearly hearsay.  And
16  the underlying case file is hearsay that was created for
17  purposes of litigation.

18  Now, the ancient documents exception can apply -- and
19  this is a sort of a chain of hearsay issue -- can apply to the
20  first level, but what the cases say -- we would point the Court
21  to *Hicks Against Charles Pfizer*, which is a decision from Judge
22  Crone in the Eastern District of Texas who cites additional
23  authority.  That's 466 F. Supp. 2d.

24  Even if a document -- and here I think the document we
25  are talking about is the clerk's docket and then all of the

1  other subsidiary documents that are attached to it.  Even if a
2  document qualifies as ancient under Rule 803.16, "other hearsay
3  exceptions," in other words, not the ancient document rule,
4  "Other hearsay exceptions must be used to render each
5  individual layer of hearsay admissible."

6      So the docket sheet is one thing, but once we get down
7  below the docket sheet and start talking about statements from
8  witnesses, expert reports, those would be some "other hearsay
9  exception," and there is none that applies in this case.  This
10 is testimony that wasn't presented.  Defendants obviously had a
11 chance to present witness testimony from additional experts,
12 from historians, from policymakers.  They presented the case
13 that they presented.

14     And so we don't think that the ancient document
15 exception applies, and, accordingly, there is no exception to
16 hearsay to let in this 900-page collection of documents.

17     **MR. SHANNON:**  Your Honor, may I respond?
18     **THE COURT:**  You may.

19     **MR. SHANNON:**  Your Honor, as we set out in the
20 pretrial order and also in our opening statement, part of the
21 defendants' theory of the case is that the case before Your
22 Honor is a needless do-over of prior litigation.

23     In the *Magnolia Bar* case, Judge Barbour held that the
24 current supreme court lines are lawful under Section 2 of the
25 Voting Rights Act.  Judge Barbour's reported opinion in

1  *Magnolia Bar* is set forth at 793 F. Supp. 1386.

2  Your Honor, the court file being offered as DX-14 is

3  the Court record providing the factual basis for Judge

4  Barbour's ruling and his related findings.  It is relevant for

5  two particular reasons.

6  Number one, it is probative of *Gingles* 3 regarding the

7  effectiveness or the lack thereof of White bloc voting in the

8  Central Supreme Court District.

9  Moreover, Your Honor, number two, it is probative of

10  the fact that the state's policy underlying the creation and

11  maintenance of the east/west configuration of the supreme court

12  districts is not tenuous.  Rather, the underlying state policy

13  was to intentionally make the districts more diverse for the

14  purpose of fostering judicial independence.

15  Now, Your Honor, that goes to Senate Factor 9.

16  Specifically, the report and the trial testimony of Belhaven

17  history professor Westley Busbee, who testified in that case.

18  And it's relevant to refute the testimony that Dr. King gave

19  yesterday when he said that he disagreed with Judge Barbour's

20  findings on this point.

21  Your Honor, as to the hearsay objection, I don't

22  believe there is anything that qualifies -- as Mr. Savitzky has

23  said, that qualifies the 803.16 exception to the extent he has

24  argued that it does.  I believe all of these documents were

25  created more than 20 years ago.  All of the records in the

1   court file are documents that were prepared prior to

2   January 1st, 1998, which is the date set forth in the hearsay

3   exception.

4           That's confirmed by the district clerk's official

5   docket, which appears in DX-14 as Part A of that record, the

6   first eight pages.  Therefore, the entirety of the court file

7   is admissible pursuant to 803.16, which is the hearsay

8   exception for ancient documents.

9           Now, Dr. Busbee's trial testimony -- Dr. Busbee is a

10  Belhaven history professor.  That testimony is, likewise,

11  admissible under Rule 804(b)(1) as former testimony.

12  Dr. Busbee recently passed away.  We can show the Court the

13  obituary if the Court desires, but I make that representation

14  to the Court.  I believe his funeral was last weekend, if I am

15  not mistaken.  But he has passed on.

16          He gave testimony in this case in 1992 that is

17  directly relevant to our theory of the case on multiple issues,

18  and that former testimony was subject to cross-examination by a

19  predecessor in interest to the plaintiffs in this case, who had

20  the same motive to develop that testimony as these folks here

21  do.  So I think that qualifies -- at least -- at the very

22  least, his trial testimony, as being admissible as former

23  testimony under Rule 804(b)(1).

24          So under both of those hearsay exceptions, we believe,

25  number one, that the entire court file is admissible as an

1    ancient document because everything in there, all of its

2    constituent documents, predate 1998.  We believe, furthermore,

3    that Dr. Busbee's testimony, in particular, is admissible under

4    Rule 804(b)(1).

5         Your Honor, the evidence that we are trying to put in

6    here, specifically this court file, goes to our theory of the

7    case, and Dr. Busbee's testimony, in particular, is the best,

8    most probative evidence that the defendants have on some of the

9    key points in this litigation and, most particularly, the

10   public interest in policy justifications for the east/west

11   configuration of the supreme court district lines.

12        We believe this evidence is admissible.  Respectfully,

13   we believe it would be reversible error to exclude this

14   evidence.  We would offer it into evidence.

15        Thank you, Your Honor.

16        **MR. SAVITZKY:**  Your Honor, if I may be heard again.

17        I mean, I understand the argument that was made in

18   opening if this case is a "do-over," but if defendants thought

19   the case should have been tried on that ground, they could have

20   moved for summary judgment.

21        So having had a trial, evidence needs to be put

22   forward at trial.  Defendants could have called a historian.

23   They could have disclosed Dr. Busbee -- I did not realize that

24   he passed away -- as an expert earlier in this case.

25   Litigation has been going on for two years.  He wasn't

1 disclosed as an expert.  No other expert historian was
2 disclosed.  Defendants chose to put on at trial -- they chose
3 not to move for summary judgment and to put on the case at
4 trial that they put on.

5 Now, the problem is this is double, triple, or
6 quadruple hearsay.  Dr. Busbee's expert report from decades ago
7 is his statement.  The document that is being sought to be
8 offered is the clerk's statement.  That's -- the clerk is the
9 declarant.  So we are talking about multiple different levels
10 of hearsay.  The rule against double and multiple hearsay
11 applies.

12 And, again, as the *Hicks* decision says, and I think
13 the great weight of the case law supports, you need to have a
14 different exception other than ancient document when you're
15 doing double hearsay and you are trying to get some subsidiary
16 document, some other level of hearsay in.  It can't be ancient
17 documents all the way down.  And there's no exception that's
18 been offered.  I think the one exception that Mr. Shannon
19 pointed to was former testimony.

20 Again, this witness or this expert from another case,
21 not this case, was not disclosed at any point as a witness in
22 this case.  It's not properly former testimony.  And,
23 accordingly, there's no applicable exception to the double
24 hearsay.  The double hearsay rule applies.

25 We cite on that again, *United States vs. Cervantes*,

1  107 F.4th 459, from the Fifth Circuit.  We are talking about a
2  statement within a statement, and there's no hearsay exception
3  for that second statement.

4          **MR. SHANNON:**  Your Honor, may I make one further
5  comment, or does Your Honor need to read?

6          **THE COURT:**  Uh-huh.

7          **MR. SHANNON:**  I would just say that one of the key
8  issues in this case is what the baseline was in 1992 because
9  that's when Judge Barbour held that the district lines we're
10 fighting about in this trial were lawful under Section 2 of the
11 Voting Rights Act, which is the only claim made in this case.
12 I don't know how this Court is supposed to determine what the
13 baseline was in 1992 without having the evidence that was
14 before Judge Barbour.  I don't know any other way to put that
15 evidence in front of this Court beyond -- beside putting in the
16 court file -- the district clerk's file.

17         There is no argument that this is not an authentic
18 document.  And I would take issue with Mr. Savitzky's
19 characterization that the "declarant" is the clerk.  The
20 declarant are the folks who generated the records that the
21 court is serving as the conservator of.  Those are documents
22 that are preserved by the clerk, but they weren't generated by
23 the clerk.  They were generated by the underlying declarants,
24 one of which was Dr. Busbee.

25         **THE COURT:**  Let me ask you this:  What form of

1  transcription or testimony do you have regarding Dr. Busbee?

2  **MR. SHANNON:**  The trial transcript from the *Magnolia*
3  *Bar* case that is contained within DX-14, Your Honor.  So is his
4  report, but his trial testimony is in that record, which is
5  former testimony.

6  **MR. SAVITZKY:**  And, Your Honor, if I may very briefly.

7  This is a 900-page document.  So in addition to
8  whatever trial transcript, as Mr. Shannon says, there are
9  expert reports.  There are declarations.  And, again, under the
10  rule for each level of hearsay, there needs to be an applicable
11  exception.  Ancient document cannot apply to all of the
12  subsidiary documents.  And so the Court would need to go
13  through each one of those and --

14  **THE COURT:**  Let me just narrow the discussion.  I am
15  not going to accept the entire court document, the 900 pages,
16  based on a number of arguments, including multiple layers of
17  hearsay.  I am focusing on Dr. Busbee.

18  If -- Mr. Shannon, you think that that concise
19  testimony establishes what you say to me that I have to
20  understand the baseline?

21  **MR. SHANNON:**  I believe it establishes what you need
22  to have to understand the baseline in terms of the policy
23  justifications for the current supreme court districts.

24  There are other issues in this litigation, however,
25  one of which being *Gingles* 3, which is whether Whites vote as a

1  bloc usually to defeat the Black-preferred candidate.  And
2  Judge Barbour found in the Central District that that was not
3  the case in 1992.  That is a baseline issue that this Court has
4  to have some evidence of.

5  **THE COURT:**  Mr. Shannon, does Judge Barbour's opinion
6  not help me understand -- I have read it, but is that not the
7  published opinion upon which I should rely?  Because it would
8  be just unusual for the Court, so many years later, to be
9  looking at a transcript or the exhibits in another file for
10  purposes of determining this case.

11  **MR. SHANNON:**  Your Honor, to that, I would say we
12  spent two weeks, and we have heard a lot about Mississippi
13  history from a lot of different experts.  I think this is a
14  case that, in large part, turns on history, and, you know,
15  where we start and stop that history is a matter we can debate.

16  **THE COURT:**  And you think that Dr. Busbee's report is
17  what is the most important evidence in the 1992 case that
18  speaks to the history at that time upon which Barbour relied?

19  **MR. SHANNON:**  No, Your Honor, I don't.  I believe it
20  speaks to the policy justification issue.  But there are other
21  issues, such as what -- the White bloc voting issue under
22  *Gingles 3* that Dr. Busbee was not focused on.

23  So I want to be clear -- and I understand the
24  Court's -- I understand where the Court is headed, but I want
25  to be clear we're not withdrawing our offer of the admission of

1 the entire DX-14.

2 **THE COURT:** Right. I understand.

3 **MR. SAVITZKY:** Your Honor, I hesitate to interrupt,

4 but if the Court would hear one more quick point on it.

5 **THE COURT:** Uh-huh.

6 **MR. SAVITZKY:** I don't think we have heard anything

7 about why this particular testimony that is in the record --

8 and I think the Court is right. You can look to Judge

9 Barbour's decision and his discussion of these issues,

10 including *Gingles* 3.

11 But I don't think we have heard anything about why

12 this testimony in the record couldn't have been adduced at

13 trial by an expert, by witnesses who would be put on, in other

14 words, the policy justifications, the history, a historian. I

15 mean, Dr. Busbee was not a policymaker. He was a historian.

16 So another historian could have come and testified.

17 And so there is no -- there is no particular reason

18 why we -- why we would need to bring in inadmissible hearsay to

19 get at a point that could have been adduced at trial.

20 **THE COURT:** Counselors, I think you've done an

21 excellent job of laying out for the Court why it is that the

22 defendants think this is very important that this entire case

23 in 1992 be considered by the Court. And I think the plaintiffs

24 have done a good job in terms of trying to bar that admission.

25 So, on a whole, my gut is that I should not accept this.

1          I think my job is to focus on the facts as they are

2    today, to focus on the testimony that I have had in this trial.

3    I understand that this trial has dealt with a lot of history,

4    and it's important history to understand, but I don't want to

5    rely upon the underlying testimony of another case.

6          I will depend and rely upon the opinion of Judge

7    Barbour, with the understanding that that judge, having heard

8    all of these 900 pages of testimony, had the better

9    understanding of what was correct to be heard and what was

10   correct to be considered as part of his decision.  And I

11   respect that.  I think it is just kind of inherently improper

12   for me to get into the weeds of another case for purposes of

13   deciding this case when I did not hear that testimony and it's

14   not part of the testimony in this case.

15         My additional concern -- and Mr. Savitzky raised it --

16   my other concern is, looking technically at 804(b)(1), former

17   testimony, I could accept Dr. Busbee's portion of the

18   transcription because he is unavailable in light of his death

19   in the last couple of weeks, but he was not disclosed as an

20   expert even earlier, prior to his demise.  And had he been

21   disclosed and he had since died prior to the trial, I certainly

22   would receive Dr. Busbee's testimony of the previous case so

23   that I would at least have that bit of his history.  But he was

24   not disclosed as an expert.

25         Yesterday I ruled that Dr. King could not be heard on

1   his opinions regarding 1, 2, and 3 because that had not been

2   disclosed to the defendants that they anticipated that he would

3   be offering opinions on *Gingles* 1, 2, and 3.

4          And you have been in litigation for about two years,

5   and there have been a lot of disclosures, but in all fairness,

6   I think that we focus on this case, this testimony, and no

7   elements of surprise with respect to now the Court, having

8   heard this testimony, going back and relying upon a 1992 court

9   transcription and file.

10         So I am not -- I will sustain the objection.  I'm not

11  going to receive the court file.

12         **MR. SHANNON:**  Your Honor, one additional question.

13  I'm not re-arguing.  I accept the Court's ruling.

14         **THE COURT:**  No.  I understand.

15         **MR. SHANNON:**  Mr. Savitzky is correct that this

16  exhibit is around 900 pages -- I think just shy of 900 pages'

17  long.  We would like to just make sure that it is preserved for

18  appellate review.  We have produced -- provided an electronic

19  copy.  Is that sufficient with the Court?

20         **THE COURT:**  Yes.

21         **MR. SHANNON:**  If the Court would like, we can file it

22  in the record.

23         **THE COURT:**  I probably don't want you to file it.

24         **MR. SHANNON:**  Thank you, Your Honor.

25         **THE COURT:**  And the clerk's office doesn't want you to

file it.

**MR. SHANNON:**  Understood, Your Honor.  Thank you.

(EXHIBIT NO. DX-14 MARKED FOR IDENTIFICATION ONLY.)

**THE COURT:**  Moving on to closing arguments -- do you need to take a break before we do closing arguments?  Is everybody okay?

**MR. SAVITZKY:**  I think plaintiffs are ready to proceed, Your Honor.

**MR. WALLACE:**  As is the defense, Your Honor.

**THE COURT:**  Thank you.  You may proceed.

**MR. SHANNON:**  Your Honor, as a matter of procedure, the defense rests.  I don't think we have --

**THE COURT:**  Thank you.  I assumed as much, but thank you for clarifying in the record.

**MR. SHANNON:**  Your Honor, and we would renew Mr. Wallace's motion as a matter of procedure that he made earlier.

**THE COURT:**  The Court is going to take it under consideration.  I'm not ruling at this time on that motion.

**MR. SHANNON:**  Thank you, Your Honor.

**MR. SAVITZKY:**  Excuse me, Your Honor.  Before I start, if I may hand the Court a copy of the PowerPoint in this case.

May it please the Court, Your Honor.

**THE COURT:**  You may proceed.

**MR. SAVITZKY:**  Your Honor, Ari Savitzky for the

1  plaintiffs Dyamone White, Derrick Simmons, Ty Pinkins, and

2  Constance Slaughter Harvey-Burwell.

3      I reserved, I think, ten minutes for rebuttal, and I

4  hope that's not wishful thinking.  It may be.  There's a lot to

5  cover today.  We'll see how much time I have left.

6      **THE COURT:**  Let me ask you about that.

7      **MR. SAVITZKY:**  Yes.

8      **THE COURT:**  I'm not trying to extend this any further

9  than need be, but I do want to hear what you both have to say,

10  and that -- closing is important for me to realize what you

11  perceive to be the true highlights.

12      Now, we're going to look at all of this for the next

13  two months, but I don't want to cut you off if you still have

14  things to be said.  And I don't want to cut you off,

15  Mr. Wallace, if you still have things to be said.

16      So I know that y'all have agreed on some timelines.

17  I'm going to be lenient.

18      **MR. WALLACE:**  Yes, ma'am.  I understand that.  I don't

19  think I have ever talked 75 minutes in my life but --

20      **THE COURT:**  I bet you have.

21      **MR. SHANNON:**  That's debatable, Your Honor.

22      **MR. WALLACE:**  My wife might support you on that.  Not

23  at a stretch, Judge.  I run out of gas.  But we will talk as

24  long as you want to hear us.

25      **THE COURT:**  Well, I -- and then I will tell you I do

1  have some questions for you this morning too, but I want you
2  both to make your closings, and then I will follow up with a
3  few questions that we have thought about over the last few
4  days.
5          You may proceed.
6          **MR. SAVITZKY:**  Thank you, Your Honor.
7          And before I start the argument, I want to make just a
8  few quick points of acknowledgement.
9          First of all, I want to acknowledge Ms. White and
10 Senator Simmons, who are in the courtroom with us today, and
11 say that it's a great honor to represent them and as well as
12 the other plaintiffs in this case.
13         I want to acknowledge and thank the court staff,
14 especially Ms. Wright and Ms. McLarty, for their tireless
15 efforts over the last two weeks.  And I know I can speak a
16 little fast, and others may speak a little fast, and we
17 appreciate all that you do.
18         I also want to thank opposing counsel for their
19 civility and professionalism over the course of this trial and
20 this litigation.
21         Your Honor, over the last two weeks, we have heard
22 about county splits and compactness scores, ecological
23 inference, CPS, the ACS, the CES, the census.  We have heard
24 about race and political behavior, racial appeals,
25 racially-polarized voting.  We have heard about the many ways

1  that history projects itself into the present, the ways it can
2  shift in its course.

3      And this Court is tasked with considering the fairness
4  of the Supreme Court lines in Mississippi for Black voters
5  today, whether they provide Black voters an equal opportunity
6  to participate and elect candidates of choice to the
7  Mississippi Supreme Court today.  And while the question is
8  complex and it's very important, the evidence, based on the
9  law, the answer is clear.  They do not.

10      The district lines enacted back in 1987, when some of
11 us were children and some of us were not yet born -- one of the
12 plaintiffs was not yet born -- dilute the voting strength of
13 Black Mississippians.  They result in the denial of that equal
14 opportunity that the law requires.  And the evidence we've
15 presented in this courtroom over the last two weeks proves
16 that.

17      We have proven that, today, Black voters could easily
18 be included in a reasonably configured Black majority supreme
19 court district made all of whole counties.  And, instead, the
20 lines that are in place fragment Black voters in Mississippi
21 and they crack the Mississippi Delta.

22      We have proven that, today, stark, pervasive,
23 racially-polarized voting patterns mean that Black voters
24 usually lose in state supreme court elections.

25      We've proven that, today, with respect to the supreme

1    court lines, the political playing field is not equal.  And

2    that reality is demonstrated by the stark and persistent

3    underrepresentation of Black Mississippians in the state's

4    highest court.

5         We have proven that, today, the justifications that

6    once underlay these lines no longer apply.  We have proven vote

7    dilution under Section 2.

8         This is an important case, Your Honor, as you said.

9    What we have heard from witness after witness is that

10   representation matters, especially in high offices and very

11   much including on the bench.  We have heard that the current

12   lines don't provide equal opportunities or fair representation,

13   equal opportunities for Black voters and for the next

14   generation of leaders in Mississippi.

15        So this case involves Mississippi's past.  It's very

16   much about Mississippi's present, about whether these lines in

17   their operation in politics today result in vote dilution.  But

18   as we have also heard over the last two weeks, it's about the

19   future as well.

20        So how do we answer such a large and important

21   question?  We start with the law.  We start with *Allen Against*

22   *Milligan*.  We start with controlling supreme court precedent --

23   *Allen* and the Fifth Circuit's application of it in *Robinson*,

24   Chief Judge Dick's application of it in *Nairne*, the three-judge

25   panel's application in the *Mississippi NAACP* case in Jackson.

1    That's how we answer the question.  We look to the law.

2         So what I want to do is go through the elements of the

3    *Gingles* vote dilution standard -- it's reaffirmed in *Milligan,*

4    and it's applied by all of those courts -- and show how we have

5    proven our Section 2 claim as to these supreme court lines,

6    brick by brick, witness by witness.  And along the way, I want

7    to take on some of the arguments the defendants have made and

8    that I think they are probably going to make.

9         So let's start with the *Gingles* vote dilution

10   framework.  The *Gingles* framework is how we carry out Congress'

11   command to prohibit voting schemes, including district lines,

12   when they have discriminatory results, regardless of the

13   intent.

14        And I want to nip something in the bud right here.  It

15   was suggested in opening that the language in the statute "on

16   account of race or color" implies some requirement of intent or

17   purpose.  And it doesn't.

18        This is the supreme court majority in *Milligan.*

19   Quote, "We have reiterated that Section 2 turns on the presence

20   of discriminatory effects, not discriminatory intent.  And we

21   have explained that it is patently clear that Congress has used

22   the words 'on account of race or color' in the Act to mean

23   'with respect to' race or color and not to connote any required

24   purpose of racial discrimination."  That's *Milligan* at

25   599 U.S. 25.

1     And while we are on the statute, let's actually do one

2   more.  It was suggested in defendants' opening that, once a

3   plaintiff proves that unequal opportunity on the totality of

4   the circumstances under subsection (b) of the statute, they

5   have to go back.  I think Mr. Shannon said you have to go back

6   to section (a) to do something else.  And that's wrong.  It's

7   not what *Milligan* or any of the cases say.  It's also not what

8   the statute says.

9     The statute says that, Once you make the required

10  showing under subsection (b), quote, "A violation of

11  subsection (a) is established," closed quote, you don't go back

12  to subsection (a) for anything.  You prove the totality of the

13  circumstances, and you prove a Section 2 violation.  It's a

14  results test.  If the result of the challenged lines is unequal

15  opportunities for Black voters, the test is met.

16    And let me nip just one other bud while I'm at it.

17  Another argument we are probably going to hear from the

18  defendants is Section 2 doesn't apply in judicial cases.

19  Federal courts in the state have been applying the VRA in

20  judicial cases for years.

21    The supreme court squarely addressed the issue in

22  *Chisom Against Roemer.*  Couldn't be clearer.  Quote, "We hold

23  that state judicial elections are included within the ambit of

24  Section 2 as amended," 501 U.S. 404.  It doesn't get clearer.

25    And, Your Honor, defendants may cite cases like

1    *Clements* and *Fusilier*.  What those cases discuss is there are
2    ways that Section 2 can be different in the judicial context
3    sometimes.

