# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF MISSISSIPPI
### GREENVILLE DIVISION

DYAMONE WHITE; DERRICK SIMMONS;
TY PINKINS; CONSTANCE OLIVIA SLAUGHTER
HARVEY-BURWELL,

      *Plaintiffs*,

      vs.

STATE BOARD OF ELECTION COMMISSIONERS;
TATE REEVES, *in his official capacity as Governor of
Mississippi*; LYNN FITCH, *in her official capacity as
Attorney General of Mississippi*; MICHAEL WATSON,
*in his official capacity as Secretary of State of
Mississippi*,

      *Defendants*,

**CIVIL ACTION NO.
4:22-cv-62-SA-JMV**

## PLAINTIFFS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

**TABLE OF CONTENTS**

PROPOSED FINDINGS OF FACT ..................................................................................1

I.     INTRODUCTION ...................................................................................................1

II.    THE REDISTRICTING PROCESS .......................................................................5

III.   PARTIES ...............................................................................................................9

    A.  Plaintiffs..............................................................................................................9

    B.  Defendants ........................................................................................................10

IV.   *GINGLES* 1 ........................................................................................................11

    A.  The Black Population in Mississippi ................................................................19

    B.  The 1987 Enacted Plan.....................................................................................24

    C.  The Illustrative Plans .......................................................................................31

V.    *GINGLES* 2 AND 3 ...........................................................................................48

    A.  *Gingles* 2 .........................................................................................................53

    B.  *Gingles* 3 .........................................................................................................60

VI.   TOTALITY OF THE CIRCUMSTANCES .........................................................76

    A.  Senate Factor 1:  Mississippi's History of Voting-Related Discrimination .....76

    B.  Senate Factor 2: High Levels of Racially Polarized Voting in Mississippi......92

    C.  Senate Factor 3: Mississippi's Voting Practices and Procedures That Tend to Enhance the Opportunity for Discrimination Against Minority Voters ..........................................111

    D.  Senate Factor 4: Use of Candidate Slating Process ........................................119

    E.  Senate Factor 5: Disparities in Education, Employment, and Health That Hinder Political Participation ........................................................................................................125

    F.  Senate Factor 6:  Racial Appeals in Mississippi Politics................................167

    G.  Senate Factor 7:  Lack of Success for Black Candidates in Mississippi .........178

    H.  Senate Factor 8:  Lack of Responsiveness to the Needs of Black Mississippians............185

    I.  Senate Factor 9:  Tenuous Justifications for the Challenged Plans .................194

PROPOSED CONCLUSIONS OF LAW.......................................................................200

I.     JURISDICTION, PARTIES, AND STANDING ...............................................200

II.    RIGHT OF ACTION TO ENFORCE SECTION 2............................................202

III.   VOTE DILUTION: THE *GINGLES* FRAMEWORK ....................................204

IV.   APPLICATION OF SECTION 2 TO JUDICIAL DISTRICTS.........................209

V.    *GINGLES* 1 ......................................................................................................212

    A.  Numerosity.......................................................................................................214

    B.  The Relevance of the Existing Plan .................................................................215

    C.  Racial Predominance .......................................................................................219

D.   Traditional Redistricting Principles ...................................................................221

VI.   *GINGLES* 2 AND 3 .............................................................................................230

VII.   TOTALITY OF THE CIRCUMSTANCES ............................................................241

A.   Senate Factors 1 and 3: Mississippi's History of Voting-Related Discrimination Against Black Voters and Voting Practices and Procedures That Tend to Enhance the Opportunity for Discrimination Against Minority Voters ...................................................................243

B.   Senate Factor 2: High Levels of Racially Polarized Voting in Mississippi .....................249

C.   Senate Factor 4: Exclusive Candidate Slating Process ....................................................261

D.   Senate Factor 5: Disparities in Education, Employment, and Health That Hinder Political Participation ...................................................................................................264

E.   Senate Factor 6: Racial Appeals in Mississippi Politics .................................................269

F.   Senate Factor 7: Lack of Success for Black Candidates in Mississippi .........................274

G.   Senate Factor 8: Lack of Responsiveness to the Needs of Black Mississippians ............280

H.   Senate Factor 9: Tenuous Justifications for the Challenged Plans ..................................283

VIII.   REMEDY ............................................................................................................295

## PROPOSED FINDINGS OF FACT

### I.    INTRODUCTION

1.    This case is a Section 2 vote dilution challenge to the Mississippi Supreme Court districting plan that has been used in Mississippi since 1987. Over the course of a two-week trial, the Court heard from eight expert witnesses, two sitting legislators and a sitting judge, and three former Justices of the State Supreme Court, and at least one witness who had not yet been born when these lines were put into place.

2.    The ultimate issue is whether, under the well-established and recently reaffirmed *Thornburg v. Gingles* framework that governs Section 2 vote dilution cases, Plaintiffs have proven that Black Mississippians "have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice" to the State Supreme Court under these district lines. 52 U.S.C. § 10301(b).

3.    As set forth below, Plaintiffs have proven their case under that framework. They have proven that Black voters could easily be included in reasonably configured Black-majority Supreme Court Districts made entirely of whole counties. They have proven that, due to stark racially polarized voting patterns and the persistent unwillingness of White voters to support Black candidates, Black voters are usually defeated in State Supreme Court elections under the current lines. And they have proven that as a matter of history and present-day-socioeconomic and political reality, the playing field is not level for Black voters with respect to Supreme Court elections under the challenged lines. That reality is demonstrated by the stark and persistent underrepresentation of Black Mississippians on the state's highest court, where there has never been more than one Black justice out of nine despite Mississippi's population being almost 40% Black.

4.    While the Court applies the established Section 2 vote dilution framework to the

facts as they exist today and as established at trial, it is notable that a Section 2 challenge was brought against these district lines in the early 1990s, shortly after they were enacted. *See Magnolia Bar Ass'n, Inc. v. Lee*, 793 F. Supp. 1386 (S.D. Miss. 1992). That challenge was not successful, and the natural question to ask is, what has changed in the 30-plus years since then? And the answer, based on the trial record, is that a great deal has changed, especially with respect to the demographics of the State of Mississippi and the voting patterns of Mississippians, which are two of the central concerns in a vote dilution case.

5.      When *Magnolia Bar* was decided it was not possible to draw one of the three State Supreme Court districts as a whole-county, Black-voting-age-population-majority district. 793 F. Supp. at 1415 ("None of the three proposed multimember districts drawn without splitting counties satisfies the first part of the [*Gingles*] tripartite test"); W. Cooper Testimony, 08/05/24 Trial Tr. 63:9–14. Today, the Black population has increased by hundreds of thousands, and configuring such a district in a reasonable manner can be done in numerous ways, as proven at trial.

6.      When *Magnolia Bar* was decided, Justice Fred Banks, the second Black person ever to serve as a Mississippi Supreme Court Justice, had just won a contested Supreme Court election in District 1 with 30 percent of the White vote in the general election. With no countervailing evidence, the court could not help but conclude that "whites will not necessarily vote as a bloc for white candidates having black opponents in Mississippi Supreme Court elections." 793 F. Supp. at 1407. Today, Black candidates in Supreme Court District 1, and especially Black Supreme Court candidates, generally get well under 10% of the White vote, and they are defeated, as proven at trial.

7.    When *Magnolia Bar* was decided, the districts at issue were only a few years old. There was an expectation that they would be updated. *E.g.*, O. Diaz Testimony, 08/06/24 Trial Tr. 308:21–309:4. And more than that, there was great and sincere hope across the political spectrum that Justice Banks' election under those lines heralded a time where politics in Mississippi would not be defined by racial division. It was in that spirit that Chief Judge Barbour wrote that

> the election of [Justice Reuben] Anderson and the election of Banks to the Mississippi Supreme Court were not aberrational but evidence that whites will not necessarily vote as a bloc for white candidates having black opponents in Mississippi Supreme Court elections so as to "usually defeat the minority's preferred candidate." The success of these black men represents, not merely personal triumphs but triumphs for the Voting Rights Act itself.

*Magnolia Bar*, 793 F. Supp. at 1407 (internal citation omitted).

8.    Justice Anderson, the first Black man to serve on the Mississippi Supreme Court, took the stand in this trial. And he referenced that same feeling of hope that the days of racial division and polarized voting were receding. He testified, "I was always hopeful that an African American would be elected statewide office in Mississippi." R. Anderson Testimony, 08/08/24 Trial Tr. 748:22–25.

9.    But history did not take the path that Chief Judge Barbour and Justice Anderson thought that it would. Four decennial Census cycles have come and gone since the Supreme Court lines were last changed. The districts are now malapportioned. And in the meantime, the trial record shows, political and racial polarization has spiked; school segregation and disinvestment have worsened, especially for predominantly Black communities like the Mississippi Delta, which is fragmented by the existing Supreme Court lines; racial appeals have stubbornly persisted in politics; and Black candidates have run for statewide office and Supreme Court and lost repeatedly.

3

That is the state of affairs today, as proven at trial.

10.    Surveying the world as it is today, Justice Anderson testified in this trial that his hope has now faded. He testified that a Black candidate winning statewide office "won't happen in my lifetime." R. Anderson Testimony, 08/08/24 Trial Tr. 748:22–25. Consistent with the testimony of virtually every witness who took that stand in this trial, Justice Anderson testified that today, race is "number one . . . [i]n politics." *Id.* at 748:7–11.

11.    A three-judge panel of federal judges in Jackson, examining the state of Mississippi politics as it exists in 2024, saw many of the same disparities as in this trial record, and unanimously concluded: "Race matters." *Mississippi State Conf. of Nat'l Ass'n for Advancement of Colored People v. State Bd. of Election Comm'rs*, --- F. Supp. 3d ----, No. 3:22-CV-734-DPJ-HSO-LHS, 2024 WL 3275965, at *31 (S.D. Miss. July 2, 2024) [hereinafter "*MS NAACP*"].

12.    The Voting Rights Act represents, among many other things, the promise of equal opportunity even when, as the trial record shows is the case in Mississippi today when it comes to Supreme Court elections, politics is deeply polarized and divided by race. It thus represents a promise not only to voters today, but to the leaders of tomorrow, including those who testified at trial. Their future is not yet written.

13.    Today, on the basis of this trial record and under the governing legal standard, as set forth below, Plaintiffs have proven a violation of Section 2. A remedy for vote dilution is required for this violation of law. And, in keeping with the spirit of the Voting Rights Act, a remedy here will not only cure the statutory harm experienced by Black Mississippians but may also hasten Mississippi back to the hopeful path that Chief Judge Barbour and Justice Anderson and others

4

perceived in the days after these lines were first drawn.

## II.    THE REDISTRICTING PROCESS

14.    The Mississippi State Legislature is responsible for establishing plans for Mississippi's electoral districts, including Supreme Court districts. ECF No. 228, Appendix A: Joint Stipulated Facts for Trial ¶ 28 [hereinafter "Joint Stipulated Facts"]; Miss. Const. § 145; *see also, e.g.*, O. Diaz Testimony, 08/06/24 Trial Tr. 307:19–21, 308:5–18; D. Simmons Testimony, 08/08/24 Trial Tr. 728:19–24.

15.    The current Supreme Court lines were drawn in 1987, "with the objective of correcting population malapportionment of the then-existing Supreme Court districts." Joint Stipulated Facts ¶¶ 30, 43.

16.    On January 2, 1987, then-Attorney General Edwin Lloyd Pittman issued a memo to Governor William Allain, Secretary of State Dick Molpus, Lieutenant Governor Brad Dye, and the leadership of the State Legislature advising them that the districts then in effect needed to be revised. Pls.' Ex. 108, January 1987 Memo of E. Pittman, at 2–3 [hereinafter "PX-108"].

17.    Pittman's memo apprised Mississippi's legislative and executive leadership of a then-pending federal lawsuit, *McCray v. Mississippi State Board of Election Commissioners*, which alleged that the Mississippi Supreme Court districts were "malapportioned in violation of the one-person, one-vote principle of the Equal Protection Clause of the Fourteenth Amendment." PX-108 at 2. The plaintiffs in that lawsuit had earlier won a ruling holding that the "one-person, one-vote" rule applied to Mississippi's Supreme Court district lines, which are also used to elect Transportation and Public Service Commissioners. Pls.' Ex. 107, February 1985 Opinion in

5

*McCray v. Mississippi State Board of Commissioners*, No. 84-CV-131 (N.D. Miss 1985), at 4–5.

18.     In the memo, Pittman stated that while his office "will do [its] best to defend" the district lines, "it is [the Attorney General's] opinion that the plaintiffs may be successful in convincing the court to hold that the use of the three Supreme Court Districts for the election of public service commissioners and highway commissioners violates the one-person, one-vote doctrine." PX-108 at 3. According to Pittman, "[w]ell-settled federal court case law now establishes that where the range of maximum deviations exceeds 10% the districts are presumptively invalid under the one-person, one-vote doctrine. . . ." *Id.*

19.     Pittman recommended that the state legislature re-draw the Supreme Court district lines during the 1987 legislative session "so as to lower the range of maximum deviations among the three districts below 10%." PX-108 at 3.

20.     Trial testimony by multiple fact witnesses with direct knowledge of these events was consistent with this documentary evidence and confirmed that balancing the population between the three districts was the legislature's primary justification for redistricting in 1987.

21.     Representative Percy Watson, who was a legislator during the 1987 redistricting, recalled that the redistricting was prompted by a lawsuit alleging that "the districts were not properly aligning on the one man, one vote rule." P. Watson Testimony, 08/07/24 Trial Tr. 499:18–500:7. Rep. Watson further testified that he and other Black legislators opposed the plan that was ultimately adopted in 1987, because, unlike an alternative plan proposed by Rep. Clayton Henderson, the 1987 plan did not enable Black voters to elect their preferred justice in the Central District. *Id.* at 500:8–501:13. The Henderson proposal failed to pass in 1987. *Id.* at 501:12–13.

6

22. Constance Slaughter-Harvey, who was Assistant Secretary of State for Elections under Dick Molpus during the 1987 redistricting and who conferred with other attorneys representing the officials who make up the State Board of Election Commissioners as part of her work, also recalled the recommendation from Attorney General Pittman and testified that the "legislature took action and redistricted" upon receiving Pittman's memo. C. Slaughter-Harvey Testimony, 08/07/24 Trial Tr. 469:6–16.

23. Thus, "[i]n January 1987, with the objective of correcting population malapportionment of the then-existing Supreme Court districts, the Legislature passed H.B. 552, a Supreme Court redistricting plan which shifted Attala and Winston counties out of District 1 and into District 3 and moved Claiborne, Copiah, and Jefferson counties into District 1 from District 2." Joint Stipulated Facts ¶ 30.

24. Since 1987, there have been multiple proposals to amend the Supreme Court districts, including bills proposed by Rep. Ed Blackmon, that would have increased the Black Voting Age Population ("BVAP") in the Central District and given Black voters an opportunity to elect a candidate of their choice. P. Watson Testimony, 08/07/24 Trial Tr. 517:15–518:2. All of those proposals failed to pass. *Id.*; *see also infra* ¶ 158 (discussing 2016 proposal to modify the districts and decrease BVAP of District 1).

25. Further, Justice Oliver Diaz, who served in the Legislature before joining the bench and eventually the Mississippi Supreme Court, testified that the Legislature was "required to redraw legislative districts and other elective districts across the state of Mississippi after each decennial census," and that he participated in redrawing legislative and trial-court districts, but

7

never Supreme Court districts. O. Diaz Testimony, 08/06/24 Trial Tr. 308:5–24.

26.     The Supreme Court district lines have not been changed since 1987, and therefore have not been updated in light of any population change reflected in the decennial census counts from 1990, 2000, 2010, and 2020. *See* P. Watson Testimony, 08/07/24 Trial Tr. 516:17–517:3.

27.     While there is no requirement in state law that the Supreme Court districts be updated on any particular schedule, current and former legislators testified that the failure to redraw the lines since 1987 is surprising. O. Diaz Testimony, 08/06/24 Trial Tr. 308:21–309:4 (noting that "it's the general consensus in the legislature that we want to draw districts after each census when we have more accurate information," and "[t]here have been fairly significant population changes throughout Mississippi" since 1987, "and yet the Supreme Court districts have not been changed at all over that period of time"); D. Simmons Testimony, 08/08/24 Trial Tr. 717:17–718:2 (stating that, while state legislative and congressional lines are redrawn every ten years, the Supreme Court district lines had not been redrawn since "1987, when [the witness] was 11 years old").

28.     There is no state in the entire country that has State Supreme Court districts that have gone unchanged for as long as Mississippi's. In total, four states utilize districts to elect judges to the state supreme court, instead of on a statewide basis: Mississippi, Louisiana, Illinois, and Kentucky. *E.g.*, C. Bonneau Testimony, 08/12/24 Trial Tr. 788:22–789:22. Of those four, only Mississippi and Kentucky utilize non-partisan elections. *Id.*

29.     Unlike Mississippi, all three of the remaining states—Illinois, Louisiana, and Kentucky—have updated their respective Supreme Court districts since the 2020 Census, a fact

8

that Defendants' expert on judicial elections, Dr. Christopher Bonneau, did not dispute. C. Bonneau Testimony, 08/12/24 Trial Tr. 853:25–854:25. Illinois, Kentucky, and Louisiana updated their districts in 2021, 2022, and 2024, respectively. 705 Ill. Comp. Stat. Ann. 23/5 (redistricting of Illinois Supreme Court districts, effective Dec. 17, 2021); Ky. Rev. Stat. Ann. § 21A.010 (redistricting of Kentucky Supreme Court districts, effective Jan. 18, 2022); La. Stat. Ann. § 13:101.2 (redistricting of Louisiana Supreme Court districts, effective May 1, 2024).

30.     Louisiana, in particular, amended its district lines to add a second majority-Black district, after a lawsuit was filed challenging the judicial districts as violating Section 2 of the Voting Rights Act.[1]

### III.    PARTIES

### A.    Plaintiffs

31.     Plaintiff Dyamone White is a citizen of the United States and the State of Mississippi, residing in Hinds County. Joint Stipulated Facts ¶ 1. She is over the age of 18. *Id.* She identifies as Black. *Id.* She is a registered voter in Supreme Court District 1 under the Enacted Plan and intends to vote in that district in future elections. *Id.* In the Illustrative Plans discussed herein, Ms. White would reside in a Black-majority District 1. *Id.*

---

[1] The Court may take judicial notice of public statements made by the Governor of Louisiana, whose office explained that the 2024 bill created a second Black-majority district. Office of the Governor, *Gov. Jeff Landry Holds Bill Signing on SB 255* (May 1, 2024) ("This bill creates a second majority-black Supreme Court seat in Louisiana."), https://gov.louisiana.gov/index.cfm/newsroom/detail/4499. The Governor also remarked: "Today, we fulfilled our responsibility and ensured the people of Louisiana will have a fair, democratic, and equally representative judiciary." *Id.*

9

32.     Plaintiff Derrick Simmons is a citizen of the United States and the State of Mississippi, residing in Washington County. Joint Stipulated Facts ¶ 2. He is over the age of 18. *Id.* Senator Simmons represents Mississippi State Senate District 12, consisting of all or part of Bolivar, Coahoma, and Washington Counties. *Id.* Senator Simmons identifies as Black. *Id.* He is a registered voter in Supreme Court District 1 under the Enacted Plan and intends to vote in that district in future elections. *Id.* In the Illustrative Plans discussed herein, Senator Simmons would reside in a Black-majority District 1. *Id.*

33.     Plaintiff Ty Pinkins is a citizen of the United States and the State of Mississippi, residing in Warren County. Joint Stipulated Facts ¶ 3. He is over the age of 18. *Id.* He identifies as Black. *Id.* He is a registered voter in Supreme Court District 1 under the Enacted Plan and intends to vote in that district in future elections. *Id.* In the Illustrative Plans discussed herein, Mr. Pinkins would reside in a Black-majority District 1. *Id.*

34.     Plaintiff Constance Olivia Slaughter Harvey-Burwell is a citizen of the United States and the State of Mississippi, residing in Hinds County. Joint Stipulated Facts ¶ 4. She is over the age of 18. *Id.* She identifies as Black. *Id.* She is a registered voter in Supreme Court District 1 under the Enacted Plan and intends to vote in that district in future elections. *Id.* In the Illustrative Plans discussed herein, Ms. Harvey-Burwell would reside in a Black-majority District 1. *Id.*

### B.     Defendants

35.     Defendant the State Board of Elections Commissioners ("SBEC") is composed of the Governor, the Attorney General, and the Secretary of State. Its respective duties are set forth

in Miss. Code Ann. § 23-15-211; *see also* K. Kirkpatrick Testimony, 08/14/24 Trial Tr. 1195:9–1196:6 (explaining composition and role of SBEC "in qualifying certain candidates, certifying certain elections, and preparing certain sample ballots").

36.　　Defendant Tate Reeves is the Governor of the State of Mississippi and is a member of the SBEC pursuant to Miss. Code Ann. § 23-15-211.

37.　　Defendant Lynn Fitch is the Attorney General of the State of Mississippi and is a member of the SBEC pursuant to Miss. Code Ann. § 23-15-211.

38.　　Defendant Michael Watson is the Secretary of State of the State of Mississippi and a member of the SBEC pursuant to Miss. Code Ann. § 23-15-211.

## IV.　*GINGLES* 1

39.　　The first *Gingles* precondition is whether "the minority group [is] sufficiently large and geographically compact to constitute a majority in a reasonably configured district." *Allen v. Milligan*, 599 U.S. 1, 18 (2023) (alteration and citation omitted); *see Thornburg v. Gingles*, 478 U.S. 30, 46–51 (1986). For purposes of illustrative districting maps drawn to demonstrate *Gingles* 1, a district is Black-majority if the Any-Part Black voting age population ("BVAP") based on the decennial Census is greater than 50%. W. Cooper Testimony, 08/05/24 Trial Tr. 47:14–20; *See also Milligan*, 599 U.S. at 18; *Wisconsin Legislature v. Wisconsin Elections Comm'n*, 595 U.S. 398, 402 (2022)

40.　　On the first precondition, plaintiffs presented expert testimony by William Cooper, who was tendered as an expert in redistricting, demographics, and census data. W. Cooper Testimony, 08/05/24 Trial Tr. 44:9–12; 45:7–9.

11

41.     Mr. Cooper is qualified by his extensive experience to testify as an expert witness in redistricting and demographics, including the drawing of electoral maps using Census data and map-drawing software. *See generally, e.g.*, W. Cooper Testimony, 08/05/24 Trial Tr. 36:18–44:8; *see also* Pls.' Ex. 1, October 3, 2022 Report of William Cooper, at 1–5 [hereinafter "PX-001"]; Pls.' Ex. 3, Exhibits A through M-2 to the October 3, 2022 Report of William Cooper, at 2–11 [hereinafter "PX-003"].

42.     Since 1987, Mr. Cooper has been qualified as an expert witness on redistricting and demographics in federal courts in over 55 voting rights cases, almost all of them Section 2 cases. W. Cooper Testimony, 08/05/24 Trial Tr. 39:14–23; 40:2–11; 40:16–41:7; *see also* PX-003 at 7–11. Notably, illustrative plans drawn by Mr. Cooper in a Section 2 case were recently reviewed and affirmed by the United States Supreme Court. *See Milligan*, 599 U.S. at 20, 31; W. Cooper Testimony, 08/05/24 Trial Tr. 40:12–15.

43.     Mr. Cooper has over thirty years of experience in voting cases in Mississippi. He served as an expert witness and map drawer in redistricting and demographics in multiple Section 2 cases involving statewide electoral districting plans in Mississippi, including *MS NAACP*, No. 22 Civ. 734 (S.D. Miss.), a recent state legislative redistricting case involving Section 2 Voting Rights Act claims that was heard by a three-judge panel in Jackson, and *Thomas v. Reeves*, No. 3:18-CV-441-CWR-FKB (S.D. Miss. 2019), a Voting Rights Act case which resulted in the revision of Mississippi State Senate lines in the Mississippi Delta. W. Cooper Testimony, 08/05/24 Trial Tr. 38:20–25; 39:5–11; 42:17–44:7; *see also* PX-001 at 2–4; PX-003 at 4. In addition to the *MS NAACP* and *Thomas* cases, Mr. Cooper testified at trial in two other state-level voting lawsuits

12

in Mississippi: *NAACP v. Fordice*, No. 3:92-CV-250-LN (S.D. Miss 1999), which involved the districts used for the Public Service Commission and Transportation Commission, and *Smith v. Clark*, No. 3:01-CV-855 (S.D. Miss 2002), which involved congressional redistricting in Mississippi. W. Cooper Testimony, 08/05/24 Trial Tr. 43:1–7; 92:16–18; *see also* PX-001 at 3; PX-003 at 8.

44. Mr. Cooper has also testified at trial as an expert witness in seven local redistricting cases in Mississippi since 1990, most or all of which involved Section 2 of the Voting Rights Act and the creation of illustrative districting plans. *See, e.g.*, *Addy v. Newton County*, No. 4:95-CV-39 (S.D. Miss. 1997); *Gunn v. Chickasaw County*, No. EC 87-cv-165 (N.D. Miss 1989); *Nichols v. Okolona*, No. 97-cv-00030 (N.D. Miss. 1995); *Fairley v. Hattiesburg*, No. 2:06-CV-167-KS-MTP (S.D. Miss. 2008); *Boddie v. Cleveland School District*, No. 4:07-CV-63-M-B (N.D. Miss. 2010); *Jamison v. City of Tupelo*, No. 1:04-CV-366 (N.D. Miss. 2007); *Fairley v. City of Hattiesburg*, No. 2:13-cv-18 (S.D. Miss. 2015); W. Cooper Testimony, 08/05/24 Trial Tr. 42:17–44:7; *see also* PX-003 at 8.

45. Mr. Cooper has also developed local electoral plans as a consultant for a number of jurisdictions in Mississippi, including Washington County, Claiborne County, Bolivar County, and Webster County. W. Cooper Testimony, 08/05/24 Trial Tr. 41:8–42:12; *see also* PX-001 at 4; PX-003 at 6. He has also drawn judicial districts in Mississippi as part of his consulting work. W. Cooper Testimony, 08/05/24 Trial Tr. 92:4–13.

46. The Court finds that Mr. Cooper's experience drawing electoral districting plans in Mississippi is extensive.

47.     For this current redistricting cycle, Mr. Cooper has testified at trial as an expert witness in redistricting and demographics in at least nine cases challenging district boundaries under Section 2 of the Voting Rights Act, all of which involved the drawing of illustrative electoral districting plans: *Caster v. Merrill*, No. 2:21-CV-1536-AMM (N.D. Ala. 2022), *Pendergrass v. Raffensperger*, No. 1:21-05337 (N.D. Ga. 2022), *Alpha Phi Alpha Fraternity v. Raffensperger*, 587 F. Supp. 3d 1222 (N.D. Ga. 2022), *NAACP v. Baltimore County*, No. 21-CV-03232-LKG (D. Md. 2022), *Christian Ministerial Alliance v. Hutchinson*, No. 4:19-CV-402-JM (E.D. Ar. 2022), *Robinson v. Ardoin*, No. 3:22-CV-211-SDD-SDJ (M.D. La. 2022), *Caroline County Branch of the NAACP v. Town of Federalsburg*, No. SAG-23-00484 (D. Md. 2023), *Dickinson Bay Area NAACP Branch v. Galveston County*, No. 3:22-CV-117-JVB (S.D. Tex. 2023), and *Nairne v. Ardoin*, No. 3:22-CV-178-SDD (M.D. La. 2023). W. Cooper Testimony, 08/05/24 Trial Tr. 39:1–11; *see also* PX-001 at 2–3; PX-003 at 2–3.

48.     Those courts and numerous others, including the three-judge panel in *MS NAACP*, have found him credible. *See, e.g.*, *MS NAACP*, 2024 WL 3275965, at \*30; *Nairne v. Ardoin*, --- F. Supp. 3d ----, No. 22 -178-SDD-SDJ, 2024 WL 492688, at \*12 (M.D. La. Feb. 8, 2024); *Alpha Phi Alpha Fraternity Inc. v. Raffensperger*, 700 F. Supp. 3d 1136, 1205 (N.D. Ga. 2023); *Singleton v. Merrill*, 582 F. Supp. 3d 924, 977, 1004–1007 (N.D. Ala. 2022), *aff'd sub nom. Milligan*, 599 U.S. 1; *Robinson v. Ardoin*, 605 F. Supp. 3d 759, 778 (M.D. La. 2022).

49.     Mr. Cooper has also drawn illustrative plans in a number of Section 2 cases involving judicial districts. *E.g.*, W. Cooper Testimony, 08/05/24 Trial Tr. 40:2–11; *see also id.* at 92:5–93:2.

14

50.     At trial, Mr. Cooper credibly testified that, in cases where he draws illustrative electoral plans, he follows "traditional districting principles," such as equal population, compactness, minimizing split counties and precincts, and respecting communities of interest. W. Cooper Testimony, 08/05/24 Trial Tr. 64:18–21, 66:8–20; *see also id.* at 66:21–75:4; PX-001 at 4–5, 24. Mr. Cooper repeatedly, consistently, and credibly testified that his overarching goal is to balance those principles in order to arrive at a reasonable plan. *E.g.*, W. Cooper Testimony, 08/05/24 Trial Tr. 66:16–20, 75:5–22, 76:6–10, 99:12–100:1.

51.     This Court finds Mr. Cooper's testimony reliable and highly credible, especially given his decades of experience drawing statewide plans and applying traditional districting principles, and his extensive experience drawing plans in Mississippi in particular.

52.     At trial, the Court overruled Defendants' objection to Mr. Cooper's qualifications, which was based on their position that "there are not experts on map drawing[]." W. Cooper Testimony, 08/05/24 Trial Tr. 44:14–21. The Court reaffirms that ruling. For one, Defendants made no *Daubert* motion or motion in limine before the deadline applicable to such motions, and instead first raise their argument about the propriety of qualifying Mr. Cooper in the pretrial order. Their untimely request to exclude expert testimony from Mr. Cooper can accordingly be rejected on timeliness grounds alone. *See, e.g.*, *Koch Foods, Inc. v. Pate Dawson Co., Inc*., No. 3:16-CV-355, 2018 WL 651371, at *3 (S.D. Miss. Jan. 31, 2018) ("The Court need not consider untimely-filed *Daubert* challenges. Particularly so where, as here, the movant neither acknowledges nor explains the motion's untimeliness." (citations omitted)); *Robinson v. Colucci*, No.16-CV-687, 2018 WL 2025861, at *9 (S.D. Miss. May 1, 2018) (denying motion to exclude expert testimony

15

for untimeliness); *Caldwell v. Wal-Mart Stores E., LP*, No. 3:10-CV-651, 2012 WL 1712377, at *1 (S.D. Miss. May 14, 2012) (same); *Penthouse Owners Assoc., Inc. v. Certain Underwriters at Lloyd's, London*, No. 1:07CV568, 2011 WL 13073684, at *2 (S.D. Miss. Feb. 9, 2011) (same); *Goode v. City of Southaven*, No. 3:17-CV-60-MPM-RP, 2019 WL 1089510, at *2–*5 (N.D. Miss. Mar. 7, 2019) (same).

53.     It also fails on the merits. As noted already, Mr. Cooper has been qualified to testify based on his experience drawing electoral maps in scores of federal courts across the country. His analysis, which includes the assessment of existing electoral plans and the creation and evaluation of illustrative electoral districting plans, makes use a specialized redistricting data file produced for redistricting by the U.S. Census Bureau, specialized software that is used to create and evaluate electoral districting plans, and specialized knowledge and experience regarding the application of traditional redistricting principles. *E.g.*, W. Cooper Testimony, 08/05/24 Trial Tr. 37:8–38:19. Mr. Cooper's analysis and testimony thus fall squarely within the ambit of Federal Rules of Evidence 702 and 703, as Courts have repeatedly concluded in prior cases. *See supra* ¶¶ 42–44, 47–49.

54.     Defendants offered Dr. David Swanson as an expert on demographics, and Dr. Swanson offered some testimony related to the configuration of Mr. Cooper's Illustrative Plans. The Court gives Dr. Swanson's testimony on the first *Gingles* precondition little weight, for a number of reasons.

55.     First, Dr. Swanson admitted he has no experience drawing redistricting plans, has never balanced traditional redistricting principles, does not know how to use map-drawing software, and did not himself use any mapping software to analyze Mr. Cooper's plans. *See* D.

16

Swanson Testimony, 08/12/24 Trial Tr. 919:5; 920:18–24; 924:14–19; D. Swanson Testimony, 08/13/24 Trial Tr. 1038:4–8, 1044:18–22. Much of Dr. Swanson's mapping-related analysis was produced by an associate, Tom Bryan, who did not testify at trial, and whose work Dr. Swanson did not (and was not able to) independently replicate or check. *E.g.*, D. Swanson Testimony, 08/12/24 Trial Tr. 924:8–925:22 (Bryan computed compactness scores, created compactness tables, and conducted the geospatial analysis in Swanson report); *id.* at 928:23–929:15 (Swanson did not and could not replicate Bryan's analysis); D. Swanson Testimony, 08/13/24 Trial Tr. 956:9–19 (Bryan gathered population data and calculated CVAP); *id.* at 1033:21–23 (Bryan calculated compactness scores); *id.* at 1034:8–11 (Bryan produced the rankings of compactness scores); *id.* at 1044:18–24 (Bryan computed core retention numbers); *id.* at 1067:24–1068:4 (Bryan assembled "cluster analysis"); *id.* at 1082:1–18 (Bryan calculated prison-adjusted CVAP); *see also* Def.'s Ex. 1, Tables and Exhibits from January 2023 Report of Dr. Swanson [hereinafter "DX-001"] at 1–8 (crediting "Bryan GeoDemographics" with all population calculations including CVAP and "prison-adjusted CVAP"), 9–13 (crediting "Bryan GeoDemographics" with "core retention" calculations), 14–17 (crediting "Bryan GeoDemographics" with all compactness score calculations), 18 (crediting "Bryan GeoDemographics" with distance to polling places calculations), 20–29 (crediting "Bryan GeoDemographics" with all maps related to "cluster analysis"), 38–39 (crediting "Bryan GeoDemographics" with tables relating to CPS estimates of participation); Def.'s Ex. 2, Appendices from January 2023 Report of Dr. Swanson [hereinafter "DX-002"] at 2 (crediting "Bryan GeoDemographics" for "cluster analysis"), 10 (crediting "Bryan GeoDemographics" for CPS calculations), 17 (crediting "Bryan GeoDemographics" for producing

17

map images).

56.     Other courts where Dr. Bryan has testified have found his analysis unreliable. *See,*
*e.g.*, *Robinson,* 605 F. Supp. 3d at 824. And here too, in a number of instances, the work produced
by Mr. Bryan contained errors or misleading omissions. For instance, Dr. Swanson did not dispute
that one of Mr. Bryan's analyses used the wrong compactness measure, *E.g.*, D. Swanson
Testimony, 08/13/24 Trial Tr. 1040:7–13, or that his district-by-district ranking tables—a
presentation of mathematical compactness scores that was developed with Mr. Bryan for this case
and that Dr. Swanson had not seen used anywhere else—systematically downgraded the Cooper
Plans based on admittedly negligible differences, *id.* at 1031:7–1037:6; *see also* D. Swanson
Testimony, 08/12/24 Trial Tr. 927:1–928:21 (not disputing Bryan erroneously miscalculated the
number of people living within a mile of their polling place as described in PX-006 at 11). Dr.
Swanson also used an analysis he developed with Mr. Bryan, "cluster analysis," to evaluate
districting "diversity," even though Dr. Swanson agreed this analysis had been developed to assess
keeping communities of interest together, and that his "diversity" approach would involve
spreading communities of interest apart. *Id.* at 1047:22–1048:3, 1058:23–1073:7; *see also infra*
¶ 103. Dr. Swanson also presented an analysis of "prison-adjusted CVAP" that was assembled by
Mr. Bryan that was overinclusive (because it included persons who are incarcerated but not on a
disenfranchising felony) but also massively underinclusive (because it did not include the tens of
thousands of persons who are disenfranchised for life due to a felony conviction but no longer
incarcerated)—and he then contradicted himself in describing how this analysis was performed.
*Id.* at 1081:23–1099:13; *see infra* ¶¶ 72–78. In all events, Dr. Swanson's very high level of reliance

18

on expert methods and work product that he did not himself produce, did not replicate, and often could not explain or account for leads the Court to accord his analysis little weight.

57.    Moreover, and for some of the reasons discussed above as well as below, Dr. Swanson's testimony was generally not credible. *E.g.*, *infra* ¶ 350.

58.    Most importantly for present purposes, Dr. Swanson simply did not claim to be offering any opinion about whether or not the Illustrative Plans satisfied *Gingles* 1, or whether the districts in the Illustrative Plans were reasonably configured or sufficiently compact. *E.g.*, D. Swanson Testimony, 08/12/24 Trial Tr. 922:24–924:9; D. Swanson Testimony, 08/13/24 Trial Tr. 1028:24–1029:4, 1046:6–9. Dr. Swanson did not dispute the bottom-line conclusion that Mr. Cooper's Illustrative Plans contain reasonably configured districts that are consistent with traditional districting principles. *E.g.*, D. Swanson Testimony, 08/13/24 Trial Tr. 1028:24–1029:5; *see also, e.g.*, *id.* at 1040:24–1041:7. Rather, Dr. Swanson agreed that Mr. Cooper's Illustrative Plans perform as well or better than the Enacted Plans with respect to various traditional redistricting principles. *E.g.*, D. Swanson Testimony, 08/13/24 Trial Tr. 1041:23–1042:21 (agreeing Cooper plan was the same or better on most mathematical compactness metrics); 1073:1–8 (agreeing that Cooper's plans group together counties with similar needs and interests).

### A.    The Black Population in Mississippi

59.    Mr. Cooper evaluated Mississippi's population using the population information from the decennial census. W. Cooper Testimony, 08/05/24 Trial Tr. 47:21–48:2; *see also* PX-001 at 9; Pls.' Ex. 2, Figures 1 through 18 from the October 3, 2022 Report of William Cooper, at 1 [hereinafter "PX-002"]. According to the 2020 Census, non-Hispanic ("NH") Whites comprise

55.35% of the population in Mississippi. W. Cooper Testimony, 08/05/24 Trial Tr. 49:19–50:5; *see also* PX-001 at 8; PX-002 at 1. African Americans are the next largest racial/ethnic category, representing 37.94% of the population in 2020—the highest proportion of any state in the nation. W. Cooper Testimony, 08/05/24 Trial Tr. 49:19–50:5; *see also* PX-001 at 8; PX-002 at 1. The 2020 Census shows that Mississippi's Black population has increased since 2000 (up from 36.62%), while the NH White population percentage has decreased since 2000 (down from 60.74%). W. Cooper, 08/05/24 Trial Tr. 49:19–50:5; *see also* PX-001 at 8; PX-002 at 1

60.    In absolute terms, Mississippi's total population has grown by about 200,000 people since 2000. W. Cooper Testimony, 08/05/24 Trial Tr. 49:19–20. Growth in the Black population is the single largest driver of overall population growth, responsible for about three quarters of the State's overall population growth. W. Cooper Testimony, 08/05/24 Trial Tr. 50:6–9. Mississippi's NH White population fell from 1.32 million to 1.315 million between 2000 and 2020. W. Cooper Testimony, 08/05/24 Trial Tr. 49:23–25; *see also* PX-001 at 8; PX-002 at 1.

61.    The statewide any-part Black voting age population ("BVAP") has steadily increased over the past two decades—from 33.29% in 2000 to 36.14% in 2020. During that same period, the NH White VAP has dropped by nearly seven percentage points, from 64.16% in 2000 to 57.76% in 2020. PX-001 at 9; PX-002 at 1. In absolute terms, the State's Black voting age population has increased from 689,000 in 2000 to 823,000 in 2020, while the NH White VAP has decreased from 1.32 million to 1.315 million. W. Cooper Testimony, 08/05/24 Trial Tr. 49:19–25; PX-001 at 9; PX-002 at 1. A summary table from Mr. Cooper's report showing the growth and change in statewide VAP by race since 1990 (PX-002 at 1) is reproduced below.

**Figure 2: Mississippi – 1990 to 2020 Census**
**Percent Voting Age Population by Race and Ethnicity**

|          | 1990      | % 1990   | 2000      | % 2000  | 2010      | % 2010  | 2020      | % 2020  |
|----------|-----------|----------|-----------|---------|-----------|---------|-----------|---------|
| Total    | 1,826,455 | 100.00%  | 2,069,471 | 100.00% | 2,211,742 | 100.0%  | 2,277,599 | 100.0%  |
| Black    | 577,669   | 31.63%   | 688,994   | 33.29%  | 773,869   | 34.99%  | 823,080   | 36.14%  |
| NH White | 1,232,687 | 67.49%   | 1,327,768 | 64.16%  | 1,348,246 | 60.96%  | 1,315,451 | 57.76%  |

62.     In his analysis, Mr. Cooper looked at demographic change in Mississippi going back to 1990, and was able to testify about patterns of growth and change over the last 30-plus years, approximately since the 1987 district lines at issue were created. W. Cooper Testimony, 08/05/24 Trial Tr. 49:19–50:9; *see also* PX-001 at 8–9; PX-002 at 1.

63.     In addition to a statewide view, Mr. Cooper also evaluated population change on a regional level. He used Mississippi's Planning and Development District ("planning district" or "PDD") boundaries as "a good way to divide up a state into smaller regions" that may be "recognizable"  W. Cooper Testimony, 8/05/24 Trial Tr. 51:2–9, 94:20–95; *see also* PX-001 at 10–12; PX-003 at 2. This regional view allowed Mr. Cooper to identify areas where the Black population was particularly numerous and concentrated that might allow for the creation of a Black-majority Supreme Court district. W. Cooper Testimony, 08/05/24 Trial Tr. 52:3–53:7; *see also* PX-001 at 10–12. As Mr. Cooper explained, the "real base of the Black population" is concentrated in five of the planning district areas, all of which are on the western side of the State. W. Cooper Testimony, 08/05/24 Trial Tr. 52:6–10; *see also* PX-001 at 12–13; PX-002 at 2; *accord* D. Swanson Testimony, 08/13/24 Trial Tr. 1056:6–19. The total population of those five contiguous planning districts is greater than a Supreme Court district. W. Cooper Testimony,

21

08/05/24 Trial Tr. 53:1–3; *see also* PX-001 at 13.

64.     Mr. Cooper also reported population growth patterns at the county level. *See* PX-003 at 17–20.

65.     Mr. Cooper also looked at the demographics of Congressional District 2, which is a Black-majority district with a BVAP of approximately 62%. *E.g.*, W. Cooper Testimony, 08/05/24 Trial Tr. 50:22–51:1; *see also* PX-001 at 12–13. Congressional District 2, in its current form, was drawn by the Legislature in 2022. W. Cooper Testimony, 08/05/24 Trial Tr. 95:11–13. *see also* PX-001 at 25.[2]  As Mr. Cooper explained, referring to the map reproduced below, which

---

[2] Congressional District 2 was first drawn as a North-South oriented, Black-majority opportunity district in the 1980s pursuant to a court order in litigation brought under Section 2 of the Voting Rights Act. *See generally Jordan v. Winter*, 604 F. Supp. 807 (N.D. Miss.) (three-judge panel), *aff'd sub nom. Mississippi Republican Exec. Comm. v. Brooks*, 469 U.S. 1002 (1984); *see also Jordan v. Winter*, No. GC 82-80-WK-0, 1984 WL 2046, at *1 (N.D. Miss. Jan. 6, 1984). Prior to this, the congressional plan had been configured by the Legislature with districts running East to West, although the State's attempts to maintain that configuration were opposed by the Attorney General of the United States and the plans had been denied Section 5 preclearance on that basis. *Jordan*, 604 F. Supp. at 809–10 & n.4; *see also State of Miss. v. Smith*, 541 F. Supp. 1329, 1330 (D.D.C. 1982) (denying Mississippi's motion for summary judgment in D.C. district court action seeking to overcome preclearance denial); *see also infra* ¶¶ 185–186 (discussing 1966 congressional redistricting). In 1986, after the district was redrawn following litigation as a majority-Black opportunity district, it elected the first Black Congressman in Mississippi since Reconstruction, Mike Espy. *E.g.*, *Martin v. Mabus*, 700 F. Supp. 327, 333 (S.D. Miss. 1988) (noting this). In 2000, the State failed to draw new, lawful congressional maps, prompting federal courts to redraw the congressional lines in 2000, *Smith v. Clark*, 189 F. Supp. 2d 512, 513, 525 (S.D. Miss.), *order enforced*, 189 F. Supp. 2d 548 (S.D. Miss. 2002), *aff'd sub nom. Branch v. Smith*, 538 U.S. 254  (2003), and then again in 2010, *Smith v. Hosemann,* 852 F. Supp. 2d 757, 758 (S.D. Miss. 2011). In 2022, for the first time in decades, the Legislature drew congressional districts for the State of Mississippi, including a version of the district originally drawn pursuant to court order in the 1980s.  *See Smith v. Hosemann*, No. 3:01-CV-855-HTW-DCB, 2022 WL 2168960, at *2 (S.D. Miss. May 23, 2022).

shows county-level BVAP and overlays PDD and Congressional District 2 lines (PX-002 at 2), because a Supreme Court district is somewhat larger than a congressional district, "it would stand to reason" that by expanding the bounds of Congressional District 2 to include additional, adjacent counties with significant amounts of Black population, "you are going to be able to create a majority Black voting age population district." W. Cooper Testimony, 08/05/24 Trial Tr. 51:15–52:2; *see* PX-001 at 12; *see also infra* ¶ 91.



**Figure 3: 2020 Percent Black by County**
**Planning Districts (blue lines) and 2022 CD 2 (red)**

66. The Court credits Mr. Cooper's unrebutted demographic analysis of population change in Mississippi, which is relevant to whether the Black population in particular areas of

23

Mississippi is sufficiently numerous and concentrated to comprise a voting-age majority in a single Supreme Court district. Consistent with Mr. Cooper's unrebutted analysis, with which Dr. Swanson agrees, the Court finds that, as a general matter, Mississippi's Black population is especially numerous and concentrated in the counties on the western side of the state along the Mississippi River, including in the Mississippi Delta, the Capital region, and Southwest Mississippi.

### B. The 1987 Enacted Plan

67. As part of his analysis and his development of the illustrative plans, Mr. Cooper considered the existing Supreme Court lines, which were adopted in 1987. W. Cooper Testimony, 08/05/24 Trial Tr. 56:2–5. The image of the lines of the 1987 Enacted Plan from Mr. Cooper's report (PX-002 at 4) is reproduced below.

24



Figure 6: Current 1987 Supreme Court Plan

68.    Mr. Cooper testified that the 1987 Enacted Plan is very similar to the plan that was

in place before it, which had been in place since at least 1940. W. Cooper Testimony, 08/05/24

Trial Tr. 56:10–23; PX-001 at 15, 27. Under the current plan, none of the districts are BVAP

majority. W. Cooper Testimony, 08/05/24 Trial Tr. 57:18–20: PX-001 at 16; PX-002 at 4. One of

the districts, District 1, is plurality Black by voting age population (49.3%) and Black voters are

in the minority in the other two (27.66% and 32.65%). W. Cooper Testimony, 08/05/24 Trial Tr.

61:22–62:4; PX-001 at 16; PX-002 at 4. Accordingly, zero percent of the State's Black population

25

currently lives in a Black voting age majority district, while about two-thirds of the White population lives in a White voting age majority district. W. Cooper Testimony, 08/05/24 Trial Tr. 61:22–62:4; PX-001 at 16; PX-002 at 4. Mr. Cooper credibly testified that maintaining the same district lines was not reflective of the patterns of population growth and change that had occurred in the decades since the lines were drawn, especially the significant growth of the Black population and the comparative decline of the White population discussed already. *E.g.*, W. Cooper Testimony, 08/05/24 Trial Tr. 61:15–21.

69.     Mr. Cooper's assessment, based on the location and concentration of the Black population in the state, was that the existing plan "fragments or cracks the Black population," meaning that it "leaves out" adjacent portions of the Black population that could be included together in a Black-majority district. W. Cooper Testimony, 08/05/24 Trial Tr. 58:1–5, 62:5–11; PX-001 at 17. This assessment is consistent with the testimony of fact witnesses, including witnesses who live in the Mississippi Delta like Senator Derrick Simmons of Greenville, and Judge Aelicia Thomas of Rosedale, who testified that the existing Supreme Court lines divide the Delta, which is the most heavily Black area in the state, across multiple districts. *See* D. Simmons Testimony, 08/08/24 Trial Tr. 718:5–10 (stating the current map "splits or separates the Delta. In fact, it splits or separates [Senator Simmons's own] senate district," which is comprised of Bolivar, Coahoma, and Washington counties); A. Thomas Testimony, 08/05/24 Trial Tr. 164:14–19 ("I thought all of the Delta was in District 1 . . . Coahoma, Tallahatchie, Leflore, [and] Tunica [should be included]"; *see also* A. Lamar Testimony, Trial Tr. 08/08/24 Trial Tr. 759:13–20 (describing how the Northern Supreme Court district includes certain "Northern Delta counties," with the rest

26

in the Central District); *id.* at 761:7–13 (noting that the Northern Supreme Court District includes the western part of Tallahatchie County, which is considered part of the Delta).

70.     Consistent with this unrebutted testimony, the Court finds that the existing Supreme Court lines fragment the Black population particularly in the Mississippi Delta area. The Court finds the split of the Delta to be "probative evidence of cracking" of the Black population. *Nairne*, 2024 WL 492688, at *16.

71.     Mr. Cooper also testified that, due to population growth and change, the 1987 Enacted Plan is no longer properly apportioned. Mr. Cooper analyzed the "population deviation" of each district in the plan, which is the percent by which the total population of the district deviates from the ideal population size of a district in a three-plan. W. Cooper Testimony, 08/05/24 Trial Tr. 60:5–17; *see also* PX-001 at 19. Mr. Cooper explained that population deviation is the way that the "one person, one vote" principle is taken into account, and that a plus-or-minus five percent deviation limit is standard in state and local redistricting, including in Mississippi. W. Cooper Testimony, 08/05/24 Trial Tr. 60:22–61:11; *see also* PX-001 at 19. *Accord* PX-108 at 3 (Pittman Memo urging change to prior district lines because "[w]ell-settled federal court case law now establishes that where the range of maximum deviations exceeds 10% the districts are presumptively invalid under the one-person, one-vote doctrine. . . ."). Mr. Cooper testified, unrebutted, that the 1987 Enacted Plan is currently outside of this plus-or-minus five percent threshold and is accordingly malapportioned. W. Cooper Testimony, 08/05/24 Trial Tr. 60:13–61:17; *see also* PX-001 at 19; PX-002 at 5. The Court credits this unrebutted testimony.

72.     One other aspect of the current district lines bears mention. It is stipulated that,

27

using the population estimates from the American Community Survey, a rolling sample-based survey that is conducted by the Census Bureau, the estimated Black citizen voting age population ("BCVAP") of 1987 Enacted Plan District 1 is 51.1%. *See* Joint Stipulated Facts ¶ 44. The legal import of this point (or lack thereof) is discussed in greater detail, *infra* ¶¶ 499–503. Most importantly, the question for *Gingles* 1 is about whether a reasonably configured *illustrative* BVAP-majority district can be drawn, and on that score, Mr. Cooper testified unequivocally and unrebutted that it can, and that it does not matter where BVAP numbers from the decennial census or BCVAP estimates from the ACS are used to measure the Black population in the Illustrative Plans. W. Cooper Testimony, 08/05/24 Trial Tr. 49:3–8; *see also* Pls.' Ex. 6, Responsive Declaration of William B. Cooper at 3 [hereinafter "PX-006"].

73.     Moreover, with respect to the Black population of District 1 in the *existing* plan (*i.e.*, the 1987 Enacted Plan), Mr. Cooper credibly testified that the use of BCVAP estimates is particularly unhelpful in this case. For one, Defendants rely on the BCVAP estimate from the 2016–2020 5-year ACS, which suffered from known data quality issues due to problems collecting ACS survey data in 2020 due to the COVID-19 pandemic, as both Mr. Cooper and Dr. Swanson acknowledged. W. Cooper Testimony, 08/05/24 Trial Tr. 87:3–88:3; D. Swanson Testimony, 08/13/24 Trial Tr. 1078:2–13; Pls.' Ex. 98, Increased Margins of Error in the Five-Year Estimates Containing Data Collected in 2020 [hereinafter "PX-098"].

74.     More importantly, though, estimating the percentage of eligible voters in each district who are Black would require accounting not just for citizenship, but for lifetime disenfranchisement due to a qualifying felony conviction under Mississippi law. Miss. Const., art.

12, §241; *see also, e.g.*, W. Cooper Testimony, 08/05/24 Trial Tr. 59:2–60:4; *accord* D. Swanson Testimony, 08/13/24 Trial Tr. 1081:4–9. Mr. Cooper, Dr. Swanson, and multiple other experts in the case all agreed that the population of persons disenfranchised in this manner in Mississippi is approximately 60% Black. *E.g.*, W. Cooper Testimony, 08/05/24 Trial Tr. 59:14–25; T. Burch Testimony, 08/07/204 Trial Tr. 565:13–17; D. Swanson Testimony, 08/13/24 Trial Tr. 1083:15–1084:5, 1088:5–8; *see also* PX-006 at 5; Pls.' Ex. 035, Expert Report of Dr. Traci Burch, at 19 [hereinafter "PX-035"]; DX-001 at 25. Mr. Cooper and other experts testified that the total number of disenfranchised persons just based on felony convictions from between 1994 and 2017 was approximately 56,000, and all experts, including Dr. Swanson, agreed that the overall total number could be much higher. *E.g.*, W. Cooper Testimony, 08/05/24 Trial Tr. 96:8–97:9; D. Swanson Testimony, 08/13/24 Trial Tr. 1087:24–1088:4; 1090:17–1091:13, 1092:2–3; *see also* PX-006 at 5.

75. Dr. Swanson testified about a "prison adjusted CVAP" estimate that was created for him by Mr. Bryan, which he testified was derived by subtracting the estimated number of Black persons currently incarcerated in each district from the Black CVAP, and then dividing that number by the total CVAP of the district. D. Swanson Testimony, 08/13/24 Trial Tr. 1082:5–1084:21, 1086:17–25.

76. This "prison adjusted" figure only attempted to account for persons who are currently incarcerated. D. Swanson Testimony, 08/13/24 Trial Tr. 1088:9–1093:21087:13–16.

However, using the same calculation method Dr. Swanson employed,[3] and then also accounting for the many tens of thousands of Black persons who are no longer incarcerated but remain permanently ineligible to vote, the adjusted BCVAP for District 1 falls below 50%. D. Swanson Testimony, 08/13/24 Trial Tr. 1088:9–1093:2.

77.    Consistent with that, Mr. Cooper credibly testified that the large number of persons affected by lifetime disenfranchisement is one reason why he did not focus on CVAP for his demographic analysis:

> [I]t makes all of the difference in the world. And that's why I really didn't focus on CVAP in this case, because I knew that based on well-documented information about the size of the felon population in Mississippi and the disproportionate impact it has on Black felons, clearly, the current plan would not be majority Black, and it would not be majority Black CVAP. . . . I mean, it still could be majority Black CVAP, but it would not have citizens that would be able to register to vote. So it would not be majority Black registered voters.

W. Cooper Testimony, 08/05/24 Trial Tr. 59:2–12.

---

[3] Dr. Swanson agreed that, to conduct his prison-adjusted CVAP, he (or Mr. Bryan) took Black CVAP, subtracted the number of incarcerated Black adults, and then divided by total CVAP. D. Swanson Testimony, 08/13/24 Trial Tr. 1086:17–25. In other words, the number he was adjusting for was subtracted from the numerator, but not from the denominator, which was total CVAP for the district. Once the implications of his method became clear on the stand, Dr. Swanson appeared to backtrack, asserting that total CVAP was not the "correct base," *id.* at 1097:10–1099:13, and suggesting that if some further adjustments were made then the Black percentage could still be above 50%, *id.* at 1179:13–1180:17. The Court does not credit Dr. Swanson's inconsistent testimony or his description of a methodology for making further adjustments that he did not explain clearly on the stand and that is not consistent with the methodology that he testified was actually used in producing the numbers presented in his own report.

30

78.     Based on this analysis, and to whatever extent it might matter, the Court finds that the eligible citizen voting age population of District 1 is less than 50% Black once the effects of lifetime felon disenfranchisement are taken into account.

### C.     The Illustrative Plans

79.     Mr. Cooper developed two illustrative three-district plans (the "Illustrative Plans") demonstrating that the Black population in Mississippi is sufficiently large and geographically compact to allow for the creation of a majority-Black Supreme Court district. *E.g.*, W. Cooper Testimony, 08/05/24 Trial Tr. 45:15–46:11; PX-001 at 4–6, 25–31.

80.     To develop the Illustrative Plans, Mr. Cooper used Maptitude, a software program that many local and state bodies (including the State of Mississippi) employ for redistricting. W. Cooper Testimony, 08/05/24 Trial Tr. 38:9–15; 66:25–67:5 (using Maptitude to draw maps and evaluate population); PX-003 at 28–38. Mr. Cooper used population data from the U.S. Census 2020 PL 94-171 data files. The PL 94-171 dataset is the demographic data from the decennial Census *(i.e.*, the complete count of the U.S. population that occurs every decade) designed by the Census Bureau for use in redistricting. *E.g.*, W. Cooper Testimony, 08/05/24 Trial Tr. 47:21–48:2; PX-003 at 14. The file contains race and ethnicity data on the total population and voting-age population found in various units of Census geography. *E.g.*, PX-003 at 14.

81.     In drawing the plans, Mr. Cooper considered the existing 1987 Enacted Plan boundaries and county boundaries and other political boundaries for Mississippi. *E.g.*, W. Cooper Testimony, 08/05/24 Trial Tr. 50:16–52:2, 64:7–17, 68:7–11, 69:10–17, 76:21–77:6, 81:2–12, 95:8–10; PX-001 at 10–11, 25. Mr. Cooper also had available for reference the State's

congressional districts and for the PDD regions, which he testified were an "effective way to take into account the various regions in Mississippi." W. Cooper Testimony, 08/05/24 Trial Tr. 93:18–94:3; *see also, e.g.*, *id.* 68:7–11, 69:10–17, 74:16–75:4, 76:21–77:6, 77:16–19, 94:14–23; PX-001 at 10–11, 25.

82.     As part of his analysis, Mr. Cooper also reviewed current and historical demographics of Mississippi, including the socio-economic, employment, education, and health characteristics of the population by race at the State level, the Congressional District level, and the county and municipal level, using estimates from the ACS. *E.g.*, W. Cooper Testimony, 08/05/24 Trial Tr. 46:19–47:10; PX-001 at 8–9, 19–20, 36–38; PX-003 at 108–192; *see also generally* Pls.' Ex. 5, 2015–2019 5-year ACS data for Mississippi Counties and Municipalities [hereinafter "PX-005"]. Mr. Cooper used the 2021 1-year ACS for statewide and congressional-district level data, and the 2015–2019 5-year ACS for lower levels of geography. *E.g.*, W. Cooper Testimony, 08/05/24 Trial Tr. 53:8–54:7; PX-001 at 36; PX-003 at 109, 151, PX-005.

83.     Mr. Cooper testified that, in constructing the Illustrative Plans in this case, he was guided by traditional districting principles, which he identified as including population equality, non-dilution of minority voting strength, compactness and contiguity, following traditional political boundaries like counties, and maintaining communities of interest. *E.g.*, W. Cooper Testimony, 08/05/24 Trial Tr. 64:18–21, 66:11–75:5 (identifying and discussing the various traditional principles); PX-001 at 24. As Mr. Cooper explained, the function of traditional redistricting principles is "to draw maps that are relatively easy to understand." W. Cooper Testimony, 08/05/24 Trial Tr. 66:8–15. Mr. Cooper testified that he balanced all of the traditional

32

principles, and that none predominated over any other. *Id.* at 66:20–21 ("I was constantly considering them, balancing them, and not prioritizing one or the other -- one over the others."), 75:6–23; PX-001 at 24–25. Mr. Cooper testified with respect to the traditional principles that, when drawing maps, he "balance[s] them as best as [he] can." W. Cooper Testimony, 08/05/24 Trial Tr. 75:8–22; 76:6–10 (balancing approach the same approach he used in *Allen v. Milligan*); *see also id.* 99:13–100:2 (reaffirming balancing approach on cross-examination).

84.    The Court credits Mr. Cooper's testimony regarding his consideration of all the various traditional districting principles in constructing his plans, his balancing approach, and his overarching goal to draw plans with compact, reasonably configured districts.

85.    With respect to his consideration of race, Mr. Cooper testified that, while he considered race in order to ensure that he was meeting the *Gingles* requirement to draw an illustrative district that was "at least 50 percent plus one BVAP," race did not predominate over the various other considerations. W. Cooper Testimony, 08/05/24 Trial Tr. 75:19–23, 97:20–98:2, 99:19–100:2. Mr. Cooper constructed all of his plans using only whole counties, without splitting any counties or precincts along racial lines or otherwise. W. Cooper Testimony, 08/05/24 Trial Tr. 73:2–6 ("Well, there are simply no splits."), 77:21–22. And Mr. Cooper specifically testified that he did not include or exclude any particular county in an illustrative majority-Black district in any of his plans because of race and that he did try to maximize BVAP or hit any BVAP target. W. Cooper Testimony, 08/05/24 Trial Tr. 68:5–12, 75:24–76:6. Mr. Cooper testified that drawing a Supreme Court plan with a majority-Black district was not difficult, and that many configurations would be possible; he testified that "it clearly can be accomplished in . . . a multiplicity of ways."

33

W. Cooper Testimony, 08/05/24 Trial Tr. 46:5–6; *see also id.* 81:21–82:2 ("There are many different ways it could be drawn. These are just two examples . . . ."). Especially in light of the fact that all of Mr. Cooper's plans are constructed entirely out of whole counties, the Court finds that race did not predominate over other traditional districting principles in the construction of the plans.

86. Mr. Cooper's Illustrative Plan 1 is a three-district plan containing one district, Illustrative Plan 1 District 1, that is 55.31% BVAP. The plan is depicted below (PX-002 at 2).



**Figure 10: Illustrative Plan 1**

87. Illustrative Plan 1 brings the population deviation of the plan below plus-or-minus five percent, consistent with the traditional principle of equal population and adhering to "one-person, one-vote." W. Cooper Testimony, 08/05/24 Trial Tr. 77:23–78:7.; PX-002 at 2.

88. All the districts in Illustrative Plan 1 are contiguous. W. Cooper Testimony, 08/05/24 Trial Tr. 68:13–21. Consistent with Mr. Cooper's unrebutted opinion, the districts in Illustrative Plan 1, and especially the new Black-majority District 1, are visually compact, which is unsurprising given that they are constructed out of whole counties. *E.g.*, W. Cooper Testimony, 08/05/24 Trial Tr. 77:10–14. Mr. Cooper testified that District 1 is "obviously" compact, and that a visual (or "eyeball") analysis was sufficient to assure him of compact districts, including "because I was working with whole counties and following areas that I understood to be significant regions like the Delta." *Id.* at 69:7–70:3, 77:10–14. Nevertheless, with respect to mathematical compactness metrics, Mr. Cooper's Illustrative Plan 1, and Illustrative Plan 1 District 1 in particular, perform comparably or better than the existing plan. W. Cooper Testimony, 08/05/24 Trial Tr. 71:16–20 (noting there was "no difference at all" between the 1987 plan and Illustrative Plan 1 despite Defendants' use of an "improper measure which made it look the illustrative plan was horribly non-compact"); 70:10–71:15 *see also* PX-006 at 10; Pls.' Ex. 7, Figures 1 through 4 from the Feb. 4, 2023 Rebuttal Report of William Cooper, at 1 [hereinafter "PX-007"]. This strongly indicates that the Illustrative Plan is sufficiently compact.

89. Illustrative Plan 1 respects existing political subdivisions, especially counties and precincts. No counties (and therefore, no precincts) are split in the Illustrative Plan 1. W. Cooper Testimony, 08/05/24 Trial Tr. 72:24–73:6. Constructing a plan entirely out of whole counties is an

35

extremely strong indicator of a reasonably configured plan that follows traditional districting principles. *Cf. Milligan*, 599 U.S. at 44 n.2 (Kavanaugh, J., concurring). It is also consistent the Mississippi Code, which emphasizes the importance of following county lines in the electoral districting process, specifying that "[e]very district shall be compact and composed of contiguous territory and the boundary shall cross governmental or political boundaries the least number of times possible," and that "[d]istricts shall be structured, as far as possible and within constitutional standards, along county lines; if county lines are fractured, then election district lines[4] shall be followed as nearly as possible." Mississippi Code Annotated [hereinafter "Miss. Code Ann."] § 5-3-101.

90.     Illustrative Plan 1 also splits fewer PDD regions than the existing plans. W. Cooper Testimony, 08/05/24 Trial Tr. 76:21–77:1; *see also id.* at 94:14–17; PX-001 at 5; PX-002 at 6. Mr. Cooper testified, and Dr. Swanson did not dispute, that these regions could "clearly" be considered communities of interest. W. Cooper Testimony, 08/05/24 Trial Tr. 74:17–75:4; *see also id.* 51:2–9, 52:3–10 (noting that the "real base of the Black population is concentrated in "roughly five of the planning district areas"); D. Swanson Testimony, 08/13/24 Tr. 1050:1–6.

91.     Illustrative Plan 1 also follows very closely the boundaries of existing Congressional District 2, which was adopted by the Legislature two years ago. W. Cooper Testimony, 08/05/24 Trial Tr. 77:4–5 (Illustrative Plan 1 "largely follows congressional district boundaries"), 78:15–79:13 (followed Congressional boundaries "perfectly" with the exception of

---

[4] In Mississippi, election districts refer to voting precincts used for elections.

36

a few changes), 95:8–10 (aligned Illustrative Plans closely with Congressional District 2); *see also id.* at 51:10–2 (considered Congressional District 2 boundaries as part of his evaluation). A comparison showing the two plans is depicted below (PX-002 at 7).



92. Illustrative Plan 1 also respects communities of interest, which Dr. Swanson agreed was an important districting consideration. D. Swanson Testimony, 08/13/24 Trial Tr. 1044:11–15 (recognizing communities of interest as a redistricting principle). In addition to county and regional lines, Mr. Cooper testified that he considered historical and environmental connections in

configuring the plans. For example, he discussed how Illustrative Plan 1 unites the communities connected by historic Highway 61. W. Cooper Testimony, 08/05/24 Trial Tr. 74:8–15. He discussed how the configuration of Illustrative Plan 1 made sense from a "riparian perspective," with each district characterized by its connection to a different body of water (the Mississippi for District 1; the Gulf for District 2; the Tennessee-Tombigbee for District 3). W. Cooper Testimony, 08/05/24 Trial Tr. 81:12–17; *see also id.* at 88:5–19.

93.    Perhaps most importantly, Illustrative Plan 1 unites the Mississippi Delta, a historically, culturally, and socioeconomically distinct region as identified by multiple expert witnesses. *See* W. Cooper Testimony, 08/05/24 Trial Tr. 73:15–74:4 (describing the Delta and testifying that it is "surely" a community of interest), 77:14–19 (explaining that Illustrative Map 1 "includes all of the core counites of the Mississippi Delta region"); M. King Testimony, 08/14/24 Trial Tr. 1360:20–1361:11 (recognizing "the Mississippi Delta [as] one of the most recognizable and cohesive political areas in the entire country" united by culture, history, and distinct policy needs shaped by pronounced disparities), 1354:2–1356:13 (describing various socioeconomic disparities between the Delta and the rest of the state, including in health and education); *see also* D. Swanson Testimony, 08/13/24 Trial Tr. 1050:25–1051:2, 1054:1–8 (agreeing that the Mississippi Delta could be considered a community of interest and that "the Delta is culturally, historically, demographically distinct").

94.    The Court credits the testimony of fact witnesses that the Illustrative Plans respect communities of interest by bringing together areas with shared interests and connections, especially the Delta.

38

95.    Plaintiff Ty Pinkins testified that he grew up in the Delta in Sharkey County, that he has worked across the Delta as an attorney representing farm workers and through a non-profit organization, and that his family had lived in the Delta for generations. T. Pinkins Testimony, 08/05/24 Trial Tr. 104:21–25, 107:17–109:17, 110:12–19. Mr. Pinkins testified that the Delta is a unique place where residents, and Black residents in particular, share deep historical and cultural ties. *Id.* at 122:5–12 ("It's a really special place. And I don't think people understand why it's so special. Because people there have endured so much."). He testified about how Deltans' common struggle has created a tight-knit community where individuals rely and look after one another. *See id. a*t 122:13–19. As he explained, if "you ain't got enough food, somebody else with a garden next door is going to help you out. . . It's an extremely special place. People who are resilient, a culture – that runs deep." *See id.* Mr. Pinkins testified that, for his family, being from the Delta is "the core of our identity." *Id.* at 123:20. He testified about how many of the Delta's Black residents are descended from people who have lived there since before the Great Migration, and those who have stayed "struggled through the same things that [his] parents and [] grandparents and [] great-grandparents and even [Mr. Pinkins] struggled through." *See* T. Pinkins Testimony, 08/05/24 Trial Tr. 123:10–17. He testified about long, difficult days chopping cotton as a teen, and about how his mother and his grandparents and great-grandparents had picked cotton—"much more difficult" labor—in generations before him. *Id.* at 119:09–121:22. Mr. Pinkins testified about how the Delta continues to be agricultural and rural in nature, and how poverty and lack of access to resources like school funding, health infrastructure, and food insecurity remain major challenges in the Delta, including for his family. *E.g.*, *id.* at 109:18–110:11, 111:25–112:16, 114:22–116:11, 124:2–20. He

testified that the "social and economic situation" for communities in Sharkey County is fundamentally similar to Delta counties further north like Bolivar and Coahoma. *Id.* at 138:19–22.

96.     Plaintiff Derrick Simmons testified about growing up in the Delta in Greenville, an area that he represents today in the State Senate, along with Bolivar and Coahoma Counties. D. Simmons Testimony, 08/08/24 Trial Tr. 699:17–19. Sen. Simmons' Delta-based district is bisected by the current Supreme Court district lines. *Id.* at 718:5–10. Senator Simmons testified that, both in his capacity as a state senator and as a criminal defense attorney, in addition to having family throughout the Delta, he travels extensively throughout the region and has spoken to "countless" Deltans. *Id.* at 700:1–22. He described the Delta as being an "agricultural area," "concentrated with Blacks," characterized by "[t]he blues, good food, [and] good entertainment." *Id.* at 699:6–11. Senator Simmons was shown Plaintiffs' Illustrative Plan 1, and testified that it would keep the Delta "all intact," and would—based on his experience as a legislator who has participated in multiple redistricting processes—be reasonable as it is "similar to what the Mississippi legislature did in 2022 with Congressional District 2." *Id.* at 718:22–719:5.

97.     Judge Aelicia Thomas, a sitting judge in Bolivar County, testified to the Delta region's "rich history," its distinctive character, and its culture of hospitality. A. Thomas Testimony, 08/05/24 Trial Tr. 149:23–150:2, 150:21–151:14. She testified that many Deltans are descended from people who were enslaved on plantations, and that there was a "heavy mentality of that that is still prevalent in the Delta." *Id.* at 154:20–155:14. She testified to the "unique" challenges of living in the Delta, including due to a lack of resources. *Id.* at 150:13–16 ("[W]e have educational issues, housing issues, economic issues that I think are unique and different from

any other area of the state."); *id.* at 151:18–154:11, 160:7–19. Judge Thomas also testified how, in light of those challenges, the people of the Delta spoke with a "collective voice" and that including the entire region in one district "would be the right thing to do." *Id.* at 165:21–166:6 (The Delta is a "collection" of different counties but "as a whole, all of us have the same issues [and] problems."). And Judge Thomas, viewing the district lines for the 1987 Enacted Plans and the Illustrative Plans, testified that while the 1987 Enacted Plan did not include all of the Delta, Plaintiffs' plans did—"it includes all of the -- all of the Delta, and . . . I think that would be right." *Id.* at 165:21–22.

98.     Plaintiff Dyamone White also testified about the challenges faced by Delta residents with respect to housing. As a consultant and banker focused on creating affordable housing in Rolling Fork, Silver City, and other communities in the Delta, Ms. White testified that many homes in the Delta are "sharecropper homes" or "Jim Walter homes" (*i.e.*, kit-built homes). D. White Testimony, 08/06/24 Trial Tr. 352:13–17. She testified that housing remains a "big challenge" for Deltans "because most cannot qualify for a mortgage because they don't have livable wages" or opportunities to earn them. D. White Testimony, 08/06/2022 Trial Tr. 354:9–18.

99.     The Court finds the testimony of individual Delta residents and civic leaders about the Delta's character and its unique qualities to be highly credible. Consistent with that testimony, as well as Mr. Cooper's testimony and that of other experts, the Court finds that Mr. Cooper's plans maintain communities of interest, including by uniting the core counties that comprise the Mississippi Delta and including them in a single Supreme Court district.

41

100.    Notably, Dr. Swanson conducted a so-called cluster analysis, which in his published work he has used to assess the existence of communities of interest for electoral districting purposes. D. Swanson Testimony, 08/13/24 Trial Tr. 1067:24–1069:21. The cluster analysis identifies whether different counties share similar socioeconomic resources and needs such that they could be considered to form a community of interest. *E.g.*, *id.* It is designed, in other words, to identify communities of interest that share commonalities (such as socioeconomic need and access to resources) beyond race. *E.g.*, D. Swanson Testimony, 08/13/24 Trial Tr. 1071:16–21. Here, Dr. Swanson agreed based on his own cluster analysis of various socioeconomic needs and resources in Mississippi that the Illustrative Plans "group[] together counties with similar needs and interests" beyond race. D. Swanson Testimony, 08/13/24 Trial Tr. 1073:1–7; *see also id.* at 1069:17–1073:7. That is literally the definition of communities of interest. *Robinson*, 86 F.4th 574, 590 (5th Cir. 2023).

101.    Mr. Cooper's testimony was credible and unequivocal:  He testified that Illustrative Plan 1 is reasonably configured "with flying colors" and that he has "no question" that it is consistent with traditional districting principles. W. Cooper Testimony, 08/05/24 Trial Tr. 79:14–17; *see also id.* at 64:19–22, 84:19–25 (testifying that the Illustrative Plans adhered to traditional redistricting principles and are "absolutely" reasonably configured). Based on all the above, the Court finds that Illustrative Plan 1 is properly apportioned, sufficiently compact, respects political subdivisions and most importantly follows county lines, and maintains communities of interest. The Court finds that Illustrative Plan 1 is reasonably configured and consistent with traditional districting principles.

42

102. No testimony was offered to establish that any other districting principles other than the traditional principles discussed by Mr. Cooper might apply in assessing the configuration of the Illustrative Plans.

103. Dr. Swanson at one point appeared to suggest that the plans might be assessed with respect to a metric that he referred to as "diversity," which involved the extent to which groups with similar characteristics were *spread across* all three of the districts in the plan. D. Swanson Testimony, 08/13/24 Trial Tr. 1058:19–1059:1, 1061:5–8 (agreeing that "a plan being more diverse means that the clusters are spread more evenly or proportionately across the different districts in the plan"), 1063:20–1064:1 (agreeing that the "'the counties in each of the three cluster analysis would be spread proportionately across the three supreme court districts if diversity was at a maximum'"). However, Dr. Swanson did not know of any instance where this metric had been used to assess electoral districts. *Id.* at 1061:9–12. And he acknowledged that, as applied to race or characteristics that track race, increasing the "diversity" of the districts would involve spreading Black voters across all three districts. *Id.* at 1063:20–1067:3 Dr. Swanson also acknowledged that his concept of diversity, by spreading groups with common connections across districts rather than grouping them together, would mean "fragmenting . . . communities of interest" such as the Mississippi Delta. *Id.* 1071:3–1072:19. The Court finds that this novel concept of "diversity," which appears to be the opposite or inverse of the traditional districting consideration of maintaining communities of interest, is not an appropriate consideration in the electoral districting context.

104. Dr. Swanson also testified about "core retention" as a potential way to evaluate

43

districting plans, but could not say whether this criterion might be relevant in evaluating a districting plan in Mississippi, or whether such a consideration made sense here, where the "core" is now nearly 40 years old. D. Swanson Testimony, 08/13/24 Trial Tr. 1043:24–1043:1 ("core" being retained is the 1987 Enacted plan), 1044:2–17 (did not "recall" whether core retention was a redistricting principle). And in any event, Dr. Swanson testified that under the Illustrative Plans, the vast majority of Mississippians would stay in their same Supreme Court district, which could be considered a "high" level of "core retention." *Id.* at 1045:13–1046:17 (agreeing 75% of the population would remain in their current district under Illustrative Plan 1 and two-thirds would stay in Illustrative Plan 2). Dr. Swanson also acknowledged that Mr. Cooper's two "least change" plans, which are discussed in more detail below, *infra* ¶¶ 111–112, maximize core retention while creating a BVAP-majority District 1, to the extent that this might be desirable. *Id.* at 1047:6–18.

105.    Mr. Cooper's Illustrative Plan 2 is a three-district plan containing one district, Illustrative Plan 1 District 1, that is 54.19% BVAP. W. Cooper Testimony, 08/05/24 Trial Tr. 81:19–20; *see also* PX-002 at 8. The plan is depicted below (PX-002 at 8).

**Figure 13: Illustrative Plan 2**



106.    Illustrative Plan 2 is configured similarly to Illustrative Plan 1. Like Illustrative Plan 1, Illustrative Plan 2 unites the core counties of the Mississippi Delta, and includes the counties along the Mississippi river on the western side of the State. W. Cooper Testimony, 08/05/24 Trial Tr. 81:1–18; PX-001 at 25, 30–31; PX-002 at 8. Like Illustrative Plan 1, it brings the districts within a plus-or-minus five percent population deviation. W. Cooper Testimony, 08/05/24 Trial Tr. 80:4–8; PX-001 at 30; PX-002 at 8. Like Illustrative Plan 1, Illustrative Plan 2 splits zero counties and precincts. W. Cooper Testimony, 08/05/24 Trial Tr. 73:1–5, 80:22–24; PX-001 at 25; PX-002 at 8. Mr. Cooper testified that compactness of Illustrative Plan 2 was similar to Illustrative Plan 1 and opined unequivocally that Illustrative Plan 2 was compact. W. Cooper

45

Testimony, 08/05/24 Trial Tr. 80:15–20 ("I think the scores are basically the same as we saw in Illustrative Plan 1").

107.    The differences between the two illustrative plans reflect some of the "different ways" that a reasonable plan can be drawn while balancing the different districting principles. Illustrative Plan 2 includes DeSoto County, which Mr. Cooper identified as the fastest growing in the State, in District 1, and places Madison County in District 3. W. Cooper Testimony, 08/05/24 Trial Tr. 77:2–4; 80:4–8; *see also* PX-002 at 8. Testimony from multiple witnesses established that, while DeSoto County is not necessarily considered to be part of the Delta, it is connected to the Delta by history, family, transportation, and economic ties. For example, Judge Thomas testified that many Deltans who have migrated out of the core Delta counties have moved to DeSoto County. A. Thomas Testimony, 08/05/24 Trial Tr. 174:13–17; *see also* T. Pinkins Testimony, 08/05/24 Tr. 139:23–140:6. Judge Thomas also testified that Deltans who have certain medical care or shopping, or other needs may need to travel to nearby DeSoto County and the Memphis area. A. Thomas Testimony, 08/05/24 Trial Tr. 177:6–178:13. DeSoto County is part of the "North Delta" PDD region. PX-002 at 8. The Court finds based on the evidence in the record that including DeSoto County with the Delta counties in a single district is one reasonable approach to configuring a whole-county, three-district plan. *Cf. Jordan v. Winter*, 604 F. Supp. 807, 809 n.3 (N.D. Miss.) (in congressional redistricting case, including DeSoto in list of Delta counties), *aff'd sub nom. Mississippi Republican Exec. Comm. v. Brooks*, 469 U.S. 1002 (1984)

108.    Moreover, the population deviation for Illustrative Plan 2 is even tighter than Illustrative Plan 1—the districts vary by under 2 percent from ideal population size. W. Cooper

46

Testimony, 08/05/24 Trial Tr. 80:4–8; PX-001 at 30; PX-002 at 8. As a result, Mr. Cooper explained, "it would be almost a certainty that by 2030 [Illustrative Plan 2] would still hold up and not be underpopulated" notwithstanding the pace of DeSoto County's growth. W. Cooper Testimony, 08/05/24 Trial Tr. 80:1–8.

109.    In sum, the Court finds that both the Illustrative Plans, and in particular the additional majority-Black districts included in them, are reasonably configured in light of the various applicable traditional districting principles. The Court finds that the Black population in Mississippi is sufficiently numerous and geographically compact to allow for the creation of a reasonably configured BVAP-majority Supreme Court district within a three-district plan. The Court reaches these findings based on its own consideration of the Illustrative Plans and its crediting of Mr. Cooper's analysis, as well as supporting witness testimony from the other experts and fact witnesses who live and work in and represent the Mississippi Delta. It is also notable that Defendants offered no expert opinion testimony contesting the bottom-line issue that the Illustrative Plans comport with traditional districting principles.

110.    As explained, *infra* ¶¶ 528–537, it is proper and certainly not impermissible for communities of interest to be considered in configuring the Illustrative Plans. However, the Court further finds that, even if communities of interest were not a factor, the Illustrative Plans would still be reasonably configured: They have substantially equal populations, use compact district shapes, and no split counties or precincts at all.

111.    In addition to the Illustrative Plans, Mr. Cooper also created two "least change" plans. As Mr. Cooper explained, his aim in creating these additional plans was to "change the

districts as least as possible so that the district is actually a true majority Black district after factoring in the felon issue." W. Cooper Testimony, 08/05/24 Trial Tr. 82:3–9; *see* PTX-001 at 32; PTX-002 at 9–10. These plans keep virtually all Mississippians—over 90%—in their same Supreme Court district. D. Swanson Testimony, 08/13/24 Trial Tr. 1047:6–18. They move a minimal number of counties, maintain the East-West configuration of the existing 1987 Enacted Plan, and would increase the BVAP of District 1. *See* W. Cooper Testimony, 08/05/24 Trial Tr. 82:4–84:6; PX-001 at 32–35; PX-002 at 9–10. For example, Least Change Plan 2 changes only seven counties, leaving District 2 entirely untouched; includes all of the core Delta counties in a 52% BVAP District 1; and maintains the East-West configuration of the plan. W. Cooper Testimony, 08/05/24 Trial Tr. 82:11–84:6; *see* PTX-001 at 34–35; PTX-002 at 10. The Least Change Plans demonstrate that, to the extent that a plan drawer wished to maximize continuity with the existing plan and maintain the East-West configuration of the plan, this could be done while also including a BVAP-majority district that includes all of the core counties of the Delta.

112.    The Least Change Plans confirm the Court's finding that a reasonably configured three-district Supreme Court Plan with a BVAP-majority district as required by *Gingles* can be drawn even if some of the criteria advanced by the Defendants, which were not shown in the trial record to constitute traditional districting principles, are nevertheless prioritized.

### V.    *GINGLES* 2 AND 3

113.    The other two *Gingles* preconditions deal with racially polarized voting behavior, identifying circumstances where voters of different races "'consistently prefer different candidates'" and where the racial minority group is "'regularly defeat[ed]'" due to such racial bloc

48

voting. *Milligan*, 599 U.S. at 18 (internal citation omitted); *accord MS NAACP*, 2024 WL 3275965, at *11. Each prong addresses a different aspect of voter behavior. The second *Gingles* prong asks whether Black voters are voting cohesively for preferred candidates, such that Black voters would in fact elect representatives of choice if drawn into a majority-Black single member district. *Milligan*, 599 U.S. at 18–19. The third prong considers the interaction between Black and White bloc voting and the extent to which White voters "vote sufficiently as a bloc to usually defeat the minority's preferred candidate." *Gingles*, 478 U.S. at 31; *accord Milligan*, 599 U.S. at 18; *MS NAACP*, 2024 WL 3275965, at *25–26.

114.    Consistent with the approach of the three-judge panel in *MS NAACP* and the district court in *Nairne*, this Court will at the *Gingles* 2 and 3 stage consider the question whether voters are in fact polarized along racial lines and whether such polarization in fact usually results in the defeat of Black candidates. *MS NAACP*, 2024 WL 3275965, at *25–26; *Nairne*, 2024 WL 492688, at *3; *see also infra* ¶¶ 543–543, 593–599. The Court will address questions about the nature and underlying causes of such racial polarization in considering Senate Factor 2 and the totality of the circumstances. *See infra* ¶¶ 201–244.

115.    On the second and third preconditions, Plaintiffs presented the expert testimony and analysis of Dr. Byron D'Andra Orey, whom the Court accepted as an expert in political science, political participation behavior, racially polarized voting, and race and politics. B. Orey Testimony, 08/06/24 Trial Tr. 205:8–17.

116.    Dr. Orey is a full professor with tenure in the Department of Political Science at Jackson State University and a former chair of the Department of Political Science. B. Orey

Testimony, 08/06/24 Trial Tr. 189:25–190:11. He received his Ph.D. in political science from the University of New Orleans and also holds a master's degree in public administration from the University of Mississippi. B. Orey Testimony, 08/06/24 Trial Tr. 191:4–7; *see also* Pls.' Ex. 12, Appendix to Dr. Orey's Expert Report, at 1 [hereinafter "PX-012"].

117.    Dr. Orey has taught, published, and conducted significant research in the area of race and political behavior, including racial polarization in Mississippi, and has repeatedly used the ecological inference method for analyzing racial polarization (or "EI") in his academic work. B. Orey Testimony, 08/06/24 Trial Tr. 193:17–194:14, 197:24–199:13; *see also* Pls.' Ex. 10, Expert Report for Byron D'Andra Orey, at 2 [hereinafter "PX-010"]; PX-012 at 1–28. Over the course of his 20-plus-year career, Dr. Orey has authored over 30 peer-reviewed publications including on political participation and behavior in Mississippi. B. Orey Testimony, 08/06/24 Trial Tr. 197:20–23; *see also* PX-012 at 2–21. He has presented work at over 100 conferences, trained numerous students who have gone on to obtain political science Ph.Ds., been awarded millions in grant funding for his work, and serves in numerous professional associations, including as President-Elect of the Southern Political Science Association, a position for which he was nominated by his peers in his field. B. Orey Testimony, 08/06/24 Trial Tr. 195:22–197:19; *see also* PX-010 at 2; PX-012 at 1–28.

118.    Dr. Orey has been qualified as an expert and offered expert trial testimony in multiple federal voting rights cases, including in the *MS NAACP* case, where (among other things) he performed an ecological inference analysis of voting by race in Mississippi. B. Orey Testimony, 08/06/24 Trial Tr. 199:11–200:22; *see also* PX-012 at 27–28.

119.    In preparing his reports and analysis in this case, Dr. Orey relied on sources and methodologies that are consistent with his work as a political scientist, including the use of ecological inference, which Dr. Orey and other experts testified is the conventional, established method for estimating support for different candidates from different racial groups. B. Orey Testimony, 08/06/24 Trial Tr. 204:12–205:4, 205:21–206:5; PX-010 at 9; *see also Nairne,* 2024 WL 492688, at *31 ("Experts agree and courts recognize that EI produces the most reliable estimates"); *see also, e.g.*, *MS NAACP*, 2024 WL 3275965, at *26; *Mo. State Conf. of the NAACP v. Ferguson-Florissant Sch. Dist.*, 201 F. Supp. 3d 1006, 1041 (E.D. Mo. 2016) ("EI is used widely by expert witnesses in assessing racially polarized voting in voting rights cases."); *Jamison v. Tupelo, Mississippi*, 471 F. Supp. 2d 706, 713 (N.D. Miss. 2007) (finding that both plaintiffs and defendants demonstrated racially polarized voting through EI analysis).

120.    Dr. Orey described the ecological inference method in detail, including its origins and development, the different types of ecological inference analysis that can be performed and that were performed in this case, and the sources of data that are used for the analysis (here, precinct level election return data from the Secretary of State's office and precinct-level demographic data from the decennial Census). B. Orey Testimony, 08/06/24 Trial Tr. 202:1–204:24. Dr. Orey testified that he has been using the ecological inference method in his work since it first appeared in the late 1990s. B. Orey Testimony, 08/06/24 Trial Tr. 204:9–11. Dr. Orey testified that his ecological inference analysis of Mississippi elections was the primary basis for his analysis and conclusions regarding racial polarization in Mississippi, including for the second and third *Gingles* preconditions. B. Orey Testimony, 08/06/24 Trial Tr. 206:3–5. He testified that

his analysis included confidence intervals for the estimates produced by the EI procedure, and that his estimates had "extremely tight intervals," indicating with a high degree of confidence (95%) that the true level of support was very close to the estimates Dr. Orey derived. *Id.* at 210:8–211:1.

121.    The testimony from Defendants' expert Dr. Bonneau was consistent. Dr. Bonneau testified that ecological inference provides "the best estimates we can get." C. Bonneau Testimony, 08/12/24 Trial Tr. 815:18–816:12. Dr. Bonneau agreed that "ecological inference is generally considered to be the most reliable method for assessing racially-polarized voting," and that courts and experts have relied upon ecological inference for decades. *Id.* at 820:13–15, 820:25–821:6, 822:20–23. Ecological inference "has been the benchmark method courts rely upon to evaluate RPV patterns in voting rights lawsuits." *Id.* at 826:20–827:3.

122.    As Dr. Bonneau confirmed, the validity of ecological inference has been corroborated by comparing voting turnout estimates to the results obtained from exit polling. C. Bonneau Testimony, 08/12/24 Trial Tr. 823:24–824:8, 825:6–827:3. According to undisputed academic literature, estimates obtained from ecological inference "closely match" the results of exit polls, showing no "convincing evidence that [ecological inference] will" bias results in favor of a finding of racially polarized voting. *Id.* at 825:6–826:13, 826:25–827:3.

123.    Based on his experience and his testimony, the Court finds that Dr. Orey is highly credible. The Court credits Dr. Orey's testimony, which was unrebutted and indeed corroborated by other experts, that ecological inference is the standard and best available method for empirically analyzing racially polarized voting for purposes of the *Gingles* analysis. *E.g.*, B. Orey Testimony, 08/06/24 Trial Tr. 204:12–24 (ecological inference is commonly relied on by political scientists

doing quantitative analysis of election results, measuring support for different candidates by race and is accepted by courts as a way of evaluating racially polarized voting in cases); *see also* C. Bonneau Testimony, 08/12/24 Trial Tr. 821:3–9 (same).

### A.     *Gingles* 2

124.    To assess racially polarized voting, Dr. Orey used the ecological inference method to estimate Black and White support for candidates in 19 biracial elections in Supreme Court District 1, all of them from 2011 and on. B. Orey Testimony, 08/06/24 Trial Tr. 207:2–208:16; *see also* PX-010 at 5–6; Pls.' Ex. 11, Tables 1 through 3 from Dr. Orey's Expert Report [hereinafter "PX-011"]; Pls.' Ex. 13, Responsive Report of Byron D'Andra Orey, at 2–3 [hereinafter "PX-013"]; Pls.' Ex. 16, Responsive Supplemental Report for Byron D' Andra Orey, at 1 [hereinafter "PX-016"]; Pls.' Ex. 17, Tables 1 through 4 from the Second Rebuttal Report of Dr. Orey [hereinafter "PX-017"].

125.    The results of Dr. Orey's analysis are undisputed. Dr. Bonneau testified that he accepts Dr. Orey's empirical results as "true and accurate." C. Bonneau Testimony, 08/12/24 Trial Tr. 820:13–15, 820:25–821:6. While Dr. Bonneau stated that estimates in general are not "perfect," he did not identify any particular flaws in Dr. Orey's implementation of ecological inference; nor did Dr. Bonneau have reason to believe whether any such flaws, to the extent they might exist, would cause Dr. Orey's results to over-estimate or under-estimate the level of racial polarization in Mississippi. *Id.* at 815:18–816:9, 820:5–821:2, 822:15–19. The Court credits Dr. Orey's testimony that the results he obtained are particularly accurate in light of his use of multiple EI methodologies, and the tight confidence intervals he reported. B. Orey Testimony, 08/06/24 Trial

53

Tr. 210:8–15 (reported confidence intervals of 95%); 210:24–212:4 ("we can be 95 percent sure that the estimate falls within that range, and these are extremely tight intervals"); *see also* PX-010 at 9–10, PX-011, PX-012 at 29–30.

126.    The Court credits Dr. Orey's unrebutted testimony that "biracial" contests are most salient and most probative in considering racially polarized voting. B. Orey Testimony, 08/06/24 Trial Tr. 208:21–209:1; *see also* PX-010 at 4. As Dr. Orey explained, focusing on such biracial contests is important because "if given the opportunity, Blacks will support a Black candidate over a White candidate in a biracial contest." B. Orey Testimony, 08/06/24 Trial Tr. 208:21–23. Focusing on biracial elections allowed Dr. Orey to "see whether or not . . . the Black electorate would have an opportunity to elect the candidate of their choice, in this particular case, the Black candidate." B. Orey Testimony, 08/06/24 Trial Tr. 208:23–209:1.

127.    The Court's finding in this regard is consistent with other courts. *See, e.g.*, *Robinson*, 605 F. Supp. 3d at 801 (crediting plaintiffs' expert opinion that "courts consider election contests that include minority candidates to be more probative than contests with only White candidates, because this approach recognizes that it is not sufficient for minority voters to be able to elect their preferred candidate only when that candidate is White"); *see also, e.g.*, *MS NAACP*, 2024 WL 3275965, at *26–27; *Nairne*, 2024 WL 492688, at *31; *United States v. City of Eastpointe*, 378 F. Supp. 3d 589, 610–11 (E.D. Mich. 2019); *United States v. City of Euclid*, 580 F. Supp. 2d 584, 598 (N.D. Ohio 2008).

128.    The set of elections examined by Dr. Orey included two "endogenous" elections (*i.e.*, elections for Supreme Court justice in District 1) and seven "quasi-endogenous" elections

(*i.e.*, elections for public service and transportation commission in District 1) as well as ten "exogenous" statewide contests, for which Dr. Orey calculated the results within District 1. B. Orey Testimony, 08/06/24 Trial Tr. 207:4–16, 209:13–18, 215:17–216:20, 218:22–219:5; *see also* PX-010 at 4–6, PX-011.

129.     Dr. Orey testified (and emphasized), and Dr. Bonneau agreed, that the endogenous elections are the most important to consider because they involve elections for the office at issue. B. Orey Testimony, 08/06/24 Trial Tr. 207:5, 215:23–24, 221:5–22; C. Bonneau Testimony, 08/12/24 Trial Tr. 829:7–14, 836:13–17. The quasi-endogenous contests, which use the same lines but involve different offices, partisan cues, and election environments, are next most probative. B. Orey Testimony, 08/06/24 Trial Tr. 207:8–12, 216:7–11; C. Bonneau Testimony, 08/12/24 Trial Tr. 831:1–10, 836:18–20. The statewide contests (including for offices such as President, U.S. Senate, Governor, and Agriculture Commissioner) are comparatively the "least important"; Dr. Orey testified that he looked at them mainly "to buttress the number of contests that we looked at" and confirm the overall level of polarization. B. Orey Testimony, 08/06/24 Trial Tr. 207:13–16, 216:3–20.

130.     Dr. Orey's initial analysis included 17 contests in total; after the 2023 election, which occurred well after he served his initial report, he analyzed the transportation and public service commission elections from that year as well. B. Orey Testimony, 08/06/24 Trial Tr. 208:10–16; *see also* PX-011; PX-017.

131.     The Court credits Dr. Orey's testimony about these different types of contests and their relative salience in the overall analysis.

132. Dr. Orey testified that every single one of the 19 contests he considered for *Gingles* 2 purposes was "extremely polarized." B. Orey Testimony, 08/06/24 Trial Tr. 229:6–8; *see also id.* at 214:2–9 (characterizing the level of racial polarization in the two supreme court races as "extreme"), 217:18–20, 218:19–21 (characterizing racially polarized voting in the quasi-endogenous election as "extremely high"), 219:20–22 (characterizing racially polarized voting in the ten statewide contests as "extremely high"), 219:23–220:8 (across all contests, "Blacks, on average, voted heavily cohesively for the Black candidate, and Whites overwhelmingly voted in support of the White candidate in large numbers and extremely low numbers for the Black candidate."). On average, Black cohesion in support of preferred candidates was over 90% and White cohesion was over 90%, with White voters typically providing "only 7, 8, 9 percent for the Black candidate." *E.g.*, B. Orey Testimony, 08/06/24 Trial Tr. 206:9–10, 244:13–21. In 15 out of the 19 contests, the Black candidate received over 90% of the Black vote, and less than 10% of the White vote. *Id.* at 212:13–20, 213:17–24, 217:3–11, 219:9–16; *see also* PX-011; PX-017. For example, in the most recent biracial Supreme Court district 1 contest, in 2020, Judge Latrice Westbrooks won over 90% support from Black voters. B. Orey Testimony, 08/06/24 Trial Tr. 213:16–19, *see also* PX-011 at 1. However, the level of White crossover voting—that is, White support for the candidate supported by Black voters—was extremely low at around 6%. B. Orey Testimony, 08/06/24 Trial Tr. at 213:22–24; *see also* PX-011 at 1. The results from Dr. Orey's reports as to the endogenous and quasi-endogenous elections (combining PX-011 at 1 and PX-017 at 1–2) are reproduced below:

56

| Election | Black Candidate | White Candidate | % Vote Black Candidate | Black Vote Black Candidate (CI) | White Vote Black Candidate (CI) | Black Candidate Won | RPV |
|---|---|---|---|---|---|---|---|
| 2011 Central Public Service Commission | Green | Posey | 44 | 90.94 (90.27-91.50) | 8.16 (7.47-8.80) | No | Yes |
| 2011 Central Transportation Commission | Crisler | Hall | 47 | 91.04 (90.44-91.42) | 8.29 (7.80-8.76) | No | Yes |
| 2012 Supreme Court | Banks | Waller | 44.4 | 81.26 (80.80-81.80) | 5.44 (5.01-5.83) | No | Yes |
| 2015 Central Transportation Commission | Coleman | Hall | 45 | 89.36 (88.90-89.83) | 4.87 (4.42-5.38) | No | Yes |
| 2019 Central Transportation Commission | Simmons | Lee | 51 | 93.97 (93.33-94.44) | 8.81 (8.12-9.79) | Yes | Yes |
| 2019 Central Public Service Commission | Stamps | Bailey | 49 | 91.36 (91.52-92.83) | 7.60 (7.07-8.51) | No | Yes |
| 2020 Supreme Court | Westbrooks | Griffis | 48.5 | 90.46 (89.97-91.03) | 6.43 (5.89-6.88) | No | Yes |
| 2023 Central Transportation Commission | Simmons | Pennington | 55.2 | 95.42 (94.91-95.80) | 16.20 (15.73-16.67) | Yes | Yes |
| 2023 Central Public Service Commission | Stamps | Bailey | 51.1 | 92.04 (93.03-96.02) | 11.44 (10.97-11.9) | Yes | Yes |

133.    Dr. Orey's bottom line conclusion regarding cohesive racial bloc voting by Blacks and Whites is uncontested. C. Bonneau Testimony, 08/12/24 Trial Tr. 794:18–22 (declining to dispute Dr. Orey's analysis of Black cohesive voting), 827:18–25 (agreeing with Dr. Orey that "Black voters typically voted for the Black candidate about 90 percent of the time"), 828:1–4 (agreeing that Dr. Orey's estimates for Black and White voting are consistent with his understanding of Black and White voting patterns), 851:16–20 (agreeing that "Black candidates who are preferred by a majority of Black voters generally earn about 10 percent of the White vote

57

in District 1"). Indeed, Dr. Bonneau went as far as to say that "virtually everyone knows that Black and White voters tend to support different candidates." *Id.* at 828:23–25. The Court credits Dr. Orey's uncontroverted analysis demonstrating consistently high levels of racially polarized voting, with Black voters cohesively supporting their preferred candidates and White voters cohesively bloc voting against Black-preferred candidates. *E.g.*, B. Orey Testimony, 08/06/24 Trial Tr. 228:20–229:8; *see also id.* at 212:5–219:22; PX-010 at 14; PX-011; PX-017.

134.    The Court also credits Dr. Orey's testimony that the level of racial polarization in Mississippi, and in Supreme Court District 1 in particular, is "extremely high." *E.g.*, B. Orey Testimony, 08/06/24 Trial Tr. 206:6 –10, 217:18–20, 219:20–22. The 90-percent-plus levels of racial cohesion in voting that Dr. Orey observed across all of the biracial election contests in District 1 in the past decade are, as Dr. Orey testified, "about as clear a case of racially-polarized voting as you can get." *Id.* at 217:8 –13. "The numbers are so high in terms of the polarized voting that they are not -- you don't really have much room left." *Id.* at 240:8 –12.

135.    Multiple fact witnesses who had run for office themselves credibly testified about the pervasiveness of racial polarization based on their own experiences in Mississippi politics. Rep. Percy Watson, a member of the Mississippi House of Representatives, testified that he didn't "receiv[e] hardly any support from White voters in [his] first election" and that "[i]t would have been impossible for [him] to win that election if [his district] had not been majority African American." P. Watson Testimony, 08/07/24 Trial Tr. 494:15–16, 495:10–11. Even today, though there has been "fluctuation over the time," Representative Watson testified that the level of White support for Black candidates like himself has not changed over the 45 years he has been in public

58

office and is "comparable today." *Id.* at 496:18–497:4. Indeed, "one of the first things" candidates in Mississippi consider when determining their chances of electoral success is to look at the Black voting-age population of a legislative or judicial district. *Id.* at 495:12–23. Sen. Simmons similarly told the Court that candidates and campaigns understand that Black candidates will be able to win votes and support from Black voters, but in predominantly White areas "it's almost certain that you are not going to get the support." D. Simmons Testimony, 08/08/24 Trial Tr. 705:1–10; *see also* A. Thomas, 08/05/24 Trial Tr. 162:3–14 (testifying that generally Black candidates will not receive votes from White Mississippians); C. Slaughter-Harvey Testimony, 08/07/24 Trial Tr. 482:7–483:3 (testifying that Latrice Westbrooks campaigned for White votes in 2020 but was unable to win significant White support).

136.    As discussed in further detail below, *infra* ¶¶ 204–207, 218–225, this testimony is also consistent with record evidence that partisan affiliation is aligned with and indeed shaped by race. *E.g.*, D. Simmons Testimony, 08/08/24 Trial Tr. 695:8–12 ("[T]here's . . . a positive correlation with being Black and being Democrat and then being White and Republican in Mississippi"). Drs. Campbell, King, and Bonneau also testified extensively about the history of racial realignment in Mississippi, and how the racial division preexisted and shaped the present partisan alignment. *See, e.g.,* J. Campbell Testimony, 08/07/24 Trial Tr. 440:1–6, 452:16–453:25; C. Bonneau Testimony, 08/12/24 Trial Tr. 837:22–838:2, 840:11–20; M. King Testimony, 08/14/24 Trial Tr. 1299:14–22, 1320:18–25. *See also infra* ¶¶ 211–217.

137.    The Court finds that Black and White voters in Mississippi and in particular in Supreme Court District 1 consistently prefer different candidates, that Black voters vote cohesively

(indeed, at an extremely high level of cohesion) in support of preferred candidates, and that White voters vote cohesively (indeed, at an extremely high level of cohesion) in opposition to those candidates.

**B.** *Gingles* **3**

138.    With respect to *Gingles* 3, Dr. Orey identified the biracial District 1 Supreme Court contests from 2020 and 2012 as the most salient contests to consider in evaluating whether White bloc voting is sufficiently intense usually to defeat Black-preferred candidates, followed by the seven District 1 Public Service and Transportation Commission contests since 2011. *E.g.*, B. Orey Testimony, 08/06/24 Trial Tr. 220:22 –221:22. This view was uncontroverted. Dr. Orey explained that, in the two District 1 Supreme Court contests where a Black candidate ran, the Black candidate obtained almost no White support and was defeated. *Id.* at 221:23–222:5 (concluding that neither Black candidate prevailed in the two District 1 Supreme Court contests because "Whites voted as a bloc, that usually . . . resulted in the defeat of the Black candidate"); *see also id.* at 212:16–214:17 (describing how levels of polarization led to defeat of Black candidates in both contests); 253:21–25 ("Whites didn't support Judge Westbrooks"); 254:6–8 ("The numbers show that only 6 percent of Whites supported Westbrooks; so Whites did not support Westbrooks");  *accord* C. Bonneau Testimony, 08/12/24 Trial Tr. 829:15–830:24. Dr. Orey testified, for example, that the extremely low level of White crossover voting was "extremely hurtful" to Judge Westbrooks' prospects in 2020, and that White bloc voting in that election was sufficient to defeat her. B. Orey Testimony, 08/06/24 Trial Tr. 214:14–17. The Court credits this uncontroverted testimony.

139.    The Court further credits Dr. Orey's testimony that, considering together all nine

of the "endogenous" and "quasi-endogenous" contests from the last decade where a Black candidate ran in District 1, *see supra* ¶ 129–132, all were contests with extremely high levels of polarization and extremely low levels of White crossover support, and the Black candidate was defeated six times out of nine. B. Orey Testimony, 08/06/24 Trial Tr. 217:5–222:16; *see also* 212:5–218:21; PX-011 at 1; PX-017 at 1–2. In those contests, Black candidates were defeated despite cohesive Black support due to "the high cohesive volume of Whites for the White candidate and not in support of the Black candidate." B. Orey Testimony, 08/06/24 Trial Tr. 222:6–16. Indeed, even in the three of nine contests where Black candidates prevailed, polarization was still extremely high, and White crossover support for Black candidates was still very low. B. Orey Testimony, 08/06/24 Trial Tr. 217:24–218:3, 218:19–21; PX-011 at 1; PX-017 at 1–2.

140.    The Court credits Dr. Orey's bottom line conclusion that, under the current lines, Whites vote sufficiently as a bloc usually to defeat the candidate preferred by Black voters in District 1. *E.g.*, B. Orey Testimony, 08/06/24 Trial Tr. 206:11–14, 228:5–8; *see also id.* at 214:10–17, 220:25–221:4 ("In Supreme Court District 1 . . . Blacks were not able to win a single election contest . . . Whites voted as a bloc to usually defeat the Black candidate"), 220:22–222:16; PX-010 at 14, PX-011 at 1, PX-017. Black candidates were defeated in two out of two of the endogenous contests (100%), and in six out of nine of the endogenous and quasi-endogenous contests combined (67%), and all nine elections featured extreme levels of White bloc voting against the Black candidate. *See* B. Orey Testimony, 08/06/24 Trial Tr. 220:22–222:16; PX-011 at 1, PX-017; *accord* C. Bonneau Testimony, 08/12/24 Trial Tr. 831:19–21. On this basis, the Court finds that Whites vote sufficiently as a bloc usually to defeat the candidate preferred by

61

Black voters. This finding is consistent with the ordinary meaning of "usually" or "typically," which Dr. Orey and Dr. Bonneau testified mean "on average," or "more often than not." B. Orey Testimony, 08/06/24 Trial Tr. 220:18–21, 221:2–4, 222:20–23, 244:13–21; C. Bonneau Testimony, 08/12/24 Trial Tr. 835:9–15.

141.     It is notable that, while Dr. Orey offered a clear opinion on *Gingles* 3 based on this data showing Black candidates being regularly defeated in District 1 contests, especially in Supreme Court contests, Dr. Bonneau disclaimed any contrary opinion as to *Gingles* 3. C. Bonneau Testimony, 08/12/24 Trial Tr. 836:24–837:2. Nor did Dr. Bonneau offer any alternative view of the data.

142.     The alternative views and arguments suggested by Defendants do not alter the Court's findings.

143.     It is true that some Black or Black-preferred candidates have prevailed in District 1, and these results are certainly relevant in considering the overall totality of the circumstances. However, they do not alter the Court's finding that White voters vote with sufficient cohesion usually to defeat the candidate of Black voters in District 1 elections.

144.     Most importantly, *none* of the instances where a Black candidate prevailed was a contested *Supreme Court* contest, which is the type of election all the experts agreed is most salient because it is the type of contest at issue in this case. *E.g.*, B. Orey Testimony, 08/06/24 Trial Tr. 221:21–222:12 (noting that Black candidates lost in the two Supreme Court contests, which are "the most important"); C. Bonneau Testimony, 08/12/24 Trial Tr. 836:13–20 (agreeing that endogenous contests are "most probative").

145.     The testimony regarding differences between the quasi-endogenous commissioner contests and the endogenous Supreme Court contests that are of most concern here was extensive and uncontroverted, and the Court credits it. As Dr. Orey explained, the commissioner contests "are partisan, and [they] are held during Mississippi state elections, such as the governor's race." B. Orey Testimony, 08/06/24 Trial Tr. 216:7–11.

146.     These differences are significant. Dr. Bonneau offered detailed testimony explaining how these different partisan and electoral conditions can have a significant effect in terms of Black-preferred candidates' electoral prospects. Electoral contests that appear further down on a ballot suffer from what is known as a roll-off effect: A subset of voters will only vote in races that appear at the top of the ballot, while skipping less prominent races that appear later in the ballot. C. Bonneau Testimony, 08/12/24 Trial Tr. 796:21–797:22; *see also* B. Orey Testimony, 08/06/24 Trial Tr. 255:3–5. And this roll-off effect is stronger in non-partisan elections. As Dr. Bonneau testified, "[p]artisan elections involve less ballot roll-off." C. Bonneau Testimony, 08/12/24 Trial Tr. 790:17–791:24, 864:14–865:11. That is because nonpartisan elections "remove a very important cue from voters," specifically the candidate's "political party affiliation." *Id.* at 798:3–24. Without that information, voters are less likely to "feel sufficiently informed" about who to vote for and, as a result, "are less likely to participate" in those races. *Id.* at 798:7–24, 864:14–17. As a result, Dr. Bonneau testified, "there is more ballot roll-off in nonpartisan supreme court elections as compared to partisan elections," and one effect of Mississippi's use of nonpartisan elections is an "unnecessary reduction in voter participation" in Supreme Court elections. *See* C. Bonneau Testimony, 08/12/24 Trial Tr. 860:3–18. Dr. Bonneau's own

scholarship shows that "nearly one-fifth of voters opt[] not to participate in a [nonpartisan] judicial election in spite of voting for higher offices." *Id.* at 867:7–15 ("The evidence from the 2012 CCES is strongly supportive of the hypothesis that nonpartisan elections depress participation.").

147.    The information deficit created by nonpartisan elections—and the resulting decline in voter participation in nonpartisan Supreme Court elections—is disproportionately borne by voters with lower levels of educational attainment. According to Dr. Bonneau's published (and award-winning) research, voters with college degrees are significantly less likely to suffer from ballot roll-off, "showing that education is not only a factor that drives individuals to the polls but that it also plays a role in whether they complete the entire ballot." C. Bonneau Testimony, 08/12/24 Trial Tr. 870:15–21, 871:14–17. (Rolloff also decreases with homeownership, *id.* at 870:21-25). In other words, voters with higher levels of educational attainment are better equipped to overcome the "information costs" imposed by nonpartisan elections. C. Bonneau Testimony, 08/12/24 Trial Tr. 861:1–18, 869:10–13. Dr. Bonneau's scholarship "confirm[s] the canonical finding that education increases turnout but also [demonstrates] that more educated individuals are more likely to vote in down-ballot judicial elections once they have already come to the polling place." *Id.* at 871:8–12.

148.    Rep. Watson, who has followed Supreme Court elections closely for over 40 years as a member of the Judiciary A committee and as an attorney, testified consistently that while lawyers and others with contact with the court system are well-informed on Supreme Court elections, "the masses, the everyday citizen . . . are not aware of Supreme Court elections," and are "less likely to vote for a candidate they do not know." P. Watson Testimony, 08/07/24 Trial

Tr. 512:13–513:10. This testimony corroborates Dr. Bonneau's testimony that voters suffer from an information deficit when it comes to these down-ballot, non-partisan, judicial contests.

149.    As detailed extensively below, *infra* ¶¶ 293–302, 316–321, there is no dispute that racial disparities in education and home ownership in Mississippi continue to exist, according to the testimony of Dr. Swanson, Dr. Bonneau and Dr. Traci Burch, a Northwestern University political scientist who studies the socioeconomic factors that influence political participation, among others. Dr. Bonneau agreed that "it was not that long ago that Black voters faced institutionalized oppression where they were not treated as full citizens of this country," and that "the effects of that historical discrimination continue to permeate life today." C. Bonneau Testimony, 08/12/24 Trial Tr. 840:25–841:16. Dr. Burch testified extensively on that subject, including about disparities in education and housing and homeownership in particular. T. Burch Testimony, 08/7/24 Trial Tr. 534:1–547:1 (testifying about and describing in detail educational disparities between Black and White Mississippians), 552:9–556:15 (testifying about and describing in detail educational disparities between Black and White Mississippians, including homeownership). Dr. Swanson, who did not dispute any of Dr. Burch's analysis regarding racial disparities in education and homeownership, has written that "the embedded history of extreme racism and exploitation contribute to socioeconomic deficits that we see in Mississippi today." D. Swanson Testimony, 08/13/24 Trial Tr. 1100:12–1100:19; *see also id.* at 1101:7–1109:3 (not disputing Dr. Burch's analysis of racial disparities). The data in the record demonstrates these disparities in education and homeownership as well. *See* PX-035 at 3–10 (educational disparities), 15–16 (homeownership disparities); *see also* PX-003 at 118, 139–140 (statewide ACS data

65

showing racial disparities in educational attainment), *id.* at 122–124, 135, 148–149 (statewide ACS data showing racial disparities in housing), *id.* at 160, 181–182 (ACS data showing racial disparities in education attainment in CD 2), *id.* at 164–166, 190–192 (ACS data showing racial housing disparities in CD 2); PX-005 (providing county-level ACS data on educational attainment and homeownership by race). So does the testimony of fact witnesses. *E.g.*, T. Pinkins Testimony, 08/05/2024 Trial Tr. 124:6–10 (discussing educational disparities); A. Thomas, 08/05/24 Trial Tr. 151:22–152:19 (discussing disparities in opportunities for higher education); D. White Testimony, 08/06/24 Tr. 354:9–18 (discussing difficulty Black Mississippians have securing a mortgage and becoming homeowners); D. Simmons Testimony, 08/08/24 Tr. 701:3–17 (discussing educational disparities).

150.    Because voters with lower educational attainment and levels of homeownership are more likely to lack sufficient information to participate in down-ballot races, particularly nonpartisan contests, and because Black voters are disproportionately more likely to have lower levels of attainment on those metrics, the structure of Mississippi Supreme Court elections—inadvertently or not—leads to depressed Black voter turnout for those endogenous contests in particular.[5]  That phenomenon persuasively explains why Black-preferred candidates sometimes

--------

[5] While Dr. Bonneau testified that a voter's race is not inherently predictive of ballot roll-off, C. Bonneau Testimony, 08/12/24 Trial Tr. 799:4–7, 886:6–8—a fact that is undoubtedly true—his

are able to prevail in District 1 when running at the top of the ticket (in presidential races, for example) or when running in partisan elections (in commissioner races, for instance), while Black-preferred candidates for Supreme Court justice lose even in the same election cycle. *See* PX-011 at 1–2.

151.    Multiple witnesses, including Dr. Bonneau and political scientist Dr. Marvin King from the University of Mississippi, whose expertise includes Southern politics and Black political behavior, also testified that voters distinguish between different offices, and may be willing to vote for Black candidates for some offices but not for others. C. Bonneau Testimony, 08/12/24 Trial Tr. 887:11–888:17 ("[V]oters . . . can consider different factors depending upon the office that they are running for. So characteristics in a candidate they may find desirable as a judge, they may not want as a president or vice versa."); M. King Testimony, 08/14/24 Trial Tr. 1413:24–1414:1, 1414:7–13 ("So what the research shows is that voters tend to peg people for certain races. You see that Blacks do better on, like [sic] school board elections, but the higher up, they tend to have less success"). In particular, Dr. Bonneau agreed that voters may view race as more salient in the context of judicial elections (as opposed to offices like Transportation Commissioner) because of stereotypes about race and crime, and because Black persons are more likely to be criminal

---

testimony is consistent with the explanation provided by Plaintiffs' expert, Dr. Burch, as to the relationship between race and turnout: There is no statistically significant difference between Black and White turnout once educational and other disparities, which are the product of historical discrimination, have been accounted for in the turnout models. T. Burch Testimony, 08/07/24 Trial Tr. 578:15–581:18; *see also* C. Bonneau Testimony, 08/12/24 Trial Tr. 869:22–25, 890:15–891:1 (explaining that education accounts for some but not all of the effect of race on turnout, which would make the variables in the model prone to insignificance); *see infra* ¶ 342.

defendants. C. Bonneau Testimony, 08/12/24 Trial Tr. 841:17–842:4. This testimony further underscores the comparative salience of the endogenous Supreme Court contests as opposed to the quasi-endogenous Commissioner races.

152.　And with respect to the 2023 election in particular, the Court credits Dr. Orey's testimony that the 2023 District 1 Public Service and Transportation Commission contests, which together account for two of the three total contests in which Black District 1 candidates have won in the past decade-plus, may be a relative outlier in the data.

153.　Dr. Orey and others credibly testified that the campaign environment in the 2023 election was atypical. While turnout was relatively low overall, K. Kirkpatrick Testimony, 08/14/24 Trial Tr. 1268:17–1269:6, the Democratic Party's efforts to win the gubernatorial contest drew an unusually large amount of national funding. B. Orey Testimony, 08/06/24 Trial Tr. 223:6–9. And the Democratic Party in 2023 made a substantial effort to turn out Black voters in particular. B. Orey Testimony, 08/06/24 Trial Tr. 255:16–23 (national Democratic spending in 2023 "could have helped mobilize the Black voters"), 268:5–13 ("In 2023, there was a concerted effort by the Democrats to go after the Black vote . . . ."); *see also* D. White Testimony, 08/06/24 Trial Tr. 342:23–343:11 (testifying that the Presley campaign increased engagement in the Black community by attending HBCU homecomings, churches, and popular black-owned eateries); PX-016 at 1–2 ("The 2023 election stood out due to the Presley campaign's unprecedented and historic expenditures and efforts to mobilize Black voters . . . 2023 should accordingly be considered exceptional, especially with respect to the mobilization of Black voters in the electorate"). Due to these circumstances, Dr. Orey testified that "the Democratic candidates may have actually received

coattails benefits; meaning that because of the support for the gubernatorial candidate, that also helped with the lower ballot contests" in 2023. B. Orey Testimony, 08/06/24 Trial Tr. 224:1–5.

154.    Rep. Watson's testimony was consistent with that, and the Court credits it as well. Rep. Watson testified that down-ballot races in Supreme Court districts are influenced by the overall turnout generated by the races at the top of the ticket, such as governor's races, which a Black Supreme Court candidate cannot independently replicate. P. Watson Testimony, 08/07/24 Trial Tr. 515:2–516:9. Rep. Watson testified that Brandon Presley's 2023 gubernatorial campaign "most definitely" caused a "greater turnout" among Black voters in the district. *Id.* at 515:16–516:2. He further explained that a Black candidate for the Mississippi Supreme Court cannot simply "do the same thing" as the Presley campaign did to generate turnout, because of "lack of money, lack of organized support, not having support financially outside the state of Mississippi," among other challenges. *Id.* at 516:3–9; *see also id.* at 498:6–13 (describing "unique challenges" faced by Black candidates associated with the Democratic Party). Dr. King also confirmed that Black candidates in general struggle comparatively with fundraising: "[I]n all levels of elected office, we see Black candidates raise less money than White candidates." M. King Testimony, 08/14/24 Trial Tr. 1412:25–1413:14.

155.    The Court finds that while evidence regarding the 2023 election shows that it is possible, at least in an outlier year and with a strong statewide ticket, for Black candidates to break through and prevail in partisan commissioner races, the data provides no similar evidence of Black candidate success in the Supreme Court contests that are at issue. Rather, in those elections, Black candidates have consistently lost.

156. The Court also finds that two out of the three total contests in which Black District 1 candidates have won in the past decade-plus were won by the same candidate, Commissioner Willie Simmons, who was an incumbent in 2023, *e.g.*, B. Orey Testimony, 08/06/24 Trial Tr. 258:15–17, which underscores the concerns regarding overreliance on outliers in the data.

157. The Court does not find Justice Leslie King's unopposed elections in 2012 and 2020 to be salient, most importantly because without opposition there is no way to measure or consider racially polarized voting or the effect of White bloc voting, which is the essential *Gingles* 3 question. *E.g.*, B. Orey Testimony, 08/06/24 Trial Tr. 245:2–11. Dr. Bonneau, while an expert in judicial elections, is not especially familiar with Mississippi politics in particular. He opined that Justice King faced no opposition because he would have been too formidable. C. Bonneau Testimony, 08/12/24 Trial Tr. 878:18–879:5. But the Court finds more persuasive the testimony of Rep. Percy Watson, a 40-plus-year veteran of Mississippi politics, who described in detail how the perceived endorsement of a White Republican Governor (in the form of an appointment) clears the field for a Black Supreme Court candidate. P. Watson Testimony, 08/07/24 Trial Tr. 514:6–19; *see also* D. Simmons Testimony, 08/08/24 Trial Tr. 723:9–18. Rep. Watson's testimony is also consistent with the testimony of Justice Oliver Diaz and Justice Rueben Anderson, among others, regarding the critical importance of appointments for Black candidates. O. Diaz Testimony, 08/06/24 Trial Tr. 294:1–10 ("Unless they have been first appointed to the court, a Black person has never won an election to a seat on the Mississippi Supreme Court."), 297:16–298:2 (testifying that an appointment gives a candidate "a tremendous leg up in an election" because the governor's supporters can get behind the candidate and that a candidate's subsequent incumbency helps with

fundraising); R. Anderson Testimony, 08/08/24 Trial Tr. 736:17–25 (testifying that he could not have made it to the Mississippi Supreme Court without first being appointed); *see also infra* ¶¶ 268–284.

158.     The finding that Justice King's lack of opposition cannot be taken as an implicit indication of overwhelming electoral strength in District 1 is further supported by the reaction of Black legislators to a 2016 proposal that would have decreased the BVAP of District 1 by 0.45%. P. Watson Testimony, 08/07/24 Trial Tr. 501:16–503:23, 511:19–22; Pls' Ex. 116, February 26, 2016 Email of Ben Collins. Black legislators forcefully opposed the measure because "Central District elections are very, very close," and "[e]ven a slight reduction" in the BVAP could have resulted in the defeat of Justice Leslie King. P. Watson Testimony, 08/07/24 Trial Tr. 503:2–504:12. The bill passed the House anyway, but was thwarted in the Senate. *Id.* at 511:19–22; D. Simmons Testimony, 08/08/24 Trial Tr. 717:5–16. This contemporaneous evidence demonstrates that, while his appointment may have cleared the field for him, Justice King's position is nevertheless still perceived as electorally precarious.

159.     The Court's findings also are not altered based on the fact that White candidates who were preferred by Black voters (namely, Justice James Kitchens, and former Public Service Commissioner Cecil Brown) have also prevailed in District 1, for at least two reasons. First of all, those elections were also polarized along racial lines, and even including those elections in the data, it remains the case that Whites voted sufficiently as a bloc usually to defeat the candidate preferred by Black voters. Even including those elections, Black-preferred candidates were defeated in two out of three of the endogenous Supreme Court contests (67%), and in six out of

eleven of the endogenous and quasi-endogenous contests combined (55%). B. Orey Testimony, 08/06/24 Trial Tr. 222:10–12, 227:16–17; *see also* PX-011, PX-014, PX-017.

160.    In any case, the Court credits the unrebutted testimony, consistent with the cases, that the 2016 Kitchens-Griffis and 2015 Brown-Bailey contests, which featured only White candidates, should not be given weight, because biracial contests are most salient for assessing the existence and effects of racially polarized voting. B. Orey Testimony, 08/06/24 Trial Tr. 208:17–209:1; *see also id.* at 228:20–24; PX-010 at 4. The evidence in the record shows why. As Dr. Orey explained, Black voters tend to prefer Black candidates when given credible, viable options. *Id.* Consistent with that, Dr. Bonneau and Dr. King testified that Black voters are aware of candidate viability and vote on that basis, including to reject nonviable perennial candidates even if they are Black. C. Bonneau Testimony, 08/12/24 Trial Tr. 844:3–10; M. King Testimony, 08/14/24 Trial Tr. 1322:24–1323:13; *see also infra* ¶¶ 240–242, 277.

161.    Here, the evidence is that Justice Kitchens, while he was preferred by 70% of Black voters, did not have nearly same 90%-plus level of cohesive support as most of the Black-preferred candidates who were Black. B. Orey Testimony, 08/06/24 Trial Tr. 227:22–228:2; PX-014 at 1; PX-011 at 1; *see also infra* ¶¶ 235–237. And there was no evidence that Black voters had a credible, viable Black candidate in 2016 who they might have supported instead of Justice Kitchens. *Cf.* C. Bonneau Testimony, 08/12/24 Trial Tr. 808:5–18 (noting that Ceola James received approximately 10% of the vote in 2008 running in the same election as Justice Kitchens); *see also* D. White Testimony, 08/06/24 Trial Tr. 363:10–23 (Ms. White, despite her high level of political involvement and attendance at the Neshoba County fair, was unaware of Ceola James' purported

72

campaign activities); *see also infra* ¶¶ 240–242. Justice Kitchens' election thus does not speak with nearly as much clarity to the question whether Black-preferred candidates can win despite White bloc voting.

162.     The Court's findings also are not altered by the fact that in some "exogenous" elections, national or statewide Black candidates like President Obama or former Congressman Mike Espy were able to carry District 1. *E.g.*, B. Orey Testimony, 08/06/24 Trial Tr. 253:2–7. Exogenous contests are fundamentally different from District 1 contests when it comes to assessing whether Whites vote sufficiently as a bloc usually to defeat Black candidates in District 1 because whether a statewide candidate is actually defeated or not is not determined based on the District 1 result alone. *E.g.*, C. Bonneau Testimony, 08/12/24 Trial Tr. 833:20–834:2. Indeed, none of the experts testified that those exogenous contests were salient for purposes of considering the *Gingles* 3 question of whether White bloc voting was usually sufficient to defeat Black candidates in District 1. Dr. Orey testified that he did not focus on those contests for purposes of *Gingles* 3, and Dr. Bonneau agreed that exogenous elections are generally the least probative. B. Orey Testimony, 8/06/24 Trial Tr. 221:5–13; C. Bonneau Testimony, 08/12/24 Trial Tr. 836:12–20. Moreover, Dr. King testified credibly and in detail about how voters have different attitudes in thinking about different offices, such that White voters' willingness to support a Black candidate over a White one in a partisan national election may be very different from a nonpartisan local judicial contest. M. King Testimony, 08/14/24 Trial Tr. 1413:24–1414:1 ("You can take the same candidate, but they will be judged differently depending on the office that they are running for"), 1414:7–13 ("You see that Blacks do better on . . . school board elections, but the higher up, they tend to have

less success"). These contests thus get little to no weight. And, even including the exogenous elections, which were also all heavily polarized along racial lines, in the data, Black-preferred Black candidates were still defeated in 12 out of 21 of the endogenous, quasi-endogenous, and exogenous contests combined (57%), meaning that even if the exogenous contests that the unrebutted expert testimony indicated are far less probative are given full weighting, Black candidates still usually lost in District 1. B. Orey Testimony, 08/06/24 Trial Tr. 219:17–22; *see also* PX-011 at 1–2; *accord* C. Bonneau Testimony, 08/12/24 Trial Tr. 834:16–835:5.

163.    The Court finds that the 2020 District 1 Supreme Court election between Judge Westbrooks and Justice Griffis, which Judge Westbrooks lost in the context of extremely high levels of racial polarization and White bloc voting, is an especially important data point. Of course, every election is different. But the Court does not find that any of the particulars of that election negate the salience of this recent, biracial, endogenous Supreme Court District 1 contest. Judge Westbrooks was a sitting appellate judge, and numerous witnesses with extensive political experience who were active in 2020, including on Judge Westbrooks' campaign, testified that she campaigned hard, raised significant funds, and tried to turn out Black voters in the Delta. *E.g.*, D. Simmons Testimony, 08/08/24 Trial Tr. 715:15–716:3. Constance Slaughter-Harvey, who credibly and specifically testified about her long history mentoring and advising Black judicial candidates in Mississippi in general and Judge Westbrooks in particular, testified that Judge Westbrooks toured the state by bus, raised enough money to compete, and campaigned for White votes, for example by sending campaign literature to White voters and going to the Rotary Club in places like Scott County. C. Slaughter-Harvey Testimony, 08/07/24 Trial Tr. 471:12–18, 473:16–

74

19, 482:7–23. As Ms. Slaughter-Harvey testified, "She raised enough money. She worked hard." C. Slaughter-Harvey Testimony, 08/07/24 Trial Tr. 473:25. Despite that, she received less than seven percent support from White voters.

164.     The fact that the COVID-19 pandemic was occurring during the 2020 election does not alter the Court's findings. There was no statistical or systematic evidence in the record indicating what those effects might have been. Ms. Slaughter-Harvey testified that COVID-19 affected White as well as Black Mississippians, which it undoubtedly did. C. Slaughter-Harvey Testimony, 08/07/24 Trial Tr. 475:3–7, 481:18–20, 482:2. And to the extent that the effects of COVID-19 were felt more acutely by Black Mississippians in a way that diminished Black turnout in particular, that would only confirm that Black voters tend to bear the effects of discrimination in health in a way that hinders their ability to participate equally in politics. *See* T. Burch Testimony, 08/07/24 Trial Tr. 560:13–16 ("Black areas . . . received the vaccine access later than many White areas, partly because of the lack of health care infrastructure"), 560:24–25 (testifying that several studies in her report "show that health can affect voter turnout in a number of ways"); *see also infra* ¶¶ 322–329.

165.     At the risk of repetition, the Court reiterates its finding based on all the evidence that Whites vote sufficiently as a bloc usually to defeat the candidate preferred by Black voters in Supreme Court District 1.

166.     The Court also finds that under Mr. Cooper's Illustrative Plans, Black voters would have a greater opportunity to elect their preferred candidate. The evidence was uncontroverted on this point as well. Dr. Orey testified that Judge Westbrooks likely would have prevailed in a district

with a higher BVAP in light of the "high correlation between Black voting and population and support for Westbrooks." B. Orey Testimony, 08/06/24 Trial Tr. 231:23–232:1; *see also id.* at 214:18–215:4 ("[G]iven the extreme level of polarized voting or Black voting from the Black community, if the district was larger, Westbrooks could have won that district"). Dr. Bonneau agreed that, given the level of racial cohesion in Mississippi, "increasing the BVAP of the district by 1 percent would typically increase the Black-preferred candidate's vote share by about 0.9 percentage points," assuming no significant changes in the level of turnout. C. Bonneau Testimony, 08/12/24 Trial Tr. 830:9–19. The evidence thus shows that a plan like the Illustrative Plans containing a higher-BVAP District 1 would meaningfully increase the opportunities for Black voters to elect candidates of choice to the Supreme Court. *See, e.g.*, *id.* at 830:2–24. As Senator Simmons testified, "for Black lawyers, the way [the current central] district is drawn . . . there is a lot of interest to become a member of the Supreme Court, but there is no opportunity," whereas implementing Illustrative Plan 1 would "mean[] that there is even more interest in becoming a member of the Mississippi Supreme Court" and "certainly an opportunity as well." D. Simmons Testimony, 08/08/24 Trial Tr. 717:11–13, 719:8–10.

## VI.    TOTALITY OF THE CIRCUMSTANCES

### A.    Senate Factor 1:  Mississippi's History of Voting-Related Discrimination

167.    The first Senate Factor is the "extent of any history of official discrimination in the state or political subdivision that touched the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process." *Gingles*, 478 U.S. at 36–37; *see also MS NAACP*, 2024 WL 3275965, at *34. It accounts for "the history of voting-related

discrimination in the State or Political subdivision." *Gingles*, 478 U.S. at 44.

168.    Based on the analysis of historian Dr. James Campbell, as well as additional testimony from Dr. King,[6] multiple fact witnesses, and Defendants' witness, Dr. Bonneau, the Court finds that Mississippi has an extensive history of voting-related discrimination, from at least 1890 to the present. *See, e.g.*, J. Campbell Testimony, 08/06/24 Trial Tr. 388:22–25.

169.    The Court qualified Dr. Campbell as an expert in race relations in the United States, the history of Mississippi after the Civil War, and the history of racial politics in the South in Mississippi from the post-Civil War era to modern day. *See* J. Campbell Trial Tr. 387:8–16. Dr. Campbell is a tenured professor of history at Stanford University. *See* Pls.' Ex. 19, J. Campbell Curriculum Vitae [hereinafter "PX-019"]. He received a master's degree in American history and a Ph.D. in history from Stanford University. *See* J. Campbell Trial Tr. 376:9–13. Dr. Campbell has received numerous awards for his scholarship, including a Guggenheim fellowship. PX-019 at 2. He teaches a course at Stanford on the civil rights movement in the United States and has written several books about civil rights in the United States and African-American history. *See* J. Campbell

---

[6] In accordance with the Court's ruling at trial, Dr. King's testimony did not contain an ultimate opinion as to Senate Factors 1, 2, or 3, but the Court may still consider his testimony—and any other relevant facts in the trial record—when rendering a conclusion as to whether each Senate Factor favors Plaintiffs. *See* M. King Testimony, 08/14/24 Trial Tr. 1312:6–14. Moreover, as indicated in the Joint Pretrial Order, Plaintiffs have proposed relying on Dr. King's testimony in relation to Senate Factors 1, 2, 3, and Defendants did not indicate or preserve any objection to that in the Joint Pretrial Order. *See* Joint Pretrial Order, ECF No. 228 at 6–7 ("Senate Factor 1: As demonstrated by the analyses of historian Dr. James T. Campbell and political scientist Dr. Marvin King among other evidence, Mississippi has an extensive history of voting-related discrimination, from at least 1890 to the present.").

Trial Tr. 381:12–24; 383:1–385:9.

170.    Dr. Campbell's work on the history of race and civil rights in Mississippi is particularly extensive. He has conducted over 70 research trips to Mississippi and has interviewed numerous Mississippians. J. Campbell Trial Tr. 378:5–20. These trips consist of spending days researching at the Mississippi Department of Archives and History, and at archives at Mississippi State University and the University of Southern Mississippi. *See* J. Campbell Trial. Tr. 378:11–18 ("I've kind of worn a chair down at the [archives]."). Dr. Campbell also has written books dealing with Mississippi. *See* PX-019 at 2–3; J. Campbell Trial Tr. 382:25–385:9. He is currently writing a book that examines the notorious murders of James Chaney, Andrew Goodman, and Michael Schwerner in Neshoba County, but focus on the community and "how a historical event reverberates though the lives of other people." J. Campbell Trial Tr. 383:7–13.

171.    The Court finds that Dr. Campbell's analysis of Mississippi's history of voting-related discrimination to be highly credible, consistent with other evidence presented in the case, and virtually undisputed by Defendants. *E.g.*, Closing Argument, 08/15/24 Trial Tr. 1535:6–9 (Defense Counsel: "So let's talk just for a second about history. We don't dispute the facts. As I said once already and as Mr. Savitzky said once already, Faulkner wins this argument. The past isn't dead.")

172.    There is no question that Mississippi has a long history of racial discrimination, with respect to the right of Black voters to register, vote, and otherwise participate in the political process, and the evidence at trial demonstrated that such discrimination has continued in some forms to the recent past and even the present day. *E.g.*, J. Campbell 08/07/24 Trial Tr. 388:22–25;

441:13–21; Pls.' Ex. 18, Oct. 3, 2022 Report of J. Campbell at 1 [hereinafter "PX-018"] ("In Mississippi, the struggle for racial equality is and always been a struggle over voting."); Pls.' Ex. 52, Oct. 3, 2022 Report of M. King at 6 [hereinafter "PX-052"] ("Mississippi's political history is characterized by consistent efforts to minimize the voting power of the state's Black population.").

173.    Mississippi's history of voting-related discrimination against African Americans has taken the forms of violent, legal, and extra-legal measures and means. *See, e.g.*, J. Campbell Testimony, 08/06/24 Trial Tr. 395:9–396:15; PX-018 at 9 (explaining the "violent reign of terror" against Black voters in Mississippi); M. King Testimony, 08/14/24 Trial Tr. 1314:14–1316:6; PX-052 at 7 ("The effects of these legal, economic efforts were immediate and long-lasting.").

174.    After the Civil War, the 1868 Mississippi Constitution, written by Black and White delegates, abolished slavery, gave voting rights to Black men, and allowed Black citizens to serve in public office. *E.g.*, J. Campbell Testimony, 08/06/24 Trial Tr. 394:17–395:8; PX-018 at 7–8 (describing the Constitution as a "visionary document"); M. King Testimony, 08/14/24 Trial Tr. 1314:5–13; PX-052 at 5.

175.    During the brief period of time that the 1868 Constitution was in effect, Black Mississippians were elected to positions of political power, including statewide office. *See* Pls.' Ex. 53, Tables 1 through 9 from the Oct. 3 Report of M. King, compiled, at 1 [hereinafter "PX-053"] (Table of Black Statewide Mississippi Officials); M. King Testimony, 08/14/24 Trial Tr. 1340:8–18; PX-052 at 5; PX-018 at 7 (Mississippi "produced the nation's first two Black [United States] Senators.").

176.    However, in response to the enactment of the 1868 Constitution, White Democrats

created the so-called "Mississippi Plan," which was an effort to obtain political power through violence, intimidation, and voter suppression of Black voters. *E.g.*, J. Campbell Testimony, 08/06/24 Trial Tr. 393–394:13, 395:9–13; PX-018 at 14; M. King Testimony, 08/14/24 Trial Tr. 1314:14– 1315:1; PX-052 at 6 (The "Mississippi plan [was] a campaign to harass and violently intimidate Black voters and prevent them [from] participating in politics."). Shortly after the enactment of the Constitution, paramilitary organizations including the Klu Klux Klan, Red Shirts, White League, and White Line proliferated across Mississippi. *See* J. Campbell Testimony, 08/06/24 Trial Tr. 395:9–25; *see also* PX-018 at 8–9; PX-052 at 6 (describing the Red Shirts' "violent intimidation" to enforce a "new racial order").

177.    Those efforts to suppress the political power of Black Mississippians were successful: "[B]y the mid-1880s, there were no Black legislators remaining in the Mississippi legislature." M. King Testimony, 08/14/24 Trial Tr. 1314:14– 1315:1; *see also* J. Campbell Testimony, 08/06/24 Trial Tr. 395:9–25; PX-018 at 9–10 (recounting Black voters' insufficient ability to exercise "political power."). Similarly, no Black person has been elected to statewide office since 1875. M. King Testimony, 08/14/24 Trial Tr. 1340:15–18; PX-052 at 22; PX-053 at 1.

178.    White leaders in Mississippi then convened a new constitutional convention in 1890 to reinvent the State's legal system. *See* J. Campbell Testimony, 08/06/24 Trial Tr. 396:19– 397:7. The President of the constitutional convention declared that its purpose was to disenfranchise Black Mississippians. *E.g.*, J. Campbell Testimony, 08/06/24 Trial Tr. 397:8– 398:1; PX-018 at 10 (quoting the chairman of the Convention as saying, "We came here to exclude

80

[Black Mississippians]. Nothing short of this will answer."); M. King Testimony, 08/14/24 Trial Tr. 1315:2–6 (testifying that "the stated purpose of the 1890 Constitution" was to "make sure Blacks could no longer participate in Mississippi politics").

179.    The 1890 Mississippi Constitution eliminated the voting power of Black Mississippians through various mechanisms, including the implementation of poll taxes, dual registration, literacy exams, residency requirements, and felony disenfranchisement. *E.g.*, J. Campbell Testimony, 08/06/24 Trial Tr. 391:12–19, 398:21–401:4; PX-018 at 10–14; M. King Testimony, 08/14/24 Trial Tr. 1315:7–1316:3. Those mechanisms, as detailed below, were formally "race-neutral," but in practice, they operated to disenfranchise Black voters, J. Campbell Testimony, 08/06/24 Trial Tr. 399:2–13; *see also* PX-052 at 6 (explaining how these mechanisms "forced Black Mississippians [out] from political life").

a.    *Poll taxes:* When registering to vote, Mississippians were required to pay a $2 per year poll tax. J. Campbell Testimony, 08/06/24 Trial Tr. 398:21–399:1. Voters had to pay it early in the year, when people were at their poorest, *id.*, and at the time, "[t]wo dollars was an enormous sum of money to people struggling to feed and clothe their children." PX-018 at 17. Black Mississippians were disproportionately unable to afford the poll tax, and even the ones who were able to pay sometimes had their money refused by registrants. J. Campbell Testimony, 08/06/24 Trial Tr. 399:2–13. Meanwhile, White voters were often not required to pay the poll tax at all. *Id.* at 398:21–399:13.

b.    *Literacy Tests:* White registrars administered literacy tests to prospective voters and often used their discretion to fail Black voters. E.g., J. Campbell Testimony,

08/06/24 Trial Tr. 404:18–405:11; PX-018 at 13 (describing the discretion as "virtually unlimited"). The literacy requirement had an "understanding clause," which was a mechanism designed to enable illiterate White people to vote. *E.g.*, *id.* at 405:5–11; PX-018 at 13; PX-052 at 6.

      c.    *Residency Requirement*: The 1890 Constitution contained a residency requirement—voters were required to have resided in the state for at least two years and in their specific election district for at least one year. J. Campbell Testimony, 08/06/24 Trial Tr. 398:22–25; PX-018 at 17; PX-052 at 6. Those requirements disproportionately affected Black Mississippians, who were more likely to be transient "tenants and sharecroppers, who routinely moved from farm to farm in search of better land and less exploitative landlords." PX-018 at 17; *see also* J. Campbell Testimony, 08/06/24 Trial Tr. 398:22–399:13.

      d.    *Felon Disenfranchisement*: The Mississippi Constitution also reduced the number of Black Mississippians eligible to vote by barring persons with certain felony convictions from voting and selecting crimes for disenfranchisement that the drafters believed Black people were more likely to commit. *See* J. Campbell Testimony, 08/06/24 Trial Tr. 399:21–400:13; PX-018 at 15; M. King Testimony, 08/14/24 Trial Tr. 1315:18–23 ("There is clear historical evidence that the authors of the 1890 Constitution selected crimes that they believed were Black crimes."). Although more types of crimes have been added to the list since 1890, the felon disenfranchisement policy continues to disproportionately impact Black voters today. *E.g.*, J. Campbell Testimony, 8/07/24 Trial

Tr. 435:6–16, 447:9–12; M. King Testimony, 08/14/24 Trial Tr. 1316:1–3. *See also supra* ¶¶ 73–77; *infra* ¶ 264, 330–332.

      e.    *Dual Registration*: The 1890 Constitution also created a system that required voters to register twice—once in federal elections and again for state and local elections. J. Campbell Testimony, 08/06/24 Trial Tr. 400:14–24, 429:20–430:15. The dual-registration posed specific risks for Black voters: "The very act of walking into a county courthouse and announcing one's desire to register was, in the context of Jim Crow Mississippi, a provocative, potentially fatal act." PX-018 at 17; J. Campbell Testimony, 08/06/24 Trial Tr. 400:14–24 (testifying that dual registration as one example of a race-neutral policy that impacted Black Mississippians differently). The system of dual registration did not permanently end until it was struck down by a federal court in the 1980s, *Mississippi State Chapter, Operation Push v. Allain*, 674 F. Supp. 1245 (N.D. Miss. 1987). *See* J. Campbell Testimony, 08/06/24 Trial Tr. 429:20–430:15; PX-018 at 18; *see also infra* ¶ 189 (noting attempt to resurrect dual registration in the mid-to-late 1990s).

180.    The collective impact of those mechanisms "essentially eliminate[d] Black voting" in Mississippi. J. Campbell Testimony, 08/06/24 Trial Tr. 400:25–401:4; PX-018 at 10 (describing how the mechanisms "virtually erased Black voters from the rolls"); PX-052 at 6 explaining how the mechanisms "forced Black Mississippians [out] from political life").

181.    In addition to those legal barriers to political participation created directly by the state government, Mississippi's Democratic Party, which was the party of the White South until the parties began realigning around 1968, restricted its membership based on race and established

83

all-White primaries. E.g., J. Campbell Testimony, 08/06/24 Trial Tr. 401:5–402:17; PX-018 at 18 (explaining the "important role" the primaries served in "reinforcing the racist regime"); PX-052 at 7 (describing the primaries as a "further barrier to Black participation"). As a result, even the Black people who were able to register to vote were denied the opportunity to participate in Democratic primaries—the only meaningful elections in a state dominated by Democrats—until the Supreme Court ended the practice of all-White primaries in 1944. *Id.*; *see also* PX-052 at 7 (describing Mississippi as "not a democracy at all" during this period in part due to White primaries). This exclusion of Black voters from Democratic primaries effectively constituted exclusion from political office in Mississippi. *See Jordan,* 604 F. Supp. at 812 (finding White primaries as evidence of official discrimination in Senate Factors analysis); *Operation Push*, 674 F. Supp. at 1250 (taking judicial notice of existence of all-White primaries).

182. Racial discrimination in voting pervaded Mississippi politics well into the 20th Century, including in the lifetimes of current Mississippi voters. Powerful politicians in the State encouraged the exclusion of Black Mississippians from political and civic life through violence and other unlawful means:

a. In the 1940s, Theodore Bilbo, a U.S. Senator from Mississippi, publicly called for violence against Black people to intimidate them from voting. J. Campbell Testimony, 08/06/24 Trial Tr. 404:1–18 ("I'm calling on every red-blooded American who believes in the superiority and integrity of the white race to get out and see that no n****rs vote."). Many Mississippians took his suggestion seriously with reports from this period reflecting registrars refusing to register Black residents to vote, armed mobs patrolling

84

polling places, and Black voters being beaten up by their White counterparts. PX-018 at 26.

       b.     In 1955, Tom Brady, who later served as a justice on the Mississippi Supreme Court until the 1970s, authored a book titled *Black Monday*, which argued that Black people are evolutionarily inferior and opposed racial integration. M. King Testimony, 08/14/24 Trial Tr. 1316:25–1317:12; PX-052 at 11–12; Pls.' Ex. 54, Images 1 through 7 from the Oct. 3, 2022 Report of M. King, at 3 [hereinafter "PX-054"].

       c.     During the 1950s and 1960s, the White Citizens' Council, the Mississippi State Sovereignty Commission, and other White groups used violence and other intimidation tactics against Black voters and enforced the racial hierarchy. *E.g.*, PX-052 at 9; PX-054 at 1–2. For instance, the White Citizens' Council also resisted the 1955 *Brown v. Board of Education* decision and conducted essay writing and competitions on topics such as "Why I believe in social separation of the races of mankind" and "Why the preservation of States rights is important to every American." PX-052 at 9–11; PX-054 at 1–2.

       d.     Political violence and intimidation were commonplace: Medgar and Charles Evers, two activists, were met with armed men when trying to vote in Decatur, Mississippi. *See* J. Campbell Testimony, 08/06/24 Trial Tr. 404:1–9; PX-018 at 23. When civil rights activists attempted to register Black voters as part of the "Freedom Summer" in 1964, three were murdered by a White lynch mob aided by the Klan and the local sheriff's office in Neshoba County. PX-018 at 32–33; J. Campbell Testimony, 08/06/24 Trial Tr. 383:5–14.

183.    During the 1950s and 1960s, Mississippi continued to devise new procedures to prevent Black residents from voting.

    a.    *Party Oaths*: After the end of the all-White primary system, Mississippi passed a law requiring that anyone campaigning for public office must swear a party oath affirming their loyalty to the party platform, which, in practice, required Black Mississippians to swear their support for poll taxes and lynching. *See* J. Campbell Testimony, 08/06/24 Trial Tr. 404:22–405:4; PX-018 at 24

    b.    *Strengthening the Literacy Test*: Mississippi also made its literacy test harder to pass, including by adding a writing requirement. J. Campbell Testimony, 08/06/24 Trial Tr. 405:5–11; PX-018 at 24, 27.

    c.    *Character Requirement*: Mississippi amended the Constitution to include a good character requirement for voters, and character-based challenges were litigated before all-White tribunals. J. Campbell Testimony, 08/06/24 Trial Tr. 405:12–14; PX-018 at 25.

    d.    *Publication of Voter Rolls*: Mississippi required the publication of the names of anyone who attempted to register in the local newspaper for two consecutive weeks, which was "designed to license violent intimidation of would-be voters." J. Campbell Testimony, 08/06/24 Trial Tr. 405:15–19; PX-018 at 29.

184.    Following the passage of the Voting Rights Act in 1965, the Legislature and local governments repeatedly used redistricting to dilute the impact of the Black vote, leading to multiple federal court orders directing the Legislature to redraw districting plans and repeated intervention from the United States Department of Justice. *E.g.*, J. Campbell Testimony, 08/06/24

Trial Tr. 407:7–408:16. These efforts included creating multimember districts with at-large voting, which was a highly effective means at diluting Black voting power. *See id.* at 408:6–13; PX-018 at 32–37; Pls.' Ex. 27, U.S. Dep't of Justice Determination Letter, Submission No. T7901 (Sept. 10, 1971) (objecting to legislation authorizing at-large county supervisor elections). These measures ensured that county boards of supervisors would remain all-White even in counties with large Black populations, such as Hinds County. *See* J. Campbell Testimony, 08/07/24 Trial Tr. 425:17–25.

185.    In 1966, Mississippi redrew its congressional districts, an unusual step given that redistricting is usually done decennially following each census. *See* J. Campbell Testimony, 08/06/24 Trial Tr. 408:18–409:7; PX-018 at 34. The focus of the 1966 redistricting was to reconfigure congressional district lines in the Delta, from a North-South orientation to an East-West orientation, so as to pull White counties from eastern Mississippi into the Delta district; the State ultimately created a district that was 51% Black but did not provide Black voters with an opportunity to elect their preferred candidates. J. Campbell Testimony, 08/06/24 Trial Tr. 408:18–409:7; PX-018 at 35.

186.    The 1966 plan was not submitted to the Department of Justice for preclearance until 15 years later, in 1981. When the Department of Justice was finally able to review the plan, its Determination Letter specifically objected to the East-West configuration of the congressional districts, which cracked the Delta. *See* J. Campbell Testimony, 08/06/24 Trial Tr. 411:3–15; J. Campbell Testimony, 08/07/24 Trial Transcript 426:2–427:18; *see also* Pls.' Ex. 28, U.S. Dep't of Justice Determination Letter, Submission No. 81-1697 (March 30, 1982). *See also supra* ¶ 65 n.2.

187.     Mississippi also used redistricting to dilute Black voting strength in Legislature. In significant part due to redistricting, 173 of the 174 state legislators in Mississippi were White in 1979, even fourteen years after the passage of the Voting Rights Act. *See, e.g.*, J. Campbell Testimony, 08/06/24 Trial Tr. 408:14–17; PX-018 at 37.

188.     Between the passage of the Voting Rights Act in 1965 to 2013, when the preclearance regime was struck down by the Supreme Court in 2013, the Civil Rights Division of the U.S. Department of Justice sustained 173 objections to Mississippi's voting procedures as violating the Voting Rights Act. *E.g.*, J. Campbell Testimony, 08/06/24 Trial Tr. 409:20–22; *See* Pls.' Ex. 112, Voting Determination Letters for Mississippi (cataloguing all 173 objections) [hereinafter PX-112].

189.     One objection from the more recent past involved an attempt by Mississippi to circumvent the requirements of the federal National Voter Registration Act ("NVRA"). *See* J. Campbell Testimony, 08/07/24 Trial Tr. 429:2–16. Dr. Campbell testified that in 1993, Congress passed the NVRA in order to facilitate voter registration. *See id.* at 429:4–9. When Mississippi finally implemented the NVRA, it did so by restoring the system of dual registration that had existed under the 1890 Constitution and that required voters register twice—once for federal elections and once for state elections. *See id.* at 430:8–15; PX-018 at 47; Pls.' Ex. 29, U.S. Dep't of Justice Determination Letter, Submission No. 95-0418 (Sept. 22, 1997).

190.     The Department of Justice also objected to numerous local redistricting plans and other measures as late as 2012. *E.g.,* PX-018 at 36 ("Other counties pursued racial gerrymanders, provoking years of litigation and more than 80 additional Section 5 objections, involving 48

88

different counties."); s*ee also* PX-112 (listing all 173 objections).

191.    Since the end of the Section 5 preclearance process, federal courts have repeatedly found state legislative plans violative of Section 2 of the Voting Rights because they diluted the power of Black voters. *MS NAACP,* 2024 WL 3275965, at *53. *See also Thomas v. Bryant*, 366 F. Supp. 3d 786, 810 (S.D. Miss. 2019) (finding a Section 2 violation) *aff'd*, 931 F.3d 455 (5th Cir. 2019), *vacated as moot on other grounds*, *Thomas v. Reeves*, 961 F.3d 800 (5th Cir. 2020); *Jamison,* 471 F. Supp. 2d at 716 (finding that the use of an at-large voting scheme in Tupelo violated Section 2); *Gunn v. Chickasaw Cnty.*, 705 F. Supp. 324 (N.D. Miss. 1989) (finding a Section 2 violation) .

192.    In more recent years, Mississippi has also imposed various new or additional restrictions that, regardless of their intent, make voting more difficult or burdensome, with those burdens often falling disproportionately on Black Mississippians. J. Campbell Testimony, 08/07/24 Trial Tr. 435:6–25; *e.g.,* PX-018 at 48–49 (explaining how Mississippi implemented "one of the strictest Voter ID laws in the nation" despite the Secretary of State office confirming that during a span of 62 elections, "zero (0) complaints would have been prevented by Voter ID"). *See also infra* ¶¶ 258, 260 (detailing these measures). Both Dr. Campbell and Dr. King described how in light of all these rules, the "cost of voting" in Mississippi is the highest in the Nation. *See infra* ¶ 256; *see also infra* ¶¶ 248–264.

193.    The testimony of Plaintiffs' experts as to Mississippi's history of discrimination against Black voters and candidates is consistent with and supported by the trial testimony of Black Mississippians, who have shown that the State's history of pervasive and often violent racial

89

discrimination and political exclusion is not some distant memory or mere vestige of the past, but continues to impact Black voters today.

194. The Court credits the testimony of multiple fact witnesses who have decades of civic and political experience in Mississippi and whose testimony demonstrates that many of the historical forms of discrimination, including poll taxes, segregation, and violence against Black voters and activists remain within the living memory of Mississippians today.

195. For instance, Justice Reuben Anderson, the first Black justice in the Mississippi Supreme Court's history, testified about his experience with obstacles to voting, including poll taxes: "So there were about five or six of us who went to Hinds County Circuit Clerk's Office, and we didn't have to tell how many bubbles were in a bar of soap, but we had to answer a lot of questions. Big challenge was probably paying the $2 to vote, to register at least." R. Anderson Testimony, 8/8/24, Trial Tr. 733:16–20.

196. Justice Anderson also testified about his experience attending a segregated law school: "I went to Ole Miss Law School in 1965. Just like everywhere else in Mississippi, Oxford was segregated, and Ole Miss was segregated pretty much. I think there were five students on campus during that time, African-American students." R. Anderson Testimony, 8/8/24 Trial Tr. 732:21–24.

197. Justice Anderson, in his legal career, had to face the threat of violence from the Ku Klux Klan, which undermined his efforts to desegregate schools in Mississippi: "As I look on the wall, most of those cases were tried before those judges in the courthouse across the street over there. Most of the cases were in the Northern District. The Southern District, we couldn't get any

plaintiffs because the Klan was so strong in southwest Mississippi. We did represent Hattiesburg and Biloxi, but we couldn't secure plaintiffs in southwest Mississippi." R. Anderson Testimony, Trial Tr. 734:22–25, 735:1–3.

198.    Constance Slaughter-Harvey, a trailblazer civil rights leader who served as Assistant Secretary of State for Elections in the 1980s and 1990s, testified about watching her father being denied the right to vote and paying poll taxes before the passage of the Voting Rights Act of 1965. C. Slaughter-Harvey Testimony, 08/07/24 Trial Tr. 458:11–15. Her father was a veteran who lost his hand while serving in the military, "yet he's not recognized." *Id.* at 458:18–19. She also volunteered as a poll watcher in the Delta for Fannie Lou Hamer. *Id.* at 460:8-16. And she specifically selected the Delta "even at the risk being murdered or killed" because she was "attracted to the fact" that "Black people were determined to vote and participate [there]" and that "voting would change their plights." *Id.* at 460:21-461:7. Ms. Slaughter-Harvey's living that history informs her sense of the present and the future. *Id.* at 478:1-6 ("I just pray that the future would not be a replica for the past, and unless we come to some sense of fairness, the future for my grandson will be like the past of my father.").

199.    Representative Percy Watson testified about graduating from a segregated high school in Hattiesburg in 1969, before becoming one of the first African American members of the state legislature since Reconstruction. Percy Watson Testimony, 08/07/24 Trial Tr. 489:9–490:10. Drawing on his 45 years of experience in the state legislature, Rep. Watson credibly testified that "[i]t would have been impossible" for him to win election if his district had not been redrawn as a majority-Black district due to the ruling in *Connor v. Finch*, 431 U.S. 407, 425 (1977). *Id.* at 489:2–

91

8; 494:25–495:10. Rep. Watson explained that, based on his knowledge of the precincts in his district, he received "hardly any support from White voters" in 1979. *Id.* at 494:11–24.

200.    There is no question that Mississippi in 2024 is different from Mississippi in 1894 or 1964. However, the Court credits the historical analysis offered by Dr. Campbell, which is also supported by testimony from Dr. King and multiple other witnesses with extensive knowledge of Mississippi politics, and finds that Mississippi has a long and particularly extensive history of official discrimination in voting, extending in some ways into the very recent past and the present. *See also infra* ¶¶ 248–264. Senate Factor 1 accordingly weighs in favor of the Plaintiffs.

### B.    Senate Factor 2: High Levels of Racially Polarized Voting in Mississippi

201.    The second Senate Factor is "the extent to which voting in the elections of the state or political subdivision is racially polarized." *Gingles*, 478 U.S. at 37. The trial record demonstrates both that the level of racial polarization in Mississippi politics is extremely high, and that this polarization is best explained by race, and is not merely happenstance or knock-on effect of partisan polarization.

#### a.    *Mississippi elections have extreme levels of racial polarization.*

202.    As set forth above, Mississippi elections are characterized by extreme patterns of racially polarized voting. *See supra* ¶¶ 130–136. Without repeating the discussion of Dr. Orey's extensive and highly credible analysis, the Court credits Dr. Orey's uncontested characterization that the observed levels of racially polarized voting by Black and White voters based on the ecological inference analysis of nearly twenty recent elections are extremely high and extremely consistent.

203. The testimony of other experts was in accord. As noted previously, Defendants' expert, Dr. Bonneau, does not dispute the accuracy of any of Dr. Orey's calculations or the resulting estimates of bloc voting that he produced—to the contrary, he agreed that Dr. Orey's estimates are consistent with his own understanding of racial voting patterns. *See supra* ¶ 125. Dr. King and Dr. Campbell also testified about the pervasiveness of racial polarization in voting in Mississippi and the South more generally. *E.g.*, J. Campbell Testimony, 08/07/24 Trial Tr. 439:24–441:3 (testifying that voting in Mississippi is "highly polarized" and that there is "almost a perfect match" at the county level when comparing party to race); M. King Testimony, 08/14/24 Trial Tr. 1313:19–1314:4, 1322:7–20, 1351:21–25.

204. Extensive testimony from non-expert witnesses confirmed the centrality of racial division and polarization to politics and elections in Mississippi today. When Justice Reuben Anderson, who was the first Black person to serve on the Mississippi Supreme Court when he was appointed in 1985, was asked about the "importance of race in Mississippi politics," he said that race is "number one." R. Anderson Testimony, 08/08/24, Trial Tr. 748:7–8. "Wherever political conversation or discussion takes place, the first thought is race." *Id.* at 748: 10–13; *see also id.* at 748:1–3 ("[R]acial polarization in electoral politics still exist[s] in Mississippi."). *See also infra* ¶ 411 (Dyamone White describing experiences of racial hostility while campaigning).

205. Rep. Watson, who is one of the longest serving members of the Mississippi legislature, testified that the level of White support he receives today is "about the same today as it was in 1979," when "hardly any" White constituents voted for him. P. Watson Testimony, 08/07/24 Trial Tr. 496:25–497:424. He explained that he could not have won outside of a Black-

93

majority district in 1979, and that he still would not be able to do so today based on the level of racially polarized voting. *Id.* at 494:25–495:7, 496:10–14.

206. Judge Thomas also credibly testified to the polarization by explaining what it was like running as a Black candidate. She testified that it was an "accepted position that, if you are Black, you are going to get the Black vote; and if you are White, you are going to get the White vote." A. Thomas, 08/05/24 Trial Tr. 162:8–11.

207. Senator Derrick Simmons, who serves as the minority leader in the Mississippi state senate, testified that race "certainly" plays a role in political party affiliation in Mississippi. D. Simmons Testimony, 08/08/24 Trial Tr. 695:8–12 ("[T]here's . . . a positive correlation with being Black and being Democrat and then being White and Republican in Mississippi."); *see also* O. Diaz Testimony, 08/06/24 Trial Tr. 298:18–22 (stating there is "absolutely" "a relationship between party affiliation and race" where the "Democratic Party is majority Black, African American, and a majority of Whites in Mississippi are associated with the Republican Party").

208. The testimony of numerous Mississippians who have extensive campaign experience and who have run for and held elective office themselves is thus completely consistent with the undisputed data showing extremely high, 90%+ levels of racially polarized voting in Mississippi elections.

*b.* *Race drives racial polarization in Mississippi politics and elections.*

209. The Court further finds, to whatever extent such a finding is necessary, that racially polarized voting in Mississippi is in fact being driven by race and racial division, and is not a mere incident of partisan preferences. The evidence in this case is very similar to and in some ways

94

more stark and straightforward than the evidence on this point that was presented in *MS NAACP*, 2024 WL 3275965, at *40–*44. And based on the trial record here, the Court makes a similar finding.

210.     In addition to extremely stark levels of racial polarization as already discussed, the trial record shows the following: (i) as a historical matter, racial polarization in politics pre-dates the current partisan divide, shaped the current partisan alignment, and continues to be reinforced today by racial appeals and other forms of racially divisive politics; (ii) racial polarization exists even within party primaries and in nonpartisan judicial elections, where the effect of partisanship is reduced or entirely controlled-for; (iii) the data and other evidence clearly shows that the race of the candidate significantly impacts the amount of White support the candidate receives, and this effect is especially stark in the context of Supreme Court elections. Each of these points supports the Court's bottom-line finding that the extreme level of racially polarized voting in Mississippi is in fact because of race, and not merely partisan polarization that happens to coincide with racial lines.

211.     *First*, the various expert witnesses agreed that the racial divide between Mississippi voters predates the current alignment of the political parties, and that attitudes towards civil rights and racial equality significantly contributed to and continue to drive that alignment. In other words, racial issues and racial division and polarization preceded and shaped partisan division and polarization.

212.     As Defendants' expert political scientist Dr. Bonneau acknowledged, historically, "it wasn't always the case that Black voters were Democrats and White voters were Republicans."

95

C. Bonneau Testimony, 08/12/24 Trial Tr. 840:11–20. Rather, there was a political realignment that caused Black voters to shift to the Democratic Party, and White voters to the Republican Party. *Id.* But while the partisan alignments of racial groups have shifted, polarization along racial lines has been consistent.

213.    Initially, following the Civil War and during the Reconstruction Era, Black Mississippians tended to identify with the Republican Party, which was seen as the party of Abraham Lincoln and emancipation, while White voters were typically Democrats. *E.g.*, J. Campbell Testimony, 08/07/24 Trial Tr. 440:1–6; PX-018 at 48–49; M. King Testimony, 08/14/24 Trial Tr. 1320:18–26.

214.    For the first two-thirds of the Twentieth Century, Black Mississippians were effectively barred from voting in any significant numbers. But as Dr. Campbell described, White voters repeatedly shifted their partisan alignments in response to issues relating to race and civil rights, breaking partially or completely with the Democratic Party and voting for varying parties in 1948 (Thurmond), 1960 (Byrd), 1964 (Goldwater), and 1968 (Wallace), each time switching to a new party to vote in support of candidates who ran on anti-civil-rights platforms. J. Campbell Testimony, 08/07/24 Trial Tr. 452:16–453:25; PX-018 at 48. Dr. Campbell's explication of this history was credible and persuasive. As he testified:

> So if you look, for example, at, you know, presidential elections as -- take that as your barometer, you know, in the former elections of the New Deal, Mississippians voted between 93 and 97 percent for Franklin Roosevelt. And four years later, 87 percent voted for Strom Thurmond. That's White voters; right? So you've had a virtually complete inversion of political partisan preference, and it's hard to explain

96

that for me in any way other than racially.

I mean, if it's, oh, I'm for states rights, I'm against you know, powerful federal government, why have you just voted for the biggest government guy in American history 95 percent?

The same thing happens spectacularly in 1964 when Mississippians get 87 percent vote for a Republican candidate for the first time since reconstruction. In 1968, four years later, 12 percent vote for the Republican candidate.

I mean, so what you see here in the -- you see a section of nine electoral cycles in which Mississippians swap – White Mississippi voters swap preferences almost completely eight times in nine elections. And I can explain each one of those in relationship to something that has happened racially. The signing of the Civil Rights Act, Barry Goldwater's decision, though he was a member of the NAACP, to oppose the voting -- not the -- beg your pardon -- the Civil Rights Act in 1964 by Lyndon B. Johnson and Goldwater's decision to oppose it.

So, to me, I think, as a historian -- and, again, I'm not a statistician, but as a historian, we're in the business of trying to interpret and explain; so we're testing a variety of explanations. *And race fits the data perfectly.*

J. Campbell Testimony, 08/07/24 Trial Tr. 452:16–453:25 (emphasis added).

215.     This reading of history is conventional in the field of political science as well. Dr. King, whose scholarly focus is on Southern politics and race, testified that the "preponderance of the political science research . . . show[s] that racial polarization predates party polarization," and "the foundation of polarization is based on race." M. King Testimony, 08/14/24 Trial Tr. 1299:14–22.

216.     The present partisan alignment began to emerge following the passage of the

97

Voting Rights Act and the Civil Rights Act in 1965, with newly-enfranchised Black voters moving to the Democratic Party—which had come to be characterized by Southern White politicians as "the party of civil rights"—while White voters began to migrate to the Republican Party. J. Campbell Testimony, 08/07/24 Trial Tr. 440:1–6; M. King Testimony, 08/14/24 Trial Tr. 1299:14–22, 1320:18–26; C. Bonneau Testimony, 08/12/24 Trial Tr. 837:22–838:2; *see also* PX-018 at 48. In other words, the Civil Rights Era was "the critical inflection point" that created the modern political party alignment. M. King Testimony, 08/14/24 Trial Tr. 1294:13–19. Defense expert, Dr. Bonneau, agreed that "there is no question the passage of the Civil Rights Act and the Voting Rights Act contributed to [the] realignment and the current configuration of the parties today." C. Bonneau Testimony, 08/12/24 Trial Tr. 840:21–24. *Id.* at 837:22–838:2.

217.    The Court credits the consistent, comprehensive qualitative analysis of Dr. Campbell, Dr. King, and Dr. Bonneau that, as a historical matter, racial polarization precedes and has driven and shaped partisan polarization in Mississippi, including the current political alignment.  And the Court notes that there is no historian or political scientist or witness who testified at trial and gave any other account.

218.    The evidence demonstrates that the political parties' identification with particular positions on racially salient issues continues into the present. As Dr. Bonneau acknowledged, the events of the 1960s were "not that long ago" and continue to have an impact today. C. Bonneau Testimony, 08/12/24 Trial Tr. 840:25–841:8. The experts' analysis demonstrated that race not only shaped but also reinforces the post-Civil Rights Era partisan alignment, *i.e.*, the deep racial polarization that the data and the trial testimony demonstrates exists today in Mississippi politics.

219. Since the Civil Rights Era, "new generations of Black voters continue to identify with the Democratic Party." M. King Testimony, 08/14/24 Trial Tr. 1294:13–19. Black voters tend to support the Democratic Party because it "tends to promote social policies that address issues like educational disparities" and "has been much more open in terms of nominating and electing Black candidates." C. Bonneau Testimony, 08/12/24 Trial Tr. 838:3–10. Non-expert witnesses repeatedly testified that they identify with the Democratic Party for these reasons. P. Watson Testimony, 08/07/24 Trial Tr. 497:8–21 (parties diverge on issues that are important to Black voters); D. Simmons Testimony, 08/08/24 Trial Tr. 694:21–695:7 ("[T]he Democratic party aligns closely with my values and my beliefs, and it, in my opinion, speaks to the struggles that I saw in my family and the struggles that I saw in my community, and it seems as if the Democratic party is more so for the employee, as opposed to the employer. It's more so for the little man as opposed to the big man, if you will.").

220. The record does indicate that Black voters would be willing to support Republican candidates based on the candidates' positions, as Constance Slaughter-Harvey testified she had done "several times." *E.g.*, C. Slaughter-Harvey Testimony, 08/07/24 Trial Tr. 479:23-25; *see also* D. White Testimony, 08/06/24 Trial Tr. 362:21–24 (stating she "didn't vote for" a particular Black candidate); C. Bonneau Testimony, 08/12/24 Trial Tr. 837:15–18 (testifying that there are "policy reasons" why Black and White voters aligned themselves into opposing political parties).

221. But the Republican Party has done very little to seek Black support; instead, according to Defendants' expert Dr. Bonneau, "the Republican Party has done a really good job of appealing to a time in the past when White people were more prominent." C. Bonneau

99

Testimony, 08/12/24 Trial Tr. 838:11–15. While the Democratic party routinely nominates (and, in Black-majority districts, elects) Black candidates, *see, e.g.*, P. Watson Testimony, 08/06/24 Trial Tr. 499:14–19, the Republican Party—the party typically favored by White voters in Mississippi—has nominated and elected almost zero Black candidates to office in Mississippi since Reconstruction. In the dataset examined by Dr. Orey, which included all biracial elections in the past decade, in District 1 and statewide, there were no contests that involved a Black Republican or a Black candidate endorsed by the Republican Party. PX-011, PX-014. Similarly, Dr. Bonneau testified that he has not found a single instance of a majority of White voters supporting a Black candidate—even a conservative one—in District 1, whether in a primary or a general election. C. Bonneau Testimony, 08/12/24 Trial Tr. 843:10–16. Justice Diaz testified he was not aware of any Black judicial candidates who had been endorsed by the Republican Party. O. Diaz Testimony, 08/06/24 Trial Tr. 299:4–7. In the State Senate, Senator Simmons testified, all 36 Republican senators in the majority are White, while 14 of 16 Democrat state senators are Black. D. Simmons Testimony, 08/08/24 Trial Tr. 704:9–12. Representative Watson also testified that, during his 45-year career, there has been little to no effort by the Republican Party to recruit Black candidates or appeal to Black voters, and that there are very few Black Republican candidates in Mississippi. P. Watson Testimony, 08/07/24 Trial Tr. 498:3–5, 499:10–17.

222.     In light of all this, the Court credits Rep. Watson's testimony that if the political division in Mississippi were in fact partisan as opposed to racial, then one would expect to see "more Black Republicans in district-wide and in statewide offices." P. Watson Testimony, 08/07/24 Trial Tr. 499:10–17. That stands in contrast to White candidates who have switched from

the Democratic Party to the Republican Party. *See, e.g.*, C. Bonneau Testimony, 08/12/24 Trial Tr. 811:2–24 (discussing example of Lynn Posey).

223.    Racial division in politics is also reinforced due to the continued use by politicians and campaigns of racial appeals designed to appeal to specific racial groups, and those appeals "entrench" the racial divide between the political parties. *E.g.*, M. King Testimony, 08/14/24 Trial Tr. 1339:2–18 (explaining that "racial appeals do continue to pervade Mississippi politics, including judicial elections . . . and reinforce racial polarization"); *see infra* ¶¶ 374–393.

224.    And this racial division is also evidenced and further exacerbated by lack of outreach to Black voters by White candidates. Several fact witnesses testified about the lack of outreach from the Republican Party (*i.e.*, the party favored by White voters) to Black voters. In his decades of experience in Mississippi politics, Rep. Watson has seen "very little" outreach by the Republican Party to Black voters. P. Watson Testimony, 08/07/24 Trial Tr. 498:3–5, 498:25–499:17. Mr. Pinkins, who is from the Delta, likewise testified that he had "never seen any White politician come and campaign in my community, and I have never heard from my family members tell me that they have seen a White politician come and campaign in my community." *See* T. Pinkins Testimony, 08/06/24 Trial Tr. 128:2–5. Ms. White, who is from western Hinds County, testified that it was "rare" for White candidates to campaign in her community and that it is typical for White candidates running for statewide office to do "nothing" to engage Black voters. D. White Testimony, 08/06/24 Trial Tr. 339:7–9, 342:16–23. Similarly, Senator Derrick Simmons testified that Black candidates rarely campaign in heavily Republican areas where "the majority of people are, in fact, White," and "it's almost certain that you are not going to get the support" of voters

101

there. D. Simmons Testimony, 08/08/24 Trial Tr. 705:2–10.

225.     All of this historical and contemporary evidence regarding the salience (indeed, the preeminence) of race-*qua*-race in shaping political division in Mississippi gives depth and context to Justice Anderson's testimony that race is "number one" in Mississippi politics today. R. Anderson Testimony, 08/08/24, Trial Tr. 748:7–13.

226.     *Second*, the electoral data analyzed by Dr. Orey showed that voting is racially polarized in partisan primaries where the candidates have the same party affiliation, as well as in nonpartisan judicial contests, where the effect of partisanship is lessened because voters may not know the partisan leaning of the candidates on the ballot.

227.     Dr. Orey identified one competitive, biracial party primary from recent years—the 2011 Democratic gubernatorial primary between Bill Luckett and Hattiesburg Mayor Johnny Dupree.[7]     B. Orey Testimony, 08/06/24 Trial Tr. 224:8–225:14. He testified that looking at primary elections is helpful because "because it kind of sanitizes race and takes away the party component." *Id.* at 224:14–15. Dr. Orey's analysis showed that the Luckett-Dupree primary contest was racially polarized, with Black voters heavily supporting Dupree (86.3%) and White voters supporting Luckett (58.8%). *Id.* at 224:22–24; *see* PX-014. He testified that this racial polarization necessarily cannot have been due to partisan affiliation because "[t]here's only one

---

[7] The Court takes judicial notice of the fact that Johnny Dupree was mayor of Hattiesburg in 2011 as that fact is not subject to reasonable dispute and is generally known within the jurisdiction. *See* Fed. R. Evid. 201(b); *see, e.g.*, City of Hattiesburg, MS, *Two City Buildings Named for Hattiesburg Mayors* (July 6, 2023), https://www.hattiesburgms.com/news-updates/two-city-buildings-named-for-hattiesburg-mayors/.

party in the primary." *Id.* at 224:25-225:2.

228.    Defendants' expert Dr. Bonneau agreed that "in the context of a primary election, voting patterns cannot be explained by partisan affiliation," because the "[p]arty is held constant" in such elections. C. Bonneau Testimony, 08/12/24 Trial Tr. 842:23–843:1. Although voters in Mississippi may participate in whatever primary they choose, Dr. Bonneau testified that there is "very, very little evidence" of Democratic voters participating in a Republican primary and vice-versa, and that "[v]oters simply don't behave that way." *Id.* at 883:11–884:2 ("It might be something that people say they are going to do, but it doesn't really happen . . . Most of the people voting in a Democratic primary are self-identified Democrats.").

229.    Dr. Orey's analysis also showed that Supreme Court elections are polarized along racial lines, even though they are nonpartisan. That includes the 2020 and 2012 biracial contests discussed already, which were both extremely polarized, *e.g.*, *supra* ¶¶ 132, 138, as well as the 2016 Kitchens-Griffis contest, where both there was also polarization (albeit less extreme polarization) and where both candidates were White. *See* B. Orey Testimony, 08/06/24 Trial Tr. 227:7–228:4; PX-014; *see also infra* ¶¶ 235–236.

230.    To be sure, nonpartisan judicial elections still retain partisan elements. *E.g.*, O. Diaz Testimony, 08/06/24 Trial Tr. 298:6–17 ("[P]olitical parties are, in fact, able to participate in judicial elections" and do so by "mak[ing] endorsements of judicial candidates"). However, when the partisan cue is taken off the ballot, some amount of partisan information is lost: According to Dr. Bonneau's experimental research, approximately 20% of voters are unable to identify the partisan affiliation of a candidate without an explicit party label on the ballot, even after reviewing

103

the candidate's campaign literature. C. Bonneau Testimony, 08/12/24 Trial Tr. 802:21–804:15. In practice, voters may be even more unaware of non-partisan candidates' ideological leanings, because campaign literature does not reach all voters. *Id.* at 857:20–858:11. This loss in partisan information is why looking at a non-partisan contests makes it "easier for us to, you know, determine whether or not race played a role." B. Orey Testimony, 08/06/24 Trial Tr. 215:14–15.

231.   Here, despite the loss of partisan information on the ballot, the data showed that racial polarization in judicial contests is just as extreme if not more extreme than in partisan contests. For example, Judge Westbrooks's 90% Black support in 2020 is comparable to the support received by Black candidates for partisan offices in 2015 and 2019. *E.g.*, PX-011 at 1–2. And the 6% White crossover vote she received is also similar, and if anything, lower than the partisan contests featuring Black candidates. *Id.* The fact that racially polarized voting remains extreme and *undiminished* despite the loss of the partisan cue on the ballot is strong empirical evidence from the data that racial polarization is operating independent from party preference.

232.   *Third*, the trial record demonstrates that the race of the candidate matters and significantly affects the voting behavior of White and Black voters, which is extremely strong evidence that racial polarization is operating independent of mere partisan preference.

233.   Dr. Orey's analysis of biracial contests showed that Black candidates in District 1 typically earned less than 10% of the White vote and almost never exceeded 15% White support. *E.g.*, PX-011 at 1-2, PX-017. Supreme Court candidates Earle Banks (2012) and Latrice Westbrooks (2020) won less than 7% of the White vote. PX-011 at 1. De'Keither Stamps, running for Public Service Commission against Republican Brent Bailey in District 1 in 2019, won less

than 8%. PX-011 at 1. Even the most successful Black candidates, such as President Obama (12% in 2012) and Mike Espy (16% in 2020) did not win even 20% White crossover support in District 1. PX-011 at 2.

234.     Black-preferred White candidates in directly comparable elections won significantly more White crossover support. Cecil Brown, a White Democrat running for Public Service Commission in 2015 against Republican Brent Bailey, won 16% White crossover support—more than double the amount won by Stamps against the same opponent four years later. B. Orey Testimony, 08/06/24 Trial Tr. 227:1–6 ("Whites provided twice the amount of support for the White candidate when compared to the Black candidate."). The below table presents the data from Dr. Orey's reports (PX-011 at 1 and PX-014).

| Election | Black-Preferred Candidate | White-Preferred Candidate | Black Vote for the Black Preferred Candidate | White Vote for the Black Preferred Candidate | Black Preferred Candidate Won? | Racial Polarization? |
|---|---|---|---|---|---|---|
| 2015 Public Service Commission | Brown | Bailey | 94.7 (94.3-96.5) | 16 (15.6-16.4) | Yes | Yes |
| | | | | | | |
| 2019 Public Service Commission | Stamps | Bailey | 91.36 (91.52-92.83) | 7.60 (7.07-8.51) | No | Yes |

235.     And the result was even more stark in the context of Supreme Court elections. Justice Jim Kitchens, a White judicial candidate endorsed by Democratic leaders, won 40% White crossover support in 2016 when running against Republican-endorsed Kenny Griffis in 2016. PX-

105

014. Four years later, Latrice Westbrooks, a Black judicial candidate also endorsed by some Democratic leaders, and running for the same office against the same Republican-endorsed opponent, won less than 7% White support. PX011 at 1. Again, the below table presents the data (PX-011 at 1 and PX-014).

| Election | Black-Preferred Candidate | White-Preferred Candidate | Black Vote for the Black Preferred Candidate | White Vote for the Black Preferred Candidate | Black Preferred Candidate Won? | Racial Polarization? |
|---|---|---|---|---|---|---|
| 2016 Supreme Court | Kitchens | Griffis | 68.3 (67.8-68.9) | 40.36 (39.7-41.0) | Yes | Yes |
| | | | | | | |
| 2020 Supreme Court | Westbrooks | Griffis | 90.46 (89.97-91.03) | 6.43 (5.89-6.88) | No | Yes |

236. These starkly different voting patterns leave no question that "in District 1, a White Democratic candidate is capable of earning a higher level of White support than Black Democrats." C. Bonneau Testimony, 08/12/24 Trial Tr. 851:25–852:3 (referring to all Black-preferred judicial candidates as Democratically-aligned, though candidates are formally nonpartisan), 853:25–853:6. As Dr. Orey credibly testified, White crossover voting was "[n]owhere near as high" in *any* of the elections he examined where the Black-preferred candidate was Black as compared to the 2016 Supreme Court race. B. Orey Testimony, 08/06/24 Trial Tr. 228:5–8. With a White candidate like Justice Kitchens, the response of voters was "very different," leading Dr. Orey to conclude that "Whites were unwilling to support the Black-preferred candidate when the candidate was Black but more so in support when the Black-preferred candidate was White." *Id.* at 228:9–19. Or, as the

106

three-judge panel in *MS NAACP* succinctly observed in looking at similar data: "Race matters." 2024 WL 3275965, at *31.

237.    The Court finds this evidence extremely compelling. And other evidence in the record regarding the different electoral fortunes of Black and White candidates is consistent. Despite the "overwhelming" power of incumbency, White challengers—both liberal and conservative—have been able to win election to the Mississippi Supreme Court by defeating an incumbent. C. Bonneau Testimony, 08/12/24 Trial Tr. 850:5–9 (agreeing that "[a]ll five of the incumbent justices who lost reelection [since 2000] were beaten by a White challenger"); Pls.' Ex. 130, Results from Mississippi Supreme Court Elections 2000-2020, compiled by C. Bonneau [hereinafter "PX-130"]. Black challengers, in comparison, have *never* succeeded in defeating an incumbent. C. Bonneau Testimony, 08/12/24 Trial Tr. 846:19–847:6, 850:10–18 (agreeing that "all three of the Black challengers [since 2000] lost"); PX-130. All four Black justices to have served on the Mississippi Supreme Court initially obtained their seat via a gubernatorial appointment and then won their subsequent elections as the incumbent. C. Bonneau Testimony, 08/12/24 Trial Tr. 846:19–847:6. Indeed, Justice Anderson testified that he would not have been able to win if he had not been appointed. R. Anderson Testimony, 08/08/24 Trial Tr. 736:23–24.

238.    And there is additional consistent evidence outside of District 1. Statewide, White Democrats have sometimes won sufficient White crossover support to prevail, but Black Democrats have not. Jim Hood, a White Democrat, served as the State's elected Attorney General

until 2020.[8] *E.g.*, *MS NAACP*, 2024 WL 3275965, at *31. No Black candidate of any political party has prevailed in a statewide election in Mississippi since Reconstruction. M. King Testimony, 08/14/24 Trial Tr. 1340:15–18; PX-052 at 22; PX-053 at 1; *see also, e.g.*, *infra* ¶¶ 397–399.

239.     Another indication that the race of the candidate matters is the fact that racial polarization intensifies when a Black candidate is on the ballot. M. King Testimony, 08/14/24 Trial Tr. 1321:17–1322:6. For instance, in Mississippi, President Obama received less White support than John Kerry, and racial polarization increased after President Obama's elections. *Id.* at 1321:17–1322:12.

240.     The Court gives little weight to the fact that, in some instances, Black voters may have supported White candidates over Black candidates, *see* C. Bonneau Testimony, 08/12/24 Trial Tr. 811:25–812:11. *MS NAACP*, 2024 WL 3275965, at *28 ("[R]acial polarization in voting is not disproved by evidence that black voters supported a white candidate. We are concerned with racial polarization of voters, *i.e.*, are white voters consistently preventing the election of the candidates that black voters would choose? It is the race of the voters, not of the candidates, that matter."). Dr. Bonneau pointed to two such instances, but in neither one was the Black candidate viable. He cited Ceola James, who received 10% of the vote in the 2008 District 1 Supreme Court

---

[8] The Court may also take judicial notice of this facts, which are not subject to dispute and can be readily determined from government sources. MS Secretary of State, *2020–2024 Mississippi Blue Book, Historical and Statistical Information* 550, 552, (2021), https://www.sos.ms.gov/content/documents/ed_pubs/pubs/BlueBook20-24/14%20Historical%20and%20Statistical%20Info.pdf.

contest and who, based on that result, appears to have been a fringe candidate in a three-way race. *See* C. Bonneau Testimony, 08/12/24 Trial Tr. 808:5–24; *see also supra* ¶ 161. Dr. Bonneau also discussed Black voters preferring Cecil Brown, a White Democrat, over Bruce Burton, a Black Democrat, in the 2015 Democratic Primary for Public Service Commissioner, but he acknowledged that Black voters may opt to support White Democrats who have "a better chance of winning" or who would better represent the interests of the Black community. *Id.* at 811:25–813:22; *see also MS NAACP*, 2024 WL 3275965, at *28 ("Quality of candidates and of opposition cannot always be irrelevant.").

241. That observation is consistent with Dr. King's testimony, which the Court credits, that Black voters behave strategically, and they may not vote for a Black candidate, even when their preference would otherwise be to support that candidate, if the candidate is not seen as politically viable. M. King Testimony, 08/14/24 Trial Tr. 1322:21–1323:13; *see also* C. Bonneau Testimony, 08/12/24 Trial Tr. 844:3–9. As Dr. King explained, there might be "unqualified Black candidates who can't raise much money" or "perennial candidates" who "put their name on every ballot," and Black voters "may not take them seriously." M. King Testimony, 08/14/24 Trial Tr. 1322:21–1323:13. Therefore, notwithstanding that Black voters may sometimes vote for White candidates, "race is still extremely significant." *Id.* And there may also be instances, as Dr. Bonneau himself acknowledged, where Black voters may choose to support a White candidate over a Black candidate for reasons related to race, including circumstances where "a White Democrat is better aligned with Black voters on issues of racial equality as compared to a Black Democrat," or where a White Democrat may be seen as "a better messenger on issues of racial

equality as compared to a Black candidate." C. Bonneau Testimony, 08/12/24 Trial Tr. 844:22–845:6.

242.    If anything, the Burton and James examples are the exceptions that prove the rule. As Dr. Bonneau acknowledged, there are relatively few examples of Black voters declining to support a Black candidate, and perhaps most importantly he was aware of no comparable examples at all of "White voters supporting Black candidates." *See* C. Bonneau Testimony, 08/12/24 Trial Tr. 843:2–16 ("I'm not going to bet my house on it."). That speaks volumes about the extent of racial division in Mississippi politics.

243.    Dr. Bonneau also pointed to Lynn Posey, who ran for Public Service Commissioner, to suggest that partisanship may matter more than race, but the Court finds that testimony unpersuasive. Specifically, Dr. Bonneau testified that, when Posey ran as a Democrat in 2007, he was the Black-preferred candidate, but when he ran as a Republican in 2011, he was no longer the Black-preferred candidate. C. Bonneau Testimony, 08/12/24 Trial Tr. 811:2–24. Setting aside the fact that Dr. Bonneau did not conduct any EI analysis to demonstrate that Posey was in fact the Black-preferred candidate in the 2007 election, Posey's partisan affiliation was not the only thing that changed between 2007 and 2011:  Black voters ostensibly preferred Posey when he was running against a White opponent (Charles Barbour) in 2007, but then voted against Posey when he was running against a Black opponent (Addie Green) in 2011. *Id.* at 808:16–24, 832:15–20; PX-011 at 1. This shift is entirely consistent with the idea that the race of the candidate has an impact on voters' preferences in Mississippi.

244.    The Court finds, in consideration of all of the evidence in the trial record, that

110

politics and voting in Mississippi is extremely polarized along racial lines; that partisan affiliation does not best explain the polarized voting patterns; and that race provides the best and most comprehensive explanation for this racial polarization. Senate Factor 2 accordingly weighs in favor of the Plaintiffs.

### C. Senate Factor 3: Mississippi's Voting Practices and Procedures That Tend to Enhance the Opportunity for Discrimination Against Minority Voters

245.    The third Senate Factor is "the extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group." *Gingles*, 478 U.S. at 37.

246.    The Court finds that Mississippi has used, and in some cases continues to use, voting practices or procedures that increase the opportunity for discrimination against Black voters, including in the areas at issue in this case, as demonstrated by the analyses of Dr. King and Dr. Campbell, which the Court credits. Many of those practices and procedures were detailed already. *See supra* ¶¶ 179–181, 183–192.

247.    Past mechanisms include poll-taxes, all-White primaries, literacy tests, and grandfather clauses. *E.g.*, J. Campbell Testimony, 08/06/24 Trial Tr. 398:22–399:19, 401:23–402:14, 405:5–11; PX-018 at 10–18; M. King Testimony, 08/14/24 Trial Tr. 1315:2–10.

248.    Continuing mechanisms that enhance the opportunity for discrimination include the majority-vote requirement; felon disenfranchisement; burdensome registration and voting procedures, such as frequent elections and "one of the strictest Voter ID laws in the nation"; and lack of early voting or no-excuse absentee voting, as discussed already and in further detail below.

111

*See* J. Campbell Testimony, 08/07/24 Trial Tr 436:22–437:5; PX-018 at 47–48, 50–51 (discussing voter ID laws and that "[c]urrent studies" rate Mississippi as the second most "costly" state in the nation for voters due to these mechanisms); M. King Testimony, 08/14/24 Trial Tr. 1318:18–1320:16; PX-052 at 26–27 (explaining how Mississippi's "high frequency of elections" lead to a decrease in voter turnout).

249.    Mississippi has utilized at-large elections districts for all manner of elected offices. By having at-large elections across a city or region, local communities and neighborhoods within those areas that were majority-Black saw their voting power diluted and suppressed, resulting in little to no representation for Black Mississippians. *E.g.*, J. Campbell Testimony, 08/07/24 Trial Tr. 424:17–425:25; PX-027 (1971 Determination Letter). For instance, Hinds County, which is approximately 40% Black, did not elect its first Black supervisors until 1979. *See id.* at 425:15–25; PX-018 at 37. The 1987 Enacted Plan, of course, uses at-large districts rather than single-member districts to elect the nine Justice to the Supreme Court.

250.    Mississippi continues to employ the majority-vote requirement for certain elections, including for Supreme Court and statewide elections. O. Diaz Testimony, 08/06/24 Trial Tr. 281:21–282:3, 296:10–19 ("In . . . judicial elections . . . the winner is required to get a majority of the votes, which is basically 50 percent plus one. If 50 percent plus one is not obtained in the general election, the election is kicked over into a runoff election among the top two vote-getters, and then somebody will get 50 percent at that point."). Assistant Secretary Kirkpatrick also confirmed that run-off elections are triggered "if a person does not receive a majority of the vote." K. Kirkpatrick Testimony, 08/14/24 Trial Tr. 1283:2–9; Miss. Code Ann. § 23-15-833; Miss. Code

Ann. § 23-15-193; M. King Testimony, 08/14/24 Trial Tr. 1318:18–1320:16.

251.    The majority-vote requirement (and the related runoff election that is triggered when no candidate wins an outright majority in the general election) is a "textbook" example of a mechanism that prevents minority candidates from prevailing in elections. *E.g,*, *Benavidez v. City of Irving, Tex.*, 638 F. Supp. 2d 709, 726 (N.D. Tex. 2009) ("The majority vote requirement . . . deprives minority voters of the opportunity to elect a candidate by 'single-shot' voting—i.e., of concentrating all of its votes on a single candidate."); *see also Nairne*, 2024 WL 492688, at *39 ("Louisiana has a majority vote requirement for its primaries and general elections . . . . The Court finds Senate Factor 3 favors the Plaintiffs.").

252.    "A majority-vote requirement . . . disadvantages minority voters by forcing their preferred candidate into a head-to-head contest with only one other candidate and eliminating the chance for a plurality victory if multiple candidates in the majority group divide the vote." *Patino v. City of Pasadena*, 230 F. Supp. 3d 667, 682 (S.D. Tex. 2017). The majority-vote requirement works similarly in Mississippi. *E.g.*, PX-018 at 39 (Dr. Campbell explaining that, "[i]n the 1967 state elections, [e]ight [Black candidates] won pluralities in the first primary, only to be defeated by white candidates in the ensuing run-offs.").

253.    Mississippi holds elections for the state legislature and other state offices in odd years, in contrast to federal elections, which are held in even years. Miss. Code Ann. 23-15-193.

254.    As a result of run-off elections and off-year elections, voters in Mississippi may be faced with going to the polls every few months, resulting in what political scientists call "voter fatigue," which reduces turnout. M. King Testimony, 08/14/24 Trial Tr. 1318:18–1320:16 ("When

you ask voters to vote often, they get tired of it. They get burned [out] by it."); *see also Nairne*, 2024 WL 492688, at \*39 (finding that combination of run-off and off-year "elections breeds voter fatigue and confusion, which is amplified in poor and under educated communities").

255.    Assistant Secretary of State Kyle Kirkpatrick confirmed that turnout "for off-year elections [is] typically lower than in presidential years." K. Kirkpatrick Testimony, 08/14/24 Trial Tr. 1269:7–16. Mr. Kirkpatrick also confirmed that turnout over the last several years in general was low, including in 2022 when turnout was only 32%. *Id.* at 1267:15–1268:1.

256.    Despite the demands placed on Mississippi voters to vote in frequent elections, Mississippi makes casting a ballot difficult for voters, relative to other states. Indeed, Mississippi tends to be "very consistently" the worst or second worst state in the country in terms of ease of voting. M. King Testimony, 08/14/24 Trial Tr. 1318:18–1320:16 ("Mississippi is typically last or next to last in the cost of voting index. It's very consistently at the bottom because, what we see, the procedures here in this state are not conducive to high turnout."); PX-052 at 26; *see also* J. Campbell Testimony, 08/07/24 Trial Tr. 436:1–437:13 ("But there is an agency that calculates what they call 'cost of voting,' which aggregates all of the factors. And Mississippi was always 50th . . . actually, the year I wrote the report, it switched. It went to 49th after the imposition of some new laws in Texas."); PX-018 at 50.

257.    The cost of voting is higher in Mississippi in part because the State does not permit early voting or non-excused absentee voting. M. King Testimony, 08/14/24 Trial Tr. 1318:18–1320:16; J. Campbell Testimony, 08/07/24 Trial. Tr. 437:2–6; PX-018 at 50. Mississippi's absentee voting rules are among the most stringent in the nation: Voters must have one of eight

specified excuses in order to vote absentee, and many absentee voters have to get both their ballot application and their actual ballot notarized. Miss. Code Ann. § 23-15-631(1)(c); J. Campbell Testimony, 08/07/24 Trial Tr. 436:1-19; PX-018 at 50; *see also* K. Kirkpatrick Testimony, 08/14/24 Trial Tr. 1230:8–15; 1232:6–18; 1279:3–12.

258.   On top of absentee ballots being heavily restricted, in 2023, Mississippi passed a law to limit the categories of people who can assist voters, including those who have blindness or another physical disability, with returning an absentee ballot in the mail. *E.g.*, J. Campbell Testimony, 08/07/24 Trial Tr. 436:2–19. Mr. Kirkpatrick confirmed that this law was later enjoined by a federal court as violating Section 208 of the Voting Rights Act. K. Kirkpatrick Testimony, 8/14/24 Trial Tr. 1274:17–1275:8. After the law was enjoined, the State amended the statute, and the injunction was vacated as moot in light of the amendment. *Disability Rts. Mississippi v. Fitch*, 684 F. Supp. 3d 517 (S.D. Miss. 2023), *vacated and remanded as moot*, No. 23-60463, 2024 WL 3843803 at *1 (5th Cir. Aug. 14, 2024); *see also* K. Kirkpatrick Testimony, 08/14/24 Trial Tr. 1275:9–17.

259.   In short, Mississippi "is a state which makes it very, very difficult for people to cast votes." J. Campbell Testimony, 08/07/24 Trial Tr. 436:1–437:13.

260.   Against the backdrop of frequent elections and difficult voting procedures, Mississippi also passed a law in 2023 that removes registered voters from the voting rolls if they do not participate in a federal election over a four-year period and do not return an address confirmation card. K. Kirkpatrick Testimony, 08/14/24 1262:8–1263:3. The removal of these more infrequent voters is not required by federal law, as Mr. Kirkpatrick acknowledged. K. Kirkpatrick

Testimony, 08/14/24 Trial Tr. 1263:10–17. Mr. Kirkpatrick also confirmed that a voter who is inappropriately purged from the voter rolls "can result in someone not being able to vote who should be able to vote." *Id.* at 1266:25–1267:3. The number of Mississippi registered voters has remained relatively constant over the last several years because even though around 250,000 new voters have registered, about the same number have been purged. *Id.* at 1264:21–1265:7. Despite that, the Secretary of State does not focus its voter registration drives in areas where registration is low, rural areas, poor areas, or where minorities live. *Id.* at 1265:22–1266:20.

261.   The Court credits expert testimony that Black voters are disproportionately impacted by the foregoing policies. Black Mississippians are more likely to need options such as early or absentee voting, because Black Mississippians "are more likely to have jobs that [pay] hourly wages," which means that taking time off to go vote imposes a greater financial burden than for those who earn a flat salary. M. King Testimony, 08/14/24 Trial Tr. 1350:1–22; J. Campbell Testimony, 08/07/24 Trial Tr. 437:4–21. That financial burden is of course exacerbated by the frequency of elections in Mississippi. Black voters are also more likely to suffer from health disparities, which makes them more reliant on absentee voting and others' assistance with returning a ballot. *E.g.*, J. Campbell Testimony, 08/07/24 Trial Tr. 437:4–21; *see also infra* ¶¶ 322–328. Black Mississippians also have higher rates of incarceration, and individuals in jail who are not otherwise disqualified from voting may not be able to exercise their right to vote, because they lack the ability to request and send an absentee ballot due to the notarization requirement. *E.g.*, Campbell Testimony, 08/07/24 Trial Tr. 1271:1–4, 1273:24–1274:5; *see also supra* ¶¶ 73–77; *infra* ¶ 264. And because Black Mississippians continue to face these and other significant

116

socioeconomic disparities that make political participation more difficult, *see infra* ¶¶ 293–321, they are also more likely to be removed from the voter rolls under Mississippi's new law for failing to vote.

262.     Consistent with the expert testimony, fact witnesses described some of the difficulties that voters encounter. In her experience working on multiple campaigns in the Delta and more rural areas of Hinds County, Dyamone White testified that voters had a difficult time finding transportation to reach the polls, and that the lack of internet access hinders both prospective voters and campaign volunteers seeking to engage voters and encourage participation. D. White Testimony, 08/06/2024 Trial Tr. 341:9–14, 345:4–9, 347:4–10. Senator Derrick Simmons testified about various challenges faced by Black voters in the Delta. For example, he testified that many voters who have had interactions with the criminal justice system erroneously believe themselves to be disenfranchised and decline to vote in consideration of Mississippi's felon disenfranchisement law. D Simmons Testimony, 08/08/24 Trial Tr. 705:13–23. He further testified how circuit clerks may remove voters from the rolls if they miss jury duty, and described challenges registering voters, securing transportation to the polls, and securing absentee ballot access for those unable to vote in person on election day. *Id.* at 705:23–706:14.

263.     The high burdens placed on voters, especially in the predominantly Black and poor and rural Delta region, are not mitigated by private efforts to give voters rides to the polls. As Dyamone White testified based on her experience as a campaign volunteer, although some organizations provide rides to the polls, these efforts are insufficient to overcome the transportation barriers faced by many Black voters in Mississippi, with many requests for rides going unfulfilled

due to demand. *See, e.g.*, D. White Testimony, 8/6/24 Trial Tr. 365:21–25 ("He does, as well as organizations, but the requests come in so fast—because I've been in parties' organizations, they come in so fast, by the time you get to Ms. Susie, 50 more people have reached out but we got to get Ms. Susie to the polls. So I mean, it's only so many you can take in a day").

264.    In addition to making voting especially difficult, the Mississippi Constitution contains a lifetime ban on voting as a consequence for certain criminal convictions. *See, e.g.*, *supra* ¶ 74; *see also* J. Campbell Testimony, 08/06/24 Trial Tr. 399:21–400:13; D. Simmons Testimony, 08/08/24 Trial Tr. 705:13–23; K. Kirkpatrick Testimony, 08/14/24 Trial Tr. 1216:3–11. That provision was expressly adopted to exclude Black Mississippians from politics, by selectively targeting criminal offenses that were believed to be associated with Black people, and the policy continues to disproportionately disenfranchise Black Mississippians who have completed their sentences. *See supra* ¶¶ 74, 178, 179(d); *infra* ¶¶ 330–332. As of 2023, Mississippi has the second-highest incarceration rate in the country, and "a disproportionate amount of them are African Americans," which likely impacts their ability to participate in elections during and after their terms of incarceration. *See* M. King Testimony, 08/14/24 Trial Tr. 1298:7–17; *see also supra* ¶ 74 (agreement among testifying experts that the population of persons disenfranchised is approximately 60% Black).

265.    Mr. Kirkpatrick confirmed that the Secretary of State's office has no enforcement or oversight authority over local election officials who implement Mississippi's voting laws including absentee balloting, voter ID, and purging of voter rolls. K. Kirkpatrick Testimony, 08/14/24 Trial Tr. 1204:20–1205:3. This lack of oversight creates additional opportunities for

discrimination by rogue elections officials. *Compare* D. Simmons Testimony, 08/08/24 Trial Tr. 705:13–23 (noting local circuit clerks may purge voters because they do not appear for jury duty) *with* K. Kirkpatrick Testimony, 08/14/24 Trial Tr. 1263:18–1264:16 (indicating such purges would not be appropriate but noting no specific training to discourage them).

266.    In light of the historical and continued use of devices and practices, both lawful and unlawful, that enhance opportunities for discrimination and disproportionately burden Black voters, Senate Factor 3 weighs in Plaintiffs' favor.

### D.      Senate Factor 4: Use of Candidate Slating Process

267.    Under the fourth Senate Factor, courts ask, "if there is a candidate slating process, whether the members of the minority group have been denied access to that process." *Gingles*, 478 U.S. at 37, 45. A "candidate slating process" generally refers to an informal or formal process of recruiting, selecting, or endorsing political candidates by an influential official or entity. *See Citizens for a Better Gretna v. City of Gretna*, 636 F. Supp. 1113, 1122 (E.D. La. 1986), *aff'd*, 834 F.2d 496 (5th Cir. 1987). A powerful and exclusive gubernatorial appointment process may, in practice, constitute a candidate slating process. *Cf. Lopez v. Abbott*, 339 F. Supp. 3d 589, 615 (S.D. Tex. 2018) ("The Texas system of voting for justices and judges for the high courts does not involve a formal slating process. Yet candidates can achieve an incumbency advantage if first appointed by the governor to fill an unexpired term.").

268.    The Court finds that, with respect to the Mississippi Supreme Court, gubernatorial appointments exert an extremely powerful force on the composition of the Court and the prospects of candidates for the Court.

269.     The governor of Mississippi is responsible for filling vacancies on the Mississippi Supreme Court, and that is the primary mechanism by which justices assume the bench. Joint Stipulated Facts ¶ 26; O. Diaz Testimony, Trial Tr. 288:16–289:1. Currently, six of the nine justices were initially appointed by a governor. Joint Stipulated Facts ¶ 27.

270.     As Justice Oliver Diaz, who was appointed to the Supreme Court himself and served on it for eight years, testified, the governor has "ultimate authority" and "complete discretion" over appointments to the Mississippi Supreme Court. O. Diaz Testimony, Trial Tr. 288:16–289:1, 290:4–12 (noting only age and residency requirements). The choice of who to appoint is "totally up to the governor." *Id.* There is "no other . . . body that approves or looks at it." *Id.*

271.     Once appointed, "incumbents almost always win" subsequent elections to remain on the Mississippi Supreme Court. C. Bonneau Testimony, 08/12/24 Trial Tr. 787:14–23. Dr. Bonneau, whose primary research area for the past 22 years has been judicial elections, opined that an appointment sends "an incredible signal" to voters about a judicial candidate's fitness for office. *Id.* at 793:15–22. Incumbent justices "have a number of advantages when running for office, including name recognition and fundraising networks." *Id.* at 846:11–14.

272.     Rep. Watson, who has followed the Mississippi Supreme Court for 45 years as a member of the Judiciary A committee and as an attorney and as a colleague of numerous justices, persuasively explained that a gubernatorial appointment effectively operates as a supercharged endorsement: "[I]f you get an appointment from the governor, that's his endorsement, and that's also the endorsement of his party." P. Watson Testimony, 08/07/24 Trial Tr. 514:2–8.

273.    Justice Diaz also confirmed how the advantages of incumbency gained through appointment to the court strongly favors appointees, who have been overwhelmingly White. *E.g.*, O. Diaz Testimony, 08/06/24 Trial Tr. 297:8–298:2 (incumbency obtained through appointment helps with name recognition, fundraising, and endorsement by the legal community); *id*. 298:18–20 ("[A]n appointment . . . provides a candidate with a tremendous leg up in an election."). And Justice Ann Lamar's testimony was consistent with that. A. Lamar Testimony, 08/08/24 Trial Tr. 765:4–9 ("I had been appointed to the court by Haley Barbour, which was a very popular Republican governor . . . For some [voters], that's all they really needed to know.").

274.    The effect of incumbency on Mississippi Supreme Court elections may have become even stronger over time: Dr. Bonneau's analysis shows that incumbents have been "[e]specially" likely to win in recent years. C. Bonneau Testimony, 08/12/24 Trial Tr. 846:8–10.

275.    Throughout the Mississippi Supreme Court's 200-year history, Black justices—a total of four—have only been able to win election after first being appointed by a White governor and then running as an incumbent justice. Joint Stipulated Facts ¶¶ 41–42; C. Bonneau Testimony, 08/12/24 Trial Tr. 846:19–847:6.

276.    Absent the powerful advantages of appointment and incumbency, Black candidates for the Supreme Court are highly unlikely to be elected—and indeed, no such candidate has prevailed in any of the three Supreme Court districts. PX-130 (Dr. Bonneau's compilation of electoral data); C. Bonneau Testimony, 08/12/24 Trial Tr. 850:10–18 (agreeing that "all three of the Black challengers [since 2000] lost"); M. King Testimony, 08/14/24 Trial Tr. 1345:2–17 (discussing all Supreme Court elections involving a Black candidate); PX-053 at 1. All four Black

121

justices have been appointed to the same seat (District 1, Place 2), one after the other, and every effort by a Black candidate to win a different seat has failed. *E.g.*, M. King Testimony, 08/14/24 Trial Tr. 1345:23–1346:5.

277.    For a Black Supreme Court candidate, an appointment by a White governor is decisive. M. King Testimony, 08/14/24 Trial Tr. 1347:7–13 ("[T]here is no evidence that Blacks can win otherwise. That's the trend."). As Rep. Watson testified, receiving such an appointment "basically assures . . . that [justice] either has no opposition or token opposition" from a non-viable opponent when the incumbent justice faces election. P. Watson Testimony, 08/07/24 Trial Tr. 514:9–14. The Court gives significant weight to Rep. Watson's testimony in light of his decades of experience serving on the Judiciary A Committee in the Mississippi House, his close observation of gubernatorial appointments and elections for the Mississippi Supreme Court for over 40 years, and his personal knowledge of all four Black justices to have served on the court. *Id.* at 490:18–492:20.

278.    Justice Reuben Anderson—the first African American to graduate from the University of Mississippi Law School and the first African American to sit on the Mississippi Supreme Court—confirmed the importance of the gubernatorial appointment for minority candidates. R. Anderson Testimony, Trial Tr. 08/08/24 Trial Tr. 732-33:25, 1-2; 735:7-10. He was appointed by a White governor in 1985 and has extensive knowledge of the appointments process and the electoral prospects for Black candidates, having "been around politics for a long time." *Id.* 737: 3–4; *see also* 733: 24–25; 734:1–5. Despite his credentials and reputation, Justice Anderson testified that, without an appointment, he would not have been elected to the Mississippi Supreme

122

Court, and, indeed, he would not have even sought the seat in the first place. R. Anderson Testimony, 08/08/24 Trial Tr. 734:35, 736:23–25, 744:10–25.

279.     Thus, while Black candidates can access the ballot and run for a seat on the Mississippi Supreme Court, the record shows that, at least thus far, such access is to some extent illusory without a gubernatorial appointment.

280.     The substantial reliance on the governor to elevate minority justices disadvantages Black attorneys who might seek a judgeship, and ultimately Black voters who the evidence indicates tend to prefer Black candidates. As Dr. King has testified, Black voters in Mississippi have not been able to elect their preferred candidate for governor for at least the last 20 years. M. King Testimony, 08/14/24 Trial Tr. 1347:14–23. The State has never had a Black Governor, and as a result, "the ability for Black voters to have any say in who the justices are via the gubernatorial appointment process is very limited because their preferred [gubernatorial] candidate is not winning." *Id.*

281.     And the evidence also indicates that efforts to increase the number of Black judges via the appointment process have not succeeded. Constance Slaughter Harvey testified about her attempts to advocate for more Black judicial appointments through the Magnolia Bar Association, including at one point sending a formal letter to Governor Musgrove after he failed to appoint any Black judges. C. Slaughter-Harvey Testimony, 08/06/24 Trial Tr. 475:13–476:6. Asked about what response she got in those efforts, she testified, "[N]one." *Id.* at 476:7–9. Judge Thomas also testified about her own efforts to become a judge, including unsuccessfully seeking a gubernatorial appointment for an open seat. A. Thomas Testimony, 08/05 Trial Tr. 158:2–17. Derrick Simmons,

123

who describe his longtime involvement in the Magnolia Bar Association, described that, "for Black lawyers, the way this district is drawn, that there is a lot of interest to become a member of the Supreme Court, but there is no opportunity." D. Simmons Testimony, 08/08/24 Trial Tr. 717:11:13.

282.     With respect to the Mississippi Supreme Court, the result of this process has been the consistent allocation of one seat of the nine-member court to a Black justice since 1985.

283.     The Court credits the testimony of Justice Diaz, whom the Court admitted as an expert on the structure and composition of the Mississippi Supreme Court, the gubernatorial appointment process, and the election process for Mississippi Supreme Court justices. O. Diaz Testimony, 08/06/24 Trial Tr. 285:21–286:4. Justice Diaz testified that "[u]nless they have been first appointed to the court, a Black person has never won an election to a seat on the Mississippi Supreme Court." O. Diaz Testimony, 08/06/24 Trial Tr. 294:1–3. Indeed, "there are more White justices serving right now today," with five White appointees sitting on the court, "than have ever been appointed in the history of Mississippi Black justices appointed." O. Diaz Testimony, 08/06/24 Trial Tr. 294:12–19.

284.     The Court therefore finds that the extensive use of judicial appointments to fill seats on the Mississippi Supreme Court, bestowing an effective endorsement on appointed candidates, has similarities to an informal and exclusive candidate slating process. And the result of this process has been diminished access for Black judicial prospects and less opportunity for Black voters. Senate Factor 4 accordingly weighs in favor of the Plaintiffs.

E. **Senate Factor 5: Disparities in Education, Employment, and Health That Hinder Political Participation**

285.    The fifth Senate Factor considers "the extent to which members of the minority group . . . bear the effects of discrimination in such areas as education, employment, and health, which hinder their ability to participate effectively in the political process." *E.g.*, *Gingles*, 478 U.S. at 37.

286.    The Court finds that there are persistent disparities between Black and White Mississippians in such areas as income, poverty, employment, educational attainment, and health, which bear on and hinder Black Mississippians' ability to participate equally in politics, as demonstrated by the analysis of Dr. Traci Burch, among other evidence. *See, e.g.*, T. Burch Testimony, 08/07/24 Trial Tr. 532:23–533:8; PX-035 at 3–20. These disparities undoubtedly exist and were not contested at trial. Defendants' expert political scientist, Dr. Bonneau, testified to the same. C. Bonneau Testimony, 08/12/24 Trial Tr. 840:25–841:16 (acknowledging continuing disparities in area like education and opining that it would be "naïve to assume that the vestiges of [past] institutionalized discrimination no longer exist[] today"). Dr. Swanson did not dispute them either. D. Swanson Testimony, Trial Tr. 08/13/24 1101:2–1102:9.

287.    For the reasons explained below, the Court also credits Dr. Burch's conclusion that there is in fact a turnout gap between Black and White Mississippians, attributable among other things to a substantial gap in educational attainment. *E.g.*, T. Burch Testimony, 08/07/24 Trial Tr. 587:11–588:9. Defendants' expert, Dr. Bonneau, in his academic work, has similarly found that, "[h]istorically, African Americans and other minorities have faced unique impediments to registration and voting," and that studies show that "Caucasian voters continue to have higher rates

of participation than minorities." C. Bonneau Testimony, 08/12/24 Trial Tr. 868:8–14. And Dr. Swanson also agreed that, all else being equal, "when a person has more education, more income, more health, they are more likely to vote and participate in politics." D. Swanson Testimony, Trial Tr. 08/13/24 1102:19-22; *see also id.* at 1167:3–14.

288.    Dr. Burch is a full professor with tenure in the Department of Political Science at Northwestern University. T. Burch Testimony, 08/07/24 Trial Tr. 525:17–21. She received her Ph.D. in Government (*i.e.*, Political Science) and Social Policy from Harvard University. PX-035 at 31; T. Burch Testimony, 08/07/24 Trial Tr. 524:21–24. She has taught, published, and conducted significant research in the area of race and political behavior. PX-035 at 1–2, 31–40; T. Burch Testimony, 08/07/24 Trial Tr. 526:6–9. Her research has been presented at professional conferences and published in peer-reviewed scholarly journals. PX-035 at 1–2, 31–40. She has also served on several committees for the American Political Science Association, the General Social Survey Board of Overseers, and the Law and Society Association. PX-035 at 1–2, 31–40. She has received a grant from the National Science Foundation supporting her research on political participation. PX-035 at 33. She has presented at over 60 conferences including on political participation and race. PX-035 at 35–39. Her peer reviewed publications have quantitatively analyzed political participation by race. T. Burch Testimony, 08/07/24 Trial Tr. 616:22–618:4.

289.    This Court received Dr. Burch as an expert in racial discrimination, political participation, and barriers to voting at trial. T. Burch Testimony, 08/07/24 Trial Tr. 528:14–16, 25.

290.    In preparing her reports, Dr. Burch relied on sources and methodologies that are consistent with her work as a political scientist, including the use of statistical methods for

126

analyzing populations and political behavior including voting behavior. *E.g.*, PX-035 at 1–2. Dr. Burch focuses on race, politics, and political behavior, and uses surveys, election data and results, statistical analysis, and descriptive analysis in her work as a political scientist. *Id.* Dr. Burch investigated Senate Factor 5 using these same methods and sources. *E.g.*, T. Burch Testimony, 08/07/24 Trial Tr. 534:6–11, 547:4–6 (noting sources including 2019 1-year American Community Survey, Mississippi Department of Education, nationwide data aggregated by EdBuild, and data from the U.S. Department of Education). The Court finds that the methodologies and data sources Dr. Burch used in his analysis are reliable and are commonly used and relied upon among experts in political science. *E.g.*, T. Burch Testimony, 08/07/24 Trial Tr. 531:4–9.

291.    The Court finds that Dr. Burch is highly credible and qualified to give expert opinion testimony regarding racial disparities in Mississippi and their effects on voter participation. The Court credits Dr. Burch's analysis, based on the political science literature, that voting and political participation has an economic "cost," and accordingly whether an individual voter participates is influenced by their own access to the resources necessary to pay the "costs" of voting, such as financial resources, leisure time, and education. *See, e.g.*, T. Burch Testimony, 08/07/24 Trial Tr. 436:20–24, 550:18–23; PX-035 at 10. As Dr. Burch testified, drawing on the literature in her field, "income and wealth, in particular, have been shown to affect voter turnout generally, and studies in Mississippi have also shown that." *E.g.*, T. Burch Testimony, 08/07/24 Trial Tr. 551:23–25. "[I]t costs money to not go to work and instead go to the polls," and Black people face disparities in areas such as education and income, affecting the relative likelihood that they have the resources that are needed to vote. T. Burch Testimony, 08/07/24 Trial Tr. 550:20–

21.

292.    The Court finds, based on the testimony of Dr. Burch as well as Dr. King and other fact and expert witnesses, that Black Mississippians continue to experience pervasive socioeconomic disparities in a number of areas that hinder political participation.

*1.  Education*

293.    The Court credits Dr. Burch's uncontested analysis demonstrating significant racial disparities in Mississippi with respect to educational attainment. *E.g.*, T. Burch Testimony, 08/07/24 Trial Tr. 545:13–19 (noting "significant disparities in both educational attainment as well as outcomes among current students in Mississippi"); PX-035 at 3–10. According to ACS data, 11.3% of White Mississippians did not complete high school, compared to 19.2% of Black Mississippians. *E.g.*, T. Burch Testimony, 08/07/24 Trial Tr. 538:7–12; PX-035 at 9; Pls.' Ex. 36, Figures 1 through 11 from the October 1 Report of T. Burch, compiled, at 3 [hereinafter "PX-036"]. On the other end of the spectrum, 26.1% of White Mississippians have a bachelor's degree or higher, compared to 16% of Black Mississippians. Burch Testimony, 08/07/24 Trial Tr. 538:2–6; PX-035 at 9; PX-036 at 3. These substantial disparities also exist in the area encompassed by Congressional District 2, and at the county level, as Mr. Cooper's ACS statistics reflect. *See supra* ¶ 149. The statewide figures are reflected in the below bar graph (PX-036 at 3; *see also* T. Burch Testimony, 08/07/24 Trial Tr. 546:1–547:1):

**Figure 3: Educational Attainment by Race in Mississippi. Source: 2019 American Community Survey 1-Year Estimates**



294.    The Court also credits Dr. Burch's analysis that these educational disparities can be traced to the long "history of official segregation and discrimination" in education and housing. *E.g.*, T. Burch Testimony, 08/07/24 Trial Tr. 536:19–22; *see also* PX-035 at 4–5. While de jure segregation has been unlawful for decades, residential patterns among other things have resulted in many school systems being as segregated today as they were decades ago. *E.g.*, PX-035 at 6–7.

295.    The Court credits Dr. Burch's analysis, which also was uncontested, regarding the numerous negative effects of residential and educational segregation on educational outcomes. Because of racial disparities in wealth, *see infra* ¶¶ 303–314, and resulting variations in local tax bases, residential segregation results in underfunded predominantly Black schools compared to

predominantly White schools. *E.g.*, PX-035 at 5–7. This resource disparity is exacerbated by the underfunding of Mississippi public schools, and as Dr. Burch testified, "Mississippi typically doesn't allocate resources for schools; that is, they don't fund schools in the budget to the level that their funding formula says they need to." T. Burch Testimony, 08/07/24 Trial Tr. 545:1–4. As she explained, "districts that are 90 percent or more White receive, on average, about \$5,561 from the state; whereas, districts that are 90 percent or more non-White receive about \$300 less. . . . [M]ultipl[ied] across hundreds of thousands of students, that could be millions of dollars." T. Burch Testimony, 08/07/24 Trial Tr. 544:19–24.

296.    These disparities in resources lead to disparities in academic performance and outcomes. Consistent with "research that shows that school segregation detrimentally effects the academic performance of Black and Latino students," T. Burch Testimony, 08/07/24 Trial Tr. 541:18–23, Dr. Burch explained based on Mississippi-specific data that "Black male and female children are much less likely to be proficient in both English and math than White Mississippi students." T. Burch Testimony, 08/07/24 Trial Tr. 542:10–12; *see also* PX-035 at 7–8. "Black students are about 49 percent of Mississippi public school students, but only 24 percent students in gifted and talented programs and 31.7 percent of students taking advanced placement courses." T. Burch Testimony, 08/07/24 Trial Tr. 542:23–543:1. Conversely, Black students are substantially more likely to be disciplined at school:  As Dr. Burch explained, "Black students are 49 percent of public school students but are 65 percent of students who experience out of school suspension." *Id*. at 543:6–8.

297.    All of this was corroborated by the expert testimony of Dr. King, who also provided

analysis of disparities in the Delta in particular. Dr. King explained that Black students disproportionately attend public schools, which the State has chronically underfunded for decades. M. King Testimony, 08/14/24 Trial Tr. 1353:15–1354:1; PX-052 at 29–30. In the entire state of Mississippi, "there is one majority Black school district that is rated as an A," while a majority of Black students attended schools in districts rated D or F. M. King Testimony, 08/14/24 Trial Tr. 1353:15–1354:1; PX-052 at 29. In the Delta, which is predominantly Black, graduation rates are lower than the rest of the state by about nine points. M. King Testimony, 08/14/24 Trial Tr. 1354:4–6; PX-053 at 2; *see also* PX-052 at 31.

298.    And the extensive expert testimony regarding racial inequality in education in Mississippi is also consistent with the testimony of fact witnesses. Both Ty Pinkins and Senator Simmons described residential segregation in communities like Rolling Fork and Greenville. *E.g.*, T. Pinkins Testimony, 08/05/24 Trial Tr. 112:22–114:5 (describing residential segregation in Rolling Fork); D. Simmons Testimony, 08/08/24 Trial Tr. 687:5–23, 690:2–24 (noting the White area was "commonly called [] the 'good side of town'" and that White people worked in professional or managerial jobs while Black people worked as wage laborers). Mr. Pinkins, Senator Simmons, and Judge Thomas all testified that schools in their predominantly Black communities are underfunded and under-resourced. T. Pinkins Testimony, 08/05/24 Trial Tr. 114:23–115:24 (describing using books that were "old and tattered" and attending school in a building that "was about to literally fall down"); A. Thomas Testimony, 08/05 Trial Tr. 152:5–19 "educational service are limited" in rural Delta areas, "which negatively affects African-American children"); D. Simmons Testimony, 08/08/24 Trial Tr. 701:4-17 (describing Delta schools as

131

"woefully underfunded"). As Senator Simmons, who represents a number of Delta counties, testified, "the facilities [at his local high school] are roughly the same as when my mom and dad went there. . .We don't have a new bond issue or a new school. And that basically is the case throughout the Delta with the school buildings being substandard or subpar." *Id.* at 701:4–17. The witnesses also testified that the result is that students from predominantly Black areas and predominantly Black schools are less likely to attend four-year colleges and achieve higher levels of educational attainment. D. Simmons Testimony, 08/08/24 Trial Tr. 687:24–689:21 (describing how one third of predominantly Black public high school graduates went to college versus 100 percent of graduates from predominantly White private schools); A. Thomas Testimony, 08/05/24 Trial Tr. 152:5–19 ("rare" for local students to attend four-year college); *see also* T. Pinkins Testimony, 08/05/24 Trial Tr. 114:23–116:14 (describing the effects of attending under-resourced public schools when he attended college), *id.* at 116:15–117:18 (discussing low graduation rates during his time in public schools and in the present).

299.    Indeed, relevant to educational and other disparities, Senator Simmons further testified that since his childhood in Greenville, "the population has declined tremendously," industrial job opportunities "have left the Delta," and healthcare and education "have actually worsened in the Delta." D. Simmons Testimony, 08/08/24 Trial Tr. 709:12–21.

300.    The Court also credits Dr. Burch's analysis, also based on an extremely well-developed body of political science literature as well as original quantitative analysis, that there is a very strong correlation between educational attainment and voter turnout. T. Burch Testimony, 08/07/24 Trial Tr. 580:12–13 ("[T]hat relationship between education and voter turnout is very

132

clear in the data."). Simply put: "[E]ducation affects voter turnout." T. Burch Testimony, 08/07/24 Trial Tr. 543:19–20. Indeed, "it's one of the most fundamental findings in political science, that people with higher educational attainment vote more than people with lower educational attainment." T. Burch Testimony, 08/07/24 Trial Tr. 543:20–23. Other experts all agreed on this point. *See* M. King Testimony, 08/14/24, Trial Tr. 1350:11-17 ("So the best predictors of voter turnout are education and income. Blacks have lower levels of educational attainment, lower levels of income. They are going to vote less."); *see also* C. Bonneau Testimony, 08/12/24 Trial Tr. 871:22–872:5, 891:25–892:1 (agreeing that "voters with less access to information, particularly those with lower levels of educational attainment, are less likely to overcome the informational costs associated with nonpartisan elections"); D. Swanson Testimony, 08/13/24 Trial Tr. 1167:3–9 (not disputing that "while Black and White people with similar educational backgrounds vote similarly, people with lower educational attainment vote at lower rates overall than people with higher educational attainment").

301.    The Court also credits Dr. Burch's original quantitative analysis regarding the relationship between race, educational attainment and voter turnout in Mississippi. *See* Pls.' Ex. 39, Feb. 6, 2023 Rebuttal Report of Dr. Traci Burch at 7–15 [hereinafter "PX-039"]; *see also* Pls.' Ex. 40, Figures 1 through 5 from the Feb. 6, 2023 Rebuttal Report of T. Burch, compiled at 1–2 [hereinafter "PX-040"]. Using Mississippi data from the Cooperative Election Survey or CES, *see infra* ¶¶ 338–339, Dr. Burch constructed a regression model with turnout as the independent variable and attributes like race and educational attainment as dependent variables. T. Burch Testimony, 08/07/24 Trial. Tr. 577:2–579:14. Her analysis confirmed the conclusion one would

expect from the literature using Mississippi-specific data: In Mississippi "lower educational attainment means you're less likely to vote," and thus "the fact that there are more Black people in that lower educational attainment group . . . is reducing turnout in the group." T. Burch Testimony, 08/07/24 Trial Tr. 581:1–5; *see also* PX-039 at 7–15.

302. Based on this extensive evidence, the Court finds that racial disparities in educational attainment hinder Black political participation as compared to White Mississippians.

### 2. *Wealth, Income, and Employment*

303. The Court credits Dr. Burch's uncontested analysis that, as a result of Mississippi's long history of discriminating against Black residents in nearly every aspect of daily life, Black Mississippians experience socioeconomic disparities that impair their ability to participate in the political process. T. Burch Testimony, 08/07/24 Trial Tr. 547:9–11, 551:23–552:5; PX-035 at 10–13.

304. As Dr. Burch explained based on data from the U.S. Census' American Community Survey and Mississippi state sources, Black Mississippians are significantly worse off in terms of income, poverty, unemployment, educational attainment, internet access, vehicle ownership, and health insurance coverage. *E.g.*, T. Burch Testimony, 08/07/24 Trial Tr. 547:12–552:5 ("Black Mississippi residents fare worse" than White Mississippians across economic indicators); PX-035 at 10–13.

305. Economically, Mississippi continues to be one of the poorest states in the nation. T. Burch Testimony, 08/07/24 Trial Tr. 552:2–4. As Dr. Burch testified, "[p]overty is nearly three times as high" with "30.6 percent of Black families in Mississippi [living] in poverty compared

with 11.7 percent of White families." T. Burch Testimony, 08/07/24 Trial Tr. 549:1–3; PX-035 at 10–12. The statewide poverty figures are reflected in the below bar graph (PX-036 at 6; *see also* T. Burch Testimony, 08/07/24 Trial Tr. 548:16-549:17):

**Figure 6: Selected Economic Characteristics by Race in Mississippi. Source: 2019 American Community Survey 1 year estimates.**



PX-036-006

306.    This racial disparity is also evident across a number of other economic indicators:

a.    *Median income:* "[F]or White households, the median household income at $57,500 is $26,000 more per year than the median Black household at $31,000 a year." T. Burch Testimony, 08/07/24 Trial Tr. 548:5–7; PX-035 at 10–11.

b.    *Unemployment:* 10.2% of Black Mississippians are unemployed, compared

135

to 4.4% of Whites. PX-035 at 12. Unemployment among Black Mississippians "was more than double that" experienced by "White Mississippi residents." T. Burch Testimony, 08/07/24 Trial Tr. 511:25–512:7.

      c.   *Lack of access to a car:* "11.3 percent of . . . Black households in Mississippi don't have access to a vehicle, compared to 3.5% of White households in Mississippi." T. Burch Testimony, 08/07/24 Trial Tr. 549:4–7; PX-035 at 12.

      d.   *Broadband access*: "With respect to broadband internet, connections, [Black] households trail White households—77.1% versus 84.4%." PX-001 at 38; *see also* PX-003 at 126,149; PX-005.

307.    Dr. King also testified credibly on this point. *See* M. King Testimony, 08/14/24 Trial Tr. 1354:21–1355:7; PX-052 at 34 ("Black Americans depend more on the social safety net, experience far less upward economic mobility, face higher risk of downward mobility, have unemployment rates that if experienced by the entire country would be considered recessionary . . . ."). And as he explained, disparities in income exacerbate racial disparities in wealth. Dr. King found that Black families have less than 15% of the median wealth of White families ($24,100 vs. $188,200). M. King Testimony, 08/14/24 Trial Tr. 1356:14–23; PX-052 at 34.

308.    Dr. King's analysis also showed, consistent with the data in the record, that the majority-Black Delta region as a whole is economically disadvantaged, with wages about 20% less than the State overall. M. King Testimony, 08/14/24 Trial Tr. 1356:8–13; PX-052 at 35; *see also* PX-005.

309.    The fact witness testimony was consistent, providing additional detail regarding

these significant disparities in income and economic status for Black Mississippians as well as the economic situation of the Delta in particular.

310. Mr. Pinkins described growing up in poverty, being hungry as a child, having to eat "molded bread with sugar on it" and picking up cans with his father, collecting pecans from neighbors' trees to feed and support their family, and chopping cotton every summer while still a child, working until his hands were covered in blisters. T. Pinkins Testimony, 08/05/24 Trial Tr. 122:9-12; *id.* at 111:5-23, 120:4-24. Mr. Pinkins explained that his experiences of poverty and food and economic insecurity were not unique among those living in the Delta. *See id.* at 124:2-16.

311. Judge Thomas described how in the predominantly Black Delta in particular, many Mississippians lack "livable[] wages," and there is an insufficient "financial base" to provide high quality services. A. Thomas Testimony, Trial Tr. 08/05/24 152:25–153:11. And Senator Simmons described how, Senator Simmons since his childhood in Greenville, industrial job opportunities "have left the Delta," and healthcare and education "have actually worsened in the Delta." D. Simmons Testimony, 08/08/24 Trial Tr. 709:12–21.

312. The Court also credits Dr. Burch's analysis, based on well-developed political science literature, that there is a strong correlation between financial status and voter turnout. As Dr. Burch demonstrated, income and poverty are significant factors influencing voter participation, generally and specifically in Mississippi. T. Burch Testimony, 08/07/24 Trial Tr. 550:18–551:2 (discussing how "the political science literature talks about the different ways that income and wealth can affect voting"). This testimony was also uncontested, and Prof. King echoed it. *See* M.

King Testimony, 08/14/24, Trial Tr. 1350:11-17 ("So the best predictors of voter turnout are education and income. Blacks have lower levels of educational attainment, lower levels of income. They are going to vote less.").

313. Dr. Burch also explained that, while voters with cars "are relatively insensitive" to polling place distance, those who lack a car face higher barriers to participation. T. Burch Testimony, 08/07/24 Trial Tr. 549:18-550:12.

314. Again, the fact witness testimony was consistent and provided a window into the practical reality. Ms. White testified, based on her experience working on multiple political campaigns, that Black voters without access to a car encountered challenges finding transportation to overcome long distances to voting precincts and polling locations. *See, e.g.,* D. White Testimony, 8/6/24 Trial Tr. 341:9–14, 345:4–9, 347:4–10. Though many organizations provide rides to the polls, these efforts are insufficient to overcome the transportation barriers faced by many Black voters in Mississippi. *See, e.g.*, D. White Testimony, 8/6/24 Trial Tr. 365:21–25. Ms. White also testified that a lack of access to internet also poses a barrier to voters, making it more difficult for voters to check their information (such as their polling location) and impeding the ability of campaign volunteers to check on mobile devices whether someone is registered to vote. D. White Testimony, 08/06/24 Trial Tr. 341:16–20.

315. The Court finds that the significant economic disparities between Black and White Mississippians hinder Black political participation as compared to White Mississippians.

### 3. Homeownership and Housing

316. The Court also credits Dr. Burch's uncontested analysis of racial disparities with

respect to housing and homeownership.

317.    Dr. Burch described discriminatory policies relating to home loans and mortgages (including "redlining") that were employed in Mississippi. T. Burch Testimony, 08/07/24 Trial Tr. 552:13–553:22; PX-035 at 13-15. She testified that the legacy of those policies continues into the present, both because homeownership represents an opportunity to build and transfer wealth, and because "racial residential segregation" remains the current reality in Jackson "and some other areas and cities in Mississippi." T. Burch Testimony, 08/07/24 Trial Tr. 554:1–8; PX-035 at 14.

318.    Both Dr. Burch and Dr. King described a major racial disparity between Whites and Blacks with respect to homeownership (78% versus 51%). T. Burch Testimony, 08/07/24 Trial Tr. 554:9–16; M. King Testimony, 08/14/24 Trial Tr. 1356:14–1357:3; PX-052 at 34. This disparity in homeownership drives disparities in wealth overall, Dr. King explained, because homeownership "is the number one means of wealth accumulation for most families." M. King Testimony, 08/14/24 Trial Tr. 1356:14–23; PX-052 at 34.

319.    This analysis is consistent with fact witness testimony as well, especially that of Dyamone White, who testified extensively about the housing issues she encountered as a banker and a consultant for a housing non-profit in the South Delta. While working within the mortgage department of a regional bank, Ms. White testified that she did not see Black Mississippians getting mortgages. D. White Testimony, 08/6/24 Trial Tr. 350:21–351:4. And as part of her work creating affordable housing at Hope Enterprise and with a non-profit in the South Delta, she also testified that homes in Issaquena, Sharkey, and Humphreys were 50 years or older and in "very poor condition." D. White Testimony, 08/06/24 Trial Tr. 352:13–17. Ms. White testified that housing

139

"is a big challenge" in the Delta and remains so, particularly for African-Americans because "most cannot qualify for a mortgage because they don't have livable wages" or "opportunities." D. White Testimony, 08/06/24 Tr. 354:9–18. *See also* A. Thomas Testimony*,* 08/05/24 Trial Tr. 153:14–154:11.

320.    The Court also credits Dr. Burch's uncontested analysis that housing disparities affect voter turnout. T. Burch Testimony, 08/07/24 Trial Tr. 554-556; *see also* PX-035 at 13-15. Dr. Burch explained how racially segregated cities "spend less money" on polling places, and that Black people in Mississippi's Second Congressional District had longer wait times at polling places. *Id.* This testimony is consistent with the other experts, including Dr. Bonneau, whose own research showed that homeownership in particular is correlated with voters completing their ballots rather than "rolling off" and not participating in down-ballot contests. *See supra* ¶ 147.

321.    The Court finds that the significant economic disparities between Black and White Mississippians hinder Black political participation as compared to White Mississippians.

### 4. *Health*

322.    The Court also credits Dr. Burch's uncontested analysis identifying racial disparities in health between Black and White Mississippians. Mississippi ranks last, or near the bottom in the country, in almost every leading health indicator. *E.g.*, PX-035 at 17. Black Mississippians fared worse than White Mississippians across numerous health indicators, including diagnoses of diabetes, high blood pressure, obesity, cancer mortality, life expectancy, and infant mortality. *E.g.*, T. Burch Testimony, 08/07/24 Trial Tr. 558:11–559:5; PX-035 at 16–18.

323.    Dr. Burch also identified significant racial disparities in access to healthcare, with more Black Mississippians lacking health insurance coverage and lacking a primary care physician. T. Burch Testimony, 08/07/24 Trial Tr. 559:16–20. As a result, "about 16 percent of Black Mississippi residents compared to about 12.5 percent of White Mississippi residents say they didn't go to a doctor last year because they were worried about the cost." T. Burch Testimony, 08/07/24 Trial Tr. 559:21–24. The Court credits Dr. Burch's conclusion that racial disparities in health insurance coverage are reflective of historic and continuing racial discrimination. *E.g.*, T. Burch Testimony, 08/07/24 Trial Tr. 560:7–21 (noting "some access to health care is related to racial discrimination, and studies have shown that. But, also, there are structural barriers more likely to be faced by Black Americans, such as . . . being in medically underserved communities, not having hospital access and food deserts," and further noting that "several studies of Mississippi" show that "the experience of racial discrimination can affect cardiac health, and in general, racial residential segregation as well leads to worse health outcomes among Black people"). *See also infra* ¶¶ 423–424.

324.    Dr. King provided additional and consistent analysis on this point as well, testifying that life expectancy in the Delta is lower by 3.1 years for men and 2.4 years for women, as compared to the rest of Mississippi. PX-053 at 3; *see also* PX-052 at 32 ("Black Mississippians are worse off than white Mississippians and the average American on virtually every health metric.").

325.    Again, the testimony of fact witnesses was entirely consistent with and provided even greater depth to the undisputed evidence of racial disparities in health in Mississippi. For

141

instance, Ms. White also testified based on her experience as an interim coordinator of the Edwards Mayoral Health Council. Ms. White became the interim coordinator when her neighbor, the previous coordinator, was admitted to the hospital due to a lung condition caused by rain falling in her house. D. White Testimony, 08/06/24 Tr. 356:7–13. Because her neighbor lacked transportation and lives far from a hospital or doctor's office, she "lingered in her house" until Ms. White found her and took her to the emergency room, at which point she was too ill to continue her previous levels of civic engagement. D. White Testimony, 08/06/24 Tr. 356:14–120. Ms. White testified that the health obstacles faced by her neighbor—a lack of access to healthcare, poor housing conditions, and an inability to participate in civic activities because of health issues—are "very typical" throughout her community and are disproportionately faced by Black people. D. White Testimony, 08/06/24 Tr. 356:24–357:9.

326.    Mr. Pinkins also testified extensively about his family's struggles with access to healthcare. He testified that after he returned from the military, he came back to the Delta to find that his father had become a double amputee, blind, and was in a wheelchair due to the lack of access to healthcare. T. Pinkins Testimony, 08/06/24 Trial Tr. 112:1–8. Mr. Pinkins testified that his mother suffers from kidney failure and has to drive three hours round trip for checkups. *See id.* at 112:8–11.

327.    That testimony is consistent with Senator Simmons' and Judge Thomas's testimony about the state of health infrastructure in the Delta. For example, because there is no neonatal intensive care unit in the Delta, if there are complications during birth, Black women must "hope and pray" that they can be "stabilized long enough to get to Jackson" or cross state lines into

142

Tennessee. A. Thomas Testimony, Trial Tr. 08/05/24 178:2–13. Senator Simmons testified that there is currently only one pediatrician for every 4,000 children causing families to "use the emergency room as their primary health provider." D. Simmons Testimony, 08/08 Trial Tr. 701:18–24. He testified that, in recent years, healthcare and education "have actually worsened in the Delta." *Id.* at 709:12–21.

328.    The Court credits Dr. Burch's uncontested analysis that health conditions significantly influence an individual's level of political participation, with both direct and indirect effects on their engagement in the political process. *E.g.*, T. Burch Testimony, 08/07/24 Trial Tr. 560:24–25 ("[S]everal studies that I reviewed in my report show that health can affect voter turnout in a number of ways."). Reduced mobility, reduced free time and money that could otherwise be devoted to politics, impaired cognitive functioning, or physical disability, all of which are experienced at higher rates by Black Mississippians, reduce one's ability and likelihood to vote. *E.g.*, T. Burch Testimony, 08/07/24 Trial. Tr. 558:8-561:6; PX-035 at 16–17.

329.    The Court finds that the health disparities between Black and White Mississippians hinder Black political participation as compared to White Mississippians.

### 5.  Criminal Justice and Incarceration

330.    The Court also credits Dr. Burch's analysis that disproportionate involvement with the criminal justice system hinders Black Mississippians' ability to participate equally in politics relative to Whites. In particular, and as noted already, Mississippi's continuing imposition of permanent disenfranchisement for certain felony offenses disproportionately impedes voting for Black Mississippians due to higher rates of incarceration within the Black community, and higher

rates of permanent disenfranchisement. Multiple experts agreed that tens of thousands of Mississippians are subject to permanent disenfranchisement on this basis, and this group is approximately 60% Black even though Blacks comprise less than 40% of the population. *See, e.g.*, *supra* ¶ 74. Dr. Burch examined data from the State Department of Corrections and reached similar conclusions to all those other experts: "Black people are overrepresented in the criminal justice system relative to their proportion of the population." T. Burch Testimony, 08/07/24 Trial Tr. 564:12–13. The Court credits that conclusion. It also credits Dr. Burch's uncontested analysis, based on published research, that disparities in criminal justice involvement are not attributable solely to "legally relevant factors." *Id.* at 564:17–24 ("Racial discrimination . . . still leads to disparate sentencing outcomes in Mississippi" as well as "jury selection and the use of peremptory challenges"); PX-035 at 19–20.

331. Moreover, Dr. Burch testified based on her original, published research "that criminal convictions can have an impact on both the people who are convicted themselves but also on the people who live in their communities," and create "almost a contagion effect with respect to political behavior," decreasing political participation even among those who are not directly affected by disenfranchisement laws. T. Burch Testimony, 08/07/24 Trial Tr. 563:8–564:24. This testimony was uncontested and the Court credits it.

332. The testimony of fact witnesses was consistent on this point as well. As noted, Senator Simmons, an experienced criminal defense attorney who appears in that capacity in this District, discussed how even those with non-disqualifying convictions may believe themselves ineligible to vote. *See* D. Simmons Testimony, 08/08/24 Trial Tr. 705:13–23.

144

333.    The Court finds that the disparities between Black and White Mississippians with respect to disenfranchisement due to felony convictions and disproportionate involvement in the criminal justice system hinder Black political participation as compared to White Mississippians.

### 6. Voter Turnout

334.    Given that Black Mississippians face disparities as compared to White Mississippians with respect to numerous socioeconomic factors that bear upon political participation, it would be a reasonable hypothesis that Black Mississippians in fact participate and turn out less than White Mississippians. *See* D. Swanson Testimony, 08/13/24 1103:14–22.

335.    Dr. Burch directly tested that hypothesis by estimating turnout by race in the 2020 election using two independent sources of data on voter turnout—the Cooperative Election Survey or "CES," and the ecological inference ("EI") method based on turnout data from the state voter file and demographic data from the 2020 Census, similar to the analysis conducted by Dr. Orey, *see supra* ¶¶ 119–122. *See* T. Burch Testimony, 08/07/24 Trial Tr. 569:13–570:14 (overview of CES); 573:5–581:18 (CES analysis); 583:23–588:9 (EI analysis); *see also* PX-039 at 4–12.

336.    The Court credits Dr. Burch's descriptions of those sources and her opinions that they are reliable, finds that Dr. Burch's methods were reliably and clearly explained in her testimony, and credits Dr. Burch's conclusion based on that data that there is in fact a racial turnout gap with respect to voting in Mississippi, with Black Mississippians have lower levels of voter turnout than White Mississippians. Importantly, and as discussed further and indicated in the below

145

summary chart (PX-039 at 14[9]), estimates derived from the CES and EI both yield a total turnout

level that is in line with the actual, overall level of turnout reported by the Secretary of State. Each of

these methods showed a significant gap in turnout between Black and White Mississippians.

*Table 1 Estimates of Mississippi Voter Turnout, by Race, 2020 General Election. Estimates of voter turnout from different sources. Confidence intervals in parentheses.*

| Universe | Method/Source | Turnout Estimates: | | | | | |
|---|---|---|---|---|---|---|---|
| Statewide | Current Population Survey 2020 (Dr. Swanson)[38] | White Turnout: | 69.8% (65.7% to 73.9%) | Black Turnout: | 72.8% (67.9% to 77.7%) | Total Turnout: | 70.3% (67.1% to 73.5%) |
| Statewide (Benchmark) | MS Secretary of State (2020 Presidential General)[39] | N/A | | N/A | | Total Turnout: | 58.7% |
| Statewide | CES 2020[40] | White Turnout: | 59.6% | Black Turnout: | 46.1% | Total Turnout: | 53.3% |
| Statewide | Ecological Inference (MS Voter File) | White Turnout: | 58% (57% to 59%) | Non-White Turnout: | 42% (33% to 51%) | Total Turnout: | 58%[41] |
| Central District (Benchmark) | MS Secretary of State (2020 Presidential General)[42] | N/A | | N/A | | Total Turnout: | 59.4% |
| Central District | Ecological Inference (MS Voter File) | White Turnout: | 62% (61% to 64%) | Non-White Turnout: | 44% (29% to 58%) | Total Turnout: | 58%[43] |

337.    Dr. Burch credibly and clearly testified that using the Secretary of State's reported

overall turnout as a benchmark against which to measure her estimates of turnout by race was

critical to ensure the accuracy of those estimates. This is because the total reported turnout is

"basically the one thing we know that is not an estimate." T. Burch Testimony, 08/07/24 Trial Tr.

592:16–25. For the 2020 General Election, benchmark data obtained from the Mississippi

Secretary of State indicated total voter turnout of approximately 58.7%. T. Burch Testimony,

---

[9] *Also included at* Pls.' Ex. 41, Table 1 from the Feb. 6, 2023 Rebuttal Report of T. Burch [hereinafter "PX-041"].

146

08/07/24 Trial Tr. 596:6–8; PX-039 at 14. Similarly, the CES estimate for voter turnout was 53.3%, and the voter turnout estimate from her EI analysis was 58%. T. Burch Testimony, 08/07/24 Trial Tr. 596:22–597:2; PX-039 at 5–6, 14. And the EI estimate also produces a highly consistent estimate of total turnout looking only at District 1. Dr. Burch testified that the similarity between the total turnout estimates for her CES and EI analysis on one hand, and the benchmark turnout estimate on the other hand, substantiates the reliability of her estimates. T. Burch Testimony, 08/07/24 Trial Tr. 597:13–17. The Court credits these analyses.

338.    The CES is a 50,000+ person national stratified sample survey administered by a team of researchers at Harvard and MIT, in collaboration with dozens of research teams across the United States. T. Burch Testimony, 08/07/24 Trial Tr. 567:5–11, 569:13–14. The CES dataset includes "validated vote" information, representing an independent validation of whether a survey respondent voted, which Dr. Burch used for her analysis. PX-039 at 4–5. In other words, the CES does not "just rely on self-reports of voters to figure out" whether they voted; rather, CES researchers "actually go and verify with data from the different states about whether that person has voted or not." T. Burch Testimony, 08/07/24 Trial Tr. 569:13–24.

339.    Dr. Burch and Defendants' expert political scientist Dr. Bonneau both testified in detail as to the CES's reliability and wide use in their field. Dr. Burch testified that CES "researchers are very strict about following the requirements of the American Association for Public Opinion Research, . . . and they lay out a detailed guide each year that notes their testing of the data, [showing] how well it is able to do things like predict presidential vote in each state," rendering it "a pretty robust survey in political science." T. Burch Testimony, 08/07/24 Trial Tr.

570:6–14. Indeed, Dr. Burch testified, the CES is "used in peer-reviewed work" by political scientists "[a]ll of the time." *Id.* at 567:12–13. For his part Dr. Bonneau used the CES (formerly known as the CCES, or Cooperative Congressional Election Study) to publish a peer-reviewed, award-winning book about voter turnout and participation. C. Bonneau Testimony, 08/12/24 Trial Tr. 866:12–20, 867:13–15, 872:6–873:16. He confirmed that the CES contains a representative sample, which was verified using mail and telephone, and that the weights provided in the survey are reliable. *Id.* Dr. Bonneau further testified that researchers should use the "validated vote" information contained in the CES, just as Dr. Burch did, in order to study voter behavior, because survey respondents are known to over-report their voting history. *Id.* at 873:6–16. Based on the testimony of Dr. Burch and Bonneau, both of whom are respected political scientists who use the CES survey in their own work and are familiar with its status in the literature, the Court finds that the CES is a reliable source for estimating state-level turnout by race.

340.    The CES's validated-vote turnout estimate was 46% for Black Mississippians in 2020, compared to 60% turnout for White Mississippians, a 14-point gap. *E.g.*, PX-039 at 6. Dr. Burch used the weighting variables suggested by the principal CES investigators for measuring turnout among all adults and observed this 14-point racial gap in turnout. *E.g.*, T. Burch Testimony, 08/07/24 Trial Tr. 573:8–11, 15–17.

341.    To test and corroborate the turnout figures generated by the survey data, Dr. Burch also conducted a regression analysis using the CES data in order to predict the probability that a White or Black Mississippi voter turned out in the 2020 election, and that regression analysis yielded the same gap in turnout. T. Burch Testimony, 08/07/24 Trial Tr. 573:12–17. Dr. Burch

discussed a chart included in her rebuttal report showing the results of this regression analysis, which showed "compared to White people, there's a minus sign in front of 0.545, . . . and two asterisks. And that is basically telling you that Black people are less likely to vote in Mississippi than White people, and it's a statistically significant result"—in fact, she found the disparity "pretty highly statistically significant." T. Burch Testimony, 08/07/24 Trial Tr. 577:13–25; *see* PX-039 at 4–6, 16; Pls.' Ex. 42, Appendix 1 from the Feb. 6, 2023 Rebuttal Report of T. Burch, at 2 [hereinafter "PX-042"] (showing "Model 1," the regression modeling turnout by race).

342. Dr. Burch also conducted regression analysis to test the relationship between educational attainment and voter turnout given the disparities in educational attainment between Black and White Mississippians she identified with respect to Senate Factor 5. *See supra* ¶ 301. Her regression analysis found that the "relationship between education and voter turnout is very clear in the data" such that a person with higher educational attainment "would be much more likely to vote than a person with less than high school." T. Burch Testimony, 08/07/24 Trial Tr. 580:2–13; PX-039 at 7–9, 16; PX-042 at 2 (showing "Model 2," the regression model including race, education, and other variables). Dr. Burch's analysis did not reveal large racial gaps in voter turnout *within* each level of educational attainment, *e.g.*, T. Burch Testimony, 08/07/24 Trial Tr. 580:15–16 ("[T]here's no real statistically significant difference between a Black person who has less than high school and a White person who has less than high school."). Rather, she explained, "the fact that there are more Black people in that lower educational attainment group is what [] is reducing turnout" among Black Mississippians compared to Whites, *id.* 581:1–5. As Dr. Burch explained, her analysis of Mississippi-specific data on education and voter turnout "confirms what

149

we know from the political science literature that has been shown over and over again. People with higher education are more likely to vote. And so those . . . racial disparities [in] education are really important because education is so important to voting." *Id.* at 581:13–18. This analysis is also corroborated in significant part by Dr. Bonneau's academic work using the dataset for years 2010 and 2012 of the CES; he found that educational attainment significantly predicted voter turnout (and ballot roll-off), and there is no statistically significant difference between racial groups when education is included in the regression model. *See* C. Bonneau Testimony, 08/12/24 Trial Tr. 866:12–20, 869:22–25, 870:17–21, 885:23–886:5.

343.    The Court credits Dr. Burch's analysis that the racial turnout gaps demonstrated by the CES are statistically significant. As discussed above, Dr. Burch tested the statistical significance of the CES data using a regression analysis, which allowed her to establish confidence in the reliability of the estimate. T. Burch Testimony, 08/07/24 Trial Tr. 577:21–578:6. The p-value of the estimates for the racial turnout gap in Mississippi was less than .01, meaning there is a greater than 99% likelihood that the observed turnout gap was not due to chance, which is a high level of confidence. *E.g.*, T. Burch Testimony, 08/07/24 Trial Tr. 577:21–578:2.

344.    Dr. Burch's EI analysis yielded similar results to her analysis of the CES data, showing that White turnout in 2020 was 58%, while Black turnout was only 42%. The Court credits Dr. Burch's conclusion, based on the confidence intervals she calculated for her EI analysis, that this estimated 16-point gap reflects a real, significant disparity in turnout levels. T. Burch Testimony, 08/07/24 Trial Tr. 586:1–587:10; PX-039 at 10–11, 14.

345.    Dr. Burch also conducted EI analysis on turnout in District 1 as currently

150

configured and found a similar gap in turnout: "White turnout was about 62 percent, and nonwhite turnout was about 44 percent." T. Burch Testimony, 08/07/24 Trial Tr. 595:13–17; PX-039 at 10–11, 14. The total District 1 turnout estimate using EI was almost identical to the benchmark total turnout for District 1 reported by the Secretary of State. *E.g.*, PX-041.

346.    The Court credits Dr. Burch's EI analysis as well. For the reasons already discussed, the Court finds that EI is an accepted and reliable—and indeed the most reliable—method available for generating estimates about voter behavior. *See supra* ¶¶ 119–122. And as noted above, Dr. Burch verified the reliability of her EI analysis by reference to benchmark data on overall voter turnout from the Mississippi Secretary of State and testified that the overall turnout estimate from her EI analysis was "[a]lmost exactly the same" as the benchmark. T. Burch Testimony, 08/07/24 Trial Tr. 597:1–4.

347.    It is highly persuasive that Dr. Burch conducted two independent analyses of turnout by race using two different, reliable sources of validated voting data, and both gave results that matched up with each other *and* matched up with the benchmark total turnout number from the Secretary of State. As Dr. Burch explained, "as a political scientist, . . . when two different studies come up with effectively identical results" it "is a great sign. It means that your results are reliable." T. Burch Testimony, 08/07/24 Trial Tr. 588:5–9. This consistency across datasets and methods strongly supports the finding that there is in fact "a large and statistically significant [racial] gap in voter turnout." *Id.* at 587:11–18.

348.    Defendants' expert Dr. Swanson did not dispute the results of any of Dr. Burch's analyses. D. Swanson Testimony, 08/13/24 1152:3–9 (no dispute CES turnout analysis is correct),

151

1152:15-1153:2 (no dispute regarding results of CES turnout regression "Model 1," including statistical significance at the .99 level), 1166:5–17 (no dispute regarding CES turnout regression "Model 2"), 1161:23–1162:20 (no dispute regarding CES overreporting analysis), 1167:21–1168:22 (no dispute regarding EI analysis).

349.    Dr. Swanson did offer some criticisms of Dr. Burch's methods and of the CES as a dataset. However, the Court gives these little weight, for multiple reasons.

350.    First, and as alluded to already, Dr. Swanson's testimony on the whole was not credible. The Court makes that finding in light of numerous factors.

a.    For one, and as discussed already, Dr. Swanson relied heavily for large portions of his analysis on Mr. Bryan, whose work was in some instances incorrect or misleading. *See supra* ¶¶ 55–56. And Dr. Swanson, meanwhile, contributed to analyses offered by Mr. Bryan in other cases that courts have held to be "wholly unreliable," *Robinson v. Ardoin*, 605 F. Supp. 3d 759, 824 (M.D. La. 2022) (rejecting novel "index of misallocation" analysis offered by Bryan and finding that Bryan's conclusions were "wholly unreliable" and that "Bryan's analysis lacked rigor and thoroughness"); *see also Singleton v. Merrill*, 582 F. Supp. 3d 924, 1006-1009 (N.D. Ala. 2022) (after detailed consideration, finding that "[b]ecause Mr. Bryan consistently had difficulty defending both his methods and his conclusions, and repeatedly offered opinions without a sufficient basis, and because we observed internal inconsistencies in his testimony on important issues, we find that his testimony is unreliable"); *Caster v. Merrill*, No. 2:21-CV-1536-AMM, 2022 WL 264819, at *60-*62 (N.D. Ala. Jan. 24, 2022 (same). *See* D. Swanson Testimony,

152

08/13/24 1173:20–1175:25 (noting work with Bryan on *Robinson*, *Singleton*, and *Caster*, including on the "index of misallocation" analysis rejected in *Robinson*).

b.　　Moreover, and specifically with regard to his opinions on voter turnout, Dr. Swanson lacked any relevant background knowledge. He acknowledged he is not a political scientist and does not study voting behavior. D. Swanson Testimony, 08/13/24 Trial Tr. 1104:4–20. He has never constructed a regression model of voting before. *Id.* at 1153:3–5. And he repeatedly indicated in his testimony he did not necessarily understand or had not heard of or used the materials or methodologies that he was opining on. *E.g.*, *id.* at 1104:4–20 (Swanson had never used King's EI method and had not heard of CES prior to this case), 1125:25-1126:2 (Swanson "thank[ing] God" he had never conducted an EI analysis or BISG analysis before), 1130:13–25 (Swanson viewed Brennan Center report on which he opined as "dense and difficult" and he could not replicate the analysis), 1171:9–19 (Swanson not familiar with EI before this case, viewed EI as a "black box affair," did not know whether political scientists provided confidence intervals with EI estimates).

c.　　Consistent with his lack of any experience using voting-related data sources like the CES, Dr. Swanson made multiple mistakes in analyzing the CES, repeatedly claiming in his disclosed report that Dr. Burch had not applied the correct weights but then admitting, upon questioning at trial, that he had been mistaken about how the weights in the CES were supposed to be applied and his criticisms of Dr. Burch were not well founded. *See* D. Swanson Testimony, 08/13/24 1142:17-1143:17 (conceding he had incorrectly

153

claimed that Dr. Burch should not have used the "common post weight," which was the proper weight to use), 1162:21-1165:12 (Swanson made a "mistake" with respect to the applicable weighting for the overreporting analysis); *see also id.* at 1144:6–1149:13 (insisting that the Current Population Survey rather than the ACS was used to construct the weighting for the adult population in the CES, but eventually conceding it was not).

d. Dr. Swanson's testimony at times also appeared to evolve on the stand, as with his shifting methodology for calculating prison-adjusted CVAP, *see supra* ¶¶ 72–78. He testified that according to the Current Population Survey Voting Supplement (another survey-based estimate), Black turnout in Mississippi in 2020 was higher than White turnout by three points, D. Swanson Testimony, 08/13/24 Trial Tr. 982:2–8, but then on cross-examination conceded that this claim was not statistically valid. D. Swanson Testimony, 08/13/24 Trial Tr. 1108:3-1109:18. He also repeatedly went on lengthy tangents instead of giving direct answers. *E.g.*, D. Swanson Testimony, 08/13/24 Trial Tr. 1118:9–1119:11, 1135:8–1137:15, 1170:11–1171:13.

e. Dr. Swanson also repeatedly contradicted his sworn deposition testimony, including on key points relating to his purported criticisms of the CES and other elements of the turnout analysis. *See, e.g.*, D. Swanson Testimony, 08/12/24 Trial Tr. 929:8–930:12 (contradicting sworn testimony that he was not capable of independently verifying Mr. Bryan's compactness scores); D. Swanson Testimony, 08/13/24 Trial Tr. 1126:12–1128:11 (contradicting sworn testimony that he had no opinion about the reliability of statistical methodology used in Brennan Center report), 1132:5–1133:16 (contradicting sworn

154

testimony that CES is validated), 1135:8–1137:15 (contradicting sworn testimony that he did not dispute CES designers' analysis demonstrating reliability of their state-level voting data), 1164:20–1165:14 (contradicting sworn testimony admitting that he had made a "mistake" regarding the proper weights to use in analyzing CES data).

f.     And Dr. Swanson also contradicted himself on the stand. In one especially revealing exchange, Dr. Swanson attempted to defend his assertion that the weights used in the CES were too high by claiming to have calculated certain statistics (such as "DFBETAs") purportedly demonstrating the outsized influence of certain individual weighting values. D. Swanson Testimony, 08/13/24 Trial Tr. 1155:2–1158:8. Having already admitted to making mistakes in selecting which weights to use with respect to other aspects of the CES analysis, Dr. Swanson nevertheless denied that he had used the wrong weights to calculate these statistics, and testified, confidently and repeatedly, that he had "replicated the model [Dr. Burch] used." *Id.* at 1155:20; *see also id.* at 1155:6–8 ("I replicated her model. That was me that did that, the logistic model. The parameters were the same"), 1155:20–22 ("[W]e had the same – I had the same parameters that she used. So I replicated the model, which means I used the same weights"), 1156:10–11 ("That's what I replicated exactly, was her model, and did all of the diagnostics"), 1157:10–11 ("We replicated her model, which means we used the same weights that she used in her model.") But, when presented with the statistics he had calculated, it became clear that his testimony was incorrect, and he had calculated those statistics using the wrong weight as well. *Id.* at 1157:16–1158:8. Perhaps Dr. Swanson simply did not recall the details of his own analysis

or was understandably confused given his lack of background or familiarity with the subject matter. But the Court finds it difficult if not impossible to credit Dr. Swanson's opinions about his and Dr. Burch's work given the utter confidence with which he was able to make assertions, under oath, that turned out to be demonstrably false.

g.    For all those reasons, the Court finds that Dr. Swanson's opinions, and in particular his attempts to critique Dr. Burch's use of the CES data and the EI method to estimate turnout by race, were generally not credible.

351.    In addition to the problem of credibility, the Court also finds Dr. Swanson's critiques of Dr. Burch unpersuasive and frequently unsupported or lacking rigor.

352.    As noted already, Dr. Swanson critiqued the use of the CES at some length on the ground that some of the weighting values were certain respondents were high and possibly influential outliers that might throw off the data, especially when conducting more granular analysis. *E.g.*, D. Swanson Testimony, 08/13/24 Trial Tr. 992:10–994:5. But this critique is in significant tension not only with Dr. Burch and Dr. Bonneau's opinions that the CES is reliable, well-constructed, and widely used by political scientists, but also with Dr. Swanson's own admissions that the CES is designed to be used, as here, to study turnout by race at the state level, and that the CES designers validated their sampling and weights by comparing the state-level samples within the survey with actual election results. *Id.* at 1133:17–1134:10. And in any case, because Dr. Swanson admittedly used the wrong weights in conducting his statistical diagnostics of the CES, Dr. Swanson had no quantitative analysis to support this critique. *Id.* at 1157:16–1158:8. Moreover, in response to his critique, Dr. Burch trimmed the maximum weighting values

156

in the data down from 15 to 5 and found that a ten-plus point racial turnout gap was still present and statistically significant. *See* Pls.' Ex. 231, June 19, 2024 Response to Supplemental Report of Dr. Swanson of Dr. Traci Burch at 1–2 [hereinafter "PX-231"]. When presented with this analysis, Dr. Swanson simply had no response and did not dispute it. D. Swanson Testimony, 08/13/24 Trial Tr. 1158:16–1159:7.

353.     Dr. Swanson offered other critiques that were palpably based on speculation. At one point, he contradicted his sworn deposition testimony agreeing that the CES designers had conducted an internal study and validated the reliability of their data and claimed, for the first time, to take issue with the fact that survey data was gathered online. D. Swanson Testimony, 08/13/24 Trial Tr. 1135:8–1137:15. The stated basis for his newfound concern was "the possibility that there are missing segments in that online panel that don't quite match up. And that's an area that has not been studied. *So I can't say that that's true now, but I'm just raising that as a question in my mind.*" *Id.* (emphasis added). In another instance, Dr. Swanson speculated that the inclusion of confidence intervals in Dr. Burch's presentation of her EI analysis was due to "something called a superpopulation," a concept from the 1940s that Dr. Swanson said somehow meant Dr. Burch's results were "inconclusive." *Id.* at 1006:9–1007:5. This "superpopulation" concept, which Dr. Swanson did not explain further, appears nowhere in any of the political scientists' discussions of EI (or in any of Dr. Swanson's or any other experts' reports); Dr. Swanson later admitted he simply did not know whether a political scientist would typically include confidence intervals when reporting the results of an EI analysis. *Id.* at 1170:11-1171:13.

354.     Dr. Swanson also speculated that the "missing voters" from the voter file (*i.e.*, the

157

voters that were unmatched to a block group when Dr. Burch geocoded the voter file for use in the EI analysis) could have somehow biased some of Dr. Burch's EI results. D. Swanson Testimony, 08/13/24 Trial Tr. 1007:11–1008:20. However, Dr. Burch explained in her rebuttal report that "EI may be performed for any 'aggregate groupings of votes for which the racial composition is known,'" PX-039 at 10 n.28 (quoting Lewis 2004:97). The block group data that Dr. Burch used— even without the people who were unmatched to block groups whom Dr. Swanson described as "missing voters"—included nearly 90% the electorate and is clearly a large "aggregate grouping" susceptible to EI analysis. *Id.*; *see also* T. Burch Testimony, 08/07/24 Trial Tr. 655:1–11. And Dr. Burch found that the "missing" group had very similar overall turnout levels to the rest of the voters in the voter file, which indicates that the small subset who were not matched to a block-group was "a random dropping out of people," and therefore not a source of bias. T. Burch Testimony, 08/07/24 Trial Tr. 654:13–22; *see also* PX-039 at 14 n.41.[10] Again, Dr. Swanson simply did not address this point.

355.     Other critiques were extreme overstatements. For example, Dr. Swanson criticized Dr. Burch for including Adams County rather than Bolivar County in District 1 in conducting her District-1-specific EI analysis, calling this a "major error," and leaving the impression that there was some flaw in Dr. Burch's results. D. Swanson 1000:25–1001:20. But he then agreed on cross-examination that he had been sent corrected raw data and results with this transposition corrected,

---

[10] Moreover, Dr. Burch also conducted an alternative analysis to account for these so-called "missing voters," which produced a similar result, showing a turnout gaps between White and Black voters of 12% statewide, and 17% in the Central District. *E.g.*, PX-039 at 14 n.41, 16.

and that the result of Dr. Burch's EI analysis of District 1 had not changed once Bolivar once substituted for Adams. *Id.* at 1168:23–1169:12.

356.    Based on the consistent racial turnout gap across multiple independent, reliable measures of turnout conducted by Dr. Burch using validated turnout data, the Court credits Dr. Burch's analyses and finds that there was a substantial, double-digit gap in voter turnout between Blacks and Whites in the 2020 election in Mississippi generally, and in the Central District specifically, with Black voters turning out at lower rates. T. Burch Testimony, 08/07/24 Trial Tr. 595:2–12.[11]

357.    The Court's finding of a racial turnout gap is not altered by turnout estimates from the Current Population Survey Voting and Registration Supplement ("CPS") offered by Defendants via Dr. Swanson. *See* D. Swanson Testimony, 08/13/24 Trial Tr. 1107:12–19 (CPS data is the "primary basis" for Dr. Swanson's opinion that there is no racial turnout gap).

358.    The CPS is an unverified, self-reported survey of voting behavior from a random sample of persons, from which estimates of voter turnout are derived. T. Burch Testimony, 08/07/24 Trial Tr. 588:16–589:9 (Dr. Burch testifying that "the Current Population Survey's

---

[11] Nor is there any reason based on the trial record to think that 2020 was an outlier with respect to the turnout gap. As Defendants' own expert explained, the CES is a cumulative dataset containing data for previous election years, and Defendants' experts could have shown that 2020 was an outlier if that had been the case but they did not do so. *See* C. Bonneau Testimony, 08/12/24 Trial Tr. 866:12–20, 867:13–15, 869:22–25, 872:6–873:16 (independent analysis showing that educational disparities led to lower voter turnout in 2010 and 2012). And more generally, Dr. Swanson did not dispute that, across all the jurisdictions formerly covered by Section 5 of the Voting Rights Act, including Mississippi, the racial turnout gap has been increasing since the end of the Section 5 preclearance process. D. Swanson Testimony, 08/13/24 Trial Tr. 1122:22–1123:5.

questions about voting rely entirely on unverified self-reports"); *accord* D. Swanson Testimony, 08/12/24 Trial Tr. 1106:14–18.[12]

359.    The evidence presented at trial showed, and the Court finds, that such self-reported surveys are fundamentally not reliable data from which to estimate voter turnout by race. Using data on voting behavior drawn from an objective source (such the state's own voter history file, as with the CES and Dr. Burch's EI analysis) rather than voters' own self-reports is important because voters will over-report having voted on surveys even when they did not actually vote. T. Burch Testimony, 08/07/24 Trial Tr. 664:16–18. Dr. Burch testified that "when the CPS asks a person if they vote, the problem is that they will give you an answer but it won't be accurate for various reasons." *Id.* at 664:7–13. Dr. Bonneau, who has used the CES extensively in his own work, agreed on that point. *See* C. Bonneau Testimony, 08/12/24 Trial Tr. 873:6–16 ("[I]f you use self-reported

---

[12] For the avoidance of any doubt, the CPS is administered by the U.S. Census Bureau, but it is not the Census. The Decennial Census is a count of every resident of the United States, conducted every 10 years, whereas the CPS is a voluntary survey administered to a sample of the population. *See, e.g.*, U.S. Census Bureau, *Decennial Census of Population and Housing*, https://www.census.gov/programs-surveys/decennial-census.html (last updated Aug. 18, 2022) ("The U.s. census counts each resident of the country, where they live on April 1, every ten years ending in zero."); U.S. Census Bureau, *Methodology*, https://www.census.gov/programs-surveys/cps/technical-documentation/methodology.html (last updated Nov. 19, 2021) ("The CPS is administered by the Census Bureau using a probability selected sample of about 60,000 occupied households. The fieldwork is conducted during the calendar week that includes the 19th of the month."); U.S. Census Bureau, *Frequently Asked Questions*, https://www.census.gov/programs-surveys/cps/about/faqs.html (last updated Oct. 2, 2023) ("About 59,000 households are selected for the CPS each month, and it is a voluntary survey.")). The above facts are drawn directly and verbatim from U.S. government websites maintained by the U.S. Census Bureau and the Bureau of Labor Statistics. The accuracy of the information cannot be reasonably questioned. *See* Fed. R. Evid. 201(b)(2).

data for voting, people will say they vote[d] when they didn't."). Dr. Swanson agreed as well. D. Swanson Testimony, 08/13/24 Trial Tr. 1110:1–1111:7. Indeed, the Census Bureau, which administers the CPS, expressly advises that respondent misreporting is a source of error. *Id.* at 1112:20–23

360. Crucially, the political science literature has demonstrated that this overreporting phenomenon is not race neutral, and that Black voters tend to overreport at higher rates. *See, e.g.,* PX-039 at 2–3; D. Swanson Testimony, Trial Tr. 1113:1–20, 1115:6–17 (agreeing that "[p]erhaps one of the most consistently documented aspects of overreporting is that African Americans overreport at higher rates than Whites." (discussing Jenkins and White, *Vote Overreporting While Black: Identifying the Mechanism Behind Black Survey Respondents' Vote Overreporting*, American Politics Research (2021)). A recent paper by Dr. Stephen Ansolabehere of Harvard University documented this phenomenon across multiple states in the South in the CPS data in particular, finding overreporting of voting on the CPS was higher for Black voters. *E.g.*, T. Burch Testimony, 08/07/24 Trial Tr. 589:11–590:12; *see also id.* at 662:6–9 (reading from Ansolabehere et al.'s article that "The CPS estimate of the Black share of the electorate is statistically significantly higher than the actual percentage of voters who are Black"); Pls.' Ex. 181, Stephen Ansolabehere et al., *The Current Population Survey Voting and Registration Supplement Overstates Minority Turnout*, 84 The Journal of Politics 1850 (2022) [hereinafter "PX-181"]. The article by Dr. Ansolabehere notes "growing concerns among researchers that the CPS may not accurately measure turnout, particularly for minority citizens" and demonstrates that in fact there is a "serious bias" in the CPS such that it "consistently overstates the participation rate among

161

Blacks and Hispanics while it sometimes underestimates participation among Whites." *See, e.g.*, T. Burch Testimony, 08/07/24 Trial Tr. 589:15–590:12, 620:4–11, 664:7–18.

361.     The CPS's overreporting problem is reflected in the numbers in Mississippi. As Dr. Burch testified, "the CPS overstated Mississippi voter turnout in 2020 by over 200,000 votes," suggesting substantial over-reporting by respondents purporting to have voted. T. Burch Testimony, 08/07/24 Trial Tr. 589:11–12. Specifically, "the CPS data are saying that voter turnout in Mississippi was 70 percent of the citizen voting-age population, but the actual voter data from the secretary of state shows that it's only 58.7 percent," demonstrating "the power of overreporting." T. Burch Testimony, 08/07/24 Trial Tr. 596:4–13.

362.     Dr. Swanson did not dispute these numbers or any of the problems with the CPS or offer any affirmative argument for why it could be considered reliable with respect to estimating turnout by race despite these issues. He agreed that the CPS overstated turnout in Mississippi in 2020 by over 200,000 votes. D. Swanson Testimony, 08/12/24 Trial Tr. 1110:1–1111:7. He repeatedly agreed that differential overreporting of voting by race is a source of bias in the CPS in particular. *Id.* at 1115:18-21; *see also id.* at 1122:15–21 (conclusion that "self-reported surveys of voting are biased" "fits the evidence"). He agreed that Dr. Ansolabehere and his co-authors did a "good job" in their article demonstrating problems with using the CPS to estimate turnout by race. *Id.* at 1116:6–1117:2. He agreed that, given the level of overreporting apparent in the 2020 CPS estimates of turnout in Mississippi, it would be a "reasonable hypothesis" that the CPS overstates Black turnout in Mississippi. *Id.* at 1117:3–8. And Dr. Swanson never, at any point, offered any countervailing reason to disregard this known, systemic bias and accept the self-reported CPS

estimates of turnout by race despite these well-documented problems and the warnings of political scientists not to use the CPS for that specific purpose.

363.    Dr. Burch furthermore tested the "reasonable hypothesis" that self-reported turnout in Mississippi in 2020 would understate the racial turnout gap and found that in fact it did. She independently analyzed the CES data, comparing the number of respondents who self-reported having voted and the number of respondents whose voting behavior was verified. T. Burch Testimony, 08/07/24 Trial Tr. 573:18–574:11. Through this analysis, Dr. Burch found that "the team was able to validate that 74 percent of the White Mississippi residents who said they voted actually voted. And for Black Mississippi residents, they were only able to validate 57 percent of people who said they voted." T. Burch Testimony, 08/07/24 Trial Tr. 574:1–5. Accordingly, "there's overreporting in both racial groups, but Black people are more likely to overreport than White people in Mississippi," meaning "the racial gap in self-reported voter turnout is going to be artificially lower because people aren't being honest about what they're doing in Mississippi." T. Burch Testimony, 08/07/24 Trial Tr. 574: 5–11. This differential overreporting means that using an unverified survey to examine turnout *by race* is particularly likely to lead to an inaccurate result. *Id.*

364.    The Court credits Dr. Burch's essentially uncontested conclusion, based on the literature as well as her own independent analysis, that the racial differential in over-reporting of voting behavior renders self-reported surveys generally, and the CPS in particular, inaccurate and unreliable for the specific purpose of measuring voter turnout by race, including and especially in Mississippi. *E.g.* T. Burch Testimony, 08/07/24 Trial Tr. 590:3–12 (stating she would not choose

163

to rely upon the CPS for voter turnout estimates, and that the CPS voter turnout data "shouldn't stand alone"); *see also id.* at 596:18 (characterizing the CPS voter turnout estimates as "unreliable"); PX-039 at 2–3.

365.    For similar reasons, the Court does not credit the Mississippi Poll from Mississippi State University, on which Dr. Swanson also relied, as a reliable source of data on the particular issue of voter turnout by race in Mississippi. The Mississippi Poll is also entirely "self-reported voting behavior," and is thus subject to the same concerns as the CPS. D. Swanson Testimony, 08/12/Trial Tr. 1121:4-6. As Dr. Burch explained, the "Mississippi Poll may be even worse than surveys like the CPS that use self-reported voter turnout, because it measures self-reported 'turnout intention.'" PX-231 at 2. This means that survey respondents are not even asked *if* they voted, but whether they *intend* to vote, causing the overreporting endemic to unverified self-reporting surveys like the CPS discussed by Dr. Burch to be exacerbated even further. *Id.* "As a result, comparatively few academic studies of voter turnout rely on this measurement," *id.*, and the Court agrees it is not reliable.

366.    Other than these two self-reported surveys, Dr. Swanson also relied on a report issued by the Brennan Center purporting to address the racial turnout gap in a large number of states. D. Swanson Testimony, 08/13/24 Trial Tr. 1131:12–16. For a number of reasons, the Court does not credit Dr. Swanson's reliance on the Brennan Center report.

367.    Dr. Swanson testified that he knew nothing about the authors of the report, that its data was not public, and that the report was published on the internet and had not peer-reviewed. D. Swanson Testimony, 08/13/24 Trial Tr. 1121:17–1122:14, 1124:1–10. He testified that, even

164

though the report was "dense and difficult" and involved the use of a "complicated" Bayesian Inferred Surname Geocoding (BISG) algorithm that he could not replicate and did not necessarily consider reliable, Dr. Swanson spent only several hours reviewing it and didn't read it in "extreme detail." *Id.* at 1128:9–11, 1130:8–1131:11. In light of these concessions, Dr. Swanson's use of the report strongly suggests that he chose to rely on it not because of its reliability for measuring turnout by race in Mississippi, but because it appeared to support his position.

368.    Dr. Burch, by contrast, cogently explained why the Brennan Center report is not a proper basis from which to draw conclusions about turnout by race in Mississippi—and Dr. Swanson did not dispute the points that she raised. For one, because the Brennan Center report only reports a "weighted turnout gap" statistic for each of dozens of States in a summary chart, and does not actually report levels of Black and White turnout in Mississippi (or any other State), it cannot be compared to any benchmark level of turnout (like official turnout numbers from the Secretary of State) to gauge its accuracy. *See* T. Burch Testimony, 08/07/24 Trial Tr. 590:3–10; *accord* D. Swanson Testimony, 08/13/24 Trial Tr. 1123:22–1124:16. For another, the *average* county-level error rates in estimating Black turnout were very high, over 14%, which Dr. Burch "a really, really big error" rate. *Id.* at 591:17–22; PX-231 at 3–4 (detailing criticisms of the Brennan Center report in writing); *accord* D. Swanson Testimony, 08/13/24 Trial Tr. 1128:25-1129:22.

369.    Other issues were identified in the course of Dr. Swanson's testimony. The Brennan Center report's BISG algorithm uses a particular source of demographic data (the 2016-2020 ACS)

165

that the Census Bureau itself warned "fails the quality standard." *Id.* at 1129:23–1130:7.[13] And there are particular reasons for concern that a one-size-fits-all BISG algorithm might not work well in Mississippi: As Dr. Swanson testified, BISG was developed to identify people of Hispanic ethnicity based on distinctive surnames. D. Swanson Testimony, 08/13/24 Trial Tr. 1125:10–24. But especially in a jurisdiction like Mississippi where Black and White people in the same geography often share surnames, Dr. Swanson agreed that BISG may be a less reliable method. *Id.* at 1128:12-24

370. The Court accordingly credits Dr. Burch's conclusion that the Brennan Center report is "not a reliable data source" for purposes of measuring voter turnout by race in Mississippi. T. Burch Testimony, 08/07/24 Trial Tr. 591:22.

371. One additional, larger point bears mention with respect to turnout. Defendants' position over the course of trial appeared to be that the voting-eligible Black population in District 1 was larger than the White population, and that Black turnout is greater than or at a minimum equal to White turnout. The trial record has not borne these out, *e.g.*, *supra* ¶¶ 72–78, 336–370, but the simple reality of District 1 elections confirms that Defendants' position cannot be right. If it was, then at currently existing levels of racial polarization in voting, Black candidates would win every election in District 1. Instead, more often than not they lose. *See also supra* ¶¶ 138–165.

---

[13] *See also* W. Cooper Testimony, 08/05/24 Trial Tr. 53:21–54:2, 87:4–88:4 (discussing why he does not use the 2016-2020 5-year ACS); D. Swanson Testimony, 08/13/24 1079:15–108:17 & Pls.' Ex. 98, U.S. Census Bureau, Increased Margins of Error in the 5-Year Estimates Containing Data Collected in 2020.

372.    The Court finds based on the expert socioeconomic analysis, the witness testimony regarding socioeconomic conditions and racial disparities in Mississippi, and Dr. Burch's voter turnout analysis that Black Mississippians' political participation is hindered due to pervasive racial disparities in socioeconomic well-being, especially in education, which plays a significant role in participation in down-ballot races like Mississippi Supreme Court contests. Senate Factor 5 accordingly weighs strongly in Plaintiffs' favor. Indeed, given the strength of the socioeconomic analysis, Senate Factor 5 would still weigh in Plaintiffs' favor even if the voter turnout analysis were not so clearcut.

### F.    Senate Factor 6:  Racial Appeals in Mississippi Politics

373.    The sixth Senate Factor assesses "whether political campaigns have been characterized by overt or subtle racial appeals." *Gingles*, 478 U.S. at 37. Both overt racial appeals and subtle, racialized references can be employed to influence voters. *Id.*

374.    The Court credits the testimony of Dr. King, Dr. Campbell, and Justice Diaz that elections in Mississippi have long been marked by both overt and subtle racial appeals, and that the unfortunate use of such appeals has continued into the present. *See* M. King Testimony, 08/14/24 Trial Tr. 1339:12–18; J. Campbell Testimony, Trial Tr. 08/06/24 at 389:6–8; 445:7–8. The experts' testimony is further supported by Justice Anderson, who has personal experience with racial appeals, both as a candidate and as the chair of Justice Fred Banks' election. R. Anderson Testimony, 08/08/24 Trial Tr. 737:23–738:6, 741:1–742:10.

375.    Racial appeals "signal[] to potential voters that a candidate has preferences or beliefs revolving around race" and that the candidate is "in alignment or agreement on their

167

attitudes and values as it relates to race." M. King Testimony, 08/14/24 Trial Tr. 1323:22–1324:2.

376.    When used against Black candidates, racial appeals may rely on negative stereotypes, including "tropes related to criminal justice, welfare," such as the idea that racial minorities are "undeserving" or abusing public benefits. M. King Testimony, 08/14/24 Trial Tr. 1324:3–1324:17.

377.    But as Dr. King also explained, racial appeals today are not necessarily aimed at voters with racist views, *i.e.*, a belief that certain racial groups are inherently inferior or superior. M. King Testimony, 08/14/24 Trial Tr. 1383:17–1385:1. Rather, such appeals may attract voters who are better described as racially conservative, based on their support for a more limited role of the government in addressing issues around race. M. King Testimony, 08/14/24 Trial Tr. 1339:12–18, 1383:17–1385:1 ("[R]acial conservatism, that's more of an ideological construct related to the size and scope of government. What should government do, and how much of it should it do.").

378.    Racial appeals may be either overt or implicit, with overt appeals being more common historically. M. King Testimony, 08/14/24 Trial Tr. 1324:18–1326:22; J. Campbell 08/07/24 Testimony, Trial Tr. 441:13–18. An example of an overt racial appeal was Theodore Bilbo's stump speech of 1946 during which he explicitly implored Mississippians to prevent Black residents from voting. *See* J. Campbell Testimony, 08/07/24 Trial Tr. 441:15–18. In recent decades, to avoid backlash for overtly appealing to race, candidates have adopted a strategy to use coded language—a strategy elucidated by Lee Atwater, a Reagan-era political strategist—to refer to Black people euphemistically and make the candidate's views about race issues known. M. King Testimony, 08/14/24 Trial Tr. 1324:18–1325:6 ("So [candidates] might refer to welfare. They

168

might refer to urban or inner city or ghetto. The implication is they're referring to Black, but they don't say Black."), 1325:7–22 ("So as [Atwater] says here, 'Now you are talking about cutting taxes, and all these things that are economic, and a byproduct of them is Blacks get hurt worse than Whites.'"); J. Campbell Testimony, 08/07/24 Trial Tr. 442:2–15; O. Diaz Testimony, 8/7/24 Trial Tr. 303:9–14. The Court credits the undisputed testimony that such coded language, or "dog-whistles," are intended to "provoke fear and anxiety" about race without appearing racial "on their face." *See* J. Campbell Testimony, 08/07/24 Trial Tr. 442:2–15.

379.    The record contains numerous examples of racial appeals in a variety of elections, spanning decades and involving candidates from all kinds of offices, including sitting state legislators, a current U.S. Senator, candidates for statewide office, as well as judicial candidates.

380.    One especially illuminating example involved Representative Lester "Bubba" Carpenter, from House District 1 in the Tishomingo County area. M. King Testimony, 08/14/24 Trial Tr. 1325:23–1326:2; Remarks of Rep. Lester Carpenter, Pls.' Ex. 74 [hereinafter "PX-074"]. In 2015, Rep. Carpenter warned his constituents in Tishomingo County, which is majority-White, of a potential "nightmare" scenario if an education-funding initiative were to pass: A "Black judge" from "predominantly Black" Hinds County could decide how to allocate education funds. PX-074. Rep. Carpenter then speculated that a Black jurist could take money from Tishomingo County and send it to Rolling Fork, which is an impoverished and predominantly Black municipality in the Delta. PX-074; M. King Testimony, 08/14/24 Trial Tr. 1326:32–1327:6; *see also* T. Pinkins Testimony, 08/05/24 Trial Tr. 104:21–105:3, 114:21–115:24 (testifying about hometown of Rolling Fork and the failing school system attended primarily by Black students).

381.    Rep. Carpenter's remarks constitute a racial appeal for at least two reasons. First, "he called out the race of the jurist," implying that that Black judges cannot be impartial. *See* PX-074; M. King Testimony, 08/14/24 Trial Tr. 1326:32–1327:6. Second, he chose to juxtapose a majority-White area against a majority-Black area, to suggest that a Black judge would take money away from White communities if given the opportunity. *See* PX-074; M. King Testimony, 08/14/24 Trial Tr. 1326:32–1327:6. The Court notes that Rep. Carpenter won his election and continues to serve in the Legislature, which is responsible for maintaining and enacting the current Supreme Court district lines. M. King Testimony, 08/14/24 Trial Tr. 1327:7–9.

382.    There are numerous examples of racial appeals invoking nostalgia for the Confederacy. The use of Confederate symbols may properly be considered a form of racial appeal, because maintaining the enslavement of Black people was the stated cause of the Confederacy (as set forth in the Secession Ordinance), and "there is a long history of Confederate imagery being associated with states' rights and anti-civil rights preferences." M. King Testimony, 08/14/24 Trial Tr. 1328:25–1329:11; *see also* T. Pinkins Testimony, 08/05/24 Trial Tr. 119:1–8 (official use of confederate symbols, in this case confederate high school mascot, "made me feel like I wasn't equal to or wasn't respected"). Examples of racial appeals invoking nostalgic references to the Confederate cause have included:

    a.    In 2014, Cindy Hyde-Smith, who was Commissioner of Agriculture at the time, posted a photo of herself wearing a Confederate uniform at the Jefferson Davis Museum, with a caption containing the sentence, "Mississippi history at its best." M. King Testimony, 08/14/24 Trial Tr. 1328:9–21; PX-052 at 16; PX-054 at 4.

170

b.    In 2014, then-U.S. Senate candidate Chris McDaniel ran a television ad that featured him speaking in front of a Confederate flag, subtly signaling his stance on race. M. King Testimony, 08/14/24 Trial Tr. 1330:24–1331:17; PX-052 at 16; PX-054 at 3.

383.    Candidates in Mississippi have also used references to lynchings or hangings as part of their racial appeals. Such references are racial in nature, given Mississippi's history of lynchings. "More Americans were lynched in Mississippi than any other state during the Jim Crow era," and "[l]ynchings were the primary tool of violent repression and intimidation to discourage Blacks from seeking political rights and political participation." M. King Testimony, 08/14/24 Trial Tr. 1330:4–13. Historically, "the targets of lynchings were Blacks who were pushing for civil rights or in some way violated the racial status quo or even their White allies." M. King Testimony, 08/14/24 Trial Tr. 1332:8–25; PX-052 at 23. Examples of appeals that invoke racial violence have included:

a.    In 2017, Representative Karl Oliver, in opposition to efforts to remove Confederate statues, stated that those who want to "destroy historical monuments of OUR HISTORY, they should be LYNCHED." PX-052 at 23; M. King Testimony, 08/14/24 Trial Tr. 1332:8–25. That statement included not only a racial appeal to the Confederacy but also a call for violence from Mississippi's dark past.

b.    In 2018, Senator Hyde-Smith, who was campaigning against a Black candidate, former Representative Mike Espy, said at a public event that if she were "invited . . . to a public hanging," she would "be on the front row." PX-052 at 16. The Court credits Dr. King's testimony that the reference to a public hanging is a reference to lynchings and

171

constitutes a racial appeal. *See* M. King Testimony, 08/14/24 Trial Tr. 1330:4–13.

384.     Candidates in Mississippi have also appealed to "states' rights" or state sovereignty, which may be code for resistance to the abolition, desegregation, or civil rights legislation. M. King Testimony, 08/14/24 Trial Tr. 1317:13–1318:2 ("Opposition . . . typically revolved around the idea that the civil rights legislation violated states' rights and sovereignty. So you would see this in many election campaigns as a way to attract voters who were against this federal intervention."), 1333:1–19 ("[G]oing back to Strom Thurmond, George Wallace again, Barry Goldwater, that anything that promotes civil rights is an automatic violation of states' rights."). Examples that invoke states' rights and opposition to civil rights legislation have included:

a.     In 2019, Representative Mark Baker characterized the Voting Acts Right as a violation of Mississippi's "sovereignty," which "is a very similar sort of coded messaging" that was used to oppose federal civil rights legislation decades ago. M. King Testimony, 08/14/24 Trial Tr. 1333:1–19; PX-052 at 16.

b.     In 1980, Ronald Reagan launched his campaign at the Neshoba County fair. J. Campbell Testimony, 08/07/24 Trial Tr. 442:20–444:5. During his stump speech, President Reagan emphasized "states' rights" and local control of schools, implying his opposition to desegregation efforts and his support for using tax dollars to fund private schools at a moment when there was a major controversy over those issues in Jackson. *See id.*

385.     Racial appeals may also make use of the stereotypical trope of the Black criminal. In 2018, former Congressman Mike Espy, who is Black, ran for U.S. Senate against Senator Cindy

172

Hyde-Smith, a White candidate. M. King Testimony, 08/14/24 Trial Tr. 1329:12–1330:3; PX-052 at 17–18. The Mississippi Republican Party distributed a misleading mailer, which used the imagery of prison bars and a red-stamped "INDICTED" to falsely suggest that Espy was a convicted criminal. PX-054 at 4; M. King Testimony, 08/14/24 Trial Tr. 1329:12–1330:3. As Dr. King explained, this mailer relied on "the stereotype of a Black criminal." M. King Testimony, 08/14/24 Trial Tr. 1329:12–1330:3.

386.     Racial appeals have been a consistent feature of Mississippi Supreme Court elections in particular. Dr. King identified, going back to 1985, racial appeals being used against at least four of the five Black candidates running in a contested election in District 1. Those examples include:

a.     Justice Reuben Anderson, the first Black justice on the court, faced racial appeals in 1986. Justice Anderson testified that his opponent, Richard Barrett, "was an out-and-out racist and a Klansman." R. Anderson Testimony, 08/08/24 Trial Tr. 737:17–738:6 (testifying that Barrett "didn't mind letting it be known that he was a racist"); *see also* PX-018 at 42 ("Barrett was not simply a segregationist, but a virulent white nationalist, who, at the time of his campaign, advocated not only the sterilization of inferior races but also the deportation of African Americans, Puerto Ricans, Asians, and Jews."). Barrett campaigned on a message that he was running against a "quota maker" and "running against reserving a seat on the Mississippi Supreme Court for the NAACP." M. King Testimony, 08/14/24 Trial Tr. 1333:20–1334:17. Dr. King persuasively explained that Barrett's campaign messages included racial appeals—the reference to a "quota" occurred

173

at a time when affirmative action was a salient policy issue and implied that Justice Anderson was an example of an "underserving" Black person "taking White jobs and that Whites were burdened by Blacks advancing." *Id.* The reference to the NAACP or the National Association for the Advancement of Colored People—"the nation's oldest civil rights organization that has a long and distinguished history of arguing for civil rights" including in the U.S. Supreme Court—is also implying that an association with civil rights and Black people is disqualifying. *Id.*

b. Justice Fred Banks, the second Black justice on the Mississippi Supreme Court, faced racial appeals in 1991. His White opponent, Judge Chet Dillard, ran newspaper advertisements that contained side-by-side photos of the two candidates to emphasize their racial identity. M. King Testimony, 08/14/24 Trial Tr. 1334:18–1335:11; Pls.' Ex. 77, Chart and images from the Oct. 3 Report of O. Diaz, at 4. According to Justice Anderson, who chaired Justice Banks' campaign and whose testimony the Court credits, Dillard made sure that the candidates' photographs were "plastered through the district [showing] that he was White and Fred was Black." R. Anderson Testimony, 08/08/24, Trial Tr. 741:18–21. Justice Anderson further stated, "we knew what it was . . . Chet was what you would say 'playing the race card,' saying to his constituents and to everybody in the district that I'm a White man. You should vote for me over a Black man." *Id.* at 742:19–23. The Court credits Justice Anderson's testimony that, although Justice Banks prevailed, Dillard's strategy of "using race to get elected" "was effective" in part, because the elections results were "real close" despite Justice Banks's experience and qualifications.

*Id.* at 746:6–23. The Court also credits Justice Diaz's testimony that a "common tactic" used "many times in Mississippi Supreme Court races" is leafleting White churches with advertisements including photographs showing a Black opposing candidate to emphasize that candidate's race "when the candidate himself has avoided doing that sort of thing." O. Diaz Testimony, 08/07/24 Trial Tr. 305:18–24. Indeed, Black candidates, even today, are typically reluctant to publicly display their photographs, because doing so would identify their race. D. White Testimony, 08/06/24 Trial Tr. 346:10–16. In addition, the photograph of Justice Banks was darkened to emphasize his race, and the caption omitted his title as a sitting justice on the Supreme Court at the time to make him appear unqualified. *See* M. King Testimony, 08/14/24 Trial Tr. 1334:18–1335:11.

   c.  Justice James Graves, the third Black justice on the Mississippi Supreme Court, also faced racial appeals. His White opponent, Judge Samac Richardson, used the campaign slogan, "one of us," which has been recognized by two three-judge panels as a racial appeal. M. King Testimony, 08/14/24 Trial Tr. 1334:18–1335:11; O. Diaz Testimony, 8/7/24 Trial Tr. 303:17–305:7; PX-052 at 19–20; *MS NAACP*, 2024 WL 3275965, at *49 (citing *Jordan,* 604 F. Supp. at 813 n.8 (N.D. Miss. 1984)). The slogan emphasized Justice Graves's race, making him "the other" and "different" from "us," meaning White people). M. King Testimony, 08/14/24 Trial Tr. 1335:16–1336:3.

   d.  Judge Latrice Westbrooks, who ran unsuccessfully for a Supreme Court seat in 2020, faced racial appeals as well. Among other examples, one campaign ad accused Judge Westbrooks of "[d]iverting funding to Criminal Defendants" and lacking "Judicial

175

Neutrality." PX-146 at 2. The ad draws upon the stereotypical association of Black candidates with criminals and the trope that Black judges cannot be impartial—the same theme that Representative Carpenter invoked regarding Black judges and education funding. M. King Testimony, 08/14/24 Trial Tr. 1336:23–1337:6. Several ads involving Judge Westbrooks utilized her photograph, emphasizing her racial identity. PX-146 at 1–3; O. Diaz Testimony, 8/7/24 Trial Tr. 332:23–333:3.

387.    Thus, Dr. King has found racial appeals being employed against four of the five Black candidates who have run in a contested election for the Mississippi Supreme Court in District 1. M. King Testimony, 08/14/24 Trial Tr. 1338:19–1339:19. The only candidate for whom Dr. King did not identify as an example was Rep. Earle Banks, who ran unsuccessfully in 2012.

388.    The Court credits Dr. King's testimony, which is supported by that of Dr. Campbell and Justices Anderson and Diaz, that the "widespread and consistent" use of racial appeals—for "decades and decades" and encompassing virtually every type of election and office—"speaks to the political culture in the state" and the extent to which politics is racialized. M. King Testimony, 08/14/24 Trial Tr. 1337:19–1339:1.

389.    Moreover, Defendants' own expert, Dr. Bonneau, acknowledged that "the Republican Party has done a really good job of appealing to a time in the past when White people were more prominent." C. Bonneau Testimony, 08/12/24 Trial Tr. 838:11–15.

390.    The Court is also persuaded by Dr. King's testimony that the prevalence of racial appeals reflects political campaigns' and candidates' beliefs that such appeals will be effective, regardless of whether racial appeals have the desired effect in specific instances. In general, "the

176

number one goal of elected officials is reelection," so "candidates will not make these racial appeals unless they feel that . . . [the appeals] will help with their reelection prospects," whether by attracting certain White voters or by dissuading some Black voters from voting. M. King Testimony, 08/14/24 Trial Tr. 1337:7–1338:8 ("[T]hese racial appeals very much play into why we get the turnout that we get.").

391.    In any event, multiple candidates discussed above, including Rep. Lester Carpenter and Rep. Karl Oliver, have been elected in recent years despite using racial appeals. *E.g.*, M. King Testimony, 08/14/24 Trial Tr. 1327:7–9, 1382:3–8.

392.    Even if a Black candidate who is subjected to racial appeals ultimately prevails, racial appeals nonetheless impact the political opportunity available to Black Mississippians. As Dr. King explained, the prospect of being subjected to racial appeals discourages other minority candidates from running, particularly when there is a high probability that such appeals will occur, as has been the case in Mississippi. M. King Testimony, 08/14/24 Trial Tr. 1337:19–1339:1 ("So if I'm a potential supreme court justice candidate and I know that 80 percent of Blacks who ran before me had to deal with racial appeals, that might very well dissuade me from running, making me think that I don't want to have to go through that to get elected."). And as Justice Anderson explained, racial appeals may be enough to influence vote totals and vote share, even if the impact of the appeals alone is not enough to tip an election. *See* R. Anderson Testimony, 08/08/24 Trial Tr. 746:6–23.

393.    The use of racial appeals is also related to ongoing racial polarization and continues to "entrench" racial divisions in Mississippi politics. M. King Testimony, 08/14/24 Trial Tr.

1339:2–11. As Dr. King explained, racial appeals are "a two-way street"—while it appeals to some voters, it also alienates other voters. *Id.* at 1330:24–1331:17 (explaining that racial appeals signal "this is my people . . . that I want to vote for me, and if you don't like the [Confederate] flag, then don't vote for me").

394.    In light of the consistent use of racial appeals in campaigns, particularly against Black Supreme Court candidates, Senate Factor 6 weighs strongly in Plaintiffs' favor.

### G.    Senate Factor 7:  Lack of Success for Black Candidates in Mississippi

395.    The seventh Senate Factor is "the extent to which members of the minority group have been elected to public office in the jurisdiction." *Gingles*, 478 U.S. at 37.

396.    The undisputed facts in the record show that Black Mississippians are starkly under-represented in both state and federal office in Mississippi, including, most importantly for this case, the state's highest court.

397.    *First*, the track record for Black candidates running in statewide office is bleak. No Black candidate has won a statewide election in Mississippi since 1875—nearly 150 years ago. PX-053 at 1; M. King Testimony, 08/14/24 Trial Tr. 1340:8–18. And no Black person has ever been elected Governor or Attorney General of Mississippi. PX-053 at 1.

398.    *Second*, Black representation in federal office is minimal—and non-existent outside of Congressional District 2, which was originally fashioned by court order to comply with Section 2. *See supra* 65 n.2. Since the end of Reconstruction, there have been two Black members elected to represent Mississippi in Congress—former Representative Mike Espy and current Representative Bennie Thompson, both elected from Congressional District 2, which is centered

178

in the Mississippi Delta and runs North-South along the Mississippi River. M. King Testimony, 08/14/24 Trial Tr. 1340:19–1341:3. There has not been a Black U.S. Senator from Mississippi since the election of Senator Hiram Revels in 1873 during Reconstruction. PX-053 at 1.

399. Indeed, even including the period of Reconstruction, when Black Mississippians were briefly elected to Congress, only five of the 130 Congress members from Mississippi have been Black. M. King Testimony, 08/14/24 Trial Tr. 1340:19–1341:7. In other words, more than a third of Mississippi's population is Black, yet the State's congressional delegation has been less than 4% Black over its history. *Id.*

400. *Third*, Black Mississippians have been particularly and severely under-represented on the Mississippi Supreme Court, both historically and in recent years. Overall, only four of the 125 justices (3%) who have served on the state high court have been Black. M. King Testimony, 08/14/24 Trial Tr. 1341:14–25; *see also* C. Bonneau Testimony, 08/12/24 Trial Tr. 788:1–6 (testifying that Mississippi has been electing justices since 1832).

401. All four Black justices were appointed by a governor to the same District 1, Place 2 seat, one after the other. M. King Testimony, 08/14/24 Trial Tr. 1345:23–1346:2; PX-111. Accordingly, "there is no evidence that Blacks can win" without a gubernatorial appointment or in any seat other than District 1, Place 2, even though there is no formal distinction between the Place assignments on the court. M. King Testimony, 08/14/24 Trial Tr. 1347:4–13; *see also* O. Diaz Testimony, Trial Tr. 286:20–287:15 ("[E]ach of the justices have general jurisdiction over everything that appears before the court."). Every Black candidate who has attempted to seek election to the Mississippi Supreme Court without a prior appointment has lost. M. King

179

Testimony, 08/14/24 Trial Tr. 1345:23–1346:2. *See also supra* ¶¶ 237–238.

402.    From 2000 to 2020 (the most recent Supreme Court election), there have been 26

Supreme Court elections across all three districts, and Black candidates have won only three times.

PX-130; C. Bonneau Testimony, 08/12/24 Trial Tr. 848:23–849:6. That *includes* the two times

that Justice Leslie King ran unopposed. C. Bonneau Testimony, 08/12/24 Trial Tr. 848:23–849:6.

And even if Senate Factor 7 also concerned Black-preferred White candidates (which it does not),

Black voters only succeeded in electing their preferred candidate five times out of 26 elections. *Id.*

at 849:7–23 (including Justice Kitchens' two victories).

403.    While Defendants suggest that Justice King's lack of opposition is an indication of

his electoral strength (and of Black voters' opportunity to elect their preferred candidate), the Court

finds that argument unpersuasive. *See supra* ¶¶ 157–158. If Black candidates were as strong as

Defendants contend, then one would expect far more Black candidates running and winning

election to the Mississippi Supreme Court, given the significant amount of interest in the position

among Black attorneys in Mississippi. D. Simmons Testimony, 08/08/24 Trial Tr. 713:22–714:7

(discussing Black lawyers' interest in serving on the Supreme Court). Rather, the Court credits the

testimony from Senator Simmons and Representative Watson that an appointment from the

governor confers a strong advantage by clearing the field of credible opposition to the Black

candidate, and that Black candidates, absent that advantage, are often deterred from running. *See*

*supra* ¶¶ 157–158; *see also, e.g.*, D. Simmons Testimony, 08/08/24 Trial Tr. 713:22–714:7,

715:24–716:3 ("But the reality of it is, there is interest for African-American lawyers in that

district, but there is really no opportunity for success.").

404. Moreover, the record shows that Justice King does *not* in fact occupy a safe seat—Black legislators in 2016 were uniformly concerned that even a less than 0.5% decrease in District 1's BVAP would imperil his chances of reelection. *See supra* ¶ 158.

405. To the extent that Black candidates have gotten elected in Mississippi, they have nearly always done so in majority-Black districts, which tempers and contextualizes those wins. As a result of the low levels of White support for Black candidates, the opportunity for Black candidates to get elected outside of Black-majority districts is "abjectly horrible." *E.g.*, M. King Testimony, 08/14/24 Trial Tr. 1340:4–7.

406. The Court also credits testimony from fact witnesses that is consistent with the above analysis.

407. Rep. Watson, who has been active in Mississippi politics for nearly half a century, credibly testified that he receives a similar amount of support from White voters today as compared to 1979 when he first ran, and that he would not be able to prevail outside of a Black-majority district even now, based on the voting patterns he has observed. P. Watson Testimony, 08/07/24 Trial Tr. 494:25–495:7, 496:10–14, 496:25–497:424. He further explained that the racial composition of a district is "extremely accurate" at predicting the success of Black candidates, and that candidates rely on BVAP to assess electoral opportunity "in every campaign." *Id.* at 495:12–496:9. The Court credits Rep. Watson's testimony given his nearly 45 years of experience campaigning in Mississippi as one of the longest serving members in the Legislature and his extensive experience advising approximately one hundred political candidates in Mississippi over the course of his political career. *Id.* at 486:6–14, 493:3–25.

408.    That testimony is consistent with Justice Anderson's, another veteran of Mississippi politics, who testified point blank that race is "number one" in Mississippi politics. R. Anderson Testimony, 08/08/24, Trial Tr. 748:7–13; *see also, e.g.*, A. Thomas Testimony, 08/04/24 Trial Tr. 162:3–14; D. Simmons Testimony, 08/08/24 Trial Tr. 705:3–10.

409.    It is also consistent with Dyamone White's testimony. Ms. White, an ambitious young professional who recently ran for the Legislature and is clearly seeking opportunities to lead, testified that there are "zero" statewide opportunities, only one congressional seat, and limited local opportunities for Black candidates to win seats. D. White Testimony, 08/6/24 Trial Tr. 357:21–358:6.

410.    Defendants note that Transportation Commissioner Willie Simmons and Public Service Commissioner De'Keither Stamps, who are Black, have won elections in District 1, but as discussed above, those are a small number of cases related to different offices with different political dynamics, where race may be a less salient factor, where ballot roll-off effects among Black voters in particular are likely different, and where the coattail effects of the 2023 gubernatorial election in particular may have been unique. *See supra* ¶¶ 145–156.

411.    The Court also credits the testimony of Black Mississippians who have faced racial hostility on the campaign trail, which bears on the opportunity available to Black candidates. For instance, Ms. Dyamone White, a young Black candidate who ran for a seat in the Mississippi House, testified that she experienced racial hostility at the Neshoba County Fair—an incident that made her feel unwelcome as a Black candidate and made her question the "little progress" that had been made in Mississippi. D. White Testimony, 08/06/24 Trial Tr. 348:6–22. Ms. White also

testified she received racially hostile messages when she was reaching out to voters during her campaign through phone calls and text, and through responses to her posts online. *Id.* at 349:5–17. Ms. White also testified that, even today, it is atypical for a candidate to include their photo on campaign signs because "most of the time, they don't want people to know what color they are," especially if they have racially ambiguous names like "Willie" or "Henry." *Id.* at 346:1–2, 346:14–16. Even so, Ms. White proudly put her face and party affiliation on her campaign yard signs. *Id.* at 345:25–346:5. While Ms. White indicated that she would persist notwithstanding those obstacles, the Court finds the fact that such incidents continue to occur to Black candidates is likely to impact Black participation generally. *See id.* at 348:23–349:4; *MS NAACP*, 2024 WL 3275965 at *108–109 ("[[I]f white voters are insulting or even threatening black candidates, that is relevant to understanding the totality of the circumstances.").

412.     The undisputed evidence shows that "having a representative judiciary is incredibly important." C. Bonneau Testimony, 08/12/24 Trial Tr. 875:3–10. Dr. Bonneau, who has studied judicial elections and demographic representation for over 20 years, testified that having a judiciary "that looks like the population . . . tends to give more legitimacy to the decisions and to the institution." *Id.* at 875:8–22. Such representation is also "important from a role modeling perspective," to "show people that, in fact, certain avenues or certain professions are not closed off to them." *Id.*

413.     Fact testimony in the record confirms the importance of having diversity of representation in public office. Senator Simmons, as a practicing criminal defense attorney, testified to the "level of distrust" that his clients, who are predominantly Black, may have when

183

they do not see judges who look like them, "based upon the dark past of Mississippi, based upon lived or learned experiences that they may have" had. D. Simmons Testimony, 08/08/24 Trial Tr. 711:17–712:17. Having a more representative judiciary would "tend[] to give more legitimacy to the decision and to the institution." C. Bonneau Testimony, 08/12/24 Trial Tr. 875:8–22.

414.    Greater opportunities for leadership also tend to attract and retain those with the drive to lead. Ms. White explained that, due to the perceived lack of political opportunity available to Black candidates in Mississippi, her politically inclined classmates have left the state, instead becoming leaders in states like Maryland, Louisiana, Tennessee, and Alabama and depriving Mississippi of the youth and energy of a future generation of Black leaders. *See* D. White Testimony, 08/06/24 Trial Tr. 358:7–14.

415.    When such opportunities to serve are open to all, the benefit of greater representation multiplies over time. As Justice Anderson describe:

> [O]ne of my law clerks is a United States District Court judge now. One of my law clerks was a United States magistrate. Two of my law clerks were trial judges. That in itself has a huge impact on the State of Mississippi.

R. Anderson Testimony, 08/08/24, Trial Tr. 749: 5–10. That is the value of "role modeling" that diversity brings. C. Bonneau Testimony, 08/12/24 Trial Tr. 875:8–22.

416.    Evincing the slow pace and uncertain direction of progress over the past decades, Justice Anderson testified that he "was always hopeful that an African American would be elected statewide office in Mississippi," but he believes now that "[i]t won't happen in [his] lifetime." R. Anderson Testimony, 08/08/24, Trial Tr. 749:5–10.

417.    The Court finds that Senate Factor 7 strongly weighs in favor of Plaintiffs, because

184

of the severe under-representation of Black candidates in public office in Mississippi, particularly and especially on the Supreme Court, and the fact that Black candidates have generally only been able to prevail in majority-Black districts or with the advantage of a gubernatorial appointment.

**H.     Senate Factor 8:  Lack of Responsiveness to the Needs of Black Mississippians**

418.    The eighth Senate Factor concerns "whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group." *Gingles*, 478 U.S. at 37. Courts consider Senate Factor 8 to be an "additional factor" that may be probative but need not be "an essential part of plaintiff's case." *Clark v. Calhoun Cnty.*, 88 F.3d 1393, 1400 (5th Cir. 1996) [*Clark II*].

419.    For this factor, courts may consider "a lack of responsiveness on the part of judges *or other elected officials*." *See, e.g.*, *Chisom v. Roemer*, No. 86-CV-4057, 1989 WL 106485, at *11 (E.D. La. Sept. 19, 1989) (emphasis added). The Court will accordingly consider the unresponsiveness of the Legislature among others in addressing issues of importance to Black voters, such as racial disparities in education, economic opportunity, and health, which is probative of whether Black voters have influence in the political process and bears on Black voters' ability to elect their preferred candidates to the Supreme Court.

420.    The Court finds that elected officials in Mississippi are unresponsive to the needs of Black voters. The trial record contains at least three grounds that support that finding: (i) the Legislature consistently refuses to adopt policies favored by Black voters that would reduce education, health, and other socioeconomic disparities that impact their ability to participate in politics; (ii) the legislative history behind the 1987 redistricting and subsequent efforts to revise

185

those district lines indicate a lack of concern for Black voters' desire for greater representation on the state supreme court; and (iii) Mississippi governors have not been responsive to the desire of Black voters for greater representation by appointing more than one Black justice.

421. *First*, the Court finds that Mississippi's public officials have been unresponsive to the particularized needs of Black Mississippians in areas negatively affecting their ability to participate equally in politics, including with respect to the longstanding and persistent racial gaps in education, health, poverty, housing, and criminal justice. *See supra* ¶¶ 293–332. As noted, this Court credits the testimony of individual Black Mississippians as to their personal experiences with these disparities, as well as the expert analyses of Dr. Burch, and Dr. King.

422. One key example is Mississippi's failure to address educational disparities, which, as discussed, impact political participation (and voter turnout in Supreme Court elections). *See supra* ¶¶ 292–301. The Court credits Dr. Burch's and Dr. King's analyses that Mississippi's successes with respect to education have been unevenly distributed, with schools being de facto segregated, and predominantly Black schools underfunded and underperforming as compared to predominantly White schools. *E.g.*, M. King Testimony, 08/14/24 Trial Tr. 1353:15–1354:1; T. Burch Testimony, 08/07/24 Trial Tr. 544:9–545:7, 16–17; PX-035 at 3–9. As Dr. King explained, since 1997, the State has fully funded education as required by state law only four times, contrary to Black voters' support for fully funding education; as he explained, consistent with Dr. Burch's testimony these "massive funding disparities" have led to disparities in educational achievement, with no meaningful improvement over time. *E.g.*, M. King Testimony, 08/14/24 Trial Tr. 1354:7–20, 1357:4–22.

186

423.    Another important example is Mississippi's decision not to expand Medicaid, which would have closed racial gaps in healthcare and health outcomes. M. King Testimony, 08/14/24 Trial Tr. 1355:3–20 (explaining that racial disparities in insurance coverage and life expectancy are higher in Mississippi due to failure to expand healthcare access); *see also supra* ¶¶ 322–328. According to Dr. Burch, the "majority of Mississippi voters favor policies such as the Medicaid expansion." PX-035 at 21. Rejecting Medicaid expansion disproportionately harms Black communities because "Black people in Mississippi have much higher poverty rates, and Medicaid is the federal program that covers low-income people and provides them with health insurance." T. Burch Testimony, 08/07/24 Trial Tr. 561:12–15. Moreover, rejecting Medicaid expansion "has been linked to rural hospital closures" like those in the Mississippi Delta. T. Burch Testimony, 08/07/24 Trial Tr. 561:17–21. The Court credits Dr. Burch's testimony that there are significant "health disparities between Black and White Mississippi residents," and that nevertheless, "Mississippi hasn't accepted the federal Medicaid expansion" and "there are also other . . . public health measures that the state could have taken and chose not to." T. Burch Testimony, 08/07/24 Trial Tr. 562:8–16. Better healthcare for Black Mississippians would lead to better quality of life and greater capacity to participate in politics. *Id.* at 560:22–561:7 ("[H]ealth can affect voter turnout in a number of ways. For instance, the reason that we see voter turnout decline very late, end of life, is usually because of health issues. And those can be reduced mobility, lower income because you can't work, and some of it is about disability and polling place accessibility. . . .").

424.    And the state has further contributed to and/or failed to address racial disparities in

187

health in other ways. One is the rollout of the COVID-19 vaccine: Dr. Burch testified that "partly because of the lack of health care infrastructure" in predominantly Black areas in Mississippi, they "received the vaccine access later than many White areas." T. Burch Testimony, 08/07/24 Trial Tr. 560:14–16. Another is the Jackson water crisis. In predominantly Black areas of Jackson, the "lack of investment in the water system . . . led to boil water advisories in 2022 as well as people being without safe running water for weeks after that." T. Burch Testimony, 08/07/24 Trial Tr. 556:24–557:3.

425. With respect to poverty, the Court credits Dr. Burch's and Dr. King's testimony that state elected officials have failed to respond to racial income and wealth disparities, *see supra* ¶¶ 303–314. For example, Dr. Burch offered testimony on how Black Mississippians—especially in the Delta—have suffered from systematic economic underdevelopment "and the lack of investment in bringing jobs to the region in a sufficient way to help alleviate poverty in the area." T. Burch Testimony, 08/07/24 Trial Tr. 551:15–19. She also testified regarding "instances in which federal funds or at least matching funds have been allocated to help alleviate poverty" in Mississippi, but "the state doesn't direct that money where it needs to go," such as the "controversy about the misuse of funds and the scandal of Brett Favre and the Temporary Assistance for Needy Families, which is welfare attainment." T. Burch Testimony, 08/07/24 Trial Tr. 551:7–14. The Court also credits Dr. King's opinion that Mississippi could help address income and wealth inequality by enacting a minimum wage law—another policy supported by a majority of Black voters. M. King Testimony, 08/14/24 Trial Tr. 1357:4–22.

426. The predominantly Black Delta has not seen a major investment in 30 years, leaving

the economic disparities discussed already unaddressed. *E.g.*, D. Simmons Testimony, 702:13–25. The Delta's bridges and roads are in poor condition and, despite some federal money for repairs, there has not been "a state comprehensive plan" to address the deficits. *Id.* at 701:25–702:6.

427.     With respect to housing, the Court credits Dr. Burch's testimony that historical official policies contributed to the residential racial segregation reflected in Mississippi, and that "public officials haven't really responded in ways that can help alleviate some of those concerns." T. Burch Testimony, 08/07/24 Trial Tr. 557:13–19; *see also supra* ¶¶ 317–320. Dr. Burch noted, for example, that the disproportionate impact of the Jackson water crisis on Black Mississippians traced back to residential segregation exacerbated by Federal Housing Administration policies dating back nearly a century. T. Burch Testimony, 08/07/24 Trial Tr. 556:20–557:6. She also testified that state officials in Mississippi have misdirected funds meant for rental assistance, which could have helped Black Mississippians who disproportionately rent rather than own their homes. T. Burch Testimony, 08/07/24 Trial Tr. 557:7–9.

428.     The Court also credits Dr. Burch's testimony that "public policies have not adequately eradicated the role of racial discrimination from the criminal justice process." T. Burch Testimony, 08/07/24 Trial Tr. 566:16–18. These public policies and acts include not just legislative action, but also can encompass the action or inaction of judges and prosecutors. T. Burch Testimony, 08/07/24 Trial Tr. 565:22–566:6 (noting that "public officials" "include judges and prosecutors" such that "racial bias in jury selection or in sentencing" can be considered an "official response[]").

429.     Rather than address racial disparities faced by Black Mississippians, the Legislature

189

has used redistricting to depress legislative representation for Black Mississippians. In 2022, the State enacted new legislative districts that diluted the voting power of Black Mississippians in both the Senate and House, according to the unanimous decision of a three-judge federal district court—a decision that the State has decided not to appeal. *MS NAACP*, 2024 WL 3275965, at *53. The dilution of the House and Senate districts reduces Black representation in the Legislature generally.

430.    The failure of the Legislature to respond to Black voters' policy preferences is consistent with political science research that Dr. King has reviewed. Specifically, controlled experiments have shown that when researchers send communications to constituent offices, correspondence from "constituents with White-sounding names are more likely to get responded to than constituents with Black-sounding names." M. King Testimony, 08/14/24 Trial Tr. 1357:23–1358:9. Those experiments show, however, that the exception was Black legislators, who "are more likely to respond to Black constituents than White legislators." *Id.*

431.    The Court's finding with respect to the lack of official responsiveness to the needs of Black voters is also supported by the testimony of individual fact witnesses, which the Court credits. For instance, Ms. White testified that White politicians rarely campaign for votes in her community, and to some extent, the failure to engage Black voters was true of both White Democrats and White Republicans. D. White Testimony, 08/06/24 Trial Tr. 339:7–9, 342:22–23. Indeed, Ms. White testified that voter apathy was extremely high among Black voters in the Delta and that as a result, they were initially skeptical of Brandon Presley's campaign, inclined to write him off as another candidate who does not pay them any attention. *Id.* at 344:3–10. Ms. White also testified that in her various capacities addressing health and housing issues, she has sent e-mails

to state and federal level officials to schedule a meeting to expand Medicaid or to partner on housing but has only ever received a response from Congressman Bennie Thompson. *Id.* at 354:19–355:11, 357:10–17.

432.    Similarly, Judge Thomas also testified to the lack of responsiveness by state officials to the needs of Black Mississippians. While campaigning, voters in the Delta explained to Judge Thomas that they would not vote because they did not see "the point" and that their "vote[s] don't matter." A. Thomas, 08/05/24 Trial Tr. 162:20–24.

433.    And Ty Pinkins testified that he had "never seen any White politician come and campaign in my community, and I have never heard my family members tell me that they have seen a White politician come and campaign in my community." T. Pinkins Testimony, 08/05/24 Trial Tr. 128:2–12. He testified that the lack of attention indicated that Black voters in the Delta were "undervalued," that it "depresses people and makes people not want to participate in the process." *Id.*

434.    Consistent with that, and Dr. King persuasively explained, this unresponsiveness also has an effect on voter turnout and creates a vicious cycle: "[P]eople are less likely to participate if they believe that elected officials aren't responsive to them, if [officials] don't represent their policy preferences." M. King Testimony, 08/14/24 Trial Tr. 1358:13–1359:1 ("[T]here is a lot of political science evidence demonstrating that participation goes up among minority groups, also among women, when they are represented by people descriptively like them because there is more responsiveness.").

435.    All of this evidence supports the finding that Black voters' voices carry less weight

in the political process.

436.    *Second*, the enactment of the Supreme Court district lines in 1987 and the maintenance of those lines since then provide further specific evidence of the unresponsiveness of the Legislature to the preferences of Black voters. In 1987, "nearly all Black legislators," representing majority-Black districts, opposed the Enacted Plan, because they preferred an alternative plan that would have created a District 1 with a higher BVAP and a greater chance for Black voters to elect their preferred justices. P. Watson Testimony, 08/06/24 Trial Tr. 500:11–501:13. Since 1987, there have been various proposals to revise the Supreme Court districts, including proposals that would have created a majority-Black district—all of those proposals have failed. *Id.* at 517:15–518:2.

437.    *Third*, despite Black voters' preference for more Black representation on the Supreme Court, Mississippi governors have, for decades, effectively reserved one seat—and only one seat—for a Black justice. Constance Slaughter-Harvey testified about urging the Governor to appoint more Black judges on behalf of the Magnolia Bar Association, but never receiving a response. C. Slaughter-Harvey Testimony, 08/07/24 Trial Tr. 476:1–9. As Dr. King explained, "because the Black-preferred candidate for governor repeatedly loses, Blacks don't really have any say in who those appointed judges are." M. King Testimony, 08/14/24 Trial Tr. 1357:23–1358:9.

438.    The Mississippi Supreme Court is responsible for "all appellate matters" in the State and is "the court of last resort" on every issue that could arise via legislation, including education funding, criminal justice, felon disenfranchisement, and health care; the court also has

192

"exclusive jurisdiction" over a number of issues, including death penalties and election contests. O. Diaz Testimony, 08/06/24 Trial Tr. 286:6–19; M. King Testimony, 08/14/24 Trial Tr. 1398:5–24. Thus, the Mississippi Supreme Court plays a pivotal role in the interpretation of laws that affect all aspects of social and civic life in Mississippi, including ones that influence Black Mississippians' ability to participate in politics and where Black Mississippians have particularized needs. And while courts are not expected to respond to litigants in the same way that elected politicians respond to constituents, judicial responsiveness can be measured in terms of the reality and perception that all parties' needs will get a fair hearing. *E.g.*, A. Thomas Testimony, 08/05/2024 Trial Tr. 178:24-179:3 ("[W]e're not asking for favors. We just want somebody who understands and at least will listen. That's it."). On that front, multiple witnesses testified that underrepresentation of Black Mississippians can feed the perception that the judicial system is unresponsive. Again, Senator Simmons testified about the "level of distrust" his Black clients may have in the judiciary, and Dr. Bonneau testified about the "legitimacy" benefits of greater representation on the bench. *See supra* ¶ 413; *see also, e.g.*, D. White Testimony, 08/06/24 Tr. Transcript 371:8-14; C. Slaughter-Harvey Testimony, 08/07/24 Trial Tr. 477:5-13 ( testifying that "as of today," Black Mississippians do not have "meaningful representation" at the Mississippi Supreme Court, and that "one spot or one face" is inadequate).

439.    The Court finds that elected officials in Mississippi have been unresponsive to the particularized needs of Black voters in ways affecting their ability to elect candidates of their choice to the Mississippi Supreme Court. Senate Factor 8 accordingly weighs in Plaintiffs' favor.

I.      **Senate Factor 9:  Tenuous Justifications for the Challenged Plans**

440.    The ninth Senate Factor concerns "whether the policy underlying the state or political subdivision's use of such voting qualification, prerequisite to voting, or standard, practice or procedure is tenuous." *Gingles*, 478 U.S. at 37. "[T]his factor requires a consideration of the policies used by Mississippi to justify its districting decisions." *MS NAACP*, 2024 WL 3275965, at *52 (citing *Teague v. Attala Cnty.*, 92 F.3d 283, 292 (5th Cir. 1996)).

441.    According to the parties' stipulated facts and the evidence at trial, Mississippi enacted the current district lines in 1987 "with the objective of correcting population malapportionment of the then-existing Supreme Court districts." Joint Stipulated Facts ¶ 30. *See also supra* ¶¶ 15–23. However, the evidence also indicated that there were other plans available that would have increased the BVAP of District 1 and drawn support from Black legislators while equalizing population. *See supra* ¶ 21. Moreover, Mr. Cooper testified and demonstrated that, since the 2000 Census, it has been possible to draw a BVAP-majority Supreme Court district without splitting a single county, while maintaining equal populations. *See* W. Cooper Testimony, 08/05/24 Trial Tr. 62:12–63:18; *see also* PX-001 at 21–24; PX-003 at 38–43. As Dr. King testified, population equality cannot be a sufficient reason for failing to create a majority-Black Supreme Court district in the Delta, because there has been a majority-Black congressional district in the Delta for decades (and there was one in 1987). *See* M. King Testimony, 08/14/24 Trial Tr. 1360:4–16. The Court credits this testimony.

442.    Indeed, the record shows that the Mississippi legislature has rejected, on multiple occasions, plans that would have created a majority-Black district that provides an equal

opportunity for Black voters to elect their preferred candidates. P. Watson Testimony, 08/07/24 Trial Tr. 517:15–518:2.

443.     Nor is there any non-tenuous reason not to treat the Mississippi Delta as a community of interest for purposes of redistricting. As Dr. King testified, one "could make a very strong and compelling argument that the Mississippi Delta is one of the most recognizable and cohesive political areas in the entire country, much less the state, because of its unique history going back to really the settling of the state but certainly the Civil War and Jim Crow." M. King Testimony, 08/14/24 Trial Tr. 1360:17–1361:11. *See also supra* ¶¶ 93–100.

444.     The Court further finds that the policy justification for these lines, namely equal population, is also no longer served by the 1987 Enacted Plans. Mr. Cooper testified, and it was not disputed that, due to population growth and change in the nearly 40 years since the lines were drawn, the populations of the districts have now diverged again, with deviations that are greater than the presumptive constitutional requirement of plus-or-minus five percent. *See supra* ¶ 71. The directive from Attorney General Pittman, which Constance Slaughter-Harvey testified was followed by Legislature, specifically identified this "ten percent deviation" requirement as the goal. *E.g.*, PX-108 at 3. The Court finds that this goal is no longer being served.

445.     To the extent that Defendants suggest that there are other reasons, not reflected in the legislative record or any historical evidence presented at trial, why the Legislature might have preferred an East-West configuration for District 1 instead of a North-South configuration, the Court also finds those arguments unpersuasive for several reasons.

446.     *First*, nothing in the trial record shows that in 1987 the Legislature had in mind any

particular justifications for the East-West configuration. After the conclusion of testimony, and shortly before closing arguments, Defendants belatedly sought to introduce the entire trial record from a prior case involving the Supreme Court districts, *Magnolia Bar Ass'n, Inc. v. Lee*, No. 90-413 (S.D. Miss.), Defs.' Ex. 14, *Magnolia Bar* Case File (marked for ID only) [hereinafter "DX-014], which, among other things, contained an expert report and related testimony from a historian who purportedly analyzed historical justifications for the East-West configuration. For the reasons explained at trial, Bench Ruling, 08/15/24 Trial Tr. 1442:20–1444:1, and in the Conclusions of Law *infra*, DX-014 cannot be admitted into this trial record because of the rule against multiple hearsay and the rule against untimely disclosure of expert opinions. *See infra* ¶¶ 687–692.

447.  Even if Defendants had offered competent evidence regarding the origins of the East-West configuration of the districts from the antebellum period, the Court would not find this to be a non-tenuous justification for the 1987 Enacted Plan. During closing arguments, counsel for Defendants offered a version of this historical argument:

> Back in 1832, the Jacksonian Democrats that wrote the Constitution would have been very conscious of the fact that they didn't want any judges on the supreme court completely controlled by the rich folks along the river. So they took all of the rich folks along the river and carried them over to the Alabama line where there would be some more folks that might have a chance to come out in a fair election.

Defs.' Closing Argument, 08/15/24 Trial Tr. 1516:4–1522:22. Of course, counsel's arguments are not evidence. *See United States v. Aguilar*, 645 F.3d 319, 326 (5th Cir. 2011); *United States v. Garza*, 608 F.2d 659, 662–64 (5th Cir. 1979). But the contention that the East-West configuration was designed "to balance the rich folks [in the Delta] with the dirt farmers," Defs.' Closing

196

Argument, 08/15/24 Trial Tr. 1548:17–23, could not justify these lines today in any event.

448.    The "rich folks along the river" to which counsel referred were those who maintained plantations on the fertile land in the Delta and enslaved generations of Black Mississippians, who did the backbreaking labor of working on those plantations. As Dr. Campbell testified, "the Black population in Mississippi is along the river and counties because that's where slavery was." J. Campbell Testimony, 08/06/24 Trial Tr. 426:24–427:4; *see also* T. Pinkins Testimony, 08/05/24 Trial Tr. 121:8-11 ("Chopping cotton is different than picking cotton. Picking cotton was much more difficult. And that's what my grandparents and my mother and my great-grandparents had to do.").

449.    Today, the Delta is home to many of the descendants of those Black Mississippians who were enslaved and exploited. *See* A. Thomas Testimony, 08/05/24 Trial Tr. 154:20-25 ("[A] lot of people from the Delta are individuals whose family members, ancestors and things that of nature, lived on and worked on plantations. All right? And the families stayed. But there is still a heavy mentality of that . . . ."); *see also* T. Pinkins Testimony, 08/05/24 Trial Tr. 121:8-11. Today, the Delta faces poverty and disinvestment, and fares worst in terms of health, education, and virtually every possible socioeconomic metric. *See supra* ¶¶ 95–98, 100, 297–299, 308–311, 319, 324, 326–327 PX-005. A desire to break up the massive power of the slaveholding class who dominated the Delta in the 1830s cannot be used to justify district lines that now fragment the political power of the descendants of the enslaved. The Court finds any such historical justification, even if it were grounded in evidence in the trial record, would not be substantial—it would be a tenuous basis to make districting decisions today (or in 1987). *See also infra* ¶¶ 696–699.

197

450. Moreover, even if there had been evidence of some substantial reason to maintain the East-West configuration of District 1, that would not alter the finding that the failure to draw a BVAP majority district is tenuous. Mr. Cooper demonstrated that it is possible to draw a majority-Black District 1 without altering the East-West orientation of the existing districts. *See supra* ¶ 111. Accordingly, the East-West orientation cannot justify the failure to create one majority-Black Supreme Court district.

451. *Second*, Mr. Kirkpatrick, an employee in the Secretary of State's office who focuses on election administration, testified that the current district lines could be justified by an interest in safeguarding "judicial independence." K. Kirkpatrick Testimony, 08/14/24 Trial Tr. 1257:5–24. Mr. Kirkpatrick was not qualified as an expert witness; he has not served as a judge and did not testify about any background as a litigator; and perhaps most importantly he was not in the legislature or serving in government in any capacity in 1987 and did not have any personal knowledge of the legislature's thinking in 1987. Rather, his testimony and opinion are "based on the research and work *with counsel*," specifically his review of the *Magnolia Bar* court opinion, which the Court has reviewed and is able to review without Mr. Kirkpatrick's characterization of the document. *Id.* at 1254:1–7, 1257:5–24. The Court gives little to no weight to Mr. Kirkpatrick's opinion as to whether the 1987 Enacted Plan was meant to serve a policy goal of promoting judicial independence.

452. Dr. King was qualified as an expert, and the Court credits his testimony that the judicial independence justification makes little sense, because the very idea of "electing judges violates the whole principle of judicial independence." M. King Testimony, 08/14/24 Trial Tr.

1362:9–1363:8. From the perspective of institutional design, judicial independence is achieved by ensuring that judges do not have "to run for reelection," not by drawing district lines a certain way. *Id.* at 1361:25–1363:8 ("For all elected officials, intentional or not, independence is corroded when they have to raise money from people that may have business in front of courts in general."). Given that Mississippi chose to have a system of elected judges, the Court finds unpersuasive the argument that the Legislature was especially motivated by a desire to preserve judicial independence when drawing district lines.

453.    Justice Lamar testified that having districts that cover a large area is "helpful so that you are not beholding [sic] to any one particular group or any one particular region of people." A. Lamar Testimony, 08/08/24 Trial Tr. 772:1–3. But when asked about examples of cases that come before the Supreme Court that may implicate particular regional interests, the example that "immediately" came to her mind on the stand was "the Katrina cases which just consumed us for a while," where there "was much more interest in that on the coast than there was on the other part of the state." *Id.* at 770:7–10. Under the 1987 Enacted Plan, the coast is concentrated in one district, highlighting the limited efficacy even assuming the purpose that Defendants ascribe to them.

454.    Indeed, and most importantly, all the witnesses were absolutely unequivocal that having a majority-Black Supreme Court district would not "in any way, shape, or form . . . compromise judicial independence." K. Kirkpatrick Testimony, 08/14/24 Trial Tr. 1285:11–18; A. Lamar Testimony, 08/08/24 Trial Tr. 775:7–14 (agreeing that it would not "be a disadvantage [to] being fair and impartial from being elected from a Black majority district"); A. Thomas Testimony, 08/05/2024 Trial Tr. 178:24-179:3 (testifying that a judge elected with support from

199

the Delta could be fair and impartial); *see also* M. King Testimony, 08/14/24 Trial Tr. 1363:9–22 ("I wouldn't assume that just because someone is elected from a Black district that they are going to be beholden to Black voters any more than I would expect a justice elected from a White majority district would be beholden to White voters . . . [Y]ou have to trust that qualified judges . . . can adequately rule on the law.").

455.    The court finds based on the trial record that, while having large, diverse districts may generally be a salutary goal in terms of designing a judicial system, the evidence did not show that *these* particular district lines serve the goal of promoting judicial independence better than any other lines within a three-district system.

*     *     *

456.    Consistent with all the foregoing findings of fact, the Court finds that the political process is not equally open to Black Mississippians with respect to Supreme Court elections under the 1987 Enacted Plan inasmuch as Black Mississippians have less opportunity than White Mississippians to participate in the political process and to elect justices of their choice to the Mississippi Supreme Court.

## PROPOSED CONCLUSIONS OF LAW

### I.    JURISDICTION, PARTIES, AND STANDING

457.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1343(a), and 1357; 42 U.S.C. §§ 1983 and 1988; and 52 U.S.C. §§ 10301, 10302, 10308(f), and 10310(e).

458.    This Court has jurisdiction to grant declaratory and injunctive relief pursuant to 28

U.S.C. §§ 2201 and 2202.

459.    The Voting Rights Act, under which Plaintiffs bring suit, validly abrogates state sovereign immunity. *Robinson*, 86 F.4th at 588; *see OCA-Greater Houston v. Texas*, 867 F.3d 604, 614 (5th Cir. 2017). No sovereign immunity defense has been preserved by the Defendants here.

460.    The State Board of Election Commissioners, as the body that holds final, statewide authority over the placement of candidates on the ballot and the certification of state legislative elections in Mississippi, is a proper defendant against whom relief may be sought in a legislative redistricting case. *See, e.g.*, *Connor v. Winter*, 519 F. Supp. 1337, 1343 (S.D. Miss. 1981). No proper party defenses have been preserved by Defendants here. All potentially necessary parties are joined or otherwise accounted for, and no failure-to-join-a-necessary-party defenses have been preserved here.

461.    Plaintiffs have Article III standing because as to each challenged district or area, at least one plaintiff has suffered a cognizable injury that is "fairly traceable to the challenged action" and "redressable by a favorable ruling." *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 149 (2010); *see also, e.g.*, *McAllen Grace Brethren Church v. Salazar*, 764 F.3d 465, 471 (5th Cir. 2014) ("It is well settled that once we determine that at least one plaintiff has standing, we need not consider whether the remaining plaintiffs have standing to maintain the suit.").

462.    With respect to vote dilution claims under Section 2 of the Voting Rights Act, a minority voter is injured when they reside in a district that is alleged to result in the dilution of the minority group's voting strength due to racially polarized voting. *See, e.g.*, *Nairne v. Ardoin,* No. 22-CV-178-SDD-SDJ, 2023 WL 7673856, at *5, *9-*10 (M.D. La. Nov. 14, 2023); *see also, e.g.*,

*Gingles*, 478 U.S. at 46–57 & n.11.

463. Here, Plaintiffs all live in Current Supreme Court District 1, and all of them would live in the new Black-majority District 1 under any of the Illustrative Plans (or the Least-Change Plans). Plaintiffs have standing to assert a Section 2 claim as to vote dilution in and around the Central Supreme Court District.

## II. RIGHT OF ACTION TO ENFORCE SECTION 2

464. Under this Court's rules, legal defenses must be raised by motion. *See* L.U.Civ. R.7(b). Defendants did not raise by motion any defense relating to a purported lack of a private right of action to enforce Section 2 of the Voting Rights Act. Nor do they argue that the issue goes to the Court's jurisdiction, which it does not. *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 89 (1998) ("It is firmly established in our cases that the absence of a valid (as opposed to arguable) cause of action does not implicate subject-matter jurisdiction."). Because the private-right-of-action issue does not implicate the Court's subject matter jurisdiction, it is waivable. Here, it has been waived.

465. In any event, the Fifth Circuit has already resolved the issue, holding that there is an implied private right of action to enforce Section 2. The Voting Rights Act contemplates enforcement actions both by the U.S. Department of Justice and by "aggrieved person[s]." *Robinson*, 86 F.4th at 588 (quoting 52 U.S.C. § 10302). Individual voters whose votes have been diluted by a challenged districting scheme "are aggrieved persons," and accordingly they have "a right . . . to bring these claims." *Id.*; *see also, e.g.*, *Morse v. Republican Party of Virginia*, 517 U.S. 186, 232 (1996) ("Although § 2, like § 5, provides no right to sue on its face, 'the existence of the

202

private right of action under Section 2 . . . has been clearly intended by Congress since 1965.'" (citing S. Rep. No. 97-417, at 30). And the Fifth Circuit subsequently denied *en banc* review of the *Robinson* panel decision. Order on Petition for Rehearing En Banc, *Robinson v. Ardoin*, No. 22-30333, Doc. 363-2 (5th Cir. Dec. 15, 2023). The Fifth Circuit later denied *en banc* review again, in another Louisiana redistricting case, on the private right of action issue. Order on Petition for Initial Hearing Ben Banc, *Nairne v. Landry* No. 24-30115, Doc. 176-1 (5th Cir. June 24, 2024). The three-judge panel in *MS NAACP* also squarely rejected Mississippi's arguments on this issue, both on the merits and as a matter of binding precedent. 2024 WL 3275965 at *9–11 ("[W]e are bound by the Fifth Circuit *Robinson* opinion that the Plaintiffs may properly bring this suit to enforce their rights under the Voting Rights Act.").

466.    And even if the law with respect to an implied right of action to enforce Section 2 were to change, Plaintiffs here could still enforce their rights under 42 U.S.C. § 1983, which provides an enforceable remedy for the deprivation of any right "secured by the Constitution and laws."

467.    While the implied-right-of-action question is governed by the standard set forth in *Alexander v. Sandoval*, 532 U.S. 275, 286 (2001), the question "whether a statutory violation may be enforced *through § 1983* 'is a different inquiry.'" *Gonzaga Univ. v. Doe*, 536 U.S. 273, 283–284 (2002). Under that inquiry, once a plaintiff demonstrates that Congress "intended to create a federal right," "the right is presumptively enforceable by § 1983." *Gonzaga Univ.*, 536 U.S. at 283–284 (emphasis omitted); *accord Health & Hosp. Corp. of Marion Cnty. v. Talevski*, 599 U.S. 166, 183–184 (2023); *MS NAACP*, 2024 WL 3275965, at *9.

468.    This presumption is rarely overcome. *See Livadas v. Bradshaw*, 512 U.S. 107, 133 (1994). To do so, a defendant must show that Congress implicitly foreclosed Section 1983 relief by creating an incompatible private remedy scheme. *E.g.*, *Gonzaga*, 536 U.S. at 284–285 n.4. The presence of a parallel *public* remedy (*i.e.*, government enforcement) is insufficient. Rather, "a more restrictive *private* remedy" is required because restrictions on *private* remedies (such as special filing or exhaustion requirements, or limits on damages) are inconsistent with the relief available under Section 1983. *Fitzgerald v. Barnstable Sch. Comm.*, 555 U.S. 246, 254, 256 (2009) (emphasis added).

469.    Section 2 makes crystal clear that it protects individual federal rights. The statute bars voting standards or practices that "result in a denial or abridgement of *the right of any citizen of the United States to vote* on account of race or color" under the law's "totality of [the] circumstances" test. 52 U.S.C. § 10301 (emphasis added). That is the type of rights-creating language that is presumptively enforceable in a Section 1983 action. *E.g.*, *Gonzaga*, 536 U.S. at 284 n.4.

470.    Here, Plaintiffs invoked Section 1983 as a basis for enforcing their Section 2 rights. Accordingly, even if the right to enforce Section 2 via an implied right of action were not a matter of settled law in the Fifth Circuit, and even if the issue had been properly preserved, Plaintiffs would in all events be able to enforce their rights by proceeding under Section 1983.

### III.    VOTE DILUTION: THE *GINGLES* FRAMEWORK

471.    Section 2 of the Voting Rights Act renders unlawful any state "standard, practice, or procedure" that "results in a denial or abridgement of the right of any citizen of the United States

204

to vote on account of race or color." 52 U.S.C. § 10301(a); *see also Gingles*, 478 U.S. at 36.

472.    Dilution of a minority community's voting strength in violation of Section 2 is "established" if, under the totality of the circumstances, the "political processes leading to nomination or election in the State . . . are not equally open to participation by members of [a racial minority group] . . . in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." 52 U.S.C. § 10301(b); *see also Gingles*, 478 U.S. at 36.

473.    The *Thornburg v. Gingles* framework governs vote dilution claims under Section 2 of the Voting Rights Act, as it has for nearly 40 years. *See Milligan*, 599 U.S. at 19; *MS NAACP*, 2024 WL 3275965, at *11.

474.    A violation of Section 2 does not require proof of discriminatory intent and can "be proved by showing discriminatory effect alone." *Gingles*, 478 U.S. at 35. In other words, Section 2 vote-dilution liability "turns on the presence of discriminatory effects, not discriminatory intent." *Milligan*, 599 U.S. at 25; *MS NAACP*, 2024 WL 3275965, at *35 ("Under Section 2 of the Voting Rights Act, though, we are concerned with whether there are discriminatory *effects*."). The essence of such a Section 2 "results" claim is that an "electoral law, practice, or structure interacts with social and historical conditions to cause an inequality in the opportunities enjoyed by black and white voters to elect their preferred representatives." *Gingles*, 478 U.S. at 47, 63.

475.    "Congress has used the words 'on account of race or color' in the Act to mean 'with respect to' race or color, and not to connote any required purpose of racial discrimination." *Milligan*, 599 U.S. at 25 (cleaned up)). The Section 2 analysis thus *does not turn on the State's or*

*voters' subjective motives*. If the *result* of the challenged scheme is unequal opportunities for Black voters, liability follows. *E.g.*, *Gingles*, 478 U.S. at 35, 47, 63; *accord Robinson*, 86 F.4th at 589.

476.    To prevail on a Section 2 claim, Plaintiffs must initially satisfy three preconditions: "'First, the minority group must be sufficiently large and geographically compact to constitute a majority in a reasonably configured district.' A district is reasonably configured when it complies 'with traditional districting criteria, such as being contiguous and reasonably compact.' Second, the minority group must be politically cohesive. Third, the white majority must be shown to vote sufficiently as a bloc to usually defeat the minority-preferred candidate." *Robinson*, 86 F.4th at 589 (quoting *Milligan*, 599 U.S. at 18); *accord Gingles*, 478 U.S. at 50–51; *MS NAACP*, 2024 WL 3275965 at *11–12.

477.    The three preconditions together indicate circumstances where the combination of district lines and persistent patterns of racially polarized voting operate to "fragment[]" minority voters in a matter that systematically disadvantages them in the political process. *E.g.*, *Gingles*, 478 U.S. at 46–51, 59 n.28; *Growe v. Emison*, 507 U.S. 25, 40 (1993).

478.    After establishing the three *Gingles* preconditions, a plaintiff must "'show, under the totality of the circumstances, that the political process is not equally open to minority votes,' causing a Section 2 violation," with respect to the challenged districting scheme. *E.g.*, *Robinson*, 86 F.4th 589 (quoting *Milligan*, 599 U.S. at 18); *MS NAACP*, 2024 WL 3275965 at *11–12.

479.    At the totality-of-the-circumstances stage, "[c]ourts must determine whether plaintiffs have an equal opportunity in the voting process to elect their preferred candidate under the challenged districting map." *Robinson*, 86 F.4th at 589 (citing *Gingles*, 478 U.S. at 44); *see*

206

*also* 52 U.S.C. § 10301(b). Courts determine liability based on "'an intensely local appraisal'" of the electoral lines at issue, as well as a "'searching practical evaluation of the "past and present reality."'" *Milligan*, 599 U.S. at 19 (quoting *Gingles*, 478 U.S. at 79). Where Plaintiffs prove based on the totality of the circumstances that members of the minority racial group "have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice" under the challenged districting scheme, "[a] violation . . . is established." 52 U.S.C. § 10301(b).

480.    Once the *Gingles* preconditions have been proven, a liability determination based on the totality of the circumstances typically follows:  "[I]t will be only the very unusual case in which the plaintiffs can establish the existence of the three *Gingles* [preconditions] but still have failed to establish a violation of § 2 under the totality of circumstances." *Teague*, 92 F.3d at 293 (quoting *Clark v. Calhoun Cnty.*, 21 F.3d 92, 97 (5th Cir. 1994); *see also Ga. State Conf. of NAACP v. Fayette Cnty. Bd. of Comm'rs*, 775 F.3d 1336, 1342 (11th Cir. 2015) (same); *MS NAACP*, 2024 WL 3275965 at *53 (same).

481.    In examining the totality of the circumstances, courts consider the so-called Senate Factors. *E.g.*, *Robinson*, 86 F.4th at 589; *accord Gingles*, 478 U.S. at 36–37, 44–45. These are also referred to as the "*Zimmer* factors" because the Senate Report that accompanied the 1982 Voting Rights Act reauthorization based this non-exclusive set of guides on the Fifth Circuit's decision in *Zimmer v. McKeithen*, 485 F.2d 1297 (5th Cir. 1973). *See Robinson*, 86 F.4th at 589; *accord Gingles*, 478 U.S. at 36–37 & n.4.

482.    The Senate Factors include: "(1) the extent of any history of official discrimination

207

in the state or political subdivision that touched the right of the members of the minority group to register, to vote, or otherwise participate in the democratic process; (2) the extent to which voting in the elections of the state or political subdivision is racially polarized; (3) the extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group;" (4) whether minority candidates have been denied access to any candidate-slating process; (5) the extent to which minorities in the state or political subdivision bear the effects of discrimination in education, employment, and health, which hinder their ability to participate effectively in the political process; "(6) whether political campaigns have been characterized by overt or subtle racial appeals;" and (7) the extent to which minority group members have been elected to public office (internal quotations omitted). *See Gingles*, 478 U.S. at 36–37 (quoting S. Rep. No. 97-417, at 28–29 (1982), *as reprinted in* 1982 U.S.C.C.A.N. 177, 206–07).

483. "Additional factors" recognized by the Senate Committee include whether there is a significant lack of responsiveness on the part of elected officials to the particular needs of members of the minority group, and whether the policy underlying the state or political subdivision's use of such voting qualification, prerequisite to voting, or standard practice of procedure is tenuous. *See Gingles*, 478 U.S. at 36–37.

484. Proportionality is another "relevant fact in the totality of circumstances to be analyzed when determining whether members of a minority group have 'less opportunity than other members of the electorate to participate in the political process and to elect representatives

208

of their choice.'" *Johnson v. De Grandy*, 512 U.S. 997, 1000, 1011 (1994) (internal quotation marks omitted); *see also League of United Latin Am. Citizens v. Perry*, 548 U.S. 399, 426 n.5 (2006) [hereinafter *LULAC*] ("[W]hether the number of districts in which the minority group forms an effective majority is roughly proportional to its share of the population in the relevant area" is a "relevant consideration") (citing *De Grandy*, 512 U.S. at 1000).

485.     When conducting the totality of the circumstances analysis, Senate Factor 2, the extent to which voting in the jurisdiction is racially polarized, and Senate Factor 7, the extent to which members of the minority group have been elected to office in the jurisdiction, are considered the most important. *Fairley v. Hattiesburg Mississippi*, 662 F. App'x 291, 296 (citing *Clark II*, 88 F.3d at 1397) ("The existence of racially polarized voting and the extent to which minorities are elected to public office remain the two most important factors considered in the totality-of-circumstances inquiry."); *Clark II*, 88 F.3d at 1398 (finding the "presence of racially polarized voting and the virtually complete absence of black elected officials in county offices" provided strong evidence of vote dilution). But there is no "requirement that any particular number of factors be proved, or that a majority of them point one way or the other." *Gingles*, 478 U.S. at 45 (quoting S. Rep. No. 97-417, at 29, 1982 U.S.C.C.A.N, 207); *Westwego Citizens for Better Gov't*, 946 F.2d at 1120.

## IV.     APPLICATION OF SECTION 2 TO JUDICIAL DISTRICTS

486.     The Voting Rights Act and *Gingles* apply to judicial districting schemes. The Supreme Court squarely addressed the issue in *Chisom v. Roemer*, 501 U.S. 380, 404 (1991), holding "that state judicial elections are included within the ambit of § 2 as amended." *Accord*

209

*Houston Lawyer's Association v. Attorney General*, 501 U.S. 419, 426 (1991) ("If a State decides to elect its trial judges, as Texas did in 1861, those elections must be conducted in compliance with the Voting Rights Act."). And courts in this district, as well as the Fifth Circuit, have repeatedly applied Section 2 and *Gingles* to judicial districts, as in *Magnolia Bar*. *See* 994 F.2d 1143, 1146 (5th Cir. 1993) (holding, in judicial redistricting case involving Supreme Court districts, that "[i]t is settled law in this circuit that section 2 claims must be analyzed under [the] two-part framework" set forth in *Gingles*) (citing *Gingles*, 478 U.S. 30); *Ewing v. Monroe Cnty., Miss.*, 740 F. Supp. 417, 426 (N.D. Miss. 1990) (holding that Monroe County's districts for electing justice court judges violated Section 2); *Martin v. Allain*, 658 F. Supp. 1183, 1200, 1204–05 (S.D. Miss. 1987) ("The use of the word 'representatives' in Section 2 is not restricted to legislative representatives but denotes anyone selected or chosen by popular election from among a field of candidates to fill an office, including judges.") (holding that at-large elections for circuit, chancery, and county judgeships in Mississippi violated Section 2). Nor is there any barrier against federal-court-imposed remedies in the judicial districting context once a violation of Section 2 has been found. *See generally, e.g.*, *Martin v. Mabus*, 700 F. Supp. 327 (S.D. Miss. 1988) (ordering partial sub-districting remedy in *Martin* case).

  487. In the judicial districting context, Section 2 can sometimes apply differently, but not in a way that affects the analysis in this case. Specifically, states may sometimes have something called a "linkage interest," which is an interest in linking judges with the particular jurisdiction in which they exercise authority, like Parish judges in Louisiana being elected by their Parish and not by some subdistrict. *See, e.g.*, *Fusilier v. Landry*, 963 F.3d 447, 459–60 (5th Cir.

210

2020); *League of United Latin Am. Citizens, Council No. 4434 v. Clements*, 999 F.2d 831, 868–69 (5th Cir. 1993) (en banc); *see also Nipper v. Smith*, 39 F.3d 1494, 1541–42 (11th Cir. 1994) (en banc) (plurality). Cases like *Clements* and more recently *Fusilier* acknowledge that, in the situation where (for example) Parish Judges are being elected by their Parishes, the linkage between the electoral district and the jurisdiction of the office can be accorded significant weight, especially where Plaintiffs seek a remedy that would in effect impose a new structure on the state's judiciary. *Fusilier*, 963 F.3d at 459–60 (declining to create judicial subdistricts as a remedy because doing so would abandon state's linkage interest); *Clements*, 999 F.2d at 885 (holding that Texas's county-based electoral system should not be "dismantled" into subdistricts based on weak evidence of dilution and the state's substantial linkage interest); *see also Houston Lawyers' Ass'n v. Att'y Gen. of Texas*, 501 U.S. 419, 426 (1991) (holding that state's "interest in maintaining the link between a district judge's jurisdiction and the area of residency of his or her voters" is one of the "factor[s] to be considered by courts among the 'totality of circumstances' in determining whether a § 2 violation has occurred"); *Nipper*, 39 F.3d at 1544.

488.    Here, however, Defendants have disclaimed the existence of any such "linkage interest" in the Supreme Court districts. Defs.' Closing Argument, 08/15/24 Trial Tr. 1516:4–5 ("So we don't have exactly the linkage issue they have in Texas, and I'm not going to suggest that we do."). And indeed, the trial testimony established that Mississippi Supreme Court Justices don't have any district-specific function or jurisdiction. As Justice Diaz and Justice Lamar and others testified, Supreme Court Justices serve the whole state. O. Diaz Testimony, 08/06/24 Trial Tr. 287:10–15 ("[E]ach of the justices have general jurisdiction over everything that appears before

211

the court."); A. Lamar Testimony, 08/08/24 Trial Tr. 769:2–15 (testifying, "I never saw myself as representing any constituency when I was on the court" and that such was "a common attitude among all nine of the justices").

489.    Accordingly, the concept of a "linkage interest" as the cases have discussed and recognized it simply does not apply here at all.

490.    Nor in any case do Plaintiffs seek a remedy that alters the structure of Supreme Court elections, such as the imposition of single-member districts or subdistricts. *Cf. Fusilier*, 963 F.3d at 459–60; *Nipper*, 39 F.3d at 1544. Rather, Plaintiffs propose maintaining the three-district system, but altering the lines in fairness to Black voters. In these circumstances, then, and consistent with *Roemer* and *Houston Lawyers' Association*, the *Gingles* test applies in full, subject to the fact-specific appraisal of all the circumstances relating to this electoral districting scheme that must be conducted as part of the totality-of-the-circumstances analysis.

## V.    *GINGLES* 1

491.    The first *Gingles* precondition is "focused on geographical compactness and numerosity, [and] is 'needed to establish that the minority has the potential to elect a representative of its own choice in some single-member district.'" *Milligan*, 599 U.S. at 18 (quoting *Growe*, 507 U.S. at 40); *see also Robinson*, 86 F.4th at 589. To satisfy the first precondition, a plaintiff must show that "the minority group [is] sufficiently large and [geographically] compact to constitute a majority in a reasonably configured district." *Milligan*, 599 U.S. at 18 (cleaned up). "A district is reasonably configured when it complies 'with traditional districting criteria, such as being contiguous and reasonably compact.'" *Robinson*, 86 F.4th at 589 (quoting *Milligan*, 599 U.S. at

212

18); *MS NAACP*, 2024 WL 3275965, at *11 (same).

492.     The *Gingles* 1 showing is typically made through the proffer of an illustrative districting plan containing a new majority-minority district, such as the Illustrative Plans offered in this case by Mr. Cooper. *Clark II.*, 88 F.3d at 1406–1407; *see also Gonzalez v. Harris Cnty.*, 601 F. App'x 255, 258 (5th Cir. 2015) ("Satisfying the first *Gingles* precondition—compactness— normally requires submitting as evidence hypothetical redistricting schemes in the form of illustrative plans."); *accord MS NAACP*, 2024 WL 3275965 at *14–15; *Nairne*, 2024 WL 492688, at *11–18, 20–30; *Alpha Phi Alpha Fraternity*, 700 F. Supp. 3d 1136 at 16–17, 26–31; *Robinson*, 605 F. Supp. 3d at 778–784, 820–838; *Singleton*, 582 F. Supp. 3d at 977, 1004–1016.

493.     Plaintiffs' illustrative plans are "not cast in stone" and are offered only "to demonstrate that a majority-[B]lack district is feasible," *Clark v. Calhoun Cnty.*, 21 F.3d 92, 95 (5th Cir. 1994) [hereinafter *Clark I*]; *see also Bone Shirt v. Hazeltine*, 461 F.3d 1011, 1019 (8th Cir. 2006) (same). The "ultimate end of the first *Gingles* precondition is to prove that a solution is possible, not necessarily to present the ultimate solution to the problem." *Rodriguez v. Harris Cnty.*, 964 F. Supp. 2d 686, 746 (S.D. Tex. 2013), *aff'd sub nom. Gonzalez,* 601 F. App'x 255 (citing *Gingles*, 478 U.S. at 50 n.17); *accord Clark I*, 21 F.3d at 95.

494.     The focus for purposes of *Gingles* 1 is on the *illustrative plans*, not on the existing districts enacted by the State. *E.g.*, *Milligan*, 599 U.S. at 19–22; *Robinson*, 86 F.4th at 590. Moreover, because the ultimate question in the *Gingles* 1 analysis is whether the minority population in a particular area is sufficiently numerous and geographically compact to form a majority in a reasonably configured single-member district, courts appropriately focus in particular

213

on the newly-added majority-minority districts in the illustrative plans in their *Gingles* 1 analysis.
*See, e.g.*, *MS NAACP*, 2024 WL 3275965 at *14; *Nairne*, 2024 WL 492688, at *13–17; *Perez v.
Abbott*, 250 F. Supp. 3d 123, 143 (W.D. Tex. 2017) (conducting district-by-district analysis of
Texas state districts). As the three-judge panel in *MS NAACP* held, "if one of the Illustrative Plans
presented by the Plaintiffs identifies a reasonably configured, compact majority-minority district
that respects traditional redistricting principles, the first *Gingles* precondition is met." 2024 WL
3275965, at *14.

### A. Numerosity

495. With respect to the numerosity of the minority population, a bright-line 50% plus
one rule applies in assessing whether the minority population in the illustrative new district is
"sufficiently large" for purposes of *Gingles* 1. *Bartlett*, 556 U.S. at 12, 18–20. That is, Plaintiffs
"asserting § 2 liability must show by a preponderance of the evidence that the minority population
in the potential election district is greater than 50 percent." *Id.* at 19–20; *see also Robinson*, 86
F.4th at 590 (citing *Bartlett*, 556 U.S. at 19–20); *MS NAACP*, 2024 WL 3275965 at *12 (same).

496. In voting rights cases when Black voters are the only minority group whose
effective exercise of the franchise is at issue, "it is proper to look at *all* individuals who identify
themselves as [B]lack" to calculate a district's BVAP and assess the numerosity of the Black
population in that district. *Georgia v. Ashcroft*, 539 U.S. 461, 473 n.1 (2003) (emphasis in
original); *see also, e.g.*, *Ga. State Conf. of NAACP v. Fayette Cnty. Bd. of Comm'rs*, 118 F. Supp.
3d 1338, 1343 n.8 (N.D. Ga. 2015); *Singleton*, 582 F. Supp. 3d at 1004. Accordingly, the "any-
part" or AP BVAP metric is appropriate when establishing the first *Gingles* precondition in a

Section 2 case. *See, e.g.*, *Robinson*, 605 F. Supp. 3d at 819–20; *Terrebonne Par. Branch NAACP v. Jindal*, 274 F. Supp. 3d 395, 419–20 (M.D. La. 2017), *rev'd on other grounds sub nom.*, *Fusilier v. Landry*, 963 F.3d 447 (5th Cir. 2020); *Alpha Phi Alpha Fraternity*, 700 F. Supp. 3d 1136 at 1234; *Singleton*, 582 F. Supp. 3d at 1002–04; *Ga. State Conf. of NAACP*, 118 F. Supp. 3d at 1343; *Covington v. North Carolina*, 316 F.R.D. 117, 125 n.2 (M.D.N.C. 2016) (three-judge court), *aff'd*, 581 U.S. 1015 (2017); *Missouri State Conf. of NAACP,* 201 F. Supp. 3d at 1033.

497.     The parties agree that the Fifth Circuit's recent decision, *Petteway v. Galveston County*, 111 F.4th 596 (5th Cir. 2024), does not impact this case. Defs.' Closing Argument, 08/15/24 Trial Tr. 1563:17–1564:1 ("I agree with [Plaintiffs'] counsel that [*Petteway*] has no substantive bearing on our case."). *Petteway* concerned whether two or more "distinct minority groups may aggregate their populations together" in order to reach the 50% plus one threshold under the first *Gingles* precondition. 111 F.4th at 601. There is no question in this case that the Black population in Mississippi is sufficient, on its own, to form a reasonably compact, majority-minority district.

498.     Based on the foregoing findings of fact, the Court concludes that Plaintiffs have established by a preponderance of the evidence that the BVAP in District 1 of each of the Illustrative Plans (and the Least Change Plans) is greater than 50 percent. *See, e.g.*, *supra* ¶¶ 86, 105, 111.

## B.     The Relevance of the Existing Plan

499.     As noted, the focus for purposes of *Gingles* 1 is on the illustrative plans offered by the plaintiffs at trial, not on the challenged plan. *E.g.*, *Milligan*, 599 U.S. at 19–22; *Robinson*, 86

F.4th at 590. Whether the *challenged* plan already contains a majority-minority district therefore is not relevant, especially not to *Gingles* 1. The question is just whether a reasonably configured BVAP-majority district can be drawn. *E.g.*, *MS NAACP*, 2024 WL 3275965, at \*14. The Court accordingly rejects Defendants' contrary arguments that a district that is currently BVAP-plurality, or BCVAP-majority, gets a pass from the ordinary *Gingles* vote dilution analysis. *But see also supra* ¶¶ 72–78 (finding 1987 Enacted Plan District 1 is not in fact voting-eligible BCVAP majority).

500.     Under the Voting Rights Act, the term "'minority' does not refer to a purely numerical fact," but rather to the protection of "'any citizen who is a member of a protected class of racial or language minorities.'" *Missouri State Conf. of the Nat'l Ass'n for the Advancement of Colored People v. Ferguson-Florissant Sch. Dist.*, 894 F.3d 924, 933 (8th Cir. 2018) (quoting *Gingles*, 478 U.S. 30 at 43); *accord Salas v. Sw. Tex. Jr. Coll. Dist.*, 964 F.2d 1542, 1547 (5th Cir. 1992) ("The plain text of the statute, as affirmed by case law, makes clear that the [Voting Rights Act] is concerned with protecting the minority in its capacity as a national racial or language group.").

501.     Accordingly, the protections of the Voting Rights Act do not vanish even where members of a minority group form a bare majority (much less a 49.3% VAP plurality, as here) in a particular district. Rather, "it may be possible for a citizen voting-age majority to lack real electoral opportunity" and still require the protection of the Voting Rights Act. *LULAC v. Perry*, 548 U.S. 399, 428 (2006); *Monroe v. City of Woodville*, 881 F.2d 1327, 1333 (5th Cir. 1989) ("Unimpeachable authority from our circuit has rejected any per se rule that a racial minority that

216

is a majority in a political subdivision cannot experience vote dilution"); *accord Wright v. Sumter Cnty. Bd. of Elections & Registration*, 979 F.3d 1282, 1308 (11th Cir. 2020) (agreeing Section 2 claims may prevail even "when members of a protected class form a majority of a challenged district's voting age population"); *Ferguson-Florissant Sch. Dist.*, 894 F.3d at 934 ("[Plaintiffs] do not lose VRA protection simply because they represent a bare numerical majority within the district."); *Pope v. Cty. of Albany*, 687 F.3d 565, 575 n.8 (2d Cir. 2012) (racial minorities who constitute a majority within a challenged district can prevail on a Section 2 claim when the district does "not present the 'real electoral opportunity' protected by Section 2); *Kingman Park Civic Ass'n v. Williams*, 348 F.3d 1033, 1041 (D.C. Cir. 2003) ("demographic and political contexts" may support finding that "minority voters might have less opportunity to elect representatives of their choice even where they remain an absolute majority in a contested voting district"). Consistent with that, a district court found vote dilution regarding a Delta State Senate district in 2019, where the BVAP of the successfully challenged district was over 50%. *See Thomas*, 366 F. Supp. at 805, *aff'd*, 931 F.3d 455 (5th Cir. 2019), *vacated as moot on reh'g*, 961 F.3d 800 (5th Cir. 2020).

502.    *Salas* does not say otherwise and would not support any categorical exception to the applicable rule.  Rather, the Fifth Circuit in *Salas* expressly held that "a protected group—even when it is the registered voter majority—may seek relief in a vote dilution case," explaining that *Gingles*' "case-by-case approach" to evaluating the situation of racial minority groups vis-a-vis a particular challenged districting scheme would be inconsistent with any "per se rule" to the contrary. 964 F.2d at 1547–1551. Moreover, *Salas* involved an existing district where minority

217

voters were *actually* a majority of *registered voters*, not merely a majority of the adult or eligible population—a critical distinction that the court itself acknowledged. *See id.* at 1547 ("Needless to say, constituting a registered voter majority is far more significant in a voting rights case than simply being a population majority."). Here, there is no evidence that Black voters comprise a majority of registered voters in Supreme Court District 1—a fact that Defendants made no effort to prove, and that is not supported by the trial record, *see supra* ¶¶ 336–364.

503.     Whatever the demographics of the existing plan, then, Section 2 requires the Court to conduct the same "'intensely local appraisal' of the challenged district," *LULAC*, 548 U.S. at 437 (quoting *Gingles*, 478 U.S. at 79), and to make a determination about whether the existing plan as a whole complies with "the VRA's substantive requirement that racial minorities have equal opportunity 'to participate in the political process and to elect representatives of their choice,'" *Ferguson-Florissant Sch. Dist.*, 894 F.3d at 934 (citing 52 U.S.C. § 10301(b)).

504.     The Court also rejects Defendants' suggestion that anything in Justice Kavanaugh's *Milligan* concurrence requires some assessment of the existing plan for purposes of *Gingles* 1. The three-judge panel in *MS NAACP* considered and rejected this exact argument. There, defendants argued in substance that "a court must first find that the districts as legislatively drawn combined or divided the black population," *i.e.*, that the existing plans constitute cracking or packing. 2024 WL 3275965 at *13. But, as the three-judge panel pointed out, Justice Kavanaugh joined the *Milligan* majority's description of *Gingles* 1 as requiring only that "the 'minority group must be sufficiently large and [geographically] compact to constitute a majority in a reasonably configured district.'" *Id.* (quoting *Milligan*, 599 U.S. at 18). The Court agrees that "[i]t is difficult to interpret

218

anything else Justice Kavanaugh wrote as being an alteration of what he accepted as the majority's understanding of precondition one." *Id.* at *13. And the Court finds persuasive the three-judge panel's explanation that Justice Kavanaugh's references to cracking and packing in his concurrence was a response to the dissenting Justices' concerns, and that Justice Kavanaugh was not suggesting some additional "precondition to a precondition" but rather "simply explaining the natural effect of satisfying precondition one." *Id.* (citing *Milligan*, 599 U.S. at 43 (Kavanaugh, J., concurring). That is, where a reasonably configured Black-majority district can be drawn, but that area is instead divided into ineffective districts, then Black voters can be said to "have been cracked" in that area. *Id.*

505.    And if there were any legal requirement of a separate finding of "cracking," the record would support such finding here. Mr. Cooper testified unrebutted that the 1987 Enacted Plan cracks Black voters in the Delta in particular, and that testimony is consistent with the testimony of Delta residents and other experts. *See supra* ¶¶ 69–70, 443. Consistent with the foregoing findings of fact, the 1987 Enacted Plan's division of the Mississippi Delta, which is a clear community of interest and also the heart of a compact and contiguous portion of the State that is heavily Black, constitutes "cracking" to whatever extent such a characterization might be required for purposes of a Section 2 claim.

### C.    Racial Predominance

506.    "Awareness of race is permissible" in the redistricting context; indeed, "Section 2 demands such consideration." *Robinson*, 86 F.4th at 593; *see also, e.g.*, *id.* at 595 (race properly "considered alongside" other traditional principles); *MS NAACP*, 2024 WL 3275965, at *14

219

("Race can also be considered in drawing illustrative districts to satisfy the first *Gingles* precondition."). In *Milligan*, the Supreme Court expressly confirmed that it is appropriate— indeed, necessary—for race to be a consideration in drawing an illustrative plan for *Gingles* 1 purposes: Section 2 "demands consideration of race" because "[t]he question whether additional majority-*minority* districts can be drawn . . . involves a quintessentially race-conscious calculus." 599 U.S. at 31 (internal citations and quotation marks omitted) (Op. of Roberts, C.J.); *id.* at 44 (Kavanaugh, J., concurring) ("[T]he effects test, as applied by *Gingles* to redistricting, requires in certain circumstances that courts account for the race of voters so as to prevent the cracking or packing—whether intentional or not—of large and geographically compact minority populations." (collecting cases)); *see also Clark II*, 88 F.3d at 1407; *MS NAACP*, 2024 WL 3275965, at *14 ("Certainly, to demonstrate that reasonably configured, majority-minority districts could be drawn, race must be considered"). And federal courts enforcing the Voting Rights Act have long "authorized race-based redistricting as a remedy for state districting maps that violate § 2." *Milligan*, 599 U.S. at 41.

507.    Accordingly, it is not a defense in a Section 2 case to claim merely that the plaintiffs' proffered *Gingles* 1 illustrative plans sought (as they were required to do under *Gingles* and *Bartlett*) to meet a 50%+ BVAP goal. "[A]n express racial target is just one consideration in a traditional redistricting analysis under *Gingles*." *Robinson*, 86 F.4th at 594 (5th Cir. 2023) (citing *Milligan*, 599 U.S. at 32).

508.    Moreover, even if a showing of racial predominance could theoretically defeat a plaintiff's attempt to satisfy *Gingles* 1, the foregoing findings of fact preclude such a showing here.

220

Mr. Cooper considered race appropriately for the purposes of satisfying *Gingles* 1, balancing it with the other traditional redistricting principles he considered. *See, e.g., Robinson*, 86 F. 4th at 595 (rejecting suggestion of racial predominance where mapping experts, including Mr. Cooper, considered race "alongside . . . the other race-neutral traditional redistricting criteria *Gingles* requires."). He drew his plans using whole counties only and testified that he did not place any county within or outside of any district based on race. *Supra* ¶¶ 83, 85. The overall thrust of Mr. Cooper's testimony was instead that, given the concentration of the Black population in the contiguous counties along the Mississippi River and on the western side of the State, and given the existence of a 60%+ Black-majority congressional district in that area already, it was "obvious that one can get a majority Black district with that base population," in the same area in any number of configurations. W. Cooper Testimony, 08/05/24 Trial Tr. 51:10–52:3; *see also supra* ¶¶ 65, 85.

509.    Based on all of the evidence presented, including Mr. Cooper's credible explication of his Illustrative Plans and his process in both his report and his testimony, the Court concludes that race did not predominate in Mr. Cooper's Illustrative Plans or in the process he used to develop them.

### D.    Traditional Redistricting Principles

510.    "Compactness under Section 2 is an imprecise concept, but traditional districting principles like maintaining communities of interest and traditional boundaries should be considered." *Robinson*, 86 F.4th at 590 (citing *LULAC*, 548 U.S. at 433)); *MS NAACP*, 2024 WL 3275965, at *13 (similar); *see also Kumar v. Frisco Indep. Sch. Dist.*, 476 F. Supp. 3d 439, 494 (5th Cir. 2020). The bottom-line question is whether the proffered illustrative districts are

221

"reasonably configured," and "[a] district will be reasonably configured . . . if it comports with traditional districting criteria, such as being contiguous and reasonably compact" and "respect[ing] existing political subdivisions, such as counties, cities, and towns." *Milligan*, 599 U.S. at 18, 20; *see also LULAC*, 548 U.S. at 433 (*Gingles* 1 analysis "should take into account 'traditional districting principles such as maintaining communities of interest and traditional boundaries'") (citation omitted); *Davis v. Chiles*, 139 F.3d 1414, 1425 (11th Cir. 1998) (plaintiffs satisfy the first *Gingles* precondition when their proposed majority-minority district is "consistent with traditional districting principles").

511.    In addition to compliance with Section 2, the traditional districting principles include population equality, contiguity, geographic compactness, respect for political boundaries, and respect for communities of interest. *See Milligan*, 599 U.S. at 18, 20; *Miller v. Johnson*, 515 U.S. 900, 916 (1995) (identifying contiguity as a traditional districting principle); *Shaw v. Reno*, 509 U.S. 630, 651–52 (1993) (identifying population equality as a traditional districting principle); *see also, e.g.*, *MS NAACP*, 2024 WL 3275965, at *13–14 (noting communities of interest,  equal populations, contiguity, and respect for existing political subdivisions like counties, cities, and towns as traditional principles); *Ga. State Conf. of NAACP v. Fayette Cnty. Bd. of Comm'rs*, 950 F. Supp. 2d 1294, 1307 (N.D. Ga. 2013) (traditional districting principles include "maintaining communities of interest and traditional boundaries," "geographical compactness, contiguity, and protection of incumbents") (citation omitted).

512.    There is no requirement that the new Black-majority district in a *Gingles* 1 illustrative plan comport with traditional redistricting principles *better* than the districts in the

222

challenged plan. Compliance with the compactness criterion requires only that an illustrative district is "*reasonably* compact and regular, taking into account traditional districting principles such as maintaining communities of interest and traditional boundaries," not that the illustrative districts are equally or more compact than the enacted districts. *Bush v. Vera*, 517 U.S. 952, 977 (1996) (emphasis in original); *accord Milligan*, 599 U.S. at 18. "The first *Gingles* precondition does not require some aesthetic ideal of compactness, but simply that the black population be sufficiently compact to constitute a majority in a single-member district." *Houston v. Lafayette Cnty.*, 56 F.3d 606, 611 (5th Cir. 1995) (quoting *Clark I*, 21 F.3d at 95).

513.    Necessarily, "there is more than one way to draw a district so that it can reasonably be described as meaningfully adhering to traditional principles, even if not to the same extent or degree as some other hypothetical district." *Chen v. City of Houston*, 206 F.3d 502, 519 (5th Cir. 2000). Accordingly, an illustrative plan can be "far from perfect" in terms of compactness yet satisfy the first *Gingles* precondition. *See, e.g.*, *Wright v. Sumter Cnty. Bd. of Elections & Registration*, 301 F. Supp. 3d 1297, 1326 (M.D. Ga. 2018), *aff'd*, 979 F.3d 1282 (11th Cir. 2020).

514.    Nor for purposes of the *Gingles* 1 analysis is there any material distinction between the compactness of the minority *population* and the compactness of the illustrative majority-minority district in the area where that population lives. *See Robinson*, 86 F.4th at 590–591. Demonstrating a reasonably configured minority-majority district is necessarily sufficient to satisfy the requirement that the "minority group . . . be sufficiently large and [geographically] compact to constitute a majority in a reasonably configured district." *Id.* (quoting *Milligan*, 599. U.S. at 18).

223

515. In this case, and in light of the foregoing findings of fact, Mr. Cooper's Illustrative Plans and the additional Black-majority district contained in each of them easily satisfy the first *Gingles* precondition. Mr. Cooper testified credibly and in detail about his balanced map-drawing process, and about his configuration of the plans. *E.g.*, *supra* ¶¶ 79–110. His plans perform as well or better than 1987 Enacted Plan with respect to criteria set forth in the State's guidelines (population equality, compactness, and county and precinct lines), which is highly probative of a plan containing reasonably configured districts. *See, e.g.*, *Milligan*, 599 U.S. at 20–22; *Robinson*, 86 F.4th at 590–92; *MS NAACP*, 2024 WL 3275965, at *18; *Nairne*, 2024 WL 492688, at *21–25. The Illustrative Plans (and the Least Change Plans) are all based on county lines and do not split a single county or precinct, which is especially important. *See, e.g.*, *Milligan*, 599 U.S. at 44 n.2 (Kavanaugh, J., concurring).

516. Notably, Defendants' expert, Dr. Swanson, did not contend that those districts are insufficiently compact or that the Illustrative Plans otherwise fail to comply with traditional redistricting principles. *E.g.*, *supra* ¶ 58.

### 1. Population Equality

517. Population equality is a traditional redistricting principle. *E.g.*, *Reynolds v. Sims*, 377 U.S. 533, 562–63 (1964); *Gaffney v. Cummings*, 412 U.S. 735, 741–746 (1973); *Shaw*, 509 U.S. at 651–52.

518. Based upon the foregoing findings of fact, all the districts in the Illustrative Plans are within the +/–5% population deviation range typically used by states, including Mississippi in the most recent state legislative redistricting process. *See supra* ¶¶ 87, 106, 108.

224

*2. Contiguity*

519.    Contiguity is a traditional redistricting principle that requires districts to be contiguous, meaning that all parts of a district are connected to one another. *E.g.*, *Harris v. Ariz. Indep. Redistricting Comm'n*, 578 U.S. 253, 258 (2016) (citation omitted) (recognizing contiguity as a traditional redistricting principle).

520.    Based upon the foregoing findings of fact, all the districts in the Illustrative Plans comport with the traditional redistricting principle of contiguity. *See supra* ¶¶ 87, 106.

*3. Compactness*

521.    Geographical compactness is assessed based on the shape of the districts. "For example, a district would not be sufficiently compact if it was so spread out that there was no sense of community, that is, if its members and its representative could not effectively and efficiently stay in touch with each other; or if it was so convoluted that there was no sense of community." *Benavidez v. Irving Indep. Sch. Dist.*, No. 3:13-CV-0087-D, 2014 WL 4055366, at *9 (N.D. Tex. Aug. 15, 2014) (quoting *Dillard v. Baldwin Cnty. Bd. of Educ.*, 686 F. Supp. 1459, 1466 (M.D. Ala. 1988)).

522.    The Illustrative Plans are sufficiently compact. Based on a visual analysis, they are regularly shaped, are not convoluted, and are constructed out of whole counties and follow the boundaries of the contiguous counties from which they are composed. They are not at all comparable, for example, to those at issue in *LULAC*, where the Supreme Court found one congressional district noncompact because it consisted of a 300-mile-long tendril connecting disparate communities in Austin and along the Mexican border. 548 U.S. at 435 (emphasis added).

225

523.     In addition, and as discussed already, Mr. Cooper's Illustrative Plans are comparable to the Enacted Plans when considering various mathematical metrics for assessing compactness. *See, e.g.*, *supra* ¶¶ 58, 88, 87, 106. Again, Mr. Cooper testified credibly and unequivocally as to the compactness of his plans and Defendants' expert does not contend that the Illustrative Plans are insufficiently compact.

524.     Based upon the foregoing findings of fact, the Illustrative Plans comport with the traditional redistricting principle of geographic compactness.

### 4.   *Traditional boundaries*

525.     The Illustrative Plans also maintain "traditional boundaries." *LULAC*, 548 U.S. at 433 (citation omitted).

526.     As noted, the Illustrative Plans consist of whole counties and split the same number of counties and precincts (zero) as the 1987 Enacted Plan. *See supra* ¶¶ 85, 88, 89, 106.

527.     Based upon the foregoing findings of fact, the Illustrative Plans comport with the traditional redistricting principle of respecting traditional political boundaries.

### 5.   *Communities of Interest*

528.     Courts have consistently recognized that "maintaining communities of interest" is a traditional redistricting principle. *LULAC*, 548 U.S. at 433; *accord Robinson*, 86 F.4th at 590 (for *Gingles* 1, "traditional districting principles like maintaining communities of interest and traditional boundaries should be considered").

529.     As one pertinent example of this, the Court affirmed in *Milligan* that an illustrative

226

district that recognized Alabama's rural Black Belt as a community of interest, and joined the Black Belt with an urban city (Mobile) was reasonably configured. *Milligan*, 599 U.S. at 1503–05.[14]  The issue is whether voters and communities in the areas at issue also share "similar needs and interests beyond race." *Robinson*, 86 F.4th at 590.

530.    Such shared characteristics may include the social and economic needs of the communities. For example, in *Theriot v. Parish of Jefferson*, the Fifth Circuit found that a majority-Black district for the Jefferson Parish Council included "low-income residents who are less-educated, more often unemployed, and more poorly-housed" and thus shared "common social and economic needs." 185 F.3d 477, 486 (5th Cir. 1999). The Court held that, "[g]iven the common thread which binds the [B]lack voters within [that district], they are entitled to an effective voice in the electoral process and to an influence over the outcome of elections." *Id.* at 487 (internal quotation marks and citation omitted)*. See also Lawyer v. Dep't of Just.*, 521 U.S. 567, 581 (1997) (affirming that a community of interest existed where people shared socioeconomic interests).

531.    Of course, illustrative plans need not perfectly encompass every community of interest*. See Luna v. Cnty. of Kern*, 291 F. Supp.3d 1088, 1110 ("Plaintiffs are . . . not required to accommodate every conceivable community of interest . . . in order to draw a sufficient illustrative map that satisfies the first *Gingles* precondition"); *Montes v. City of Yakima*, 40 F. Supp. 3d 1377,

---

[14] The dissent in *Milligan* agreed that communities of interest are a traditional districting principle to be considered as part of the *Gingles* 1 inquiry. *See* 599 U.S. at 96 (Alito, J., dissenting) ("[T]he first [*Gingles*] precondition . . . takes into account . . . traditional districting criteria like attempting to avoid the splitting of political subdivisions and 'communities of interest.'").

1399 (E.D. Wash. 2014) (holding that *Gingles* 1 does not require a "perfectly harmonized districting plan," as such a requirement "would put the cart before the horse").

532.     Nor are Plaintiffs "require[d] . . . to establish there are no identifiable differences between the communities joined in their illustrative map. It is simply too easy to identify at least some differences between any two communities." *Kern,* 291 F. Supp. 3d at 1116; *see also MS NAACP*, 2024 WL 3275965, at *14. "Illustrative plans that focus[] on other, different, overlapping communities of interest are valid; there is no need to conduct a 'beauty contest" between the maps. *Robinson*, 86 F.4th at 592 (citing *Milligan*, 599 U.S. at 21).

533.     To reiterate its prior findings, Mr. Cooper considered communities of interest such as counties (which he used as the building blocks for his plans) as well as planning and development districts, *see, e.g.*, *Karcher v. Daggett*, 462 U.S. 725, 758 (1983) (noting "residents of political units such as townships, cities, and counties often develop a community of interest"), and other connections between communities, such as economic, regional, and transport-related ties. *See, e.g.*, *supra* ¶¶ 81–82, 92.

534.     Mr. Cooper also considered the Mississippi Delta, which is the most distinctive community of interest in the State, and which has distinctive characteristics, needs, and interests that include but also extend far beyond race. *E.g.*, *Robinson*, 86 F.4th at 590; *MS NAACP*, 2024 WL 3275965, at *19 (recognizing historical Black communities). That distinctiveness, credibly testified to in detail by numerous witnesses, including community leaders and lifelong residents from the Delta, encompasses the Delta's cultural and political history and identity relating to slavery, agriculture, the blues, and the civil rights movement, its rural and agrarian character, and

228

its particular socioeconomic needs and challenges especially with relation to education, health, and employment. *E.g.*, *supra* ¶¶ 93–100. The Delta's status as a community of interest is undisputable on this record. Configuring a three-district plan to unite rather than fragment the Delta is accordingly reasonable.

535.    To the extent that Defendants contend that there are some differences between the northern and southern parts of the Delta, that does not preclude a finding that the Illustrative Plans respect communities of interest, because there is no dispute that the Delta as a whole has distinct characteristics and interests. *E.g.*, *MS NAACP*, 2024 WL 3275965, at *14 ("[E]ven urban and rural communities can be configured into reasonably compact districts if they share cultural, economic, social, and educational ties despite the geographical distance."). Defendants do not argue otherwise; if anything, their contention is that the 1987 Enacted Plan *intentionally* encompasses parts of the state with dissimilar interests. *See* Defs.' Closing Argument, 08/15/24 Trial Tr. 1549:4–10; A. Lamar Testimony, 08/08/24 Trial Tr. 771:16–772:8; *see also supra* ¶ 103. Moreover, when pressed on this specific point, multiple witnesses testified that the Deltans from the north and south of the region shared a common identity. *See* T. Pinkins, 08/05/24 Trial Tr. 137:12–21, 138:17–22; A. Thomas, 08/05/24 Trial Tr. 165:21–166:6.

536.    Based upon the foregoing findings of fact, the Illustrative Plans comport with the traditional redistricting principle of respecting communities of interest.

537.    Notably, the Illustrative Plans balance various districting principles in different ways, but both are reasonable. For example, the district shapes in Illustrative Plan 1 are slightly more geographically compact, while the district population numbers in Illustrative Plan 2 are

229

slightly closer to true equality for "one-person, one-vote" purposes. *See supra* ¶¶ 86–100, 105–109. Both plans unite the Delta as a community of interest and respect county lines as well as planning district and other boundaries, while sufficiently adhering to principles like compactness and population equality as well.

### 6. *Overall Conclusion*

538.    Based upon the foregoing findings of fact and conclusions of law, the Court holds that Illustrative Plan 1 contains a reasonably configured BVAP-majority District 1 and satisfies the first *Gingles* precondition.

539.    Based upon the foregoing findings of fact and conclusions of law, the Court holds that Illustrative Plan 2 contains a reasonably configured BVAP-majority District 1 and satisfies the first *Gingles* precondition.

540.    Based upon the foregoing findings of fact and conclusions of law, the Court holds that the Least Change Plans also satisfy the first *Gingles* precondition. While those plans, because they make fewer changes to the 1987 Enacted Plan, are less visually compact and more unequal in terms of population than the Illustrative Plans, they keep more voters in their existing districts, maintain some element of the East-West configuration, while including a BVAP-majority District 1 that contains the core Delta counties, and perform similarly to the Enacted Plans with respect to traditional redistricting principles.

### VI.    *GINGLES* 2 AND 3

541.    The second and third *Gingles* preconditions involve racially polarized voting. Racially polarized voting exists where there is a "consistent relationship between [the] race of the

voter and the way in which the voter votes." *Gingles*, 478 U.S. at 53 n.21 (alteration in original).

542.    The second and third *Gingles* preconditions concern the behavior of *voters* and the electoral outcomes that result from racially polarized voting behavior. They identify those instances where the risk of dilution-by-submergence is at its highest, namely "'where minority and majority *voters* consistently prefer different candidates' and where minority *voters* are submerged in a majority voting population that 'regularly defeat[s]' their choices." *Milligan*, 599 U.S. at 17–18 (emphasis added); *see also MS NAACP*, 2024 WL 3275965, at *25.

543.    As *Milligan*'s emphasis on voter behavior and electoral outcomes makes clear, any inquiry into *why* voters are polarized, and the role played by partisanship, is part of the totality of the circumstances inquiry, not the *Gingles* 2 and 3 analysis. *E.g., Teague*, 92 F.3d at 292; *MS NAACP*, 2024 WL 3275965, at *32. To the extent *Clements*, 999 F.2d 831, can be read to suggest that this inquiry regarding the role of partisanship takes place in connection with the third *Gingles* precondition rather than the totality of the circumstances, *Milligan* strongly suggests that this is incorrect: "The third precondition, focused on racially polarized voting, 'establish[es] that the challenged districting thwarts a distinctive minority vote' at least plausibly on account of race." 599 U.S. at 19; *accord Nairne*, 2024 WL 492688, at *36, *38 *and Alpha Phi Alpha*, 700 F. Supp. 3d 1136, 1266 at 56 n.45 (both applying *Milligan* to hold that the partisanship issue is more properly analyzed in the context of the totality of the circumstances); *Lopez*, 339 F. Supp. 3d at 612–613 (considering issue at the totality-of-the-circumstances phase); *see also MS NAACP*, 2024 WL 3275965, at *32 & n.7 (citing *Milligan* and noting that, in *Clements*, the Fifth Circuit also discussed partisanship as part of the "totality" inquiry). Either way, however, the trial record does

not support Defendants on this issue as stated in the discussion of Senate Factor 2, *infra*.

544. The second *Gingles* precondition requires a showing that "the minority group . . . is politically cohesive." *Gingles*, 478 U.S. at 51. It asks whether Black voters are voting cohesively for preferred candidates, such that Black voters would in fact elect representatives of choice if drawn into a majority-Black single member district. *Milligan*, 599 U.S. at 18-19; *MS NAACP*, 2024 WL 3275965, at *25 ("The second *Gingles* precondition concerns the voting behavior of black voters."). This showing of minority political cohesiveness is typically made by demonstrating "that a significant number of minority group members usually vote for the same candidates." *Gingles*, 478 U.S. at 56 (cleaned up); *MS NAACP*, 2024 WL 3275965, at *25. The *Gingles* 2 precondition, by establishing "the political cohesiveness of the minority group, shows that a representative of its choice would in fact be elected" in a majority-minority district. *Milligan*, 599 U.S. at 18–19.

545. The third *Gingles* precondition requires a showing that "the white majority votes sufficiently as a bloc to enable it—in the absence of special circumstances, such as the minority candidate running unopposed—usually to defeat the minority's preferred candidate." *Gingles*, 478 U.S. at 51; *accord Milligan*, 599 U.S. at 1. *Gingles* 3 "'establish[es] that the challenged districting thwarts a distinctive minority vote' at least plausibly on account of race." *Id.* at 19 (quoting *Growe*, 507 U.S. at 40); *accord MS NAACP*, 2024 WL 3275965, at *25. "The relevant consideration under the third *Gingles* precondition is the *challenged* plan." *Robinson*, 86 F.4th at 596 (emphasis in original). "[T]he proper question to ask is this: If the [S]tate's districting plan takes effect, will the voting behavior of the white majority cause the relevant minority group's preferred candidate

usually to be defeated?" *Robinson*, 86 F.4th at 597; *accord MS NAACP*, 2024 WL 3275965, at *26.

546.    Together, *Gingles* 2 and 3 provide a complete picture of how racial polarization operates in the area of focus. They ask, in sum:  "[D]o cohesion among the minority group and bloc voting among the majority population both exist." *Id.* at *26.

547.    As noted above, *supra* ¶ 500, references in the case law to the "majority" and "minority" refers not to the numerical status of racial groups in any particular district, but rather to the general status of White and Black votes as members of the racial majority or minority in the State. As above, then, whether the current district is BVAP plurality or BCVAP majority is not relevant. The *Gingles* 3 analysis is about the effect of White bloc voting on the political opportunities of Black voters, *i.e.*, "whether whites vote sufficiently as a bloc usually to defeat the minority's preferred candidates." *Gingles*, 478 U.S. at 56.

548.    Plaintiffs in redistricting cases in Mississippi have repeatedly demonstrated racially polarized voting for purposes of the second and third *Gingles* preconditions. Most recently, the court in *MS NAACP* found that "racial polarization among voters in Mississippi is quite high." 2024 WL 3275965, at *32 ("Black-preferred candidates are consistently unable to win elections unless running in a majority-minority district. White voters are also cohesive in voting for candidates that usually defeat the black-preferred candidates."). The panel further concluded, after examining seven different regions of Mississippi, that there is "no suggestion of significant regional polarization variations in Mississippi." *Id.* at *27.

549.    Other courts have consistently found that voting is racially polarized in Mississippi.

233

*See, e.g., Thomas*, 366 F. Supp. 3d at 807 (Mississippi Delta State Senate district); *Fairley v. City of Hattiesburg*, 122 F. Supp. 3d 553, 580 (S.D. Miss. 2015), *aff'd*, 662 F. App'x 291 (5th Cir. 2016); *Jamison v. Tupelo*, 471 F. Supp. 2d 706, 713 (N.D. Miss. 2007); *Teague*, 92 F.3d at 285; *Clark II*, 88 F.3d at 1395; *Houston v. Lafayette Cnty.*, 20 F. Supp. 2d 996, 1003 (N.D. Miss. 1998); *Ewing,* 740 F. Supp. at 425; *Gunn*, 705 F. Supp. at 319; *Jordan v. City of Greenwood*, 599 F. Supp. 397, 401-02 (N.D. Miss. 1984).

550.    Applying the *Gingles* principles to the foregoing findings of fact, the Court concludes that Plaintiffs have established *Gingles* 2 and 3. *See supra* ¶¶ 124–166.

551.    As described already, and summarized below, there is abundant record evidence showing that Black voters in Mississippi are politically cohesive, and also that White bloc voting typically results in the defeat of Black-preferred candidates, both statewide and in the particular areas of focus. *Id.* Indeed, Dr. Orey testified that the level of polarization is "extreme"—a conclusion accepted by Defendants' expert, Dr. Bonneau, as true and accurate. *See supra* ¶¶ 125–134.

552.    Courts generally rely on statistical analyses to estimate the proportion of each racial group that voted for each candidate. *See, e.g.*, *Gingles*, 478 U.S. at 52–54; *Nipper*, 39 F.3d at 1505 n.20; *Citizens for a Better Gretna v. City of Gretna*, 834 F.2d 496, 500–03 (5th Cir. 1987); *see also League of United Latin Am. Citizens, Council No. 4434 v. Clements*, 986 F.2d 728, 743 (5th Cir. 1993), *on reh'g en banc*, 999 F.2d 831 (5th Cir. 1993); *MS NAACP*, 2024 WL 3275965, at *26.

553.    And courts have recognized ecological inference ("EI"), a statistical method for

estimating racial vote shares using election return and demographic data, as an appropriate analysis—and, indeed, "the most accurate and reliable" method—for determining whether a plaintiff has satisfied the second and third *Gingles* preconditions. *E.g.*, *MS NAACP*, 2024 WL 3275965, at *26; *see also Nairne*, 2024 WL 492688, at *31–34; *Alpha Phi Alpha Fraternity*, 587 F. Supp. 3d 1222, 1303–1313 (N.D. Ga 2023); *Caster v. Merrill*, No. 2:21-cv-1536-AMM, 2022 WL 264819, at *27, *38, *68–70 (N.D. Ala. Jan. 24, 2022), *aff'd sub nom. Milligan*, 599 U.S. 1; *Rose v. Raffensperger*, 584 F. Supp. 3d 1278, 1294 (N.D. Ga. Jan. 24, 2022); *Patino v. City of Pasadena*, 230 F. Supp. 3d 667, 691 (S.D. Tex. 2017); *Benavidez v. City of Irving*, 638 F. Supp. 2d 709, 723–24 (N.D. Tex. 2009); *Bone Shirt v. Hazeltine*, 336 F. Supp. 2d 976, 1003 (D.S.D. 2004), *aff'd*, 461 F.3d 1011 (8th Cir. 2006). Defendants' expert, Dr. Bonneau, agreed that ecological inference is the best method available for measuring racially polarized voting. C. Bonneau Testimony, 08/12/24 Trial Tr. 821:3–6, 822:20–23, 826:20–827:3 ("Since the late 1990s, EI has been the benchmark method courts rely upon to evaluate RPV patterns in voting rights lawsuits.").

554.    Dr. Orey conducted a statistical analysis of Mississippi elections using EI. As noted already, this Court found Dr. Orey credible, his analysis sound, and his conclusions and testimony reliable. *See supra* ¶¶ 115–140.

555.    Dr. Orey properly focused on biracial elections (that is, elections featuring at least one Black candidate and at least one White candidate), which courts, including the Fifth Circuit, have repeatedly held are more probative than the elections only involving white candidates in assessing racial polarization. See *MS NAACP*, 2024 WL 3275965, at *27; *Nairne*, 2024 WL

235

492688, at *31; *see also Magnolia Bar Ass'n v. Lee*, 994 F.2d 1143, 1149 (5th Cir. 1993) ("This court has repeatedly stated that, when statistical evidence is used to establish legally significant white bloc voting, the most probative elections are generally those in which a minority candidate runs against a white candidate." (citing *Westwego Citizens for Better Government v. City of Westwego*, 872 F.2d 1201, 1208 n. 7 (5th Cir. 1989)); *E. Jefferson Coal. For Leadership & Dev. V. Par. Of Jefferson*, 926 F.2d 487, 493 (5th Cir. 1991); *Campos v. City of Baytown*, 840 F.2d 1240, 1248–49 (5th Cir. 1988); *Gretna*, 834 F.2d at 503–04; *see also Wright*, 979 F.3d at 1301; *Jenkins v. Red Clay Consol. Sch. Dist. Bd. of Educ.*, 4 F.3d 1103, 1128 (3d Cir. 1993). *Supra* ¶¶ 126–127.

556.    Dr. Orey's analysis is "district-specific." *Gingles*, 478 U.S. at 103 (O'Connor, J., concurring). He did not attempt to rely on statewide voting statistics to establish legally significant racially polarized voting in the area of focus. *See, e.g., Magnolia Bar Ass'n v. Lee*, 994 F.2d 1143, 1151. He analyzed District 1 contests, and also looked at District 1 results for certain statewide contests. *E.g.*, *supra* ¶¶ 124, 128.

557.    Especially with respect to *Gingles* 3, Dr. Orey focused on District 1 contests, and endogenous contests *i.e.*, elections for the same office within the same area, in particular. *E.g.*, *supra* ¶ 138. This was proper, as courts have held that endogenous elections are especially probative. *Magnolia Bar*, 994 F.2d at 1149 ("[E]lections involving the particular office at issue will be more relevant than elections involving other offices."); *see also MS NAACP*, 2024 WL 3275965, at *27 ("We agree that [endogenous] elections are the most probative here . . . and are the most analogous ones.").

558.     Based on the foregoing findings of fact, the second *Gingles* precondition is satisfied here, because Black voters in Mississippi in the areas of interest are politically cohesive. *See* 478 U.S. at 49. "Bloc voting by blacks tends to prove that the black community is politically cohesive, that is, it shows that blacks prefer certain candidates whom they could elect in a single-member, black majority district." *Id.* at 68. Dr. Orey's unchallenged analysis clearly demonstrates extremely high levels of cohesiveness among Black Mississippians in supporting their preferred candidates, especially in District 1 elections—typically cohesion over 90%. *Supra* ¶¶ 132–137. Indeed, *Gingles* 2 appears to be undisputed by Defendants. Def.'s Closing, 08/15/24 Trial Tr. 1524:5-7 ("Nobody doubts that Blacks vote cohesively in Mississippi. We've never said a word to the contrary.").

559.     Based on the foregoing findings of fact, the third *Gingles* precondition is satisfied here, because White voters vote heavily as a bloc to defeat the minority candidate in District 1, and usually the minority candidate in District 1 is in fact defeated. *Supra* ¶¶ 138–141.

560.     There is no specific threshold percentage required to demonstrate bloc voting, as "[t]he amount of white bloc voting that can generally 'minimize or cancel' black voters' ability to elect representatives of their choice . . . will vary from district to district." *Gingles*, 478 U.S. at 55-56 (internal citations omitted). Racial bloc voting at the 90% plus level has consistently been held to establish the third *Gingles* precondition. In *Milligan*, for example, the evidence was that, "on average, Black voters supported their candidates of choice with 92.3% of the vote" while "white voters supported Black-preferred candidates with 15.4% of the vote" and "that the candidates preferred by white voters in the areas that he looked at regularly defeat the candidates preferred by

237

Black voters." 599 U.S. at 22. In *Robinson*, the evidence similarly showed that Black voter cohesion was 83.8% on average, and that White crossover voting was between 11.7 percent and 20.8 percent—and the Court concluded this was sufficient to show legally significant polarization. 86 F.4th at 597. In *MS NAACP*, and *Nairne*, and *Alpha Phi Alpha* in Georgia, the numbers were similar as well. *MS NAACP*, 2024 WL 3275965, at *29-*30; *Nairne*, 2024 WL 492688, at *31; *see also Alpha Phi Alpha*, 700 F. Supp. 3d at 1275.

561. Here, in Supreme Court contests featuring Black candidates, White voters voted well over 90% as a bloc to defeat Black candidates in both of the two contested District 1 elections, in 2020 and 2012. *Supra* ¶¶ 132–134, 138. Looking at all District 1 contests (*i.e.*, including Public Service Commission and Transportation Commission contests from 2011 through 2023), White bloc voting was consistently greater than 90%, and Black candidates were defeated two thirds of the time (3 out of 9). *Supra* ¶¶ 132–134, 139–140. In other words: Whites voted sufficiently as a bloc usually to defeat Black candidates in District 1, particularly in Supreme Court elections.

562. As noted already, the fact that the current district is BCVAP majority according to the ACS estimate of citizen voting age population is not relevant, because the question is about political opportunity and whether Black candidates are usually defeated under the current lines, which they are. *See supra* ¶ 547. Indeed, the trial record shows why any reliance on the BCVAP numbers from the ACS, shorn of context, would not be appropriate. The preponderance of the evidence showed that once felon disenfranchisement is taken into account, the eligible share of Black voting-age citizens drops well below 50%. *See supra* ¶¶ 72–78. The evidence also showed that Black turnout was hindered by deep-seated socioeconomic disparities that impact voting and

238

participation. *See supra* ¶¶ 292–333; *see also* ¶¶ 334–348. The evidence also showed that burdens on voting remain. *See, e.g.*, *supra* ¶¶ 246–265. And it showed that Black candidates in District 1 are usually defeated. *See, e.g.*, *supra* ¶ 140.

563.    It is true that Black candidates have prevailed in some of the more recent elections for Transportation and most recently Public Service Commissioner in District 1, but "proof that some minority candidates have been elected does not foreclose a a § 2 claim." *MS NAACP*, 2024 WL 3275965, at *28; *see also Clark II*, 88 F.3d at 1397 ("[T]he election of a few minority candidates does not necessarily foreclose the possibility of dilution of the black vote."). That is especially true when the few examples of successful Black candidates are for offices that differ from the ones at issue in the case. As discussed, *e.g.*, *supra* ¶¶ 145–150, the commissioner races have fundamentally different political dynamics from Supreme Court races: The ballot roll-off effect, which disproportionately affects Black voters due to lower levels of educational attainment and home ownership, is stronger in nonpartisan judicial contests. Furthermore, there is no dispute that voters often have different criteria when voting for different offices, and the salience of race may vary across offices. *E.g.*, *supra* ¶ 151.

564.    Additionally, when considering how much weight to accord to examples of Black candidates who have prevailed, it is appropriate to be mindful of special circumstances that may have been present those elections. *Gingles*, 478 U.S. at 54. As the Supreme Court explained in *Gingles*, Defendants may defeat Plaintiffs' showing on the third *Gingles* prong if Black candidates prevail in the challenged districts because of "a diminution in usually severe white bloc voting." 478 U.S. at 54. By contrast, when White bloc voting usually results in the defeat of Black

candidates, or when victories by Black candidates are more often due to "special circumstances, such as incumbency and lack of opposition," then Plaintiffs will have met their burden. *Id.* at 50, 54; *see also MS NAACP*, 2024 WL 3275965, at *28, 43

565.    Here, White bloc voting is consistent and extremely high across all of the key election contests, and special circumstances explain the few examples of Black candidates (none of them Supreme Court candidates) prevailing in contested elections. For instance, the evidence on the whole indicates that the 2023 election, during which two of the three such victories occurred, was something of an outlier as compared to Supreme Court elections, due to coattails effects among Black voters from the Brandon Presley campaign, *e.g.*, *supra* ¶¶ 152–156. Even in those contests, White cross-over voting for Commissioners Simmons (who was an incumbent in 2023) and Stamps was extremely low. *Supra* ¶¶ 132–134, 140.

566.    To the extent that Defendants seek to rely on Justice King's elections in 2012 and 2020, there is no data to support their position. Justice King ran unopposed, as an incumbent appointed by a White Republican governor, which unrebutted testimony indicated helped clear the field of credible opposition. *Supra* ¶¶ 157–158.

567.    Even considering victories by non-judicial candidates in District 1 elections, Black candidates in District 1 contests still "usually" lost (and in contested Supreme Court elections, Black challengers *always* lost). Thus, the Court concludes that, while victories by some Black candidates have potential relevance when considering the totality of the circumstances, they do not alter the bottom-line conclusion on *Gingles* 3. *Cf. MS NAACP*, 2024 WL 3275965, at *31 (even "if an occasional candidate supported overwhelmingly by black voters can break the color barrier

just a bit among white voters," this does not "prove[] anything other than that there will be outliers in statistical analysis").

568. Based on the foregoing findings of fact and conclusions of law, the third *Gingles* precondition is satisfied here.

## VII. TOTALITY OF THE CIRCUMSTANCES

569. After a plaintiff establishes the *Gingles* preconditions, the "totality of circumstances" must be considered to make a final determination whether minority voters "have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." 52 U.S.C. § 10301(b); *see also Milligan*, 599 U.S. at 26; *LULAC*, 548 U.S. at 425–26; *Robinson*, 86 F.4th at 597. The Court applies this analysis "specifically to the facts of each case and the state electoral mechanism while also considering the [Senate] factors as a guide." *Id.*

570. The totality of the circumstances inquiry "is peculiarly dependent upon the facts of each case," "requires an intensely local appraisal of the design and impact of the contested electoral mechanisms," and "depends upon a searching practical evaluation of the past and present reality and on a functional view of the political process." *Gingles*, 478 U.S. at 45, 79 (citations and internal quotation marks omitted); *see also, e.g., Westwego Citizens for Better Gov't, v. City of Westwego*, 946 F.2d 1109, 1115 (5th Cir. 1991) (discussing how the lingering effects of racial discrimination continued to impact voting in Westwego).

571. The Senate factors "are 'neither comprehensive nor exclusive.'" *Ga. State Conf. of NAACP*, 775 F.3d at 1342 (quoting *Gingles*, 478 U.S. at 45). Nor is there any "requirement that

any particular number of factors be proved, or that a majority of them point one way or the other."

*Gingles*, 478 U.S. at 45 (quoting S. Rep. No. 97–417, at 29, 1982 U.S.C.C.A.N, 207); *see also Westwego Citizens for Better Gov't*, 946 F.2d at 1120; *see also McMillan v. Escambia Cnty.*, 748 F.2d 1037, 1042–47 (5th Cir. 1984) (finding a Section 2 violation based on Senate Factors 1, 2, 3, 5, 7, and 9); *Miss. State Chapter, Operation Push v. Allain*, 674 F. Supp. 1245, 1262–68 (N.D. Miss. 1987) (finding a Section 2 violation after determining that five Senate Factors weighed in plaintiffs' favor), *aff'd*, 932 F.2d 400 (5th Cir. 1991).

572.    The most important considerations are Senate Factor 2, the extent to which voting in the jurisdiction is racially polarized, and Senate Factor 7, the extent to which members of the minority group have been elected to office in the jurisdiction. *E.g.*, *Fairley*, 662 F. App'x at 296 (citing *Clark II*, 88 F.3d at 1397) ("The existence of racially polarized voting and the extent to which minorities are elected to public office remain the two most important factors considered in the totality-of-circumstances inquiry."); *Clark II*, 88 F.3d at 1398 (finding the "presence of racially polarized voting and the virtually complete absence of black elected officials in county offices" provided strong evidence of vote dilution). The presence or absence alone of these factors is not, however, dispositive. *See, e.g.*, *Major v. Treen*, 574 F. Supp. 325, 351 (E.D. La. 1983) (three-judge court).

573.    As noted already, "it will be only the very unusual case in which the plaintiffs can establish the existence of the three *Gingles* [preconditions] but still have failed to establish a violation of § 2 under the totality of circumstances." *Teague*, 92 F.3d at 293 (quoting *Clark v. Calhoun County*, 21 F.3d 92, 97 (5th Cir. 1994); *see also Ga. State Conf. of NAACP*, 775 F.3d at

1342 (same); *MS NAACP*, 2024 WL 3275965 at *53.

574.    Looking to the totality of the circumstances, including the Senate Factors, this is not the "'very unusual case'" where liability does not follow after the *Gingles* preconditions are met, *Teague*, 92 F.3d at 293 (quoting *Clark*, 21 F.3d at 97). *See MS NAACP*, 2024 WL 3275965 at *53 (so concluding based on Section 2 totality-of-the-circumstances analysis of statewide districting plan after trial conducted in 2024).

575.    Indeed, the evidence as to the Senate Factors in this case is extremely similar to, and in some instances more powerful than, the evidence that supported a liability determination in *MS NAACP*, another very recent Mississippi Section 2 involving a statewide districting plan.

### A.    Senate Factors 1 and 3: Mississippi's History of Voting-Related Discrimination Against Black Voters and Voting Practices and Procedures That Tend to Enhance the Opportunity for Discrimination Against Minority Voters

576.    Senate Factor 1 considers "the history of official voting-related discrimination in the state or political subdivision." *Gingles*, 478 U.S. at 36–37, 44. Senate Factor 3 involves assessing "the extent to which the state of political subdivision has used voting practices or procedures that tend to enhance the opportunity for discrimination against the minority group," weighs in Plaintiffs' favor. *Gingles*, 478 U.S. at 37, 45. These factors may be considered together because to some extent they both involve the State's historical and current voting practices and procedures. *E.g.*, *MS NAACP*, 2024 WL 3275965 at *34. As in *MS NAACP*, which evaluated largely the same evidence, these factors weigh in Plaintiffs' favor. *Id.* at *39.

577.    For purposes of Senate Factors 1 and 3, "'the most relevant historical evidence is relatively recent history, not long-past history,' but 'even long-ago acts of official discrimination

243

give context.'" *MS NAACP*, 2024 WL 3275965, at *35 (quoting *Veasey v. Abbott*, 830 F.3d 216, 232, 257 (5th Cir. 2016)). Accordingly, there is "no bar . . . as to when older history becomes too attenuated or diluted by later events to be relevant in a Voting Rights Act claim." *Id.*

578.    "Mississippi plainly has a long history of official discrimination against African-Americans seeking to vote." *Thomas*, 366 F. Supp. 3d at 807; *see also Teague*, 92 F.3d at 293–94 ("That Mississippi has a long and dubious history of discriminating against blacks is indisputable."); *Clark II*, 88 F.3d at 1399 ("The long and unhappy history of discrimination in Mississippi requires no protracted discussion."); *Jamison*, 471 F. Supp. 2d at 714 ("[T]he court acknowledges that official discrimination historically has hindered potential minority voters in Mississippi. . ."). In fact, the history of discrimination is so undisputed that courts have taken judicial notice of it. *See e.g.*, *Fairley,* 122 F. Supp. 3d at 567 (S.D. Miss. 2015), *aff'd sub nom*. *Fairley*, 662 F. App'x 291 (5th Cir. 2016).

579.    Moreover, as discussed in the foregoing findings of fact, *see supra* ¶¶ 292–333 (impact of socioeconomic disparities on political participation), ¶¶ 334–347 (finding that Black voters in fact have lower turnout than White voters in Mississippi), to whatever extent it might be relevant and necessary, Plaintiffs have paired their evidence regarding Mississippi's official history of discrimination with a showing that barriers and disparate burdens on participation exist today, and that Black Mississippians "do not in fact participate to the same extent as other citizens."

*Cf. N.A.A.C.P. v. Fordice*, 252 F.3d 361, 368 (5th Cir. 2001).[15]

580.    Plaintiffs have presented extensive expert testimony about the history of voting discrimination, and the deployment of voting practices and procedures that enhance the opportunity for discrimination, through the testimony and reports of Dr. Campbell and Dr. King, *see supra* ¶¶ 172–192, 246–265. As Dr. Campbell explained, Mississippi has a long and consistent history of employing discriminatory voting devices, as well as "invent[ing] . . . new processes, new procedures, and new devices" designed to impede Black voting every time the door was "crack[ed] open" to increase access to voting for Black Mississippians, as with the passage of the Voting Rights Act in 1965. *E.g.*, J. Campbell Testimony, 08/06/2024 Trial Tr. 403:3–405:19.

581.    Plaintiffs also presented extensive evidence that Mississippi's past history of discrimination in voting continues to impact Black voters today. *Supra* ¶¶ 248, 250–265; *see, e.g.*, J. Campbell Testimony, 08/07/2024 Trial Tr. 421:7–437:21; M. King Testimony, 08/14/24 Trial Tr. 1315:11–1316:3 (testifying about the historical origins and present-day discriminatory effects of lifetime felony disenfranchisement); PX-112 (voting determination letters through 2012); *see also, e.g.*, K. Kirkpatrick Testimony, 08/14/24 Trial Tr. 1262:8–14, 1285:8–10 (testifying that Mississippi utilizes a majority-vote requirement in statewide elections, including for judicial office, and enacted in 2023 a process for purging voters based on their failure to vote).

---

[15] The holding that such evidence was lacking in *Fordice* is unsurprising given that it was a two-day trial where Plaintiffs' called three witnesses *total*. *See* Defs.-Appellees' Br., *NAACP v. Fordice*, No. 99-60505 (5th Cir.), 2000 WL 33978942, at *2. Needless to say, the evidence in this case is very different.

582.    Individual voters' testimony showed that the history of exclusion still influences the lives of Black Mississippians, and for some represents their own lived experience. *Supra* ¶¶ 194–199; *e.g.*, R. Anderson Testimony, 8/8/24, Trial Tr. 733:16–20 (testifying about personal experience with poll taxes, largely segregated student body at University of Mississippi, and threats from the KKK); C. Slaughter-Harvey Testimony, 08/07/24 Trial Tr. 458:11–15 (testifying about father being subjected to poll taxes and being denied the right to vote); Percy Watson Testimony, 08/07/24 Trial Tr. 489:9–490:10 (testifying about experience attending segregated public school); *see also* D. White Testimony, 08/06/24 Trial Tr. 345:25–346:5, 348:6–22, 349:5–17 (testifying to receiving racist messages as a Black candidate in 2023).

583.    Also relevant, Plaintiffs demonstrated at trial that Mississippi employs various voting practices that, while not inherently unlawful, make the cost of voting higher in Mississippi than virtually any other State, and that higher cost of voting has a greater impact on Black voters. *See supra* ¶¶ 254–260; *see also* PX-018 at 53 (Dr. Campbell finding that Mississippi has either the highest or second-highest cost of voting in the country, due to extremely restrictive voter ID law, lack of early voting, unavailability of online voter registration, failure to allow no-excuse mail voting, and unusually complex mail ballot procedures, including notarization); PX-052 at 27–28 (Dr. King reaching similar conclusions and also citing Mississippi's frequent elections causing voter fatigue); *accord* K. Kirkpatrick Testimony, 08/14/24 Trial Tr. 1238:17-25 (voter identification requirements); 1259:20-23 (no online voter registration); 1259:24-1260:1-4 (no same-day voter registration; 30-day advance registration requirement); 1269:20-25 (no-excuse absentee voting not available); 1273:3–1274:16 (absentee ballot process requires signature of

246

official authorized to administer an oath like a notary public); 1275:24-25 (no early voting).

584.    The existence and use of restrictive voting practices may exacerbate the dilution caused by racial polarization in the absence of effective Black-majority districts. *See, e.g.*, *Gingles*, 478 U.S. at 47 (affirming that at-large voting may "operate to minimize or cancel out the voting strength of racial minorities in the voting population") (citation omitted). That includes practices that the trial record showed are all used in Mississippi, such as majority vote requirements, absentee ballot restrictions, odd year elections, and a history of racial gerrymandering and use of at-large elections. *See Harvell v. Blytheville Sch. Dist. No. 5*, 71 F. 3d 1382, 1390 (8th Cir. 1995) (finding that "majority vote requirement" and "staggered terms" "tend to suppress minority voters' influence"); *see also Nairne*, 2024 WL 492688, at *39 (weighing Senate Factor 3 in favor of Plaintiffs because state "has a majority vote requirement for its primaries and general elections" and holds odd-year elections which "breed[] voter fatigue and confusion, which is amplified in poor and under educated communities"); *Alpha Phi Alpha*,  700 F. Supp. 3d at 64 n.54 (law restricting absentee ballot usage weighed for plaintiffs under Senate Factor 3 because of its "actual or perceived negative impact on Black voters" who had used absentee voting in greater numbers before passage of the law); *Singleton*, 582 F. Supp. 3d at 1021 (weighing history of court invalidations of racial gerrymanders and at-large voting systems on grounds of racially discriminatory purpose or effect in favor of Plaintiffs under Senate Factor 3).

585.    The trial record showed that voting rules and procedures that increase the cost of voting and burden the right to vote disproportionately for Black Mississippians remain in place, and in some cases have been expanded. These include lifetime felony disenfranchisement;

restrictions on absentee voting, including new restrictions imposed in the last year; a strict voter ID law; a new voter purge law, beyond what federal law requires, that will lead to less frequent voters being taken off the active list and subjected to additional barriers; odd-year state legislative elections that lead to lower turnout and more voter fatigue, especially among less educated voters; and a lack of early voting, mail-in voting, or same-day registration, or other practices that might make it easier to vote and ameliorate the effects of past discrimination and socioeconomic disparities. *Supra* ¶¶ 248–265. Such restrictive policies are relevant whether or not they are lawful. *See, e.g.*, *Nairne*, 2024 WL 492688, at \*36–39; *Jamison*, 471 F. Supp. 2d at 714. That is especially so where both the expert and fact witness testimony showed that the burdens imposed by restrictive voting rules fall disproportionately on Black voters, *e.g.*, *supra* ¶¶ 261–265. *See Nairne*, 2024 WL 492688, at \*39; *Alpha Phi Alpha*, 700 F. Supp. 3d at 64 n. 54; *see also Singleton*, 582 F. Supp. 3d at 1021.

586.    "To be sure, Mississippi is a much different state today" as compared to 1965. *MS NAACP*, 2024 WL 3275965 \*39 (citing *Teague*, 92 F.3d at 293–94). But the fact that the very worst discriminatory voting rules were eradicated after 1965 is not a defense to vote dilution, as recent Section 2 merits determinations in Mississippi (*MS NAACP* and *Thomas*), Alabama (*Milligan*), Georgia (*Alpha Phi Alpha*), and Louisiana (*Robinson* and *Nairne*) all demonstrate.

587.    Indeed, at a minimum the evidence here with respect to Senate Factors 1 and 3 is comparable to the evidence relied on by the courts in *Milligan* and in *MS NAACP*. That evidence included recent evidence of unlawful districting actions (from 2000 and 2010), *see* 2024 WL 3275965 at \*38 (discussing *Smith v. Clark*, 189 F. Supp. 2d 548, 559 (S.D. Miss. 2002) and *Smith*

248

*v. Hosemann*, 852 F. Supp. 2d 757, 760–61 (S.D. Miss. 2011), which exists here, *e.g.*, *supra* ¶ 191. Indeed, the fact that there was a liability finding with respect to state legislative districting in *MS NAACP* itself makes that point even stronger.

588.     The other evidence considered sufficient for Senate Factors 1 and 3 in *MS NAACP*, 2024 WL 3275965, at *39 is also unsurprisingly present here. That includes the numerous Department of Justice voting determination letters stretching into the last decade, blocking proposed voting measures due to potentially discriminatory or retrogressive effects, *see supra* ¶¶ 184–190; PX-112, challenges to the imposition of at-large voting systems, *see supra* ¶ 191, as well as recent, successful challenges to voting restrictions by plaintiffs in federal court, *see supra* ¶¶ 258, 260.

589.     Based on the foregoing findings of fact and conclusions of law, the extensive history of discrimination against Black voters in Mississippi, and the persistence of at least some voting practices that enhance the opportunity for discrimination, supports the determination that Black voters have less opportunity than Whites to participate in the political process and to elect representatives of their choice to the State Supreme Court. Accordingly, Senate Factors 1 and 3 weigh in Plaintiffs' favor.

### B.     Senate Factor 2: High Levels of Racially Polarized Voting in Mississippi

590.     The second Senate Factor is "the extent to which voting . . . is racially polarized." *Clements*, 999 F.2d at 850 (quoting S. Rep. No. 97-417, at 29, 1982 U.S.C.C.A.N., 206). This factor "overlaps with *Gingles* precondition three, which is also routinely described as concentrating on racial polarization," but the universe of relevant evidence is "broader" at this

stage. *MS NAACP*, 2024 WL 3275965, at *39. For instance, courts may consider and weigh statewide evidence or exogenous elections as well. *Id.*

591.    Senate Factor 2, along with Senate Factor 7, are generally considered the most important factors. *See MS NAACP*, 2024 WL 3275965, at *39 ("[R]acial bloc voting is one of the two most important factors, the other being minority candidates' success or failure in elections. If both factors are 'present, the other factors . . . are supportive of, but not essential to, a minority voter's claim.'" (quoting *Gingles*, 478 U.S. at 48 n.15)).

592.    Here, as already discussed in context of the second *Gingles* precondition, the undisputed facts show extremely stark and persistent levels of racially polarized voting in Mississippi. The extent of this racial polarization is sweeping and weighs heavily in favor of a finding of liability. Proof of such racially polarized voting *itself* creates an inference of racial bias in the electoral system. *See Teague*, 92 F.3d at 290 ("Plaintiffs are to present evidence of racial bias operating in the electoral system by proving up the *Gingles* factors.") *accord United States v. Marengo Cnty. Comm'n*, 731 F.2d 1546, 1567 (11th Cir. 1984) (Wisdom, J.) (racially polarized voting is "the surest indication of race-conscious politics").

593.    To the extent that Defendants argue the observed differences in voting behavior between Black and White Mississippians are driven by partisan affiliation rather than race, this question is properly considered as part of the totality of the circumstances, but the argument cannot carry the day on this trial record. *See Teague*, 92 F.3d at 292; *see also Gingles*, 478 U.S. at 74. Rather, the record is starkly to the contrary.

594.    The burden to rebut the inference of race-conscious politics that follows from

racially polarized voting patterns, and to demonstrate that stark patterns of racial polarization in the electorate are due to something other than race, lies in the first instance with the defendant. A Section 2 plaintiff does not have "the burden of negating all nonracial reasons possibly explaining" those voting patterns. *Teague*, 92 F.3d at 295; *accord id.* at 290; *Nairne*, 2024 WL 492688 at *38. Rather, it is for the defendant to "try to rebut plaintiffs' claim of vote dilution via evidence of 'objective, nonracial factors.'" *See Teague*, 92 F.3d at 292 (quoting *Nipper v. Smith*, 39 F.3d 1494, 1513 (11th Cir. 1994)); *MS NAACP*, 2024 WL 3275965, at *33 ("Defendants may attempt to rebut [plaintiffs'] claims of vote dilution via evidence of objective, nonracial factors like partisan politics; as we stated before, it is not the Plaintiffs' burden to negate all nonracial reasons possibly explaining voting patterns." (cleaned up)). Viewing the burden this way makes sense because, in a Section 2 results case, Plaintiffs are not required to affirmatively prove the ultimate or underlying *cause* of unequal opportunity for Black voters, only the unequal *result* of the imposition of the challenged districting plan. *See Milligan,* 599 U.S. at 18.

595. Like the rest of the totality of circumstances factors, courts balance the relative strength of evidence the parties direct to each factor—including racial polarization—to determine whether Black Mississippians' votes are being diluted. *See, e.g.*, *Lopez*, 339 F. Supp. 3d at 604 ("[P]laintiffs do not bear the burden in the first instance to eliminate factors other than race as influencing voters.") (citation omitted); *accord Teague,* 92 F.3d at 295. Defendants have not made and cannot make the necessary showing here—and to the contrary, Plaintiffs have adduced comprehensive evidence affirmatively demonstrating the centrality of racial division in Mississippi politics, *see supra* ¶¶ 209–244.

251

596.    In the few instances where defendants have succeeded with a "party-not-race defense," there has been record evidence that "indisputably proves that partisan affiliation, not race, best explains the divergent voting patterns among minority and white citizens." *Clements*, 999 F.2d at 850. Thus, in *Clements*, the evidence showed very high levels of White crossover voting in Texas judicial elections for minority-preferred candidates, between 30 and 40 percent. *Id.* at 861. In addition, both political parties "aggressively recruited" minority candidates, successfully nominated them, and elected them with White support, such that there was a track record of minority candidates winning elections repeatedly and "without fail" with support primarily from White voters, including in contests against White candidates. *Id.* at 861.

597.    Similarly, in *Lopez v. Abbott*, another Texas judicial districting case, both parties were running minority candidates, and White voters were consistently voting to elect minority candidates nominated by their preferred party. 339 F. Supp. 3d at 612–613.

598.    Likewise in *Whitcomb v. Chavis*, 403 U.S. 124 (1971), on which Defendants also rely, poor Black and poor White voters in one section of the Indiana county at issue were voting for one party, and wealthier voters elsewhere were voting for the other party—but both parties were nominating and electing Black candidates, and doing so with White support. 403 U.S. at 149–153 & nn.29–30. Justice White described a similar scenario in his *Gingles* concurrence, in which both parties were nominating racially mixed slates of candidates, such that White voters were supporting and electing Black candidates and vice versa. 478 U.S. at 83 (White, J., concurring).

599.    The common thread among these cases—and the reason why the facts in each could support the conclusion that the polarization of the electorate might be partisan rather than racial in

252

nature—is that White voters were consistently *voting for and electing to office* minority candidates, both by "crossover" voting for minority voters' preferred candidates in significant numbers, and by voting for minority nominees from their own preferred party. These cases teach that, when the facts demonstrate that there are two genuinely multi-racial coalitions operating in politics, with both parties nominating and electing minority candidates with White support, the mere fact that the racial composition of the two coalitions varies somewhat may not be sufficient to sustain a Section 2 claim. In that situation, it might be said that partisan affiliation "best explains" polarization. *Clements*, 999 F.2d at 850.

600.    As the three-judge panel unanimously recognized in *MS NAACP*, looking at the same state and very similar facts, "[t]his case is different." 2024 WL 3275965, at *40. One key difference is the extraordinary degree of racial polarization in Mississippi: *Clements* "did not consider polarization of this magnitude or the effect it has on open participation when coupled with cracking and packing"—the exact same circumstances reflected in the trial record here. *See MS NAACP*, 2024 WL 3275965, at *41.

601.    In Mississippi, and on this trial record, "[t]here is no proof that whites constitute a majority of the Democratic Party, that Republicans aggressively recruit and unfailingly support black Republican candidates, or that elected white officials respond to black constituents as they did in Texas" in *Clements*. *MS NAACP*, 2024 WL 3275965, at *41. The trial record in this case— and the political reality in Mississippi—simply has "none of those facts." *Id.* at *40. The levels of racial polarization in Mississippi are far higher than in *Clements*, *see supra* ¶¶ 134–140; the Republican Party has made no apparent effort to recruit Black candidates, *see supra* ¶¶ 221–222,

253

275–283; and White elected officials are frequently not responsive to Black Mississippians, *see supra* ¶¶ 420–439; *MS NAACP*, 2024 WL 3275965, at \*41 (crediting Black Mississippians "who all testified—without contradiction—that their elected officials ignore the black community").

602.     Even if it were not Defendants' burden to rebut the presumption that polarization is on account of race at this stage, the evidence in the record confirms Plaintiffs' position that politics and polarization in Mississippi are very much driven by race.

603.     Unrebutted testimony from political elders in the State, including Justice Anderson and Representative Watson, provides a helpful starting point for understanding the centrality of race in Mississippi politics today. For instance, Justice Anderson, who was the first Black person to serve on the Mississippi Supreme Court when he was appointed in 1985, testified that race is the "number one" factor in Mississippi politics and that "racial polarization in electoral politics still exist[s] in Mississippi." R. Anderson Testimony, 08/08/24, Trial Tr. 748:1–8. Rep. Watson, who is one of the longest serving members of the Mississippi legislature, testified that racial polarization is just as intense today as it was when he was first elected in 1979. P. Watson Testimony, 08/07/24 Trial Tr. 496:25–497:424.

604.     Second, there is no dispute that partisan affiliation in Mississippi rests on a racial divide, which predates the party division. *MS NAACP*, 2024 WL 3275965, at \*43 ("That Mississippi voters have been separated by race even when most black voters were Republicans and white voters were Democrats adds weight to our finding that racially polarized voting best explains the divide."); *see supra* ¶¶ 211–225. Dr. King, whose testimony was credited by *MS NAACP*, provided the same opinion in this case: "[T]he political science research . . . show[s] that

racial polarization predates party polarization," and "the foundation of polarization is based on race." *E.g.*, M. King Testimony, 08/14/24 Trial Tr. 1299:14–22. Dr. Campbell reached the same conclusion based on his review of the history of partisan realignment. *E.g.*, J. Campbell Testimony, 08/07/24 Trial Tr. 440:1–6.

605.    Indeed, there is no dispute that the party lines in Mississippi formed in significant part based on the parties' response to issues of racial equality and civil rights. *MS NAACP*, 2024 WL 3275965, at *43 (applying instruction from *Clements* that courts must "remain[] 'sensitive to the reality that political positions can be proxies for racial prejudice" (quoting *Clements*, 999 F.2d at 879)); *see supra* ¶¶ 216–219. As Dr. King testified, the Civil Rights Era was "the critical inflection point" that created the modern political party alignment. M. King Testimony, 08/14/24 Trial Tr. 1294:13–19; *see also, e.g.*, J. Campbell, 08/07/24 Trial Tr. 452:9–453:25 (describing partisan shifts in White electorate over the course of the 20th Century, including "spectacular[]" swings during the Civil Rights Era, and explaining that "race fits the data perfectly"). As was the case in *MS NAACP*, even Mississippi's own expert on political science agrees that "there is no question the passage of the Civil Rights Act and the Voting Rights Act contributed to [the] realignment and the current configuration of the parties today." C. Bonneau Testimony, 08/12/24 Trial Tr. 837:22–838:2, 840:11–24; *see MS NAACP*, 2024 WL 3275965, at *43–44 (citing Mississippi's expert who "testified that racial division and the Democratic Party's association with civil rights 'definitely played a role' in [the] party realignment" in Mississippi and continues to affect politics today); *supra* ¶¶ 212, 216.

606.    Third, as Dr. Orey and Dr. King explained, it is possible to distinguish racial

polarization from partisan polarization by examining whether voting is racially polarized in party primaries, where partisanship is held constant—an approach that Defendants' expert, Dr. Bonneau, agrees with. *See supra* ¶¶ 226–227; *see also* C. Bonneau Testimony, 08/12/24 Trial Tr. 842:23–843:1, 883:11–884:2; M. King Testimony, 08/14/24 Trial Tr. 1299:23–1300:3. Additionally, one can examine whether racial polarization is similarly extreme in nonpartisan elections, where partisanship is less obvious to lower-information voters and has less of an effect than in partisan races where candidates' partisan affiliation is displayed on the ballot itself. *See supra* ¶¶ 229–231; C. Bonneau Testimony, 08/12/24 Trial Tr. 802:21–804:15, 857:20–858:11. This loss in partisan information is why looking at a non-partisan contests makes it "easier for us to, you know, determine whether or not race played a role." B. Orey Testimony, 08/06/24 Trial Tr. 215:14–15.

607.    Examining party primaries and non-partisan elections in the trial record confirms that the evident polarization in the electorate is racial, not partisan.

608.    The evidence showed that racial polarization continues to exist in partisan primaries, though the candidates have the same partisan affiliation. *See supra* ¶¶ 227–228. And racial polarization in nonpartisan, judicial elections is no less extreme than in partisan elections featuring Black and White candidates. *See supra* ¶¶ 229–231. This evidence, which every relevant expert agreed is sound, is highly probative of the existence of racial polarization in Mississippi. At best, Defendants merely point out that there is a correlation between race and party, but they fail to explain why that correlation exists and they fail to rebut Plaintiffs' explanation that the underlying dynamic is racial, even if it can and does manifest in the form of two competing political parties. *See MS NAACP*, 2024 WL 3275965, at *43 (finding expert testimony that

256

polarization is based on partisanship unpersuasive because the expert "fail[ed] to consider the record evidence explaining why black voters might choose white Democrats — like support for issues important to black citizens. And even [the defense expert] acknowledges that 'it's possible for political affiliation to be motivated by race.' Yet he never examined the political positions of the two state parties — or any candidates — to determine whether race factored into partisan voting."). Courts have repeatedly rejected similarly half-baked attempts to explain away that patterns of racial polarization that plaintiffs have identified, and this Court adopts the same. *Cf. Clements*, 999 F.2d at 860–61 (holding it "entirely correct . . . that courts should not summarily dismiss vote dilution claims in cases where racially divergent voting patterns correspond with partisan affiliation"); *see also Robinson*, 605 F. Supp. 3d at 840–41; *see also Nairne*, 2024 WL 492688 at *38; *Alpha Phi Alpha Fraternity*, 587 F. Supp. 3d at 1305–06; *NAACP, Spring Valley Branch v. E. Ramapo Cent. Sch. Dist.*, 462 F. Supp. 3d 368, 381 (S.D.N.Y. 2020).

609.    A deeper dive into the trial record would only cement that conclusion, because Plaintiffs affirmatively adduced extensive evidence bearing on the racial nature and causes of racially polarized voting in Mississippi, affirmatively demonstrating that race best explains the electorate's clear polarization along racial lines.

610.    For one, the data itself showed that the race of the candidate matters in Mississippi elections. In *Clements* and other cases like it, there were consistently high levels of White crossover voting for and electing Black candidates. *E.g.*, 999 F.2d at 861. In Mississippi, White voters voted against Black candidates almost uniformly, in election after election. Indeed, the court in *MS NAACP* unanimously concluded based on similarly stark EI analysis that "a black-majority

257

district is a virtual prerequisite for black candidates' success in Mississippi politics." 2024 WL 3275965, at *50.

611.    Unlike the high levels of White cross-over voting in *Clements*, the undisputed data in the trial record shows that the White support for Black candidates is typically 10% or less. *E.g.*, *supra* ¶¶ 132–134, 138–140, 233. The only times in the modern era that White support has exceeded 20% for a candidate supported by Black voters have been for White candidates, namely Justice Kitchens and Jim Hood. *E.g.*, *supra* ¶¶ 234–236, 238.

612.    In *Clements*, both parties were consistently nominating minority candidates. But as undisputed evidence shows, there is not a single example of a majority of White voters supporting a Black candidate—politically conservative or otherwise—in District 1. C. Bonneau Testimony, 08/12/24 Trial Tr. 843:10–16. *E.g.*, *supra* ¶¶ 242. Again, the evidence here showed that, unlike in *Clements*, the political party favored by White voters is not recruiting Black candidates for office in the first place. *E.g.*, *supra* ¶ 221–222.

613.    And perhaps most importantly, in *Clements*, White voters were voting for *and electing* minority candidates to office. Here, by contrast there has not been a Black candidate elected statewide since Reconstruction, even while White candidates from both parties (including Jim Hood, a White Democrat) have won statewide office in the recent past, *see, e.g.*, *supra* ¶¶ 221, 238, 307–402. And similarly, in District 1 elections, White voters voted against Black candidates at 80%+ levels of cohesion in *every single election* and, in most cases, over 90% cohesion. *E.g.*, *supra* ¶¶ 132–134, 138–140, 233.

614.    In contrast to cases like *Clements*, it is easy to see why the *MS NAACP* panel

258

unanimously found that "[r]ace matters" in Mississippi politics: White candidates associated with Democrats or liberals are capable of earning much higher levels of White support as compared to Black candidates perceived as having the same partisan or ideological affiliation. For instance, Justice Kitchens earned about 40% of the White vote—approximately more than quadruple the level of support that most Black candidates receive in contested elections in District 1, and Cecil Brown also received more than double the White support of a similarly situated Black Democrat. *Supra* ¶¶ 234–237; *MS NAACP*, 2024 WL 3275965, at *31 (finding that polarization in Mississippi is racial because "when . . . Attorney General Jim Hood, ran for Governor in 2019," he "received almost 18 percent of the white vote and 96 percent of the black vote," while for "black Hattiesburg mayor Johnny DuPree," "the Democratic nominee for Governor in 2011, his white crossovers were only 8.4 percent, less than half of what Attorney General Hood received").

615.    Defendants point out *two* examples of Black voters preferring to support a White candidate over a Black Democrat, going back at least as far as 2008 to locate those instances, in an effort to show that politics is not racialized. *See* C. Bonneau Testimony, 08/12/24 Trial Tr. 811:25–812:11. But Defendants have identified no examples of White voters crossing racial lines to vote for Black candidates. If anything, the apparent paucity of those examples strengthens Plaintiffs' case. In any event, the racial polarization inquiry focuses on "the races of the voters" and whether "White voters consistently prevent[] the election of the candidates that black voters would choose"—in other words, Black voters do not have to invariably vote for Black candidates in order to receive the protections of Section 2. See *MS NAACP*, 2024 WL 3275965, at *28. Indeed, political opportunity is hardly equal if Black voters can only elect candidates of one race but not

259

any other.

616.    Nor are the two specific examples that Defendants identify persuasive. Dr. Bonneau noted that Black voters opted not to support Ceola James and Bruce Burton, both Black candidates, but there is no indication that either was a viable candidate. *See, e.g.*, *supra* ¶¶ 161, 240; *see also MS NAACP*, 2024 WL 3275965, at *28 ("Quality of candidates and of opposition cannot always be irrelevant.").

617.    Dr. Bonneau also tried to rely on elections involving Lynn Posey, who ran for Public Service Commissioner, to suggest that partisanship may matter more than race, but the Court finds that testimony unpersuasive. When Posey ran as a Democrat in 2007, he was the Black-preferred candidate, but when he ran as a Republican in 2011, he was no longer the Black-preferred candidate. C. Bonneau Testimony, 08/12/24 Trial Tr. 811:2–24. But Posey's partisan affiliation was not the only thing that changed between 2007 and 2011: Black voters preferred Posey when he was running against a White opponent (Charles Barbour) in 2007, but then voted against Posey when he was running against a Black opponent (Addie Green) in 2011. *Id.* at 808:1–24, 832:15–20; PX-011 at 1. If anything, this fact pattern is further evidence that the race of the candidate does have an impact on voters' preferences in Mississippi.

618.    The data thus supports the conclusion that race "best explains" the stark patterns of racial polarization in Mississippi and reaffirms that Senate Factor 2 weighs strongly in favor of liability. *Clements*, 999 F.2d at 850; *MS NAACP*, 2024 WL 3275965, at *43.

619.    This Court's conclusions are also consistent with numerous courts that have similarly found racially polarized voting in Mississippi without conducting an inquiry into

partisanship as a cause of racially polarized voting. *See, e.g., Thomas*, 366 F. Supp. 3d at 807, aff'd, 931 F.3d 455 (5th Cir. 2019); *Fairley*, 122 F. Supp. 3d at 580, aff'd, 662 F. App'x 291 (5th Cir. 2016); *Jamison.*, 471 F. Supp. 2d at 713; *Clark II*, 88 F.3d at 1395–97; *Houston* , 20 F. Supp. 2d at 1003; *Ewing,*740 F. Supp. at 425; *Gunn v. Chickasaw Cnty.*, 705 F. Supp. 315, 319 (N.D. Miss. 1989); *Jordan* 599 F. Supp. at 402.

620.    Based upon the foregoing findings of fact, elections in Mississippi are characterized by patterns of extremely racially polarized voting, and race best explains those racially polarized voting patterns. Racial polarization remains stark and persistent; it is historically prior (and in no small part has shaped) the present partisan alignment of Black and White voters; and it operates in all types of elections, even absent partisan cues, especially with respect to White voters' persistent opposition to Black candidates, including for the Supreme Court. In general, Black candidates in Mississippi nearly always lose outside of Black-majority districts, and Black voters do not receive responsive representation—including in the state legislature responsible for drawing the Supreme Court lines—as a result. All of this strongly supports the determination that Black voters have less opportunity than Whites to participate in the political process and to elect candidates of their choice to the Mississippi Supreme Court. Senate Factor 2 weighs extremely strongly in favor of the Plaintiffs.

### C.    Senate Factor 4: Candidate Slating Process

621.    Under the fourth Senate Factor, courts ask, "if there is a candidate slating process, whether the members of the minority group have been denied access to that process." *Gingles*, 478 U.S. at 37, 45. If no such process exists, courts disregard this factor. *E.g.*, *MS NAACP*, 2024 WL

261

3275965, at *33 ("We do not consider Factor 4, as no evidence was offered relevant to the slating of candidates.").

622.    A "candidate slating process" generally refers to an informal or formal process of recruiting, selecting, or endorsing political candidates by an influential official or entity. *See Citizens for a Better Gretna v. City of Gretna, La.*, 636 F. Supp. 1113, 1122 (E.D. La. 1986), *aff'd*, 834 F.2d 496 (5th Cir. 1987). A powerful and exclusive gubernatorial appointment process may effectively constitute a candidate slating process. *Cf. Lopez*, 339 F. Supp. 3d at 615 ("The Texas system of voting for justices and judges for the high courts does not involve a formal slating process. Yet candidates can achieve an incumbency advantage if first appointed by the governor to fill an unexpired term."). Here, the evidence supports that conclusion, leading this factor to weigh in Plaintiffs' favor.

623.    First, as to the power of appointments, there is no question that gubernatorial appointments confer an immense electoral advantage on judicial candidates that is almost never overcome. *See supra* ¶¶ 271–274, 277–279; *see also, e.g.*, C. Bonneau Testimony, 08/12/24 Trial Tr. 787:14–23 ("[I]ncumbents almost always win"); O. Diaz Testimony, 08/06/24 Trial Tr. 297:18–20 ("[A]n appointment . . . provides a candidate with a tremendous leg up in an election."); P. Watson Testimony, 08/07/24 Trial Tr. 514:9–14 (explaining that endorsement, particularly for a Black candidate, "basically assures . . . that [justice] either has no opposition or token opposition" from a non-viable opponent when the incumbent justice faces election).

624.    No Black justice has ever been elected without an appointment—in other words, every Black candidate who has challenged a sitting justice has lost. *See, e.g.*, *supra* ¶¶ 275–279;

*see also*, *e.g.*, Joint Stipulated Facts ¶¶ 41–42 ("No Black candidate for the Mississippi Supreme Court has ever won election without first being appointed to the Court by the Governor."); C. Bonneau Testimony, 08/12/24 Trial Tr. 850:10–18 (discussing Black candidates who lost when challenging an incumbent); PX-130 (election results).

625.    Second, there is circumstantial evidence that the appointments process has been racially exclusive. Appointees to the Mississippi Supreme Court—historically and in the present— have been disproportionately White. As Justice Diaz testified, "there are more White justices serving right now today," with five White appointees sitting on the court, "than have ever been appointed in the history of Mississippi Black justices." O. Diaz Testimony, 08/06/24 Trial Tr. 294:11–19. Indeed, six of the nine sitting justices were initially appointed, but only one is Black, and there have only been four Black justices in Mississippi's entire history. Joint Stipulated Facts ¶¶ 27, 41.

626.    All four Black justices have been appointed to the exact same District 1, Place 2 seat, with each new Black justice replacing a departing Black justice. Joint Stipulated Facts ¶¶ 29, 35, 38, 40. Black challengers for the other seats have lost. *E.g.*, PX-130. And advocacy efforts to seek the appointment of additional Black judges have been unsuccessful. *Supra* ¶¶ 280–282. The political effect of this dynamic is to essentially clear the field for one Black judge by bestowing the appointment of a White governor from the majority party, *see supra* ¶¶ 271–274, 277–279, while maintaining vote dilutive district lines that, in the context of extreme racially polarized voting, prevent Black judges from taking any of the other seats.

627.    Although not a formal slating process, the power of gubernatorial appointments,

263

combined with the consistent practice, over nearly 40 years, of never appointing more than a single Black justice, in an electoral context where Black challengers have never prevailed, operates similarly to a slating process that excludes minority candidates, and the Court concludes that Senate Factor 4 favors the Plaintiffs.

628.    Indeed, whether or not the appointments process can appropriately be analogized to a candidate slating process is ultimately beside the point. The Senate Factors are not intended to be exhaustive of relevant circumstances that may be considered in deciding the ultimate question in a Section 2 case. *See, e.g.*, *MS NAACP*, 2024 WL 3275965, at *50 (holding that courts may consider threats to Black candidates, even if not formally part of Senate Factor 6, because of "the Supreme Court's observation in *Gingles* that the 'list of typical factors is neither comprehensive nor exclusive'") (quoting *Gingles*, 478 U.S. at 45). Here, the prevalence of a powerful appointment process that has maintained only a single seat for Black judges on the State's highest court supports the Plaintiffs' case.

### D.    Senate Factor 5: Disparities in Education, Employment, and Health That Hinder Political Participation

629.    Senate Factor 5, measuring "the extent to which members of the minority group . . . bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process," weighs in Plaintiffs' favor as well. *Gingles*, 478 U.S. at 37. Courts have recognized that, as a result of past discrimination, Black voters in Mississippi suffer from socioeconomic disadvantages that diminish their ability to participate in the political process. *See, e.g.*, *Teague*, 92 F.3d at 294; *Thomas*, 366 F. Supp. 3d at 807 ("There are vast differences between [Black and White Mississippians] on education,

264

employment, income, housing, and health indices, among others, that ultimately reflect the effects of slavery and segregation."); *see also Magnolia Bar*, 793 F. Supp. at 1409 (noting that due to the fact that Black Mississippians "continue to bear the effects of discrimination in critical areas of socioeconomic attainment" like education and automobile ownership, Senate Factor 5 "will be a factor on which the plaintiffs in voting rights cases will always win in the foreseeable future").

630.    "Plaintiffs are not required to prove a causal connection between [socioeconomic disparities] and a depressed level of political participation." *Teague*, 92 F.3d at 294; *Thomas*, 366 F. Supp. 3d at 807 (same). Depressed levels of income, education and employment are a consequence of severe historical disadvantage. "[P]olitical participation by minorities tends to be depressed where minority group members suffer effects of prior discrimination such as inferior education, poor employment opportunities, and low incomes." *Thomas*, 366 F. Supp. 3d at 808 (citing *Gingles*, 478 U.S. at 69); *see also Citizens for a Better Gretna*, 636 F. Supp. at 1120 ("Depressed levels of participation in voting and candidacy are inextricably involved in the perception of futility and impotence such a history engenders"); *St. Bernard Citizens For Better Gov't v. St. Bernard Par. Sch. Bd.*, No. CIV.A. 02-2209, 2002 WL 2022589, at *9 (E.D. La. Aug. 26, 2002) ("Both Congress and the Courts have recognized the effect lower socio-economic status has on minority participation in the political process."); *Major*, 574 F. Supp. at 340–41 (similar).

631.    While direct evidence of a turnout or participation gap may be highly relevant, it is not essential. A plaintiff may prove Senate Factor 5 by demonstrating "that voting and political participation is influenced by financial resources, education, income, and unemployment" and "that [B]lack Mississippians are worse off than white voters in terms of these factors." *MS NAACP*,

2024 WL 3275965, at *49 ("Irrespective of the size or even existence of turnout discrepancies, we find that the record establishes [B]lack Mississippians' ability to participate effectively in Mississippi politics is hindered by racial gaps in education access, financial status, and health.").

632.     Here, Plaintiffs proved both those aspects as well as an actual turnout gap between Black and White Mississippians.

633.     Plaintiffs adduced extensive, unrebutted evidence that Black Mississippians suffer socioeconomic hardships stemming from centuries of racial discrimination. As demonstrated via the expert analysis and testimony of Dr. Burch and Dr. King, and the ACS data compiled by Mr. Cooper, Mississippi's Black residents experience stark socioeconomic disadvantages across all areas of life: Poverty rates among Black Mississippians are three times that of Whites; educational attainment, especially with respect to higher education, is significantly lower; rates of disease and lack of access to medical care are significantly higher. *Supra* ¶¶ 292–333. This evidence was largely admitted or agreed to by Dr. Bonneau and Dr. Swanson. *E.g.*, *supra* ¶ 286. And it was deepened by the testimony of fact witnesses. *Supra* ¶¶ 292–333.

634.     Plaintiffs have also demonstrated that these disparities burden political participation. Dr. Burch in particular testified regarding the established empirical link in the political science literature between political participation and socioeconomic categories like income, poverty, educational attainment, and health. *Supra* ¶¶ 300 (education), 312–313 (income and wealth), 320 (housing), 328 (health), 330–331 (criminal justice); *see also, e.g.*, *Gingles*, 478 U.S. at 69 ("[P]olitical participation by minorities tends to be depressed where minority group members suffer effects of prior discrimination such as inferior education, poor employment

266

opportunities, and low incomes."). She also showed empirically, using Mississippi-specific data, that voter participation is driven by educational attainment. *E.g.*, *supra* ¶¶ 300, 342. And Dr. Swanson and Dr. Bonneau not only agreed with Dr. Burch's analysis on this point as well, *supra* ¶¶ 300, 342, but Dr. Bonneau's own published scholarship independently demonstrated an empirical link between education and homeownership, and participation in down-ballot, non-partisan judicial races like those at issue here, *supra* ¶ 348. Dr. Bonneau's work thus vividly illustrates the larger point hammered home by Dr. Burch's analysis: Voting has "costs"—including informational costs—that voters with more resources, such as education, will be better equipped to afford. *See MS NAACP*, 2024 WL 3275965, at *45 (agreeing with expert analysis that "voting and political participation has economic costs such that whether individual voters participate is influenced by financial resources, leisure time, and education.").

635.   The unrebutted and comprehensive evidence that Black Mississippians experience lower levels of education, income, homeownership, and health, and that these and other socioeconomic deficits have been shown to affect political participation, is in itself sufficient for Senate Factor 5 to weigh in Plaintiffs' favor. *See MS NAACP*, 2024 WL 3275965, at *49 (Senate Factor 5 supports plaintiffs in light of "record establish[ing] [B]lack Mississippians' ability to participate effectively in Mississippi politics is hindered by racial gaps in education access, financial status, and health"); *see also Nairne*, 2024 WL 492688, at *39–41 (crediting analysis that disparities in these factors depress turnout).

636.   Moreover, though, Plaintiffs also demonstrated a significant turnout gap between Black and White Mississippians, which Dr. Burch found using two independent methods, both of

which were based on verified (*i.e.*, reliable, non-self-reported data), and both of which produced consistent results that matched up with the publicly reported turnout levels. *Supra* ¶¶ 334–347.

637.    In contrast to Dr. Burch's reliance on established methods from political science, Defendants argue there was no turnout gap by pointing to the self-reported CPS numbers. However, as Dr. Burch demonstrated, and as Dr. Swanson agreed, the self-reported surveys, and in particular the CPS, overstate turnout, and overstate Black turnout in particular. *Supra* ¶¶ 357–365; *accord Thomas*, 366 F. Supp. 3d at 808 (noting "known issues with self-reported voting surveys"); *see also* PX-181. There is no dispute that the level of overreporting in Mississippi is massive. *Supra* ¶¶ 361–362. Simply put, in light of the known and uncontested issue of racial differentials in overreporting of voting, the CPS is not a reliable basis for assessing turnout by race in Mississippi.

638.    While the Court in *MS NAACP* recognized the criticisms of the CPS are "reasonable," it made no finding either way on the CPS's reliability. *MS NAACP*, 2024 WL 3275965, at *49. But here, Dr. Burch's analysis includes one piece of evidence that was not available in *MS NAACP*. Dr. Burch used the Mississippi-specific CES data set, which contains both verified and self-reported voting information, to determine that Black and White Mississippians *in fact* overreport voting at (sharply) differential rates. *See supra* ¶¶ 363–364. The mix of evidence here on the existence *vel non* of a racial turnout gap is thus stronger in this case than in *MS NAACP*. Dr. Swanson's attempt to rely on the non-peer-reviewed, Brennan Center study does not alter the calculus, especially given Dr. Burch's cogent criticisms of using that study to examine voter turnout by race in Mississippi, and Dr. Swanson's own inability or unwillingness

to defend the study's methodology or its reliability. *See supra* ¶¶ 366–370.

639.     Based upon the foregoing findings of fact, Black Mississippians suffer from disparities in income, education, health, and other areas, which impede their ability to participate equally in politics as compared to Whites. Senate Factor 5 weighs strongly in favor of the Plaintiffs.

### E.     Senate Factor 6: Racial Appeals in Mississippi Politics

640.     Senate Factor 6, "whether political campaigns have been characterized by overt or subtle racial appeals," weighs in Plaintiffs' favor. *Gingles*, 478 U.S. at 37. Here, Plaintiffs have provided specific examples of both "blatant" as well as "subtle and furtive" racial appeals during campaigns over the past few decades. *Id.* at 40.

641.     Federal courts have repeatedly recognized the continued use of racial appeals in Mississippi's political campaigns, including many of the same examples in the trial record here. *See, e.g.*, *MS NAACP*, 2024 WL 3275965, at *50 ("The evidence supports that some candidates continue to make racial appeals. We find that Senate Factor 6 weighs in favor of the Plaintiffs."); *Martin v. Allain*, 658 F. Supp. 1183, 1195 (S.D. Miss. 1987) (finding continued existence of both "overt" and "subtle" racial appeals in Mississippi).

642.     For this factor, courts consider whether "candidates continue to make racial appeals," rather than attempt to assess whether a specific appeal was successful in suppressing Black political participation or electing the majority candidate. *E.g.*, *MS NAACP*, 2024 WL 3275965, at *50; *see also Nairne*, 2024 WL 492688, at *41 (citing "multiple instances of subtle and overt racial appeals in political advertising" and "find[ing] that Senate Factor 6 weighs in favor of the Plaintiffs"). Racial appeals are relevant even if utilized in campaigns for offices other

than those at issue in the case. *See, e.g.*, *MS NAACP*, 2024 WL 3275965, at *50 (citing examples from a judicial election, a congressional election, a commissioner election, and a U.S. Senate primary in a case challenging state legislative districts); *see also Nairne*, 2024 WL 492688, at *41 & n.463 (citing examples from gubernatorial and congressional elections in a case challenging state legislative districts).

643.    Plaintiffs have provided numerous examples of racial appeals in a variety of elections, spanning decades and involving candidates from all kinds of offices, including recent examples involving sitting state legislators, a current U.S. Senator, candidates for statewide office, as well as nearly every White candidate running against a Black opponent in a Supreme Court election. *See supra* ¶¶ 378–387.

644.    Multiple federal courts in Mississippi have ruled that the use of Confederate symbols and imagery is a form of racial appeal. *MS NAACP*, 2024 WL 3275965, at *49 (discussing ad showing Chris McDaniel speaking next to Confederate flag); *Jordan*, 604 F. Supp. at 813 & n.8 (discussing ad displaying Confederate monuments). This Court agrees. Plaintiffs have identified multiple examples, including the same Chris McDaniel ad relied upon by the *MS NAACP* panel, of prominent candidates utilizing Confederate symbols to glorify Mississippi's involvement in the Civil War, which was fought to preserve slavery, and to signal the candidate's position on race. *See* 2024 WL 3275965, at *49. Relatedly, Plaintiffs have also pointed to an example of a sitting legislator, in 2017, calling for the lynching of individuals who seek to remove Confederate monuments. PX-052 at 23; M. King Testimony, 08/14/24 Trial Tr. 1332:8–25.

645.    Courts have also recognized the use of racial stereotypes and slogans as racial

appeals, including several that Plaintiffs rely on here. For instance, Plaintiffs introduced evidence of a sitting state legislator, Rep. Lester Carpenter, questioning the impartiality of Black judges and urging voters to oppose a law that could "allow a Black judge to decide what happens with public schools" and to shift funding to the Delta. *See MS NAACP*, 2024 WL 3275965, at *49; *see* PX-074; M. King Testimony, 08/14/24 Trial Tr. 1326:2–1327:6. Judge Latrice Westbrooks, who was seeking election to the Mississippi Supreme Court in 2020, faced similar accusations that she lacked "Judicial Neutrality," and that she favored "[d]iverting funding to Criminal Defendants." PX-146 at 2. During Justice Anderson's campaign, after he had just been appointed as the first Black justice on the Mississippi Supreme Court, his opponent campaigned on a message that he was running against a "quota maker" and "running against reserving a seat on the Mississippi Supreme Court for the NAACP." M. King Testimony, 08/14/24 Trial Tr. 1333:20–1334:17. The characterization of the NAACP, which is "the nation's oldest civil rights organization," as a disqualifying association for Justice Anderson, again draws on the stereotype that Black judicial candidates are not impartial and are not qualified. *Id.*

646.    In 2004, Justice Graves' White opponent used the campaign slogan, "one of us," which has been recognized by two three-judge panels as a racial appeal. *MS NAACP*, 2024 WL 3275965, at *49 (citing *Jordan*, 604 F. Supp. at 813 & n.8). The slogan emphasized Justice Grave's race, making him "the other" and "different" from "us" (White people). M. King Testimony, 08/14/24 Trial Tr. 1335:16–1336:3.

647.    Another type of racial appeal involves emphasizing the Black candidate's race by prominently featuring their photograph. Justice Anderson testified that Judge Dillard, who ran

against Justice Banks in 1991, made sure that the candidates' photographs were "plastered through the district [showing] that he was White and [Banks] was Black." R. Anderson Testimony, 08/08/24, Trial Tr. 741:18–20. Dr. King further testified that Dillard's ads darkened Justice Banks' skin color and misleadingly suggested that he was unqualified despite being the incumbent justice. M. King Testimony, 08/14/24 Trial Tr. 1334:18–1335:11. The ads run against Judge Westbrooks in 2020 also featured her image alongside the messages about her purported lack of neutrality and support for criminal defendants. *E.g.*, PX-146.

648.     The record also shows that the visibility of Black candidates (and their racial identity) continues to impact political participation today. Undisputed testimony shows that Black candidates have faced "racial animosit[y]" from voters while campaigning, *MS NAACP*, 2024 WL 3275965, at *50, and often do not include photos of themselves for that reason. For instance, Ms. Dyamone White testified that she had a hostile encounter at the Neshoba County Fair while she was running as a candidate in 2023, and that she received discriminatory messages on the phone after she displayed her photo on campaign signs. *See* D. White Testimony, 08/06/24 Trial Tr. 348:6–22, 345:25–346:5, 349:5–17. The Court also credits Ms. White's testimony that Black candidates typically do not include their photos on campaign literature. *Id.* at 346:1–2, 346:14–16. As the *MS NAACP* panel found, "if white voters are insulting or even threatening black candidates, that is relevant to understanding the totality of the circumstances," even if those actions are not formally considered a form of racial appeal. 2024 WL 3275965, at *50.

649.     The fact that some of the candidates who have used racial appeals have been criticized or ultimately defeated in an election, does not diminish the relevance of the appeals. The

272

very existence of these racial appeals reflects an environment where race is highly salient in politics, and where campaigns believe that racial appeals will be effective in further polarizing voters. *See, e.g.*, *Missouri State Conf. of the NAACP*, 201 F. Supp. 3d at 1078, *aff'd*, 894 F.3d 924 (8th Cir. 2018). Indeed, courts weigh examples of racial appeals in Plaintiffs' favor regardless of the outcome of the elections in which they were deployed. *See, e.g.*, *MS NAACP*, 2024 WL 3275965, at *49 (citing racial appeal from failed campaign against Justice Graves in 2004). That approach makes sense—elections are won and lost for a variety of reasons, and racial appeals may have an effect on voters and candidates even if the effect is not large enough to swing an election on its own. *See* R. Anderson Testimony, 08/08/24 Trial Tr. 746:6–22 (explaining that racial appeal against Justice Banks was effective even though his opponent ultimately lost). For instance, as Dr. King explained, a consistent pattern of Black candidates being subjected to racial appeals may discourage future candidates from participation. *See supra* ¶ 392. And while some might react negatively to the use of a racial appeal, that is not surprising, given that the effect of a racial appeal is to polarize the electorate and attract support from a subset of the public. *See supra* ¶¶ 388–390, 393; *see also* M. King Testimony, 08/14/24 Trial Tr. 1330:24–1331:17 (explaining that racial appeals signal "this is my people . . . that I want to vote for me, and if you don't like the [Confederate] flag, then don't vote for me"). And in any event, many of the candidates who have made racial appeals in recent years, including Rep. Carpenter, Rep. Oliver, and Senator Hyde-Smith, have been successful.

650.    Based upon the foregoing findings of fact, and the history and continued use of racial appeals in political campaigns in Mississippi, particularly in nearly every campaign

involving Black and White candidates for the Supreme Court, the Court concludes that Senate Factor 6 weighs strongly in Plaintiffs' favor.

### F. Senate Factor 7: Lack of Success for Black Candidates in Mississippi

651. Senate Factor 7, "the extent to which members of the minority group have been elected to public office in the jurisdiction," weighs heavily for Plaintiffs. *Gingles*, 478 U.S. at 37.

652. "The extent to which minority candidates are elected to public office also contextualizes the degree to which vestiges of discrimination continue to reduce minority participation in the political process." *Veasey*, 830 F.3d at 261. Accordingly, "[u]nlike the second and third *Gingles* preconditions, the Court now must specifically look at the success of *Black* candidates, not just the success of Black preferred candidates." *Alpha Phi Alpha*, 700 F. Supp. 3d at 1364.

653. When the challenged district lines at issue involve state office, courts consider the extent of under-representation of minorities statewide, not just the geographic area where a majority-minority district could be created and not just the specific office at issue. *E.g.*, *MS NAACP*, WL 3275965, at *50–51 (finding Senate Factor 7 weighs in plaintiffs' favor because no Black candidates have prevailed in races for governor or U.S. Senator in case challenging state house and senate districts); *Nairne*, 2024 WL 492688, at *41–42 (same); *Alpha Phi Alpha*, 700 F. Supp. 3d. at 1364 (finding Senate Factor 7 weighed in plaintiffs' favor because Black candidates tended to lose in statewide office and in non-Black majority districts, even though Black candidates in Georgia had some success in commissioner and U.S. Senate races).

654. Here, Plaintiffs' evidence, including Dr. King's testimony and the parties'

274

stipulated facts, as well as the testimony of other experts and fact witnesses, demonstrates that Black Mississippians are completely unrepresented in statewide elected offices and rarely succeed in local and district-based elections outside of majority-Black districts. No Black candidate has won a statewide election in Mississippi since 1875—nearly 150 years ago; no Black person has ever been elected Governor or Attorney General of Mississippi; no Black person has been elected to U.S. Senate since Hiram Revels in 1873; only two Black people have represented Mississippi in Congress since the end of Reconstruction, Rep. Espy and Rep. Thompson, both from the same majority-Black congressional district, Congressional District 2. *See supra* ¶¶ 397–398; *MS NAACP*, 2024 WL 3275965, at *50 ("[T]here has not been a black candidate elected to statewide office since the end of Reconstruction 150 years ago. In recent elections, the Democratic Party has had some black nominees for statewide office, including for the United States Senate and Governor, but all have been defeated."). Overall, only five out of the 130 Mississippian congress members have been Black in the State's history, *i.e.*, 4% of Mississippi's representatives in Congress have been Black in a state where Black people make up more than a third of the population. *See supra* ¶¶ 399. All of those facts strongly indicate a lack of equal political opportunity. *See MS NAACP*, 2024 WL 3275965, at *50; *Nairne*, 2024 WL 492688, at *41; *Alpha Phi Alpha*, 700 F. Supp. 3d. at 1364.

655.    Black underrepresentation on the Mississippi Supreme Court even more stark. In the entire history of the Mississippi Supreme Court, there have been only four Black justices out of a total of 125 (3%), and none has been able to win election without first being appointed by a White governor. *See supra* ¶¶ 400. Since 2000, there have been 26 Supreme Court elections, and

Black candidates (two) have won a total of three times, two of them, in unopposed elections. *See, e.g.*, *supra* ¶ 402; PX-130. Unlike White candidates, no Black candidate has ever been able to defeat an incumbent justice—every Black challenger, across all the districts, has lost. *See, e.g.*, *supra* ¶¶ 401-402.

656.    Defendants' argument that District 1 is "competitive," on the basis that electoral margins are tighter than in other districts, elides the overall lack of electoral opportunity available to Black candidates for the Supreme Court *as a whole*. Supreme Court Districts 2 and 3 have a BVAP of 27.66% and 32.65% respectively, Joint Stipulated Facts ¶ 45. In light of the unrebutted testimony that in Mississippi Black candidates essentially never win elections outside of Black-majority districts, *see, e.g.*, *supra* ¶¶ 405–409, Districts 2 and 3 are completely unwinnable for Black candidates. *See also MS NAACP*, 2024 WL 3275965, at *50 ("[A] black-majority district is a virtual prerequisite for black candidates' success in Mississippi politics."). Consistent with that, those districts have only ever elected White justices, and the only Black candidate to even attempt to run outside of District 1 in the last two decades, Michael Shareef, ran in District 2 in 2016 and earned only 33% of the vote. PX-053 at 1; PX-130.

657.    Because Districts 2 and 3 are necessarily uncompetitive for Black candidates, the starting point of the current Mississippi Supreme Court district lines is that Black candidates are locked out of six of the nine seats.

658.    Even within District 1, Black candidates have not been able to win except in Place 2, which is the one seat to which Black attorneys have been appointed by the Governor. *See, e.g.*, *supra* ¶ 401. Both candidates who have attempted to run for another seat in District 1 have lost.

276

*E.g.*, PX-053 at 1; PX-130.

659.    The successful election of Commissioners Simmons and Stamps in District 1, while notable, is not indicative of electoral opportunity for judicial candidates. As discussed, the political dynamics of commissioner and other partisan elections are quite different from nonpartisan judicial elections, not the least of which is the significant difference in voter participation in down-ticket judicial contests. *See supra* ¶¶ 145–156, 410. Accordingly, the structure of Supreme Court elections, combined with the socioeconomic effects of historical discrimination against Black residents, causes Black voter participation in Supreme Court elections to be especially low. The success of Black candidates in other elections is therefore not indicative of success in judicial elections.

660.    Regardless of the differences between Supreme Court and other elections, a small number of recent victories by Black candidates cannot overcome a longstanding, historical pattern to the contrary. *E.g.*, *Alpha Phi Alpha*, 700 F. Supp. 3d at 1364–65 (holding that Senate Factor 7 weighed in the plaintiffs' favor, even though Georgia had recently elected Senator Raphael Warnock and had sporadically elected Black candidates for Attorney General, Labor Commissioner, and Public Service Commissioner, and explaining that "[t]he Supreme Court in *Gingles*, when discussing the success of a select few Black candidates, cautioned courts in conflating the success of a few minority candidates as dispositive"); *see also, e.g.*, *Clark II*, 88 F.3d at 1397 ("[T]he election of a few minority candidates does not necessarily foreclose the possibility of dilution of the black vote."); *Gunn v. Chickasaw Cnty., Mississippi*, 166 F.3d 341, 1998 WL 912195 at *3 (5th Cir. 1998) (unpublished) (minority candidates winning some elections

277

unpersuasive where they did "not necessarily indicate significant crossover-voting by whites"); *MS NAACP*, 2024 WL 3275965, at *28 ("[P]roof that some minority candidates have been elected does not foreclose a § 2 claim." (quoting *Gingles*, 478 U.S. at 75)).

661.    The unrebutted testimony in the trial record is that, to the extent that Black candidates have had sustained success getting elected to local or municipal office, those victories (still) occur almost exclusively in majority-Black jurisdictions. M. King Testimony, 08/14/24 Trial Tr. 1393:3–22; *MS NAACP*, 2024 WL 3275965, at *50. Moreover, the possibility of victory for Black candidates in particular subparts of District 1 does not indicate that Black candidates can prevail district-wide. *See Thomas*, 366 F. Supp. 3d at 806 ("It is not credible to draw a conclusion about white bloc voting in [a district] based exclusively on the fact that there are some black elected officials in parts of the District."). As Dr. King explained, Black candidates have less opportunity of getting elected as the size of the district grows. M. King Testimony, 08/14/24 Trial Tr. 1393:3– 22 ("So the larger the district is, Blacks have a harder time winning.").

662.    Section 2 of the Voting Rights Act does not guarantee proportional representation, but "[n]onetheless, proportionality 'is a relevant fact in the totality of the circumstances to be analyzed when determining whether members of a minority group have "less opportunity . . . to participate in the political process."'" *MS NAACP*, 2024 WL 3275965, at *50 (quoting *Johnson v. De Grandy*, 512 U.S. 997, 1000 (1994)); *see also Robinson*, 86 F.4th at 597–98 ("'[W]hether the number of districts in which the minority group forms an effective majority is roughly proportional to its share of the population in the relevant area' is a 'relevant consideration' for courts to make.") (citing *LULAC*, 548 U.S. at 426). In *MS NAACP*, while the Court held that Senate

278

Factor 7 favored the plaintiffs, it held that the weight for this Senate Factor was slight in light of the *De Grandy* proportionality principle, which makes sense because Black candidates had achieved a significant degree of success in state legislative elections in existing Black-majority districts. 2024 WL 3275965, at *50; *see also id.* at *3 (challenged plans had 15 Black-majority State Senate districts out of 52 total, and 42 Black-majority State House districts out of 122).

663.     Here, the *De Grandy* principle operates in the other direction. Black representation in the Mississippi Supreme Court—one out of nine—is far below proportionality and also lags significantly behind other representative bodies in Mississippi, such as the state legislature. *Cf. MS NAACP*, 2024 WL 3275965, at *50. And the expert and fact testimony in the trial record, including from Dr. King and Dr. Bonneau, all indicates that greater descriptive representation would be beneficial, not only to Black voters and attorneys, but also for the institutional legitimacy of the Supreme Court. *See supra* ¶¶ 412–415, 438.

664.     Moreover, even if District 1 were drawn to be an effective-Black-majority district, and the voters in that district chose to elect three Black justices to the Mississippi Supreme Court, representation would still be less than proportional. Mississippi's statewide BVAP exceeds 36 percent. *See supra* ¶ 61. As a matter of total population, the State is just under 38% Black. *See supra* ¶ 59. If three of the nine justices were Black, that would represent 33% of the court. As such, Plaintiffs are not using Section 2 to establish proportional representation.

665.     Mississippi's persistent failure to draw districts that would increase Black representation—for four Census cycles—is particularly notable given the consistent growth in Black population in Mississippi over that time period, *supra* ¶¶ 60–61. *See MS NAACP*, 2024 WL

3275965, at *50 ("[I]t is relevant that the Mississippi Legislature left the number of majority-black districts unchanged following the recent Census, despite substantial increases in the black population and corresponding losses in the white population."); *Bone Shirt*, 336 F. Supp. 2d at 1049 (accepting evidence from Mr. Cooper showing that minority group's population "rapidly increas[ed in] both their absolute numbers and share of the population" and finding that plaintiffs "presented evidence of disproportionality").

666.    Based upon the foregoing findings of fact, Black Mississippians are underrepresented in public office in Mississippi and almost never win elections except in Black-majority districts. And that underrepresentation is especially severe with respect to the Mississippi Supreme Court. Seven Factor 7 weighs strongly in Plaintiffs' favor.

### G.    Senate Factor 8: Lack of Responsiveness to the Needs of Black Mississippians

667.    Senate Factor 8, whether there is a "lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group," also weighs in Plaintiffs' favor. *Gingles*, 478 U.S. at 37.

668.    Courts consider Senate Factor 8 to be an "additional factor" that may be probative, but "[u]nresponsiveness is not an essential part of plaintiff's case," and a finding that elected officials have been responsive has "limited relevance." *Clark II*, 88 F.3d at 1400 (quoting S. Rep. 417 at 29 n.116); *see also id.* ("Indeed, in *Westwego III,* we rendered judgment for the plaintiffs, even though we agreed with the district court that the plaintiffs had failed to prove a lack of responsiveness." (citing *Westwego*, 946 F.2d at 1123)). Responsiveness "'is considerably less important under the results test'" in Section 2 cases, because Section 2 "'protects the access of

280

minorities not simply to the fruits of government but to participation in the process itself.'" *McMillan v. Escambia Cnty., Fla.*, 748 F.2d 1037, 1045–46 (5th Cir. 1984) (internal citations omitted). Therefore, "the absence of [a slating process under Senate Factor 4, racial appeals under Senate Factor 6, and unresponsiveness under Senate Factor 8] is not conclusive under the section 2 'totality of the circumstances' test." *Id.*

669.     For this factor, in a case involving elected judges, courts may consider "a lack of responsiveness on the part of judges *or other elected officials*." *See, e.g.*, *Chisom v. Roemer*, No. 86-CV-4057, 1989 WL 106485, at *11 (E.D. La. Sept. 19, 1989) (emphasis added). Considering the unresponsiveness of officials occupying positions other than the ones being challenged is particularly appropriate when the "unresponsiveness contributes significantly to the inability of blacks to participate equally in the political process." *Marengo Cnty.*, 731 F.2d at 1573 n.49 (considering the unresponsiveness of the Board of Registrars, whose composition was not being challenged). Here, because the Legislature is the body that has held the power to redraw the Supreme Court lines, the Legislature's unresponsiveness to racial disparities that are related to Black voters' ability to participate in politics, such as education, income, and health, is especially relevant to Senate Factor 8 and the overall vote dilution inquiry.

670.     As set forth already, Black Mississippians face numerous socioeconomic disparities in areas like education, health, income and employment, and home ownership and housing. *See supra* ¶¶ 292–301, 303–314, 316–320, 322–328. The evidence in the trial record, including the credible testimony of experts like Dr. Burch and Dr. King, is that the Mississippi Legislature has too often failed to respond to those needs. *See supra* ¶¶ 422–434. The policy actions supported by

Black voters that would have addressed those needs include fully funding public education across the state, expanding Medicaid access (a policy known to reduce racial disparities in healthcare), investing in impoverished communities in the predominantly Black Delta (including by shoring up hospitals and health infrastructure there), enacting a minimum wage law, and avoiding the misuse of public funds meant for the poor. *See supra* ¶¶ 423 & 426–425; *MS NAACP*, 2024 WL 3275965, at *51 (finding unresponsiveness based on Mississippi legislature's failure to fund education and expand Medicaid).

671.    The lack of responsiveness is confirmed by the credible and unrebutted testimony of multiple fact witnesses that White candidates rarely, if ever, campaign in Black neighborhoods and communities. *See supra* ¶¶ 431–435. *See MS NAACP*, 2024 WL 3275965, at *51 (same).

672.    The Legislature's unresponsiveness can also be observed in the area of redistricting. In 2022, the State enacted new legislative districts that diluted the voting power of Black Mississippians in both the Senate and House. *MS NAACP*, 2024 WL 3275965, at *53. The dilution of the House and Senate districts reduces Black representation in the state legislature, which is directly responsible for maintaining the challenged district lines for the Mississippi Supreme Court (and failing to update them for nearly 40 years).

673.    The enactment of the current Supreme Court districts in 1987—and the repeated rejection of efforts by Black legislators to revise the district lines to create more opportunity for Black voters—is itself an example of unresponsiveness. *See supra* ¶¶ 436–437; *MS NAACP*, 2024 WL 3275965, at *52 (finding that "the redistricting plan itself" represents a lack of responsiveness); *see Nairne*, 2024 WL 492688, at *42–43.

282

674.    Finally, as explained above, the record reveals a long history of Mississippi governors appointing one Black justice to one seat on the Supreme Court—and no more—despite Black Mississippians making up a far larger proportion of the population, and despite Black attorneys and other constituents advocating for the appointment of more Black judges. *See supra* ¶¶ 276–283, 401, 437. Given the critical importance of appointments and incumbency for the election of Black justices to the Supreme Court, the longstanding appointments practice effectively imposes a ceiling on the number of Black justices. That is not responsive to the interests and preferences of Black Mississippians.

675.    Based upon the foregoing findings of fact, the Court concludes that elected officials in Mississippi have not been consistently responsive to the particularized needs of Black Mississippians on basic and important issues like education and health. Senate Factor 8 weighs in Plaintiffs' favor.

### H.    Senate Factor 9: Tenuous Justifications for the Challenged Plans

676.    Senate Factor 9, determining that the policy underlying the state or political subdivision's use of the challenged standard, practice, or procedure is "tenuous," favors Plaintiffs. *Gingles*, 478 U.S. at 37.

677.    For Senate Factor 9, courts examine whether the legislature's policy considerations—as stated by the Legislature—are legitimate and non-tenuous. The focus is on the considerations that "led to the creation" of the challenged districts. *MS NAACP*, 2024 WL 3275965, at *52. In other words, the inquiry "requires a consideration of the policies used by Mississippi to justify its districting decisions in this case." *Id.* (internal citation omitted).

678. Here, Mississippi enacted the current district lines in 1987 "with the objective of correcting population malapportionment of the then-existing Supreme Court districts." Joint Stipulated Facts ¶ 30. That objective is confirmed by the fact testimony of multiple witnesses, including Representative Watson, who was present for the 1987 redistricting process, as well as contemporaneous documentary evidence. *See supra* ¶¶ 15–23.

679. But that population equality rationale cannot explain the failure to create a majority-BVAP Supreme Court district. As Mr. Cooper has shown, it has been possible, for decades, to create a majority-Black district while complying with population equality. Moreover, the population deviation in the current districts has grown significantly since 1987 and is now greater than the 10% threshold that ordinarily triggers a "one-person, one-vote" problem. *See supra* ¶¶ 71, 444. Like Mr. Cooper, Dr. King also testified that, based on the way that Mississippi has drawn a majority-Black congressional district in the Delta that complies with population requirements, it is obviously possible to do so for the Supreme Court districts as well. M. King Testimony, 08/14/24 Trial Tr. 1360:4–16.

680. Other than the population equality rationale, the record does not contain any evidence of the contemporaneous justifications that the Legislature may have had for the particular configuration of the 1987 district lines. As discussed *supra*, Dr. King and other witnesses have testified that the Delta is perhaps the most distinctive community of interest in Mississippi, if not the entire country, and, after conducting his analysis, Dr. King found no justifications for failing to respect the Delta as a community of interest during redistricting. *See supra* ¶¶ 443; *see also, e.g.*, *supra* ¶ 93–100.

284

681.    Defendants attempted to offer the testimony of a few lay witnesses to speak to justifications for the current lines. At the outset, none of them were legislators in 1987 (or ever) or claimed to have any specialized understanding of the considerations that informed the Legislature in making the specific decisions it made in 1987. Accordingly, they cannot speak to what considerations "led to the creation" of the 1987 Enacted Plan, or what specific "policies [were] used by Mississippi to justify its districting decisions" at that time. *MS NAACP*, 2024 WL 3275965, at *52. Their testimony on those particular questions thus is not due any weight.

682.    Assistant Secretary of State Kirkpatrick suggested that the current configuration of the Supreme Court districts fosters judicial independence. K. Kirkpatrick Testimony, 08/14/24 Trial Tr. 1257:15–24. However, Mr. Kirkpatrick did not testify that he had any particular expertise or experience that might support this opinion; rather, he said that he based his opinion on "looking through prior Mississippi cases like *Magnolia Bar vs. Lee*." *Id.* at 1254:1–7. *See supra* ¶¶ 451. Moreover, Mr. Kirkpatrick acknowledged that, even if the current district lines promote judicial independence, there is absolutely no reason that a districting plan containing a majority-Black district could not do the same. K. Kirkpatrick Testimony, 08/14/24 Trial Tr 1285:11–19.

683.    Justice Ann Lamar similarly opined in her testimony that "it is helpful" to have "a district that covers a large area with lots of different types of people," so that justices "are not behold[en] to any one particular group or any one particular region of people." A. Lamar Testimony, 08/08/24 Trial Tr. 771:19–772:8. However, Justice Lamar's own testimony indicated that the current district map already clusters together certain regional interests, with the entire Gulf Coast being covered by District 2, which undermines any argument that the Delta should not be

kept whole within a district. *Id.* at 770:7–11 (citing the example of "the Katrina cases" where there "was much more interest in that on the coast than there was on the other part of the state"). Justice Lamar also did not offer an opinion on whether Plaintiffs' Illustrative Plans would be any more or less diverse on the whole than the current plans, and in any case she testified that Mississippi Supreme Court justices do not "represent" the parochial interests of their constituents, but rather apply the law equally across all cases. *See supra* ¶¶ 453–454. And most importantly, Justice Lamar also agreed that being elected from a Black-majority district would not affect the judge's ability to be "fair and impartial." A. Lamar Testimony, 08/08/24 Trial Tr. 775:7–15.

684.     The Court also finds persuasive Dr. King's testimony that judicial independence—setting aside for the sake of argument that there is no specific evidence that the Legislature was specifically motivated by that principle in drawing these particular lines in 1987—is highly unlikely to have been a key consideration, because the concept of judicial independence is in significant tension with the decision to use of judicial elections in the first place. *See supra* ¶ 452.

685.     But even if the Court were to credit the notion that promoting judicial independence was one of the policies underlying the configuration of the 1987 Enacted Plan, some other configuration of counties into three large districts could also serve this goal. Again, the critical point is that it is totally undisputed that having one of those large districts be Black-majority would have no effect on the ability of all the Justices of the Mississippi Supreme Court to be fair and impartial. *Supra* ¶ 454. The general notion of judicial independence thus are not a policy justification for these lines in particular, or for the districting decision to maintain a plan that does not contain any Black-majority districts. *MS NAACP*, 2024 WL 3275965, at *52.

686.    During closing arguments, counsel for the Defendants made wide-ranging arguments about the supposed historical origins and purposes of the East-West configuration of the Supreme Court districts. *E.g.*, Defs.' Closing Argument, 08/15/24 Trial Tr. 1516:4–1522:22. But "the proper function of the attorneys in closing argument is to assist the [factfinder] in analyzing, evaluating and applying the evidence and *not to testify as an expert witness*." *See United States v. Thompson*, 482 F.3d 781, 785 (5th Cir. 2007) (emphasis added) (internal quotation marks and citation omitted). While attorneys may express their "opinion or knowledge of the case," the opinion urged must be based "on the evidence in the case." *Id.* at 786. Defendants never called a historian to give any testimony about the early history of these districts.

687.    However, on the last day of trial, immediately prior to the start of closing arguments, Defendants sought admission of the "complete court file" issued by the Clerk of the Southern District of Mississippi for the case *Magnolia Bar* case challenging the Supreme Court lines, including the entire trial record from 1992. Defs.' Motion on DX-014, 08/15/24 Trial Tr. 1432:8–25. The file contains nearly 900 pages of documents from more than three decades ago, consisting of a mix of trial transcripts, witness declarations, expert reports, and other court submissions, none of which was introduced or specifically discussed by a live witness at trial. Defendants sought to introduce the case file to provide evidence of "the state's policy underlying the creation and maintenance of the east/west configuration of the supreme court districts." Defs.' Motion on DX-014, 08/15/24 Trial Tr. 1435:2–14. Within that case file, Defendants chiefly sought admission of the report and testimony of an expert historian from the *Magnolia Bar* case, Dr. Westley Busbee, who testified in 1992 about the state's original policy justifications for the

287

challenged district lines. *Id.* at 1435:15–20.

688.    Plaintiffs objected on the grounds that the court case file, because it contains statements submitted to the Clerk, constitutes multiple hearsay under Rule 805 of the Federal Rules of Evidence. *See United States v. Cervantes*, 107 F.4th 459, 472 (5th Cir. 2024) ("Hearsay within hearsay is inadmissible unless both parts are shown to be admissible."). While Defendants invoke the ancient documents exception to hearsay under Federal Rule of Evidence 803(16), the ancient documents exception can only apply to the first level of hearsay; the documents that are contained within the case file provided by the Clerk of Court must fall within some other hearsay exception in order to be admissible. *See Hicks v. Charles Pfizer & Co. Inc.*, 466 F. Supp. 2d 799, 807 (E.D. Tex. 2005) ("Even if a document qualifies as ancient under Rule 803(16), other hearsay exceptions must be used to render each individual layer of hearsay admissible."); Defs.' Motion on DX-014, 08/15/24 Trial Tr. 1435:21–1436:8. That is the approach adopted by the majority of the courts to have considered the interaction of the ancient-documents exception with the rule against multiple hearsay.[16]

689.    The Court further notes that a contrary rule in this context is simply incompatible

---

[16] *See, e.g.*, *Langbord v. United States Dep't of Treasury*, 832 F.3d 170, 190 (3d Cir. 2016) ("[S]tronger precedent supports the application of Rule 805 to ancient documents."); *United States v. Hajda*, 135 F.3d 439, 444 (7th Cir. 1998) ("The document itself falls under Fed.R.Evid. 803(16), but Stanislaw's actual statement needs a separate exception in order to be admissible."); *United States v. Habteyes*, 356 F. Supp. 3d 573, 586 (E.D. Va. 2018) ("[A]ny statements in the Ledger that constitute 'first-level hearsay' are admissible under Rule 803(16), but any statements in the Ledger that constitute hearsay within hearsay are inadmissible unless a separate hearsay exception applies.").

with basic trial practice, as litigants could freely seek to introduce and admit the entire case files of every case they might seek to cite and rely upon, all without the benefit of live testimony and cross-examination, effectively using the courts' filing system to launder potentially unreliable documents that were prepared specifically for litigation. Defendants could have sought to introduce the evidence they wished to rely upon by finding appropriate witnesses and experts who could have testified at trial, subject to cross-examination, but they chose not to do so.

690.    The Court also notes that allowing for the admission of the documents that Defendants seek to introduce here is antithetical to the animating purpose of the ancient document rule, which is premised on the idea that an ancient document, created before the litigation came about rather than in the litigation context, can be considered more reliable because it "antedates the present controversy." *E.g.*, *Hicks*, 466 F. Supp. 2d at 805. Here of course, all of the documents in the *Magnola Bar* case file, including those that Defendants sought to include, were created for litigation purposes, and indeed, in order to litigate a Section 2 claim involving these district lines.

691.    Plaintiffs also specifically objected to the admission of Dr. Busbee's report and testimony as improper expert disclosure, because at no point in the litigation did Defendants indicate that they intended to rely on Dr. Busbee's work as an expert historian. Defs.' Motion on DX-014, 08/15/24 Trial Tr. 1437:21–1438:24. That objection was and is sustained. While Defendants noted that Dr. Busbee passed away around the time of the trial, and invoked the hearsay exception for the former testimony of an unavailable witness, Fed. R Evid. 804(b)(1), that does not address the improper disclosure issue. *See* Defs.' Motion on DX-014, 08/15/24 Trial Tr. 1436:9–1437:4. Defendants' expert disclosures were due on January 6, 2023 (after an extension

granted by the Magistrate Judge), more than 1.5 years before the start of trial. ECF No. 73. Dr. Busbee, who was alive at that time, was not disclosed. Nor was any other defense expert historian. Defendants did not offer any justification for the failure to designate Dr. Busbee as an expert, nor did they explain why Dr. Busbee's testimony is uniquely important (*i.e.*, why another historian or political scientist could not have provided the same or similar testimony). Plaintiffs would have been significantly prejudiced by the admission of new, undisclosed expert testimony, with no possibility of cross examination and on the last day of trial. And a continuance would not have been either practicable or sufficient to cure the prejudice to Plaintiffs, given the extremely late stage of the case and Dr. Busbee's passing. On these facts, even setting hearsay aside, the expert evidence Defendants sought to introduce was also properly excluded as an expert disclosure violation. *See Hamburger v. State Farm Mut. Auto. Ins. Co.*, 361 F.3d 875, 883 (5th Cir. 2004) (setting forth four-factor test for exclusion of late-disclosed expert).

692.    Defendants did not raise any other hearsay exceptions. For completeness, the residual exception, which Defendants did not raise and which they therefore waived, does not apply either. Dr. Busbee's report and testimony and other litigation documents were, by definition, prepared for litigation and therefore lack the requisite indicia of reliability for them to be admitted into the record absent the opportunity to conduct full cross-examination of the declarant. *See Hager v. Brinker Texas, Inc.*, 102 F.4th 692, 703 (5th Cir. 2024); *United States v. Stone*, 604 F.2d 922, 925 (5th Cir. 1979); *Fractus, S.A. v. AT&T Mobility LLC*, 2019 WL 4805910, at *2 (E.D. Tex. Sept. 30, 2019).

693.    And even were the Court to consider Dr. Busbee's report and testimony, they would

not change this Court's findings and conclusions. For starters, and setting aside the lack of cross-examination, the Court would give Dr. Busbee's testimony reduced weight because he appeared to be answering a different question than the task at hand. Dr. Busbee's ultimate opinion was that the 1987 redistricting plan "was created without discriminatory intent"—which is not the question before this Court. DX-014 at 202 (Busbee report), 762 (Busbee testimony).

694.    Nor would the Court find Dr. Busbee's analysis on the particular question of interest here persuasive. Dr. Busbee's report and testimony contained extensive general discussion of political theory and philosophy, including why the judiciary is generally viewed by political theorists and the Framers of the U.S. Constitution as a distinct branch of government that should be separate from "partisan politics." *See* DX-014 at 192–94 (Busbee report), 739–754 (testimony). With regard to the East-West division of the districts, Dr. Busbee testified that there was a specific historical desire to ensure that the "more aristocratic elements in the west" of the state "would not dominate the state Supreme Court." *E.g.*, DX-014 at 743. He testified that dividing these interests led to "greater . . . diversity" within each district, which in turn purportedly helped "maintain that judicial independence which will enable [the court] to administer the law" impartially. DX-014 at 761–62.

695.    Dr. Busbee did not provide any evidence, however, indicating that the Legislature had those particular considerations in mind when enacting the challenged Supreme Court districts in 1987. The closest he came in any of the materials in the *Magnolia Bar* record was a footnote mentioning a 1935 statute, more than 50 years before the 1987 redistricting, affirming the general view that judicial offices should be held with "absolute impartiality" and that judges should be

291

removed from "political affiliations or obligations." DX-014 at 193. In other words, during the 1992 trial, Dr. Busbee appears to have assumed that the Legislature's period-specific goals—a purported desire to draw East-West districts because "historically in Mississippi the tension has been between west and east"—could be carried forward and attributed to present-day policy makers. DX-014 at 761.

696. Even if Dr. Busbee's analysis were admissible evidence, the Court would not credit this testimony over the other evidence in the trial record. Most importantly, in *this* trial, witnesses on both sides agreed that having one of the three Supreme Court districts be majority-Black would not render Justices on the Mississippi Supreme Court any less fair and impartial. *E.g.*, *supra* ¶ 454. They also acknowledged the ways in which the current district lines do not necessarily diversify regional interests, and instead sometimes lead to one region with distinct interests in certain matters of law and policy (like the Gulf Coast) being concentrated in a single district. *See supra* ¶¶ 453. As Dr. King explained at trial, it is far from obvious that maximizing judicial independence is the goal that the Legislature is attempting to achieve with the structure of the Mississippi Supreme Court: While making judicial elections nonpartisan was likely intended to make judges "independent of the political parties," the decision to elect judges in the first place evinces a desire to balance the principle of judicial independence with some degree of exposure to the concerns and interests of a judge's constituents, or else the State would have eliminated elections entirely. *See, e.g.*, M. King Testimony, 08/14/24 Trial Tr. 1403:8–13; *see also, e.g.*, *supra* ¶ 452. Accordingly, and again, the general goal of judicial independence cannot justify these particular district lines or the failure to draw one of the three Supreme Court districts as majority-Black. *See*

292

*MS NAACP*, 2024 WL 3275965, at *52 ("There is no evidence of when such considerations led to the creation of a particular district and resulted in the failure to create a black-majority district in that same area. We needed more than generalized statements for this defense in light of the Plaintiffs' evidence of a Section 2 violation.").

697.     To the extent that Dr. Busbee did analyze the 1987 redistricting in particular, his findings are consistent with the testimony in this case—that the 1987 legislature was primarily focused on the "rather urgent need" to reduce "the population disparities among the three districts." DX-014 at 196. Dr. Busbee also noted that the 1987 legislature rejected a proposal from a Black legislator, Representative Clayton Henderson, that would have created a majority-Black district; that proposal was supported by "most of the seventeen black representatives." *Id.* at 197. All of that is consistent with the evidence in the record. *See supra* ¶¶ 15–23.

698.     As for the specific East-West configuration of the districts and Dr. Busbee's historical explanation for them, the Court could not credit any suggestion that the specific historical interest-balancing that the Legislature may have sought in the antebellum period still constitutes a state interest that is even cognizable, let alone "substantial." *Clements*, 999 F.2d at 872.

699.     The counties along the river did once form the political base of an "aristocratic" planting class; today, they are home to hundreds of thousands of Black voters, and the counties with the State's highest concentrations of Black citizens. *See supra* ¶¶ 63, 65–66, 447–449. That is not a coincidence. To paraphrase the three-judge panel in *MS NAACP*: History matters. *Cf.* 2024 WL 3275965, at *31. The designers of the East-West districts may well have sought to dilute the political power of the aristocratic, slave-owning planters, but today, fragmenting the Delta and the

River counties instead dilutes the political power of Black Mississippians, many of them descendants of plantation slavery. Viewed in this light, the history related by Dr. Busbee only confirms that the State has no non-tenuous interest (and certainly no substantial interest) in maintaining these particular lines in the present day. Indeed, it underscores the fundamental justice of a remedy.[17]

700.    Based upon all of the evidence in the trial record and the foregoing findings of fact, the Court concludes that the policy justifications underlying the challenged plans are tenuous. Senate Factor 9 weighs in Plaintiffs' favor.

*       *       *

701.    Based on the totality of the circumstances, and considering all of the evidence including the various Senate Factors, Black voters in Mississippi have less opportunity than Whites to participate in the political process and to elect representatives of their choice to the State Supreme Court under the 1987 Enacted Plan. 52 U.S.C. § 10301. On "an intensely local appraisal of the design and impact of the contested electoral mechanism[]," *Gingles*, 478 U.S. at 79 (internal quotation marks and citations omitted), and on the application of the *Gingles* vote dilution framework to the facts of this case and the present political reality in Mississippi, the Court concludes that the continued use of the 1987 Enacted Plan violates Section 2 of the Voting Rights

---

[17] Moreover, as Mr. Cooper has shown using his Least Change Plans, given the population changes that have occurred in Mississippi, it is now possible to create a majority-BVAP District 1 while maintaining the East-West configuration. *See supra* ¶ 111. For this reason as well, maintaining that general geographic orientation of the district lines is not a non-tenuous reason for failing to include a Black-majority Supreme Court district.

Act.

## VIII. REMEDY

702.    Because the Court has determined that the 1987 Enacted Plan violates Section 2 of the Voting Rights Act, further use of the Enacted Plan will be enjoined. In addition to success on the merits, the other permanent injunction considerations warrant such relief.

703.    The harm suffered by Plaintiffs and other Mississippi voters from unlawful electoral maps is irreparable. Voting is "a fundamental political right, because [it is] preservative of all rights." *Yick Wo v. Hopkins*, 118 U.S. 356, 370 (1886). "And the right of suffrage can be denied by a debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise." *Reynolds*, 377 U.S. at 555. "Though the states retain considerable power to regulate elections, their power has limits: in the course of their regulation, they may not unduly burden the citizens' right to vote—the fundamental political right, because [it is] preservative of all rights. Indeed, voting is of the most fundamental significance under our constitutional structure." *Harding v. Edwards*, 487 F. Supp. 3d 498, 503 (M.D. La. 2020) (internal quotation marks omitted)*.

704.    Given the fundamental importance of the right to vote, courts frequently hold that violations of rights in voting and redistricting cases constitute irreparable harm. *See, e.g.*, *Robinson*, 605 F. Supp. 3d at 851 (M.D. La.), *aff'd in relevant part* 86 F.4th at 599 (preliminary injunction based on irreparable harm in Section 2 case was "valid when it was issued"); *see also Obama for Am. v. Husted*, 697 F.3d 423, 436 (6th Cir. 2012); *Williams v. Salerno*, 792 F.2d 323, 325–326 (2d Cir. 1986); *League of Women Voters of N. Carolina v. North Carolina*, 769 F.3d 224,

247 (4th Cir. 2014). "Federal courts at all levels have recognized that violation of constitutional rights constitutes irreparable harm as a matter of law." *De Leon v. Perry*, 975 F. Supp. 2d 632, 663 (W.D. Tex. 2014), *aff'd sub nom. De Leon v. Abbott*, 791 F.3d 619 (5th Cir. 2015).

705.    Where Plaintiffs prevail in a redistricting case, it falls to the Legislature in the first instance to draw a lawful plan. *See, e.g.*, *Wise v. Lipscomb*, 437 U.S. 535, 539–40 (1978) (opinion of White, J.) (collecting cases); *Robinson*, 86 F.4th at 601.

706.    If the Legislature cannot or will not adopt a remedial map that complies with federal law, then the job of drawing a map may fall to this Court. *Wise*, 437 U.S. at 540 (when "those with legislative responsibilities do not respond, or the imminence of a state election makes it impractical for them to do so, it becomes the unwelcome obligation of the federal court to devise and impose a reapportionment plan." (internal citations and quotation marks omitted)).

707.    In order to hold future elections under lawful plans, the Legislature should produce a Supreme Court districting plan that complies with Section 2, consistent with this Opinion, by the end of the 2025 Legislative Session.

708.    A lawful plan for Mississippi Supreme Court districts is one that creates a majority-Black district including the area in and around the Mississippi Delta, and one under which, viewed as a whole, Black voters have an equal opportunity to elect candidates of their choice.

709.    This timeline balances the relevant equities and serves the public interest by providing the Legislature with its rightful opportunity to craft a remedy in the first instance, while also ensuring that, if an acceptable remedy is not produced, there will be time for the Court to fashion one in time for the possibility of calling a special election for 2025 or 2026.

710.     Mississippi is holding a general election for the Mississippi Supreme Court in November 2024, and the next election is not until 2028. As a practical matter, it is too close to the 2024 election at this point to alter the district lines and start the process over, even on a special or truncated schedule. *Cf. Merrill v. Milligan*, 142 S. Ct. 879, 880 (2022) (Kavanaugh, J., concurring).

711.     In these circumstances, special elections after the adoption of a new, lawful plan may be necessary to ensure a complete remedy. *See MS NAACP*, 2024 WL 3275965, at *55 (ordering special elections to remedy Section 2 violation following adoption of remedial plans); *Watkins v. Fordice*, 791 F. Supp. 646, 648 (S.D. Miss. 1992) (ordering special elections for three-year terms in a state legislative redistricting case following adoption of remedial districts); *see also generally North Carolina v. Covington*, 581 U.S. 486, 488 (2017) (laying out three-factor test for whether special election remedy is appropriate).

712.     Because there is sufficient time to do so, the Court will defer for now a decision on whether to hold special elections and on what timeframe. If the Legislature does not provide for a revised election schedule that completely remedies vote dilution with respect to the Supreme Court districts, the Court will consider a motion for special elections at the conclusion of the 2025 Legislative Session.

297

Respectfully submitted,

This the 23rd day of September, 2024.

/s/ Joshua Tom
AMERICAN CIVIL LIBERTIES UNION
OF MISSISSIPPI FOUNDATION
Joshua Tom (Miss. Bar No. 105392)
101 South Congress Street
Jackson, MS 39201
(601) 354-3408
JTom@aclu-ms.org

ACLU FOUNDATION
Ari J. Savitzky*
Ming Cheung*
Victoria Ochoa*
Sophia Lin Lakin*
125 Broad Street, 18th Floor
New York, New York 10004
(212) 549-2500
asavitzky@aclu.org
mcheung@aclu.org
vochoa@aclu.org
slakin@aclu.org

* Admitted pro hac vice

SIMPSON THACHER & BARTLETT LLP
Jonathan K. Youngwood (Miss. Bar No. 106441)
Janet A. Gochman*
Noah Gimbel*
Kate Lambroza*
425 Lexington Avenue
New York, NY 100017
(212) 455-2000
jyoungwood@stblaw.com

SOUTHERN POVERTY LAW CENTER
Bradley E. Heard*
Ahmed Soussi*
Sabrina Khan*
150 E Ponce de Leon Avenue, Suite 340
Decatur, GA 30030

(470) 521-6700

bradley.heard@splcenter.org
ahmed.soussi@splcenter.org
sabrina.khan@splcenter.org

*Attorneys for Plaintiffs*

298

## **CERTIFICATE OF SERVICE**

I, Joshua Tom, do certify that on this day I filed a true and correct copy of the foregoing with the Clerk of the Court using the ECF system which sent notice to all counsel of record.

This the 23rd day of September, 2024.

/s/ *Joshua Tom*
Joshua Tom