## THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF MISSISSIPPI
## GREENVILLE DIVISION

**DYAMONE WHITE; DERRICK SIMMONS; TY PINKINS; CONSTANCE OLIVIA SLAUGHTER HARVEY-BURWELL**                                        **PLAINTIFFS**

**VS.**                           **CIVIL ACTION NO. 4:22-cv-00062-SA-JMV**

**STATE BOARD OF ELECTION COMMISSIONERS; TATE REEVES** *in his official capacity as Governor of Mississippi*; **LYNN FITCH** *in her official capacity as Attorney General of Mississippi*; **MICHAEL WATSON** *in his official capacity as Secretary of State of Mississippi*                   **DEFENDANTS**

---

### DEFENDANTS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

---

Defendants State Board of Election Commissioners, Tate Reeves, in his official capacity as Governor of Mississippi, Lynn Fitch, in her official capacity as Attorney General of Mississippi, and Michael Watson, in his official capacity as Secretary of State of Mississippi (collectively "Defendants") submit these Proposed Findings of Fact and Conclusions of Law.

### PROPOSED FINDINGS OF FACT

**Background**

1.    Plaintiffs Dyamone White, Derrick Simmons, Ty Pinkins, and Constance Olivia Slaughter Harvey-Burwell ("Plaintiffs") under 52 U.S.C. § 10301, otherwise known as Section 2 of the Voting Rights Act of 1965 ("VRA"), challenge the lines of Mississippi's Supreme Court District 1 claiming that the lines dilute the voting strength of blacks and deny them equal opportunity to elect the candidates of their choice on the basis of race.  [Dkt. #133], at 46.  They

1

filed their original Complaint on April 25, 2022, which also included a claim under 42 U.S.C. § 1983 alleging that District 1's lines were drawn, maintained, or reaffirmed for the purposes of discrimination on the basis of race in violation of the Fourteenth and Fifteenth Amendments. [Dkt. #1], at 53-55. Plaintiffs' Amended Complaint dropped any claim of intentional discrimination and instead relied solely on alleged abridgement of the right to vote under Section 2 of the VRA. *See* [Dkt. #133]. Plaintiffs request that this Court adopt or implement new lines for District 1 that increase the Black Voting Age Population (BVAP) of District 1, which they contend is required under Section 2 to have an equal opportunity to participate in the political process and elect the candidates of their choice. *Id*. at 47.

2. The Mississippi Constitution provides for the existence of three Supreme Court districts from which Justices are to be elected, with three Justices elected from each of the three districts.[1] [Dkt. #228], at 18. Mississippi has elected its judges since the Constitution of 1832. Tr. at 788. The Supreme Court seats for each district are denominated as "Places" (e.g., "District 1, Place 1"). [Dkt. #228], at 18. Mississippi Supreme Court Justices are elected, and elections for each position are held on an at-large, districtwide basis. *Id*. Mississippi Supreme Court Justices are elected to eight-year terms, which are staggered. *Id*.

3. District 1, known as the "Central District," consists of the following counties: Bolivar, Claiborne, Copiah, Hinds, Holmes, Humphreys, Issaquena, Jefferson, Kemper, Lauderdale, Leake, Madison, Neshoba, Newton, Noxubee, Rankin, Scott, Sharkey, Sunflower, Warren, Washington, and Yazoo. [Dkt. #228], at 20.

4. District 2, known as the "Southern District," consists of the following counties: Adams, Amite, Clarke, Covington, Forrest, Franklin, George, Greene, Hancock, Harrison, Jackson, Jasper,

---

[1] Certain proposed findings of fact cite to the Parties' Joint Pretrial Order because they were stipulated. *See* [Dkt. #228], at 16-22.

2

Jefferson Davis, Jones, Lamar, Lawrence, Lincoln, Marion, Pearl River, Perry, Pike, Simpson, Smith, Stone, Walthall, Wayne, and Wilkinson. *Id*.

5.      District 3, known as the "Northern District," consists of the following counties: Alcorn, Attala, Benton, Calhoun, Carroll, Chickasaw, Choctaw, Clay, Coahoma, Desoto, Grenada, Itawamba, Lafayette, Lee, Leflore, Lowndes, Marshall, Monroe, Montgomery, Oktibbeha, Panola, Pontotoc, Prentiss, Quitman, Tallahatchie, Tate, Tippah, Tishomingo, Tunica, Union, Webster, Winston, and Yalobusha. *Id*.

6.      Before the adoption of non-partisan judicial elections by the Mississippi Legislature, Supreme Court Justices were elected in partisan elections with a party primary. *Id*. Since 1994, Mississippi Supreme Court Justices have been elected in non-partisan elections without any party primary. *Id*. at 19. These elections occur during even numbered years, and they coincide with federal elections, including races for President, United States House of Representatives, and United States Senate. Tr. at 1224.

7.      When a vacancy on the Supreme Court arises, the Justice's remaining term is filled by a person appointed by the Governor. [Dkt. #228], at 18. Six of the nine current Mississippi Supreme Court Justices were appointed. *Id*. This is not uncommon; about a third of state supreme court Justices in other states are first appointed to their positions. Tr. at 792.

8.      The district lines for the three Supreme Court districts are set by the Mississippi Legislature. [Dkt. #228], at 18. From at least 1890 until 1987, the geographic boundaries of the three Supreme Court districts did not change. *Id*. at 19. In January 1987, the Legislature passed H.B. 552, Laws 1987, Ch. 491, a Supreme Court redistricting plan that shifted Attala and Winston counties out of District 1 and into District 3 and moved Claiborne, Copiah, and Jefferson counties into District 1 from District 2. *Id*. at 20. That bill corrected population malapportionment of the

3

then-existing Supreme Court districts. *Id*. The U.S. Department of Justice precleared the plan in December 1987. *Id*.

### District 1's Electoral History

9. The Mississippi Supreme Court has had four black Justices in its history and all four of those Justices have sat in the District 1, Place 2 seat. *Id*. at 22.

10. In 1985 Justice Reuben Anderson, who is black, was appointed by Governor Bill Allain, a Democrat, to fill a vacancy in the District 1, Place 2 seat on the Mississippi Supreme Court, becoming the first black Justice in the court's history. [Dkt. #228], at 20-21. In the 1986 special election to serve the remainder of that term, Justice Anderson defeated his opponent Richard Barrett, in the Democratic primary election. *Id*. In 1988, Justice Anderson was elected to a full term, running unopposed. *Id*. at 21.

11. Upon Justice Anderson's resignation in 1991, Governor Ray Mabus, a Democrat, appointed Justice Fred Banks, who is black, to the same District 1, Place 2 seat. *Id*. In a 1991 special election, Justice Banks, running as an incumbent Democrat, defeated his challenger, Republican Chet Dillard. *Id*. Banks won 118,122 votes, or about 51 percent of the total vote, compared to 111,949 votes for Dillard. *Id*. Banks received about 30 percent of the white vote, combined with nearly unanimous black support. *Id*. Based in part on these results, the Court in *Magnolia Bar Ass'n v. Lee*, 793 F. Supp. 1386, 1407 (S.D. Miss. 1992), *aff'd,* 994 F.2d 1143 (5th Cir. 1993), *cert. denied*, 510 U.S. 994 (1993), concluded in 1992 that "whites will not necessarily vote as a bloc for white candidates having black opponents in Mississippi Supreme Court elections so as to 'usually defeat the minority's preferred candidate.'" *Id*.

12.     Justice Fred Banks later won reelection in 1996 in a non-partisan contest.[2]  *Id*.
Justice Banks resigned in 2001 and Governor Ronnie Musgrove, a Democrat, appointed Justice
James Graves, who is black, to the same District 1, Place 2 seat.  *Id*.  Running as an incumbent,
Justice Graves, the black-preferred candidate, later won a contested election in 2004, prevailing in
a runoff.  *Id*.; Tr. at 795.

13.     Upon Justice Graves's resignation in 2011, Governor Haley Barbour, a Republican,
appointed Justice Leslie King, who is black, to the same District 1, Place 2 seat.  [Dkt. #228], at
21.  District 1 voters elected Justice King to a full term in 2012 and re-elected him in 2020.  *Id*.
Both times Justice King ran unopposed.  *Id*.  Defendants' expert Dr. Christopher Bonneau
explained that the fact Justice King ran unopposed in 2012, DX-8, at 11, and 2020, *id.* at 18, cannot
be discounted in establishing black-preferred candidates' performance in District 1.  Tr. at 878.
First of all, that means no one has challenged him for his seat and, as Dr. Bonneau explained, the
most common reason for that "is people don't think they can win," indicating the relative political
strength of that candidate.  *Id*. at 879.  Plaintiffs' witness Senator Derrick Simmons testified that
no candidate has run against Justice King because he is supported by the black community.  *Id*. at
723.

14.     Current day, the three serving Justices in District 1 are: Leslie King, a black former
Democratic state legislator supported by black voters; Jim Kitchens, a white former Democratic
district attorney endorsed by Democratic Congressman Bennie Thompson and supported by black
voters (Tr. at 195, 246, 727, 1394); and Kenny Griffis, a white Republican appointed by Governor
Phil Bryant who is not supported by black voters.  Tr. at 371-72.  The same district lines for

---

[2] This race occurred after the 1994 revision to the applicable statute by the Mississippi
Legislature making the races non-partisan, thereby removing party primaries.

Supreme Court District 1 control elections for a single Commissioner on both the Public Service Commission and the Transportation Commission. Rather than having three members elected from each district like the Mississippi Supreme Court, voters elect only one individual to represent their district for those Commissions. Consequently, the Public Service Commission and the Transportation Commission are composed of three members each.

15. The current Public Service Commissioner for the Central District is De'Keither Stamps, a black Democrat supported by black voters. Tr. at 246, 809-10, 1394. The current Transportation Commissioner for the Central District is Willie Simmons, a black Democrat supported by black voters. *Id*. Thus, currently, out of the five offices elected based on the boundaries of the district lines composing Mississippi Supreme Court District 1, four of the offices are occupied by persons whom black voters prefer. And out of the four persons occupying those offices, three are black. The lone, black-preferred white officeholder is Mississippi Supreme Court Justice Jim Kitchens, who has the full support of Rep. Bennie Thompson and black voters. *Id*. at 227, 1394. The lone candidate not preferred by black voters holding office in the Central District is Justice Kenny Griffis.

16. The table below shows the results for contests for the Mississippi Supreme Court, Public Service Commission, and Transportation Commission in District 1 since 2004. Results highlighted in blue specify victory by the black-preferred candidate and results highlighted in red specify a loss by the black-preferred candidate:

| Year | Race | Black Voters' Preferred Candidate | Other Candidate | Other Candidate | Other Candidate |
|---|---|---|---|---|---|
| 2004 | Supreme Court Position 1 | William L. (Bill) Waller, Jr. | Richard Ray Grindstaff | N/A | N/A |
| 2004 | Supreme Court Position 2 | James Graves | Ceola James | Samac S. Richardson | William L. (Bill) Skinner |
| 2007 | Public Service Commissioner | Lynn Posey | Lee Dilworth | Charles Barbour | N/A |
| 2007 | Transportation Commissioner | Dick Hall | Rudy Warnock, Jr. | N/A | N/A |
| 2008 | Supreme Court Position 3 | Jim Kitchens | Ceola James | Jim Smith | N/A |
| 2011 | Public Service Commissioner | Addie Green | Lynn Posey | N/A | N/A |
| 2011 | Transportation Commissioner | Marshland Crisler | Dick Hall | N/A | N/A |
| 2012 | Supreme Court Position 1 | Earle S. Banks | William L. (Bill) Waller, Jr. | N/A | N/A |
| 2012 | Supreme Court Position 1 | Leslie D. King | N/A | N/A | N/A |
| 2015 | Public Service Commissioner | Cecil Brown | Brent Bailey | LaTrice D. Notree | N/A |
| 2015 | Transportation Commissioner | Mary H. Coleman | Dick Hall | N/A | N/A |
| 2016 | Supreme Court Position 3 | Jim Kitchens | Kenny Griffis | N/A | N/A |
| 2019 | Public Service Commissioner | De'Keither A. Stamps | Brent Bailey | N/A | N/A |
| 2019 | Transportation Commissioner | Willie L. Simmons | Butch Lee | N/A | N/A |
| 2020 | Supreme Court Position 1 | Latrice Westbrooks | Kenny Griffis | N/A | N/A |
| 2020 | Supreme Court Position 2 | Leslie D. King | N/A | N/A | N/A |
| 2023 | Public Service Commissioner | De'Keither A. Stamps | Brent Bailey | N/A | N/A |
| 2023 | Transportation Commissioner | Willie L. Simmons | Ricky Pennington, Jr. | N/A | N/A |

DX-8.

