**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
GREENVILLE DIVISION**

DYAMONE WHITE; DERRICK SIMMONS;
TY PINKINS; CONSTANCE OLIVIA SLAUGHTER
HARVEY-BURWELL,

    *Plaintiffs*,

vs.

STATE BOARD OF ELECTION COMMISSIONERS;
TATE REEVES, *in his official capacity as Governor of Mississippi*; LYNN FITCH, *in her official capacity as Attorney General of Mississippi*; MICHAEL WATSON, *in his official capacity as Secretary of State of Mississippi*,

    *Defendants*,

CIVIL ACTION NO.
4:22-cv-62-SA-JMV

**<u>PLAINTIFFS' REPLY MEMORANDUM IN SUPPORT OF
THEIR MOTION FOR JUDICIAL NOTICE</u>**

## INTRODUCTION

Defendants agree that the facts of the November 2024 elections are appropriate for judicial notice. Accordingly, Plaintiffs' motion for judicial notice, ECF No. 258, should be granted as unopposed. For completeness, Plaintiffs do not oppose Defendants' request to include the vote totals of the three non-viable candidates who were eliminated after the November 5 general election and did not participate in the runoff election on November 26. Defendants, however, misstate the relevance of those facts and misconstrue the trial record and the legal precedent in their discussion of what inferences may be drawn from them. The results of the 2024 Supreme Court election, in which a Black-preferred incumbent candidate lost in District 1, strongly corroborate the extensive evidence in the trial record and further support a finding that, under the *Gingles* framework and especially with respect to the third *Gingles* precondition, Black-preferred candidates are usually defeated under the challenged district lines.

## ARGUMENT

Defendants concede in their brief that the facts in Plaintiffs' motion are appropriate for judicial notice. Defs.' Br. (ECF No. 261) at 2 ("Defendants do not dispute that this Court may judicially notice the results of the 2024 Mississippi Supreme Court elections . . . ."). Nor do Defendants deny that, following those elections, there is now at most one justice serving on the Mississippi Supreme Court who is a candidate preferred by Black voters,[1] in a state that is nearly 40% Black. Pls.' Br. (ECF No. 259) at 6; Pls.' Proposed Findings of Facts and Conclusions of

---

[1] Justice Leslie King, a Black justice on the Mississippi Supreme Court, ran unopposed in 2012 and 2020. Pls.' Proposed Findings of Fact (ECF No. 252) ¶ 157. Because those races were uncontested, there is no way to empirically measure racial polarization and determine whether Justice King is a Black-preferred candidate. *Id.* Nevertheless, Defendants have continued to describe Justice King as a Black-preferred candidate. *E.g.*, Defs.' Closing Argument, 08/15/2024 Trial Tr. 1529:7-8, 20–23.

Law ("PFOFCOL") (ECF No. 252) ¶ 664. Justice Jim Kitchens, who Defendants have asserted is a Black-preferred candidate, lost in District 1 despite the significant advantage of incumbency and his ability, as a White candidate, to earn much higher levels of White support than Black candidates who are preferred by Black voters. Pls.' Br. at 6; Pls.' PFOFCOL (ECF No. 252) ¶¶ 234–238 (evidence showing Justice Kitchens received about six times as many White votes in 2016 as Justice Latrice Westbrooks did in 2020 in District 1, as well as other examples); *id.* ¶¶ 271, 274 (evidence regarding power of incumbency). That is highly relevant to the third *Gingles* precondition and strongly corroborates Plaintiffs' extensive trial evidence showing that Black-preferred candidates are usually defeated under the challenged Supreme Court lines. Meanwhile, four White justices were either elected or re-elected in 2024, with no Black candidate prevailing, adding to the overwhelming historical pattern of underrepresentation of Black candidates in the office at issue, which is relevant under Senate Factor 7. Pls.' Br. at 6; Pls.' PFOFCOL ¶¶ 395–417, 651–666.

