IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
GREENVILLE DIVISION

DYAMONE WHITE, et al.                                                    PLAINTIFFS

v.                                                    CAUSE NO. 4:22-CV-62-SA-JMV

STATE BOARD OF ELECTION
COMMISSIONERS, et al.                                                    DEFENDANTS

ORDER AND MEMORANDUM OPINION

On April 25, 2022, the Plaintiffs filed this lawsuit challenging the district boundaries

utilized in Mississippi Supreme Court elections. They contend that the current electoral map

illegally dilutes the votes of Black voters in District 1 (the Central District) in violation of Section

2 of the Voting Rights Act of 1965. They seek declaratory and injunctive relief.

*Brief Factual and Procedural Background*

The Plaintiffs in this case are Dyamone White, Derrick Simmons, Ty Pinkins, and

Constance Olivia Slaughter Harvey-Burwell, all of whom are Mississippi citizens living in District

1 under the current electoral map. The Defendants are the Mississippi State Board of Election

Commissioners, Governor Tate Reeves, Attorney General Lynn Fitch, and Secretary of State

Michael Watson.

The Mississippi Constitution provides for the existence of three Supreme Court districts

from which Justices are elected. Three Justices are elected from each district on an at-large,

districtwide basis. Prior to 1994, Justices were elected in partisan elections, but the contests have

been non-partisan since that time.

The district boundary lines are drawn by the Mississippi Legislature. The map utilized

today was enacted in 1987. Under the current map, District 1 is referred to as the Central District;

District 2 is referred to as the Southern District; and District 3 is referred to as the Northern District.

District 1 consists of the following counties: Bolivar, Claiborne, Copiah, Hinds, Holmes, Humphreys, Issaquena, Jefferson, Kemper, Lauderdale, Leake, Madison, Neshoba, Newton, Noxubee, Rankin, Scott, Sharkey, Sunflower, Warren, Washington, and Yazoo.

District 2 consists of the following counties: Adams, Amite, Clarke, Covington, Forrest, Franklin, George, Greene, Hancock, Harrison, Jackson, Jasper, Jefferson Davis, Jones, Lamar, Lawrence, Lincoln, Marion, Pearl River, Perry, Pike, Simpson, Smith, Stone, Walthall, Wayne, and Wilkinson.

District 3 consists of the following counties: Alcorn, Attala, Benton, Calhoun, Carroll, Chickasaw, Choctaw, Clay, Coahoma, Desoto, Grenada, Itawamba, Lafayette, Lee, Leflore, Lowndes, Marshall, Monroe, Montgomery, Oktibbeha, Panola, Pontotoc, Prentiss, Quitman, Tallahatchie, Tate, Tippah, Tishomingo, Tunica, Union, Webster, Winston, and Yalobusha.

Mississippi Supreme Court Justices are elected to eight-year terms, which are staggered. Mississippi Supreme Court elections are held during even numbered years and therefore coincide with federal elections such as Presidential, United States House of Representatives, and United States Senate elections. In the event of a vacancy on the court, the Governor fills the vacancy by appointment.

In the Mississippi Supreme Court's history, only four Black persons have served as a Justice. None of these Justices served at the same time. All of them have held the same seat— District 1, Place 2. And all of them were first appointed to the position by a sitting Governor.

The Plaintiffs initiated this lawsuit on April 25, 2022. Their premise is straightforward— the current electoral map violates Section 2 of the Voting Rights Act by illegally diluting the votes of Black citizens in the Central District.[1] The Amended Complaint [133] requests a declaration

---

[1] In their original Complaint [1], the Plaintiffs also alleged that the continued utilization of the current map violated the Fourteenth and Fifteenth Amendments of the United States Constitution because the

that the current map violates Section 2, an injunction prohibiting further utilization of the map, and the imposition of a deadline for State authorities to enact a new plan. The Plaintiffs also seek fees and costs associated with bringing this action.

The case proceeded to a bench trial commencing on August 5, 2024. During the eight-day trial, the Court heard testimony from a total of seventeen witnesses, received voluminous documentary proof, and heard extensive arguments from counsel.

*Analysis and Discussion/Findings of Fact and Conclusions of Law[2]*

The Court will address several preliminary matters before turning to the substance of the Plaintiffs' claim.

I.    *Preliminary Matters*

At the outset, the Court clarifies the task before it. As noted above, the district boundaries at issue are not only used for Mississippi Supreme Court elections but also for Public Service Commissioner and Transportation Commissioner elections. Unlike Mississippi Supreme Court elections, which are non-partisan, the Public Service Commissioner and Transportation Commissioner positions are elected on a partisan basis. For purposes of the present case, the Amended Complaint [133] clearly addresses only Mississippi Supreme Court elections—not Public Service Commissioner or Transportation Commissioner elections. However, pursuant to Mississippi law, those election districts mirror the Supreme Court election districts. *See* MISS. CODE ANN. § 77-1-1 ("A public service commission . . . is hereby created, consisting of three (3) members, one (1) to be elected from each of the three (3) Supreme Court districts by the qualified

---

discriminatory effect was intentional—"not merely accidental or incidental." [1] at p. 54. This claim has since been abandoned, as it was not included in the Plaintiffs' Amended Complaint [133].

[2] Rule 52 of the Federal Rules of Civil Procedure directs courts to make findings of fact and conclusions of law following a bench trial. *See* FED. R. CIV. P. 52(a). Consistent with that Rule, the Court has appended hereto its Findings of Facts and Conclusions of Law. However, this Order and Memorandum Opinion contains the Court's full analysis on the relevant factual and legal issues.

electors of such district."); Miss. Code Ann. § 65-1-3 ("There shall be a [Mississippi Transportation Commission] which shall consist of three (3) members, one (1) from each of the three (3) Supreme Court Districts of the state.").

While recognizing an indirect implication of the Public Service Commissioner and Transportation Commissioner election districts by operation of these statutes, the Court notes that the Amended Complaint [133] seeks no specific relief pertaining to those election districts.

In addition, the Defendants have preserved an argument that there is no private right of action to pursue a Section 2 claim. The Pretrial Order [228] provides:

> Defendants acknowledge that the Fifth Circuit has held that private parties may sue to enforce the Voting Rights Act and that they are unaware of any court that has held the private-right-of-action issue to be jurisdictional. However, purely for the purpose of preserving the issue for possible United States Supreme Court review, Defendants contend that the Voting Rights Act does not contain a private cause of action to enforce Section 2, 52 U.S.C. § 10301, that a Section 2 claim may not be asserted under 42 U.S.C. § 1983, and that these right-of-action issues are jurisdictional in nature.

[228] at p. 4.

The Eighth Circuit has relatively recently held that Section 2 of the Voting Rights Act contains no private right of action. *See Ark. State Conf. NAACP v. Ark. Bd. of Apportionment*, 86 F.4th 1204, 1206-07 (8th Cir. 2023). However, as the Defendants concede, the Fifth Circuit has rejected this argument. *See*, *e.g.*, *Robinson v. Ardoin*, 86 F.4th 574 (5th Cir. 2023). Last year, the District Court for the Southern District of Mississippi applied Section 2 in a private right of action case, concluding "[t]he existence of a private right of action in opinions such as *Shelby County* has simply been assumed by courts. Indeed, for decades, Supreme Court and circuit court opinions have resolved Section 2 cases brought by private parties without addressing whether there was even a right for those parties to sue." *Miss. State Conf. NAACP v. State Board of Election Comm'rs*,

739 F. Supp. 3d 383, 411 (S.D. Miss. 2024) ("*Miss. NAACP*") (citations omitted). The *Miss. NAACP* court addressed the issue in significant detail, and this Court finds that explanation quite persuasive, particularly its ultimate conclusion that "[i]f a court now holds, after almost 60 years, that cases filed by private individuals were never properly brought, it should be the Supreme Court, which has the controlling word on so momentous a change." *Id*. at 410-11.

Bearing in mind that the Defendants simply preserve this argument for appellate purposes, the Court sees no need to provide any further explanation on the issue. This Court is bound by *Robinson*, which squarely rejects the Defendants' contention. *See Robinson*, 86 F.4th at 588 ("We conclude that the Plaintiffs here are aggrieved persons, that our *OCA-Houston* decision has already held that sovereign immunity has been waived, and that there is a right for those [private] Plaintiffs to bring these claims.") (citations omitted).

The Court next addresses the fact that this case concerns judicial districts as opposed to legislative districts. The parties agree that the United States Supreme Court's decision in *Chisom v. Roemer*, 501 U.S. 380, 111 S. Ct. 2354, 115 L. Ed. 2d 348 (1991), makes clear that Section 2 applies to judicial elections. However, while conceding this point, the Defendants emphasized in closing argument that "no one has gone to the end of a Section 2 case about judges and decided to redraw districts. It has never happened." [251] at p. 1513. To the extent the Defendants' contention in this regard concerns the fact that a court itself has never redrawn a district as opposed to ordering a legislative body to do so, the argument misses the point. The Plaintiffs have not at this time requested that the Court redraw the Mississippi Supreme Court districts—rather, the Amended Complaint [133] requests that, in the event of a liability finding, the Court "[s]et a reasonable deadline for State authorities to enact or adopt [new districts]." [133] at p. 47. Additionally, it is worth emphasizing that courts have engaged in a Section 2 analysis in the context of judicial

5

elections—in fact, even with regard to the same map as is at issue in this case. *See Magnolia Bar Ass'n, Inc. v. Lee*, 793 F. Supp. 1386 (S.D. Miss. 1992), aff'd on appeal, 994 F.2d 1143 (5th Cir. 1993).

Although recognizing that Section 2 is applicable to judicial redistricting cases, the Court is aware that there are ways in which the analysis in a judicial redistricting case varies from a legislative redistricting case. For instance, in a 1993 en banc decision, the Fifth Circuit made clear that a state's linkage interest—that is, the state's interest in maintaining the connection between an elected judge's electoral base to the area over which the judge exercises jurisdiction—has some relevance to the analysis. *See League of United Latin Am. Citizens, Council No. 4434 v. Clements*, 999 F.2d 831, 870 (5th Cir. 1993) (en banc). Even though this case involves no such concern since Mississippi Supreme Court Justices do not exercise district-specific functions, *Clements* illustrates the point that cases of this nature differ from legislative redistricting cases.[3]

Ultimately, though, the Court sees no need to stray from the well-established *Gingles* framework. *See Thornburg v. Gingles*, 478 U.S. 30, 106 S. Ct. 2752, 92 L. Ed. 2d 25 (1986). The differences between this case and a legislative redistricting case will simply be taken into account as part of the totality of the circumstances portion of the analysis which the Court will address in detail hereinafter. *See, e.g.*, *Bartlett v. Strickland*, 556 U.S. 1, 15, 129 S. Ct. 1231, 173 L. Ed. 2d 173 (2009) (quoting *Voinovich v. Quilter*, 507 U.S. 146, 154, 113 S. Ct. 1149, 122 L. Ed. 2d 500 (1993)).

Next, the Court turns to the underlying data concerning the Black Citizen Voting Age Population ("Black CVAP") and Black Voting Age Population ("BVAP") of the Supreme Court

---

[3] To be clear, the Court is aware that the Defendants do not take the position that a linkage interest is at issue in this case.

Districts based on the current electoral map. In the Pretrial Order [228], the parties stipulated to the following facts:

> 44. According to the 2016-2020 5-year American Community Survey, the estimated Black CVAP of the Supreme Court districts is: District 1, 51.1%; District 2, 27.9%; District 3, 33.3%.

> 45. According to the 2020 U.S. Census count, the BVAP of the Supreme Court districts is: District 1, 49.2%; District 2, 27.66%; District 3, 32.65%.

[228], Ex. 1 at p. 7.

According to the Defendants, the stipulated fact in Paragraph 44 resolves the case. In moving for judgment under Rule 52(c), they took the position that "[t]he Supreme Court in the *Bartlett* case, says that you only get to the *Gingles* calculation where an election district could be drawn in which minority voters form the majority, *but such a district is not drawn*." [251] at p. 1424 (emphasis added). And because the Black CVAP of District 1 is already over 50 percent, the Court, they argue, need not go any further and should enter judgment in their favor.

The Court disagrees. Importantly, the raw data—whether looking to the American Community Survey ("ACS") or the United States Census data—does not reflect voter *eligibility*. At trial, the Court heard extensive testimony from William Cooper—one of the Plaintiffs' experts—and others about felon disenfranchisement in Mississippi and the disproportionate impact that it has on Black Mississippians. Cooper testified as follows:

> Well, yes, there are tens of thousands of Black persons of voting age who have been convicted of a felony who cannot register to vote. I mean, it is a very high number. I think in a case that is cited in my declaration there are an estimated 56,000 felons who were unable to vote based on a review of court records or, I guess, corrections records going from 1994 to 2017, and 60 percent of those were determined to be African American.

7

> And, of course, that is just one 23-year period. That does not include anybody who was convicted of a felony from 1950 or so all the way up to 1994, likely disproportionately Black, and it would not include anybody who was convicted after 2017.

[244] at p. 59-60.

The Court is cognizant that the parties disagree as to whether, after taking into account felon disenfranchisement, the proportion of eligible Black voters in District 1 falls below 50%. The Plaintiffs assert that it does, while the Defendants contend that the number is still above 50%. In addition to Cooper's testimony, there was much testimony elicited on that point from David Swanson, one of the Defendants' experts.

The Court will address this discrepancy in significant detail hereinafter but need not do so at the outset because, even accepting as true the Defendants' premise that the proportion of eligible Black voters in District 1 exceeds 50%, that fact alone would not wholly preclude Section 2 liability. The Defendants cite the United States Supreme Court's 2009 decision in *Bartlett* to support their position. *See Bartlett*, 556 U.S. 1, 129 S. Ct. 1231. However, *Bartlett* does not make such a holding. Rather, it concerned crossover districts, which the Supreme Court defined as "one in which minority voters make up less than a majority of the voting-age population. But in a crossover district, the minority population, at least potentially, is large enough to elect the candidate of its choice with help from voters who are members of the majority and who cross over to support the minority's preferred candidate." *Id.* at 13, 129 S. Ct. 1231.

Additionally, the Fifth Circuit has directly rejected the argument the Defendants now assert. *See, e.g.*, *Salas v. Southwest Texas Jr. Coll. Dist.*, 964 F.2d 1542, 1547 (5th Cir. 1992) ("We first consider whether plaintiffs, as members of a registered voter majority class, are precluded, as a matter of law from bringing a vote dilution claim. We hold that they are not. . . [A] protected group—even when it is the registered voter majority—may seek relief in a vote dilution case.");

8

*see also Monroe v. City of Woodville*, 881 F.2d 1327, 1328 (5th Cir. 1989), modified on reh'g, 897 F.2d 763. The Fifth Circuit has made abundantly clear that Section 2 relief is not precluded simply because a minority class maintains a voting age population majority. However, whether that minority group may "obtain relief is, of course, a question of proof[.]" *Salas*, 964 F.2d at 1547. In *Salas*, the Fifth Circuit ultimately affirmed the district court's conclusion that "the cause of the Hispanic voters' lack of electoral success [was] failure to take advantage of political opportunity, rather than a violation of § 2[.]" *Id*. at 1556. But that ultimate conclusion does not undermine the fact that the plaintiffs were able to present their claims on the merits, despite maintaining a registered voter majority. Consequently, this Court will analyze the proof presented at the trial in this case to determine whether votes of Black voters are illegally diluted.

Furthermore, the Court feels compelled to address an argument the Defendants raised in their opening statement. At that time, defense counsel referenced the two previous cases involving a challenge to the present boundaries and stated: "Your Honor, those Fifth Circuit holdings are binding on this Court unless the plaintiffs can show that something has changed, that the district lines that provided equal opportunity in 1992 and 1999 no longer do so." [244] at p. 3.

The Court is certainly mindful of and has closely reviewed the previous decisions that defense counsel referenced—both of which were affirmed by the Fifth Circuit. But this case involves the presentation of new facts and data over two decades later. Therefore, while those cases are helpful and do provide some context, the Court's ruling is based upon the evidence presented in *this* case.

As a final preliminary matter, the Court notes that during the course of trial, it admitted into evidence (over the Defendants' objection) the reports of the Plaintiffs' experts. "Generally, expert reports are inadmissible hearsay because they are out-of-court statements offered to prove

the truth of the matter asserted and fall within the definition of hearsay in Federal Rule of Evidence 801(c)(2)." *Balfour Beatty Rail, Inc. v. Kan. City So. Ry. Co.*, 173 F. Supp. 3d 363, 413 (N.D. Tex. 2016) (citing *Bianco v. Globus Med., Inc.*, 30 F. Supp. 3d 565, 570 (E.D. Tex. 2014)); *see also Kerek v. Crawford Elec. Supp. Co., Inc.*, 2019 WL 6311365, at *2 (M.D. La. Nov. 25, 2019). In accepting the reports into evidence, the Court noted that the case was presented via a bench trial and therefore it did not have the same concerns as it would have had in a jury trial. However, recognizing that the Defendants raised objections to the admission of the reports, the Court, out of an abundance of caution, has only considered the testimony presented at trial—not the substance of the reports—in reaching its conclusion.[4]

Having resolved those preliminary issues, the Court turns to the merits of the Plaintiffs' vote dilution claim.

## II. Section 2 Claim

The Plaintiffs' sole claim is that Mississippi's current Supreme Court electoral map violates Section 2 of the Voting Rights Act. The statute provides:

> **(a)** No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color, or in contravention of the guarantees set forth in section 10303(f)(2) of this title, as provided in subsection (b).
>
> **(b)** A violation of subsection (a) is established if, based on the totality of the circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) in that its members have less

---

[4] Of course, to the extent that certain graphs, charts, etc. to which the experts referred are contained within their respective reports, the Court has looked to those visualizations. However, as to the explanations of the data, the Court has considered only the testimony presented at trial as opposed to simply relying on explanations contained in the reports. In other words, the Court resolves this case based solely on the evidence presented at trial.

> opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. The extent to which members of a protected class have been elected to office in the State or political subdivision is one circumstance which may be considered: *Provided*, That nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population.

52 U.S.C. § 10301.

In 1986, the Supreme Court decided *Thornburg v. Gingles*, 478 U.S. 30, 106 S. Ct. 2752, and developed a three-part framework for evaluating claims brought under Section 2. The *Gingles* framework has been applied time and time again since 1986 with the Supreme Court most recently applying it in *Allen v. Milligan*, 599 U.S. 1, 143 S. Ct. 1487, 216 L. Ed. 2d 60 (2023). As the Supreme Court articulated in *Milligan*:

> *Gingles* began by describing what § 2 guards against. "The essence of a § 2 claim," the Court explained, "is that a certain electoral law, practice, or structure interacts with social and historical conditions to cause an inequality in the opportunities enjoyed by black and white voters." That occurs where an "electoral structure operates to minimize or cancel out" minority voters' "ability to elect their preferred candidates." Such a risk is greatest "where minority and majority voters consistently prefer different candidates" and where minority voters are submerged in a majority voting population that "regularly defeats" their choices.

*Id*. at 17-18 (quoting *Gingles*, 478 U.S. at 47-48, 106 S. Ct. 2752) (internal citations omitted).

Liability in a Section 2 case "turns on the presence of discriminatory effects, not discriminatory intent." *Nairne v. Ardoin*, 715 F. Supp. 3d 808, 855 (M.D. La. Feb. 8, 2024), aff'd on appeal, --- F.4th ---, 2025 WL 2355524 (5th Cir. Aug. 14, 2025) (quoting *Milligan*, 599 U.S. at 25, 143 S. Ct. 1487).[5] In other words, a Section 2 plaintiff need not prove discriminatory intent to

---

[5] On August 14, 2025, a Fifth Circuit panel issued an opinion affirming the district court's ruling in *Nairne*. Issuance of the mandate was withheld. *See Nairne v. Landry*, Fifth Circuit Case No. 24-30115, dkt. [313]. The appellants have filed an opposed motion for abeyance of appeal and suspension of deadlines. *Id*. at [315]. That motion remains pending currently. The Court is aware of the ongoing litigation in *Nairne* but sees no need to further delay the issuance of a ruling in this case. Throughout this Order and Memorandum

prevail. *Id*. Rather, "[t]o succeed in proving a Section 2 vote-dilution claim, plaintiffs must first satisfy the three *Gingles* preconditions." *Miss. NAACP*, 739 F. Supp. 3d at 412 (quoting *Milligan*, 599 U.S. at 18, 143 S. Ct. 1487). The preconditions are as follows:

> First, the minority group must be sufficiently large and geographically compact to constitute a majority in a reasonably configured district. A district is reasonably configured when it complies "with traditional districting criteria, such as being contiguous and reasonably compact." Second, the minority group must be politically cohesive. Third, the white majority must be shown to vote sufficiently as a bloc to usually defeat the minority-preferred candidate. "The third precondition, focused on racially polarized voting, 'establishes that the challenged districting thwarts a distinctive minority vote' at least plausibly on account of race."

*Id*. (quoting *Milligan*, 599 U.S. at 18-19, 143 S. Ct. 1487; *Growe v. Emison*, 507 U.S. 25, 40, 113 S. Ct. 1075, 122 L. Ed. 2d 388 (1993)) (internal citations omitted).

Section 2 plaintiffs must satisfy all three preconditions, and the failure to satisfy any one of them is fatal to the claim. *See Gingles*, 478 U.S. at 40-41, 106 S. Ct. 2752 ("Unless these points are established, there neither has been a wrong nor can there by a remedy."). This is true even though "the *Gingles* requirements cannot be applied mechanically and without regard to the nature of the claim." *Bartlett*, 556 U.S. at 19, 129 S. Ct. 1231 (quoting *Voinovich*, 507 U.S. at 158, 113 S. Ct. 1149).

