IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
ABERDEEN DIVISION

DISABILITY RIGHTS MISSISSIPPI                                        PLAINTIFF

v.                                              CIVIL ACTION NO. 1:24-cv-99-SA-DAS

PALMER HOME FOR CHILDREN                                           DEFENDANT

SANCTIONS ORDER

This matter comes before the Court on its own initiative. On May 22, 2025, the Court entered its initial Order to Show Cause [46] directing Plaintiff, Disability Rights Mississippi's ("DRMS") counsel, Greta Kemp Martin, Esq., to show cause as to why the Court should not impose sanctions against her pursuant to Rule 11 of the Federal Rules of Civil Procedure. A hearing on this matter was held on June 16, 2025. Stated briefly, the underlying conduct at issue is Martin's submission of legal memoranda containing fabricated case citations and nonexistent quotes attributed to existing cases.

Subsequently, on September 9, 2025, the Court entered a second Order to Show Cause [86] providing Martin and DRMS with notice of its intent to exercise its inherent power to impose the appropriate sanction (either in the alternative or in addition to Rule 11), outlining other potential sanctionable conduct, and giving them an opportunity to respond. Both Martin and DRMS submitted responses to the Court's second show cause order. *See* [87, 88].

Having considered the record, the applicable law, and Martin's explanation and evidence presented at the hearing, the Court is prepared to rule on the sanctions issue, as well as on the related pending Motions [53, 61].

*Relevant Factual and Procedural Background*

This lawsuit arises from a dispute related to DRMS' access authority to Palmer Home's campus located in Desoto County, Mississippi, which operates as a children's residential home. DRMS is the designated protection and advocacy system for Mississippi citizens with disabilities.

DRMS' authority derives from a trio of federal statutes.[1] On its merits, this case presents the Court with a unique set of facts and a legal issue which has not been previously considered in the Fifth Circuit.

Palmer Home moved for summary judgment on April 25, 2025. *See* [35]. On the same date, Martin, counsel for DRMS, filed a competing Motion for Permanent Injunction [37]. Thereafter, the parties fully briefed the Motions [35, 37].

Of the relevant filings, Martin filed the following legal memoranda on behalf of DRMS: (1) a Memorandum [38] in support of DRMS' permanent injunction motion, (2) a Response Memorandum [40] in support of DRMS' opposition to Palmer Home's summary judgment motion, and (3) a Reply [43] to Palmer Home's response in opposition to DRMS' permanent injunction motion. Each of the three legal memoranda [38, 40, 43] submitted by Martin (on behalf of DRMS) contain either fabricated case citations, fake quotes from real cases, or a combination of both.

Notably, on May 9, 2025, Palmer Home filed a Response [42] to DRMS' permanent injunction motion and noted that its counsel was unable to locate a purported quote within DRMS' cited authority. *See* [42] at p. 11 n.17. Despite Palmer Home's notation, one week later, Martin (on behalf of DRMS) filed a Reply [43] that contained the same purported quote. *See* [43] at p. 2. Upon a close review of the cited authority, the Court determined that the quote was indeed a fake quote that does not appear anywhere in the cited case. Thus, Martin's Reply [43] not only failed to address the issue Palmer Home raised in its Response [42] but *again* cited the fake quote.

On May 16, 2025, Palmer Home filed its last memorandum related to the pending Motions [35, 37]—a Reply [45] in support of its summary judgment motion. In the first paragraph of its Reply

---

[1] The relevant federal statutes, commonly referred to as the Protection and Advocacy or "P&A" statutes, include the Protection and Advocacy for Individuals with Mental Illness Act ("PAIMI"), as amended, 42 U.S.C. § 10801 *et seq.*; the Developmental Disabilities Assistance and Bill of Rights Act of 2000 ("PADD"), as amended, 42 U.S.C. § 15041 *et seq.*; and the Protection and Advocacy of Individual Rights Act ("PAIR"), as amended, 29 U.S.C. § 794e.

[45], Palmer Home again raised concerns with Martin's cited legal authority stating that DRMS supported its position with "legal authority that exists nowhere except in DRMS's briefs[.]" [45] at p. 1. Additionally, Palmer Home specifically noted that it was unable to locate additional purported quotes and a case cited by Martin in DRMS' Response Memorandum [40]. *See id.* at pp. 3 n.4, 5 n.5, 10 n.11, 12 n.12.

After a thorough review of all three of Martin's submitted legal memoranda [38, 40, 43] and the authorities cited therein, the Court determined that Martin cited a combined total of three fabricated cases and six fake quotes.

On May 22, 2025, the Court entered an Order to Show Cause [46] directing Martin to show cause as to why the Court should not impose sanctions against her for failure to comply with Federal Rule of Civil Procedure 11. The Order [46] set the matter for hearing and specifically directed Martin to provide the Court with copies of the fabricated cases at issue, as well as copies of the real cases the fake quotes were attributed to with highlighted portions of the quoted material.

On the same date, Martin filed a Response [48] to the Order [46], though the Court did not require her to do so. In her Response [48], Martin explains that she "relied on an internal reference document developed for efficiency in drafting." [48] at p. 1. Martin admits to committing mistakes; however, she describes the mistakes as "citation errors" and "old-fashioned copy and paste errors." *Id.* at pp. 1, 7-8. As to the fake quotes, Martin explains in her Response [48] that the same were in reality "paraphrased summary lines for internal use only" which she "inadvertently failed to remove… when inserting case citations" resulting in "several filings incorrectly attribut[ing] paraphrased summaries to the courts themselves." *Id.* at p. 1. Martin's Response [48] included a chart containing detailed explanations of the "mistakes" made with respect to each citation that the Court listed in its Order to Show Cause [46]. The Response [48] also included several cases attached as exhibits—none of which satisfied the Court's specific directive. In light of Martin's response, the

3

Court directed Martin to provide a copy of the identified "internal reference document" at the scheduled hearing via a supplemental Order [49]. *See* [49].

The Court held a show cause hearing on June 16, 2025, during which Martin expressed embarrassment and regret for her mistakes. She also produced the "internal reference document" and explained that the document was comprised of screenshots from a Microsoft OneNote file, which she had developed and utilized for organizational purposes. The document contains a list of legal citations followed by short phrases in quotation marks. At the hearing, Martin explained that she had revised the document following the entry of the Court's Order to Show Cause [46] to avoid further mistakes, and, as a result, she was unable to provide the unrevised, original version that she had relied on for preparation of her legal briefs. Martin denied using generative artificial intelligence ("AI") to draft her legal briefs or to conduct legal research. She did admit, however, to not reviewing some of the cases at issue prior to citing them in her legal briefs and subsequently filing those briefs with the Court.

Palmer Home's attorneys were present at the show cause hearing and were provided with an opportunity to be heard. Amanda Tollison, lead counsel for Palmer Home, expressed that, during the briefing process, she and other attorneys within her firm conducted extensive legal research to attempt to locate the nonexistent cases and fake quotes contained in Martin's filings in order to formulate its responses. Palmer Home made an *ore tenus* motion for attorney's fees at the hearing, and the Court directed counsel to file the request in writing. Palmer Home subsequently filed its Motion for Attorney's Fees and Litigation Costs [53], seeking the total sum of $27,252.90 in attorney's fees and costs.

After Palmer Home filed its Motion [53], DRMS retained new counsel and, through its recent filings, takes the position that any monetary sanctions imposed as a result of Martin's conduct should not be allocated against it. Martin resigned from her position as Litigation Director of DRMS and

4

moved to withdraw from her representation of it in this case. She then retained independent counsel to represent her interests.

Through their respective attorneys, Martin and DRMS filed separate responses in opposition to Palmer Home's Motion for Attorney's Fees and Litigation Costs [53]. DRMS also filed a Motion for Leave to File Amended Pleadings and Request for Status Conference and to Stay Ruling [66] on July 17, 2025, through its new counsel.

On September 9, 2025, the Court entered a second Order to Show Cause [86] providing Martin with notice of the Court's intent to exercise its inherent power to impose an appropriate sanction and an opportunity to file a written response. In light of the apparent competing interests between Martin and DRMS regarding potential sanctions, the Court likewise provided DRMS with notice and an opportunity to respond via the same Order [86]. In its Response [87], DRMS reiterates its position that it should not be sanctioned as a result of Martin's conduct. In her Response [88], Martin maintains her previous explanations to this Court, admits that her conduct is sanctionable, and argues that sanctions outside of the purview of Rule 11 are not warranted.

*Rule 11 Standard*

"'[T]he central purpose of Rule 11 is to deter baseless filings in district court and thus… streamline the administration and procedure of the federal courts.'" *Sec. & Exch. Comm'n v. Faulkner*, 2018 WL 3708426, at *2 (N.D. Tex. Aug. 3, 2018) (quoting *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 393, 110 S. Ct. 2447, 110 L. Ed. 2d 359 (1990)). In pertinent part, Rule 11 provides:

> By presenting to the court a pleading, written motion, or other paper—whether by signing, filing, submitting, or later advocating it—an attorney or unrepresented party certifies that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances:… the claims, defenses, and other legal contentions are warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law[.]

5

FED. R. CIV. P. 11(b)(2).

