# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF MISSISSIPPI
### GREENVILLE DIVISION

|  |  |
|---|---|
| DYAMONE WHITE; DERRICK SIMMONS; TY PINKINS; CONSTANCE OLIVIA SLAUGHTER HARVEY-BURWELL, <br><br> *Plaintiffs*, <br><br> vs. <br><br> STATE BOARD OF ELECTION COMMISSIONERS; TATE REEVES, *in his official capacity as Governor of Mississippi*; LYNN FITCH, *in her official capacity as Attorney General of Mississippi*; MICHAEL WATSON, *in his official capacity as Secretary of State of Mississippi*, <br><br> *Defendants.* | **CIVIL ACTION NO.** <br> **4:22-cv-00062-SA** |

## PLAINTIFFS' REMEDIAL SUBMISSION

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................. 1

BACKGROUND .................................................................................................................. 3

    **I.**    Plaintiffs Prove Vote Dilution at Trial and the Legislature Is Given an
Opportunity to Remedy the Violation ......................................................... 4

    **II.**    The Legislature Fails to Adopt a Plan to Remedy the Section 2 Violation ................ 5

PLAINTIFFS' PROPOSED PLANS ...................................................................................... 6

ARGUMENT ...................................................................................................................... 11

    **I.**    A COMPLETE AND DURABLE REMEDY IS REQUIRED ............................... 11

    **II.**    PLAINTIFFS' PROPOSED REMEDIAL PLANS ARE COMPLETE AND
DURABLE REMEDIES ...................................................................................... 16

        **A.**    Each of Plaintiffs' Proposed Plans Remedies Vote Dilution ........................ 16

        **B.**    Each of Plaintiffs' Proposed Plans Is Reasonably Configured ..................... 19

        **C.**    Plaintiffs' Proposed Plans Offer Durable Remedies .................................... 20

    **III.**    THE COURT SHOULD ORDER SPECIAL ELECTIONS IN DISTRICT 1,
PLACES 1 AND 3 AND SET NEW QUALIFYING AND RELATED
DEADLINES ........................................................................................................ 24

CONCLUSION ................................................................................................................... 27

**TABLE OF AUTHORITIES**

**Cases**

*Abbott v. Perez*,
 585 U.S. 579 (2018) ................................................................................................ 13

*Allen v. Milligan*,
 599 U.S. 1 (2023) .............................................................................. 7, 12, 14, 19

*Baldus v. Members of Wis. Gov't Accountability Bd.*,
 862 F. Supp. 2d 860 (E.D. Wis. 2012) ............................................................ 13, 18

*Bartlett v. Strickland*,
 556 U.S. 1 (2009) ................................................................................................ 12

*Bone Shirt v. Hazeltine*,
 387 F. Supp. 2d 1035 (D.S.D. 2005)................................................................... 13

*Bone Shirt v. Hazeltine*,
 461 F.3d 1011 (8th Cir. 2006).............................................................................. 18

*Bush v. Vera*,
 517 U.S. 952 (1996) ............................................................................................ 19

*Callais v. Landry*,
 732 F. Supp. 3d 574 (W.D. La. 2024).......................................................... passim

*Evenwel v. Abbott*,
 578 U.S. 54 (2016) .............................................................................................. 15

*Kirksey v. Bd. of Sup'rs of Hinds Cnty., Miss.*,
 554 F.2d 139 (5th Cir. 1977)............................................................................... 12

*League of United Latin Am. Citizens v. Perry*,
 548 U.S. 399 (2006) ...................................................................................... 12, 14

*Louisiana v. Callais*,
 No. 24-109 (U.S., argued Mar. 24, 2025, reargued Oct. 15, 2025).................... 2, 16

*McCray v. Miss. Bd. of Election Comm'rs*,
 No. 84-CV-131 (N.D. Miss. Feb. 12, 1985)...................................................... 15, 21

*Miller v. Johnson*,
 515 U.S. 900 (1995) .................................................................... 15, 19, 20, 21

*Miss. State Conf. of the NAACP v. State Bd. of Election Comm'rs*,
 739 F. Supp. 3d 383 (S.D. Miss. 2024)............................................................ 11, 15

*Miss. State Conf. of the NAACP v. State Bd. of Election Comm'rs,*
   782 F. Supp. 3d 336 (S.D. Miss. 2025)................................................................ 1, 11, 13, 17

*Miss. State Conf. of NAACP v. State Bd. of Election Comm'rs,*
   782 F. Supp. 3d 349 (S.D. Miss. 2025)................................................................ passim

*Monroe v. City of Woodville,*
   881 F.2d 1327 (5th Cir. 1989).......................................................................... 12

*North Carolina v. Covington,*
   581 U.S. 486 (2017) ....................................................................................... 26

*Palmer v. Hobbs,*
   686 F. Supp. 3d 1213 (W.D. Wash. 2023) ........................................................ 18

*Perez v. Abbott,*
   253 F. Supp. 3d 864 (W.D. Tex. 2017).............................................................. 18

*Perry v. Perez,*
   565 U.S. 388 (2012) ....................................................................................... 14

*Reynolds v. Sims,*
   377 U.S. 533 (1964) ................................................................................... 15, 21

*Shaw v. Reno,*
   509 U.S. 630 (1993) ....................................................................................... 19

*Singleton v. Allen,*
   690 F. Supp. 3d 1226 (N.D. Ala. 2023) ............................................................ 13

*Singleton v. Allen,*
   No. 2:21-CV-1291, 2023 WL 6567895 (N.D. Ala. Oct. 5, 2023) .......................... 1, 12, 13, 14

*Thomas v. Bryant,*
   366 F. Supp. 3d 786 (S.D. Miss. 2019)............................................................. 12

*United States v. Brown,*
   561 F.3d 420 (5th Cir. 2009).................................................................... 11, 12, 15

*United States v. Dallas Cnty. Comm'n,*
   850 F.2d 1433 (11th Cir. 1988)............................................................... 12, 13, 18

*White v. State Bd. of Election Comm'rs,*
   795 F. Supp. 3d 794 (N.D. Miss. 2025) ............................................................ passim

*White v. State Bd. of Election Comm'rs,*
   No. 4:22-CV-62-SA, 2025 WL 3688160 (N.D. Miss. Dec. 19, 2025) .................... passim

**Statutes**

52 U.S.C. § 10301 ............................................................................................. 4, 11

52 U.S.C. § 20301 ................................................................................................ 25

52 U.S.C. § 20302(a)(8)(A) ................................................................................. 26

Miss. Code § 23-15-367 ....................................................................................... 26

Miss. Code § 23-15-977 ....................................................................................... 26

Miss. Code § 65-1-3 ............................................................................................. 15

Miss. Code § 77-1-1 ............................................................................................. 15

Miss. Code § 9-3-1 ................................................................................................. 6

