IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
GREENVILLE DIVISION

DYAMONE WHITE; DERRICK
SIMMONS; TY PINKINS;
CONSTANCE OLIVIA SLAUGHTER
HARVEY-BURWELL                                                              PLAINTIFFS

VS.                                            CIVIL ACTION NO. 4:22-cv-00062-SA-JMV

STATE BOARD OF ELECTION
COMMISSIONERS; TATE REEVES
*in his official capacity as Governor of
Mississippi*; LYNN FITCH *in her
official capacity as Attorney General of
Mississippi*; MICHAEL WATSON *in
his official capacity as Secretary of
State of Mississippi*                                                       DEFENDANTS

---

### DEFENDANTS' MEMORANDUM ON REMEDIAL ISSUES

---

Defendants submit this memorandum on remedial issues as directed by the Court's April 14, 2026 order. Dkt. 291 at 1. Defendants respectfully submit that this Court should stay further remedial proceedings until the U.S. Supreme Court issues its ruling in *Louisiana v. Callais*, S. Ct. No. 24-109. If the Court does not stay further remedial proceedings and wait for the Mississippi Legislature to enact a new map at its upcoming special session, the Court should reject plaintiffs' proposed remedial maps and draw its own. And, in all events, the Court should reject plaintiffs' request for November special elections for District 1, Positions 1 and 3, or at least defer special elections until 2027.

### BACKGROUND

**Factual Background.** The Mississippi Supreme Court is composed of nine Justices chosen from electoral districts established by the Legislature. Miss. Const. art. VI, §§ 145, 145A, 145B;

1

*see* Miss. Code Ann. § 9-3-1 (District 1 - Central District, District 2 - Southern District, and District 3 - Northern District). The nine Supreme Court judgeships are separate offices designated by position number within each district. Miss. Code Ann. § 23-15-993 (establishing position numbers 1, 2, and 3 for each district). The following lists the current Supreme Court Justices by district and position, and the last election held, the first and last full years of the position's term, and the next scheduled election year for the position:[1]

| Supreme Court Justice | District and Position | Last Election | First Year of Term | Next Election | Last Year of Term |
|---|---|---|---|---|---|
| Justice T. Kenneth Griffis | District 1, Position 1 | 2020 | 2022 | 2028 | 2029 [2] |
| Presiding Justice Leslie D. King | District 1, Position 2 | 2020 | 2021 | 2028 | 2028 |
| Justice Jennifer K. Branning | District 1, Position 3 | 2024 | 2025 | 2032 | 2032 |
| Justice David M. Ishee | District 2, Position 1 | 2018 | 2020 | 2026 | 2027 [3] |
| Justice David P. Sullivan | District 2, Position 2 | 2024 | 2025 | 2032 | 2032 |
| Chief Justice Michael K. Randolph | District 2, Position 3 | 2020 | 2021 | 2028 | 2028 |
| Open | District 3, Position 1 | 2024 | 2025 | 2032 | 2032 |
| Open | District 3, Position 2 | 2024 | 2025 | 2032 | 2032 |
| Presiding Justice Josiah D. Coleman | District 3, Position 3 | 2020 | 2021 | 2028 | 2028 |

---

[1] *See* Miss. Code Ann. § 9-3-1 (district boundaries); *id.* § 23-15-991 (terms of office); *id.* § 23-15-993 (positions); Election Results for Last Supreme Court Elections, Mississippi Secretary of State's Website (accessible by election year at https://www.sos.ms.gov/elections-voting/election-results); Mississippi Supreme Court Justices, Mississippi Supreme Court's Website (accessible at: https://courts.ms.gov/appellatecourts/sc/scjustices.php/). Elections for District 1, Position 1 and District 2, Position 1 occur 14 months before the start of the next term (*see* Miss. Code Ann. § 23-15-991; *id.* § 23-15-993) to reduce the number of positions that "shall become vacant at any one time" (Miss. Const. art. IV, § 149).

[2] Plaintiffs' filing in October 2025 miscalculated the end of Justice Griffis's term as January 5, 2031, and incorrectly asserted that 5 years remained on that term. Dkt. 272 at 22; *see* Dkt. 293 at 29 (incorporating plaintiffs' October 2025 filing by reference). (Page number citations to ECF docket entries and exhibits to this memorandum refer to the ECF number or page number at the top of the page.)

[3] Plaintiffs' filing in October 2025 also miscalculated the end of Justice Ishee's term as December 31, 2028, and incorrectly asserted that 3 years remained on that term. Dkt. 272 at 22; *see* Dkt. 293 at 29 (incorporating plaintiffs' October 2025 filing by reference).

Supreme Court Justices are ordinarily elected at a general election in even-numbered years to serve staggered eight-year terms (as was the case for each of the current sitting Justices). Miss. Const. art. VI, § 149; Miss. Code Ann. § 23-15-991; *id.* § 23-15-993. Those elections always run on a 9-month election cycle. Candidates for Supreme Court positions must file qualifying papers in February, the election day occurs in November, and a subsequent runoff takes place a few weeks later if no candidate receives a majority of the votes cast at the first election. Miss. Code Ann. § 23-15-977(1)(a) (February qualifying); *id.* § 23-15-991 (elections held in November, concurrent with congressional elections); *id.* § 23-15-981 (runoffs); *see* Miss. Const. art. VI, § 150 (age, residency, and attorney qualifications for office); Miss. Code Ann. § 23-15-1033 (November congressional elections); 2025-2026 Secretary of State Candidate Qualifying Guide, Ex. 3; 2026 Secretary of State Elections Calendar, Ex. 5. When a "special" election is required for a Supreme Court position, state law provides that such elections run on the same 9-month election cycle (February qualifying, November election day) as every general election for Supreme Court positions. Miss. Code Ann. § 23-15-849(2). A "special" election is only required when a vacancy for a Supreme Court position occurs with "half or more than half" (4 years) of the position's term remaining. *Id.* § 23-15-849(2)(a); *see id.* § 23-15-849(2)(b) (no special election when "less than half" the term remains when a vacancy occurs); Miss. Const. art. VI, § 149 (8-year terms); Miss. Code Ann. § 23-15-991 (same). The "special" election is held at the next scheduled November election for state officers or congressional representatives that is "nine (9) months after the vacancy to be filled" occurs. *Id.* § 23-15-849(2)(a); *see id.* § 23-15-193 (state-officer elections); *id.* § 23-15-1033 (congressional elections); Oliver E. Diaz, Jr. Testimony, Trial Tr. Vol. 2 at 287-89 (describing procedure for special elections). That state or federal statewide November election is, necessarily, always more than 9 months before the "special" election statute is triggered.