4           Specifically, there can be cases where there is
5    something called a "linkage interest," interest in linking
6    judges with a particular jurisdiction in which they exercise
7    authority, like a parish judge in Louisiana being elected by
8    their parish.  It's explained at 963 F.3d 459, this concept.
9    In those situations, parish judges in parishes, courts give
10   some weight when a plaintiff comes in and says, "Let's
11   restructure the judiciary."

12          But this case has nothing to do with that.
13   Mississippi Supreme Court Justices don't have any
14   district-specific function or jurisdiction.  Justice Diaz,
15   Justice Lamar, and others told us they serve the whole state.
16   The whole concept of a linkage interest in the cases, as they
17   have discussed it and recognized it, just doesn't apply here.
18   And even if it did, it would just be another factor to consider
19   on the totality of the circumstances.

20          And let's be clear at the outset about this.
21   Plaintiffs are not seeking to impose single-member districts, a
22   new structure for the judiciary of Mississippi.  We are talking
23   about three districts with three justices, each made up of
24   whole counties, same basic system.  Plaintiffs merely seek to
25   alter the lines so that Black voters get a fair shot.

1          So let's talk about what the law is and then get into

2   the evidence.  *Gingles* has been applied by courts for decades.

3   The supreme court reaffirmed it in *Milligan*, not a plurality of

4   the court, a majority of the Court.  And then the Fifth Circuit

5   applied it and reaffirmed it in *Robinson* on the same type of

6   evidence that was presented in this case, including some of the

7   same experts.

8          And then following *Robinson*, in *Nairne* in the Middle

9   District of Louisiana and *the NAACP* case in the Southern

10  District, sister district courts applied the same standard,

11  came to liability findings after trial based on the same type

12  of evidence that has been presented here.  And, again, many of

13  the same experts, like Mr. Cooper, Dr. Burch, Dr. King.

14         And we aren't here to reinvent the wheel.  We aren't

15  here to get creative with the statute.  We are here to apply

16  the law to the facts presented in this trial.

17         So the first thing we do is we apply the *Gingles*

18  preconditions.  We determine whether the basic dilution dynamic

19  exists.  And then if the preconditions are met, we broaden the

20  inquiry, and we ask about the totality of the circumstances

21  using those senate factors as a guide.

22         So I want to talk at a high level about the function

23  played by those three *Gingles* preconditions.  Why are they so

24  important?

25         *Gingles* 1 asks whether, looking at the illustrative

1  lines, a reasonably configured -- again, the illustrative
2  lines, a reasonably configured Black majority district can be
3  drawn consistent with traditional districting principles.  It
4  tells us whether there is a large, concentrated population of
5  Black voters in a particular area of the state.

6  And then *Gingles* 2 and 3 ask whether patterns of
7  racially-polarized voting exist such that Black voters, despite
8  voting cohesively for preferred candidates, will typically
9  usually be defeated under the current lines in light of
10  persistent bloc voting.  And these tell us, among other things,
11  whether the current lines -- on 2 and 3, we start to think
12  about the current lines -- are minimizing the voting strength
13  of that large Black population.

14  And the Fifth Circuit has said, for example, in the
15  *Teague* case, that it will be the "very unusual case," only the
16  very unusual case, where those conditions will be shown -- a
17  large Black population and high levels of racially-polarized
18  voting -- where those conditions are shown and an ultimate
19  determination of vote dilution does not follow.

20  Why is that?  The reason is that the *Gingles*
21  preconditions illustrate that fragmentation dynamic, a
22  fragmentation of large Black populations by existing electoral
23  lines, where Black voters fragmented are usually defeated at
24  the polls in the context of racially-polarized voting.  And the
25  evidence shows that's exactly what's happening here.  Black

1  voters in Mississippi are being fragmented by these supreme
2  court lines.

3       And while there are ways that this case is unique,
4  certainly, including because these districts are about 40 years
5  old, this isn't the very unusual case when it comes to applying
6  the Section 2 test.  Rather, the evidence is fundamentally like
7  the evidence in *Milligan,* in *Robinson*, in *Nairne,* and in
8  *Mississippi NAACP*.

9       So, Your Honor, I'm going to talk about the evidence,
10 march us through the *Gingles* test, the different factors, the
11 evidence we've heard.  But as we dig into the trial record, I
12 want to answer one more big question.  It's one that
13 Mr. Shannon posed in opening.  What has changed?  What's
14 changed?  What's changed since Chief Judge Barbour decided the
15 *Magnolia Bar* case over 30 years ago?  It's a fair question.
16 And after two weeks of evidence and testimony, the answer is
17 everything.  Everything.

18      Change Number 1.  A reasonable Black-majority district
19 can now be drawn.  In *Magnolia Bar*, one key reason the
20 plaintiffs lost -- I'd say the primary reason -- was that they
21 couldn't draw a three-member district, Black majority, almost
22 certainly not without using whole counties.  So they lost on
23 *Gingles* 1.  And Mr. Cooper went back and looked, and he still
24 couldn't do it with whole counties with those 1990 census
25 numbers that applied.  That was his testimony last week.

1    And now flash forward.  The Black population has grown
2    massively.  Voting-age population is up over 130,000 in just
3    two decades, more if you keep going back to 1987.  Drawing one
4    of the districts as a BVAP majority district using whole
5    counties only is now easy.  Plaintiffs have presented multiple
6    configurations.  So the evidence of illustrative plans being
7    offered today are reasonably configured is overwhelming and
8    it's largely uncontested.

9    Change Number 2.  Racial polarization and White bloc
10   voting have gotten worse.  When *Magnolia Bar* was decided, Fred
11   Banks, Justice Banks had just won a contested supreme court
12   election with 30 percent of the White vote.  That's what this
13   Court heard over the last two weeks.  And so Judge Barbour
14   looked at the evidence, and no countervailing evidence, and
15   concluded that "Whites will not necessarily" -- quote, "Whites
16   will not necessarily vote as a bloc for White candidates having
17   Black opponents in Mississippi Supreme Court elections."

18   And now flash forward.  Today, no Black candidate gets
19   30 percent of the White vote.  None.  We looked at almost two
20   dozen elections.  None.  That's the evidence in this case.  No
21   Black candidate got 20 percent of the White vote in any of
22   those elections.

23   In District 1 races, it's undisputed that most Black
24   candidates get less than 10 percent of the White vote.  Judge
25   Westbrooks, a sitting Court of Appeals judge, got 6 or 7

1    percent crossover vote.  That's a sea change from where things
2    were in 1992 and on another one of the critical core issues in
3    the *Gingles* analysis.

4            Change Number 3.  The evidence is far more extensive.
5    The evidence presented in those prior cases was, in some
6    instances, minimal.  *Fordice*, the other case they cite,
7    especially, a two-day trial.  Plaintiffs called three witnesses
8    in total.  And that's just not much grist, not much grist at
9    all for the intensely local appraisal that happens in a
10   Section 2 case.

11           And now flash forward.  Plaintiffs presented extensive
12   expert testimony, not just on the *Gingles* preconditions but on
13   all of the Senate Factors, on the totality of the
14   circumstances, on the political process in Mississippi, its
15   history, its dynamics, its inputs, its outputs.  And that was
16   combined with testimony, completely missing in the *Fordice*
17   case, from numerous fact witnesses who spoke to racial
18   polarization, the political conditions in the Delta, the
19   history of these lines, their present day effects.  This Court
20   heard from a sitting judge and a senate minority leader and no
21   less than three former justices in the Mississippi Supreme
22   Court.

23           Change Number 4, the passage of decades.  In the
24   1990s, these district lines were hot off the presses.  Justice
25   Diaz, who was in the legislature not long after, testified that

1    the expectation was that they would be redrawn periodically, as
2    other electoral lines are.

3         And now flash forward.  Four decennial census cycles
4    have come and gone since these lines were last changed.  There
5    has been no change.  The lines are now malapportioned in terms
6    of population.  And in the meantime, the evidence shows that
7    political and racial polarization have spiked.  Segregation and
8    disinvestment have gotten worse for schools, especially in
9    predominantly Black communities.  Racial appeals have
10   stubbornly persisted in politics.  Black candidates have run
11   for statewide office and supreme court, and they've lost
12   repeatedly.

13        Looking around, Your Honor, everything has changed.
14   And so in light of that, the thing to do is what the law
15   requires, make that intensely local appraisal on the facts as
16   they exist today, as established over the last two weeks in
17   this courtroom.

18        Your Honor, here is what the evidence shows.  Starting
19   with *Gingles* 1, the standard is straightforward.  It's
20   flexible.  Can a reasonably configured Black majority district
21   be drawn consistent with traditional districting principles?
22   That's the standard as considered and reaffirmed by a majority
23   of the Court in *Milligan*.

24        And the discussion of *Gingles* 1 in the Mississippi
25   *NAACP* case by that panel is illuminating.  I did hear at one

1  point some reference to Justice Kavanaugh's concurrence.  We

2  may hear about that when defendants close.  The three-judge

3  panel discussed *Milligan* in detail, considered at length, and

4  firmly rejected the idea that Justice Kavanaugh's concurrence

5  involved any, quote, "alteration of what he accepted as the

6  majority's understanding of precondition one."  In the Westlaw

7  Report, that's pages 13 to 14 in that three-judge panel case.

8       So the *Gingles* 1 standard is very clear.  It involves

9  looking at illustrative plans and asking if they are reasonably

10 configured looking at traditional districting principles.  We

11 take into account the traditional principles like compact

12 shape, equal population, contiguity, communities of interest,

13 respect for existing political subdivisions like counties.  And

14 the evidence that these illustrative plans are reasonably

15 configured is comprehensive and it's almost entirely

16 uncontested.

17      Start with Bill Cooper.  Mr. Cooper did a detailed

18 demographic analysis demonstrating that there are areas in the

19 state where the Black population is numerous and concentrated.

20 The demographic reality is that Mississippi's Black population

21 has grown substantially and Mississippi's White population,

22 slightly down level.

23      Mr. Cooper analyzed population at the state level, the

24 county level, regional level, congressional district level, and

25 identified particular regions of the state where this growth

1    makes it almost certain, just on a demographic basis, that a
2    whole-county majority Black supreme court district can be
3    drawn.  The population is changing, and it's been changing.
4    But the political reality of these district lines has not
5    changed.

6           Mr. Cooper's analysis also showed that the lines that
7    have now been in place for so long exceed that plus or minus
8    5 percent population deviation that is typically used when you
9    implement the one person, one vote principle.

10          Now, the general area that Mr. Cooper identified where
11   a Black majority district can be drawn is actually the same
12   area Dr. Swanson identified using his cluster analysis.  It's
13   the area that numerous experts and fact witnesses identified as
14   including the Mississippi Delta.  Mr. Cooper testified that the
15   Mississippi Delta is cracked under the current lines, as, in
16   sum and substance, did all of those fact witnesses who looked
17   at these lines, as did Dr. King.

18          Mr. Cooper demonstrated in his report and on the stand
19   that his illustrative plans each include a reasonably
20   configured BVAP majority Supreme Court District 1.  And that's
21   the entirety of what *Gingles 1* requires.

22          How do we know that these illustrative districts are
23   reasonably configured?  Well, for one, on the objective metrics
24   and traditional principles, Cooper's illustrative plans are
25   comparable, comparable or often better than the existing lines.

1     The evidence is uncontested that, on population

2   equality, Mr. Cooper's plans reduce that population imbalance.

3   The evidence is uncontested that Cooper's plans split zero

4   counties, zero precincts, zero municipalities.  County lines

5   are expressly referenced -- referenced -- excuse me -- in the

6   Mississippi Code on redistricting.  "Following them" -- and

7   this is -- Justice Kavanaugh points this out in Footnote 2 of

8   his concurrence in *Milligan.*  "Following them is a key

9   indication that a plan is reasonable."

10     The evidence is uncontested that the districts in

11   Cooper's plans are reasonable in their shape.  Dr. Swanson

12   agreed.  There are no extreme shapes here.  He agreed they

13   perform comparably or better than the existing plan on most of

14   the mathematical metrics.  He didn't offer any negative opinion

15   on these district shapes.  And Mr. Cooper, who has done this

16   time and time again, told you he has no doubt that these

17   whole-county plans are sufficiently compact.

18     The evidence is also uncontested that Cooper's plans

19   respect and unite communities of interest.  Mr. Cooper spoke to

20   this, how his plans unite the Delta, split a few of those

21   planning and development district regions, include Highway 61,

22   how they made more sense from a riparian perspective with the

23   Mississippi, then the Gulf, and the Tenn-Tom each anchoring one

24   of those three districts.

25     The testimony from the fact witnesses is absolutely

1    overwhelming on the communities of interest front.  Witnesses
2    from across the Delta -- from Ty Pinkins in Sharkey County, to
3    Judge Thomas in Bolivar County, Derrick Simmons who represents
4    territory going up to Coahoma County -- talked about the Delta,
5    about the common challenges, interests, and identity that it
6    represents.

7            Dr. King called it one of the most distinctive
8    communities in the Nation, similar to and maybe even more so
9    than the Black Belt in Alabama, which was discussed in the
10   *Milligan* case as a community of interest.  The Delta is a
11   community of interest that can be taken into account when
12   configuring a reasonable plan.

13           And the kicker of it is, Dr. Swanson's cluster
14   analysis, which his own published work says can be used to
15   evaluate communities of interest, supports the plaintiffs.  He
16   agreed that Cooper's illustrative plans joined together
17   counties with similar needs and interests beyond race.  And
18   that is literally the definition of communities of interest as
19   discussed by the Fifth Circuit in *Robinson*, 86 F.4th 590.

20           And if all of that wasn't enough evidence of a
21   balanced and reasonable plan, the Black majority district in
22   Cooper's Illustrative Plan 1 also follows those congressional
23   district lines enacted by the Mississippi State Legislature
24   just two years ago.

25           Your Honor, Mr. Cooper has drawn numerous electoral

1    maps in Mississippi and across the country.  He has drawn
2    judicial districts.  He's testified in over 50 federal cases.
3    He was forthright, knowledgeable, specific, unequivocal on the
4    stand.  He told the Court that these districts aren't hard to
5    draw, that he didn't move any particular county in or out
6    because of race.

7         And defendants might have a few responses to all of
8    this, but none of them are borne out by the evidence, and
9    perhaps even more importantly, none of them have to do with
10   *Gingles* 1.  One thing they will say at some point is that the
11   existing district is majority Black CVAP using those ACS
12   estimates.  Mr. Wallace started to get into this in the Rule 52
13   argument.

14        And that's true if you just look at the CVAP estimate,
15   but it's neither here nor there for *Gingles* 1.  On *Gingles* 1,
16   the question is just whether a reasonably configured BVAP
17   majority district can be drawn, whether the illustrative plan
18   is reasonably configured.  Because the *Gingles* 1 focus is on
19   the illustrative plans, it doesn't matter if the existing
20   district is majority CVAP, even majority BVAP.  It doesn't
21   matter for *Gingles 1* purposes.

22        As Mr. Cooper noted from his experience -- he was the
23   expert in that *Thomas* case -- you can have a Section 2 lawsuit
24   even when the challenged district is already BVAP majority,
25   just like the case in that Delta state senate district in 2019

1   where the BVAP of the successfully challenged district was
2   over 50 percent.  And Judge Reeves's decision is reported at
3   366 F. Supp. 3d 805.

4            And that makes sense because the question is whether
5   the result of the lines is vote dilution.  So we have to look
6   at, is there a district that could be drawn, and do the current
7   lines fragment and dilute the vote of that community?  That's
8   the question.

9            So it is true the existing district has a relatively
10  high BVAP compared to 30 percent, but on *Gingles* 1, it doesn't
11  matter.  The BVAP or the BCVAP of the existing district might
12  matter if the higher Black population meant that Black voters
13  were usually able to overcome White bloc voting and win
14  elections.  But as we'll talk about on *Gingles* 3, the evidence
15  doesn't bear that out.

16           And the other problem with defendants' argument -- and
17  we might as well address it now when we are talking about
18  *Gingles* 1 -- is if you are going to use CVAP, if you are going
19  to use that estimate rather than using the census numbers, you
20  should think about the population that is actually eligible to
21  vote, and you should factor in felon disenfranchisement, which
22  the uncontested evidence indicates affects many tens of
23  thousands of Black Mississippians who are permanently
24  disqualified from voting.

25           And when it comes to measuring the population that is

1    actually eligible, yeah, Mr. Cooper didn't take out a

2    calculator and do it, but he testified felon disenfranchisement

3    makes all of the difference in the world.  He said, "That's why

4    I really didn't focus on CVAP in this case, because I knew

5    that, based on well-documented information about the size of

6    the felon population in Mississippi and the disproportionate

7    impact it has on Black felons, clearly, the current plan would

8    not be majority Black, and it would not be majority Black CVAP"

9    after taking that into account.

10          And, sure enough, when you do the math and when Black

11   voting eligibility is adjusted to include those tens of

12   thousands, it drops under 50 percent.  That's what we did with

13   Dr. Swanson on the stand.  I don't understand, honestly, why

14   the arithmetic started to change and why we started needing to

15   subtract from the denominator once we were factoring in folks

16   who were out of prison when we didn't do it when people who are

17   in prison were being included.

18          But I think it's pretty clear that Dr. Swanson didn't

19   dispute the numbers.  He didn't dispute how he did his own

20   calculation.  And when you do his calculation on the numbers,

21   then the adjusted Black CVAP goes well under 50 percent.

22          Here's another argument that defendants may make.

23   They may talk about core retention.  In the end, none of the

24   experts testified it was a districting principle.  Dr. Swanson

25   agreed that Cooper's plans keep the vast majority of

1  Mississippians in their current supreme court districts.  And
2  by the way, in case the Court wanted to consider it, Mr. Cooper
3  also presented least-change plans that show you can make a true
4  Black majority district by shifting as few as seven counties.

5      Maybe defendants will talk about Dr. Swanson's
6  diversity theory -- as a reminder, this was the idea completely
7  foreign to the law and practice of redistricting, as I
8  understand it -- that you should intentionally spread groups
9  across districts in a plan to make them more -- I think he used
10  the term "diverse."  That's not a districting principle.  It's
11  more like a dilution principle.  You won't find any case
12  embracing it.  And as Dr. Swanson conceded, it's basically the
13  opposite of considering communities of interest.  It's exactly
14  what the traditional principles tell us not to do.

15      And that, I think, brings us to the last point they
16  may make on *Gingles* 1.  I suspect you will hear some version of
17  the argument that the very concept of communities of interest
18  shouldn't apply here.  And that's going to get them nowhere for
19  two reasons.

20      First of all, it just doesn't matter because you can
21  take communities of interest out of the equation entirely, and
22  on the facts that have been presented, the illustrative plans
23  are still reasonably configured with equal populations, compact
24  district shapes, no county splits at all.  That's the ball game
25  on *Gingles* 1.

1    But, second of all, it's wrong as a legal matter.
2 Here's Judge Southwick in *Robinson*.  On *Gingles* 1, "Traditional
3 districting principles like maintaining communities of interest
4 and traditional" --

5    **THE COURT:**  Slow down.

6    **MR. SAVITZKY:**  -- "boundaries should be considered,"
7 page 590.

8    And forget the majority in *Milligan*.  Here's Justice
9 Alito dissenting in *Milligan*.  Quote, "The first *Gingles*
10 precondition takes into account traditional districting
11 criteria like attempting to avoid the splitting of political
12 subdivisions and 'communities of interest.'"  And that's page
13 96, 599 U.S.  And, of course, in the *Mississippi NAACP* case,
14 the Court there considered communities of interest as well.

15    So I take their argument to be that there is some
16 exception for these districts where communities of interest
17 stop being one of the key traditional districting principles
18 that we always consider.  And there isn't any evidence in the
19 record to show that that is the case.  There aren't any cases
20 that support that.  And the fact that these lines are and have
21 been used not only for supreme court but for public service
22 commission and transportation commission only underscores that
23 we should use the traditional principles that apply in every
24 other case.

25    Your Honor, the cases say that *Gingles* 1 is not a

1  beauty contest.  If it was a beauty contest, I would like our
2  odds.  On the strength of Mr. Cooper's unequivocal and
3  comprehensive testimony, Dr. Swanson's concessions, and the
4  overwhelming testimony of Mississippians from across the Delta,
5  the illustrative plans are reasonably configured and *Gingles* 1
6  is met.
7         So let's talk about the second and third *Gingles*
8  preconditions and proving those.  Before we get to the
9  evidence, I want to make something clear about the order of
10  proof.  There have been some arguments about the relationship
11  between party and race.  They suggest that the polarization
12  between Black and White voters that we see in the data and the
13  evidence is due to a mere coincidence of party affiliation,
14  even though this case involves nonpartisan elections.
15         And this argument came up in the three-judge panel
16  case as well, and the Court dealt with that there in, I think,
17  precisely the right way, by thinking about this issue on the
18  totality of the circumstances.  And so I will address it there.
19         On *Gingles* 2 and 3, as the cases apply them, the
20  question is simply about what voters are doing.  *Gingles* 2, are
21  Black voters voting cohesively for preferred candidates?
22  *Gingles* 3, are White voters voting against those candidates
23  such that they usually lose outside of Black majority
24  districts?
25         In other words, it's about the preferences of voters.

It's about whether voters are divided by race. And in the cases, what you typically see is 85, 90 percent cohesive voting by Black voters for one candidate -- and by "the cases," I mean the cases where plaintiffs prevail on the merits -- and you see White cohesion around 85 percent or more.

In *Milligan*, it was about 90 percent Black cohesion. White crossover voting was around 15 percent. That's discussed at page 22 in *Milligan*. In *Robinson,* you had about 90 percent Black cohesion. You had White crossover voting between 11 and 20 percent. That's 86 F.4th at 597.

What are these factors doing? *Gingles* 2 is looking at Black voters. We look at Black cohesion to determine, if plaintiffs win, if we draw a Black-majority district, will Black voters actually vote cohesively and elect candidates. *Milligan* talks about that at pages 18 and 19.

And then *Gingles* 3 looks at the interaction between Black and White bloc voting under the current lines. It establishes that the challenged districting, the existing lines, thwart a distinctive minority vote at least plausibly on account of race.

And so what does the trial record show? The Court heard from Dr. Orey on *Gingles* 2 and 3, an accomplished political scientist with extensive experience conducting the standard analysis used by courts to assess racially-polarized voting, ecological inference. He analyzed nearly two dozen

1    elections.  He looked at every biracial election in District 1
2    for the last decade or so.  His analysis is largely, if not
3    totally, uncontested by Dr. Bonneau.  It's corroborated by
4    Dr. King and by fact witness testimony.