**Section 2 Analysis and the *Gingle*s Factors**

17.     For a Section 2 claim to proceed, three prerequisites must be proven: (1) "the minority group must be able to demonstrate that it is sufficiently large and geographically compact to constitute a majority in a single-member district:" (2) "the minority group must be able to show that it is politically cohesive;" and (3) "the minority must be able to demonstrate that the white majority votes sufficiently as a bloc to enable it . . . **_usually_** to defeat the minority's preferred candidate." *Thornburg v. Gingles*, 478 U.S. 30, 51-52 (1986) (emphasis added).  "If a plaintiff makes that showing, it must then go on to prove that, under the totality of the circumstances, the district lines" violate Section 2.  *Abbott v. Perez*, 585 U.S. 579, 614 (2018).

18.     As for the first *Gingles* factor, it cannot be disputed that there is a sufficiently large and geographically compact black majority "in a single-member district."  That is because, according to the 2020 five-year American Community Survey, the estimated Black Citizen Voting Age Population (CVAP) of the current Supreme Court districts is: District 1, 51.1%; District 2, 27.9%; and District 3, 33.3%.  [Dkt. #228], at 22.  And according to the 2020 U.S. Census count, the Black Voting Age Population of the Supreme Court districts is: District 1, 49.29%; District 2, 27.66%; District 3, 32.65%.  DX-1, at 1.

19.     Nevertheless, Plaintiffs' expert William Cooper created a series of illustrative maps based on Planning & Development Districts ("PDDs") as signifying regional communities of interest.  Tr. at 93.  He admitted that PDDs in Mississippi are private, non-profit Mississippi corporations and further admitted he used the lines because they were simply "convenient," as there would be less basis to consider PDD lines in a judicial case as opposed to a legislative one.  *Id*. at 94.  Mississippi's PDDs have never been utilized by the Mississippi Legislature to develop

the State's Supreme Court districts.  *Id.* at 95.

20.     "Second, the minority group must be 'politically cohesive[ ]' . . . [a]nd third, a district's white majority must 'vote [ ] sufficiently as a bloc' to usually 'defeat the minority's preferred candidate.'"  *Cooper v. Harris*, 581 U.S. 285, 301-02 (2017) (quoting *Gingles*, 478 U.S. at 50-51).

21.     Defendants' expert Dr. Christopher Bonneau testified that for Mississippi Supreme Court races since 2000 that, except for one race in 2004 between white Chief Justice William Waller and Richard Grindstaff (both of whom are white), contests for District 1 seats have been competitive.  Tr. at 787, 792; DX-6, at 1.

22.     Plaintiffs cite the loss of State Representative Earle Banks in his race against incumbent Mississippi Supreme Court Justice William Waller in 2012 and Latrice Westbrooks's loss against current Mississippi Supreme Court Justice Kenny Griffis in 2020 as proof that white bloc voters usually defeat black-preferred candidates.  Plaintiffs' expert Dr. Orey testified about the performances of black candidates against white candidates in just two Mississippi Supreme Court races in District 1, PX-11, at 1, and "quasi-endogenous elections" for Public Service Commissioner and Transportation Commissioner in biracial elections (i.e., when blacks ran against whites).  PX-11, at 1-2; Tr. 809-10.  Dr. Orey opined white voters voted as a bloc to defeat the black candidates (Earle Banks in 2012 and Latrice Westbrooks in 2020), but not that black-*preferred* candidates were *usually* defeated by white bloc voters under *Gingles* factor 3.[3]  Tr. at 809-10, 822.

---

[3] Dr. Orey's testimony downplays Commissioner Simmons's and Stamps's wins for their seats in 2023 using the District 1 lines and claims they should be given little weight: "No one or two contests should be given any precedence."  Tr. at 222.  Yet, as discussed below, his testimony on this point cannot be reconciled with his singular focus on the 2012 Banks and 2020 Westbrooks contests as lack of equal opportunity under *Gingles*.

23.     Dr. Orey does not account for the effects COVID-19 had on Westbrooks's campaign or any effects the COVID-19 pandemic could have had on black voter turnout during that unusual year.  Plaintiffs' witness Constance Slaughter-Harvey testified that it was very difficult for Latrice Westbrooks to campaign for her 2020 race against Justice Kenny Griffis, a race she lost.  Tr. at 481.  She said the pandemic was particularly hard for the black community because "COVID hit us hard" and blacks were "very, very careful about going out unless it was critical."  *Id*.  She noted one instance where Westbrooks went to a campaign event in Forest, Mississippi, but no one turned out "because of COVID," which was "detrimental" to Westbrooks's campaign.  *Id*.

24.     Plaintiffs also champion Dr. Orey's analysis of "biracial" District 1 commissioner contests.  PX-11, at 1-2.  While Dr. Orey's analysis may be relevant to racially polarized voting, it omits the 2023 results[4] for Public Service Commissioner and Transportation Commissioner.  *Id*.  Further it fails to include the relevant contests, which are those between black-*preferred* candidates and the other non-, black-preferred candidates.  *Id*.  When one listens carefully to Dr. Orey's testimony, this distinction becomes clear: "[In] the Supreme Court District 1 contest, *Blacks* were not able to win a single election contest . . . Whites voted as a bloc to usually defeat the *Black* candidate."  Tr. at 221.  Context is key because Dr. Orey ignores Justice King's contests where he has run unopposed and fails to consider the performances of black-*preferred* candidates like Justice

---

[4] Dr. Orey downplays the significance of Stamps's and Simmons's victories in 2023 on the basis that outside money funded Democratic candidate Brandon Presley's campaign.  But he fails to explain how this is not indicative of equal opportunity under Section 2.  Nor do Plaintiffs show that funding in 2023 exceeded that in earlier years.  Former Justice Ann Lamar testified that Democrats were able to conduct a vigorous campaign in 2008.  Tr. 765-68.  Assistant Secretary of State Kirkpatrick testified that turnout in the 2023 general election was low, yet the black-preferred candidates won both the Public Service Commissioner and Transportation Commissioner seats in District 1 *in spite of* that low turnout.  *Id*. at 1268-69.

Jim Kitchens and Commissioners Lynn Posey and Cecil Brown. In his testimony, Dr. Orey conflates *black* candidates' performance with the performance of black-*preferred* candidates, focusing only on election results for black candidates. *Id*. at 221-22.

25.      Defendants' expert Dr. Christopher Bonneau noted that during the 2012 election, former President Barack Obama, a strong black candidate, won District 1's vote for President with around 54% of the vote, about 10 percentage points better than black-preferred Supreme Court candidate Earle S. Banks performed. Tr. at 795-96. He added that in the 2020 election another strong black candidate, Mike Espy, in the race for Senate, performed about six percentage points better than black-preferred Supreme Court candidate Latrice Westbrooks did in District 1, a margin that well exceeded what would have been required to defeat Justice Griffis in that 2020 contest.[5] *Id*. at 796. Dr. Bonneau testified that nothing prevented those black-preferred candidates from performing well (and victoriously) in 2012 and 2020—the two principal examples Plaintiffs rely on to support their contention of blacks' lack of equal opportunity. *Id*.

26.      Dr. Bonneau attributed Banks's and Westbrooks's performance with voters relative to the context of other black candidates in exactly the same election to "roll-off" at the ballot box. Tr. at 796-97. He testified that the Supreme Court races, because they were non-partisan, lacked an important cue for voters, which is the political party affiliation of the candidate. *Id*. at 798. The lack of party affiliation for a race that was further down ballot was a very plausible explanation for why Banks and Westbrooks performed poorer than Obama and Espy in 2012 and 2020. Dr. Bonneau testified that one way Supreme Court campaigns deal with lack of party affiliation

---

[5] Plaintiffs' expert Dr. Orey acknowledged that blacks turned out to vote in sufficient numbers in 2012 and 2020 in District 1 to elect Barack Obama and Joe Biden, respectively, but he attributed "voter roll off" on voters' ballots to why those votes were not cast for Earle Banks and Latrice Westbrooks. Tr. at 252-55. He did not testify that black voters rolled off at a higher rate than whites.

information is by demonstrating what party supports what candidate, for instance, in the case of Congressman Bennie Thompson's sample ballots advocating for Latrice Westbrooks in 2020. *Id.* at 799. Nevertheless, Dr. Bonneau testified there is no evidence that black voters roll off in higher proportion that white voters. *Id.* at 799, 886. Plaintiffs' expert Dr. Orey agreed that voter roll-off has no racial correlation. *Id.* at 255.

27.     In any event, Dr. Bonneau explained that Banks's 2012 race was close to being competitive, Tr. at 799-800, running against Chief Justice Waller, who had been the black-preferred candidate in earlier elections. Westbrooks's 2020 race certainly met Dr. Bonneau's definition of competitive.[6] *Id.* at 799. Plaintiffs' witness Senator Percy Watson agreed, calling Central District elections regularly "very, very close elections." *Id.* at 504.

28.     Dr. Bonneau testified regarding the 2019 and 2023 contests for Public Service Commissioner using the District 1 lines and black-preferred candidates' performance in those contests. Tr. at 809-10. De'Keither Stamps, a black candidate who is indisputably a black-preferred candidate, narrowly lost to Brent Bailey in 2019. *Id.* at 809, 1394. Yet Dr. Bonneau testified that close/competitive elections generate electoral competition and when Stamps ran against then-incumbent Bailey again in 2023, Stamps defeated Bailey, a victory for a black-preferred candidate in a contest using the District 1 lines. *Id.*

29.     Dr. Bonneau also testified about the 2019 and 2023 Transportation Commissioner contests that used the District 1 lines. Tr. at 810. In 2019, Willie Simmons, the black-preferred, black candidate, defeated Butch Lee, who is white; Simmons obtained 51 percent of the vote to Lee's 49 percent. *Id.* at 810, 1394. Neither candidate was an incumbent in that race, so Simmons

---

[6] Dr. Bonneau explained that in the political science literature, an election contest is considered competitive when the winner in a two-person contest wins with no more than fifty-five percent (55%) of the vote. Tr. at 799.

had no incumbency advantage. *Id*. at 810. And in 2023, Simmons, the incumbent, black-preferred candidate, defeated white candidate Ricky Pennington, Jr. by a larger margin, roughly 54.5 percent to 45.6 percent. *Id*. at 810-11. Dr. Bonneau testified about how Lynn Posey, who ran for the Public Service Commissioner seat in District 1 in 2007 as a Democrat was the black-preferred candidate and won the race that year. *Id*. at 811. When Posey switched from the Democratic Party to the Republican Party in 2011, he won that race as an incumbent but was no longer the black-preferred candidate, proving the importance of party affiliation in obtaining the black vote. *Id*.

30.     Importantly, Dr. Bonneau testified that just because a candidate is black does not mean that candidate is the black-preferred candidate. Tr. at 808. He noted the 2008 Supreme Court election for District 1, Seat 2 involving white candidate Jim Kitchens, a black candidate Ceola James, and the incumbent Chief Justice Jim Smith. *Id*. James, a black candidate, only received 10% of the vote, but Jim Kitchens was the black-preferred candidate and won the election, defeating the white incumbent candidate Chief Justice Smith. *Id*.