The outcome of the 2024 Supreme Court election, in which a Black-preferred candidate with substantial advantages nevertheless lost in District 1, thus confirms the trial record, which shows that political opportunity is not equally available to Black voters under the Mississippi Supreme Court district lines. Defendants, by contrast, miss the mark in downplaying Justice Kitchens' loss and focusing on the vote totals of Black candidates who were not viable to begin with.

I. **JUSTICE KITCHENS' LOSS CONFIRMS THAT BLACK VOTERS DO NOT HAVE EQUAL POLITICAL OPPORTUNITY UNDER THE CURRENT DISTRICT LINES**

Under the third *Gingles* precondition, a Section 2 plaintiff must show that the candidates preferred by Black voters "usually" lose. *See Robinson v. Ardoin*, 86 F.4th 574, 589 (5th Cir. 2023) (quoting *Allen v. Milligan*, 599 U.S. 1, 18 (2023)); Pls.' PFOFCOL (ECF No. 252) ¶¶ 140, 476.

2

The trial record showed that this was the case prior to the November 2024 elections. Pls.' PFOFCOL (ECF No. 252) ¶¶ 138–165. In resisting this conclusion, one of Defendants' primary arguments was to point to Justice Kitchens, whom Defendants argued was a Black-preferred candidate who could win in District 1. *E.g.*, Defs.' Closing Argument, 08/15/24 Trial Tr. 1528:7–8, 1529:20–23; Defs.' PFOFCOL (ECF No. 253) ¶ 14.

Justice Kitchens' loss undermines Defendants' primary argument on the third *Gingles* precondition and further supports the conclusion, already well-supported by the trial record, that this precondition is satisfied. *E.g.*, Pls.' PFOFCOL (ECF No. 252) ¶¶ 138–165.

Defendants attempt to minimize the election results by noting that Justice Kitchens lost by a thin margin, Defs.' Br. at 5–6, but that ignores the extensive record evidence that Justice Kitchens is an unusually *strong* Black-preferred candidate and yet *still* lost. He was an incumbent candidate, and incumbency is, according to Defendants' own expert, an "incredible" advantage in the context of these elections. C. Bonneau Testimony, 08/12/24 Trial Tr. 787:14–23, 793:15–22, 846:8–14; *see also* Pls.' PFOFCOL (ECF No. 252) ¶¶ 271–276. Uncontroverted trial testimony also showed that White candidates in general, and Kitchens in particular, are generally in a stronger electoral position than Black candidates preferred by Black voters, because they earn a significantly higher level of White support than a Black candidate. Pls.' PFOFCOL (ECF No. 252) ¶¶ 234–238; B. Orey Testimony, 08/06/2024 Trial Tr. 227:7–228:8 (explaining that White support for Kitchens was "a lot higher than normal" and that Black candidates earned "[n]owhere near" that level of White votes); *see also Mississippi State Conf. of Nat'l Ass'n for Advancement of Colored People v. State Bd. of Election Commissioners* ("*MS NAACP*"), No. 3:22-CV-734-DPJ-HSO-LHS, 2024 WL 3275965, at *31 (S.D. Miss. July 2, 2024) (comparing Jim Hood's level of White support against Johnny DuPree's). Indeed, as the trial record showed, Justice Kitchens was the *only* Black-

preferred candidate to win a contested Supreme Court election in District 1 in decades; Justice King, the only Black justice on the Court, has only run unopposed, and other Black candidates, while receiving overwhelming support from Black voters, have lost. *See* Pls.' PFOFCOL (ECF No. 252), ¶¶ 138, 140, 144, 157–159, 163.

The fact that Justice Kitchens has now also lost, despite possessing those powerful advantages not possessed by Black candidates, only confirms that these district lines do not provide Black voters with equal opportunities to elect preferred candidates to the State Supreme Court.

Defendants claim that the incumbency advantage is not "insurmountable," because Justices Jenifer Branning and David Sullivan both unseated an incumbent in 2024. Defs.' Br. at 6. But that only confirms the trial record, which shows that incumbency is insurmountable *for Black candidates but not for White ones*. Pls.' PFOFCOL (ECF No. 252) ¶ 237. Justices Branning and Sullivan join a substantial list of White candidates who have successfully challenged an incumbent; by contrast, no Black challenger has *ever* been able to unseat an incumbent in the entire history of the Mississippi Supreme Court. *Id.* The 2024 elections are yet more evidence of a barrier that is uniquely insurmountable for Black candidates—further confirmation that the political playing field remains unequal in Mississippi with respect to State Supreme Court elections.