If a plaintiff establishes each of the *Gingles* preconditions, "he must then 'show, under the totality of the circumstances, that the political process is not equally open to minority voters,' which, in turn, establishes a Section 2 violation." *Miss. NAACP*, 739 F. Supp. 3d at 412 (quoting *Milligan*, 509 U.S. at 18, 143 S. Ct. 1487). The totality of the circumstances analysis is governed

---

Opinion, the Court makes reference to both the district court's decision in *Nairne* and the Fifth Circuit panel's opinion. Rather than clarify each time, the Court now specifies that citations to 715 F. Supp. 3d 808 refer to the district court's decision and citations to 2025 WL 2355524 refer to the Fifth Circuit panel's decision.

by a series of factors, commonly referred to as the Senate Factors. *Id*. at 413 (citing *Clements*, 999 F.2d at 849). The Court will articulate and address those factors after analyzing the *Gingles* preconditions.

        A.      *Gingles Precondition One*

The first *Gingles* precondition is "focused on geographical compactness and numerosity" and is "needed to establish that the minority has the potential to elect a representative of its own choice in some single-member district." *Milligan*, 559 U.S. at 18, 143 S. Ct. 1487 (quoting *Growe*, 507 U.S. at 40, 113 S. Ct. 1075). To satisfy the first precondition, a Section 2 plaintiff "must show by a preponderance of the evidence that the minority population in the potential election district is greater than 50 percent." *Nairne*, 715 F. Supp. 3d at 824 (quoting *Bartlett*, 566 U.S. at 19-20, 129 S. Ct. 1231). "Because 'only eligible voters affect a group's opportunity to elect candidates,' this requirement is analyzed in terms of Black voting-age population." *Id*. (quoting *League of United Latin Am. Citizens v. Perry*, 548 U.S. 399, 429, 126 S. Ct. 2594, 165 L. Ed. 2d 609 (2006)). "If the BVAP [in the potential election district] is greater than 50 percent, it must also be sufficiently compact such that a reasonably configured majority-minority district can be drawn." *Miss. NAACP*, 739 F. Supp. 3d at 413 (citing *Perry*, 548 U.S. at 433, 126 S. Ct. 2594).

        i.      *Justice Kavanaugh's Allen v. Milligan Concurrence*

Prior to addressing the evidence presented in this case, the Court turns to an additional argument that the Defendants raise. They contend that Justice Kavanaugh's concurrence in *Milligan* creates an additional hurdle the Plaintiffs must clear prior to proceeding.[6] The *Miss. NAACP* court referred to this same argument as a request to impose "a precondition to the precondition[.]" *Miss. NAACP*, 739 F. Supp. 3d at 413.

---

[6] For context, the Court notes that the impact of Justice Kavanaugh's concurrence is of critical importance since the *Milligan* decision was decided by a 5-4 vote.

In order to explain this argument, this Court begins with the *Milligan* majority's articulation of the applicable standard for the first precondition:

> First, the minority group must be sufficiently large and geographically compact to constitute a majority in a reasonably configured district. A district will be reasonably configured, our cases explain, if it comports with traditional districting criteria, such as being contiguous and reasonably compact.

*Milligan*, 559 U.S. at 18, 143 S. Ct. 1487 (citations and quotation marks omitted).

Justice Kavanaugh joined this portion of the majority's opinion. *Id*. at 42, 143 S. Ct. 1487 (Kavanaugh, J., concurring in all but Part III-B-1). In the concurrence, Justice Kavanaugh wrote:

> As the Court's precedents make clear, *Gingles* does not mandate a proportional number of majority-minority districts. *Gingles* requires the creation of a majority-minority district only when, among other things, (i) a State's redistricting map cracks or packs a large and geographically compact minority population and (ii) a plaintiff's proposed alternative map and proposed majority-minority district are reasonably configured.

*Id*.

Taking this language, the Defendants contend that the Plaintiffs must first show that the current map "cracks or packs a large and geographically compact minority population." *Id*. But the context of this concurrence is critical. Justice Kavanaugh appears to be responding to the State of Alabama's contention "that *Gingles* inevitably requires a proportional number of majority-minority districts[.]" *Id*. In other words, this portion of Justice Kavanaugh's concurrence is, in this Court's view, his response to the State of Alabama's argument that *Gingles* itself should be abandoned because it runs contrary to the proportionality disclaimer in Section 2's text. *See* 52 U.S.C. § 10301(b) (". . . nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population."). As the *Miss. NAACP* court explained it, "[w]e view this portion of Justice Kavanaugh's opinion as simply explaining the

14

natural effect of satisfying precondition one. The effect is that if a reasonably configured majority-minority district can be formed that satisfies traditional redistricting principles and does not join 'geographically dispersed minority voters into unusually shaped districts,' then minority voters have been cracked from that minority district to form majority districts." *Miss. NAACP*, 739 F. Supp. 3d at 414 (quoting *Milligan*, 559 U.S. at 43, 143 S. Ct. 1487 (Kavanaugh, J., concurring)).

This Court agrees. Notably, Justice Kavanaugh joined the portions of the majority opinion that apply the *Gingles* preconditions—again, a framework that has been applied continuously since 1986. The Court does not view Justice Kavanaugh's explanation as a signal to stray from that well-settled precedent. The Court will instead apply that well-settled precedent which has governed cases of this nature for nearly 40 years.

### ii.     *Evidence Presented in this Case*

Reverting to the case *sub judice*, William Cooper testified as an expert for the Plaintiffs. The Court accepted Cooper as an expert in redistricting, demographics, and census data, and he testified in detail as to each of these topics. Cooper has testified as an expert witness in over 55 federal redistricting cases—approximately 90% to 95% of them, he estimated, were Section 2 cases. Numerous courts across the country have found his work and his testimony credible and reliable. *See*, *e.g.*, *Miss. NAACP*, 739 F. Supp. 3d at 416; *Nairne*, 715 F. Supp. 3d at 836; *Singleton v. Merrill*, 582 F. Supp. 3d 924, 1005 (N.D. Ala. 2022); *Alpha Phi Alpha Fraternity Inc. v. Raffensperger*, 700 F. Supp. 3d 1136, 1266 n. 45 (N.D. Ga. Oct. 2023) (on appeal). The Court sees no need to walk through each of his qualifications. Suffice it to say, he is well-qualified.

At trial, Cooper testified that his overarching task in this case was "to determine whether or not it would be possible to draw a majority Black voting age population district for the Supreme Court comprised of three districts." [244] at p. 45. He reached the conclusion that "it clearly can

be accomplished in . . . a multiplicity of ways." *Id*. at p. 46. As part of his work in this case, he created two Illustrative Plans and two Least Change Plans. At trial, Cooper testified about both Illustrative Plans and about one of the Least Change Plans.

In creating these alternative plans, Cooper considered demographic and socioeconomic data for the entire State.

Start with demographics. The United States Census data reveals that in the years since the 2000 Census, the statewide Black population has increased. Meanwhile, the statewide White population has decreased during that same time period. Thus, the overall proportion of Black Mississippians has increased. More specifically, in 2000, Black Mississippians accounted for 33.29% of the statewide population. That number rose to 36.14% in 2020. The Non-Hispanic White population decreased from 64.16% to 57.76% during that same time period.

Cooper also testified about the socioeconomic attributes of Mississippi's population and the impact that race plays on those attributes. He testified that sharp disparities exist between White Mississippians and Black Mississippians in nearly every category, such as poverty rates, median income, high school graduation rates, and unemployment, among others. Cooper further testified that these disparities are consistent statewide.

In considering the current map, which again was enacted in 1987, in conjunction with the 2020 United States Census numbers, Cooper concluded that there are no majority Black Voting Age Population ("BVAP") districts. His conclusion is that the current map fragments or "cracks" the Black population. Again, he concluded that this problem could be remedied via a new map, which could be drawn in "a multiplicity of ways." [244] at p. 46.

Before turning to Cooper's alternative plans, the Court clarifies its task in analyzing them. As noted previously, it must first be shown that the BVAP in the potential election district is greater

16

than 50%. *Nairne*, 715 F. Supp. 3d at 824 (quoting *Bartlett*, 566 U.S. at 19-20, 129 S. Ct. 1231). "If the BVAP is greater than 50 percent, it must also be sufficiently compact such that a reasonably configured majority-minority district can be drawn." *Miss. NAACP*, 739 F. Supp. 3d at 413 (citing *Perry*, 548 U.S. at 433, 126 S. Ct. 2594). Thus, there is "a numerosity requirement and a compactness requirement." *Rodriguez v. Harris Cnty., Tex.*, 964 F. Supp. 2d 686, 725 (S.D. Tex. 2013) (citing *Johnson v. De Grandy*, 512 U.S. 997, 1011, 114 S. Ct. 2647, 129 L. Ed. 2d 775 (1994)).

Although the numerosity requirement is relatively straightforward, the inquiry surrounding the compactness requirement is "an imprecise concept[.]" *Miss. NAACP*, 739 F. Supp. 3d at 414; *see also Robinson v. Ardoin*, 86 F.4th 574, 590 (5th Cir. 2023) ("Compactness under Section 2 is an imprecise concept[.]"). However, it undoubtedly incorporates traditional districting principles, such as "communities of interests and maintaining traditional boundaries." *Id*. (citing *Perry*, 548 U.S. at 433, 126 S. Ct. 2594). In *Milligan*, the Supreme Court affirmed the district court's conclusion that the first precondition was satisfied where "none of plaintiffs' maps contained any tentacles, appendages, bizarre shapes, or any other obvious irregularities[.]" *Milligan*, 599 U.S. at 20, 143 S. Ct. 1487. Additionally, "equal populations, contiguity, and respect for existing political subdivisions like counties, cities, and towns" are relevant to the analysis. *Miss. NAACP*, 739 F. Supp. 3d at 414 (citing *Milligan*, 599 U.S. at 20, 143 S. Ct. 1487). And "[r]ace can also be considered in drawing illustrative districts to satisfy the first *Gingles* precondition." *Id*. at 415 (citing *Milligan*, 599 U.S. at 31, 143 S. Ct. 1487). "Section 2 itself 'demands consideration of race.' The question whether additional majority-*minority* districts can be drawn, after all involves a 'quintessentially race-conscious calculus.'" *Milligan*, 599 U.S. at 30-31, 143 S. Ct. 1487 (quoting *Abbott v. Perez*, 585 U.S. 579, 587, 138 S. Ct. 2305, 201 L. Ed. 2d 714 (2018)); *De Grandy*, 512

17

U.S. at 1020, 114 S. Ct. 2647) (emphasis in original). But "race may not be 'the *predominant* factor in drawing district lines unless there is a compelling reason.'" *Id*. (quoting *Cooper v. Harris*, 581 U.S. 285, 291, 137 S. Ct. 1455, 197 L. Ed. 2d 837 (2017)) (emphasis added).

Here, the Court notes that the Defendants do not dispute that there is a sufficiently large and compact Black majority such that a reasonably configured majority BVAP district can be drawn. This is because, in their view, District 1 of the current plan *already* constitutes such a district. The Plaintiffs contend that the Defendants' premise is flawed, though, because the data upon which they rely for that proposition only accounts for the voting age population—not voter *eligibility*.

In analyzing the first precondition, the focus is ordinarily on the illustrative plans adduced by a Section 2 plaintiff—not the existing plan. *See*, *e.g.*, *Milligan*, 599 U.S. at 20, 143 S. Ct. 1487 (considering only the illustrative plans when analyzing the first precondition). However, since it was such a point of contention between the parties during the trial, the Court will address the data pertaining to the current map.

As quoted previously, the stipulated facts on this point are as follows:

> 44.    According to the 2016-2020 5-year American Community Survey, the estimated Black CVAP of the Supreme Court districts is: District 1, 51.1%; District 2, 27.9%; District 3, 33.3%.

> 45.    According to the 2020 U.S. Census count, the BVAP of the Supreme Court districts is: District 1, 49.2%; District 2, 27.66%; District 3, 32.65%.

[228], Ex. 1 at p. 7.

The Census data is straightforward. The BVAP of District 1 is 49.2%, thus *below* the 50% threshold. *See*, *e.g.*, *Nairne*, 715 F. Supp. 3d at 835 (quoting *Perry*, 548 U.S. at 429, 126 S. Ct.

2594) (explaining that this requirement "is analyzed in terms of Black voting-age population ('BVAP') because 'only eligible voters affect a group's opportunity to elect candidates.'").

Conversely, according to the raw data of the 2016-2020 ACS, the Black CVAP of District 1 is 51.1%. But the Plaintiffs say the Court should not consider this number in isolation because the ACS data does not in any way reflect voter eligibility and therefore is not in and of itself sufficient to establish that the proportion of eligible Black voters in District 1 is over 50% (to the extent it is relevant).

On direct examination, Cooper testified that, as it pertains to this data, felon disenfranchisement "makes all of the difference in the world." [244] at p. 59. According to Cooper, "based on well-documented information about the size of the felon population in Mississippi and the disproportionate impact [disenfranchisement] has on Black felons, clearly, the current plan would not be majority Black, and it would not be majority Black CVAP." *Id*. Cooper went on to provide a further explanation:

> Well, yes, there are tens of thousands of Black persons of voting age who have been convicted of a felony who cannot register to vote. I mean, it is a very high number. I think in a case that is cited in my declaration there were an estimated 56,000 felons who were unable to vote based on a review of court records or, I guess, corrections records going from 1994 to 2017, and 60 percent of those were determined to be African American.
>
> And, of course, that is just one 23-year period. That does not include anybody who was convicted of a felony from 1950 or so all the way up to 1994, likely disproportionately Black, and it would not include anybody who was convicted after 2017.

*Id*. at p. 59-60.

For their part, the Defendants emphasize the testimony of David Swanson, Ph. D., who testified on their behalf as an expert in demographics. When Swanson was questioned about the impact that felon disenfranchisement would have on the Black CVAP in District 1, he testified

about two charts that he prepared which were admitted at trial. The first chart includes a population count for Mississippi prisoners broken down by prisoner race as well as by housing facility. *See* [242], Ex. 1 at p. 5 (Table III.E.1). It also includes the total prisoner count in the State of Mississippi, which was listed as 18,747. *Id*. Swanson testified that he retrieved this data from the Mississippi Department of Corrections. He then looked to the location of the facilities and subtracted the prisoner population from the Black CVAP total. This work is illustrated in his second chart. [242], Ex. 1 at p. 6 (Table III.E.2). According to Swanson, accounting for the total Black prisoner population in District 1—a total of 2,718 prisoners—the Black CVAP drops only from 51.1% to 51.0%. Therefore, as stated by Swanson, accounting for the prisoner population does not result in the Black CVAP decreasing below the 50% threshold.

Defense counsel proceeded to ask Swanson about the 56,000 *former* prisoner number that Cooper relied upon. Swanson answered "no" when asked if he was "able to find any information about people who have been released and can't vote but they are not in prison anymore[.]" [249] at p. 13. Nonetheless, his testimony was that, even assuming that there are 56,000 disenfranchised Mississippians with 60% of them being Black, the Black CVAP in District 1 would remain above 50%. His specific testimony on that point was as follows:

> Q.    Are there enough people among those former prisoners that would bring the any part Black population below 50 percent?
>
> A.    I don't believe so if you just do the simple addition and subtraction.
>
> Q.    Okay. And how -- you start with 56,000, 60 percent Black. In round numbers, what do you get?
>
> A.    You get a little over 30,000. And then you divide that, and it's roughly, give or take, about 14,000. You don't know exactly where they are geographically distributed. If you say they are equally distributed among the three districts, it

> would be 14,000 people in District 1. Then you would subtract, and it still remains above 50 percent.
>
> Q.     That 14,000 is the difference between Black ex-prisoners and non-Black ex-prisoners?
>
> A.     It would be the Black ex-prisoners, yeah.
>
> Q.     Okay. But the difference between them, again, divided between three districts, is that enough to pull the 51 percent down below 50 percent?
>
> A.     No.
>
> Q.     And, you know, this is assuming they are alive in Mississippi. Do we have any way of knowing whether they are alive in Mississippi?
>
> A.     I don't believe so.

[249] at p. 13-14.

Swanson was questioned about this extensively on cross-examination. Importantly, he did not dispute the estimate that there were approximately 56,000 total persons rendered ineligible to vote by a disqualifying felony that occurred between 1994 and 2017. He likewise agreed with Cooper's estimate that the group of approximately 56,000 persons disenfranchised during that 23-year period would be about 60% Black. Swanson also admitted that while his adjusted Black CVAP calculation took into account *current* prisoners, he did *not* conduct an analysis to account for former prisoners who were convicted of a disenfranchising felony. The Court sees this as a critical distinction. And while the Court is aware of the Defendants' contention that there is no way to definitively know the number of disenfranchised citizens living in District 1, Swanson's failure to attempt in any way whatsoever to account for disenfranchised persons who are no longer in custody is a glaring deficiency in his work.

Furthermore, even of the current prisoner population that Swanson did consider, he apparently did not consider the crimes for which any of the prisoners were convicted. This is particularly noteworthy since (as discussed in significant detail hereinafter) Mississippi's felon disenfranchisement provision does not include all felony offenses—only certain enumerated ones. *See* Miss. Const. Art. XII, § 241. In addition, Swanson admitted that his tabulation of the number of current prisoners living in District 1 "doesn't include all incarcerated people because there were only some facilities where [he] could get a bead on the geography[.]" [249] at p. 137. There was also no testimony as to the county of residence of any of these current prisoners. Thus, even considering only the current prisoner population like Swanson did (which is necessarily an incomplete representation of disenfranchised persons), his analysis is still inaccurate.

Plaintiffs' counsel also walked Swanson through his calculation of the adjusted Black CVAP of eligible voters. Although not disputing the underlying data, when asked to apply the estimates of disenfranchised Black Mississippians living in District 1, Swanson refused to concede that the Black CVAP would fall below 50%. However, when asked (on multiple occasions) what errors Plaintiffs' counsel made in arriving at the conclusion that the adjusted Black CVAP would fall below 50% after taking into account the estimated number of disenfranchised Mississippians living in District 1, Swanson did not provide a response that was in any way compelling. An example of such an exchange during his cross-examination is as follows:

> Q.    And you would agree that, because 60 percent of the population is disqualified as Black, the greater that population, the more that differential is going to reduce the relative share of the adjusted citizen voting-age population that is Black?
>
> A.    But at the same time, I would point out that the White population is going to be adjusted downward too; so it may not be as low as 46 percent. Because when you look at this prisoner-adjusted population, when you say 51 percent, that

takes into the other -- into account the other racial groups; correct? That's how you calculate the percent. Yes?

. . .

Q.    Well, it's correct according to the way that you calculated adjusted Black CVAP; correct?

A.    But you are also using that without making the adjustments for the White population, the White CVAP, is my point. And when you talk about the 51 percent and bring it down to 46 percent, you are talking about an adjustment percentage of the entire population.

And so if -- if the White population is going down at a similar rate -- you follow me? -- because the adjustments to the White CVAP population, then it's not going to be as low as 46 percent. That's simple arithmetic.

What you are doing is taking the Black VAP and assuming that the other populations is the same base, and that may or may not be true. And I'm posing the question, because it's a research question, that if you take convicted felons out of the White population, whatever the percentage is there, it's going to reduce that number too.

So the numbers -- the CVAP percentages may not be as low as what you say they are. That's the only point I'm trying to make.

[249] at p. 146-148.

The Court did not find these explanations (among others throughout Swanson's testimony) persuasive.[7]

---

[7] While Swanson testified that Plaintiffs' counsel's line of questioning failed to consider disenfranchised White Mississippians in District 1, he did not provide any mathematical calculation to support his ultimate conclusion that the Black CVAP would remain above 50%. The Court also notes that Swanson was offered a calculator to walk through the calculations—he refused the offer. Although remaining adamant that the Black CVAP would remain above 50% even after accounting for felon disenfranchisement, Swanson never explained that conclusion with an actual calculation. Even on redirect examination, when asked, he (again) concluded that the Black CVAP would remain above 50%, but he provided nothing other than vague references to some of the data points to support the conclusion. While generally accepting Swanson's premise that White disenfranchised felons should be taken into account in order to determine the Black CVAP percentage of eligible voters, the Court finds telling Swanson's failure to *ever* actually conduct that

23

In addition, Swanson acknowledged that the Census Bureau issued a release advising researchers to use caution when utilizing the 2016-2020 ACS (the same data set addressed in Paragraph 44 of the Pretrial Order [228]) because in 2020, the ACS faced challenges collecting data because of the COVID-19 pandemic. *See* [239], Ex. 3 at p. 1-2. In other words, the Defendants' own expert acknowledged that the data upon which the Defendants now rely carries with it a caution as to its potential inaccuracy.

Overall, Swanson's admissions, his failure to take into account disenfranchised felons who are no longer in custody in conducting his own analysis, and his failure to articulate a compelling reason as to how the Black CVAP would remain above 50% in District 1 after taking into account felon disenfranchisement left this Court completely unpersuaded by his testimony. His calculations were inaccurate and incomplete. The Court did not find Swanson to be credible and has afforded his testimony minimal weight. To be clear, in reaching this conclusion, the Court is aware that the numbers that the parties rely upon are estimates. The Court does not discount Swanson's testimony on that premise. Rather, as set forth previously, his analysis did not even attempt to account for all relevant considerations in order to obtain the most accurate percentage of eligible Black voters. Again, this Court finds his testimony lacking in credibility.

Stated concisely, although recognizing the fact that the data necessarily involves estimates, the Court finds that the percentage of Black *eligible* voters in District 1 is below 50%—regardless of whether the United States Census data or the ACS data is utilized. In reaching this conclusion, the Court has taken into account numerous considerations. One such consideration is the fact that the 56,000 number of disenfranchised Mississippians (of which approximately 60% are Black) includes only those convicted between 1994 and 2017. It does not account for anybody convicted

---

mathematical calculation. His generalized assertions that the Black CVAP would remain above 50% are insufficient, particularly when considered in light of his admissions during cross-examination.

of a disqualifying felony prior to 1994 or after 2017. The Court was presented nothing to indicate that the same disproportionate percentages would not be applicable to those additional categories of disenfranchised felons. Of course, the estimates do not account for disenfranchised felons who have died or who no longer reside in Mississippi. But, again, having considered all of the evidence presented on this point, the Court finds that the percentage of Black eligible voters in District 1 is less than 50%.