Accordingly, "[a]n attorney has a duty to conduct a 'reasonable inquiry into the facts and law of a case at the time [at] which she affixes her signature on any papers to the court.'" *Faulkner,* 2018 WL 3708426 at *2 (quoting *Mercury Air Grp., Inc. v. Mansour*, 237 F.3d 542, 548 (5th Cir. 2001)). "An attorney's conduct is judged… with an objective, not a subjective, standard of reasonableness." *Snow Ingredients, Inc. v. SnoWizard, Inc.*, 833 F.3d 512, 528 (5th Cir. 2016) (citing *Whitehead v. Food Max of Mississippi, Inc.*, 332 F.3d 796, 802 (5th Cir. 2003)). "Reasonableness is reviewed according to the 'snapshot' rule, focusing upon the instant the attorney affixes [her] signature to the document." *Id.* (quoting *Smith v. Our Lady of the Lake Hosp., Inc.*, 960 F.2d 439, 444 (5th Cir. 1992)) (internal quotation marks omitted). "In light of the objective standard of reasonableness applied under Rule 11, an attorney's subjective good faith is not enough to immunize [her] from sanctions based on a Rule 11 violation." *Dodson v. Nichols*, 2024 WL 4299023, at *4 (M.D. La. Sept. 26, 2024) (citing *Thomas v. Cap. Sec. Servs., Inc.*, 836 F.2d 866, 873 (5th Cir. 1988)).

"The district court is vested with considerable discretion in determining the appropriate sanction to impose upon the violating party." *Thomas*, 836 F.2d at 877 (citations and internal quotation marks omitted). "When Rule 11 has been violated, the court must 'carefully choose sanctions that foster the appropriate purpose of the rule, depending upon the parties, the violation, and nature of the case.'" *Faulkner,* 2018 WL 3708426 at *2 (quoting *Thomas*, 836 F.2d at 877). "The Fifth Circuit has held that the sanction imposed 'should be the least severe sanction adequate to [accomplish] the purpose of Rule 11.'" *Ferris v. Amazon.com Servs.*, 2025 WL 1122235, at *2 (N.D. Miss. Apr. 16, 2025) (quoting *Thomas*, 836 F.2d at 878-79). A sanction imposed under Rule 11 "must be limited to what suffices to deter repetition of the conduct or comparable conduct by others similarly situated." FED. R. CIV. P. 11(c)(4).

*The Court's Inherent Authority*

Aside from Rule 11, "[f]ederal courts retain the inherent power to sanction abuse of the judicial process." *Massachusetts Mut. Life Ins. Co. v. Williamson*, 2019 WL 7195318, at *3 (N.D. Miss. Dec. 26, 2019) (citing *Manez v. Bridgestone Firestone N. Am. Tire, LLC*, 533 F.3d 578, 591 (7th Cir. 2008)). "The Supreme Court in *Chambers v. NASCO* held that federal courts have inherent power to sanction parties and their attorneys." *In re Garcia Grain Trading Corp.*, 2024 WL 5151307, at *3 (Bankr. S.D. Tex. Dec. 17, 2024) (citing *Chambers v. NASCO, Inc.*, 501 U.S. 32, 47, 111 S. Ct. 2123, 115 L. Ed. 2d 27 (1991)). "While sanctions under this power do not require a violation of a court order (as would a sanction based on civil contempt), they ordinarily require a specific finding of bad faith on the part of the party to be sanctioned." *Williamson*, 2019 WL 7195318 at *3 (citing *In re Sealed Appellant*, 194 F.3d 666, 671 (5th Cir. 1999)).

The "inherent power of a court can be invoked even if procedural rules exist which sanction the same conduct." *Chambers*, 501 U.S. at 50, 111 S. Ct. 2123. "A court ordinarily should rely on relevant rules and statutes, rather than the inherent power, but 'if in the informed discretion of the court, neither the statute nor the rules are up to the task, the court may safely rely on its inherent power.'" *In re Garcia*, 2024 WL 5151307 at *3 (quoting *Chambers*, 501 U.S. at 53, 111 S. Ct. 2123). A sanction imposed under the court's inherent authority, "must employ the least possible power adequate to the end proposed." *Nat. Gas Pipeline Co. of Am. v. Energy Gathering, Inc.*, 86 F.3d 464, 467 (5th Cir. 1996) (internal quotation marks and citations omitted). "If there is a reasonable probability that a lesser sanction will have the desired effect, the court must try the less restrictive measure first." *Id.*

*Analysis and Discussion*

Though the present issue abounds within the judicial system at large, federal courts in Mississippi have not yet addressed this type of sanctionable conduct resulting from a licensed

7

attorney's submission of legal filings tainted with fabricated legal authority. This Court recently addressed comparable issues involving *pro se* litigants. *See Ferris*, 2025 WL 1122235 at *1; *see also Newbern v. DeSoto Cnty. Sch. Dist.*, 782 F. Supp. 3d 329, 332 (N.D. Miss. 2025). In *Ferris*, the *pro se* plaintiff admitted to using AI to generate pleadings and responsive motions submitted to the Court—all of which contained fake case citations. 2025 WL 1122235 at *1. In this case, however, Martin is a licensed attorney who denies that she used AI and instead attributes the mistakes to her own lack of diligence.

On this point, the Court notes that it disbelieves Martin's explanations regarding the source of her mistakes and is highly suspicious that she used AI to generate the legal authorities cited in her legal memoranda [38, 40, 43]. As explained in more detail hereinafter, Martin's filings contain fabricated case citations comprised of some parts corresponding to real cases, but the same are not real cases as cited. Martin also provides a legal citation in one of her filings that does not lead to any existing case. Federal district courts have described these sort of citations as "hallucinatory" citations, which are indicative of AI usage. *See, e.g., Bevins v. Colgate-Palmolive Co.*, 2025 WL 1085695, at *7 n.10 (E.D. Pa. Apr. 10, 2025) ("Both citations appear to be [AI] 'hallucinations' made up of parts of actual cases."); *Strong v. Rushmore Loan Mgmt. Servs., LLC*, 2025 WL 100904, at *6 (D. Neb. Jan. 15, 2025) (explaining that several of plaintiff's citations included existing case names but the actual legal citations were completely different, giving rise to the court's suspicions that plaintiffs utilized AI, "which is known to result in the sort of fictional or 'hallucinatory' citations the [plaintiffs] provide.").

In addition to the fabricated case citations, Martin takes direct responsibility for preparing the "inadvertently quoted" case summaries, which the Court refers to as the fake quotes. At the show cause hearing, Martin represented to the Court that the quoted phrases were her summaries based on her interpretation of the cases. In Martin's Response [48] to the initial Order to Show Cause [46], she

8

alleges that "[t]he inadvertent inclusion of summary quotes did not alter the holdings of these cases. If anything, the internal summaries reflected a truncated explanation of why the Plaintiff relied on each case, offering a shorthand guide to their applicability to the Plaintiff's position." [48] at p. 8 (emphasis added). The Court finds this statement to be patently false. In fact, Martin's "inadvertently quoted" case summaries misrepresent, either entirely or in part, the facts and rulings of the cases cited to support her propositions. The Court will discuss the fake quotes in detail below but, for now, notes that this too is indicative of AI utilization. *See Moales v. Land Rover Cherry Hill*, 2025 WL 1249616, at *3 (D. Conn. Apr. 30, 2025) (explaining that plaintiff cited several cases that did not match the proposition for which they were cited, giving the court reason to believe plaintiff may have used AI in drafting his submissions).

Though Martin contends her legal citations were merely poorly presented and describes her mistakes as citation errors, "[t]hat a [c]ourt is unable to discern from the face of a filing whether it was written by artificial intelligence is the case except in uncommon situations in which a court is presented with obvious evidence of artificial intelligence." *Id.* at *3 n.17. Absent a direct admission, however, the Court cannot definitively state that an attorney or party utilized AI regardless of how obvious it appears. At minimum, the Court finds that Martin was not honest in her explanations for these reasons and others. In an attempt to avoid becoming part of a new trending statistic, Martin has disfavored herself in attributing the sham citations and nonexistent quotes to herself. If her explanation to the Court is actually truthful, it clearly demonstrates an extreme deviation from her professional and ethical responsibilities.

Nonetheless, whether Martin used AI or not to generate fictitious legal authority does not ultimately bear on the issue at hand. The Court need not make any finding as to whether Martin actually used AI to generate the fictitious case citations and fake quotes or to draft any portion of the filings to make a determination on the present issue. *See United States v. Hayes*, 763 F. Supp. 3d

1054, 1066-67 (E.D. Cal. 2025) ("Citing nonexistent case law or misrepresenting the holdings of a case is making a false statement to a court. *It does not matter if generative AI told you so*.") (additional citations omitted; emphasis added)). The Court now turns to its analysis of Martin's conduct.

I.    *Rule 11 Violations*

"In the first published federal appellate case addressing this issue, the Second Circuit observed that 'at the very least, the duties imposed by Rule 11 require that attorneys read, and thereby confirm the existence and validity of, the legal authorities on which they rely. Indeed, we can think of no other way to ensure that the arguments made based on those authorities are warranted by existing law, Fed. R. Civ. P. 11(b)(2), or otherwise legally tenable.'" *Mavy v. Comm'r of Soc. Sec. Admin.*, 2025 WL 2355222, at *6 (D. Ariz. Aug. 14, 2025) (quoting *Park v. Kim*, 91 F.4th 610, 615 (2d Cir. 2024)). In other words, where an attorney simply fails to read the legal authorities relied upon in a brief prior to submitting the same for judicial consideration, that attorney has engaged in conduct that runs afoul to the mandates of Rule 11. *See Kim*, 91 F.4th at 615; *see also* FED. R. CIV. P. 11(b)(2).

Though more common in cases involving admitted AI usage, federal district courts within the Fifth Circuit have recently reached the same conclusion. *See Elizondo v. City of Laredo*, 2025 WL 2071072, at *2 (S.D. Tex. July 23, 2025) (finding plaintiff's counsel in violation of Rule 11 for filing a brief "containing fabricated or materially inaccurate case citations" and explaining that the attorney "failed to make a reasonable inquiry required by Rule 11[.]"); *see also Gauthier v. Goodyear Tire & Rubber Co.*, 2024 WL 4882651, at *2 (E.D. Tex. Nov. 25, 2024) (finding plaintiff's counsel in violation of Rule 11 where he "submitted [a] Response without reading the cases cited[.]"). Thus, as these authorities makes clear, "[t]he filing of papers 'without taking the necessary care in their preparation' is an 'abuse of the judicial system' that is subject to Rule 11 sanction." *Mata v. Avianca, Inc.*, 678 F. Supp. 3d 443, 460 (S.D.N.Y. 2023) (quoting *Hartmarx Corp.*, 496 U.S. at 398, 110 S. Ct. 2447).