**Other Authorities**

H. Con. Res. 64, 2026 Gen. Assemb., Reg. Sess. (Miss. 2026) ............................. 6

S. Rep. No. 97-417 (1982) .................................................................................... 12

**INTRODUCTION**

This Court afforded the Mississippi Legislature the whole of the 2026 legislative session "to enact a new Mississippi Supreme Court electoral map to remedy the Section 2 violation that this Court found." *White v. State Bd. of Election Comm'rs*, No. 4:22-CV-62-SA, 2025 WL 3688160, at \*3 (N.D. Miss. Dec. 19, 2025). Because the Legislature did not enact any plan, the Court now has the "obligation" to "exercise its traditional equitable powers" and put in place a remedial map that "completely remedies the prior dilution of minority voting strength." *White v. State Bd. of Election Comm'rs*, 795 F. Supp. 3d 794, 860 (N.D. Miss. 2025) (citation omitted); *accord Miss. State Conf. of the NAACP v. State Bd. of Election Comm'rs*, 782 F. Supp. 3d 336, 342, 345 (S.D. Miss. 2025) ("*Miss. NAACP III*"). In aid of that process, Plaintiffs respectfully submit three proposals that remedy the Section 2 violation while respecting traditional redistricting principles and federal law, including one plan that was drawn without *any* reference to racial demographics. *See generally* Ex. 1, Declaration of William S. Cooper ("Cooper Decl.").

Plaintiffs' plans address all of the goals that the Court must consider at the remedial phase. First and foremost, a Section 2-compliant plan must remedy the Section 2 violation and provide Black voters with a "reasonable" or "realistic opportunity" to elect their preferred candidates. *Miss. NAACP III*, 782 F. Supp. 3d at 341; *see also Singleton v. Allen*, No. 2:21-CV-1291, 2023 WL 6567895, at \*13 (N.D. Ala. Oct. 5, 2023). Each of Plaintiffs' proposed plans satisfy that goal because, based on expert quantitative analysis of past electoral performance, each plan includes a District 1 in which Black voters are able to elect candidates of their choice. *See generally* Ex. 2, Report of Dr. Byron D'Andra Orey ("Orey Rept.").

Second, in choosing between remedial plans that provide sufficient opportunity, courts engage in an "equitable weighing process," considering the nature and severity of the violation, traditional redistricting principles, ease of implementation, and any lawful policy judgments that

1

the state legislature may have expressed.  *E.g.*, *Miss. State Conf. of NAACP v. State Bd. of Election Comm'rs*, 782 F. Supp. 3d 349, 357–61 (S.D. Miss. 2025) ("*Miss. NAACP IV*").  Here, each of Plaintiffs' proposed plans appropriately balances neutral, traditional districting principles, equalizes total population, and includes compact districts built with whole counties.  *See* Cooper Decl. 5–6, 8–19.  Each one offers a slightly different emphasis—the Race-Blind Plan emphasizes race-blindness and population equality; the Least-Change Plan minimizes county shifts and looks most like the current plan; and the Regional Plan follows the lines of the legislatively enacted congressional plan while equalizing population and keeping state-defined regions together and is nearly identical to a plan the Court already reviewed and determined was reasonable and balanced. *See id.*

Finally, the Court should also adopt a plan that is well-insulated from further legal challenge and thus provides a durable remedy for the violation found.  Plaintiffs' proposed plans do that.  And the Race-Blind Plan is particularly durable as a remedy.  That plan is insulated from any changes in the law regarding the use of race in drawing remedial districts, no matter the outcome of the United States Supreme Court's pending decision in *Louisiana v. Callais*, No. 24-109 (U.S., argued Mar. 24, 2025, reargued Oct. 15, 2025), because racial data simply was not used in drawing the plan.  *See* Cooper Decl. 4, 8–10.  Moreover, the Race-Blind Plan and the Regional Plan significantly equalize population between the districts, protecting against "one-person, one-vote" deficiencies going forward.

Each of Plaintiffs' three proposed plans provides a complete remedy to the Section 2 violation in this case.  Each plan includes a reasonably configured Supreme Court District 1 that provides fair and equal opportunity to minority voters (despite racial polarization, felony disenfranchisement, and other factors that suppress political participation), corrects population

malapportionment, and adheres to traditional redistricting principles, including contiguity, compactness, respect for political subdivisions, and communities of interest.

After ordering a remedial plan into place, the next issue is the extent and timing of special elections in 2026 under the new plans. The Court has already determined that "[s]pecial elections are justified under the circumstances and [that] it *will* order" them as a remedy. *White*, 2025 WL 3688160, at *3. Consistent with their prior submissions to the Court, Plaintiffs submit that the Court should provide for special elections in two of the three seats in District 1 (Place 1 and Place 3). Ordering special elections in just those districts will provide a remedy for injured voters while minimizing disruption to the State Supreme Court and is thus a tailored and equitable remedy under the circumstances. Pls.' Br. re: Remedial Issues 5–14, ECF No. 272.

Moreover, to afford state and local officials sufficient time to hold these special elections and any other regular elections in 2026 under the new plan, Plaintiffs propose a set of new qualifying deadlines for these seats, using as a template the remedial decision in last year's state legislative case. *See Miss. NAACP IV*, 782 F. Supp. 3d at 361; *see also White*, 2025 WL 3688160, at *4 ("[T]he Court intends to act swiftly so as to meet any and all deadlines necessary to carry out special elections in November 2026.").

## BACKGROUND

This Court is familiar with the underlying facts of this case and the trial record, which Plaintiffs incorporate here by reference. Plaintiffs recite only those facts necessary to provide context for the present proposals. *See generally White*, 795 F. Supp. 3d 794, ECF No. 264; *White*, 2025 WL 3688160, ECF No. 280; *see also* Pls.' Proposed Findings of Fact and Conclusions of Law, ECF No. 252.

3

**I.  Plaintiffs Prove Vote Dilution at Trial and the Legislature Is Given an Opportunity to Remedy the Violation**

After an eight-day trial, this Court ruled in August of last year that the districting plan used to elect Justices to the Mississippi Supreme Court violates Section 2 of the Voting Rights Act, 52 U.S.C. § 10301.  *White*, 795 F. Supp. 3d at 860.  The Court found that, as a matter of political reality, Black voters in District 1 did not have equal opportunity to elect their preferred candidates, despite constituting a plurality of the population, due to "extreme" racial polarization and other relevant factors, such as the disproportionate impact of felony disenfranchisement.  *Id.* at 813–14, 823–24, 830–31, 837.  With respect to the *Gingles* preconditions and the effects of racial polarization, the trial record "paint[ed] a clear picture": "White bloc voting usually results in the defeat of Black-preferred candidates."  *Id.* at 831.  And in considering the totality of the circumstances and the ultimate question of equality of opportunity to elect Supreme Court Justices, the Court found that the relevant factors "overwhelmingly weigh in favor of the Plaintiffs."  *Id.* at 831–59.

Based on its extensive factual findings, the Court held that the current Mississippi Supreme Court map violates Section 2 and determined that a new map must be drawn to remedy the violation.  *White*, 795 F. Supp. 3d at 860.  The Court permanently enjoined the existing Supreme Court map, which had been enacted in 1987, from being used in future elections.  *Id.* at 860.