3

State laws and regulations on judicial-candidate qualification, campaigns, and campaign finance align with the 9-month election cycle for Supreme Court elections. Miss. Code Ann. § 23-15-973 *et seq.* (general provisions on judicial candidates); *id.* § 23-15-1021 *et seq.* (judicial-campaign finance); Miss. Code of Judicial Conduct, Canon 5 (candidate political activity); *see also* Ann H. Lamar Testimony, Trial Tr. Vol. 4 at 751-72 (discussing campaign efforts and experience); Oliver E. Diaz, Jr. Testimony, Trial Tr. Vol. 2 at 317-20 (discussing Supreme Court campaigns and campaign finance). Supreme Court positions are nonpartisan offices (as are all judgeships). Miss. Code Ann. § 23-15-976; *see id.* § 23-15-973 (prohibiting judicial candidate's alignment with any political "party" or "faction" or candidates for "any other office"). Supreme Court candidates must comply with certain campaign-fundraising limitations and disclosure requirements. Miss. Code Ann. § 23-15-1021 (individual and political-action-committee contribution limits); *id.* § 23-15-1023 (campaign-finance disclosures); *id.* § 23-15-807 (reporting); *see* 2026 Secretary of State Campaign Finance Guide, Ex. 4 at 7, 17, 21-22. Supreme Court candidates must raise and manage campaign funds through campaign committees. Miss. Code of Judicial Conduct, Canon 5C(2) (prohibition on candidate's personal "solicit[ation]" or "accept[ance]" of "campaign contributions," allowance for "campaign committee" fundraising, management, and expenditures). And the timeframe for the fundraising activities of a candidate's campaign committee is tied to the election cycle: committees may seek contributions between "the date the candidate qualified for the election" and "120 days" after the election. *Ibid.*

For nearly 200 years, Mississippi law has provided for an east (bordering Alabama) to west (bordering the Mississippi River) configuration for each of the State's three Supreme Court election districts, without dividing county lines.[4] In 1987, the Legislature last modified the

---

[4] *See* Hutchinson's Code, 1848, ch. 55, art. 9 and art. 11, § 1; Miss. Code 1857, ch. 63, § 1; Miss. Code § 402 (1871); Miss. Code § 1397 (1880); Miss. Code § 4337 (1892); Miss. Code § 4900 (1906);

Supreme Court districts. Miss. Code Ann. § 9-3-1 (Rev. 1987); *see* 1987 Miss. Laws, ch. 491, § 1, 1987 H.B. 522. The 1987 changes maintained the three districts' current east-west configuration and whole-county composition by moving Attala and Winston Counties to District 3 and Jefferson, Claiborne, and Copiah Counties to District 1. *Compare* Miss. Code, ch. 12, § 1941 (1942) *with* Miss. Code Ann. § 9-3-1 (Rev. 1987). *See also* 1987 H.B. 552 – DOJ Preclearance File, Ex. 6 at 7-20, 39-41, 55, 77-104, 108-144, 191-204 (pre-1987 maps and statutes, and legislative history on 1987 H.B. 552) (Trial Ex. PX-173). Since 1987, the districts have remained in their current form:

**Supreme Court District 1**
**Counties:** Bolivar, Claiborne, Copiah, Hinds, Holmes, Humphreys, Issaquena, Jefferson, Kemper, Lauderdale, Leake, Madison, Neshoba, Newton, Noxubee, Rankin, Scott, Sharkey, Sunflower, Warren, Washington, Yazoo

**Supreme Court District 2**
**Counties:** Adams, Amite, Clarke, Covington, Forrest, Franklin, George, Greene, Hancock, Harrison, Jackson, Jasper, Jefferson Davis, Jones, Lamar, Lawrence, Lincoln, Marion, Pearl River, Perry, Pike, Simpson, Smith, Stone, Walthall, Wayne, Wilkinson

**Supreme Court District 3**
**Counties:** Alcorn, Attala, Benton, Calhoun, Carroll, Chickasaw, Choctaw, Clay, Coahoma, Desoto, Grenada, Itawamba, Lafayette, Lee, Leflore, Lowndes, Marshall, Monroe, Montgomery, Oktibbeha, Panola, Pontotoc, Prentiss, Quitman, Tallahatchie, Tate, Tippah, Tishomingo, Tunica, Union, Webster, Winston, Yalobusha



State of Mississippi Judiciary website, https://courts.ms.gov/appellatecourts/sc/scdistricts.php; *see* Miss. Code Ann. § 9-3-1.

In the early 1990s, the United States District Court for the Southern District of Mississippi rejected a challenge under section 2 of the Voting Rights Act to the "east-west configuration" feature of the current Supreme Court districts. *Magnolia Bar Ass'n, Inc. v. Lee*, 793 F. Supp. 1386, 1391 (S.D. Miss. 1992), *aff'd*, 994 F.2d 1143 (5th Cir. 1993). Relevant here, the district court ruled that the State has "valid state policies for the existing district lines." 793 F. Supp. at 1417. That

---

Hemmingway's Code, 1917, § 3179; Miss. Code § 3357 (1930); Miss. Code, ch. 12, § 1941 (1942); Miss. Code Ann. § 9-3-1 (Rev. 1987).

ruling rested on historical legislative facts and expert-witness testimony showing: (1) "the east-west configuration of the district lines fosters political and economic diversity"; (2) an original "north-south configuration of the district lines" would have produced "homogenous districts lacking political and economic diversity"; (3) the "east-west configuration" of the districts "combined" historical "diverse political and economic interests"; (4) modern "economic and political differences" still persist within the districts; and (5) the State's "interests" in "economically and politically diverse supreme court districts would be 'reversed' if the lines were reconfigured in a north-south fashion." *Ibid.*; *see id.* at 1411 (crediting the State's "genuine state interests in maintaining an elected supreme court that is insulated as much as possible from political interference in its decision-making process"); Dkt. 264 at 99-102 (Aug. 19, 2025 Order and Opinion discussing *Magnolia Bar v. Lee*). *See also* Affidavit of Westley F. Busbee, Jr. and Report, Ex. 7 at 11-27; Trial Testimony of Westley F. Busbee, Jr. in *Magnolia Bar v. Lee*, USSD No. J90-0413(B), Ex. 8 at 4-12, 25-27; *NAACP v. Fordice*, 252 F.3d 361, 364, 372-73 (5th Cir. 2001) (upholding district court's rejection of section 2 challenge to the "east-west district lines" for Transportation Commission and Public Service Commission elections, and citing the State's legitimate interests in maintaining the districts' configuration to service the Department of Transportation's established maintenance districts); Mississippi Department of Transportation, Current Districts and Maintenance Districts Map, Ex. 9.

**Litigation Background.** In April 2022, plaintiffs filed this lawsuit challenging the current configuration of the Mississippi Supreme Court districts under section 2 of the Voting Rights Act and the Fourteenth and Fifteenth Amendments. *See* Dkt. 1 at 52-55; *see also* Dkt. 133 (amended complaint).