5        And the word that came up again and again when
6    Dr. Orey was on the stand was "extreme."  The degree of
7    racially-polarized voting that Dr. Orey found is extreme in
8    election after election after election, especially in the
9    biracial contests that courts and scholars tell us are the
10   place to focus.

11       On *Gingles* 2, every single contest we looked at, the
12   level of polarization was, quote, "extremely high."  Black
13   cohesiveness was almost always over 90 percent.  White cohesive
14   voting against the Black candidate was almost always 90 percent
15   or higher.  Dr. Orey said the numbers are so high you just
16   don't have much room left.

17       And Dr. Bonneau didn't disagree with any of that.  And
18   witness after witness confirmed it based on decades of
19   experience in Mississippi politics.  Percy Watson, Derrick
20   Simmons, and others told the Court candidates and campaigns
21   understand that Black candidates will be able to win votes and
22   support from Black voters, but in predominantly White areas,
23   it's almost certain that you are not going to get that support.
24       Frankly, I don't take defendants to be disputing the
25   existence of extreme, pervasive, consistent patterns of

1 | racially-polarized voting.  And you couldn't dispute it on this
2 | record.  So that's *Gingles* 2.

3 | On *Gingles 3,* the question is whether
4 | racially-polarized voting patterns, and in particular White
5 | bloc voting, mean that Black voters' preferred candidates will
6 | usually be defeated on the current lines.  Do White voters vote
7 | sufficiently as a bloc usually to defeat the candidates
8 | supported by Black voters?  And the answer is yes.

9 | Right here on the screen are the key elections to
10 | consider.  The nine biracial endogenous and quasi-endogenous
11 | contests in that district, where you have a Black candidate and
12 | a White candidate, that are most probative of whether high
13 | levels of White bloc voting will usually result in the defeat
14 | of Black-supported candidates.

15 | Dr. Orey testified these are the key contests,
16 | especially -- especially those two supreme court elections.
17 | And Dr. Bonneau agreed.  And, remember, Dr. Bonneau actually
18 | testified he wasn't offering an opinion on *Gingles* 3 in the
19 | first place.

20 | So in these two supreme court elections, which are the
21 | most important contests, Black challengers lost both times,
22 | garnering well under 10 percent White crossover voting.
23 | 5 percent, 6 percent.

24 | And looking at the nine contests as a whole, including
25 | those commissioner races, including different election years,

1    Black candidates lost two-thirds of the time.  Six out of
2    nine, they were defeated.  And by any fair definition of
3    "usually," and certainly by the more-often-than-not definition
4    that Dr. Orey and Dr. Bonneau both agreed on, Black candidates
5    are usually defeated in these District 1 contests with
6    extremely high degrees of White bloc voting.

7         Now, in terms of writing an opinion in this case, you
8    could stop there and move to the totality of the circumstances.
9    But, again, I want to anticipate what defendants are going to
10   argue.

11        And no doubt they are going to point out that
12   sometimes in some of these contests Black candidates won.  And
13   that's true, but it doesn't get them anywhere.  For one, again,
14   it's those supreme court contests, those two endogenous
15   elections.  They are the most important.  That's what the
16   experts agreed on.  And in those races, the Black candidates
17   lost both times, 0 for two.

18        For another, the cases tell us that the election of
19   a few minority candidates doesn't foreclose the possibility
20   of a vote-dilution problem.  *Clark*, for example, says that,
21   80 F.3d 1397.

22        No doubt you can factor it into the ultimate question
23   of whether there is an equal opportunity to participate and
24   elect candidates of choice, but in terms of *Gingles* 3, the
25   question is narrower.  Is White bloc voting sufficiently high

1   that these Black candidates are usually being defeated?  And
2   two-thirds of the time, looking at these key contests, is
3   usually, by any reasonable definition.

4          And, third, we need to be mindful of outliers, as
5   Dr. King and Dr. Orey told us.  Two of the three races where
6   Black candidates won involved a single candidate, Willie
7   Simmons, and he was an incumbent in 2023.  Two of the three
8   involved a single election in 2023 that Dr. Orey identified as
9   a potential outlier, with a Democratic candidate for governor
10  at the top of the ticket, had unprecedented focus on Black
11  turnout.

12         And Dyamone White and Derrick Simmons talked about
13  that as well.  Percy Watson contrasted the 2023 election with
14  judicial elections where, for reasons also discussed by Justice
15  Diaz, it's harder, especially for Black judicial candidates, to
16  break through.

17         And Dr. Bonneau's testimony is actually especially
18  important here.  He studied judicial elections, including
19  nonpartisan judicial elections, closely.  That's his field.
20  And what he testified, based on his own scholarship, is that
21  you see more ballot roll-off, more folks not voting for some
22  offices as they go down the ballot, in these nonpartisan
23  judicial contests.

24         He testified that roll-off is especially high among
25  voters with lower levels of education, lower levels of home

1  ownership.  That's his scholarship.  And in Mississippi,

2  according to the undisputed evidence, that means voters who are

3  more likely to be Black.

4           And all of that makes it harder for Black supreme

5  court candidates in Mississippi to overcome White bloc voting.

6  All of that is consistent with the evidence that Black

7  candidates might sometimes in this district break through in

8  the partisan commission races, but they aren't doing it in the

9  supreme court contests that are at issue here.

10          And Dr. King spoke to this as well.  He testified that

11  voters think about different things when electing candidates to

12  different offices.  Willingness to elect a Black transportation

13  commissioner may not mean willingness to elect a Black supreme

14  court justice.

15          The defendants may also say, "Well, what about Leslie

16  King?  What about Justice King?"  It's true he won his

17  elections.  He won them with 100 percent of the vote because

18  they were uncontested.

19          And the cases specifically say we don't consider

20  uncontested elections when we think about this question.  And

21  the reason for this is that uncontested elections don't, and

22  they literally can't, tell us anything about whether Black

23  candidates are or are not defeated by White bloc voting against

24  them.  You can't vote against an unopposed candidate.

25          And that's especially true here given all of the

1    testimony from Justices Diaz and Anderson and Lamar about the
2    power of the government's -- the governor's -- excuse me --
3    appointment, which we heard is like a super endorsement and a
4    signal.  Percy Watson said it can -- especially from a White
5    Republican governor for a Black candidate, it can clear the
6    field of credible opposition.

7         Especially given the power of that appointment, it's
8    very telling that, when there was a proposal in 2016 to change
9    these lines and lower the BVAP by just half a point, Black
10   members of the house of representatives strenuously opposed it
11   because they felt that even that minor change would endanger an
12   incumbent like Justice King.

13        And by the way, we are going to talk about candidates
14   who could have run but didn't.  The actual evidence in the
15   record here on that subject supports plaintiffs' theory of the
16   case.

17        Senators Simmons and Constance Slaughter-Harvey
18   testified about the interest in running for supreme court among
19   Black attorneys in Mississippi.  But as Senator Simmons told
20   us, the interest is not matched by opportunities.

21        And as Dr. King testified, district lines, district
22   composition matter.  When candidates don't see a real
23   opportunity, they don't run.  They decide not to run.  And the
24   evidence indicates that potential Black supreme court
25   candidates could look at these districts, look at these

1  results, and decide they can't win.

2  And what else?  Defendants may also say, "Well, look
3  at Justice Kitchens.  He won."  That's true.  First of all, you
4  can add Justice Kitchens and Cecil Brown into this mix.  Black
5  supported candidates still are going to be defeated more often
6  than not.  Still usually the case.  And if you look at supreme
7  court elections, it will be one out of three.  If Justice
8  Kitchens -- those two Black candidates still lose.

9  And, second of all, the unrebutted testimony from the
10  experts, consistent with the cases, is that we focus on
11  biracial contests.  As Dr. Orey explained, Black voters tend to
12  prefer Black candidates when given credible, viable options.
13  As Dr. King testified, Black voters are keenly aware of
14  candidate viability.  They vote on that basis.

15  And so looking at contests without credible Black
16  candidates -- defendants didn't put on evidence that candidates
17  like Ceola James or Bruce Burton, who we mentioned, were
18  considered viable by Black voters -- doesn't speak clearly to
19  whether Black-preferred candidates can win despite White bloc
20  voting.  And that's the question.

21  Defendants may also point to those exogenous
22  elections, like Barack Obama and Mike Espy.  All of the
23  experts, including Dr. Bonneau, testified that those are far
24  less probative.  And Dr. King's analysis about different
25  attitudes or different offices applies even more strongly

1    there.

2          They may tell you Judge Westbrooks didn't lose because
3    of race.  And, first of all -- and let's be clear about this --
4    it's not "because of."  It's not "because of."  The question is
5    just whether White bloc voting was sufficiently high for
6    Black-preferred candidates to be defeated.  There is no dispute
7    that it was.

8          Judge Westbrooks was a sitting appellate judge.  All
9    of the evidence was that she campaigned hard, raised money.
10   Constance Slaughter-Harvey talked about that.  Turned out Black
11   voters in the Delta, as Derrick Simmons discussed.  She went on
12   bus tours.  She campaigned for White votes.  She went to the
13   Rotary Club.

14         And I suppose one other thing defendants may say is
15   something we talked about already.  They may say, "Well,
16   District 1 is already BVAP plurality and CVAP majority."  We
17   talked about that.

18         "Maybe," they'll say, "if people in District 1 -- if
19   Black voters in District 1 just registered at even higher rates
20   and then voted for Black candidates at even higher levels of
21   cohesion than this, maybe then they could win a supreme court
22   seat."  That's not how this works.  Black voters do not need to
23   vote with 100 percent cohesiveness for preferred candidates for
24   the protections of Section 2 to kick in.

25         On *Gingles* 3, we look at the elections as they are.

1    We ask what result occurs in light of racial polarization.  And
2    the numbers show that White voters in District 1 are voting
3    massively as a bloc against Black candidates in these
4    elections, and usually the Black candidates are defeated,
5    especially in supreme court races.  That's *Gingles* 3.

6         So let's talk about the totality of the circumstances.
7    And, again, it will be the very unusual case in which the
8    plaintiffs can establish these preconditions and still have
9    failed to show a violation under the totality of the
10   circumstances.  Again, that's *Teague*, 92 F.3d 293.  And that's
11   because, again, once you have demonstrated the three
12   preconditions, you have demonstrated that racially-polarized
13   voting patterns are operating to minimize Black voting
14   strength, even though lines could be reasonably drawn to give
15   Black voters a full and fair opportunity.

16        And so at the totality of the circumstances phase, we
17   look at the big picture.  We look at past and present reality,
18   as the cases tell us.  We ask whether the political process is
19   equally open as to these district lines.

20        And, now, having mentioned equality, I hear another
21   argument from defendants in my ear.  Something like, "It's hard
22   to imagine finding a more equal district than District 1,"
23   something like that in the pretrial brief.  And, Your Honor,
24   this misstates the question.  That argument misstates the
25   question.

1          Once we're on totality of the circumstances, once we
2    have established we can draw a reasonable illustrative
3    district, once we establish what happens in the districts as
4    drawn, then we zoom out.  On the totality of the circumstances,
5    the question, as Judge Southward quoted in *Robinson*, is whether
6    Black voters, quote, "have an equal opportunity in the voting
7    process to elect their preferred candidate under the challenged
8    districting map."  Under the challenged districting map.

9          And Dr. Bonneau and Dr. King looked at supreme court
10   elections across the state, across the entire challenged map.
11   Dr. Bonneau said that, counting Leslie King's two unopposed
12   wins, counting those, Black-preferred candidates had won five
13   supreme court elections out of 26, total, since 2000, all five
14   in District 1.  None from the other two districts.

15         In other words, what Drs. Bonneau and King saw was
16   that the other two districts that have large White majorities
17   have only ever been represented by White justices.  And as long
18   as the unfortunate reality of pervasive racially-polarized
19   voting that was demonstrated in this record remains, that will
20   likely continue to be the case.

21         And then we have District 1, which has a larger Black
22   population, large enough to come closer, maybe even large
23   enough to sometimes win in those partisan commissioner races in
24   a good year for Black turnout but not actually, at least on
25   this evidence, to win a contested supreme court contest.

1         So defendants' argument is treating those two White

2   majority districts, one of which takes in many of the counties

3   in the North Delta, like they don't exist.  They want to focus

4   all of the attention on District 1, argue about whether it's

5   equal, and bank those other two districts where Black voters

6   will never have an opportunity, as long as racially-polarized

7   voting exists at this level, to win elections.  It's not the

8   law.  It's not fair.  It's not right.  It's not the law.

9         And so at the totality of the circumstances stage, we

10  think about the challenged map.  We look to the senate factors

11  to guide our analysis of these lines.  And in particular, I

12  would submit that the Mississippi *NAACP* case is instructive on

13  the senate factors piece.

14        Now we're looking at much the same history, much the

15  same political process.  Much of the evidence is similar.  The

16  analysis is similar.  Obviously, it's a different record.  And

17  we would submit that, on an intensely local appraisal of these

18  districts, based on this trial record, the end result should be

19  the same.

20        So what I want to do is walk through these senate

21  factors.  We don't have to win them all.  It's not a

22  requirement that you get certain ones or all of them.  They are

23  considerations to help guide the inquiry.  And I'll talk about

24  each of them and how they contribute to the overall picture of

25  district lines that deny Black Mississippians a full and fair

1  opportunity to elect candidates of choice to the Mississippi
2  Supreme Court.

3      Starting with Senate Factors 1 and 3, "The most
4  relevant historical evidence is relatively recent history, but
5  even long-ago acts" -- and this is the three-judge panel citing
6  *Veasey Against Abbott* -- "even long-ago acts of official
7  discrimination give context to the *Gingles* analysis."

8      Dr. Campbell and Dr. King detailed the long history of
9  discrimination against Black voters in the political process.
10  No one disputes it.  They testified that racial exclusion was a
11  key driver of political development in Mississippi from the
12  1890 Constitution, to White primaries, to gerrymandering, and
13  vote dilution.  Sometimes these barriers have been
14  race-conscious.  More often, they have been -- and some cases
15  still are -- facially race-neutral.

16      Your Honor, there's no better place than Oxford to
17  quote the man who said, "The past is never dead.  It's not even
18  past."  And make no mistake, the history of discrimination
19  continues to impact Black Mississippians to this day.  The
20  testimony this Court heard in trial shows that history exerts
21  an influence personally for individuals and for voters.

22      Constance Slaughter-Harvey testified about watching
23  her father be denied a ballot, about working as a poll watcher
24  with Fannie Lou Hamer, being inspired by Mississippians in the
25  Delta who put their lives at risk.  Percy Watson talked about

1   attending a segregated school.  Justice Anderson talked about
2   Oxford being segregated when he got here for law school, about
3   paying a poll tax himself, about trying desegregation cases
4   around the state and being unable to find plaintiffs in areas
5   where the Klan was too strong.

6         These aren't stories from a book.  They're the lived
7   experiences of flesh and blood witnesses who testified in this
8   courtroom.  Things are different now, and that is very much a
9   good thing.  But the past is not past.  It remains with us.

10        And the testimony also shows that barriers remain,
11  barriers that resonate from the past.  Dyamone White, a young
12  leader eager to get into politics, testified about offensive
13  comments made to her while making political phone calls, while
14  visiting Neshoba to campaign.

15        On Senate Factor 3, voting practices that tend to
16  enhance discrimination, the record shows that those have
17  continued deep into the modern era.

18        You heard Dr. Campbell describe some of the nearly 200
19  interventions that are listed in the record.  That included an
20  effort to redraw the state's congressional lines in 1967 to
21  stretch east to west in order to dilute Black voting strength.
22  And it's shown here (indicating), Plaintiffs' 28.  It includes
23  the widespread adoption of at-large districts.  Again, the
24  district here (indicating).  It includes an attempt in the
25  1990s to resurrect the dual registration rule from the 1890

1   Constitution in order to confound the implementation of the

2   National Voter Registration Act.  And those are in addition to

3   the numerous successful voting rights cases, Section 2 cases,

4   districting cases like the three-judge panel case or the *Thomas*

5   case in recent years.

6           Now, you heard that Mississippi Supreme Court

7   elections use a majority vote requirement, which the cases say

8   can have discriminatory effects.  You heard that Mississippi

9   has very frequent elections, which Dr. King testified can cause

10  voter fatigue.  You heard extensive testimony on Mississippi's

11  felony disenfranchisement, which affects tens of thousands.

12  You heard about the adoption of voter ID laws shortly after

13  *Shelby County*, another potential barrier.

14          You heard about restrictions on absentee voting,

15  notarization requirements.  You heard about the adoption of

16  voter purge rules beyond what federal law requires.  You heard

17  from Mr. Kirkpatrick about how many of these rules are enforced

18  at the local level without significant oversight.  You heard

19  about how Mississippi does not offer early voting, mail voting,

20  or online registration or same day registration or other

21  practices that may make it easier to vote.

22          As Dr. Campbell and Dr. King explained, Mississippi

23  has some of the most burdensome voting rules in the nation.

24  The cost of voting is extremely high.  And that's why the

25  testimony that you heard about rides to the polls and things

1 like that matter.

2 Mississippi does not make it easy to vote. It makes
3 it hard, very hard. The fact that Congressman Thompson tries
4 to help voters get to the polls doesn't and can't make up for
5 that. As Dyamone White testified, not everyone can get a ride.

6 Defendants may come and tell you that none of this
7 amounts to a denial of the right to vote. And they'll point to
8 the voters you heard from at trial, and they say -- they'll
9 say, "Well, these folks didn't have any problem voting. They
10 testified they vote all of the time."

11 Think about the character and the fortitude of the
12 people who you heard from who testified. Ms. White said she
13 would go back to Neshoba. Even if it meant bringing security,
14 she would go back. Aelicia Thomas pushed for 20 years to get
15 to the bench. Setback after setback. Ty Pinkins talked about
16 chopping cotton as a teenager, multiple tours in Iraq. These
17 are strong people. And that's to say nothing of people like
18 Constance Slaughter-Harvey and Justice Anderson.

19 You heard from people at this trial who have overcome
20 all kinds of obstacles. But that doesn't mean for a second
21 that the high cost of voting in Mississippi don't press more
22 heavily on the shoulders of Black Mississippians. And so
23 Senate Factors 1 and 3 do weigh in favor of the plaintiffs.

24 Let's talk about Senate Factor 2, the extent of racial
25 polarization, often considered the most important.

1          Regarding the level of polarization in Mississippi in

2 politics, the evidence is extremely strong in plaintiffs'

3 favor.  Again, the levels of polarization are extreme,

4 completely pervasive in all the elections we looked at.

5 Witness after witness talked about racial division in politics,

6 about how Black candidates can't win outside of Black majority

7 districts.

8          Justice Anderson testified that, in Mississippi

9 politics, race is number one.  And defendants are going to say,

10 "Well, the voter behavior we see in Mississippi is party

11 polarization.  It's being driven by party and not by race."

12 Evidence doesn't support that claim.

13          Now, the way the Court should think about this and

14 resolve this sort of party versus race defense is well

15 described in the three-judge panel case starting in the Westlaw

16 Reporter at page 39.  So I want to just talk about who has the

17 burden on this, what's the law, what are the facts.

18          On the burden, proof of racially-polarized voting,

19 which we have here to a massive degree, we talked about in

20 *Gingles* 2 and 3, creates an inference of racial bias in the

21 electoral system.  And that's what *Teague* tells us.  Judge

22 Wisdom in *Marengo County*, an 11th Circuit decision, wrote that

23 Racially-Polarized voting is itself, quote, "the surest

24 indication of race-conscious policy."

25          And so once a plaintiff shows racially-polarized

1  voting patterns, "They don't have the burden" -- and now I'm
2  quoting the three-judge panel -- "the burden of negating all
3  nonracial reasons possibly explaining" those polarized voting
4  patterns.

5          **COURTROOM DEPUTY:**  Five minutes.

6          **MR. SAVITZKY:**  We don't have to prove a negative.  As
7  the Court said, we have no duty to disprove the factors other
8  than race affected voting patterns.  What *Teague* says, it is up
9  to the defendants to try to rebut plaintiffs' claim of vote
10  dilution via evidence of objective, nonracial factors.

11          And what do they have to do?  The *NAACP* case discusses
12  this in detail, talks about the *Clements* case.  That's a
13  judicial case out of Texas.  That was a case where the
14  inference was rebutted.

15          And what did you have there?  Large amounts of White
16  crossover voting, 30 to 40 percent; both parties aggressively
17  recruiting and nominating and electing minority candidates;
18  White voters consistently voting for and electing minority
19  candidates to office based on their party preferences.

20          And the three-judge panel looked at the circumstances
21  in Mississippi and said this case is different.  Circumstances
22  in Mississippi are different.  They are not that.  And the
23  record in this case is similar, and it's even more stark.  On
24  the level of White crossover voting, it's miniscule.  It's not
25  30 or 40 percent.  Totally different from *Clements*.

1          There is no evidence of both parties recruiting and
2   nominating Black candidates for the supreme court.  Justice
3   Diaz hadn't heard of such a thing.  Dr. Bonneau hadn't seen it
4   in his research.  Percy Watson hadn't seen it.  And on top of
5   that, something that was relevant in the three-judge panel
6   case, witnesses testified, Dyamone White and Ty Pinkins, that
7   White candidates don't campaign in their areas and haven't
8   responded to their outreach.

9          And we can actually go deeper.  The quality of the
10  data allows it.  We have primary elections.  Dr. Orey looked at
11  a competitive head-to-head primary, and he testified -- and
12  Dr. Bonneau didn't dispute -- party can't explain why you still
13  see polarization.

14          And perhaps most telling, we can see the way that
15  voters react differently to the race of candidates.  Look at
16  the election on the screen.  Justice Kitchens got 40 percent of
17  the White crossover vote against then-Judge Griffis, a number
18  that is more than double what any Black candidate has obtained
19  in the last decade plus.  Four years later, Judge Westbrooks
20  ran in the same district against the same opponent.  White
21  crossover support was less than 7 percent.

22          What the three-judge panel says applies here even more
23  strongly.  Race matters.  And that's consistent with the
24  secondary literature discussed by Dr. King and others.

25          And if more were somehow needed, the historical and

political science evidence shows that, while party and race are correlated now, it's race that has driven that change over the course of history.  "Race fits the data perfectly," testified Dr. Campbell.  "Racial polarization is what caused partisan polarization," testified Dr. King.  There's no other evidence in the record.

And none of this is predetermined.  Voters vote based on their values and their interests.  And when parties and candidates change their message and positions, voters can respond.  Polarization could change.

But on the facts as they stand today on this trial record, and especially on the data from election after election after election, the extreme nature of racial polarization shown here is undeniable.  Senate Factor 2, that most important factor, weighs decisively in favor of the plaintiffs.