31.     Plaintiffs' focus in this case has been to illustrate underperformance by black candidates, but *Gingles* focuses on the performance of black-*preferred* candidates. This was explained in Plaintiffs' cross-examination of Dr. Bonneau regarding recent election results for the three offices elected in District 1 lines where Plaintiffs framed the question on cross-examination as how black candidates perform against white candidates, but *not* how black-preferred candidates perform against non-black-preferred candidates, which is the relevant analysis. Tr. at 834-35. Dr. Bonneau noted this discrepancy and pointed out that by accepting that incorrect premise, "we are not looking at all of the relevant data." *Id*. at 834. *See id*. at 835 ("Again, if we are only looking at elections involving a Black candidate and a White candidate.").

32.     Dr. Bonneau noted the 2015 primary for Public Service Commissioner in District 1

where Cecil Brown, a white Democrat, beat Bruce Burton, a black Democrat, with Brown having a majority of the black voter support. Tr. at 811-12. Brown, the black-preferred candidate, later beat Brent Bailey in the general election, a victory for a black-preferred candidate for a race within the District 1 lines. *Id*. at 812; DX-8, at 12.

33. Dr. Bonneau concluded that, in analyzing recent elections for Mississippi Supreme Court, Public Service Commissioner District 1, and Transportation Commissioner seats in District 1, black voters are able to participate and to elect candidates of their choice, and there are no impediments to their doing so. Tr. at 814. He explained that all those election contests use the same district lines. So, in analyzing the effect of those district lines on outcomes of elections, Dr. Bonneau testified that differences in the elected office at issue have no effect on judging the lines' ultimate effect on those contests. *Id*. at 880-81. In other words, according to Dr. Bonneau, one is comparing apples to apples when looking at the three offices elected by District 1's lines. *Id*.

34. In 2020, the year the most recent census was taken, the Current Population Survey ("CPS") showed registration rates of 79.2% for white Mississippians and 83.4% for black Mississippians. Tr. at 982. Defense expert demographer Dr. David Swanson reported that "thousands" of Mississippians responded to the CPS survey. *Id*.. at 983-84. Multiplying those rates by the CVAP of both races produces a black registered voter majority of 300,454 and a white registered voter minority of 256,770.

35. The voting age population of District 1 in 2020 was 716,402, of which 45.4% was white and 49.3% was black. DX-1, at 17, Table III.D.1. All other races make up 5.3% of the voting age population, or 37,969 people. *Id*. Even if all those individuals are registered to vote, an unlikely supposition, blacks would retain a registered voter majority in District 1. *Id*.

36.    Yet Plaintiffs have asserted that the current black majority CVAP in District 1 is illusory because that total includes convicted felons.  Yet in obtaining current prisoner population reports from the Mississippi Department of Corrections, Defendants' expert Dr. David Swanson recalculated eligible voters in each district, as shown below:

**Table III.E.2 2020 Census Voting Age Population for Existing SCOMS Districts**

| Existing Districts | CVAP | WNH | APB | Black Prisoners | Other Prisoners | % APB | %APB - Prison Adj. |
|---|---|---|---|---|---|---|---|
| 1 | 705,555 | 324,204 | 360,256 | 2,718 | 2,029 | 51.1% | 51.0% |
| 2 | 781,300 | 527,524 | 218,180 | 1,476 | 780 | 27.9% | 27.8% |
| 3 | 751,245 | 479,855 | 250,322 | | | 33.3% | 33.3% |
| **Grand Total** | **2,238,100** | **1,331,583** | **828,758** | **4,194** | **2,809** | 37.0% | 37.0% |

Source: Calculations for author by Bryan GeoDemographics using 2016-2020 ACS DOJ CVAP and MS DOC Reported Prisoner Populations.

DX-1, at 26, Table III.E.2.  Although some prisoners remain eligible to vote, Dr. Swanson deducted all prisoners because there was no way to determine who retained the franchise (the right to vote).  Tr. at 959-61.  Therefore, the actual number of eligible voters and eligible black voters is slightly higher.

37.    Plaintiffs' expert William Cooper stated based on a report on a journalistic website, PX-6, at 5 n.3, that 56,000 ineligible voters, 60% of whom are black, have been freed from Mississippi prisons.  Tr. at 56.  He offered no information concerning how many have died or how many presently reside in the State or in District 1.  Mr. Cooper speculated that the deduction of ineligible former prisoners from the count of eligible voters might drive the proportion of eligible black voters below 50.0%, PX-6, at 6, but he admitted he had not attempted the calculation necessary to verify that.  Tr. at 95-97.  The Court declines to credit Mr. Cooper's unsupported speculation in this regard.

38.    Dr. Swanson reported the results of annual surveys taken by the Social Science Research Center at Mississippi State University.  Tr. at 976-78.  Every year the survey of

Mississippians revealed, consistent with the CPS, that the percentage of eligible blacks registered to vote in Mississippi slightly exceeds the percentage of eligible whites. *Id*. at 978. The survey does not ask whether respondents voted in a particular election but rather determines how often they vote. Majorities of both blacks and whites report that they always vote, but the percentage of blacks so responding always slightly exceeds the percentage of whites. Plaintiffs have not challenged the reliability of the Mississippi State surveys in any way.

39. Plaintiffs also claim white voter turnout exceeds that of blacks in District 1, indicating that black voter turnout is depressed in the District. Precedent extending over the last quarter of a century establishes that blacks and whites both have an equal opportunity to participate in the political process and to elect candidates of their choice. The Fifth Circuit approved Judge Lee's finding that "in recent years Mississippi's African-American and white citizens have maintained virtual parity in voter turnout." *N.A.A.C.P. v. Fordice*, 252 F.3d 361, 368 (5th Cir. 2001). In *Shelby County v. Holder*, 570 U.S. 529 (2013), the United States Supreme Court relied on CPS data to show that in 2004, the last election before Congress amended the Voting Rights Act in 2006, Mississippi had a black registration percentage of 76.1%, the highest among the covered States, and 3.8% more than the white registration percentage. *Id.* at 548. In the 2012 election, the Census Bureau found that "African-American voter turnout exceeded white voter turnout in five of the six States originally covered by § 5, with a gap in the sixth State of less than one-half of one percent." *Id.*

40. To overcome that factual history, Plaintiffs rely only upon their evidence of turnout in Mississippi in the 2020 general election. Plaintiffs' expert Dr. Traci Burch's whole analysis of voter turnout in District 1 hinges on a single election year, 2020. As discussed below, there is no

reason to believe that 2020, during the height of the COVID-19 pandemic, was a typical year to study turnout, much less black voter turnout.

41.     Experts for both sides initially based their turnout estimates for 2020 on the CPS, the same source used by the Supreme Court in *Shelby County*.  Plaintiffs' expert Dr. Burch, however, miscalculated the turnout, erroneously finding the CPS to show that white turnout exceeded black turnout.  This Court is familiar with that issue because it was the basis for continuing the first trial date in this matter and the Court's later order on expert fees.  [Dkt. #215].  Dr. Swanson established that the CPS showed a black turnout of 72.9% and a white turnout of 69.8%.  DX-9.  Dr. Burch therefore turned to an analysis of two sources of data to try to analyze black voter turnout to find numbers lower than that reported by CPS and the Mississippi State surveys.

42.     In her first method, Dr. Burch used King's ecological inference, a statistical method she had never previously used in her published work, to analyze the entire Mississippi voter registration file obtained from the office of the Secretary of State.  PX-39, at 10.  She began by attempting to assign each name to a census block group as reported by the Census Bureau, but she was unable to put 240,527 registered voters in any location.  PX-39, at 10 & n.28.  Defendants' expert Dr. Bonneau explained that while King's ecological inference "may be the best estimates we can get . . . they are not unproblematic . . . [because] the results are highly dependent upon how the data are specified."  Tr. at 816.  He explained that studies show the assumptions made by the analyst can create "varying results with the EI."  *Id*.

43.     Using these admittedly incomplete numbers, Dr. Burch concluded that the white turnout percentage exceeded the black turnout percentage.  However, when she revised her calculations to account for the missing voters, her calculations were inconclusive on their face.

DX-9, at 16, Table 3. The white turnout in District 1 ranged between 68% and 71%, and the non-white turnout, including blacks and all other races, ranged between 23% and 83%. *Id*. The failure to calculate black turnout at all, coupled with the broad scope of uncertainty about turnout, renders it impossible to conclude whether white or black turnout is higher. Furthermore, Dr. Burch's lack of experience with King's EI and her acknowledgment that something had to be done to correct for a quarter of a million missing names makes it impossible to rely on her initial calculation. Accordingly, her work with the Secretary of State's voter file does not reliably establish racial turnout in 2020.

44. Dr. Burch, of course, has substantial experience with the simple arithmetic and the logistic regression that she used to analyze another set of data provided by the 2020 Cooperative Election Study ("CES"). PX-51. CES purported to take a survey of 462 Mississippi residents and to compare it to the Secretary of State's records to verify whether the participants had voted in 2020. Both the survey and the verification have significant problems.

45. First, the use of year 2020 for a survey (CES or otherwise) is problematic. Plaintiffs' expert Cooper explained that the Census Bureau had difficulty conducting reliable surveys in 2020 because of the pandemic. Tr. at 99. In fact, Cooper testified that he intentionally removed 2020 survey data from his data set used in formulating his socioeconomic analysis because, as he explained to the Court, he held concerns over the reliability of 2020 data given the COVID-19 pandemic. *Id*. at 87-88. He and Dr. Swanson agreed that some Census Bureau data simply were not made available for 2020 because the surveys were unreliable. *Id.*. at 99, 986. There is no reason to believe that a survey of black voter turnout during the 2020 election year at the height of the COVID-19 pandemic is reasonable for Dr. Burch to have relied on.

18

46.     In any event, Dr. Burch could not establish that the survey taken on behalf of CES had produced a reliable sample for 2020.  CES purchased a survey from an entity called YouGov, about which the record reveals nothing except that it conducted its survey through the internet. PX-51, at 6.  Dr. Swanson testified without contradiction that internet surveys are inferior to surveys conducted by personal interviews and that they tend disproportionately to exclude disadvantaged communities, such as Mississippi blacks.  Tr. at 988, 1134-36.  Plaintiffs did not explain why the YouGov survey should be considered reliable notwithstanding these defects.

47.     The verification process employed by CES also relies on the work of others.  CES took the names in the YouGov survey and checked whether the Secretary of State recorded them as having voted in 2020.  The Secretary of State's records, however, necessarily rely on a long chain of hearsay.  Poll workers in each precinct record the names of everyone who shows up to vote, but human error makes it possible that an individual could have voted without being accurately recorded.   Miss. Code Ann. § 23-15-545.  The poll worker's records go to the county election commission, which sends its records to the Secretary of State.  Tr. at 1245-46.  A mistake anywhere along the chain could result in a voter being erroneously recorded as not having voted. The possibility of such mistakes is why both federal and state law account for these issues by making any action on a voter's registration status for failure to vote occur over several elections and not a single election.  *See Husted v. A. Phillip Randolph Inst.*, 584 U.S. 756, 772 (2018).  *See also* 52 U.S.C. § 20507; Miss. Code Ann. § 23-15-152.  Finally, CES could have read the records incorrectly.

48.     In addition to problems with the survey and the verification, potential problems arise with weighting for CES respondents.  Unless a sample is a perfect reflection of the relevant population, each participant must be weighted on the basis of such factors as age, sex, and race to

render the sample more representative of the whole. CES provided weights to use when analyzing its sample, but Dr. Burch could not explain why or whether those weights were appropriate. Tr. at 633-36. Dr. Swanson noted that some weights were very high; for instance, some young black males each accounted as an equivalent of over ten participants. *Id*. at 992-93. In addition, the few black respondents rendered the results less reliable. Dr. Burch confirmed that the numbers of Native American, Hispanic, and Asian respondents were too small to allow accurate analysis, *id*. at 648-51, but she did not explain why the number of black participants was substantially more reliable. All witnesses confirmed that a larger sample is generally better than a smaller sample. *Id*. at 571-72, 993, 1025-26.