Defendants also suggest that the circumstances of Justice Kitchens' loss were "unusual," because the runoff occurred soon after a U.S. presidential election and two days before Thanksgiving. Defs.' Br. at 6 (emphasis omitted). But the circumstances of this election are not just entirely usual but mandated by state law, and thus extremely likely to recur in the future. Under Mississippi law, runoffs must occur four weeks after the November general election, *i.e.*, *always* around Thanksgiving. Miss. Code Ann. § 23-15-981. Furthermore, Supreme Court justices are elected to eight-year terms, Miss. Code Ann. § 23-15-991, and in District 1 at least those

4

elections are *always* held in presidential election years. *See generally* Pls.' Ex. 111.

Notably, the requirement of a runoff election when no candidate wins a majority of the vote (*i.e.*, a "majority-vote requirement") is explicitly named in Senate Factor 3 as a mechanism that can enhance the opportunity for discrimination against minority voters. *E.g.*, *Veasey v. Abbott*, 830 F.3d 216, 245 (5th Cir. 2016). As Defendants appear to acknowledge, holding elections in quick succession and in close proximity to a major holiday places significant burdens on voters. *See* Defs.' Br. at 6 (discussing 65% drop in turnout). Voters must find out about the runoff election and then take time, potentially away from work or family obligations, to vote a second time after having just done so. These voting practices in turn exacerbate the effects of discrimination and hinder political participation, as prescribed by Senate Factor 5. Again, the trial evidence was overwhelming that the informational and economic costs of voting are harder to bear for Black Mississippians, especially in the Delta, due to major disparities with respect to the socioeconomic resources that citizens must possess and deploy to participate in politics, including education, income, transportation, and health. Pls.' PFOFCOL (ECF No. 252) ¶¶ 261, 285–372.

These higher costs of voting mean Black voters are likely to have greater difficulty voting in a quick-turn runoff election just before Thanksgiving. *See* Pls.' PFOFCOL (ECF No. 252) ¶¶ 248, 252, 254–255, 583–585 (evidence showing how frequent elections, majority-vote requirement, and other voting practices increase "voter fatigue" and reduce turnout, disproportionately burdening Black Mississippians). The circumstances of Justice Kitchens' loss thus exemplify how Mississippi's election rules and stark racial disparities in education, income, and other categories combine to disadvantage Black voters and diminish their opportunity to elect preferred candidates despite pervasive racially polarized voting—all consistent with Plaintiffs' trial evidence.

## II. DEFENDANTS' ATTEMPT TO AGGREGATE THE VOTES OF NON-VIABLE BLACK CANDIDATES IS UNFOUNDED AND CONTRARY TO LAW

Defendants also try to minimize Justice Kitchens' loss by speculating about an election that never happened—one in which Justice Kitchens completely absorbed the vote totals of two Black candidates (who also ran in the November 5 general election) and hypothetically ended up with 51% of the vote (the apparent combined vote share of those *three* candidates). Defs.' Br. at 3. This suggestion is improper on multiple levels.