Having resolved that preliminary matter concerning the existing map, the Court turns to Cooper's alternative maps.

a.    *Illustrative Plan 1*

At trial, Cooper testified about his process in drawing the Illustrative Plans. He utilized Maptitude software, a software program that multiple states, including Mississippi, use for redistricting. He testified that in creating the plans, he was guided by traditional districting principles, such as population equality, compactness, continuity, and maintaining communities of interest. He said that he took race into consideration at a "high level" but did not use it as a determining factor in his placement of any particular county inside or outside of any particular district. [244] at p. 67.

On direct examination, Cooper walked through Illustrative Plan 1, which places the following counties in District 1: Adams, Amite, Attala, Bolivar, Carroll, Claiborne, Coahoma, Copiah, Franklin, Grenada, Hinds, Holmes, Humphreys, Issaquena, Jefferson, Lawrence, Leflore, Lincoln, Madison, Montgomery, Panola, Pike, Quitman, Sharkey, Sunflower, Tallahatchie, Tate, Tunica, Walthall, Warren, Washington, Wilkinson, Yalobusha, and Yazoo. Cooper testified at length about the Illustrative Plan—a picture of which (with planning district overlays) is set forth below:

25



[234], Ex. 1 at p. 27.

Beginning with numerosity, Cooper testified that the BVAP in District 1 of Illustrative Plan 1 is 55.31%. Thus, it exceeds the 50% threshold.

Concerning the traditional districting principles that he took into account, Cooper defined continuity in this context as "all parts of the district must be connected directly to one another physically in a sense that you wouldn't be driving outside a district to get to another part of the district in another part of the state." [244] at p. 68. All three districts are continuous in Illustrative Plan 1.

26

Cooper also testified as to compactness measures. He largely relied on the "visual method" because he was "working with whole counties and following areas that [he] understood to be significant regions like the Delta, like the Congressional District 2 and the planning districts, which are areas of interest . . . and divide the state up into ten fairly understandable regions that are in many ways consistent with other definitions one might find." *Id.* at p. 69. But he nevertheless also considered other traditional compactness measures like the Reock, Polsby-Popper, the Original Schwartzberg, and the convex hull tests. The Polsby-Popper test is a perimeter measure that looks at the perimeter of the theoretical district and considers how it would relate to a circle. The Reock test is similar. Under each of those tests, the end result is calculated through the software and provides a score between zero and one—with the most compact you could possibly have being 1.0. Cooper also provided an explanation of the convex hull and the Original Schwartzberg tests.

According to Cooper, Illustrative Plan 1 easily meets the visual test. As to the mathematical measures, he testified as follows:

> Q.     And, Mr. Cooper, just again, at a high level -- we don't need to run through the numbers. They're in the record, but at a high level, looking at Figure 1, comparing the overall compactness of Illustrative Plan 1 and the current plan, how does Illustrative Plan 1 stack up in terms of compactness?
>
> A.     It's not far. The numbers that you see here, even with the Polsby-Popper score, .28, that's an acceptable measure in most situations. If you get down to the single digits, it might be problematic, but .28 is fine.
>
> Q.     And then looking at Figure 2, I see this is comparing just District 1 in the illustrative plan and the current plan. How does District 1 stack up in each plan in terms of those mathematical compactness metrics?
>
> A.     There's really no difference. For Polsby-Popper, it's the same, .15. There's another measure in there called convex hull, which is sort of like the Original Schwartzberg in the sense that it simplifies the perimeter so you are not biased on

> that due to the odd twists and turns of the Mississippi River. And under that measure, the Illustrative Plan 1 outsourced the Supreme Court plan .74 to .65 for [convex hull].

[244] at p. 72.

Cooper additionally testified about his consideration of communities of interest. The Court heard testimony from multiple witnesses, such as Ty Pinkins, Derrick Simmons, and others, about the Delta as a whole, their respective experiences there, and it being a community of interest. The Court found that testimony credible and has no trouble concluding that the Mississippi Delta is a community of interest.[8]

District 1 of Illustrative Plan 1 notably "includes all of the core counties of the Mississippi Delta region, which would involve all of South Delta, two or three of the counties in North Central, and certainly Yazoo and . . . Warren in this Central Planning District." [244] at p. 77. Illustrative Plan 1 splits no counties whatsoever. As to planning districts, District 1 incorporates all of the Southwest, South Delta, and North Central planning districts and splits the Central and North Delta planning districts. Additionally, approximately 85% of the Black population of Congressional District 2 (enacted by the State Legislature) is included in District 1 of Illustrative Plan 1.

Cooper also testified about percent deviation, which he defined as "the population difference from the ideal population size for a three-district plan in Mississippi." [244] at p. 60. According to Cooper, District 1 under the current plan is underpopulated by 5.39%, whereas District 1 in Illustrative Plan 1 is underpopulated by 3.14%. Cooper testified that the deviation percentage should be below 5% and, thus, Illustrative Plan 1 meets that requirement.

Ultimately, Cooper testified that Illustrative Plan 1 passes the test of being reasonably configured "with flying colors." [244] at p. 79. The Court found Cooper's testimony credible and

---

[8] Even Swanson conceded that the Mississippi Delta could be considered a community of interest.

persuasive. His methodology was consistent with the applicable standards, and the Court further finds his conclusions reliable.

In addition, the numerosity requirement is undoubtedly satisfied. The BVAP of 55.31% is well beyond the requisite threshold.

Illustrative Plan 1, like the illustrative plans in *Milligan*, contains no "tentacles, appendages, bizarre shapes, or any other obvious irregularities[.]" *Milligan*, 599 U.S. at 20, 143 S. Ct. 1487. Likewise, the districts in Illustrative Plan 1 are clearly contiguous and continuous. They are also sufficiently compact. They pass the visual test, and the mathematical measures, despite their shortcomings (to which Cooper testified), support this conclusion. The Plan divides no counties. It also incorporates a significant portion of the Mississippi Delta—a well-known community of interest. Additionally, the Court finds that while Cooper admittedly took race into account, he did not cross the line between racial consciousness and impermissible racial predominance. He addressed a number of other factors (addressed above) that were part of the analysis. The data supports Cooper's testimony on that topic, and the Court finds his representation to the Court on that point to be credible.

In short, the Court has no trouble finding that District 1 in Illustrative Plan 1 is sufficiently compact and reasonably configured. In reaching this conclusion, the Court notes that the Defendants made some arguments in opposition to the Plaintiffs' position but largely did not dispute Cooper's conclusions. For instance, Swanson provided some critiques of the Plan, but he likewise admitted that he has no experience drawing redistricting plans, does not know how to use map-drawing software, did not himself use any mapping software in analyzing Cooper's plans, and does not consider himself an expert in electoral map drawing. And notably, Swanson

ultimately agreed that Cooper's plans perform as well as or better than the current map in many of the relevant metrics.

Illustrative Plan 1 satisfies the first *Gingles* precondition.

    *b.*    *Illustrative Plan 2*

Cooper also testified about Illustrative Plan 2. District 1 of Illustrative Plan 2 encompasses the following counties: Adams, Amite, Attala, Bolivar, Carroll, Claiborne, Coahoma, Copiah, DeSoto, Franklin, Grenada, Hinds, Holmes, Humphreys, Issaquena, Jefferson, Leflore, Montgomery, Panola, Pike, Quitman, Sharkey, Sunflower, Tallahatchie, Tate, Tunica, Warren, Washington, Wilkinson, Yalobusha, and Yazoo. Illustrative Plan 2 (with planning district overlays) is pictured below:



[234], Ex. 1 at p. 30.

Cooper testified that he utilized the same process to create Illustrative Plan 2 as he did with Illustrative Plan 1. He explained that the biggest difference between the two plans is that DeSoto County was shifted into District 1 and Madison County was moved to District 3. Cooper described DeSoto County as the fastest growing county in Mississippi. Aelicia Thomas, who serves as a county and youth court judge in Bolivar County and has lived in that county for 27 years, testified that while DeSoto County is not typically considered a part of the Mississippi Delta, many Delta residents frequently travel there for economic, medical, and/or other reasons.

Concerning numerosity, the BVAP of District 1 in Illustrative Plan 2 is 54.19%, surpassing the requisite 50% threshold.

As to compactness, the scores of Illustrative Plan 2 are extremely comparable to Illustrative Plan 1. In fact, Cooper testified that District 1 in Illustrative Plan 2 is underpopulated by only 1.59%, making the population deviation even closer to zero than Illustrative Plan 1. *See* [244] at p. 80. The Court also notes that all three districts in Illustrative Plan 2 are contiguous and continuous and there are no "tentacles, appendages, bizarre shapes, or any other obvious irregularities[.]" *Milligan*, 599 U.S. at 20, 143 S. Ct. 1487.

Since the Defendants largely do not dispute that the first precondition is satisfied and the Court has already analyzed Illustrative Plan 1 in more significant detail, the Court sees no need to further address Illustrative Plan 2 but does note, for the purpose of clearly articulating its findings, that it finds Illustrative Plan 2 to satisfy the first precondition.

B.     *Gingles Preconditions Two and Three*

"The second *Gingles* precondition concerns the voting behavior of black voters. It asks whether a significant number of black voters usually vote for the same candidates, such that they would elect their representative of choice in a majority-minority district[.]" *Miss. NAACP*, 739 F. Supp. 3d at 433 (citations omitted and internal quotation marks omitted).

The third precondition "focuses on the electoral outcome resulting from racially polarized behavior." *Id*. It looks to whether "the white majority votes sufficiently as a bloc to enable it . . . usually to defeat the minority's preferred candidate." *Growe v. Emison*, 507 U.S. 25, 40, 113 S. Ct. 1075, 122 L. Ed. 2d 388 (1993) (quoting *Gingles*, 478 U.S. at 50-51, 106 S. Ct. 2752). "'[T]he plausibility that the challenged [] districting thwarts minority voting on account of race' must be established. In other words, a plaintiff must provide proof that 'whites vote sufficiently as a bloc

usually to defeat the minority's preferred candidates.'" *Miss. NAACP*, 739 F. Supp. 3d at 433 (quoting *Robinson*, 86 F.4th at 595; *Gingles*, 478 U.S. at 56, 106 S. Ct. 2752). The inquiry into whether a district "experiences legally significant racially polarized voting requires discrete inquiries into minority and white voting practices." *Id.* (quoting *Gingles*, 478 U.S. at 56, 106 S. Ct. 2752). Oftentimes, courts analyze the second and third preconditions together. *See id.*; *Emison*, 507 U.S. at 40, 113 S. Ct. 1075.

The Plaintiffs presented the testimony of Byron D'Andra Orey, Ph. D., as to the second and third preconditions. The Court accepted Orey as an expert in political science, political participation behavior, racially polarized voting, and race and politics.

Beginning with *Gingles* 2, Orey testified that he utilized the ecological inference methodology to analyze the existence of racially polarized voting. Orey has been using the ecological inference technique "since its inception," which he pegged as 1997. [245] at p. 23. According to Orey, ecological inference is commonly relied upon by political scientists in conducting quantitative analyses of election results and in measuring support for different candidates by race.

Indeed, courts across the country consistently accept experts utilizing ecological inference in Section 2 cases. *See*, *e.g.*, *Nairne*, 715 F. Supp. 3d at 860 ("Experts agree and courts recognize that EI produces the most reliable estimates[.]"). Notably, the Defendants' expert, Christopher Bonneau, Ph. D., agreed that ecological inference is the best method to analyze this information, while nonetheless making clear that the outcomes are estimates—"they may be the best estimates we can get, but they are not unproblematic in the sense that the results are highly dependent upon how the data are specified." [247] at p. 39. Bonneau likewise testified that he did not dispute the accuracy of any of Orey's computations.

Orey testified that biracial contests—that is, elections where a Black candidate runs against a White candidate—are the most telling in analyzing the existence of racially polarized voting. This is consistent with the conclusions of other courts. *See*, *e.g.*, *Miss. NAACP*, 739 F. Supp. 3d at 435 (noting that the expert "focused on contests that included both black and white candidates because courts have found these biracial contests to be more probative than contests with only white candidates for a *Gingles* polarized-voting analysis."); *Nairne*, 715 F. Supp. 3d at 861 ("This Court finds—and both Defendants' expert and additional courts agree—that biracial statewide elections are the most probative for determining racial polarization.") (citations and quotation marks omitted).

He also explained endogenous, quasi-endogenous, and exogenous elections. Here, endogenous elections would be Supreme Court elections in District 1. Quasi-endogenous elections are those that use the same district lines but elect different positions—here, the Public Service Commissioner and Transportation Commissioner elections. And exogenous elections would be statewide elections. Orey analyzed a total of 19 biracial elections across these three categories dating back to 2011. The Court will address each of the election categories separately.

Beginning with the endogenous elections, the Court first notes their importance: "The Fifth Circuit once stated that when considering whether there is racial bloc voting under *Gingles*, 'elections involving the particular office at issue will be more relevant than elections involving other offices.'" *Miss. NAACP*, 739 F. Supp. 3d at 435-36 (quoting *Magnolia Bar*, 994 F.2d at 1149). In the recent *Nairne* decision, the Fifth Circuit reiterated this principle, noting that "[e]ndogenous contests are typically more probative than exogenous elections for different offices because they capture voter behavior in the precise electoral setting challenged in the lawsuit."

*Nairne*, 2025 WL 2355524 at *6 (citing *Magnolia Bar*, 994 F.2d at 1149). Bonneau agreed that these elections are the most probative to the task at hand.

Since 2011, there have been two biracial Supreme Court elections in District 1—the 2012 race between Earle Banks and William Waller, Jr. and the 2020 race between Latrice Westbrooks and Kenny Griffis. Orey conducted an ecological inference analysis concerning those elections and prepared the following chart, which was discussed at length at trial:

| Election | Black Candidate | White Candidate | % Vote Black Candidate | Black Vote Black Candidate (CI)[13] | White Vote Black Candidate (CI) | Black Candidate Won | RPV |
|---|---|---|---|---|---|---|---|
| 2012 Supreme Court | Banks | Waller | 44.4 | 81.26 (80.80-81.80) | 5.44 (5.01-5.83) | No | Yes |
| 2020 Supreme Court | Westbrooks | Griffis | 48.5 | 90.46 (89.97-91.03) | 6.43 (5.89-6.88) | No | Yes |

[236], Ex. 1 at p. 1.

During his testimony, Orey provided a detailed overview of the information contained in the chart. The fifth column provides the percentage of Black vote for the Black candidate. It also includes a confidence interval utilizing a 95% threshold. As explained by Orey, "because we use a 95 percent threshold, we can be 95 percent sure that the estimate falls within that range[.]" [245] at p. 29. Looking to those percentages of the Black vote for the Black candidate (81.26% in 2012 and 90.46% in 2020), Orey testified that the level of cohesive Black voting for Black candidates is extremely high. In his opinion, 80% or more is an "extremely high" number in this category. *Id.* at p. 31. Conversely, the White support for Black candidates (addressed in the sixth column) was strikingly low—being 5.44% in 2012 and 6.43% in 2020. When questioned how he would characterize the level of racial polarization in these two endogenous elections, Orey answered "extreme." *Id.* at p. 33.

Next, Orey testified about quasi-endogenous biracial elections in District 1. As noted above, this includes Public Service Commissioner and Transportation Commissioner elections—that is, elections that utilize the same map but involve positions different than that of Mississippi Supreme Court Justice. His initial report, which he prepared in October 2022, analyzed five such contests—2011 Public Service Commissioner, 2011 Transportation Commissioner, 2015 Transportation Commissioner, 2019 Public Service Commissioner, and 2019 Transportation Commissioner. The chart he prepared to summarize those analyses follows the same format of the endogenous elections addressed above:

| Election | White Candidate | Black Candidate | % Black Candidate | Black Vote Black Candidate (CI) | White Vote Black Candidate (CI) | Black Candidate Won | RPV |
|---|---|---|---|---|---|---|---|
| 2011 Central Public Service Commission | Posey | Green | 44 | 90.94 (90.27-91.50) | 8.16 (7.47-8.80) | No | Yes |
| 2011 Central Transportation Commission | Hall | Crisler | 47 | 91.04 (90.44-91.42) | 8.29 (7.80-8.76) | No | Yes |
| 2015 Central Transportation Commission | Hall | Coleman | 45 | 89.36 (88.90-89.83) | 4.87 (4.42-5.38) | No | Yes |
| 2019 Central Public Service Commission | Bailey | Stamps | 49 | 91.36 (91.52-92.83) | 7.60 (7.07-8.51) | No | Yes |
| 2019 Central Transportation Commission | Lee | Simmons | 51 | 93.97 (93.33-94.44) | 8.81 (8.12-9.79) | Yes | Yes |

[236], Ex. 1 at p. 1.

After Orey prepared his initial report, two additional quasi-endogenous biracial contests occurred in 2023. Willie Simmons, a Black man, defeated Ricky Pennington, Jr., a White man, for the Transportation Commissioner position, and De'Keither Stamps, a Black man, defeated Brent Bailey, a White man, for the Public Service Commissioner position. Orey prepared a supplemental report to address those elections. He also prepared tables to address those elections, but the format is different than those addressed above. Nonetheless, the tables are set forth below:

36

**Table 1.**

| Simmons v. Pennington, Jr. | EI Estimate | Confidence Intervals |
|---|---|---|
| Black Vote for Simmons | 95.42 (.23) | 94.91-95.80 |
| Black Vote for Pennington, Jr. | 4.56 (.26) | 4.12-5.19 |

**Table 2.**

| Simmons v. Pennington, Jr. | EI Estimate | Confidence Intervals |
|---|---|---|
| White Vote for Simmons | 16.20 (.23) | 15.73-16.67 |
| White Vote for Pennington, Jr. | 83.76 (.23) | 83.3-84.2 |

**Table 3.**

| Stamps v. Bailey | EI Estimate | Confidence Intervals |
|---|---|---|
| Black Vote for Stamps | 92.04 (.26) | 91.39-92.49 |
| Black Vote for Bailey | 7.91 (.26) | 7.50-8.53 |

**Table 4.**

| Stamps v. Bailey | EI Estimate | Confidence Intervals |
|---|---|---|
| White Vote for Stamps | 11.44 (.27) | 10.97-11.9 |
| White Vote for Bailey | 88.57 (.21) | 88.12-88.99 |

[236], Ex. 6 at p. 2-3.

Orey's conclusions as to the existence of racial polarization in these elections were largely synonymous with his conclusions as to the endogenous ones. Black support for the Black candidates in all seven of these elections was near or exceeded 90%. White support for the Black candidates did not exceed 16.20% in any of them and for five of the elections was below 10%. Although Orey's method of organizing the relevant data for the 2023 elections differed from his

organization of the first five elections, they tell the same story. Orey ultimately concluded that all seven of these elections were racially polarized.

Next, Orey testified about exogenous biracial elections. The chart he prepared organizing the results of his analyses is as follows:

| Election | White Candidate | Black Candidate | Percent Black Candidate | Black Vote Black Candidate | White Vote Black Candidate | Black Candidate Won | RPV |
|---|---|---|---|---|---|---|---|
| 2011 Governor | Bryant | DuPree | 53 | 90.94 (90.20-91.51) | 8.11 (7.45-8.71) | No | Yes |
| 2012 President | Romney | Obama | 54 | 92.72 (92.13-93.32) | 12.12 (11.13-13.38) | Yes | Yes |
| 2015 Governor | Bryant | Gray | 41 | 87.76 (87.06-88.17) | 4.44 (4.04-5.01) | No | Yes |
| 2015 Secretary of State | Hosemann | Graham | 44 | 87.58 (87.12-87.97) | 4.67 (4.11-5.21) | No | Yes |
| 2018 U.S. Senate | Hyde-Smith | Espy | 57 | 94.91 (94.27-95.49) | 16.42 (15.70-17.36) | Yes | Yes |
| 2019 Treasurer | McRae | Green | 49 | 92.38 (92.20-93.49) | 7.16 (6.48-7.76) | No | Yes |
| 2019 Sec. of State | Watson | DuPree | 51 | 94.35 (93.81-94.84) | 8.73 (8.24-9.51) | Yes | Yes |
| 2019 Insurance Commission | Chaney | Amos | 49 | 92.08 (91.52-92.62) | 6.66 (6.08-7.26) | No | Yes |
| 2019 Attorney General | Fitch | Collins | 53 | 94.54 (93.87-95.08) | 10.82 (10.13-11.51) | Yes | Yes |
| 2020 U.S. Senate | Hyde-Smith | Espy | 55 | 96.34 (95.94-96.68) | 13.5 (12.71-14.30) | Yes | Yes |

[236], Ex. 1 at p. 2.

To be clear, Orey testified that the "Black Candidate Won" column addressed whether or not the Black candidate won the majority of votes in District 1—not whether the Black candidate actually prevailed in the statewide election.[9]

For purposes of *Gingles* 2, Orey's conclusion as to exogenous elections was the same as with endogenous and quasi-endogenous elections—there is extreme racially polarized voting. Black voters cohesively supported Black candidates at anywhere from 87% to 96% in these elections. And White support for Black Candidates never exceeded 17% and was as low as 4.44% in one election.

---

[9] In fact, multiple witnesses testified to the fact that *no* Black candidate has been elected to statewide office in Mississippi since the end of Reconstruction.

In sum, considering the biracial endogenous, quasi-endogenous, and exogenous elections since 2011, Orey concluded that Black voters in Mississippi cohesively support Black candidates. On cross-examination, Bonneau agreed that "it's clear that Black voters in Mississippi vote cohesively for one set of candidates." [247] at p. 51.