Additionally, an attorney's compliance with Rule 11(b)(2) is not limited to being assessed only at the time a pleading is submitted. *Id.* at 461; *see also Payne v. Univ. of S. Mississippi*, 2015 WL 3549862, at *2 n.1 (S.D. Miss. June 5, 2015). In fact, an attorney violates Rule 11 by "later advocating for a position first asserted in a previously filed document." *Payne*, 2015 WL 3549862 at *2 n.1 (internal quotation marks and citations omitted). The advisory committee notes relative to the 1993 amendment to subdivisions (b) and (c) of Rule 11 provide in pertinent part:

> These subdivisions restate the provisions requiring attorneys and pro se litigants to conduct a reasonable inquiry into the law and facts before signing pleadings, written motions, and other documents, and prescribing sanctions for violation of these obligations. The revision in part expands the responsibilities of litigants to the court, while providing greater constraints and flexibility in dealing with infractions of the rule. The rule continues to require litigants to "stop-and-think" before initially making legal or factual contentions.
>
> …
>
> The rule applies only to assertions contained in papers filed with or submitted to the court…. However, a litigant's obligations with respect to the contents of these papers are not measured solely as of the time they were filed with or submitted to the court, but include reaffirming to the court and advocating positions contained in those pleadings and motions after learning that they cease to have any merit.

FED. R. CIV. P. 11 advisory committee's note to 1993 amendment.

The Court has carefully considered the circumstances of this case in conjunction with the expanding case law on this issue. For the reasons provided below, the Court finds that Martin violated Rule 11.

### A.  Martin cited authority she knew she had not read.

As noted above, through its own research, the Court determined that three legal citations contained in Martin's filings were fabricated and did not correspond to existing cases as cited in her filings. The fabricated legal citations, which were included in the Court's initial Order to Show Cause [46], are: (1) *Allen v. Gov't of D.C.*, 197 F.R.D. 689, 696 (D. Ariz. 2000); (2) *Miller v. Indiana Dep't*

11

*of Corr.*, 849 F. Supp. 1206, 1207 (N.D. Ind. 1994); and (3) *Iowa Protection and Advocacy Services v. Tanager Place*, 2001 WL 34098652 (N.D. Iowa Sept. 21, 2001).

Beginning with the first citation, the case name *Allen v. Gov't of D.C.* does not appear at the citation 197 F.R.D. 689, 696 (D. Ariz. 2000). The case appearing at that citation is *Arizona Center for Disability Law v. Allen*, 197 F.R.D. 689 (D. Ariz. 2000), which ends on page 694 and has no page 696 as cited by Martin in her Memorandum [40].[2] As to the second fabricated case citation at issue, the case name *Miller v. Indiana Dep't of Correction* corresponds to an existing unpublished case but the correct legal citation to that case is 33 F.3d 56 (7th Cir. 1994).[3] The legal citation following that case name as cited by Martin in her Memorandum [38] is 849 F. Supp. 1206 (N.D. Ind. 1994), which *does not correspond to any existing case*.[4] Finally, with respect to the third fabricated case citation at issue, the case name similarly corresponds to an existing case which has a different legal citation than that provided by Martin in her Memorandum [40]. The legal citation that was provided—2001 WL 34098652 (N.D. Iowa Sept. 21, 2001)—leads to a different existing case.[5] Again, while these citations are comprised of parts corresponding to real cases (with the exception of 849 F. Supp. 1206 (N.D. Ind. 1994) which does *not* correspond to any existing case), they are not real cases *as cited*.

---

[2] The only cases this Court has located with similar names as "*Allen v. Gov't of D.C.*" are *Allen, Girard v. Government of Dc Office of Corporate*, Case Number: 2000-CA-007576-B in the District of Columbia Superior Court, and a case in the United States District Court for the District of Columbia styled *Joseph Allen v. District of Columbia*, 812 F. Supp. 1239 (D.D.C. 1993). Neither of these cases involve similar law as is applicable in this case.

[3] The existing Seventh Circuit case *Miller v. Indiana Dep't of Corr.*, 33 F.3d 56 (7th Cir. 1994) involves a Section 1983 claim and addresses whether the claim was *Heck* barred. That case was superseded by *Miller v. Indiana Dep't of Corr.*, 75 F.3d 330 (7th Cir. 1996) and is wholly irrelevant to this case.

[4] The Court thoroughly searched for a case corresponding to 849 F. Supp. 1206 (N.D. Ind. 1994) and found none.

[5] There is a 2005 case in the Northern District of Iowa styled *Iowa Protection and Advocacy Services v. Tanager Place*, but the legal citation to that case is 404 F. Supp. 2d 1120 (N.D. Iowa 2005). The legal citation cited by DRMS, 2001 WL 34098652 (N.D. Iowa Sept. 21, 2001), leads to a 2001 case in the Eastern District of California styled *Legal & Safety Emp. Rsch., Inc. v. U.S. Dep't of the Army*. That case was an action brought against the United States Department of the Army under the Freedom of Information Act and does not involve similar law as this case.

At the show cause hearing, Martin admitted that she did not read *Miller v. Indiana Dep't of Corr.*, 75 F.3d 330 (7th Cir. 1996), the existing case which is included in one of the fabricated legal citations, prior to submitting her legal filing containing that citation:

> THE COURT: Well, did you go to that -- did you physically pull the case and read it?
>
> MS. MARTIN: I have -- yes, Your Honor, I have since. I have pulled *Miller v. Indiana Department of Corrections*.
>
> THE COURT: I'm talking about prior to submitting it to the Court. Your memorandum, when you filed it, prior to filing, you tell me, as an officer of the Court, did you go to that cite and read that case?
>
> MS. MARTIN: No, Your Honor.

[68] at p. 13-14.[6]

When asked whether her legal citation 849 F. Supp. 1206 (N.D. Ind. 1994) corresponded to an existing case, Martin responded that she was "not sure." *Id.* at p. 13. The Court then asked whether it was correct in its understanding that Martin did not check the citation to ensure it corresponded to a real case. *Id.* Although Martin never admitted that the Court was correct in its understanding, she explained that the citation "was an error." *Id*. Had Martin read *Miller v. Indiana Dep't of Corr.* prior to submitting her filing, she would have realized that the case has no relevance whatsoever to the case at bar and thus did not support the proposition for which she cited it. She would have also discovered that her legal citation was fictitious and unassociated with any existing case.

Additionally, Martin admitted that she did not read *Iowa Protection and Advocacy Services v. Tanager Place*, 404 F. Supp. 2d 1120 (N.D. Iowa 2005), the existing case forming part of another of her fabricated legal citations, prior to submitting her briefs. She also admitted to not reviewing the

---

[6] The fabricated case citation "*Miller v. Indiana Dep't of Corr.*, 849 F. Supp. 1206, 1207 (N.D. Ind. 1994)" was cited by Martin in DRMS' Memorandum in Support of Plaintiff's Motion for Permanent Injunction [38]. *See* [38] at p. 6.

legal citation provided in her memorandum containing that citation.[7] Specifically, Martin stated as follows:

> THE COURT: *Iowa Protection and Advocacy Services v. Tanager Place*. That's 2001 Westlaw 34098652. Did you review the legal citation in that case to ensure that it corresponded to the *Iowa Protection and Advocacy Services* case prior to your filing?
>
> MS. MARTIN: Your Honor, not prior to the filing. Again, I had it -- it was an error of citation.
>
> …
>
> THE COURT: Did you review that case before submitting it in brief form to this Court?
>
> MS. MARTIN: I reviewed the case before I put it into the internal database that I use, and I -- I—
>
> THE COURT: That's not the question I asked you. Did you review it?
>
> MS. MARTIN: I did not review it, again, before taking it from my database, no.
>
> …
>
> THE COURT: And, again, you did not review the cite to determine that that was an appropriate case with -- appropriate case name and appropriate citation prior to filing it in this case?
>
> MS. MARTIN: No, Your Honor. I did not go to that specific cite. Again, just -- we've used the *Iowa Protection and Advocacy Services* case quite a bit, and I absolutely should have gone and reviewed it again and not just relied on the familiarity of that case, yes.

[68] at p. 14-15.

At minimum, Martin would have realized that the legal citation she provided leads to an unrelated case, *Legal & Safety Emp. Rsch., Inc. v. U.S. Dep't of the Army*, and does not support the

---

[7] The fabricated case citation "*Iowa Protection and Advocacy Services v. Tanager Place*, 2001 WL 34098652 (N.D. Iowa Sept. 21, 2001)" was cited by Martin in DRMS' Memorandum in Opposition to Defendant's Motion for Summary Judgment [40]. *See* [40] at p. 7.

14

proposition for which she cited it had she reviewed her legal citation before submitting her filing. Had she read the existing *Iowa Protection* case, she would have spotted the issue.

The Court need not address all of the fabricated citations to reach its conclusion. These examples are illustrative of Martin's conduct. The Court finds that, in failing to read *Miller* and failing to read and verify the legal citation to *Tanager Place*, Martin made *no* inquiry, much less the "reasonable inquiry" required by Rule 11. *See* FED. R. CIV. P. 11(b)(2); *see also Gauthier*, 2024 WL 4882651 at *2 ("At the very least, the duties imposed by Rule 11 require that attorneys read, and thereby confirm the existence and validity of, the legal authorities on which they rely.") (citing *Park*, 91 F.4th at 615). She acted in clear violation of Rule 11 and appears to not dispute it. *See* [88] at p. 1.