After further briefing from the parties regarding the remedy process, in December 2025 the Court provided the Mississippi Legislature with the opportunity to enact a new electoral map for the Mississippi Supreme Court during its 2026 regular legislative session.  *White*, 2025 WL 3688160, at *3.  The Court further indicated that it would order special elections to be held in November 2026 in light of the length of time remaining in the eight-year terms for two District 1

seats (Place 1 and Place 3). *Id.* at *3–4. The Court deferred identifying the particular districts in which special elections would be held until new districts are in place. *Id.* at *2–3.

The Court emphasized in its December remedial order that it would be prepared to act "swiftly" to put remedial plans into effect if the Legislature did not enact a plan that remedied the violation proven at trial. *White*, 2025 WL 3688160, at *4.

## II. The Legislature Fails to Adopt a Plan to Remedy the Section 2 Violation

In January 2026, Plaintiffs' counsel wrote a letter to Mississippi Legislative leaders noting the Court's decision and its December remedial order and urging the Legislature to enact a plan along the lines of Illustrative Plan 1, which Plaintiffs had submitted to prove the *Gingles* factors at trial. *See* Ex. 3, Letter of *White* Plaintiffs to Lieutenant Governor Delbert Hosemann and Legislative Leaders (Jan. 13, 2026). The letter noted that the Court had reviewed this plan already and had "no trouble" concluding that it was reasonably configured, and that the plan also "did not cross the line between racial consciousness and impermissible racial dominance." *Id.* at 3 (citing *White*, 795 F. Supp. 3d at 817). The letter stated that "[w]e stand ready to help the Legislature achieve that goal [of enacting a lawful Supreme Court plan] and are happy to meet with any of you at any time," and noted that counsel was "willing to share and discuss other potential districting configurations and electoral mechanisms that could ensure compliance with Section 2 in State Supreme Court elections while remaining consistent with applicable Mississippi law and districting principles." *Id.* at 4 & n. 12.

The Legislature did not enact a plan. No new plan was ever introduced, no hearings were held, and measures that carried forward the existing lines (but could have been amended to alter Section 9-3-1 of the Mississippi Code) died in conference on March 30, 2026. *See* Ex. 4, Mississippi Legislature, 2026 Regular Session, 009-0003-0001, https://www.legislature.ms.gov/legislation (click "Locate by Code Section" hyperlink; then enter

"09"-"03"-"01" in the boxes following "Code Section"; then click "Find Measures") (last updated Apr. 16, 2026); Miss. Code § 9-3-1.  On April 15, by operation of a resolution which had extended the length of its regular session by approximately two weeks, the Legislature adjourned *sine die*. *See* H. Con. Res. 64, 2026 Gen. Assemb., Reg. Sess. (Miss. 2026).

**PLAINTIFFS' PROPOSED PLANS**

Plaintiffs' proposed remedial plans, prepared by Plaintiffs' expert Mr. Cooper, are detailed in Exhibit 1 and summarized below.

*__Remedial Plan 1 (the Race-Blind Plan)__*



Cooper Decl. at 11, fig. 5.

6

Plaintiffs' Remedial Plan 1 provides Black voters with a fair and equal opportunity to elect their preferred candidates while most effectively equalizing total population between the three districts, creating contiguous, visually compact, whole-county districts, and including the Delta—a historic community of interest that had been "cracked" under the prior plan—into one district. Cooper Decl. at 8–12; *see also White*, 795 F. Supp. 3d at 817. Remedial Plan 1 maintains much of the 1987 plan districts' population bases, with the base of District 1 in Hinds and Madison County and the Delta, the base of District 2 in Hattiesburg and the Gulf Coast, and the base of District 3 in North Mississippi, including DeSoto County, Tupelo, and the Golden Triangle area. Cooper Decl. at 12.

Mr. Cooper developed Plaintiffs' Remedial Plan 1 as a "race-blind" remedial plan with no consideration of racial data at any stage of the plan's development, thus eliminating any possible concerns of impermissible "racial predominance" or any other potentially impermissible use of race. Cooper Decl. at 4, 8–10; *see White*, 795 F. Supp. 3d at 817. Rather than considering racial data, Mr. Cooper drew Remedial Plan 1 based on county lines, district populations, visual compactness, and county-level sustained poverty statistics from the U.S. Census Bureau. Cooper Decl. at 4, 8–10.

The population deviation between the three districts in Remedial Plan 1 is less than +/- 1%, Cooper Decl. at 12, correcting the malapportionment in the existing districts' populations, which has grown significantly since 1987 and now exceeds +/-5%. *See White*, 795 F. Supp. 3d at 857. The districts in Remedial Plan 1 are visually compact: There are no "tentacles, appendages, bizarre shapes, or any other obvious irregularities" in the Plan. *Allen v. Milligan*, 599 U.S. 1, 20 (2023). Each district in Remedial Plan 1 is made up of whole counties and is clearly compact and contiguous. Cooper Decl. at 9, 11, fig. 5. Remedial Plan 1 respects the boundaries of political

7

subdivisions by splitting zero counties, only one municipality (because the municipality crosses county lines), and zero voting tabulation districts ("VTDs" or precincts). *Id.* at 18, fig. 12.

***Remedial Plan 2 (the Least-Change Plan).***



Cooper. Decl. at 13, fig. 7.

Plaintiffs' Remedial Plan 2 maintains the overall east-west configuration of the 1987 Plan and minimizes the number of people shifted into a new district, with over 90% of Mississippians remaining in their existing Supreme Court district. Cooper Decl. at 6, 12–14.

8

Like Plaintiffs' "Least Change Plan 2," which was included in their trial-phase submissions, Tr. Ex. PX-1 at 35, Remedial Plan 2 remedies the 1987 Plan's split of the Delta by moving five northern Delta counties from District 3 into District 1: Coahoma, Leflore, Quitman, Tallahatchie, and Tunica. Cooper Decl. at 14. The remaining changes help balance population: Leake and Neshoba Counties are moved into District 3 to compensate for the North Delta population moved into District 1, and then Adams and Wilkinson County are moved from population-heavy District 2 into underpopulated District 1. *Id.* The Plan thus brings the total population deviation to approximately +/- 2.5% while shifting only nine total counties from the existing lines. *See id.* While the population deviation in this plan is larger than in Plaintiffs' Remedial Plans 1 and 3, Remedial Plan 2 resolves the existing malapportionment in the 1987 Plan. Furthermore, each district in Remedial Plan 2 is contiguous and keeps all counties and VTDs whole (although it does split seven small municipalities that cross county lines). Cooper. Decl. at 18, fig. 12.

***Remedial Plan 3 (the Regional Plan).***



Cooper. Decl. at 15, fig. 9.

Plaintiffs' Remedial Plan 3 is almost identical to Illustrative Plan 1, which was presented to the Court at the trial phase of the case, Tr. Ex. PX-1 at 27, and subsequently found by the Court to satisfy the first *Gingles* precondition and to be consistent with traditional districting principles. Cooper Decl. at 5; *White*, 795 F. Supp. 3d at 815–17.