6

On August 19, 2025, this Court issued its post-trial liability order, crediting plaintiffs' claim that "the current electoral map [for Mississippi Supreme Court elections] illegally dilutes the votes of Black voters in District 1 (Central District) in violation of Section 2 of the Voting Rights Act of 1965." Dkt. 264 at 1; *see id.* at 10-103. The Court ruled "that the current Mississippi Supreme Court electoral map violates Section 2" and preliminarily "enjoined [defendants] from utilizing the current electoral map in any further Mississippi Supreme Court elections." *Id.* at 104 (capitalization altered). But the Court added that it "will provide the Mississippi Legislature an opportunity to enact a plan in compliance with Section 2." *Ibid.* Defendants timely appealed the Court's preliminary injunction to the United States Court of Appeals for the Fifth Circuit. Dkt. 269. That Court stayed defendants' appeal pending decisions in other redistricting cases pending at the U.S. Supreme Court and the Fifth Circuit. *See* Order, *White v. SBEC*, Order, *White v. SBEC*, Dkt. 27 at 1, CA5 No. 25-60506 (Sept. 29, 2025) (staying further appeal proceedings "pending resolution in *SBEC v. Mississippi NAACP* (S. Ct. No. 25-234), *Louisiana v. Callais* (S. Ct. No. 24-109), *Nairne v. Landry* (CA5 No. 24-30115), and related cases"); *see also* Motion of Defendants to Place Appeal in Abeyance, *White v. SBEC*, Dkt. 11 at 7-10, CA5 No. 25-60506 (Sept. 23, 2025); Dkt. 273 at 3-5 (discussing *Mississippi NAACP*, *Callais*, *Nairne*, and other pending related cases warranting a stay). All these cases remain pending as of the date of this filing.

On September 9, 2025, this Court entered an order on remedial issues. Dkt. 267. That order required the parties to submit simultaneous memoranda on "their respective positions as to an appropriate deadline to impose upon the Legislature to enact a new Mississippi Supreme Court electoral map"; "their respective positions as to the need for potential special elections"; and "any remedial issues of which they believe the Court should be made aware." Dkt. 267 at 1. After considering the parties' submissions, the Court ruled that the Mississippi Legislature would have

"until the conclusion of its regular 2026 session" to enact a new remedial map. Dkt. 280 at 6. The Court further granted plaintiffs' request for November 2026 special elections but deferred "a definitive ruling as to which seats will be subjected to a special election" until "after a new map has been enacted." Dkt. 280 at 6.

During the Mississippi Legislature's 2026 regular session, legislators introduced two bills related to the Supreme Court districts. 2026 House Bill 1749; 2026 Senate Bill 2138. These measures proceeded through the legislative process until they expired in late March, and during that process neither bill was ever modified to propose a new district plan.[5] Thus, the Legislature concluded its regular session on April 15 without passing a bill to adopt a new Supreme Court districts map. *See* House Concurrent Resolution 64 (providing sine die adjournment on April 15).

On April 23, 2026, Governor Reeves called an Extraordinary Session of the Legislature to address legislation on the Supreme Court districts. State of Mississippi, A Proclamation By the Governor (April 23, 2026), Ex. 1; *see* Miss. Const. art. V § 121 (Governor's authority to call special session by "public proclamation" of the "subjects and matters to be considered by the Legislature," "whenever, in his judgment, the public interest requires it"). The proclamation calls the Legislature to convene for its special session to consider Supreme Court districts beginning 21 days "after the United States Supreme Court issues its decision in *Callais*." Proclamation, Ex. 1 at 2.

---

[5] *See* Mississippi Legislature website, History of Actions, HB 1749, https://billstatus.ls.state.ms.us/2026/pdf/history/HB/HB1749.xml, and History of Actions, SB 2138, https://billstatus.ls.state.ms.us/2026/pdf/history/SB/SB2138.xml.

**ARGUMENT**

**I.     The Court Should Stay Further Remedial Proceedings Until The U.S. Supreme Court Issues Its Ruling In *Louisiana v. Callais*.**

This Court has preliminarily enjoined defendants from "utilizing the current electoral map in any further Mississippi Supreme Court elections." Dkt. 264 at 104. But the Court has not entered a final judgment. Defendants have fully cooperated with this Court's efforts to determine the remedial terms to be incorporated into a final judgment, and they will continue to do so. However, defendants respectfully request that this Court stay further remedial proceedings and the entry of any final judgment until the U.S. Supreme Court decides *Louisiana v. Callais*, S. Ct. No. 24-109 (consolidated with *Robinson v. Callais*, S. Ct. No. 24-110). The *Callais* decision will likely issue within the next 2 months. Shortly after that decision, the Mississippi Legislature will hold a special session to address revisions to the State's Supreme Court districts. Proclamation, Ex. 1. A stay will thus conserve the resources of the Court and the parties. It will afford the Legislature a full opportunity to revise the districts as guided by the Supreme Court in *Callais*. *See* Dkt. 264 at 104 (indicating the Court would "provide the Mississippi Legislature an opportunity to enact" a section 2 compliant map); *see also* Dkt. 280 at 6. And it will ensure that the Court and the parties also have the benefit of that guidance should further remedial proceedings be necessary here.

*Callais* will likely provide the Legislature needed guidance on how remedial redistricting plans must be crafted. *Callais* involves a three-judge district court's decision that invalidated a Louisiana redistricting plan adopted after a different district court ruled that Louisiana's prior plan conflicted with section 2 of the Voting Rights Act. *See Louisiana v. Callais*, No. 24-109, Jurisdictional Statement at 5-16 (July 30, 2024). The case was briefed and argued at the Supreme Court's October 2024 Term. Near the end of that Term, the Supreme Court set the case for re-argument and ordered the parties to address: "Whether the State's intentional creation of a second

majority-minority congressional district violates the Fourteenth and Fifteenth Amendments to the U.S. Constitution." Order, *Louisiana v. Callais*, S. Ct. No. 24-109 (Aug. 1, 2025). *Callais* was re-briefed and re-argued in October 2025. *See* Docket, *Louisiana v. Callais*, S. Ct. No. 24-109 (Oct. 15, 2025). The Supreme Court can be expected to decide *Callais* before the end of this Term, which usually occurs in late June. Obviously, the ruling will remain unknown until the Supreme Court issues its decision. But an answer to the question presented in *Callais* would likely dictate what can and cannot be done when the Legislature addresses revisions to the Supreme Court districts at its upcoming special session.

Likewise, the Court and the parties need *Callais*'s guidance in this case. Should the Legislature adopt new Supreme Court districts at its upcoming special session, *Callais* is expected to dictate how the Court and the parties evaluate those districts, whether further proceedings may be necessary, and/or any further steps toward entry of a final judgment. Even absent a legislative plan, and should further proceedings be necessary, *Callais* still will likely shape the character and outcome of those proceedings. Either way, a ruling in *Callais* will impact future action in this case—and any potential appeals by the parties.[6]

Plaintiffs' own remedial submission underscores the need for a stay. Plaintiffs predict that their so-called "race blind" plan (Remedial Plan 1) is "insulated" from any "possible outcomes" in *Callais*. Dkt. 293 at 21; *see id.* at 26-29 (arguing that Remedial Plan 1 will withstand the "hypothetical development" that *Callais* will "change the law"). That is either a tacit admission

---

[6] As the Court is aware, defendants appealed the Court's preliminary injunction following the liability phase of the case and the Fifth Circuit has stayed that appeal pending *Callais* and other redistricting cases. *See* Dkt. 280 at 1 n.1; *see also* Order, *White v. SBEC*, Dkt. 27 at 1, CA5 No. 25-60506 (Sept. 29, 2025). This Court noted that defendants' appellate-stay request said that a stay at the Fifth Circuit would not prevent this Court "from considering whether and when to move forward with remedial proceedings in this case." Dkt. 280 at 1 n.1. Indeed, this Court has discretion (as it did in September) to stay further remedial proceedings—and it should do so now that a decision in *Callais* is imminent and will likely directly impact both the Legislature's analysis and any further proceedings in this case.

that Remedial Plans 2 and 3 are not so "insulated," or a clever way to steer the Court toward the plaintiffs' most preferred plan—or both. Regardless, the only way to know if *any* of plaintiffs' plans comport with *Callais* is to wait for *Callais*. A stay is the best way, indeed the only way, to ensure that any remedial plan crafted by the Legislature, the parties, or this Court will satisfy what the U.S. Supreme Court will direct in *Callais* about the constitutional, statutory, and other requirements for remedial plans.