I want to just briefly touch on Senate Factor 4.  That's the exclusion of members of the minority group from candidate slating processes.

It can come up in judicial cases.  It often doesn't come up, but in judicial cases -- and we cite the *Lopez* case in Texas -- where there is a significant appointments process, it can be relevant.  Obviously, we don't have party slates here.  The candidate who gets to run as an incumbent with that super endorsement is selected by the governor.  And as we heard, six of the current nine justices were selected by the governor.

1    All four of the Black justices on the Court were selected by
2    the governor.

3         And remember what Justice Diaz said.  There are more
4    White justices who were first appointed to the Court sitting on
5    that body today than there have been Black justices in history
6    in Mississippi.  And there's evidence that White judges can win
7    without that appointment, but there isn't evidence that Black
8    justices can win without that appointment.

9         The point is only that the prominence of this
10   appointments process, where decisions are made by, invariably
11   thus far, a White governor, in the context where politics are
12   highly divided by race, operates in practice to disadvantage
13   Black candidates.  And the fact evidence is consistent as well.
14   For example, Constance Slaughter-Harvey testified about urging
15   Governor Musgrove to appoint more Black judges, without
16   success.

17        So we aren't hanging our case on this, but it's
18   another data point.  It matters.  It's another way in which
19   there is an unequal playing field for Black voters when it
20   comes to supreme court elections in Mississippi.

21        On Senate Factor 5 -- and I realize I may be going a
22   little slower than I anticipated.

23        **THE COURT**:  So keep up with the time over, but you may
24   continue.

25        **MR. SAVITZKY**:  Excuse me, Your Honor?

1    **THE COURT:**  I have asked Tracy to keep up with your
2    time you go over because I'm going to extend it to the
3    defendants too.  But you may finish.

4    **MR. SAVITZKY:**  I appreciate the opportunity, Your
5    Honor.

6        On Senate Factor 5, the evidence, and especially the
7    testimony of Dr. Burch, shows that racial disparities persist
8    in Mississippi along every conceivable metric of socioeconomic
9    well-being.  Dr. Burch discussed the gaps in education, income,
10   health, transportation, criminal justice.  Her testimony was
11   backed up by Mr. Cooper's comprehensive analysis of the ACS
12   data, by Dr. King's testimony, completely undisputed by
13   Dr. Swanson.

14       On education, for example, the educational attainment
15   gap between Black and White Mississippians is large and
16   consistent with extensive evidence of persistent de facto
17   segregation in schools; underfunding of public schools,
18   especially predominantly Black public schools; more discipline
19   for Black students; lower performance.  Dr. Burch talked about
20   all of this.

21       And the evidence is that the situation is in some ways
22   getting worse.  Remember Derrick Simmons's testimony talking
23   about how Greenville schools have closed since its population
24   has become less racially mixed.  And the evidence is that this
25   inequality in education is deeply and intimately connected to

1    the legacy of discrimination.  Legally segregated schools are
2    not ancient history.  We heard from witnesses who attended
3    them.

4         And Dr. Burch's analysis showed that education is
5    absolutely critical in terms of voting and participation.  She
6    testified, "It's one of the most fundamental findings in
7    political science that people with higher educational
8    attainment vote more than people with lower educational
9    attainment."  No one contests that.

10        And what her analysis showed is that this is true in
11   Mississippi.  Education is highly correlated with turnout.
12   Black voters and White voters at each educational level vote at
13   similar rates.  Black college graduates and White college
14   graduates vote at similar rates.  Black folks with a high
15   school degree, White folks with a high school degree vote at
16   similar rates.

17        But education is not distributed equally between
18   Blacks and Whites in Mississippi.  White Mississippians are ten
19   points more likely to have a college degree, eight points more
20   likely to lack a high school diploma.  And that inequality
21   drives the turnout gap.  It increases the burdens on voters.

22        And the testimony is that education, money, vehicle
23   access, Internet make a difference for people whether they turn
24   out and vote in an election.  People require resources to vote.
25   And on every measurement of those resources, Black

1   Mississippians are worse off.

2           And on criminal justice, the evidence was, again,
3   uncontested.  60 percent of those who are incarcerated and
4   disqualified from voting are Black.  Mississippi is 30 percent
5   Black.

6           Again, the totally uncontested testimony is that all
7   of these are connected to discrimination, the history of
8   discrimination, and they affect the costs of participation,
9   making it more difficult for Black Mississippians to
10  participate in comparison to Whites.  That's the type of
11  evidence the three-judge panel relied on in Senate Factor 5.

12          And, Your Honor, these aren't just statistics.  These
13  are people's lives.  Dyamone White testified about the people
14  in the Delta who couldn't get a mortgage because they don't
15  make a living wage.  Senator Simmons talked about the Black
16  Mississippians who have had interactions with the criminal
17  justice system who may believe they are disenfranchised even if
18  they aren't.

19          Ty Pinkins talked about his brother going to the ER
20  for lack of affordable health care, his mother driving three
21  hours to get a checkup with kidney failure, about seeing family
22  members dealing with diabetes just start to disappear and to
23  rot away because they didn't have access to health care.  "It's
24  been detrimental on my family."

25          All of that affects participation.  That is what the

1   uncontested evidence shows.  And so, Your Honor, the evidence
2   shows these disparities contribute to an actual gap in turnout
3   in Mississippi between Black and White voters.

4          The Court was treated to a battle of the experts
5   during the trial.  Let me make one thing clear.  You don't need
6   to resolve that battle.

7          Here's what the three-judge panel said in thinking
8   about the same type of ballot.  "Irrespective of the size or
9   even existence of turnout discrepancies, we find that the
10  record establishes Black Mississippians' ability to participate
11  effectively is hindered by racial gaps in education access,
12  financial status, and health."

13         Senate Factor 5 thus weighs in favor of the
14  plaintiffs.  So you don't need to resolve this question of is
15  there really a turnout gap or not.  But, Your Honor -- and I
16  know I'm going slower than anticipated.  I could talk about
17  quantitative methods for analyzing voter turnout until the cows
18  come home and --

19         **THE COURT:**  But don't.

20         **MR. SAVITZKY:**  Don't do it.

21         But I do want to be clear that, if you look at this
22  battle, if you want to resolve it, it's a technical knockout.

23         Just briefly looking at the chart, Dr. Burch's
24  multiple independent methods to estimate voter turnout by race,
25  including in District 1, they line up -- her total turnout

1  numbers line right up with the secretary of state's own numbers
2  on how many people voted.

3  What are the methods she used?  She used ecological
4  inference.  We have heard about that method.  It's the best
5  method we have in political science to estimate turnout and
6  candidate support by race.  The EI analysis yields a total
7  turnout number that is right on the money.  58 percent.

8  Dr. Swanson testified he didn't know how to run EI.
9  He hadn't investigated the King's EI method before this case.
10 He -- his biggest complaint was he didn't understand it.  It
11 was a "black box" to him.

12 And by the way, remember his confusion about whether
13 these numbers in the parentheses were confidence intervals?  He
14 talked about it on direct and then on cross.  He said, "Are
15 these confidence intervals?  We don't know."  Look at the title
16 on the top of this page.  Look at the last sentence.
17 "Confidence intervals in parentheses."  It just says it right
18 there.

19 Then we have the CES, the other method Dr. Burch used.
20 She testified it's widely used, a reliable voting survey.  It's
21 a totally separate methodology.  It verifies voting behavior.
22 So it's not an unverified self-report.

23 Dr. Bonneau, another political scientist, vouched for
24 the CES's reliability.  He used it to write his own
25 award-winning book.  And the CES, like the EI analysis, shows a

1  big turnout gap and a total level that is in line with the
2  actual benchmark number.

3       And, again, Dr. Swanson didn't know about the CES
4  until he got involved in this case.  He hasn't used it.  He
5  came up with some convoluted statistical arguments about why he
6  doesn't like how Dr. Burch analyzed the data.  He doesn't
7  dispute what the data shows.  And it turned out he had a whole
8  second set of criticisms that he put in his report on the CES,
9  but those turned out to be based on his own mistaken
10 understanding of how to use the weights in the CES.

11      And, Your Honor, I don't like talking badly about
12 people; so this part is a little hard for me.  But Dr. Swanson
13 wasn't credible.  He couldn't explain his conclusions.  His
14 CVAP calculation method, which seemed so simple at first,
15 seemed to evolve on the stand when he didn't like where the
16 results were going.  He didn't do most of the analysis in his
17 report.  More than once it turned out that the analysis that
18 was done for him was wrong or misleading.

19      He repeatedly contradicted his sworn deposition
20 testimony.  He contradicted his testimony on the stand about
21 the -- remember, he talked about the DFBETAS, the statistical
22 diagnostics that he had run, at length, saying that he had done
23 exactly what Dr. Burch did, confidently, and then was handed
24 his report and said he was wrong.  So what from his criticisms
25 of Dr. Burch can we actually trust?

1          And, then, on the one hand, we have Dr. Burch using

2   two independent, well-established methods in her field to show

3   a big turnout gap.

4          What's Dr. Swanson relying on?  He told you his

5   primary source is the CPS.  He also looked at another poll.

6   Those are unverified surveys.  There's no dispute there's a

7   huge overreporting problem.  The data shows it.  200,000 plus

8   people in Mississippi more than actually turned out if you just

9   use the CPS numbers.  It's massive overreporting.

10         And Dr. Swanson also doesn't dispute the literature

11  that this overreporting problem is differential on the basis of

12  race.  It's well-documented.  It's undisputed Black voters tend

13  to overreport at higher rates that biases these unverified

14  surveys like the CPS.  We talked about the Ansolabehere study.

15  It shows that.  Dr. Swanson said the study was well-taken.

16         And we never heard -- what we never heard from

17  Dr. Swanson is why can we trust the CPS despite this problem

18  that he admits occurs.  Why should we trust these unverified

19  surveys?  Why should we rely on them over methods that

20  political scientists actually use?

21         And defendants may come in and say, "Well, no one has

22  done a study on Mississippi.  Maybe there isn't this

23  differential overreporting problem here."  But Dr. Burch did do

24  that study.  She used the CES.  She looked at reported voting

25  versus validated voting.  She showed a statistically

1    significant difference between overreporting for Black and
2    White voters.  And Dr. Swanson replicated Dr. Burch's analysis
3    and said she did it right.

4            So that makes the evidence here of turnout gap
5    actually stronger than it was in the three-judge panel case
6    where we didn't have a Mississippi-specific analysis showing
7    that overreporting.  It makes the CPS implausible and
8    untrustworthy for the specific question -- for the specific
9    question of turnout by race.

10           So rather than explain how the unverified survey
11   should be relied on, Dr. Swanson pulled out one more source --
12   and then we'll stop on the battle of the experts -- this
13   Brennan Center report, this Internet publication.  He didn't
14   know the authors of the Brennan Center report.  Can't vouch for
15   the methods.  Can't replicate them.  Admits the only mention of
16   Mississippi is on a single page in a summary chart.  Admits it
17   doesn't actually have an estimate of the level of turnout.
18   Admits it uses a complex methodology for estimating people's
19   race based on their surnames that he can't use himself.  Admits
20   it could be unreliable in Mississippi.  Admits it's got a
21   14 percent error rate in predicting Black turnout on average.
22   Could be higher in Mississippi.  Admits that they use in their
23   algorithm that 2016-to-2020 ACS census data that the Census
24   Bureau itself said fails the data quality standard.

25           And the theme in all of this is that Dr. Swanson was

1    not able to credibly and cogently support his opinions, either

2    the ones criticizing Dr. Burch, or the ones advancing the idea

3    that there's no turnout gap.

4         So the uncontested and extensive expert testimony,

5    whether or not you believe we've proven the preponderance by a

6    preponderance of the turnout gap, is that Senate Factor 5

7    weighs in our favor based on all these disparities and the

8    burdens they place on participation.  But we have proven the

9    turnout gap as well.

10        On Senate Factor 6, the evidence shows that racial

11   appeals sadly persist in Mississippi politics.  Dr. King

12   testified candidates use them.  They can signal the White

13   voters that Black voters aren't "one of us."  They can use

14   discriminatory tropes or stereotypes, portray Black candidates

15   as more -- as somehow criminal or unable to follow the law,

16   like the ads we saw against Mike Espy or Latrice Westbrooks.

17   They suggest that Black judges can't be fair.  They serve to

18   let voters know a candidate's race even when the candidate

19   doesn't want to let them know, like in the Fred Banks -- the

20   Justice Banks election in 1991.  It can invoke troubling

21   elements of the past, like the Confederate flag, Confederate

22   uniforms.  They divide voters into "us versus them."

23        The Court seen a number of these ads in this case

24   discussed in the testimony of Justice Diaz and Justice Anderson

25   and with Dr. King.  Our point is not that every candidate does

1    this.  Our point is not that it works for every voter.  It
2    doesn't.  But the reason we think about racial appeals, the
3    reason we consider this as part of the totality of the
4    circumstances is because, as Dr. King testified, it shows that
5    candidates and campaigns believe it could work.  It's relevant
6    evidence of the state of politics and the state of racial
7    division in politics.  And that's what we're thinking about.

8         These appeals are real.  They divide and demoralize
9    Mississippians.  They have continued to the present day,
10   including in varying forms in supreme court elections -- Reuben
11   Anderson, Justice Banks, Justice Graves, and Judge Westbrooks
12   in 2020.  The Senate Factor 6 weighs in favor of the plaintiffs
13   as well.

14        On Senate Factor 7, the trial record shows the
15   underrepresentation of Black Mississippians in elected office
16   persists, especially in the Mississippi Supreme Court.  The
17   record shows that, despite having the highest Black population
18   percentage in the nation, Mississippi has no Black statewide
19   officials.  Hasn't had one in 145 years.  And the supreme court
20   Black candidates who have run without the backing of a White
21   governor have lost.  And there's a stunning level of
22   underrepresentation.

23        And remember Justice Anderson's testimony, consistent
24   with Dr. King's testimony, he couldn't have won without that
25   appointment.  The last time a Black justice who is a sitting

1  incumbent won a contested election was in 2004 when Judge

2  Graves won.  Every time a Black candidate has run outside of

3  that one spot, that District 1, Place 2 spot, they have lost.

4  So in the three-judge panel case, the Court said

5  Senate Factor 7 weighed in favor of the plaintiffs, but that

6  was tempered because, in the state legislative context, there

7  were a number of Black majority districts.  In thinking about

8  proportionality, which *Johnson Against De Grandy* tells us to

9  think about, the underrepresentation was not so extreme.  In

10  this case, it's different.  It's much more stark.  The

11  underrepresentation is extreme.

12  Let me make one more point on this.  It's a simple

13  one.  We heard about it from Derrick Simmons, Constance

14  Slaughter-Harvey, from Dr. Bonneau in describing the value of

15  descriptive representation for the legitimacy of state

16  judiciaries, from Justice Anderson talking about his service

17  and his law clerks who have gone on and taken the bench

18  themselves.  Representation matters.  It matters in public

19  life.  It matters in the judiciary.  It matters in the

20  Mississippi Supreme Court.  Due to the extreme

21  underrepresentation of Black jurists on that body, Senate

22  Factor 7 weighs strongly in plaintiffs' favor.

23  On senate Factor 8, responsiveness, the evidence is

24  that policymakers are too often unresponsive to the

25  particularized needs of Black voters.  There's extensive

1   testimony about education, its effects.  As Dr. King and others

2   testified, the State rarely follows its own funding formula.

3   Education is extremely unequal, as Dr. Burch and Dr. King and

4   Senator Simmons and others testified.  And that ties into the

5   evidence that education is intimately connected to voting and

6   participation.

7         It ties into some of the racial appeals that we heard

8   about, like about Initiative 42.  There's plenty more in the

9   record on health, the health needs in the Delta in particular,

10  which could be alleviated by policy action, like expanding

11  Medicaid.

12        On economic development, Dyamone White talked about

13  how she tried to contact local officials who work on a housing

14  plan.  No one got back to her.  Congressman Thompson got back

15  to her.  We heard about HB 1020 from Dr. Bonneau, how unusual

16  it was to remove the power of local elected officials when the

17  local representatives didn't support it.

18        We're not here to litigate the merits of these

19  policies.  We're not.  The relevance is, again, about what

20  nonresponsiveness to the needs of Black voters tells us about

21  the state of the political process and racial division in the

22  political process.  Senate Factor 8, on that score, weighs in

23  favor of the plaintiffs.

24        I'm going to talk about Senate Factor 9 and then sum

25  it up.  On Senate Factor 9, the Court looks at whether the

1    policy underlying the state standard or practice is tenuous.

2    And the word "underlying" is critical here.  We look at the

3    actual policy justifications.  It's not an invitation for

4    lawyers to come up with arguments after the fact.

5    The three-judge panel said, in the Mississippi *NAACP*

6    case, we consider the policies used by Mississippi to justify

7    its districting decisions.  So what are the policies underlying

8    these lines?  We have evidence in the record.

9    Attorney General Pittman said we have got to redraw

10   these lines, make the population equal.  Representative Watson

11   and Constance Slaughter-Harvey talked about that process.  They

12   were in politics at the time.  They testified on it.  The idea

13   was to equalize the population in these districts.  That was

14   it.  That's what the record shows was the policy rationale last

15   time these districts were changed.  Black legislators tried to

16   draw a district that was strong for Black voters.  They were

17   voted down.

18   Defendants could have put a historian on the stand or

19   a legislator or a policymaker to offer some additional

20   evidence.  We would have cross-examined them.  They didn't do

21   that.

22   So looking at the one rationale that does appear in

23   the trial record, that rationale no longer holds.  These

24   districts are now malapportioned.

25   And by the way, Dr. Bonneau didn't dispute that

1 Mississippi is the only state that is still using lines from
2 this long ago to elect to the supreme court.

3 So I do want to anticipate what I think are going to
4 be some of the policy rationales that will be offered, which I
5 don't think hold water, with the Court's indulgence to address
6 them.

7 **THE COURT:** On Senate Factor 9?

8 **MR. SAVITZKY:** On Senate Factor 9.

9 **THE COURT:** You may.

10 **MR. SAVITZKY:** I think they're going to probably rely
11 on Justice Lamar's testimony about how it's good to have big
12 and diverse districts. That isn't testimony from a legislator
13 or a policymaker. It is a policy argument.

14 And, obviously, she sat on the Court. We don't have
15 any reason to think that the big, diverse districts that are
16 proposed by the plaintiffs operate any differently than the
17 big, diverse districts proposed -- or that currently exist.
18 Any-three district plan is going to have many different places
19 with different local interests and concerns, just like Justice
20 Lamar was talking about.

21 The illustrative districts include the Delta, also
22 include other areas as well. So there's no interest in having
23 big, diverse districts that the current lines serve that some
24 other three-district plan, like the ones plaintiffs proposed,
25 wouldn't also serve.

1          And by the way, under the current lines, there are

2    some regional interests that are only in one district.  Justice

3    Lamar talked about Katrina and how it spawned all of these

4    legal cases that were of tremendous interest.  The Gulf is in

5    one district.  So any claim that the concept of diversity

6    requires this particular set of three districts that crack the

7    Delta isn't supported by the evidence.  It's not supported by

8    Justice Lamar's testimony.

9          I would also expect to hear some arguments about how

10   the current lines serve the goal of judicial independence.

11   Mr. Kirkpatrick talked about that.  I don't know if

12   Mr. Kirkpatrick was born when these lines were drawn.  I

13   understand that he responded to the interrogatories in this

14   case.  And I would agree -- I would agree, if judicial

15   independence were actually on the line here, that would be a

16   good policy reason to take a long pause.  But it isn't.

17         First of all, Dr. King testified on this.  The idea

18   that the judiciary in Mississippi is structured to maximize

19   independence as opposed to other valid considerations, like

20   democracy and representation, is inconsistent with holding

21   elections in the first place.

22         I'm a voting rights lawyer.  Elections are fine.  It's

23   okay to elect judges.  The point is only that, from a political

24   science perspective, the rationale that having judges raise

25   money and run for office promotes judicial independence doesn't

1  hold.

2      But there's a deeper and more important point, and

3  it's just dispositive of this argument.  When Justice Lamar and

4  Kyle Kirkpatrick were asked whether a judge elected from a

5  Black majority district could be fair and impartial and

6  independent just like a judge from a White majority district,

7  they said, yes, of course.  And so did Aelicia Thomas, and so

8  did Derrick Simmons, and so did Dr. King.  Because there is and

9  can be only one answer.  That's the case.

10      Now I'm going to really sum up.  Thank you, Your

11  Honor, for your indulgence.

12      **THE COURT:**  Thank you.  I'm --

13      **MR. SAVITZKY:**  And I want to -- oh, sorry, Your Honor.

14  Go ahead.

15      **THE COURT:**  I'm going to give you an opportunity, very

16  briefly, after I hear from the defendants, but I'm cutting into

17  your time on the end because we've used this.  I wanted to hear

18  the senate factors altogether.

19      Now, tell me how much extra time we gave him.

20      **COURTROOM DEPUTY:**  He went 87 minutes total.

21      **THE COURT:**  87 total?

22      **COURTROOM DEPUTY:**  Uh-huh.

23      **THE COURT:**  Defendants can have that much time as

24  well.

25      Mr. Wallace --

1    **MR. WALLACE:**  I'll try not to use it, but I thank you,

2    Your Honor.

3         **THE COURT:**  Mr. Wallace, we're going to take a break

4    at this time.  If -- during your expansive closing, if you come

5    to a point where you wish to take a break, you may do so.

6    Okay?

7         **MR. WALLACE:**  Thank you, Your Honor.

8         **THE COURT:**  We will be in recess for 15 minutes.

9         **MR. SAVITZKY:**  Thank you, Your Honor.

10    (RECESS TAKEN.)

11         **THE COURT:**  Okay.  Mr. Wallace, your closing argument.

12         **MR. WALLACE:**  Thank you, Your Honor.

13         **THE COURT:**  You may proceed.

14         **MR. WALLACE:**  Thank you, Your Honor.

15         This is my light show.

16         You're seeing something that you haven't seen much in

17    this case, which is the actual statute you're being asked to

18    enforce.

19         And I note that when the Fifth Circuit entered its

20    most recent Section 2 case two weeks ago *en banc* in *Petteway,*

21    they began where you ought to begin, with the statutory

22    language.  However other many steps you go through to get

23    through *Gingles* and senate factors and any other relevant

24    factors you discern, your conclusion, when you get there, has

25    to line up with this language.  This is what has to be proven

1  because that's what Congress adopted.

2      And the first thing I want you to do is look at the
3  word "standard."  It says that "No voting standard" -- and
4  there's a bunch of other nouns there -- "shall be applied so as
5  to result in the denial or abridgment of the right to vote."

6      What standard is this lawsuit about?  This standard
7  is -- this lawsuit is about the standard that consists of the
8  district lines in the Central District of Mississippi.  That's
9  what they claim is denying or abridging the right of Black
10 voters to vote.  They're not challenging anything else.