49.     Dr. Burch claimed that both her arithmetical analysis and her regression analysis of the CES data showed that the percentage of whites who voted in 2020 exceeded the percentage of blacks. PX-51, at 6. She claimed the results to be statistically significant, but Dr. Swanson criticized her for failing to conduct and disclose the diagnostic tests necessary to determine the reliability of her work. Tr. at 1156, 1159, 1166, 1183-84. Instead, she displayed the coefficients resulting from her work as Model 1 in Table 2 of her Appendix. PX-59, at 16. In her testimony, Dr. Burch confirmed counsel's understanding that "there is a difference between Black and White, and Black is negative." Tr. at 643. She did not claim the size of that gap to have been clearly established, so she never testified that the gap was sufficient to erase the gap by which black eligible voters exceed white eligible voters.

50.     At the legislative redistricting trial earlier this year, Dr. Byron Orey, who testified in this trial on a different issue, performed the same analysis of the CES data as Dr. Burch did here. He admitted that the calculations did not reach the "95 percent confidence level," which the Court described as "typically the lowest level of statistical significance that is used to determine the

reliability of the estimates." *Mississippi State Conf. of the N.A.A.C.P. v. State Board of Election Comm'rs*, Civil Action No. 3:22-CV-734-DPJ-HSO-LHS, 2024 WL 3275965, at *47 (S.D. Miss. July 2, 2024). That Court made no finding as to comparative racial turnout in 2020, but found, "at the very least, that whatever gap existed in the turnout in Mississippi in 1965 is greatly reduced today." *Id.* at *49.

51.     Dr. Burch observed that the percentages of Mississippians who reported voting in 2020 to CPS would result in turnout higher than the actual turnout reported by the Secretary of State. She acknowledged that overreporting affects the relative turnout of blacks and whites only in the event of "differential overreporting of voter turnout by race." PX-39, at 2. She cited a single scholarly article to show that the CPS "consistently overestimates Black turnout even more so than White turnout." PX-39, at 3, citing PX-181, Ansolabehere, Fraga & Schaffner*, The Current Population Survey Voting and Registration Supplement Overstates Minority Turnout* (2022). Dr. Burch confirmed that this study did not examine Mississippi, but examined other Southern states, which is why she felt that she could use it along with the CPS in an expert report in Louisiana after she had rejected the CPS in her reports in this case. Tr. at 670-71. Defendants' expert Dr. Bonneau disagreed with the concept that blacks would falsely report voting behavior at an incidence rate higher than whites, credibly stating that he had not seen such evidence in his experience. *Id*. at 886.

52.     Moreover, other evidence before the Court reveals that Mississippi is substantially different from other Southern states in other aspects of black voting behavior. As already noted, the Supreme Court in *Shelby County* found that black registration in Mississippi substantially exceeds that in other Southern states formerly governed by Section 5 of the Voting Rights Act. In addition, the recent report of the Brennan Center for Justice at New York University shows that in

2020 the turnout gap between white and black in Mississippi was negative, meaning that the black turnout percentage exceeded the white turnout percentage. DX-5, at 14. The declared purpose of the study was to show that the Supreme Court had been wrong in *Shelby County* in finding the racial gap to have disappeared, declaring that "the gap has consistently grown since 2012 and is growing most quickly in parts of the country that were previously covered under Section 5 of the 1965 Voting Rights Act." DX-5, at 3. The fact that the finding on Mississippi contravenes the expressed purpose of the study constitutes a guarantee of trustworthiness within the meaning of Fed. R. Evid. 807(a)(1). The authors of the Brennan Center report had no reason whatsoever to misrepresent Mississippi's numbers to make Mississippi look good.

53. Recognizing that the Ansolabehere study did not analyze overreporting for Mississippi specifically, Dr. Burch attempted to calculate differential overreporting from the CES data. She simply took the numbers of respondents of each race whom CES purported to have validated as having voted and divided them by the number of respondents who reportedly told YouGov that they had voted. PX-39, at 6. In any event, given Dr. Burch's inability to substantiate the reliability of YouGov's survey or CES's validation, this Court cannot consider her calculations sufficient to undermine the CPS data on which the Supreme Court and other courts have traditionally relied.

54. Whatever the merits of Dr. Burch's calculations concerning the 2020 election, no witness testified that the 2020 election was typical in any way. Indeed, Dr. Burch agreed that she had made no such claim. Tr. at 621. By contrast, the Mississippi State study shows, without contradiction, that over a number of years a larger percentage of blacks than whites have reported themselves as always voting. *Id*. at 977-78. This evidence, together with the 2020 survey reports of both CPS and the Brennan Center, satisfies this Court that the white turnout percentage in 2020,

22

as in most recent years, did not exceed the black turnout percentage. If there may be any doubt about 2020 turnout, Plaintiffs have certainly not shown a gap sufficient to erase the lead in eligible voters indisputably enjoyed by blacks under the 2020 Census.

**Senate factor 1**

55. Senate factor 1 concerns the "extent of any history of official discrimination in state . . . that touched the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process." *Gingles*, 478 U.S. at 36–37 (quoting S. REP. NO. 97-417, at 28-29 (1982), as reprinted in 1982 U.S.C.C.A.N. 177, 206–07).

56. Defendants largely do not dispute Mississippi's past history of discrimination in the State as having affected blacks' ability in the past to register to vote, vote, and otherwise participate in the democratic process. They do, however, challenge the concept that such history places significant burdens on black voters in today's day and age. Plaintiffs' political science expert Dr. Marvin King agreed that in looking at each of the Senate factors, what is important is the effect of those factors—whether that is an effect on black voters' ability to vote, participate in the electoral process, or obtain success at the ballot box. Tr. at 1365.

57. Plaintiffs' expert Dr. James Campbell testified about Mississippi's history of racially discriminatory voting laws and procedures, but he testified as to only three laws currently in effect that he contends have a racially discriminatory effect, admitting that most of the laws that he would characterize as state-sanctioned methods of discouraging voting by black Mississippians are not in effect today. Tr. at 435, 447. He testified that felon disenfranchisement, "strict" voter ID laws, and absentee voter laws are recent examples. *Id*. But Dr. Campbell testified that these laws are race neutral. *Id*. at 447. Lawsuits challenging their legality have been repeatedly dismissed by federal courts as nondiscriminatory, or because the plaintiffs apparently deemed them

23

not sufficiently warranted to be worth pursuing to final judgment. *See, e.g., Harness v. Watson*, 47 F.4th 296, 309-10 (5th Cir. 2022) (holding the felony disenfranchisement law was not motivated by discriminatory intent but was an attempt "to eliminate several objections contained in the then-recent findings of the Civil Rights Commission."); Order, Dkt. #60, *O'Neil v. Hosemann*, Civil Action No. 3:18-cv-00815-DPJ-FKB (S.D. Miss. Oct. 30, 2020) (voluntarily dismissing lawsuit filed by multiple plaintiffs, including the N.A.A.C.P., challenging Mississippi's absentee-ballot procedures). Plaintiffs have neither alleged nor proven that there is anything illegal about Mississippi's laws in these three cases. Moreover, Dr. Campbell did not testify about any specific effect those laws have had on black voters in District 1 election contests.

58.     Mississippi's Assistant Secretary of State for Elections Kyle Kirkpatrick noted that only certain *state* felonies result in disenfranchisement. Tr. at 1216. Federal felony convictions and felony convictions in other states do not count. *Id*. He testified that eligible voters in jail, black and white, are able to vote. *Id*. at 1218.

59.     Moreover, Kirkpatrick's office actively promotes voter registration through deliberate efforts targeted not only at adults of all ages, including students just turning voting age and at Mississippi's colleges and universities. Tr. at 1218-22. As for absentee ballot voting, Kirkpatrick described a liberal process giving individuals up to 45 days before an election for a voter to cast an absentee ballot for a host of reasons, which include work schedule limitations, travel (or temporary residence) outside the county on election day, and any temporary or permanent disabilities that hamper voting. *Id*. at 1230-32. In fact, a law passed by the Mississippi Legislature this year streamlines the absentee ballot process and allowed for early absentee voting. *Id*. at 1233-34.

60.     As to Mississippi's current voter ID law, Kirkpatrick explained that the law

provided various remedies available for someone who arrives at a polling place without identification; his testimony demonstrates there is little chance a prospective, registered black voter will be denied the opportunity to vote because of that law. Tr. at 1239-41. Kirkpatrick testified that the electronic State Election Management System records any voter forced to vote by affidavit ballot because of an identification problem at the polls; moreover, the testified the data shows affected affidavit voters constitute a "very, very low number, into a fractional percentage of the total number of votes cast." *Id*. at 1242.

61.     Kirkpatrick also testified about the "bottom-up" election and voting facilitation process governing Mississippi's elections. Tr. at 1198-1202. He testified that the Secretary of State's office maintains an elections hotline, which is available year-round for election officials and the general public who have any questions about voting. *Id*. at 1202. He testified about the many methods that black voters have to register to vote, with online access to the necessary forms, or through visits to various governmental offices. *Id*. at 1206-08.

**Senate factor 2**

62.     Senate factor 2 concerns the extent to which voting in the elections of the state or political subdivision is racially polarized. *Gingles*, 478 U.S. at 36–37 (quoting S. REP. NO. 97-417, at 28-29 (1982), as reprinted in 1982 U.S.C.C.A.N. 177, 206–07).

63.     Defendants' expert Dr. Bonneau testified about the important role a candidate's party plays in driving votes by blacks for one candidate or another. He did not dispute the calculations by Plaintiffs' expert Dr. Orey that established the relative black support for certain candidates. Tr. at 794. But Dr. Bonneau attributes blacks' support for certain candidates as primarily motivated by party and noted that because Mississippi Supreme Court contests are nonpartisan the "important cue" of party affiliation of the judge is removed as information for the

voter. *Id*. at 798.

64.     Yet Dr. Bonneau testified the parties do a good job of filling this information void. He described those efforts at length, Tr. at 804-07, including how Democratic Party leaders tell voters who the Democrat really is so as to provide the "important cue" that is missing from nonpartisan judicial elections. He noted the Democratic Party through Democratic Representative Bennie Thompson does an especially good job of getting this information to black voters. *Id*. at 799. What those efforts reveal is that the differences in racial voting are not some nefarious effort by white voters to vote against black candidates, but rather black voters' now deep-rooted entwinement with the Democratic Party establishing that political party drives the differences in voting. *Id*. at 814-15.

65.     Typically, Dr. Bonneau testified that even on occasions when a black-preferred candidate lost a race in a seat elected by the District 1 lines, it was not because of racial polarization but because of party polarization. Tr. at 820. Plaintiffs' expert Dr. Orey testified that in Mississippi party and race are "inextricably linked." *Id*. at 252. Their historian, Dr. Campbell, testified that party and race in Mississippi are inseparable, describing the two categories as "a perfect match." *Id*. at 440. One of their experts, former Justice Oliver Diaz, agreed on the strong relationship between party and race. *Id*. at 298. He noted his admission that "[p]arty politics continue to play a major role in judicial elections in general and even more acutely in elections to the Supreme Court." *Id*. at 311. Plaintiff Ty Pinkins agreed, testifying that "[p]olitical parties matter to voters." *Id*. at 141. So, as Plaintiffs' historian Dr. Campbell acknowledged, it could be race or it could be party, *id*. at 449, but evidence of racially polarized voting as reflecting white motivation to deny black Mississippians electoral success on account of race is not present.

**Senate factor 3**

66.     Senate factor 3 concerns the extent to which a state or political subdivision has used unusually large election districts, majority vote requirements, anti-single shot provisions or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group. *Gingles*, 478 U.S. at 36–37 (quoting S. REP. NO. 97-417, at 28-29 (1982), as reprinted in 1982 U.S.C.C.A.N. 177, 206–07).  Plaintiffs put on no evidence of Senate Factor 3 that would warrant a finding of this factor in their favor.

**Senate factor 4**

67.     Senate factor 4 concerns "if there is a candidate slating process, whether the members of the minority group have been denied access to that process." *Gingles*, 478 U.S. at 36–37 (quoting S. REP. NO. 97-417, at 28-29 (1982), as reprinted in 1982 U.S.C.C.A.N. 177, 206–07).  "There is no candidate slating process in Mississippi." *Magnolia Bar*, 793 F. Supp. at 1409.  Plaintiffs put on no evidence of Senate Factor 4 to warrant a finding of this factor in their favor.