For one, there is no factual basis in the judicially noticeable facts or the trial record to assume (as Defendants do) that the two Black candidates, Ceola James and Abby Gale Robinson, received exclusively Black support. In order to know whether a candidate is supported by Black or White voters, ecological inference or some other quantitative analysis of the election results is typically needed. B. Orey Testimony, 08/06/2024 Trial Tr. 204:21–24 (testifying that ecological inference is "the conventional method" that courts rely on for evaluating racial voting patterns); *see, e.g.*, *Westwego Citizens for Better Gov't v. City of Westwego*, 946 F.2d 1109, 1118 (5th Cir. 1991) ("Usually, plaintiffs in a vote dilution case will attempt to establish both the second and third *Gingles* factors with statistical evidence of racial polarization of the electorate."); *MS NAACP*, 2024 WL 3275965, at *26 (describing acceptable statistical methods). This is why, while Dr. Orey testified that his results showed Black voters tended to support the Black candidates in the particular biracial elections he examined, B. Orey Testimony, 08/06/2024 Trial Tr. 221:23–222:16, he explained that determining whether a particular candidate was preferred by Black voters depended on his empirical analysis of "how voters actually turned out and voted in elections," *id.* at 206:3–5, 271:4–9. Thus, Dr. Orey testified that Justice Kitchens, a White candidate, was a candidate preferred by Black voters based on his analysis of the 2016 election. *Id.* at 227:7–228:8; *see also* Pls.' Ex. 14 at 1. By contrast, he was unable to conclusively determine whether Justice

6

King was a candidate preferred by Black voters because Justice King had not run in any contested elections that could be subjected to quantitative analysis. B. Orey Testimony, 08/06/2024 Trial Tr. 245:2–4.

There is no evidence in the trial record, from Dr. Orey or any witness, indicating that either Ceola James or Abby Gale Robinson earned a significant share of the Black vote in 2024 (or in any other election). There is no analysis of the Black and White vote shares of any of the five candidates in the November 5, 2024 General Election. In the absence of either statistical analysis (i.e., racially polarized voting analysis, such as those performed by Dr. Orey) or credible qualitative evidence, courts may not infer racial voting patterns simply from the race of the candidate. *See Brewer v. Ham*, 876 F.2d 448, 453–54 (5th Cir. 1989); *see also, e.g.*, *MS NAACP*, 2024 WL 3275965, at *28 ("We are concerned with racial polarization of voters, *i.e.*, are white voters consistently preventing the election of the candidates that black voters would choose? It is the race of the voters, not of the candidates, that matter."). That is what Defendants are asking the Court to do.

Moreover, the evidence that *is* in the record contradicts the suggested inference that Ceola James and Abby Gale Robinson earned only or mostly Black support. For instance, Senator Derrick Simmons—who is a resident of the Central District, a politically informed legislator, and an attorney closely following judicial elections—testified that he had no knowledge of any candidates other than Kitchens and Branning, who were the top two contenders. D. Simmons Testimony, 08/08/2024 Trial Tr. 704:14–15, 713:22–714:5, 728:1–7. Senator Simmons did not even know whether any Black candidate was running against Justice Kitchens. *Id.* at 728:1–7. The evidence is thus that James and Robinson were obscure, nonviable candidates. And to that point, Dr. Marvin King testified that Black voters do not automatically vote for Black candidates—

they closely consider candidate viability, and may reject unqualified, "perennial candidates" who are Black but are not viewed as serious options. M. King Testimony, 08/14/2024 Trial Tr. 1322:21–1323:13.

And even if this Court could properly presume that Kitchens, James, and Robinson combined to win 100% of Black voters' votes in the November 2024 General Election despite no quantitative or other evidence to support this speculation, it would still be irrelevant as a matter of law. Defendants cite no case in which any court has assessed the *Gingles* preconditions by looking not at actual election results, but at hypothetical, counterfactual results where the support of all Black-preferred and all Black candidates is aggregated together. *See* Defs.' Br. at 3. There is none. Rather, the *Gingles* preconditions look at political behavior *as it exists*, requiring courts to conduct "discrete inquiries into minority and white voting practices." *MS NAACP*, 2024 WL 3275965, at *25 (quoting *Thornburg v. Gingles*, 478 U.S. 30, 56 (1986)). And the third *Gingles* precondition simply asks whether Black-preferred candidates—that is, the candidates preferred by a majority of Black voters—"usually" win actual elections despite racially polarized voting, not whether candidates *could* prevail if they somehow consolidated 100% of the Black vote. *E.g.*, *Id.* at *11 (*quoting Allen v. Milligan*, 599 U.S. 1, 18 (2023)). The third precondition requires courts to consider actual election results and actual political reality; courts may not substitute counterfactual speculation about what would happen if Black voters voted with literally 100% cohesion for a single candidate in place of the required analysis.