Considering the data submitted at trial, as well as the testimony related thereto, the Court agrees. It is clear that Black voters cohesively vote for the same candidates. *See Miss. NAACP*, 739 F. Supp. 3d at 433 ("The second *Gingles* precondition concerns the voting behavior of black voters. It asks whether a significant number of black voters usually vote for the same candidates, such that they would elect their representative of choice in a majority-minority district[.]") (citations omitted). The Court found Orey's methodology, testimony, and conclusions—most, if not all, of which were uncontradicted—on this point credible and persuasive. The Plaintiffs carried their burden of proof as to *Gingles* 2.[10]

That brings the Court to the third precondition. As noted above, on this point, "a plaintiff must provide proof that 'whites vote sufficiently as a bloc usually to defeat the minority's preferred candidates.'" *Miss. NAACP*, 739 F. Supp. 3d at 433 (quoting *Gingles*, 478 U.S. at 56, 106 S. Ct. 2752). This requires "discrete inquiries into minority and white voting practices." *Id*. at 434 (quoting *Gingles*, 478 U.S. at 56, 106 S. Ct. 2752). Much of the same data addressed in connection with *Gingles* 2 is relevant here, but the Court must dig further into it and consider *results*, as the relevant question is whether White voters vote sufficiently as a bloc to *usually defeat* the Black voters' preferred candidate. *See*, *e.g.*, *Gingles*, 478 U.S. at 56, 106 S. Ct. 2752 (explaining that the

---

[10] It is also worth noting that the underlying voting pattern data presented at the trial in this case is similar to—and perhaps even more racially polarized—than the data presented in *Nairne*. Considering the data presented in *Nairne*, the Fifth Circuit concluded that "[t]he statistics are stark and clearly show that voting in Louisiana is intensely racially polarized[.]" *Nairne*, 2025 WL 2355524 at *15.

relevant inquiry is "whether whites vote sufficiently as a bloc usually to defeat the minority's preferred candidates.").

This is where the opinions of the parties' respective experts starkly diverge. According to Orey, White voters do vote sufficiently as a bloc to usually defeat Black voters' preferred candidate. Bonneau, for his part, testified that Black voters are able to participate in the electoral process and to elect candidates of their choice: "I conclude that they are able to do both. There are no impediments to participation that I looked at and that they are able to elect candidates of their choice." [247] at p. 37.

The Court notes that Bonneau testified, and the Defendants continually stress, that partisanship—not race—is what motivates these voting blocs. This issue is more appropriately addressed in connection with the totality of the circumstances analysis, rather than in connection with the *Gingles* preconditions. *See*, *e.g.*, *Nairne*, 715 F. Supp. 3d at 867-68 ("To the extent party preference is relevant to the § 2 inquiry, it is appropriately assessed when analyzing the 'totality of the circumstances,' not in the assessment of racially polarized voting under *Gingles* II and III."); *Miss. NAACP*, 739 F. Supp. 3d at 449-50 (taking partisanship into account at the totality of the circumstances stage); *Teague v. Attala Cnty.*, 92 F.3d 283, 292 (5th Cir. 1996) ("A defendant may try to rebut plaintiffs' claim of vote dilution via evidence of objective, nonracial factors under the totality of the circumstances standard."); *Raffensperger*, 700 F. Supp. 3d at 1266 n. 45 ("The Court finds that the inquiry into whether partisanship is the motivating factor behind the polarization is not relevant to the *Gingles* precondition inquiry, but may be relevant to the overall totality of the circumstances."). Consistent with these precedents, the Court will fully analyze the role of partisanship in connection with the totality of the circumstances inquiry hereinafter. However, the Court also notes that some of the relevant arguments pertaining to the third precondition implicate

40

partisanship and the Court will therefore necessarily address partisanship to some extent in its analysis of the third precondition.

With that overarching background in mind, the Court will walk through the underlying data and evidence. Concerning the endogenous elections, there is no dispute that in the only two contested biracial elections since 2011, the Black (and Black-preferred) candidate (Banks in 2012 and Westbrooks in 2020) lost. For ease of reference, the statistics from those elections are set forth again below:

| Election | Black Candidate | White Candidate | % Vote Black Candidate | Black Vote Black Candidate (CI)[13] | White Vote Black Candidate (CI) | Black Candidate Won | RPV |
|---|---|---|---|---|---|---|---|
| 2012 Supreme Court | Banks | Waller | 44.4 | 81.26 (80.80-81.80) | 5.44 (5.01-5.83) | No | Yes |
| 2020 Supreme Court | Westbrooks | Griffis | 48.5 | 90.46 (89.97-91.03) | 6.43 (5.89-6.88) | No | Yes |

[236], Ex. 1 at p. 1.

The data itself is relatively self-explanatory, but, as the Defendants emphasize, "[c]ontext is key[.]" [253] at p. 10. The Court agrees, and the case law makes clear that there must be a discrete inquiry into voting practices. *See*, *e.g.*, *Miss. NAACP*, 739 F. Supp. 3d at 433-34.

The Court begins with the 2012 race between Banks and Waller. Extensive testimony was presented as to this particular election. Bonneau testified that former President Barack Obama carried District 1 with approximately 54% of the vote, whereas Banks received approximately 44.4% of the vote.

Both Orey and Bonneau testified that voter roll-off played a role the outcome of the 2012 Supreme Court election, as it does in any election involving multiple electoral races. The concept of roll-off is straightforward and well-known. As defined by Orey, "[r]oll-off is when you vote at the top of the ticket, and then you decide not to vote on lower level ballot -- I mean, contest." [245]

at p. 74. There is no evidence that Black voters or White voters are more likely to roll-off. In fact, both Orey and Bonneau testified that they had no reason to believe that either Black or White voters would be more likely to roll-off. But Bonneau did testify that roll-off occurs more frequently for non-partisan races, such as Mississippi Supreme Court elections.

Orey testified about the 2012 election at some length during cross-examination. For context, William Waller, Jr., who ran against Banks, is the son of former Mississippi Governor William Waller, Sr. In relation to the 2012 election, Orey's testimony was in pertinent part as follows:

> Q. You do know, don't you, that Governor Waller was the first White governor to bring Blacks into positions of responsibility and authority in Mississippi state government?
>
> A. I'll take your word on that.
>
> . . .
>
> Q. . . . you probably know that Bill Waller prosecuted Byron De La Beckwith twice. You know that, don't you?
>
> A. Yes.
>
> Q. So isn't it possible that Black voters in the Central District continue to hold the Waller family in high regard?
>
> A. That's possible. Yeah, that's possible.
>
> Q. And matter of fact, if you look at your numbers, you will see that Chief Justice Waller got about a fifth of the Black vote in that election; isn't that right?
>
> A. Banks got 80 percent.
>
> Q. And the other -- and there were only two candidates in the race. So the 20 percent went to the chief; isn't that right?
>
> A. Correct.

42

Q.      Okay.

A.      That's extremely high polarized voting.

[245] at p. 67-68.

As this line of questioning makes clear, the Defendants take the position that it is the conduct of Black voters—not White bloc voting—that carried Waller to victory. The Court notes, though, that Black voters still voted at a mark of over 80% in favor of Banks. Nonetheless, despite this level of support (which Orey categorized as "extremely high"), Banks did not even receive 45% of the total vote. And Bonneau himself testified that he only considered an election to be competitive when the losing candidate received at least 45% of the total vote. *See* [247] at p. 22.

While the Defendants make much of the fact that the Black support for Banks was 81.26% (as opposed to 90.46% for Westbrooks in 2020), there is no dispute that the White support for Banks was only 5.44%. Stated conversely, White voters voted for Waller—and thus against the Black candidate at a rate of *nearly 95%*. This is extremely significant bloc voting against the Black candidate. Although the Court is aware that Black voters supported Banks at 81.26% instead of 90.46%, to argue that cohesive White voting against Banks did not result in his defeat is, in this Court's view, simply disingenuous. Black voters cohesively voted in favor of Banks, yet he still did not even carry 45% of the vote. Again, this was not even a competitive election utilizing the metrics articulated by the Defendants' own expert.

The Court next looks to the 2020 race between Westbrooks and Griffis. In that election, Westbrooks carried over 90% of the Black vote and still only received 48.5% of the total vote. Mike Espy, a Black man who was the Democratic nominee for United States Senate, and former President Joe Biden, a White man who was the Democratic Presidential nominee, both carried District 1 in this election, yet the Black (and Black-preferred) candidate for the Supreme Court—

43

Westbrooks—did not prevail. The Defendants take the position that Westbrooks' failure to prevail under these circumstances was indicative of her not being able to garner sufficient Black support, as illustrated by the following line of questioning during Orey's cross-examination:

> Q.    A lot of Blacks who voted for Joe Biden didn't go all the way down the ballot and vote for Judge Westbrooks, did they?
>
> A.    I don't know that but –
>
> Q.    Isn't that what you said in your report about roll-off?
>
> A.    90-some-odd percent of the vote for Westbrooks came from Blacks.
>
> Q.    I understand that. I know she was a Black-preferred candidate. But people who manage to get to the polls, overcome whatever barriers there might have been, actually mark ballots, a lot of them didn't go all the way to the ballot and mark – down to the bottom and vote for Latrice Westbrooks, even though they could have?
>
> A.    Didn't vote for that particular contest.

[245] at p. 73.

The Defendants seemingly take the position that Black voters rolling off and not supporting Westbrooks is indicative of failing to utilize a purported advantage as it pertains to the current districting scheme. Thus, like they pointed to Black voters supporting Banks in 2012 at a rate of 81.26% instead of over 90%, the Defendants again point to the conduct of Black voters, as opposed to White bloc voting, as the reason for Westbrooks' defeat. The Court is unpersuaded.

First, the Court reiterates that no evidence was presented to indicate that Black voters are more likely to roll-off than White voters. Rather, roll-off is simply inevitable in every election for Black and White voters alike. The fact that some Black voters may have voted for Biden and/or

Espy and rolled off before reaching the Supreme Court election on the ballot does not carry the day for the Defendants.

Instead of speculating that Black voter roll-off is solely to blame for the outcome, the Court will revert to the data. Even though some voters (Black and White) certainly rolled off before reaching the Supreme Court election on the ballot, there is no dispute that, of the voters that did vote in the race, Westbrooks carried over 90% of the Black vote—Black voters overwhelmingly supported her. On the other hand, she received only 6.43% of the White vote. By comparison, Espy received 13.5% of the White vote in the same election.

Stated simply, the Court finds that White crossover voting—not roll-off of Black voters— explains the 2020 election outcomes. The evidence admitted at trial indicates that Espy possesses a unique ability to garner White support as a Black candidate. In fact, the 13.5% of White crossover vote that Espy received in 2020 was the second highest of any of the ten analyzed biracial exogenous elections—second only to the special election between Espy and Cindy Hyde-Smith for the same position in 2018 wherein Espy received 16.42% of the White vote. These two elections were the only two of the analyzed biracial exogenous elections where the Black candidate received more than 10% of the White vote. Thus, the evidence reveals that Espy is an outlier as far as a Black candidate being able to obtain any notable White support. Again, Westbrooks received only 6.43% of the White vote—this is extreme racial polarization, and it is hard for the Court to reach any conclusion other than that White voters sufficiently voted as a bloc to defeat her. If anything can be gleaned from this dynamic, it is that Black-preferred candidates can prevail in District 1 when White voters are willing to support them.

The data is clear that in both 2012 and 2020, White voters sufficiently voted as a bloc to defeat the Black (and Black-preferred) candidate—despite Black voters cohesively voting in favor

of their preferred candidate. The Court finds credible Orey's testimony on this point. Bonneau reached a different conclusion, which this Court squarely rejects. The data here is so overwhelmingly staggering in favor of White bloc voting to defeat the Black-preferred candidates that the Court cannot reach any other conclusion.

Next, the Defendants argue that Orey's analysis is not fully inclusive of all relevant data because, while it takes into account the biracial contests since 2011, it does not take into account the contest where a White candidate who was Black-preferred won a contested Supreme Court election in District 1. In particular, the Defendants point to the 2016 election where Jim Kitchens prevailed over Kenny Griffis. At trial, there was testimony, which went unrebutted, that Kitchens, a White man, was the Black-preferred candidate.

In the 2016 election, Kitchens received 68.3% of the Black vote. *See* [236], Ex. 4 at p. 1. White support for Kitchens exceeded 40%. *Id*.

The Defendants contend that the Court should take this election into account when analyzing *Gingles* 3. On the other hand, the Plaintiffs take the position that Black voters may be acting strategically in electing certain White candidates. While that may be the case, the Defendants' point is well-taken—the Black-preferred candidate did prevail. However, it is also noteworthy what did *not* happen in the 2016 election—that is, White voters did *not* vote as a bloc at a rate of over 90% against the Black-preferred candidate like in 2012 and 2020. *See* [236], Ex. 4 at p. 1. Although the Court finds that it is not as salient as the biracial contests discussed previously, the Court will consider the 2016 election in its *Gingles* 3 analysis. *See*, *e.g.*, *Miss. NAACP*, 739 F. Supp. 3d at 435 (noting that the expert "focused on contests that included both black and white candidates because courts have found these biracial contests to be more probative than contests with only white candidates for a *Gingles* polarized-voting analysis.").

The Defendants also argue that the Court should consider Leslie King's uncontested victories in 2012 and 2020. They contend that these results show that Black voters can elect a candidate of choice. Notably, the Defendants cite no authority indicating that unopposed elections provide any probative value on this topic. And in a previous Section 2 case, the District Court for the Southern District of Texas recognized the lack of probative value that an uncontested election provides on this analysis. *See Rodriguez*, 964 F. Supp. 2d at 763 n. 63 (citing *Gingles*, 478 U.S. at 54, 106 S. Ct. 2752) ("Given that the incumbent ran unopposed, the Court finds that the [plaintiffs'] exclusion of the 2006 race was proper because in the 2006 race, voters did not have the opportunity to oppose the Latino-preferred candidate, therefore the 2006 race will have little probative value on the question of racial bloc voting."). This Court agrees. Although cognizant of the Defendants' sentiment that the lack of opposition may indicate that no challenger feels confident of being able to mount a successful challenge to King, that notion is certainly speculative to some extent, and the Court finds it more appropriate to consider the contested elections in gauging whether White voters sufficiently vote as a bloc so as to usually defeat Black-preferred candidates. *See Gingles*, 478 U.S. at 51, 106 S. Ct. 2752 ("[T]he minority must be able to demonstrate that the white majority votes sufficiently as a bloc to enable it—in the absence of special circumstances, *such as the minority candidate running unopposed*, usually to defeat the minority's preferred candidate.") (emphasis added); *see also Pope v. Cnty. of Albany*, 94 F. Supp. 3d 302, 346 (N.D. N.Y. 2015) ("[C]andidates running unopposed does not necessarily signal there was no better candidate. Indeed, *Gingles* specifies candidates running unopposed in its definition of 'special circumstances.'"). After all, when there is no opposition to the Black-preferred candidate, there can be no bloc voting against the Black-preferred candidate.

Considering the analyzed endogenous elections as a whole, the Black-preferred candidate lost both of the biracial contests. And even taking into account the 2016 election where Kitchens won, the Black-preferred candidate still lost two of the three Supreme Court elections.

The Court next turns to the analyzed quasi-endogenous elections. From 2011 through 2019, Orey analyzed five biracial elections, the results of which are set forth (again) below:

| Election | White Candidate | Black Candidate | % Black Candidate | Black Vote Black Candidate (CI) | White Vote Black Candidate (CI) | Black Candidate Won | RPV |
|---|---|---|---|---|---|---|---|
| 2011 Central Public Service Commission | Posey | Green | 44 | 90.94 (90.27-91.50) | 8.16 (7.47-8.80) | No | Yes |
| 2011 Central Transportation Commission | Hall | Crisler | 47 | 91.04 (90.44-91.42) | 8.29 (7.80-8.76) | No | Yes |
| 2015 Central Transportation Commission | Hall | Coleman | 45 | 89.36 (88.90-89.83) | 4.87 (4.42-5.38) | No | Yes |
| 2019 Central Public Service Commission | Bailey | Stamps | 49 | 91.36 (91.52-92.83) | 7.60 (7.07-8.51) | No | Yes |
| 2019 Central Transportation Commission | Lee | Simmons | 51 | 93.97 (93.33-94.44) | 8.81 (8.12-9.79) | Yes | Yes |

[236], Ex. 1 at p. 1.

In the 2011 elections, White bloc voting against the Black-preferred candidates (Addie Green and Marshand Crisler) was significant. In both of those elections, the White crossover vote was less than 9%. In the Public Service Commissioner race, Green received over 90% of the Black vote, yet still only received 44% of the total vote. As noted previously, this is below the threshold that Bonneau recognized as even being a competitive race. *See* [247] at p. 22. Similarly, Crisler carried over 91% of the Black vote but only earned 47% of the total vote. White voters sufficiently voted as a bloc to defeat the Black-preferred candidates in the 2011 quasi-endogenous elections.

The 2015 Transportation Commissioner election results tell a very similar story. Mary Coleman received over 89% of the Black vote. The White crossover vote was less than 5%.

Ultimately, Dick Hall carried 55% of the total vote and won the election. White voters voted sufficiently as a bloc to defeat Coleman.

Although not addressed in Orey's analysis since it was not a biracial election, the Defendants urge the Court to consider the 2015 Public Service Commissioner election. In that election, Cecil Brown, who is White, was the Black-preferred candidate and prevailed over another White candidate, Brent Bailey. For the same reasons set forth above in connection with the Kitchens endogenous election, the Court will consider this election for purposes of the present analysis. However, because this was not a biracial contest, the Court finds that this election is not as salient for purposes of analyzing voting polarization based on race. *See*, *e.g.*, *Miss. NAACP*, 739 F. Supp. 3d at 435.

The 2019 elections were closer races, and the Court heard more testimony about those contests. In the Public Service Commissioner race, De'Keither Stamps, who is a Black man and was the Black-preferred candidate, obtained over 91% of the Black vote yet received less than 8% of the White vote. He lost to the White candidate, Brent Bailey, in a very competitive race. In the Transportation Commissioner race, Willie Simmons, who is a Black man and was the Black-preferred candidate, garnered almost 94% of the Black vote. The White crossover vote was less than 9%. Simmons ultimately defeated Butch Lee, the White candidate, in another very competitive race.

In 2023, Simmons won re-election. In that election, he received over 16% of the White vote. That year, Stamps renewed his bid against Bailey and was ultimately successful. The Black support for Stamps was similar to 2019 (approximately 91.36% in 2019 and 92.04% in 2023). However, the White support he received increased (approximately 7.60% in 2019 and 11.44% in 2023).

The Court notes that the Plaintiffs take the position that the 2023 election was in some ways an outlier because of the unusual dynamics of Mississippi's gubernatorial election that was on the ballot. More specifically, the Plaintiffs emphasize that Brandon Presley, a viable White Democratic candidate, was on the ballot in the gubernatorial election against incumbent Tate Reeves. As with the Defendants' contentions pertaining to partisanship, the Court will address the Plaintiffs' argument as to the 2023 gubernatorial election in connection with Senate Factor 2. *See*, *e.g.*, *Nairne*, 715 F. Supp. 3d at 867-68; *Teague*, 92 F.3d at 292. But, for now, the Court notes that the Black (and Black-preferred) candidate won both of the 2023 Commissioner elections.

Considering the analyzed quasi-endogenous elections, the Black-preferred candidate lost four of the seven biracial contests. Even including Brown's victory for Public Service Commissioner in a contest between two White candidates in 2015, the Black-preferred candidate lost four of the eight elections.

The Court lastly looks to the analyzed exogenous elections. Orey's chart is copied below:

| Election | White Candidate | Black Candidate | Percent Black Candidate | Black Vote Black Candidate | White Vote Black Candidate | Black Candidate Won | RPV |
|---|---|---|---|---|---|---|---|
| 2011 Governor | Bryant | DuPree | 53 | 90.94 (90.20-91.51) | 8.11 (7.45-8.71) | No | Yes |
| 2012 President | Romney | Obama | 54 | 92.72 (92.13-93.32) | 12.12 (11.13-13.38) | Yes | Yes |
| 2015 Governor | Bryant | Gray | 41 | 87.76 (87.06-88.17) | 4.44 (4.04-5.01) | No | Yes |
| 2015 Secretary of State | Hosemann | Graham | 44 | 87.58 (87.12-87.97) | 4.67 (4.11-5.21) | No | Yes |
| 2018 U.S. Senate | Hyde-Smith | Espy | 57 | 94.91 (94.27-95.49) | 16.42 (15.70-17.36) | Yes | Yes |
| 2019 Treasurer | McRae | Green | 49 | 92.38 (92.20-93.49) | 7.16 (6.48-7.76) | No | Yes |
| 2019 Sec. of State | Watson | DuPree | 51 | 94.35 (93.81-94.84) | 8.73 (8.24-9.51) | Yes | Yes |
| 2019 Insurance Commission | Chaney | Amos | 49 | 92.08 (91.52-92.62) | 6.66 (6.08-7.26) | No | Yes |
| 2019 Attorney General | Fitch | Collins | 53 | 94.54 (93.87-95.08) | 10.82 (10.13-11.51) | Yes | Yes |
| 2020 U.S. Senate | Hyde- Smith | Espy | 55 | 96.34 (95.94-96.68) | 13.5 (12.71-14.30) | Yes | Yes |

[236], Ex. 1 at p. 2.

These results speak for themselves. Racially polarized voting existed in all ten of these elections. The Black vote for the Black-preferred candidate exceeded 90% in eight of the ten elections and never fell below 87%. The 2018 Senate race between Cindy Hyde-Smith and Mike Espy was the only election where the White crossover vote exceeded 15%.

Of these ten biracial exogenous elections, the Black candidate carried District 1 five times and failed to do so five times.

Considering all of the analyzed elections across all three categories (endogenous, quasi-endogenous, exogenous), White bloc voting is prevalent. Excluding the 2015 Brown election and 2016 Kitchens election (the only elections where the Black-preferred candidate was White), White crossover voting never exceeded 17%. Orey characterized this type of polarization as extreme, and this Court found his testimony persuasive.

However, the third precondition asks not only whether White bloc voting exists but whether "the white majority votes sufficiently as a bloc to enable it . . . usually to defeat the minority's preferred candidate." *Growe*, 507 U.S. at 40, 113 S. Ct. 1075 (quoting *Gingles*, 478 U.S. at 50-51, 106 S. Ct. 2752). Here, it does.

This is particularly so when considering the endogenous elections. As emphasized above, White bloc voting is prevalent in all analyzed elections but particularly in the Supreme Court elections. In each of the two analyzed biracial elections, which are more probative, the White vote for the Black-preferred candidate was less than 7%. Both Black (and Black-preferred) candidates lost. In 2012, Banks was not even able to reach the requisite threshold for the election to be considered competitive applying Bonneau's articulated metric.