Notwithstanding the Court's finding above, it is noteworthy that Martin's written Response to the Show Cause Order [48] alleges that "it is important to note for the record that none of these cases cited are fictious or irrelevant. Each is a valid, published authority that supports the arguments made." [48] at p. 1-2. The Court finds that, in asserting that her cited cases were not fictious nor irrelevant to the present case via her subsequent Response [48], Martin essentially re-affirmed to this Court that she had conducted a reasonable inquiry into those cases prior to submitting her filings. This re-affirmation on her part is also a violation of Rule 11 because she conducted no inquiry in the first place.

### B. Martin failed to verify multiple fake quotes and misrepresented case law.

The Court next addresses the multiple fake quotes contained in Martin's filings and her misrepresentations of case law. The Court determined that there were a total of six fake quotes in Martin's submissions. Again, as to all fake quotes at issue, Martin maintains that she "inadvertently failed to remove [the] internal summary lines when inserting case citations. As a result, several filings incorrectly attributed paraphrased summaries to the courts themselves." [48] at p. 1. According to Martin, the fake quotes at issue are her paraphrased summaries of the cases cited and the quotation

marks surrounding the phrases were, for an unknown reason, included with her case summaries within her internal reference document. *See id.*

At the show cause hearing, Martin admitted to not reviewing the following four cases, to which a portion of the fake quotes were attributed, prior to quoting them in her filings: *Charlotte-Mecklenburg Bd. of Educ. v. Disability Rts. of N. Carolina*, 430 F. Supp. 3d 74 (W.D.N.C. 2019); *Michigan Prot. & Advoc. Serv., Inc. v. Miller*, 849 F. Supp. 1202 (W.D. Mich. 1994); *Connecticut Off. of Prot. & Advoc. For Persons With Disabilities v. Hartford Bd. of Educ.*, 464 F.3d 229 (2d Cir. 2006); and *Iowa Prot. & Advoc. Servs., Inc. v. Gerard Treatment Programs, L.L.C.*, 152 F. Supp. 2d 1150 (N.D. Iowa 2001).[8] For example, as to the first case listed, Martin testified as follows:

> THE COURT: So let's talk about *Charlotte-Mecklenburg* -- that's M-e-c-k-l-e-n-b-u-r-g -- *Board of Education v. Disability Rights of North Carolina*, 430 F. Supp. 3d 74, page 80. And that is Western District, North Carolina, 2019. This is the quote. "The fact that other agencies have conducted investigations does not eliminate Disability Right's federal authority." That's your quote; correct?
>
> MS. MARTIN: Correct, Your Honor.
>
> THE COURT: Did you review that case to ensure that the purported quote you copied from your internal reference document was actually contained in the court's opinion prior to your filing?
>
> MS. MARTIN: I did not prior to the filing. I reviewed the case before I put it into the database, and that is my personal summary that was erroneously copied.

[68] at p. 15-16.

Similarly, regarding the fake quote attributed to *Hartford*, Martin agreed that the purported quote was not in the case opinion and admitted to not reading that case prior to citing it in her filing:

> THE COURT: There's a case you use, *Connecticut Office of Protective -- Protection and Advocacy for Persons with Disabilities v. Hartford Board of Education*. And, again, your quote, inside quotation marks, "The agency's authority does not hinge on a facility's willingness to

---

[8] All fake quotes attributed to these cases are contained in DRMS' Memorandum in Opposition to Defendant's Motion for Summary Judgment [40]. *See* [40] at p. 5, 6-7, 11-12.

self-identify as serving individuals with developmental disabilities, nor
does it depend on the severity of the disabilities served." Is that quote
inside the *Hartford* case?

MS. MARTIN: No, Your Honor.

THE COURT: Did you review *Hartford* to ensure that that quote
wasn't there?

MS. MARTIN: Not before filing the brief, Your Honor. Before putting
it in the document.

*Id.* at p. 23.

In sum, Martin makes the same admission as to the other cases listed above. *See id.* at p. 22,

26-27. Regarding all the fake quotes, Martin explained that the case summaries were her own

interpretations of the cases cited and the same were not intended to be included in her filings. Despite

her reasoning, Martin's admits to only having reviewed the cases at the time she incorporated them

into her internal reference document but not afterwards and, particularly, not before filing her

memoranda in this case. She also acknowledged that the quoted phrases surrounded by quotation

marks appear to be direct quotes from cases and are therefore misleading:

THE COURT: Is it fair to say that it is reasonable on my part that where
I see a quote with quotation marks I can assume that that language came
from an actual, real, existing case?

MS. MARTIN: Absolutely. Absolutely.

THE COURT: You misled us in that regard.

MS. MARTIN: Completely unintentionally. I completely understand
the Court's concern, and I take full responsibility.

*Id.* at p. 18.

The Court finds that, in failing to read the quoted cases, and thereby failing to verify that the

purported quotes were contained in those cases, Martin violated Rule 11. *See* FED. R. CIV. P.

11(b)(2); *see also Gauthier*, 2024 WL 4882651 at *2. Similar to the violations surrounding the

fabricated case citations, Martin abandoned her "duty to conduct a reasonable inquiry into the facts

17

and law of [these] case[s] at the time [at] which she affixe[d] her signature on [her filings] to the court." *Faulkner,* 2018 WL 3708426 at *2 (internal quotation marks and additional citation omitted).

Moreover, the Court is compelled to point out a discrepancy in Martin's explanation relative to the fake quotes.

In Martin's Reply Brief in Support of Plaintiff's Motion for Permanent Injunction [43], a fake quote attributed to *Alabama Disabilities Advoc. Program v. SafetyNet Youthcare, Inc.*, 65 F. Supp. 3d 1312 (S.D. Ala. 2014), was made part of a case illustration, which, unlike the other fake quotes addressed above, did *not* follow the legal citation in a parenthetical.[9] That portion of the Reply [43] reads as follows:

> Courts have consistently rejected similar efforts by other facilities to evade oversight through narrow semantic distinctions or the refusal to label their services as "treatment." For instance, in *Alabama Disabilities Advocacy Program v. SafetyNet Youthcare, Inc.*, 65 F. Supp. 3d 1312, 1322 (S.D. Ala. 2014), the court expressly rejected the defendant's attempt to evade P&A jurisdiction based on labeling distinctions, emphasizing that "[t]he relevant inquiry focuses on the nature of the services provided, not the label the facility assigns itself." *Id*.

[43] at p. 2.[10]

Similarly, in DRMS' Memorandum in Opposition to Defendant's Motion for Summary Judgment [40], this particular fake quote was cited in the following context:

> Congress deliberately chose expansive language to prevent facilities from evading oversight based on technical classifications or self-serving labels. The Court in *SafetyNet Youthcare* provided on-point guidance: "The relevant inquiry focuses on the nature of the services provided, not the label the facility assigns itself." *Alabama Disabilities Advocacy Program v. SafetyNet Youthcare, Inc.*, 65 F. Supp. 3d 1312, 1322 (S.D. Ala. 2014).

---

[9] *SafetyNet*, as well as the other cases cited and attributed fake quotes, was listed in the Court's initial Order to Show Cause [46]. *See* [46] at p. 2.

[10] This was not, however, the only instance Martin cited the fake *SafetyNet* quote—she did so on two other occasions. *See* [38] at p. 7; [40] at p. 4.

[40] at p. 4.

Martin's explanation at the show cause hearing falls short with respect to this particular fake quote given the manner in which it was incorporated into her briefs and because she directly attributed the quote to the court. At the hearing, Martin conceded that the quote does not appear anywhere in the case. *See* [68] at p. 20. It is of particular concern that Martin used the fake quote in her Reply [43] as part of a case illustration *after* defense counsel expressed concern regarding the same quote a week prior. *See* [42] at p. 11 n.17.[11]

Even if the Court believed Martin's explanation that these fake quotes were her paraphrased summaries "invertedly" quoted in her briefs, which it does not, Martin's "summary" of *SafetyNet* and her illustration of the case misrepresent the court's holding. Following the *SafetyNet* citation and fake quote, Martin elaborated in the Reply [43]:

> The *SafetyNet* court further clarified that Congress's use of broad statutory definitions was a purposeful choice designed precisely to encompass a wide variety of residential and supportive services provided to vulnerable individuals, *even when such services are not explicitly labeled as medical or clinical "treatment."* Palmer Home's position closely mirrors *the unsuccessful arguments rejected by federal courts* in *SafetyNet* and similar decisions, underscoring the weakness and inapplicability of their defense.

[43] at p. 2 (emphasis added).

It is clear that, citing *SafetyNet*, Martin represents in her filings that the case turns on the nature of services. But *SafetyNet* does *not* support that proposition.

In that case, there was no dispute that the defendant was a residential facility which provided the treatment services covered under the relevant federal statutes. *SafetyNet*, 65 F. Supp. 3d at 1315.

---

[11] In her Response to the Show Cause Order [48], which was filed after all briefing on the pending motions had concluded, Martin alleged that "Defendant filed responses to Docket Nos. 38 and 40 without raising any concern about the challenged citations." [48] at p. 8. It appears that, at the time she filed her Response [48], she had not carefully read Defendant's Response Memorandum [42] and Reply [45], in which defense counsel raised several of the issues.