10

The only difference between Illustrative Plan 1 and Remedial Plan 3 is a one-county shift that moves Leake County from District 3 to District 1, which lowers the overall population deviation to 1.87% (less than +/- 1%), compared to Illustrative Plan 1's overall deviation of 6.16% (+/- 3.15%). *Compare* Cooper Decl. at 14–16 *with* Tr. Ex. PX-001 at 27. Adding Leake County to District 1 also makes the District more closely follow the lines of the Legislature's 2022-adopted Congressional District 2: Under Remedial Plan 3, all counties that are in Congressional District 2, including Leake County, are included in Supreme Court District 1. Cooper Decl. at 18.

Like Remedial Plan 1, Remedial Plan 3 splits no counties or VTDs and includes all the core counties of the Mississippi Delta region in District 1. Cooper Decl. at 18, fig. 12; *White*, 795 F. Supp. 3d at 816. Remedial Plan 3 also splits zero municipalities and significantly reduces regional splits, considering Planning and Development District boundaries. *Id.* at 18, fig. 12. And, like Remedial Plan 1, Remedial Plan 3 maintains the general population bases of the 1987 plan districts. Cooper Decl. 17.

## ARGUMENT

### I. A COMPLETE AND DURABLE REMEDY IS REQUIRED

At the remedial stage, "the court's first and foremost obligation" is "to correct the Section 2 violation." *White*, 2025 WL 3688160, at *2, (quoting *Miss. State Conf. of the NAACP v. State Bd. of Election Comm'rs*, 739 F. Supp. 3d 383, 464 (S.D. Miss. 2024) ("*Miss. NAACP I*")). A Section 2 violation occurs when citizens "have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice" on account of race or color. *Miss. NAACP III*, 782 F. Supp. 3d at 340 (quoting 52 U.S.C. § 10301(b)); *see also United States v. Brown*, 561 F.3d 420, 434–35 (5th Cir. 2009) (same). Any remedial plan must "completely remed[y] the prior dilution of minority voting strength," *White*, 795 F. Supp. 3d at 860 (quoting *Miss. NAACP I*, 739 F. Supp. 3d at 464), and "fully provide[] equal opportunity

11

for minority citizens to participate and to elect candidates of their choice." *United States v. Dallas Cnty. Comm'n*, 850 F.2d 1433, 1437–38 (11th Cir. 1988) (quoting S. Rep. No. 97-417, at 31 (1982)).  The court must also ensure that the remedy is "tailored to the circumstances giving rise to the § 2 violation." *Brown*, 561 F.3d at 435.

Remedying a Section 2 violation does not depend on creating a district with any specific racial composition.  *See, e.g.*, *Miss. NAACP IV*, 782 F. Supp. 3d. at 353.  Unlike at the trial phase, where Supreme Court precedent specifically requires Plaintiffs to demonstrate reasonably configured illustrative plans with a Black voting-age population greater than 50%, *see Bartlett v. Strickland*, 556 U.S. 1, 9 (2009); *accord Milligan*, 599 U.S. at 18, the "majority-Black" status of the district is no longer relevant at the remedial phase.  Rather, the question is one of political opportunity for Black voters.  As the Supreme Court has recognized, it is "possible for a citizen voting-age majority to lack real electoral opportunity." *Cf. League of United Latin Am. Citizens v. Perry*, 548 U.S. 399, 428 (2006) ("*LULAC*").  Thus, the mere fact that a district is greater than 50% Black does not establish its validity as a remedy for vote dilution.  *See, e.g.*, *Monroe v. City of Woodville*, 881 F.2d 1327, 1333 (5th Cir. 1989) ("Unimpeachable authority from our circuit has rejected any *per se* rule that a racial minority that is a majority in a political subdivision cannot experience vote dilution."); *see also, e.g.*, *Thomas v. Bryant*, 366 F. Supp. 3d 786, 805, 809–10 & n.80 (S.D. Miss. 2019), *aff'd*, 931 F.3d 455 (5th Cir. 2019), *vacated as moot*, 961 F.3d 800, 801 (5th Cir. 2020); *Kirksey v. Bd. of Sup'rs of Hinds Cnty., Miss.*, 554 F.2d 139, 150 (5th Cir. 1977); *Miss. NAACP IV*, 782 F. Supp. 3d. at 353.  At the same time, a district with less than a 50% Black voting-age population may be a valid Section 2 remedy so long as Black voters in that district are actually able to elect candidates of their choice.  *See, e.g.*, *Singleton*, 2023 WL 6567895, at *16

12

(three-judge panel) (ordering into place a remedial congressional district that was 48.7% BVAP after finding it was effective for Black voters).

Rather than considering any demographic target or threshold for the district's minority population, the critical issue is whether a remedial plan is "effective" in providing fair and reasonable electoral opportunity to the group that has suffered vote dilution. *E.g.*, *Miss. NAACP III*, 782 F. Supp. 3d at 340; *see also Singleton*, 2023 WL 6567895, at \*13; *accord Abbott v. Perez*, 585 U.S. 579, 587 (2018). To determine whether a district is effective, the court must consider a functional analysis of local political realities—akin to the analysis that originally identified the Section 2 violation—to determine whether such voters can prevail despite racial polarization and various barriers to political participation. *See, e.g.*, *Miss. NAACP IV*, 782 F. Supp. 3d at 352–57; *see also Dallas Cnty. Comm'n*, 850 F.2d at 1437. Courts typically rely on expert analysis of prior election results (often called "effectiveness" analysis or "performance" analysis) to determine whether Black voters will be able to elect candidates of their choice despite patterns of racially polarized voting. *See, e.g.*, *Miss. NAACP IV*, 782 F. Supp. 3d at 352–57 (relying on such analyses); *Miss. NAACP III*, 782 F. Supp. 3d at 342–49 (same); *Singleton v. Allen*, 690 F. Supp. 3d 1226, 1295 (N.D. Ala. 2023) (three-judge panel) (collecting appellate and remedial cases relying on performance analyses); *Baldus v. Members of Wis. Gov't Accountability Bd.*, 862 F. Supp. 2d 860, 862 (E.D. Wis. 2012) (determining effectiveness based on turnout rates and population data); *Bone Shirt v. Hazeltine*, 387 F. Supp. 2d 1035, 1041 (D.S.D. 2005) (determining effectiveness of remedial district based on likely vote shares, calculated using voting age population and turnout estimates), *aff'd*, 461 F.3d 1011 (8th Cir. 2006). "[A] performance analysis 'should demonstrate that the Black-preferred candidate often would win an election in the subject district.'" *E.g.*, *Singleton*, 2023 WL 6567895, at \*16 (approvingly quoting report of special master in adopting

13

remedial plan where performance analysis showed Black-preferred candidate had carried 16 of 17 recent statewide contests in remedial district); *accord Miss. NAACP IV*, 782 F. Supp. 3d at 356 (considering whether proposed opportunity districts in remedial plan allowed Black voters to prevail in electing a candidate of choice a majority of the time).