**II.     If The Court Does Not Stay Further Remedial Proceedings And Wait For The Legislature To Enact A New Map At Its Upcoming Special Session, The Court Should Reject Plaintiffs' Proposed Remedial Maps And Draw Its Own Map.**

The plaintiffs' three proposed remedial maps far exceed what the Voting Rights Act requires—instead of an opportunity, they seek a guarantee that Black-preferred candidates get elected. Whatever *Callais* ultimately holds, a remedial plan that guarantees a racial class its political preference is unprecedented and conflicts with the Constitution. If the Court declines to stay further remedial proceedings until the decision in *Callais*, it should reject the plaintiffs' remedial plans. The plans are fraught with constitutional concerns, and all three substantially disrupt Mississippi's longstanding east-west Supreme Court district configuration and the neutral state interests that this Court and the Fifth Circuit have recognized. While defendants do not submit a remedial plan for consideration, their expert, Dr. John Alford, offers an illustrative plan moving a single county, which demonstrates just how simple a fix could be and that, in reality, plaintiffs are purely focused on racial guarantees. Dr. Alford Report, Ex. 2.

If the Court does not stay further proceedings in this case to allow the Legislature to redraw Supreme Court districts in the upcoming special session post-*Callais*, the Court should reject plaintiffs' plans and draw a court-ordered map under neutral judicial-remedy principles.

11

**A. Plaintiffs' proposed maps exceed the remedial task and seek a political guarantee for a racial class in District 1.**

Section 2 does not require a court to choose the strongest possible minority performing map, nor does it authorize a court to move from equal opportunity to practical assurance. *See League of United Latin American Citizens v. Perry*, 548 U.S. 399, 428 (2006). The Supreme Court has plainly stated: "'the ultimate right of § 2 is equality of opportunity, not a guarantee of electoral success for minority-preferred candidates of whatever race.'" *See ibid.* (quoting *Johnson v. De Grandy*, 512 U.S. 997, 1014 n.11 (1994)). Indeed, "minority voters are not immune from the obligation to pull, haul, and trade to find common political ground." *Johnson*, 512 U.S. at 1020. Consistent with those principles, one three-judge court in this Circuit explained that "the VRA does not require that minority opportunity districts be drawn to give minorities a sure chance or even the best chance at electing their candidates of choice." *Perez v. Abbott*, 253 F. Supp. 3d 864, 889 (W.D. Tex. 2017) (three-judge court), *rev'd in part on other grounds*, 585 U.S. 579 (2018). "A 'real opportunity' is not a guarantee of success." *Id.* at 882.

Federal law, including the authorities cited by plaintiffs, does not entitle them to the highest performing map, only an appropriately tailored one. Dkt. 293 at 16-20. Dr. Orey, plaintiffs' expert, states "District 1 in each plan functions as an effective opportunity district for Black voters." Dkt. 293-2 at 3. Under Dr. Orey's analysis, each plan posts a District 1 effectiveness score above .520 and the minority-preferred candidate wins 13 of 16 contests, or 81.3% of the time. Dkt. 293-2 at 2-4. That is not a narrowly tailored remedy. *See Veasey v. Abbott*, 830 F.3d 216, 269 (5th Cir. 2016) (en banc) ("any remedy 'should be sufficiently tailored to the circumstances giving rise to the [section] 2 violation … and to the extent possible, courts should respect a legislature's policy objectives when crafting a remedy'"); *United States v. Brown*, 561 F.3d 420, 435 (5th Cir. 2009) (section 2 remedy must be "sufficiently tailored to the circumstances giving rise to the § 2

12

violation"); *Clark v. Calhoun County, Miss.*, 88 F.3d 1393, 1406 (5th Cir. 1996) ("a tailored response to a found violation must use race at the expense of traditional political concerns no more than is reasonably necessary to remedy the wrong"). Plaintiffs' proposed plans, as shown in the below table using figures from Dr. Orey's Report, create a new District 1 designed to win repeatedly and decidedly under the set of elections Dr. Orey chose to rely on:

| Plan | District 1 BVAP | District 1 Effectiveness score | District 1 Wins | District 1 % Won |
|---|---|---|---|---|
| Race-Blind Plan | 54.5% | .530 | 13/16 | 81.3% |
| Least-Change Plan | 52.2% | .522 | 13/16 | 81.3% |
| Regional Plan | 55.0% | .537 | 13/16 | 81.3% |

Dkt. 293-2 at 2-3.[7]

The results of Dr. Orey's analysis are even more extreme when focused on the more recent elections. Dr. Orey admits that he used the same elections (2015-2024) to analyze performance that the plaintiffs in the recent state legislative redistricting case offered. Dkt. 293-2 at 2-3. But Dr. Orey fails to mention that the three-judge court in that case rejected the use of stale 2015 elections. *See MS NAACP v. SBEC*, 782 F. Supp. 3d 349, 356 (S.D. Miss. 2025) (three-judge court) ("[Dr. Alford's] exclusion of the 2015 election results is reasonable. We reiterate that 'more recent elections better explain the opportunities that will exist in future elections.'"). As demonstrated in the tables below and in Dr. Alford's report, for the post-2015 election period, every one of plaintiffs' plans registers a percent-won score of 100%. Ex. 2 at 8-9. In other words, under plaintiffs' preferred district designs and when excluding the 2015 stale elections, the minority-

---

[7] The table above is a summary of Dr. Orey's Table 1 and includes only District 1 because Districts 2 and 3 are not alleged to be opportunity districts under any of plaintiffs' proposed plans and their performance figures do not bear on the remedial issue before the Court.

preferred candidate wins every election in District 1—13 for 13, 100% of the time. That is a guarantee, not an opportunity.

**B. Dr. Orey's report is result-driven, analytically unsound, and entitled to no weight.**

Dr. Orey's remedial analysis is not a neutral assessment of whether plaintiffs' maps are sufficient to cure the violation in a narrowly-tailored fashion, with changes to the existing map that are no broader than reasonably necessary. *Brown*, 561 F.3d at 435; *Clark*, 88 F.3d at 1407; *see Upham v. Seamon*, 456 U.S. 37, 43 (1982) (at the remedial stage, a federal court's "modifications of a state plan" must be "limited to those reasonably necessary to cure any constitutional or statutory defect"). Rather, Dr. Orey's analysis strains credulity in a single direction. Every material methodological choice advances the same features: stronger District 1 performance, a higher remedial floor, and less room for any narrower alternative to qualify as sufficient. At least four features of Dr. Orey's methodology show that his report systematically inflates plaintiffs' remedial showing.