11     There's a lot of red herrings floating around this
12 lawsuit.  They complain that Blacks are disadvantaged by
13 nonpartisan elections.  Whether or not that's the case, they
14 haven't asked you to order us to go back to partisan elections
15 for judges.

16     They have told you that -- they have told you that
17 roll-off may disadvantage Black voters because they are at the
18 bottom of the ballot.  They haven't asked you to order that the
19 ballot be rearranged, put the supreme court above president.

20     Dr. King talked about voter fatigue.  They haven't
21 asked you to rearrange the election schedule.  I think he
22 talked this morning for the first time in this case about
23 runoffs.  And there are runoffs in supreme court cases, but
24 they haven't asked you to abolish runoffs.

25     The only thing they are challenging, the thing they

1    say that denies them equality is the district lines.  That's
2    all you're being asked to look at.  And if the district lines
3    aren't denying them equality, this case is over.  So that's
4    where -- and by the way, one man, one vote fits in here, I
5    suppose, because there are people inside those district lines.

6    But the fact is that the 10 percent spread that
7    applies to -- that applies to legislative bodies does not apply
8    to judgeship bodies.  The supreme court in *Chisom* cited
9    *Wells vs. Edwards* to that effect.  So there's a fraction larger
10   than the 10 percent spread here, but if they thought that
11   denied equal protection, they would have brought that lawsuit,
12   and they didn't.  So all we are talking about is the district
13   lines.

14   Now, the denial must be on account of race or color.
15   And I don't know whether you deal with that issue earlier in
16   your analysis or later in your analysis.  But the supreme
17   court, in its *en banc* decision in *Clements,* says that you must
18   consider whether the district lines deny equality on the basis
19   of race and color or on the basis of something else.

20   And *Clements en banc* decision holds that if the
21   evidence shows that political party is the driver of election
22   outcomes, then this statute doesn't apply.  There's nothing
23   wrong with that.  How you determine that may be difficult.  And
24   *Clements* did not tell you what the burden of proof was or the
25   standard of proof.

1    There's a case called *Teague,* and that doesn't tell
2    you either, but it -- however you get there, you have to
3    determine that this is being -- I think plaintiffs have the
4    burden of proof on everything, but I acknowledge it may be a
5    little open question at the Fifth Circuit.  At the end of the
6    day, you have got to make a resolution.  Is this party driven?
7    Is this race driven?  That's what you get from the language of
8    the statute.

9    Now, there's two other things in Section B.  Section B
10   says that plaintiffs can get relief "if it has been shown" -- I
11   don't have this memorized -- "that the political processes" --
12   and the key political process you're worried about here is
13   district lines -- "are not equally open to participation in
14   that its members have less opportunity than other members of
15   the electorate to participate in the political process and to
16   elect representatives of their choice."  Two types of equality.
17   Participation in the political process and electing
18   representatives of their choice.

19   The key to participating in politics is being
20   registered to vote.  And here I did not hear anything in the
21   plaintiffs' closing that challenged the demonstration we
22   discussed earlier this morning that there is a majority Black
23   registration in the Central District.  That's what -- that's
24   what the CPS shows.  That's what the supreme court saw in
25   *Shelby.*  And whether or not the voting population is a little

1  over 50 percent or a little under 50 percent, the Black spread
2  on registration clearly establishes this is a Black majority
3  registration district, and I haven't heard anything to the
4  contrary.

5  So if you -- if you register, you have opportunities.
6  Why don't you use it?  We heard from their witnesses about the
7  difficulties that they have today in persuading young Black
8  folks to come out and vote.  I would not denigrate for a moment
9  the challenges that anybody faces.  I have worked in enough
10  elections to know it's hard to get people out to vote.  It's
11  hard to convince them to vote for you, but it's a part of the
12  job of elections.

13  And Judge Thomas says we can get people out for
14  national elections.  We can get them out for local elections
15  when their cousin is running for constable or really -- I
16  always think constable elections are more important than
17  presidential elections.  And those are the things that you get
18  people out to vote for.  The things in the middle, like supreme
19  court and statewide offices, she says, "I can't get them out on
20  it."  That's not a denial of equal opportunity.  It's failure
21  to exercise equal opportunity.

22  The named plaintiff, Ms. White, said that, where she
23  works in Hinds County, Blacks and Whites have the same
24  opportunity to get out and vote.  She can't get Black folks to
25  do it.  She said the problem was apathy.  Her word.  Not mine.

1    Because I know it's difficult.  But the *Salas* case says if
2    you've got a registration majority and you're not using it,
3    that's not entitling you to relief under Section 2.

4            The second aspect of equality is the equal opportunity
5    to elect representatives of their choice.  And I was very
6    pleased to hear Mr. Savitzky say that we're talking about the
7    facts on the ground today because the facts on the ground today
8    are that, of the five elections held, five seats elected from
9    the Central District and nowhere else -- these are pure Central
10   District line elections -- out of the five, you have three
11   Black elected officials.  You have one Black-preferred elected
12   official.  And you have only one elected candidate, Justice
13   Griffis, who was not preferred by the Black community.  Four
14   out of five looks equal in my book.

15           And the fact is -- the fact is that they came very
16   close to getting that fifth election -- that fifth seat in
17   2020.  Constance Slaughter-Harvey said that Ms. Westbrooks --
18   Judge Westbrooks was working hard.  She -- you know, she hired
19   a bus.  She came to Scott County.  And nobody came out to see
20   her because of COVID.  They were afraid of getting sick.

21           I'll bet it was really hard to run for office in 2020
22   where you have to go knocking on doors and shaking hands and
23   getting people to meet you and get excited about you.  So it
24   not only hampered her campaigning but it hampered the ability
25   of people to come out and vote in any way, shape, or form.

1          So if you're looking at anomalous elections --
2   Dr. King said the two commissioners were anomalous elections,
3   even though, in a normal year with a normal turnout, they did
4   just fine.  The real -- I've got to find another word besides
5   anomalous.  The real atypical election is 2020, where
6   candidates couldn't campaign and voters couldn't come out to
7   vote.  Would that have made a difference?  I don't know.  But I
8   do know it's not the district lines that beat Judge Westbrooks
9   because four other people preferred by Black voters have
10  managed to get elected in that district.

11          And just looking at the statute and knowing what
12  equality means, I think you could stop right there, but there's
13  a lot more case law out there, and we're going to go through
14  it.  I'm going to begin with the case law on judges because
15  that's what we're here for.

16          *Chisom* says that "Judges in judicial elections are
17  subject to Section 2.  Its holding is limited to the meaning of
18  representatives."  As you see down here, the statute says
19  "elect representatives of your choice."  And the Fifth Circuit
20  initially thought, well, judges aren't representatives so
21  that -- you know, that doesn't apply here.  But looking at the
22  statute as a whole, the supreme court says, "Representatives
23  must be construed broadly."  Otherwise, you could pass a law
24  that says Black people can't vote for judges, and you couldn't
25  touch it because they're not representatives.

1       But in saying that judges are covered by Section 2, I
2  think as counsel has admitted, they never said that you're
3  covered in exactly the same way.  And the fact is that -- the
4  fact is that judicial elect -- that no one has gone to the end
5  of a Section 2 case about judges and decided to redraw
6  districts.  It has never happened.  Didn't happen in -- it
7  didn't happen in *Chisom* because Louisiana settled on remand.
8  And it didn't happen in Texas either.  And that's how we got to
9  the *Clements* case.

10      There are two aspects of the *Clements* case that are
11 important, and there were two bases that led to the denial of
12 relief by the Fifth Circuit *en banc*.  One was the question of
13 polarized voting.  The Fifth Circuit says we have got to decide
14 whether there's -- there's polarized voting in Texas.  There's
15 no doubt about that -- is it polarized on the basis of race, or
16 is it polarized on the basis of party?  That's what you have to
17 decide.

18      And they based this decision on Justice White's
19 concurrence in the *Gingles* case.  Justice White did not go
20 along with Justice Brennan on the definition -- on the question
21 of what kind of voting matters.  Justice Brennan said what I
22 think Dr. King said yesterday, which is the voting is polarized
23 when Whites and Blacks vote differently.  If that's what it
24 means, every election in Mississippi and probably every
25 election in this country is racially polarized because

1  everybody knows that there are differences between the way
2  White folks and Black folks vote.

3      But Justice White said no.  That's not the issue.  The
4  issue is whether race is what is driving that division so that
5  there is no way you can overcome it.  And Justice White had
6  written the *Whitcomb vs. Chavis* case.  He had written the
7  *White vs. Regester* case, and Congress took his language.  All
8  of this equal participation stuff is straight out of *White vs.*
9  *Regester,* written by Justice White.

10      And he said that means -- that means that a race is so
11 polarized that race is the only thing that matters and that
12 nobody has a chance of overcoming that.  Where you see party
13 being more important, that's -- that's what counts, and that's
14 what's illegal under Section 2.  And that is what the Fifth
15 Circuit so found in *Clements*.

16      And the classic line from the *Clements* decision is
17 "Section 2 is implicated only where Democrats lose because they
18 are Black, not where Blacks lose because they are Democrats,"
19 999 F.2d at 854.

20      I don't know that *Clements* gives you a whole lot of
21 resources for answering that question, Your Honor, but that's
22 the question you have to decide.  That's what "on account of
23 race or color" means.  They did not decide who had the burden
24 of proof because the Court says it was overwhelming in Texas
25 that party was involved.  And I don't think the Fifth Circuit

1   has yet decided who has the burden of proof.  But the question
2   you have to answer is are blacks losing because they're Black
3   or because they're Democrats.

4           The other thing *Clements* did was to say that a
5   substantial state interest can overcome even the proof of a
6   dilution case.  Now, this is generally considered to be part of
7   the totality of the circumstances.  Totality of the
8   circumstances, by the way, is the actual language the statute
9   uses.  None of this *Gingles* stuff is in the statute, although
10  the supreme court has developed it in an attempt to streamline,
11  I suppose, the adjudication of these cases.

12          But the real thing -- the real question Congress asked
13  you to do is look at the totality of the circumstances to see
14  if there is equality and a substantial state interest can
15  overcome -- to overcome even a case of a showing of dilution.

16          In that case, it was the linkages, they called it,
17  between a judge and his jurisdiction.  And every -- Texas says
18  everybody in this jurisdiction ought to be able to vote for
19  every judge.  That's important.

20          Now, we don't have at-large supreme court elections in
21  Mississippi.  Many of the places that do, that is the linkage
22  issue on which the cases are decided.  Everybody subject to
23  jurisdiction of the Court ought to be allowed to vote for them.

24          Mississippi did it differently in 1832 when we drew
25  the lines across the state.  And it may very well have been

1    200 years ago they decided it's just too big a territory for

2    people to elect judges at-large.  We need to get them closer to

3    home.  For whatever reason, we haven't changed that.

4           So we don't have exactly the linkage issue they have

5    in Texas, and I'm not going to suggest that we do.  But we do

6    have an interest that Judge Barbour found, which is that, when

7    they did this in 1832, they drew the east/west to diversify the

8    electorate and to keep justices from being beholden to any one

9    group.

10          Your Honor is not going to read the raw testimony on

11   that, but you said you're going to read Judge Barbour's

12   decision, and that's what -- that's what he found.

13          Back in 1832, the Jacksonian Democrats that wrote the

14   Constitution would have been very conscious of the fact that

15   they didn't want any judges on the supreme court completely

16   controlled by the rich folks along the river.  So they took all

17   of the rich folks along the river and carried them over to the

18   Alabama line where there would be some more folks that might

19   have a chance to come out in a fair election.

20          So -- and here's the result.  If you decide, as Judge

21   Barbour did, that the east/west divisions are a substantial

22   state interest, then here is what *Clements* says.  "Proof of

23   dilution, considering the totality of the circumstances, must

24   be substantial in order to overcome the state's interest."

25   That's 999 F.2d 876.

1       So plaintiffs don't -- if you believe there is a state
2   interest here, plaintiffs don't just have to prove dilution,
3   they have to prove substantial dilution.  Here, we think the
4   interest is substantial but the proof isn't.

5       This is still the law in the Fifth Circuit.  The
6   *Fusilier* case, once again, from Louisiana that Mr. Cooper
7   testified in, they refused to break up the parish in the
8   districts.  And the most important -- perhaps the most
9   important cases you need to care about from the Fifth Circuit
10  are the two cases that have already approved these district
11  lines.

12      In *Magnolia Bar*, the Fifth Circuit did -- did not, as
13  I recall, reach the question of whether the east/west lines
14  were substantial.  They affirmed on the basis that Judge
15  Barbour was correct in saying that White -- that the White
16  majority, which then existed, did not usually defeat
17  Black-preferred voters in light of the elections of Judge
18  Anderson and Judge Banks.  So I'm not telling you that they
19  affirmed the east/west decision.  They affirmed them on a
20  different basis.  But that was Judge Barbour's decision.

21      In the *Fordice* case, which attacked the same lines for
22  the public service and transportation commission, the Fifth
23  Circuit looked at it.  They assumed that all -- that all three
24  of the *Gingles* prerequisites had been made.  And by the way, if
25  you look at Judge Lee's decision, contrary to counsel, he found

1    that you could create a Black majority district on the basis of
2    the 1990 lines.

3         The defendants attacked that on appeal.  The Fifth
4    Circuit said we don't have to decide that.  Because we think he
5    was so right on the totality of the circumstances, we affirm
6    him on that basis.  And in that process, they found that the
7    east/west lines were a substantial state interest as they
8    related to the public service commission and as they relate to
9    the transportation commission.

10        Now, those are the cases that actually deal with
11   judgeships.  And the judgeship redistricting cases have gone
12   through *Gingles* basically because they don't have anything else
13   to go through.  That's -- those were decided.  Those were
14   designed for real representatives, but the courts have assumed
15   they apply to judges, and they worked at them.

16        But as I told you this morning, you don't even get
17   started down the road in *Gingles* unless you're asking for an
18   additional black majority district to be made.  *Bartlett* says
19   that.  *Allen* says that.  If you -- you know, if the objective
20   is to make a black majority district and you have already got
21   one, you can go home.  You're done.  There's nothing to remedy.

22        We have gone through, earlier this morning, the math.
23   It starts with the census data giving you a 51 percent citizen
24   voting Black majority.  I think Mr. Savitzky suggested that,
25   well, you shouldn't look -- you know, you shouldn't calculate

1  citizen majority because the ACS is not the ten-year census.
2  You ought to stick with the ten-year census.

3       The *Bartlett* case tells you that you have to look at
4  the citizen numbers, as best you can, to see whether you have a
5  minority majority district or whether you don't.  You have to
6  look at them.  They're the only numbers you have got.  And the
7  numbers that the federal government has given us -- again,
8  nobody here has given us and nobody has attacked the ACS as
9  being a bad survey -- gets you to 51 percent.  As I told you
10 this morning, I think that by itself wins the case, but we do
11 have a majority district.

12      So if you've got -- if you get past that hurdle, if
13 you say, well, we already have a majority district, why don't
14 we quit, but you want to go forward, then the first thing you
15 get is whether the maps are any good.  And this is controlled
16 by Justice Kavanaugh's concurrence in *Allen* just last year.
17 Just as the Fifth Circuit told us that the *Byers* and *White*
18 concurrence was controlling in *Gingles*, the Kavanaugh
19 concurrence, whatever it means, is controlling here on the
20 question of whether or not you need a map and what a map is
21 for.

22      I wish he had said more, but he said twice, "The
23 reason you have a map is to remedy cracking and packing."  Now,
24 packing is when you put too many Blacks in a district so you're
25 denying Black influence in neighboring districts.  Cracking is

1    when you split up -- and I think Justice Kavanaugh says this --

2    it's when you split up an existing district and crack it, or

3    you split up an area that could be a district.  I don't know

4    what he thinks cracking is.  I told you what he says.

5          I think what cracking is, is what happened in *Hinds*

6    *vs.* -- I'm sorry -- it's what happened in *Kirksey vs. Hinds*

7    *County* years ago.  That was the redistricting of the

8    supervisors.  And Jackson, then, as now, has a whole lot of

9    Black neighborhoods and plenty of places that you don't need a

10    computer to figure out we can make a Black supervisor's

11    district out of this.  And instead, the county split up the

12    City of Jackson and all of those Black neighborhoods, carried

13    them out into the countryside, and made five majority White

14    districts.  That's cracking.

15          What has happened in the Delta is not cracking, and

16    the Delta certainly wasn't intended to be cracking because

17    these lines were drawn before there was hardly anybody living

18    in the Delta.  But are they, 200 years later, cracking a

19    district that could otherwise be made?

20          The Delta does not have enough people to control one

21    out of three districts.  You go back and look at the history of

22    the Delta.  When we tried the original Section 2 case over in

23    Judge Keady's courtroom 40 years ago, they had created a black

24    majority district, including the Delta and a few neighboring

25    places.  They did not endorse the Justice Department letter

1    that was put up on your screen this morning.

2          The Justice Department says, "Looks to me like you

3    cracked the Delta 40 years ago."  That's not the issue.  In

4    those days, if the Justice Department says you can't enforce

5    this statute, that was the end of it.  The Court didn't have

6    any authority to second-guess the Justice Department.

7          You get everybody in court and say, "All right.  You

8    can't enforce this statute.  What are we going to do instead?"

9    And there were a lot of folks there saying, "We used to have a

10   Delta district.  We'd like to have it back."  The Justice

11   Department said, "We'd like to have a Delta district."  And the

12   Court says, "All right.  We'll go ahead and give you a Delta

13   district."

14         The Delta district, including the whole Delta, as

15   Judge Clark said from, you know, Catfish Row in Vicksburg to

16   the lobby of the Peabody, couldn't control one out of five

17   congressional districts.  They had a Black majority, which was

18   promptly won by a White Republican.  Then Section 2 was passed.

19   The supreme court looked at it again and said, "Y'all look at

20   this again."  And what happened is, they said, "All right.

21   Black majority isn't enough.  We're going to make a Black

22   voting-age majority."  And it still wasn't enough.  Republicans

23   won again in 1984.  Eventually, in 1986, Mike Espy got elected.

24         And what that tells you is that what the Court had

25   done was to create an equal opportunity district, just like --

just like the statute says.  They created a district that

Whites could win sometimes and Blacks could win sometimes, and

it depends on what issues were out in the world that year and

not what skin color you had.  That was a pretty good district

that they created, and it doesn't exist anymore.

When we went down to four seats, we had to go to -- we

had to redraw everything.  That was done by Judge Jolly in his

court in 2001, I guess it was.  And that wasn't a Delta

district.  It took what then existed.

By that time, it had moved -- 1984, they took in West

Hinds County where Ms. White is from out in Edwards, but they

didn't take in Jackson.  They said the City of Jackson has

nothing whatsoever to do with the Delta.  And they kept going

south to pick up Claiborne and Jefferson, two other counties

that have nothing to do with the Delta.

Now, here we are trying to build a Delta district that

is going to control the whole of a single district in a

three-seat plan.  Delta couldn't control the five-seat plan.

Delta couldn't control the four-seat plan.  You can make a

Black district, which, in fact, is what they are asking you to

do, but you can't create a Delta district that is going to

control a judgeship.

So this is not like the *Kirksey* case in Hinds County.

There is not an obvious Black district sitting there waiting to

be made.  You have to go pull in people who the Court said

1  40 years ago -- the Court said 40 years ago, "I have nothing
2  whatsoever to do with the district."

3       So I would suggest to you there's no cracking here.
4  If there's no cracking, Judge Kavanaugh says, "I don't care
5  about the map.  We don't have -- we don't have anything that
6  needs to be remedied."

7       I would also say, if you believe that Judge Kavanaugh
8  would look at -- Justice Kavanaugh, because he is the
9  controlling vote, would look at these facts and say there's an
10 injury, there's a cracking injury that we need to figure out
11 how to remedy and go with the maps, then I'm not telling you
12 and we've never told you that Mr. Cooper's maps are terrible.

13      Mr. Swanson said you are using whole counties so you
14 can't create the salamander.  It's not as ugly as a lot of
15 things are.  I think he agreed that if you're just looking at
16 the compactness of the Central District, then the compactness
17 in Cooper's Plan 1 and in the existing law are fairly close,
18 but there are serious problems when you look at the other two
19 districts because you can't just draw a good district on the
20 west side of the state without having an effect on everybody
21 else.

22      And if you look at the effect they have in Plan 1,
23 they take Rankin County and Justice Griffis and put him in with
24 Pascagoula.  If there is such a thing as an eyeball test, that
25 flunks it.  And if your real objective here is to make sure

Justice Griffis can't beat Judge Westbrooks next time, best way to do it is to make sure he has got to run in Pascagoula. So that's the problem with the plans. Not that District 1 is ugly, but it's what it does to everybody else.

The second point is Black cohesion. Nobody doubts that Blacks vote cohesively in Mississippi. We've never said a word to the contrary. And as a matter of fact, they vote much more cohesively than Whites. If anybody is exercised by racial identity in this state, it's the Black votes. You can look at the numbers and see it.

Now, there is a lot of reasons -- there is a lot of reasons for it. Dr. King told you that Bennie Thompson was the best organizer in these parts, and he is. He does a very good job of preserving Black cohesion. If you want to know how they preserve Black cohesion on the other side of the district in Noxubee County, you can read the *U.S. vs. Brown* case. It tells you all about it.

And Senator Simmons, if I remember correctly, said that these days, when we go campaign, we spend all of our time in the Black neighborhoods. We just don't think it makes sense to go anywhere else. And that may be a good, sensible political thing, but these are the things that are driving cohesion. It's not anything that the State of Mississippi is doing or any of the White voters in Mississippi are doing. They're concentrating on preserving that cohesion. So they've

1  got that.

2       You go to the third *Gingles* point.  Is the White

3  majority bloc voting usually defeating Black-preferred

4  candidates?  I never heard Mr. Savitzky say the words "White

5  majority" anywhere in his closing, but that's what *Gingles*

6  requires.  It requires that a White majority is outvoting Black

7  folks.

8       The one thing we know we don't have in this district

9  is a White majority.  Whether the Black district is 40 --

10 whether the Black percentage is 49.9 or 50.1, everybody knows

11 that the Whites are four or five points behind that.  You don't

12 need King's EI to tell you that a minority cannot be

13 responsible for defeating somebody who's four or five points

14 ahead of them.  It just doesn't make any sense.  So there isn't

15 a White minority here at all.

16       But if you want to know -- oh, and by the way,

17 Dr. King -- if you want to know about racially-polarized

18 voting, Dr. King says, "Well, you know you've got

19 racially-polarized voting when the outcomes are predictable."