**Senate factor 5**

68.     Senate factor 5 concerns the extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process. *Gingles*, 478 U.S. at 36–37 (quoting S. REP. NO. 97-417, at 28-29 (1982), as reprinted in 1982 U.S.C.C.A.N. 177, 206–07).  This evidence is relevant only to explain depressed levels of black participation.  S. REP. NO. 97-417, at 29, n.114, as reprinted in 1982 U.S.C.C.A.N. 177, 207 n.114.  The prior discussion of turnout shows that black participation is not depressed, so there is nothing to explain.  The Court will nevertheless address Plaintiffs' irrelevant evidence.

27

69.    Defendants largely did not dispute that black Mississippians lag behind whites in areas of education, employment, and health, but they did challenge that there was evidentiary proof that it affected black voters' ability to participate effectively in the political process. The proof is in the pudding when you look at black-preferred candidates' performance in District 1 races over the last 20 or so years, indicating that black voters participate effectively and that black-preferred candidates perform well despite the poorer educational or employment attainment of blacks or their relatively poor health as compared to their white counterparts.

70.    Plaintiffs attempted to elicit such proof from Plaintiff Ty Pinkins who claimed that "access to voting" was an issue in the Mississippi Delta; but when asked to explain what he meant, Pinkins testified that those voters know "they can vote and they can go to the polls," but they are depressed when they "can't elect the person that they feel best represents them or best understand their circumstances." Tr. at 124-25. What Pinkins described is opportunity, and he described no instances of barriers to voting. And his assessment that black voters are disappointed in their preferred candidates' performance, *id*., is not proof that those voters cannot participate effectively in the political process. In any event, the evidence of recent election results in District 1 contravenes the idea that black voters should be "depressed" about their candidates' performance. They may not win every election, but they *usually* win when they run.

71.    Pinkins testified that he is a motivated voter, testimony this Court will credit. Tr. at 125-26. He is an example of a black voter has been fully able to participate in the political process in Mississippi, something he admitted. *Id*. at 135. But his allusions to "games and tricks that are put in place so [black voters] can't elect the people that they would" are unsupported by any hard evidence. *Id*. at 126.

72.     Plaintiffs' witness Judge Aelicia L. Thomas, a Bolivar County Court Judge, testified about what she perceived as apathy among black voters in the Mississippi Delta specifically.  Tr. at 162.  She testified not that she perceived that there were barriers to voting, but rather that black voters in the Delta were apathetic based on their (mistaken) assumption that their "[v]ote[s] don't matter."  *Id*.  She testified about how "everybody is going to come out" when it is an election they care about (like President for example), but in "off years" there will be "not so much interest."  *Id*. at 163.  Plaintiff Dyamone White echoed her testimony, complaining about how black voters acted as if they did not care, using Brandon Presley's race against Governor Tate Reeves as an example. *Id*. at 344.

73.     Judge Thomas, like Ty Pinkins, is an active voter who regularly votes all the time. *Id*. at 170.  Plaintiff White testified that she is very active in the political process in Mississippi and always votes.  *Id*. at 338, 363-64.  So is Plaintiffs' witness Constance Slaughter-Harvey, who likewise testified that she is an engaged and active voter.  *Id*. at 480.

74.     White generally described black voters as having trouble with "transportation" relative to voting, Tr. at 345, noting one instance when a voting precinct was "15-20" miles from someone's home near Edwards.  *Id*. at 365.  But during cross-examination, she admitted she could not state that for certain without further investigation.  *Id*.  Plaintiffs' expert Dr. Burch's testimony on this point acknowledged that she did not identify any voter in District 1 who was unable to vote because of what she asserted were barriers to voting.  *Id*. at 608-12.  She also acknowledged that there are multiple services that provide transportation to black voters who lack the ability to get to the polls on voting days.  *Id*.  She also agreed that all voters, black or white, have the opportunity to go to the polls and vote.  *Id*. at 368.  The sample ballots distributed by Representative Thompson provide a phone number to call for transportation to the polls.  DX-7, at 5.

**Senate factor Six**

75.     Senate Factor 6 concerns "the use of overt or subtle racial appeals in political campaigns." *Gingles*, 478 U.S. at 37 (quoting S. REP. NO. 97-417, at 28-29 (1982), as reprinted in 1982 U.S.C.C.A.N. 177, 206–07).

76.     Plaintiffs offered evidence of appeals based on race through their experts former Mississippi Supreme Court Justice Oliver Diaz and Dr. Marvin King.  Plaintiffs' proof of their use in recent times in Mississippi Supreme Court elections was largely historical and not recent. Plaintiffs' historian Dr. James T. Campbell offered brief examples of racial appeals dating back 80 years ago.  Tr. at 441.  Justice Diaz, for example, offered only two examples and neither of them was recent.  He testified about a race 20 years ago between former Justice James Graves and Samac Richardson (a race Justice Graves won) and testified that Richardson's use of an ad stating that he was "one of us" was a racial appeal.  *Id*. at 303.  Another of his examples involved Chet Dillard's advertisement in his unsuccessful 1991 race against Justice Fred Banks.  *Id*. at 306.

77.     Although Justice Diaz claimed racial appeals can be "very important in – a race – in an election race," he offered no testimony about instances when a racial appeal (much less a recent one) was ever effective.  He acknowledged that both candidates who used racial appeals in his examples did not win.  *Id*. at 321-22.  On redirect examination, Justice Diaz testified about an internet ad allegedly run by an outside third party against Latrice Westbrooks in her 2020 race against Justice Griffis, but the singular fact that the ad used Judge Westbrooks's photograph and stated that she had a liberal agenda in which she ignored the law merely constitutes a common political attack on all Democratic candidates.  The Court is not convinced this constitutes a sort of racial appeal within the meaning of Senate Factor 6.  *Id*. at 330-36; PX-146.  After all,

Congressman Thompson's sample ballot also included a photograph of Judge Westbrooks. DX-7, at 1.

78.     Plaintiffs' expert Dr. King refused to accept the premise that more recent racial appeals,[7] which he contended impacted current black voters' opportunity to elect their preferred candidates, are of more significance under *Gingles* than older ones. Tr. at 1366. He claimed that racial appeals from years long past became "entrenched with the [white] voters" and influence their behavior today. *Id*. But this is quite the logical leap. The question is whether racial appeals have motivated a white bloc of voters to vote against a black-preferred candidate to deny black voters an equal opportunity to elect their preferred candidate in relatively recent races. The fact that racial appeals may have happened long ago irrelevant to answering this question in the present sense. Dr. King's claim that Senate factor 6 only asks whether "racial appeals were made" is simply mistaken. *Id*. at 1372.

79.     As for recent racial appeals, Dr. King testified about a comment made by a Tishomingo County state House Representative whose district is geographically far from white voters in District 1. Tr. at 1371-72. But how that racial appeal affected white voters in District 1 as to any one race is left entirely unclear. The same can be said about a racial appeal made by former State House representative Gene Alday, who lost his primary after making statements about blacks in Tunica County, which is not within the District 1 lines. *Id*. at 1382.

---

[7] Dr. King testified that black candidates "may . . . also be guilty of making racial appeals." Tr. at 1369. He says the emphasis is on the impact such racial appeals could have because they will "have different impacts when Whites are the majority making that appeal as opposed to when Blacks are the minority and mak[e] that same appeal." *Id*. Of course, Dr. King mistakenly believes that whites constitute a majority of the eligible voting age population in District 1 when, in fact, blacks—not whites—constitute the majority. *Id*. at 1396-97.

80.    In any event, the white candidates appearing on the District 1 ballot whom Dr. King believed to have indulged in racial appeals, except for Senator Cindy Hyde-Smith, were defeated, and Dr. King could not testify as to whether Senator Hyde-Smith purposefully made a racial appeal or believed she was engaging in such an appeal. *Id*. at 1376-77. He also could not tie her claimed racial appeals to any level of success vis-à-vis white voters in her campaigns except that she won. *Id*. at 1380-82. Dr. King acknowledged that the two instances he claimed in which Senator Hyde-Smith made racial appeals actually hampered her ability to fundraise during her 2020 campaign, but he insisted that they must have helped her for the simple fact that she beat Mike Espy in both races. *Id*. at 1382. Of course, Mike Espy carried District 1 in those races.

**Senate factor 7**

81.    Senate factor 7 concerns the extent to which members of the minority group have been elected to public office in the jurisdiction. *Gingles*, 478 U.S. at 36–37 (quoting S. REP. NO. 97-417, at 28-29 (1982), as reprinted in 1982 U.S.C.C.A.N. 177, 206–07). "[T]here have been 'significant increases in the number of African-Americans serving in elected offices'; more specifically there has been approximately a 1,000 percent increase since 1965 in the number of African-American elected officials in the six States originally covered by the Voting Rights Act." *Shelby County*, 570 U.S. at 547 (quoting H.R. Rep. 109-478, at 18 (2006), 2006 U.S.C.C.A.N. 618, 527).

82.    Plaintiffs' expert Dr. King claims black candidates in Mississippi face substantial barriers to political office, but Dr. King primarily focuses on black candidates' success in statewide elections. Tr. at 1396. He performed no analysis of whether blacks constitute a proportional membership of the Mississippi House of Representative or State Senate seats located within District 1. *Id*. at 1392. He did not analyze the percentage of local officials who are black in the

counties that make up District 1. *Id.* He did not analyze black officials' performance in the Mississippi Court of Appeals seats in counties that make up District 1. *Id.* at 1395.

83. The Court finds it reasonable to conclude that increased black voter participation in Mississippi in recent decades has led to considerable electoral success by minority candidates in Mississippi. Plaintiffs' expert Dr. Orey testified that he was unaware of testimony in federal court by the N.A.A.C.P.'s expert, Dr. Allan Lichtman, about 25 years ago, *see N.A.A.C.P. v. Fordice*, 252 F.3d at 368, to the effect that black and white voter participation had by then reached parity in Mississippi. Tr. at 263. But as reflected in one of the publications identified in his CV, which was admitted into evidence, Dr. Orey has previously written that "Mississippi has the largest number of blacks serving in the legislature and currently leads the nation in the number of black elected officials." "Evolution and Devolution of the Voting Rights Act? Black Descriptive and Substantive Representation" In <u>Minority Voting in the United States.</u> August 2015. Editors: Kyle Kreider and Thomas Balidino (Praeger). Byron D'Andra Orey, Gloria Billingsly and Athena King. As Dr. Orey has written, "[o]ver the years, Mississippi has consistently possessed the largest percentage of black state legislators in the country." *Id.* Dr. Orey made these findings and lists this professional publication on his Curriculum Vitae. PX-10, at 21. In any event, blacks have been elected in District 1 seats. Currently, three out of the five available seats for public office in District 1 (the relevant "jurisdiction" for Senate factor 7 purposes) are held by blacks.

84. The Court finds that minority election success in District 1 is not a novel or fleeting occurrence. Even in District 1 as it was then constituted in 1986—*i.e.*, before the removal of Attala and Winston Counties and the addition of Claiborne, Jefferson, and Copiah Counties, see *supra*, ¶ 8—former Mississippi Supreme Court Justice Reuben Anderson, who is black, sought and obtained the support of white voters in District 1. *See* Tr. 737-40. He won District 1 with

approximately 73% of the vote in 1986. *Id*. Justice Anderson testified that he had the support of prominent white businesspeople and politicians and was able to raise money to compete, handily defeating Richard Barrett, an avowed segregationist. *Id.* He also testified that he successfully worked to have his own supporters back his successor, Justice Fred Banks, who is also black; Justice Anderson testified that as a candidate running to retain his seat on the Court, Justice Banks took the time to "get out and meet and shake hands with people," ultimately winning his bid for reelection in District 1 under the current district lines in 1991, with 30% of the white vote. *Id.* at 741-47. The Court finds these examples to be compelling evidence that minority candidates have for many years been able to compete successfully for election to the Supreme Court in District 1 when they actively sought the support of white voters.