In this case, Defendants have repeatedly argued that Justice Kitchens is the Black-preferred candidate in the Central District election in 2024, *e.g.*, Defs.' Br. at 2, which is consistent with Dr. Orey's analysis showing that he earned nearly 70% of the Black vote in 2016, *e.g.*, Pls.' Ex. 14 at 1. With respect to the 2024 Supreme Court elections, then, the relevant fact for *Gingles* purposes

8

(and especially for the third *Gingles* precondition) is simply that Justice Kitchens lost despite being the preferred candidate of a large majority of Black voters (and despite the various advantages that have made him a stronger candidate than Black-preferred Supreme Court candidates who are Black, *see supra* part I). The vote totals of Black candidates who were not viable and who were not necessarily preferred by Black voters in the first place is neither here nor there.

### III. DEFENDANTS' SUGGESTION THAT THE BLACK VOTE IS NOT POLITICALLY COHESIVE IS INCORRECT

Defendants have previously conceded the second prong of *Gingles*, which requires Plaintiffs to prove that Black voters are politically cohesive. Defs.' PFOFCOL (ECF No. 253) ¶ 119 ("Defendants do not dispute the political cohesiveness of black voters under the second prong of *Gingles*."); Cross Examination by M. Wallace, 08/06/2024 Trial Tr. 242:5–6 ("And I'll tell you and the Court, I'm not here to argue against Black cohesive voting. It exists."). But Defendants now appear to suggest—based on the small vote shares earned by James and Robinson, and again, without any data or expert quantitative analysis as to the racial breakdown of the voters in the 2024 General Election—that the Black vote in the Central District was so "split" as to not be cohesive in 2024. Defs.' Br. at 5.

As already explained, *see supra* part II, it is not proper to make assumptions about the racial composition of the voters who supported candidates James and Robinson without any ecological inference analysis or any other evidentiary basis beyond the candidates' race. But even if such inferences could be drawn, Defendants would also be wrong as a matter of law.

For purposes of assessing racial polarization and cohesion, the performance of non-viable Black candidates is irrelevant. *E.g.*, *MS NAACP*, 2024 WL 3275965, at *28. *Gingles* was decided in the context of elections that "offer[] voters the choice of supporting a *viable* minority candidate," and "implicit in the *Gingles* holding is the notion that black preference is determined from elections

9

which offer the choice of a black candidate." *Citizens for a Better Gretna v. City of Gretna, La.*, 834 F.2d 496, 503–04 (5th Cir. 1987) (emphasis added). As Senator Simmons' testimony predicted, former Justice Kitchens and now-Justice Branning were the only viable candidates in the Central District race. D. Simmons Testimony, 08/08/2024 Trial Tr. 728:1–7. The results of the General Election confirm the non-viability of the three remaining candidates, with each earning about 10% or less of the total vote, falling far behind the top two candidates. Pls.' Br., Ex. A at 3. Accordingly, neither James nor Robinson (nor the third also-ran candidate, Byron Carter) were serious options for Black voters.

Again, the evidence on Black voter cohesion in Mississippi is massive and uncontested. Black voters, on average, voted for the same candidates over 90% of the time according to Dr. Orey's unrebutted analysis. Pls.' PFOFCOL (ECF No. 252) ¶ 132. The evidence of Black political cohesion is so overwhelming that Defendants' own expert, Dr. Christopher Bonneau, conceded that fact at trial. C. Bonneau Testimony, 08/12/2024 Trial Tr. 828:1–10 ("I think it's clear that Black voters in Mississippi vote cohesively for one set of candidates.").