Although Black candidates have prevailed in some of the analyzed quasi-endogenous and exogenous elections, the Court views those elections as far less probative. The Fifth Circuit does

too. *See Magnolia Bar*, 994 F.2d at 1149 ("It also follows that elections involving the particular office at issue will be more relevant than elections involving other offices."); *see also Nairne*, 2025 WL 2355524 at *6.

Ultimately, the Court found Orey's testimony credible and persuasive. His methodology went undisputed—Bonneau (and the Defendants) only dispute his conclusions. In addition to pointing to the voting patterns of Black voters, the Defendants emphasize partisanship and other external factors, such as Waller's family ties (as briefly referenced previously) and the impact of the COVID-19 pandemic, in an attempt to explain the outcomes of the 2012 and 2020 endogenous elections respectively. The Court notes those arguments and will address them, along with other external, nonracial factors, in more detail in its analysis of Senate Factor 2. *See, e.g.*, *Miss. NAACP*, 739 F. Supp. 3d at 449-50.

Reverting to the relevant inquiry before the Court as to the third precondition, though, "the proper question to ask is this: . . . [does] the voting behavior of the white majority cause the relevant minority group's preferred candidate usually to be defeated?" *Miss. NAACP*, 739 F. Supp. 3d at 434 (quoting *Robinson*, 86 F.4th at 597) (internal punctuation omitted). Here, the election results paint a clear picture. White bloc voting *usually* results in the defeat of Black-preferred candidates in District 1. In reaching this conclusion, the Court again notes it is particularly persuaded by the outcomes of the endogenous elections, which the parties agree is the most probative category.

The Plaintiffs carried their burden as to the third precondition.[11]

---

[11] In *Milligan*, the Supreme Court emphasized the district court's conclusion that "on average, Black voters supported their candidates of choice with 92.3% of the vote while white voters supported Black-preferred candidates with 15.4% of the vote. Plaintiffs' experts described the evidence of racial polarized voting in Alabama as 'intense,' 'very strong,' and 'very clear.' Even Alabama's expert conceded 'that candidates preferred by white voters in the areas that he looked at regularly defeat the candidates preferred by Black voters.'" *Milligan*, 599 U.S. at 22, 143 S. Ct. 1487 (quoting *Singleton*, 582 F. Supp. 3d at 1016-18). The Supreme Court saw "no reason to disturb the District Court's careful factual findings." *Id.*, 143 S. Ct. 1487. This Court cannot help but note the similarities between the statistics presented in this case and in *Milligan*.

C.      *Totality of the Circumstances*

Having concluded that the Plaintiffs satisfied their burden as to all three preconditions, the Court turns to the totality of the circumstances analysis. This inquiry mandates a "'searching practical evaluation of the past and present reality' of the political process in Mississippi." *Miss. NAACP*, 739 F. Supp. 3d at 442 (quoting *Gingles*, 478 U.S. at 79, 106 S. Ct. 2752). "That evaluation considers the totality of the circumstances, described as 'an intensely local appraisal of the design and impact of the contested electoral mechanisms.'" *Id*. (quoting *Gingles*, 478 U.S. at 79, 106 S. Ct. 2752). "It is only the very unusual case in which the plaintiffs can establish the existence of the three *Gingles* factors but still have failed to establish a violation of § 2 under the totality of circumstances." *Nairne*, 715 F. Supp. 3d at 868 (quoting *Clark v. Calhoun Cnty.*, 21 F.3d 92, 97 (5th Cir. 1994)).

"In 1986, the Supreme Court adopted 'typical factors' to be considered in this portion of the Section 2 vote-dilution analysis." *Miss. NAACP*, 739 F. Supp. 3d at 442 (quoting *Gingles*, 478 U.S. at 79, 106 S. Ct. 2752). "The United States Senate referred to these factors in its report on the 1982 amendments to the Voting Rights Act," and most courts therefore refer to them as the Senate Factors. *Id*. The Factors are as follows:

1.      the extent of any history of official discrimination in the state or political subdivision that touched the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process;

2.      the extent to which voting in the elections of the state or political subdivision is racially polarized;

3.      the extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group;

53

4.      if there is a candidate slating process, whether the members of the minority group have been denied access to that process;

5.      the extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment, and health, which hinder their ability to participate in the political process;

6.      whether political campaigns have been characterized by overt or subtle racial appeals;

7.      the extent to which members of the minority group have been elected to public office in the jurisdiction[;]

8.      whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group; and

9.      whether the policy underlying the state or political subdivision's use of such voting qualification, prerequisite to voting, or standard, practice or procedure is tenuous.

*Id.* (quoting *Teague*, 92 F.3d at 292-93; *Gingles*, 478 U.S. at 36-37, 106 S. Ct. 2752).

These Factors are not necessarily exhaustive: "While the enumerated factors will often be pertinent to certain types of [Section] 2 violations, particularly to vote dilution claims, other factors may also be relevant and may be considered." *Gingles*, 478 U.S. at 45, 106 S. Ct. 2752. This inquiry "is peculiarly dependent upon the facts of each case. Defendants may attempt to rebut plaintiffs' claims of vote dilution via evidence of objective, nonracial factors like partisan politics; . . . [however,] it is not the Plaintiffs' burden to negate all nonracial reasons possibly explaining voting patterns." *Miss. NAACP*, 739 F. Supp. 3d at 442-43 (quoting *Gingles*, 478 U.S. at 79, 106 S. Ct. 2752; *Teague*, 92 F.3d at 292, 295) (internal quotation marks omitted). Instead, the analysis is based on the totality of the circumstances. *Nairne*, 715 F. Supp. 3d at 868 (quoting *Gingles*, 478 U.S. at 36, 106 S. Ct. 2752).

54

The Court will walk through the evidence presented as to each of the Senate Factors.

i.      *Senate Factors One and Three*

Stated simply, Senate Factor 1 looks to "the history of voting-related discrimination in the State or political subdivision." *Nairne*, 715 F. Supp. 3d at 868 (quoting *Gingles*, 478 U.S. at 44, 106 S. Ct. 2752). Similarly, Factor 3 concerns "the extent to which the state or political subdivision has used voting practices or procedures that tend to enhance the opportunity for discrimination against the minority group[.]" *Gingles*, 478 U.S. at 45, 106 S. Ct. 2752. The Court will analyze the factors together because they "both look at the history of discrimination." *Miss. NAACP*, 739 F. Supp. 3d at 443.

The District Court for the Southern District of Mississippi has recognized that "Mississippi plainly has a long history of official discrimination against African-Americans seeking to vote." *Thomas v. Bryant*, 366 F. Supp. 3d 786, 807 (S.D. Miss. 2019). Similarly, the Fifth Circuit has acknowledged that it is "indisputable" that "Mississippi has a long and dubious history" of discriminating against Black people. *Teague*, 92 F.3d at 293-94. The evidence presented in this case was no different. In fact, the Defendants essentially concede as much, noting in their post-trial submission that they "largely do not dispute Mississippi's past history of discrimination in the State as having affected blacks' ability in the past to register to vote, vote, and otherwise participate in the democratic process." [253] at p. 23.

But the Defendants "do, however, challenge the concept that such history places significant burdens on black voters *in today's day and age*." *Id*. at p. 23 (emphasis added). They emphasize an opinion from the District Court for the Southern District of Texas, wherein that court expressed the need to focus this "analysis on *recent* evidence of discrimination." *Lopez v. Abbott*, 339 F. Supp. 3d 589, 611 (S.D. Tex. 2018) (citing *McCleskey v. Kemp*, 481 U.S. 279, 298 n. 20, 107 S.

Ct. 1756, 95 L. Ed. 2d 262 (1987)) (emphasis added). For their part, the Plaintiffs take the position that the accumulation of Mississippi's history of voting discrimination, in conjunction with a number of the state's current voting mechanisms, do indeed continue to impact Black Mississippians to this day.

The Defendants are correct that recent evidence of discrimination has a stronger probative value than older evidence. The Fifth Circuit has said so. *See Veasey v. Abbott*, 830 F.3d 216, 257-58 (5th Cir. 2016) (noting that "long-ago evidence of discrimination has less force than more contemporary evidence.").

In accordance with this precedent, the Court will certainly give more weight to more recent evidence and the *current* circumstances that Black Mississippians face. But the full history provides context to those current circumstances. So, the Court will (briefly) walk through the testimony presented as to the more distant history before transitioning into the more recent events.

The Court heard extensive testimony from James T. Campbell, Ph. D. After Campbell testified as to his credentials and achievements, the Plaintiffs tendered him—and the Court accepted him—as an expert in race relations in the United States, the history of Mississippi after the Civil War, and the history of racial politics in the South and Mississippi from the post-Civil War era to modern day. Campbell began by testifying about voting practices in the Reconstruction Era. He described the atmosphere as it pertains to race as "extremely violent and fraught" at that time. [245] at p. 212.

In 1868, the Mississippi Constitution enshrined Black people's right to vote and included a stipulation that it could never be amended in such a manner as to deprive people of this right. *Id*. at p. 214. White Mississippians responded by employing a coordinated effort—dubbed the Mississippi Plan—to obtain political power through violence, intimidation, and suppression of

Black voters. *Id*. Paramilitary organizations, such as the White League, the White Line, the Red Shirts, and the Ku Klux Klan, emerged and engaged in violent intimidation not only in Mississippi but across most of the southern United States. *Id*.

In 1890, shortly after a national election where the Republicans obtained control of the Presidency and both the United States Senate and the House of Representatives, leaders in Mississippi convened a new Constitutional Convention to reinvent the state's legal system. *Id*. at p. 215. The President of the Convention, Saul Calhoun, stated as follows concerning the purpose of the Convention: "We came here to exclude the Negro. Nothing short of this will answer." *Id*. at p. 216. This quote does not appear in the published proceedings of the Convention, but it did appear in the *Jackson Clarion-Ledger* newspaper, which published detailed minutes of each day of the Convention. Campbell referred to the newspaper as "for state purposes the newspaper of record." *Id*. The Convention undeniably accomplished this stated goal, as the 1890 Mississippi Constitution eliminated the voting power of Black Mississippians through various facially race-neutral mechanisms, such as poll taxes, dual registration, literacy exams, residency requirements, and felon disenfranchisement. Campbell testified that the collective impact of these mechanisms, in addition to Mississippi's Democratic Party (the party of the White South at the time) establishing all-White primaries, "essentially eliminate[d] Black voting." *Id*. at p. 220.

Suppression of Black voters continued into the 20th century. *Id*. at p. 223. Prominent White Mississippians played a role in perpetuating this reality. *Id*. For instance, in the 1940s, Theodore Bilbo, a United States Senator from Mississippi, called for violence against Black people as an intimidation tactic. *Id*. During the 1950s and 1960s, White groups, such as the White Citizens' Council and the Mississippi State Sovereignty Commission, continued to engage in violence against potential Black voters. *Id*.

The Voting Rights Act was passed in 1965. The Act "created stringent new remedies for voting discrimination, attempting to forever banish the blight of racial discrimination in voting." *Milligan*, 599 U.S. at 10, 143 S. Ct. 1487 (quoting *South Carolina v. Katzenbach*, 383 U.S. 301, 308, 86 S. Ct. 803, 15 L. Ed. 2d 769 (1966)) (internal quotation marks omitted). Only sixteen years later, "many considered the [Voting Rights Act] 'the most successful civil rights statute in the history of the Nation.'" *Id.*, 143 S. Ct. 1487 (quoting S. Rep. No. 97-417, p. 111 (1982)). But despite this widespread praise for the Voting Rights Act, Campbell provided numerous examples of continued efforts to suppress the Black vote in Mississippi during this time. In total, according to Campbell, between the passage of the Act in 1965 and the United States Supreme Court's striking down of the preclearance regime in *Shelby County* in 2013, the State of Mississippi was found to be in violation of the Voting Rights Act 173 times. [245] at p. 228.

The reality that Black Mississippians—specifically, potential Black voters—face today is different than in times past, though. Of the previously-referenced facially race-neutral mechanisms included in the 1890 Mississippi Constitution that indisputably disproportionately impacted Black Mississippians, only the residency requirement and the felon disenfranchisement provision remain in effect. The Plaintiffs have made no argument as to the residency requirement, and the Court sees no need to address it.

But felon disenfranchisement was addressed at significant length during the trial and in the parties' post-trial submissions. Article 12, § 241 of the Mississippi Constitution permanently disenfranchises certain felons—in particular, those who have been convicted of murder, rape, bribery, theft, arson, obtaining money or goods under false pretense, perjury, forgery, embezzlement, or bigamy. *See* MISS. CONST. ART. XII, § 241.

The Defendants direct this Court's attention to the Fifth Circuit's en banc decision in *Harness v. Watson*, 47 F.4th 296 (5th Cir. 2022). There, the court concluded that the current version of Article 12, § 241 does *not* violate the Equal Protection Clause of the United States Constitution. *Id*. Notably, though, that decision addressed only whether there was discriminatory *intent* as required to prove an Equal Protection claim. The Fifth Circuit did *not* conclude that Mississippi's felon disenfranchisement laws have no racially disparate impact. The case *sub judice* presents a different question altogether. The Court finds the Defendants' reliance on *Harness* to be a non-starter—that decision is not helpful in resolving the issue presently before the Court.[12]

At trial, numerous experts agreed that the proportion of persons disenfranchised in Mississippi is approximately 60% Black. For the Plaintiffs, Cooper and Burch both testified to this point. In fact, Swanson, who, as referenced above, testified as a defense expert, agreed. The Court finds the unrebutted testimony on this point credible and that Mississippi's felon disenfranchisement provision disproportionately impacts Black Mississippians.

In addition to historical mechanisms, the Plaintiffs also point to more recently enacted mechanisms that they contend enhance the opportunity for discrimination against Black Mississippians—strict voter identification laws, strict absentee voting requirements, and majority vote requirements in statewide elections.

The Court will address each of them.

Kyle Kirkpatrick, a defense witness who holds the title of assistant secretary of state for elections at the Office of the Mississippi Secretary of State, explained that Mississippi first

---

[12] The Court also notes that on July 18, 2024, less than a month before the commencement of the trial in this case, the Fifth Circuit issued an en banc opinion concluding that Mississippi's felon disenfranchisement provision does not violate the Eighth Amendment of the United States Constitution. *See Hopkins v. Watson*, 108 F.4th 371 (5th Cir. 2024), cert. denied --- S. Ct. ---, 2025 WL 299516 (Jan. 27, 2025). But that decision likewise has no bearing on the Court's analysis here—the fact that the provision does not violate the Eighth Amendment does not preclude a finding that it disproportionately impacts Black Mississippians.

implemented voter identification as a constitutional initiative in 2012 and it was fully implemented a couple of years later. During his direct testimony, Kirkpatrick walked through the various types of identification that an individual can present in order to vote in Mississippi. On cross-examination, Kirkpatrick agreed that driver's licenses are the most frequently utilized method of identification used at polling places. This ties into other testimony about Black Mississippians experiencing higher poverty rates and being less likely to have a vehicle, which the Court will address in further detail hereinafter.

Kirkpatrick also testified about Mississippi's absentee voting requirements. There are specific statutorily defined excuses pursuant to which an individual may vote absentee. Kirkpatrick provided some examples of those excuses, such as the individual having a temporary or permanent disability, being 65 years of age or older, being outside of the county on election day, or working from 7:00 AM to 7:00 PM on election day. During his direct examination, Campbell testified that Mississippi's absentee voting laws are among the strictest in the United States.

Campbell also agreed that Mississippi's voter identification and absentee voting laws are facially race-neutral, but he explained that he nevertheless believes they have a disproportionate impact on Black voters:

> Historically, again, if people don't have access to an automobile, if people live in a place that is remote -- and it's also what people bring to the table. You know, if I have to go and have a conversation with the postmaster or I have to find a lawyer or public notary to notarize a form . . . There are certain people in the circumstances of their lives -- and this is not just Black people, but it's also poor people, which, in Mississippi, would be disproportionately Black -- these things are harder, and, in my opinion, they're designed to be harder.

[246] at p. 22.

60

The Court credits Campbell's testimony that these laws disproportionately impact Black Mississippians. Although these policies are facially neutral, the Court finds that they disproportionately impact Black voters in a negative manner.

Lastly, the Court looks to majority vote requirements. The District Court for the Southern District of Texas has articulated the disadvantage that a majority-vote requirement can impose on the minority: "A majority-vote requirement [] disadvantages minority voters by forcing their preferred candidate into a head-to-head contest with only one other candidate and eliminating the chance for a plurality victory if multiple candidates in the majority group divide the vote." *Patino v. City of Pasadena*, 230 F. Supp. 3d 667, 682 (S.D. Tex. 2017). And the United States Supreme Court "has long recognized that multimember districts and at-large voting schemes *may* operate to minimize or cancel out the voting strength of racial minorities in the voting population." *Gingles*, 478 U.S. at 47-48, 106 S. Ct. 2752 (quoting *Burns v. Richardson*, 384 U.S. 73, 88, 86 S. Ct. 1286, 16 L. Ed. 2d 376 (1966)) (additional citations and internal quotation marks omitted) (emphasis added). Theoretically, the basis "for this type of impairment is that where minority and majority voters consistently prefer different candidates, the majority, by virtue of its numerical superiority, will regularly defeat the choices of minority voters." *Id*. at p. 48, 106 S. Ct. 2752.

At trial, there was extensive, largely unrebutted testimony that Black Mississippians are exponentially more likely than White Mississippians to be poor, lack access to a vehicle, and face economic hardship by having to take off work to vote. All of this is, of course, compounded if an election goes to a run-off and a voter therefore has to overcome the obstacles to voting on multiple occasions. However, at trial, there was minimal testimony as to the frequency of run-off elections in Mississippi Supreme Court elections—or any other elections for that matter. In light of the Plaintiffs' failure to present significant evidence on that point, the Court sees no need to articulate

the differences between the case at bar and cases where the majority vote requirement has been found to operate to the detriment of minority voters, such as *Clark v. Calhoun Cnty., Miss.*, 88 F.3d 1393, 1398 (5th Cir. 1996).

This Court does not find this mechanism as one that illustrates discriminatory impact on Black Mississippians. *See*, *e.g.*, *Magnolia Bar*, 793 F. Supp. at 1409 ("Although abolition of the majority vote requirement . . . might increase chances for electoral success of [African-American] candidates, a majority vote requirement is not inherently discriminatory.").

Nevertheless, taking all of these matters into account, the Court finds that the Plaintiffs have carried their burden. The evidence reveals a history of voting-related discrimination in Mississippi and the utilization of voting practices and procedures that continue to enhance the opportunity to discriminate against or suppress the votes of Black Mississippians. Although neither the long-standing felon disenfranchisement provision nor any of the above-referenced more recently enacted mechanisms are facially discriminatory, the Plaintiffs have shown that they continue to suppress Black Mississippians in the voting arena.[13]

It is also not lost on this Court that the Legislature's districting plan *following even the most recent Census* has been found to violate the Voting Rights Act. *See Miss. NAACP*, 739 F. Supp. 3d 383. The Defendants' contention that Black voters no longer face suppression in Mississippi is simply an inaccurate characterization of the present reality. To be fair, the Court agrees with the conclusion of the District Court for the Southern District of Mississippi that "Mississippi is a much different state today than during the period of its 'long and dubious history'" of discriminating against Black people. *Id*. at 444 (quoting *Teague*, 92 F.3d at 293-94). But

---

[13] Bonneau himself agreed that the effects of historical discrimination continue to permeate life today in terms of the opportunities available to Black Mississippians. *See* [247] at p. 64.

progress away from that long and dubious history does not equate to a finding in the Defendants' favor on this point.[14]

Instead, for the reasons articulated herein, the Court finds that Senate Factors 1 and 3 weigh in the Plaintiffs' favor.

*ii.* *Senate Factor Two*

"Senate Factor 2 examines 'the extent to which voting in the elections of the state or political subdivision is racially polarized.'" *Nairne*, 715 F. Supp. 3d at 870 (quoting *Gingles*, 478 U.S. at 37, 106 S. Ct. 2752). This Factor "overlaps with *Gingles* precondition three, which is also routinely described as concentrating on racial polarization." *Miss. NAACP*, 739 F. Supp. 3d at 449 (citing *Milligan*, 599 U.S. at 19, 143 S. Ct. 1487). The District Court for the Southern District of Mississippi recognized this Factor as "one of the two most important factors, the other being minority candidates' success or failure in elections." *Id.*

Of critical importance, "under the totality-of-the-circumstances analysis, 'a defendant may try to rebut plaintiffs' claim of vote dilution via evidence of objective, nonracial factors.'" *Id.* (quoting *Teague*, 92 F.3d at 292) (additional citation and quotation marks omitted). This is precisely what the Defendants argue here—that racial polarization in Mississippi is, according to them, based on *partisanship* and not race. *See* [253] at p. 47 (asserting that "[v]oting is polarized by party, not race.").

---

[14] Further underscoring this point is the testimony of Percy Watson, a Black legislator who has served in the Mississippi House of Representatives since 1979. He testified that since 1987 there have been multiple proposals to amend the current Mississippi Supreme Court map in such a way that would increase the BVAP. Those proposals have all failed. The Defendants did not dispute this testimony, and the Court has no reason to question its accuracy. The continued inaction of the Mississippi Legislature in this area, even when given a specific opportunity to take action, runs counter to the Defendants' position that Black Mississippians no longer face obstacles in the voting arena.

At the outset of this analysis, it is important to address the fact that Mississippi Supreme Court elections are nonpartisan, which at first blush might create the impression that partisanship necessarily does not play a role in the outcome. On this point, it should be noted that the scope of relevant evidence at this stage is much broader—in other words, the Court can consider other elections (which are partisan), not just Mississippi Supreme Court elections. *See Miss. NAACP*, 739 F. Supp. 3d at 449 ("To begin, the scope of relevant evidence is broader at this stage. While we focused our review of the *Gingles* preconditions on the districts at issue, we may consider more under the totality analysis.") (citing *Perry*, 548 U.S. at 438, 126 S. Ct. 2594). Thus, the scope of relevant evidence encompasses elections that *are* partisan.