The *SafetyNet* court made no clarification as to the effect of how a facility *labels* its services and whether they describe them as treatment or not. Martin's argument on this point in her Reply [43] is simply false and inaccurate. The central issue in *SafetyNet* was whether the plaintiff had authority to access a specific program of the facility which served persons with less severe disabilities. *Id.* at 1315-16. In ruling in favor of the plaintiff, the court explained that the statutory definitions of *mental illness and developmental disability* were broad in scope, rejecting the argument that the severity of the disability mattered. *Id.* at 1322-23. In summary, the holding in *SafetyNet* vastly differs from that which Martin represented in her Reply [43].

Moreover, Martin's own explanation at the hearing regarding this case supports the Court's finding that she misrepresented its holding. When asked further about the case, she provided an explanation that does not support her case "summary" and prior illustration of the case in her Reply [43]:

> THE COURT: So I know that the nature of the services is an important issue in this case. You've cited *Alabama v. SafetyNet*, but this case does not address any inquiry of the nature of the services. You agree with that?
>
> MS. MARTIN: Your Honor, I believed, like I said, with the highlighted information, one of the -- not trying to get into the merits of the case, but one of the issues -- one of the issues is the admission policy utilized by Palmer Home and level and degree of disabilities and the nature of the services they provide for those disabilities. And in the *Alabama/SafetyNet*, there's a whole section *about moderate versus mild versus severe disabilities*. And that was more where I was getting into, again, with a summary that was not supposed to see the light of day. But that was what I was getting at with that summary, is the nature -- is that admission policy, I believe, is a major factor in their argument.
>
> THE COURT: So with that, can you explain to me the correlation between the portions that you highlighted in Exhibit 4 of your response to [the] show cause order and the fake *SafetyNet* quote?
>
> MS. MARTIN: Your Honor, I believe the highlighted portion is on page 7. It talks about the plain meaning -- *differentiates between moderate mental illness or disability*. That is what I have highlighted in my copy.

…

> MS. MARTIN: And so our point of including this case was that, whether it's mild, moderate, severe, again, it -- it's -- it doesn't -- they do take children with disabilities. They've placed that at issue. And so we were trying to provide the Court with a case that directly addresses that and that there's no differentiation between the nature of services provided for children with mild or moderate or severe disabilities.

[68] at p. 20-22 (emphasis added).

Despite Martin's acknowledgment of the central issue in *SafetyNet* as explained by the Court, none of Martin's illustrations of the case nor her quoted "summary" relate to the severity of the disabilities. She clearly did not review *SafetyNet* before expounding on it in her Reply [43] because she misrepresented the holding of the case and incorporated an unsupported fake quote attributed to that case in the same section. This conduct too violates Rule 11. *See Faulkner,* 2018 WL 3708426 at *2; *Gauthier*, 2024 WL 4882651 at *2 ("[t]he Response presents a false statement of law to the court, and it appears that [plaintiff's counsel] failed to make a reasonable inquiry required by Rule 11…").

## II. *Bad Faith*

In addition to violating Rule 11, the Court finds that Martin acted in bad faith and attempted to perpetrate fraud on the Court by citing fabricated legal authority in her filings and subsequently making certain misrepresentations.

"Bad faith is not simply bad judgment or negligence, but rather it implies the conscious doing of a wrong because of dishonest purpose or moral obliquity;… it contemplates a state of mind affirmatively operating with furtive design or ill will." *Miller v. Dunn*, 774 F. Supp. 3d 806, 818 (N.D. Tex. 2024) (quoting *Budri v. FirstFleet Inc.*, 2021 WL 849012, at *6 (N.D. Tex. Feb. 18, 2021)) (internal quotation marks and additional citations omitted). "The Court's mere displeasure is not enough." *Richard v. Inland Dredging Co.*, 2016 WL 5477750, at *2 (W.D. La. Sept. 29, 2016).

"In order to impose sanctions against an attorney under its inherent power, a court must make a specific finding that the attorney acted in bad faith." *Sandifer v. Gusman*, 637 F. App'x 117, 121 (5th Cir. 2015) (quoting *Chaves v. M/V Medina Star*, 47 F.3d 153,156 (5th Cir.1995)) (internal quotation marks omitted). "However, 'when bad faith is patent from the record and specific findings are unnecessary to understand the misconduct giving rise to the sanction, the necessary finding of bad faith may be inferred.'" *Id.* (quoting *Blanco River, L.L.C. v. Green*, 457 F. App'x 431, 439-39 (5th Cir. 2012); *see also In re Sealed Appellant*, 194 F.3d at 671. Stated differently, "in the absence of direct evidence of subjective bad faith, this standard can be met if an attorney's conduct is so egregious that it could only be committed in bad faith." *Purchasing Power, LLC v. Bluestem Brands, Inc.*, 851 F.3d 1218, 1224-25 (11th Cir. 2017) (citing *Roadway Exp., Inc. v. Piper*, 447 U.S. 752, 767, 100 S. Ct. 2455, 65 L. Ed. 2d 488 (1980) (stating that inherent powers require a finding that "counsel's conduct… constituted or was tantamount to bad faith[.]")).

Courts throughout the country have held that citing fictitious or fabricated legal authority in filings without verifying their accuracy is conduct tantamount to bad faith. *See United States v. McGee*, 2025 WL 2888065, at *7 (S.D. Ala. Oct. 10, 2025) (finding an attorney acted in bad faith where he utilized AI in drafting a motion containing fabricated citations and failed to check the citations prior to submitting the motion to the court); *see also Johnson v. Dunn*, 792 F. Supp. 3d 1241, 1262-63 (N.D. Ala. 2025) (same); *Hayes*, 763 F. Supp. 3d at 1066-67 (finding an attorney acted in bad faith in citing fictitious cases and quotes and misrepresenting the source of his mistakes).

Again, as the Court noted above, Martin's filings contained three fabricated citations that are nonexistent cases as cited and one legal citation, 849 F. Supp. 1206 (N.D. Ind. 1994), that does not correspond to any existing case. She admitted at the show cause hearing that she did not verify the citations before citing them in her legal filings and was "not sure" whether the citation 849 F. Supp. 1206 (N.D. Ind. 1994) led to an existing case. [68] at p. 13. Accordingly, the Court finds that Martin

acted in bad faith in citing fictious legal authority without verifying the citations prior to submitting her filings to this Court or, alternatively, that such conduct is tantamount to bad faith.

Further, the Court finds that Martin made misrepresentations in response to the Court's inquiry. In *Johnson*, the District Court for the Northern District of Alabama provided an explanation that the Court finds particularly relevant to this issue:

> To be clear, not every error in a motion is recklessness or more. To err is human, and minor typographical errors, even in citations, occasionally occur despite attorney's best efforts. Likewise, some factual or legal authorities are the subject of reasonable debate, and a mere disagreement with one side's view does not necessarily mean that the view is objectively false. *The insertion of bogus citations is not a mere typographical error, nor the subject of reasonable debate.*

*Johnson*, 792 F. Supp. 3d at 1263 (emphasis added).

The Court agrees with the *Johnson* court's reasoning, and it is not alone in doing so. In *Hayes*, the District Court for the Eastern District of California sanctioned a defense attorney in a criminal case after he cited a fictitious case followed by a nonexistent quote in a motion to unseal. *Hayes*, 763 F. Supp. 3d at 1073. In that case, the Government pointed out in a response that it was unable to locate a case the defense cited in its brief supporting the motion. *Id.* at 1057. The defense attorney then filed a reply to the Government's response acknowledging "the government's observation," clarifying that he intended to cite a different case, and describing the mistake as an "inadvertent citation error." *Id.* at 1058. At the hearing on the motion, the court asked the defense attorney to explain his citation, and, after attributing the quote to an existing case that did not support it, the attorney apologized for "the citation error" and the "misquote." *Id.* at 1060. The court, disbelieving the defense attorney's explanation, found that he knowingly made inaccurate and misleading statements in his written reply to the government's response and knowingly made inaccurate and misleading statements at the hearing. *Id.* at 1065. The court further found that the attorney made the misrepresentations knowingly

and willfully "with the intent to mislead the Court, which violated the standards of professional conduct, including the duty of candor to the court, and demonstrate[d] bad faith." *Id.* at 1067.

The Court reiterates that it does not believe the sham citations at issue here to be mere typographical errors, though Martin attempted—both in her written Response [48] and at the hearing—to pass them under that guise.

In her Response [48] to the Court's initial show cause order, Martin referred to these sham citations as "citation errors." [48] at p. 7. Similarly, at the show cause hearing, when asked directly about these sham citations, she explained either that their inclusion "was an error" or that she had committed "an error of citation." [68] at p. 13-14. The Court does not find these responses adequate nor credible. Martin failed to credibly explain how these fictitious case citations were created, particularly the one that does not lead to an existing case. Inventing a case and inventing a citation is more than inadvertence.

Martin also blatantly misrepresented that the citations were legitimate in her Response [48] wherein she alleged that "it is important to note for the record that none of these cases cited are fictious or irrelevant. Each is a valid, published authority that supports the arguments made." [48] at p. 1-2. This statement is simply false and was a clear misrepresentation to the Court. Additionally, the Court finds the citations including *Miller* and *U.S. Dep't of the Army* are totally irrelevant to this case, yet those cases were partially cited.

As in *Hayes*, this Court finds that Martin knowingly and deliberately made misrepresentations in her Response [48] with the intent to mislead the Court. This demonstrates bad faith on her part. At the time she filed her initial Response [48] on May 22, 2025, which, again, was unsolicited, Martin knew she had not conducted the requisite inquiry into the fabricated citations before submitting her filings. She admitted as much at the show cause hearing. She still chose to advance her

24

misrepresentations that the fabricated citations were just citation errors and deny that the same are fictitious.