In addition to ensuring an effective remedy, in choosing between multiple options that could remedy the Section 2 violation, courts may weigh several other equitable and legal considerations. *Miss. NAACP IV*, 782 F. Supp. 3d. at 357 (declining to evaluate remedial options on a "continuum between an equal chance on one end to a guarantee on the other"). These include the nature and severity of the violation, the extent of disruption to governmental operations, traditional redistricting factors, and any lawful policy judgments that the state legislature expressed in a "recently enacted plan." *Miss. NAACP IV*, 782 F. Supp. 3d at 357–61 (quoting *Perry v. Perez*, 565 U.S. 388, 393 (2012)). The Court may prioritize particular traditional districting principles, including those identified as important by the Legislature. *E.g.*, *Singleton*, 2023 WL 6567895, at *12–14. But a Section 2 remedy may disregard considerations like partisanship, "incumbency protection," *LULAC*, 548 U.S. at 440–41, or "core retention," *Milligan*, 599 U.S. at 21–22, particularly when such considerations may perpetuate vote dilution. If the state legislature has failed to express any policy preferences by not enacting a plan, the Court need not defer to policy judgments expressed by other state officials or entities. *Miss. NAACP IV*, 782. F. Supp. 3d at 360 ("We should defer to state legislative judgments if they satisfy the requirements of the Voting Rights Act and the United States Constitution, but to defer to others would create its own federalism concern.").

In addition to these considerations, the Court should also adopt a plan that is likely to be insulated from further legal challenge, such as by correcting the population imbalance of the

existing districts (which could give rise to a one-person, one-vote challenge) and avoiding excessive considerations of race (which could prompt a challenge that the remedial district violates Equal Protection). *See, e.g.*, *Miller v. Johnson*, 515 U.S. 900, 916, 920 (1995) (explaining when considerations of race in districting impermissibly predominate over other considerations); *see also Callais v. Landry*, 732 F. Supp. 3d 574, 610–14 (W.D. La. 2024) (invalidating Louisiana plan adopted by the Legislature ostensibly to comply with Section 2 as a racial gerrymander), *on appeal*, No. 24-109 (U.S., argued Mar. 24, 2025, reargued Oct. 15, 2025); *Reynolds v. Sims*, 377 U.S. 533, 577 (1964) (establishing one-person, one-vote requirement).[1] The need to adopt a durable remedy is part and parcel of the Court's task in "'correct[ing] the Section 2 violation.'" *White,* 2025 WL 3688160, at *2 (quoting *Miss. NAACP I*, 739 F. Supp. 3d at 464); *see also Brown*, 561 F.3d at 435. A remedy that is invalidated will leave voters suffering their original injury, an inequitable result; a durable remedy, on the other hand, ensures them complete relief. *See Miss. NAACP I*, 739 F. Supp. 3d at 464 (a district court remedying a Section 2 violation "should exercise its traditional equitable powers to fashion the relief so that it completely remedies the prior dilution of minority voting strength") (citation omitted).

---

[1] Legislative districting plans must have a population deviation between the largest and smallest of their districts of not more than 10% to avoid presumptive inconsistency with the one-person, one-vote requirement. *See, e.g.*, *Evenwel v. Abbott*, 578 U.S. 54, 60 (2016). A court in this district has held that this requirement applies to Public Service Commissioner and Transportation Commissioner districts in Mississippi, Order, *McCray v. Miss. Bd. of Election Comm'rs*, No. 84-CV-131 (N.D. Miss. Feb. 12, 1985) (Senter, C.J.) (admitted at trial as Tr. Ex. PX-108). Because by statute those commissioner positions use the same districts as the Mississippi Supreme Court, Miss. Code §§ 65-1-3, 77-1-1, and because the population deviation of the districts under the now-enjoined 1987 Mississippi Supreme Court plan is greater than 10%, the districts would currently be presumptively unconstitutional for use in Public Service and Transportation Commissioner elections even if their use was not already enjoined by this Court's order.

15

II.  **PLAINTIFFS' PROPOSED REMEDIAL PLANS ARE COMPLETE AND DURABLE REMEDIES**

Based on the principles set forth above, all three of Plaintiffs' remedial plans are permissible options for the Court to select. *See* Cooper Decl. at 3–5. Critically, each plan remedies the Section 2 violation at issue here by providing equal opportunity to Black voters in Mississippi to effectively elect their preferred candidates in District 1.

Furthermore, each remedial plan (1) is reasonably configured; (2) adheres to and balances traditional redistricting principles; (3) eliminates any residual legal risk that might arise from a one-person, one-vote challenge; and (4) especially with respect to the Race-Blind Plan, is insulated from any claim of racial gerrymandering and other possible outcomes in the Supreme Court's pending decision in *Louisiana v. Callais. See Landry*, 732 F. Supp. 3d at 610–14 (concluding Louisiana Legislature's addition of Black-majority congressional district to remedy likely Section 2 violation was unconstitutional because newly-drawn majority-minority district did not "comply with traditional districting principles"), *on appeal*, *Louisiana v. Callais*, No. 24-109 (U.S., argued Mar. 24, 2025, reargued Oct. 15, 2025).

Between the three, Plaintiffs' Remedial Plan 1 (the Race-Blind Plan) best achieves all of the relevant objectives, though the other Remedial Plans are acceptable as well. *See* Cooper Decl. at 5–6. Remedial Plan 3 (the Regional Plan) is the next best option: it achieves many of the same goals and is similar to the Illustrative Plan that this Court found to be reasonably configured at trial. Remedial Plan 2 (the Least-Change Plan) also provides a remedy while prioritizing minimal changes to the current map.

A.  **Each of Plaintiffs' Proposed Plans Remedies Vote Dilution**

Most importantly, each of Plaintiffs' proposed remedial plans includes an *effective* district that incorporates the core counties of the Mississippi Delta such that Black voters will be able to

16

elect candidates of choice to the Mississippi Supreme Court. Orey Rept. at 3; *see also* Cooper Decl. at 11, 13, 15.

Dr. Orey conducted the same performance analysis that was conducted in the remedial phase of the state legislative case. *See Miss. NAACP IV*, 782 F. Supp. 3d at 352–56 (describing use of "effectiveness score" and "percent won score" metrics); *Miss. NAACP III*, 782 F. Supp. 3d at 342–49. He considered the results from 16 biracial statewide election contests from the last decade. Orey Rept. at 1–2. He broke down the election results within each district in each of the remedial plans to determine the average voteshare obtained by the candidate preferred by Black voters (the "effectiveness score"). Orey Rept. at 1–2. Dr. Orey also calculated the number of contests in which the candidate preferred by Black voters won a majority of the vote in each district in each of the plans (the "percent won score"). *Id.*

The performance analysis shows that, in each of the three plans, District 1 both performs and functions as the only opportunity district in the three-district configuration. Orey Rep. at 2–3. District 1 in each plan has an effectiveness score greater than 0.5, meaning the average voteshare for the candidate preferred by Black voters is greater than 50% in District 1. *Id.* (showing effectiveness scores of .530, .522, and .537 in, respectively, the Race-Blind, Least-Change, and Regional Plans). Moreover, for each of the plans, the Black-preferred candidate prevailed in District 1 in 13 out of the 16 statewide contests in the dataset, indicating that each plan includes a district that provides a realistic opportunity for Black voters to elect a candidate of their choice. Orey Rep. at 2–3. All of Plaintiffs' remedial plans accordingly satisfy the most important requirement: They completely remedy the unlawful vote dilution proven at trial by providing Black voters with a realistic opportunity to elect candidates of their choice to the Supreme Court

17

despite persistent, high levels of racially polarized voting. *E.g.*, *Miss. NAACP III*, 782 F. Supp. 3d at 349.