First, Dr. Orey's analysis uses a sixteen-election universe of exogenous statewide contests. Dkt. 293-2 at 1-2. The problem is not just that those races are exogenous. His analysis wrongly uses that single exogenous dataset as a rigid remedial floor. Under Dr. Orey's own chosen election set, all three plaintiff maps produce the same 13-of-16 win rate, and when excluding stale 2015 elections they produce a 13-of-13 win rate. That is an unlawful guarantee, not a tailored remedy.

Second, Dr. Orey's framing shows that plaintiffs elevate race over section 2's governing inquiry. His report repeatedly defines the inquiry in terms of "Black-preferred Black candidates." Dkt. 293-2 at 1-4. But section 2 protects an opportunity to elect candidates of choice, not candidates of a particular race. This Court recognized exactly that point at the liability stage when it treated the 2016 Kitchens election as relevant because "the Black-preferred candidate did

14

prevail" even though Justice Kitchens is white. Dkt. 264 at 46. By designing his analysis around Black-preferred Black candidates, Dr. Orey narrows the field to skew the results and gives race a role the liability opinion (appropriately) did not assign or approve.

Third, Dr. Orey's 60% percent-won benchmark is as arbitrary as it is unsupported. Ex. 2 at 7. He says only that a score below 60% "suggests" the district may not provide a realistic opportunity. Dkt. 293-2 at 2. No cited support. No analysis. Nothing to back up this threshold. The three-judge district court in the state legislative case recently rejected the same 60% benchmark. The plaintiffs' expert in that case "offer[ed] no logical basis for the 60% figure" and the court rejected a "60% threshold" as an "unsupported and admittedly imprecise marker." *MS NAACP v. SBEC*, 782 F. Supp. 3d 335, 347, 348 (S.D. Miss. 2025) (three-judge court). The same holds true here. Dr. Orey does not (and cannot) justify his 60% benchmark. And that benchmark improperly transforms "opportunity" into repeated, assured success—a guarantee. The Court should reject it.

Fourth, Dr. Orey's methodology fails to distinguish adequacy from overcorrection. Each of plaintiffs' maps produces a District 1 that wins 13 of 16 elections. Each remains well-above Dr. Orey's arbitrary threshold of 60% won. His analysis thus cannot help the Court answer the question that matters at the remedy phase: what is necessary, and no more, to cure the violation found. *Upham*, 456 U.S. at 42-43; *see White v. Weiser*, 412 U.S. 783, 795 (1973) ("a district court should not pre-empt the legislative task nor 'intrude upon state policy any more than necessary'"). And because Dr. Orey's approach shows that all three of plaintiffs' maps provide guaranteed election success (each wins 13 of 16 contests and 13 of 13 post-2015), plaintiffs' proposed plans are not appropriate remedies, they are an unlawful overcorrection. *See* Dkt. 293-2 at 2-4.

15

**C. Mr. Cooper's line-drawing rationales are flawed, and each of plaintiffs' maps is unnecessarily disruptive.**

The line-drawing choices in Mr. Cooper's declaration (Dkt. 293-1) confirm that plaintiffs' proposed plans are flawed. None of plaintiffs' three plans is a restrained, obvious, or least-change remedy. Each imposes major structural changes on the existing Supreme Court districts. Two of the three plans abandon the existing east-west configuration for a north-south Delta-core District 1. And even the so-called Least-Change Plan is not, in fact, least change. As Dr. Alford explains, the State's preference for the general configuration of the districts "is quite clear," because "the broad geographical configuration of three East-West districts has remained relatively stable for at least 80 years." Ex. 2 at 3.

Mr. Cooper's so-called Race-Blind Plan (Remedial Plan 1) shifts 33 counties and retains only 73.82% of the benchmark plan's core population. Dkt. 293 at 25; Dkt. 293-1 at 11, 19. Mr. Cooper claims that he began with a sustained-poverty map and drew District 1 "with nothing more than county lines visible on screen," without even referencing the 1987 plan or planning districts. Dkt. 293-1 at 9; *see id.* 8-10, 19. That approach ignores state policies and well-established law.[8] Mr. Cooper's Remedial Plan 1 is a sweeping redesign detached from Mississippi's actual baseline map in ways that thwart the State's longstanding preference for three east-west Supreme Court districts. Ex. 2 at 3; *see Magnolia Bar*, 793 F. Supp. at 1417; *Fordice*, 252 F.3d at 372-73. *See also* 1987 H.B. 552 – DOJ Preclearance File, Ex. 6 at 7-20, 39-41, 55, 77-104, 108-144, 191-

---

[8] When adopting a remedial map, federal courts should "follow the policies and preferences of the State." *White*, 412 U.S. at 795. Those "policies and preferences" may be drawn from "statutory and constitutional provisions" and from "legislative policies" shown in prior enacted plans. *Ibid. See also Perez v. Perry*, 565 U.S. 388, 392-393 (2012) (explaining that courts should rely on a "recently enacted plan" for congressional districts when an "old plan gives no suggestion as to where [ ] new districts should be placed"); *Abrams v. Johnson*, 521 U.S. 74, 79 (1997) ("When faced with the necessity of drawing district lines by judicial order, a court, as a general rule, should be guided by the legislative policies underlying the existing plan, to the extent those policies do not lead to violations of the Constitution or the Voting Rights Act.")

204 (pre-1987 maps and statutes, and legislative history on 1987 H.B. 552) (Trial Ex. PX-173); Affidavit of Westley F. Busbee, Jr. and Report, Ex. 7 at 11-27; Trial Testimony of Westley F. Busbee, Jr. in *Magnolia Bar v. Lee*, USSD No. J90-0413(B), Ex. 8 at 4-12, 25-27. Moreover, plaintiffs have produced zero evidence that state policy has ever considered sustained-poverty data a criterion for drawing judicial districts at any level.

Mr. Cooper's so-called Least-Change Plan (Remedial Plan 2) fares no better. Dkt. 293-1 at 12-14. Dr. Alford explains why: District 1 is underpopulated, District 2 is overpopulated, and District 3 is already very close to ideal. "District 3 is very close to the ideal population with only .33% (a little over 3,000 people) over the ideal," and "[t]hat means that a typical least-change plan would begin by focusing on what can be accomplished by moving population out of District 2 and into District 1, while, if possible, leaving the already nearly ideally populated District 3 untouched." Ex. 2 at 5. Mr. Cooper instead moves five Delta counties out of near-ideal District 3 into District 1, then moves Leake and Neshoba out of District 1 into District 3, and then moves Adams and Wilkinson out of District 2 into District 1. Ex. 2 at 5; Dkt. 293-1 at 13-14. That is not "least change." It is a multi-step redesign of nine counties to preserve Mr. Cooper's preferred Delta-core District 1.[9]

Mr. Cooper's Regional Plan (Remedial Plan 3) is a slightly refined version of the same Delta-core theory. Mr. Cooper says it is "almost identical" to trial-phase Illustrative Plan 1 except for adding Leake County to reduce deviation. Dkt. 293-1 at 14-16. The result is still a major restructuring of the existing districts, and it produces the same guarantee performance numbers as

---

[9] These changes are not merely abstract. As Dr. Alford notes, Mr. Cooper's Least-Change Plan removes Neshoba County from current District 1 thereby removing sitting Justice Jennifer Branning from the current district that elected her. Ex. 2 at 5. As such, Mr. Cooper's Least-Change Plan runs afoul of another commonly applied redistricting criterion, incumbency protection. *See Perry*, 548 U.S. at 440-41 (citing *Karcher v. Dagget*, 462 U.S. 725, 740 (1983)).

plaintiffs' other plans. Ex. 2 at 6; *see id.* at 8-10. It is no more modest in practical effect than Mr. Cooper's so-called Race-Blind Plan. This Court should reject each of plaintiffs' proposed plans.