20 You can't look at this record and think that outcomes are

21 predictable in the Central District.  It is the kind of

22 district the Delta congressional district used to be.  It's

23 closely balanced.  You can't tell how the races are going to

24 come out, and it depends on all kinds of factors.  So if that's

25 his definition of racially-polarized voting, we don't have it.

1       But I want to start with "usually."  Whatever kind of
2   voting we have, what usually happens.  And if you go through,
3   starting with now, since Mr. Savitzky says "where we are now,"
4   you see who usually wins.

5       In 2023, two elections in this district for
6   commissioners, Commissioner Stamps and Simmons both won.
7   That's Black-preferred candidates winning in the Central
8   District.  They made a suggestion from the bench -- from the
9   box that, well, they won because the National Democrats --

10      I've had this happen before.

11      (PAUSE IN PROCEEDINGS DUE TO POWER OUTAGE.)

12      **MR. WALLACE:**  They suggested there's all of this
13  out-of-state Democratic money coming in.  Nobody introduced any
14  evidence that Justice Westbrooks -- that Judge Westbrooks
15  couldn't raise enough money to do a good job.

16      Justice Lamar told you that, when she ran in 2008,
17  there was a huge "get out to vote" drive in the Delta for the
18  Obama election.  All kinds of money coming in.  I can't think
19  of any reason why President Biden wouldn't have spent as much
20  money on "get out to vote" as President Obama did.  Nobody has
21  told you that "get out and vote" money is the difference
22  between 2023 and 2020.

23      The real problem in 2020 -- and I'm moving backwards
24  from the 2023 election -- Westbrooks narrowly loses, but the
25  real reason for that, as I've already said, has got to be

1    COVID.  Constance Slaughter-Harvey told you how hard it was.

2    It did not defeat -- whatever problem she had, it wasn't the

3    district lines in 2020 because Black and Democratic candidates

4    further up the ballot, President Biden, Mike Espy running for

5    Senate, they all got a majority in the Central District.

6         Was it COVID that kept her from effectively

7    campaigning?  That's the only evidence we've heard from the

8    box.  Nobody has come -- Judge Westbrooks hasn't come in here

9    to tell us why -- what she did and what she didn't do and why

10   she thinks she lost.  And it's their burden.

11        So I don't think the 2020 election, under those

12   unusual circumstances, is enough to disrupt the plan that has

13   been in place for 20 years.  But let's keep going.

14        In 2019, Commissioner Simmons won, a Black candidate

15   winning an empty seat that nobody had appointed him to.  He

16   won.  Stamps ran a very close race.  Worked hard for four years

17   and came back and won it the next time.

18        And that's what Professor Bonneau told us about the

19   benefits of competitive districts; that if somebody goes out

20   there and almost wins, you can spend the next four years

21   telling people, if you give me a little more help, we can push

22   it over.  And that is exactly what Mr. Stamps did.  That

23   doesn't look like White folks making it impossible for Black

24   folks to win.

25        You go back four years more to 2015.  Cecil Brown was

1  the Black-preferred candidate in the public service commission.
2  He won.  The other one was won by Dick Hall, who had been in
3  the legislature and the commissioner's office forever.  As
4  everybody has told you, it's hard to beat incumbents.  He held
5  onto that seat.  But four years later when the seat came open,
6  Mr. Simmons won it.

7          Go to -- I skipped 2016.  In 2016, Justice King and
8  Justice Kitchens, both Black-preferred, were elected.  And
9  Mr. Savitzky told you uncontested elections don't mean anything
10 because you can't analyze them to see whether Whites would
11 outvote Blacks.

12         Maybe that's the way a political scientist with a
13 computer looks at it.  Anybody who has ever run for office
14 knows that, if an incumbent does not have an opponent, it's
15 because nobody out there thinks they can win.  There is no
16 shortage of people who would like to be supreme court justices
17 or constables or anything else, and if you think you can win,
18 you're going to take a shot at it.

19         The reason that nobody has taken a shot at Justice
20 King is that they don't think they can beat him.  And if that
21 doesn't give political scientists numbers to crunch, I say too
22 bad, because real politics tells you that's a Black-preferred
23 candidate that the White folks can't possibly beat.

24         2012 is their next anomalous race.  Earle Banks lost,
25 but unlike other folks, he had two problems.  One is that he

had no judicial experience. Dr. Bonneau told you that usually costs you four or five votes -- 4 or 5 percent in a judicial race. He got 44 percent. Had he spent his life in circuit court instead of in the house of representatives, that's another 4 or 5 percent he could pick up.

And the other problem he had -- the other problem he had is he was running against Bill Waller. Bill Waller got a fifth of the Black vote, twice as much as anybody else has gotten in this century, as best I can tell from the numbers we've seen, and that is because when his -- that's because his father -- because his father prosecuted Byron De La Beckwith.

And by the way, we now have evidence that he, in fact, appointed Black folks. Because you saw that ad from Chet Dillard yesterday when he said, "I appointed the first few Black folks to the highway patrol." You look at the dates. That's Bill Waller's administration. Bill Waller, Jr., was going to get the benefit of that affection. So we think, for those reasons, 2012 is as atypical as the Westbrooks race was for different reasons.

So you go back one step further, 2008, King wins and Kitchens beats an incumbent. Black power is working pretty well in this district. I don't see how you can say that the district lines are beating people.

Now, they complain that, if you look at the numbers, the White majority is not providing enough crossover votes to

1    make up for the Black votes that are not supporting the

2    Black-preferred candidate for one reason or another.  I don't

3    see any case that says the White minority, in this case, is

4    under any obligation to provide votes for a Black candidate.

5    It just says you can't usually defeat them.

6         One thing I wish we knew in this case is why things

7    have changed because we know, when this started, Reuben

8    Anderson got 78 percent of the vote -- 78 percent of the White

9    vote.  Fred Banks got 30 percent of the White vote.  And

10   Mr. Savitzky says since then everything has changed.  Why?  It

11   would have been nice to have heard some evidence.

12        It would have been nice to have heard some evidence

13   that Black candidates are doing everything that Reuben Anderson

14   did, and for some reason, they can't possibly win.  It would

15   have been nice to have Judge Westbrooks or somebody from her

16   committee come in here and say, "I went to the president of

17   Trustmark and couldn't get any help.  I went to all of the law

18   firm leaders, and I couldn't get any help.  I went to the two

19   richest men in Mississippi and couldn't get any help.  I talked

20   to all of the ex-governors and couldn't get any help."  But

21   they didn't do that.

22        There just isn't any evidence to show why -- the

23   substantial Black vote that Justice Anderson and Justice Banks

24   got in the last century when they went out and asked for it,

25   why isn't that working anymore?  And I don't know.  I would

1  have liked to have heard it.

2       And I think it's part of their burden to show why a
3  district that was completely winnable for Black folks in the
4  last century is no longer winnable in this century.  As I've
5  just gone through the history, I think it is winnable.  But if
6  you believe it isn't, then you really are obliged to show what
7  has changed, and they haven't done that.

8       Now, let's go to whether or not there is
9  racially-polarized voting in Mississippi.  Nobody denies that
10  Blacks and Whites vote differently.  That was King's
11  definition.  But Justice White said that's not enough.  You've
12  got to show -- you've got to show not just that they vote
13  differently but that they vote differently on lines of race
14  instead of on lines of party.  And that's the prevailing rule
15  in this circuit under *Clements*.

16       To me, the clearest evidence in this case that party
17  makes the difference rather than race is the Lynn Posey
18  election.  Lynn Posey, in 2007, was a White Democrat, and he
19  was the Black-preferred candidate for the public service
20  commissioner.  Four years later, he had changed to the
21  Republican Party, ran for the same job.  He was not the
22  Black-preferred candidate.  That certainly looks like what was
23  controlling there was party.

24       And, again, we see that Black and White Democrats in
25  recent years have had no trouble getting elected, with the

1  exception of the COVID year in 2020.  It is clearly the case
2  that there are enough Democrats in the Central District that
3  they usually win but not always.  We think these facts show
4  party-polarized voting.

5       I would say to Your Honor -- and these are district
6  court decisions by which you are not bound, but in Alabama,
7  Dr. Bonneau was a witness in their supreme court case.  The
8  Alabama court found it's party, not race.  Mr. Cooper told you
9  he was a witness in the Arkansas Supreme Court case.  They lost
10 that one too.  In *Lopez vs. Abbott,* which they cite for some
11 reasons they like, was the Texas Supreme Court case, and they
12 came to exactly the same conclusion.  It's party, not race.

13      Again, the Fifth Circuit itself has not given you a
14 lot to work with in making that decision.  But it's a decision
15 you have got to make, and it's a decision that other district
16 judges have found does not apply, does not work in supreme
17 court cases.

18      Now, that's -- that covers the two parts:  Do you
19 usually win?  And is it racially-polarized voting or
20 party-polarized voting?

21      I do think that there is a third possibility, a third
22 consideration that may fit in here and may fit in somewhere
23 else.  In the *Salas* case, the district court said that they did
24 not prove the third *Gingles* point because of what -- because
25 the causative factor was the failure of the Hispanic community

1    to get out and exercise their vote.  They're not being beaten
2    by the White community.  They're getting beaten by their own
3    failure to come out and vote.  *Salas* looked at that as the
4    third *Gingles* point.  The Fifth Circuit looked at it as
5    totality of the circumstances, but however you look at it, it's
6    a point that has to be considered.

7            I won't go over *Salas*.  I went over that earlier this
8    morning.  But I think *Salas* tells us, under these
9    circumstances, if -- if four out of five isn't enough for you,
10   then you have got to explain why you -- you know, why you
11   didn't take advantage of your registration majority.

12           Now, let's go quickly through the totality of the
13   circumstances.  And I can never remember what the senate factor
14   numbers are, but I know what the factors are.  So I'll talk
15   about them.

16           The first thing you have to know about the senate
17   factors is you can't just list all of the bad things that have
18   ever happened in Mississippi.  You have to show how that is
19   affecting political life today.  *Clements* says that.  *Fordice*,
20   which is the appeal from Judge Lee's case, says that.  You
21   can't just give a litany of evil because you -- you have to
22   show how those effects are happening today.

23           Dr. King didn't think that was the law.  He told you
24   yesterday, "All I've got to show you is there are these
25   offensive advertisements out there.  I don't have to show you

1    they did anything."  And we've had the same problem with their

2    other experts.  We've had a lot of explanation -- we've talked

3    about the historical difficulties that people used to face

4    under poll taxes and literacy tests and all of the rest of it,

5    but you've got to show is there something that is still

6    happening today that is affecting elections.

7             And I think we've asked every expert who went up in

8    that box, "Can you tell me of anybody who could not vote

9    because of any of these historical and socioeconomic factors?"

10   And the answer has always been, "Well, the literature tells me

11   that this is likely to happen."  I can't cross-examine the

12   literature.  You're on notice from *Clements* and *Fordice* that

13   you'd better show how this happens in the real world.  And I

14   haven't heard anything to connect literature theory to the real

15   world.

16            Mr. Savitzky likes to say -- he likes to rely on the

17   *Teague* case that says, if you prove the first three points,

18   then you're generally going to win.  That was promptly

19   corrected by the Fifth Circuit after *Johnson v. De Grandy*

20   because they said the same thing to Judge Senter in the *Clark*

21   case.  I can't remember which county they were redistricting up

22   here, but they told -- they said that to Judge Senter.  Says,

23   "We've got all three points made so we think -- we think you

24   ought to take this back and fix it."

25            And then the supreme court decided *Johnson v.*

1  *De Grandy*, which says you are not under an obligation to create

2  all of the Black districts you could create.  And in *Clark* too,

3  they said, "Well, Judge Senter was right.  We missed that one."

4  And they went on and reversed him anyway.  But the so-called

5  presumption does not exist.

6       So let's talk for just a second about history.  We

7  don't dispute the facts.  As I said once already and as

8  Mr. Savitzky said once already, Faulkner wins this argument.

9  The past isn't dead.

10      And Dr. Campbell, to his credit, after going through

11 all of the terrible voting mechanisms we've used to keep Blacks

12 from voting in Mississippi, gave us a list of the bad ones that

13 he thinks still affect the real world.  He said felon

14 disenfranchisement is a bad thing; voter ID is a bad thing; and

15 the difficulty of getting absentee ballots is a bad thing.  So

16 let's go through them.

17      Felon disenfranchisement, whether it's a bad thing or

18 not, is illegal.  The Fifth Circuit twice *en banc* has held

19 there is nothing wrong with Mississippi's felon

20 disenfranchisement law.  The 15th Amendment itself says on its

21 face you can disqualify felons from voting.  There's just no

22 constitutional problem here.

23      Then voter ID.  Voter ID has been upheld as

24 constitutional by the supreme court.  Mississippi worked very

25 hard on it.  He put -- former Secretary Hosemann's article, he

1  worked very hard to try to come up with something that would
2  not disadvantage anybody.  And the Justice Department
3  apparently gave him a hard time but no litigant has.  You know,
4  if the ACLU or the NAACP thought that voter ID was no good,
5  they could sue him, and they haven't.  Voter ID is legal in the
6  nation and in Mississippi.

7  And finally is absentee ballot.  I really don't
8  understand this one.  Nobody has suggested that there's any
9  such thing as a federal right to an absentee ballot.  If there
10  were, there's no indication that we would be denying it.
11  Actually, we have absentee ballot rules in Mississippi.  And
12  people very often suggest, "Well, we ought to make it easier to
13  vote because absentee ballot fraud is not a problem."

14  In Mississippi, we have read *United States vs. Brown*.
15  We know that absentee ballot fraud is a problem in Mississippi,
16  and we are entitled to try and protect against it.  And while
17  these requirements may be difficult, nobody has suggested
18  there's anything illegal about them.  Once again, if they were
19  illegal, somebody would sue.

20  You can't come in to this case suing about district
21  lines and try to get an adjudication that felon
22  disenfranchisement is illegal, that voter ID is illegal, and
23  absentee ballots are illegal.  You don't get drive-by
24  constitutional litigation like that.  Zero plus zero plus zero
25  is still zero.  I don't think there is a law that says three

1   legal laws add up to a Section 2 violation.  But if there is
2   one, I'm sure Mr. Savitzky will tell me about it when he gets
3   back up.

4          Again, *Fordice* says you have to show that these
5   historical factors actually hampered the ability of minorities
6   to participate.  And what Judge Lee has said in that case is
7   that, whatever problems we have, they're not affecting turnout;
8   they're not affecting participation.  Blacks and Whites have
9   reached parity 25 years ago.  They still have it.  None of
10  these problems, if they exist, were a Section 2 violation.

11         We go on to socioeconomics and participation because
12  those things are tied together.  The staff report says that, if
13  Black participation is depressed, then you can look at all of
14  the socioeconomic factors.  And Your Honor thought there was
15  some evidence of suppressed participation and let those factors
16  in.  But, once again, you've got to show do they prevent
17  somebody from voting.  And I didn't hear any testimony to that
18  effect.

19         Again, Burch cited general principles.  The literature
20  shows that it makes it harder for Black folks to vote, but it
21  doesn't show that Black folks failed to overcome those hurdles
22  here in Mississippi because she didn't come down here and she
23  couldn't look.

24         Now, Mr. Savitzky asked Dr. Swanson, "Is it a
25  reasonable hypothesis that -- that the socioeconomic -- the

1    socioeconomic issues depress Black turnout?"  And Dr. Swanson
2    says, "Yeah, it's a reasonable hypothesis.  You need to go test
3    it."

4         Mississippi State tests that hypothesis every year.
5    It has a survey and says, "Are you participating in politics?
6    Do you usually vote?  Do you not usually vote?"  That's the
7    question Your Honor needs to know the answer to, do people
8    usually vote.

9         And the answer that Mississippi State gets is that
10   Black folks usually vote more often than White folks do.
11   Nobody has said that the literature says that the question
12   Mississippi State asks is a bad question that gets bad answers.
13   You haven't heard a word about that.

14        You didn't hear a word about it in Mr. Savitzky's
15   opening because there's nothing wrong with the on-the-ground,
16   door-to-door survey that Mississippi State tests -- does --
17   does every year.  So they're asking the right question that you
18   need the answer to, and Mississippi State is a good place to
19   get it.

20        Judge Lee told us the same thing 25 years ago when he
21   told us that we have reached parity and the Fifth Circuit
22   affirmed.  What he found 25 years ago the CPS still confirms,
23   that Blacks and Whites are at least at parity.  Mississippi
24   State confirms that Blacks and Whites are at least at parity.
25   And the Brennan Center, only two years ago, shows that they are

1   at least at parity.  In 2020, they found Blacks a little ahead.
2   In 2022, they found Blacks a little bit behind.  Nobody says
3   there's a huge gap -- gap there.
4          So they attack -- they don't attack Mississippi State.
5   They do attack the CPS.  And they say the CPS is bad because
6   people tell you they vote more often than they do.  There are
7   false positives in there.  Yes, there are a lot of false
8   positives.  Every time you go to the dentist, the dentist asks
9   you, "Do you floss?"  And I bet a lot of people in this room
10  have given a false positive on that.
11         So, yes, there are false positives in the response
12  that the CPS gets, but they're not relevant unless the --
13  because if Blacks and Whites overreport in the same measure,
14  you take out the overreporting people, and you've still got a
15  Black lead on turnout.
16         Now, there is literature, once again, that says maybe
17  Blacks do overreport more than Whites.  And we didn't lie about
18  that.  Our experts acknowledged that literature, but that
19  literature isn't here to be cross-examined.
20         And when Dr. Bonneau was asked why that was, he said,
21  "I can't think of any reason why Black folks would give worse
22  answers than White folks."  Dr. Burch read out some reasons
23  that I think came from the Ansolabehere report.  And I asked
24  her, "Can you tell me why White folks wouldn't be affected to
25  the same extent by those reasons?"  And she couldn't.  So if

1   there is a difference, nobody can explain why it happens, which
2   makes you think the difference may not be quite as real as you
3   think it is.

4           Now, they rely on Ansolabehere.  And he didn't study
5   Mississippi, and they want you to believe that the other
6   southern states he studied are just like Mississippi.  I often
7   tell my Northern friends, the South isn't one big Mississippi.
8   Even Mississippi isn't one big Mississippi.

9           And to say that, because there's overreporting in
10  North Carolina, there must be overreporting in Mississippi
11  doesn't necessarily follow.  And, indeed, there's reason to
12  believe it's not true because the records show, compared to
13  other states in the South, Mississippi is doing a much better
14  job of getting Blacks to register and to vote than anyplace
15  else.

16          If you look at the *Shelby* decision, there's a
17  3.8 percent Black advantage on -- on -- on registration.  If
18  you look at the Brennan Center report, Blacks are ahead in
19  Mississippi and no place else in the South.  So is there a
20  reason Mississippi may be different?  Well, I think you've
21  heard something about that too.

22          Dr. King said Congressman Thompson is pretty good at
23  getting people motivated.  He works very hard.  He sends out
24  those sample ballots.  He picks people up.  It works.  I think
25  there's every reason to believe that the efforts being made on

1  behalf of local Black political officials really is bringing
2  out a better turnout than anywhere else in the South.  In any
3  event, there's no study in Mississippi that says there isn't.

4       Mr. Savitzky says, "Well, now there is a study in
5  Mississippi because Dr. Burch did the math."  And I want to
6  talk about Dr. Burch's math for just a minute, but I want to
7  begin by saying something about both experts.

8       When this case started, Dr. Burch relied on the CPS.
9  We got Dr. Swanson because, given all of his experience with
10 the census, he knows all about the CPS.  Then she found out --
11 as a matter of fact, he knows enough about the CPS that he
12 could show her why she used it wrong.  And she said, "All
13 right.  I have to start over."  And then she went off to CES
14 and other things.

15      And, of course, both of these experts were talking
16 about something they don't usually do.  She told you that she
17 had never used King's EI in her published work.  Dr. Swanson
18 would absolutely confirm the same thing.  So you've got two
19 people who were hired to talk about the CPS who had to try to
20 talk about something else.

21      It's not a question of credibility.  Dave Swanson is
22 as credible as they come.  Dr. Burch is as credible as they
23 come.  They were wrestling with the subject matter that neither
24 one of them is terribly familiar with.  And that may not be
25 much use to you, Your Honor, but those are the facts about

1   where we are.

2   So she looked at the CES.  And let's talk about what
3   the CES is.  And I was so happy to hear Mr. Savitzky this
4   morning arguing about multiple hearsay because the CES is
5   multiple hearsay in both directions.  If you talk about where
6   the survey comes from -- and this is right -- this is in
7   evidence -- the CES report says we got an outfit called YouGov
8   to do the survey.  And YouGov does this survey not by
9   on-the-ground door knocking but by connecting with people who
10  have -- who have Internet access.

11  And as Dr. Swanson has testified, given his experience
12  on this exact subject with Indian communities, underprivileged
13  folks tend not to have Internet access.  And an Internet survey
14  is going to -- is going to disproportionately exclude, in
15  Mississippi, many Black voters.

16  So are there ways to correct for that?  Probably.  But
17  we don't know if it was done here because plaintiffs don't --
18  Dr. Burch didn't know anything about YouGov, didn't know
19  anything about how they did the survey.  How they did the
20  survey in the year of 2020 where the Census Bureau couldn't get
21  good surveys done, can you really rely on the hearsay you're
22  getting from YouGov?  I think it's unlikely.

23  Then she's getting the hearsay from CES, and it gets
24  hearsay in another direction.  It takes these names, whether
25  they're a good sample or not, and compares them to public

1  records.  Now, whether that's any good depends on the public
2  records, among other things.

3  Mr. Kirkpatrick told you that, if a poll worker makes
4  a mistake and records the wrong person as voting so that
5  somebody who didn't vote gets -- somebody who did vote gets
6  recorded as not voting, that goes from the poll worker to the
7  county election commission.  It goes to the secretary of
8  state's office.  And that error is maintained in the secretary
9  of state's office.  Not from any fault of the secretary of
10  state, but he's just recording the hearsay he gets from two
11  steps down the chain.  And then that hearsay goes to CES, and
12  they're the ones who have to look at it, try to figure out what
13  it says, and match it up to the hearsay they got from YouGov.

14  Now, that seems like a multiple hearsay problem to me.
15  And the answer that you get from the witnesses is, "Well,
16  academics rely on CES."  And for what academics are being asked
17  to do, maybe it's perfectly reliable.  This Court isn't an
18  academic.  This Court is not looking at opinions.  This Court
19  has to know facts, who voted and who didn't.

20  Those are not a matter of expert opinion.  That's a
21  matter of fact.  And whether those facts were properly recorded
22  and properly considered by CES is not in the record here.  And
23  whether those facts were applied to a survey that was validly
24  done by YouGov is not in the record here.  I suggest to you
25  that you can't rely on CES at all.