**Senate factor 8**

85.     Senate factor 8 concerns whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group. *Gingles*, 478 U.S. at 36–37 (quoting S. REP. NO. 97-417, at 28-29 (1982), as reprinted in 1982 U.S.C.C.A.N. 177, 206–07).

86.     Plaintiffs offered no evidence about how this factor has any bearing on assessing the totality of the circumstances with respect to the Mississippi Supreme Court. The Mississippi Supreme Court is not a representative body, yet this factor appears to ask whether individuals making up the body have responded to "needs" that the body is powerless to address. This factor also calls into question the Mississippi Supreme Court's purpose or charge under the State's Constitution and its important role in maintaining separate branches of government.

87.     Plaintiffs' expert Justice Oliver Diaz testified that there are nine Justices and which District they are elected from does not affect the role they play on the Court or in decision making.

Tr. at 307. All nine Justices are "equally responsible for all of the cases that are pending at the Mississippi Supreme Court." *Id*. This aligned with former Mississippi Supreme Court Justice Ann Lamar's testimony on this point in which she said she never saw herself "as representing any constituency when [she] was on the [C]ourt." *Id*. at 769. The Justices pledge "to do justice to the law and justice to the facts and justice to the individual cases that come before [them]." *Id*. This was a common attitude shared by members of the Court. *Id*.

88.     When Plaintiff Dyamone White was asked what she expected the Mississippi Supreme Court to do about what she described as "obstacles" black Mississippians face, she said "nothing," acknowledging that elected officials' responsiveness is more relevant to members of Mississippi's legislative bodies and executive positions. Tr. at 370. Plaintiffs' witness Senator Simmons testified this case was not necessarily about obtaining any certain policy result or different ruling from the Mississippi Supreme Court, but about obtaining more blacks on the Court. *Id*. at 724-26. And Plaintiffs' expert Dr. King could not persuasively explain how the Mississippi Supreme Court would be more responsive to black voters' needs. *Id*. at 1398-1402.

**Senate factor 9**

89.     Senate factor 9 concerns "whether the policy underlying the state or political subdivision's use of such voting qualification, prerequisite to voting, or standard, practice or procedure is tenuous." *Gingles*, 478 U.S. at 36–37 (quoting S. REP. NO. 97-417, at 28-29 (1982), as reprinted in 1982 U.S.C.C.A.N. 177, 206–07).

90.     In analyzing the "tenuousness" factor in *Magnolia Bar Ass'n, Inc*, 793 F. Supp. at 1417, Judge Barbour accepted the State's argument that "the east-west configuration of the [Supreme Court] district lines fosters political and economic diversity," and on that basis found that "there are valid state policies for the east-west configuration of the supreme court district

lines." Dr. Swanson's analysis of socioeconomic conditions in Mississippi's 82 counties shows that the east-west division continues to exhibit diversity. DX-1, Ex. III.H.3.a.

91.     On this point, Defendants' expert Dr. Bonneau testified that state supreme courts are "collegial institutions" and that those positions are not charged with "pandering" to what "the majority of their constituents want" because of the risk such activity would lead to disharmony and more ideological infighting, hampering the institution's work. Tr. at 802. His testimony was compelling support for the notion that the east-west running Supreme Court district lines in Mississippi provide some beneficial effect for maintaining the institutional integrity of that Court.

92.     Dr. Bonneau contrasted a Supreme Court district drawn in its current fashion with what he described as representative bodies with extreme polarization of their noncompetitive seats, like Congress. Tr. at 801. Many members of Congress do not need to moderate toward the middle or take into account the "positions of those who don't agree with them seriously because they know they're going to win anyway," which Dr. Bonneau explained leads to "incredibly ineffective policymaking, decisional behavior, and so on." *Id*. And so, the non-partisan Supreme Court seats drawn in a fashion to avoid contributing to polarization of voter groups has benefit for the institution. *Id*. at 803.

93.     Assistant Secretary of State Kirkpatrick testified that the lines as drawn foster judicial independence. Tr. at 1257. Having the Justices elected over a wide area, both geographically and population-wise, prevents a single case or outcome from causing a Justice to lose an election and, otherwise, that concern could factor into a particular judge's decision-making. *Id*. Justice Ann Lamar gave real world testimony on this point and explained that how the districts were currently drawn (east-to-west) meant she was not beholden to any one constituency, freeing her to make legally sound decisions without fear of voter retribution. *Id*.

## PROPOSED CONCLUSIONS OF LAW

94.     To begin with, Congress did not create a private right of action to enforce Section 2 of the Voting Rights Act. *Arkansas State Conf. N.A.A.C.P. v. Arkansas Bd. of Apportionment*, 86 F.4th 1204 (2023), *reh'g den.*, 91 F.4th 967 (8th Cir. 2024); *contra Robinson v. Ardoin*, 86 F.4th 574, 588 (5th Cir. 2023). Indeed, the plain text of the Voting Rights Act shows that Congress grants the exclusive enforcement authority over the Act to the Attorney General of the United States. 52 U.S.C. § 10308(d). The Court concludes that Defendants preserved this defense for trial and any appeal in both their Answer to Plaintiffs' Amended (operative) Complaint ([Dkt. #138 at 21, Thirteenth Defense]) and the governing Pretrial Order ([Dkt. #228], at 4, ¶ 6). Nevertheless, the *Robinson* decision is binding on the Court.

95.     The Fifth Circuit has recently made clear that any consideration of a claim under the Voting Rights Act must begin with the language of the statute. *Petteway v. Galveston County*, 111 F.4th 596, 604 (5th Cir. 2024) (en banc). Plaintiffs assert their claim under § 2 of the Voting Rights Act, 52 U.S.C. § 10301, which states as follows:

(a) No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color, or in contravention of the guarantees set forth in section 10303(f)(2) of this title, as provided in subsection (b).

(b) A violation of subsection (a) is established if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. The extent to which members of a protected class have been elected to office in the State or political subdivision is one circumstance which may be considered: Provided, That nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population.

96.     Here, the "standard," per 52 U.S.C. § 10301(a), challenged by Plaintiffs is the boundary surrounding District 1 and enabling the residents therein to vote for Supreme Court Justices.  Their witnesses have mentioned other standards that affect voting all over Mississippi, but the District 1 boundary is all they seek to change.

97.     A standard violates Section 2(a) only when it "results in the denial or abridgement of the right of any citizen of the United States to vote on account of race or color."  52 U.S.C. § 10301(a).  No decision of the Fifth Circuit explains which party has the burden of proving that any "denial or abridgement" takes place "on account of race or color," rather than something else. In rejecting a Section 2 challenge to the election of the Supreme Court of Texas at large, a district court explained its view of the proper order of proof:

> … Plaintiffs have the duty in the first instance, to demonstrate some evidence of racial bias through the factors used in the preconditions and totality of circumstances test.  Upon doing so, the burden shifts to the State to demonstrate some evidence of partisan politics (or some other issue) influencing voting patterns. If the State does so, then the Court must balance the relative strength of the evidence directed to each of the totality of circumstances factors to determine whether racial bias best explains the alleged vote dilution.

*Lopez v. Abbott*, 339 F.Supp.3d 589, 604 (S.D. Tex. 2018).  After balancing the evidence, that Court concluded, "Plaintiffs have not satisfied their burden to show that the voting methodology results in a denial or abridgment of the right of any citizen of the United States to vote on account of race or color."  *Id.* at 619.  This Court agrees that, with this element of a statutory violation, as with all others, Plaintiffs' evidence must outweigh that of Defendants.

98.     It is important to note at the outset that the boundary of District 1 has twice been held not to deny equal opportunity to black voters.  Judge Barbour upheld the use of the boundary for the Supreme Court in *Magnolia Bar Ass'n, Inc. v. Lee*, 793 F. Supp. 1386 (S.D. Miss. 1992), *aff'd,* 994 F.2d 1143 (5th Cir. 1993), *cert. denied*, 510 U.S. 994 (1993), and Judge Lee upheld its

use for the two Commissioners' positions[8] in *N.A.A.C.P. v. Fordice*, No. 3:92-cv-250-LN (S.D. Miss. July 7, 1999), *aff'd,* 252 F.3d 361 (5th Cir. 2001). In those cases, there was no evidence that black voters preferred either of the two white Justices or the two white Commissioners, but both Courts rejected the plaintiffs' Section 2 claims based on, among other things, victories by black candidates for the Supreme Court (Justice Reuben Anderson and Justice Fred Banks).

99. By contrast, *this* case's record unquestionably shows much greater success for black-preferred candidates within the boundary of District 1 since Judge Barbour's and Judge Lee's decisions in 1992 and 1999, respectively. Plaintiffs have not shown that circumstances have changed such that this Court should render a liability ruling different from Judge Barbour and Judge Lee in those cases.

100. The Fifth Circuit has declared, in accordance with the statute's language, that the standard alleged to have resulted in a denial of the right to vote, here District 1's boundary, must be shown to have brought about this alleged denial based on "race or color," and not political party. In other words, "§ 2 is implicated only where Democrats lose because they are black, not where blacks lose because they are Democrats." *League of United Latin Am. Citizens v. Clements*, 999 F.2d 831, 854 (5th Cir. 1993) (en banc) (hereinafter "*Clements*").

101. Recently, a three-judge panel, which heard substantially the same evidence as presented here concerning elections of Justices in District 1, found such evidence insufficient to show racial polarization in the district. Judges Leslie Southwick, Dan Jordan, and Sul Ozerden rejected the assertion that racial polarization existed in elections held in Supreme Court District 1

---

[8] The District 1 boundaries apply not just to Supreme Court elections but also to districts of the Public Service Commission and the Department of Transportation.

where "'party was not on the ballot.'"[9] [Dkt. #224] at 70-71 in *Miss. State Conf. of the NAACP v. State Board of Election Commissioners*, No. 3:22-cv-734-DPJ-HSO-LHS, 2024 WL 3275965, at *31-32 (S.D. Miss. July 2, 2024). This Court agrees, based on the evidence presented here, that party rather than race, explains polarization in District 1 elections. Because elections for Supreme Court Justices in District 1 are not racially polarized, Plaintiffs have failed to prove that their supposed injury is "on account of race or color" as required by Section 2(a).

102. Although the discussion could end there, the Court will also address the other requirements of Section 2 of the Voting Rights Act. As discussed above, Plaintiffs must also prove that, "based on the totality of the circumstances, … the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a)," by showing that blacks "have less opportunity than other members of the electorate to participate in the political process *and* to elect representatives of their choice." 52 U.S.C. § 10301(b) (emphasis added). Thus, Plaintiffs must show that blacks have less opportunity both "to participate in the political process" and "to elect representatives of their choice." *Id.* As explained below, the evidence here fails to prove either.

103. Whatever level of black participation is disclosed by the evidence, Plaintiffs must explain how the boundaries of District 1 presently deny them an equal opportunity "to elect

---

[9] Although party names are not on ballots for judicial elections in Mississippi, the three judge panel in the state legislative redistricting case acknowledged the evidence of partisan participation in those elections, and concluded:

> We agree with the Plaintiffs that not all voters would be aware of the partisan alliances behind individual supreme court candidates. Nonetheless, a high-enough percentage of voters knows which party supports which judicial candidate for us to reject Dr. Handley's factual claims as to these elections.

2024 WL 3275965, at *32.

representatives of their choice." The statute compels an examination of "the totality of the circumstances," but those circumstances will be strange indeed if they can show how control of four out of five offices in District 1 denies equality to black voters.[10]

104.    Plaintiffs have structured their case around the three prerequisites required by the Supreme Court's decision in *Thornburg v. Gingles*, 478 U.S. 30 (1986), as well as the so-called "Senate factors" listed in that decision. In that case, the Court identified three "preconditions for multimember districts to operate to impair minority voters' ability to elect representatives of their choice": (1) "the minority group must be able to demonstrate that it is sufficiently large and geographically compact to constitute a majority in a single-member district," (2) "the minority group must be able to show that it is politically cohesive," and (3) "the minority must be able to demonstrate that the white majority votes sufficiently as a bloc to enable it … usually to defeat the minority's preferred candidate." *Id.* at 50-51. "If a plaintiff fails to establish any one of these three preconditions, a court need not consider the other two, leaving the plaintiff with no remedy." *Robinson v. Ardoin*, 36 F.4th 574, 589 (5th Cir. 2023).