The cases in Defendants' brief offer no support for their position that the Black vote was not sufficiently cohesive in the November 5, 2024 General Election in District 1. First, Defendants cite dicta from a footnote in a panel decision that was vacated by the en banc Fifth Circuit and therefore has no precedential value. *See* Defs.' Br. at 5 (citing *League of United Latin Am. Citizens, Council No. 4434 v. Clements*, 986 F.2d 728, 744 n.5 (5th Cir.), *vacated on reh'g en banc*, 999 F.2d 831 (5th Cir. 1993)). Even if it were good law, the footnote appears to concern a hypothetical scenario where the minority vote is evenly split between three candidates, *see Clements*, 986 F.2d at 744 n.5, unlike here, where there is a clear, Black-preferred candidate in Justice Kitchens, a fact that Defendants have repeatedly acknowledged. Similarly, *Agee v. Benson*, which Defendants also

10

cite, involved an election in which "the black vote was almost evenly split between two primary candidates." No. 1:22-cv-272, 2023 WL 10947213, at *5 (W.D. Mich. Aug. 29, 2023). Next, Defendants rely on *Levy v. Lexington Cnty., S.C.*, 589 F.3d 708 (4th Cir. 2009), which held that racial cohesion requires a *majority* of Black voters to support the same candidate. *Id.* at 720 & n.18 (noting that an election where "no candidate during that election achieved more than 50 percent of the minority vote" is an example of non-cohesiveness). Again, there has been no racially polarized voting analysis of the November 2024 Supreme Court elections—but even assuming that candidates James and Robinson did draw Black support, Justice Kitchens earned more than twice as many votes as James and Robinson *combined*. *See* Pls.' Br., Ex. A at 3. Thus, even assuming that Black support was divided among those three candidates, there would still be no question that Justice Kitchens won a large majority of the Black vote, consistent with his performance in past elections. Pls.' Ex. 14 at 1. Finally, Defendants cite *Fusilier v. Landry*, solely for the general proposition that Section 2 plaintiffs must prove racial cohesion. 963 F.3d 447, 455, 458 (5th Cir. 2020). That is true—and here Plaintiffs have done that, as Defendants have already conceded in their post-trial filings, and as demonstrated by the overwhelming evidence in the trial record. *See also MS NAACP*, 2024 WL 3275965, at *29 (holding that racial cohesion in Mississippi is high among both Black and White voters); Pls.' PFOFCOL (ECF No. 252) ¶¶ 124–37, 541–58.

## CONCLUSION

The Court should grant Plaintiffs' unopposed motion for judicial notice and proceed to enter judgment in Plaintiffs' favor.

This the 30th day of January, 2025.

/s/ *Joshua Tom*
AMERICAN CIVIL LIBERTIES UNION
OF MISSISSIPPI FOUNDATION
Joshua Tom (Miss. Bar No. 105392)
101 South Congress Street
Jackson, MS 39201
(601) 354-3408
*JTom@aclu-ms.org*

ACLU FOUNDATION
Ari J. Savitzky*
Ming Cheung*
Victoria Ochoa*
Sophia Lin Lakin*
125 Broad Street, 18th Floor
New York, New York 10004
(212) 549-2500
*asavitzky@aclu.org*
*mcheung@aclu.org*
*vochoa@aclu.org*
*slakin@aclu.org*

* Admitted *pro hac vice*

SOUTHERN POVERTY LAW CENTER
Bradley E. Heard*
Ahmed Soussi*
Sabrina Khan*
150 E Ponce de Leon Avenue, Suite 340
Decatur, GA 30030
(470) 521-6700
*bradley.heard@splcenter.org*
*ahmed.soussi@splcenter.org*
*sabrina.khan@splcenter.org*

SIMPSON THACHER & BARTLETT LLP
Jonathan K. Youngwood (Miss. Bar No. 106441)
Janet A. Gochman*
Noah Gimbel*
Kate Lambroza*
425 Lexington Avenue
New York, NY 100017
(212) 455-2000
*jyoungwood@stblaw.com*

*Attorneys for Plaintiffs*

**CERTIFICATE OF SERVICE**

I, Joshua Tom, hereby certify that on January 30, 2025, I electronically filed the foregoing with the Clerk of the Court using the ECF system which sent notification of such filing to all parties on file with the Court.

This the 30th day of January, 2025.

/s/ Joshua Tom
Joshua Tom