And even considering Mississippi Supreme Court elections, Bonneau testified that in some ways these elections, while technically nonpartisan, are still partisan:

> So [Supreme Court] elections in Mississippi are nonpartisan, but in some ways they are nonpartisan in name only. You have candidates campaigning with partisan political figures. You have partisan political figures endorsing candidates for the state supreme court. And so they are sending a cue as to which voter -- as to which party supports which candidate.

[247] at p. 26.

Bonneau's opinion on this point was supported by other evidence. For instance, during the 2020 campaign, Westbrooks' campaign account posted on Twitter a photograph of Westbrooks posing with United States Democratic Congressman Bennie G. Thompson. [242], Ex. 5 at p. 1. The post accompanying the photograph announced Thompson's endorsement of Westbrooks as a candidate. Similarly, the account also posted a photograph of Westbrooks with Joe Biden, who at that time was the Democratic Presidential nominee, with the message: "It was an honor to meet you, Vice President Biden! I wish you many blessings in your journey." *Id*. at p. 3. According to

Bonneau, messages of this nature are ways that candidates in nonpartisan elections signal to voters their partisan affiliations.

Although it has already discredited portions of Bonneau's testimony, the Court found Bonneau's testimony on this particular point persuasive. While Mississippi Supreme Court elections are nonpartisan, it would be naïve to assume that partisanship plays *no* role in them. The evidence presented at trial indicated that the opposite is true. With that being said, the Court accepts the Defendants' premise that partisanship *could* be the reason underlying the outcomes of the relevant elections. Therefore, rather than simply categorically disregarding the Defendants' argument based on the nonpartisan nature of the Supreme Court elections, the Court will analyze the evidence presented at trial.

The Court first notes the testimony of fact witnesses. Reuben Anderson, the first Black person to serve as a Justice on the Mississippi Supreme Court, testified that race is the "number one" factor in Mississippi politics and agreed with the premise that "racial polarization in electoral politics still exist[s] in Mississippi." [248] at p. 72. Similarly, Percy Watson testified that he believes racial polarization in the state is just as intense now as it was when he was first elected nearly a half century ago. The Court found both Anderson and Watson's testimony, which was based on their own personal experiences in Mississippi politics, credible. Moreover, as set forth more fully hereinafter, their beliefs are supported by the data.

Before addressing the statistics from some recent elections, the Court feels compelled to confront another point—the fact that partisanship in Mississippi rests upon a racial divide. Multiple witnesses testified that Black Mississippians are more likely to identify as Democrats and that White Mississippians are more likely to identify as Republicans. For example, Oliver Diaz, who previously served in the state Legislature and later as a Justice on the Mississippi Supreme Court,

testified as an expert in political science, political participation, racially polarized voting, and race and politics. Diaz testified that there is "absolutely" a relationship between party affiliation and race and that the "Democratic Party is majority Black, African American, and majority of Whites in Mississippi are associated with the Republican Party." [245] at p. 117. The Court credits Diaz's testimony, which went unrebutted, on that point.

Additionally, the Court finds the historical context as to the political parties to be relevant. As the District Court for the Southern District of Mississippi put it, "context also matters." *Miss. NAACP*, 739 F. Supp. 3d at 454. At trial, Campbell testified about partisan realignment during the Civil Rights Era:

> A.    . . . That collapses a little after the Civil War, and you get the third-party system, which is the one that we have now, which is Democrats and Republicans. Since 1856, we haven't elected anybody that is not from one of those parties.
>
> What happens, however, is the constituency of each of these parties flip-flops. It's quite extraordinary. So the south, which we colloquially refer to as the "red states," those are the bluest of blue states for most of the post-reconstruction era really right into the civil rights era. White southerners and Mississippians in particular, this is a one-party state.
>
> Q.    In your opinion, is there racially-polarized voting in Mississippi?
>
> A.    Well, in some sense, by definition, there is historically because only White people are voting. But what happens very quickly, once you have a Voting Rights Act, is you see this process of partisan realignment in which White voters which traditionally voted as Democrats begin to migrate into the Republican Party.

[246] at p. 24-25.

As Campbell's testimony, which the Court found quite credible, illustrates, there is a strong correlation between partisanship and race in Mississippi. This correlation has existed for many

decades. On this point, the District Court for the Southern District of Mississippi concluded that the fact "[t]hat Mississippi voters have been separated by race even when most black voters were Republicans and white voters were Democrats adds weight to our finding that racially polarized voting best explains the divide—at least on this record." *Miss. NAACP*, 739 F. Supp. 3d at 454. The same is true on the record before this Court. From a voting standpoint, there was a clear racial divide amongst Mississippians long before the current partisan alignment—that divide has remained since the realignment. This bolsters the Plaintiffs' contention that race, rather than partisanship, explains the division.

The Defendants urge the Court to consider the Fifth Circuit's conclusion in *Clements*, which the Defendants phrase as follows: "If partisan affiliation, not race, best explains the divergent voting patterns among minority and white citizens, then there is no 'legally significant' racially polarized voting[.]" [253] at p. 47 (quoting *Clements*, 999 F.2d at 850).

Considering the Defendants' heavy reliance on it, a closer look at *Clements* is warranted. *Clements* was a Section 2 case concerning Texas' system of electing state trial judges. 999 F.2d at 837. The district court concluded that "plaintiffs need *only* demonstrate that whites and blacks generally support different candidates to establish legally significant white bloc voting." *Id*. at 850 (emphasis added). In reaching this conclusion, the district court did not grapple with the reasons *why* such bloc voting existed. *Id*. The Fifth Circuit reversed, holding that "[w]ithout an inquiry into the circumstances underlying unfavorable election returns, courts lack the tools to discern results that are in any sense 'discriminatory.'" *Id*. The court articulated that "[w]hen the record indisputably proves that partisan affiliation, not race, best explains the divergent voting patterns among minority and white citizens[,]" there is no Section 2 violation. *Id*.

67

Continuing on, the Fifth Circuit concluded that the evidence presented at trial in that case clearly indicated that partisanship, not race, explained the divergent voting patterns:

> First, white voters constitute the majority of not only the Republican Party, but also the Democratic Party, even in several of the counties in which the former dominates. In Dallas County, for example, 30-40% of white voters consistently support Democrats, making white Democrats more numerous than all of the minority Democratic voters combined. The suggestion that Republican voters are galvanized by a "white" or "anti-minority" agenda is plausible only to the extent that the Democratic Party can be viewed as a vehicle for advancing distinctively minority interests, which clearly is not the case. At the same time, white Democrats have in recent years experienced the same electoral defeats as minority voters.
>
> . . .
>
> Second, both political parties, and especially the Republicans, aggressively recruited minority lawyers to run on their party's ticket. Consequently, white as well as minority voters found themselves not infrequently voting against candidates sharing their respective racial or ethnic backgrounds in favor of their party's nominee. . . To conclude on this record that political parties serve as proxies for race is simply unwarranted.

*Id*. at 861.

The dissimilarities between the facts of *Clements* and the record before this Court are vast. Here, there was no evidence presented—nor any argument made—that White voters make up any significant portion of the Democratic electorate in the State of Mississippi. In fact, as referenced previously, the proof in this case was the exact opposite. Looking at the analyzed quasi-endogenous elections (which are partisan elections utilizing the same map), for example, White support for Democrats never exceeded 17% and was oftentimes well below that. These numbers stand in stark contrast to the 30-40% of White voters supporting Democrats in *Clements*. Similarly, there was no evidence presented in this case that either political party has made an effort to

aggressively recruit minority candidates to run on their party's ticket.[15] Stated simply, the facts of this case and *Clements* are incongruent.

Reverting to the evidence presented here, the Court finds particularly noteworthy the analyzed endogenous elections. As noted multiple times previously, in 2012, White voters supported Earle Banks at a level of 5.44% and similarly supported Latrice Westbrooks at a level of 6.43% in 2020. Chronologically between those two elections, in 2016, White voters supported Jim Kitchens at a level of over 40%. While there undoubtedly may be other reasons as to why White voters chose not to support Banks and Westbrooks but chose to support Kitchens, it cannot be overlooked that all three of those candidates were the Black-preferred candidate, but only Kitchens was a White candidate. To view it linearly, White support for the Black-preferred candidate was: 5.44% in 2012 (Black candidate), over 40% in 2016 (White candidate), 6.43% in 2020 (Black candidate). As the District Court for the Southern District of Mississippi phrased it: "[r]ace matters." *Miss. NAACP*, 739 F. Supp. 3d at 440. This Court agrees.

In emphasizing the above-referenced endogenous elections and the race of the candidates, this Court remains cognizant that "[u]nder § 2, it is the *status* of the candidate as the *chosen representative of a particular racial group*, not the race of the candidate, that is important." *Gingles*, 478 U.S. at 68, 106 S. Ct. 2752 (emphasis in original); *see also Miss. NAACP*, 739 F. Supp. 3d at 437 ("It is the race of the voters, not the candidates, that matter."). The Court certainly does not desire to run afoul of the United States Supreme Court's directive and does not rely solely on that evidence in concluding that racially polarized voting exists in this case. However, considering that the Defendants urge this Court to adopt the conclusion that it is partisanship—not

---

[15] Neither party emphasizes it and the Court recognizes that it is only one person, but Percy Watson specifically denied the Republican Party having ever made an effort to recruit him during his time in the Mississippi Legislature. *See* [246] at p. 83.

race—influencing election outcomes, the Court finds this evidence to have probative value. After all, it shows that, in endogenous elections, holding constant the Black-preferred nature of a candidate (which can be correlated to partisanship), the two Black candidates both received over 30% *less* support from White voters. Again, "[r]ace matters." *Miss. NAACP*, 739 F. Supp. 3d at 440.

The Defendants contend that the Court should take particular note of external factors in the 2012 and 2020 elections. As to the 2012 election, they place emphasis on Banks' opponent—William Waller, Jr. As noted in connection with the third precondition, the Defendants emphasize that Waller's father, William Waller, Sr., was a former governor of Mississippi who, while in that position, brought Black Mississippians into positions of responsibility and authority in the state's government. In addition, he twice prosecuted Byron De La Beckwith for the murder of Medgar Evers—a prominent Black civil rights activist in Mississippi. On cross-examination, Orey agreed that it is "possible that Black voters in the Central District continue to hold the Waller family in high regard[.]" [245] at p. 68. The Defendants assert that the Court should take this into account in analyzing whether race drove the outcome of the 2012 election.

Concerning the 2020 election, the Defendants emphasize that the COVID-19 pandemic placed the entire country in flux during the campaign and continuing through the time of the election. Constance Slaughter Harvey testified that the pandemic made it particularly difficult for Westbrooks to campaign. She cited an example of when Westbrooks went to a campaign event in Forest, Mississippi, but the attendance was poor—in Slaughter Harvey's estimation because of the pandemic.

The Court agrees that these external factors certainly may have played *some* role in the outcome of the 2012 and 2020 elections. Any number of other factors also could have impacted

70

the elections. But, overall, the Court does not find that these explanations are sufficient to explain away the outcomes of those elections. This is particularly so when the results of those elections are considered in light of the other analyzed elections. Extreme racial polarization existed in these elections, but it also was present in *every other analyzed biracial election*. The Court does not find that 2012 and 2020 were outliers and rejects the Defendants' contention that those external factors caused the election results. Those elections, while they had unique attributes, were consistent with the norm.

Despite that fact, the Defendants emphasize the present reality in District 1—they note that "candidates preferred by black voters hold four out of five elected positions chosen within District 1 boundaries." [253] at p. 47. While this is an objective fact (or at least was at the time of trial and at the time the post-trial submissions were filed), additional context is necessary. The four referenced persons include: Leslie King (Supreme Court), Jim Kitchens (Supreme Court), De'Keither Stamps (Public Service Commissioner), and Willie Simmons (Transportation Commissioner).

Before providing additional context as to each of those individuals, the Court must address the fact that a District 1 Supreme Court election occurred in November 2024—subsequent to the completion of the trial in this case. In that election, Jim Kitchens, who as referenced above is a White man who is a Black-preferred candidate, was the incumbent. Four candidates ran against him: Jenifer Branning (a White woman), Byron Carter (a White man), Ceola James (a Black woman), and Abby Robinson (a Black woman). The general election results were as follows:

| Candidate | Reported Votes | Percentage of Total |
|---|---|---|
| Jenifer Branning | 147,892 | 41.34% |
| Byron Carter | 25,390 | 7.10% |
| Ceola James | 38,345 | 10.72% |
| Jim Kitchens | 127,266 | 35.58% |
| Abby Gale Robinson | 18,824 | 5.26% |
| TOTAL | 357,717 | 100.00% |

[258], Ex. 1 at p. 3

Kitchens and Branning proceeded to a runoff election three weeks later. In the runoff, Branning received 50.55% of the vote and defeated Kitchens.

The Plaintiffs filed a Motion for Judicial Notice [258], requesting that the Court take judicial notice of the election results. In their view, the results bolster their case. The Defendants agree that the Court should take judicial notice of the results but contend that the Court should reach different inferences based on the data. The Court grants the request for judicial notice of the 2024 election results. The question then becomes what conclusions can be drawn from those results.

The Plaintiffs contend that Kitchens' loss illustrates that Black-preferred candidates continue to be usually defeated in contested Supreme Court elections in District 1. The Defendants urge the Court to consider the results from the general election. They point out that the sum of votes for Kitchens and the two Black candidates (James and Robinson) was 184,435—or 51.56% of the total votes cast in the election.

The difficulty in reaching any firm conclusions based on these numbers is obvious—the Court does not have the benefit of an analysis of the racial breakdown of support for each candidate. This is particularly important because of Kitchens' unique ability to garner White support as a Black-preferred candidate. As discussed at length previously, he received around 40% of the White vote in 2016. However, the Court does not find it appropriate to speculate as to whether he received similar White support in 2024.

The Court finds it appropriate to take judicial notice of Branning's victory but declines to make any inferences based on that outcome for the same reason previously articulated—it does not have the benefit of anything other than the raw vote totals. Instead, the Court notes Kitchens' defeat so as to be clear it is not misstating the current composition of elected officials in District 1.

As noted above, the Court finds it appropriate to consider the specific context surrounding the respective elections of the Black-preferred candidates in District 1.

The Court begins with King. He was appointed to the Mississippi Supreme Court by Governor Haley Barbour in 2011. By virtue of that appointment, he has enjoyed the privileges associated with incumbency. The Court heard much testimony about the power of incumbency from multiple witnesses. For example, Diaz described incumbency as "a great weight" because it provides name recognition and assists with fundraising. [245] at p. 117. The Court credits that testimony. After being appointed, King has run unopposed in two elections—being reelected in 2012 and 2020. The Court views his holding of his current seat as minimally probative under the circumstances. King was appointed to the seat in 2011 and since that time has not run in an opposed election to retain it.

The Court addressed Kitchens at length previously. While multiple witnesses at trial identified him as the Black-preferred candidate, he is a White man and received over 40% of the White crossover vote—a rate that is significantly higher than in any other election—whether it be endogenous, quasi-endogenous, or exogenous. In other words, he is in many ways an outlier.

De'Keither Stamps and Willie Simmons won their respective Commissioner elections in 2023. The Court heard extensive testimony about the 2023 election. As referenced previously, that year, Mississippi saw a gubernatorial race between incumbent Tate Reeves, a White man who ran as a Republican, and Brandon Presley, a White man who ran as a Democrat. Reeves defeated Presley in that election. During his direct examination, Orey testified that this election was atypical in some respects because "for the first time in a while, the National Democratic Party provided funds to the State Democratic Party for the gubernatorial election." [245] at p. 42. The Defendants attacked this opinion during Orey's cross-examination by emphasizing that it was not contained in his report, as well as questioning the source for that opinion. However, regardless of whether or not Presley received funding from out of state, the Court heard testimony that Presley made extensive efforts to reach out to the Democratic base—more so than other candidates in the recent past. Dyamone White specifically testified about her efforts to share Presley's platform during the campaign—the Court credits that testimony. Again, setting aside the funding issue noted above, Orey concluded that because of the "increase in saliency of that year, the Democratic candidates may have actually received coattails benefits; meaning that because of the support of the gubernatorial candidate, that also helped with the lower ballot contests." [245] at p. 43.

The Court will look to the data, which, as noted above, was not disputed. Notably, both Stamps and Simmons were on the ballot for the same positions in 2019—the last time those positions were on the ballot prior to 2023. In that election, Stamps received 7.6% of the White

vote, and Simmons received 8.81% of the White vote. *See* [236], Ex. 1 at p. 1. While Simmons prevailed in his election, Stamps did not. Just four years later, the same candidates received substantially higher White support—with Stamps receiving 11.44% of the White vote and Simmons receiving 16.20% of the White vote. *See* [236], Ex. 6 at p. 2-3. While the incumbency advantage *could* have played a role in Simmons' election, Stamps experienced a similar boost in White support and was *not* the incumbent. Other than the 2023 election, the White crossover vote never exceeded 10% in any of the biracial quasi-endogenous elections since 2011.

The data supports Orey's conclusion that the 2023 election was an outlier. The Court credits his testimony on that point.

Again, while it is an objective fact that four of the five elected positions in District 1 were at the time of trial held by Black-preferred candidates, when considered in context, the potency of that fact is weakened. Furthermore, Section 2 relief is not precluded simply because Black candidates who overwhelmingly receive Black support and obtain a slight increase in White support can occasionally win an election. *See*, *e.g.*, *Miss. NAACP*, 739 F. Supp. 3d at 440 ("We do not find that, if an occasional candidate supported overwhelmingly by black voters can break the color barrier just a bit among white voters, this proves anything other than that there will be outliers in statistical analysis."). The Court views that as precisely what has occurred (and continues to occur) in District 1—when Black-preferred candidates receive a slight increase in White support, such as Stamps did in 2023, those candidates can prevail.

In short, the Court finds that the Plaintiffs have established the existence of polarized voting on account of race. And while the Defendants have certainly emphasized *some* evidence to support their position and the Court agrees that partisanship plays *some* role in the outcome of these elections, the Court does not find that "partisan affiliation, not race, best explains the divergent

75

voting patterns among minority and white citizens." *Id*. at 454 (quoting *Clements*, 999 F.2d at 850).[16] The Court instead specifically finds that race best explains these divergent voting patterns.

Senate Factor 2 weighs in the Plaintiffs' favor.

*iii.*     *Senate Factor Four*

Under Senate Factor 4, the reviewing court determine "if there is a candidate slating process, [and] whether the members of the minority group have been denied access to that process." *Gingles*, 478 U.S. at 37, 106 S. Ct. 2752. "Slating has been defined as 'the creation of a package or slate of candidates, before filing for office, by an organization with sufficient strength to make the election merely a stamp of approval of the pre-ordained candidate group.'" *Rodriguez*, 964 F. Supp. 2d at 785 (quoting *Overton v. City of Austin*, 871 F.2d 529, 534 (5th Cir. 1989)). "Where a slating organization exists, the ability of minorities to participate in that slating organization and to receive its endorsement may be of paramount importance." *Id*. (citation omitted).

At trial, there was no evidence presented of a formal slating process. Indeed, in *Magnolia Bar*, the District Court for the Southern District of Mississippi specifically recognized that "[t]here is no candidate slating process in Mississippi." 793 F. Supp. at 1409. However, in 2018, the District Court for the Southern District of Texas decided *Lopez* and provided the following synopsis as to the existence, or lack thereof, of a slating process:

> The Texas system of voting for justices and judges for the high courts does not involve a formal slating process. Yet candidates can achieve an incumbency advantage if first appointed by the governor to fill an unexpired term. This is a fairly common scenario, as over half of the justices who have held seats on the Supreme Court of

---

[16] On this point, it should also be noted that extreme racial polarization exists in Mississippi Supreme Court elections, despite the fact that those elections are nonpartisan. Although the Court is aware of the testimony as to the role that partisanship nevertheless plays in these elections, it cannot be ignored that racial polarization exists regardless of whether the race is partisan or not. This fact supports the Plaintiffs' position.

> Texas and a third of the judges on the Court of Criminal Appeals over the analyzed period began their tenure with gubernatorial appointments.

*Lopez v. Abbott*, 339 F. Supp. 3d 589, 615 (S.D. Tex. 2018).

As far as this Court is aware, the Fifth Circuit has not endorsed this expansive view of Senate Factor 4, and this Court sees no need to delve into it. It is undisputed that there is no formal candidate slating process in Mississippi. The Court views Senate Factor 4 as inapplicable and of no probative value in analyzing this case.

iv.    *Senate Factor Five*

Senate Factor 5 concerns "the extent to which members of the minority group . . . bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process[.]" *Gingles*, 478 U.S. at 37, 106 S. Ct. 2752.

In large part, the Plaintiffs' evidence on Senate Factor 5 is dependent upon the testimony of Traci Burch, Ph. D. Burch is a full professor with tenure at Northwestern University. She possesses a Ph. D. in Government and Social Policy, which she earned at Harvard University. Her accolades in the area of race and political behavior are extensive. The Court accepted Burch as an expert witness in racial discrimination, political participation, and barriers to voting.

Burch testified that she "used standard sources for political science, such as the reviews of scholarly literature in [the] field and related fields; the analysis of demographic data, census data, surveys, historical records, government reports; some legislative proceedings and court records; as well as public opinion surveys" to reach her conclusions. [246] at p. 116. Framing it at a high level of generality, Burch looked to education, employment, income, poverty, housing, health, and criminal justice and concluded that "Black Mississippians experienced disparities, worse outcomes in all of these factors." *Id*.

Burch walked through each of these topics in detail. Educational disparities in Mississippi are vast. The 2019 American Community Survey showed that for individuals age 25 and older, 26.10% of White Mississippians possessed a bachelor's degree or a higher level of education whereas that number for Black Mississippians was 16.00%. *See* [237], Ex. 6 at p. 3. That survey also revealed that there are more Black Mississippians who have not completed high school (19.20%) than have completed a bachelor's degree or higher (16.00%). *Id*. Burch also testified that educational segregation continues to exist in Mississippi and that this segregation detrimentally impacts the academic performance of Black and Latino students. *See* [237], Ex. 6 at p. 1. As to the importance of this information, Burch studied the impact of educational disparities on political participation and testified that "the consensus in the literature is that education affects voter turnout. It's one of the most -- it's one of the most fundamental findings in political science, that people with higher educational attainment vote more than people with lower educational attainment." [246] at p. 128.