The Court also notes other misrepresentations that Martin made. In Martin's Response to the Show Cause Order [48], she alleges that "[t]he inadvertent inclusion of summary quotes *did not* alter the holdings of these cases. If anything, the internal summaries reflected a truncated explanation of why the Plaintiff relied on each case, offering a shorthand guide to their applicability to the Plaintiff's position." [48] at p. 8 (emphasis added). This is false. In fact, Martin's "inadvertently quoted" case summaries misrepresent, either entirely or in part, the facts and rulings of the cases cited.

For example, Martin cites *Charlotte-Mecklenburg Bd. of Educ. v. Disability Rts. of N. Carolina*, 430 F. Supp. 3d 74, 80 (W.D. N.C. 2019), followed by a parenthetical which states "rejecting school district's argument that P&A access was unnecessary because *other entities* had investigated: 'The fact *other agencies* have conducted investigations does not eliminate DRNC's federal authority.'" [40] at p. 12 (emphasis added). But *Charlotte-Mecklenburg* did not involve an investigation by any other agency or entity other than that of the plaintiff, Disability Rights of North Carolina ("DRNC"). That case involved two main issues unrelated to investigations by other entities or agencies—specifically, whether the Family Educational Rights and Privacy Act ("FERPA") prohibited disclosure of information to DRNC and whether DRNC had sufficient factual basis for its probable cause determination. *Charlotte-Mecklenburg,* 430 F. Supp. 3d at 79. Martin's cited quote clearly misrepresents the court's ruling in that case.

Additionally, in the case chart incorporated in her Response [48], Martin elaborated on the ruling in *Charlotte-Mecklenburg*: "In this case, the Court rejected the idea that a school district could not provide records to a P&A due to potential violation and *investigation under FERPA*." [48] at p. 7 (emphasis added). And in support of the "inadvertently quoted" case summary attributed to *Charlotte-Mecklenburg*, Martin submitted a copy of the case with highlighted portions of the opinion, which

25

she contends support her summary. *See* [48], Ex. 8 at p. 4. The highlighted portion of the opinion explains that FERPA did not prohibit the protection and advocacy system from obtaining parental information where the system had satisfied the prerequisites to obtain that information under the federal protection and advocacy statutes. *Id.* At the show cause hearing, Martin stood by her position that the fake quote was supported by the case based on the highlighted portion of the case opinion she had provided:

> THE COURT: Where in that case does the case discuss an investigation under FERPA?
>
> MS. MARTIN: Let me pull the case out. Your Honor, what I attached as an exhibit would have been what we used -- what I used to rely on to form that summary. And it was my understanding when I developed that summary that the -- FERPA being -- conducting investigations into special education needs was the investigation of a federal agency, but I highlighted what I relied upon for that summary in the exhibit to my response.
>
> THE COURT: Does that case even address an issue regarding the effect of investigations by other agencies?
>
> MS. MARTIN: In my opinion, it does, Your Honor.

[68] at p. 16-17.

In other words, Martin's explanation is that she understood FERPA, the Family Educational Rights and Privacy Act, a federal law, to be a federal agency that conducted some investigation in the case. The Court does not find this explanation credible nor reasonable.

It is undisputed that Martin held the position of Litigation Director at DRMS at the time of her filings and is presumably an experienced lawyer. The Court declines to believe that she lacked the necessary reading comprehension skills to understand that FERPA, a well-known acronym, stands for the Family Educational Rights and Privacy Act and that she instead understood it to be a federal agency. This is especially the case given that the *Charlotte-Mecklenburg* court engaged in a statutory

26

interpretation of FERPA on the same page of its case opinion that Martin highlighted and submitted to this Court. *See* [48], Ex. 8 at p. 4.

The Court need not address each of the quotes to make its point. It finds that Martin knowingly and deliberately misrepresented in her Response [48] that the fake quotes did not alter the holdings of the cited cases with the intent to mislead this Court. She attempted to perpetuate these misrepresentations at the show cause hearing. She acted in bad faith. *See In re Sealed Appellant*, 194 F.3d at 671 (affirming district court's finding that conduct of attorney who testified falsely under oath or was deliberately misleading was "tantamount to bad faith.").

III.    *Sanctions Generally*

This matter has been a complete waste of valuable judicial resources. Rather than focusing its efforts on addressing the merits of the underlying Motions [35, 37], the Court has diverted a substantial amount of time in resolving this issue. Truly, countless hours have been expended on this matter. Regardless of Martin's contrition, harm has resulted from her acts. First, besides the obvious deviation noted, "[t]he Court's time [has been] taken from other important endeavors" in order to investigate the fabricated authority. *Mata*, 678 F. Supp. 3d at 448. Second, and highly relevant here, defense counsel had to expend additional resources in researching the fabricated citations and quotes, and DRMS may have been "deprived of arguments based on authentic judicial precedents." *Id.* Perhaps the most egregious effect—the public, whose taxpayer dollars funded Martin's salary, "is justifiably horrified and outraged when filings in a court of law substitute lazy, convenient fictions for the truth." *Johnson*, 792 F. Supp. 3d at 1257.[12]

---

[12] According to the declaration of the Executive Director of DRMS, Polly Tribble, DRMS "is a federally funded nonprofit agency…[that] relies on federal grants for approximately 99% of its operations." [73], Ex. 1 at p. 1. Tribble's declaration was submitted in support of an unrelated Motion for Voluntary Dismissal [73], which is currently pending before the Court, and is part of the record in this case.

Having found that Martin is in clear violation of Rule 11 and that she acted in bad faith, the Court will impose appropriate sanctions pursuant to its sanctioning authority under Rule 11 and its inherent power. Before analyzing the appropriate sanctions, the Court will first address an argument raised by Martin in opposition to the Court's use of its inherent power to impose appropriate sanctions.

### A. Sufficiency of Rule 11

Martin concedes that her conduct is sanctionable under Rule 11. However, she argues that sanctions pursuant to the Court's inherent authority are not appropriate because her misconduct "strikes at the very heart of Rule 11" and therefore Rule 11 is "up to the task." [88] at p. 5.

Importantly, the Court is not sanctioning conduct that solely violates Rule 11 but also Martin's bad faith conduct.

To that end, in *Chambers*, the Supreme Court explained that where "each of the other [sanctioning] mechanisms reaches only certain individuals or conduct, the inherent power extends to a full range of litigation abuses." *Chambers*, 501 U.S. at 47, 111 S. Ct. 2123. It is true, as Martin points out, that *Chambers* also states that "when there is bad-faith conduct in the course of litigation that could be adequately sanctioned under the Rules, the court ordinarily should rely on the Rules rather than the inherent power." *Id.* at 50, 111 S. Ct. 2123. "But if in the informed discretion of the court, neither the statute nor the Rules are up to task, the court may safely rely on its inherent power." *Id.*, 111 S. Ct. 2123. The Supreme Court did not expressly explain when the rules are not "up to task," but, irrespectively, the court's ruling in *Chambers* is guiding.

In *Chambers*, the Supreme Court affirmed a district court's resort to its inherent authority to award attorney's fees and litigation expenses for the defendant's "series of meritless motions and pleadings and delaying actions." *Id.* at 38, 111 S. Ct. 2123. Despite the availability of other sanctioning mechanisms for the conduct at issue, including Rule 11, the Supreme Court explained that:

There is, therefore, nothing in the other sanctioning mechanisms or prior cases interpreting them that warrants a conclusion that a federal court may not, as a matter of law, resort to its inherent power to impose attorney's fees as a sanction for bad-faith conduct. *This is plainly the case where the conduct at issue is not covered by one of the other sanctioning provisions. But neither is a federal court forbidden to sanction bad-faith conduct by means of the inherent power simply because that conduct could also be sanctioned under the statute or the Rules.*

*Id.* at 50, 111 S. Ct. 2123 (emphasis added).

The Supreme Court found that the district court had not abused its discretion in resorting to its inherent power to award fees and further noted that:

It is true that the District Court could have employed Rule 11 to sanction Chambers for filing "false and frivolous pleadings," 124 F.R.D., at 138, and that some of the other conduct might have been reached through other Rules. *Much of the bad-faith conduct by Chambers, however, was beyond the reach of the Rules; his entire course of conduct throughout the lawsuit evidenced bad faith and an attempt to perpetrate a fraud on the court, and the conduct sanctionable under the Rules was intertwined within conduct that only the inherent power could address.* In circumstances such as these in which all of a litigant's conduct is deemed sanctionable, requiring a court first to apply Rules and statutes containing sanctioning provisions to discrete occurrences before invoking inherent power to address remaining instances of sanctionable conduct would serve only to foster extensive and needless satellite litigation, which is contrary to the aim of the Rules themselves.

*Id.* at 50-51, 111 S. Ct. 2123 (emphasis added).

Here, as in *Chambers*, only part of Martin's conduct is sanctionable under Rule 11 (i.e., failing to conduct a reasonable inquiry into the law), but other conduct, such as her misrepresentations underlying the Court's bad faith determinations, fall outside of Rule 11. And, in the Court's view, Martin's conduct in violation of Rule 11 is also partially intertwined with her bad faith conduct that can only be addressed by the Court's inherent power. Specifically, the Court is referring to Martin's act of citing fictious legal authority without verifying the citations before submitting her filings to the Court. For these reasons, the Court finds that Rule 11 alone is not "up to task."

Finally, the Court notes that a "primary aspect" of the Court's discretion to exercise its inherent power "is the ability to fashion an appropriate sanction for conduct which abuses the judicial process." *Chambers*, 501 U.S. at 44-45, 111 S. Ct. 2123. After careful consideration given the circumstances of this case, the Court finds it necessary to exercise its inherent power to impose the appropriate sanctions.