Notably, while Plaintiffs' proposed plans perform and remedy vote dilution, District 1 is likely to remain competitive even under any of these plans. The average voteshare for Black-preferred statewide candidates is in the low 50% range for each plan. Orey Rep. at 2–3. Moreover, the results of the statewide, partisan elections that must be used for the performance analysis may somewhat overstate the effectiveness of the district in non-partisan, down-ballot Supreme Court contests.[2] *See White*, 795 F. Supp. 3d at 826 (noting that Supreme Court candidates preferred by Black voters have had less success in District 1 than candidates running statewide); *see also* Orey Rept. at 3. This possibility militates in favor of Remedial Plans 1 and 3, which have slightly higher effectiveness scores—and it counsels strongly against adopting a weaker plan than those presented by the Plaintiffs.[3]

---

[2] Because Supreme Court elections have not previously been held using the district configurations in the proposed remedial plans, analysis of past election results using those lines must be based on the results of statewide contests, which can be broken down to the county level and recompiled up to the district level. *See* Orey Rept. at 1; *see also* Report of Dr. Lisa Handley, Expert Report of Dr. Lisa Handley on the 2025 Mississippi Senate and House Remedial Plans at 4 & n.3, *Miss. State Conf. of the NAACP v. State Bd. of Election Comm'rs*, No. 3:22-CV-734 (S.D. Miss. Mar. 14, 2025), ECF No. 243-10 (conducting same form of recompilation analysis to assess effectiveness of state legislative districts).

[3] In addition to a quantitative assessment of election results, courts can consider other factors that may inform whether or not proposed districts will in fact be effective for voters whose electoral strength has been diluted. Those factors include registration and turnout rates, including racial turnout gaps, *e.g.*, *Bone Shirt v. Hazeltine*, 461 F.3d 1011, 1023 (8th Cir. 2006); *Ketchum v. Byrne*, 740 F.2d 1398, 1414 (7th Cir. 1984); *Baldus*, 862 F. Supp. 2d at 862; the effects of incumbency, including whether any incumbents reside in the proposed remedial districts, *Bone Shirt*, 461 F.3d at 1019, 1023; and whether "past discrimination, current social/economic conditions, and a sense of hopelessness" disproportionately reduce minority turnout. *Palmer v. Hobbs*, 686 F. Supp. 3d 1213, 1234 (W.D. Wash. 2023); *see also Dallas Cnty. Comm'n*, 850 F.2d at 1440 (rejecting district court's remedial district as ineffective because of "the fact that black citizens share a vastly lower socio-economic status than do whites . . . , and that black citizens have been the victims of past discrimination," both of which cause lower levels of voter registration and turnout and political participation). Gaps in turnout may be especially relevant because when lower-turnout minority

18

**B.** **Each of Plaintiffs' Proposed Plans Is Reasonably Configured**

Plaintiffs' Remedial Plans are also reasonably configured. All three plans are firmly based on traditional redistricting principles: They are made up of whole counties; contain visually compact, contiguous districts; respect regional communities of interest; maintain the population bases of the districts from the existing plan; and significantly equalize total population across the districts. Cooper Decl. at 3, 4, 5, 10, 12–13, 14–15, 17–18, 19, 20. None involve anything close to the type of "bizarrely shaped" districts that courts have found to be impermissibly configured. *See, e.g.*, *Bush v. Vera*, 517 U.S. 952, 960–65 (1996); *Miller*, 515 U.S. at 908; *Shaw v. Reno*, 509 U.S. 630, 635–36 (1993); *Landry,* 732 F. Supp. 3d at 599–604; *cf. Milligan*, 599 U.S. at 27–29 (discussing these cases in describing how the requirement to draw reasonably-configured illustrative districts makes proving Section 2 liability "more difficult"). Indeed, the Court has already considered a plan configured almost identically to Remedial Plan 3 and had "no trouble" concluding it was reasonably configured. *White*, 795 F. Supp. 3d at 817.

The metrics confirm the visuals: Plaintiffs' plans substantially reduce population deviation from the current plan, feature comparable scores of geometric district compactness as measured by the Reock and Polsby-Popper scores, and similarly preserve the boundaries of political subdivisions, including planning districts, counties, municipalities, and voting precincts (or VTDs). Cooper Decl. at 17–18. The Remedial Plans are also within or above the norm of core retention scores for a typical *Gingles* lawsuit, which are often in the 60% range. *Id.* at 19.

---

voters are combined with higher-turnout White voters into one district, minority voters will likely have "have less practical opportunity to elect." *Perez v. Abbott*, 253 F. Supp. 3d 864, 889–90 (W.D. Tex. 2017) (three-judge panel). Here, those considerations again support adopting a plan that is at least as strong in terms of performance as those proposed by the Plaintiffs. *See White*, 795 F. Supp. 3d at 831–59 (discussing racial turnout gaps, socioeconomic disparities, and other structural factors that burden political participation by Black voters).

19

Remedial Plans 1 and 3 have core retention scores of 73.82% and 74.84%, and Remedial Plan 2 has an "exceptional" 94% core retention score. *Id.*

Plaintiffs' plans illustrate how it is possible to draw more than one balanced, reasonable plan depending on which traditional principles or considerations are emphasized. As Mr. Cooper explains:

> While each of the Remedial Plans accomplishes an appropriate balance of the various factors, the plans have slightly different emphases. Remedial Plan 1, the "race-blind" plan, most effectively equalizes total population, ensuring compliance with the constitutional "one-person, one-vote" requirement into the future for Supreme Court as well as Public Service and Transportation Commission elections. Remedial Plan 2, a "least-change" plan, minimizes the number of people that are shifted into a new district and maintains the general shape of the 1987 Plan. Remedial Plan 3 is almost identical to Illustrative Plan 1 that I developed in the trial phase of the case. It is similar to the congressional districting plan passed by the Legislature in 2022.

Cooper Decl. 5–6.[4]

### C. Plaintiffs' Proposed Plans Offer Durable Remedies

In addition to remedying the vote dilution violation and being reasonably configured, Plaintiffs' plans are also designed to be durable remedies, because they solve potential legal infirmities with the existing plan, and are not susceptible to attack based on any impermissible use of race in the line-drawing process.