**D. If the Court must draw a map, materially narrower alternatives exist, and the Court should apply neutral remedial principles and implement the least intrusive workable remedy.**

For the reasons explained in Section I, defendants maintain that, before adopting any new map, the Court should wait for the Supreme Court's decision in *Callais* and allow the Legislature to address new districts post-*Callais*. But even if the Court chooses not to stay further remedial proceedings, the answer is not to select one of plaintiffs' maps.

Plaintiffs argue that because the Legislature did not enact a plan during the regular session, "the Court need not defer to policy judgments expressed by other state officials or entities." Dkt. 293 at 19; *see also* Dkt. 293-5 at 1-2. But defendants do not contend that this Court must defer to a nonexistent enacted map, nor do defendants ask the Court to substitute executive preferences for legislative judgment. The point is narrower and more basic: "reapportionment is primarily the duty and responsibility of the State through its legislature or other body, rather than of a federal court." *Chapman v. Meier*, 420 U.S. 1, 27 (1975) (citing *Reynolds v. Sims*, 377 U.S. 533, 586 (1964) and *Maryland Committee v. Tawes*, 377 U.S. 656, 676 (1964)). When a court must act, it "should not preempt the legislative task nor 'intrude upon state policy any more than necessary.'" *Upham*, 456 U.S. at 41-42 (quoting *White*, 412 U.S. at 795). The Fifth Circuit likewise requires a section 2 remedy to be "sufficiently tailored to the circumstances giving rise to the § 2 violation." *Brown*, 561 F.3d at 435. And any tailored response must use race at the expense of traditional districting concerns no more than is reasonably necessary to remedy the wrong. *Clark*, 88 F.3d at 1406. Any court-drawn remedy therefore must provide opportunity, not guarantee. *See Perry*, 548 U.S. at 428.

In drawing a map, the Court must use the neutral guideposts federal courts apply when they draw judicial districts to remedy Voting Rights Act violations. For example, in *Martin v. Mabus*, the Southern District of Mississippi rejected proposed judicial remedies that "over-emphasized black voting strength," sought "super-majority districts," and risked injecting race too heavily into judicial elections. 700 F. Supp. 327, 330-35 (S.D. Miss. 1988). Instead, the court required compact and contiguous districts, preservation of whole counties where feasible, minimal division of cities and towns, use of current precinct lines where county divisions were unavoidable, no precinct splitting, and minimized population variance. *Id.* at 332-34. *Clark v. Roemer* applied the same framework, requiring compact and contiguous districts, preservation of parish and municipal boundaries, use of existing precinct lines, minimal population deviation, and avoidance of both dilution and packing. 777 F. Supp. 445, 466-68 (M.D. La. 1990). In its remedial order, the court described the proper judicial response as the "least intrusive workable remedy." *Clark v. Roemer*, 777 F. Supp. 471, 480-83 (M.D. La. 1991).

Under those guideposts, plaintiffs' maps go too far. They are performance-driven first with traditional criteria a distant second. They substantially rearrange the existing districts to create a Delta-core District 1, move far more counties and voters than a restrained remedy would require, and produce the same essential result across all three plans. Under Dr. Orey's 2015-2024 dataset, each plan yields 13 wins in 16 contests, or 81.3% of the time. Dkt. 293-2 at 2-4. And once stale 2015 elections are excluded, each plan yields 13 wins in 13 contests, or a 100% win rate. Ex. 2 at 9; *see MS NAACP*, 782 F. Supp. 3d at 355-56 (accepting the exclusion of 2015 election results because "more recent elections better explain the opportunities that will exist in future elections"). That is not a modest judicial remedy keyed to opportunity. It is an overbroad redesign aimed at repeated and guaranteed electoral success.

19

Consistent with existing legal principles pre-*Callais* that guide federal courts in redrawing district plans, a far narrower race-conscious fix exists than anything plaintiffs propose. Dr. Alford moves just one county—Adams County—as an example of a true least-change plan. And, his point is not that Adams County is the only possible move (indeed, the same could be said for other counties like Leflore or Coahoma). It is that a far narrower change than plaintiffs propose can both correct the population problem and satisfy the law's remedial requirement of opportunity rather than guarantee. Ex. 2 at 8-9. The tables below review the performance metrics for the 1987 Plan, the 1987 + Adams County (True Least Change) example, and Mr. Cooper's three plans while using Dr. Alford's 50% threshold, as opposed to Dr. Orey's unsupported and previously rejected 60% threshold (even though every plan analyzed exceeds the 60% threshold):

**Table 1 (2015-2024)**

| Effectiveness and Percent Won Scores of Black-Preferred Black Candidates by Proposed District Plan | | | | | | | |
|---|---|---|---|---|---|---|---|
| | | | 2015-2024 | | 2015-2024 | | |
| Plan | District | BVAP | Effectiveness Score | 0.50 Threshold | Wins/ Total | % Won | 50% Threshold |
| Benchmark 1987 Plan | District 1 | 49.3% | 0.499 | Below | 10 of 16 | 62.5% | Above |
| True Least-Change Plan Example (1987 + Adams) | District 1 | 49.5% | 0.501 | Above | 10 of 16 | 62.5% | Above |
| Cooper Least-Change Plan | District 1 | 52.2% | 0.522 | Above | 13 of 16 | 81.3% | Above |
| Cooper Race-Blind Plan | District 1 | 54.5% | 0.530 | Above | 13 of 16 | 81.3% | Above |
| Cooper Regional Plan | District 1 | 55.0% | 0.537 | Above | 13 of 16 | 81.3% | Above |

*Notes: Effectiveness Score = average vote share of Black-preferred Black candidates across 16 contests in each district. BVAP = Black Voting-Age Population. An effectiveness score below 0.50 indicates candidates receive less than 50% of the vote on average. A % Won score below 50% suggests the district may not provide Black voters with a realistic opportunity to elect candidates of their*

Ex. 2 at 8 (Table 1 (2015-2024)).

Table 2 below isolates the more recent 2018-2024 elections for a reason. As stated, in the recent Mississippi legislative remedial litigation, the three-judge court approved giving more weight to the more recent elections and accepted Dr. Alford's exclusion of the 2015 election. Ex.