1    So when she took the validated voter information and
2    looked to see how many people had voted and how many people
3    hadn't and whether White vote was more -- was better reported
4    than Black and White, she's looking at bad data, and she's
5    looking at data that excludes a large portion of the Black
6    community in a year when it was hard to get data.  So, yes, the
7    only evidence you've got of overreporting in Mississippi is
8    math that Dr. Burch did based on the multiple hearsay that
9    Mr. Savitzky was arguing against earlier this morning.
10    In any event, she went on and did the same math on
11    turnout relying on CES, and it didn't tell her very much.  I
12    asked her about her Model 1.
13    And I said, "You look at all of these decimals and all
14    of these asterisks, and what does it tell you?"
15    And her answer to me is, "It tells us that Blacks do
16    vote a little less than Whites."
17    "Does it tell you how much?"
18    "No."
19    The 60/46 in her report may be her best estimate, but
20    the answer -- "Does it tell you how much?"  "No."  And in a
21    district in which Blacks are ahead in registration and ahead in
22    population, if it doesn't make much difference, it isn't going
23    to change that very much.
24    She also went down and did -- and did a different
25    calculation based on secretary of state numbers, but she told

1   you when she did that, on a statewide basis, there were a

2   quarter of a million people missing.  She didn't tell you why

3   those quarter of a million people didn't infect her

4   calculations.  That seems like a lot of people to miss.  And

5   she ought to be able to explain, well, you know, those quarter

6   of a million people did not affect the outcome "because."  And

7   I don't think I ever heard her say that.

8          And then she looked at the Central District where --

9   in particular, where I think there were 70-some-odd-thousand

10  people missing.  And she says, "Well, I knew I had a problem,

11  and so I tried to solve the problem by adding -- by reducing

12  the CVAP by 11 percent."  I don't know why that works, but

13  that's what she did.

14         And when she got that, she got numbers that were no

15  good.  That's her Table 3 where the Black turnout has a spread

16  of, like, 23 to 83.  And the White has their own spread.  It's

17  still a big spread.  And, you know, if those spreads overlap,

18  you can't really tell who's ahead.  It's -- so I don't think

19  they have demonstrated turnout when you get into the details or

20  the numbers and see where those numbers came -- came from.

21         So socioeconomic problems are real, but they have not

22  shown us that depressed turnout or depressed Black

23  participation is real.  If it is, maybe it's caused by

24  socioeconomics.  There were socioeconomic problems in *Salas,*

25  and the Fifth Circuit said, "You got a majority.  You got to

1 tell me why you couldn't use it." The fact that they didn't
2 use it isn't enough to get a Section 2 violation.

3 I want to get quickly into the racial appeals. Again,
4 Dr. King says, "Well, it doesn't matter whether it had any
5 effect. All I have to do is show it happened." The effect is
6 the people who made them got in big trouble.

7 The candidate who ran -- who ran that language against
8 Reuben Anderson got beat. The candidate who ran that ad
9 against Fred Banks got beat. The candidate who ran ads against
10 James Graves got beat. Racial appeals are apparently -- I
11 don't know what a legislator in Tunica has to do with this
12 case, but the legislator in Tunica who talked about welfare
13 checks got beat.

14 Dr. King says that doesn't -- and by the way, Dr. King
15 says, "I can't tell you whether any of these people were
16 intentionally doing race discrimination. Anyway, it doesn't
17 matter. If it looks problematic, it's a racial appeal."

18 And anybody -- a racial -- a racial conservative is
19 anybody that believes in limited government. Presumably, if
20 you do an ad about limited government, that's a racial appeal.
21 I'm sorry. I don't buy it. Anything that looks like a racial
22 appeal in Mississippi is hurting you, not helping you.

23 And, again, Dr. King says, "Yeah, you can get him
24 elected is the Rule 1 of politics." All of these ads violate
25 Rule 1.

1    Now, I do want to say one thing about -- I want to say
2    two things about the Latrice Westbrooks PAC ad.  What is --
3    Kenny Griffis didn't do it.  I mean, Kenny Griffis, apparently,
4    whatever his intentions may be, is smart enough to know that
5    racial appeals don't work in the Central District.  So holding
6    him or the State responsible for what a PAC did, when a PAC has
7    the authority under the First Amendment to campaign, seems to
8    me to make no sense.

9    But that ad, there's no racial appeal in there.  It
10   was talking about crime.  And, yeah, in the year that George
11   Floyd was killed, crime was a big deal on both sides of the
12   fence.  And you cannot be forbidden to talk about a legitimate
13   issue because somebody might think it's a racial appeal.

14   The other half is that it had Judge Westbrooks's
15   picture.  Yeah, it had Judge Westbrooks's picture.  You know
16   what else has Judge Westbrooks's picture?  Bennie Thompson's
17   sample ballot.  It's in the record.

18   Judge Reeves down in Jackson loves to apply the
19   goose/gander rule.  It seems to me, if the goose can put
20   Latrice Westbrooks's picture on the ballot, then the gander can
21   put her picture anywhere.  These aren't racial appeals.  These
22   are legitimate.  If it's a real racial appeal, the history
23   shows it doesn't work.

24   Let me say a word about responsiveness.  We still have
25   problems in Mississippi.  We have difficulty -- differences

1    about how those problems have to be addressed.  That's why we
2    have elections for the legislature.  That's not why we have
3    elections for the supreme court.  Nobody has said that the
4    supreme court has anything to do about any of the
5    responsiveness problems they have complained about.  And so all
6    of that, it seems to me, is -- is beside the point.

7             Now, we've got to get to -- we've got to get to state
8    interest.  They've got a letter from the mid-'80s from Attorney
9    General Pittman saying that you need to draw new lines for one
10   man, one vote purposes.  You know, I was a big fan of Chief
11   Justice Pittman, but he wasn't a legislator any more than Kyle
12   Kirkpatrick was a legislator.  And what he -- the only
13   legislator I know in this building is Judge Mills, and I don't
14   think we can go ask him.  So we don't know for sure what they
15   were thinking about in 1887 -- in 1987, and Judge -- Attorney
16   General Pittman's letter doesn't tell us anything about that.

17            But Judge Barbour's opinion, which you've said you are
18   going to consider, does.  And Judge Barbour looked at the
19   supreme court lines, and he said these were set up by
20   Jacksonian Democrats to balance the rich folks with the dirt
21   farmers, and anybody that wanted to be on our supreme court had
22   to campaign with rich folks, and they had to -- had to campaign
23   with dirt farmers.

24            The nature of the river counties and the eastern
25   counties has changed in the 200 years, but there is still

1    differences.  Dr. Swanson looked at those differences and drew
2    you a picture of socioeconomic need and resources distributed
3    all about the state.

4          And to the extent -- to the extent Judge Barbour is
5    right, he's confirmed that the needy counties are dispersed
6    among three districts, and the prosperous counties and the
7    middle counties are dispersed between three districts.  If that
8    kind of diversity that Judge Barbour blessed is a good thing --
9    and I think it is -- then it still holds true today.  There are
10   still differences on both sides of the state.

11         So I'm not telling you that Judge Barbour -- that the
12   Fifth Circuit affirmed that part of his opinion.  They didn't
13   get to it.  When Judge Lee said the same thing, they did affirm
14   his opinion and said east/west is a good way to do the
15   commissioners.  So I don't think there's any reason to think
16   that the supreme court is any different from the commissioners.
17   East/west is a sensible way to do.

18         Does it have an effect in the real world?  Justice
19   Lamar said, "Yes, it does."  Justice Lamar said that having
20   different groups in different places gets you out to meet
21   different people and gives you different considerations.  And
22   that's important for a judge when you're running for office.
23   We've heard a lot -- our witness and their witness didn't like
24   judgeship elections much at all.

25         A friend of mine just retired as chief justice of the

1   Michigan Supreme Court.  He once told me that there's something
2   humbling about standing on a voter's doorstep trying to explain
3   collateral estoppel.  Not everything about elections may be
4   good, but that kind of diversity in campaigning is good.  And
5   Justice Lamar said that she believes it's good for judicial
6   independence.

7        Now, the question is not can a judge elected from a
8   black majority district be fair.  We have three of them right
9   now.  Everybody says they're all fair.  But if you load up
10  everything on the west side of the state, then you don't have
11  that diversity anymore.  And one particular part of the
12  diversity you don't have is utility work.

13       Justice Lamar volunteered that utility cases are
14  things that may be politically sensitive.  And if you do what
15  plaintiffs work -- want you to do and put the entire Entergy
16  service area into one district, it's going to have an effect on
17  how judges think.

18       And if it doesn't -- Judge King told you this problem.
19  He said, "Everybody may be as fair as you possibly can."  He
20  was talking about raising money.  He said, "It may not have any
21  real influence at all, but it does change the perception."

22       And if the perception is that a judge is unduly
23  influenced by money or unduly influenced by one political party
24  or faction, that perception is a problem.  And that is a
25  perception that, for 200 years, we've avoided in Mississippi

1  because we have diverse, in the real meaning of that word,

2  districts going east and west.

3  So I think Judge Barbour and Judge Lee were both right

4  that east/west is a valid and substantial state interest.  And

5  that takes us back to *Clements*.  "Proof of dilution,

6  considering the totality of the circumstances, must be

7  substantial in order to overcome the state's intent."

8  Even if you believe everything that plaintiffs have

9  put on, the fact that they lost one election in 2020 and one

10 election in 2012 by close margins and unusual circumstances, if

11 that proves dilution at all, it strikes me that it's not a very

12 substantial dilution.  And what the Fifth Circuit has told you

13 is, if you've got a good state interest, you ought to protect

14 competitive, unless you've got a strong dilution case that

15 requires you to override it.

16 These seats -- these district lines, which is all

17 you're talking about -- anything else that causes problems for

18 Black candidates is not in this lawsuit.  These district lines

19 were held to be sufficient in 1992.  They were held to be

20 sufficient in 1999.  And all that has happened since then is

21 that Black-preferred candidates occupy two seats instead of

22 one.  There's no dilution here, certainly not enough to

23 overcome these substantial interests in preserving independence

24 and preserving the perception of independence.

25 I want to conclude by reminding the Court of something

1   the Court probably remembers.  When Sylvester Croom took over
2   the Mississippi State football program several years ago,
3   you'll remember the T-shirts that said "The only color that
4   matters is maroon."

5          In this court, in our supreme court, and every other
6   court, the only color that matters is black.  When Justice
7   Anderson sat in that box and pointed at the pictures on these
8   walls, what do you see?  You see black.  They are dominated by
9   black robes.  The people inside the robes are entitled honor
10  for the work they do, but the real message of every one of
11  these pictures is that the black robe ensures fairness and
12  equal treatment for everybody.

13         The robe -- the black robe is designed not to -- to
14  enhance communities of interest but to suppress the differences
15  that are drawn between one person or another.  When you put --
16  a judge puts on the black robe, he or she is agreeing not to
17  follow your personal principles.  You're agreeing not to care
18  about your personal characteristics, whether it's your skin
19  color or anything else.  You are agreeing not to be the servant
20  of a community of interest but to be a servant of the law.

21         **COURTROOM DEPUTY:**  Five minutes.

22         **MR. WALLACE:**  And that is what is happening on our
23  supreme court.  Both Justice Diaz and Justice Lamar said all of
24  those people up there are doing the right thing.  He said
25  they're trying to serve the whole state.  They are not trying

1  to represent a community of interest.  They are trying to serve

2  the law.  And they are not broken up into factions, whether

3  they're party factions or racial factions or any other

4  factions.  Our supreme court and the system we've used to elect

5  them for 200 years is doing what we want to do.  No witness

6  said otherwise.

7        Senator Simmons, who is here today, confirmed it.  He

8  says, "You know, I think the judges are perfectly fair."  You

9  know, I -- they are.  I'm not criticizing them in any way,

10  shape, or form.  We have a competitive Black majority district,

11  and it's a district that nobody can take for granted.

12        Senator Simmons said one other thing.  He said he

13  tries to convince individual Black voters who don't know the

14  Court as well as he does that they're getting a fair shake.

15  And he says it's hard to do because they are not entirely

16  convinced that White judges can be as fair to them as Black

17  judges are.  And Senator Simmons says, "You know, that's not

18  true.  They are as fair, but I understand why they feel that

19  way."

20        Dr. Bonneau understands why they feel that way.  He

21  volunteered that descriptive representation, which means being

22  represented by somebody that looks like you, can be important

23  in our democracy.  But as he said about nonpartisan elections

24  not being worth the squeeze, the question is whether it's worth

25  the squeeze to try to -- to try to change the district lines in

1    order to provide descriptive representation.

2             Whether it's a good idea or a bad idea, the Voting
3    Rights Act doesn't require it.  There's nothing in the Voting
4    Rights Act that says we want to put people out there so voters
5    will feel better about the folks they have to represent them.
6    The Voting Rights Act says what we want is to have an equal
7    opportunity to participate and have an equal opportunity to
8    elect.  And they've got that, and the consequences are we have
9    a good supreme court that everybody likes.

10            It's hard on Senator Simmons to convince those voters
11   of what he knows and has testified to be the truth.  I
12   understand that.  But I don't think anything in the Voting
13   Rights Act says we solve that problem by pretending we can
14   segregate election districts and not have that have an effect.

15            And Dr. Bonneau told you what that effect was going to
16   be.  He told you what happens when you have noncompetitive
17   districts.  Right now we've got a very competitive district.
18   Black-preferred candidates win most of the time but not all of
19   the time.  We have a district where everybody has to pay
20   attention to all of the voters or they're going to lose their
21   jobs.

22            And Dr. Bonneau says, when you get districts where you
23   don't have to pay attention to the opposition, where you have
24   one group safely ensconced over here and another group safely
25   ensconced over here and they never have to pay attention to

1  anything else, what you get is partisan rank.  It gives you
2  polarization.  It feeds on itself, and it gets worse election
3  after election.

4       For 200 years, we've avoided that with this plan.  We
5  have a good supreme court that everybody admits is doing its
6  job.  Listen to Professor Bonneau.  Do not turn our supreme
7  court into the United States Congress.

8       I thank you, Your Honor.

9       **THE COURT:**  Thank you.

10      Mr. Savitzky, I'm going to give you five minutes.

11      **MR. SAVITZKY:**  Thank you, Your Honor.  I appreciate
12  the Court's indulgence, and I'll try not to speak fastly but
13  cover the points that I want to cover.

14      Just a couple of things to respond to Mr. Wallace.

15      First of all, just to be clear, if we prevail -- if
16  there's a liability finding, you don't draw the districts.  The
17  legislature will draw the districts, and they will get to
18  decide how they want to configure a black majority district.
19  And we've shown you can draw one that has that east/west
20  configuration that's made of whole counties.  So that will be
21  their decision.

22      On Justice Kavanaugh, the evidence is that there is
23  cracking here.  The Delta is cracked.  And he was in the
24  majority in *Milligan*.

25      On the question of party versus race, I think we've

1   addressed that extensively.  I think the three-judge panel
2   addressed it extensively.  They addressed the *Whitcomb Against*
3   *Chavis case.*  They addressed *Clements.*  The cite on *Clements* is
4   pages 860 to 861 where it talks about the very different
5   circumstances, where you had multiracial coalitions competing
6   in politics.  That's not what we see on this evidence.

7             Mr. Wallace said why -- they have to say why.  I don't
8   think we need to prove why there's racial division in
9   Mississippi politics, but the evidence does show it.  It shows
10  that there's extreme polarization.  It shows that there is a
11  historical explanation for that, as the witnesses testified to,
12  and it shows that the race of the candidates matter.

13            And by the way, Mr. Wallace mentioned Lynn Posey, Lynn
14  Posey and those two elections.  The race of the opponent
15  changed.  Race of candidates matters.  That is what the
16  evidence shows.

17            We've talked about participation in politics.  They
18  assert that there is a majority Black registration rate in the
19  district based on the unverified CPS surveys, not on voter
20  rolls, and, again, the math doesn't add up.  If it's a majority
21  Black registration district and there's high levels of Black --
22  greater Black participation, Black candidates would win every
23  time.  Black candidates would win every time.  But they're not.
24  The evidence shows that, more often than not, they're losing.
25  Their theory doesn't add up.

1   　　　　Two more points, Your Honor.  I know I have a short
2   amount of time.  Three more.  One is very quick, which is just,
3   on the 1987 lines, we don't just have a memo from Justice
4   Pittman.  We also have testimony from Percy Watson on that
5   point and from Constance Slaughter-Harvey.  There was live
6   testimony.  Percy Watson was in the legislature.

7   　　　　Two more points.  One is on the historical reasons on
8   1832 and the 200-year-old nature of these districts.  There's
9   no evidence of a continuing state interest in dividing the
10  lines in order -- in order to compensate for the rich folks
11  along the river, as Mr. Wallace described.

12  　　　　The history is the rich folks on the river, as he
13  described, were the landowning gentry who owned slaves and
14  whose descendants live, in large proportions, in the Delta
15  today.  And so it would not be a historical irony but a
16  historical tragedy to say the desire to limit the political
17  power of that planting class so long ago, in the 1800s, would
18  justify vote dilution that harms the descendants of the
19  enslaved today.

20  　　　　The strength of our case on the *Gingles* factors, on
21  the senate factors, on the established law would easily
22  overcome any interest in maintaining lines based on what folks
23  thought 200 years ago in that regard.

24  　　　　Let me make one last point, please, Your Honor.  And I
25  just want to go back to Chief Judge Barbour in *Magnolia Bar*,

1  thinking about history and about the present.

2       Chief Judge Barbour was looking at these districts in

3  1992.  He was looking at a world where the lines had just been

4  redrawn, where Constance Slaughter-Harvey was the Assistant

5  Secretary of State For Elections; where Reuben Anderson, the

6  first black graduate of Ole Miss law, was now a former justice;

7  where Justice Banks was sitting on the Court, having won with

8  30 percent of the White vote despite being on the national

9  board of the NAACP.

10       And looking at that world, when I read Chief Judge

11  Barbour's opinion, it's brimming with hope.  It's brimming with

12  hope.  He says, "The election of Anderson and the election of

13  Banks to the Mississippi Supreme Court were not aberrational

14  but evidence that Whites will not necessarily vote as a bloc

15  for White candidates having Black opponents in Mississippi

16  Supreme Court elections so as to usually defeat the minority's

17  preferred candidate.  The success of these Black men represents

18  not merely personal triumphs but triumphs for the Voting Rights

19  Act itself."

20       And more than 30 years later, Your Honor, Reuben

21  Anderson took the stand in this courtroom.  He referenced that

22  same hope, that the days -- the hope is the days of racial

23  division and polarized voting were receding.  He said, "I was

24  always hopeful that an African American would be elected

25  statewide in Mississippi."  That's what he testified.  That's

1  how he felt.  But today the world looks different.  He
2  testified that his hope has faded.  He told the Court, "It
3  won't happen in my lifetime."

4          History didn't take the path that Chief Judge Barbour
5  and Reuben Anderson thought it was going to take.  Consistent
6  with all of the testimony from the witnesses you have heard who
7  took the stand, Justice Anderson testified that today, where we
8  are now, where history has taken us, race is number one in
9  politics.  That is what he testified.

10          And I want to be clear, hope isn't dead.  The hope
11  isn't dead.  Justice Anderson testified he doesn't expect to
12  see that in his lifetime, but he still hopes for it for his
13  daughter, for his grandson.  He's not -- he said he's not
14  optimistic, but he does say he has that hope.

15          And, Your Honor, the Voting Rights Act embodies the
16  hope that Chief Judge Barbour and Reuben Anderson and so many
17  Mississippians have felt.  It was reauthorized again and again
18  with the support most recently of Senators Lott and Cochran and
19  the signature of President Bush and reaffirmed by the supreme
20  court just last year.  It's the promise to ensure equal
21  opportunity even when -- as in Mississippi today, as the
22  evidence shows when it comes to supreme court elections, even
23  when politics is deeply polarized and divided along racial
24  lines.

25          The witnesses you heard from in this trial represent

1    Mississippi's past, as Justice Anderson does, and its present
2    and its future, people who have served and want to serve the
3    state, who love their home, people like Derrick Simmons and
4    Dyamone White.  These lines don't do right by the
5    Mississippians who came and testified in this courtroom.  They
6    fragment the Delta.  They dilute the voting strength of Black
7    Mississippians.  They grossly underrepresent Black
8    Mississippians in the state's highest court.  They don't do
9    what the law requires.  They don't meet Section 2's promise.

10          The trial evidence proves our case.  A finding of
11   liability is justified under the case law, and it would be
12   just.  So we ask the Court to find in our favor and to put a
13   remedy into place.

14          **THE COURT:**  Thank you.

15          Mr. Savitzky, and, Mr. Wallace, those were excellent
16   closing arguments, and they helped this Court.  I don't think
17   it's necessary that you file a post-trial brief.  I think I
18   have been briefed.  Okay?  So that's going to be very helpful
19   the way you have laid it out in the summary.

20          **MR. WALLACE:**  My wife will be glad to hear you said
21   that.

22          **THE COURT:**  I do wish that you would file findings of
23   facts and conclusions of law.  You tell me what you need.  Two
24   weeks?  Three weeks?  Whatever you think.  I've taken pretty
25   good notes and got real-time transcription.  So, you know, I'm

1    looking for those things that you think are most important.

2         **MR. WALLACE:**  Judge, sometimes you get what you ask

3    for and wish you hadn't.  The Jackson airport case has gone

4    back to the Fifth Circuit for the -- either the third or fourth

5    time, depending on how you count it, and they just granted my

6    motion to expedite.  So I owe them a brief in the next two

7    weeks.  We can get this done in 30 days.

8         **THE COURT:**  Okay.  Is 30 days okay with you,

9    Mr. Savitzky?

10        **MR. SAVITZKY:**  Yes, Your Honor.  30 days will be fine.

11   Thank you very much.

12        **THE COURT:**  Okay.  So submit your findings and your

13   conclusions of law.  I've got a couple or three questions, and

14   some of this, honestly, I think you have addressed in your

15   closing, but just to satisfy myself and my very, very studious

16   clerks, I'm going to ask these questions.

17        So in -- there's a recent *en banc* decision, *Petteway,*

18   that you have mentioned.  The Fifth Circuit rejected the use of

19   minority coalition claims and Section 2 claims.  That opinion

20   applies the ruling in the context of *Gingles* 1.  What is the

21   plaintiffs' position as to the applicability of that opinion in

22   light of Dr. Burch's EI analysis?

23        **MR. SAVITZKY:**  Yes, Your Honor.  And if there's a

24   particular aspect of the *Petteway* decision that the Court would

25   like me to address, I'm happy to.