105.    It is not entirely clear that the *Gingles* test should apply in this case for judicial districts. The Supreme Court in *Chisom v. Roemer*, 501 U.S. 380 (1991),[11] held that judges are

---

[10] Currently, black voters' preferred candidates hold positions in two of the three seats in District 1 of the Supreme Court as well as the positions on the Public Service Commission and Department of Transportation, being four of the five elected positions within the boundaries of District 1.

[11] The Fifth Circuit recently dissolved the consent decree entered by the parties in the *Chisom* litigation after determining that the State of Louisiana has complied with all terms of the decree. *Chisom v. Louisiana ex rel. Landry*, No. 22-30320, 2024 WL 3982181 (5th Cir. Aug. 29, 2024) (en banc). In so doing, the Court noted that courts in voting rights cases regarding redistricting "must devote heightened attention to principles of federalism and the State's ability to run its own elections." *Id.* at *6 (citing *In re Landry*, 83 F.4th 300, 306-07 (5th Cir. 2023)).

"representatives" within the meaning of § 2(b), but neither that Court nor the Fifth Circuit has upheld a claim to revise the boundary of a judicial district.[12]  The Fifth Circuit recently rejected such an effort in *Fusilier v. Landry*, 963 F.3d 447 (5th Cir. 2020).  District Courts in Alabama and Arkansas, as in *Lopez*, have rejected challenges to the election of Supreme Court Justices at large. *Alabama State Conf. of N.A.A.C.P. v. Alabama*, 612 F. Supp. 3d 1232 (M.D. Ala. 2020); *Christian Ministerial Alliance v. Sanders*, No. 4:19-CV-00402-JM, 2023 WL 4745352 (E.D. Ark. July 25, 2023).  Those courts applied the procedures devised for multimember districts in *Gingles*, but they did not find plaintiffs to have carried their burden, even assuming those procedures apply to judicial districts.  This Court will thus, likewise, discuss the *Gingles* preconditions.

106.    The plaintiffs in *Gingles* were seeking to divide a multimember district into single-member districts, but that is not what Plaintiffs seek in this case.  The Supreme Court in *Growe v. Emison*, 507 U.S. 25 (1993), held that the "*Gingles* threshold factors apply to a § 2 dilution challenge to a single-member districting scheme, a so-called 'vote fragmentation claim," *id.*, at 40, which is the claim Plaintiffs present here.

107.    The first precondition, or "prong," addresses whether the minority plaintiffs can show that a majority-minority district can be created for the minority to have "the potential to elect its preferred candidate …."  *Robinson*, 86 F.4th at 589.  The Supreme Court's latest discussion of *Gingles* is set forth in *Allen v. Milligan*, 599 U.S. 1 (2023), where five Justices retained the *Gingles* analysis, *id.*, at 24, but five Justices also did not fully agree on what *Gingles* means and how it

---

[12] Before *Chisom* and *Clements*, Judge Barbour subdivided a handful of judicial districts in *Martin v. Allain*, 658 F. Supp. 1183 (S.D. Miss. 1987).  Because Attorney General Moore chose not to appeal, the Fifth Circuit had no opportunity to address the issue.

should be applied. Only four Justices joined Part III-B-1 of *Allen*, which discussed the use of illustrative maps to establish the first *Gingles* consideration.

108. When a jurisdiction is already divided into districts, the *Gingles* analysis is employed to determine whether more districts having a majority of minority citizens may be created. "Where an election district could be drawn in which minority voters form a majority, but such a district is not drawn," then, "assuming the other *Gingles* factors are also satisfied," relief might be granted. *Bartlett v. Strickland*, 556 U.S. 1, 18 (2009) (opinion of Kennedy, J.). The plurality in *Allen* agreed; the purpose of every illustrative map that has ever been submitted is "to show, as our cases require, that an additional majority-minority district could be drawn." 599 U.S. at 333 (opinion of Roberts, C.J.).

109. The *Bartlett* Court emphasized the need for "an objective, numerical test: Do minorities make up more than 50 percent of the voting-age population in the relevant geographic area?" *Id. Bartlett* continued, "[I]t is a special wrong when a minority group has 50 percent or more of the voting population and could constitute a compact voting majority but, despite racially polarized bloc voting, that group is not put into a district." *Id.* at 19. Here, blacks, as a matter of "objective, numerical" fact, already have a voting majority in District 1.[13] Their majority status holds true when you consider the relative voter registration rates along the lines of race in District 1. *See supra* ¶ 34. Removal of black disenfranchised felons does not change this conclusion. *See supra* ¶ 36.[14] Plaintiffs cannot be entitled to relief under § 2 under the logic of *Bartlett* and *Allen.*

---

[13] The estimated Black Citizen Voting Age Population (CVAP) in District 1 is 51.1%. [Dkt. #228], at 22.

[14] Plaintiffs' burden of proving that an additional black majority district can be created necessarily includes the burden of proving how many black majority districts there presently are. Their failure to attempt to quantify the effects of felons on the percentage of eligible black voters in District 1 prevents them from carrying that burden.

43

110.     In the circumstances prevailing shortly after Section 2 was amended in 1982, the Fifth Circuit declared in dictum that a BVAP majority and black registered voter majority in a district would not necessarily preclude relief.  Affirming the denial of relief under Section 2, the Court said:

> As *de jure* restrictions on the right to vote mercifully recede into the historical past, we should expect it to be increasingly difficult to assemble a *Zimmer*-type voting rights case against an at-large electoral district where a minority-majority population exists.  Such a case is not, however, precluded as a matter of the law.

*Monroe v. City of Woodville*, 881 F.2d 1327, 1333 (5th Cir. 1989), citing *Zimmer v. McKeithen*, 485 F.2d 1297 (5th Cir. 1973) (en banc), *aff'd*, *sub nom. East Carroll Par. Sch. Board v. Marshall*, 424 U.S. 636 (1976).

111.     The Fifth Circuit reached the same result in a case where Hispanics had both a voting age majority and a registered voter majority.  *Salas v. Southwest Tex. Jr. Coll. Dist.,* 964 F.2d 1542, 1544 (5th Cir. 1992).  As in *Monroe*, the Court acknowledged the possibility that such majorities might be "illusory," *id.* at 1555, but the plaintiffs had failed to prove that.  The plaintiffs had attempted to show that the registered voter majority did not exist, because of "'soft' voting rolls that included residents who had moved away and double listings for the same voter," but they "failed to provide credible studies." *Id.*  Here, Plaintiffs do not contest the registration percentages by race provided by the CPS.

112.     The plaintiffs in *Salas* had also tried to prove "practical impediments to voting," including "the inadequacy of absentee voting procedures." *Id.* at 1555-56.  Plaintiffs here also complained about alleged impediments, but they failed to show that anyone had been unable to vote for such reasons.

113.    Finally, based on evidence from multiple elections, the plaintiffs in *Salas* asserted that "low turnout at elections was the result of prior discrimination." *Id.* at 1556. Rejecting that argument, the Fifth Circuit held:

> [T]hey offered no evidence directly linking this low turnout with past official discrimination. Obviously, a protected class is not entitled to Section 2 relief merely because it turns out in a lower percentage than whites to vote. Further, the high incidence of Hispanic *registration* in the District is persuasive evidence that Hispanic voters are not deterred from participation in the political process because of the effects of prior discrimination, including unemployment, illiteracy, and low income.

*Id.* (emphasis in original). Plaintiffs here have only offered disputed evidence on a single election, during the COVID-19 pandemic year of 2020, and they have not tried to explain why black turnout has somehow been deterred while black registration has not. Thus, the black voting majority in District 1 cannot be considered illusory under the analysis in *Salas.*

114.    The Supreme Court has also observed that a population majority may be "hollow" unless that majority has been adjusted to take citizenship into account. *League of United Latin Am. Citizens v. Perry*, 548 U.S. 399, 429 (2006). That deduction is necessary "because only eligible voters affect a group's opportunity to elect candidates." *Id.* Here, blacks constitute a majority of eligible and registered voters in District 1. The evidence shows that there is already a majority-minority district—District 1. Plaintiffs do not seek to create "a single-member district" as included in the first prong of *Gingles.*

115.    Moreover, Plaintiffs' proposed maps fail to meet the requirements in Justice Kavanaugh's controlling concurrence in *Allen*.[15] Justice Kavanaugh did not join Part III-B-1 of

---

[15] Because the concurring opinion explains Justice Kavanaugh's controlling vote on this issue, these are the principles which this Court must apply in this case. *See Marks v. United States*, 430 U.S. 188, 198 (1977) ("When a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, 'the holding of the Court may be viewed as that position taken by those Members who concurred in the judgment on the narrowest grounds

*Allen* and wrote a concurrence to clarify his views that a map creating a majority-minority district is needed only when the current map "cracks or packs a large and 'geographically compact' minority population" and when plaintiffs' "proposed alternative map and proposed majority-minority district are 'reasonably configured' – namely, by respecting compactness principles and other traditional districting criteria such as county, city, and town lines." *Id.* at 43 (Kavanaugh, J., concurring).

116.    Plaintiffs here do not allege packing, but they do assert that the Delta area has been "cracked." Justice Kavanaugh did not fully specify his understanding of cracking. However, it has traditionally been applied to the separation of a compact and populous black area by attaching small portions of that area to multiple majority white districts. *See*, *e.g.*, *Kirksey v. Board of Supers. of Hinds Cnty., Miss.*, 554 F.2d 139, 141 (5th Cir. 1977) (en banc), *superseded by statute on other grounds as stated in Clements*, 999 F.2d at 866. The Delta, by contrast, is a sparsely populated region that extends over 200 miles from Vicksburg to Memphis. Gathering such a huge area into a district to help create a black majority, different from the black majority already in existence in District 1, would disregard the Supreme Court's teaching that the Voting Rights Act does not require maximizing the number of black districts. *Miller v. Johnson*, 515 U.S. 900, 924-26 (1995); *Johnson v. De Grandy*, 512 U.S. 997, 1016-17 (1994).

117.    Moreover, the proposed maps that Plaintiffs have introduced are not "reasonably configured" so as to respect "traditional districting criteria." Traditional districting criteria include such concepts as "communities of interest and traditional boundaries" and are "generally defined

----

….,'" quoting *Gregg v. Georgia*, 428 U.S. 153, 169 n.15 (1976) (opinion of Stewart, Powell, and Stevens, JJ.).) *See also United States v. Mississippi*, 82 F.4th 387, 394 n.11 (5th Cir. 2023) (stating that a "concurrence in the judgment on narrower grounds supplied the judgment's fifth and controlling vote") (citing *Marks*).

by the given state's districting guidelines." *Robinson*, 86 F.4th at 590. The traditional districting criterion applied to Mississippi Supreme Court districts for almost two centuries has been to divide the state from east to west, using whole counties. Plaintiffs' maps do not follow the traditional east-west pattern.

118. Plaintiffs have failed to show the need for a newly configured district under the first prong of *Gingles*. Nor have they offered an alternative map that is reasonably configured in accordance with Justice Kavanaugh's concurrence.

119. Defendants do not dispute the political cohesiveness of black voters under the second prong of *Gingles*. The only remaining prong is whether Plaintiffs have shown "that the white majority votes sufficiently as a bloc to enable it … usually to defeat the minority's preferred candidate."[16] *Gingles*, 478 U.S. at 51. They have not. Voting is polarized by party, not race. If "partisan affiliation, not race, best explains the divergent voting patterns among minority and white citizens, then there is no "legally significant" racially polarized voting under the third *Gingles* precondition. *Clements*, 999 F.2d at 850. There is not a white majority in District 1, and candidates preferred by black voters hold four out of five elected positions chosen within District 1 boundaries.