Her testimony as to other economic factors was similar. She testified, based on the 2019 American Community Survey, that the median household income in Mississippi for White households was over $57,500 compared to just over $31,000 for Black households. *See* [237], Ex. 6 at p. 5. Data surrounding unemployment, poverty, and individuals' lack of access to vehicles reveals more of the same. The unemployment rate was 4.40% for White Mississippians and 10.20% for Black Mississippians. The poverty rate for Black Mississippians was nearly three times the rate of White Mississippians (30.60% compared to 11.70%). And the percentage of White Mississippians who lack access to a vehicle was 3.50% whereas that number was 11.30% for Black Mississippians.

Burch testified that these considerations are important because income and wealth have been shown to impact voter turnout generally and in Mississippi specifically.

The Court credits Burch's testimony, which was well-supported by the data, on these topics. Notably, the Defendants raised little to no resistance to these conclusions. As they phrased it in their post-trial submission, "Defendants largely did not dispute that black Mississippians lag behind whites in areas of education, employment, and health, but [did] challenge that there was evidentiary proof that it affected black voters' ability to participate effectively in the political process." [253] at p. 28. This position is consistent with the testimony of Bonneau, who agreed that the history of discrimination "continues to be visible in other aspects of life today[.]" [247] at p. 64.

The Court notes that the Defendants' premise is correct—Senate Factor 5 does not simply inquire into whether racial disparities exist but, rather, looks to whether such disparities hinder Black Mississippians' ability to effectively participate in the political process. *See Gingles*, 478 U.S. at 37, 106 S. Ct. 2752. As the District Court for the Southern District of Mississippi framed it, "[t]he factual issue for us is the current effect of these conditions on black-voter turnout. The disparities continue to exist, but are black Mississippians currently voting in lower percentages than whites because of the effects of discrimination? If not, then any past hindrance caused by those conditions to black citizens' ability to participate effectively in the political process has been overcome." *Miss. NAACP*, 739 F. Supp. 3d at 456.

To analyze this question, Burch examined voter turnout in the 2020 general election, which at the time of trial was the most recent Presidential election. On cross-examination, the Defendants, in an attempt to discredit her, questioned Burch about her failure to consider other elections. The Defendants engaged in this same tactic in the *Miss. NAACP* case—the court there concluded that

"examining multiple elections would give a clearer picture, but we acknowledge that [the] analysis is only weakened, not discredited, by its consideration of solely 2020." *Id*. This Court fully agrees with that logic. The Court does not discredit Burch's analysis but takes into account that it only included one election.

In analyzing the 2020 election, Burch estimated voter turnout in two different ways: (1) a regression analysis utilizing the Cooperative Election Survey ("CES") and (2) ecological inference ("EI") based on turnout data from the state voter file and demographic data from the 2020 Census. Her conclusion for both methods was the same—White voter turnout exceeded Black voter turnout at a statistically significant rate.

The Court begins with the CES. Burch explained that the CES is a national sample survey administered by researchers at Harvard and MIT with approximately 50,000 participants. Burch indicated that the CES is particularly reliable because the dataset includes validated voter turnout information, meaning that unlike many surveys, it does not simply rely upon self-reporting. Rather, as Burch explained it, "[t]hey get data from across the country from secretaries of state, and it's aggregated by Catalist or L2 or one of these data vendors. And then they verify voter turnout for each voter in the survey." [246] at p. 154. Burch testified that the CES is a political science data source that is consistently relied upon by experts in the field.

The CES's validated voter turnout estimate for the 2020 general election was 46% for Black Mississippians and 60% for White Mississippians (with a total voter turnout of 53.3%). *See* [237], Ex. 9 at p. 6. Burch conducted a regression analysis in an attempt to test and corroborate these data points. She walked through that analysis in detail, ultimately reaching the conclusion that the difference in turnout based on race was statistically significant. She testified about a chart contained in her rebuttal report (and admitted into evidence) and explained the statistical

80

information contained therein. *See* [237], Ex. 9 at p. 16. The p-value of the estimates for the gap in racial turnout was less than .01, meaning that it is "[g]reater than 99 percent that it's not due to chance." [246] at p. 163.

Burch also testified about her EI analysis, the results of which were rather similar to her analysis of the CES data. The EI analysis yielded statewide results of 42% turnout for non-White Mississippians compared to 58% turnout for White Mississippians. Burch also conducted an EI analysis for turnout in District 1 and reached a similar conclusion with non-White voter turnout being 44% and White voter turnout being 62%.[17]

Burch testified that the results from the CES analysis and the EI analysis being so similar gave her confidence in their reliability. Her confidence in the reliability of her conclusions was further bolstered when looking to the 58.7% overall level of statewide turnout reported by the Mississippi Secretary of State. She testified that her results being so close to the Secretary of State's reported total (the benchmark) is important because "benchmark is basically the one thing we know that is not an estimate." [246] at p. 177.[18]

On cross-examination, the Defendants raised concerns with both the CES and Burch's EI analysis. Beginning with the CES, she was questioned extensively about the fact that only 462 of the approximately 50,000 persons surveyed were from Mississippi. Burch testified that this number was still sufficient for purposes of obtaining an accurate estimate: "So, again, 462, even with error -- even with random error and the like, it's still enough of a sample size to detect even small differences. But you even need -- you don't even need that big a sample size when you're

---

[17] On cross-examination, Burch was questioned about why she did not break down the CES data further and look at the CES data at the districtwide level like she did with the EI analysis. She testified that the CES data could not reliably be broken down further than the statewide level. That testimony was not rebutted, and the Court has no reason to discredit it.

[18] For the sake of clarity, the Court notes that the Mississippi Secretary of State does not report voter turnout on the basis of race.

dealing with a voter turnout gap as big as the one we're finding in Mississippi." [246] at p. 216. The Defendants also questioned the reliability of the manner in which CES gathers its data. Additionally, as to her EI analysis, the Defendants pushed Burch on the fact that her confidence intervals overlapped in a portion of her analysis, which is indicative of the potential existence of a statistically insignificant result.[19]

The Court recognizes these concerns and does not downplay them. But it also notes that Bonneau provided relevant testimony as to each of these categories. Concerning the Defendants' criticism of Burch's ecological inference work, Bonneau testified that the King's EI method is "not unproblematic" but "they *may be the best estimates we can get*." [247] at p. 39 (emphasis added). And, as to Burch's utilization of the CES, Bonneau testified that the CES is commonly relied upon by experts in the field:

> Q.     In 2020, the CCES was renamed to CES or Cooperative Election Study; is that right?
>
> A.     Sure.
>
> Q.     The CES or CCES is a dataset commonly relied upon by political scientists to study elections and turnout?
>
> A.     Yes.
>
> Q.     The CES or CCES is weighted to ensure a representative sample?
>
> A.     It is.

---

[19] To be more specific, the overlapping confidence intervals concerned the portion of Burch's analysis where she attempted to account for unmatched voters, which she explained as follows: "So Mississippi's voter file does contain -- notoriously has been shown to contain some errors. And so I wasn't able to match registered voters -- some of those registered voters to the 2020 census block groups. And so I do provide an analysis of what those unmatched voters look like, and it's very similar to what we would expect. So 60 percent of the unmatched people voted statewide and 59 percent in the Central District. And so that's a sign that, in general, is kind of a random dropping out of people. And, like I said, random error doesn't bias the results in terms of typos and stuff like that. It's more systematic error that we worry about." [246] at p. 239.

*Id.* at p. 95.

Additionally, the Defendants utilized their other expert, Swanson, to present evidence contradicting Burch's conclusions. In particular, Swanson testified about the Current Population Survey ("CPS"). He said that the CPS is completed "under contract with the Bureau of Labor Statistics." [249] at p. 32. According to the CPS data, Black voter turnout in Mississippi actually *exceeded* White voter turnout. That data shows 72.9% turnout for Black Mississippians compared to 69.8% for White Mississippians (with a total turnout percentage of 70.3%). During her testimony, Burch provided an explanation for these numbers—largely that the numbers are not verified (unlike the CES data, which is verified) and that there is a significant issue with overreporting in surveys like CPS that rely on self-reporting. She went on to testify that it is her opinion that Black respondents are more likely to untruthfully indicate that they voted compared to White respondents. In fact, Swanson himself agreed to this point on cross-examination:

> Q.    And underneath that heading [in an article included in the end notes of Swanson's report], it says, "Perhaps one of the most consistently documented aspects of overreporting is that African Americans overreport at higher rates than Whites." Did I read that correctly?
>
> A.     You did.
>
> Q.    And based on the evidence you have seen, you agree with that assessment?
>
> A.    I do.

[249] at p. 168.

This certainly weighs against reliance on the CPS. Burch's critiques of the CPS data are further corroborated by the fact that these numbers, including a total voter turnout percentage of 70.3%, are significantly higher than the benchmark number of total voter turnout—58.7%—provided by the Mississippi Secretary of State. *See* [237], Ex. 9 at p.14.

In addition to the CPS, Swanson testified about two other sources—(1) the Mississippi Poll conducted by Mississippi State University and (2) a report issued by the Brennan Center. The Court will address each of them.

On direct examination, Swanson described the Mississippi Poll as a study "that's put together by the Social Science Research Center at Mississippi State University." [249] at p. 30. Swanson testified that he knew the founder of the survey research plan and has confidence in the work. As to the conclusions that can be drawn from the Mississippi Poll, Swanson testified:

> Q.    Okay. Then what does that study tell you about how frequently Black folks and White folks vote in Mississippi?
>
> A.    They have had a question for some years when they do the Mississippi Poll, which is approximately every two years, about voting behavior. And the question they ask is: Do you usually vote? Are you registered, and do you usually vote?
>
> Q.    And that's not asking about a specific election. It's what you usually do. Is that right?
>
> A.    Yes.
>
> Q.    Okay. And what has that – what have the answers to those polling questions shown over the years that Mississippi State has been doing the study?
>
> A.    It shows generally that the percents are fairly close if you look at White and Black voters. Sometimes one exceeds the other, and another time the other one exceeds the first one.
>
> Q.    And has that been consistent over a large number of years?
>
> A.    It has. And it seems to be consistent when looking at -- over the years that we have had the data for that we were supplied -- kindly suppled with by the current director of the survey research lab at [the Social Science Research Center].

[249] at p. 30-31.

Swanson also testified about a report issued by the Brennan Center for Justice at NYU Law School. The report is entitled "Growing Racial Disparities in Voter Turnout, 2008-2022" but was released in 2024. As to the findings contained in this report, Swanson testified as follows:

> Q.    And what do you understand from the chart -- well, it's at the top of the page. What does the weighted turnout gap mean?
>
> A.    It means the difference between White and Black voters.
>
> Q.    And in the left-hand column, all the way at the bottom, next to your old home in Hawaii, is Mississippi. And what is the weighted turnout gap between Black and White in Mississippi in 2020?
>
> A.    Minus 1.3 percent.
>
> Q.    What does that mean?
>
> A.    It means that Blacks outperformed Whites by approximately 1.3 percent in the voter turnout in the 2020 election.
>
> Q.    Let's go over the next column, 2022, Mississippi. What does that say?
>
> A.    It says there that 0.7 percent of White -- White turnout was higher by 0.7 percent than Black turnout.
>
> Q.    All right. And those close margins varying back and forth -- is that consistent with the information you found in the CPS and in the Mississippi State University report?
>
> A.    It is.
>
> Q.    Does that lead you to have some reason to believe that the numbers that the Brennan Center found might be reliable?
>
> A.    It does.

[249] at p. 71-72.

Thus, in Swanson's view, the Mississippi Poll and the Brennan Center report illustrate that there is parity in Black and White voter turnout in Mississippi.

The Plaintiffs raise numerous concerns with the reliability of both sources. As to the Mississippi Poll, Swanson testified that the data is based on self-reporting. Thus, the data is subject to the same concerns as the CPS. This includes overreporting, which is more common in Black respondents than White respondents. The Court harbors these same concerns and finds that it weighs against the probative value of the source.

Regarding the Brennan Center report, Burch testified as to multiple problems that she believes indicate its lack of reliability:

> Q.   Do you recall what some of the reasons were you think it's not something you should rely on?
>
> A.   Yes. So, first, you don't have any actual report of voter turnout in the state. So you don't know what they're calculating voter turnout to even be. They just produce this estimate of how statewide election results or something would change if people voted the same, but you don't know anything about White voter turnout -- the actual estimate of voter turnout by race or overall. They don't report. So you don't have basic information with which to evaluate the information.
>
>      The second problem is they -- the authors, because it's a nationwide report, don't really go into much detail about how they calculated their estimates for any particular state. So we don't know things like how they dealt with missing data in Mississippi or -- and the like. They just don't give that information.
>
>      Finally, the authors of the report tell you in an appendix that their average error rate in Black -- in predicting Black turnout for which they actually have a benchmark is -- they're off by 14 and a half percentage points on average, which is really -- a really, really big error. So I -- so it's just not a reliable data source.

[246] at p. 176.

The Court acknowledges these concerns. In particular, there being no detail provided about the way in which the estimates in the report were calculated, along with the high error rate in

predicting Black turnout, gives this Court significant pause in relying on the findings contained in this report. The Court is not convinced that those findings, which (as far as this Court was advised during the trial) have not been peer reviewed, should be relied upon here.

Ultimately, the Court found Burch's testimony and analyses credible and persuasive. In particular, the Court is swayed by the fact that both of her methodologies reached similar outcomes—both of which were very close to the benchmark number provided by the Mississippi Secretary of State. Again, the Court does not seek to downplay the Defendants' concerns with the CES or Burch's EI analysis. But it does note that Bonneau himself testified that the CES is commonly relied upon by experts in the field and that EI, while not unproblematic, is the best estimate that can be obtained.

Furthermore, in reaching its conclusion, the Court is cognizant that all of these outcomes are estimates and each of them presents its own shortcomings. The Court also remains mindful of the fact that Burch only analyzed the 2020 election and no others. But, overall, the Court finds Burch's analyses and testimony to be far more credible than Swanson's.

In sum, the Court accepts Burch's conclusion that there is a racial disparity in political participation. Although there are competing arguments as to the extent of that disparity, the Court does not find it necessary to definitively decide that question. For purposes of this analysis, the Court finds that the disparity exists.[20]

---

[20] In reaching this conclusion, the Court is aware of the Defendants' assertion that this Court must rely on the CPS in light of the United States Supreme Court's reliance upon it in *Shelby County*, 570 U.S. 529, 133 S. Ct. 2612. In their post-trial submission, the Defendants specifically assert "[i]n *Shelby County v. Holder*, the United States Supreme Court relied on CPS data to show that in 2004, the last election before Congress amended the Voting Rights Act in 2006, Mississippi had a black registration percentage of 76.1%[.]" [253] at p. 16 (internal citation omitted). This Court certainly does not intend to circumvent Supreme Court precedent. But this Court also notes that Burch provided testimony as to the reliability of CPS data—in fact, she has relied upon it in the past on multiple occasions. But she now, based on new studies that have been released since the *Shelby County* decision and which were discussed in detail at trial, is of the opinion that it is not the most reliable dataset to rely upon in analyzing voter turnout. Ultimately, though, this Court need not wholly disregard the CPS data to reach its conclusion. The Court is aware that all of these numbers

Furthermore, the Court is persuaded by Burch's testimony regarding the impact of educational attainment on voter turnout. As emphasized above, the data is overwhelming insofar as it concerns Black Mississippians lagging behind White Mississippians in nearly every aspect of education. Burch studied the impact of educational disparities on political participation and testified that "the consensus in the literature is that education affects voter turnout. It's one of the most -- it's one of the most fundamental findings in political science, that people with higher educational attainment vote more than people with lower educational attainment." [246] at p. 128. This was borne out by her research as well. She conducted a regression analysis and concluded that once education is included in the model, the statistically significant relationship between race and voter turnout is completely diminished. She explained this in more detail:

> What is interesting, too, is that what this -- what this chart means is that, within each of these groups, there's no real statistically significant difference between a Black person who has less than high school and a White person who has less than high school. Where the action is in terms of how race is affecting voting isn't that, you know, Black people less than high school just don't like to vote compared to White people. It's because . . . there are just more Black people in that low education group. So if we think about the fact that education has such a big effect on voter turnout and low -- lower educational attainment means you're less likely to vote, the fact that there are more Black people in that lower educational attainment group is what -- is reducing turnout in the group.

[246] at p. 165-66.

The Court found this explanation persuasive and credits it.

In summary, there is extensive evidence in the record that Black Mississippians experience substantially greater hardships in education access, financial status, and wealth. The Court also

---

are *estimates*. Of the three datasets/methodologies employed, it is the furthest away from the benchmark number. Considering the totality of the evidence presented on this issue at *this* trial, the Court finds that the Plaintiffs have shown, by a preponderance of the evidence, that White voter turnout exceeded Black voter turnout in the 2020 election.

accepts the evidence indicating that Black Mississippians participate in the political process at a rate lesser than White Mississippians. Additionally, the Court accepts the evidence presented linking the socioeconomic factors to political participation.

As an aside, the Court also notes that the District Court for the Southern District of Mississippi seemingly held that it was not necessary for Section 2 plaintiffs to prove the existence of turnout discrepancies:

> This factor required us to consider the extent past discrimination affected black voters' ability to participate in Mississippi's political process today. *Teague*, 92 F.3d at 292. We credit Dr. Orey's conclusion that voting and political participation is influenced by financial resources, education, income, and unemployment. We find that black Mississippians are worse off than white voters in terms of these factors. The percentage of black voters who live below the poverty line is more than twice that of white voters, and they are less likely to graduate high school and college where they would have access to the required education needed to navigate the political process.
>
> Irrespective of the size *or even existence of* turnout discrepancies, we find that the record establishes black Mississippians' ability to participate effectively in Mississippi politics is hindered by racial gaps in education access, financial status, and health. Senate Factor 5 thus weighs in favor of the Plaintiffs.

*Miss. NAACP*, 739 F. Supp. 3d at 460 (emphasis added).

For the reasons set forth above, this Court finds that the Plaintiffs have shown the existence of turnout discrepancies and provided persuasive evidence of a causal link between the hardships that Black Mississippians face and those discrepancies. However, even without that discrepancy finding, this Court would reach the same conclusion for the same reasons articulated by the court in *Miss. NAACP*.

Senate Factor 5 weighs in the Plaintiffs' favor.

v. *Senate Factor Six*

This factor looks to "[w]hether political campaigns have been characterized by overt or subtle racial appeals[.]" *Gingles*, 478 U.S. at 37, 106 S. Ct. 2752. They have.

At the outset of this discussion, it is noteworthy that courts find racial appeals relevant even if utilized in campaigns for an office other than the one at issue in the case. *See*, *e.g.*, *Miss. NAACP*, 739 F. Supp. 3d at 461 (analyzing, in a state legislative redistricting case, examples of alleged racial appeals in a judicial election, Agriculture Commissioner election, and United States Senate primary election); *Nairne*, 715 F. Supp. 3d at 874 (citing, in a state legislative redistricting case, example of racial appeal in a gubernatorial election).

The Plaintiffs presented multiple examples of racial appeals in Mississippi elections through various witnesses. Marvin King, who was tendered and accepted as an expert in political science, African American studies, and racial polarization, testified as to multiple examples. Generally speaking, his opinion was that "[i]n Mississippi, political campaigns *have* been characterized by overt and subtle racial appeals." [250] at p. 137 (emphasis added).

King testified about a racial appeal utilized by Lester "Bubba" Carpenter, a state representative from Tishomingo County, during his 2015 re-election campaign for District 1 of the Mississippi House of Representatives. Carpenter's remarks were recorded, and the video was admitted into evidence. During his remarks, Carpenter discussed a potential funding initiative and described a potential "nightmare" scenario wherein, if the initiative was passed, a "Black judge" from Hinds County could decide how to allocate education funds. Carpenter went on to speculate that a Black jurist could take money from Tishomingo County and "transition" it to Rolling Fork, which is a predominantly Black municipality in the Mississippi Delta.

King testified that he believes this was a racial appeal. The Court agrees. The Defendants attempt to downplay the significance of the remarks because Tishomingo County is not located within Supreme Court District 1, but that is beside the point. Notably, the Defendants cite no authority indicating that such statements should be rendered irrelevant on that basis.

King also testified about alleged racial appeals of Cindy Hyde-Smith, one of Mississippi's current United States Senators. Specifically, he testified about a social media post that Hyde-Smith made wherein she was at the Jefferson Davis Museum wearing "Confederate garb" and included in the post a statement that said, in part, "Mississippi history at its best." [250] at p. 142. King testified that he viewed this reference to the Confederacy to be a racial appeal. The Court agrees.[21]

King also referenced a 2014 ad that Chris McDaniel, a candidate for United States Senate at the time, ran with a Confederate flag in the background. The *Miss. NAACP* court considered this precise evidence and concluded that it "was an isolated incident, but we accept it was seeking white-voter support." *Miss. NAACP*, 739 F. Supp. 3d at 460. This Court finds that conclusion persuasive.

Reverting to Hyde-Smith, in 2018, she was campaigning for the United States Senate against Mike Espy. During a public event, Hyde-Smith made reference to being invited to a public hanging and being on the front row. Another racial appeal.

King walked through other examples of alleged racial appeals in Mississippi elections for other offices but, candidly, the Court sees no need to address each of them. The examples provided above—in the not-so-distant past—are illustrative of the continued utilization of racial appeals during elections in Mississippi.

---

[21] The use of Confederate symbols and imagery has previously been considered a form of racial appeal. *See*, *e.g.*, *Miss. NAACP*, 2024 WL 3275965 at *49. As King phrased it, "there is a long history of Confederate imagery being associated with states' rights and anti-civil rights preferences." [250] at p. 143. The Court credits this testimony.

The Court does, however, find it appropriate to further address some of King's testimony concerning alleged racial appeals in Mississippi Supreme Court elections. King identified several such appeals.