### B. Attorney's Fees and Costs

"Pursuant to its inherent power, 'a court may assess attorney's fees when a party has acted in bad faith, vexatiously, wantonly, or for oppressive reasons.'" *Seals v. Herzing Inc.-New Orleans*, 482 F. App'x 893 (5th Cir. 2012) (quoting *Chambers*, 501 U.S. at 45-46, 111 S. Ct. 2123). Recently, the Fifth Circuit held that "[p]recedent concerning sanctions issued pursuant to the court's inherent power does not require a showing that the opposing litigant was prejudiced." *Ben E. Keith Co. v. Dining All., Inc.*, 80 F.4th 695, 701 (5th Cir. 2023) (citing *Chambers*, 501 U.S. at 50-51, 111 S. Ct. 2123) (collecting cases). According to the Fifth Circuit, this is "[f]or good reason" because a court "invokes its inherent power to vindicate its own interests, not the interest of the opposing litigant." *Id.* (citing *Flaksa v. Little River Marine Constr. Co.*, 389 F.2d 885, 887–88 (5th Cir. 1968)) (additional citations omitted).

The Court has found that Martin acted in bad faith and has extensively addressed its basis for its findings above. Having made that determination, the Court, utilizing its inherent authority, finds it an appropriate sanction to award Palmer Home attorney's fees and costs. *See Chambers*, 501 U.S. at 45-46, 111 S. Ct. 2123 (describing an assessment of attorney's fees as a "less severe sanction" as

opposed to the "particularly severe sanction" of outright dismissal of a lawsuit.).[13] Considering the extensive amount of time it took this Court to decipher the issue across multiple filings, the Court credits the testimony of Palmer Home's counsel at the hearing and her explanation regarding the substantial amount of work her firm undertook in "run[ning] down [the] ghost cases" and fake quotes contained in Martin's filings. [68] at p. 41. Certainly, Palmer Home, as the litigant, should not have to bear the financial responsibility of paying for legal fees associated with and caused by Martin's violations. The Court finds, in equity, that Palmer Home should be reasonably compensated.

The Court is cognizant of Palmer Home's pending Motion for Attorney's Fees and Litigation Costs [53] but, in light of the Court's decision to assess fees on its own accord, the Motion [53] is denied as moot. In doing so, however, the Court will necessarily rely on some of the documentation attached to Palmer Home's Motion [53].

---

[13] The Court notes that it has complied with the mandates of due process as required to assess fees pursuant to its inherent power. *See McClenny Moseley & Assocs.*, 2024 WL 2874371, at *3 (5th Cir. June 7, 2024) ("A court… must comply with the mandates of due process, both in determining that the requisite bad faith exists and in assessing fees.") (quoting *Chambers*, 501 U.S. at 50, 111 S. Ct. 2123). The Court has already outlined the relevant procedural history above but will briefly elaborate in this regard. "Due process requires adequate notice and an opportunity to be heard." *Sandifer v. Gusman*, 637 F. App'x 117, 121 (5th Cir. 2015) (citing *Am. Airlines, Inc. v. Allied Pilots Ass'n*, 968 F.2d 523, 530 (5th Cir.1992)). In its initial Order to Show Cause [46], the Court notified Martin that the Court was inclined to impose sanctions under Rule 11 and described her potentially sanctionable conduct, including listing the citations to the fabricated legal authority and the cases associated with the fake quotes. *See* [46] at p. 2. Martin then submitted her Response [48] to the initial show cause order acknowledging the Court's concern with respect to each of the citations and quotes and providing a detailed explanation in the form of a case chart. *See* [48] at p. 2-7. A hearing was held on June 16, 2025 during which Martin was allowed to mount her defense. *See generally* [68]. Thereafter, the Court issued its second Order to Show Cause [86] notifying Martin and DRMS of its intent to exercise its inherent power to impose the appropriate sanctions, either in the alternative or in addition to Rule 11 sanctions, and providing them with an opportunity to respond. *See generally* [86]. In that Order [86], the Court identified additional sanctionable conduct not included in its prior Order [46] and noted that an apparent dispute existed between DRMS and Martin relative to how potential monetary sanctions should be allocated between them, if imposed. Both DRMS and Martin then submitted their respective responses—each arguing against the Court's exercise of its inherent power and against the imposition of monetary sanctions. *See* [87] at p. 4; *see also* [88] at p. 3. Accordingly, they each were provided with sufficient notice of the sanctionable conduct at issue, notice of the sanction authorities under which the Court would act, and ample opportunity to be heard.

*i.      Lodestar*

"Once a court orders that a party must pay reasonable fees and expenses as a sanction, the lodestar analysis is then used to determine the proper amount of fees 'by multiplying the reasonable number of hours expended in defending the suit by the reasonable hourly rates for the participating lawyers.'" *In re Oil Spill by Oil Rig "Deepwater Horizon" in Gulf of Mexico, on Apr. 20, 2010*, 2021 WL 4192060, at *2 (E.D. La. Sept. 15, 2021) (quoting *Skidmore Energy, Inc. v. KPMG*, 455 F.3d 564, 568 (5th Cir. 2006)). "In determining the fee award, the court should exclude all time that is excessive, duplicative, or inadequately documented." *Id.* (citing *Watkins v. Fordice*, 7 F.3d 453, 457 (5th Cir. 1993)).

In line with the Supreme Court's directive that fee-shifting sanctions be compensatory rather than punitive in nature, the Court will only assess fees incurred in relation to Martin's violations and not the entire litigation. *See Goodyear Tire & Rubber Co. v. Haeger*, 581 U.S. 101, 108, 137 S. Ct. 1178, 197 L. Ed. 2d 585 (2017). As such, the Court will consider the itemized invoices submitted in support of Palmer Home's Motion [53] in determining the amount of reasonable attorney's fees. *See* [53], Ex. 2-3. In total, the invoices reflect attorney's fees and costs in the amount of $27,252.90. The Court notes that, among other arguments, Martin and DRMS raised objections to the total amount of fees on reasonableness grounds. The Court will consider those objections.

First, the Court considers whether defense counsels' hourly rates are reasonable. "When an attorney's customary billing rate is the rate at which the attorney requests the lodestar be computed and that rate is within the range of prevailing market rates, the court should consider this rate when fixing the hourly rate to be allowed. When that rate is not contested, it is *prima facie* reasonable." *Quantlab Techs. Ltd. (BVI) v. Godlevsky*, 317 F. Supp. 3d 943, 951 (S.D. Tex. 2018) (citing *La. Power & Light Co. v. Kellstrom*, 50 F.3d 319, 328 (5th Cir. 1995)).

32

As this Court has recently found, "[a]n hourly rate of $250-300 is customary for attorneys practicing law in federal courts for the Northern District of Mississippi." *McMillian v. Aberdeen Sch. Dist.*, 2025 WL 611070, at *5 (N.D. Miss. Feb. 25, 2025) (citing *Cooper v. Majestic Mississippi, LLC*, 2022 WL 22822795, at *4 (N.D. Miss. May 25, 2022)). In *McMillian*, this Court also found a paralegal rate of $90 per hour to be reasonable. *Id.* at *6.

In this case, Defense counsels' invoices reflect "the firm's blended rate of $400/hour" for entries billed by three attorneys—Amanda J. Tollison, Donna Brown Jacobs, and Dillon Pitts—and $200 per hour for a single entry by a legal assistant/paralegal. [53], Ex. 1 at p. 2. Though a blended rate, the Court finds that $400 per hour is not within the range of prevailing market rates in this District. The Court notes that Tollison submitted an affidavit in support of the total amount of attorney's fees reflected in the submitted invoices, but the same does not provide any justification for calculating the lodestar by utilizing a rate above the customary range. Absent proof to justify otherwise (of which there is none in the record), the Court finds that $300, the higher-end customary rate, is an appropriate hourly rate for the defense attorneys and that $90 is an appropriate paralegal rate.[14]

Next, the Court considers whether the number of hours expended is reasonable. In this regard, DRMS and Martin's objections relate to duplicative entries, entries for work that is conducted in the normal course of litigation, and entries for work that could have been avoided. These objections largely overlap with the Court's task of excluding time that is duplicative or excessive. *See In re Oil Spill*, 2021 WL 4192060 at *2. The Court finds that some time entries are excessive—specifically the time billed by Donna Brown Jacobs, an attorney who works for Palmer Home's counsel's law firm. The Court notes that Jacobs is not an attorney of record in this case and, candidly, the Court does not

---

[14] The Court notes that, in *McMillian*, it awarded attorney's fees at a rate above the customary market rate for attorneys practicing law in this district. *See id.* However, unlike here, the proposed rates in that case were supported by sworn declarations of counsel justifying the upward variance.

find that it was necessary for her to expend time on this issue. The Court sees no need to address each submission line by line but finds the following entries are excessive:

| Date: | Attorney | Task | Time Billed |
|-------|----------|------|-------------|
| 5/9/25 | DBJ | Review and provide comment on response to DRMS motion for permanent injunction, at request of A. Tollison. | .50 |
| 6/09/25 | DBJ | Detailed review of counsel's response to show cause order, including review of several cases cited therein; confer with A. Tollison re same. | 1.50 |
| 6/27/25 | DBJ | Review and provide proposed edits to documents submitted in support of motion for attorney's fees as sanctions against DRMS attorney; confer with A. Tollison re same. | .80 |

The Court will therefore reduce the total time billed by deducting the time for the above referenced entries.

Lastly, there are two entries for the time defense counsel spent traveling to attend the show cause hearing. "Travel time is often reduced by 50% of the attorney's rate absent evidence that any legal work was accomplished during travel time." *Id.* at *5 (citations omitted). The Court will accordingly reduce defense counsels' hourly rates by 50 percent for travel time.