---

[4] All three of Plaintiffs' remedial plans eliminates the unnecessary division of the Delta, which this Court "ha[d] no trouble concluding [is] a community of interest," *White*, 795 F. Supp. 3d at 816. Any attempt to argue that "uncracking" the Delta amounts to impermissible race-consciousness will fail. A mapdrawer "is free to recognize communities that have a particular racial makeup, provided its action is directed toward some common thread of relevant interests." *Miller*, 515 U.S. at 920. As this Court recognized, the Delta—apart from its racial makeup—is a unique community with numerous historical and present interests that tie its residents together. *White*, 795 F. Supp. 3d at 816.

In 1987, when the current Supreme Court districts were enacted, the Mississippi legislature had a stated objective of bringing population deviation within "the plus or minus 5 percent range which would normally be the standard for determining whether or not a district is properly apportioned." *White*, 795 F. Supp. 3d at 857 (emphasis omitted) (citation omitted). That objective makes sense, because the prior lines had recently been held unlawful on that basis. *See* Order, *McCray v. Miss. Bd. of Election Comm'rs*, No. 84. Civ. 131 (N.D. Miss. Feb. 12, 1985) (Senter, C.J.) (admitted as Tr. Ex. PX-108 at trial); *accord Reynolds v. Sims*, 377 U.S. 533, 568 (1964). Now, the current plan is again imbalanced, with District 1 being underpopulated by 5.39% under 2020 Census numbers, thereby falling outside the +/- 5% deviation threshold. *White*, 795 F. Supp. 3d at 816, 856–57; Cooper Decl. at 7. It is therefore subject to legal attack, especially because the Supreme Court lines are also used to elect non-judicial positions. *See supra* n.1.

Plaintiffs' plans fix this infirmity. *See* Cooper Decl. at 11, 13, 15, 17. The overall population deviations are +/- 1.24% in Remedial Plan 1, +/- 3.82% in Remedial Plan 2, and +/- 1.87% in Remedial Plan 3. *See id.* at 18. Remedial Plans 1 and 3 in particular bring the deviation lower than any of the illustrative plans introduced at trial, advancing the districting principle that the Legislature itself identified as important the last time it passed a plan and making it more likely that those plans can each function as a viable remedy well into the 2030s if necessary.

Then there is the matter of *Callais*. Defendants have suggested that the U.S. Supreme Court's pending decision in *Callais* could impact the resolution of this case, *e.g.*, Defs.' Response to Order Directing Briefing at 4, ECF No. 273, but even if this were a valid consideration now, this Court can address it by adopting a remedy that is unlikely to be disturbed by *Callais*.

In *Callais*, a three-judge court rejected as a racial gerrymander the Louisiana Legislature's congressional districting plan, finding that the legislature had intentionally sought to create a

21

"majority-Black" congressional district, and that the district was "highly irregular" in shape, divided political subdivisions and communities, and did not "comply with traditional districting principles." *Landry*, 732 F. Supp. 3d at 589, 600, 604–606, 610–14; *cf. Miller*, 515 U.S. at 917-920. Whatever the Supreme Court ultimately decides about those conclusions, Plaintiffs' proposed plans are quite different from the map at issue in *Callais*. Here, each of Plaintiffs' proposed plans are made up of whole counties, and reflect a balanced application of traditional districting principles. *See supra* at 16; Cooper Decl. at 5, 8–19; *accord White*, 795 F. Supp. 3d at 814–18 (reviewing illustrative plans, including one nearly identical to Remedial Plan 3, and concluding that they comport with traditional principles and avoid improper racial predominance). The visual contrast between the congressional district at issue in *Callais* (District 6, in green below) and the visually-compact, whole-county Supreme Court districts that Plaintiffs offer here speaks volumes:



22

*Landry*, 732 F. Supp. 3d at 589. *Callais* is very different from this case.

And in any event, even if the U.S. Supreme Court in the *Callais* appeal were to change the law in some way that more sharply limited the use of race in districting to comply with Section 2—indeed, even if the Court took the drastic step of holding that race could not be considered at all for that purpose—Remedial Plan 1 in particular is designed to withstand any such hypothetical development. As described in Mr. Cooper's report, in preparing the race-blind Remedial Plan 1, Mr. Cooper constructed the districts by referencing a map from a February 2026 report prepared by the U.S. Census Bureau that identified counties experiencing sustained poverty over the 20-year period from 2005 to 2024, a broad-based metric for the socioeconomic character of the area. Cooper Decl. at 4, 8–12 & n.1. He created contiguous, visually compact districts and continued shaping them until he had reduced population deviation to almost zero. *Id.* at 9–10. He did not consider racial demographics at all (and indeed did not consider the county-level sustained poverty numbers, either) but rather simply consulted the Census Bureau's map and applied other race-neutral districting principles, especially population equality: the principle that drove the Legislature when it last revised these lines in 1987. *Id.* at 8–11; *see also White*, 795 F. Supp. 3d at 856–57.

Race-blind Remedial Plan 1 is thus the most durable option regardless of the outcome of *Callais*, because it was drawn without any consideration of racial data.[5] To be sure, all of Plaintiffs' remedial plans are firmly based on traditional principles and would withstand a racial

---

[5] Moreover, if the Supreme Court in *Callais* were to hold that the intentional creation of a "majority-Black" district violates Equal Protection, such a holding would be similarly unlikely to impact this Court's remedial order. While the three-judge court in *Landry* found that the Louisiana Legislature had intentionally used a racial demographic target in constructing the congressional district challenged in that case, *Landry*, 732 F. Supp. 3d at 604–606, this Court need not and should not do that because, as explained above, the question at the remedial phase of the case is about whether Black voters have political opportunity in the remedial district, not whether the district meets any particular demographic target or threshold. *See supra* at 12–14.

23

gerrymandering challenge notwithstanding an affirmance in *Callais*. But Remedial Plan 1 in particular is most insulated from a range of outcomes in *Callais*, including even substantial changes in the law, and is thus the best choice to ensure a remedy that is effective, reasonably configured, durable, and therefore complete. The Court should adopt it to remedy the Section 2 violation proven at trial.

### III. THE COURT SHOULD ORDER SPECIAL ELECTIONS IN DISTRICT 1, PLACES 1 AND 3 AND SET NEW QUALIFYING AND RELATED DEADLINES

This Court has already held that "[s]pecial elections are justified" here and that it "*will* order the same*" following the adoption of a remedial plan. *White*, 2025 WL 3688160, at *3. Now, following the adoption of one of Plaintiffs' remedial plans, the Court should specify that special elections will take place in 2026 for District 1, Places 1 and 3, and set new qualification deadlines to effectuate these special elections and any other 2026 Supreme Court elections that have been on hold due to the Court's injunction.[6]

The Court is familiar with the parties' prior briefing on special elections, which Plaintiffs incorporate here by reference. *See* Pl.s.' Br. re: Remedial Issues, ECF No. 272. The current District 1, Place 1 seat is held by Justice Kenny Griffis, who was sworn in on January 3, 2022 and whose term runs through January 2030; the current District 1, Place 3 seat is held by Jenifer Branning, who was sworn in on January 6, 2025 and whose term runs through January 2033. The Court already determined that the "extensive amount of time remaining on these terms" necessitated special elections to correct the Section 2 violation, or else "the harm inflicted by the election of Justices under an illegal map [will] not be fully rectified until January 2033." *White*, 2025 WL 3688160, at *2.