20

2 at 7; *see MS NAACP*, 782 F. Supp. 3d at 356. The same logic applies here. Once stale 2015 elections are removed, plaintiffs' maps are maps that win every time—using their own dataset.

**Table 2 (2018-2024)**

| Effectiveness and Percent Won Scores of Black-Preferred Black Candidates by Proposed District Plan | | | | | | | |
|---|---|---|---|---|---|---|---|
| | | | 2018-2024 | | 2018-2024 | | |
| Plan | District | BVAP | Effectiveness Score | 0.50 Threshold | Wins / Total | % Won | 50% Threshold |
| Benchmark 1987 Plan | District 1 | 49.3% | 0.514 | Above | 10 of 13 | 76.9% | Above |
| True Least-Change Plan Example (1987 + Adams) | District 1 | 49.5% | 0.516 | Above | 10 of 13 | 76.9% | Above |
| Cooper Least-Change Plan | District 1 | 52.2% | 0.536 | Above | 13 of 13 | 100.0% | Above |
| Cooper Race-Blind Plan | District 1 | 54.5% | 0.544 | Above | 13 of 13 | 100.0% | Above |
| Cooper Regional Plan | District 1 | 55.0% | 0.550 | Above | 13 of 13 | 100.0% | Above |

Notes: *Effectiveness Score = average vote share of Black-preferred Black candidates across 16 contests in each district. BVAP = Black Voting-Age Population. An effectiveness score below 0.50 indicates candidates receive less than 50% of the vote on average. A %Won score below 50% suggests the district may not provide Black voters with a realistic opportunity to elect candidates of their*

Ex. 2 at 9 (Table 2 (2018-2024)).

These tables show plaintiffs cannot prove that their three plans are proper or necessary remedies. The current District 1 + Adams County (True Least Change) example already exceeds the 0.50 effectiveness line under Dr. Alford's analysis, posting a 62.5% win rate over the full period and a 76.9% win rate over the more recent and probative period post-2015. Shifting only Adams County from District 2 to District 1 would reduce District 1's underpopulation from -5.39% to roughly -2.40%, reduce District 2's overpopulation from +5.07% to roughly +2.07%, and leave District 3 untouched. Ex. 2 at 7-10.[10] As Dr. Alford explains, "[e]ven this slight under performance

---

[10] Judicial-election districts are not subject to the same one-person, one-vote constraints as legislative districts because, unlike legislators, judges are not policymakers who represent constituencies. *See, e.g.*, *Wells v. Edwards*, 347 F. Supp. 453, 454 (M.D. La. 1972) (holding "that the concept of one-man, one-vote apportionment does not apply to the judicial branch of the government"), *summarily aff'd*, 409 U.S. 1095 (1973); *Chisom v. Roemer*, 501 U.S. 380, 402-403 (1991) (explaining that section 2 applies to judicial elections but the "one-person, one-vote rule" does not). But population balance remains a neutral and legitimate consideration in crafting any remedial judicial map, and it is especially relevant here because

21

of the benchmark plan can be easily corrected with a least change plan, as illustrated purely for example purposes by the plan that shifts Adams County out of District 2 and into District 1." *Id.* at 8. And a "similar level of effectiveness can be achieved by other single-county shifts." *Id.* at 7 n.5.

In addition, and most telling overall about plaintiffs' remedial submission, under Dr. Orey's approach to analyzing district effectiveness, the current District 1—the district that this Court found violated section 2—already effectively performs at over .50 for the minority candidate of choice and wins 76.9% of the time when the stale 2015 elections are excluded. Ex. 2 at 9-10. Yet in plaintiffs' view, that already high level of effectiveness *of the current districts* is not enough. They want a remedial plan that jumps to 81.3% won for the 2015-2024 elections analyzed by Dr. Orey and jumps to 100% in the elections post-2015. Opportunity is not enough; plaintiffs want this Court to disregard the law and deliver a guarantee.

In sum, if the Court does not stay further proceedings and allow the Legislature to consider legislation on the Supreme Court districts post-*Callais*, the Court should reject plaintiffs' maps and draw its own plan under the foregoing neutral remedial principles. Use the current Supreme Court districts plan as the baseline, preserve Mississippi's longstanding district configuration and rely on other traditional criteria as much as possible, minimize county and population movement, avoid unnecessary disruption to District 3, and make only those changes genuinely necessary to cure the violation found. If a court-drawn map becomes necessary, controlling law requires the least intrusive workable remedy—not plaintiffs' guaranteed proposals.

---

the same district lines are also used for Public Service Commission and Transportation Commission elections. *See Martin*, 700 F. Supp. at 332-34; Dkt. 264 at 3-4.

**III.     In All Events, The Court Should Reject Plaintiffs' Request For November Special Elections For District 1, Positions 1 And 3, Or At Least Defer Special Elections Until 2027.**

Plaintiffs seek special elections for 2 of the 3 Supreme Court positions in District 1, on an expedited schedule, with elections in November 2026 on general election day for congressional elections. Dkt. 293 at 29-32. The Court should reject that proposal. If the State must conduct special elections for any Supreme Court positions on a new map, those elections should be held in 2027.

Requiring the State to hold any special elections in November defies the practical reality that without a new map, no elections can take place. No new map has yet been adopted; the Legislature will convene to undertake that task after the U.S. Supreme Court issues its decision in *Callais*, and for all the reasons explained above, plaintiffs' proffered maps are unlawful. This alone shows that if special elections for any Supreme Court positions are warranted, those elections should be held in 2027.

Pressing forward with special elections between now and November would also undermine state policy on special elections for Supreme Court seats. Under plaintiffs' proposal, special elections in 2026 could run on a 5-month schedule (assuming the elections could begin to proceed by June). Dkt. 293 at 32. But state law requires that every special election for Supreme Court positions runs on the same 9-month election cycle as regular Supreme Court elections. Miss. Code Ann. § 23-15-849(2)(a). The regular Supreme Court election cycle runs from February (qualifying deadline) to November (election day). *Id.* § 23-15-977(1)(a); *id.* § 23-15-991. A special election must follow the same 9-month cycle—the "special" election cannot be held in less than 9 months. *Id.* § 23-15-849(2)(a) (special elections take place at the next scheduled November election for state officers or congressional representatives that is "nine (9) months after the vacancy to be

23

filled" occurs). The only way to honor state law on Supreme Court special elections is to hold any special elections in 2027, not November 2026.