1    As I understand it, the *Petteway* case deals primarily

2    with, as the Court says, *Gingles* 1 and with the ability to draw

3    an illustrative district for *Gingles* 1 purposes that

4    combines -- that's a minority majority district but isn't a

5    black majority district or a Hispanic majority district.  So in

6    *Galveston*, what was offered were majority minority districts

7    where the majority of minorities was a combination of Black and

8    Hispanic voters.

9    So that's not applicable here.  This is a case where

10   we're talking about drawing a black majority district.  And so

11   the idea of what -- they're called coalition claims, and this

12   issue has been litigated -- was litigated in the Fifth Circuit

13   and in other areas as well.  But this isn't a case involving

14   coalition claims.  So I would say that the thrust of the

15   *Petteway* decision is not applicable in this case.

16   **THE COURT:**  So before you even respond, let me just

17   say, our recollection of Dr. Burch's testimony is that she

18   testified that she looked at White versus non-White, as well as

19   non-Hispanic, Black alone and in combination versus Black.

20   Does *Petteway* have any impact on her calculation that include

21   non-White together?

22   **MR. SAVITZKY:**  So -- and I don't think so.  I think

23   that *Petteway* applies to the question of, are you -- are you

24   able to hit that 50 percent plus requirement for the

25   illustrative district that you are drawing in terms of

1   population by combining different racial minorities?  That's
2   the question.

3          The analysis that Dr. Burch is doing -- and, again, I
4   think -- I'm not sure if it's the same analysis, but it's
5   certainly not a *Gingles* 1 analysis.  It's not an analysis of
6   the population in the district.  So if you're looking at
7   turnout -- and I think that's what the Court is referencing --
8   that's a different question; right?

9          And so the ways that political scientists will look at
10  voter turnout, the extent to which, well, if I use the EI
11  methodology, I'm going to need to look at one group versus the
12  other.  So look at Black versus non-Black, White versus
13  non-White.  It's a different question entirely than the
14  composition of an illustrative district in terms of the
15  population demographics of the district.

16          **THE COURT:**  Okay.

17          **MR. WALLACE:**  I agree with counsel that it has no
18  substantive bearing on our case.  You mentioned Dr. Burch.  I
19  think the -- as I understood her testimony, she did not compare
20  Black directly to White because of the limitations of the data
21  she was working with and the system she was using.  And she had
22  to put those 20,000 Choctaws, Hispanics, and Delta Chinese
23  somewhere.  So sometimes she put them with the Whites, and
24  sometimes she put them with the Blacks.  That may go to how
25  precise her calculations are, but it's got nothing to do with

1 *Petteway.*

2 **THE COURT:** Okay.

3 **MR. WALLACE:** As I started, *Petteway* is procedurally

4 important because it tells you to begin and end with the

5 statute, make sure you connect what you're doing to what the

6 statutory language says.

7 **THE COURT:** Thank you. Could I ask you to move that

8 poster for me? Just put it down so I can see who's in the

9 gallery.

10 So we have heard a lot of testimony -- this may be

11 stating the real obvious here. Okay? So bear with me. We've

12 heard lots of testimony about the Black voting-age population

13 in District 1. Seems that the parties are using different

14 data. It's pretty obvious.

15 To reach a conclusion, like the plaintiffs concluding

16 that it's not currently a majority Black district, Black voting

17 district, and the defendants concluding that it is -- and

18 that's in your closing. Okay? Y'all are looking at it

19 differently.

20 So here's my question for the defendants: Even if the

21 Court were to accept your conclusion, does that preclude a

22 Section 2 vote dilution claim?

23 **MR. WALLACE:** Well, I'll go first this time, Your

24 Honor.

25 I don't think we are using different data. I don't

1   think we are using -- we have a stipulation.  If you look at

2   the census data, including the American Community Survey, which

3   nobody has challenged, then the Black citizen voting-age

4   population is 51.1 percent.  The question is should that number

5   come down because there are some Blacks who can't vote and

6   other people who can't vote.  And they don't even really have

7   any data.

8        We have a 56,000 number that Mr. Cooper says he got

9   somewhere, and we have to take suppositions about who lives

10  where and who's still alive and how to deduct them.  So our --

11       **THE COURT:**  So let me ask you that.  Is that

12  because -- y'all know this case so well.  Are we correct in

13  that we do kind of start at the same place --

14       **MR. WALLACE:**  Yes.

15       **THE COURT:**   -- and you say stay there because the

16  evidence is not sufficient to say how many Blacks have been

17  disenfranchised that would subtract from that Black voting

18  population, and then the plaintiffs contend, well, that's not a

19  real number by starting at 51.1 because, unless you account for

20  those that are not in the Black voting-age population, you

21  truly don't get to a number that is accurate that would put you

22  at a place where, indeed, it is not a majority minority Black?

23  Is that right?

24       **MR. WALLACE:**  I think we start from the same place.

25  We disagree about how far down from that place we go.  And as

1    to whether being a black majority district -- if it's not a

2    Black majority -- if it is already a black majority district,

3    does that preclude relief?  That was my first argument this

4    morning, and you heard it.

5              **MR. SAVITZKY:**  And, Your Honor, I would --

6              **THE COURT:**  Yes, please.  Uh-huh.

7              **MR. SAVITZKY:**  Just to address that point.

8              I agree that there is a disagreement on the law on

9    this question, and I think we made our argument as well.  As I

10   understand the law -- we've argued the law.  We put it in our

11   findings of fact, our conclusions of law as well -- there's no

12   legal requirement or barrier about the existing district, the

13   district that's currently there, having more or less than

14   50 percent Black voting-age population no matter what metric

15   you use.  It doesn't matter for purposes of Section 2.

16             What matters is whether Black voters are able to elect

17   candidates of choice or whether they are usually defeated;

18   right?  So you could have a situation where the Black

19   voting-age population is way over 50 percent, but because of

20   the circumstances, Black voters are not able to elect

21   candidates of choice.  And in -- in that case, there could be a

22   Section 2 problem, a vote dilution problem.

23             **THE COURT:**  Okay.  When I get to totality of the

24   circumstances?

25             **MR. SAVITZKY:**  Yes.

1    So the other point, though, is, I think there are two
2  different places to start here.  And there's a difference
3  between the census and the ACS; right?  There's the census,
4  which is the complete count.  Every ten years we actually count
5  the population; right?  Those are the actual census numbers.
6  This is not a black majority district using those numbers.

7    And I would cite the Court just to *Georgia Against*
8  *Ashcroft,* 539 U.S. 461.  It talks about the use of the -- an
9  any part Black census metric to measure Black population.  So
10  there's a 49.3.  It's not a 50 percent Black district using
11  those numbers.  I think, again, it's stipulated, if you use
12  that CVAP estimate of the ACS, which is an estimate, it's 51.

13    And then I agree we have a debate, based on the
14  evidence, about how far down that number goes once you are
15  trying to think about, well, who is actually eligible?  Not
16  just who's eligible because of citizenship but who's eligible
17  because of disenfranchisement.

18    **THE COURT:**  Right.  I understand.  Okay.

19    So incumbency is part of the senate factor analysis.
20  Multiple cases have referenced it and considered it in a
21  legislative redistricting case.  It isn't too difficult to
22  figure out how incumbents would be impacted if the lines were
23  shifted and if you would have two incumbents facing off.

24    Isn't it a little tougher in this case to analyze how
25  a potential line would infect or affect those incumbents?  Any

1  thoughts?

2          **MR. WALLACE:**  You may proceed.

3          **MR. SAVITZKY:**  Thank you, Counsel.

4          So, Your Honor, I think incumbency can come into play.

5  Primarily, I think it comes into play in *Gingles* 1 right when

6  you're evaluating the reasonableness of the plan; so before you

7  sort of get to the totality, when you are looking at the plan

8  offered by the plaintiffs and you think about the different

9  factors.

10          And it can come into play more often in, like, a state

11  legislative plan where there are potential pairings of

12  incumbents and where there's evidence that the -- that the

13  state map drawers considered incumbency because they're

14  redrawing the lines every ten years and they have different

15  incumbents and different concerns.  So that can come up as a

16  real consideration.

17          So I think, in this case, it's less of an issue.  It's

18  not clear -- there wasn't any testimony on whether incumbency

19  is considered in these lines.  And, obviously, it's a

20  three-district system made up of county lines.  And we've shown

21  many different ways to draw the districts.  I'm not sure any

22  incumbents would be paired, which is usually the thing that you

23  think about.  But, certainly, there are so many different

24  configurations that are made available that I don't think that

25  would be any impediment.

1         **THE COURT:** So you don't think the fact that there are

2 three places in each district, yet the judge doesn't have to

3 come -- I think I'm right about this, and I may be wrong -- the

4 judge doesn't have to reside within that place; right?

5         **MR. SAVITZKY:** They're at-large districts.

6         **THE COURT:** Yes.

7         **MR. SAVITZKY:** So in District 1, for example, you can

8 live in Neshoba County or you can live in Tunica County,

9 anywhere in the district. So there's no -- the places only

10 designate that they are elected sort of at different times.

11         **THE COURT:** Okay.

12         **MR. WALLACE:** Incumbency comes into play in two ways.

13 One is in determining who usually wins elections. And you've

14 heard that incumbency is a -- is an advantage. And as you look

15 at the Earle Banks's election, one problem he had was he was

16 running against an incumbent who was particularly popular with

17 Black voters. That's one way incumbency comes into the case.

18         The other way incumbency comes into the case is how

19 you draw the lines if you decide to draw lines, and it is

20 usually the case that, when the legislature draws lines, it

21 works very hard to give every incumbent a place where they

22 don't have to run against somebody else.

23         And, of course, that's the problem with Illustrative

24 Plan 1. It takes Justice Kenny Griffis in Rankin County and

25 makes him run against three justices who already have a job in

1    the Southern District.

2         So those are the two ways incumbency comes into this
3    case.

4         **THE COURT:**  Okay.

5         **MR. SAVITZKY:**  And, Your Honor, just briefly on this
6    point.

7         No dispute that on the totality of the circumstances
8    this sort of broader concept of incumbency and how it comes
9    into play in terms of the opportunity of Black voters to elect
10   candidates in the district would be something to consider.
11   And, obviously, we would submit that the fact that the only
12   Black justices who have sat on the Court are folks who have
13   been appointed and achieved incumbency first through the
14   appointment of the governor is one important consideration.

15        On the districting point in particular, I think this
16   is also a different situation only because these elections
17   happen every eight years.  They're relatively infrequent.  But,
18   again, I think it's for the legislature, if there's a liability
19   finding, to figure out how to draw these lines.  We don't have
20   evidence that that's something that actually is considered when
21   you put these lines together, but the legislature would have
22   that opportunity.

23        And, of course, you look at the least-change plans,
24   for example, and only seven counties are moved around.  You can
25   look at the Delta.  Rankin, Madison, Hinds all stay in there.

1   East/west is maintained.  So there are many different ways to

2   draw a true black majority district here.  And I don't think

3   there is any reason to think that the legislature couldn't take

4   incumbency into account, if it wanted to, after a liability

5   finding.

6           **THE COURT**:  Okay.  So I want to ask you a question

7   about Senate Factor 8.  You know, we've heard a lot about

8   whether elected officials are unresponsive to the minority's

9   particularized needs.  And I've heard a lot about, well, what

10  is the supreme court going to do about that need?

11          So this goes, I think, in large part, to the -- I

12  guess this is where I am right now, is an acknowledgement that

13  it's hard for the supreme court to recognize -- or to respond

14  to a particular need if that is Medicaid, unless they're ruling

15  on a Medicaid decision.  Okay?

16          Is it -- is there any other way to even talk about

17  that other than just maintaining judicial independence?  That

18  we don't need supreme court justices that respond to

19  particularized needs.  We need supreme court justices that are

20  fair, that take all facts into consideration.  Is there any

21  other way for me to look at that?  And if so, tell me.

22          **MR. SAVITZKY**:  Yes, Your Honor.

23          And I actually do think -- you know, what Senate

24  Factor 8 is getting at is it's one way to think about the

25  political process and the extent to which racial division

1  affects the political process and makes the political playing

2  field unequal.  So it goes to the larger political context.

3  It's not about the responsiveness of the particular body whose

4  lines are being challenged.  I think that's an important

5  distinction.

6        So I think you can.  And there is some evidence in the

7  record about the extent to which the supreme court could be

8  responsive to some of the particularized needs of Black voters.

9  But the broader point is that the responsiveness of

10  policymakers who have more discretion, like legislators, is

11  actually highly relevant.  And that's the primary evidence that

12  the Court can look to in evaluating that.  Because the question

13  isn't is this particular body nonresponsive.  The question is

14  do these lines result in unequal opportunities and to consider

15  that when you look at the entire political context.

16        So the responsiveness of those policymakers with

17  discretion tells about the political context.  It tells us

18  about whether officials respond to Black voters and Black

19  constituents when they reach out.  And I would submit that the

20  evidence here and the testimony from individual witnesses is

21  that too often that does not happen.

22        **MR. WALLACE:**  I think we have a historical agreement

23  on this one because I was born before 1987, and I remember the

24  cases in the '60s where federal courts tried to deal directly

25  with the problem of nonresponsiveness.

1    In Mississippi, the streets would stop being paved
2 when you got to the Black neighborhoods.  The White
3 neighborhoods had sewers.  The Black neighborhoods didn't.
4 Those cases would wind up in court, and federal judges would
5 have to be, you know, municipal planners to tell people what to
6 do.

7    And I think part of the problem that led to *Zimmer*
8 saying break up these at-large city governments and make sure
9 Black folks get representation was the thought that, if you've
10 got Black representation, they could stand up and say, "Get me
11 a sewer," and you wouldn't have to come to court.  So that
12 logic makes sense when you're dealing with a representative
13 body.  You know, you want representatives to represent people
14 who have real needs and do that effectively, and that's
15 where -- that's where responsiveness comes in.

16    The supreme court doesn't do any of that.  The supreme
17 court isn't passing Medicaid.  It isn't paving sidewalks.  Its
18 job is to ignore all of that and to enforce the law.  And so I
19 don't think what's going on in the representative bodies, good,
20 bad, or indifferent, has any effect on what you ought to decide
21 about the supreme court.

22    **THE COURT:**  And I do acknowledge -- and somebody said
23 it.  And it's been said many times before -- that, you know, we
24 all come from different places.  So from whence you came gives
25 you better insight as to, you know, what those -- that

1  particular group's needs may be.

2       Okay.  Let's talk about core retention.  Dr. Swanson

3  testified about the core retention numbers with respect to

4  Cooper's plan and the least-change plans too.

5       Didn't the supreme court indicate that core retention

6  has limited or no weight in *Allen*?

7       **MR. WALLACE:**  I wouldn't say no weight, but I would

8  agree limited.  We're not trying to tell you that this is a

9  huge factor on liability, but it is a practical factor.  That

10 as you consider whether we need any kind of remedy at all,

11 think of the disruption that it will cause in order to increase

12 the Black population in District 1 by about 40,000 people.

13      The first thing Plan 1 does is take 80,000 people out.

14 So they've got to bring 120,000 Black folks in.  Seems to me

15 you ought -- it's almost like *Clements* says.  You ought to have

16 a pretty substantial problem before you start disrupting people

17 to that extent.

18      But I absolutely agree the *Allen* case says it ain't a

19 big deal.

20      **MR. SAVITZKY:**  And I don't know if you need to hear

21 much more about it.  I mean, often there are -- there are

22 states where core retention is not taken into account.  I

23 think, in a legislative context, when you have a new plan and

24 you have an alternative plan, you look which one sort of

25 matches up to the old plan more.  That's the situation we see

1  core retention potentially being used.

2         But in a situation where the lines haven't been

3  changed in 40 years, I would submit it has really no relevance

4  at all.  As soon as you change the lines, then you're going to

5  change the lines.  So there isn't anything to compare it to.

6         But I would also say, and the evidence was, the vast

7  majority of Mississippians would stay in their existing supreme

8  court districts under any of these plans.  I mean, under the

9  least-change plans, it's well over 90 percent, but even on

10  Plan 1, 75 percent of Mississippians stay in their same

11  district.

12         **THE COURT:**  Okay.  So I've heard about Justice

13  Kavanaugh's concurrence in *Milligan,* that a court must first

14  find that the districts, as legislatively drawn, combined or

15  divided the Black population.  The Southern District, in its

16  case a few months ago, rejected this argument.  Tell me what's

17  incorrect about what the Southern District did.

18         Mr. Wallace, you may go first.

19         **MR. WALLACE:**  Well, I told you that in my brief, Your

20  Honor, if I remember correctly.  I think I -- you know, we had

21  the brief almost written when the case came down.  And I think

22  I have a footnote about it -- a long footnote on page 9 if you

23  want to go back and read it.

24         **THE COURT:**  Okay.

25         **MR. WALLACE:**  But the short answer is the three judges

1  said, "Well, he agreed with the other four justices on how to
2  apply *Gingles* point 1, and so there's no change." And -- well,
3  he did agree with them on how to apply it, but I think that
4  the -- I think that the concurrence -- because, remember, I
5  mean, there's a part of the opinion he didn't join. He had
6  some reason not to join the opinion.

7          And I think his concurrent says, "You get to *Gingles* 1
8  when you need a remedy for cracking and packing." And that, I
9  believe -- to the extent that the three-judge court said there
10 was no difference at all, I think they missed it.

11         I will say one other thing while I'm standing up.
12 Everybody at both of these tables hopes that the legislature
13 settles that problem, but...

14         **THE COURT:** I bet so.

15         **MR. WALLACE:** And we hope they settle your problem
16 when we get to that point, but there're never any guarantee of
17 that; so...

18         **THE COURT:** Right.

19         **MR. SAVITZKY:** And, Your Honor, just briefly on that
20 point.

21         We do think the three-judge court got it right. Let's
22 be very clear that Justice Kavanaugh joined the entirety of
23 *Milligan* with the exception of one subsection of one section,
24 including -- and *Milligan* was primarily about *Gingles* 1. I
25 mean, the Court reaffirmed the entire standard, but it was very

1    focused on *Gingles* 1.  And Justice Kavanaugh joined on, more or
2    less, the entirety of that opinion, including the Court's
3    statement of the basic parameters in *Gingles 1* that we're
4    looking at.  Are the illustrative plans reasonably configured
5    looking at traditional districting principles?

6              So -- and in terms of his concurrence -- and we cited
7    the Court.  I think it's page 44, Footnote 2 of Justice
8    Kavanaugh's -- of Justice Kavanaugh's concurring opinion.  But
9    he points out, in terms of evaluating an illustrative plan,
10   maintaining county lines, using county lines -- in this case,
11   we have plans that are drawn -- whole county lines is -- is a
12   strong indicator you have reasonable plans that are
13   well-configured.

14             So we think the panel got that one right and wouldn't
15   read anything more into the concurrence other than Justice
16   Kavanaugh explaining some of his additional thoughts.

17             And, again, cracking, we have evidence of that here.
18   I mean, that's what this case is about.

19             **THE COURT**:  Plaintiffs, in your amended complaint, you
20   do not request that this Court implement the plan -- and we've
21   talked about that -- to create the district.  I want to be sure
22   that I understand the relief requested is that I simply decide
23   the -- as y'all refer to it, the liability part of this to find
24   that the present plan violates the Voting Rights Act and then
25   direct the appropriate authorities to redraw, if you succeed?

1      **MR. SAVITZKY**:  Yes, Your Honor.  That's correct.  And

2   that -- that is the process.

3          I mean, I think there have been -- especially not as

4   often these days, but in the past, there have been instances

5   where a districting plan is challenged, and there's a liability

6   determination, and the legislature chooses not to act.  And,

7   eventually, the Court who decided the case has to appoint a

8   special master to engage in the process.  But the legislature

9   always gets the first shot.

10         It is in the Court's discretion how to -- how much

11  time to allow or how that process will play out, but it's the

12  legislature's job to draw district lines in the first instance.

13  So we're looking for a liability finding, and then, hopefully,

14  the legislature would draw a plan that would comport with the

15  Court's ruling, and that would be the end of it.

16         **MR. WALLACE**:  That's correct.  And just to be clear,

17  Your Honor, you will retain jurisdiction in case the

18  legislature doesn't fix it.  If it doesn't happen, it comes

19  back to you.

20         **THE COURT**:  And on that point, I join with you and

21  hope that the legislature solves the problem.

22         I just want to make a couple of observations, before

23  we quit for the day, in the two-week period that we have had.

24  I want all of you lawyers to understand that all through the

25  last two weeks we've had several law clerks in and out and

1 hearing some of the testimony, and I am so proud that they have

2 had the opportunity to hear such good counselors of the law

3 argue such an important case.

4    So it's been -- it's been good that in this courtroom

5 those law clerks have had the opportunity to hear you make

6 argument in this case as well as hear the testimony of these

7 very, very important witnesses.

8    There's a lot of political might in this courtroom,

9 and I'm going to ask -- Mr. Wallace, I'm going to pick on you

10 and say, could you get this law changed to where this too is a

11 three-judge panel decision?

12    **MR. WALLACE:** I'll be honest with you, Your Honor, we

13 thought about it.

14    First of all, generally, the judiciary hates

15 three-judge panels, especially the Court of Appeals hates

16 three-judge panels, and they've gone to Congress to get rid of

17 as many of them as they possibly can.

18    You know, an argument can be made -- we decided not to

19 make -- that this will control the commissioners who are

20 legislative bodies, and we should have asked for a three-judge

21 panel, and we decided it would be a whole lot simpler with one

22 judge than with three judges.

23    Now, knowing your pleasure, if we do this again, we'll

24 see if we can get you some help.

25    **THE COURT:** Well, I am joking with you, but truly just

1  went for some months just assuming it would be a three-judge

2  panel until I at some point realized, no, Sharion, this is you.

3  And so there may be some -- after -- after the decision, there

4  may be some effort on everybody's part to say, well, we need

5  three judges instead of one making these decisions.

6          But I want to thank you, thank you for your excellent

7  preparation and work in this case, and to doing -- for doing

8  your very best to prepare me to make a decision.  So I've

9  enjoyed having you in the courtroom over the last two weeks.

10         You are dismissed.

11         **MR. SAVITZKY:**  Thank you, Your Honor.

12         **MR. SHANNON:**  Thank you, Your Honor.

13     (CONCLUDED AT 1:32 P.M.)

14

15

16

17

18

19

20

21

22

23

24

25

CERTIFICATE

    I, Phyllis K. McLarty, Federal Official Realtime Court
Reporter, in and for the United States District Court for the
Northern District of Mississippi, do hereby certify that
pursuant to Section 753, Title 28, United States Code, that the
foregoing pages, 1419-1580, Volume 8, are a true and correct
transcript of the stenographically reported proceedings held in
the above-entitled matter and that the transcript page format
is in conformance with the regulations of the Judicial
Conference of the United States.

    Witness my hand, this 3rd day of September, 2024.

                        /s/ Phyllis K. McLarty
                        PHYLLIS K. McLARTY, RMR, FCRR, CCR #1235
                        Federal Official Court Reporter