120. Plaintiffs have not established the third precondition, which requires proof that, in the absence of a Section 2 remedy, a white majority voting bloc will usually "defeat the minority's preferred candidate." *Allen*, 599 U.S. at 18.

---

[16] "The second and third *Gingles* preconditions are often analyzed together." *Christian Ministerial All. v. Sanders*, 2023 WL 4745352, at *16 (E.D. Ark. July 25, 2023).

121.    Because the Court determines that Plaintiffs have failed to meet the *Gingles* three preconditions, it need not address the Senate factors.  Nevertheless, the proof at trial revealed the following regarding their application.

122.    *Gingles* does refer to Senate factor 1, "the extent of any history of official discrimination in the state or political subdivision that touched the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process."  478 U.S. at 36-37.  But as the Fifth Circuit held in *Clements*, such history is relevant only if it can be shown that "these effects of past discrimination actually hamper the ability of minorities to participate."[17] 999 F.3d at 866.  *See also Fordice*, 252 F.3d at 367-68 ("[a]bsent an indication that these facts 'actually hamper the ability of minorities to participate,' they are, however, insufficient to support a finding that minorities suffer from unequal access to Mississippi's political process").  The Fifth Circuit has held that "contemporary examples of discrimination are more probative than historical examples" and that "long-ago evidence of discrimination has less force than more contemporary evidence."  *Veasey v. Abbott*, 830 F.3d 216, 257-58 (5th Cir. 2016).  The most relevant question is whether there is "recent evidence of discrimination."  *Lopez*, 339 F. Supp. 3d at 611.

123.    Plaintiffs failed to present any meaningful *recent* evidence of official discrimination.  Plaintiffs did not identify a single black voter whose opportunity to participate in the political process was hampered in any way by any of the historical practices Plaintiffs' witnesses identified.  The Fifth Circuit has held that, to be relevant, evidence must "properly link the effects of past and current discrimination with the racially disparate effects of the challenged

---

[17] "'[P]roof of socioeconomic disparities and a history of discrimination without more' does not demonstrate that a group of citizens has less opportunity to participate in the political process."  *Fairley v. Hattiesburg, Miss.*, 662 F. App'x 291, 298 (5th Cir. 2016) (quoting *Clark v. Calhoun Cnty., Miss.*, 88 F.3d 1393, 1399 (5th Cir. 1996)).

law." *Veasey*, 830 F.3d at 246. But Plaintiffs and other fact witnesses testified that they are registered to vote and vote regularly. Considering the evidence showing that black-preferred candidates win in District 1, there is no connection between the history and today's voting. There was also evidence submitted showing that blacks usually vote in higher percentages than whites in Mississippi. These findings also apply to Senate factor 3.

124. As to Senate factor 2, and as discussed relative to *Gingles*' third element, *see supra* ¶ 119, the Court concludes that party, as opposed to race, explains any polarized voting in District 1 elections. The evidence presented at trial supports this conclusion. *See supra* ¶¶ 63-65. Because elections for Supreme Court Justices in District 1 are polarized for reasons not based on race, Senate factor 2 weighs in Defendants' favor.

125. The Court concludes that there is insufficient evidence regarding Senate factors 3 and 4 to warrant a finding in Plaintiffs' favor on these factors. *See supra* ¶¶ 66-67.

126. Nor is there any evidence that socioeconomic factors, as addressed in Senate factor 5, have caused black voters not to participate in elections. *See Salas*, 964 F.2d at 1556 (high registration percentage- "is persuasive evidence that [minority] voters are not deterred from participation in the political process because of the effects of prior discrimination, including unemployment, illiteracy, and low income"). The evidence put on showed motivated black voters who participate in Mississippi elections. Based on the evidence, this Court cannot reasonably conclude that black voters are hampered in their ability to vote in District 1 contests based on depressed socioeconomic status. *See supra* ¶¶ 68-74.

127. As for Senate factor 6, the evidence of racial appeals presented by Plaintiffs is mostly stale and little of it involved recent contests in District 1. *See supra* ¶¶ 76-80. This factor does not weigh in Plaintiffs' favor.

128.    Senate factor 7 asks about the electoral success of blacks in the "jurisdiction," but Plaintiffs' evidence pertained mostly to statewide offices and no analysis was conducted on the extent to which blacks enjoy electoral success in District 1 outside of the Supreme Court, Public Service Commission, or Transportation Commission.  *See supra* ¶¶ 81-84.  Rebutting Plaintiffs' contentions on this factor is evidence of black candidate success in District 1 contests for the Mississippi Supreme Court, Transportation Commission, and Public Service Commission.  This factor does not weigh in Plaintiffs' favor.

129.    Senate factor 8 analyzes whether elected officials are "responsive" to black citizens' needs in District 1 but because Plaintiffs cannot prove that the Mississippi Supreme Court has been unresponsive to their needs, *see supra* ¶¶ 86-88, this factor does not weigh in their favor. Finally, Senate factor 9, which asks whether the reasons behind the voting practice challenged (in this case, the boundaries of District 1) is tenuous.  Consistent with Judge Barbour's findings in *Magnolia Bar Ass'n, Inc.*, 793 F. Supp. at 1417, this Court concludes that the State has legitimate reasons for the current design of its Supreme Court districts.  The Court credits the testimony of Justice Lamar and Assistant Secretary of State Kyle Kirkpatrick on this point.  *See supra* ¶¶ 90-93.

130.    Plaintiffs' failure to prove a depressed level of participation by black voters in District 1 precludes a finding that they "have less opportunity than other members of the electorate to participate in the political process," as § 2(b) requires.  Academic studies of circumstances that may tend to depress black participation do not establish that black participation here is actually depressed.  Plaintiffs must carry "the burden to demonstrate that the African-American citizens of Mississippi 'do not in fact participate to the same extent as other citizens.'"  *Fordice*, 252 F.3d at 368, quoting *Clements*, 999 F.2d at 866.  Evidence of tendencies elsewhere will not establish "that

minority voters *in this case* failed to participate equally in the political process." *Id.* at 867 (emphasis in original).

131.    Plaintiffs' evidence of depressed participation is limited to a single general election during the height of the COVID-19 pandemic in 2020.  Even if that evidence were to be accepted as true, it would not support a "finding—essentially on the basis of one election—that whites vote sufficiently as a bloc so as to usually defeat the preferred candidate" of plaintiffs' group.  *Rangel v. Morales*, 8 F.3d 242, 243 (5th Cir. 1993).  Reversing a finding that Section 2 was violated by the maintenance of an at-large judicial district, the Fifth Circuit said that "this single race is not sufficient, in our view, to support a determination that the white bloc vote will usually defeat the preferred candidate of Hispanics." *Id.* at 248.  The Court emphasized "the fact that, at the time of trial, Hispanics constituted 46% of the registered voters in the Thirteenth Judicial District.  The evidence at trial revealed that Hispanic voters could control election outcomes with relatively little support from Anglo voters." *Id.* at 249.

132.    Here, because the single election of 2020 cannot establish that black participation is usually depressed, particularly in the light of the successes of black-preferred candidates in 2016, 2019, and 2023, Plaintiffs cannot prevail.

133.    Plaintiffs seek to have this Court use Section 2 of the Voting Rights Act to order "more success in place of some." *Johnson v. De Grandy*, 512 U.S. 997, 1012-13 (1994).  But Section 2 does not provide black voters a guarantee of electoral victory for their preferred candidates in every race.  It does require that black voters have equal opportunity to elect their preferred candidates.  Plaintiffs' evidence focuses on the success of black candidates for District 1 seats and their desire to secure more seats for black individuals.  But Section 2 does not "'establish[] a right to have members of a protected class elected in numbers equal to their

proportion in the population.'" *Harding v. County of Dallas, Tex.*, 948 F.3d 302, 308 (5th Cir. 2020) (quoting 52 U.S.C. § 10301(b)); *Milligan*, 599 U.S. at 14.

134.    Defendants have shown that such equal opportunity exists in District 1.  Testimony at trial proved that while Mississippi Supreme Court races are nonpartisan, party politics play a strong role in Supreme Court elections.  Most of Plaintiffs' witnesses (and their experts for that matter) had strong ties to the Democratic Party and there are obvious political reasons their Party desires complete and absolute success in District 1.  But federal courts are "not responsible for vindicating generalized partisan preferences." *Rucho v. Common Cause*, 139 S.Ct. 2484, 2501 (2019).  And "[t]he Voting Rights Act does not guarantee that nominees of the Democratic Party will be elected, even if black voters are likely to favor that party's candidates.'" *Clements*, 999 F.2d at 854 (quoting *Baird v. Consol. City of Indianapolis*, 976 F.2d 357, 361 (7th Cir. 1992)). Section 2 "is implicated only when Democrats lose because they are black, not where blacks lose because they are Democrats." *Id.*

135.    Even had Plaintiffs proved dilution, the Court finds, in accordance with the Fifth Circuit's decision in *Clements*, that such dilution was not substantial enough to overcome the State's interest[18] in its east-west boundaries for Supreme Court districts to ensure each Justice is from a diverse electorate so as to hold no bias in favor of any one group.  *See Magnolia Bar Ass'n*, 793 F. Supp. at 1417; *Fordice*, 252 F.3d at 372-73.

136.    In sum, Plaintiffs have failed to prove two of the three *Gingles* factors and, even if they had, consideration of the nine Senate factors counsels against a finding of Section 2 liability under the totality of the circumstances analysis.  Therefore, under the "totality of circumstances,"

---

[18] *See Clements*, 999 F.2d at 876 ("plaintiffs cannot overcome a substantial state interest by proving insubstantial dilution").

52 U.S.C. § 10301(b), Plaintiffs have failed to show that Mississippi's elections for Supreme Court justices from District 1 "are not equally open to participation" by black voters or that they likely lack equal opportunity to elect Justices of their choice.

137.    Creating electoral districts "'is primarily the duty and responsibility of the State[s],' not the federal courts." *Milligan*, 599 U.S. at 29 (quoting *Abbott v. Perez*, 138 S.Ct. 2305, 2324 (2018)).  This Court will not so intercede in the State of Mississippi's sovereignty and redraw the boundary of Mississippi's Supreme Court District 1 unless Section 2 mandates it do so.  It does not.

This the 23rd day of September, 2024.

Respectfully submitted,

DEFENDANTS STATE BOARD OF ELECTION COMMISSIONERS, TATE REEVES, IN HIS OFFICIAL CAPACITY AS GOVERNOR OF MISSISSIPPI, LYNN FITCH, IN HER OFFICIAL CAPACITY AS ATTORNEY GENERAL OF MISSISSIPPI, AND MICHAEL WATSON, IN HIS OFFICIAL CAPACITY AS SECRETARY OF STATE OF MISSISSIPPI

/s/ *Charles E. Cowan*
CHARLES E. COWAN (MSB #104478)
MICHAEL B. WALLACE (MSB #6904)
WISE CARTER CHILD & CARAWAY, P.A.
Post Office Box 651
Jackson, Mississippi  39205-0651
Tel.:  (601) 968-5500
Fax:  (601) 944-7738
mbw@wisecarter.com
chc@wisecarter.com


REX M. SHANNON III (MSB #102974)
BETH WINDSOR USRY (MSB #99267)
JUSTIN L. MATHENY (MSB #100754)
STATE OF MISSISSIPPI
OFFICE OF THE ATTORNEY GENERAL

CIVIL LITIGATION DIVISION
Post Office Box 220
Jackson, Mississippi 39205-0220
Tel.: (601) 359-4184
Fax: (601) 359-2003
rex.shannon@ago.ms.gov
beth.usry@ago.ms.gov
justin.matheny@ago.ms.gov

## CERTIFICATE OF SERVICE

I, Charles E. Cowan, one of the attorneys for the above-named State Defendants, do hereby certify that I have this date caused to be filed with the Clerk of the Court a true and correct copy of the above and foregoing via the Court's ECF filing system, which sent notification of such filing to all counsel of record.

THIS the 23rd day of September, 2024.

s/ *Charles E. Cowan*
CHARLES E. COWAN