First, he identified the 1986 special primary election between Reuben Anderson and Richard Barrett, a White man. According to King, Barrett claimed that Anderson was a "quota maker" which King believes had an implication that "Blacks were taking White jobs and that Whites were burdened by Blacks advancing. So that's the specific value of this term 'quota makers.'" [250] at p. 147-48. Notably, during his testimony, Anderson himself described Barrett as an "out-and-out racist and a Klansman" who "didn't mind letting it be known that he was a racist." [248] at p. 61-62.

During his 2004 campaign for the Mississippi Supreme Court, James Graves, a Black man, was opposed by Samac Richardson, a White man. During the campaign, Richardson identified himself as "one of us." *Id*. at p. 149. King described that phrase as follows:

> And so "one of us" is -- in a lot of different literature, both in political science, political psychology, sociology, we talk about "others," this concept of the "other." And so Graves's opponent was trying to say that Graves is an "other." He is not one of us. He is somehow different. And in the context of this race at this time, the unwanted "other" meant Black.

*Id*. at p. 149-50.

The use of this phrase has previously been considered a racial appeal. *See, e.g.*, *Jordan v. Winter*, 604 F. Supp. 807, 813 n. 8 (N.D. Miss. 1984). This Court agrees and credits King's explanation of its underlying meaning.

At trial and in their post-trial submission, the Defendants made much of the fact that some of the candidates who have engaged in racial appeals have been unsuccessful. The Court sees that issue as a non-starter. The Defendants have cited no authority indicating that the candidate who

engages in a racial appeal must prevail for Factor 6 to weigh in favor of the Plaintiffs, and this Court is unaware of any such authority. Furthermore, even if that were the case, the reality is that some of the candidates who made these appeals during the course of their respective campaigns *have* nonetheless won election and/or re-election. The Court squarely rejects the Defendants' contention.

Overall, the Court found the evidence presented at trial, including the testimony of King and others, persuasive. The evidence supports that racial appeals have—in the distant past and continuing into more recent times—been a part of campaigns in Mississippi. This includes elections for Mississippi Supreme Court, as well as other offices. Senate Factor 6 weighs in the Plaintiffs' favor.

    *vi.*    *Senate Factor Seven*

The seventh factor concerns "the extent to which members of the minority group have been elected to public office in the jurisdiction." *Gingles*, 478 U.S. at 37, 106 S. Ct. 2752. "Senate Factor 7 is a particularly important factor in the totality-of-the-circumstances analysis." *Miss. NAACP*, 739 F. Supp. 3d at 461. As articulated by the Fifth Circuit, "[t]he extent to which minority candidates are elected to public office [] contextualizes the degree to which vestiges of discrimination continue to reduce minority participation in the political process." *Veasey*, 830 F.3d at 261 (citing *Gingles*, 478 U.S. at 45, 106 S. Ct. 2752).

At a statewide level, the success of Black candidates in Mississippi's history is quite limited and, in recent times, non-existent. No Black candidate has been elected to statewide office in Mississippi since 1875. In other words, "there has not been a black candidate elected to statewide office since the end of Reconstruction 150 years ago." *Miss. NAACP*, 739 F. Supp. 3d at 461. Since 1875, only two Black Mississippians, Mike Espy and Bennie Thompson, have served in Congress.

They were elected from the same House District and served consecutive to each other with Thompson winning election in 1993 for the same seat that Espy previously held. This House District is the only majority Black House District in the State. Furthermore, in the entirety of Mississippi's history, a total of 5 out of 140 Congress members—roughly 3.6%—elected from Mississippi have been Black.

Turning specifically to the Mississippi Supreme Court, the numbers remain bleak. Out of the 125 Justices who have served on the Mississippi Supreme Court, only four have been Black. As noted above, all four of those Justices have held the same seat (District 1, Place 2). Notably, all four of them were first appointed by the then-sitting Governor. No Black person has *ever* been elected to the Mississippi Supreme Court without first obtaining a gubernatorial appointment. No Black person from either of the two other Districts has ever served on the Mississippi Supreme Court. In short, the evidence illustrates that Black candidates who desire to run for the Mississippi Supreme Court face a grim likelihood of success.

To reiterate, in an endogenous election, a Black candidate has *never* won without possessing the incumbency advantage. The Court finds this fact critical.

But, on the other hand, it cannot be ignored that Black candidates were elected for the Public Service Commissioner and Transportation Commissioner positions as recently as 2023. The Court addressed above the reasons that *could* have led to that outcome, as well as the differences in those elections and Supreme Court elections. However, even setting aside those factors, the Court finds that a small number of victories by Black candidates does not preclude a Section 2 claim—particularly when considered in light of all other evidence that was presented as to the lack of success of Black candidates. *See*, *e.g.*, *Gingles*, 478 U.S. at 75, 106 S. Ct. 2752 ("[T]he language

of § 2 and its legislative history plainly demonstrate that proof that some minority candidates have been elected does not foreclose a § 2 claim.").

The Court is well-aware that Section 2 does not guarantee proportional representation. *See Nairne*, 2025 WL 2355524 at *7 ("Although § 2 guarantees equal political opportunity, it does not establish a right to proportional representation."). But "proportionality is a relevant fact in the totality of the circumstances to be analyzed when determining whether members of a minority group have less opportunity . . . to participate in the political process." *Miss. NAACP*, 739 F. Supp. 3d at 462 (quoting *De Grandy*, 512 U.S. at 1000, 114 S. Ct. 2647) (quotation marks omitted). To the extent that proportionality is relevant, it is hard to reach any conclusion other than that this consideration favors the Plaintiffs. Currently, one of nine Supreme Court Justices is Black, despite the fact that Black Mississippians make up approximately 37% of the population statewide. Historically, less than 3.5% of the Justices who have ever served on the Supreme Court have been Black.

Senate Factor 7 weighs in favor of the Plaintiffs.

*vii.     Senate Factor Eight*

Senate Factor 8 concerns whether "elected officials are unresponsive to the [minority's] particularized needs." *Gingles*, 478 U.S. at 45, 106 S. Ct. 2752.

There is a tension between the parties as to the relevance of Factor 8. For their part, the Defendants argue that the Mississippi Supreme Court is not a representative body and therefore the Court should afford Factor 8 no weight. During the trial, numerous witnesses testified that they recognized that the Mississippi Supreme Court lacks the power to directly address many, if not all, of the societal issues that Black Mississippians face. The Court need not address that testimony in

any significant detail, as the role of the judiciary and legislative branches of government are, for purposes of this case, clear.

In their post-trial submission, the Plaintiffs ask the Court to "consider the unresponsiveness of the Legislature among others in addressing issues of importance to Black voters, such as racial disparities in education, economic opportunity, and health, which is probative of whether Black voters have influence in the political process and bears on Black voters' ability to elect their preferred candidates to the Supreme Court." [252] at p. 188.

The Court is cognizant of the trial testimony concerning Mississippi's elected officials exhibiting a lack of responsiveness to the needs of Black voters. For instance, both Burch and King testified about the unequal distribution of educational resources between predominantly Black and predominantly White areas of the State. Derrick Simmons, who is a Black attorney serving in the Mississippi Senate, also testified to this point based on his personal experience growing up in the Mississippi Delta. King and Burch additionally testified that the Legislature's failure to expand Medicaid disproportionately harms Black Mississippians. This is because, as stated by Burch, "Black people in Mississippi have much higher poverty rates, and Medicaid is the federal program that covers low-income people and provides them with health insurance." [246] at p. 146.

The Court has no reason to doubt any of this testimony. Notably, the District Court for the Southern District of Mississippi found many of these same issues to weigh in favor of the plaintiffs as to Senate Factor 8. *See Miss. NAACP*, 739 F. Supp. 3d at 462-63.

The circumstances of this case are different, though, and different considerations are at play. In short, the Court agrees with the Defendants' position that Senate Factor 8 simply is not relevant to a case involving Mississippi Supreme Court districts. There was no evidence presented that the Mississippi Supreme Court has played any role in the lack of responsiveness to the

minority's particularized needs that the Plaintiffs raised. That is not to say that the Factor weighs against the Plaintiffs—the Court simply views it as inapplicable. *See*, *e.g.*, *Bartlett*, 556 U.S. at 15, 129 S. Ct. 1231 (explaining that the analysis need not be applied mechanically).

To be clear, the law is not settled as to whether Senate Factor 8 would be wholly inapplicable in a case involving state judicial elections, such as this one. This is particularly so in light of the language the United States Supreme Court utilized in *Chisom* when concluding that Section 2 applies to judicial elections:

> The fundamental tension between the ideal character of the judicial office and the real world of electoral politics cannot be resolved by crediting judges with total indifference to the popular will while simultaneously requiring them to run for elected office. When each of several members of a court must be a resident of a separate district, and must be elected by the voters of that district, it seems both reasonable and realistic to characterize the winners as representatives of that district.

*Chisom*, 501 U.S. at 400-01, 111 S. Ct. 2354.

The Court acknowledges that this language could reasonably be construed as to indicate that Factor 8 *is* applicable. Considering that there is some uncertainty and for the sake of clarity and completeness as to this Court's findings, the Court specifically concludes that it does credit the testimony of the Plaintiffs' witnesses as to the elected officials' lack of responsiveness to the minority's particularized needs. Therefore, to the extent that the factor is applicable, it weighs in favor of the Plaintiffs.

*viii.    Senate Factor Nine*

The final Senate Factor "considers 'whether the policy underlying the state or political subdivision's use of such voting qualification, prerequisite to voting, or standard, practice or procedure is tenuous.' This factor requires a consideration of the policies used by Mississippi to

justify its districting decisions in this case." *Miss. NAACP*, 739 F. Supp. 3d at 463 (quoting *Gingles*, 478 U.S. at 75, 106 S. Ct. 2752; citing *Teague*, 92 F.3d at 292).

Of note, the parties stipulated in the Final Pretrial Order [228] that the Mississippi Legislature adopted the current map in H.B. 552, Laws 1987, Ch. 491 "[i]n January 1987, *with the objective of correcting population malapportionment of the then-existing Supreme Court districts*[.]" [228] at p. 20 (emphasis added). For their part, the Plaintiffs contend that the population malapportionment objective is no longer being furthered by the current map in light of the population shift throughout the state since that time. As the Court emphasized previously, Cooper testified that based on the most recent Census, the percent deviation of District 1 is -5.39%, meaning that "District 1 is underpopulated by 5.39 percent, which puts it *outside of the plus or minus 5 percent range which would normally be the standard for determining whether or not a district is properly apportioned for a legislative district or a judicial district*." [244] at p. 60 (emphasis added). Cooper's testimony in this regard went unrebutted. Thus, the Legislature's 1987 stated objective of correcting population malapportionment is not being furthered by the continued utilization of the current electoral map.

The Defendants take the position that the current east-west configuration of the Supreme Court District lines is critical to foster judicial independence and political diversity. Kyle Kirkpatrick, who as referenced previously serves as the assistant secretary of state for elections, testified that the current configuration of the Supreme Court districts supports the public interest of judicial independence. To support this conclusion, he testified that:

> My understanding, based on the research and work with counsel, is
> that there are public interests in creating judicial independence. And
> that was done through -- by having these judges elected over a wide
> area, both geographically and population-wise. That prevents a --
> maybe a single case or single ruling from causing a judge to find his
> favor in that district, which would cause him to lose an election,

> which could then maybe factor into that judge's decisionmaking on
> that case. So it creates a safeguard for judicial independence.

[250] at p. 71.

The Defendants also called as a witness Ann Lamar, an attorney who previously served as a Justice on the Mississippi Supreme Court. Lamar testified that she believed having districts that cover a large area is "helpful so that you are not behold[en] to any one particular group or any one particular region of people." [248] at p. 96.

The Court has no reason to discredit either Kirkpatrick or Lamar's testimony and, in fact, has no reason to believe that either of them did not testify truthfully. However, the Court need not discredit their testimony as to these points to reject the Defendants' argument. Notably, both of them agreed that there is no reason to believe that a Black Justice or any Justice elected from a majority Black district would be less likely to be fair and impartial.

Stated simply, while there may be some articulable purpose for the east-west configuration of the District lines, there was no persuasive evidence presented that that particular configuration is necessary to keep the Mississippi Supreme Court functioning properly. The Court acknowledges the Defendants' reliance on this purpose but finds that it is entitled to minimal weight.

The Defendants also place significant emphasis on Judge Barbour's decision in *Magnolia Bar*, 793 F. Supp. 1386. This Court is, of course, aware that the Fifth Circuit affirmed the decision. *See Magnolia Bar*, 994 F.2d 1143.

*Magnolia Bar* is a 1992 case wherein the plaintiffs, in addition to challenging the at-large, multimember, numbered post and staggered term features of Supreme Court elections, challenged "the east-west district lines which divide the State of Mississippi into three supreme court districts. . . contend[ing] that the east-west configuration of these lines dilutes black voting strength by dividing the heavily black populated areas on the western side of the state into each of three

99

majority white districts." 793 F. Supp. 1391. In other words, the *Magnolia Bar* plaintiffs challenged the same lines at issue in this case.

In *Magnolia Bar*, the district court held that the plaintiffs "satisfied the tripartite *Thornburg* test with respect to their claim that the existing supreme court district lines impermissibly dilute black voting strength[]" but failed to present persuasive evidence as to several of the Senate Factors. *Id*. at 1416. The court placed significant emphasis on the tenuousness of state policies underlying the existing Supreme Court district lines. *Id*. at 1417. In particular, the court concluded that "there are valid state policies for the existing district lines, and finds that these policies, when considered under the totality of the circumstances, foreclose Plaintiffs' district lines vote dilution claim." *Id*. The court credited expert witness testimony that "the interests of the State of Mississippi in having economically and politically diverse supreme court districts would be 'reversed' if the lines were reconfigured in a north-south fashion." *Id*.

Additionally, the district court emphasized the strong policy underlying the need to preserve county lines when creating or proposing new districts in Voting Rights Act litigation. *Id*. Notably, the court found that the plaintiffs "implicitly conceded the viability of this principle during the presentation of their case by proposing only districts drawn without splitting counties, and failing to introduce, until rebuttal, evidence of proposed districts with split counties." *Id*. On that point, the court ultimately concluded that "[t]here is a strong public policy in Mississippi of drawing supreme court districts along county lines and that policy is a valid one." *Id*.

The court also addressed the subdistricts that the plaintiffs had proposed. *Id*. at 1418. To provide context, the plaintiffs had proposed a map with north/south districts containing three single member subdistricts. *Id*. In addressing those proposed subdistricts, the court held:

> Moreover, even if the Court were to accept the feasibility of
> Plaintiffs' proposed subdistricts that utilize split counties, Plaintiffs'

second proposed subdistrict has, according to Plaintiffs' expert, a black voting age population of only 50.01 percent. This conclusion by Plaintiffs' expert is questioned in light of a black majority of only 54.71% in that proposed sub-district. This exceedingly slim majority is perhaps non-existent. The Court is mindful that voting age population data should be reliable, and notes that courts should be wary of numerically unstable majorities. The Court finds that Plaintiffs have failed to prove by a preponderance of the evidence that a second sub-district with a black voting age majority can be created. Accordingly, as a practical matter Plaintiffs would gain nothing from splitting counties in contravention of natural political boundaries.

*Id*. at 1418 (internal citations omitted).

Considering these conclusions as to tenuousness, the court ruled in favor of the plaintiffs: "Plaintiffs have demonstrated a history of official discrimination, socioeconomic effects of discrimination, and racial appeals in political campaigns, to which the Court will not accord significant weight. The Court finds that the valid state policies, when weighed against the factors on which Plaintiffs have prevailed, foreclose Plaintiffs' section 2 district line challenge." *Id*.

The differences between *Magnolia Bar* and the present case are quite noticeable. To begin, the Defendants here presented no expert testimony that the state's interests in having "economically and politically diverse supreme court districts would be 'reversed' if the lines were reconfigured in a north-south fashion." *Id*. at 1417. Notably, at the end of the trial, the Defendants sought to admit the entirety of the record from the *Magnolia Bar* case in an attempt to introduce into evidence the testimony of the expert, Westley Busbee, who testified in that case. The Court sustained the Plaintiffs' objection to the introduction of that evidence and articulated its reasons for doing so on the record.

The Defendants attempted to present no other expert evidence on that point. And while two fact witnesses (Kirkpatrick and Lamar) recognized the existence of the judicial independence policy, they also conceded that they had no reason to believe that a Justice elected from a majority

Black district could not be fair and impartial. In other words, the record in this case as to the policy justifications stands in stark contrast to the record in *Magnolia Bar*.[22]

Ultimately, the record before this Court is significantly divergent from the record in *Magnolia Bar*. The Court therefore finds that *Magnolia Bar* does not preclude a different finding in this case, even though that case was affirmed by the Fifth Circuit.

Additionally, it is worth reiterating the scope of the Plaintiffs' requested relief in this case. They ask the Court to find the current map in violation of Section 2 and to direct the state Legislature to enact a new plan. They do *not* ask this Court to redraw the map in a north-south configuration or direct the Legislature to redraw the map in such a fashion. In other words, a liability finding in the Plaintiffs' favor does not necessarily prohibit the Legislature from enacting a new map configured in an east-west orientation. Indeed, the Least Change Plans that Cooper created maintain the east-west configuration.

The Plaintiffs have presented evidence militating against the Defendants' stated justifications for the current map in the form of admissions by the Defendants' own witnesses on cross-examination as well as the undisputed expert testimony of Cooper illustrating that the Legislature's stated purpose for the 1987 lines is no longer being furthered based on the current population dispersion in the state.

The Court finds that Senate Factor 9 weighs in the Plaintiffs' favor.

ix.    *Senate Factors Summary*

In analyzing the Senate Factors, the Court has engaged in a "'searching practical evaluation of the past and present reality' of the political process in Mississippi." *Miss. NAACP*, 739 F. Supp. 3d at 442 (quoting *Gingles*, 478 U.S. at 79, 106 S. Ct. 2752). And the Court's "intensely local

---

[22] Additionally, this case does not involve sub-districts as one of the plaintiffs' proposals in *Magnolia Bar* did.

appraisal" yields a very clear conclusion—the Plaintiffs have carried their burden. *Id*. (quoting *Gingles*, 478 U.S. at 79, 106 S. Ct. 2752). "That evaluation considers the totality of the circumstances, described as 'an intensely local appraisal of the design and impact of the contested electoral mechanisms.'" *Id*. (quoting *Gingles*, 478 U.S. at 79, 106 S. Ct. 2752). This is not one of the "very unusual" cases where "the plaintiffs can establish the existence of the three *Gingles* factors but still have failed to establish a violation of § 2 under the totality of circumstances." *Nairne*, 715 F. Supp. 3d at 868 (quoting *Clark*, 21 F.3d at 97).

Rather, the Court finds that the Senate Factors overwhelmingly weigh in favor of the Plaintiffs. The current Mississippi Supreme Court map violates Section 2 of the Voting Rights Act.

### III.    Remedy

In light of its conclusion, the Court must determine the appropriate remedy.

Although determining the proper remedy can be a difficult task, "[o]ne thing is clear . . . the court's 'first and foremost obligation' must be 'to correct the Section 2 violation.'" *Miss. NAACP,* 739 F. Supp. 3d at 464 (quoting *United States v. Brown*, 561 F.3d 420, 435 (5th Cir. 2009)). "[T]he district court should exercise its traditional equitable powers to fashion the relief so that it completely remedies the prior dilution of minority voting strength." *Id*. (citations omitted). Though the issue is context-dependent, "it would be the unusual case in which a court would be justified in not taking appropriate action to [ensure] that no further elections are conducted under the invalid plan." *Reynolds v. Sims*, 377 U.S. 533, 585, 84 S. Ct. 1362, 12 L. Ed. 2d 506 (1964).

The Court returns to the relief the Plaintiffs sought in their Amended Complaint [133]. They specifically requested a declaration that the map violates Section 2, an injunction prohibiting

further utilization of the map, and the imposition of a deadline for the State authorities to enact a new plan.

At this time, the Court finds that declaratory and injunctive relief are appropriate. It is hereby DECLARED that the current Mississippi Supreme Court electoral map violates Section 2 of the Voting Rights Act. The Defendants are hereby ENJOINED from utilizing the current electoral map in any further Mississippi Supreme Court elections.

As to the need to enact a new plan, the Court notes that this is first an issue for the Legislature. *See Robinson*, 86 F.4th at 601 ("Federalism concerns are heightened in the present context: even after a federal court has found a districting plan unconstitutional, redistricting and reapportioning legislative bodies is a legislative task which the federal courts should make every effort not to preempt.") (quoting *McDaniel v. Sanchez*, 452 U.S. 130, 150 n. 30, 101 S. Ct. 2224, 68 L. Ed. 2d 724 (1981)) (additional citation and internal quotation marks omitted). Additionally, when questioned by the Court at the conclusion of trial, counsel agreed that, in the event of a liability finding for the Plaintiffs, the Mississippi Legislature should first be given an opportunity to enact a new plan prior to this Court taking any action in that regard. The Court agrees and will provide the Mississippi Legislature an opportunity to enact a plan in compliance with Section 2 of the Voting Rights Act. The Court will convene a status conference with the parties to address an appropriate deadline to impose upon the Legislature to take such action.

At this time, the Court holds in abeyance the Plaintiffs' request for the imposition of fees and costs. Should they desire to do so, the Plaintiffs should re-urge this issue after a remedy is fully ordered and carried out.

*Conclusion*

For the reasons set forth herein, the Court finds in favor of the Plaintiffs, as they have proven their Section 2 claim by a preponderance of the evidence.[23] As indicated above, the Court will convene a status conference with the parties in due course.[24]

SO ORDERED this the 19th day of August, 2025.

/s/ Sharion Aycock
SENIOR UNITED STATES DISTRICT JUDGE

---

[23] During the trial, the Defendants moved for judgment as a matter of law pursuant to Rule 52(c). The Court declined to render any judgment at that time. For the reasons set forth in this Order and Memorandum Opinion, that motion is DENIED.

[24] Following the trial, the parties, at the direction of the Court, submitted proposed findings of fact and conclusions of law. *See* [252], [253]. The Court has referenced those submissions throughout this ruling. In reaching its conclusion, the Court has reviewed both submissions in extensive detail and made every endeavor to address all pertinent arguments. To the extent that the Court has not considered any particular argument, it would not have changed the outcome.