Taking into account the modifications set forth above, the Court calculates the lodestar as follows:

| | Hours | Rate | Fees |
|---|-------|------|------|
| Amanda J. Tollison | 33.7 | $300 | $10,110 |
| Dillon Pitts | 30.2 | $300 | $9,060 |
| Paralegal | .20 | $90 | $18 |
| A. Tollison Travel | 3 | $150 | $450 |
| D. Pitts Travel | 6 | $150 | $900 |
| | | **Total Fees: $20,538** | |

"The lodestar 'is presumptively reasonable and should be modified only in exceptional cases.'" *Gilmore v. Audubon Nature Inst., Inc.*, 353 F. Supp. 3d 499, 507 (E.D. La. 2018) (quoting *Watkins*, 7 F.3d at 457). The Court is unaware of "any other considerations" that would justify adjusting the lodestar amount. *Combs v. City of Huntington, Texas*, 829 F.3d 388, 395 (5th Cir. 2016). Accordingly, the Court finds that the amount of $20,538.00 represents a reasonable attorney's fee. The Court further finds that this figure represents the sum total of the fees that, but-for Martin's bad faith behavior, Palmer Home would not have accrued. *See Haeger*, 581 U.S. at 110, 137 S. Ct. 1178 ("[T]rial courts… need not, and indeed should not, become green-eyeshade accountants… The essential goal in shifting fees is to do rough justice, not to achieve auditing perfection.") (internal quotation marks and citations omitted). As noted above, the Court appreciates the amount of time that was necessary in deciphering this issue. Given the nature of this case and the complexity of the law involved, the Court finds that the amount of time expended on this issue by Palmer Home's counsel was reasonable.

In addition to attorney's fees, Palmer Home also incurred expenses related to Martin's violations. The Court finds it appropriate to award Palmer Home the portion of those expenses for mileage associated with its counsels' attendance at the hearing. *See Chambers*, 501 U.S. at 58, 111 S. Ct. 2123 (affirming the district court's award of attorney's fees and related expenses as a sanction pursuant to its inherent authority). That amount is $345.10, which the Court finds reasonable and justified under the circumstances and excludes all remaining expenses related to document reproduction. *See* [53], Ex. 2 at p. 4; Ex. 3 at p. 4.

ii.    *Responsible Party*

As the Court has indicated previously, DRMS and Martin dispute how any potential monetary sanction should be allocated between them. In its Response [87] to the Court's second Order to Show Cause [86], DRMS argues that it should not be subjected to monetary sanctions because it was

35

unaware that Martin cited fictitious legal authority in filings submitted on its behalf. It also contends that its Executive Director, Ms. Tribble, has no legal background and that DRMS completely relied on Martin as its in-house counsel and had no reason to suspect any misconduct.

Martin does not place blame on DRMS and has expressed that she "does not desire that DRMS suffer financially for her conduct[.]" [88] at p. 3. Upon retaining new counsel, DRMS moved to amend the tainted filings in attempt to remediate the issue. *See generally* [66]. It also accepted Martin's resignation according to its Response [87]. *See* [87] at p. 4.

The Court does not find any bad faith on the part of DRMS and neither can Martin's bad faith be imputed on the agency to justify sanctions against it. *See In re Moore*, 739 F.3d 724, 733 (5th Cir. 2014). In reaching its decision the Court has considered that Martin was the Litigation Director at DRMS during the relevant time period. She reported to Ms. Tribble, her boss, at the time she committed the violations. *See* [68] at p. 31. As a non-attorney, Ms. Tribble had no reason to suspect the misconduct at issue, and she simply relied on Martin as the top legal official at DRMS. Therefore, Martin alone bears the burden of the sanction associated with her bad faith conduct. The Court releases DRMS without sanction. Martin is hereby ORDERED to pay Palmer Home the sum of $20,883.10 in reasonable attorney's fees and costs within thirty days of the date of this order.

### C. Nonmonetary Sanctions pursuant to Rule 11

Considering that this is the first time a licensed attorney is being sanctioned for these types of violations in this federal district, the Court will impose nonmonetary sanctions mindful of the importance of deterring members of the bar from engaging in similar conduct. *See Cordova v. Univ. Hosp. & Clinics, Inc.*, 92 F.4th 266, 274 (5th Cir. 2024) (explaining that deterrence is the primary purpose to be achieved by Rule 11 sanctions). An appropriate and reasonable sanction must "correspond to the extreme dereliction of professional responsibility that sham citations reflect" and

"effectively communicate that made-up authorities have no place in a court of law." *Johnson*, 792 F. Supp. 3d at 1246.

"To serve [the] multiple purposes of Rule 11, the district court should carefully choose sanctions that foster the appropriate purpose of the rule, depending upon the parties, the violation, and the nature of the case." *Thomas*, 836 F.2d at 877. "In considering what form of sanction to impose, the Court may consider: (1) whether the conduct was willful or negligent; (2) whether the activity was isolated or part of a pattern of activity; (3) whether the conduct affected only a single event within the case or the entire litigation; (4) any previous similar conduct by the attorney; (5) whether the conduct was intended to cause injury; (6) the effect of the conduct on the litigation in terms of time and expense; (7) whether the responsible party was trained in the law; and (8) what sanction, given the financial resources of the responsible person, is needed to deter similar activity by other litigants." *SyncPoint Imaging, LLC v. Nintendo of Am. Inc.*, 2018 WL 6788033, at *6 (E.D. Tex. Dec. 26, 2018) (citing *Bullard v. Chrysler Corp.*, 925 F. Supp. 1180, 1190 (E.D. Tex. 1996) (in turn citing FED. R. CIV. P. 11 Advisory Committee's note to 1993 amendment)).

In reaching its decision, the Court finds that Martin acted willfully in that she repeatedly attempted to mislead the Court. The Court acknowledges that Martin has expressed regret and apologized for her mistakes, but her apologies serve no mitigating purpose due to her lack of candor. It follows that she also failed to comply with the Court's initial Order to Show Cause [46] directing her to provide the Court with copies of the fabricated cases as cited in her filings, as well as copies of the cases with the fake quotes highlighted therein. Martin did not comply because she could not.

The Court further finds that Martin failed to take any corrective action upon being notified of her mistakes by both defense counsel and the Court. Additionally, Martin committed the violations in three separate filings [38, 40, 43], which establishes that she engaged in a pattern of activity. *See*

*Thomas*, 836 F.2d at 875 (explaining that a "series of filings may indicate a pattern of attorney conduct of some consequence.").

Furthermore, the Court reiterates that the merits of this case involve a unique set of facts and present an issue of first impression—whether DRMS' access authority under the federal protection and advocacy statutes applies to a private, children's residential home such as Palmer Home's campus. Again, the particular facts of this case have not been previously considered in the Fifth Circuit. The Court finds that Martin's violations occurred at crucial stage of this litigation irrespective of the case's current procedural posture. Through the tainted filings, DRMS is not only opposing Palmer Home's Motion for Summary Judgment [35] but seeks a permanent injunction against Palmer Home. *See* [37, 38]. Given the nature of this case, it is imperative that legal counsel act with utmost diligence and that their arguments be rooted in existing law. Martin is a licensed attorney, has apparent access to legal research resources, and is presumably well trained in the law. Thus, she was aware of her duties prior to committing the violations. For these reasons, the Court finds that Martin's conduct has affected the entire litigation and not just a single event in its proceedings.

As to the remaining considerations, the Court has already explained that this matter has constituted a significant waste of the Court's time and resources.

*Conclusion*

The Court has carefully considered the appropriate sanctions to impose against Martin and has researched how other district courts have sanctioned attorneys for similar misconduct. Bearing in mind that the Court should impose the least severe sanction adequate to deter other members of the larger bar from engaging in similar conduct, the Court finds that both monetary and nonmonetary sanctions are warranted in this case for the reasons the Court has explained above. The Court further finds that no lesser sanction will serve the necessary deterrent purpose, vindicate the Court's interest, or otherwise rectify this misconduct.

Pursuant to the Court's inherent power and Rule 11, it is hereby ORDERED:

(1) The Clerk of Court shall electronically transmit a copy of this order to all the District Judges and Magistrate Judges in this District. The Clerk of Court shall electronically transmit a copy of this order to the Clerk of Court for the Southern District of Mississippi for transmittal to all the District Judges and Magistrate Judges in the Southern District. Martin disclosed to the Court that she is attorney of record in two pending cases in the Circuit Courts of Hinds and Harrison counties. Accordingly, the Clerk of Court shall transmit a copy of this order to the Circuit Clerk of those counties so that the Circuit Clerk can distribute it to the judges presiding over the cases in which Martin is counsel of record in those counties.

(2) The Court notes that Martin is attorney of record in one other pending case in this District that is assigned to the undersigned. The Clerk of Court shall file a copy of this Order in that case (Cause No. 4:22-cv-62-SA).

(3) The Clerk of Court shall electronically transmit a copy of this Order to the State Bar of Mississippi, of which Martin is a member.

(4) Martin is directed to attend a continuing legal education course, for a minimum of three (3) hours of Mississippi CLE credit, on the topic of hallucinatory citations generated by AI in the legal field and submit proof of attendance to the Court within 60 days of the date of this Order. It is the Court's intent that this CLE be independent from Martin's preexisting minimum CLE requirement as a member of the Mississippi Bar. In other words, she should not claim these credits as part of her independent duty as a member of the Mississippi Bar.

(5) Martin is directed to pay Palmer Home the sum of $20,883.10 in reasonable attorney's fees and costs within 30 days of the date of this Order.[15]

SO ORDERED, this the 19th day of December, 2025.

/s/ Sharion Aycock_____
SENIOR UNITED STATES DISTRICT JUDGE

---

[15] Martin's Motion to Withdraw [61] as counsel for DRMS is hereby GRANTED.  The Clerk of Court shall terminate her as counsel in this litigation. Finally, the Court notes that this litigation remains in a unique procedural posture and many motions remain pending. The Court will enter a separate Order addressing those filings.