---

[6] This includes the election for the District 2, Place 1 seat currently held by Justice David Ishee.

24

All of Plaintiffs' proposed plans fashion District 1 as a district that provides Black voters with a fair opportunity to elect candidates of choice. *See supra* at 16–18. Accordingly, following adoption of one of those plans, it would be proper to hold special elections for the two District 1 seats with many years left on the Justices' terms to allow Black voters the opportunity to elect candidates of their choice and thus remedy the ongoing harm of a Voting Rights Act violation. *White*, 2025 WL 3688160, at *2. Limiting judicially-ordered special elections to those two seats would represent the minimum intrusion into state electoral processes necessary to provide complete relief.

To minimize burdens on election officials who will be implementing the Court's decision, the Court should set qualification deadlines for the District 1 special elections (and any other Supreme Court elections impacted by the Court's current injunction) that will allow enough time for the candidate qualification process, ballot creation, and compliance with the 45-day mail-ballot deadline under the Uniformed and Overseas Citizens Absentee Voting Act (UOCAVA), 52 U.S.C. § 20301 *et seq.* Because Mississippi Supreme Court elections are nonpartisan, there is no need for a partisan primary election (as in the state legislative case) or an otherwise lengthy election timeline—the Court may simply order that a special election take place during the November 2026 general election, in which all eligible candidates may file to run.

Based on recent experience, Mississippi election officials can go from a court order to election day within a span of three months. *See, e.g.*, *Miss. NAACP IV*, 782 F. Supp. 3d at 360–61 (setting August 5, 2025 primary elections for state legislature in May 7, 2025 order). Here, there is considerably more time. The process comprises the following steps:

- Once a map is selected, the updated Supreme Court district assignments must be input by local officials into the Statewide Election Management System (SEMS) for any

25

county that has been placed in a new district.  *See, e.g.*, SBEC's Proposed Findings of Fact and Conclusions of Law at 67-68, *Miss. State Conf. of the NAACP v. State Bd. of Election Comm'rs*, No. 3:22-CV-734 (S.D. Miss. March 29, 2024), ECF No. 219 (describing operation of SEMS, Mississippi's electronic voter database, and how county officials update SEMS as part of the redistricting process).  Because all of the proposed plans here are drawn using whole counties, this is an administratively simple task that can be done on a batch basis once the Secretary of State provides the new district designations (*i.e.*, the new maps) to county officials.

- Candidates then need to formally indicate their decision to run, a ministerial process that occurs during a designated qualifying period.  *See, e.g.*, Miss. Code § 23-15-977 (setting out qualifying process and deadline for Supreme Court and other judicial offices).  The Mississippi Code ordinarily provides that candidates must indicate their decision to run by February 1, and sets the maximum length of the qualifying period at one month.  *Id.*  Because the existing qualifying deadline has already passed, one will need to be set by the Court, as the court in the state legislative case did as part of its remedial duty.  *Miss. NAACP IV*, 782 F. Supp. 3d at 361; *cf. North Carolina v. Covington*, 581 U.S. 486, 488 (2017).  In the state legislative case, the court set a one-week qualifying period, beginning less than four weeks from the date of the court's order.  *Miss. NAACP IV*, 782 F. Supp. 3d at 361.  Of course, candidates can begin campaigning prior to or during the qualifying period.

- Sample ballots must be furnished to county officials 60 days before the election.  *See* Miss. Code § 23-15-367.

- Ballots must be printed by 45 days before the election pursuant to UOCAVA. *See* 52 U.S.C. § 20302(a)(8)(A).

Consistent with the above, Plaintiffs propose the following timeline, with deadlines more generous than those adopted by the three-judge panel at the remedy phase of the state legislative redistricting case, including a three-week qualifying period (although an even longer or later qualifying period would also be workable). The proposed timeline begins with June 1 as a notional control date for a decision and the beginning of the process:

- June 1, 2026: Plans Shared with Local Election Officials to update SEMS.

- June 22, 2026: Qualifying Period Begins.

- July 13, 2026: Qualifying Period Ends.

- September 4, 2026: Deadline to furnish sample ballots.

- September 18, 2026: UOCAVA Deadline to Print and Send Overseas Absentee Ballots.

- November 3, 2026: Special General Election Day (coinciding with existing General Election for U.S. Congress, Mississippi Supreme Court, and other offices).

A proposed remedial order including this schedule is attached as Exhibit 5.

### CONCLUSION

The Court should adopt Plaintiffs' Remedial Plan 1, or, in the alternative, Plaintiffs' Remedial Plans 2 or 3, in order to provide complete relief for the unlawful vote dilution proven at trial.

The Court should further order special elections to proceed in November 2026 for the current District 1, Place 1 and District 1, Place 3 seats and set new qualification deadlines for the

27

2026 Supreme Court elections along the lines set forth herein, subject to any modifications as may

be made in the interest of justice.

Respectfully submitted,

This the 17th day of April 2026.

<table>
<tr><td>

AMERICAN CIVIL LIBERTIES UNION
OF MISSISSIPPI FOUNDATION
Joshua Tom (Miss. Bar No. 105392)
Ayanna Hill (Miss. Bar No. 106590)
101 South Congress Street
Jackson, MS 39201
(601) 354-3408
*JTom@aclu-ms.org*
*AHill@aclu-ms.org*

SIMPSON THACHER & BARTLETT LLP
Jonathan K. Youngwood (Miss. Bar No. 106441)
Janet Gochman*
Noah Gimbel*
Kate Lambroza*
425 Lexington Avenue
New York, NY 100017
(212) 455-2000
*jyoungwood@stblaw.com*
*jgochman@stblaw.com*
*ngimbel@stblaw.com*
*klambroza@stblaw.com*

</td><td>

/s/ *Ari J. Savitzky*
ACLU FOUNDATION
Ari J. Savitzky*
Ming Cheung*
Nina McKay*
Sophia Lin Lakin*
125 Broad Street, 18th Floor
New York, New York 10004
(212) 549-2500
*asavitzky@aclu.org*
*mcheung@aclu.org*
*nmckay@aclu.org*
*slakin@aclu.org*

SOUTHERN POVERTY LAW CENTER
Bradley E. Heard*
Ahmed Soussi*
Sabrina Khan*
150 E Ponce de Leon Avenue, Suite 340
Decatur, GA 30030
(470) 521-6700
*bradley.heard@splcenter.org*
*ahmed.soussi@splcenter.org*
*sabrina.khan@splcenter.org*

</td></tr>
</table>

* Admitted *pro hac vice*

*Attorneys for Plaintiffs*

28

## **CERTIFICATE OF SERVICE**

I hereby certify that on April 17, 2026, I served this Plaintiffs' Remedial Submission and

all Exhibits appended thereto on all parties in this matter via the CM/ECF system.

Dated: April 17, 2026                    Respectfully submitted,

                                         /s/ Ari J. Savitzky
                                         Ari J. Savitzky