Supreme Court special elections are always held on a 9-month election cycle, for many sensible reasons. Candidates need that time to raise campaign funds and run effective campaigns, and voters need well-run campaigns and time to learn the candidates to know who they are voting for. Unlike smaller and more compact legislative districts or districts for local offices, each Supreme Court district spans hundreds of miles and dozens of counties—this is true under the districts' current configuration and would remain so under any other conceivable layout. That makes campaigning in a Supreme Court district a massive undertaking, made only more difficult on a compressed 5-month timeframe. *See* Ann H. Lamar Testimony, Trial Tr. Vol. 4 at 751-72 (discussing campaign efforts and experience); Oliver E. Diaz, Jr. Testimony, Trial Tr. Vol. 2 at 317-20 (discussing Supreme Court campaigns and campaign finance). In addition, unique rules apply to Supreme Court candidates that sharply limit how they campaign and how they raise campaign funds. For example, Supreme Court candidates cannot legally hitch their campaign to the campaign of a congressman or another state official. Miss. Code Ann. § 23-15-973; *see* Oliver E. Diaz, Jr. Testimony, Trial Tr. Vol. 2 at 275-77 (discussing work of the Committee on Judicial Elections and Intervention during elections). Candidates may raise and manage campaign funds only through campaign committees. Miss. Code of Judicial Conduct, Canon 5C(2). Supreme Court elections are very expensive due to large geographical districts and other factors. *See* Oliver E. Diaz, Jr. Testimony, Trial Tr. Vol. 2 at 318 (estimating that successful Supreme Court campaigns would probably cost "between 500,000 and a million dollars"). Strict campaign contribution limits and disclosure rules apply. Miss. Code Ann. § 23-15-1021; *id.* § 23-15-1023; *id.* § 23-15-807; *see* 2026 Secretary of State Campaign Finance Guide, Ex. 4 at 7, 17, 21-22. And all that campaign

activity is already time-restricted—Supreme Court candidates' campaign committees can only form and operate during and shortly after the statutory 9-month election cycle. Miss. Code of Judicial Conduct, Canon 5C(2).

Plaintiffs argue that this Court should push forward with November 2026 special elections for District 1, Positions 1 and 3 using one of their proposed plans. Dkt. 293 at 29-32. This position lacks merit. Their argument mainly rests on the view that District 1, Positions 1 and 3 have "many years" left on their "terms," so special elections for those positions are needed to give plaintiffs "complete relief." Dkt. 293 at 30. But plaintiffs offer no principled distinction between the number of years left in the terms of District 1, Positions 1 and 3 versus District 1, Position 2.[11] If the Court is going to order special elections because plaintiffs' votes were diluted in District 1, it should order elections for all 3 positions—in 2027, not 2026.

Plaintiffs also suggest that their timetable will "minimize burdens on election officials" who can implement a special election "during the November 2026 general election" for congressional offices and that "recent experience" in the legislative-redistricting case shows "election officials" need only "three months" to adjust elections after a new map is adopted. Dkt. 293 at 30. These points do not help plaintiffs. Although Mississippi "election officials" may be able to implement a special election in 2026 during the already-scheduled general election, the same is true for the scheduled general election in 2027. Moreover, the recent legislative-redistricting case is an inapt comparison for the work it will take for election officials to prepare for the judicial special elections plaintiffs propose. The legislative case involved moving a portion

---

[11] In plaintiffs' brief submitted in October, they claimed that the test for which positions should be forced to run in special elections was whether Justices had not yet "serve[d] a majority of their terms." Dkt. 272 at 15. But plaintiffs' submission miscalculated the terms for District 1, Position 1 and District 2, Position 1. Dkt. 272 at 22; *see supra* nn. 2, 3. And District 1, Position 1 has less than a "majority" (4 years) left on its term. So while defendants dispute that any special elections should go forward in 2026, under plaintiffs' test, only District 1, Position 3 would qualify to be forced to a special election.

25

of voters to new legislative districts in only three discrete and geographically confined areas of the State. *See MS NAACP*, 782 F. Supp. 3d at 339 (noting new districts were required only around "Senate districts in the DeSoto County and Hattiesburg areas" and "a House district in northeastern Mississippi"). Here, at least 2 of plaintiffs' proposed plans each would needlessly shift 30 or more counties and hundreds of thousands of voters to new districts, and plaintiffs' other proposed plan would still require moving 9 counties and tens of thousands of voters. *See* Dkt. 293-1 at 11 (Remedial Plan 1 - 33 County shift), 13 (Remedial Plan 2 - 9 County shift); 15 (Remedial Plan 3 - 30 County shift). And in looking to the "burdens on election officials" plaintiffs ignore what matters most—the burdens on candidates and voters who would be forced to adjust to 2026 special elections held on a compressed timetable. As explained, the harms caused by casting aside state special-elections laws, compressing the election schedule and the window for campaign fundraising, and forcing candidates to run campaigns to educate voters in a large election district show that plaintiffs' compressed 2026 election schedule is unfair and unworkable.

Finally, plaintiffs emphasize that the Court's December 19, 2025 order ruled that "it '*will*' order" 2026 special elections. Dkt. 293 at 29. But that approach rested on an equitable calculation 5 months ago, under different circumstances than those existing today. The Court may always re-evaluate its prior interlocutory decisions. Fed. R. Civ. P. 54(b); *see Austin v. Kroger Texas, L.P.*, 864 F.3d 326, 336 (5th Cir. 2017) ("Under Rule 54(b)," a district court "is free to reconsider and reverse its decision for any reason it deems sufficient, even in the absence of new evidence or an intervening change in or clarification of the substantive law."). It will take more time to resolve the remedial phase of the case than could have been foreseen in December. Holding November 2026 special elections is impracticable and incompatible with state law. And proceeding with 2026

26

special elections on a hastily-adopted map would be unworkable and unfair for candidates and voters. Those harms can all be avoided by holding any special elections, if needed, in 2027.

## REQUESTS FOR RELIEF

Defendants respectfully request that the Court should enter an order staying further remedial proceedings in this case until the U.S. Supreme Court issues its ruling in *Louisiana v. Callais*, S. Ct. No. 24-109. Alternatively, should the Court decline to stay further remedial proceedings and wait for the Mississippi Legislature to enact a new map at its upcoming special session, the Court should reject plaintiffs' proposed remedial maps and draw its own. In all events, the Court should reject plaintiffs' request for November special elections for District 1, Positions 1 and 3, or at least defer special elections until 2027.

THIS the 25th day of April, 2025.

Respectfully submitted,

STATE BOARD OF ELECTION
COMMISSIONERS, TATE REEVES, IN HIS
OFFICIAL CAPACITY AS GOVERNOR OF
MISSISSIPPI, LYNN FITCH, IN HER OFFICIAL
CAPACITY AS ATTORNEY GENERAL OF
MISSISSIPPI, AND MICHAEL WATSON, IN HIS
OFFICIAL CAPACITY AS SECRETARY OF
STATE OF MISSISSIPPI, DEFENDANTS

LYNN FITCH, ATTORNEY GENERAL
STATE OF MISSISSIPPI

JUSTIN L. MATHENY (MSB #100754)
STATE OF MISSISSIPPI
OFFICE OF THE ATTORNEY GENERAL
Post Office Box 220
Jackson, Mississippi 39205-0220
Tel.: (601) 359-3680
Fax: (601) 359-2003
justin.matheny@ago.ms.gov

MICHAEL B. WALLACE (MSB #6904)

27

CHARLES E. COWAN (MSB #104478)
WISE CARTER CHILD & CARAWAY, P.A.
Post Office Box 651
Jackson, Mississippi 39205-0651
Tel.: (601) 968-5500
Fax: (601) 944-7738
mbw@wisecarter.com
chc@wisecarter.com

ATTORNEYS FOR DEFENDANTS